UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JEROME MARTIN, JR.,
SAMUEL CARSON,
WILLIAM KYLE SWEENEY,
SEAN COATES,

  *Defendants.*

Case No. 98-cr-329-RCL

## MEMORANDUM OPINION

In 2001, defendants Jerome Martin, Jr., Samuel Carson, William Sweeney, and Sean

Coates were each convicted for narcotics- and racketeer-influenced corrupt organization ("RICO")

conspiracies, murder and other violent crimes, violent crimes in aid of racketeering, narcotics

trafficking, and weapons possession. The trial court sentenced each defendant to lengthy prison

terms in 2002. In February 2008, defendants each moved under 28 U.S.C. § 2255 to vacate, set

aside, or correct their sentences. ECF Nos. 1017, 1020, 1021, 1023. Years later—beginning in

2014—defendants filed numerous amendments to their initial motions.[1] ECF Nos. 1104, 1140,

1156, 1166, 1170, 1182, 1183, 1184, 1191, 1192, 1197, 1198, 1229, 1233, 1273. The government

then filed an omnibus response in opposition. ECF No. 1255.

Defendants pepper their motions with claims alleging government misconduct, ineffective

assistance of counsel, and unconstitutional sentences. Many are time-barred or procedurally

---

[1] Defendants style these filings as "supplements," but they are better understood as amendments to the original § 2255 motions per Rule 15 of the Federal Rules of Civil Procedure. *See United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002).

defaulted.   Some claims are one-sentence assertions with no factual support.   And other claims misrepresent the record.   All told, defendants have alleged nearly ninety claims for the Court to adjudicate.   After considering defendants' filings, the government's response, and the entire record, the Court will **DENY** defendants' motions to vacate, set aside, or correct their sentences.

## I.      BACKGROUND

### A. Factual Background

This case is a "story of mayhem and disorder." *United States v. Carson*, 455 F.3d 336, 339–47 (D.C. Cir. 2006).   Defendants organized and operated a massive narcotics conspiracy around the 200 block of K Street, Southwest, in the District of Columbia for nearly twenty years. *Id.* at 339.   Their drug business "led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for human life." *Id.*   Defendants' drug conspiracy ended only after a multiyear investigation by the Federal Bureau of Investigation ("FBI") resulted in their arrests. *Id.*   Though defendants' § 2255 motions focus on the crimes listed below, these events are only a fraction of defendants' overall misconduct.

In 1991, defendant Carson shot and killed Anthony Fortune after a dispute over a craps game.   An eyewitness testified that Carson "walk[ed] towards [Fortune], shooting," then "stood over top of him and shot him."   02/13/01 (AM) Tr. 25, ECF No. 668.   Carson then got into a car driven by Martin and the two drove away. *Id.* at 27.   Other witnesses testified that Martin and Carson bragged about shooting Fortune years later. *See, e.g.*, 03/12/01 (PM) Tr. 34–35, ECF No. 954 (James Montgomery).

In 1993, the defendants kidnapped Anthony Pryor—who testified against them at trial.   A Maryland resident awoke to the sound of four individuals outside. *Carson*, 455 F.3d at 343.   She saw four men arguing with Anthony Pryor. *Id.*   After an argument, the men began to fight him.

*Id.* Pryor started to run, but an assailant shot him twice and the men kidnapped him. *Id.* As the car drove off, the witness saw that the door to the trunk had come off of the car. *Id.* Later that night, police investigated a car that was missing a trunk door and had "bloodstains," "clothing items, car parts, and duct tape . . . scattered all around." *Id.* Defendant Coates's fingerprints were found on the car. *Id.* Coates later told James Montgomery—the government's key witness at trial—that he had kidnapped someone who had broken the trunk door of a car to escape. *Id.*

In 1996, K Street members committed a robbery that resulted in the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson. *Id.* at 344. Sweeney, Coates, and Montgomery drove to Gaskins's craps house in Temple Hills, Maryland. *Id.* at 345. Sweeney brought a .40 caliber Glock firearm with him. *Id.* at 345. Sweeney and Montgomery jumped out of the car to rob the house; Coates stayed behind. *Id.* "Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out." *Id.* Montgomery recounted this story in detail at trial.

Seemingly undeterred by the blood on their hands, defendants soon began killing off potential witnesses. In 1997, the FBI arrested Robert Smith, one of the K Street gang's main suppliers. *Id.* at 346. Smith agreed to cooperate and gave statements incriminating the defendants in crimes of violence—including the Maryland triple murder. *Id.* at 347. Carson and Montgomery looked for opportunities to kill Smith, but he was often with others. *Id.* On June 16, 1997, Carson borrowed Montgomery's car. *Id.* Smith was shot later that day. *Id.* Though the government presented no eyewitness testimony at trial, Montgomery testified that when Carson returned with the car, Carson said, "man, trust me, we're all right" and told Montgomery to avoid the crime scene. *Id.* Smith was shot eleven times—seven times in the head. *Id.*

**B.  Procedural Background**

On September 18, 1998, the government indicted defendants for a narcotics conspiracy, a racketeering conspiracy, murders, other violent crimes, narcotics trafficking, and weapons possession. *Id.* at 347. Judge Thomas Penfield Jackson presided over a nine-month joint trial of all the defendants. *Id.* Ultimately, the jury returned guilty verdicts against defendants on most counts in the indictment. *Id.* The Court sentenced each defendant to life imprisonment, with consecutive sentences based on 18 U.S.C. § 924(c) to run after the life sentences. *See id.* at 382. In 2006, the D.C. Circuit affirmed defendants' convictions. *Id.* at 339. The Supreme Court denied defendants' petitions for writs of certiorari on February 20, 2007. *Carson v. United States*, 549 U.S. 1246 (2007).

These collateral proceedings then began. On February 15, 2008, then-Chief Judge Thomas F. Hogan ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter" to defendant Sweeney's counsel. ECF No. 1016. The remaining defendants indicated that they received access to these materials at that time. *See, e.g.*, ECF No. 1170 at 9 n.6 (stating that the records were "turned over by the clerk in 2008"). Defendants all filed their first § 2255 motions between February 18 and 28, 2008. ECF Nos. 1017, 1020, 1021, 1023.

Years later—starting in November 2014—defendants each filed amendments to their § 2255 motions. ECF Nos. 1156, 1166, 1170, 1197, 1198, 1273. After *Johnson v. United States*, 135 S. Ct. 2251 (2015), and *Davis v. United States*, 139 S. Ct. 2319 (2019), defendants submitted arguments that their convictions under 18 U.S.C. § 924(c) were unconstitutional. ECF Nos. 1182, 1183, 1184, 1192, 1229. Defendants also moved to adopt arguments in their co-defendants' motions. ECF Nos. 1024, 1185, 1228, 1229 1230, 1249, 1279. On March 18, 2020, the government filed an omnibus response to these filings. ECF No. 1255.

## II.     LEGAL STANDARD

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside, or correct his

sentence if: (1) the sentence was imposed "in violation of the Constitution or laws of the United

States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence "was in excess of

the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack."

28 U.S.C. § 2255(a). The petitioner bears the burden to prove his right to relief by a preponderance

of the evidence. *United States v. Baugham*, 941 F. Supp. 2d 109, 112 (D.D.C. 2012). Moreover,

a district court need not hold an evidentiary hearing when "the motion and the files and records of

the case conclusively show the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

Obtaining collateral relief requires a defendant to clear several procedural hurdles. First,

§ 2255 motions are subject to a one-year statute of limitations.   28 U.S.C. § 2255(f).   The

limitations period begins on the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2255(f)(1)–(4).   In most cases, the operative date will be the date that the "judgment of

conviction becomes final." *Dodd v. United States*, 545 U.S. 353, 357 (2005). If a defendant seeks

Supreme Court review, the judgment is "final" when the Supreme Court affirms the conviction on

the merits or denies the certiorari petition altogether. *See Clay v. United States*, 537 U.S. 522, 527 (2003).

Claims raised after the one-year limitations period may still be considered if they "relate back" to timely claims. Claims relate back to the date of the initial § 2255 motion if they "arose out of the conduct, transaction or occurrence set out . . . in the original [motion]." Fed. R. Civ. P. 15(c)(1)(B); *see United States v. Hicks*, 283 F.3d 380, 383 (D.C. Cir. 2002). But later-raised claims will not relate back when they "assert[] a new ground for relief" based on "facts that differ in both time and type" from the facts supporting the original pleading. *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *see United States v. Coughlin*, 251 F. Supp. 3d 212, 218–19 (D.D.C. 2017).

Second, a defendant procedurally defaults any claims not raised on direct appeal unless he can show (1) cause excusing the default and (2) prejudice resulting from the alleged error. *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008) (citing *Massaro v. United States*, 538 U.S. 500, 503 (2003)). To establish cause, a defendant must demonstrate "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Prejudice requires that the defendant show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). This procedural-default limitation, however, does not apply to claims for ineffective assistance of counsel. *Massaro*, 538 U.S. at 509.

Finally, a district court may deny § 2255 motions that "offer only bald legal conclusions with no supporting factual allegations." *Mitchell v. United States*, 841 F. Supp. 2d 322, 328

(D.D.C. 2012) (citing *Sanders v. United States*, 373 U.S. 1, 19 (1963)). And "conclusory arguments may be summarily dismissed" by a district court. *United States v. Geraldo*, 523 F. Supp. 2d 14, 22 (D.D.C. 2007) (citing *United States v. Morrison*, 98 F.3d 619, 626 (D.C. Cir. 1996)).

## III.   DISCUSSION

Defendants raise copious challenges to their convictions. But the Court need not evaluate the merits of all these claims. Some claims are barred by § 2255(f)'s statute of limitations. Others are procedurally defaulted after not being raised on direct appeal. And many are conclusory legal assertions without supporting facts. Defendants' remaining claims fall into in three groups: (1) allegations of government misconduct, (2) allegations of ineffective assistance of counsel, and (3) arguments that some of their sentences under 18 U.S.C. § 924(c) are unconstitutional. Ultimately, the Court finds that none of defendants' arguments warrant a vacated sentence and will **DENY** their § 2255 motions.

### A.   Government Misconduct

The Court begins with defendants' claims that the government violated their Fifth Amendment rights through misconduct. In criminal cases, the prosecution must disclose material evidence to the defense that is favorable to an accused, including potential impeachment evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). This duty vindicates the Fifth Amendment's fair-trial guarantee and ensures that miscarriages of justice do not occur. *See United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015). A *Brady* violation occurs when the prosecution: (1) "fails to disclose to the defense, whether willfully or inadvertently," (2) "exculpatory or impeachment evidence that is favorable to the accused," and

(3) "the withholding of that information prejudices the defense." *Straker*, 800 F.3d at 603; *see Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

To show prejudice, a petitioner must show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Put another way, the question is whether it is reasonably likely that the favorable evidence would have put the case in such a different light that it "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 435. For example, the failure to disclose potential impeachment material will not violate *Brady* when it "would have been negligible and cumulative of similar evidence presented to the jury." *United States v. Oruche*, 484 F.3d 590, 599 (D.C. Cir. 2007); *see United States v. Brodie*, 524 F.3d 259, 268–69 (D.C. Cir. 2008). When disclosure "happen[s] late rather than not at all," the defendant must show a "reasonable probability that an earlier disclosure would have changed the trial's result" to establish prejudice. *Straker*, 800 F.3d at 603 (quotations omitted).

