**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SAMUEL CARSON; SEAN COATES; JEROME MARTIN, JR.; AND WILLIAM K. SWEENEY,<br><br>    *Defendants.* | Case No. 1:98-cr-329-6-RCL |

**DEFENDANTS' SUPPLEMENTAL MOTION TO VACATE, SET ASIDE, OR
CORRECT THEIR SENTENCES PURSUANT TO 28 U.S.C. § 2255**

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   PROCEDURAL HISTORY.....................................................................................4

III.  BACKGROUND ...................................................................................................7

      A.    Defendants Diligently Sought Exculpatory Material About Robert "Butchie" Smith's Murder Throughout Pretrial and Trial Proceedings. ...................................8

      B.    Defendants Continued to Diligently Seek Exculpatory Material About Butchie Smith's Murder on Direct Appeal. ............................................................12

      C.    Defendants for the First Time Received Access to Some *Brady* Material During Habeas Proceedings and Continued to Diligently Pursue Additional Exculpatory Material About Butchie Smith's Murder............................................13

      D.    The New Disclosures Made During Defendants' Appeal of This Court's § 2255 Decision Revealed Additional Exculpatory Material About Butchie Smith's Murder. ...............................................................15

IV.   LEGAL STANDARDS ........................................................................................20

V.    ARGUMENT........................................................................................................26

      A.    Defendants' Supplemental § 2255 Motion Is Timely and Procedurally Proper....26

      B.    The Government's Evidentiary Suppression Undermines Confidence in Defendants' Trial. ........................................................................30

            1.    The Government's suppression of the exculpatory material revealed in the New Disclosures compels relief for Carson and Sweeney because it directly undermines the jury's verdict on the RICO predicate act of Butchie Smith's murder. ..................................30

            2.    The Government's suppression of the exculpatory material revealed in the New Disclosures warrants relief for all Defendants because it reasonably could have affected a pivotal evidentiary ruling with cascading effects across myriad charged offenses and undermines the credibility and testimony of key prosecution witnesses. ..........................34

            3.    Considered collectively and in context, the cumulative effect of the Government's evidentiary suppression warrants relief for all Defendants. ............................................41

VI.   CONCLUSION....................................................................................................48

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Dretke,*
  540 U.S. 668 (2004)..................................................................................................29

*Brady v. Maryland,*
  373 U.S. 83 (1963)..................................................................................................1, 21

*Brown v. State,*
  281 Md. 241, 378 A.2d 1104 (1977) .....................................................................37

*Clark v. Warden,*
  934 F.3d 483 (6th Cir. 2019) .................................................................................35

*Conley v. United States,*
  415 F.3d 183 (1st Cir. 2005)...........................................................................21, 22, 25

*Dennis v. Sec'y, Pa. Dept. of Corrs.,*
  834 F.3d 263 (3d Cir. 2016) (en banc)..................................................................24

*DeWitt v. District of Columbia,*
  43 A.3d 291 (D.C. 2012) ........................................................................................44

*Douglas v. Workman,*
  560 F.3d 1156 (10th Cir. 2009) .............................................................................27

*Fuentes v. T. Griffin,*
  829 F.3d 233 (2d Cir. 2016)....................................................................................24

*Giglio v. United States,*
  405 U.S. 150 (1972)...........................................................................................23, 24

*Juniper v. Zook,*
  876 F.3d 551 (4th Cir. 2017) .................................................................................35

*Killian v. Poole,*
  282 F.3d 1204 (9th Cir. 2002) ...............................................................................25

*Kyles v. Whitley,*
  514 U.S. 419 (1995).................................................................4, 21, 22, 26, 30, 41, 48

*Mahler v. Kaylo,*
  537 F.3d 494 (5th Cir. 2008) .................................................................................25

*McClesky v. Zant,*
  499 U.S. 467 (1991).................................................................................................28

*Miller v. Angliker,*
848 F.2d 1312 (2d Cir. 1988)..................................................................................25

*Monroe v. Angelone,*
323 F.3d 286 (4th Cir. 2003) ..................................................................................25

*Napue v. Illinois,*
360 U.S. 264 (1959)................................................................................................23

*Smith v. Sec'y, Dept. of Corrs.,*
572 F.3d 1327 (11th Cir. 2009) ..............................................................................22

*Smith v. Sec'y of N.M. Dept. of Corrs.,*
50 F.3d 801 (10th Cir. 1995) ..................................................................................25

*Spicer v. Roxbury Corr. Inst.,*
194 F.3d 547 (4th Cir. 1999) ..................................................................................25

*Strickler v. Greene,*
527 U.S. 263 (1999)..........................................................................................21, 29

*Turner v. United States,*
582 U.S. 313 (2017)................................................................................................21

*United States v. Ausby,*
916 F.3d 1089 (D.C. Cir. 2019) (per curiam) ..............................................23, 24, 46

*United States v. Bagcho,*
151 F.Supp.3d 60 (D.D.C. 2015).......................................................................26, 42

*United States v. Butler,*
955 F.3d 1052 (D.C. Cir. 2020)..............................................................................24

*United States v. Carson,*
455 F.3d 336 (D.C. Cir. 2006)..........................................5, 11, 12, 32, 33, 34, 47

*United States v. Clay,*
165 F.3d 33 (7th Cir. 1998) ....................................................................................36

*United States v. Coates,*
2022 WL 17980232 (D.C. Cir. Dec. 23, 2022)..........................................................6

*United States v. Cuffie,*
80 F.3d 514 (D.C. Cir. 1996)..........................................................21, 23, 30, 48

*United States v. Hicks,*
283 F.3d 380 (D.C. Cir. 2002)............................................................................5, 26

*United States v. Hughes,*
    514 F.3d 15 (D.C. Cir. 2008) ................................................................................28

*United States v. Johnson,*
    592 F.3d 164 (D.C. Cir. 2010) ................................................................................1

*United States v. Lloyd,*
    71 F.3d 408 (D.C. Cir. 1995) ................................................................22, 26, 42

*United States v. Martin,*
    2021 WL 4989983 (D.D.C. Oct. 27, 2021) (*Martin I*) ........5, 10, 26, 27, 28, 31, 36, 37, 41, 42

*United States v. Martin,*
    2022 WL 1618869 (D.D.C. May 23, 2022) (*Martin II*) ...........................................5

*United States v. Nelson,*
    979 F.Supp.2d 123 (D.D.C. 2013) ......................................................................29

*United States v. Rivera,*
    412 F.3d 562 (4th Cir. 2005) ..............................................................................34

*United States v. Robinson,*
    68 F.4th 1340 (D.C. Cir. 2023) ...........................................21, 23, 30, 40, 41

*United States v. Smith,*
    77 F.3d 511 (D.C. Cir. 1996) ......................................................................23, 30

*United States v. Straker,*
    800 F.3d 570 (D.C. Cir. 2015) (per curiam) ..................................22, 44, 45

*Wearry v. Cain,*
    577 U.S. 385 (2016) ....................................................................................21, 41

*Wilson v. Beard,*
    589 F.3d 651 (3d Cir. 2009) ..............................................................................25

**Statutes**

28 U.S.C. § 2254 ........................................................................................................24

28 U.S.C. § 2255 ............................................................................................1, 5, 10, 27

28 U.S.C. § 2255(f) ...................................................................................................27

**Other Authorities**

D.C. Cir. R. 41(b) ......................................................................................................8

Fed. R. Evid. 804(b)(1) ...............................................................................................53

Fed. R. Civ. P. 15(d) ...............................................................................................................25, 26

## I.    INTRODUCTION

After this Court denied the 28 U.S.C. § 2255 motions of Defendants Samuel Carson, Sean Coates, Jerome Martin, Jr., and William K. Sweeney (collectively, "Defendants"), the court of appeals granted a certificate of appealability.  During the briefing of that appeal, counsel for the United States of America (the "Government") disclosed new exculpatory evidence, and the court of appeals accordingly remanded the record in this case to permit this Court to consider the new evidence in the first instance.[1]  Defendants, by and through undersigned counsel, thus jointly submit this supplemental 28 U.S.C. § 2255 motion to address the exculpatory evidence revealed in the new disclosures.[2]

The new disclosures were transmitted to undersigned counsel for Defendants only after Defendants filed their opening brief on appeal addressing, among other things, *Brady* violations due to the Government's repeated failure to provide exculpatory evidence throughout this case's 25-year history.  Specifically, the new disclosures were transmitted by the Government on three different occasions:  April 11, 2025; April 22, 2025; and May 7, 2025 (each individually a "New Disclosure" and, collectively, the "New Disclosures").[3]  *See generally* App 2-45; Exs. A-C.  Each time, counsel for the Government expressly stated that the New Disclosure was being made "[p]ursuant to the government's continuing obligation under *Brady v. Maryland*, 373 U.S. 83

---

[1] *See* D.C. Cir. Nos. 21-3072, 21-3073, 21-3078, 22-3016, and 23-3015.  The July 30, 2025 Order remanding the record states that Defendants' appeal remains pending and has been "held in abeyance" to allow this Court to consider the supplemental *Brady* disclosures in the first instance. *See* App 1600 (Dkt. No. 1366 at 1); D.C. Cir. R. 41(b).

[2] Out of an abundance of caution, Defendants have concurrently filed a new joint standalone petition based on this same newly disclosed exculpatory evidence.

[3] On March 10, 2026, following requests from the Defendants, the Government disclosed additional material related to Michael Farrar, an eyewitness to the murder of Robert "Butchie" Smith.  *See* App 46-52 (Ex. D (3/10/2026 Disclosure Letter)).

1

(1963)." App 2 (Ex. A (4/11/2025 Disclosure Letter) at 1); App 20 (Ex. B (4/22/2025 Disclosure Letter) at 1); App 43 (Ex. C (5/7/2025 Disclosure Letter) at 1); *see also* App 46 (Ex. D (3/10/2026 Disclosure Letter) at 1).[4]  Both individually and collectively, the New Disclosures consist of plainly exculpatory evidence that had always been in the Government's possession and which is directly relevant to and reinforces Defendants' existing *Brady* claims.

The New Disclosures all consist of previously undisclosed eyewitness evidence that persons other than the Defendants had been responsible for the murder of Robert "Butchie" Smith, a crime that formed a critical aspect of the Government's case against all Defendants.  In particular, the New Disclosures include evidence that the Government had interviewed a witness, Michael Farrar, an eyewitness to the murder of Butchie Smith, and that Farrar identified Andre Chappelle (not any of the Defendants) as Smith's murderer.  They also include grand jury testimony from Clarence Gutrick, another eyewitness to Smith's shooting, in which Gutrick also identified Andre Chappelle (again, not any of the Defendants) as the person who shot and killed Smith.[5]

At trial, the Government did not contend that Chappelle committed Smith's murder, nor had it suggested that possibility in pretrial disclosures.  Instead, the Government presented testimony at trial that Carson was the person who killed Smith and that, by virtue of the alleged RICO conspiracy, the other Defendants were all likewise responsible.  The New Disclosures

---

[4] These materials were not available to Defendants' counsel either during trial or when litigating the § 2255 motion before this Court.  Nothing in the record suggests that these materials had previously been disclosed, and, for avoidance of doubt, attached is a Declaration of Lexi Negin Christ, who served as trial counsel for Defendant Carson, attesting to the fact that trial counsel never received the exculpatory material the Government has now produced on appeal of the § 2255 motion and how she would have used this newly disclosed evidence had it been available to her at trial.  App 49–52 (Declaration of Lexi Negin Christ).

[5] Gutrick testified that Anthony Hawkins (not any of Defendants) was with Chappelle when Chappelle shot and killed Smith.  *See* App 3 (Ex. A (4/11/2025 Disclosure Letter)).

directly contradict this testimony.  The matter was extraordinarily significant not only because it directly supported a central charge against the Defendants, but also because it led to a cascading series of significant evidentiary rulings that infected all other charges.  Specifically, based on the Government's proffered evidence, the trial court determined that Defendants (either directly or through their participation in the conspiracy) were responsible for Smith's murder, a pivotal determination that led the trial court to allow FBI Special Agent Vincent Lisi to testify about extensive hearsay statements that Smith had purportedly made before his murder describing Defendants' purported roles in most of the charged crimes.  App 796-797 (Dkt. No. 451, at 1-2); *see also* App 836-837 (Dkt. No. 597, at 18-19).  That decision, in turn, permitted the Government to wield Smith's hearsay statements as central pieces of evidence against Defendants at trial, without giving them their constitutional right to confront a key witness against them.

