## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Samuel Carson, Sean Coates,<br>Jerome Martin, Jr., and William K.<br>Sweeney,<br><br>Defendants. | Case No. 1:98-cr-329-6-RCL |

---

# APPENDIX
in support of Defendants' Supplemental § 2255 Motion

---

# VOLUME 2 OF 9

**Excerpts of Transcripts (1996–March 14, 2001)**

December 10, 1996 ..................................................................................................................53

September 27, 2000 ................................................................................................................56

January 10, 2001 ..................................................................................................................60a

February 1, 2001 (morning session) ......................................................................................61

March 7, 2001 (afternoon session).........................................................................................69

March 12, 2001 (afternoon session).......................................................................................92

March 13, 2001 (afternoon session).....................................................................................127

March 14, 2001 (morning session) ......................................................................................145

March 14, 2001 (afternoon session).....................................................................................165

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 3 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 16 of 443
Case 1:98-cr-00329-RCL   Document 450   Filed 11/02/00   Page 10 of

S-E-C-R-E-T

IN THE CIRCUIT COURT

FOR PRINCE GEORGE'S COUNTY, MARYLAND

IN RE:

Special Investigation          Grand Jury No. 56,192

_____/

TRANSCRIPT OF PROCEEDINGS

Grand Jury Room

County Courthouse

Upper Marlboro, Maryland

Tuesday, December 10, 1996

The Grand Inquest for the State of

Maryland for the Body of Prince George's County, was

convened at 9:30 o'clock a.m., Betty C. Ford,

Foreman, presiding.

PRESENT:

(A quorum of twenty-one members of the

Grand Jury was present.)

JOHN MALONEY, Assistant State's

Attorney for Prince George's County.

W. C. LYNN, Clerk-Reporter to the

Grand Jury.

S-E-C-R-E-T

FILED

NOV 0 2 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 4 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 17 of 443
Case 1:98-cr-00329-RCL   Document 450   Filed 11/02/00   Page 29 of 43

4

forth by me and other people here in the Grand Jury.

Do you understand that?

A. Yes.

Q. First of all, who is John Pinkney?

A. My fiance.

Q. And do you know a person named Dennis Green?

A. Yes.

Q. How did you know him?

A. Through John.

Q. And did there come a time, some days before Thanksgiving, that you saw Dennis Green?

A. Yes.

Q. Describe what happened.

A. Dennis came to my house and asked me could he come in. I let him in. He was on the telephone, talking to one of his friends.

Q. And who else was in the -- is it a townhouse?

A. Yes.

Q. Who else was there?

A. Just me and Dennis.

Q. And what, if anything, did you hear?

A. He told whoever he was talking to on the telephone that they should have came around there

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 5 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 18 of 443
Case 1:98-cr-00329-RCL   Document 450   Filed 11/02/00   Page 30 of 43

5

and they must have asked him why, and he said because me just took three people out of the street.

Q.    Did you hear anything else?

A.    And whoever he was talking to must have asked him who is we.  He said me, California, and Free, and the rest of the guys.

_Who_

Q.    Do you know who the rest of the guys are?

A.    I know of California and Free, but I don't know them.

Q.    Showing you what is a statement made by you, apparently a nine page statement.

Look at that.

Is this the statement that you made to the police yesterday?

A.    Yes, it is.

Q.    And is that a truthful statement that you gave to them?

A.    Yes, it is.

Q.    Okay.

MR. MALONEY:  For the record, I am showing a statement given 12-8-96 by Cheree Lenette Owens, and signed by her.

_we are setting this soon_

BY MR. MALONEY:

Q.    Describe what happened after you

                        UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA

    UNITED STATES,                      :
                GOVERNMENT,             :
                                        :
     VS.                                :    CR. NO. 98-329
                                        :
    VINCENT HILL,                       :
    JEROME MARTIN,                      :
    SAMUEL CARSON,                      :
    WILLIAM K. SWEENEY,                 :
    MAURICE PROCTOR,                    :
    SEAN COATES,                        :
                DEFENDANTS.             :
                                        :
    UNITED STATES                       :
                GOVERNMENT,             :
                                        :
       VS.                              :      CR. NO. 99-348
                                        :
    GARY PRICE,                         :
                DEFENDANT               :
                                        :

                                             WASHINGTON, D. C.
                                             SEPTEMBER 27, 2000

                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE THOMAS P. JACKSON

    FOR THE GOVERNMENT:                 PETER ZEIDENBERG, AUSA
                                        ANJALI CHATURVEDI, AUSA
                                        555 4TH ST., N.W.
                                        WASHINGTON, D. C. 20001

    FOR THE DEFENDANT HILL:             CHRISTOPHER DAVIS, ESQ.
                                        601 INDIANA AVE., N.W.
                                        #901
                                        WASHINGTON, D. C.  20001

    FOR THE DEFENDANT MARTIN:           JOANNE HEPWORTH, ESQ.
                                        305 H STREET, N.W.
                                        2ND FLOOR
                                        WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
LEXI NEGIN CHRIST, ESQ.
419 7TH STREET, N.W.
WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
717 D STREET, N.W.
SUITE 400
WASHINGTON, D. C.  20004

LEONARD LONG, ESQ.
1818 11TH ST., N.W.
WASHINGTON, D.C.  20001

FOR THE DEFENDANT PROCTOR:         HOWARD BRAMSON, ESQ.
717 D STREET, N.W.
THIRD FLOOR
WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:         FREDERICK JONES, ESQ.
901 6TH STREET, S.W.
#409
WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:          JONATHAN ZUCKER, ESQ.
601 INDIANA AVE., N.W.
#901
WASHINGTON, D. C.  20004

COURT REPORTER:          PHYLLIS MERANA
6816 U. S. COURTHOUSE
3RD & CONSTITUTION AVE., N.W.
WASHINGTON, D. C.  20001

127

KILL ROBERT SMITH.  AND WE ALSO WANT ALL THE RECORDS, FOR INSTANCE, FROM THE HOPE VILLAGE SHOOTING, TO SHOW TO THE JURY TO SAY, "SOMEONE ELSE WAS OUT THERE, NOT EVEN JUST WITH A MOTIVE TO KILL HIM, BUT SOMEONE ELSE TRIED TO KILL HIM."

AND THIS ALL COMES WITHIN THE THIRD-PARTY DEFENSE THAT THE D. C. COURT OF APPEALS UNDER THE BROWN BEALE STANDARD HAS SET FORTH.  THAT WE HAVE TO SHOW TO THE JURY THAT THERE IS A FACTUAL BASIS TO ASSERT A THIRD-PARTY DEFENSE -- A THIRD-PARTY PERPETRATED DEFENSE.

THE COURT:  I WOULD THINK THAT IF THE GOVERNMENT HAS ANY EVIDENCE -- ANY EVIDENCE THAT SOMEONE OTHER THAN A NAMED DEFENDANT WAS RESPONSIBLE FOR ROBERT SMITH'S DEATH, THEN THAT EVIDENCE WOULD BE PRODUCIBLE AS BRADY MATERIAL.

MR. KIERSH:  THAT'S OUR POSITION.

THE COURT:  ALL RIGHT.

MR. KIERSH:  BUT I JUST WANT TO MAKE THE RECORD CLEAR, TOO, THAT THE GOVERNMENT MAY LOOK AT SOME EVIDENCE AND SAY, "WELL, WE DON'T THINK -- HERE IS SOME EVIDENCE THAT HE WAS SHOT."

THE COURT:  THAT'S TRUE OF ANY EVIDENCE.

MR. KIERSH:  BUT I WOULD SUBMIT TO THE COURT IT'S BRADY.  IF THERE IS ANY EVIDENCE WHATSOEVER THAT ANYBODY ON THIS PLANET, OTHER THAN WILLIAM SWEENEY, TRIED TO KILL ROBERT SMITH, IT IS BRADY.  AND ANY RECORD THAT THE GOVERNMENT HAS RELATED TO THE SHOOTING, FOR INSTANCE, AT

200

MR. KIERSH:  WELL, SURE HE WAS.

THE COURT:  HOW ABOUT UNRELATED ONGOING INVESTIGATIONS?

MR. KIERSH:  HE WAS GETTING A BENEFIT FOR IT. THERE ARE TWO REASONS WHY THAT INFORMATION SHOULD BE TURNED OVER.  NUMBER ONE IS TO SHOW THAT MR. SMITH WAS TRYING TO CURRY FAVOR WITH THE GOVERNMENT BECAUSE HE WAS GETTING HUGE BENEFITS FROM THE GOVERNMENT.

AGAIN, THIS MAN IS A CAREER CRIMINAL WHO IS OUT ON THE STREET ONLY BY VIRTUE OF THE FACT THAT HE IS COOPERATING WITH THE GOVERNMENT.  BUT THE OTHER REASON IS WHAT WE TALKED ABOUT BEFORE.  THE FACT THAT MR. SMITH WAS GIVING INFORMATION IN UNRELATED CASES, THOSE INDIVIDUALS, IF THEY KNEW ABOUT HIS COOPERATION, HAD A MOTIVE TO KILL HIM.  AND THAT'S EXACTLY WHAT WE WANT TO OFFER TO THE JURY.  THAT THERE WAS MOTIVATION BEYOND THESE PEOPLE TO KILL HIM.  SO THERE ARE TWO VERY SOUND REASONS.

THE COURT:  LET ME TAKE A LOOK AT THE 302'S UNREDACTED IN CAMERA.

MS. CHATURVEDI:  CERTAINLY, YOUR HONOR.  IF I COULD JUST ADDRESS THIS BRIEFLY.  AGAIN, IT IS SORT OF A LEAP OF FAITH.  IF THE OTHER PEOPLE WHO MR. SMITH IMPLICATED -- IF THEY KNEW THAT HE WAS COOPERATING WITH LAW ENFORCEMENT, PERHAPS THEY HAD A MOTIVE.  THAT IS ONE LEAP OF FAITH.

App 59

201

THE COURT: SURE.

MS. CHATURVEDI: AND THE SECOND ONE IS IS THERE ANY EVIDENCE TO SUGGEST ANY OF THOSE PEOPLE, ASSUMING THEY DID KNOW ABOUT THE COOPERATION, TOOK ANY STEPS TO HARM MR. SMITH.

THERE IS NO SUCH EVIDENCE. IF THE DEFENSE IS TRYING TO RAISE THIRD-PARTY CULPABILITY, THERE HAS TO BE MORE THAN MERE SPECULATION.

MR. KIERSH CITED TO THE BROWN BEALE CASE FROM THE D. C. COURT OF APPEALS. THE WINFIELD CASE, WHICH IS THE MOST MOST RECENT CASE ON THAT POINT, SAYS YOU CAN'T JUST DRAW A BLANK. YOU CAN'T JUST PULL AT STRAWS SPECULATING THAT SOMEONE ELSE MAY HAVE WANTED TO HAVE THIS PERSON KILLED AND WE SHOULD BE ENTITLED TO KNOW THAT. I WILL PROVIDE --

THE COURT: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO -- THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

MS. CHATURVEDI: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

THE COURT: YES.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
       GOVERNMENT,       :

  VS.                    :      CR. NO. 98-329

VINCENT HILL,          :
JEROME MARTIN,        :
SAMUEL CARSON,        :
WILLIAM K. SWEENEY,    :
MAURICE PROCTOR,      :
SEAN COATES,         :
       DEFENDANTS.    :

UNITED STATES         :
       GOVERNMENT,       :

  VS.                    :      CR. NO. 99-348

GARY PRICE,          :
       DEFENDANT      :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JANUARY 10, 2001
(MORNING SESSION.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:         PHYLLIS MERANA
                      6816 U. S. DISTRICT COURT
                      3RD & CONSTITUTION AVE., N.W.
                      WASHINGTON, D. C. 20001

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 12 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 47 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 2 of 77

2

```
FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                ANJALI CHATURVEDI, AUSA
                                555 4TH ST., N.W.
                                WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
                                601 INDIANA AVE., N.W.
                                #910
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                305 H STREET, N.W.
                                2ND FLOOR
                                WASHINGTON, D. C.  20001


FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                LEXI NEGIN-CHRIST, ESQ.
                                419 7TH STREET, N.W.
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
                                717 D STREET, N.W.
                                SUITE 400
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:      HOWARD BRAMSON, ESQ.
                                717 D STREET, N.W.
                                THIRD FLOOR
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
                                901 6TH STREET, S.W.
                                #409
                                WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                601 INDIANA AVE., N.W.
                                #901
                                WASHINGTON, D. C.  20004
```

(Page 47 of Total)

App 60b

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 13 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 48 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 14 of 77

14

MS. HEPWORTH:  THANK YOU, YOUR HONOR.

THE COURT:  NOW, I HAVE LOOKED AT THE CASE AUTHORITY THAT YOU HAVE PROVIDED ME WITH RESPECT TO THE JENCKS ACT AND ITS APPLICATION TO GRAND JURY TESTIMONY AND 302'S OF SPECIAL AGENT LISI.

I BELIEVE THE MOST PERTINENT CASE IS THE CASE OF UNITED STATES VERSUS MASON, D. C. CIRCUIT, AT 523 F. 2D, 1122, DECIDED IN 1975, WHICH, IN EFFECT, HOLDS THAT STATEMENTS OF A WITNESS WHICH ARE NOT RELEVANT TO HIS TESTIMONY AT TRIAL NEED NOT BE DISCLOSED UNDER THE JENCKS ACT.  THE COURT, HOWEVER, OBSERVES THAT THE UNREDACTED STATEMENTS OUGHT TO BE FILED UNDER SEAL WITH THE COURT, AND I WILL ASK THE GOVERNMENT TO PROVIDE THE UNREDACTED STATEMENTS.

MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.  JOANNE HEPWORTH FOR MR. MARTIN.

THE COURT:  I ALSO AM RELYING UPON THE CASE OF UNITED STATES VERSUS CARTER, ALSO THE D. C. CIRCUIT, 70 F.3D 146, DECIDED IN 1995, WHERE THE COURT STATES, QUOTE, IF THE UNPRODUCED STATEMENT COULD NOT HAVE ASSISTED THE DEFENSE IN CROSS-EXAMINING THE WITNESS, THERE IS NO REASON FOR THE TRIAL COURT TO ORDER A MISTRIAL OR FOR AN APPELLATE COURT TO REVERSE A CONVICTION.

IF I UNDERSTAND THE GOVERNMENT'S REPRESENTATION CORRECTLY, THAT MATERIAL WHICH HAS BEEN EXCISED FROM SPECIAL

Case 1:98-cr-00329-RCL  Document 1375-4  Filed 04/06/26  Page 14 of 159
USCA Case #23-3015  Document #2077668  Filed: 10/01/2024  Page 49 of 443
Case 1:98-cr-00329-RCL  Document 654  Filed 07/19/01  Page 15 of 77

15

AGENT LISI'S GRAND JURY TESTIMONY AND HIS 302'S IS HIS PARAPHRASE OF THE QUOTATIONS OF OTHER PERSONS WHO MAY OR MAY NOT BECOME WITNESSES IN THE CASE, RATHER THAN STATEMENTS OF HIS OWN, AND HE DOES NOT INTEND, ON HIS DIRECT TESTIMONY AT THIS TIME, TO RELATE ANY OF THOSE STATEMENTS OF OTHER PERSONS, AND SO THEY ARE NOT RELEVANT TO THE SUBJECT OF HIS TESTIMONY.

I AM NOT PREPARED AT THIS POINT, HOWEVER, MR. ZEIDENBERG, TO CONCLUDE THAT THEY WILL NOT BECOME JENCKS MATERIAL IF THE OTHER PERSONS ARE THEMSELVES CALLED TO TESTIFY.

NOW, YOU WANTED TO BE HEARD, MS. HEPWORTH?

MS. HEPWORTH:  I AM SORRY, YOUR HONOR.  I THINK MR. KIERSH WANTED TO BE HEARD FIRST.

MR. KIERSH:  THANK YOU, YOUR HONOR.  GOOD MORNING.

YOUR HONOR, WE WOULD ASK, AND WE THINK IT'S CONSISTENT WITH THE VERY SPECIFIC LANGUAGE OF THE JENCKS ACT THAT THE INFORMATION THAT THE GOVERNMENT SEEKS -- WELL, THE REDACTED INFORMATION -- NOT THAT IT JUST BE PLACED UNDER SEAL, BUT THAT THE COURT REVIEW IT IN CAMERA.

AND I WOULD SUBMIT TO THE COURT THE ACT REQUIRES THE COURT TO CONDUCT A FULL IN CAMERA EVALUATION OF THE SUBSTANCE OF THE TESTIMONY, AND I POINT OUT THAT WE SUBMIT THIS IS VERY IMPORTANT.

AND I WANT TO GO BACK TO SOMETHING THAT OCCURRED

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 15 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 50 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 16 of 77

16

IN SEPTEMBER AT THE MOTIONS HEARINGS.  WE HAD FILED A BRADY MOTION PURSUANT TO THE 302 STATEMENTS OF AGENT LISI.  THE GOVERNMENT REPRESENTED TO THE COURT, "WELL, THERE IS NO BRADY IN THERE."  THE COURT THEN REVIEWED THE 302'S IN CAMERA AND THEN THE COURT CAME BACK AND SAID, "WELL, THERE IS BRADY," AND THEN YOU ORDERED THAT THE GOVERNMENT TURN OVER --

THE COURT:  I FOUND ONE INSTANCE OF BRADY.

MR. KIERSH:  WELL, WHATEVER IT IS, YOU DID FIND BRADY, WHICH WAS INCONSISTENT WITH WHAT THE GOVERNMENT WAS PROFFERING TO THE COURT.  AND UNDER SECTION (C) OF THE BRADY ACT OR THE JENCKS ACT, IT REQUIRES THE COURT TO CONDUCT AN IN CAMERA REVIEW.

AND WE WOULD ASK THAT -- I KNOW IT'S BURDENSOME, BUT THIS IS SOMETHING THAT SHOULD HAVE BEEN -- WE ALL SHOULD HAVE BEEN ALERTED TO THIS PRETRIAL.  BUT I WOULD ASK THE COURT TO REVIEW ALL OF THE GRAND JURY TESTIMONY THAT IS REDACTED AND ALL THE 302'S SO THAT THE COURT CAN MAKE AN INDEPENDENT EVALUATION, BECAUSE I WOULD SUBMIT TO THE COURT THAT, YOUR HONOR, YOU ARE IN A MUCH, MUCH BETTER SITUATION AND POSTURE TO EVALUATE THIS TESTIMONY THAN THE COURT OF APPEALS IS.

YOU'RE FAMILIAR WITH THIS CASE.  YOU KNOW WHAT THE RESPECTIVE PARTIES' THEORIES ARE.  YOU HAVE MUCH MORE ABILITY TO GIVE THIS A CONTEXTUAL ANALYSIS THAN THE COURT OF

17

APPEALS CAN.  SO WE WOULD ASK FOR THAT PROCESS TO BE DONE.

THE COURT:  MR. ZEIDENBERG?

MR. ZEIDENBERG:  YOUR HONOR, WE WILL PROVIDE THE REDACTED AND UNREDACTED GRAND JURY TESTIMONY, AND IF THE COURT WISHES --

THE COURT:  IT ISN'T THAT THE COURT WISHES.  IT'S THAT THE ACT REQUIRES IT UPON REQUEST OF THE DEFENSE.

MR. ZEIDENBERG:  WE CERTAINLY HAVE NO OBJECTION IF THE COURT WISHES TO DO IT.  WE'RE NOT REQUESTING IT.  I UNDERSTAND THAT, PERHAPS OUT OF AN ABUNDANCE OF CAUTION, SO THERE IS NO QUESTION --

THE COURT:  THE ACT REQUIRES IT.

MR. ZEIDENBERG:  THAT'S FINE, YOUR HONOR.

THE COURT:  YOUR MASON CASE REQUIRES IT.

MR. ZEIDENBERG:  WE'RE PREPARED TO GIVE THE COURT THAT MATERIAL.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  AND I THINK THAT THE COURT WILL SEE IT'S QUITE VOLUMINOUS.

THE COURT:  I AM SURE IT IS.

MR. ZEIDENBERG:  BUT I THINK THAT IN SOME WAY, THE COURT'S JOB WILL BE MADE EASIER WHEN THE COURT HEARS THE NATURE OF THE DIRECT EXAMINATION BECAUSE THE DIRECT EXAMINATION IS GOING TO BE -- THE ONE WE INTEND TO PROVIDE IS A VERY GENERAL OVERVIEW.  AND THE MATERIAL THAT IS

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 17 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 52 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 30 of 77

30

BLOCKS.

Q.   THANK YOU.   YOU CAN RESUME THE STAND.

(WITNESS RETAKING STAND.)

Q.   NOW, AGENT LISI, AFTER WAYNE PERRY WAS ARRESTED AND INCARCERATED, CAN YOU TELL US WHETHER OR NOT YOU NOTICED ANY MARKED DIFFERENCE IN THE LEVEL OF VIOLENCE OR DRUG ACTIVITY IN SOUTHWEST WHERE YOU'RE REFERRING TO?

MR. BRAMSON:   OBJECTION.

THE COURT:   OVERRULED.

THE WITNESS:   NO, WE DID NOT.

BY MR. ZEIDENBERG:

Q.   CAN YOU DESCRIBE WHAT OBSERVATIONS -- PERSONAL OBSERVATIONS YOU HAD MADE -- AND I AM REFERRING NOW TO POST-1993, GOING INTO 1994 -- OF THE DRUG ACTIVITY IN THE AREA OF GREENLEAF GARDENS?

A.   SURE.

DURING THAT TIME, AS SOME MAY REMEMBER, THE SOUTH CAPITOL STREET RAMP WAS UNDER CONSTRUCTION.   OUR OFFICE IS LOCATED IN SOUTHWEST, DOWN NEAR BUZZARD'S POINT ALL THE WAY AT THE WATER, NEAR THE COAST GUARD BUILDING.

THE ROUTE THAT WE HAVE HAD TO TAKE FROM OUR OFFICE AND TO OUR OFFICE THROUGHOUT THE DAY WOULD GO NEAR THIS AREA.

WE WERE ALREADY FAMILIAR WITH THIS AREA FROM THE WAYNE PERRY INVESTIGATION, AND WE WOULD RIDE BY, AND WE

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 18 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 53 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 31 of 77

31

WOULD NOTICE --

MR. BRAMSON:  OBJECTION.  HE IS TALKING ABOUT WHAT OTHER PEOPLE WOULD NOTICE.

THE COURT:  HE IS TALKING ABOUT WHAT HE NOTICED, I BELIEVE.

MR. BRAMSON:  BUT HE IS SAYING "WE," YOUR HONOR.

THE COURT:  THE OBJECTION IS OVERRULED.

MR. BRAMSON:  THANK YOU.

THE WITNESS:  I NOTICED, WHILE RIDING THROUGH THERE, AN INCREASE IN THE VEHICLE TRAFFIC.  SPECIFICALLY, YOU COULD RIDE THROUGH THERE, AND IT WAS AN OPEN-AIR MARKET.

THERE WERE TIMES WHEN CARS WOULD BE LINED UP IN THE EVENINGS ON WEEKENDS, FRIDAY NIGHTS -- THREE OR FOUR CARS LINED UP, AND PEOPLE COMING TO THE WINDOW, AND YOU COULD SEE THEM REACH IN THE WINDOW AND TAKE MONEY AND HAND SOMETHING IN.  AND THIS KIND OF TRAFFIC REALLY PICKED UP.

BY MR. ZEIDENBERG:

Q.  WHAT TIMES OF THE DAY, NIGHTS, OR WEEKENDS DID YOU NOTICE THAT?

A.  ALL TIMES.  MORNING, AFTERNOON, AND EVENING.  ON WEEKENDS -- YOU KNOW, IF I WOULD HAVE A CHANCE TO RIDE THROUGH THERE ON THE WEEKEND.  ALL TYPES OF WEATHER.  HEAVY SNOW AND HEAVY RAIN.