A court should evaluate prejudice under *Brady* based on the suppressed evidence as a whole rather than an "item by item" basis. *Kyles v. Whitley*, 514 U.S. 419, 420 (1995). That is, individual pieces of evidence may not have impacted a trial—meaning that the government's failure to disclose was not a *Brady* violation. "But the synergistic force of the omitted evidence considered together might well generate a reasonable probability of altering the evidentiary balance." *Straker*, 800 F.3d at 608. The Court will address each defendant individually in its analysis.

### i. *Jerome Martin*

On February 18, 2008, Jerome Martin filed a timely § 2255 motion. ECF No. 1021. He raised two claims in this initial motion:

- The government violated *Brady* by withholding information that an eyewitness, Steven Thomas, described the shooter of Anthony Fortune as someone other than Martin or Carson. *Id.* at 8–10.

- The government, by representing that shooting victim James Coulter could not be found, violated Martin's due-process rights by preventing him from calling Coulter as a witness. *Id.* at 11–12.

Martin reiterated these claims in an amendment to his § 2255 motion. ECF No. 1233. These claims are either procedurally barred or meritless.

### a. *Steven Thomas's Description of Anthony Fortune's Murderer*

At trial, the jury found Carson and Martin guilty of murdering Anthony Fortune. The government successfully argued that Carson shot the victim while Martin aided and abetted. *See Carson*, 455 F.3d at 342. One witness, Charlene Wilson, testified that she saw Carson shoot Fortune, then get into a car driven by Martin. 02/13/01 (AM) Tr. 25–28, ECF No. 668; 02/13/01 (PM) Tr. 34, ECF No. 950. Other witnesses testified that Carson and Martin later admitted to shooting Fortune. *See* 02/15/01 (PM) Tr. 58–59, ECF No. 951 (Donald Nichols); 03/12/01 (PM) Tr. 34–35, ECF No. 954 (James Montgomery); 04/04/01 (AM) 85–86, ECF No. 689 (Charles Bender); 04/09/01 (PM) Tr. 14, ECF No. 963 (Eugene Byars); 04/25/01 Tr. Tr. 04/25/01 AM 40–41, ECF 696 (Arthur Rice).

Martin claims that the government withheld evidence that another witness—Steven Thomas—exonerated Martin and Carson for this murder. ECF No. 1021 at 10–11. Martin's counsel hired a private investigator who interviewed Thomas about the shooting. *See* ECF No. 1021 at 10; ECF No. 1233 at 21–22. Thomas represented that, shortly after Fortune's murder, he told police that neither Martin nor Carson had shot Anthony Fortune. ECF No. 1021 at 14–15. Rather, the shooter was someone "very dark-complected, stocky and taller than Martin." *Id.* Martin argues that the government possessed and withheld this exculpatory information from him and Carson, violating *Brady*. ECF No. 1021 at 10–11; ECF No. 1233 at 22–23.

But Martin procedurally defaulted this claim by not raising it during his direct appeal. Martin's only evidence of Thomas's statements is an affidavit from Martin's investigator. *See* ECF No. 1021 at 14–15. This affidavit does not state when the investigator interviewed Thomas, so Martin has not shown that he lacked this information while the direct appeal was pending. Nor has he shown cause and prejudice excusing this default. *See Hughes*, 514 F.3d at 17.

Martin cannot show prejudice excusing his default because even if the Court were to consider his claim, the trial court committed no error. By the time of trial, the government possessed two of Thomas's statements: (1) a Metro Police Department ("MPD") form detailing Thomas's police interview and (2) Thomas's grand-jury testimony about the murder.[2] According to the MPD form, Thomas told police that he was sitting in his car when he heard gunshots from behind him. Thomas did not describe the shooter or say that he saw the shooter. Thomas later testified to a grand jury about this murder. When asked if he saw the shooter, Thomas replied, "No." Since Thomas did not describe the shooter to police or the grand jury, this evidence was not exculpatory. The government therefore bore no *Brady* obligation to provide this evidence to the defense. Either under procedural-default principles or as a *Brady* violation, Martin's claim fails.

### b. *Defense Access to Witness James Coulter*

Martin next argues that the government violated his Fifth Amendment rights by preventing James Coulter from appearing as a witness. *See* ECF No. 1021 at 11–12; ECF No. 1233 at 25–26. The jury found Martin guilty for attempting to murder Coulter and for using a firearm during the attempted murder. *See* ECF No. 810 at 14. In his § 2255 motions, Martin represents that Coulter

---

[2] The government disclosed these documents to Martin on June 6, 2019. ECF No. 1268 at 103. The government also provided these documents to the Court, which it has reviewed.

gave a "signed, witnessed statement" that Martin did not shoot him, meaning that Martin "would have called Coulter to testify" as a "crucial witness" if possible. ECF No. 1021 at 12; ECF No. 1233 at 28. But Martin's claim is procedurally defaulted, and he has not identified any "objective factors" showing cause. Since Martin has not identified any cause excusing his default, this claim is procedurally barred.[3]

### ii.  *Samuel Carson*

Samuel Carson's first § 2255 motion—filed *pro se*—included three grounds for relief. ECF No. 1023 at 5. Carson offered no factual support for these claims, instead referencing an "Attached Memorandum of Law and Facts." *See id.* Carson did not attach this memorandum to his first § 2255 motion and has not provided it to the Court. Even "liberally constru[ing]" Carson's motion, *United States v. Gooch*, 842 F.3d 1274, 1278 (D.C. Cir. 2016), the Court may summarily deny the following bare-bones claims.[4]  *See Mitchell*, 841 F. Supp. 2d at 328; *Geraldo*, 523 F. Supp. 2d at 22.

- Carson was deprived of his Sixth Amendment right to effective assistance of counsel because of a "Failure to Investigate" and a "Failure to Object to Inadmissible Evidence." ECF No. 1023 at 5.

---

[3] Additionally, Martin has not shown that this missing testimony prejudiced him at trial—i.e., "infect[ed] his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Martin has not provided Coulter's "signed, witnessed statement that Martin did not shoot him" to the Court. Moreover, the evidence presented at trial inculpated Martin. In 1995, defendant Vincent Hill implied that Coulter needed to be killed. 02/15/01 (PM) Tr. 60, ECF No. 951. Coulter was shot later that year. 01/30/01 (PM) Tr. 54–55, ECF No. 944. One witness—Eugene Byars—testified that Martin complained about trying (but failing) to kill Coulter at a craps game. 04/09/01 (PM) Tr. 23, ECF No. 963. Another witness—Donald Nichols—heard defendant Hill ask Martin why his gun jammed when shooting Coulter and tell Martin that he should have used two guns. 02/15/01 (PM) Tr. 62, ECF No. 951. Since Martin has not proven cause or prejudice, his claim must fail for procedural default.

[4] Carson's motion raises a timing issue as well. His first § 2255 motion was filed on February 28, 2008—eight days after § 2255(f)(1)'s one-year statutory deadline. *See* ECF No. 1023; 28 U.S.C. § 2255(f)(1). However, Carson signed and dated the motion as of February 18, 2008—two days before that deadline. *See* ECF No. 1023 at 7. For *pro se* § 2255 motions, the date of filing is the date the motion is placed in the prison mailing system. *Houston v. Lack*, 487 U.S. 266, 270–71 (1988). The government maintains that Carson has failed to show when he placed the motion in the prison mailing system, which Carson answers by attesting that he mailed his § 2255 motion on February 18. *See* ECF No. 1255 at 80–81; ECF No. 1278-1 at 1. The Court need not decide this issue because it may summarily deny Carson's claims.

- Carson's sentence was "Imposed in Violation of The United States Constitution." *Id.*

- "Newly Discovered Evidence" establishes that Carson was denied his Fifth Amendment right to due process. *Id.*

Years later, Carson filed an amended § 2255 motion. ECF No. 1170. This amended motion included the following government-misconduct claims, two of which are time-barred:

- The government violated Carson's due-process rights by failing to maintain the trial exhibits, including a fingerprint card lifted from the Maryland triple murder. *Id.* at 29–30.

- The government violated *Brady* and *Giglio* by withholding documents that it submitted to the trial court for *in camera* review before and during trial. *See* ECF No. 1170 at 10–20.[5]

- The government violated *Brady* by failing to disclose that it paid benefits to two witnesses—Cheree Owens and John Pinckney—who testified before a grand jury regarding the Maryland triple murder. Pinckney and Owens did not testify in the K Street trial. Carson posits that the government paid these witnesses to "disappear[]." *Id.* at 21–29.

Carson asserts a new ground for relief with his due-process claim about the fingerprint card, making it time-barred. *See Mayle*, 545 U.S. at 650. Nor will the Court consider his *Brady* claim regarding documents submitted for *in camera* review. Chief Judge Hogan unsealed this case's trial records on February 15, 2008. ECF No. 1016. Carson acknowledged that, in 2008, he had access to these records. *See, e.g.*, ECF No. 1170 at 9 n.6. Under § 2255(f)(4), Carson could raise claims based on this newly discovered evidence until February 15, 2009. *See* 28 U.S.C. § 2255(f)(4). But Carson submitted this claim in 2015, years after the statutory deadline. Further, it is a stretch to say that this *Brady* claim relates back when Carson's original claim for "[n]ewly [d]iscovered [e]vidence" lacked any detail.

---

[5] Chief Judge Hogan unsealed these documents during these § 2255 proceedings on February 15, 2008. ECF No. 1016.

However, Carson's *Brady* claim about the Maryland triple-murder witnesses is neither time-barred nor procedurally defaulted. Carson argues that the government paid Cheree Owens and John Pinckney to prevent them from testifying at the K Street trial. ECF No. 1170 at 21–29. Carson discovered this evidence when his private investigator interviewed Owens, on May 29, 2004. According to Carson's investigator, Owens divulged that the government moved her and Pinckney to several locations and paid for moving and housing costs after their grand-jury testimony. ECF No. 1133-2 at 10. Since Carson filed his amended § 2255 motion within a year of discovering this evidence, this claim is not time-barred. *See* 28 U.S.C. § 2255(f)(4). And because Carson lacked this evidence on his direct appeal, the claim is not procedurally defaulted.

Even still, Carson cannot succeed because the government did not violate *Brady*. This Court previously denied Carson's request for discovery on this issue. Mem. Op. at 7, ECF No. 1124. Because Owens and Pinckney did not testify at the K Street trial, the government only had a duty to disclose *Brady* material. *Id.* And as this Court has noted, "the government met its *Brady* obligations" by disclosing "(1) Owens's and [Pinckney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinckney]; and (3) the fact that [Pinckney] and Owens absconded with the government's money." *Id.* Therefore, this *Brady* claim fails.

### iii.   William Sweeney

William Sweeney filed many claims in his § 2255 motions, most of which are time-barred. Sweeney raised three government-misconduct claims in his first § 2255 motion:

- The government violated *Brady* and *Giglio* by not turning over evidence impeaching the credibility of government witness James Montgomery that it used in *United States v. Steven Dewitt*, No. 1991 FEL 5548 (D.C. Super. Ct. Dec. 17, 2004). *Id.* at 16.

- The government committed prosecutorial misconduct by obtaining testimony "by any means necessary" from its key witnesses. *Id.*

- The government violated Sweeney's Sixth Amendment rights by obtaining "jailhouse" confessions implicating Sweeney for several crimes. *Id.* at 16–17.

ECF No. 1017 at 16–17.

Sweeney raised additional government-misconduct claims in an amended motion on November 28, 2014. ECF No. 1140-2. He reiterated these arguments in another amended § 2255 motion on February 25, 2015. ECF No. 1156. And on October 31, 2018, Sweeney attempted to add a claim alleging cruel and unusual punishment under the Eighth Amendment. ECF No. 1227 at 2–3. These new claims are untimely by several years, so the Court will not consider them:

- The government violated *Brady* and *Giglio* by not disclosing that government witness James Montgomery lied to an FBI investigator about the murder of Timothy Benton. *Id.* at 24–25.