Had the Defendants had access to this evidence before trial—as was their constitutional right under *Brady*—it would have fundamentally altered the trial.  In the context of the Defendants' case, it is hard to imagine more significant *Brady* material than what is contained in the New Disclosures.  Defense counsel could have used that information to prevent the Government from offering Smith's hearsay statements into evidence through Special Agent Lisi.  Defendants could have used this exculpatory evidence to discredit key prosecution witnesses, including Special Agent Lisi (who testified at trial as follows:  "Q:  Didn't you pick up Michael Farrar up to question him after 'Butchie' was murdered?  A:  No, Sir.  Q:  Didn't you inquire of him about Butchie's murder?  A:  No.") App 183 (May 30 Tr. at 18).  And Defendants could have called into question numerous statements by the Government about the absence of *Brady* evidence (including generally and specifically related to the Butchie Smith murder) that now appear to have been patently false.

Perhaps even more shockingly, the Government has provided no explanation for the late disclosures. In Defendants' prior § 2255 submissions, Defendants generally focused on *Brady* violations where the Government had filed materials under seal which were later revealed to contain *Brady* material—and where Defendants were able to point to inconsistencies in the Government's representations to the trial court. Defendants continue to respectfully submit that those prior-identified *Brady* violations were significant and warrant a new trial. But the New Disclosures are of an even greater magnitude, and the Government's apparent misconduct is even more difficult to understand or justify. As detailed further herein, because the Smith murder was so central to the Government's case, Defendants made repeated motions before and during trial seeking disclosure of any and all exculpatory evidence concerning it. Time and time again, the Government represented that it had no evidence that anyone other than Defendants was responsible for Smith's murder. Yet, in fact, the Government knew the whole time that it had met with multiple witnesses who identified someone else as the killer, and the Government had even called one of them before the grand jury to provide such testimony. There is simply no excuse for this type of *Brady* violation.

Both on its own and when evaluated in context with the Defendants' previously asserted *Brady* claims, the evidence identified in the New Disclosures compels the conclusion that Defendants are entitled to relief because the Government's repeated "evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, based on the New Disclosures and for the reasons set forth herein, Defendants respectfully reaffirm and renew their requests for relief.

## II.    PROCEDURAL HISTORY

Defendants' supplemental § 2255 motion stems from pervasive due process violations that occurred before, during, and after a lengthy federal criminal trial in this Court from 2000-2001.

4

As a result of that trial, the trial court sentenced Defendants and entered corresponding written judgments from which each Defendant timely appealed. *See United States v. Carson*, 455 F.3d 336, 347 (D.C. Cir. 2006). On direct appeal, a panel of the U.S. Court of Appeals for the D.C. Circuit upheld Defendants' convictions and sentences "*in toto*." *Id.* at 339. Thereafter, each Defendant timely filed a motion for post-conviction relief to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, which were each amended through supplemental filings submitted between 2014 and 2018 after Defendants received access to material that was sealed during the trial proceedings and had remained under seal during Defendants' direct appeals.[6] This Court denied the motions, as amended, in October 2021. *See generally United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021) (*Martin I*).[7] Defendants then requested certificates of appealability, which this Court denied in May 2022. *See generally United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022) (*Martin II*).

---

[6] *See, e.g.*, App 959 (Dkt. 1017); App 976 (Dkt. 1020); App 1029 (Dkt. 1021); App 1046 (Dkt. 1023); App 1072 (Dkt. 1140); App 1101 (Dkt. 1156); App 1103 (Dkt. 1166); App 1112 (Dkt. 1170); App 1188 (Dkt. 1182); App 1192 (Dkt. 1183); App 1195 (Dkt. 1184); App 1197 (Dkt. 1191); App 1211 (Dkt. 1197); App 1295 (Dkt. 1198); App 1386 (Dkt. 1229); App 1389 (Dkt. 1233); App 1433 (Dkt. 1273).

[7] Defendants had styled their later-in-time filings as "supplements" (*see, e.g.*, App 1386 (Dkt. No. 1229)), but, in ruling on the motions, this Court noted that "they are better understood as amendments to [Defendants'] original § 2255 motions per Rule 15 of the Federal Rules of Civil Procedure." *See Martin I*, 2021 WL 4989983, at *1 & n.1 (citing *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002)); *see also Hicks*, 283 F.3d at 385 (explaining the difference between Rule 15(a)-(c) amendments and Rule 15(d) supplemental pleadings, stating that "[t]he distinguishing feature of" a supplemental pleading "is that it sets forth 'transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented,'" whereas "amendments . . . typically rest on matters in place *prior to* the filing of the original pleading") (emphasis in original); 6A Wright & Miller's Federal Practice & Procedure § 1504 (3d. ed.) (updated May 20, 2025) ("Amended and supplemental pleadings differ in two respects. The former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading; the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings.").

Defendants thereafter sought certificates of appealability from the court of appeals, which were granted, in part, on December 23, 2022, to allow appeal of, *inter alia*, whether the United States violated Defendants' rights to due process by withholding sealed *Brady* materials.  *See generally United States v. Coates*, 2022 WL 17980232 (D.C. Cir. Dec. 23, 2022).  Defendants filed their opening Appellants' brief in the consolidated appeal on September 27, 2024, and the Government filed its responsive Appellee's brief on April 4, 2025.[8]  After filing Appellee's brief, but before the time for Defendants to file their reply brief, counsel for the Government made a trio of supplemental *Brady* disclosures transmitted to undersigned counsel for Defendants on April 11, April 22, and May 7, 2025 (each individually a "New Disclosure" and, collectively, the "New Disclosures").

Based on these intervening New Disclosures, Defendants filed an unopposed motion to stay the deadline for their reply brief and to remand the record for this Court to consider the recently disclosed material and develop the record as pertinent to the issues on appeal.[9]  The remaining deadlines were suspended on May 29, 2025,[10] and, on July 30, 2025, the court of appeals granted Defendants' motion and ordered that "the record be remanded so appellants can present to the district court in the first instance arguments about the supplemental *Brady* disclosures made in April and May 2025 and for the district court to make factual findings concerning those

---

[8] *See* D.C. Cir. Nos. 21-3072, 21-3073, 21-3078, 22-3016, and 23-3015; *see also* App 1618 (Br. of Appellants, *United States v. Coates*, Nos. 21-3072, 21-3073, 21-3078, 22-3016 & 23-3015 (D.C. Cir. Sept. 28, 2024)); App 1769 (Br. for Appellee, *United States v. Coates*, Nos. 21-3072, 21-3073, 21-3078, 22-3016 & 23-3015 (D.C. Cir. Apr. 4, 2025)).

[9] *See* App 1935 (Unopposed Mot. to Remand the Record and to Stay the Deadline for Defendants-Appellants' Reply Brief, *United States v. Coates*, Nos. 21-3072, 21-3073, 21-3078, 22-3016 & 23-3015 (D.C. Cir. May 27, 2025)).

[10] *See* App 1942 (Clerk's Order, *United States v. Coates*, No. 21-3072 (D.C. Cir. May 29, 2025)).

disclosures." App 1597-1600 (Dkt. Nos. 1363, 1364, 1365, 1366). This Court subsequently directed the parties to submit a proposed schedule for further proceedings to address the New Disclosures, which the parties submitted on December 17, 2025, and this Court granted on the same date. App 1601-1602 (Dkt. Nos. 1367, 1372). This timely supplemental pleading follows.

## III. BACKGROUND

Throughout the course of the trial proceedings, and during appeal and habeas proceedings thereafter, the Government withheld substantial volumes of critical information and evidence that were both material and favorable to Defendants. This was not some one-off mistake, but rather appears to have reflected a considered decision to tread close to, and at times over, the lines of due process.

The New Disclosures are just the latest and most extreme examples of the Government's behavior that pervaded Defendants' trial and subsequent proceedings, violating Defendants' due process rights. Not only did the Government wait to disclose this exculpatory eyewitness evidence identifying others as those responsible for a murder that Defendants were alleged to have committed (and charged with as a predicate act of the RICO conspiracy) until after the court of appeals had issued a certificate of appealability forcing it to defend its actions, but the Government had until then made repeated representations to Defendants and the trial court that it did not have any such information.

The New Disclosures are quintessential *Brady* evidence that undoubtedly should have been disclosed prior to trial. The materials go directly to one of Defendants' core arguments at trial— *i.e.*, that Defendants were not responsible for Smith's death and thus did not cause his unavailability. As a result of the Government's withholding of this key *Brady* material, numerous highly prejudicial out-of-court statements allegedly made by Smith to Special Agent Lisi about the core alleged conspiracy and other specific offenses were allowed to be presented at trial and

formed part and parcel of Defendants' convictions.   Further, the trial court's conclusion that Defendants caused Smith's death, made without the benefit of the withheld material demonstrating otherwise, also precluded Defendants from presenting exculpatory evidence in the defense case. Failure to disclose this *Brady* evidence during the pretrial proceedings concerning the admissibility of Smith's hearsay statements, during trial and in the proceedings thereafter, despite Defendants' repeated requests, violated Defendants' constitutional due process rights.

### A.    Defendants Diligently Sought Exculpatory Material About Robert "Butchie" Smith's Murder Throughout Pretrial and Trial Proceedings.

Leading up to and throughout the course of the months-long trial, Defendants filed numerous and repeated discovery requests and motions seeking discovery and the disclosure of all *Brady*, *Giglio*, and Jencks Act materials in the case against them, including specific requests for such materials regarding Butchie Smith's murder.   For example, on November 17, 1998, Sweeney's trial counsel sent a Rule 16 discovery request that specifically requested "[a]ny information which has come or may come to the attention of the government from any source indicat[ing] that persons other than the defendant may have caused or have been responsible for any of the offenses alleged in the indictment." *See* App 408 (Dkt. No. 71 at 3); App 418-426 (Dkt. No. 71 at 13-21).  Sweeney's counsel reiterated that request in motions to compel filed on February 9, 1999 (*see* App 406 (Dkt. No. 71)) and July 17, 2000 (*see* App 482 (Dkt. No. 340)).[11]

Time and again the Government represented to Defendants and the trial court either that it had fully complied with its disclosure obligations or that there was no such information—including no exculpatory evidence regarding Smith's murder.  For example, in response to one of the specific

---

[11] Each of the other Defendants moved for leave to join Sweeney's various motions and requests, which the trial court granted. *See* App 504 (Dkt. 342); App 732 (Dkt. 372) (Carson); App 512 (Dkt. 350); App 731 (Dkt. 371) (Coates); App 515 (Dkt. 359); App 749 (Dkt. 436) (Martin).

*Brady* requests from Sweeney's counsel, the lead prosecutor represented that he had "reviewed the investigative file and there is no information therein that would exculpate Mr. Sweeney." App 408 (Dkt. No. 71 at 3). In a subsequent written opposition to one of defense counsel's motions to compel discovery (which again specifically sought "Information Pertaining to Robert Smith," App 482-484 (Dkt. No. 340 at 1-3), the Government stated:

> In essence, defendant is making a demand under <u>Brady</u>, for any information which would show that a third party committed the crimes attributed to defendant Sweeney. The government recognizes and will continue to notify defendant Sweeney of all <u>Brady</u> material. However, the <u>Brady</u> doctrine does not extend to information which is based purely upon speculation by the defense. *There is no information in the possession of the United States that anyone other than William Sweeney and his co-defendants believed that Robert Smith was cooperating with law enforcement. Without some reason to believe that anyone other than Sweeney was aware of this cooperation, the government believes that the request merits no response.*

App 597-598 (Dkt. No. 360 at 74-75) (emphasis added). There are myriad examples of similar requests and representations. *See, e.g.*, App 433 (Dkt. No. 228) (Oct. 28, 1999); App 459 (Dkt. No. 293) (May 18, 2000); App 473 (Dkt. No. 322) (June 30, 2000) (citing to Defendants' oral requests for *Brady* materials in investigative files, which were denied on the same day (App 471-472 (Dkt. No. 321)); App 479 (Dkt. No. 328) (July 16, 2000); App 740 (Dkt. No. 409); App 744 (Dkt. No. 410) (Sep. 25, 2000); App 66-67 (Feb. 1, 2001 Tr. 65:24-66:25); App 810 (Dkt. No. 594) (May 14, 2001).