Q.  NOW, IN REGARDS TO VIOLENCE -- SPECIFIC ACTS OF VIOLENCE IN THE AREA -- DID YOU RECEIVE REPORTS OF VIOLENCE IN THAT

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 19 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 54 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 32 of 77

32

AREA?

A.   YES, SIR.

Q.   AND AS A RESULT OF THOSE REPORTS AND AS A RESULT OF YOUR OBSERVATIONS AND THOSE OBSERVATIONS OF OTHER AGENTS, WAS A DECISION MADE REGARDING CONDUCTING AN INVESTIGATION THERE?

A.   YES, SIR.   IN LATE 1995 -- THROUGHOUT 1995, WE WERE URGED BY SOME PEOPLE TO OPEN AN INVESTIGATION INTO THAT AREA.   AND IN LATE 1995, WE DID OPEN AN INVESTIGATION.

Q.   WHAT DOES THAT MEAN?

A.   IT MEANS A COUPLE OF THINGS.   ADMINISTRATIVELY FOR US, THE F.B.I. -- THE TYPES OF CASES THAT WE WORK, WE HAVE TO SIT DOWN AND DOCUMENT WHAT WE PLAN TO DO, WHERE OUR INVESTIGATION WILL BE FOCUSED, AND WHAT WE EXPECT THE INVESTIGATION TO COVER.

      WE DID THIS.   WE ARE GIVEN A CASE NUMBER.   ONCE WE HAVE THAT CASE NUMBER, THAT IS THE CASE NUMBER FOR THAT INVESTIGATION.   AND ANYTHING WE DO IS A PART OF THAT INVESTIGATION THROUGHOUT THE INVESTIGATION.

Q.   WHAT DID YOU HAVE TO DO -- WELL, SPECIFICALLY, WHAT WAS THE GOAL OF YOUR INVESTIGATION?

A.   WHEN WE BEGAN THE INVESTIGATION, OUR SQUAD OR TASK FORCE PRIMARILY WOULD HAVE TWO TYPES OF INVESTIGATIONS.   ONE WOULD FOCUS ON INDIVIDUALS -- PEOPLE THAT WERE BELIEVED TO HAVE BEEN RESPONSIBLE FOR VIOLENT CRIMES.   OTHERS WOULD BE TO FOCUS ON NEIGHBORHOODS.

33

THIS WAS TO FOCUS ON THAT NEIGHBORHOOD, TO IDENTIFY WHO WAS RESPONSIBLE FOR THE VIOLENCE IN THAT AREA AND INVESTIGATE THEM AND ULTIMATELY PROSECUTE THE PEOPLE RESPONSIBLE.

Q.  DID YOU HAVE SPECIFIC INDIVIDUALS -- WHEN YOU OPENED THIS INVESTIGATION, DID YOU HAVE SPECIFIC INDIVIDUALS IN MIND AS TO WHO YOU INTENDED TO TARGET AND ARREST IN THE COURSE OF THAT INVESTIGATION?

A.  NO, NOT SPECIFICALLY.  WE LOOKED AT THE AREA, AND WE TRIED TO GET AN IDEA OF HOW WE WANTED TO PROCEED WITH THE INVESTIGATION, BUT THERE WERE NO SPECIFIC PEOPLE THAT WE TARGETED.  IT WAS MOSTLY THE AREA THAT WE FOCUSED ON.

Q.  NOW, ARE YOU FAMILIAR WITH THE DEFENDANTS THAT ARE PRESENT IN THE COURTROOM TODAY?

A.  YES, SIR.

Q.  AND COULD YOU PLEASE IDENTIFY THEM BY NAME AND INDICATE WHERE IT IS THEY ARE SEATED?

A.  SURE.

Q.  AND IF YOU COULD ALSO INDICATE WHETHER YOU'RE FAMILIAR WITH ANY PARTICULAR STREET NAMES THAT ARE ASSOCIATED WITH THAT DEFENDANT.

A.  SURE.  SITTING -- I GUESS WE'LL START THE FURTHEREST FROM ME -- AT THE END OF DEFENSE TABLE, WEARING A DARK SUIT, A WHITE SHIRT, AND A DARK TIE IS GARY PRICE.  HE IS KNOWN AS "HARRY O."

41

THE COURT: OVERRULED. GOVERNMENT'S PB-12 IS ADMITTED.

(WHEREUPON, GOVERNMENT'S

**EXHIBIT NUMBER PB-12** WAS

RECEIVED IN EVIDENCE.)

BY MR. ZEIDENBERG:

Q. NOW, YOU SAID THE DECISION WAS MADE TO CONDUCT AN INVESTIGATION INTO THIS AREA?

A. YES, SIR.

Q. CAN YOU TELL THE LADIES AND GENTLEMEN, FIRST OF ALL, WHAT YOUR ROLE WAS IN THAT INVESTIGATION?

A. SURE. I WAS THE CASE AGENT FOR THE INVESTIGATION.

THERE WERE SEVERAL AGENTS, AS WELL AS DETECTIVES AND/OR OFFICERS, WHO WOULD WORK ON IT. ONE PERSON IS LISTED AS THE CASE AGENT. HOWEVER, WE ALL WORKED AS CO-CASE AGENTS. IT WAS MORE OF A TEAM.

AT ONE POINT, I WOULD SAY WE HAD AS MANY AS FIVE AGENTS WORKING ON THE INVESTIGATION AND PERHAPS THREE DETECTIVES. SOMETIMES IT WAS AS LITTLE AS TWO AGENTS AND TWO DETECTIVES.

Q. WHAT DID YOU DO INITIALLY WHEN YOU DECIDED TO CONDUCT OR INITIATE THIS INVESTIGATION? WHAT WERE THE FIRST STEPS YOU HAD TO TAKE?

A. WHEN WE FIRST DECIDE TO OPEN UP A CASE, WE GET A GENERAL PLAN OF ATTACK -- WHAT WE WANT TO DO. TO GIVE US AN IDEA OF

*Clerks File*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES,
          GOVERNMENT,                    :

 VS.                                     :        CR. NO. 98-329

VINCENT HILL,                            :
JEROME MARTIN,                           :
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :
MAURICE PROCTOR,                         :
SEAN COATES,                             :
          DEFENDANTS.                    :
_____             :
UNITED STATES                            :
          GOVERNMENT,                    :

 VS.                                     :        CR. NO. 99-348

GARY PRICE,                              :
          DEFENDANT                      :
_____             :

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 1, 2001
(MORNING SESSION)
(10:24 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 23 of 159
USCA Case #23-3015    Document #2077668    Filed 07/19/01    Page 87 of 443
Case 1:98-cr-00329-RCL    Document 674    Filed 07/19/01    Page 2 of 104

2

FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
                                 555 4TH ST., N.W.
                                 WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #910
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                 305 H STREET, N.W.
                                 2ND FLOOR
                                 WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7TH STREET, N.W.
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
                                 717 D STREET, N.W.
                                 SUITE 400
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:       HOWARD BRAMSON, ESQ.
                                 717 D STREET, N.W.
                                 THIRD FLOOR
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
                                 901 6TH STREET, S.W.
                                 #409
                                 WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #901
                                 WASHINGTON, D. C.  20004

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 24 of 159
USCA Case #23-3015    Document #2077668    Filed 07/19/01    Page 88 of 443
Case 1:98-cr-00329-RCL    Document 674    Filed 07/19/01    Page 3 of 104

3

I N D E X

WITNESS                    DIRECT      CROSS

ANDRE MURRAY

     BY MR. ZEIDENBERG     9

     BY MR. KIERSH                    69

PROCTOR OR "POO POO?"

A. YES.

Q. AND DO YOU SEE HIM IN COURT?

A. YES.

Q. AND COULD YOU POINT OUT MR. PROCTOR?

A. "POO POO" IN THE BLACK. HE HAS ON A BLACK TOP.

MR. ZEIDENBERG: YOUR HONOR, MAY THE RECORD REFLECT THE IDENTIFICATION OF MR. PROCTOR?

MR. BRAMSON: OBJECTION. HE DID NOT IDENTIFY MR. PROCTOR, BUT SOMEBODY ELSE.

THE COURT: WHAT WAS YOUR OBJECTION?

MR. BRAMSON: THE WITNESS DID NOT IDENTIFY MR. PROCTOR, BUT ANOTHER INDIVIDUAL.

THE COURT: ALL RIGHT. WHO DO YOU THINK IS MR. PROCTOR?

THE WITNESS: SITTING IN FRONT OF THE SCREEN.

THE COURT: SITTING IN FRONT OF THE SCREEN?

THE WITNESS: YES.

THE COURT: MR. BRAMSON?

MR. BRAMSON: A CONTINUING OBJECTION.

THE COURT: THE OBJECTION IS OVERRULED. THE RECORD WILL REFLECT AN IDENTIFICATION.

BY MR. ZEIDENBERG:

Q. AND HOW LONG HAVE YOU KNOWN MR. PROCTOR, "POO POO."

A. SINCE HE WAS YOUNG.

Case 1:98-cr-00329-RCL     Document 1375-4     Filed 04/06/26     Page 26 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 90 of 443
Case 1:98-cr-00329-RCL    Document 674    Filed 07/19/01    Page 63 of 104

63

Q.   AND WAS THERE ONE INDIVIDUAL THAT YOU GENERALLY

ASSOCIATED WITH MR. PROCTOR IN TERMS OF BEING EITHER FRIENDS

OR ASSOCIATES -- CLOSE FRIENDS OR ASSOCIATES OF HIS?

        MR. BRAMSON:   OBJECTION.

        THE COURT:   OVERRULED.   YOU CAN CROSS-EXAMINE.

        MR. BRAMSON:   YOUR HONOR --

        THE COURT:   YOU CAN CROSS-EXAMINE.

        MR. BRAMSON:   GUILT BY ASSOCIATION IS NOT

LEGITIMATE EXAMINATION.

        THE COURT:   WOULD YOU PLEASE SIT DOWN,

MR. BRAMSON.   THE OBJECTION IS OVERRULED.   YOU CAN

CROSS-EXAMINE.

BY MR. ZEIDENBERG:

Q.   WAS THERE AN INDIVIDUAL THAT HE WAS PARTICULARLY CLOSE

WITH, TO YOUR KNOWLEDGE?

        MR. BRAMSON:   OBJECTION.   IT CALLS FOR OPINION AND

SPECULATION.

        THE COURT:   OVERRULED, MR. BRAMSON.

BY MR. ZEIDENBERG:

Q.   IF YOU KNOW.

A.   SIR?

Q.   IF YOU KNOW, WAS THERE SOMEONE THAT HE WAS PARTICULARLY

CLOSE TO, TO YOUR KNOWLEDGE -- MR. PROCTOR, "POO POO"

A.   YES.

Q.   WHO WAS THAT?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 27 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 91 of 443
Case 1:98-cr-00329-RCL    Document 674    Filed 07/19/01    Page 65 of 104

65

(JURY OUT.)

(AFTER RECESS.)

THE COURT:  ALL RIGHT.  MR. KIERSH, ARE YOU READY FOR THE JURY?

MR. KIERSH:  YES, YOUR HONOR.  I HAVE JUST ONE PRELIMINARY MATTER.

MR. DAVIS BROUGHT UP THIS ISSUE OF THE PRESENTENCE REPORT EARLIER THAT YOUR HONOR SAID YOU WOULD SIGN AN ORDER FOR.

QUITE FRANKLY, I CAME IN HERE THIS MORNING NOT EXPECTING TO HAVE TO EXAMINE MR. MURRAY, BUT GIVEN HIS TESTIMONY, I DO HAVE TO EXAMINE HIM.

I WOULD JUST ASK THE COURT TO ALLOW ME TO LATER ON COME BACK, IF THERE IS SOMETHING IN THE PRESENTENCE REPORT, AND REOPEN MY CROSS.

I WILL GO FORWARD NOW, BUT IF THERE IS SOMETHING IN THE PRESENTENCE REPORT THAT IS RELEVANT, I WOULD ASK TO REOPEN.

THE COURT:  I WILL HOLD THAT IN RESERVE.

MR. KIERSH:  VERY WELL.

THE COURT:  LET'S BRING THE JURY IN.

MS. NEGIN-CHRIST:  GOOD MORNING, YOUR HONOR.

CAN I ASK THE COURT'S INDULGENCE A MINUTE?

WITH RESPECT TO THIS WITNESS, I WOULD MAKE TWO JENCKS REQUESTS.  THE FIRST ONE IS THAT HE TESTIFIED THAT HE

HAD A RELATIONSHIP WITH DETECTIVE OR OFFICER FULTON, WHO I KNOW IS IN THE COURTROOM, AND THAT HE HAD, ON SEVERAL OCCASIONS, INFORMED OFFICER FULTON ABOUT PLACES THAT HE COULD -- THAT OFFICER FULTON COULD RECOVER GUNS.  AND TO THE EXTENT THAT OFFICER FULTON WOULD HAVE ANY DOCUMENTATION OF THIS PERSON BEING A RELIABLE INFORMANT, OR, ON THE OTHER HAND, BEING AN UNRELIABLE INFORMANT, THAT WOULD BE JENCKS AND POTENTIALLY BRADY MATERIAL.

THE SECOND JENCKS REQUEST I HAVE IS FOR THE GOVERNMENT TO PROVIDE US WITH THE LETTER THAT MR. MURRAY WROTE TO ASSISTANT UNITED STATES ATTORNEY WAINSTEIN AT THE TIME THAT HE WAS ASKING FOR HELP WITH PAROLE, BECAUSE THIS WITNESS HAS BASICALLY SAID IN HIS DIRECT TESTIMONY THAT, YOU KNOW, HE DIDN'T -- HE DOESN'T WANT ANY HELP FROM MR. ZEIDENBERG.

HE DIDN'T WANT ANY HELP.  HE DID THIS BECAUSE HE WAS CONCERNED FOR THE COMMUNITY.  BUT, ON THE OTHER HAND, THERE IS THIS LETTER TO MR. WAINSTEIN, AND I WOULD ASK THE GOVERNMENT TO PRODUCE THAT, IF THEY HAVE IT IN THEIR POSSESSION.

THE COURT:  MR. ZEIDENBERG.

MR. ZEIDENBERG:  WELL, ON THE FIRST ISSUE, I WOULD DISAGREE RESPECTFULLY THAT ANYTHING HE TALKED ABOUT TO OFFICER FULTON WOULD BE JENCKS.  IT WOULDN'T BE JENCKS UNLESS IT CONCERNED THE EVENTS ABOUT WHICH HE TESTIFIED.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 29 of 159
USCA Case #23-3015   Document #2077668   Filed 10/01/2024   Page 93 of 443
Case 1:98-cr-00329-RCL   Document 674   Filed 07/19/01   Page 86 of 104

86

Q.  AND YOU WENT TO A SENTENCING HEARING THEN, CORRECT?

A.  I WENT TO A WHAT?

Q.  A SENTENCING HEARING.

A.  NO, I DIDN'T.

Q.  WELL, THE JUDGE HAD TO IMPOSE A SENTENCE BECAUSE SOMEBODY GAVE YOU TWO TO SIX YEARS IN JAIL FOR THAT.

A.  YES.  A SENTENCING HEARING MEANING WHAT?

Q.  DID YOU PRESENT AN ARGUMENT TO THE JUDGE AS TO WHAT YOU BELIEVED YOUR SENTENCE SHOULD BE?

A.  DID I PRESENT IT?

Q.  OR YOUR COUNSEL.

A.  YES.

Q.  OKAY.  SO THE JUDGE HEARD BOTH SIDES?

A. BY A P.S.I. REPORT.

Q.  OKAY.  AND DID THE JUDGE SAY TO YOU, "WELL, MR. MURRAY, BEFORE I IMPOSE A SENTENCE, I WANT TO HEAR WHAT YOU HAVE TO SAY"?

A.  YES.

Q.  AND DID YOU ANSWER.

A. YES, I DID.

Q.  AND YOU SAID SOMETHING TO THE EFFECT, "I AM SORRY, AND I AM CHANGING MY LIFE, AND I AM GOING TO FOLLOW THE RULES NOW"?

A.  I NEVER TOLD HIM I WAS CHANGING MY LIFE.

Q.  WELL, YOU SAID, "I AM GOING TO FOLLOW THE RULES NOW"?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 30 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 168 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 1 of 94



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C. |
| | . March 7, 2001 |
| vs. | . 2:12 p.m. |
| VINCENT HILL, | . (AFTERNOON SESSION) |
| JEROME MARTIN, | . |
| SAMUEL CARSON, | . |
| WILLIAM K. SWEENEY, | . |
| SEAN COATES, | . |
| Defendants | . |

. . . . . . . . . . . . .

**FILED**

**MAR 1 1 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

    Government,

  vs.

Docket No. CR 99-348

GARY PRICE,

    Defendant.

. . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                         ANJALI CHATURVEDI, AUSA
                         U.S. Attorney's Office
                         555 Fourth Street, N.W.
                         Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                         601 Indiana Avenue, N.W.
                         Suite 910
                         Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                         305 H Street, N.W.
                         Second Floor
                         Washington, D.C.  20001



BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

(Page 168 of Total)

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 31 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 169 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 2 of 94

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 32 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 170 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 3 of 94

3

P R O C E E D I N G S

THE COURT:  Would you ask Officer Best, please, to return.  You can bring the jury in now.

(Jury In.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 33 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 171 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 52 of 94

52

(Bench conference on the record.)

MS. CHATURVEDI:  Your Honor, the next witness is James Montgomery, and the marshals have asked for us to take a recess to allow them to bring him up.  He's the next witness.

MR. BESHOURI:  Your Honor, before the government goes, can we take up an issue or two briefly?  The Court was provided some months ago with a James Montgomery file, and the Court noted within that file were a number of FBI 302's.  I think amounting to 10 or 11 of them.

The government has advised that they don't intend to turn those over as Jencks.  It's my recollection when we took this issue up before in another context that the Court believed that 302's were statements of the witness, and I would ask the government to turn those over.  That's the first point.

THE COURT:  I don't recall that they were statements of the witness.  I mean, in the case of Montgomery, if you're talking about the materials that I reviewed in camera --

MR. BESHOURI:  Yes.

THE COURT:  -- then I will ask the government to double-check and see whether or not any one of them is in substance a statement of the witness.

MR. ZEIDENBERG:  Your Honor, we have reviewed the 302's.  All the 302's that pertain to Robert Smith, Butchie, have been turned over.  The other 302's do not in our view

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 34 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 172 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 53 of 94

53

constitute Jencks.  They are not -- they are -- Agent Lisi takes rough notes, and then from them he writes up a narrative that is not shown to the witness.  It is not meant to be substantially verbatim and is not substantially verbatim and in no way can be construed under the Jencks Act in the cases interpreting it as statements of James Montgomery.

MR. BESHOURI:  If I may reply briefly.

MR. ZEIDENBERG:  I'm happy -- if I may -- we've litigated this I believe in the context of another witness, but I'm happy to provide the Court with case authority to support that proposition.  302's drafted in that fashion do not constitute Jencks.

MR. BESHOURI:  My view, if I may, Your Honor?

THE COURT:  Sure.

MR. BESHOURI:  My view is -- I'm in total agreement with the government when it comes to rough notes.  That is not Jencks.  But when rough notes evolve into from phrases and words into full statements and sentences, we come much, much closer if not substantially verbatim in terms -- as to the witness' statements to the FBI agent.

I have to defer to the Court, because obviously I can't look at these to make an argument that they are substantially verbatim.

THE COURT:  How many of them are there?  How many of them are we talking about?

54

MR. ZEIDENBERG:  I can't --

MS. CHATURVEDI:  Rather lengthy, Your Honor.  We previously submitted a three-ring notebook to Your Honor with a table of contents, and it listed -- it included all of the 302's.

THE COURT: Well, I gather that the only ones that I have looked at are the ones that deal with Butchie?

MS. CHATURVEDI:  No, Your Honor.

THE COURT:  I've looked at all of them?

MS. CHATURVEDI:  Actually, Your Honor, you had asked the government to provide in camera all the 302's relating to James Montgomery.  I did do that previously.  Your Honor reviewed those documents.

THE COURT:  We did review those?

MS. CHATURVEDI:  In camera.

THE COURT:  All right.

MS. CHATURVEDI:  Your Honor previously ruled that they weren't Jencks.

THE COURT:  Then my prior determination stands.

MR. BESHOURI:  With all due respect, I do remember the Court saying that there was no Brady in those 302's save for one point that the Court advised us of in that order, but I don't recall the Court taking any position on whether they were Jencks.

THE COURT:  Maybe that's true.  I am not sure that I

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 36 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 174 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 55 of 94

55

did look for Jencks.

MS. CHATURVEDI:  I think Your Honor returned the notebook to the government.

THE COURT:  Would you see if you can find it and let me look at it again.

MS. CHATURVEDI:  In addition, Your Honor, as Mr. Zeidenberg has said, we have case authority as to whether or not 302's constitute Jencks material and we can provide that to counsel and the Court at the same time.

MR. KIERSH:  On a related matter, we'd like to see the --

THE COURT:  Let me let the jury go.

MR. KIERSH:  Okay.

(End of bench conference.)

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 37 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 175 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 76 of 94

76

Q.   Subsequent to that, Mr. Montgomery, on November 2, 2000, did you enter into a third plea agreement with the United States?

A.   Yes, I did.

MR. ZEIDENBERG:  Can I approach again, Your Honor?

THE COURT:  Yes.

BY MR. ZEIDENBERG:

Q.   Showing you what's been marked G42A, do you recognize that, sir?

A.   Yes.

Q.   Is that the plea agreement that you entered into on November 2, 2000?

A.   Yes.

Q.   Can you tell the ladies and gentlemen what it is you pled guilty to on November 2, 2000?

A.   Each count?

Q.   Well, the count to which you pled guilty was what, the charge you pled guilty to was what?

A.   RICO conspiracy.

Q.   And in pleading guilty to that RICO conspiracy did you have to admit your responsibility for a number of criminal acts?

A.   Yes.

Q.   Okay.

MR. ZEIDENBERG:  Your Honor, if I haven't already

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 38 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 176 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 77 of 94

77

done so, I move to admit Government Exhibit G42E and G42A.

THE COURT: E is already in, G42A is admitted.

MR. ZEIDENBERG: Thank you.

(Whereupon, Government's Exhibit G42A was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q. Now, going to the overt acts, or the predicate acts, going to the first one, Mr. Montgomery, can you tell the ladies and gentlemen what the first predicate act you pled guilty to pursuant to that plea agreement?

A. To the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q. Actually that's number two. I would ask you to look just above that. It should be on the --

A. I'm sorry. To conspiracy, conspiracy to distribute and possess with intent to distribute 1,000 kilograms of marijuana.

Q. Okay. And let me just stop you and ask you about that. Were you involved in a marijuana conspiracy in the 1990's?

A. Once it was explained to me, yes, I realized that I was.

Q. At the time you were selling marijuana did you believe you were involved in a conspiracy?

A. No.

Q. As you understand it, your responsibility here, you say that you pled guilty to distribute and possess over a thousand

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 39 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 177 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 78 of 94

78

kilos of marijuana, did you -- do you believe you personally sold a thousand kilos of marijuana?

A.   No.

Q.   What is your understanding of why it is you're responsible for selling 1,000 kilos of marijuana?

A.   I don't remember -- I don't remember how it was explained to me, but I remember certain aspects.

Q.   Well, what is your understanding of why it is you are responsible for selling a thousand kilos if you didn't personally sell a thousand kilos?

A.   If I am correct, that any conspiracy that everyone is responsible for -- everyone who sold it is responsible for each other.

Q.   Now, going to number two, what was the second predicate act that you admitted your responsibility for?

A.   For the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q.   Did you participate in the murders of Maurice Hallman and Leonard Hyson?