- The government violated *Brady*, *Giglio*, and *Napue v. Illinois*, 360 U.S. 264 (1959), by not disclosing that a cooperating witness—Theodore Watson—had "chronically lied and schemed in pursuit of a departure" in his own prosecution in another jurisdiction. *Id.* at 11–24.

- The government violated *Brady* and *Giglio* by not disclosing that another witness—Charles Bender—stated that co-defendant Martin had confessed to murdering Anthony Fortune. *Id.* at 25–26.

- The government violated *Brady* and *Giglio* when it did not disclose a report regarding a cooperating witness, Arthur Rice. At trial, James Montgomery had testified that he and Carson killed two individuals. Rice, however, told the FBI that he was present at the time of the murder, heard gunshots, and saw only Martin and Carson fleeing the scene. This information would have impeached Montgomery's credibility. *Id.* at 26–27.

- The government violated *Brady* and *Giglio* by not disclosing that a cooperating witness—Andrew Murray—told the government that another individual killed informant Robert Smith. *Id.* at 27–28.

- The government violated *Brady* and *Giglio* by not disclosing information pertaining to the murder of informant Robert Smith. *Id.* at 28–46.

- The trial court abused its discretion by sealing government documents showing that others had a motive to kill, or in fact killed, informant Robert Smith. *Id.* at 46–55.

- The trial court sentenced Sweeney to life without parole for the narcotics conspiracy. This sentence should be vacated based on *Miller v. Alabama*, 567 U.S. 460 (2012), because Sweeney was a juvenile for some years of the conspiracy. ECF No. 1229 at 2–3.

Even if the Court assumes that Sweeney's prior counsel could not access the previously sealed evidence at issue until June 17, 2010, Sweeney had until June 17, 2011 to raise new claims. *See* ECF No. 1280 at 3; 28 U.S.C. § 2255(f)(4). Because he filed these new claims years after that date, they are untimely.[6] Therefore, the Court will discuss only the claims in Sweeney's first § 2255 motion.

### a. *Evidence Impeaching James Montgomery's Credibility*

Sweeney first asks the Court to find a *Giglio* violation based on an unrelated case. In 1992, the D.C. Superior Court convicted a man named Steven Dewitt for murdering Paul Ridley. *United States v. Steven Dewitt*, No. 1991 FEL 5548 (D.C. Super. Ct. Dec. 17, 2004). After serving thirteen years in prison, Dewitt filed an actual-innocence claim. *Id.* at 3–4. Dewitt claimed that Samuel Carson—the defendant in this case—killed Paul Ridley. *Id.* "If [Carson] did, Dewitt did not; there [was] no room in the evidence for finding that both did." *Id.* at 3. James Montgomery testified at the actual-innocence proceedings that Carson told him about murdering Paul Ridley. *Id.* at 13, 15. As the opposing party, the government tried to impeach Montgomery's credibility at a hearing on

---

[6] Sweeney argues that the Court should equitably toll the statute of limitations because of his prior counsel's "extraordinary negligence"—she purportedly failed to respond to his messages and did not file the amended motion promptly. ECF No. 1277 at 15–16. The Court is unconvinced. A court may equitably toll § 2255(f)'s statute of limitations if the defendant has "pursu[ed] his rights diligently" and "some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see United States v. McDade*, 699 F.3d 499, 504 (D.C. Cir. 2012). Equitable tolling should be employed "only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). The Court cannot see that Sweeney's delays amount to an extraordinary circumstance. Given that Sweeney wrote a letter to his counsel in August 2010 laying out the *Brady* material "in impressive detail," ECF No. 1277 at 4, nothing prevented him from filing the motion *pro se* if he no longer felt that his counsel was sufficiently engaged.

this claim. *Id.* at 15–18. The Superior Court ultimately found Dewitt was "more likely than not" innocent and ordered a new trial. *Id.* at 94.

Sweeney takes the Court on an inferential journey. He points out that the government "did not believe" Montgomery's testimony in the *Dewitt* actual-innocence proceedings. ECF No. 1017 at 16. Because the government sought to impeach Montgomery's credibility in *Dewitt*, Sweeney argues that the government *must* have had materials it relied on in that case. *See id.* So, the government *must* have had those materials during the K Street trial. *See id.* By not turning those materials over, the government violated *Giglio*. *See id.*

But Sweeney cannot overcome his procedural default on this claim. The *Dewitt* proceedings took place in 2004, all while Sweeney's appeal pended before the D.C. Circuit. Sweeney has not identified "objective factor[s]" that caused him not to raise this claim on appeal. *Cf. McCleskey*, 499 U.S. at 493. More importantly, no prejudice resulted from this purported error. The government tried to undermine Montgomery's credibility in *Dewitt* in two ways: (1) by suggesting that "Carson may have been lying to [Montgomery]" to "enhance his reputation as a killer" of informants; or (2) that Montgomery "could be lying," as he struggled to remember some details of Ridley's murder. *Dewitt*, No. 1991 FEL 5548 at 15–17.[7] Any impeachment material the government had concerned the *Dewitt* proceedings—not this case. The Court will not draw the counterfactual inference that Sweeney requests.

### b. *Misconduct in Obtaining Witness Testimony*

Next, Sweeney speculates that the government obtained witness testimony "by any means necessary," thereby committing prosecutorial misconduct. ECF No. 1017 at 16. This argument

---

[7] Even still, the Superior Court found Montgomery's testimony credible. Montgomery "ha[d] no stake" in the *Dewitt* litigation," "[did] not know Dewitt," and got "no benefit out of testifying . . . against his former friend." *Id.* at 18.

fails for two reasons.  First, Sweeney could have brought this claim on direct appeal and has not established cause or prejudice excusing his procedural default.  Second, Sweeney has not provided any detail or explanation other than identifying two issues: (1) the government procured Arthur Rice's testimony "by misrepresentation and bending of the [Rule 35] procedural rules"; and (2) the government entered plea agreements with James Montgomery "after he lied and violated previous plea agreements." *Id.*  In other words, this claim is vague and conclusory.  *See Mitchell*, 841 F. Supp. 2d at 328; *Geraldo*, 523 F. Supp. 2d at 22.  For both reasons, this claim must fail.

### c.  *Misconduct in Procuring Jailhouse Confessions*

Finally, Sweeney asserts that the government "procur[ed] 'jailhouse' confessions" violating his Sixth Amendment rights under *Massiah v. United States*, 377 U.S. 201 (1964).  ECF No. 1017 at 16; *see id.* at 11 (listing alleged confessions).[8]  But Sweeney did not raise this claim on direct appeal.  Since Sweeney has not shown cause or prejudice excusing this default, this claim is procedurally barred.

### iv.  *Sean Coates*

Sean Coates raised three government-misconduct claims in his first § 2255 motion, which he timely filed within § 2255(f)'s one-year statute of limitations.  ECF No. 1020 at 4–5, 47–50. These claims are that:

- The government violated *Brady* and *Giglio* by withholding evidence impeaching the credibility of government witness James Montgomery. *Id.* at 50.

- The government violated Coates's right to due process when it sought the admission of fingerprint evidence implicating Coates in Anthony Pryor's

---

[8] Further, Sweeney's reliance on *Massiah* is unfounded.  He raises this claim in a section alleging *Brady* violations and prosecutorial misconduct.  ECF No. 1017 at 16–17.  But *Massiah*'s holding implicates a defendant's Sixth Amendment right to *counsel*, not the Fifth Amendment's right to due process.  *See Massiah*, 377 U.S. at 206.  The Court discusses Sweeney's ineffective-assistance *Massiah* claims in Section III(B)(iii)(d), *infra*.

kidnapping when it "knew [the fingerprint] had admissibility problems." *Id.* at 47–48.

- The government violated Coates's right to due process by eliciting false testimony regarding Coates's involvement in the murder of Michael Jones. *Id.* at 48–49.

These claims were available to Coates on direct appeal, but he did not raise them. Therefore, they are procedurally defaulted. Coates identifies no cause or prejudice to excuse this default. Indeed, Coates cannot show prejudice because these claims are meritless.

*a. Evidence Impeaching James Montgomery's Credibility*

Coates makes the same *Giglio* argument as Sweeney regarding James Montgomery's testimony at the Steven Dewitt proceedings. *See supra* Section III(A)(iii)(a). By withholding that it tried to impeach Montgomery's credibility in the Dewitt proceedings, the government purportedly violated *Giglio*. ECF No. 1020 at 4, 50. As explained above, Coates has procedurally defaulted this claim. Coates did not raise it on direct appeal and has not shown cause or prejudice excusing the default.

*b. Fingerprint Evidence Regarding Anthony Pryor's Kidnapping*

Next, Coates argues that the trial court erred by admitting testimony about Coates's fingerprint on the car used to kidnap Anthony Pryor. This claim misrepresents the record and is procedurally barred.

In October 1993, several men shot and kidnapped Pryor by placing him in the trunk of a Cadillac. *Carson*, 455 F.3d at 343. Pryor broke the trunk door off and escaped. *Id.* Police found Coates's fingerprint on the Cadillac. *Id.* In Coates's telling, the government "knew it had admissibility problems" with this fingerprint: it "improperly elicited [the fingerprint] through rank hearsay," "did not put on any foundational evidence" supporting its admission, and did not supply

a "fingerprint expert to testify whether the fingerprint matched" Coates's fingerprint.  ECF No. 1020 at 4.

This claim is procedurally defaulted because Coates did not raise it on direct appeal.  Nor has Coates explained cause and prejudice excusing his default.  Coates does not identify any objective factors causing his failure to bring this claim on appeal  *Cf. McCleskey*, 499 U.S. at 493. Even assuming the trial court erred,  Coates has not shown prejudice.  Other witnesses implicated Coates in the crime.  James Montgomery testified that Coates had robbed someone and put the victim in the trunk of a "burgundy Cadillac" who "ended up breaking the trunk off the car." 03/13/01 (AM) Tr. 21, ECF No. 680.  Sweeney corroborated these details in a jailhouse confession. *See* 02/08/01 (PM) Tr. 60–61, ECF No. 948.  These details matched the Cadillac missing a trunk and covered in bloodstains that police recovered.  04/23/01 (PM) Tr. 64, ECF No. 694.  It is hard to say that any error worked to Coates's "actual and substantial disadvantage" here, much less that Coates has demonstrated prejudice. *Cf. Frady*, 456 U.S. at 170.  Coates therefore cannot overcome his procedural default.[9]

### c.  *Allegedly False Testimony Regarding the Michael Jones Shooting*

Finally, Coates makes a conclusory allegation that the government "knowingly elicited false testimony" about his involvement in the June 20, 1992 shooting of Michael Jones.  ECF No. 1020 at 5.  Coates did not raise this claim on direct appeal and has not shown cause or prejudice regarding his procedural default.  Nor would Coates succeed on the merits of this claim.  Coates asserts that "not one scintilla of evidence point[s] to [his] involvement" in this shooting, ECF No.

---

[9] Additionally, Coates misrepresents the record when describing the fingerprint evidence.  Sergeant Dwight Deloatch testified that police found Coates's fingerprint on the car used to kidnap Pryor.  04/24/01 (AM) Tr. 30–31.  The government did not elicit this testimony on direct examination.  Rather, Sweeney's counsel asked Sergeant Deloatch about the fingerprints on cross-examination. *Id.* at 17.  Judge Jackson warned Sweeney's counsel about "open[ing] the door" to this testimony, but Sweeney's counsel proceeded. *Id.*  On redirect, the government elicited Deloatch's testimony that the fingerprint belonged to Coates. *Id.* at 30–31.