Before trial, the Government moved to admit, through Special Agent Lisi's testimony, Robert "Butchie" Smith's out-of-court statements to Special Agent Lisi about Smith's claimed interactions with Defendants, which Smith allegedly made to Special Agent Lisi before Smith's

murder on June 16, 1997.[12]  Defendants adamantly opposed that motion.  *See, e.g.*, App 491 (Dkt. No. 341); App 504 (Dkt. No. 342); App 512 (Dkt. No. 350); App 699 (Dkt. No. 363); App 727 (Dkt. No. 367); App 733 (Dkt. No. 396).   During the September 27, 2000 hearing on the Government's motion to admit Smith's statements as hearsay against Defendants, the defense specifically requested (again) *Brady* material including any evidence the Government had that others might have wanted to kill Smith.  App 58 (Tr. 9/27/2000 at 127); App 59 (Tr. 9/27/2000 at 200).  And the trial court unequivocally stated that if the Government had any such evidence, it should turn it over, admonishing that, "if the government has any evidence -- any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as *Brady* material."  App 58 (Tr. 9/27/2000 at 127:10-13).  But the Government stated it had none ("we don't have any such information").  App 60 (Tr. 9/27/2000, 201:20-21).  The Government insisted that cooperating government witness James Montgomery provided the "key testimony" linking Carson, and indirectly the other Defendants, to Smith's murder, which formed the foundation of the trial court's decision to allow Smith's hearsay testimony to be presented to the jury.  *See Martin I*, 2021 WL 4989983, at *12.  As this Court summarized in its October 27, 2021 Order Denying Defendants' 28 U.S.C. § 2255 motions:

> In Montgomery's telling, Carson and Sweeney were aware that Smith 'was cooperating with the Feds' about the Maryland triple murder case.  Carson told Montgomery that 'without [Smith], they don't have no case.'  So, Montgomery and Carson sought to 'catch' Smith and kill him.  Carson borrowed Montgomery's car the night of the shooting.  Later that evening, Carson returned and told Montgomery to stay away from the murder scene and 'not to drive [his car] if [he] didn't have to.'  Montgomery did not see the shooting.

---

[12] *See* App 819-820 (Dkt. No. 597 at 1-2) (referencing Dkt. 314).

*Id.* (alterations in original) (citations omitted); *see also Carson*, 455 F.3d at 346-47, 360-61 (summarizing the Government's evidence of Smith's murder).

Relying primarily on Montgomery's testimony, and the lack of contrary evidence, the trial court found both that (A) Carson murdered Smith, "either alone or in conjunction with others," and that this "made [Smith] unavailable as a witness for the government"; and (B) because Coates, Martin, and Sweeney were co-conspirators in Smith's murder, Smith's out-of-court statements could be admitted against them as well. *See Carson*, 455 F.3d at 362 (alteration in original). In a pretrial order, the trial court granted the Government's motion to admit Smith's out-of-court statements, "subject to the condition that the government disclose any and all evidence in its possession which may impeach the out-of-court statements of Smith . . . or may indicate that persons other than defendants attempted to or had reason to murder Smith."[13] Despite this clear direction, the Government did not at that time (or at any other time until after the Defendants filed their § 2255 appeal brief) disclose the evidence that it would later reveal in the New Disclosures.

Butchie Smith's out-of-court statements were central evidence supporting the Government's conspiracy theory against all Defendants—including regarding the "drug things" and "drug matters" underlying the narcotics conspiracy that the Government in closing argument to the jury described as "the bread and butter" of the "group." App 239 (May 29, 2001 (PM) Tr. at 13); App 272 (June 26, 2001 (AM) Tr. at 37). For example, Special Agent Lisi testified that Smith told him about Sweeney's "sources of supply of marijuana," "how he got into selling marijuana," when "he had ventured into selling some heroin," and "how his drug operation worked," App 238 (May 29, 2001 (PM) Tr. at 12); App 242 (May 29, 2001 (PM) Tr. at 27); and Smith purportedly admitted to Special Agent Lisi that Smith himself at times "distributed

---

[13] App 796-797 (Dkt. No. 451 at 1-2); *see also* App 836-837 (Dkt. No. 597 at 18-19).

11

marijuana directly" to both William Sweeney and Sean Coates.  App 241 (May 29, 2001 (PM) Tr. at 26)).  Special Agent Lisi testified that, according to Smith, Sweeney had told Smith about his involvement in the triple murders in Temple Hills, Maryland; in the murder of Donnell "Robocop" Whitfield; and in a conspiracy to kill Kenneth Adams and to kidnap Anthony Pryor.  App 242-243 (May 29, 2001 (PM) Tr. at 28-29); App 248 (May 29, 2001 (PM) Tr. at 34); App 268-269 (June 26, 2001 (AM) Tr. at 25, 29); App 244-245 (May 29, 2001 (PM) Tr. at 30-31).  And because Smith was allowed to "testify" through Special Agent Lisi, Defendants had no opportunity to cross-examine him and thus no meaningful ability to challenge the veracity of the statements relayed by Special Agent Lisi to the trial court and the jury.

### B.    Defendants Continued to Diligently Seek Exculpatory Material About Butchie Smith's Murder on Direct Appeal.

On direct appeal, Defendants continued to seek undisclosed *Brady* materials and specifically challenged the trial court's admission of Butchie Smith's out-of-court statements.[14] The court of appeals affirmed the trial court's ruling granting admission of Smith's out-of-court statements, holding that "[a]mple evidence" supported the trial court's factual findings about Smith's murder.  *See Carson*, 455 F.3d at 363.  In the absence of any contrary testimony and without the opportunity for impeachment or presentation of alternative theories that would have been available with the New Disclosures and other *Brady* material withheld by the Government,

---

[14] *See, e.g.*, Order, *United States v. Carson*, No. 02-3015 (D.C. Cir. Oct. 2, 2002) (per curiam order denying Defendants-Appellants' motion to allow counsel to review sealed portions of the trial record); *see also* Br. of Appellants Sweeney, Carson, Coates, Martin & Hill, *United States v. Carson*, No. 02-3015, at 33 (Defendants-Appellants challenged the district court's admission of Smith's hearsay statements as violative of Defendants-Appellants' Confrontation Clause rights) (D.C. Cir. Apr. 25, 2005), *available at* 2005 WL 1410177; Reply Br. of Appellants Sweeney, Carson, Coates, Martin & Hill, *United States v. Carson*, No. 02-3015 (D.C. Cir. July 6, 2005), *available at* 2005 WL 1848162; Dkt. Nos. 1088, 1094.

the court of appeals credited the following evidence of Carson's alleged involvement in Smith's

murder:

> Montgomery testified at length about his and Carson's activities leading up to Smith's murder; their motive for killing Smith; their ongoing hunt for him; their failed opportunities; Carson's use of Montgomery's car just before Smith's murder; Carson's return after the murder; his acknowledgment of Smith's murder and his assurance that they were 'all right'; his instruction to Montgomery not to drive near the murder scene; and Montgomery's understanding that Carson meant that, if he did drive near the scene, observers might identify the car in relation to the murder.

*Id.*; *see also id.* at 346-47.  The court of appeals also affirmed the trial court's ruling that Coates,

Martin, and Sweeney were co-conspirators in Smith's murder because, even though there was "no

direct evidence of an explicit agreement to kill adverse witnesses," "[t]he evidence was more than

sufficient to infer the existence of such an agreement and to conclude that Smith's murder was in

furtherance of the conspiracy and reasonably foreseeable." *Id.* at 364.  Accordingly, the court of

appeals upheld the trial court's ruling that Defendants had forfeited any rights they had by causing

Butchie Smith's unavailability, so Smith's out-of-court statements were properly admitted against

them without running afoul of the Confrontation Clause.  *See id.* at 360-67.

> **C.**    **Defendants for the First Time Received Access to Some *Brady* Material During Habeas Proceedings and Continued to Diligently Pursue Additional Exculpatory Material About Butchie Smith's Murder.**

On February 15, 2008, this Court ordered the unsealing of *Brady* materials that were sealed

during the initial trial, including an April 2, 1999 *ex parte* notice that stated:  "Investigation of [the

Butchie Smith] murder has identified Andre Chappell[e] and Anthony Ricardo Hawkins, a known

associate of Samuel Carson, as having murdered Smith."  App 1091 (Dkt. No. 1143-1 at 12).[15]

---

[15] Although the material was ordered unsealed on February 15, 2008, Defendants and their counsel were unable to obtain prompt access to the materials; indeed, the clerk's office was unable to locate and turn over the material until June 17, 2010.  *See* App 1595 (Dkt. No. 1280-1).

Prior to the unsealing of this document, Defendants were unaware that the Government had identified other suspects in Smith's murder, and in fact had been told precisely the opposite—despite having repeatedly specifically requested any such materials, and despite the trial court's clear directive that the Government provide any such materials. *See supra* pp. 8-10. And while the Government asserted in the undisclosed *ex parte* notice that Hawkins was a "known associate" of Carson (*see* App 1091 (Dkt. No. 1143-1 at 12)), it produced no evidence to that effect.

Following these disclosures, Defendants continued to diligently seek undisclosed *Brady* material throughout their habeas proceedings.[16] These diligent requests included explicit requests for exculpatory information about Robert "Butchie" Smith's murder. For example, on June 16, 2017, Sweeney expressly requested "any and all files containing information about Andre Chappell[e] and Anthony Ricardo Hawkins, relating to the murder of Robert Smith," and requested this court conduct a full evidentiary hearing on the issue.[17] On November 9, 2019, Sweeney filed a motion for discovery seeking materials from the Government relating to Smith's murder.[18] As additional *Brady* material was disclosed, Defendants filed supplemental motions to incorporate that material.[19] But none of the additional *Brady* material shed any additional light on how Chappelle and Hawkins had been identified as suspects in Smith's murder, or what evidence might support that lead.

---

[16] *See, e.g.*, App 1052 (Dkt. No. 1088) (Def. Carson's Mot. for Discovery) (Apr. 18, 2012); App 1059 (Dkt. No. 1094) (Def. Carson's Reply Mot. for Discovery) (July 12, 2012).

[17] *See* App 1241-1242 (Dkt. No. 1197 at 31-32 n.14) (Suppl. Mot. to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 & Incorporated Mem. of Facts & Law) (June 16, 2017).

[18] *See generally* App 1427 (Dkt. No. 1242) (Def., William K. Sweeney's Mot. for Discovery) (Nov. 9, 2019).

[19] *See supra* n.6.

**D.**      **The New Disclosures Made During Defendants' Appeal of This Court's § 2255 Decision Revealed Additional Exculpatory Material About Butchie Smith's Murder.**

Each of the New Disclosures revealed additional exculpatory evidence related to Butchie Smith's murder that is directly relevant to and reinforces Defendants' existing *Brady* claims. The April 11, 2025 and April 22, 2025 New Disclosures disclose a trove of materials relating to Clarence Gutrick's eyewitness account of Smith's shooting and, specifically, Gutrick's identification of Andre Chappelle as having shot and killed Smith with Anthony Hawkins at the scene. Together, these New Disclosures include: (1) a copy of the Grand Jury Testimony of Clarence Gutrick in re: Andre Chappelle, dated July 11, 1997; (2) a D.C. "Superior Court Search Warrant Affidavit"; (3) Notes of debriefing of Clarence Gutrick; (4) "Debriefing letter concerning Clarence Gutrick"; (5) "Notes of Gutrick interview"; and (6) "Officer notes."[20]

The New Disclosures reveal that Gutrick first expressed an interest in cooperating with the Government in its investigation into Smith's murder on July 2, 1997—around a week and a half after the shooting. *See* App 27 (Ex. B (4/22/2025 Disclosure Letter) attachment at 6). In that initial outreach, Gutrick's counsel conveyed that Gutrick "has the full name of the killer" and arranged a debriefing for July 7, 1997. App 27 (Ex. B (4/22/2025 Disclosure Letter) attachment at 6). When Gutrick was debriefed by D.C. law enforcement on July 7, 1997, he conveyed that he was out in the street when he saw two people, Andre Chappelle and Anthony Hawkins, shoot Smith. App 25 (Ex. B (4/22/2025 Disclosure Letter) attachment at 4). Gutrick told law enforcement that he did not see a car involved in the shooting. App 25-26 (Ex. B (4/22/2025 Disclosure Letter) attachment at 4-5). That same day, the following information was also provided

---

[20] *See* App 3 (Ex. A (4/11/2025 Disclosure Letter) at 2); App 20-21 (Ex. B (4/22/2025 Disclosure Letter) at 1-2).

to Special Agent Lisi by an unidentified witness (WF-15807-SI-C): "Andre Chappelle has a close associate named 'Tony', but the source does not know his last name. Within the past month, Andre shot with a shotgun and killed a young male near Martin Luther King Ave., SE. 'Nate', which is short of Nathaniel, and Mike were witnesses to the murder." App 36 (Ex. B (4/22/2025 Disclosure Letter) attachment 3 at 4).[21]

On July 9, 1997, the lead prosecutor in Defendants' trial met with Gutrick. *See* App 25-26 (Ex. B attachment at 4-5); App 38 (Ex. B attachment 3 at 6). During that meeting, Gutrick described the shooting in detail and unambiguously identified Chappelle and Hawkins as the two subjects responsible for Robert "Butchie" Smith's murder. *See* App 25 (Ex. B (4/22/2025 Disclosure Letter) attachment at 4) (Gutrick "saw two people, Andre Chappelle and Anthony Hawkins, shoot 'Butch'"); *id.* (Gutrick "saw Chappelle and Hawkins run up and shoot Butch w/ only Chapelle shooting"); App 38 (Ex. B (4/22/2025 Disclosure Letter) attachment 3 at 6) ("On the evening of July 9, 1997, . . . [t]he co-operator told Wagner the identities of the gunmen and the circumstances of the shooting of SMITH as observed by said co-operator. The co-operator identified two subjects one as ANDRE' CHAPPELLE and the other as ANTHONY HAWKINS . . . ."). The prosecutor met with Gutrick again on July 11, 1997, when Gutrick again detailed the

---

[21] Given the context of the New Disclosures, Defendants understand this information to be referring to Smith's murder and the "source" to be Gutrick. *See* App 2 (Ex. A (4/11/2025 Disclosure Letter) at 1) (describing the April 11, 2025 New Disclosure as providing "further information related to the Government's pretrial representation that it had suspected Andre Chappelle and Anthony Hawkins of murdering Robert 'Butchie' Smith"); App 20 (Ex. B (4/22/2025 Disclosure Letter) at 1) (describing the April 22, 2025 New Disclosure as providing "additional information related to the identification of Andre Chappelle and Anthony Hawkins as suspects in the murder of Robert 'Butchie' Smith"). Defendants further understand that "Mike" likely refers to Michael Farrar, another previously undisclosed eyewitness of Smith's murder who was the primary subject of the May 7, 2025 New Disclosure and who also identified Chappelle as the shooter. *See infra* pp. 19-20.