A.   Yes.

Q.   Going to number three, what was the third predicate act that you admitted responsibility for in that plea?

A.   Assault with intent to kill of a police officer on September 10, 1991.

Q.   Where did that shooting occur?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 40 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 178 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 79 of 94

79

A.    On East Capitol Street.

Q.    Did you participate in that shooting?

A.    Yes.

Q.    What was the fourth predicate act that you admitted responsibility for?

A.    First degree murder while armed on June 22, 1994, the murder of Timothy Benton.

Q.    Did you participate in the murder of Timothy Benton on June 22, 1994?

A.    Yes.

Q.    What was the fifth predicate act that you pled guilty to, or I should say admitted responsibility for?

A.    Conspiracy to commit murder in connection with the efforts made to kill Kenneth Adams.

Q.    And Kenneth Adams, as far as you knew at the time, was a government witness at the time you were trying to kill him?

A.    Yes.

Q.    Is that why you were trying to kill him?

A.    Yes.

Q.    What was the sixth predicate act that you admitted responsibility for in that plea?

A.    Aiding and abetting in first degree premeditated murder in connection with Chrishauna Gladden's murder.

Q.    Which occurred when?

A.    October 5, 1996.

80

Q.    What was the seventh -- let me jump back.  Did you participate in the murder of Chrissy Gladden and assist in that murder?

A.    Yes.

Q.    And number seven, what was that predicate act that you admitted responsibility for?

A.    Three counts of attempted armed robbery and three counts of murder in connection with the November 17, 1996 murders of Alonzo Gaskins,  Darnell Mack, and Melody Anderson.

Q.    Mr. Montgomery, did you participate in that home invasion and subsequent murders of those three individuals?

A.    Yes.

Q.    What was the eighth and final predicate act that you admitted responsibility for in connection with this plea?

A.    Conspiracy to commit murder in connection with the efforts to find and kill Robert Smith, aka Butchie, a government witness.

Q.    Did you make efforts to try and find and kill Butchie?

A.    Yes.

Q.    What was the reason you were trying to kill Butchie, was it because of his status as a government witness?

A.    No.  Because of some information he found out about us.

        MR. KIERSH:  Objection.

        MR. ZEIDENBERG:  I will rephrase it, Your Honor.

        THE COURT:  Do you want to approach the bench?

81

MR. KIERSH:  If the question is going to be rephrased so that we avoid the problem then we don't need to.

THE COURT:  Well, I'm not sure what the rephrasing is that needs to be made.  Do you mean it was a leading question?

MR. KIERSH:  No, no, Your Honor.  It's the substance of it.  Mr. Zeidenberg has already agreed to rephrase it to avoid problems.

BY MR. ZEIDENBERG:

Q.   Did you believe that Butchie, Robert Smith, might end up testifying against you and others?

A.   Yes.

Q.   Is that why you wanted to kill him?

A.   Yes.

Q.   Now, what is your understanding, Mr. Montgomery, of what penalties you face potentially in connection with this plea agreement that you signed, this last plea agreement, in November of 2000?

A.   Excuse me?

Q.   What do you think -- what's your penalty?  What's the possible penalty in this case?

A.   Life without parole.

Q.   Mr. Montgomery, can you tell the ladies and gentlemen when you first started committing robberies in the District of Columbia, how old were you?  When I say robberies -- let me

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 43 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 181 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 82 of 94

82

rephrase it.  Why don't we rephrase it as stealing.

THE COURT:  As what?

MR. ZEIDENBERG:  Stealing.

THE WITNESS:  When I was about 7 or 8.

BY MR. ZEIDENBERG:

Q.    Where were you stealing from?

A.    From out of stores.

Q.    What kind of stores?

A.    Like food stores.

Q.    Such as?

A.    Safeway, People's Drug Store.

Q.    What were you stealing?

A.    Toys, candy.

Q.    Did that stealing from stores, such as the Safeway or drug stores, progress into other activities?

A.    Yes.

Q.    Such as what?

A.    Going to shopping malls and shoplifting and breaking into things.

Q.    Did you do that alone or did you do that with other people?

A.    With other people.

Q.    Who did you do it with?

A.    A lot of other people.

Q.    I am asking if you could confine your answer to the

83

defendants that are involved in this case.

A.    Me, Chin, Bird, and Pimp.

Q.    What type of activities were you involved in with Chin, Birdy, and Pimp, and if you could give us an age range, how old were you at the time?

A.    Personally myself I had been doing it longer than they had.

Q.    Okay.

A.    I think it was maybe around the age of 13 or 14.

Q.    And what type of activities were you getting involved in by that time?

A.    Pretty much breaking into video game machines and parking meters.

Q.    Who were you involved in this activity with?

A.    Chin, Bird, and Pimp.

Q.    What did you -- after you were 13-14 what type of activities subsequent to that did you get involved in?

A.    Selling drugs.

Q.    At some point were you stealing dirt bikes?

A.    Yes.  Yeah, I was stealing dirt bikes before I was selling drugs.

Q.    And where were you stealing dirt bikes from?

A.    From different places.  But at times, if I couldn't find a dirt bike nowhere out in the community, I would go down to the police station and steal one.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 45 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 183 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 84 of 94

84

Q.   How would you steal a dirt bike from the police station?

A.   I would have to have somebody to go with me to keep lookout.

Q.   I'm sorry?

A.   I would have to take somebody with me to keep lookout.

Q.   Who did you bring with you as lookouts?

A.   Chin a few times.

Q.   And can you just explain how it is that you could go to the police station and steal a dirt bike?

A.   Well, back then I assume that because we was so young they would never expect us to be up to nothing, so it made it kind of pretty easy.

THE COURT:  You can pick a convenient point, Mr. Zeidenberg.

MR. ZEIDENBERG:  This is as good as any, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we are going to conclude for the day.  And as you recall, we are not going to be in session tomorrow.  So we will be back on Monday morning at 10:00.  Have a nice weekend.  Be healthy.

(Jury out.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 46 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 184 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 85 of 94

85

(Jury out.)

MR. DAVIS:  Your Honor, after Mr. Montgomery is out of the courtroom I would like to address the Court very briefly.

THE COURT:  You may address the Court briefly.

MR. DAVIS:  Very briefly, Your Honor, we would make -- on behalf of Mr. Hill I would make a Jencks and a combination Jencks and Brady request regarding Mr. Montgomery's witness protection file and related paperwork.  I do this for several reasons.  The Witness Protection Program -- I have been through this in other cases -- it involves a process of interviewing witnesses, interviewing the witness that wants to enter the program, and it also -- a series of evaluations are done to determine whether the witness is appropriate for the program.

And once the individual is accepted then there are evaluations done to determine whether the witness' continued acceptance and continuance in the program is acceptable. Polygraphs are done, psychologicals are done -- I don't know much about Mr. Montgomery's background, and I mean no disrespect to him, but he sounds a bit slow.  Say, for example, if he were retarded, there is a wealth of information out there that indicates that individuals that suffer from retardation are literally extremely easily led.  They thrive on pleasing other individuals.  This is something we would

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 47 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 185 of 443
Case 1:98-cr-00329-RCL   Document 953   Filed 03/11/03   Page 86 of 94

86

consider Brady.

I have some unsubstantiated information that Mr. Montgomery has suffered brain damage in the past. I noticed he has a very large scar on the side of his head. When they did the psychological testing these are factors that would have been touched upon possibly during the evaluation process.

But I think since the whole objective of the Witness Protection Program is to interview the witness and determine that witness' fitness in the program, there must be some Jencks material or Brady material that has come out of it.

Now, since we are going to be in recess for several days, what I would request, understanding the sensitive nature of all these materials, what I would request is is that the United States make his complete Witness Protection file and related paperwork available to Your Honor, and Your Honor can review it ex parte and make a determination as to whether or not there is Brady material or Jencks contained in it.

I have received these materials in the past in cases of this nature.

THE COURT:  Do you have any authority on it?

MR. DAVIS:  Well, I haven't.  I have never had it contested before.

THE COURT:  What other Judges have you had it --

MR. DAVIS:  Well, most recently with Judge Sporkin in the Fern Street case, where several polygraphs that were

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 48 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 186 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 87 of 94

87

turned over, there were some evaluations that were turned over that were within like a report format.

MR. ZEIDENBERG:  Your Honor, if I could, I don't mean to interrupt.

MR. DAVIS:  I think Mr. Volkov turned them over to us before.  And I think he is the head of the gang unit now. I don't know why he did it.  But we didn't even have to file for it, we just requested it and the Judge reviewed it.

MR. ZEIDENBERG:  Your Honor, as a matter of fact, we have already turned that material over to Your Honor.  That was part of the material that the Court reviewed months ago.

THE COURT:  In camera?

MR. ZEIDENBERG:  In camera review, pursuant to a request -- I think Mr. Kiersh made the request at that time -- the entire paperwork pertaining that Mr. Davis is referring to was reviewed already by Your Honor.

THE COURT:  Okay.

MR. ZEIDENBERG:  And the Court ruled that there was no Brady of any type.

THE COURT:  That's correct.  And it's already been placed under seal and is a Court exhibit as I recall.

MR. ZEIDENBERG:  Your Honor, I --

MR. DAVIS:  Your Honor, I don't mean to interrupt, but the very fact that Mr. Montgomery was discharged from the program shows that he was not in compliance with the rules.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 49 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 187 of 443
Case 1:98-cr-00329-RCL    Document 953    Filed 03/11/03    Page 88 of 94

88

And I have a glimpse of what was -- of the reason, as to why he was discharged from the grand jury materials. But in the context of not being able to follow the rules or not being totally forthright with individuals or having been caught making misrepresentations, these are things that at this stage of the case -- this is probably the most critical witness in this case for all of these defendants. And I think we have to be very careful in reviewing his materials.

THE COURT: Whatever exists, according to Mr. Zeidenberg, I have already reviewed.

MR. DAVIS: Plus, I am not an expert, but there are some mental health issues with this man, either in terms of retardation or in terms of brain damage. There is something going on here, just from watching him, what little I can see from where I am seated.

THE COURT: I will, once again, review the materials if they are available to me.

MR. DAVIS: That's what I would ask, Your Honor. I would ask that you be provided the complete materials, and then in the context of my representations now, check them again to see if there is something.

THE COURT: I will look.

MS. CHATURVEDI: Your Honor, just factually, Mr. Montgomery was not discharged from the Witness Protection Program, contrary to Mr. Davis' assertions. I will return the

89

notebook to chambers that I had previously provided, so that Your Honor can have a chance to look at those materials again. And there is no evidence of any sort of brain damage or retardation found in any of the documents provided to the Court, but I will provide them by the close of business tomorrow.

THE COURT:  All right.

MR. KIERSH:  Maybe I can shed some light on this. There is a document, and I don't have it with me now so I can't identify it with precision  -- what I will do is I will find it and I will provide it to all counsel.  But there is a document in Mr. Montgomery's past that talks about him having brain damage.  So this notion of him --

THE COURT:  Well, if you can find a document it might help us identify what it is that you're talking about.

MR. KIERSH:  Yes, I will.  Over the recess I will get that and supply it to everyone so everyone knows -- give it some context.

THE COURT:  Okay.

MR. BESHOURI:  Separate issue, Your Honor.  I have resisted objecting up until now about these events that happened when Mr. Montgomery was a young teenager, an adolescent, parking meters, stealing -- breaking into parking meters, that sort of thing -- he has included my client in that activity.  That's, of course, way beyond or prior to the

90

conspiracy alleged here.

THE COURT:  And I will reiterate the instruction, if you will remind me on Monday, that this background material is not charged in the indictment and is to be considered by the jury only in connection with Mr. Montgomery's credibility.

MR. BESHOURI:  I appreciate that, Your Honor.  It, obviously, has an impact on my client.  And I am asking the Court to put some brakes on to what extent the government can go into this just to establish a relationship.  They have, obviously, established a relationship, so the need for this kind of testimony is -- frankly, it's unnecessary to establish a relationship any longer.  All it's doing is piling on during a period that precedes the conspiracy by many, many years.

THE COURT:  At the moment it does not appear to me to be excessive, but I will keep that in mind.  If you will remind me on Monday, if you wish a repetition of the cautionary instruction, I will be glad to give it.

MR. BESHOURI:  Very well.

MR. ZUCKER:  Your Honor, if I may, it was touched on before by Mr. Beshouri but it seems to have fallen by the wayside.  On the 302s -- in connection with the conversation on the 302s that Agent Lisi prepared there was also reference to some notes he prepared, notes he made while interviewing Mr. Montgomery, and I would ask that those be --

THE COURT:  I have reviewed those.

91

MR. ZUCKER:  You have?

THE COURT:  I have reviewed Agent Lisi's notes. They do not constitute Brady material --

MR. ZUCKER:  Or Jencks?

THE COURT:  And none that I saw would be characterized as Jencks Act statements.

MR. ZUCKER:  Thank you.

THE COURT:  Monday morning at 10:00.

(Whereupon, the hearing was adjourned at 4:35 p.m.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C. |
| | . March 12, 2001 |
| vs. | . 1:42 p.m. |
| | |
| VINCENT HILL, | . (AFTERNOON SESSION) |
| JEROME MARTIN, | . |
| SAMUEL CARSON, | . |
| WILLIAM K. SWEENEY, | . |
| SEAN COATES, | . |
| | |
| Defendants | . |

. . . . . . . . . . . . . . . . . :

UNITED STATES OF AMERICA,            .

            Government,            .

    vs.            .

GARY PRICE,            .

            Defendant.            .

. . . . . . . . . . . . . . . . .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Docket No. CR 99-348

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:            PETER ZEIDENBERG, AUSA
            ANJALI CHATURVEDI, AUSA
            U.S. Attorney's Office
            555 Fourth Street, N.W.
            Washington, D.C.  20001

For the Defendant Hill:            CHRISTOPHER DAVIS, ESQ.
            601 Indiana Avenue, N.W.
            Suite 910
            Washington, D.C.  20004

For the Defendant Martin:            JOANNE HEPWORTH, ESQ.
            305 H Street, N.W.
            Second Floor
            Washington, D.C.  20001



BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 54 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 192 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 2 of 96

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 93

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 55 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 193 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 3 of 96

3

P R O C E E D I N G S

THE COURT:  Ready for the jury?

MR. ZEIDENBERG:  Yes, Your Honor.

THE COURT:  All right.  Mr. Montgomery, you may resume the stand, and we can bring the jury in.

THE DEPUTY MARSHAL:  Jury panel, Your Honor.

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present. THE COURT:  Thank you, Marshal.  We're all set.

MR. ZEIDENBERG:  Thank you, Your Honor.

JAMES MONTGOMERY, GOVERNMENT'S WITNESS, RESUMED THE STAND

DIRECT EXAMINATION (Cont.)

BY MR. ZEIDENBERG:

Q.   Mr. Montgomery, I just have a -- want to go back and ask you a couple of more questions about the murders of Maurice Hallman and Leonard Hyson, who you knew as Slick.

Immediately after the shootings while you were still in the alley or leaving the alley with Mr. Carson, did you talk to Mr. Carson about whether or not he had fired his gun?

A.   I mean, it was obvious that he had fired his gun, cause I seen Slick laying right there bleeding in the head.  He said to me that I was scared.  So I was like I ain't scared.  And I told him -- so I told him do he think that this is my first time ever killing someone, like that.

Q.   When the shooting happened, you said that you couldn't

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 56 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 194 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 4 of 96

4

hear the other gunshots; is that right?

A.    I told him that when I was shooting Maurice, I ain't hear his gun go off, and he told me that that's because he's sharp.

Q.    He's sharp?

A.    Right.  And he said that he hit him in the head six times before he hit the ground.

Q.    Did he say where he had shot the victim, Mr. Hyson?

A.    In the head.

Q.    Did you say where you had shot Mr. Hallman?

A.    I told him that I hit him one in the body and the rest in the head.

Q.    Did you know whether or not that was true?

A.    I wasn't sure if I hit them all in his head, but I know I hit him in his head.

Q.    Now, I want to direct your attention to 1991.  Do you recall Samuel Carson getting a red Acura Legend in 1991 at some point?

A.    Yes.

Q.    Do you remember the first time you had gotten inside that car?

A.    Yeah.

Q.    Can you tell the ladies and gentlemen about that?

A.    I don't remember exactly what time of the year it was.  I know it was warm outside.  I had this scooter, so he told me to park it in front of his mother house.  And his mother was

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 57 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 195 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 14 of 96

14

associated with?

A.    The Fifth and O and Sursum Corda.

Q.    How did you know that he was her baby's father?

A.    Because I heard Chin saying it before.

Q.    Now, did you have a conversation with Mr. Carson shortly before those young women were killed about him possibly getting killed with his own gun?

A.    Yes.

Q.    Can you tell the ladies and gentlemen about that conversation, what you remember of it?

A.    Chin was saying that he had an AK, and he put it over T.T. house.

Q.    What's an AK?

A.    AK-47 is a assault rifle.

Q.    What did he say he had done with it?

A.    Put it over T.T. house.  He kept it over T.T. house.  And she was -- she kept telling Chin that she put the gun in a closet behind a lot of stuff so her kids wouldn't find it and play with it or whatever.

Chin said that he kept on asking her about the gun, and she kept giving him excuses.  So he say that Pimp told him that he going soft over a broad.

Q.    I'm sorry?

A.    Chin said that Pimp told -- Pimp kept saying to him that he going soft over a broad.

15

Q.   Soft over a broad?

A.   Right.  And that she going to end up letting him get killed by his own gun.

Q.   Now, had you ever been in that apartment?

A.   Yeah.

Q.   When you were in the apartment, did you notice any photographs of Sam Carson?

A.   One.

Q.   Where was it?

A.   Not exactly sure, but I believe it was on the wall over top of the table like where the little kitchen area is.

Q.   What did the picture look like?

A.   Chin had on a Kufie and a stripy shirt and some blue jeans.

Q.   What size was the picture?

A.   A poster size.

Q.   Now, in the spring or summer of 1991, did you have a conversation with Sam Carson about the murders of T.T. and Terita?

A.   I believe when I first seen it on the news that they had got killed, I asked Chin was that his work, and he told me, no.  And then one day I was coming over his mother house, and he was coming in, and he said he was about to lay down because the homicide detectives had came and got him and questioned him about T.T. and Terita murder.

16

Q.    Did he tell you about what happened when he got picked up by the homicide?

A.    They questioned him.

Q.    What did h say about it?

A.    That they ain't have nothing on him.  But, I mean, at that particular time he didn't tell me that whether he did or whether he didn't commit those murders or not.

Q.    Did he subsequently talk to you about what happened?

A.    Yes.

Q.    What did he tell you?

A.    That Meechie and Poo-Poo and Chin, they went over T.T. house, and Meechie was driving, and Poo-Poo was in the back, and Chin said that he went in.  You know, he came up the steps and knocked on the door, and she came downstairs and opened the door.

Q.    I'm going to ask you to keep your voice up, Mr. Montgomery so everyone can hear you.

A.    He say that she came downstairs to open the door, and he came in.  He closed the door behind him, and he went up the steps, and they went into the living room area, and he was talking to her, and she asked him who was with him, and he said, that he told her nobody wasn't with him.  But Poo-Poo and Meechie was outside waiting for him.

So he said that they sat down on the couch and was talking, and he kept asking her about the gun, and she kept on

Case 1:98-cr-00329-RCL     Document 1375-4     Filed 04/06/26     Page 60 of 159
USCA Case #23-3015     Document #2077668     Filed: 10/01/2024     Page 198 of 443
Case 1:98-cr-00329-RCL     Document 954     Filed 03/11/03     Page 17 of 96

17

saying that she got to get the knob fixed or whatever and --

Q.   I'm sorry?

A.   She kept saying that she had to get the knob fixed.

Q.   The knob to what?

A.   To her door.  She said the knob was broke off the door.
And Chin said he told her that he know how to open it with a
butter knife.  So he said that she kept on saying that she'll
get the gun for him, but she couldn't get it right now because
it was behind a lot of stuff; and she didn't want to wake her
kids up or wake the kids up, whatever.

So Chin said that he got up and went to the bathroom, and
put his gun in a clothes hamper, and he said he came back out.
And he said he yawned in front of her, and lift his shirt up
so she could see that he wasn't strapped.

So he said he sat back down, and he said he was trying to
give her the benefit of the doubt, you know, so she could get
the gun.  And she kept giving him excuses and kept giving him
excuses.  So he said that he got back up and he went in the
bathroom.  Told her that he had to go back to the bathroom and
got the gun.

And he said that he came out and he shot her in the head,
and then Terita was in the bed, and he said that she was
lifting up, and before she opened her eyes that he shot her in
the head, and she just laid back down.

Q.   Did he say what he did at that point?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 61 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 199 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 18 of 96

18

A.    He said that he wiped off everything that he touched, and he took his picture and left.  And he said, when he got back outside and got in the car, then Meechie pulled off fast and made the tires screech, and he got mad at him about that, and told him, don't never pull off like that.

Q.    Now, going back to the picture, did he tell you why it is he took the picture?

A.    I'm not sure if he told me the reason why he took the picture.

Q.    Did he say what he did with the picture once he took it?

A.    I don't know what he did with the picture.

Q.    Now, did you have a conversation with Meechie about this homicide, double homicide?

A.    Yeah, down at Lorton.

Q.    And when was it that you were down in Lorton?

A.    From '91 to '94.

Q.    And do you remember when it was in '91 that you got arrested?

A.    November 13.

Q.    I'm sorry?

A.    November 13.

Q.    1991?

A.    Yes.

Q.    How long before you got sent to Lorton after you got arrested in November of '91?

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 62 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 200 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 28 of 96

28

A.   Off a phone.

Q.   What do you mean?

A.   Off the phone.  It was posted on the phone in the jail.

Q.   I'm sorry?

A.   It was posted on the phone in the D.C. Jail.

Q.   What's posted on the phone there?

A.   The number to the FBI.  So I called them and lied to them telling them that I knew of some murders that had happened, and they questioned me about it, and I blamed it on Wayne.

Q.   On who?

A.   On Wayne.

Q.   Wayne who?

A.   On Wayne Perry.

Q.   Now, after you called the FBI, did they bring you some place to speak with them?

A.   Yeah.

Q.   And what murders did you blame on Wayne Perry?

A.   T.T. and Terita murder and Penny Baker.

Q.   Penny Baker?

A.   Yeah.

Q.   And when you told them that Wayne Perry was responsible for that, can you tell the ladies and gentlemen why it was you picked Wayne Perry's name?

A.   Because Alpo already had got locked up, and when Alpo got locked up, Wayne and them was making bets that Alpo was going

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 63 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 201 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 29 of 96

29

to snitch on them.

Q.    Okay.  Let me stop you there, because that's a name that we haven't heard before.  Who is Alpo?

A.    Alberto Martinez.

Q.    And what relationship did Alpo have with Wayne Perry?

A.    Drug dealer.

Q.    Okay.  So you're saying that Alpo -- he was close to Wayne?

A.    I don't know what their friendship relationship was.

Q.    Alpo gets arrested?

A.    Yeah.

Q.    And what was Wayne saying about what was going to happen once Alpo got arrested?

A.    That Alpo was going to snitch on him, because they said Alpo was crying in court.

Q.    So as a result that you knew that Alpo was likely to snitch on Wayne, why did you think it was a good idea to blame these murders on Wayne?

A.    So that -- I was trying -- well, really, I got charged for the assault on a police officer, and I knew that I didn't assault the police officer.  I ain't know how I was going to beat it, so I more or less I was trying to make a fake bargain with them to get me off of it.  I mean, basically that's it.

Q.    So was it -- was there any truth to that story that Wayne Perry was involved in killing those two women?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 64 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 202 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 33 of 96

33

something to do with Boo-Boo getting killed or getting Boo-Boo killed.