1020 at 49, but this assertion contravenes the record.  At trial, government witness Arthur Rice

testified that Coates and another individual "rode up on [Michael Jones]," that Jones "tried to run,"

and that Coates "shot at him." 04/24/01 (PM) Tr. 54, ECF No. 970.  Coates then "stood over top

of [Jones]" and "hit him about four times." *Id.*  Since the government elicited eyewitness testimony

about this shooting and Coates has not shown where any falsehoods lie, this misconduct claim also

fails.

*     *     *

In short, the Court will **DENY** defendants' government-misconduct claims.

## B. Ineffective Assistance of Counsel

To prevail on an ineffective-assistance-of-counsel claim, a defendant must prove: (1) that

"counsel's performance was deficient," and (2) "the deficient performance prejudiced the

defendant." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  If a defendant fails to prove

either element, a court need not analyze the other. *United States v. McLendon*, 944 F.3d 255, 260–

61 (D.C. Cir. 2019) (citing *Strickland*, 466 U.S. at 697).  Counsel's performance is deficient when

it "[falls] below an objective standard of reasonableness." *Id.* at 688.  A district court must also

"indulge a strong presumption that the counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689.  To establish prejudice, a defendant must show "that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *United States v. Udo*, 795 F.3d 24, 30 (D.C. Cir. 2015).  A reasonable

probability is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at

689.  Finally, a district court may summarily dismiss ineffective-assistance claims if the defendant

"fail[s] to allege sufficient facts or circumstances" to show "constitutionally deficient

20

performance," or if the defendant fails to provide evidentiary support for his allegations. *See United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998).

### i. Jerome Martin

Martin did not bring any ineffective-assistance claims in his first § 2255 motion. He added two claims in his amended § 2255 motion:

- Trial counsel should have recalled Charlene Wilson to impeach her testimony about Anthony Fortune's murder. ECF No. 1233 at 29–34.
- Trial counsel did not investigate or present evidence showing that Martin did not shoot James Coulter. *Id.* at 34–36.

These claims are time-barred. Martin submitted his amended § 2255 motion on November 21, 2018, nearly nine years after his conviction. *See* 28 U.S.C. § 2255(f)(1). Since Martin did not raise any ineffective-assistance claims in his first § 2255 motion, these claims do not relate back. The Court cannot consider these time-barred claims.

### ii. Samuel Carson

In his first § 2255 motion, Carson included an ineffective-assistance claim for his trial counsel's "Failure to Investigate" and "Failure to Object to Inadmissible Evidence." ECF No. 1023 at 5. He gave no further details in this motion. Instead, Carson referenced a nonexistent "Memorandum of Law and Facts." *See id.* These conclusory allegations cannot overcome the strong presumption that an attorney rendered adequate services. *See Parker v. United States*, 199 F. Supp. 3d 88, 91 (D.D.C. 2016); *see also United States v. Gwyn*, 481 F.3d 849, 855 (D.C. Cir. 2007) (requiring a defendant alleging counsel's failure to investigate to show "precisely what information would have been discovered through further investigation").

Years later, on April 9, 2015, Carson filed an amended § 2255 motion. *See* ECF No. 1170 at 30–43. This motion contained the following ineffective-assistance claims:

- Trial counsel did not cross-examine a fingerprint examiner regarding Dennis Green. *Id.* at 36–39.

- Trial counsel should have recalled Charlene Wilson to impeach her based on her prior testimony. *Id.* at 39.

- Trial counsel did not cross-examine witnesses about alleged government payments in exchange for their testimony. *Id.* at 39–41.

- Trial counsel did not investigate whether Carson had a rental car when others accused him of borrowing a car to murder Robert Smith. *Id.* at 41.

- Trial counsel should have argued that James Montgomery's mental impairments could have affected his memory or susceptibility to government manipulation. *Id.* at 41–42.

- Trial counsel did not object to the trial court's *in camera* review of potential *Brady* and *Giglio* material. *Id.* at 42.

- Appellate counsel did not seek review of the trial court's decisions to seal purported *Brady* material. *Id.* at 43.

Most of these claims run into § 2255(f)'s time bar. Only one claim plausibly relates back to Carson's allegation of trial counsel's "failure to investigate"—the failure to investigate whether Carson had a rental car when Smith was murdered. The remaining claims in Carson's second motion do not relate back and come years after § 2255(f)'s time limit.

But Carson cannot succeed on his claim about the rental car. The jury found Carson guilty of conspiracy to murder a potential witness, Robert Smith. ECF No. 810 at 22. James Montgomery provided the key testimony for this charge. In Montgomery's telling, Carson and Sweeney were aware that Smith "was cooperating with the Feds" about the Maryland triple murder case. 05/23/01 (PM) Tr. 23, ECF No. 972. Carson told Montgomery that "without [Smith], they don't have no case." *Id.* So, Montgomery and Carson sought to "catch" Smith and kill him. *See id.* at 24–26. Carson borrowed Montgomery's car the night of the shooting. *Id.* at 28. Later that evening, Carson returned and told Montgomery to stay away from the murder scene and "not to

22

drive [his car] if [he] didn't have to." *Id.* at 31. Montgomery did not see the shooting. *See id.* at 28–31.

Carson argues that his counsel should have investigated whether he "had a rental car" the night that Smith was killed. ECF No. 1170 at 41. If so, then Carson would have had no need to borrow Montgomery's car. *See id.* Carson hoped to cast doubt on Montgomery's version of the events leading to Smith's murder. *See id.*

The Court cannot see how this alleged failure to investigate prejudiced Carson. First, the argument is outlandish. Even if Carson had rented a car, he could still have borrowed Montgomery's car to kill Smith. Moreover, Carson's counsel had opportunities to—and did—impeach Montgomery's credibility on other grounds. The trial judge even acknowledged that he could not "imagine a witness that you could have for which there is more impeachment material than has already been supplied here." ECF No. 1170 at 62–63. On cross-examination, Montgomery admitted that he was "happy that [Smith] was dead" because "another snitch [was] off the street" who could have hurt him. 05/23/01 (PM) Tr. 46, ECF No. 972. And Montgomery thought that he would be "in the free and clear regarding the [Maryland] triple murder" if Smith were dead. *Id.* at 46–47. The jury knew that Montgomery had a motive to kill Smith, but it still found Carson guilty. Evidence that Carson had a rental car that evening would not raise a reasonable probability of a different result.

### iii.  *William Sweeney*

Sweeney throws everything but the kitchen sink toward his ineffective-assistance argument, raising twenty claims in his first motion. In an amendment on November 28, 2014, Sweeney added seven new ineffective-assistance claims. ECF No. 1140-2. On February 25, 2015, Sweeney filed a second amended motion reiterating these claims. ECF No. 1156 at 68–69. To

begin with, § 2255(f) bars all of Sweeney's new claims—i.e., the claims in Sweeney's second and third § 2255 motions. Sweeney raised these claims long after the one-year statutory deadline, and the claims do not relate back to his first § 2255 motion.

- Trial counsel did not ask the trial court to review Theodore Watson's personnel file from another jurisdiction, which would have impeached his credibility as a government witness. ECF No. 1140-2 at 57–62.

- Appellate counsel did not seek review of sealed materials related to government witness James Montgomery. *Id.* at 64–65.

- Appellate counsel did not seek review of sealed materials related to government witness Arthur Rice. *Id.* at 65–66.

- Appellate counsel did not seek review of sealed materials related to government witness Andre Murray. *Id.* at 66–67.

- Appellate counsel did not seek review of sealed materials related to government witness Charles Bender. *Id.* at 68–69.

- Trial counsel did not object to the trial court's *in camera* procedure to review *Brady* material. *Id.* at 79–80.

- Trial counsel was ineffective under the cumulative-error doctrine. *Id.* at 80.

Thus, the Court will dismiss these claims as time-barred.

Next, the Court will dismiss Sweeney's claims for which he provided little-to-no detail or explanation. *See Parker*, 199 F. Supp. 3d at 91 (noting that "vague or conclusory allegations" cannot prove an ineffective-assistance claim).

- Trial counsel did not call Anthea Henry as an alibi witness for the Donell Whitfield murder. ECF No. 1017 at 7–8.

- Trial counsel did not recall Charlene Wilson and Ronald Sowells after the government disclosed *Brady* material casting doubt on their credibility. *Id.* at 8–10.

- Trial counsel did not impeach James Montgomery through prior inconsistent statements and material showing bias. *Id.* at 10.

- Trial counsel did not give support "for the cross examination of John Venable about his arrest for criminal charges that were dismissed during the time between the alleged crime and his testimony at trial." *Id.* at 10.

- Trial counsel did not request that the Court admit evidence showing James Montgomery's unreliability. *Id.* at 10–11.

- Trial counsel did not give an opening statement at the beginning of the case. *Id.* at 11.

- Trial counsel did not "corroborate jail records with court records" to impeach a government witness testifying to the veracity of business records. *Id.* at 11–12.

- Trial counsel did not properly object to or appeal the trial court's admission of reputation evidence concerning Wayne Perry. *Id.* at 12.

- Trial counsel did not properly object to, or appeal, the trial court's admission of hearsay evidence that another man—"Lil Ty"—killed one of Sweeney's alleged victims. *Id.* at 12.

Sweeney's motion raises these arguments without explaining why they indicate deficient performance or how they prejudiced him at trial. Therefore, the Court will dismiss them as vague and conclusory.

Thus, the Court will discuss only those claims in Sweeney's motions that are timely and substantive. These are that:

- Trial counsel did not call an expert to testify about Sweeney's Tourette Syndrome. *Id.* at 7.

- Trial counsel did not recall Reginald Switzer to cross-examine him about the murder of Donnell Whitfield, when *Brady* disclosures showed that Switzer conspired with government witness James Montgomery to kill Whitfield. *Id.* at 8–9.

- Trial counsel did not ask the court to admit testimony by Wesley Smith and Frederick Miller, which would have exonerated Sweeney for two alleged murders. *Id.* at 15.

- Trial counsel did not make a *Massiah* demand as to Sweeney's jailhouse confession to Charles Bender. *Id.* at 11.

- Trial counsel did not object to the *ex parte* communications between the Court and Juror Number Three and failed to argue the issue properly on appeal. *Id.*

- Trial counsel did not properly object to nor appeal the testimony of Dr. Jonathan Arden about autopsies he had not conducted. *Id.* at 12.

- Trial counsel did not properly object to nor appeal the testimony of "a police officer" about "fingerprint evidence he had not lifted." *Id.*

- Trial counsel did not properly object to the trial court's admission of statements by Robert Smith to FBI Agent Lisi. *Id.*

- Appellate counsel "failed to note sections of sealed matters" for the D.C. Circuit to review and failed "to cite authority for those requests." *Id.*

- The trial court denied Sweeney his right to effective assistance of counsel by permitting only one attorney to represent him at trial. *Id.* at 14.

The Court takes each of these arguments in turn.