16

homicide and again "made two positive identifications of HAWKINS and CHAPPELLE as the individuals he saw participate in the shooting death of ROBERT SMITH." *Id.*

Thereafter, on July 11, 1997, Gutrick testified before a grand jury and provided sworn testimony consistent with his prior debriefings. *See generally* App 4-17 (Ex. A (4/11/2025 Disclosure Letter), Gutrick GJ Tr.). During the prosecutor's examination, Gutrick testified under oath that, on June 16, 1997, he personally witnessed the shooting of Robert "Butchie" Smith. *See* App 6 (Gutrick GJ Tr. at 3:8-12); App 7-12 (Gutrick GJ Tr. at 4:13-9:13). Gutrick told the grand jury that he saw two unmasked men running across the street, toward Smith, and immediately recognized one of the men as Andre Chappelle. App 9 (Gutrick GJ Tr. at 6:8-23); *see also* App 10-11 (Gutrick GJ Tr. at 7:1-8:4). Gutrick testified that he saw Chappelle pull out a black semi-automatic gun from his waist and begin shooting toward Smith. App 11 (Gutrick GJ Tr. at 8:11-24). He said: "I saw Butchie get shot. He fell, and I saw the guy Andre [Chappelle] standing over top of him, he finished shooting." App 12 (Gutrick GJ Tr. at 9:5-9). Gutrick recalled that Chappelle fired "about five or more" shots. App 12 (Gutrick GJ Tr. at 9:10-13). Gutrick said the other man with Chappelle did not have a gun and that, after Chappelle finished shooting, the two men ran back through the alley. App 12 (Gutrick GJ Tr. at 9:14-21); *see also* App 25 (Ex. B attachment at 4). While Gutrick did not know or recognize the second man at the time of the shooting, he later was able to identify that man as Anthony Hawkins after they got locked up in the same jail. *See* App 11 (Gutrick GJ Tr. at 8:5-10); App 13 (Gutrick GJ Tr. at 10:5-20). Gutrick expressed unqualified confidence in his identification of Hawkins:

> Q:    And when you first saw him, what did you think?
>
> A:    That was the guy that was with Andre Chappelle.
>
> Q:    Any doubt in your mind?
>
> A:    No.

17

App 13 (Gutrick GJ Tr. at 10:17-20).  Gutrick also testified that, while in the basketball area of the jail one day, he overheard Hawkins talking to other people about the shooting and heard Hawkins say, "My man got his ass," which Gutrick understood to be a reference to Chappelle's shooting of Smith.  App 14-15 (Gutrick GJ Tr. at 11:9-12:10).  None of this grand jury testimony had previously been disclosed to the Defendants.  *See supra* n.4.

Based upon Gutrick's eyewitness testimony and information from another cooperating individual about Chappelle's possession of the same type of firearm identified by Gutrick as the weapon used in the shooting (*i.e.*, a black semi-automatic handgun), law enforcement obtained a search warrant on what they believed to be Chappelle's residence.  *See* App 22 (Ex. B attachment at 1); *see also* App 33-35 (Ex. B attachment 3 at 1-3).  The search warrant was executed on the address provided by the FBI informant ("318**8** 15th Pl., S.E."), but law enforcement then learned that the informant had given the wrong address and Chappelle's correct address was "318**6** 15th Pl. S.E."  App 24 (Ex. B (4/22/2025 Disclosure Letter) attachment at 3) (emphasis added).  It is unclear whether a new search warrant for the correct address was ever issued and, if so, what the results were or whether the apparent gun used in Smith's murder was located.  Information on this warrant had not previously been disclosed to the Defendants.  *See supra* n.4.

The "Officer notes" provided as part of the April 22, 2025 New Disclosure include "police officer notes mentioning Petey Johnson in relation to the Smith shooting."  App 21 (Ex. B (4/22/2025 Disclosure Letter) at 2).  The notes state that an unidentified caller told Detective Robbie Saunders of the First District that Smith was with Petey and Jason Johnson all weekend: "The caller thinks that they might . . . have some involvement in the case.  This 'Petey' and Jason Johnson were w/ the Dec [*i.e.*, Butchie Smith] all week and weekend until the shooting."  App 40-

18

41 (Ex. B (4/22/2025 Disclosure Letter) attachment 3 at 8-9).[22]  This information on Petey Johnson

had not previously been disclosed to the Defendants.  *See supra* n.4.

The May 7, 2025 New Disclosure provided, as the Government conceded, "additional

information related to the identification of Andre Chappelle as a suspect in the murder of Robert

'Butchie' Smith."  App 43 (Ex. C (5/7/2025 Disclosure Letter) at 1).  The Government's letter

states that there is "information in the government's file indicating that another witness, Michael

Farrar," also "identified Chappelle as the shooter."  *Id.*  Specifically, "Farrar claimed that he

witnessed the shooting from a block away" and "initially told law enforcement that he observed

two men participate in the shooting, though only one (Chappelle) had a gun," and "Farrar selected

Chappelle's photo from a photo array."  App 43-44 (Ex. C (5/7/2025 Disclosure Letter) at 1-2).

The May 7, 2025 New Disclosure stated in conclusory fashion, however that, "[s]hortly before

trial . . . Farrar told prosecutors that the shooter was actually Sam Carson" and "explained that he

did not initially identify Carson because Carson, with whom Farrar was incarcerated at the D.C.

Jail, told Farrar that he 'better keep his mouth shut' about what he had seen," and that "Farrar died

at the D.C. Jail in 2004."  App 44 (Ex. C (5/7/2025 Disclosure Letter) at 2).  During trial, however,

Special Agent Lisi expressly represented to Defendants and the trial court that he never interviewed

Farrar about Smith's murder.  *See* App 258 (May 30, 2001 (AM) Tr. at 19) ("I will tell you right

now, I never after 'Butchie's' murder, picked up Michael Farrar and interviewed him.").  Since

Farrar has been dead since 2004, the Government's failure to disclose this information has

permanently deprived Defendants of the opportunity to follow up on it with him, and it appears

---

[22] Notably, these notes appear to refer to the same Petey Johnson (also known as "Fat Petey") who
Defendants contend had motive to kill Smith and was in fact rumored to have killed Smith, as
memorialized in a collection of interview notes with government informant Andre Murray that
was not disclosed to Defendants until after June 2010.  *See* App 1075 (Dkt. No. 1142-2).

19

that the Government's decision to deprive the Defendants of this opportunity was a conscious choice.

In a March 10, 2026 letter, the Government expanded on the New Disclosures as to Mr. Farrar, quoting from internal memoranda that made clear both that Farrar had been consistent up until the eve of trial with his statements that Chappelle had killed Smith, but also that the Government made a conscious decision not to reveal this contrary evidence to the Defendants. According to the Government now, an AUSA had written in an undated internal departure request memorandum for Michael Farrar the following:

> During a witness conference with Farrar shortly before trial, Farrar threw us a curveball.  While telling us about Butchie's murder, he stated that the shooter was not Andre Chappell[e] – as he had maintained all along – but was actually Sam Carson. . . . We never knew quite what to make of Farrar's about-face.  While his later version of events was obviously more "helpful" to our case, we had serious doubts as to its veracity.  Particularly since another witness (Gutrick) had previously corroborated Farrar when Farrar was pointing the finger at Andre Chappelle.  Because of these doubts, **and because of the impeachment material we would have had to turn over had we called Farrar as a witness**, we decided not to call him at during [sic] the trial.

App 47 (Ex. D (3/10/2026 Disclosure Letter) at 2) (quoting an undated, internal departure request memorandum (for Michael Farrar), by AUSA Anjali Chaturvedi) (emphasis added).  Even though Farrar was prepared to provide testimony "helpful" to their case against Defendants, the Government decided not to call him so that they could attempt to bury the exculpatory testimony he and Gutrick had previously provided – exculpatory evidence that the Government did not begin to disclose until 2025.

## IV.    LEGAL STANDARDS

The Supreme Court's landmark *Brady* decision established that fundamental due process requires prosecutors to disclose evidence favorable to the defense and material to a criminal

defendant's guilt or punishment. *See Brady*, 373 U.S. at 87. Evidence is "favorable to the defense" if it is either exculpatory (*i.e.*, directly pointing to innocence) or impeaching (*i.e.*, undermining the credibility of prosecution witnesses), *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), and is "material" if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Turner v. United States*, 582 U.S. 313, 324 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)).

With respect to materiality, the question is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. "In other words, the undisclosed evidence must raise a 'probability sufficient to undermine confidence in the outcome.'" *United States v. Robinson*, 68 F.4th 1340, 1348 (D.C. Cir. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("To prevail on [a] *Brady* claim, [a claimant] . . . must show only that the new evidence is sufficient to 'undermine confidence' in the verdict.") (citation omitted). The "reasonable probability" standard "is not a particularly demanding one." *Robinson*, 68 F.4th at 1348. A "'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). "This somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal." *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005) (citations omitted); *see also, e.g.*, *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) ("[O]ur focus is on the 'potential impact that the undisclosed evidence might have had on the fairness of the proceedings' rather than on the overall strength of the government's case.").

21

"Thus, the law makes it easier for [habeas petitioners] to obtain a new trial where the government has engineered an unfair trial by withholding material exculpatory [or impeachment] evidence." *Conley*, 415 F.3d at 188 (alterations in original) (citation omitted).

In addition, the materiality of suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. "More specifically, 'the effect of each nondisclosure must not only be considered alone, for the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently "material" to justify a new trial.'" *United States v. Lloyd*, 71 F.3d 408, 412 (D.C. Cir. 1995) (citation omitted). This means that, for example, "[i]f the prosecution fail[ed] to turn over two pieces of impeachment evidence" and "an error-by-error approach might find no *Brady* violation in either case because for each scenario the evidence as a whole—including the evidence left unimpeached because of the other alleged violation—would be enough to sustain the conviction," "the synergistic force of the omitted evidence considered together might well generate a reasonable probability of altering the evidentiary balance"—*i.e.*, a "cumulative impact that could alter the prejudicial effect of the prosecution's substantial missteps." *United States v. Straker*, 800 F.3d 570, 608 (D.C. Cir. 2015) (per curiam); *see also, e.g.*, *Smith v. Sec'y, Dep't. of Corr.*, 572 F.3d 1327, 1347 (11th Cir. 2009) ("Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part.").

To be clear, materiality "is not a sufficiency of the evidence test" and a defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35; *see also id.* at 435 ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably

22

be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

Accordingly, "the amount of additional evidence indicating guilt is not dispositive," and the

inquiry instead "focuses . . . on the potential impact the undisclosed evidence might have had on

the fairness of the proceedings"—for example, "whether the undisclosed information could have

substantially affected the efforts of defense counsel to impeach the witness, thereby calling into

question the fairness of the ultimate verdict." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir.