Q.    So as far as you understood, they were responsible?

A.    Right.

Q.    So what happened while you were at Chin's mother's house this day, right after Boo-Boo gets killed?  What is the discussion about?

A.    Pimp was calling around trying to find a van within a reasonable price, because he was saying that they knew his van when they see it.

Q.    So what happened?

A.    So he never got another van from out of that book or nothing.  Basically I don't think nothing will happen that particular day.

Q.    Now, after Boo-Boo got killed, did you have a conversation with Sam Carson about what led up to Boo-Boo getting killed and the murder of Tony Fortune?

A.    Yeah.

Q.    Can you tell the ladies and gentlemen about your conversation with Sam Carson about that?

A.    Chin was saying that -- let me say this first.  Once Boo-Boo got killed, I really didn't care why the beef was on, but Chin was telling me that Boo-Boo got killed because he killed Tony Fortune.

Q.    Because who killed Tony Fortune?

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 65 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 203 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 34 of 96

34

A.    Chin.

Q.    Did you know who Tony Fortune was?

A.    I heard of him.  I didn't know him.

Q.    What did Chin tell you about what happened with Tony Fortune?

A.    He say that Pimp and Tony Fortune had had some words before, and Tony Fortune was trying to lean on Pimp.

Q.    Lean on Pimp?

A.    Yeah.  Like trying to -- they said -- I heard a lot of different rumors about Tony Fortune, but I don't know him. But Chin was telling me that Tony Fortune was trying to make Pimp pay him, pay him money.  And, you know, they had a brief brush right then and there, but nothing happened.

Then he was saying that at the crap game Pimp had won most of the money, and Tony Fortune was mad about it, and telling Pimp that he couldn't quit or that he had to give him back some of his money.

So Chin say that he whispered in Pimp ear and ask him, do you want me to kill this piece of shit?

Q.    Did he say what, if any, response Mr. Martin, Pimp, said when Chin asked him if he wanted him to kill Tony Fortune?

A.    He didn't say Pimp say yes or no, but he said he went and got a gun.

Q.    Did he say where he went to get his gun?

A.    He said he went to the car.  But as to what car, I don't

35

know.

Q.    What did he say happened once he got his gun?

A.    That he shot Tony and he fell, and then he went over top of him and hit him some more.

Q.    Did Chin say what happened after he had killed Tony Fortune in terms of a beef starting up?

A.    Yeah, and he said that they had came through -- that Boot-Em-Up and them had came through before and had shot or whatever and Boo-Boo and Pimp was mad at each other because Pimp was creeping with Boo-Boo baby mother, Shaun, so they was having words.  They wasn't beefing with each other, but they just wasn't having words.

Q.    Now, after Boo-Boo was killed, do you recall visiting Boo-Boo's baby's -- strike that.

    Do you remember visiting Boo-Boo's mother's house on Ridge Road?

A.    Yeah.

Q.    And do you recall who else was there?

A.    Me and Ty was together, and we came in.  Boo-Boo was already dead, so we came in Boo-Boo mother house, and Pimp and South was in there cleaning their guns.  So me and Ty came in there to put our guns up.  The gun I had belonged to Ty.

Q.    Ty, the individual you identified from a picture the other day?

A.    Right.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 67 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 205 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 36 of 96

36

Q.   Okay.  What happened next?

A.   So we was about to leave back out, and Pimp said that Kyle had just gave him a call saying that Block and them was around 58th.

Q.   And who is Block again?  Remind us.

A.   What do you mean, who is he?

Q.   Who is Block?

A.   I don't know him personally.

Q.   No, who did you understand Block to be?  What role did he have?

A.   Drug dealer.

Q.   I'm sorry?

A.   A drug dealer as far as I know.  I mean, as far as from being around 58th

Q.   Okay.  And was he someone that you associated with being responsible for Boo-Boo getting killed?

A.   Right.  That he had something to do with Boo-Boo getting killed.

Q.   Now, what was your plan for that evening, this particular evening?

A.   Before this?

Q.   Well, once you got into the house this evening, at Boo-Boo's mother's house, what was the plan?  Was there just a plan discussed for that evening?

A.   No.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 68 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 206 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 37 of 96

37

Q.    What happened?

A.    We was putting the guns -- Ty was about to put the guns in Boo-Boo mother house, so Pimp said that Kyle called him saying that Block was around there.  So Pimp asked me was I going?  So I say, no doubt.

Q.    Going where?

A.    Around there to where Block was at.  So I say, no doubt. And he ask me did I have a gun?  So I showed him the pistol I had.  It was a revolver.  So he gave me another pistol.

Q.    What kind of gun did he give you?

A.    An automatic, a 9 millimeter automatic.

Q.    So what happened once you had that 9 millimeter.

A.    What do you mean, what happened?

Q.    What happened?  Did you guys stay in the house or did you go out?

A.    We left.

Q.    Tell us.

A.    So Pimp had a AR 15, so he asked me did I want to take that.  And I was like, no, cause it was too big, and I didn't want somebody to see me coming out Boo mother house with that gun.

So we get in Anthony car, and Pimp driving and South in the passenger seat.  Ty sitting behind Pimp, and I was sitting behind South.  So we go around there, and I'm telling Pimp that I don't know none of them.  I say the only one I know is

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 69 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 207 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 38 of 96

38

Keith Holmes.  I said I know him when I see him.  I don't really know him, but I know him when I see him.

So I said if you see anybody that you think with it, let me know, and I said, I'm going to blast them.  You know what I mean?  And I had every intention of doing it.  So I said, I'm going off of whatever you go off of.  So we kind of finished and went through the alley.  Pimp was telling everybody to spread out in case they see us and try to bust.  So we won't -- so one of us won't shoot one of our own.

So we walked out, came out the alley and was walking up Blaine, and we had our guns out in full view.  So we walked almost to the top of Blaine.

Q.   Is this daytime or nighttime?

A.   It's nighttime.

Q.   And what happened when you got to the top of Blaine?

A.   So it was mostly like little kids.  Other people was running as they seen us coming up the street.  So I say, you don't see nobody?  I was pressed to bust somebody.  I was pressed.

Q.   What does that mean?

A.   I was pressed to shoot somebody.  I wanted to get some get-back for them killing Boo-Boo.

Q.   What happened?

A.   It could have been a person that didn't have nothing to do with it.  If he had pointed to them and said they did, I

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 70 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 208 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 39 of 96

39

was going to give it to them.

Q.    What happened?

A.    So I said, you don't see nobody that look like -- he was like, no, and we left.  So we go back the same way that we came up there, and we come back through the alley and went back to the car.

So as we was getting in the car, Putney pulled up.

Q.    Who did?

A.    Putney.

Q.    Who is Putney?

A.    Lawrence Brown.

Q.    Who is he?

A.    Putney is a friend of ours.

Q.    Where is -- does he work?

A.    He work in the court building.

Q.    What court building?

A.    Superior Court.

Q.    What happened when you saw Putney?

A.    He pulled up on us.  He pulled up on us unexpectedly, and all of us drew our guns on him, and he was scared.

Q.    What was Putney driving?

A.    He was driving a Jetta.

Q.    What happened when you pointed your guns at him?

A.    I mean, you could just see the look of fear on his face. And Pimp was saying, no, no, no, no, no, like that.  And so we

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 71 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 209 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 40 of 96

40

got in the car, and Putney was saying, man, I was just speechless.  That's it.  Like that.

So, you know, we laughed about it real brief and then he pulled off.  And then we got back in the car and we pulled off.

Q.   Now, on this particular night, did you end up shooting your gun?

A.   Yeah.

Q.   Tell us about when the shooting started.

A.   We was going back down East Capitol Street.  So we got by where East Capitol and Benning Road, and Pimp spotted Block van and said he was going by way of Texas Avenue.  So he was like, they go right there.  Saying he trying to come through there, trying to come through.  So we hurry up and got back around B Street.

So Pimp parked Anthony car on B Street.  So we got out and we ran behind these big green trash cans.  And so we was waiting for them to come.  Pimp was saying, they probably going to come from the top, meaning they going to come down Ridge Road.  So I didn't know what type of vehicle they was in at the time.  I knew that he's saying they was in a van,  but I didn't see the van when he was saying that they was in the van.  There they go.  There they go.

So I told him, I said, I don't know how the vehicle look. I say, whatever you go on, I'm going on, like that.  So we

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 72 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 210 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 41 of 96

41

stay right there behind the trash cans.  It seemed like it took forever, like he must have just kept going or maybe it wasn't them or whatever, so we started walking out, and sure enough, the van came through.

Q.    What did the van look like?

A.    It was a white Caravan.

Q.    A white Caravan?

A.    Yeah.

Q.    And when you saw the white caravan, who started shooting first?

A.    We was walking out, about to walk back out to B Street, so Pimp said, there they go right there.  And he ran out busting his gun.  So I started busting my guns.

Q.    Who else was shooting, do you recall?

A.    South and Ty.  They started busting their guns.

Q.    What happened?

A.    We shot the van up, and it sped off across Minnesota Avenue and South had the Mac, so he was still shooting after we had got done.

Q.    What happened after you finished shooting?

A.    So we was walking back through these woods.  We was going through this path, and so Pimp said, man, you ain't even shooting.  So I said, yes, I did.  I said, shit, I was lighting that joint up.

So he was like, let me see your gun.  So I gave him the

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 73 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 211 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 42 of 96

42

gun that he gave me.  I give it to him, and he checked the clip and see that I did.  I bust that joint.  So the other revolver I had, I think I only shot like two or three times out of that.

Q.    What did he say after he saw that you had shot?

A.    He said that I did good.

Q.    Now, --

A.    And I told him, I said, let's go reload and get their ass.

Q.    I'm sorry?

A.    I said, let's go reload and get their ass some more.

Q.    What did he say?

A.    He said, that's enough for tonight.

Q.    Now, did you even know who it was that you were shooting at in that van?

A.    No.

Q.    Did you care who it was?

A.    No.

Q.    Why were you shooting at it?

A.    Because he said that it's Block and them.  He knew better than I knew.

Q.    And your reason for wanting to kill Block was what?

A.    Cause he had something to do with Boo-Boo getting killed.

THE COURT:  I'm going to interrupt you now, Mr. Zeidenberg.  We're going to take a brief recess.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 74 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 212 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 45 of 96

45

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.

BY MR. ZEIDENBERG:

Q.   Good afternoon.  Mr. Montgomery, I'd like to direct your attention to the evening of September 10, 1991.  Were you involved in a shootout with the Metropolitan Police on that evening?

A.   Yes.

Q.   And directing your attention to slightly earlier in the evening, prior to the shootout actually beginning, can you tell the ladies and gentlemen what led up to that shooting?

A.   I had came around Ridge Road probably about -- around noontime to meet with Pimp.  We had discussed the day before that I was going to meet him there so that we could try to catch up with the dudes that we was trying to retaliate on.

Q.   And specifically who was it you were looking for?

A.   Keith Holmes and Block and Sugar Spoon.

Q.   Again, did you know them by face or just by name?

A.   I only knew Keith Holmes by face.

Q.   So when you came around on September 10 around noontime, what happened?  Did you see Pimp?

A.   No, I'm not sure what time it was when he came, but I was waiting there for awhile before he got there.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 75 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 213 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 46 of 96

46

Q.    Then what happened?

A.    Then we went to get South.  We went to get South, and then we come got a dude, Boo.  He got this dude named Boo, Juan Bowie, to -- Juan Bow.  It's Bow or Bowie.  It's one or the other -- to get him some illegal paper tags.

Q.    Paper tags?

A.    For his Mazda van.

Q.    Right.

A.    So after we had got that, then me, Pimp and South went down to Southwest and got Chin.  Went over to Chin mother house and got Chin.  So then we went riding around looking for Boot-Em-Up and Block, Keith Holmes, Sugar Spoon, Pee-Wee or anybody else affiliated with them or with the death of Boo-Boo.

Q.    What were you planning on doing if you saw any of those individuals?

A.    We discussed that if we catch Boot-Em-Up that we was going to rob him and torture him and we was going to kill him.

Q.    And any of the others?

A.    On sight, anybody else on sight we was going to deal with them right then and there.

Q.    Meaning what?

A.    We was going to kill them right there.

Q.    What happened?  Did you find them?

A.    No, we went around Wheeler Road, through Paradise.  We

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 76 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 214 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 47 of 96

47

went around Fifth and Sixth Street, Northeast.  We went around 58th.  We went up Eastern High School, and we went to Anacostia High School and we went over H.D. Woodson.

Q.    Did you find anyone you were looking for?

A.    No.

Q.    Now, did you go back out later that evening shortly -- right around dark?

A.    When it started getting dark, I was keeping -- Ty let me keep his motorcycle, so I already had it.  It was parked at the top of Ridge Road.

Q.    And this is Ty, the individual you identified the other day?

A.    Right.  So I told -- I made the suggestion that one of them could get on the bike with me and shoot off the back of the bike, since they know the van, since they know Pimp van. So if they see Pimp van, they might not be focused on a motorcycle.  You know what I mean?  We came back out.  We went through Mayfair and Paradise.

Q.    Now, at this point are you on a motorcycle or in a van?

A.    I'm on a motorcycle and Pimp is on the back.

THE COURT:  Who are these guys you were looking for? What neighborhood are they associated with?

THE WITNESS:  In various neighborhoods.  It's like a few different neighborhoods.

THE COURT:  Okay.  This Ridge Road crowd or --

48

THE WITNESS:  Two of us was from Southwest, and the rest was from Ridge Road.

THE COURT:  And where were these guys that you were looking for?

THE WITNESS:  In various parts of D.C.

THE COURT:  Okay.

BY MR. ZEIDENBERG:

Q.   What neighborhood --

MR. ZEIDENBERG:  If I may, Your Honor.

BY MR. ZEIDENBERG:

Q.   What neighborhood did you associate -- the individuals that you were looking for, what neighborhood did you associate them with?

A.   Paradise and 58th.

Q.   58th Street, Northeast?

A.   Right.

Q.   And that was the area around where Tony Fortune hung out?

A.   Yes.

Q.   Now, the second time that you go out on this September 10, 1991, when you're on the motorcycle, who is on the motorcycle with you?

A.   Pimp.

Q.   Who is in the van?

A.   Chin, Chin was driving the van, and South was in the passenger seat, and Man and Steve Bay in the back.

49

Q.    I'm sorry.  In the back are who?

A.    Man and Steve Bay.

Q.    Steve Bay?

A.    Yeah.

Q.    Do you know Steve Bay's true name?

A.    No.

Q.    Have you ever heard the name Steve Ellington?

A.    No.

Q.    Are you armed at the time?

A.    Yeah.

Q.    How are you armed?

A.    With a semiautomatic pistol.

Q.    Was Jerome Martin, Pimp, armed?

A.    Yes.

Q.    What was he armed with?

A.    Glock.

Q.    A Glock?  Do you know what caliber?

A.    I'm not sure, but I believe it was a 9 millimeter.

Q.    The individuals in the van, Sam Carson, Steve Bay, South, and Man, were they armed?

A.    Yes.

Q.    Do you know -- could you tell us what you know about that, what you recall?

A.    Chin had a semiautomatic pistol and -- everybody had a semiautomatic pistol except for South.  He had a Mac-11.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 79 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 217 of 443
Case 1:98-cr-00329-RCL    Document 954   Filed 03/11/03   Page 55 of 96

55

Q.    Okay.   The car -- the van -- strike that.

The car that you saw, was it turning in the direction of Southern Avenue such as that (indicating)?

A.    I'm not sure if it went on the right side or if it went down the wrong way of the street, but it did go in that direction.

Q.    Okay.   And what did you see Jerome Martin do?

A.    Shooting at the car.

Q.    On foot or on the motorcycle?

A.    On foot.

Q.    And while he was shooting at the car, was his helmet on or off?

A.    He was taking it off.  He was running and trying to unfasten the helmet while he was busting.

Q.    And then what do you recall happening next?

A.    The van pulled out into by the median strip diagonal.   It was diagonal.

Q.    Diagonally across the street?

A.    Diagonally in the lane.

Q.    Okay.

A.    I pulled out and was telling Pimp to hop on, because I wanted him to hop on so that we could continue to chase the car going out Maryland so he could shoot at them while I was riding the bike.

Q.    What happened?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 80 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 218 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 56 of 96

56

A.    He didn't hop back on, so I just kept on hollering for him to hop back on the bike, to hop on, hop on. I kept saying that. And then he turned around and was shooting from the direction where the high-rise was at.

So I didn't know at that particular time who he was shooting at. I'm thinking that it was probably more of them dudes.

Q.    At some point did you look in the direction of the high-rises?

A.    Yeah. I mean, I could see some shots coming from that way, but I just didn't realize at that time that they was police.

Q.    At some point did you realize it was the police?

A.    Yeah, when one of them fell.

Q.    I'm sorry?

A.    When they fell.

Q.    What did you see happen?

A.    I could see the badge.

Q.    What did you see? Tell --

A.    I was thinking that it was more or less a security guard or something probably from that building.

Q.    What did you see happen?

A.    The person was shooting at Pimp, and Pimp was shooting back, and he was saying, get your ass back.

Q.    Who was saying, get your ass back?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 81 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 219 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 57 of 96

57

A.    Pimp.

Q.    What direction was Pimp shooting at at the time he was saying that?

A.    In the direction where the officer or the security was shooting from.

Q.    Did you notice how many police officers there were?

A.    I only seen one, but there could have been more.

Q.    How long -- strike that.

        What happened next after Pimp was shooting in the direction of the police officers?

A.    They opened the door on the side of the van and South started busting.  South started shooting out the side of the van.

Q.    In what direction?

A.    In the direction of the security or the officers.

Q.    Then what happened?

A.    Pimp hopped in the van and they sped -- we took off.

Q.    Now, which direction did you take off?

A.    We went up South Capitol -- I mean, Southern Avenue.

Q.    Now, as you look at this picture, EC300, was it a right turn or a left turn on to Southern Avenue?

A.    A right turn.

Q.    Now, where were you in relation to the van?

A.    On the motorcycle.  I was behind the van.

Q.    Okay.  Did you follow after the van?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 82 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 220 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 58 of 96

58

A.    Yeah.

Q.    Now, while this shooting was going on, did you -- where were you in relation to where all these bullets were flying?

A.    Right in the middle.

Q.    Did you get hit?

A.    No.

Q.    Did you consider taking off and leaving while the bullets were flying?

A.    No.

Q.    Why not?

A.    Because I was responsible for Pimp, and if I would have left him, then I would have got killed.

Q.    What do you mean when you say you were responsible for Pimp?

A.    He was on the bike with me.

Q.    So what?

A.    So he my responsibility if he on the bike with me.

Q.    What does that mean that he's your responsibility?

A.    That if he on the bike with me, I can't leave him.  I can't leave him.

Q.    Why not?

A.    For the reason I just explained.  He's my responsibility. I mean, I wouldn't have left him anyway, though.

Q.    Now, where did the van and you go once you turned right on to Southern Avenue?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 83 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 221 of 443
Case 1:98-cr-00329-RCL   Document 954   Filed 03/11/03   Page 59 of 96

59

A.   We stayed on Southern Avenue going all the way up Southern Avenue, and then I seen -- no, we stayed on Southern Avenue and I'm not sure -- I knew it was from the passenger side of the van that Pimp shot at somebody that was going down the street.  At that time I didn't -- put it like this.  I'm not going to say Pimp shot at the person, because I didn't know at that particular time, but somebody shot at a person on the sidewalk.

Q.   Okay.  So while you're driving along you hear a shot come from the van?

A.   Right.

Q.   And you believe it was directed at someone on the street?

A.   Right.

Q.   What did you do when you heard the shot come?

A.   So I slowed down on the bike, and I was about to stop and shoot the person because I was thinking that that was one of the people.  I'm thinking that's one of them has something to do with Boo being killed.

Q.   Did you shoot at that person?

A.   Did I shoot them?

Q.   Yes.

A.   No.

Q.   What happened next?

A.   The van kept going and I sped back up to keep up with them.

60

Q.   Now, at some point did you see a police car?

A.   Yeah.

Q.   Can you tell us about that?

A.   The police was coming in the opposite direction of where we was traveling.  So as -- and he had his lights on.  He didn't have his siren on, but he had his lights on, so I slowed down, and I was watching the police, and he slowed -- after he went past us, I could see him looking at the van, and that was the reason why I slowed down and was watching him.

So the police car, I seen his brake lights come on and looked like he was about to make a U-turn.  So I sped up and was pointing back telling Chin and them the police is about to come.  I said, the police is about to come.

Q.   Who is driving the van at this point?

A.   Chin was driving.

Q.   Okay.  What happened when you notified -- when you signaled to Chin that the police were coming?

A.   They turned on a side street.

Q.   What did you see happen next?

A.   I turned on the side street with them, and then they turned on another street and pulled over briefly and threw their guns out, and I stopped and got their guns and got back on the bike.  I ain't never throw my gun.  I picked their guns up.

Q.   Now, how many guns did you see come flying -- how did the

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 85 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 223 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 61 of 96

61

guns get out of the van?  What did you see?

A.    I don't know who particularly threw the guns out.

Q.    Did the van come to a complete stop?

A.    Right.

Q.    Where were the guns thrown?

A.    In somebody yard.

Q.    Now, after the guns came out of the van, did the van continue on?

A.    Yeah.

Q.    What did you do?

A.    I stopped.  I stopped and put the bike in neutral and picked up -- I picked up Pimp gun, and I picked up South gun, and I picked up Steve Bay gun and got back on the bike.  I didn't see Chin gun.

Q.    And how were you able to carry all those guns?

A.    I put them in my waistband, and I pushed some of them in my pants pocket.

Q.    What did you do at that point?

A.    I went back around Ridge Road.

Q.    What happened when you got back to Ridge Road?

A.    When I got back around there, I parked the bike and knocked on Steve Bay and them door, and I think it's his uncle or his nephew, Darrell, or somebody answered the door, and I asked him could he hold the guns till Steve Bay and them got back.  And he did, he held them.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 86 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 224 of 443
Case 1:98-cr-00329-RCL    Document 954   Filed 03/11/03   Page 62 of 96

62

Q.    Now, at some point later did you meet up again with Chin and Pimp?

A.    Yeah.

Q.    How much later?

A.    I'm not sure.  Probably about -- maybe 30 to 45 minutes.

Q.    When you saw them again, were they in the van or were they on foot or how would they get there?

A.    They was in the car with Anthony.

Q.    Any sign of Pimp's van?

A.    No.

Q.    Did you talk about what happened with Pimp and Chin?

A.    Well, when they first pulled up, I told -- I just said, I said, I got you all guns.  And Pimp says, you got mine?  I said, yeah.  And South said, you got mine?  I said, yeah.  I said I got everybody gun except for Chin.

Q.    What happened then?

A.    So we went back up there to the yard.  I showed him where the yard was that I found their guns, and we looked, and we never found Chin gun.  Then we rode on the street where they had abandoned the van, and Pimp was mad saying that -- he said, he was like, shit.  He was like, man, we should have hit the Maryland side like that.  And then he was mad because he left his ID and his pager.

Q.    I'm sorry?

A.    He was mad because he left his ID and pager in the van.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 87 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 225 of 443
Case 1:98-cr-00329-RCL    Document 954    Filed 03/11/03    Page 67 of 96

67

A.    We needed them for that particular beef for Block and them.  We hardly had no guns.

Q.    And what about 37th Place?  Do you know how Mr. Martin was able to get guns?

A.    Chin told me that Pimp uncle be having guns.  That he get his guns.  I don't know.  I'm not saying that just because that's Pimp uncle, but that's where Pimp got his guns, but Chin particularly told me that he gets his guns from Pimp uncle.

Q.    Now, when these beefs were going on, and I'm talking about this beef with 58th Street, was the two evenings that you just talked about, September 10 and you talked before the break about another evening you went out looking for them, were these the only occasions that you went out looking to shoot at the people from 58th Street?