### a.   *Failure to Call Expert to Testify About Tourette Syndrome*

Sweeney argues that his trial counsel was ineffective by not calling a neurologist, Dr. Jonathan Pincus, to testify about Sweeney's Tourette Syndrome. Sweeney's condition causes him to "bark" every few seconds. *See* 04/03/01 (AM) Tr. 18–20, 43 ECF No. 688; 06/11/01 (AM) Tr. 25, ECF No. 716. Dr. Pincus would have explained that even if Sweeney did not exhibit tic symptoms at trial, high-stress events tended to trigger Sweeney's tics. ECF No. 1017 at 7. Because several murders in this case involved unknown assailants who did *not* have tic symptoms, Sweeney hoped this testimony would lead the jury to infer that he did not commit those crimes. *See id.* This argument fails, however, because Sweeney cannot show how his counsel's performance prejudiced him at trial.

Dr. Pincus's testimony would have been cumulative to evidence the jury already considered in its findings. When police officers arrested Sweeney for the Maryland triple murder, they saw someone "very cool," "calm," and "relaxed." 04/03/01 (AM) Tr. 18–20. Those officers

did not hear Sweeney "bark" when interviewing him. *Id.* at 18–20, 43. But kidnapping victim Anthony Pryor testified that Sweeney "make[s] a noise every five seconds." 06/11/01 (AM) Tr. 25. Pryor explained that Sweeney "has a disorder" and makes noises "all the time." *Id.* So, Pryor "would have picked him out immediately when I was trying to . . . figure out a voice [while being kidnapped]." *Id.* Sweeney admits that his counsel "crossed almost every eyewitness" to Sweeney's crimes about whether they heard someone exhibiting "barking" or "tics." ECF No. 1017 at 7. Since Pryor already told the jury that Sweeney had tic symptoms, Dr. Pincus's testimony would have been cumulative. Thus, the Court does not find that any error here prejudiced Sweeney.

### b. *Failure to Recall Reginald Switzer to Testify*

Sweeney next points to his trial counsel's failure to recall government witness Reginald Switzer. ECF No. 1017 at 8. This claim likewise fails because no prejudice resulted from this purported error.

The jury found Sweeney guilty of killing Donnell "Robocop" Whitfield. ECF No. 810 at 32. Switzer testified that he heard Sweeney confess to killing Whitfield. 05/15/01 (PM) Tr. 8–9, ECF No. 991. Later in the trial, James Montgomery testified that he had offered to help Switzer kill Whitfield. 05/23/01 (AM) Tr. 53–54, ECF No. 711. Sweeney's counsel raised a *Brady* objection about this testimony.[10] 05/23/01 (PM) Tr. 3, ECF No. 972. The defense's theory was that Switzer killed Whitfield, not Sweeney. *Id.* at 4. So, had Sweeney's counsel known that Montgomery's testimony would corroborate that theory, "he could have made use of that corroborative evidence" when cross-examining Switzer and Montgomery. *Id.* at 9.

---

[10] The government noted that Montgomery's recollection was "unknown to [them] until several days" prior to his testimony. 05/23/01 (PM) Tr. 11, ECF No. 972.

But the jury found Sweeney guilty for murdering Donnell Whitfield despite plenty of evidence inculpating Switzer. Switzer believed Whitfield had previously shot him. 05/15/01 (PM) Tr. 6, ECF No. 991. No surprise, then, that Switzer admitted his open desire to kill Whitfield himself:

> Q: And you thought you had a good reason for murdering [Whitfield], and that's because it was retaliation against his shooting you, correct?
> A: Yes.
> Q: And you wanted him dead?
> A: Yes.

*Id.* at 34; *see id.* at 9, 40. In fact, Switzer testified that he had staked out Whitfield's home at least twice—while armed—but did not seize the opportunity to kill Whitfield. *Id.* at 7–8. And Switzer told the jury that he was "upset" when he learned about Whitfield's death because Switzer had "wanted to do it [him]self." *Id.* at 9. James Montgomery's testimony merely corroborated that Switzer "wanted to get" Whitfield in retaliation. *See* 05/23/01 (AM) Tr. 53–54, ECF No. 711. Since the jury considered this inculpatory evidence when it found Sweeney guilty, Sweeney suffered no prejudice from his counsel's failure to recall Switzer to testify. *Cf. United States v. Mitchell*, 216 F.3d 1126, 1131 n.2 (D.C. Cir. 2005) (finding cumulative evidence "plainly insufficient" to satisfy *Strickland*).

### c. (Purported) Failure to Seek Admission of Wesley Smith and Frederick Miller's Testimony

Sweeney also claims that his trial counsel did not try to admit testimony by Wesley Smith and Frederick Miller. ECF No. 1017 at 10–11. But this argument misconstrues the record. In fact, Sweeney's trial counsel *did* seek admission of these individuals' testimony.

Trial counsel argued that Wesley Smith's testimony would show that Robert Smith—rather than Sweeney—committed the Maryland triple murder. 06/06/01 (AM) Tr. 29, ECF No. 715. He

argued that Robert Smith's out-of-court statements to Wesley Smith were admissible under various hearsay exceptions. *Id.* at 29–32; 06/11/01 (PM) Tr. 11, ECF No. 977. The trial court rejected these arguments. 06/11/01 (PM) Tr. 19, ECF No. 977. Because the trial court found probable cause to believe that Sweeney had murdered Robert Smith, it held that Sweeney could not use any out-of-court statements by Smith at trial. *Id.* at 19; *cf.* Fed. R. Evid. 804(a).

Sweeney's counsel also proffered that a witness named Frederick Miller would testify that "someone named Little Ty" admitted to murdering Glenn Jenkins, rather than Sweeney. 06/25/01 (PM) Tr. 3, ECF No. 982. Little Ty's admission, counsel argued, was a statement against penal interest. *Id.* The trial court disagreed. *Id.* at 5. The penal-interest hearsay exception requires that "corroborating circumstances . . . clearly indicate [the statement's] trustworthiness." Fed. R. Evid. 804(b)(3). Since counsel provided "nothing to corroborate" Little Ty's out-of-court statement, the trial court refused a request for Miller to testify. 06/25/01 (PM) Tr. 5. Since Sweeney's counsel *did* take the actions that Sweeney sought, his counsel did not perform deficiently.

> ### d. *Failure to Make a* Massiah *Demand as to Sweeney's Jailhouse Confession to Charles Bender*

Sweeney next posits that his trial counsel was ineffective by not raising a *Massiah* issue with respect to Sweeney's jailhouse confession to Charles Bender.[11] In *Massiah v. United States*, the Supreme Court held that the government violates a criminal defendant's Sixth Amendment right to counsel by (1) expressly or impliedly (2) using an informant (3) to elicit incriminating statements from a person (4) whose right to counsel has attached. *Massiah*, 377 U.S. at 206. At trial, Charles Bender testified that Sweeney confessed to "punishing" Donell "Robocop" Whitfield

---

[11] Sweeney brings the same claim as to his jailhouse confessions to Donald Nichols, Eugene Byars, Theodore Watson, Reginald Switzer, and Arthur Rice. But Sweeney has not provided any transcript citations or argument beyond a one-sentence conclusory statement regarding these witnesses. The Court will not do his work for him here. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (noting that courts "are not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments").

and to being "on a case . . . in Maryland, a triple homicide." 04/04/01 (AM) Tr. 69–71, ECF No. 689.

But nothing suggests that the government used Bender as a jailhouse informant. Sweeney relies heavily on *Watson v. United States* (*Watson I*), 940 A.2d 182, 185 (D.C. 2008), another case in which Bender gave testimony incriminating the defendant. The D.C. Court of Appeals remanded *Watson I* to determine if Bender was a government informant.[12] After another round of appeals, the D.C. Court of Appeals held "that the government *did not* bid Bender, implicitly or otherwise, to engage in freelance investigative sorties on its behalf [when speaking to Sweeney], nor did the government acquiesce in his doing so." *Watson v. United States* (*Watson II*), 66 A.3d 542, 547 (D.C. 2013) (emphasis added).[13] Sweeney has not explained how Bender acted as a government agent. And regardless, this Court credits the finding of the D.C. Court of Appeals that Bender was not acting as a government agent when hearing Sweeney's confessions. A lawyer "is not ineffective when he fails to file a meritless motion," *United States v. Sayan*, 968 F.2d 55, 65 (D.C. Cir. 1992), so Sweeney's trial counsel was not ineffective for failing to raise this losing argument.

> e.  *Failure to Object to the Trial Court's Ex Parte Communication with Juror Number Three, and Failure to Raise on Appeal*

The Court will dismiss Sweeney's next argument because his counsel did not perform deficiently. During the jury's deliberations, the trial court excused Juror Number Three. Several jurors expressed concerns that Juror Number Three had lied about a drinking problem and had

---

[12] The issue in *Watson I*—whether Bender acted as a government agent when eliciting incriminating statements from a suspect in a wholly different murder case—is unrelated to this proceeding. However, Bender was cooperating with the government's K Street investigation at the time, so some of the facts given at Watson's remand hearing involved Sweeney's jailhouse confessions to Bender. *See Watson II*, 66 A.3d at 544–45.

[13] The *Watson II* opinion refers to Sweeney as "Draper," one of his known aliases. *See Carson*, 455 F.3d at 336.

become "visibly despondent." *Carson*, 455 F.3d at 349. The jurors brought these concerns up by speaking to a deputy marshal and the judge *ex parte*. *See id.* Sweeney argues that his counsel should have objected to these *ex parte* communications and raised the issue on appeal. In Sweeney's view, the *ex parte* conversations directly led to Juror Number Three's dismissal. *See* ECF No. 1017 at 11. But, as the D.C. Circuit noted on direct appeal, the trial court relied on a "combination of factors" to dismiss Juror Number Three—including that he "had lied about his symptoms before visiting the hospital, provided inaccurate voir dire responses about mental health treatment[,] and was," according to other jurors, "distracted and unfocused (and even threatening) during deliberations." *Carson*, 455 F.3d at 352. Because the trial court dismissed Juror Number Three for reasons other than the *ex parte* discussion, Sweeney's counsel had nothing to gain by objecting to the discussion. As the D.C. Circuit explained:

> [T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*Id.* at 354 (cleaned up). Sweeney's trial counsel was not deficient for failing to raise a meritless objection.[14] *Cf. Sayan*, 968 F.2d at 65.

### f.   The Government's Alleged Use of Inadmissible Evidence

Next, Sweeney posits that his counsel should have objected to and appealed rulings admitting (1) testimony of  Dr. Jonathan Arden, "who testified as to autopsies he had not conducted," (2) testimony of a police officer "regarding fingerprint evidence he had not lifted,

---

[14] Though Sweeney also argues that his counsel did not "raise this issue properly on appeal," ECF No. 1017 at 11, his counsel *did* raise the issue on appeal—as evidenced by the D.C. Circuit's discussion of the issue. The Court will not find defective performance based solely on counsel losing an argument.

examine[d,] or compared with the known prints," and (3) out-of-court statements made by Robert

Smith. ECF No. 1017 at 12. All three arguments fail.

First, the autopsy claim. Dr. Arden, a forensic pathology expert, testified at trial about

autopsies that other doctors performed. *See* 02/08/01 (AM) Tr. 22, ECF No. 670. At the time, the

Supreme Court's holding in *Ohio v. Roberts*, 448 U.S. 56 (1980), authorized this practice. But

after the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), autopsy

reports are likely testimonial in this Circuit. *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 72–73

(D.C. Cir. 2011) (holding that autopsy reports are generally testimonial); *United States v. Bostick*,

791 F.3d 127, 149–50 (D.C. Cir. 2015) (assuming without deciding that autopsy reports were

testimonial). If autopsy reports are testimonial, an expert violates the Sixth Amendment's

Confrontation Clause by testifying about autopsies the expert did not personally perform. *See*

*Moore*, 651 F.3d at 74.