1996); *see also, e.g.*, *United States v. Ausby*, 916 F.3d 1089, 1092-93 (D.C. Cir. 2019) (per curiam)

("The 'reasonable likelihood' standard does not require the defendant to show 'that he "more likely

than not" would have been acquitted' absent the false statements. Rather, the defendant need show

only that the false testimony '"undermine[s] confidence" in the verdict.'") (citations omitted);

*Cuffie*, 80 F.3d at 518 ("Although the remaining evidence standing alone would have been

sufficient to convict, the *Brady* materiality inquiry is not an assessment of the sufficiency of the

evidence. Rather, the court has emphasized that 'the amount of additional evidence indicating

guilt is not dispositive of our inquiry.'") (citations omitted).[23]

     As the D.C. Circuit summarized in the related context of alleged violations of *Giglio v.*

*United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), involving the

government's knowing presentation of false or misleading evidence against a criminal defendant,

which is subject to the same "reasonable likelihood" standard for materiality:

> That "'reasonable likelihood' standard does not require the
> defendant to show 'that he more likely than not would have been
> acquitted' absent the false statements. Rather, the defendant need

---

[23] Conversely, "[t]o uphold a verdict in light of a *Brady* violation, the evidence must be sufficient to show that there is no reasonable probability that the verdict would have been different." *Robinson*, 68 F.4th at 1348 (citing *Bagley*, 473 U.S. at 682). Such a verdict cannot be sustained if there is a reasonable probability that the undisclosed evidence would have caused "even one juror" to "harbor[] a reasonable doubt as to the defendant's guilt on any count." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

show only that the false testimony 'undermines confidence' in the verdict. Thus, even if the false testimony '*may* not have affected the jury's verdict,' it is material if the evidence reasonably *could* have affected the verdict."

So understood, the "reasonable likelihood" test "is quite easily satisfied." The standard is "strict" against the government, "not just because [the cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Indeed, we have described the reasonable-likelihood standard as establishing "a veritable hair trigger for setting aside the conviction," and as "mandat[ing] a virtual automatic reversal of a criminal conviction."

*United States v. Butler*, 955 F.3d 1052, 1058 (D.C. Cir. 2020) (emphases in original) (citations omitted).[24] Applying these standards, courts across the country regularly grant habeas relief based on *Brady*/*Giglio* or *Napue* violations (even under the more stringent standards for habeas petitions arising under 28 U.S.C. § 2254). *See, e.g.*, *Ausby*, 916 F.3d at 1092-95 (granting § 2255 habeas relief on *Napue* claim based on testimony that "the government knew or should have known" was "false or misleading" at the time of trial); *Dennis v. Sec'y, Pa. Dept. of Corrs.*, 834 F.3d 263, 269, 308-13 (3d Cir. 2016) (en banc) (affirming district court's order granting § 2254 habeas relief based on the "cumulative prejudice" and "cumulative impeachment value" of three pieces of suppressed evidence that "would have given defense counsel unique ability to discredit the Commonwealth's primary witnesses, bolster his alibi defense . . . , highlight the shoddiness of the Commonwealth's investigation, and perhaps point to another perpetrator"); *Fuentes v. T. Griffin*, 829 F.3d 233, 245-53 (2d Cir. 2016) (granting § 2254 habeas relief based on suppressed impeachment evidence that "would have . . . both provided a basis for questioning [a prosecution

---

[24] In *Giglio*, the Supreme Court made clear that the nondisclosure of evidence that would impeach the credibility of a key witness "falls within [the general *Brady*] rule." 405 U.S. at 154. "A *Napue* violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false." *Straker*, 800 F.3d at 603 (citations omitted).

24

witness's] credibility and provided further support for [defendant]'s version of the events");
*Mahler v. Kaylo*, 537 F.3d 494, 496, 499-504 (5th Cir. 2008) (granting § 2254 habeas relief because government violated its *Brady* obligations by suppressing "pretrial witness statements that either contradicted or were inconsistent with" prosecution witnesses' trial testimony on central issue); *Monroe v. Angelone*, 323 F.3d 286, 298-317 (4th Cir. 2003) (granting § 2254 habeas relief based on suppressed exculpatory material that, considered collectively, "would have significantly impaired the credibility of . . . a key prosecution witness"); *Smith v. Sec'y of N.M. Dept. of Corrs.*, 50 F.3d 801, 834-35 (10th Cir. 1995) (granting § 2254 habeas relief on *Brady* claim because nondisclosure of evidence implicating another suspect "altered and affected [the defendant]'s preparation and presentation of his defense at trial" and "the cumulative effect of the prosecution's nondisclosures undermines our confidence in the outcome of the trial"); *Miller v. Angliker*, 848 F.2d 1312, 1321-24 (2d Cir. 1988) (granting § 2254 habeas relief on *Brady* claim based on withheld evidence from a related investigation, which "suggested that the murders might have been committed by" another suspect, because "the withheld information is sufficient to undermine confidence in the outcome").[25]

---

[25] *See also, e.g.*, *Wilson v. Beard*, 589 F.3d 651, 659-67 (3d Cir. 2009) (affirming district court's order granting § 2254 relief on *Brady* claim based on "the significant impeachment value of the undisclosed information"); *Conley*, 415 F.3d at 189-94 (affirming district court's order granting § 2255 petition based on government's suppression of impeachment evidence that raised "serious doubts about the reliability of a trial infested with constitutional error") (quoting *Wood v. Batholomew*, 516 U.S. 1, 8 (1995)); *Killian v. Poole*, 282 F.3d 1204, 1208-12 (9th Cir. 2002) (granting § 2254 habeas relief based on perjurious statements of key prosecution witness); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555-62 (4th Cir. 1999) (affirming district court's order granting § 2254 petition based on nondisclosure of material impeachment evidence).

## V.      ARGUMENT

### A.      Defendants' Supplemental § 2255 Motion Is Timely and Procedurally Proper.

Under Federal Rule of Civil Procedure 15(d), pleadings may be supplemented "on just terms" to put forth "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Defendants' supplemental § 2255 motion is based on facts revealed in the New Disclosures that update and further reinforce Defendants' original § 2255 motions and amendments.[26]  In these circumstances, supplementation is proper— and, indeed, necessary—to ensure that both this Court and the D.C. Circuit are able to properly assess Defendants' *Brady* claims, which "must be evaluated in the context of the entire record," *United States v. Bagcho*, 151 F.Supp.3d 60, 73 (D.D.C. 2015) (quoting *Agurs*, 427 U.S. at 112), based upon "the cumulative effect" of all "suppressed evidence considered collectively, not item by item," *Kyles*, 514 U.S. at 436-37.  *See, e.g.*, *Lloyd*, 71 F.3d at 413 (granting new trial based on undisclosed *Brady* evidence, noting that courts "must construe the undisclosed evidence . . . 'collectively, not item-by-item,'" and holding that "the combined weight of the materiality exculpatory evidence contained in the undisclosed [material] merits a new trial") (quoting *Kyles*, 514 U.S. at 436).  Indeed, the court of appeals remanded the record to this Court with the specific

---

[26] As noted, Defendants recognize that this Court noted that Defendants' prior "supplements" to their initial § 2255 motions were "better understood as amendments." *See supra* n.7 (citing *Martin I*, 2021 WL 4989983, at *1 & n.1).  Defendants have styled this filing as a supplement because the New Disclosures occurred "after the date of the pleading to be supplemented," Fed. R. Civ. P. 15(d), but, to the extent it too is better understood as an amendment (for example, because the underlying evidence was itself "in place *prior to* the filing of the original pleading," *Hicks*, 283 F.3d at 386 (emphasis in original)), Defendants maintain that amendment would be equally appropriate and proper for all the same reasons.  Moreover, as noted *supra* n.2, in an abundance of caution, Defendants have concurrently filed a new standalone § 2255 motion and, to the extent this Court concludes that this supplement is procedurally barred, Defendants request that the Court consider the contents of this submission as incorporated in the new standalone § 2255 motion and thus timely filed within the one-year statute of limitations.  *See* Defendants' Motion To Vacate, Set Aside, Or Correct Their Sentences Pursuant To 28 U.S.C. § 2255 (April 3, 2026).

direction that Defendants "present to the district court in the first instance arguments about the supplemental *Brady* disclosures made in April and May 2025 and for the district court to make factual findings concerning those disclosures." *See* Dkt. No. 1366.[27]

This Court previously concluded that certain of the Defendants' prior supplements to their § 2255 motions were either untimely or procedurally improper, *see Martin I*, 2021 WL 4989983, but no such argument can apply to the current filing. Defendants' supplemental motion is timely because this filing comes within one year of Defendants' receipt of the New Disclosures; and Defendants' claims are not procedurally barred because Defendants lacked the information contained in the New Disclosures on direct appeal.

By statute, § 2255 motions, including amendments and supplements thereto, are subject to a one-year statute of limitations beginning on the latest of: (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2255(f). In this instance, the one-year limitations period began on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* Because

---

[27] Even without a specific order directing such an exercise, courts permit supplementation where, as here, a defendant seeks to introduce newly discovered *Brady* material, even when the underlying § 2255 motion has already been decided and is pending appellate review. *See, e.g., Douglas v. Workman*, 560 F.3d 1156, 1187-89 (10th Cir. 2009) (permitting supplementation of newly discovered "impeachment evidence going to the credibility of the key witness").

Defendants did not receive the New Disclosures until April 11, 2025; April 22, 2025; and May 7, 2025, respectively (*see generally* App 2-45; Exs. A-C), this filing is timely.

Defendants' arguments are also not procedurally defaulted. A timely § 2255 motion may be considered procedurally defaulted only if the claim was not raised on direct appeal, and in that case not where the claimant can show (1) cause excusing the default and (2) prejudice resulting from the alleged error. *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008); *see McClesky v. Zant*, 499 U.S. 467, 493-94 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (explaining that, to establish cause, a defendant must demonstrate "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available). Here, Defendants' claims are procedurally proper because Defendants—due to no fault of their own but rather as a result of the Government's failure to disclose it as required—did not have access to the material revealed in the New Disclosures, and did not know or have reason to know of its existence, on direct appeal. This straightforward conclusion is consistent with the Court's prior holding as to Carson's amended § 2255 motion asserting a *Brady* claim resulting from his investigator's discovery of the payments and relocations made by the Government to Maryland triple-murder witnesses: "because Carson lacked this evidence on his direct appeal, the claim is not procedurally defaulted." *Martin I*, 2021 WL 4989983, at *7.

Despite Defendants' numerous requests and this Court's instructions, the Government withheld (either intentionally or inadvertently) exculpatory evidence regarding Butchie Smith's murder for decades, and Defendants reasonably relied on the Government's repeated representations that no such evidence existed. Criminal defendants and their counsel have a right to reasonably rely on the government's assurances that it has disclosed all exculpatory materials,

28

and defendants need not "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).[28] *United States v. Nelson* applied these principles in holding that, even if a criminal defendant "had a duty to exercise due diligence to find" a specific piece of additional *Brady* material (there, a specific e-mail), "his duty would have been extinguished by the government affirmatively representing that it had disclosed all" such evidence (there, all electronic communications between parties that would have included the e-mail at issue). 979 F.Supp.2d 123, 133-34 (D.D.C. 2013). "'When the prosecution represents that all such material has been disclosed[,]' it is reasonable for defense counsel to rely on the prosecution's representation"—*i.e.*, "defendants [do not have to] scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* (alterations in original) (quoting *Banks*, 540 U.S. at 695).[29]

Here, the Government repeatedly represented to Defendants, to the trial court, and to the court of appeals that it disclosed all relevant material. It did so both explicitly and implicitly via their actions by, among other things, submitting certain *Brady* material (but not the evidence now revealed in the New Disclosures) to the trial court under seal; disclosing additional *Brady* material throughout the course of the trial and on direct appeal; and, after opposing Defendants' requests for *Brady* material related to Smith's murder, not producing any such materials despite the trial

---

[28] *See also, e.g.*, *Strickler*, 527 U.S. at 289 ("In summary, petitioner has established cause for failing to raise a *Brady* claim prior to federal habeas because (a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the Commonwealth confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received 'everything known to the government.'").

[29] *See also, e.g.*, *Nelson*, 979 F.Supp.2d at 134 ("Here, the government represented that it disclosed to the defense a complete set of electronic communications between Nelson and Detective Palchak. Thus, it was reasonable for Nelson to rely on the government's representation and not conduct further investigation to discover any undisclosed communications.").

court's clear directive to do so. Defendants had to rely on the Government's representations. And, as explained in more detail below, Defendants suffered significant prejudice from the Government's failure to provide the evidence contained in the New Disclosures during trial. *See infra* Part V.B.