A.    No.

Q.    Can you just -- without going into the details of every time, give the ladies and gentlemen some idea of how frequently you did this and who you were with?

A.    Pretty much of the time I didn't know any of the people by face except for Keith Holmes.  A lot of times whenever I had the transportation, a motorcycle or car or whatever, and then I go around Mayfair trying to find any car that looked like a car that belonged to them or could possibly belong to one of them and write down the tag number.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 88 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 226 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 1 of 68

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              .  Docket No. CR 98-329
                                       .
            Government,                 .  Washington, D.C.
                                       .  March 13, 2001
    vs.                                 .  2:20 p.m.
                                       .
VINCENT HILL,                          .  (AFTERNOON SESSION)
JEROME MARTIN,                         .
SAMUEL CARSON,                         .
WILLIAM K. SWEENEY,                    .
SEAN COATES,                           .
                                       .
            Defendants                  .

. . . . . . . . . . . . . . . .        .

UNITED STATES OF AMERICA,              .

            Government,                 .

    vs.                                 .  Docket No. CR 99-348

GARY PRICE,                            .

            Defendant.                  .
                                       .
. . . . . . . . . . . . . . . .        .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 89 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 227 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 2 of 68

2

```
For the Defendant Carson:     JOSEPH BESHOURI, ESQ.
                              LEXI NEGIN-CHRIST, ESQ.
                              419 7th Street, N.W.
                              Washington, D.C.  20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
                              717 D Street, N.W.
                              Suite 400
                              Washington, D.C.  20004

For the Defendant Coates:     FREDERICK JONES, ESQ.
                              901 6th Street, S.W.
                              Suite 409
                              Washington, D.C.  20024

For the Defendant Price:      JONATHAN ZUCKER, ESQ.
                              601 Indiana Ave., N.W.
                              Suite 901
                              Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                              Official Court Reporter
                              Room 6810 U.S. Courthouse
                              Washington, D.C.  20001
                              (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 90 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 228 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 30 of 68

30

I said, let me think about it.  Then he kept on saying, you bull shitting.  You ain't trying to get this money.

Q.    You ain't -- I'm going to ask you to keep your voice up, Mr. Montgomery.

A.    He said, you're bull shitting.  You ain't trying to get this money.  So I said, would you let me think about it?  So he's like, man, you bull shitting.  He said, I'm going to let Bird get this money then.

Q.    I'm sorry?

A.    He said, I'm going to let Bird get this money then.

Q.    Mr. Montgomery, I'm going to ask you now about the murder of someone by the name of Tim-Tim or Timothy Benton.  Are you familiar with somebody by the name of Tim-Tim?

A.    Yes.

Q.    And were you a witness to and a participant in the murder of Tim-Tim?

A.    Yes.

Q.    And directing your attention to the evening of June 22, 1994, were you driving your car in Southeast, D.C.?

A.    Yes.

Q.    Did you see Tim-Tim?

A.    Yes.

Q.    Can you tell the ladies and gentlemen what happened? First of all, who Tim-Tim was and what happened when you saw him?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 91 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 229 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 31 of 68

31

A.    Tim-Tim was a person, he was a friend of Poo-Poo's.  I really didn't know him that well.  I had just recently met him.  I was coming through Capers, and he flagged me down and asked me where Poo-Poo was at.  So I told him that I didn't know.

And he asked me was I about to go down to Southwest.  I told him, yeah.  He asked me could I take him down there.  So I told him I'd take him down there, but I wasn't bringing him back.  So he agreed.

Q.    What car are you driving?

A.    My Cadillac.

Q.    What happened?

A.    So when we first came down Southwest, we came through K Street, and Poo-Poo wasn't out there.  So I took him around Second Street.  I was going to drop him off around Second Street.  So we seen Poo-Poo around Second Street in the court.

So when we pulled up, Poo-Poo came over to the car and was talking to Tim-Tim.  So he was saying that something about Tim-Tim been ducking him and this and that and this and that, and told me to pull down in front of where his mother was living at.

Q.    Who told you to pull down?

A.    Poo-Poo.

Q.    What happened?  Did you do that?

A.    Yeah.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 92 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 230 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 32 of 68

32

Q. What happened at that point?

A. So Poo-Poo went to -- he said he had to go put his stash up. To my knowledge, he wanted to put his stash up. And he got in the back seat and was telling Tim-Tim that he fucked up with him for messing up his money, this and that, this and that.

Q. Now, let me stop you. Where are people seated in the car?

A. I'm driving.

Q. Okay. Who is in the front passenger seat?

A. Tim-Tim.

Q. Who is in the back seat?

A. Poo-Poo.

Q. Now, what is the conversation between Poo-Poo and Tim-Tim once Poo-Poo gets in the car?

A. Poo-Poo wasn't hollering at him, but he told him that he was mad at him for messing up his money.

Q. Did he say what he was messing his money up over?

A. That's all he said was that Tim-Tim messed up his money.

Q. What happened next?

A. So Tim-Tim was telling him that if you make another move with him that he wasn't going to mess it up. So Poo-Poo told him that he'll give him some more coke, but Tim-Tim had to bring him back all the money for them to be back on ground level.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 93 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 231 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 33 of 68

33

Q.    Did Tim-Tim agree to this?

A.    He did agree.  So I told Poo-Poo that I was about to go back around the other side of the house, so he told me to take him -- to drive him to get this coke to give to Tim-Tim right quick.  It wasn't going to take long.  So I agreed, and I took them.

Q.    Where were you at this point?  What part of town?

A.    We were still sitting in front of his mother house.

Q.    Where is this?

A.    On Canal Street.

Q.    Then what happened?

A.    So we -- I'm listening to the directions he's telling me to go.  So we get on M Street, and we come across South Capitol Street Bridge, and then we come down where Barry Farm is at and we're on Martin Luther King Avenue.

Q.    What part of town?

A.    Southeast.

Q.    What happened then?

A.    So we go up Good Hope Road, and then we get on Minnesota Avenue.  So Poo-Poo in the back seat, and he keep like jumping around, acting silly or whatever.  So I'm looking at him in the rearview mirror.

So I'm really not saying nothing.  Tim-Tim not saying nothing.  Poo-Poo really not saying much.  We continued down Minnesota Avenue and we turn on some street that he told me to

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 94 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 232 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 34 of 68

34

turn onto.  So I made the left turn on the street.

So I was assuming we was where wherever Poo-Poo said his father lived at or whatever.  So then he told me to make another turn.  So we turned, and he was like slow down right here.  So I slowed down.

Then he shot Tim-Tim in the head.  And when he shot him in the head, I jumped.

Q.   What was the first indication you had that that was happening?

A.   Well, when he shot him, his blood splashed all over the side of my face, and it was warm.  So I wiped it off.  And I looked back at Poo-Poo, and he's sitting with his arms on the seat, and he going like this (indicating).  So I was mad.  I was mad, because he shot him in my car.  So I look at Tim-Tim, and he got blood running down his face, and it's like dripping off his nose.

Q.   Could you see where he had been shot?

A.   No.  I could see the blood running off his nose.

Q.   What did you notice about Tim-Tim's face?

A.   So his eyes was just blinking like he was dazed.  So I was like, damn, you fucked up.  So I said, hit him again.

Q.   You said that to who?

A.   I said it to Poo-Poo.  So I said, hit him again.

Q.   What did Poo-Poo say?

A.   So Poo-Poo shot again, bam, he missed, and he shot my

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 95 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 233 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 35 of 68

35

car.  I said, damn, man, you shot my mother fucker car.  Man, good night.

So he said, push him out.  So I leaned over and pushed him out and pulled forward and let his feet fall out.  So we was pulling off.  So I looked in the rearview mirror and Tim-Tim is lifting up off the ground.

So I said, ho, I said, he's getting up.  I busted a U-turn, and I don't know or I'm not sure if I ran him over.  But my intent was to run him over with the car.  So Poo-Poo got out, and he shot him again in the head and got back in the car.

Q.   Did you have any conversation with Poo-Poo when he got back in the car?

A.   He got back in the back.  He got back in the back seat.  So I told him to get up front.  So he climbed over the seat and got up front.  So then he was like, man, it's a good thing I did killing him, man, because if I would give him some more coke, he was going to kill both of us.  You know he had a gun on him.

So I said, did you get his gun?  So he was like, no.  So I said, why you ain't get his gun?  He said, no, that joint probably got bodies on it.  But as I say, all of us is we kill somebody, we're going to get their gun.  You going to get their gun.  So I didn't argue with him or nothing.  I didn't say nothing, but in my mind I was thinking that he just trying

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 96 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 234 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 36 of 68

36

to say that to make me feel better about him shooting him in my car.

Q.    What did the inside of your car look like?

A.    There was blood specks everywhere.

Q.    What did you do with your car?

A.    So we got back on 295, and I came off the Howard Road exit and came back down, came back across South Capitol Street.  We got back down to Southwest, and we parked in front of Poo-Poo mother live at.  So we seen the uncle, Poo-Poo Uncle Willy.

So Poo-Poo got his uncle to wash my car, wipe the inside of it out, to wash it up.  And me and Poo-Poo walked down to the waterfront to throw the gun away.

Q.    Where did you throw the gun away?

A.    In the river, in the Potomac River.

Q.    What part of the waterfront were you at when you threw it in?

A.    The same part where I threw the .30 carbine.

Q.    That's over by Ft. McNair?

A.    Yeah.

Q.    Mr. Montgomery, I'm going to ask you now about the murder of Chrishauna Gladden.  Did you have a conversation in the summer, late summer of 1996 with Meat about some witnesses?

A.    Yes.

Q.    Can you tell us about that conversation?

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 97 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 235 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 37 of 68

37

A.   He came to me one day and said that Pimp was trying to get in contact with me and that he needed me to get on top of some witnesses for him.

Q.   Now, what does that mean to you when you heard that?

THE COURT:  Say it again?

MR. ZEIDENBERG:  The question or the answer, Your Honor?

THE COURT:  His answer.

BY MR. ZEIDENBERG:

Q.   What was it that you recall Meat saying to you?

A.   He came to me and said that Pimp was trying to get in contact with me, and that Pimp needed for me to get on top of some witnesses for him.

Q.   Now, what does that mean to you when he said, you were needed to get on top of some witnesses for Pimp?

A.   It mean that whatever witnesses he have, he want me to get rid of them.

Q.   And when you say, get rid of them, what do you mean?

A.   To kill them.

Q.   How many conversations did you have with Meat about this? Do you remember exactly?

A.   I don't remember exactly how many, but a few.

Q.   And what else did Meat tell you during this first conversation?

A.   He said that Pimp said he going to call me at 907.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 98 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 236 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 58 of 68

58

A.    44.

Q.    M44?

A.    Yes.

Q.    Is that a fair and accurate representation of what the area of 37th Place looked like at the time?

A.    This is 37th.  I'm not sure if it looked like this at that time.

Q.    Okay.  Does that show the building that you were in the night that Chrissy Gladden was killed, is that shown on that photograph?

A.    It shows the row of houses.  I can't see the actual house.

Q.    All right.  Mr. Montgomery, let me ask you about what happened once you are in the house and Big Jim left.  You said you had a conversation with Chin?

A.    Yes.

Q.    What happened next?

A.    Nothing.  They went in the house.

Q.    How long did the girls go in the house?

A.    For maybe an hour or an hour and a half.

Q.    What did you and Chin do for that hour or hour and a half?

A.    Stayed looking out the window.

Q.    What happened after about an hour or an hour and a half?

A.    When they first went in the house it was our assumption

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 99 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 237 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 59 of 68

59

that they was in the bedroom downstairs, because no sooner they went in the house a light in the room downstairs -- a light in the room downstairs came on. And we could see people moving around in there, so we assumed that it was them.

After about an hour or hour and a half of waiting the light went out. So I said -- I said, I think they are about to come out, and for sure they came out.

Q. What happened when they came out?

A. First Chrissy came out, then Trina came out, and then Rashida came out. So Chin hopped down and put his hood on.

Q. What was Chin wearing that night?

A. He had on a blue and white polo sweatshirt, it was a white sweatshirt with a blue hood.

Q. I'm sorry?

A. A white sweatshirt with a blue hood on it, and a black leather jacket.

Q. What type of jacket?

A. A black leather jacket.

Q. Okay.

A. And some blue jeans.

Q. What happened next?

A. So when he jumped down, I said, -- I said, you sure you don't want me to do it, because I still wasn't sure.

Q. You were not sure about what?

A. I still wasn't sure if he had listened to me when I asked

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 100 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 238 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 60 of 68

60

him not to shoot Trina.  So he said, no, I got it.  He said, just let me know when to go.  So I stayed looking out the window, and I waited until I seen Rashida locking the door.  That way I knew they wasn't going to be able to run back in the house.

So when I seen her locking the door, as soon as she turned around to walk away from the door, so I said, go, go, go, like that.  And he ran out there and had his hand up like this (indicating).

Q.    You're indicating he had his arm --

A.    His right hand.

Q.    In front of his face?

A.    Right.

Q.    And then what happened?

A.    And he bust a few shots in the girl, and Chrissy started screaming -- all of them, all of them started screaming.  And Chrissy and Rashida ran back to the door and was bunched up in the door.  And I jumped down and ran out the back and met Chin back at the car.

Q.    How many shots did you see Chin fire?

A.    Maybe once or twice.

THE COURT:  I'm sorry?

THE WITNESS:  Maybe once or twice.

BY MR. ZEIDENBERG:

Q.    Did you stick around to see him finish or did you leave

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 101 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 239 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 61 of 68

61

before it was all over?

A.   I left before it was over.

Q.   Where did you run?

A.   Back to the car.

Q.   What route did you take?

A.   The same route we took to get there.

Q.   Back out the back door?

A.   Right.  And through those fences.

Q.   What happened when you got back to the car?

A.   Right after I got there Chin was -- Chin was right on my heels, he was right there.

Q.   What happened once he got back to the car?

A.   Chin was driving, I was in the passenger's seat.  And I still had my scanner on, my police scanner.

Q.   Where was the scanner while you were inside the house?

A.   I had it in my ear.  I had an ear plug in my ear.

Q.   And once you got into the car and started going where did you go?

A.   We left out and we went up Ridge Road.  We went going -- I guess that's east or north up Ridge Road.

Q.   Where did you go once you got up Ridge Road?

A.   Made a right onto I think that's Alabama Avenue, I believe that's Alabama Avenue, and we went down to Pennsylvania Avenue, and then came straight over down Pennsylvania Avenue and got on 295.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 102 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 240 of 443
Case 1:98-cr-00329-RCL   Document 955   Filed 03/11/03   Page 62 of 68

62

Q.    Where did you go from there?

A.    We came off the Howard Road exit and came back across South Capitol Street Bridge.

Q.    What did you do once you got off the South Capitol Street Bridge?

A.    We went -- we parked the Caddy behind Chin mother building, and then we walked down the waterfront and threw the gun away.

Q.    Who threw the gun away?

A.    I don't remember if I threw it away or Chin threw it away.

Q.    Were you together?

A.    Yeah.  It's either I threw the gun away and he threw the clip away or vice-versa.

Q.    What happened after you threw the gun in the river?

A.    We was walking back down to our neighborhood.  So I asked Chin did he want to go get Robin.

THE COURT:  Did he want to do what?

THE WITNESS:  Did he feel like going to get Robin. So he said, do you want to?  So I said, it don't matter to me, I don't give a fuck, like that.  So he said, I don't got not more iron.  So I said, take me to get mine.  So I went to get my .30 carbine, the gun that you showed earlier.

BY MR. ZEIDENBERG:

Q.    Where did you get it from?

63

A.    From over this girl's house that I was messing with at the time.

Q.    Did you get the gun?

A.    Yeah.

Q.    What happened after you got the gun?

A.    So we went around Wheeler Road.  So I was strapped and he wasn't strapped.

Q.    Why were you going to Wheeler Road?

A.    To try to catch Robin so we can kill her.

Q.    What happened when you got to Wheeler Road?

A.    When we got there we didn't see her car there, so we went and parked.  And I still had the scanner in my ear, my police scanner, I still had it on.  So we went into -- we got in some bushes whereas so we could see when she pulled up, we got in some bushes.  So we stayed right there for a while.  We stayed right there for probably about an hour.