Sweeney's counsel did not perform deficiently by not raising this issue at trial or on appeal.

The Supreme Court decided *Crawford* in 2004—three years after Sweeney's trial, and two years

before the decision in Sweeney's direct appeal. *See Crawford*, 541 U.S. at 36. At the time of trial,

*Roberts* provided the operative rule for Confrontation Clause issues relating to autopsies. It would

be a stretch to find Sweeney's counsel deficiently performed for following then-existing law. Nor

did Sweeney's counsel perform deficiently by not raising this Confrontation Clause issue on

appeal. *Crawford* did not specify the contours defining a testimonial statement. And by 2009,

"every court post-*Crawford* ha[d] held that autopsy reports are *not* testimonial." *Melendez-Diaz*

*v. Massachusetts*, 557 U.S. 305, 335 (2009) (Kennedy, J., dissenting) (citing Comment, *Toward a*

*Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial*

*Statement*, 96 Calif. L. Rev. 1093, 1094, 1115 (2008)). Courts in this Circuit only began discussing

the issue years after Sweeney's appeal concluded. *See United States v. Moore*, 651 F.3d 30, 72–73 (D.C. Cir. 2011); *United States v. Williams*, 740 F. Supp. 2d 4 (D.D.C. 2010).[15]  Sweeney's counsel did not perform deficiently by "failing to foresee a change in the law." *See United States v. Williams*, 374 F. Supp. 2d 173, 175–76 (D.D.C. 2005).

Second, Sweeney fares no better regarding his claim that an unnamed "police officer" testified about fingerprint evidence that the officer "had not lifted, examine[d,] or compared with the known prints." ECF No. 1017 at 12.  Police lifted Sweeney's fingerprint from a door of the house where the Maryland triple murder occurred.  Only two people testified about this fingerprint: evidence technician William McClellan, who testified to lifting the fingerprint off of the door, and fingerprint examiner Elores Clark, who determined that the print matched Sweeney's left middle finger. *See* 04/02/01 (PM) Tr. 17, 49, 71–72, ECF No. 960.  Contrary to Sweeney's claim, the record shows that McClellan testified to lifting the fingerprint himself, and Clark testified to examining and comparing that fingerprint and Sweeney's fingerprint.  Sweeney's counsel was not ineffective for failing to raise this meritless issue.

Third, Sweeney argues that his trial counsel should have objected to the trial court's admission of statements by Robert Smith that incriminated Sweeney.  Yet—again—Sweeney's counsel *did exactly that*.  Counsel opposed the government's pretrial motion to admit these statements. *See* ECF Nos. 341 & 491.  But the trial court admitted Smith's statements.  Though the statements were made out of court, the trial court found that Smith was a co-conspirator and Sweeney's statements to him were in furtherance of the conspiracy.  05/29/01 (AM) Tr. 88–89,

---

[15] Moreover, the issue remains unsettled among the circuits. *Compare United States v. De La Cruz*, 514 F.3d 121, 134 (1st Cir. 2008); *United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013); *Mitchell v. Kelly*, 520 F. App'x 329 (6th Cir. 2013) (per curiam); *McNeiece v. Lattimore*, 501 F. App'x 634, 636 (9th Cir. 2012); *United States v. MacKay*, 715 F.3d 807, 831–32 (10th Cir. 2013), *with United States v. Ignasiak*, 667 F.3d 1217, 1232 (11th Cir. 2012); *Bostick*, 791 F.3d at 127.

ECF No. 712. The court also noted that Carson had killed Smith, thereby making him unavailable. *Id.*; *cf.* Fed. R. Evid. 804(a). Sweeney's counsel *did* challenge this decision on appeal, and the D.C. Circuit upheld the trial court's ruling. *Carson*, 455 F.3d at 360, 367. At every step, Sweeney's counsel took the necessary steps to challenge these statements' admissibility. Sweeney cannot prove deficient performance simply because his counsel did not win an argument.

g. *Appellate Counsel's Failure to Challenge the Trial Court's Decision to Seal Portions of the Record*

While defendants' case was on direct appeal, the D.C. Circuit denied defense counsels' motion to review "all sealed portions of the trial record." Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002). The D.C. Circuit noted that it would review sealed materials *in camera* if counsel identified "specific evidentiary rulings of the district court [he] claim[ed] were erroneous." *Id.* Defense counsel then filed a second motion arguing the same, which the D.C. Circuit also rejected. Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Aug. 28, 2003). Sweeney argues that his appellate counsel gave a defective performance by "fail[ing] to note sections of sealed matters for the [D.C. Circuit] to review." ECF No. 1017 at 12; ECF No. 1156-1 at 60–62. Again, this argument fails because Sweeney misrepresents the record. Defense counsel moved for the D.C. Circuit to review these *Brady* materials. The D.C. Circuit denied those motions. The Court cannot find that Sweeney's attorney performed defectively simply for losing a motion.

h. *Failure to Challenge the Trial Court's Ruling that Sweeney Was Not Entitled to Two Attorneys at Trial*

Sweeney's next challenge concerns his representation at trial. A grand jury indicted Sweeney for violent crimes in aid of racketeering ("VICAR")—crimes permitting the death penalty. *See* Second Retyped Indictment 64, ECF No. 760; 18 U.S.C. § 1959(a)(1). From

November 1998 through August 2000, Steven Kiersh and Paul DeWolfe jointly represented Sweeney. *See* ECF Nos. 37, 45. At a status hearing on December 16, 1999, the government informed defense counsel that it would not seek the death penalty in these cases. ECF No. 1026 at 4. Weeks later, Sweeney's counsel requested that the trial court authorize appointment of two attorneys for Sweeney based on the complexity of the case, notwithstanding the government's decision to forego the death penalty. ECF Nos. 1142-7 On January 4, 2000, the trial court granted this request. ECF No. 252.

Later that year, DeWolfe withdrew from representing Sweeney. ECF No. 356. The trial court then appointed Leonard Long, Jr. as Sweeney's co-counsel. *See* ECF No. 408. This appointment came with controversy. Counsel Long had represented a co-conspirator, Stephon Mason, in a different matter. 11/13/01 Tr. 12, ECF No. 639. The government moved to disqualify Long, which the trial court granted. *Id.* at 13. From then on, Kiersh was Sweeney's sole attorney.

Sweeney argues that trial counsel should have appealed Long's disqualification, requested a second counsel or a continuance after Long's disqualification, or argued that 18 U.S.C. § 3005 entitled Sweeney to two attorneys at trial. ECF No. 1017 at 14–15; ECF No. 1156-1 at 75–87. Again, Sweeney has not shown how these errors resulted in prejudice. As this Court has discussed at length in this opinion, the government presented a comprehensive case against Sweeney. Sweeney's counsel did object to Long's disqualification. And at the time, it was far from clear whether 18 U.S.C. § 3005 even entitled Sweeney to two attorneys.[16] Sweeney has not shown that this purported failure deprived him of a fair trial. *Cf. Strickland*, 466 U.S. at 687.

---

[16] Per 18 U.S.C. § 3005:

> Whoever is indicted for treason or other capital crime [sic] shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . .

> i.   *Not Securing Admission of Statements by Cheree Owens and John Pinckney Regarding the Maryland Triple Murder*

Sweeney also argues that the trial court erroneously excluded statements by Cheree Owens and John Pinckney—who "implicat[ed] Dennis Green and his friends" in the Maryland triple murder—because of his trial counsel's "ineffective attempts." ECF No. 1017 at 15. Sweeney also contends that counsel "compounded the problem by not raising this issue" on appeal. *Id.* Though Sweeney does not elaborate on what these "ineffective attempts" were, he overlooks that his counsel *did* move the trial court to admit Owens and Pinckney's testimony. *See* ECF Nos. 450 & 507. Further, Sweeney's counsel *did* challenge the issue on appeal—the D.C. Circuit simply ruled against him. *See Carson*, 455 F.3d at 378–80. Since Sweeney has not proven deficient performance, this claim fails as well.

> j.   *Failure to Challenge Consecutive Sentences Under 18 U.S.C. § 924(c)*

Finally, Sweeney claims that his trial counsel should have challenged the consecutive sentences he received for using a firearm while committing a "crime of violence" under 18 U.S.C. § 924(c). ECF No. 1017 at 13. As explained below, *see infra* Section III(C), the trial court did not err in sentencing Sweeney. Sweeney's counsel was not ineffective for failing to raise a losing argument.

### iv.   **Sean Coates**

Like Sweeney, Coates sweeps all sorts of conduct into an argument that his counsel was "totally ineffective throughout the entire [trial]." ECF No. 1020 at 1. Coates brought more than

---

18 U.S.C. § 3005. The government charged Sweeney with a capital crime—murder in aid of racketeering. *See* Second Retyped Indictment 64, ECF No. 760; 18 U.S.C. § 1959(a)(1). But the government did not seek the death penalty against Sweeney. ECF No. 1026 at 4. At the time of trial, the Eleventh Circuit had held § 3005 did not entitle a defendant to two court-appointed attorneys when the government stopped seeking the death penalty. *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998). Starting in 2002, a majority of circuits have agreed with this interpretation. *See United States v. Cordova*, 806 F.3d 1085, 1101–02 (D.C. Cir. 2015) (collecting cases).

twenty ineffective-assistance claims in his first § 2255 motion, timely filed on February 19, 2008.

ECF No. 1020. Coates raised three new ineffective-assistance claims in an amended § 2255

motion filed on February 24, 2015.[17] Since Coates filed the new claims long after § 2255(f)'s one-

year deadline, the Court will summarily deny them. The Court discusses Coates's remaining

claims below.

### a. Failure to Cross-Examine Various Witnesses

First, Coates argues that his trial counsel represented him ineffectively by declining to

cross-examine several government witnesses, or by cross-examining them deficiently. ECF No.

1020 at 9–15. These witnesses were:

- FBI Agent Lisi, who identified Coates on several videos presented to the jury depicting individuals picking up and selling drugs. *Id.* at 9–10.

- Ronald Switzer, who testified that Coates and co-defendant Hill were "the people out there making big money in 1996 and 1997." *Id.* at 11.

- Donald Nichols, who testified that Coates "would be out selling on a typical day." *Id.*

- James Montgomery, who testified that Coates "[was] selling drugs" in 1989. *Id.*

- Charles Bender, who testified that he sold drugs with Coates in 1994 and 1995. *Id.* at 13.

- Ronald Sowells, who testified that "30 or 40 people" sold marijuana in the alley behind Delaware Avenue and K Street, including Coates. *Id.* at 13.

- Paul Franklin, who testified that Coates sold marijuana in the alley behind Delaware Avenue and K Street and that he had "bagged up [marijuana]" at Coates's mother's home. *Id.* at 14.

---

[17] These ineffective-assistance claims were that: (1) trial counsel did not call Coates's sister as an alibi witness for the Maryland triple murder; (2) trial counsel did not advise Coates to testify that he was with his sister on the night of the Maryland triple murder; and (3) trial counsel did not object to faulty aiding-and-abetting jury instructions. ECF No. 1166 at 1–7.

- Demetrius Hunter, who testified that "he occasionally sold [marijuana]" for Coates in 1994 and 1995. *Id.* at 15.

Even if Coates's counsel were deficient in cross-examining all eight of these witnesses about Coates's drug-selling practices, this claim fails because Coates has not demonstrated prejudice. The government not only relied on these witnesses' testimony, but also introduced video evidence showing Coates moving drugs. 01/23/01 (PM) Tr. 33–35, ECF 940. FBI Agent Lisi identified Coates as the person on the video. *See id.* That video evidence, combined with the direct testimony of these witnesses, makes it hard to believe that a "reasonable probability" exists that Coates would not have been convicted for this charge. *Cf. Udo*, 795 F.3d at 30.