**B.     The Government's Evidentiary Suppression Undermines Confidence in Defendants' Trial.**

The New Disclosures revealed highly relevant evidence that reinforces Defendants' claims and—both independently and especially in combination with other suppressed evidence— warrants relief because the Government's repeated "'evidentiary suppression' undermines confidence in the outcome of [Defendants'] trial." *Kyles*, 514 U.S. at 434. Again, the question is *not* whether there was sufficient other evidence to convict, *id.* at 434-35; *Cuffie*, 80 F.3d at 518; *Smith*, 77 F.3d at 515; rather the Government must show that there is "no reasonable probability that the verdict would have been different"—*i.e.*, not "even one juror" might have "harbored a reasonable doubt" had the evidence been disclosed. *Robinson*, 68 F.4th at 1348 (citing *Bagley*, 473 U.S. at 682). The Government cannot come close to meeting this standard given the amount of *Brady* material withheld and its centrality to the defense of the case.

        1.     *The Government's suppression of the exculpatory material revealed in the New Disclosures compels relief for Carson and Sweeney because it directly undermines the jury's verdict on the RICO predicate act of Butchie Smith's murder.*

The evidence revealed in the New Disclosures, standing alone, is enough to undermine confidence in the jury's verdict as to both Carson and Sweeney on the RICO predicate act of Butchie Smith's murder (which was charged on the verdict form as "Racketeering Act 50").[30] At

---

[30] Unlike Carson and Sweeney, Coates and Martin were not specifically charged with the RICO predicate act of Butchie Smith's murder. *See* App 929-958 (Dkt. No. 810 (Verdict Form)). That said, as set forth above and explained in more detail below, the exculpatory evidence revealed in the New Disclosures, standing alone—and even more clearly when considered collectively with

trial, cooperating government witness James Montgomery testified that Carson was directly responsible for Smith's murder. Specifically, Montgomery testified that Carson and Sweeney grew concerned that Smith (who had been acting as an FBI informant at the time of his murder) was cooperating with federal authorities and that, after Sweeney disclosed during a jail visit from Carson that Sweeney had informed Smith about a murder, Carson responded to Montgomery that without Smith the police would not have a solid case, and that failing to "hit" Smith would likely lead to their arrests. *See* App 167-168 (March 14, 2001 (PM) Tr. at 8-9); App 225-226 (May 23, 2001 (PM) Tr. at 23-24).

Montgomery testified that he and Carson looked for Smith but were unable to carry out a shooting. App 226-229 (May 23, 2001 (PM) Tr. at 24-27). Montgomery continued that on June 16, 1997, he gave Carson his car keys, that Carson left without disclosing his destination, and that shortly thereafter Montgomery learned about a shooting on Half Street where Smith was killed. App 230 (May 23, 2001 (PM) Tr. at 28). But Montgomery did not see the shooting. *Martin I*, 2021 WL 4989983, at *12. Having tied Carson and Sweeney to the shooting exclusively through supposed conversations and surmise, Montgomery claimed at trial, "I said, you know them peoples got hit. He was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys" and said to stay away from the murder scene and "not to drive [his car] if [he] didn't have to." App 232-233 (May 23, 2001 (PM) Tr. at 30-31); *see also Martin I*, 2021 WL 4989983, at *12 (summarizing

additional suppressed evidence—warrants relief for all Defendants given the centrality of Butchie Smith's hearsay testimony to myriad charged offenses, including the overall narcotics conspiracy and other RICO predicate acts and charged counts. *See infra* Parts V.B.2-3.

Montgomery's testimony); *Carson*, 455 F.3d at 346-47, 360-61 (summarizing the Government's evidence of Smith's murder).

The evidence contained in the New Disclosures, however, identifies two men other than Defendants as having murdered Smith. The April 11, 2025 New Disclosure revealed testimony from eyewitness Gutrick who—examined by the lead prosecutor in Defendants' trial and testifying under oath before a grand jury—unmistakably identified Andre Chappelle as the shooter. *See* App 7-15 (Ex. A (4/11/2025 Disclosure Letter), Gutrick GJ Tr. at 4:13-12:10); *see also supra* pp.15-18. Gutrick's grand jury testimony also suggested that there were other potential eyewitnesses to Smith's murder (*i.e.*, Gutrick's friends, who were with him at the time). *See* App 8 (Gutrick GJ Tr. at 5:3-4); App 11-13 (Gutrick GJ Tr. at 8:25-10:4). The materials included with the April 22, 2025 New Disclosure further suggested that there were even more potential eyewitnesses who were involved in the events leading up to Smith's murder but were not previously disclosed to the defense (*i.e.*, Petey and Jason Johnson). *See* App 40-41 (Ex. B (4/22/2025 Disclosure Letter) attachment 3 at 8-9). And the May 7, 2025 New Disclosure indicates that eyewitness Farrar also initially identified Chappelle as Smith's shooter. App 43-44 (Ex. C (5/7/2025 Disclosure Letter) at 1-2).[31]

At no point did Montgomery testify that anyone other than Carson murdered Smith. He never mentioned Andre Chappelle or Anthony Hawkins as participants.[32] Further, the New

---

[31] To be sure, the Government's May 7, 2025 New Disclosure contends that Farrar later recanted and told prosecutors that Carson was actually the shooter. *See* App 44 (Ex. C (5/7/2025 Disclosure Letter) at 2); *supra* pp. 19-20. Regardless, Farrar's eyewitness account and identification of the shooter (whether Chappelle or Carson) should have been a point for the trial court and jury to consider.

[32] Nor was any testimony or other evidence presented that Chappelle and Hawkins acted with the knowledge of any of Defendants, much less at their behest.

Disclosures contradict certain factual bases underlying Montgomery's testimony, including the implication that Montgomery's car was used in committing the murder and that the murder would be committed without any eyewitnesses. According to the New Disclosures, Gutrick specifically told law enforcement that he did not see a car (App 25-26 (Ex. B (4/22/2025 Disclosure Letter) attachment at 4-5); and even the fact that there were multiple eyewitnesses to Smith's murder runs counter to "Montgomery's and Carson's desire to eliminate Butchie Smith without anyone watching." *See Carson*, 455 F.3d at 363.

The Government's failure to disclose this evidence not only prevented Defendants from presenting it at trial, but also prevented Defendants from engaging in their own investigation of the allegations in order to more fully develop their case—*e.g.*, interviewing the multiple eyewitnesses and persons with knowledge identified in the New Disclosures, or following up on the outcome of the search warrant of Chappelle's home for the apparent gun used in the shooting.

If Defendants had been able to put forward evidence of multiple eyewitnesses identifying persons other than Defendants as the true shooters and otherwise undermining Montgomery's testimony about Smith's murder, there is, at the very least, a reasonable probability that at least one juror would have harbored reasonable doubt that the Government proved "Racketeering Act 50" ("Conspiracy to commit murder of Robert Smith, a/k/a 'Butchie,' between in or about April 1997 and on or about June 17, 1997") as to Carson or Sweeney. App 942 (Dkt. No. 810 at 22); *see also* App 894 (Dkt. No. 760 at 53). And, as discussed further *infra* Parts V.B.2-3, the New Disclosures had a cascading effect on the entirety of the trial and the various other offenses for which all Defendants were convicted.

2.   *The Government's suppression of the exculpatory material revealed in the New Disclosures warrants relief for all Defendants because it reasonably could have affected a pivotal evidentiary ruling with cascading effects across myriad charged offenses and undermines the credibility and testimony of key prosecution witnesses.*

The New Disclosures affect far more than just a single predicate act. As discussed, one of the more contentious issues at trial was the admissibility of numerous out-of-court statements that Smith supposedly had made to Special Agent Lisi before his murder. These out-of-court statements would have been inadmissible hearsay (and also would have violated Defendants' Sixth Amendment rights to confront Smith) but for the trial court's ruling that Carson, "either alone or in conjunction with others," murdered Smith and that Coates, Martin, and Sweeney also were co-conspirators in Smith's murder. *See Carson*, 455 F.3d at 362; *see also supra* p. 11. The trial court's finding that all Defendants (either directly or indirectly through their participation in the conspiracy) were responsible for Smith's murder—and, thus, "caused" Smith's unavailability at trial—led the trial court to permit Smith's otherwise-hearsay out-of-court statements into evidence against the Defendants and excuse any Confrontation Clause issues with Smith's testimony. *See supra* p. 11. As a result of the trial court's ruling on the admissibility of Smith's out-of-court statements, Special Agent Lisi was permitted to recount Smith's hearsay testimony implicating Defendants in multiple crimes underpinning the Government's conspiracy theory and charged offenses. *See supra* pp. 11-12. The D.C. Circuit affirmed this ruling on direct appeal. *See Carson*, 455 F.3d at 360-67; *see also supra* p. 13.

The evidence revealed in the New Disclosures goes directly to this pivotal evidentiary ruling.[33] If the Government had properly disclosed to the defense that it had credible evidence

---

[33] *See United States v. Rivera*, 412 F.3d 562, 568 n.6 (4th Cir. 2005) (holding the government's burden to provide the defense with exculpatory evidence pursuant to *Brady* applies to a Rule 804(b)(6) hearing).

that Smith was not murdered by Defendants but by others (*i.e.*, Chappelle with Hawkins), given the absence of any evidence that Chappelle or Hawkins were acting in concert with Defendants, the trial court would not have found that Defendants caused Smith's unavailability and, thus, would have concluded that Smith's statements were inadmissible hearsay and could not be used against Defendants at trial.  This alternative outcome is particularly plausible given the obvious relevance and objective strength of the evidence, which includes sworn testimony from an eyewitness who was examined before a grand jury by the lead prosecutor in Defendants' trial and unequivocally identified Chappelle as the person who shot and killed Smith and both Chappelle and Hawkins as those responsible for Smith's murder.  *See* App 7-15 (Ex. A (4/11/2025 Disclosure Letter), Gutrick GJ Tr. at 4:13-12:10); *see also supra* Part III.D.

Gutrick's grand jury testimony was consistent with his prior statements to law enforcement (*see supra* pp. 15-18), and further corroborated and strengthened by Farrar's independent identification of Chappelle as the shooter.  *See* App 43-44 (Ex. C (5/7/2025 Disclosure Letter) at 1-2).  Even though Farrar supposedly later recanted and instead identified Carson as the shooter (*see* App 44 (Ex. C (5/7/2025 Disclosure Letter) at 2)), it was apparently not until "shortly before trial" – presumably long after certain of the representations the Government had made to the trial court disclaiming knowledge of any exculpatory evidence regarding the Butchie Smith murder. And regardless of his supposed later recantation (App 47 (Ex. D (3/10/2026 Disclosure Letter) at 2)), Farrar's initial identification of Chappelle and the Government's "serious doubts as to [the] veracity" of Farrar's recantation and subsequent version of events (*Id.*) "is undoubtedly the sort of favorable evidence contemplated by *Brady*."  *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019); *see also, e.g.*, *Juniper v. Zook*, 876 F.3d 551, 565 (4th Cir. 2017) ("[A]n eyewitness account pointing to a different suspect undoubtedly constitutes exculpatory material.") (citation omitted).

"[E]ven where a witness positively identified the accused out of court but recants at trial, the prior identification is admissible and available for the jury to consider." *United States v. Clay*, 165 F.3d 33 (Table) (7th Cir. 1998) (citing to *United States v. O'Malley*, 796 F.2d 891, 898-99 (7th Cir. 1986)). By revealing significant evidence that points to others being responsible for Smith's murder, the New Disclosures also contradicted Montgomery's testimony, which provided the "key" link between Defendants and Smith's murder. *See Martin I*, 2021 WL 4989983, at *12.

Had the evidence from the New Disclosures been made available to the defense at the time of trial, there is more than a reasonable likelihood that Smith's out-of-court statements would never have been allowed into evidence. This would have affected not only the predicate act directly related to Smith's murder (*see supra* Part V.B.1), but also many of the other charged offenses—including the narcotics conspiracy and related counts—that relied on Smith's out-of-court statements as evidence.

For example, Smith's statements, as presented in court through Special Agent Lisi, included information about Defendants' alleged narcotics activities in Southwest D.C., which the Government in closing argument to the jury described as "the bread and butter" of the "group." App 272 (June 26, 2001 (AM) Tr. at 37). Special Agent Lisi testified that Smith had told him details about Sweeney's "sources of supply of marijuana," "how he got into selling marijuana," when "he had ventured into selling some heroin," and "how his drug operation worked" (App 238-239 (May 29, 2001 (PM) Tr. at 12-13)), and that Smith himself admitted to having "distributed marijuana directly" to both William Sweeney and Sean Coates (App 241 (May 29, 2001 (PM) Tr. at 26)). Based in part on this evidence, which could not be effectively cross-examined because it was hearsay testimony, all Defendants were convicted of narcotics conspiracy, RICO predicate

acts involving narcotics that supported their convictions for RICO conspiracy, and other narcotics-related counts.  App 921-958 (Dkt 810).