On my police scanner I kept on hearing the police was nearby, they was like a couple of streets over.  So I told -- I told Chin that it sounded like -- I took the plug out so he can hear it.  I didn't want him to think I was faking, so I let him hear it.  I let him hear the police thing come across the scanner.  And I told him that the police was in the area, and let him hear it.  So he asked me did I want to leave.  So I said, it would probably be the safest thing to do for right now.  So we left.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 104 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 242 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 64 of 68

64

Q.    When Chin ran back to the car initially after you left the house, did you have any conversation with him while you were driving back to the waterfront?

A.    When we was going up Ridge Road, right after we left, -- before any of this even took place he -- Chin used to always keep on saying that the scanner was fake, and this and that, it don't pick up shit, and all this stuff.  So after when -- after we killed Chrissy -- so we was going up Ridge Road -- so I took the ear plug out and turned the scanner up so he can hear the call, so he can hear the call for gunshots going across -- coming out on the radio.  So I turned down the radio in the car -- so I said, do you hear that, do you hear that shit, I said, you talking about this joint don't work, do you hear that, like that.  And then he rubbed me on my head like that, like I was a little boy, way to be there Bama, like that.  He just said, way to be there Bama, like that.

Q.    Mr. Montgomery, when you were at the window, before you ran out the back of the house, did you see who it was Chin was running up to, which of the three women?

A.    If she was in this room right now today I don't know how she looks.

Q.    But you said there were three women that you did know -- I mean, there were two women -- there were three women altogether, correct?

A.    Right.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 105 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 243 of 443
Case 1:98-cr-00329-RCL    Document 955    Filed 03/11/03    Page 65 of 68

65

Q.    And you knew two of them?

A.    Right.

Q.    Who were the two you knew?

A.    Rashida and Trina.

Q.    The person that Chin ran up to was it Trina?

A.    No.

Q.    Was it Rashida?

A.    No.

Q.    Was it the person that Big Jim had identified as Chrissy?

A.    Yes.

Q.    What did you see Chrissy do when Chin ran up to her?

A.    She was screaming.

Q.    After she screamed what happened?

A.    She fell.

Q.    After Chrissy fell did you see what Chin did?

A.    No.

Q.    Is that when you ran out?

A.    Yes.

        MR. ZEIDENBERG:  Your Honor, this might be a good time to break for the day.

        THE COURT:  Very well.  We will recess for the day, ladies and gentlemen, and reconvene tomorrow morning at 10:00.

        (Jury out.)

        (Whereupon, the hearing was adjourned at 4:20 p.m.)

                - - - - -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,                 :

                                        :

VS.                                     :    CR. NO. 98-329

                                        :

VINCENT HILL,                           :
JEROME MARTIN,                          :
SAMUEL CARSON,                          :
WILLIAM K. SWEENEY,                     :
SEAN COATES,                            :
            DEFENDANTS.                 :

                                        :

UNITED STATES                           :
            GOVERNMENT,                 :

                                        :

   VS.                                  :    CR. NO. 99-348

                                        :

GARY PRICE,                             :
            DEFENDANT                   :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MARCH 14, 2001
(MORNING SESSION)
(10:20 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 108 of 159
USCA Case #23-3045   Document #2077668   Filed 07/19/2024   Page 246 of 443

14

A.   (INDICATING.)

Q.   OKAY.  SO IT'S BEFORE YOU GET TO THE SIDEWALK WHICH RUNS IN BETWEEN THE TWO SETS OF BUILDINGS?

A.   YES.

Q.   AND THE WOMAN THAT YOU BELIEVED TO HAVE BEEN CHRISSY, MR. MONTGOMERY -- WHERE WAS SHE THE LAST TIME YOU SAW HER?

A.   IN THE YARD.

Q.   OKAY.  WHERE WAS SHE -- IF YOU COULD JUST INDICATE AGAIN WITH THE POINTER.  LET ME ERASE THE MARK YOU HAVE THERE.  AS NEARLY AS YOU CAN REMEMBER, WHERE WAS CHRISSY THE LAST TIME YOU SAW HER ALIVE?

A.   COMING OUT OF -- COMING OUT -- WALKING TOWARDS THE EXIT TO COME OUT OF THE YARD.

Q.   TO THE SIDEWALK?

A.   RIGHT.

Q.   MR. MONTGOMERY, I'D LIKE TO ASK YOU SOME QUESTIONS NOW ABOUT A TRIPLE MURDER WHICH OCCURRED IN TEMPLE HILLS, MARYLAND ON NOVEMBER 17, 1996.  WERE YOU PRESENT WHEN THOSE MURDERS TOOK PLACE?

A.   YES.

Q.   AND HAVE YOU PLED GUILTY TO PARTICIPATING IN THOSE MURDERS?

A.   YES.

Q.   I'D LIKE TO TALK TO YOU ABOUT THOSE MURDERS AND THE EVENTS THAT LED UP TO THEM AT THIS TIME.

USCA Case #31-3816-00329-RCL  Document #2007666681   Filed 07/19/001/Page 15 of 79  Page 247 of 443

15

NOW, SOMETIME PRIOR TO THESE MURDERS, WAS THERE -- DID YOU HAVE A CONVERSATION WITH ANY OF YOUR CO-DEFENDANTS OR YOUR FORMER -- ANY OF THE DEFENDANTS IN THIS CASE ABOUT ATTENDING A FIGHT IN LAS VEGAS?

A.  ME AND "CHIN".

Q.  CAN YOU TELL US ABOUT THAT CONVERSATION -- WHAT YOU REMEMBER OF IT?

A.  BASICALLY, HE ASKED ME WAS I GOING TO THE FIGHT.

Q.  WHAT FIGHT WAS IT?

A.  HOLYFIELD-TYSON.  HOLYFIELD-TYSON ONE.

Q.  AND DO YOU RECALL WHERE THAT FIGHT WAS GOING TO BE HELD?

A.  LAS VEGAS.

Q.  DID "CHIN" TELL YOU WHO WAS GOING TO BE GOING TO THE FIGHT?

A.  I DON'T KNOW IF HE TOLD ME AT THAT PARTICULAR TIME.

Q.  AT SOME POINT, DID HE?

A.  YES.

Q.  WHO DID HE SAY WAS GOING TO GO?

A.  THAT HIM AND "DRAPER" WAS GOING, AND THAT IF I WAS GOING, THAT I NEEDED TO GIVE "DRAPER" MY -- GIVE HIM MY MONEY OR EITHER GIVE THE MONEY TO "DRAPER" SO THAT "DRAPER" COULD GIVE IT TO SOMEBODY HE KNEW -- A TRAVEL AGENT OR SOMETHING, SO THEY COULD BOOK MY RESERVATIONS.

Q.  DID YOU GO TO THE FIGHT?

A. NO.

16

Q.  WHY NOT?

A.  MY FINANCIAL STATUS WAS MESSED UP.

Q.  WHAT DO YOU MEAN BY THAT?

A.  I DIDN'T HAVE THAT MUCH MONEY.

Q.  NOW, DID YOU HAVE A CONVERSATION WITH "CHIN" AFTER THE FIGHT -- AFTER HE GOT BACK FROM THE FIGHT?

A.  YES.

Q.  WHAT DID HE TELL YOU ABOUT HIS TRIP?

A.  BASICALLY, WHEN WE FIRST SPOKE ABOUT IT, HE WAS JUST TELLING ME HOW THE GIRLS WAS UP THERE AND STUFF LIKE THAT. THAT THEY HAD A NICE TIME.  IT WAS REAL NICE.  HE SAID THAT HIM, "DRAPER" AND -- "CHIN," "DRAPER" AND BAM AND "GOOCH" HUNG TOGETHER MOST OF THE TIME THEY WAS UP THERE.  AND HE SAID THAT THE DUDE, "LONNIE," HAD WON LIKE $50,000.00. LONNIE -- HE SAID HE HAD WON LIKE $50,000.00 WHILE HE WAS UP THERE.

Q.  DID YOU KNOW THE NAME "LONNIE?"

A. NO.

Q.  WHAT DID "CHIN" TELL YOU ABOUT "LONNIE" AND WHO HE WAS?

A.  "CHIN" SAID THAT "DRAPER" TOLD HIM THAT "LONNIE" WAS WORTH LIKE A HALF A MILLION OR BETTER.

Q.  WHERE WAS "LONNIE" FROM?

A.  I DON'T KNOW.

Q.  DID "CHIN" AT SOME POINT TELL YOU WHERE HE LIVED?

A.  IT HAD LATER BEEN DISCUSSED.  I DON'T KNOW IF "DRAPER"

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 111 of 159
USCA Case #23-3015   Document #2077668   Filed 07/19/2024   Page 249 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 11/00/2001   Page 17 of 79

17

SAID IT OR "CHIN" SAID IT, BUT --

Q.   WHERE DID THEY TELL YOU HE LIVED OR HE WAS FROM?

A.   TEMPLE HILLS.  THAT HE HAD A CRAP HOUSE OUT THERE.

Q.   I AM SORRY?

A. THAT HE HAD A CRAP HOUSE OUT IN TEMPLE HILLS.

Q.   WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" AND "DRAPER" ABOUT ROBBING "LONNIE"?

A.   YES.

Q.   CAN YOU TELL THE LADIES AND GENTLEMEN ABOUT THAT?

A.   FIRST, "CHIN" HAD TOLD ME THAT "DRAPER" HAD A MOVE LINED UP WITH THE DUDE, "LONNIE", THAT HE HAD ALREADY TOLD ME ABOUT.  IT'S THE SAME DUDE THAT HE WAS SAYING WON THE $50,000.00.  SO WHEN HE WAS TELLING ME THAT "DRAPER" HAD THE MOVE LINED UP, I ASKED HIM WAS I WITH IT.  AND HE SAID "YES."  BUT HE TOLD ME, "DON'T TELL `BIRD' ABOUT IT."

Q.   DID "CHIN" SAY WHY NOT TO TELL "BIRD" ABOUT IT?

A. BECAUSE "BIRD" DON'T EVER WANT TO DO NOTHING.  WHENEVER THINGS HAPPEN, "BIRD" DON'T EVER WANT TO DO NOTHING.  HE JUST ALWAYS WANTS TO BE THE DRIVER.

Q.   WHAT ELSE DID "CHIN" TELL YOU ABOUT IT?

A.   I MEAN, AT THAT PARTICULAR TIME, I BELIEVE THAT WAS ALL THAT PARTICULAR CONVERSATION WAS.

Q.   DID "CHIN" TELL YOU HOW MUCH MONEY HE HOPED TO MAKE OUT OF THIS MOVE?

A.   NOT AT THAT PARTICULAR TIME.

Q.  AT SOME POINT LATER, DID HE?

A.  YES.  WHEN WE FURTHER DISCUSSED ROBBING "LONNIE".

Q.  WHAT DID "CHIN" TELL YOU ABOUT THAT?

A.  I AM NOT SURE WHO GAVE THE MOST INSIGHT AS FAR AS ABOUT THE DUDE "LONNIE" OR WHATEVER.  I DON'T KNOW "LONNIE".  I NEVER KNEW HIM.  IF I SEEN HIM TODAY, I WOULDN'T KNOW WHO HE WAS.  BUT I KNOW MORE OR LESS THE CONVERSATION CONSISTED OF THAT "LONNIE" WAS A BITCH ASS NIGGER, THAT HE WAS SOFT, THIS AND THAT, AND THAT WE COULD ROB HIM AND WE DIDN'T HAVE TO KILL HIM.  AND THAT IF WE EVER GET LOW ON MONEY AGAIN, WE COULD SNATCH HIM AGAIN.

Q.  IF YOU EVER WHAT?

A.  IF WE EVER GET LOW ON MONEY AGAIN, THAT WE WOULD BE ABLE TO SNATCH HIM AGAIN.

Q.  WAS THERE AN AMOUNT OF MONEY DISCUSSED ABOUT HOW MUCH YOU WERE HOPING TO GET FROM THIS?

A.  250,000.00.

Q.  WHO HAD THAT FIGURE?

A.  "CHIN"

Q.  DID "CHIN" SAY HOW THE MONEY WOULD BE DIVIDED?

A.  THAT WE WOULD GET $83,000.00 APIECE.

Q.  SPLIT BETWEEN WHOM?

A.  ME, "CHIN" AND "DRAPER".

Q.  NOW, AT THIS TIME IN NOVEMBER OF 1996, WHAT WAS YOUR FINANCIAL SITUATION LIKE?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 113 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 251 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 19 of 9

19

A.   MESSED UP.

Q.   HOW SO?

A.   WELL, MY HUSTLING WEED HAD SLOWED DOWN A LOT.  SO I MEAN, MORE OR LESS, I WAS JUST HUSTLING DAY-TO-DAY.

Q.   WHAT WAS THE PROBLEM WITH HUSTLING OUT IN SOUTHWEST AT THIS POINT, IF ANYTHING?

A. I WAS SELLING DIME BAGS OF WEED THEN.  SO IT TOOK LONGER TO MAKE A NICE AMOUNT OF MONEY, AND TENSION WAS RUNNING HIGH BECAUSE WE WERE "BEEFING" WITH L STREET.

Q.   AND WHAT ABOUT THE FACT THAT YOU WERE "BEEFING" WITH L STREET?  HOW DID THAT AFFECT SELLING MARIJUANA OUT THERE?

A.   BECAUSE YOU HAVE TO BE CAUTIOUS AS TO WHO YOU SERVE OR WHO YOU LET WALK UP ON YOU.  YOU HAVE TO PRETTY MUCH TRY TO JUST STAY ON POINT AND TRY NOT TO LET NOBODY, YOU KNOW, GET UP ON YOU THAT COULD SHOOT YOU OR WHATEVER.

Q.   WHAT WERE YOU GOING TO DO WITH THIS MONEY?

A.   WE WERE GOING TO GET SOME MORE GUNS SO WE CAN GO BACK SO WE CAN GET AT "WOOZIE" AND THEM -- SO WE COULD KILL "WOOZIE" AND THEM.

Q.   WHAT WAS THE SITUATION WITH GUNS AT THIS POINT, AS FAR AS YOUR GROUP WAS CONCERNED?

A.   WE DIDN'T HAVE ANY.

Q.   WHAT HAPPENED TO THEM ALL?

A.   I MEAN I HAD A FEW GUNS, BUT AT THAT PARTICULAR TIME, I DIDN'T HAVE THEM ANY MORE.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 114 of 159
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 252 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 20 of 95

20

Q. WHAT HAD HAPPENED TO THEM?

A. I HAD A S.K.S. AND THE GUY I GOT IT FROM WANTED -- I HAD A S.K.S., AN ASSAULT RIFLE, AND THE GUY THAT I GOT IT FROM WANTED IT BACK. SO I HAD TO GIVE IT BACK TO HIM. AND THEN I HAD A MACHINE GUN. I DON'T KNOW WHAT PARTICULAR KIND IT WAS, BUT IN ONE INSTANCE I SHOT AT "WOOZIE" AND THEM, AND THE GUN KEPT JAMMING. I HAD CLEANED IT AND OILED IT, AND IT JUST KEPT JAMMING. SO I GOT RID OF IT. I GAVE IT BACK TO THE DUDE THAT I GOT IT FROM AND GOT MY MONEY BACK.

Q. AS FAR AS YOU KNOW, WHAT DID "CHIN" TELL YOU ABOUT WHETHER OR NOT HE HAD A GUN IN THAT TIMEFRAME?

A. WHAT TIMEFRAME ARE YOU TALKING ABOUT?

Q. WE'RE TALKING ABOUT NOVEMBER OF '96.

A. DURING THE TIME WE WERE IN THE DISCUSSION TALKING ABOUT ROBBING "LONNIE"?

Q. YES.

A. NO, WE DIDN'T HAVE A GUN.

Q. DID HE HAVE A GUN?

A. NO.

Q. WHAT ABOUT "DRAPER"?

A. NONE OF US HAD GUNS.

Q. OKAY. WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" ABOUT INVESTING SOME OF THE PROCEEDS YOU HOPED TO GET FROM THIS ROBBERY?

A. YES.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 115 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 253 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 29 of 79

29

A.  "CHIN" IS DRIVING, "DRAPER" IS IN THE PASSENGER'S SEAT, AND I AM SITTING IN THE BACK

Q.  WHAT HAPPENED WHEN YOU GOT TO TEMPLE HILLS?

A.  WE PARKED -- WE PARKED ON THE SAME STREET, BUT AT THE TOP OF -- THE TOP END OF THE CORNER OF WHERE THE HOUSE WAS AT.

Q.  NOW, IF I COULD HAVE A25.

CAN YOU TURN OFF THE JURY'S MONITOR.

CAN YOU SEE THAT, MR. MONTGOMERY, ON YOUR SCREEN?

A.  I CAN SEE IT, BUT NOT REAL CLEAR.

Q.  ALL RIGHT.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT -- IN FACT, I HAVE A --

MAY I APPROACH, YOUR HONOR?

THE COURT:  SURELY.

BY MR. ZEIDENBERG:

Q.  I AM SHOWING YOU WHAT'S BEEN MARKED A25, A HARD COPY OF THAT PHOTOGRAPH.  DO YOU RECOGNIZE THAT?

A.  YES.

Q.  IS THAT THE AREA IN TEMPLE HILLS, MARYLAND THAT YOU WENT OUT TO ON NOVEMBER 17, 1996?

A.  YES.

Q.  AND DOES THAT APPEAR TO BE A FAIR AND ACCURATE AERIAL PHOTOGRAPH OF THAT AREA?

A.  YES.

MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE

App 144j

GOVERNMENT'S EXHIBIT A25.

THE COURT:  GOVERNMENT'S EXHIBIT A25 IS ADMITTED.

(WHEREUPON, GOVERNMENT'S

**EXHIBIT NUMBER A25** WAS

RECEIVED IN EVIDENCE.)

MR. ZEIDENBERG:  AGENT LISI, I'D ASK IF YOU COULD FOCUS IN ON 25TH AVENUE, KEEPING A PORTION OF 25TH AVENUE BOTH ON IVERSON STREET AND IT LOOKS LIKE THE STREET OPPOSITE OR PARALLEL TO IVERSON.

THANK YOU.

BY MR. ZEIDENBERG:

Q.  ALL RIGHT, MR. MONTGOMERY.  CAN YOU SEE THAT ON YOUR SCREEN NOW?

A.  YES.

Q.  ALL RIGHT.  THE STREET WHERE -- THE LOCATION YOU WERE LOOKING FOR -- WHAT TYPE OF RESIDENCE OR LOCATION WAS IT? WHAT DO YOU UNDERSTAND TOOK PLACE AT THAT HOUSE?

A.  THEY GAMBLE IN THERE.  IT WAS A CRAP HOUSE.

Q.  OKAY.  AND DO YOU SEE THE LOCATION OF WHERE THAT CRAP HOUSE WAS LOCATED ON 25TH AVENUE IN THAT PICTURE?

A.  I SEE IT.  YES.

Q.  OKAY.  USING THE PEN -- THE LIGHT PEN NEXT TO YOUR MONITOR, CAN YOU PUT AN ARROW, THE BEST YOU CAN RECALL, WHERE THAT LOCATION IS?

A.  (DOING AS DIRECTED.)

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 117 of 159
USCA Case #23-3015   Document #2077668   Filed 10/01/2024   Page 255 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 31 of 79

31

Q. AND IF YOU JUST TOUCH IT AGAINST THE SCREEN -- YOU HAVE LEFT AN ARROW.  IS THAT THE APPROXIMATE LOCATION?

A. YES.

Q. AND, FOR THE RECORD, YOU'RE INDICATING A RESIDENCE THAT'S LOCATED IN THE MIDDLE OF 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. NOW, WHEN YOU FIRST CAME UP TO TEMPLE HILLS THAT NIGHT, WHERE EXACTLY DID YOU, "CHIN" AND "DRAPER" GO?  WHERE DID YOU PARK THE CAR?

A. (INDICATING.)

Q. OKAY.  AND YOU'RE INDICATING ON THE CORNER OF -- WELL, YOU WERE ON 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. YOU WERE ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE WAS LOCATED?

A. RIGHT.

Q. AND I TAKE IT YOU WERE POINTING TOWARDS IVERSON STREET?

A. RIGHT. YES.

Q. NOW, WHEN YOU GOT THERE, WHAT HAPPENED?  WHAT DID YOU DO?

A. WE SAT THERE FOR A WHILE.  AND THEN "CHIN" HAD DECIDED THAT IT WAS A BAD SPOT SITTING RIGHT THERE.  SO WE LEFT.  WE LEFT FROM RIGHT THERE.  WE RODE AROUND.  WE WENT PAST WHERE HIS BARBER SHOP WAS AT.  IT WAS CLOSED.  IT WAS ALREADY

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 118 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 256 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 32 of 79

32

CLOSED. WE WENT TO WENDY'S AND GOT SOMETHING TO EAT. WE CAME BACK. THEN WE PARKED OVER HERE. (INDICATING.)

Q. NOW, YOU'RE INDICATING 25TH AVENUE ON THE OTHER SIDE OF COLEBROOK ROAD?

A. YES.

Q. OR COLEBROOK DRIVE. YOU'RE STILL ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE IS LOCATED?

A. YES.

Q. NOW, AT SOME POINT DID YOU GO BACK TO YOUR HOUSE?

A. YES.

Q. AND I SAY "YOUR HOUSE." THAT WOULD BE YOUR MOTHER'S HOUSE?

A. RIGHT.

Q. DID SHE LIVE NEARBY THERE?

A. ONE BLOCK OVER.

Q. WHAT STREET DID SHE LIVE ON AT THE TIME?

A. 26TH AVENUE.

Q. WHY DID YOU GO TO YOUR HOUSE?

A. WE HAD CUT THE ENGINE OFF IN THE VAN. SO WE WENT IN MY MOTHER'S HOUSE AND DRUNK SOME TEA AND HOT CHOCOLATE.

Q. HOW LONG WERE YOU AT YOUR MOTHER'S HOUSE, WOULD YOU ESTIMATE?

A. BETWEEN 15 AND 30 MINUTES.

Q. DID YOU STAY THERE OR DID YOU LEAVE?

A. WE LEFT BACK OUT.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 119 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 257 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 33 of 79

33

Q.  WHERE DID YOU GO?

A.  WE CAME BACK -- WE CAME BACK AND DROVE -- WE DROVE -- WE DROVE IN THE BACK ON THE PARKING LOT TO SEE IF WE SEE ANY CAR THAT "LONNIE" MIGHT BE DRIVING BECAUSE "DRAPER" WAS SAYING THAT HE DIDN'T SEE "LONNIE" -- I GUESS WHATEVER CAR "LONNIE" NORMALLY DRIVES, HE DIDN'T SEE IT.

Q.  NOW, WHAT PARKING LOT ARE YOU REFERRING TO?

A.  THE PARKING LOT BEHIND "LONNIE'S HOUSE -- BEHIND THE CRAP HOUSE.

Q.  IS THAT SHOWN HERE IN THIS PICTURE?

A.  YES.

Q.  OKAY.  THAT WOULD BE WHAT LOOKS LIKE A PARKING LOT RIGHT BEHIND WHERE THE CRAP HOUSE IS LOCATED?

A.  RIGHT.

Q.  WHAT HAPPENED THEN?

A.  WE CAME FROM BEHIND THERE.  WE MADE A RIGHT COMING OUT OF THERE AND RODE BACK DOWN TOWARDS WHERE IVERSON STREET IS AT.

Q.  AND WENT WHERE?

A.  AND WE WAS LOOKING ON THAT STREET TO SEE -- SO WE COULD SEE IF LONNIE'S CAR WAS OUT THERE.

Q.  DID YOU SPOT LONNIE'S CAR AT THAT POINT?

A.  NO.

Q.  WHERE DID YOU GO THEN?

A.  SO WE WENT AND GOT "BIRD."

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 120 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 258 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 34 of 79

34

Q.   WHERE DO YOU GO TO GET "BIRD"?

A.   KENNILWORTH.

Q.   TELL US ABOUT THAT.

A. BEFORE WE WENT AND GOT HIM, "DRAPER" CALLED HIM ON HIS
CELLPHONE TO MAKE SURE HE WAS THERE TO LET HIM KNOW WE WERE
ABOUT TO COME AND PICK HIM UP.

Q.   AT THIS POINT, HAD "BIRD" BEEN TOLD WHAT WAS GOING TO
HAPPEN THAT NIGHT?

A.   NO.

Q.   WHAT HAD CHANGED?  WHY DID YOU MAKE A DECISION TO GET
"BIRD"?

A.   BECAUSE WE DIDN'T KNOW IF "LONNIE" WAS IN THE HOUSE, AND
WE DIDN'T KNOW HOW MANY PEOPLE WAS IN THE HOUSE, IF, INDEED,
"LONNIE" WAS IN THERE.

Q.   HOW WAS "BIRD" GOING TO HELP YOU WITH THAT?

A.   BECAUSE THEY SAID THAT "BIRD" GO THERE SOMETIMES AND
GAMBLE AND THAT "BIRD" AND "LONNIE" WAS COOL AND THAT
"LONNIE" BE GIVING "BIRD" TABLE SCRAPS -- LIKE GIVING HIM
TWO OR THREE HUNDRED DOLLARS.  THEY SAID THAT LONNIE USED TO
GIVE "BIRD" TABLE SCRAPS -- LIKE GIVE HIM TWO OR THREE
HUNDRED DOLLARS FOR NOTHING.

Q.   AND WHY WAS IT HELPFUL, IN YOUR UNDERSTANDING, TO HAVE
"BIRD" ALONG IF HE WAS COOL WITH "LONNIE"?

A.   SO THAT "BIRD" COULD GO IN TO SEE HOW MANY PEOPLE WAS IN
THE HOUSE OR TO SEE IF "LONNIE" WAS IN THERE.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 121 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 259 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 51 of 79

51

A.   THE LIVING ROOM.

Q.   WHAT HAPPENED NEXT?  DID YOU SEE WHERE "DRAPER" WAS AT THIS POINT?

A.   NOT FULLY.  I SEEN HIM.  HE WAS TO MY LEFT, BUT I DIDN'T SEE WHAT EXACTLY HE WAS DOING.

Q.   WHO DID HE HAVE?

A.   HE HAD THE OTHER GUY, "LONNIE".

Q.   WHAT HAPPENED NEXT?

A.   SO DARNELL MACK WAS -- HE SAID, "I AIN'T EVEN LOOKING AT YOU."  HE SAID, "I AIN'T TRYING TO SEE YOUR FACE."

I WASN'T WORRIED ABOUT HIM SEEING MY FACE ANYWAY BECAUSE HE HAD THE MASKS ON," BUT I TRIED TO LIFT UP HIS -- I WAS IN THE PROCESS OF LIFTING UP HIS JACKET SO I COULD SHOCK HIM WITH THE STUN GUN.  AND THEN --

MR. KIERSH:  YOUR HONOR, I WAS NOT ABLE TO UNDERSTAND THE LAST RESPONSE OF THE WITNESS.

THE COURT:  HE WAS LIFTING UP HIS JACKET SO HE COULD STUN HIM WITH THE STUN GUN.

MR. KIERSH:  OKAY.

THE WITNESS:  SO THEN "DRAPER" STARTED SHOOTING -- STARTED BUSTING.  I DIDN'T KNOW WHY.  SO I MEAN I WAS LIKE -- WHEN THE SHOTS FIRST HAPPENED, I WAS KIND OF LIKE AWESTRUCK AS TO WHY HE WOULD SHOOT "LONNIE" WHEN THAT'S THE ONE WE WANT.  THEN HE CAME -- HE HIT -- HE SHOT DARNELL MACK.

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 122 of 159
USCA Case #23-3015   Document #2077668   Filed 10/01/2024   Page 260 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 52 of 9

52

AND I MEAN I WAS RIGHT -- WE WAS CLOSE. AND THE GUNPOWDER RESIDUE HAD GOT UP MY NOSE. SO I WAS LIKE -- (SNIFFING) -- DOING LIKE THAT TO CLEAR MY SINUSES UP. THEN HE SHOT "LONNIE" SOME MORE. AND THEN HE SHOT DARNELL MACK SOME MORE AND THEN RAN OUT THE DOOR. SO I WAS STILL STANDING RIGHT THERE DOING LIKE THIS -- (INDICATING) -- CLEARING MY SINUSES. THEN I RAN OUT. I RAN OUT THE DOOR AS WELL.