### b. *Alleged Pretrial and Trial Errors*

Next, Coates marshals arguments about purported errors that his counsel committed at trial. These errors are that:

- Trial counsel did not use the "rich fodder for cross-examination" when the government called Ronald Sowells, who testified about Coates attempting to murder him. *Id.* at 18–23.

- Trial counsel lodged only a "nonspecific objection" about the fingerprints on the car used to kidnap Anthony Pryor. A police officer testified that those fingerprints belonged to Coates. *Id.* at 24.

- Trial counsel "sat down without laying a finger" on government witness James Montgomery after Montgomery testified about Coates's involvement in the Maryland triple murder. *Id.* at 24–27.

- Trial counsel gave an "obviously off the cuff" opening statement and failed to challenge several of Coates's many charged crimes. *Id.* at 33.

- Trial counsel did not adequately prepare for trial. *Id.* at 34–40.

- Trial counsel did not make discovery requests relating to Coates's charged crimes. *Id.* at 34–36.

- Trial counsel did not properly cross-examine detective Robert Mitchell about Ronald Sowell's shooting. *Id.* at 35.

- Trial counsel did not object to testimony by police sergeant Dwight Deloatch about Anthony Pryor's kidnapping. *Id.* at 38–40.

- Trial counsel did not participate in the discussion of jury instructions. *Id.* at 40.

- Trial counsel "misunderstood" the dispute over the admissibility of Robert Smith's out-of-court statements. The issue concerned whether Coates had caused Smith's unavailability, thereby waiving a hearsay objection. *See* Fed. R. Evid. 804(a). Counsel did not challenge this issue nor cross-examine the government's witness on this point. ECF No. 1020 at 40–41.

- Trial counsel "continuously failed to object to hearsay solicitations" by the government. *Id.* at 41–42.

- Trial counsel gave a closing argument that "barely passed the giggle test given the seriousness of his allegations." *Id.* at 43–45.

Other than highlighting these inadequacies, Coates has made no showing that his counsel performed deficiently or that these errors prejudiced his case. Nor could Coates do so. The jury found Coates guilty for conspiring to distribute marijuana, for conspiring to engage in racketeering activity (including multiple felony murders), and for using firearms when committing crimes of violence. ECF No. 810 at 34–40. To support these charges, the government put on a strong evidentiary showing. Multiple witnesses testified with personal knowledge that Coates sold drugs. *See, e.g.*, 01/25/01 (PM) Tr. 5–6, ECF No. 942 (Ronald Switzer); 02/15/01 (AM) Tr. 31–32 (Donald Nichols). The government showed the jury video of Coates picking up drugs. *See* 01/23/01 (PM) Tr. 33–35. And forensic evidence—Coates's fingerprints—showed he was present at the scene of an attempted kidnapping. 04/24/01 (AM) Tr. 31, ECF No. 695. Amid all of this evidence, Coates is hard-pressed to explain how there exists a reasonable probability that his trial could have had a different result. None of the errors Coates alleges could have overcome this evidence, even when considered in the aggregate. *Cf. Udo*, 795 F.3d at 33. Thus, these arguments fail.

### c. Ineffective Cross-Examination of Yusef Simmons About His Kidnapping

Coates next takes issue with his trial counsel "appear[ing] to be caught off guard" when the government called Yusef Simmons to the stand, despite counsel knowing ahead of time that Simmons would testifying. ECF No. 1020 at 16. Simmons testified at trial that Coates and other K Street members kidnapped him as part of a feud between the K Street and L Street gangs. 02/06/01 (AM) Tr. 22–23, ECF No. 672. However, Coates has not shown how his trial counsel gave a deficient performance. The record tells a contrary story. Coates's trial counsel got Simmons to admit that the kidnapping was about money rather than a conflict with the K Street gang. *Id.* at 70–72. Simmons also admitted that he never saw Coates holding a gun during the kidnapping and that he did not name Coates in his statement to the police. *Id.* If Coates's counsel was "caught off guard" by Simmons taking the stand, he appeared to have recovered quickly. In any event, this cross-examination does not appear so inadequate as to fall outside of the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### d. Ineffective Cross-Examination of Arthur Rice

Coates's next ineffective-assistance claim concerns the shooting of Michael Jones. As part of the racketeering case against Coates, the jury found that Coates conspired to murder Jones. *See* ECF No. 1020 at 27. The government relied on Arthur Rice as its key witness to prove this crime— Rice testified that he saw Coates "pump bullets into" Jones. 04/30/01 (AM) Tr. 10, ECF No. 698. Coates takes issue with his counsel's cross-examination of Rice. ECF No. 1020 at 27–32. After Rice had testified that he saw Coates shoot Jones, Coates's counsel asked Rice: "Now that, sir, is a lie, isn't that correct?" *Id.* Rice replied that he was not lying. *Id.* Coates's counsel did not ask further questions about this shooting. *See id.* While Coates's counsel arguably could have challenged Rice further, Coates has not proven that any error was prejudicial. Coates takes

umbrage that his counsel's cross-examination was cursory. *See* ECF No. 1020 at 30. But Coates

has not identified how his counsel could have challenged Rice's testimony. And Rice testified that

Coates "pump[ed] bullets" into Jones. 04/30/01 (AM) Tr. 10. Without further explanation about

how Rice's testimony could have been impeached, the Court finds it hard to believe that further

cross-examination could have changed the jury's mind.

### e.   *Ineffective Assistance of Appellate Counsel*

Coates raises three arguments to suggest that his appellate counsel performed deficiently:

- Appellate counsel did not challenge the admission of Coates's fingerprint, which police had found on the car used to kidnap Anthony Pryor. *Id.* at 45.

- Appellate counsel did not identify specific *Brady* rulings Coates believed to be erroneous, as directed by the D.C. Circuit. Instead, appellate counsel included a section titled, "The Court's response to *Brady* and *Jencks* Request [sic] was Lackadaisical." *Id.* at 46.

- Appellate counsel did not bring an ineffective-assistance claim on appeal about the admission of the fingerprint evidence and the out-of-court statements by Robert Smith. *Id.*

None of these arguments meet the mark.

First, Coates argues that appellate counsel should have objected to the admission of

fingerprint evidence regarding the Anthony Pryor kidnapping. *Id.* at 45. Police found Coates's

fingerprints on the Cadillac used to kidnap Pryor. 04/24/01 (AM) Tr. 31, ECF No. 695. This

argument fails because Coates cannot show prejudice. As noted above, the government presented

a strong case that Coates kidnapped Pryor. *See supra* Section III(A)(iv)(b). James Montgomery

testified that Coates told him about kidnapping Pryor. *See* 03/13/01 (AM) Tr. 20–22. And the

details Coates provided to Montgomery—specifically, the broken trunk—matched the Cadillac

found with a missing trunk. *See id.* Without a showing of prejudice, Coates fails on this argument.

Second, Coates objects to his appellate counsel's method of challenging purported *Brady*,

*Giglio*, and Jencks Act violations. ECF No. 1020 at 46. But Coates has not shown how his counsel

performed deficiently.  As discussed above, *supra* Section III(B)(iii)(g), the D.C. Circuit denied defense counsels' motion to review "all sealed portions of the trial record" while on direct appeal. Order at 1, *United States v. Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002).  The Circuit agreed to review sealed materials *in camera* if counsel challenged "specific evidentiary rulings."  *Id.* Defense counsel, in a joint brief, challenged these rulings in a section titled "The Court's Response to *Brady* and Jencks Requests Was Lackadaisical."  *See* ECF No. 1020 at 46.  Coates argues that his counsel performed deficiently by not complying with the D.C. Circuit's order.  *Id.* at 45–46. In effect, Coates challenges the tactical methods that his attorneys used to challenge his conviction on appeal.  Because attorneys have "wide latitude . . . in making tactical decisions," *Strickland*, 466 U.S. at 689, the Court will not find that Coates's counsel performed deficiently on this ground.

Third, Coates contends that his appellate counsel should have brought an ineffective-assistance claim against his trial counsel for not objecting to the admissibility of (1) Coates's fingerprint and (2) out-of-court statements by Robert Smith.  ECF No. 1020 at 46.  This Court is unconvinced.  The trial court's admission of Coates's fingerprint did not prejudice him because the government presented a strong case that he kidnapped Anthony Pryor—even without Coates's fingerprint on the kidnapping car.  *See supra* Section III(A)(iv)(b).  Moreover, Coates's appellate counsel *did challenge* the admissibility of Robert Smith's out-of-court statements on direct appeal. *See Carson*, 455 F.3d at 360–67.  The D.C. Circuit rejected that argument.  *Id.*  Without a showing of prejudice, the Court cannot find that Coates's appellate counsel was ineffective.

\*       \*       \*

Therefore, the Court will **DENY** defendants' claims for ineffective assistance of counsel.

### C.  Challenges to Convictions Under 18 U.S.C. § 924(c)

Defendants also challenge their convictions for using a firearm "during and in relation to any crime of violence or drug trafficking crime." *See* 18 U.S.C. § 924(c).  Two defendants argue that their § 924(c) sentences should merge into a single sentence.  All of the defendants argue that their sentences are unconstitutional in light of *United States v. Davis*, 139 S. Ct. 2319 (2019).

### i.  *Sweeney and Coates's Ineffective-Assistance Claims Fail*

In addition to their ineffective-assistance claims listed above, Sweeney and Coates argued that their counsel should have challenged their consecutive sentences under § 924(c).  ECF No. 1017 at 13 (arguing these sentences violated the Double Jeopardy Clause); ECF No. 1020 at 47.  At trial, the jury found Sweeney and Coates guilty of multiple § 924(c) offenses for the Maryland triple murder.  *See* ECF No. 810.  These § 924(c) sentences were to run consecutively following their life sentences.  In defendants' view, the multiple § 924(c) sentences should have merged because they stemmed from the use of a single weapon during (what they contend was) a single crime of violence.  Coates also argues that his consecutive § 924(c) sentences were improper because he did not have a prior § 924(c) conviction before this case.  ECF No. 1166 at 7–9.  Neither of these arguments have merit, so defendants did not suffer prejudice from their lawyers' conduct.