Special Agent Lisi also provided extensive testimony regarding information about violent crimes said to have been committed by Defendants that Smith supposedly learned about from Sweeney, including statements about the shooting of Michael Jones (*see* App 243-244 (May 29, 2001 (PM) Tr. at 29-30); *see also* App 268 (June 26, 2001 (AM) Tr. at 25)); the attempts to find and kill Kenneth Adams (*see* App 245-246 (May 29, 2001 (PM) Tr. at 31-32); *see also* App 268 (June 26, 2001 (AM) Tr. at 25)); the kidnapping and shooting of Anthony Pryor (*see* App 247-248 (May 29, 2001 (PM) Tr. at 33-34); *see also* App 268 (June 26, 2001 (AM) Tr. at 25)); the murder of Donnell "Robocop" Whitfield (*see* App 248-249 (May 29, 2001 (PM) Tr. at 34-35); *see also* App 268 (June 26, 2001 (AM) Tr. at 25)); and the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson (*see* App 250-254 (May 29, 2001 (PM) Tr. at 38-43); *see also* App 268 (June 26, 2001 (AM) Tr. at 25)).  Smith's statements were particularly critical for the Maryland triple-murder offense, for which the Government relied on Smith's hearsay testimony, as relayed through Special Agent Lisi, and the testimony of cooperating government witness Montgomery, who Defendants were unable to properly cross-examine and impeach as a result of withheld *Brady* evidence.  Indeed, without the supposed "corroboration" of Montgomery's testimony implicating Sweeney in the triple murders by Smith's hearsay, the jury could not have found Sweeney responsible for those murders because, under Maryland law, the uncorroborated testimony of an accomplice was insufficient for a murder conviction.  *See Brown v. State*, 281 Md. 241, 378 A.2d 1104, 1107 (1977), *abrogated by State v. Jones*, 466 Md. 242, 216 A.3d 907 (2019).

Moreover, as a direct result of the trial court's finding that Defendants were responsible for causing Smith's unavailability, Defendants were prevented from entering into evidence

37

Butchie Smith's out-of-court statement (made to Butchie Smith's uncle, Wesley Smith) implicating Butchie Smith himself in the Maryland triple murders, thus further undermining Defendants' ability to properly put forth their defense. *See Martin I*, 2021 WL 4989983, at *15 ("Because the trial court found probable cause to believe that Sweeney had murdered Robert Smith, it held that Sweeney could not use any out-of-court statements by Smith at trial.").

To be sure, the Government presented other evidence – not directly implicated by this *Brady* material – in support of many of these charges. But the hearsay testimony of Butchie Smith (and testimony regarding his murder) was unquestionably some of the most salacious and damning evidence against Defendants, which is precisely why the Government referenced it repeatedly during its closing arguments.[34]

---

[34] *See* App 267a (June 26, 2001 (AM) Tr. at 24:10-18) ("Because of them, you did not see Robert 'Butchie' Smith walk in that door and testify on that witness stand. So as I talk to you during the course of this trial…and I remind you what Robert Smith would have said, please pause and reflect on the fact that the reason you didn't hear from them yourselves is because the K Street Crew murdered them."); App 268 (June 26, 2001 (AM) Tr. at 25:1-19) ("If Robert Smith had been permitted to testify – if he had not been murdered, he would have told you about a lot of things that his nephew, William Sweeney, 'Draper,' told him. Robert Smith could have come into this courtroom and he would have told you that his nephew, 'Draper,' confessed to him that Draper was responsible for the triple murder, that Draper was responsible for the murder of 'Robocop,' and that Draper was responsible for the killing of 'Whitey,' that 'Draper' was responsible for assisting in locating and trying to kill witnesses in the case against Clifton Edwards, 'Meechie,' and that Draper confessed to 'Butchie' that, in fact, 'Draper' had participated in the kidnapping of 'Wysocki.' And 'Butchie' would have told you himself that 'Draper' made efforts to try to kill Kenneth Adams..."); App 282a (June 26, 2001 (PM) Tr. at 18:10-12) ("Robert Smith, Butchie, told Agent Lisi that Draper had confessed to him that Draper had gone along as well" to look for Michael Jones"); App 282b (June 26, 2001 (PM) Tr. at 24:13-17) ("If Robert Smith had been permitted to be alive to come into this courtroom, you would have heard it from Robert Smith, Butchie's, lips. But the information came to you anyway, because Robert Smith told Agent Lisi, yeah, Draper told me, told me that he killed Robocop."); App 288-289 (June 27, 2001 (PM) Tr. at 7:17-8:7) ("Robert Smith told Agent Lisi about a number of conversations that he, 'Butchie' had had with Draper – conversations where 'Draper' confessed not only his role in the triple homicide, but acknowledged that he was there with Sam Carson, Sean Coates and James Montgomery. You heard also that 'Draper' admitted to his uncle that he had killed 'Robocop'; that he had killed 'Whitey'; that, in fact, he had participated in the kidnapping of Anthony Pryor, 'Wysocki,' and that when 'Draper' committed the kidnapping of 'Wysocki,' he was accompanied by Sean Coates,

The verdict itself also reveals that the hearsay testimony of Butchie Smith had a significant impact on the jury, as evidenced by the fact that Defendants were generally convicted of offenses that were impacted by Butchie Smith's hearsay testimony, and acquitted of many of the offenses that were not supported by Butchie Smith's hearsay testimony. The diverging convictions and acquittals is perhaps most stark in the jury's conclusions on the drug conspiracy charges with respect to marijuana and narcotics, and separately crack cocaine and PCP, as to which all Defendants were charged. App 842-920 (Dkt. No. 760). Special Agent Lisi testified that Smith told him about Sweeney's "sources of supply of marijuana," "how he got into selling marijuana,"

---

Sam Carson and Vincent Hill. 'Draper' also told his uncle 'Butchie' that he, 'Draper,' along with others, were following Kenny Adams, another government witness, and that the plan was to find and locate Kenny Adams with the intention of killing him."); App 291 (June 27, 2001 (PM) Tr. at 10:17-21) ("So when you're looking to blame someone for the absence of Robert Smith, look no further. Look across the room. They are the reasons you didn't hear from Robert Smith. They are the ones who were too scarred [sic] to let Robert Smith walk into the courtroom. They were cowards."); App 306-307 (June 27, 2001 (PM) Tr. at 25:25-26:11) ("Remember what Agent Lisi told you. Agent Lisi told you that Robert Smith informed him that Draper was 'clocking' Kenny, meaning of course, they were looking to kill him."); App 311-312 (July 3, 2001 (PM) Tr. at 92-93) ("How did Butchie, Robert Smith, know about this shooting [Michael Jones]? How did he know that Sean Coates did it, and the details, where it happened, why it happened, how it happened? How did he know if Draper hadn't told him?"); App 315 (July 5, 2001 (AM) Tr. at 25) ("Another point that wasn't used or referred to at all by the defense: how did 'Butchie,' Robert Smith, know about this attempt on Kenny Adams I life? Remember, that's the reason Kenny Adams is still alive today—because 'Butchie' called Agent Lisi. Agent Lisi was out of the country. He gets a page. He speaks to 'Butchie.' 'Butchie' says, 'You'd better move him because they are going to kill him. They found out where he lives.' And, sure enough, they had found out where he lived. How did 'Butchie' know this if he hadn't been talking to Draper?"); App 316-317 (July 5, 2001 (AM) Tr. at 43-44) ("How did 'Butchie' and James Montgomery both know that Sweeney and Carson went to Vegas together for the Tyson/Holyfield fight, and why did both Sweeney and Carson mention they had seen "Lonnie" Gaskins there? . . . Why would they add the additional fact, 'guess who we saw there, man? Lonnie Gaskins. And he was winning big.' Why would they mention that fact if they weren't already targeting him. . . . Why would "Butchie" falsely implicate his own nephew, Sweeney, in this murder?"); App 317 (July 5, 2001 (AM) Tr. at 44) ("And why would he implicate falsely his own nephew out of the whole universe of people he could have identified? If for some reason – whatever reason it is – he decides, 'I am just going to make up a story about the triple murder,' why would he pick his own nephew?"); App 318 (July 5, 2001 (AM) Tr. at 45) ("They got locked up because 'Butchie' had given the information first. 'Butchie' came forward. That led to the arrest of all the defendants.).

when "he had ventured into selling some heroin," and "how his drug operation worked" (App 238 (May 29, 2001 (PM) Tr. at 12); App 242 (May 29, 2001 (PM) Tr. at 27)), and Smith purportedly admitted to Special Agent Lisi that Smith himself at times "distributed marijuana directly" to both William Sweeney and Sean Coates (App 241 (May 29, 2001 (PM) Tr. at 26)). Defendants were convicted of conspiracy to distribute narcotics and marijuana. App 921-958 (Dkt. No. 810). In contrast, Special Agent Lisi did *not* testify to the allegations of conspiracy to distribute crack cocaine and PCP; and none of the Defendants were convicted of these charges. *Id.* The Government's evidence on these charges relied on the testimony of unreliable and self-interested cooperating witnesses, Montgomery and Reginald Switzer – both the subjects of Defendants' arguments regarding the recently unsealed *Brady* evidence pending before the court of appeals – and Paul Franklin and Donald Nichols. App 274a-274b (June 26, 2001 (AM) Tr. at 54-55). It is very possible that the jury found these witnesses not credible, and that without the testimony of Butchie Smith, through Special Agent Lisi, to bolster the testimony of cooperating witnesses (as was the case in the narcotics and marijuana conspiracy charges), not enough to find guilt beyond a reasonable doubt.

The same pattern emerged with respect to Counts 10 and 38 of the Indictment (and associated Racketeering Acts), which were associated with the alleged murder of Glenn Jenkins. There was no testimony from Special Agent Lisi (or, through Special Agent Lisi, Butchie Smith) as to these counts, just testimony from cooperating witness Paul Franklin, and Defendants Sweeney and Coates were acquitted. App 282a-282c (June 26, 2001 (PM) Tr. at 18-20); App 900-901, 916 (Dkt. No. 760). While it is of course impossible to know with certainty what led the jury to acquit on these counts and deem certain racketeering acts unproven, the fact that the jury acquitted on any counts shows that at least some jurors harbored some reasonable doubt, *see*

*Robinson*, 68 F.4th at 1349 (considering as relevant as part of its *Brady* analysis that "the jury deliberated for two-and-a-half days before it returned unanimous guilty verdicts on forty-four counts but acquitted on another count…This may at least suggest that some jurors verged on a conclusion that the government had not proven some count or counts beyond a reasonable doubt."), and further supports the conclusion that the *Brady* violations here likely impacted the case.

Given the centrality of the issues to which the withheld evidence is relevant, the Government cannot meet its burden to show that, if the evidence had been properly disclosed to the defense in a timely manner, it would not have had a significant impact before or during trial such that there is no reasonable likelihood the trial outcome would have been different. The New Disclosures would have helped Defendants to impeach prosecution witnesses, challenge the Government's narrative, and place the Government's case "in a different light." *United States v. Johnson*, 592 F.3d 164, 172 (D.C. Cir. 2010) (quoting *Cone*, 556 U.S. at 471 n.17). This is "sufficient to 'undermine confidence' in the verdict," which is enough "[t]o prevail on [a] *Brady* claim." *See Wearry*, 577 U.S. at 392. As noted, the applicable "reasonable probability" standard "is not a particularly demanding one." *Robinson*, 68 F.4th at 1348.

> 3.    *Considered collectively and in context, the cumulative effect of the Government's evidentiary suppression warrants relief for all Defendants.*

The need for relief based on the evidence revealed in the New Disclosures is even clearer when that evidence is considered in the context of the additional suppressed evidence that Defendants previously identified in their prior § 2255 motions and amendments. All of this evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. In other words, "the effect of each nondisclosure must not only be considered alone, for the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently 'material' to justify a new trial." *Lloyd*, 71 F.3d at 412 (citation

41

omitted).  This means that, even if the material revealed in the New Disclosures were not enough, standing alone, to undermine confidence in Defendants' trial, the inquiry does not end there.  And while this Court previously did not reach the merits of most of Defendants' *Brady*-related claims (finding them to be time-barred or procedurally defaulted) and did not find the arguments that it did consider convincing enough to warrant relief, *see Martin I*, 2021 WL 4989983, at *4-22, *26, the Court must now consider all of that material anew, too, because "[m]ateriality . . . 'must be evaluated in the context of *the entire record*." *Bagcho*, 151 F.Supp.3d at 73 (emphasis added) (quoting *Agurs*, 427 U.S. at 112).