Q. WHO RAN OUT THE DOOR FIRST?

A. "DRAPER" DID.

Q. DID THE DOOR ACTUALLY CLOSE BEFORE YOU WENT OUT?

A. YES.

Q. WHAT TYPE OF DOOR ARE WE TALKING ABOUT?

A. A SCREEN DOOR.

Q. DID YOU OPEN THE SCREEN DOOR?

A. I PUSHED IT OPEN WITH MY THUMB.

Q. WHAT HAPPENED OR WHAT DID YOU SEE ONCE YOU GOT TO THE DOOR?

A. I WAS COMING OUT BASICALLY LIKE RIGHT -- PRETTY MUCH RIGHT AFTER HIM. AND HE SHOT WHILE WE WERE OUTSIDE, BUT I DIDN'T SEE HIM ACTUALLY SHOOT THE GIRL, BUT HE DID SHOOT WHEN WE WAS OUTSIDE WHEN I WAS COMING OUT.

Q. HOW MANY GUNSHOTS DID YOU HEAR AS YOU WERE GOING OUT?

A. WELL, WE WERE RUNNING ACROSS THE LAWN -- THE GRASS. AND HE SHOT BACK. AND I JUMPED. I JUMPED WHILE I WAS RUNNING

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 123 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 261 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 53 of 79

53

BECAUSE HE ALMOST SHOT ME.  HE WAS SHOOTING BACK WHILE HE WAS RUNNING.  AND I WAS THINKING THAT HE ALMOST SHOT ME.  SO JUST, OUT OF INSTINCT, I JUMPED.

Q.  WHEN YOU RAN OUT THE DOOR, DID YOU SEE ANYONE LAYING IN YOUR PATH?

A.  WHEN I CAME OUT, I HAD TO JUMP ACROSS THE GIRL.  SHE WAS LAYING ON THE PORCH.

Q.  WHERE DID YOU GO ONCE YOU JUMPED OVER THE GIRL ON THE PORCH?

A.  I RAN BACK TO THE VAN.

Q.  WHO GOT INTO THE VAN FIRST?

A.  "DRAPER" DID.

Q.  AND THEN?

A.  AND THEN ME.

        MR. ZEIDENBERG:  WOULD YOU TURN OFF THE JURY'S MONITOR.

        THE COURT:  WOULD THIS BE AN APPROPRIATE TIME FOR A RECESS?

        MR. ZEIDENBERG:  THAT WOULD BE FINE, YOUR HONOR.

        THE COURT:  ALL RIGHT.  TEN MINUTES, LADIES AND GENTLEMEN.

        (RECESS WAS TAKEN.)

        (JURY OUT.)

App 144r

59

YOUNG WOMAN?

A. YES.

THE COURT: WHO SHOT DARNELL MACK?

THE WITNESS: "DRAPER"

THE COURT: ALL RIGHT. YOU HAD ONLY A STUN GUN; IS THAT RIGHT?

THE WITNESS: YES.

THE COURT: ALL RIGHT.

BY MR. ZEIDENBERG:

Q. AND JUST SO IT'S CLEAR, WHO SHOT "LONNIE" GASKINS?

A. "DRAPER."

Q. WHAT WERE YOU DOING AT THE TIME "DRAPER" SHOT GASKINS AND MACK?

A. TRYING TO CLEAR MY SINUSES AT FIRST. I MEAN HE SHOT THE GUY WITH THE BLUE JACKET, "LONNIE," FIRST. AND THEN WHEN HE SHOT DARNELL MACK -- WHEN HE FIRST SHOT "LONNIE," I LOOKED BECAUSE I HAD JUMPED WHEN I FIRST HEARD THE GUNSHOT. I JUMPED FROM THE BLAST. AND THEN HE SHOT DARNELL MACK. AND THE GUN WAS CLOSE TO MY FACE, SO THE GUNPOWDER RESIDUE OR WHATEVER HAD GOT INTO MY SINUSES. I WAS DOING LIKE THAT TO CLEAR MY SINUSES. (INDICATING.)

Q. THEN YOU SAID HE WENT BACK AND SHOT GASKINS?

A. HE WENT BACK AND SHOT "LONNIE", AND THEN SHOT DARNELL MACK AGAIN.

Q. NOW, WHEN YOU WERE LEAVING THE HOUSE, YOU SAID YOU

App 144s

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 125 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 263 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 60 of 79

60

STEPPED OVER A WOMAN?

A.   YES.

Q.   AND IF WE COULD TURN OFF THE JURY'S MONITOR, MR. WEST.

I WOULD LIKE TO SHOW YOU WHAT'S MARKED PG102 AND PG103.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THOSE PHOTOGRAPHS TODAY AND ALSO PRIOR TO THIS MORNING?

A.   YES.

Q.   AND ARE THEY FAIR AND ACCURATE REPRESENTATIONS OF WHAT THE SCENE LOOKED LIKE AS YOU WERE LEAVING THE HOUSE THAT DAY?

A.   YES.

MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE PG102 AND 103 AND ASK TO PUBLISH THEM TO THE JURY, STARTING WITH PG102.

THE COURT:  AND THAT'S 103?

MR. ZEIDENBERG:  THE ONE THAT IS ON THE MONITOR RIGHT NOW IS 102, YOUR HONOR, AND THE CLOSE-UP IS 103.

THE COURT:  ALL RIGHT.

YOU HAVE SEEN THEM BOTH?

THE WITNESS:  YES.

THE COURT:  ARE THEY BOTH FAIR AND ACCURATE?

THE WITNESS:  YES.

THE COURT:  GOVERNMENT'S EXHIBITS PG102 AND 103 ARE ADMITTED.

App 144t

*Clerks File* 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,       :

                     :

  VS.                :    CR. NO. 98-329

                     :

VINCENT HILL,        :

JEROME MARTIN,      :

SAMUEL CARSON,      :

WILLIAM K. SWEENEY,  :

SEAN COATES,        :

        DEFENDANTS.  :

                     :

UNITED STATES      :

        GOVERNMENT,        :

                     :

  VS.                :    CR. NO. 99-348

                     :

GARY PRICE,        :

        DEFENDANT    :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MARCH 14, 2001
(MORNING SESSION)
(10:20 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:        PHYLLIS MERANA
                            6816 U. S. DISTRICT COURT
                            3RD & CONSTITUTION AVE., N.W.
                            WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

14

A.   (INDICATING.)

Q.   OKAY.  SO IT'S BEFORE YOU GET TO THE SIDEWALK WHICH RUNS IN BETWEEN THE TWO SETS OF BUILDINGS?

A.   YES.

Q.   AND THE WOMAN THAT YOU BELIEVED TO HAVE BEEN CHRISSY, MR. MONTGOMERY -- WHERE WAS SHE THE LAST TIME YOU SAW HER?

A.   IN THE YARD.

Q.   OKAY.  WHERE WAS SHE -- IF YOU COULD JUST INDICATE AGAIN WITH THE POINTER.  LET ME ERASE THE MARK YOU HAVE THERE.  AS NEARLY AS YOU CAN REMEMBER, WHERE WAS CHRISSY THE LAST TIME YOU SAW HER ALIVE?

A.   COMING OUT OF -- COMING OUT -- WALKING TOWARDS THE EXIT TO COME OUT OF THE YARD.

Q.   TO THE SIDEWALK?

A.   RIGHT.

Q.   MR. MONTGOMERY, I'D LIKE TO ASK YOU SOME QUESTIONS NOW ABOUT A TRIPLE MURDER WHICH OCCURRED IN TEMPLE HILLS, MARYLAND ON NOVEMBER 17, 1996.  WERE YOU PRESENT WHEN THOSE MURDERS TOOK PLACE?

A.   YES.

Q.   AND HAVE YOU PLED GUILTY TO PARTICIPATING IN THOSE MURDERS?

A.   YES.

Q.   I'D LIKE TO TALK TO YOU ABOUT THOSE MURDERS AND THE EVENTS THAT LED UP TO THEM AT THIS TIME.

USCA Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 15 of 79   Page 247 of 443

15

NOW, SOMETIME PRIOR TO THESE MURDERS, WAS THERE --
DID YOU HAVE A CONVERSATION WITH ANY OF YOUR CO-DEFENDANTS
OR YOUR FORMER -- ANY OF THE DEFENDANTS IN THIS CASE ABOUT
ATTENDING A FIGHT IN LAS VEGAS?

A.   ME AND "CHIN".

Q.   CAN YOU TELL US ABOUT THAT CONVERSATION -- WHAT YOU
REMEMBER OF IT?

A.   BASICALLY, HE ASKED ME WAS I GOING TO THE FIGHT.

Q.   WHAT FIGHT WAS IT?

A.   HOLYFIELD-TYSON.  HOLYFIELD-TYSON ONE.

Q.   AND DO YOU RECALL WHERE THAT FIGHT WAS GOING TO BE HELD?

A.   LAS VEGAS.

Q.   DID "CHIN" TELL YOU WHO WAS GOING TO BE GOING TO THE
FIGHT?

A.   I DON'T KNOW IF HE TOLD ME AT THAT PARTICULAR TIME.

Q.   AT SOME POINT, DID HE?

A.   YES.

Q.   WHO DID HE SAY WAS GOING TO GO?

A.   THAT HIM AND "DRAPER" WAS GOING, AND THAT IF I WAS
GOING, THAT I NEEDED TO GIVE "DRAPER" MY -- GIVE HIM MY
MONEY OR EITHER GIVE THE MONEY TO "DRAPER" SO THAT "DRAPER"
COULD GIVE IT TO SOMEBODY HE KNEW -- A TRAVEL AGENT OR
SOMETHING, SO THEY COULD BOOK MY RESERVATIONS.

Q.   DID YOU GO TO THE FIGHT?

A.   NO.

16

Q. WHY NOT?

A. MY FINANCIAL STATUS WAS MESSED UP.

Q. WHAT DO YOU MEAN BY THAT?

A. I DIDN'T HAVE THAT MUCH MONEY.

Q. NOW, DID YOU HAVE A CONVERSATION WITH "CHIN" AFTER THE FIGHT -- AFTER HE GOT BACK FROM THE FIGHT?

A. YES.

Q. WHAT DID HE TELL YOU ABOUT HIS TRIP?

A. BASICALLY, WHEN WE FIRST SPOKE ABOUT IT, HE WAS JUST TELLING ME HOW THE GIRLS WAS UP THERE AND STUFF LIKE THAT. THAT THEY HAD A NICE TIME.  IT WAS REAL NICE.  HE SAID THAT HIM, "DRAPER" AND -- "CHIN," "DRAPER" AND BAM AND "GOOCH" HUNG TOGETHER MOST OF THE TIME THEY WAS UP THERE.  AND HE SAID THAT THE DUDE, "LONNIE," HAD WON LIKE $50,000.00. LONNIE -- HE SAID HE HAD WON LIKE $50,000.00 WHILE HE WAS UP THERE.

Q. DID YOU KNOW THE NAME "LONNIE?"

A. NO.

Q. WHAT DID "CHIN" TELL YOU ABOUT "LONNIE" AND WHO HE WAS?

A. "CHIN" SAID THAT "DRAPER" TOLD HIM THAT "LONNIE" WAS WORTH LIKE A HALF A MILLION OR BETTER.

Q. WHERE WAS "LONNIE" FROM?

A. I DON'T KNOW.

Q. DID "CHIN" AT SOME POINT TELL YOU WHERE HE LIVED?

A. IT HAD LATER BEEN DISCUSSED.  I DON'T KNOW IF "DRAPER"

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 131 of 159
USCA Case #23-3015    Document #2077608    Filed 07/19/01    Page 249 of 443

17

SAID IT OR "CHIN" SAID IT, BUT --

Q.   WHERE DID THEY TELL YOU HE LIVED OR HE WAS FROM?

A.   TEMPLE HILLS.   THAT HE HAD A CRAP HOUSE OUT THERE.

Q.   I AM SORRY?

A.  THAT HE HAD A CRAP HOUSE OUT IN TEMPLE HILLS.

Q.   WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" AND
"DRAPER" ABOUT ROBBING "LONNIE"?

A.   YES.

Q.   CAN YOU TELL THE LADIES AND GENTLEMEN ABOUT THAT?

A.   FIRST, "CHIN" HAD TOLD ME THAT "DRAPER" HAD A MOVE LINED
UP WITH THE DUDE, "LONNIE", THAT HE HAD ALREADY TOLD ME
ABOUT.   IT'S THE SAME DUDE THAT HE WAS SAYING WON THE
$50,000.00.   SO WHEN HE WAS TELLING ME THAT "DRAPER" HAD THE
MOVE LINED UP, I ASKED HIM WAS I WITH IT.   AND HE SAID
"YES."   BUT HE TOLD ME, "DON'T TELL `BIRD' ABOUT IT."

Q.   DID "CHIN" SAY WHY NOT TO TELL "BIRD" ABOUT IT?

A.  BECAUSE "BIRD" DON'T EVER WANT TO DO NOTHING.   WHENEVER
THINGS HAPPEN, "BIRD" DON'T EVER WANT TO DO NOTHING.   HE
JUST ALWAYS WANTS TO BE THE DRIVER.

Q.   WHAT ELSE DID "CHIN" TELL YOU ABOUT IT?

A.   I MEAN, AT THAT PARTICULAR TIME, I BELIEVE THAT WAS ALL
THAT PARTICULAR CONVERSATION WAS.

Q.   DID "CHIN" TELL YOU HOW MUCH MONEY HE HOPED TO MAKE OUT
OF THIS MOVE?

A.   NOT AT THAT PARTICULAR TIME.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 132 of 159
USCA Case #23-3015    Document #2077668    Filed 07/19/01    Page 250 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/10/01    Page 18 of 79

18

Q.   AT SOME POINT LATER, DID HE?

A.   YES.  WHEN WE FURTHER DISCUSSED ROBBING "LONNIE".

Q.   WHAT DID "CHIN" TELL YOU ABOUT THAT?

A.   I AM NOT SURE WHO GAVE THE MOST INSIGHT AS FAR AS ABOUT THE DUDE "LONNIE" OR WHATEVER.  I DON'T KNOW "LONNIE".  I NEVER KNEW HIM.  IF I SEEN HIM TODAY, I WOULDN'T KNOW WHO HE WAS.  BUT I KNOW MORE OR LESS THE CONVERSATION CONSISTED OF THAT "LONNIE" WAS A BITCH ASS NIGGER, THAT HE WAS SOFT, THIS AND THAT, AND THAT WE COULD ROB HIM AND WE DIDN'T HAVE TO KILL HIM.  AND THAT IF WE EVER GET LOW ON MONEY AGAIN, WE COULD SNATCH HIM AGAIN.

Q.   IF YOU EVER WHAT?

A.   IF WE EVER GET LOW ON MONEY AGAIN, THAT WE WOULD BE ABLE TO SNATCH HIM AGAIN.

Q.   WAS THERE AN AMOUNT OF MONEY DISCUSSED ABOUT HOW MUCH YOU WERE HOPING TO GET FROM THIS?

A.   250,000.00.

Q.   WHO HAD THAT FIGURE?

A.   "CHIN"

Q.   DID "CHIN" SAY HOW THE MONEY WOULD BE DIVIDED?

A.   THAT WE WOULD GET $83,000.00 APIECE.

Q.   SPLIT BETWEEN WHOM?

A.   ME, "CHIN" AND "DRAPER".

Q.   NOW, AT THIS TIME IN NOVEMBER OF 1996, WHAT WAS YOUR FINANCIAL SITUATION LIKE?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 133 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 251 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 19 of 79

19

A.  MESSED UP.

Q.  HOW SO?

A.  WELL, MY HUSTLING WEED HAD SLOWED DOWN A LOT.  SO I MEAN, MORE OR LESS, I WAS JUST HUSTLING DAY-TO-DAY.

Q.  WHAT WAS THE PROBLEM WITH HUSTLING OUT IN SOUTHWEST AT THIS POINT, IF ANYTHING?

A. I WAS SELLING DIME BAGS OF WEED THEN.  SO IT TOOK LONGER TO MAKE A NICE AMOUNT OF MONEY, AND TENSION WAS RUNNING HIGH BECAUSE WE WERE "BEEFING" WITH L STREET.

Q.  AND WHAT ABOUT THE FACT THAT YOU WERE "BEEFING" WITH L STREET?  HOW DID THAT AFFECT SELLING MARIJUANA OUT THERE?

A.  BECAUSE YOU HAVE TO BE CAUTIOUS AS TO WHO YOU SERVE OR WHO YOU LET WALK UP ON YOU.  YOU HAVE TO PRETTY MUCH TRY TO JUST STAY ON POINT AND TRY NOT TO LET NOBODY, YOU KNOW, GET UP ON YOU THAT COULD SHOOT YOU OR WHATEVER.

Q.  WHAT WERE YOU GOING TO DO WITH THIS MONEY?

A.  WE WERE GOING TO GET SOME MORE GUNS SO WE CAN GO BACK SO WE CAN GET AT "WOOZIE" AND THEM -- SO WE COULD KILL "WOOZIE" AND THEM.

Q.  WHAT WAS THE SITUATION WITH GUNS AT THIS POINT, AS FAR AS YOUR GROUP WAS CONCERNED?

A.  WE DIDN'T HAVE ANY.

Q.  WHAT HAPPENED TO THEM ALL?

A.  I MEAN I HAD A FEW GUNS, BUT AT THAT PARTICULAR TIME, I DIDN'T HAVE THEM ANY MORE.

Case 1:98-cr-00329-RCL     Document 1375-4     Filed 04/06/26     Page 134 of 159
USCA Case #23-3015   Document #2077668   Filed 07/19/01   Page 20 of 79   Page 252 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 20 of 79

20

Q.   WHAT HAD HAPPENED TO THEM?

A.   I HAD A S.K.S. AND THE GUY I GOT IT FROM WANTED -- I HAD A S.K.S., AN ASSAULT RIFLE, AND THE GUY THAT I GOT IT FROM WANTED IT BACK.  SO I HAD TO GIVE IT BACK TO HIM.  AND THEN I HAD A MACHINE GUN.  I DON'T KNOW WHAT PARTICULAR KIND IT WAS, BUT IN ONE INSTANCE I SHOT AT "WOOZIE" AND THEM, AND THE GUN KEPT JAMMING.  I HAD CLEANED IT AND OILED IT, AND IT JUST KEPT JAMMING.  SO I GOT RID OF IT.  I GAVE IT BACK TO THE DUDE THAT I GOT IT FROM AND GOT MY MONEY BACK.

Q.   AS FAR AS YOU KNOW, WHAT DID "CHIN" TELL YOU ABOUT WHETHER OR NOT HE HAD A GUN IN THAT TIMEFRAME?

A.   WHAT TIMEFRAME ARE YOU TALKING ABOUT?

Q.   WE'RE TALKING ABOUT NOVEMBER OF '96.

A.   DURING THE TIME WE WERE IN THE DISCUSSION TALKING ABOUT ROBBING "LONNIE"?

Q.   YES.

A.   NO, WE DIDN'T HAVE A GUN.

Q.   DID HE HAVE A GUN?

A.   NO.

Q.   WHAT ABOUT "DRAPER"?

A.   NONE OF US HAD GUNS.

Q.   OKAY.  WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" ABOUT INVESTING SOME OF THE PROCEEDS YOU HOPED TO GET FROM THIS ROBBERY?

A.   YES.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 135 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 253 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 29 of 79

29

A. "CHIN" IS DRIVING, "DRAPER" IS IN THE PASSENGER'S SEAT, AND I AM SITTING IN THE BACK

Q. WHAT HAPPENED WHEN YOU GOT TO TEMPLE HILLS?

A. WE PARKED -- WE PARKED ON THE SAME STREET, BUT AT THE TOP OF -- THE TOP END OF THE CORNER OF WHERE THE HOUSE WAS AT.

Q. NOW, IF I COULD HAVE A25.

CAN YOU TURN OFF THE JURY'S MONITOR.

CAN YOU SEE THAT, MR. MONTGOMERY, ON YOUR SCREEN?

A. I CAN SEE IT, BUT NOT REAL CLEAR.

Q. ALL RIGHT. HAVE YOU HAD AN OPPORTUNITY TO LOOK AT -- IN FACT, I HAVE A --

MAY I APPROACH, YOUR HONOR?

THE COURT: SURELY.

BY MR. ZEIDENBERG:

Q. I AM SHOWING YOU WHAT'S BEEN MARKED A25, A HARD COPY OF THAT PHOTOGRAPH. DO YOU RECOGNIZE THAT?

A. YES.

Q. IS THAT THE AREA IN TEMPLE HILLS, MARYLAND THAT YOU WENT OUT TO ON NOVEMBER 17, 1996?

A. YES.

Q. AND DOES THAT APPEAR TO BE A FAIR AND ACCURATE AERIAL PHOTOGRAPH OF THAT AREA?

A. YES.

MR. ZEIDENBERG: YOUR HONOR, I MOVE TO INTRODUCE

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 136 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 254 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 30 of 79

30

GOVERNMENT'S EXHIBIT A25.

THE COURT:  GOVERNMENT'S EXHIBIT A25 IS ADMITTED.

(WHEREUPON, GOVERNMENT'S

**EXHIBIT NUMBER A25** WAS

RECEIVED IN EVIDENCE.)

MR. ZEIDENBERG:  AGENT LISI, I'D ASK IF YOU COULD FOCUS IN ON 25TH AVENUE, KEEPING A PORTION OF 25TH AVENUE BOTH ON IVERSON STREET AND IT LOOKS LIKE THE STREET OPPOSITE OR PARALLEL TO IVERSON.

THANK YOU.

BY MR. ZEIDENBERG:

Q.  ALL RIGHT, MR. MONTGOMERY.  CAN YOU SEE THAT ON YOUR SCREEN NOW?

A.  YES.

Q.  ALL RIGHT.  THE STREET WHERE -- THE LOCATION YOU WERE LOOKING FOR -- WHAT TYPE OF RESIDENCE OR LOCATION WAS IT? WHAT DO YOU UNDERSTAND TOOK PLACE AT THAT HOUSE?

A.  THEY GAMBLE IN THERE.  IT WAS A CRAP HOUSE.

Q.  OKAY.  AND DO YOU SEE THE LOCATION OF WHERE THAT CRAP HOUSE WAS LOCATED ON 25TH AVENUE IN THAT PICTURE?

A.  I SEE IT.  YES.

Q.  OKAY.  USING THE PEN -- THE LIGHT PEN NEXT TO YOUR MONITOR, CAN YOU PUT AN ARROW, THE BEST YOU CAN RECALL, WHERE THAT LOCATION IS?

A.  (DOING AS DIRECTED.)

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 137 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 255 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 31 of 79

31

Q. AND IF YOU JUST TOUCH IT AGAINST THE SCREEN -- YOU HAVE LEFT AN ARROW. IS THAT THE APPROXIMATE LOCATION?

A. YES.

Q. AND, FOR THE RECORD, YOU'RE INDICATING A RESIDENCE THAT'S LOCATED IN THE MIDDLE OF 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. NOW, WHEN YOU FIRST CAME UP TO TEMPLE HILLS THAT NIGHT, WHERE EXACTLY DID YOU, "CHIN" AND "DRAPER" GO? WHERE DID YOU PARK THE CAR?

A. (INDICATING.)

Q. OKAY. AND YOU'RE INDICATING ON THE CORNER OF -- WELL, YOU WERE ON 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. YOU WERE ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE WAS LOCATED?

A. RIGHT.

Q. AND I TAKE IT YOU WERE POINTING TOWARDS IVERSON STREET?

A. RIGHT. YES.

Q. NOW, WHEN YOU GOT THERE, WHAT HAPPENED? WHAT DID YOU DO?

A. WE SAT THERE FOR A WHILE. AND THEN "CHIN" HAD DECIDED THAT IT WAS A BAD SPOT SITTING RIGHT THERE. SO WE LEFT. WE LEFT FROM RIGHT THERE. WE RODE AROUND. WE WENT PAST WHERE HIS BARBER SHOP WAS AT. IT WAS CLOSED. IT WAS ALREADY

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 138 of 159
USCA Case #23-3015   Document #2077668   Filed 10/01/2024   Page 256 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 32 of 79

32

CLOSED.  WE WENT TO WENDY'S AND GOT SOMETHING TO EAT.  WE CAME BACK.  THEN WE PARKED OVER HERE.  (INDICATING.)

Q.  NOW, YOU'RE INDICATING 25TH AVENUE ON THE OTHER SIDE OF COLEBROOK ROAD?

A.  YES.

Q.  OR COLEBROOK DRIVE.  YOU'RE STILL ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE IS LOCATED?

A.  YES.

Q.  NOW, AT SOME POINT DID YOU GO BACK TO YOUR HOUSE?

A.  YES.

Q.  AND I SAY "YOUR HOUSE."  THAT WOULD BE YOUR MOTHER'S HOUSE?

A.  RIGHT.

Q.  DID SHE LIVE NEARBY THERE?

A.  ONE BLOCK OVER.

Q.  WHAT STREET DID SHE LIVE ON AT THE TIME?

A.  26TH AVENUE.

Q.  WHY DID YOU GO TO YOUR HOUSE?

A.  WE HAD CUT THE ENGINE OFF IN THE VAN.  SO WE WENT IN MY MOTHER'S HOUSE AND DRUNK SOME TEA AND HOT CHOCOLATE.

Q.  HOW LONG WERE YOU AT YOUR MOTHER'S HOUSE, WOULD YOU ESTIMATE?

A.  BETWEEN 15 AND 30 MINUTES.

Q.  DID YOU STAY THERE OR DID YOU LEAVE?

A.  WE LEFT BACK OUT.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 139 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 257 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 33 of 79

33

Q.  WHERE DID YOU GO?

A.  WE CAME BACK -- WE CAME BACK AND DROVE -- WE DROVE -- WE DROVE IN THE BACK ON THE PARKING LOT TO SEE IF WE SEE ANY CAR THAT "LONNIE" MIGHT BE DRIVING BECAUSE "DRAPER" WAS SAYING THAT HE DIDN'T SEE "LONNIE" -- I GUESS WHATEVER CAR "LONNIE" NORMALLY DRIVES, HE DIDN'T SEE IT.

Q.  NOW, WHAT PARKING LOT ARE YOU REFERRING TO?

A.  THE PARKING LOT BEHIND "LONNIE'S HOUSE -- BEHIND THE CRAP HOUSE.

Q.  IS THAT SHOWN HERE IN THIS PICTURE?

A.  YES.

Q.  OKAY.  THAT WOULD BE WHAT LOOKS LIKE A PARKING LOT RIGHT BEHIND WHERE THE CRAP HOUSE IS LOCATED?

A.  RIGHT.

Q.  WHAT HAPPENED THEN?

A.  WE CAME FROM BEHIND THERE.  WE MADE A RIGHT COMING OUT OF THERE AND RODE BACK DOWN TOWARDS WHERE IVERSON STREET IS AT.

Q.  AND WENT WHERE?

A.  AND WE WAS LOOKING ON THAT STREET TO SEE -- SO WE COULD SEE IF LONNIE'S CAR WAS OUT THERE.

Q.  DID YOU SPOT LONNIE'S CAR AT THAT POINT?

A.  NO.

Q.  WHERE DID YOU GO THEN?

A.  SO WE WENT AND GOT "BIRD."

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 140 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 258 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 34 of 79

34

Q.   WHERE DO YOU GO TO GET "BIRD"?

A.   KENNILWORTH.

Q.   TELL US ABOUT THAT.

A. BEFORE WE WENT AND GOT HIM, "DRAPER" CALLED HIM ON HIS CELLPHONE TO MAKE SURE HE WAS THERE TO LET HIM KNOW WE WERE ABOUT TO COME AND PICK HIM UP.

Q.   AT THIS POINT, HAD "BIRD" BEEN TOLD WHAT WAS GOING TO HAPPEN THAT NIGHT?

A.   NO.

Q.   WHAT HAD CHANGED?  WHY DID YOU MAKE A DECISION TO GET "BIRD"?

A.   BECAUSE WE DIDN'T KNOW IF "LONNIE" WAS IN THE HOUSE, AND WE DIDN'T KNOW HOW MANY PEOPLE WAS IN THE HOUSE, IF, INDEED, "LONNIE" WAS IN THERE.

Q.   HOW WAS "BIRD" GOING TO HELP YOU WITH THAT?

A.   BECAUSE THEY SAID THAT "BIRD" GO THERE SOMETIMES AND GAMBLE AND THAT "BIRD" AND "LONNIE" WAS COOL AND THAT "LONNIE" BE GIVING "BIRD" TABLE SCRAPS -- LIKE GIVING HIM TWO OR THREE HUNDRED DOLLARS.  THEY SAID THAT LONNIE USED TO GIVE "BIRD" TABLE SCRAPS -- LIKE GIVE HIM TWO OR THREE HUNDRED DOLLARS FOR NOTHING.

Q.   AND WHY WAS IT HELPFUL, IN YOUR UNDERSTANDING, TO HAVE "BIRD" ALONG IF HE WAS COOL WITH "LONNIE"?

A.   SO THAT "BIRD" COULD GO IN TO SEE HOW MANY PEOPLE WAS IN THE HOUSE OR TO SEE IF "LONNIE" WAS IN THERE.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 141 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 259 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 51 of 79

51

A.   THE LIVING ROOM.

Q.   WHAT HAPPENED NEXT?  DID YOU SEE WHERE "DRAPER" WAS AT THIS POINT?

A.   NOT FULLY.  I SEEN HIM.  HE WAS TO MY LEFT, BUT I DIDN'T SEE WHAT EXACTLY HE WAS DOING.

Q.   WHO DID HE HAVE?

A.   HE HAD THE OTHER GUY, "LONNIE".

Q.   WHAT HAPPENED NEXT?