First, Sweeney and Coates may be charged with separate § 924(c) charges for each murder they committed.  Section 924(c)(1)(A) applies to individuals who "use[]," "carr[y]," or "possess[]" a firearm in furtherance of a "crime of violence."  18 U.S.C. § 924(c)(1)(A).  Courts have struggled to interpret this provision, but several guideposts seem apparent.  When a defendant commits only one predicate offense, the government may charge only one § 924(c) violation.  *United States v. Anderson*, 59 F.3d 1323, 1334 (D.C. Cir. 1995) (en banc).  And if a defendant "uses" a firearm only once, even if he commits multiple predicate offenses when doing so, the government may

43

still charge only one § 924(c) violation. *United States v. Wilson*, 160 F.3d 732, 749–50 (D.C. Cir. 1998). This case differs. Sweeney used his firearm three distinct times to commit three distinct predicate offenses—the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. ECF No. 810 at 32–33. Accordingly, the separate § 924(c) charges for each of these offenses are proper.[18]

Second, Coates's argument also fails. Coates contends that the trial court should not have applied the "second or subsequent" penalty of twenty years per conviction under § 924(c) because he did not have a prior conviction at the time of his instant verdict. ECF No. 1166 at 7–8. The Supreme Court previously held to the contrary. In *Deal v. United States*, the Supreme Court held that § 924(c)'s "second or subsequent conviction" language referred to a *finding of guilt* rather than a judgment of conviction. 508 U.S. 129, 132–37.[19] The jury found Sweeney and Coates guilty on a § 924(c) violation for possessing a firearm while kidnapping Anthony Pryor. ECF No. 810 at 32, 40. Accordingly, the trial court sentenced Sweeney and Coates only to a five-year sentence on that charge. *See* ECF No. 860 at 16; ECF No. 928 at 5. The remaining findings of guilt under § 924(c)—including those for the Maryland triple murder—correctly had a twenty-

---

[18] The D.C. Circuit has alluded to this possibility in dicta. *See Anderson*, 59 F.3d at 1334 (suggesting that the government could charge separate § 924(c) violations when a defendant "fires a gun on separate and distinct occasions"); *Wilson*, 160 F.3d at 749 (explaining that multiple predicate offenses "could support more than one § 924(c) charge"). Other circuits have approved this interpretation. *See, e.g., United States v. Rentz*, 777 F.3d 1105, 1115 (10th Cir. 2015); *United States v. Sandstrom*, 594 F.3d 634, 659 (8th Cir. 2010); *United States v. Rahim*, 431 F.3d 753, 757 (11th Cir. 2005).

[19] In the First Step Act of 2018, Congress modified § 924(c)(1)(C) to eliminate this practice of "stacking" § 924(c) penalties for first-time offenders. The penalty now applies only "after a prior [§ 924(c)] conviction . . . has become final." 18 U.S.C. § 924(c)(1)(C). However, the text of the First Step Act makes clear that this language applies only to offenses committed "before the date of enactment . . . if a sentence for the offence has *not been imposed* as of such date of enactment." First Step Act of 2018, Pub. L. No. 115-391, § 403(b), 132 Stat. 5194, 5222 (emphasis added); *cf. Dorsey v. United States*, 567 U.S. 260, 264, 272 (2012) (opining that statutes reducing criminal sentences generally do not apply to crimes committed before enactment). The trial court sentenced Coates in 2002—long before the First Step Act came into law—so the Court will not apply the prohibition against "stacking" to him. *Cf. United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020); *United States v. Cruz-Rivera*, 954 F.3d 410, 413 (1st Cir. 2020).

year sentence applied.  Since the trial court correctly sentenced Sweeney and Coates, they suffered

no prejudice and cannot succeed on their ineffective-assistance claims.

### ii.  Defendants' Johnson/Davis Claims Fail

In a final set of arguments, defendants challenge their convictions under 18 U.S.C. § 924(c)

in light of two intervening Supreme Court decisions: *Johnson v. United States*, 576 U.S. 591

(2015), and *United States v. Davis*, 139 S. Ct. 2319 (2019).  They filed amended motions raising

these claims or adopting claims raised by their co-defendants.  *See* ECF Nos. 1182, 1183, 1184,

1192, 1229.

Section 924(c) sets out mandatory minimum sentences for using, carrying, or possessing a

firearm "during and in relation to any crime of violence or drug trafficking crime."  18 U.S.C.

§ 924(c)(1)(A).  A "crime of violence" is a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of
> physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course
> of committing the offense.

*Id.* § 924(c)(3).  The first clause is known as the "elements" clause, the second as the "residual"

clause.  *Davis*, 139 S. Ct. at 2324.  When the trial court sentenced defendants in 2002, a prior

conviction could be a crime of violence under either clause.  But in 2019, the Supreme Court held

§ 924(c)(3)(B), the residual clause, to be unconstitutionally vague.  *Davis*, 139 S. Ct. at 2336.  The

Court did not invalidate § 924(c)(3)(A), the elements clause.  *See id.*

Although these defendants cannot be convicted under § 924(c)(3)'s residual clause, the

question remains: Do their § 924(c) convictions qualify as crimes of violence under the elements

clause?  Answering this question requires applying a "categorical approach" to the offense.  *See*

*Taylor v. United States*, 495 U.S. 575, 600 (1990); *United States v. Kennedy*, 133 F.3d 53, 56 (D.C.

Cir. 1998).  Under the categorical approach, a court must look to whether the statutory elements

of the offense necessarily require the "use, attempted use, or threatened use of physical force."  *See*

18 U.S.C. § 924(c)(3)(A).  If so, then the Court may uphold defendants' convictions.  Even though

the underlying convictions may be state-law crimes, federal courts should compare these elements

for themselves.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010).

### a.  Denying Sweeney and Coates's Claims

Before addressing the merits of defendants' arguments, the Court will deny Sweeney and

Coates's § 924(c) claims.  Sweeney never filed an amended motion raising a § 924(c) argument.

Rather, he filed a motion adopting the arguments in Martin's amended motion.  *See* ECF No. 1229

at 3.  Martin argued that his § 924(c) conviction—based on attempting to murder James Coulter—

should be vacated.  The government did not charge Sweeney with this attempted murder, nor did

Sweeney make his own arguments about his § 924(c) convictions.  *See Kelly*, 552 F.3d at 831.

The Court will dismiss this inapposite argument.

Coates's argument also fails.  First, his entire *Johnson/Davis* argument arises from a one-

paragraph supplement filed after the *Johnson* decision.  ECF No. 1184 at 1.  This claim, which

Coates never explained further, is too conclusory for this Court to grant relief.  *See Mitchell*, 841

F. Supp. 2d at 328.  Second, his *Johnson/Davis* claim is time-barred.  The Supreme Court decided

*Johnson* on June 26, 2015.  *Johnson*, 576 U.S. at 591.  But Coates filed his supplement on June

27, 2016, making it untimely.  For either reason, Coates's *Johnson/Davis* claim fails.

### b.  Jerome Martin

Martin's § 924(c) conviction involves several layers of offenses.  The § 924(c) conviction

stemmed from Martin's attempted murder of James Coulter, a VICAR charge.  ECF No. 810 at

14.  Martin's conviction for assault with intent to kill while armed ("AWIKWA") formed the basis

of this VICAR charge. *Id.* at 13.   In the District of Columbia, AWIKWA requires (1) an assault (2) with specific intent to kill (3) while armed. *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999); *see* D.C. Code §§ 22-401, 22-4502 (2001).   "A specific intent to kill exists when a person acts with the purpose or conscious intention of causing the death of another." *Logan v. United States*, 483 A.2d 664, 671 (1984).   Proof of a "conscious disregard of the risk of death or serious injury" does not amount to specific intent to kill. *See Graure v. United States*, 18 A.3d 743, 759 (D.C. 2011).

Martin contends that AWIKWA is not a "crime of violence" under 18 U.S.C. § 924(c)(3).[20] This charge requires the Court to assess a newly drawn line by the Supreme Court.  In *Borden v. United States*, 141 S. Ct. 1817 (2021), the Supreme Court held that reckless offenses do not qualify as crimes of violence under the ACCA's elements clause. *Id.* at 1825.  So, if someone can commit AWIKWA with a reckless *mens rea*, then Martin's conviction should be vacated. *See* ECF No. 1272 at 20–21, 21 n.14.  This Court finds this distinction unavailing here.  A person acts recklessly by "consciously disregard[ing] a substantial and unjustifiable risk" that a certain result will occur. Model Penal Code § 2.02 (Am. L. Inst. 2020).  Since AWIKWA requires the specific intent to kill another—which, by definition, requires more than "consciously disregarding" the risk of death— it is impossible for someone to commit AWIKWA recklessly.  And AWIKWA involves the "use, attempted use, or threatened use" of force against another. *See* 18 U.S.C. § 924(c)(3).  Therefore, Martin's VICAR conviction—based on an AWIKWA charge—is a crime of violence under § 924(c)(3)'s elements clause, so the Court will affirm Martin's § 924(c) conviction.

---

[20] The jury found Martin guilty for § 924(c) offenses based on: (1) using a firearm when attempting to murder Coulter and (2) possessing a firearm while committing AWIKWA against Coulter.  His *Johnson/Davis* motion addresses only his attempted-murder charge. *See* ECF No. 1182 at 1–2.  Because the trial court only imposed a sentence for the § 924(c) charge based on AWIKWA, *see* ECF No. 1268 at 123 n.66, the Court addresses only the AWIKWA charge in this discussion.

### c. Samuel Carson

Carson fares no better. The Court begins by dismissing several of Carson's § 924(c) arguments as untimely. On June 24, 2016, Carson filed a timely placeholder motion challenging his § 924(c) convictions. ECF No. 1183. One year later, Carson filed an amended motion raising three new challenges—the § 924(c) convictions for the Maryland triple murder. ECF No. 1191. After the government filed its omnibus response, ECF No. 1255, Carson supplemented his *Johnson* motion challenging his § 924(c) convictions for D.C. crimes. ECF No. 1272. The Court will not permit Carson's D.C. supplement to relate back to his original *Johnson* motion. The "central policy of the relation-back doctrine" is to ensure the non-moving party has "sufficient notice of the facts and claims giving rise to the proposed amendment." *Hicks*, 283 F.3d at 388 (quoting *Anthony v. Cambra*, 236 F.3d 568, 576 (9th Cir. 2000)). Permitting Carson's D.C.-related arguments to relate back would defeat this policy altogether. A supplement that does not "merely . . . elaborate upon his earlier claims," but rather "introduce[s] a new legal theory based on facts different from those underlying the timely claims" should be rejected. *See Hicks*, 283 F.3d at 388–89. Therefore, the Court will not consider Carson's D.C.-related § 924(c) convictions.

The Court has little trouble affirming Carson's remaining § 924(c) convictions based on the Maryland triple murder. The jury found Carson guilty of felony murder as to Alonzo Gaskins, Darnell Mack, and Melody Anderson. ECF No. 810 at 21–22. The Court's categorical analysis thus depends on the elements of the predicate offense—murder. *See id.*; *cf. United States v. García-Ortiz*, 904 F.3d 102, 105–06 (1st Cir. 2018). This Court has previously held that murder, in Maryland, is a crime of violence under § 924(c)(3)'s elements clause. *United States v. Machado-Erazo*, 986 F. Supp. 2d 39, 53–54 (D.D.C. 2013). The intervening eight years have only strengthened this Court's conclusion. Maryland's first-degree murder statute requires "a

deliberate, premeditated, and willful killing." Md. Code Ann. § 27–407 (West 2001). Since "the intentional causation of bodily injury necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. 157, 169 (2014), the Court again concludes that murder, in Maryland, is a crime of violence within the meaning of § 924(c)(3)'s elements clause. Carson's § 924(c) convictions are affirmed.

### D. Defendants' Adoption of Co-Defendants' Claims

Finally, defendants moved at various times to adopt the claims in their co-defendants' motions. ECF Nos. 1024, 1185, 1228, 1229 1230, 1249, 1279. Because the Court finds that all of defendants' claims are time-barred, procedurally defaulted, conclusory, or meritless, it must also **DENY** these adopted claims.

### IV.   CONCLUSION

In sum, none of defendants' arguments in their original § 2255 motions or amendments are convincing.[23] For the reasons discussed above, the Court will **DENY** the § 2255 motions and supplements of defendants Jerome Martin, Jr., Samuel Carson, William Sweeney, and Sean Coates. ECF Nos. 1017, 1020, 1021, 1023, 1170, 1182, 1183, 1184, 1185, 1191, 1197, 1198, 1229. A separate order shall issue this date addressing the remaining motions on this docket.

Date: October 26, 2021

Royce C. Lamberth
United States District Judge

---

[23] Any claim not specifically discussed in this opinion is summarily denied.