Most notably, the evidence revealed in the New Disclosures both reinforces and sheds new light on Defendants' existing claims regarding the Government's pervasive suppression of material that would have been highly probative of the admissibility and credibility of testimony from key prosecution witnesses like James Montgomery and Special Agent Lisi.  Montgomery spent nearly 10 days on the witness stand and testified about nearly every significant violent act alleged at trial, implicating one or more of the Defendants in eight murders and one attempted murder, along with a shootout with the D.C. Metropolitan Police Department.  *See* App 92-126 (March 12, 2001 (PM)); App 127-144 (March 13, 2001 (PM)); App 145-164 (March 14, 2001 (AM)); App 165-178 (March 14, 2001 (PM)); App 179-206 (March 15, 2001 (AM)); App 218-234 (May 23, 2001 (PM)).  Despite his own extensive criminal record (which included admissions to, implications in, or convictions for multiple violent offenses such as assault with a deadly weapon, numerous murders, and assaulting a police officer while armed), Montgomery's testimony was the primary evidence presented on several charges, often with limited or no corroboration.  *See* App 69-92 (March 7, 2001 (PM)); App 179-206 (March 15, 2001 (AM)).  This Court previously acknowledged that his testimony provided the "key" link between Defendants and Smith's murder,

42

supporting the trial court's pivotal hearsay ruling. *See Martin I*, 2021 WL 4989983, at *12; *see also supra* pp. 10-11.

As Defendants have previously briefed in this Court and in the D.C. Circuit, the Government withheld a trove of *Brady* and *Giglio* material that would have undercut Montgomery's testimony, and the New Disclosures only add to that pile. For example, Montgomery testified at trial that he knew Carson was planning to kill Smith and went with Carson in one failed attempt to kill Smith in advance of the successful "hit" and, accordingly, that when he learned about a shooting on the street where Smith was killed, he knew right away that Carson had done it. *See* App 226-233 (May 23, 2001 (PM) Tr. at 24-31); *see also supra* p. 31. But Special Agent Lisi's notes of a pretrial interview with Montgomery, which were sealed by the trial court and not made available to Defendants until at least nine years after their trial, revealed that Montgomery had initially told prosecutors a much less certain story: "After Butchie got hit, James [Montgomery] *thought* either Chin [Carson] did it or get Pug or BJ to do it." App 1187 (Dkt 1174-3, at 31) (emphasis added). Rather than definitively pinning the murder on Carson in that debriefing, Montgomery had suggested two others might have done it and was not definite even as to that (*i.e.*, Montgomery did not know but "*thought*" any of those three might have done it). *See id.* Yet at trial Montgomery was able to offer his far more certain testimony without impeachment either from the interview notes *or* from the evidence revealed in the New Disclosures pointing to alternative suspects responsible for Smith's murder.

The potential compounding, cumulative effects of the suppressed material that could have been used to impeach Montgomery or otherwise undermine his credibility with the jury is not limited to evidence about Smith's murder. Material that was sealed at trial revealed that the Government failed to disclose other evidence of Montgomery's ever-shifting stories. For example,

43

sealed notes of Special Agent Lisi—compared with Montgomery's trial testimony—demonstrate that Montgomery changed his story about the murder of Timothy "Tim" Benton, for which Montgomery was ultimately charged.[35]   Specifically, Special Agent Lisi's notes indicate that Montgomery initially claimed that Carson and Maurice "Poo-Poo" Proctor were responsible for Benton's murder:  "1994 Chin [Carson] borrowed Grey Cadillac Said he & Poo-Poo [Maurice Proctor] killed Tim [Benton] in it." App 1077 (Dkt. No. 1142-4).  At trial, however, Montgomery vividly recounted that he himself (not Carson) was driving with Proctor and Benton when Proctor shot Benton in the head, and Montgomery claimed to have pushed Benton out of the car and ran him over before Proctor got out of the car and shot Benton again.  *See* App 130-135 (March 13, 2001 (PM) Tr. at 31-36).  The Government also knew—and did not disclose to the defense—that Montgomery had falsely accused Carson of killing Paul Ridley, a crime for which the Government had already convicted Steven DeWitt.  *See DeWitt v. District of Columbia*, 43 A.3d 291 (D.C. 2012) (noting that DeWitt was convicted on May 13, 1991).  Considered collectively, all of the suppressed material that could have been used to impeach Montgomery or otherwise undermine his credibility with the jury compels relief.  After all, given Montgomery's central role in implicating Defendants in crime after crime based exclusively on his own testimony, undermining his credibility with the jury would have had a significant widespread effect on multiple aspects of the Government's case.

Special Agent Lisi was another key witness who played a pivotal role for the prosecution, and as to whom the New Disclosures support and enhance the Defendants' existing *Brady* and *Giglio* claims.  Because Special Agent Lisi had led the FBI team that established an observation

---

[35] *See* App 79 (March 7, 2001 (PM) Tr. at 79) (Montgomery admits Benton murder as RICO predicate); *see also* App 1124-1125 (Dkt. No. 1170 at 13-14); App 1234 (Dkt. No. 1197 at 24); App 1274 (Dkt. No. 1197 at 64)

post overlooking a D.C. street corner that Defendants allegedly frequented, he offered first-hand testimony about the surveillance recordings and his personal observations of Defendants (except for Sweeney) engaging in what was described as drug activity and gambling. *See, e.g.*, App 60g-60k (Jan. 10, 2001 (AM) Tr. at 30-33, 41). But as discussed at length above, Special Agent Lisi also testified extensively regarding Smith's hearsay statements that implicated Defendants in multiple crimes underpinning the government's conspiracy theory. *See supra* p. 12. Indeed, Special Agent Lisi's hearsay testimony from Smith often served as the only evidence offered on certain charges, aside from Montgomery's account. *See, e.g.*, App 236-254 (May 29, 2001 (PM)). Yet the evidence revealed in the New Disclosures casts doubt on the veracity of some of Special Agent Lisi's statements—namely, his representation to Defendants and the trial court that he never interviewed Farrar about Smith's murder: "I will tell you right now, I never after 'Butchie's' murder, picked up Michael Farrar and interviewed him."[36] *See* App 258 (May 30, 2001 (AM) Tr. at 19).

---

[36] Even if literally true insofar as Special Agent Lisi may not have been the one to personally "pick[] up" and "interview[]" Farrar, the statement is misleading because it suggests that the Government never interviewed Farrar about Smith's murder. In fact, the May 7, 2025 New Disclosure makes clear that the Government not only talked with Farrar about Smith's murder but "Farrar claimed that he witnessed the shooting from a block away" and "identified Chappelle as the shooter." App 43 (Ex. C (5/7/2025 Disclosure Letter) at 1-2). Especially given that Farrar apparently maintained that version of events up until "a witness conference with Farrar shortly before trial" App 47 (Ex. D (3/10/2026 Disclosure Letter) at 2), it strains credulity to suggest that Special Agent Lisi would not have known about Farrar's statements given that he was the case agent and would have been responsible for familiarizing himself with the investigative file, not just the interviews in which he personally participated. And even if Special Agent Lisi was unaware, the Government would have had an affirmative obligation to correct the misleading representation: "The government commits a Napue violation 'when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.'" *Ausby*, 916 F.3d at 1092 (quoting *Straker*, 800 F.3d at 602). Similarly, the Government made misleading representations about its investigation into Smith's murder, stating during a sidebar with the trial court during defense counsel's cross-examination of Special Agent Lisi—after objecting to defense counsel's line of questioning about other suspects or potential witnesses to Smith's murder—that, "the only suspect . . . the only

The New Disclosures also compound specific *Brady* violations the Defendants previously briefed regarding the November 17, 1996 triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson in Temple Hills, Maryland—a crime that Carson, Coates, and Sweeney would each ultimately be convicted of at trial (and which formed, in part, the basis of the racketeering conspiracy against all Defendants). *See* App 941-44, 948-50, 954-56 (Dkt. 810 at 21-24, 28-30, 34-36). The Defendants were convicted of that murder based largely on the hearsay testimony of Butchie Smith (which the New Disclosures undercut); but that was made possible in part because the Government improperly prevented Defendants from admitting testimony of two other witnesses, John Pinckney and Cheree Owens, who had testified under oath before a state-convened grand jury in Prince George's County, Maryland that the triple murders were committed by Dennis Green (rather than any of the Defendants). *See* App 53-55 (December 10, 1996 Grand Jury Tr.); App 753-755 (Dkt. No. 450 at 1-3). Defendants were unable to locate Pinckney and Owens to testify at trial and sought to introduce the grand jury testimony under the hearsay exception for former testimony of unavailable witnesses. *See* App 753 (Dkt. No. 450); App 801 (Dkt. No. 452); Fed. R. Evid. 804(b)(1). The Government denied knowing Pinckney's and Owens' whereabouts and argued adamantly against the admission of their grand jury testimony, including on the grounds that Pinckney and Owens were purportedly unreliable and untrustworthy, having

---

suspect in Agent Lisi's mind that ordered [Smith's] murder was William Sweeney." *See* App 261-265 (May 30, 2001 (AM) Tr. at 45-49). Again, even if literally true insofar as Special Agent Lisi himself may not have had other suspects in mind who might have ordered Smith's murder, the statement is misleading because it suggests that the Government had no other suspects and no witnesses who identified potential suspects in Smith's murder, which the New Disclosures prove false. *See supra* Part III.D. Indeed, the New Disclosures in fact prove that the Government *consciously* chose not to call Farrar so that they could (wrongly) withhold "the impeachment material [they] would have had to turn over had [they] called Farrar as a witness." App 47 (Ex. D (3/10/2026 Disclosure Letter) at 2). That impeachment material was in fact *Brady* material that would have made plain that the Government's representations were patently false.

absconded with government funds shortly after their grand jury testimony. *See* App 805 (Dkt. No. 481 at 2).[37] In reality, however, the FBI had moved Pinckney and Owens around to numerous locations and paid them significant sums of money in the months after their grand jury testimony, and the payments had continued at least throughout the trial and direct appeal of this case. *See* App 1133-1136 (Dkt. No. 1170 at 22-25). In other words, rather than having absconded with government funds and disappeared after their grand jury testimony, Pinckney and Owens were *deliberately* moved by the federal government, which then either lost track of them or consciously decided not to disclose their location or make efforts to find them. This calls into question the veracity of the Government's representations to Defendants and to the trial court regarding Pinckney and Owens, including whether they were actually unable to be called to testify at trial or—if they truly were unavailable—whether their grand jury testimony should have been admitted under Rule 804(b)(1).[38]

Considered collectively and in context, the Government's pervasive evidentiary suppression—including but not limited to its inexplicable suppression of the significant *Brady*

---

[37] Based on the Government's representations, the trial court ultimately denied (and the court of appeals affirmed as not an abuse of discretion) Defendants' request to admit the testimony, finding an insufficient connection between the federal authorities prosecuting the Defendants and the authorities overseeing the Maryland case, given that the United States was not a party to the state grand jury proceedings and there was insufficient evidence that the Maryland authorities were used or "effectively controlled" by the federal authorities. *See Carson*, 455 F.3d at 377-81.

[38] Special Agent Lisi testified at trial that, "up until Butchie mentioned the triple homicide on December 6, 1996, there were no real suspects in the triple homicide that he knew of." App 260 (May 30, 2001 (AM) Tr. at 35:16-19). This testimony is important because it both highlights the importance of Smith's testimony in supporting the charges and reveals another potential *Napue* violation. Given that Pinckney and Owens testified before the grand jury on *Tuesday, December 10, 1996* (*see* App 753-755 (Dkt. No. 450 at 1-3)), it strains credulity to suggest that the Government had not, by *Friday, December 6, 1996* (*i.e.*, at most one full business day before the Maryland grand jury was convened), already spoken with Pinckney and Owens and, accordingly, likely identified at least one other "real suspect[]" for the triple murder by that time.

47

material revealed in the New Disclosures—undermines confidence and calls into question the fairness of Defendants' trial, compelling relief for all Defendants irrespective of the sufficiency of remaining evidence. *See Kyles*, 514 U.S. at 434; *Cuffie*, 80 F.3d at 517-19.

## VI.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court enter an order stating, in response to the partial remand from the court of appeals, that this Court shall grant Defendants' § 2255 motions and vacate their convictions upon a full remand to this Court. In the alternative, to the extent additional information regarding the New Disclosures or other withheld material would be beneficial to informing the Court's decision, Defendants respectfully request an evidentiary hearing to further develop the record.

April 3, 2026

Respectfully submitted,

*/s/ John Longstreth*
John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com
johnathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

*/s/ Mark Lanpher*
Mark Lanpher
Gabrielle Leeman
ALLEN OVERY SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Telephone: (202) 508-8000
mark.lanpher@aoshearman.com
gabrielle.leeman@aoshearman.com

*Counsel for Sean Coates*

*/s/ Eric Kirchman*
Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue, Suite 205
Rockville, MD 20850
(202) 347-4052
kirchlaw@gmail.com

*Counsel for William K. Sweeney*

*/s/ David Smith*
David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
(202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

48