A.   SO DARNELL MACK WAS -- HE SAID, "I AIN'T EVEN LOOKING AT YOU."  HE SAID, "I AIN'T TRYING TO SEE YOUR FACE."

         I WASN'T WORRIED ABOUT HIM SEEING MY FACE ANYWAY BECAUSE HE HAD THE MASKS ON," BUT I TRIED TO LIFT UP HIS -- I WAS IN THE PROCESS OF LIFTING UP HIS JACKET SO I COULD SHOCK HIM WITH THE STUN GUN.  AND THEN --

         MR. KIERSH:  YOUR HONOR, I WAS NOT ABLE TO UNDERSTAND THE LAST RESPONSE OF THE WITNESS.

         THE COURT:  HE WAS LIFTING UP HIS JACKET SO HE COULD STUN HIM WITH THE STUN GUN.

         MR. KIERSH:  OKAY.

         THE WITNESS:  SO THEN "DRAPER" STARTED SHOOTING -- STARTED BUSTING.  I DIDN'T KNOW WHY.  SO I MEAN I WAS LIKE -- WHEN THE SHOTS FIRST HAPPENED, I WAS KIND OF LIKE AWESTRUCK AS TO WHY HE WOULD SHOOT "LONNIE" WHEN THAT'S THE ONE WE WANT.  THEN HE CAME -- HE HIT -- HE SHOT DARNELL MACK.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 142 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 260 of 443
Case 1:98-cr-00329-RCL   Document 681   Filed 07/19/01   Page 52 of 79

52

AND I MEAN I WAS RIGHT -- WE WAS CLOSE.  AND THE GUNPOWDER RESIDUE HAD GOT UP MY NOSE.  SO I WAS LIKE -- (SNIFFING) -- DOING LIKE THAT TO CLEAR MY SINUSES UP.  THEN HE SHOT "LONNIE" SOME MORE.  AND THEN HE SHOT DARNELL MACK SOME MORE AND THEN RAN OUT THE DOOR.  SO I WAS STILL STANDING RIGHT THERE DOING LIKE THIS -- (INDICATING) -- CLEARING MY SINUSES.  THEN I RAN OUT.  I RAN OUT THE DOOR AS WELL.

Q.  WHO RAN OUT THE DOOR FIRST?

A.  "DRAPER" DID.

Q.  DID THE DOOR ACTUALLY CLOSE BEFORE YOU WENT OUT?

A.  YES.

Q.  WHAT TYPE OF DOOR ARE WE TALKING ABOUT?

A.  A SCREEN DOOR.

Q.  DID YOU OPEN THE SCREEN DOOR?

A.  I PUSHED IT OPEN WITH MY THUMB.

Q.  WHAT HAPPENED OR WHAT DID YOU SEE ONCE YOU GOT TO THE DOOR?

A.  I WAS COMING OUT BASICALLY LIKE RIGHT -- PRETTY MUCH RIGHT AFTER HIM.  AND HE SHOT WHILE WE WERE OUTSIDE, BUT I DIDN'T SEE HIM ACTUALLY SHOOT THE GIRL, BUT HE DID SHOOT WHEN WE WAS OUTSIDE WHEN I WAS COMING OUT.

Q.  HOW MANY GUNSHOTS DID YOU HEAR AS YOU WERE GOING OUT?

A.  WELL, WE WERE RUNNING ACROSS THE LAWN -- THE GRASS.  AND HE SHOT BACK.  AND I JUMPED.  I JUMPED WHILE I WAS RUNNING

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 143 of 159
USCA Case #23-3015    Document #2077668    Filed 07/19/01/2024    Page 261 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 53 of 79

53

BECAUSE HE ALMOST SHOT ME.  HE WAS SHOOTING BACK WHILE HE WAS RUNNING.  AND I WAS THINKING THAT HE ALMOST SHOT ME.  SO JUST, OUT OF INSTINCT, I JUMPED.

Q.  WHEN YOU RAN OUT THE DOOR, DID YOU SEE ANYONE LAYING IN YOUR PATH?

A.  WHEN I CAME OUT, I HAD TO JUMP ACROSS THE GIRL.  SHE WAS LAYING ON THE PORCH.

Q.  WHERE DID YOU GO ONCE YOU JUMPED OVER THE GIRL ON THE PORCH?

A.  I RAN BACK TO THE VAN.

Q.  WHO GOT INTO THE VAN FIRST?

A.  "DRAPER" DID.

Q.  AND THEN?

A.  AND THEN ME.

        MR. ZEIDENBERG:  WOULD YOU TURN OFF THE JURY'S MONITOR.

        THE COURT:  WOULD THIS BE AN APPROPRIATE TIME FOR A RECESS?

        MR. ZEIDENBERG:  THAT WOULD BE FINE, YOUR HONOR.

        THE COURT:  ALL RIGHT.  TEN MINUTES, LADIES AND GENTLEMEN.

        (RECESS WAS TAKEN.)

        (JURY OUT.)

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 144 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 262 of 443
Case 1:98-cr-00329-RCL    Document 681    Filed 07/19/01    Page 59 of 79

59

YOUNG WOMAN?

A.   YES.

THE COURT:  WHO SHOT DARNELL MACK?

THE WITNESS:  "DRAPER"

THE COURT:  ALL RIGHT.  YOU HAD ONLY A STUN GUN; IS THAT RIGHT?

THE WITNESS:  YES.

THE COURT:  ALL RIGHT.

BY MR. ZEIDENBERG:

Q.   AND JUST SO IT'S CLEAR, WHO SHOT "LONNIE" GASKINS?

A.   "DRAPER."

Q.   WHAT WERE YOU DOING AT THE TIME "DRAPER" SHOT GASKINS AND MACK?

A.   TRYING TO CLEAR MY SINUSES AT FIRST.  I MEAN HE SHOT THE GUY WITH THE BLUE JACKET, "LONNIE," FIRST.  AND THEN WHEN HE SHOT DARNELL MACK -- WHEN HE FIRST SHOT "LONNIE," I LOOKED BECAUSE I HAD JUMPED WHEN I FIRST HEARD THE GUNSHOT.  I JUMPED FROM THE BLAST.  AND THEN HE SHOT DARNELL MACK.  AND THE GUN WAS CLOSE TO MY FACE, SO THE GUNPOWDER RESIDUE OR WHATEVER HAD GOT INTO MY SINUSES.  I WAS DOING LIKE THAT TO CLEAR MY SINUSES.  (INDICATING.)

Q.   THEN YOU SAID HE WENT BACK AND SHOT GASKINS?

A.   HE WENT BACK AND SHOT "LONNIE", AND THEN SHOT DARNELL MACK AGAIN.

Q.   NOW, WHEN YOU WERE LEAVING THE HOUSE, YOU SAID YOU

60

STEPPED OVER A WOMAN?

A. YES.

Q. AND IF WE COULD TURN OFF THE JURY'S MONITOR, MR. WEST.

I WOULD LIKE TO SHOW YOU WHAT'S MARKED PG102 AND PG103. HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THOSE PHOTOGRAPHS TODAY AND ALSO PRIOR TO THIS MORNING?

A. YES.

Q. AND ARE THEY FAIR AND ACCURATE REPRESENTATIONS OF WHAT THE SCENE LOOKED LIKE AS YOU WERE LEAVING THE HOUSE THAT DAY?

A. YES.

MR. ZEIDENBERG: YOUR HONOR, I MOVE TO INTRODUCE PG102 AND 103 AND ASK TO PUBLISH THEM TO THE JURY, STARTING WITH PG102.

THE COURT: AND THAT'S 103?

MR. ZEIDENBERG: THE ONE THAT IS ON THE MONITOR RIGHT NOW IS 102, YOUR HONOR, AND THE CLOSE-UP IS 103.

THE COURT: ALL RIGHT.

YOU HAVE SEEN THEM BOTH?

THE WITNESS: YES.

THE COURT: ARE THEY BOTH FAIR AND ACCURATE?

THE WITNESS: YES.

THE COURT: GOVERNMENT'S EXHIBITS PG102 AND 103 ARE ADMITTED.



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C. |
| | . March 14, 2001 |
| vs. | . 2:20 p.m. |
| | . |
| VINCENT HILL, | . (AFTERNOON SESSION) |
| JEROME MARTIN, | . |
| SAMUEL CARSON, | . |
| WILLIAM K. SWEENEY, | . |
| SEAN COATES, | . |
| | . |
| Defendants | . |

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| . . . . . . . . . . . . . | . |
| UNITED STATES OF AMERICA, | . |
| Government, | . |
| vs. | . Docket No. CR 99-348 |
| GARY PRICE, | . |
| Defendant. | . |
| . . . . . . . . . . . . . | . |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                            ANJALI CHATURVEDI, AUSA
                            U.S. Attorney's Office
                            555 Fourth Street, N.W.
                            Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                            601 Indiana Avenue, N.W.
                            Suite 910
                            Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                            305 H Street, N.W.
                            Second Floor
                            Washington, D.C.  20001



BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 147 of 159
USCA Case #23-3085   Document #2077668   Filed 03/10/03   Page 265 of 443
Case 1:98-cr-00329-RCL   Document 956   Filed 11/03/02   Page 2 of 88

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 148 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 266 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 8 of 88

8

(End of bench conference.)

THE COURT:  The objection is overruled.  You may proceed.

BY MR. ZEIDENBERG:

Q.    What did Chin tell you about his conversation with Draper?

A.    He said that when he went to see Draper, he specifically asked him, who did he tell about the murder that happened out in Temple Hill.  He said that Draper told him the only person he told was Butchie, his cousin.

Q.    And did you know who Butchie was?

A.    Yes.

Q.    Who --

A.    Butchie is Draper cousin.

Q.    What did Chin say about the fact that Draper had told Butchie?

A.    He said that if we hit Butchie, then they don't have no case, but eventually they was going to come and get us, if we don't hit Butchie.

Q.    And when he said hit Butchie or get Butchie, what did you understand that to mean?

A.    To kill him.

Q.    When he explained that to you, did that sound like a reasonable proposition, a reasonable plan?

A.    Yes.

9

Q.   Did Chin tell you what he thought would happen to you and him if you didn't kill Butchie?

A.   Eventually that they was going to come and pick us up too.

Q.   On the triple?

A.   Yes.

Q.   Now, directing your attention to July 31, 1997, were you arrested, along with Sam Carson, Chin, on that date?

A.   Yes.

Q.   Where was it that you were arrested?

A.   On Second Street in Southwest.

THE COURT:  I'm sorry.  I didn't get your date again?

MR. ZEIDENBERG:  July 31, '97.

BY MR. ZEIDENBERG:

Q.   At the time you were arrested, what did you understand you were being charged in connection with?

A.   When we first got arrested, they didn't say what we was being charged for.  I mean, when the Metropolitan Police first grabbed us, they didn't say where they was taking us or why we was being handcuffed.

Q.   Where did they take you eventually?

A.   To the Metropolitan Police Department Homicide.

Q.   At some point did you come to learn what it was they wanted to talk to you about and what you were arrested for?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 150 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 268 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 14 of 38

14

and shot the girl and I said when the gunshots started that I was telling Chin to pull off, to pull off, and we left.

Q.    Now, did you identify the person that you believe Draper went into the house with?

A.    Yes.

Q.    Who did you say Draper went into the house with?

A.    J.P.

Q.    And who is J.P.?

A.    I don't really know.

Q.    Is he an actual person?

A.    Yeah, I know him from -- met him one time with Draper, and me and Bird talked about robbing him before.

Q.    Can you explain -- first of all, when you were talking to the police, before you gave this statement, who did they tell you they knew was involved in the murder?

A.    Excuse me?

Q.    When you were talking to the police prior to giving this statement, who did they tell you they believed was involved in this?

A.    Me, Chin, Bird, and Draper.

Q.    And when you gave this statement that you gave, blaming basically Draper and this person named J.P. -- well, let me ask you this.

What did you tell in your statement to the police abut whether what you, Chin, and Birdy knew about what was going to

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 151 of 159
USCA Case #23-3015    Document #2077668    Filed 03/11/2024    Page 269 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 15 of 88

15

happen?

A.    I told them that we didn't have no knowledge of what was going to happen, and I told them we didn't have nothing to do with it or have any knowledge of what was going to happen.

Q.    Now, what was going through your mind when you gave this statement?  What was your thinking?

A.    I was upset that -- I was already upset that Draper had told his cousin about what had happened.  Because of him telling Butchie, it brought the heat on all of us.

Q.    So, therefore, what?

A.    So I tried to disassociate me, Bird, and Chin with having anything to do with it and blame it on Draper.

Q.    And your reason for wanting to blame it on Draper was what?

A.    Because he told his cousin, and his cousin was an informant.

Q.    How did you learn that his cousin was an informant?

A.    Chin said that Draper later found out that Butchie was cooperating with the FBI.

Q.    When did Chin tell you that?

A.    Not the same day when he went to see Draper.  It was at a later time.

Q.    Now, after you gave this statement, the statement was an oral statement or a written statement at this point?

A.    What do you mean?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

16

Q.   Was it -- at this point was it a written statement or are you just telling them what happened?

A.   I believe I just told them.  I'm not certain.

Q.   Okay.  At some point did you give a written statement saying basically the same thing that you just said to the Prince George's County Homicide?

A.   Yes.

MR. ZEIDENBERG:  May I approach?

THE COURT:  Surely.

BY MR. ZEIDENBERG:

Q.   Showing you what's been marked M47 and ask you if you recognize it?

A.   Yes.

Q.   What is M47?

A.   It's a statement of victim, witness, suspect.  This is the statement that I wrote.

Q.   Is that your handwriting?

A.   Yes.

MR. ZEIDENBERG:  Your Honor, I'd move to introduce Government's Exhibit M47?

MR. KIERSH:  Objection.

THE COURT:  Approach the bench.

(Bench conference on the record.)

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 153 of 159
USCA Case #23-3015    Document #2077668    Filed 10/31/2024    Page 271 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 09/11/03    Page 22 of 88

22

THE COURT:  August 5 he went into the Grand Jury in Prince George's County?

MR. ZEIDENBERG:  Yes, Your Honor.

THE COURT:  All right.

BY MR. ZEIDENBERG:

Q.    And at the time you appeared in the Grand Jury at Prince George's County, were you asked to adopt that statement that's before you, sitting right before you, M47?

A.    What do you mean by adopt?

Q.    Were you asked whether or not your statement about the triple murder was true and accurate?

A.    Yes.

Q.    And they referred specifically to that handwritten statement?

A.    Yes.

Q.    They asked you in the Grand Jury is that a truthful recitation of what happened?

A.    Yes.

Q.    What did you say about it?

A.    I said that it was.

Q.    And I take it was that the truth or a lie?

A.    That was a lie.

Q.    Now, after you left the Grand Jury in Prince George's County, were you brought over to the District of Columbia and asked to go into the Grand Jury here?

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 154 of 159
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 272 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 23 of 88

23

A.    Yes.

Q.    And I take it after you -- well, why don't you tell us. After you gave that statement in Prince George's County and you went into the Grand Jury, what happened to the charges against you in Prince George's County?

A.    They was -- I was charged in D.C. with them.

Q.    Okay.  You were charged in D.C.  What were you told about what you were facing in D.C.?

A.    That an indictment was about to be brought against Southwest on a conspiracy.

Q.    What kind of a conspiracy?

A.    On a  marijuana conspiracy, narcotics.

Q.    And what was the evidence -- did someone explain to you what the evidence was against you in regards to that?

A.    Yes.

Q.    What was told to you about that?

        MR. ZUCKER:  Your Honor, I'd ask -- it's hearsay. Could he at least tell us who the defendant was?

        THE COURT:  Tell what?

        MR. ZUCKER:  He said, was it explained to you?  And he's about to say what was explained.  Could we at least find out who gave this explanation, which prosecutor?

        THE COURT:  Okay.

BY MR. ZEIDENBERG:

Q.    Did someone tell you about what the charges were or what

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 173

29

Q.    Was money spent direct -- just explain to the ladies and gentlemen how you received this money that you did get?

A.    Each time that they gave me money, I always had to sign for it.

Q.    And what was the money to go for?

A.    When I first got out, they gave me money for cosmetics and things like that and money to eat with and things like that.

Q.    What about your housing?

A.    I didn't have a house at that time.

Q.    No, but, I mean, as far as paying rent?

A.    I was given money to pay my rent, and maybe a little extra money to like get groceries and things like that, but not a substantial amount of money, not a whole lot.

Q.    Now, at this location you were at, were you visited by Agent Lisi?

A.    Yes.

Q.    And during one of these visits in 1997, after you had pled guilty the first time, did you tell Agent Lisi that there was more information that you had not disclosed?

A.    Yes.

Q.    And what information did you tell Agent Lisi?  Without going into the specifics, what incidents did you tell him about?

A.    T.T. and Terita murder and Chrissy, Chrissy murder.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 174

Case 1:98-cr-00329-RCL   Document 1375-4   Filed 04/06/26   Page 156 of 159
USCA Case #23-3015   Document #2077668   Filed 03/11/2024   Page 274 of 443
Case 1:98-cr-00329-RCL   Document 956   Filed 03/11/01   Page 30 of 88

30

Q.   T.T. and Terita, the two women?

A.   Yes.

Q.   And Chrissy Gladden up on 37th Place?

A.   Yes.

Q.   Did you tell him about what you knew about those incidents, those murders?

A.   Yes.

Q.   Can you tell the ladies and gentlemen what prompted you to tell Agent Lisi at that point about T.T. and Terita and Chrissy Gladden?

A.   Because of the conversation I had with the U.S. Attorney Jim Dinan.

Q.   What about that conversation?

A.   That --

Q.   Was it a recent conversation or an old conversation?

A.   It was a recent conversation.

Q.   And what had he said in that conversation?

A.   That if they find out, like if he said, if, for instance, someone else come forward and cooperate and they tell -- and that person tell them about incidents or something that I was involved in that I did not tell them about, that especially if it was like murder or whatever, that I would definitely be charged with it, and it's better for me to be up front and put it all on the table with them so that they -- it would be better if they hear it from me than to hear it from someone

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

35

Q.    And at that point when you entered into that plea agreement, did you tell about all the criminal activity about which you knew about?

A.    No.

Q.    Did you tell about all the criminal activity you were involved in?

A.    No.

Q.    So you didn't fulfill the obligations under that second plea agreement, did you?

A.    No.

Q.    Now, going back to the beginning of 1999, did you contact Agent Lisi again and tell him you had additional information you wanted to give him?

A.    Yes.

Q.    What was that information you wanted to tell him about?

A.    I told him the truth about the murder of Maurice and Slick.  I told him about my involvement in Tim-Tim's murder. I told him that -- I told him about 95 percent of the truth of the triple homicide murder.

Q.    What did you tell him about the triple homicide at this point?

A.    Told him that me, Chin, Bird, and Draper, that it was, indeed, us, and not somebody else with Draper.

Q.    So you put -- you took J.P. out of it?

A.    Right.

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 158 of 159
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 276 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 36 of 88

36

Q.    And what did you say what your particular roles were in it at this point when you talked to Agent Lisi?

A.    I told him that it was the truth that Chin did not go in the house, and that -- I told him that I was the actual person that went in the house, but I told him that I didn't go in the house, that Bird went in the house.

Q.    Okay.  So at this point you're saying you did or did not go in the house?

A.    Right.

Q.    Which one?

A.    Say that I didn't go in the house.

Q.    Did not?

A.    Did not.

Q.    And who did you say went in the house?

A.    Bird.

Q.    And who else?

A.    And Draper.

Q.    Was that the truth?

A.    No.

Q.    Why was it -- first of all, as to the other incidents, the other murders, Tim-Tim's, Slick and Mo, why did you decide to disclose this information to Agent Lisi in the beginning of 1999?

A.    Because after -- when we first killed Maurice and Slick, Raymond knew about it, and Raymond used to be running his

Case 1:98-cr-00329-RCL    Document 1375-4    Filed 04/06/26    Page 159 of 159
USCA Case #23-3015    Document #2077668    Filed 10/31/2024    Page 277 of 443
Case 1:98-cr-00329-RCL    Document 956    Filed 03/11/03    Page 66 of 88

66

Q.   And you said, well, you know, Draper over there, he went on some of the moves with me; is that right?

A.   I don't recall me saying that.

Q.   Well, you said that Mr. Sweeney went into that house in Maryland and committed the triple murder.  That was your testimony about an hour and a half ago; is that right?  Didn't you testify to that?

A.   Yes.

Q.   Okay.  That event, is that one of the moves that you talked about?

A.   Yes, it wasn't my move.

Q.   Well, but you said it was a move, correct?

A.   Yes.

Q.   All right.  And you're saying that Mr. Sweeney was part of that, right?

A.   Yes.

Q.   And you said you knew him from the streets; is that right?

A.   Yes.

Q.   Okay.  On August 5, 1997, when you spoke with the Prince George's County Police, you had known Mr. Sweeney for about six or seven years; is that correct?

A.   I'm not sure.

Q.   Well, if you know him for about 11 years, and the statement to the police was about 4 years ago, 11 minus 4 is