## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Samuel Carson, Sean Coates,<br>Jerome Martin, Jr., and William K.<br>Sweeney,<br><br>    Defendants. | Case No. 1:98-cr-329-6-RCL |

-----

# APPENDIX
in support of Defendants' Supplemental § 2255 Motion

-----

-----

# VOLUME 3 OF 9

## Excerpts of Transcripts (March 15–July 2001)

March 15, 2001 (morning session) ...........................................................................................179

May 23, 2001 (morning session) .............................................................................................207

May 23, 2001 (afternoon session)............................................................................................218

May 29, 2001 (afternoon session)............................................................................................236

May 30, 2001 (morning session) .............................................................................................255

June 26, 2001 (morning session) .............................................................................................266

June 26, 2001 (afternoon session)............................................................................................281

June 27, 2001 (afternoon session)............................................................................................285

July 3, 2001 (afternoon session) .............................................................................................308

July 5, 2001 (morning session) ...............................................................................................313

*Clerks File*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————

UNITED STATES,
       GOVERNMENT,      :

                          :

 VS.                      :   CR. NO. 98-329

VINCENT HILL,           :
JEROME MARTIN,         :
SAMUEL CARSON,         :
WILLIAM K. SWEENEY,   :
SEAN COATES,          :
       DEFENDANTS.     :
                          :
———————————————————
UNITED STATES         :
       GOVERNMENT,    :

                          :

  VS.                    :   CR. NO. 99-348

                          :

GARY PRICE,          :
       DEFENDANT      :
———————————————————

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MARCH 15, 2001
(MORNING SESSION)
(10:15 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:           PHYLLIS MERANA
                          6816 U. S. DISTRICT COURT
                          3RD & CONSTITUTION AVE., N.W.
                          WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

3

INDEX

WITNESS:                    CROSS (CONTINUED.)

JAMES MONTGOMERY

     BY MR. KIERSH              6

App 181

17

TRAFFICKING?

A. WELL, THEY GOT THE HEROIN FROM SOMEBODY. AND I DON'T KNOW WHO HELPED THEM SELL IT.

Q. DID "BUTCHIE" GIVE YOU INFORMATION ABOUT PETEY JOHNSON?

A. YES.

Q. DID HE GIVE YOU INFORMATION ABOUT DARRYL HINES -- TO INVESTIGATE HIM?

A. HE WAS DEAD.

Q. DEAD BEFORE DECEMBER OF '96?

A. HE DIED IN JULY OF '96.

Q. OKAY. WAS ANYONE CHARGED WITH THAT?

A. I BELIEVE SOMEBODY WAS CHARGED, AND THEN IT WAS DISMISSED.

Q. OKAY. WAS "BUTCHIE" CONSIDERED A SUSPECT IN THAT MURDER?

A. NO, SIR. NOT AT ALL.

Q. NOW, MICHAEL FARRAR WAS ALSO A DRUG DEALER WHO WAS UNDER INVESTIGATION BY THE F.B.I.?

A. NO, SIR.

Q. NEVER?

A. NOT TO MY KNOWLEDGE.

Q. OKAY. JUST TO YOUR KNOWLEDGE.

AND DID YOU KNOW THAT MICHAEL FARRAR CARRIED WEAPONS?

A. AT THAT TIME, NO. I CAME TO LEARN IT LATER ON.

18

Q.   THAT HE WAS SOMEONE WHO WOULD BE IN POSSESSION OF WEAPONS?

         MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  I DON'T THE RELEVANCE OF WHETHER OR NOT MICHAEL FARRAR --

         THE COURT:  OVERRULED.

         THE WITNESS:  I CAME TO LEARN LATER ON.  I DIDN'T KNOW MUCH ABOUT MICHAEL FARRAR AT ALL.

BY MR. KIERSH:

Q.   LATER ON DID YOU LEARN?

A.   AFTER "BUTCHIE'S" MURDER, I LEARNED THAT HE WAS ARRESTED WITH A GUN, YES.

Q.   OKAY.

         YOU TOOK MICHAEL FARRAR OFF THE STREET ONE TIME, DIDN'T YOU?  YOU PICKED HIM UP TO QUESTION HIM?

A.   NO, SIR.

Q.   DIDN'T YOU PICK MICHAEL FARRAR UP TO QUESTION HIM AFTER "BUTCHIE" WAS MURDERED?

A.   NO, SIR.

Q.   DIDN'T YOU INQUIRE OF HIM ABOUT "BUTCHIE'S" MURDER?

A.   NO.

         MS. CHATURVEDI:  OBJECTION, YOUR HONOR.

         THE COURT:  NO GOOD-FAITH BASIS?

         MS. CHATURVEDI:  I DON'T UNDERSTAND THE RELEVANCE OF THIS LINE OF QUESTIONING.

         MR. KIERSH:  OF COURSE IT IS RELEVANT.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 8 of 166
USCA Case #23-3015    Document #2077668    Filed 07/19/01    Page 281 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 9 of 9

9

YOU TALKED ABOUT -- YOU ADMITTED YOUR INVOLVEMENT IN THE FIRST DEGREE MURDERS OF MAURICE HALLMAN AND LEONARD HYSON; CORRECT?

A.   CORRECT.

Q.   OKAY.  NOW, WHEN DID THOSE MURDERS OCCUR?

A.   1989.

Q.   OKAY.  NOW, MR. SWEENEY, MY CLIENT, HAD NOTHING TO DO WITH THOSE MURDERS?

A.   NOT AT ALL.

Q.   RIGHT.

NOW, THOSE MURDERS -- THOSE MURDERS OF MR. HALLMAN AND MR. HYSON -- WHERE DID THEY OCCUR?

A. IN SOUTHWEST.

Q.   OKAY.  WHERE IN SOUTHWEST?

A.   IN THE JAMES CREEK HOUSING AREA.

Q.   OKAY.   WHERE IS THAT IN RELATION TO K STREET, SOUTHWEST?

A.   BETWEEN FIRST STREET AND HALF STREET, SOUTHWEST.

Q.   NOW, MR. HALLMAN AND MR. HYSON -- WERE THESE PEOPLE, AS FAR AS YOU KNEW, USING THE TERMINOLOGY YOU USED YESTERDAY, "SNITCHES"?

A.   NO.

Q.   YOU DIDN'T KILL THEM BECAUSE THEY WERE "SNITCHES," IS THAT RIGHT?

A.   NO.

Q.  YOU DIDN'T KILL THEM BECAUSE OF SELLING MARIJUANA ON K STREET; DID YOU?

A.  NO.

Q.  IT HAD NOTHING TO DO WITH SOME CONSPIRACY; ISN'T THAT RIGHT?

A.  CORRECT.

Q.  OKAY.   THEN YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF TIMOTHY BENTON. DO YOU REMEMBER THAT?

A.  YES.

Q.  OKAY.  WHEN WERE YOU INVOLVED WITH THE MURDER OF MR. BENTON?

A.  1994.

Q.  AND WHERE WAS MR. BENTON KILLED?

A.  IN MY CAR.

Q.  AND WHERE WAS YOUR CAR AT THE TIME MR. BENTON WAS KILLED?

A.  WE WERE IN SOUTHEAST.

Q.  OKAY.  SOUTHEAST WASHINGTON?

A.  YES.

Q.  OKAY.  AND HOW FAR FROM K STREET IN SOUTHWEST WASHINGTON AT THE TIME WERE YOU INVOLVED WITH THE MURDER OF MR. BENTON?

A.  HOW FAR?

Q.  YES.

A.  IT'S A GREAT DISTANCE.  IT'S A GREAT DISTANCE.  I'M NOT

13

A.  NO.

Q.  AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT WHERE?  IN THE HEAD IN YOUR CAR?

A.  YES.

Q.  OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

A.  NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

Q.  RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

A.  CORRECT.

Q.  AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING YOU KNOW AHEAD OF TIME?

A.  CORRECT.

Q.  HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS EVENT?

A.  NOT AT ALL.

Q.  AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND AND TRY TO DRIVE OVER HIM?

A.  CORRECT.

Q.  AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT -- MR. BENTON'S MURDER, AS FAR AS YOU KNOW?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 11 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 284 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 31 of 98

31

A.  PRETTY MUCH FOR MYSELF.

Q.  FOR YOURSELF.

AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

A.  YES.

Q.  AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY HOUSE?

A.  CORRECT.

Q.  NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A JAIL OR PRISON; ISN'T THAT RIGHT?

A.  YES.

Q.  LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE OUT DOING YOUR BUSINESS; RIGHT?

A.  YES.

Q.  YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A CURFEW FOR YOU?

A.  RIGHT.

Q.  SO IT'S NOT SO BAD; RIGHT?

A.  CORRECT.

Q.  BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A HALFWAY HOUSE?

A.  YES.

Q.  BECAUSE THAT SUITED YOUR NEEDS?

A. YES.

Q.  AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 12 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 285 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 32 of 88

32

A.  YES.

Q.  LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

A.  I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

Q.  OKAY.

A.  BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON DOING RIGHT.

Q.  AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A GRAND JURY IN MARYLAND?

A.  YES.

Q.  AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

A.  YES.

Q.  ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL SOMEONE NAMED ROBIN?

A.  YES.

Q.  WHO IS THAT?

A.  SHE WAS A GOVERNMENT WITNESS AS WELL.

App 188

41

Q.  AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF
2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO
CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS
THREATENED ME."  DO YOU REMEMBER THAT?

A.  WHEN WAS THIS?

Q.  MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN
INTO CUSTODY.

A.  MARCH 4TH?

Q.  MARCH 4TH, 2000.  YOU CAME BEFORE JUDGE JACKSON.  DO YOU
REMEMBER THAT?

A.  THAT'S INCORRECT.

Q.  EXCUSE ME.  MARCH 15TH, 2000.

A.  YES.

Q.  OKAY.  IT WAS ACTUALLY ONE YEAR AGO TODAY?

A.  YES.

Q.  OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?

A.  CORRECT.

Q.  BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION
PROGRAM; CORRECT?

A.  CORRECT.

Q.  AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS
THREATENED ME."  DO YOU RECALL THAT?

A.  NO, I DO NOT RECALL THAT.

Q.  WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH
YOUR RECOLLECTION?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 14 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 287 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 42 of 88

42

A.   MAYBE.

Q.   OKAY.

          IF I MAY HAVE THE COURT'S INDULGENCE.

          MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS

BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER

4, THE MARCH 15, 2000 TRANSCRIPT.

          MR. KIERSH:   MAY I APPROACH THE WITNESS, YOUR

HONOR?

          THE COURT:   SURE.

BY MR. KIERSH:

Q.   SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.   CAN

YOU READ THIS?

A.   YES, I READ VERY WELL.

Q.   TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

A.   UNITED STATES GOVERNMENT VERSUS --

Q.   JUST READ IT TO YOURSELF.

A.   ALL RIGHT.

Q.   OKAY?

A.   UH-HUH.

Q.   NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4,

LINE 7.

          READ THAT TO YOURSELF.   OKAY?

A.   FROM PAGE 7 ON DOWN?   I MEAN   --

Q.   LINE 7, PAGE 4.

A.   HERE YOU GO, SIR.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 15 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 288 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 43 of 85

43

Q.  NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH 15TH, 2000?

A.  I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE SAID IT.

Q.  YOU DON'T DISPUTE IT, DO YOU?

A.  NO, I AM NOT DISPUTING IT.

Q.  OKAY.  YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T THREATENED OR ANYTHING," CORRECT?

A.  BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND "LOVEY" TOLD ME THAT "PIMP" TOLD HER --

        MS. HEPWORTH:  OBJECTION.

        THE WITNESS:  -- THAT I HAD BETTER KEEP MY MOUTH SHUT --

        MR. HEPWORTH:  OBJECTION.

        THE WITNESS:  -- IF I KNOW WHAT'S GOOD FOR ME. AND I ALSO TOLD THEM THAT --

        MS. HEPWORTH:  OBJECTION, YOUR HONOR.

        THE WITNESS:  -- MY SISTER'S BOYFRIEND, KIM, TOLD ME THAT --

        MS. HEPWORTH:  OBJECTION, YOUR HONOR.

        THE COURT:  WAIT A MINUTE.  THERE IS NO QUESTION PENDING.

BY MR. KIERSH:

Q.  NOW, LET'S ME JUST GO BACK.  YOU TOLD JUDGE JACKSON --

OF 1997, BEFORE YOU ENTERED INTO THE PLEA, DID YOU TELL THE GOVERNMENT -- DID YOU TELL AGENT LISI THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A.   WHAT PARTICULAR TIME ARE YOU SPEAKING ABOUT?

Q.   IN AUGUST OF 1997 WHEN YOU WENT INTO THE GRAND JURY IN PRINCE GEORGE'S COUNTY AND SAID, "JOHNNIE PROCTOR WENT INTO THE HOUSE AND DID THE TRIPLE."

A.   NO, I WAS NOT TRUTHFUL.

Q.   I KNOW YOU WEREN'T TRUTHFUL, BUT HAD YOU TOLD THEM PRIOR TO NOVEMBER 4TH OR 5TH, 1997, THAT YOU HAD LIED IN THE PRINCE GEORGE'S COUNTY GRAND JURY?

A.   I DON'T THINK I DID TELL THEM AT THAT TIME.

Q.   WHEN YOU ENTERED INTO THE SECOND AGREEMENT, THAT AGREEMENT HAD THE SAME REQUIREMENT THAT YOU BE FORTHRIGHT AND TELL THEM EVERYTHING YOU KNOW; RIGHT?

A.   THE SECOND AGREEMENT WAS NOT IN AUGUST OF '97.

Q.   NO.  NO.  OKAY.  I AM SORRY.  THE SECOND AGREEMENT WAS SIGNED ON NOVEMBER 4TH, '97, AND FORMALLY ENTERED IN THIS COURT ON NOVEMBER 5TH, '97; IS THAT RIGHT?

A.   YES.

Q.   AND THE SECOND AGREEMENT HAD THE SAME REQUIREMENTS AS THE FIRST AGREEMENT, THAT YOU BE FORTHRIGHT AND YOU TELL THE GOVERNMENT EVERYTHING YOU KNOW; ISN'T THAT RIGHT?

A.   CORRECT.

Q.   OKAY.  MY QUESTION IS DID YOU TELL THE GOVERNMENT,

84

BEFORE YOU ENTERED INTO THE SECOND AGREEMENT, THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A. I DON'T THINK I DID.

Q. SO YOU WERE VIOLATING THE AGREEMENT RIGHT FROM THE BEGINNING; WEREN'T YOU?

A. YES.

Q. AND YOU DIDN'T TELL THE GOVERNMENT, PRIOR TO ENTERING INTO THE SECOND AGREEMENT, THAT YOU WERE INVOLVED IN THE MURDER OF MR. HALLMAN; ISN'T THAT RIGHT?

A. CORRECT.

Q. SO YOU WERE VIOLATING ON THAT LEVEL; CORRECT?

A. YES.

Q. YOU DIDN'T TELL THE GOVERNMENT ON NOVEMBER 4TH AND NOVEMBER 5TH THAT YOU WERE INVOLVED IN THE MURDER OF MR. HYSON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE MURDER OF MR. BENTON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE TRIPLE MURDER IN TEMPLE HILLS; ISN'T THAT CORRECT?

A. CORRECT.

Q. SO ON NOVEMBER 4TH AND NOVEMBER 5TH, EVEN THOUGH THIS IS THE SECOND TIME BACK AND EVEN THOUGH YOU SWORE TO TELL THE TRUTH TO JUDGE JACKSON, YOU WERE LYING?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 18 of 166

USCA Case #23-3815    Document #2077668    Filed 07/19/2024    Page 291 of 443
Case 1:98-cr-00329-RCL    Document 1375-5    Filed 07/19/2001    Page 85 of 88

85

A. I THINK WITHHOLDING INFORMATION IS MORE LIKE IT.

Q. OKAY. WELL, DIDN'T THE AGREEMENT SAY YOU HAVE TO TELL EVERYTHING?

A. YES.

Q. AND YOU SAID YOU WOULD TELL EVERYTHING; RIGHT?

A. YES.

Q. BUT YOU DIDN'T DO IT; RIGHT?

A. TRUE.

Q. SO WHEN YOU SIGNED THE AGREEMENT WITH THE UNITED STATES ON NOVEMBER 4TH, WHERE YOU PROMISED TO TELL EVERYTHING, YOU WERE LYING BECAUSE YOU DIDN'T TELL THEM EVERYTHING?

A. YES.

Q. ISN'T THAT RIGHT?

A. YES, YOU ARE CORRECT.

Q. AND YOU LIED BECAUSE YOU THOUGHT IT WAS IN YOUR BEST INTEREST TO LIE; ISN'T THAT RIGHT?

A. YES.

        MAY I ADD SOMETHING ELSE?

Q. JUST ANSWER MY QUESTIONS.

A. ALL RIGHT.

        THE COURT: YOU WILL GET A CHANCE ON REDIRECT EXAMINATION TO OFFER ANY EXPLANATION YOU NEED.

        MR. KIERSH: THE COURT'S INDULGENCE.

BY MR. KIRSCH:

Q. NOW, YOU CAME BACK BEFORE JUDGE JACKSON IN FEBRUARY --

App 194

13

A.  NO.

Q.  AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT WHERE?  IN THE HEAD IN YOUR CAR?

A.  YES.

Q.  OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

A.  NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

Q.  RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

A.  CORRECT.

Q.  AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING YOU KNOW AHEAD OF TIME?

A. CORRECT.

Q.  HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS EVENT?

A.  NOT AT ALL.

Q.  AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND AND TRY TO DRIVE OVER HIM?

A.  CORRECT.

Q.  AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT -- MR. BENTON'S MURDER, AS FAR AS YOU KNOW?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 20 of 166
USCA Case #23-3015    Document #2077668    Filed 07/19/2024    Page 293 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 10/10/01    Page 20 of 88

20

Q. PERRY AND DARNELL MACK?

A. TO MY UNDERSTANDING, YES.

Q. AND YOU WERE INVITED TO THE PARTY?

A. YES.

Q. OKAY.

SO IN TERMS OF THE PREDICATE ACTS TO THE RICO CONSPIRACY THAT YOU ACKNOWLEDGE INVOLVEMENT WITH, THERE WERE SIX MURDERS SO FAR THAT WE'VE TALKED ABOUT; CORRECT?

A. YES.

Q. OKAY. AND THEN YOU ALSO TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF CHRISHAUNA GLADDEN; CORRECT?

A. CORRECT.

Q. SO THERE ARE SEVEN MURDERS THAT YOU'RE DIRECTLY INVOLVED WITH AND YOU ACKNOWLEDGE AS PREDICATE ACTS AS PART OF YOUR PLEA BEFORE THIS COURT; CORRECT?

A. CORRECT.

Q. OKAY. NOW, DO YOU KNOW ANYTHING ABOUT A DOMINICO BENSON?

A. YES.

Q. WERE YOU INVOLVED IN HIS MURDER?

A. NO.

Q. MICHAEL SALTERS? WERE YOU INVOLVED IN HIS MURDER?

A. NO.

Q. NOW, WE HAVE GOT SEVEN MURDERS THAT YOU HAVE TOLD THE

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 21 of 166
USCA Case #23-3015    Document #2077668    Filed 07/19/01    Page 294 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 10/01/2024    Page 21 of 88

21

LADIES AND GENTLEMEN OF THE JURY ABOUT.

YOU TOLD US THAT YOU WERE INVOLVED WITH AN ASSAULT WITH INTENT TO KILL A POLICE OFFICER; IS THAT CORRECT?

A. YES.

Q. THAT YOU WERE DIRECTLY INVOLVED WITH, RIGHT?

A. CORRECT.

Q. OKAY. AND YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR PLANS TO DISCUSS KILLING "WOOZIE," WHOSE REAL NAME IS THOMAS FIELDS; IS THAT RIGHT?

A. YES.

Q. OKAY. AND MR. FIELDS WAS FROM L STREET; RIGHT?

A. YES.

Q. YOU DIDN'T KNOW MR. FIELDS?

A. I DIDN'T KNOW HIM?

Q. DID YOU KNOW HIM?

A. YES.

Q. YOU KNEW HIM PERSONALLY?

A. YES.

Q. DID YOU CONSIDER HIM TO BE A FRIEND?

A. YES, BEFORE THE BEEF HIT. BEFORE THE BEEF CAME DOWN, YES.

Q. HE WAS A FRIEND OF YOURS?

A. HE WAS ALL RIGHT.

Q. ALL RIGHT, BUT THEN HE WAS A GUY, YOU KNOW, YOU GOT INTO THIS BEEF WITH, AND THEN YOU SAID, "I AM GOING TO GO OUT AND

31

A.  PRETTY MUCH FOR MYSELF.

Q.  FOR YOURSELF.

AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

A.  YES.

Q.  AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY HOUSE?

A.  CORRECT.

Q.  NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A JAIL OR PRISON; ISN'T THAT RIGHT?

A.  YES.

Q.  LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE OUT DOING YOUR BUSINESS; RIGHT?

A.  YES.

Q.  YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A CURFEW FOR YOU?

A.  RIGHT.

Q.  SO IT'S NOT SO BAD; RIGHT?

A.  CORRECT.

Q.  BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A HALFWAY HOUSE?

A.  YES.

Q.  BECAUSE THAT SUITED YOUR NEEDS?

A.  YES.

Q.  AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

App 198

32

A.  YES.

Q.  LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

A.  I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

Q.  OKAY.

A.  BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON DOING RIGHT.

Q.  AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A GRAND JURY IN MARYLAND?

A.  YES.

Q.  AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

A.  YES.

Q.  ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL SOMEONE NAMED ROBIN?

A.  YES.

Q.  WHO IS THAT?

A.  SHE WAS A GOVERNMENT WITNESS AS WELL.

App 199

33

Q. OKAY. SHE WAS ONE OF THOSE SNITCHES -- MAGGOTS TYPE OF PEOPLE YOU TALKED ABOUT?

A. YES.

Q. OKAY. AND HAVE YOU TOLD THE GOVERNMENT -- THE PROSECUTORS AND AGENT LISI -- ABOUT ALL OF THESE DIFFERENT CRIMES: THE ROBBERIES, THE LIES, THE CONSPIRACIES, AND THE MURDERS? DID YOU TELL THEM ALL THIS OVER SOME COURSE OF TIME?

A. YES.

Q. OKAY. AND AFTER YOU TOLD THEM ABOUT YOUR INVOLVEMENT IN THIS CASE, FROM 1997 UNTIL 2000 -- UNTIL MARCH OF 2000, YOU WEREN'T EVEN LOCKED UP; ISN'T THAT RIGHT?

A. CORRECT.

Q. OKAY.

AND YOU WEREN'T LOCKED UP -- YOU WERE IN COURT WHEN THE GOVERNMENT WOULD COME IN UP UNTIL MARCH -- UP UNTIL NOVEMBER OF 1999 -- THE GOVERNMENT WOULD COME IN AND SAY, "WE'RE NOT ASKING FOR MR. MONTGOMERY TO BE LOCKED UP"?

A. THAT'S NOT CORRECT.

Q. WELL, WEREN'T YOU IN COURT WHEN THE GOVERNMENT SAID, "WE DO NOT OPPOSE MR. MONTGOMERY'S BEING RELEASED"?

A. THAT WAS IN '97.

Q. OKAY. AND IN '98?

A. I WAS STILL OUT.

Q. RIGHT. YOU DIDN'T GET LOCKED UP UNTIL MARCH OF 2000?

App 200

USCA Case 3:01-cr-00329-RCL   Document 2077-5   Filed 07/19/01   Page 34 of 88   Page 298 of 443

34

A. CORRECT.

Q. AND THAT'S AFTER TELLING THE GOVERNMENT, OVER THE COURSE OF TIME, ABOUT ALL OF THESE CRIMES THAT YOU HAVE BEEN INVOLVED WITH; ISN'T THAT RIGHT?

A. ON TWO OCCASIONS, THEY DID ASK FOR ME TO GET STEPPED BACK.

Q. RIGHT, BUT JUDGE JACKSON DIDN'T STEP YOU BACK, RIGHT?

A. CORRECT.

Q. HE LET YOU STAY OUT ON THE STREET; ISN'T THAT RIGHT?

A. CORRECT.

Q. AND YOU KNOW THAT MY CLIENT, WILLIAM SWEENEY, SINCE 1997 -- YOU KNOW HE HAS BEEN LOCKED UP THE WHOLE TIME; ISN'T THAT RIGHT?

A. YES.

Q. OKAY. YOU KNOW THAT THE ONLY REASON THAT YOU WEREN'T LOCKED UP DURING THIS TIME IS BECAUSE YOU WERE PROVIDING INFORMATION TO THE GOVERNMENT; ISN'T THAT RIGHT?

A. COULD YOU ASK THAT QUESTION AGAIN?

Q. YES. THE REASON WHY YOU WEREN'T LOCKED UP DURING THIS PERIOD OF TIME FROM 1997 TO 2000 WAS BECAUSE YOU WERE PROVIDING INFORMATION TO THE GOVERNMENT?

A. TO MY UNDERSTANDING?

Q. TO YOUR UNDERSTANDING.

A. TO MY UNDERSTANDING, IN 1997, WHEN I TOLD MR. LISI ABOUT MY INVOLVEMENT IN CHRISSY'S MURDER, THEY BROUGHT ME BACK TO

App 201

41

Q. AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF 2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS THREATENED ME." DO YOU REMEMBER THAT?

A. WHEN WAS THIS?

Q. MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN INTO CUSTODY.

A. MARCH 4TH?

Q. MARCH 4TH, 2000. YOU CAME BEFORE JUDGE JACKSON. DO YOU REMEMBER THAT?

A. THAT'S INCORRECT.

Q. EXCUSE ME. MARCH 15TH, 2000.

A. YES.

Q. OKAY. IT WAS ACTUALLY ONE YEAR AGO TODAY?

A. YES.

Q. OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?

A. CORRECT.

Q. BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION PROGRAM; CORRECT?

A. CORRECT.

Q. AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS THREATENED ME." DO YOU RECALL THAT?

A. NO, I DO NOT RECALL THAT.

Q. WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH YOUR RECOLLECTION?

App 202

42

A.  MAYBE.

Q.  OKAY.

        IF I MAY HAVE THE COURT'S INDULGENCE.

        MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER 4, THE MARCH 15, 2000 TRANSCRIPT.

        MR. KIERSH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

        THE COURT:  SURE.

BY MR. KIERSH:

Q.  SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.  CAN YOU READ THIS?

A.  YES, I READ VERY WELL.

Q.  TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

A.  UNITED STATES GOVERNMENT VERSUS --

Q.  JUST READ IT TO YOURSELF.

A.  ALL RIGHT.

Q.  OKAY?

A.  UH-HUH.

Q.  NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4, LINE 7.

        READ THAT TO YOURSELF.  OKAY?

A.  FROM PAGE 7 ON DOWN?  I MEAN  --

Q.  LINE 7, PAGE 4.

A.  HERE YOU GO, SIR.

App 203

Q. NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH 15TH, 2000?

A. I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE SAID IT.

Q. YOU DON'T DISPUTE IT, DO YOU?

A. NO, I AM NOT DISPUTING IT.

Q. OKAY. YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T THREATENED OR ANYTHING," CORRECT?

A. BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND "LOVEY" TOLD ME THAT "PIMP" TOLD HER --

MS. HEPWORTH: OBJECTION.

THE WITNESS: -- THAT I HAD BETTER KEEP MY MOUTH SHUT --

MR. HEPWORTH: OBJECTION.

THE WITNESS: -- IF I KNOW WHAT'S GOOD FOR ME. AND I ALSO TOLD THEM THAT --

MS. HEPWORTH: OBJECTION, YOUR HONOR.

THE WITNESS: -- MY SISTER'S BOYFRIEND, KIM, TOLD ME THAT --

MS. HEPWORTH: OBJECTION, YOUR HONOR.

THE COURT: WAIT A MINUTE. THERE IS NO QUESTION PENDING.

BY MR. KIERSH:

Q. NOW, LET'S ME JUST GO BACK. YOU TOLD JUDGE JACKSON --

60

A.   I GOT ARRESTED IN WASHINGTON, D. C.

Q.   OKAY.  YOU GOT ARRESTED ON AUGUST 5TH; CORRECT?

A.   THAT'S INCORRECT.

Q.   OKAY.  ON AUGUST 7, 1997, YOU SIGNED THIS LETTER WITH YOUR LAWYER SAYING YOU AGREE TO MEET WITH THE OFFICE OF THE UNITED STATES ATTORNEY HERE IN THE DISTRICT OF COLUMBIA TO HAVE AN OFF-THE-RECORD DISCUSSION; CORRECT?

A.   I GUESS IT MUST BE CORRECT BECAUSE IT IS SIGNED BY ME.

Q.   YOU DON'T DISPUTE THIS LETTER -- THE AUTHENTICITY; DO YOU?

A.   NO, I AM NOT DISPUTING IT.

Q.   AS A MATTER OF FACT, NOT ONLY DID YOU SIGN IT, BUT YOU ALSO DATED IT AUGUST 7, 1997; IS THAT RIGHT?

A.   CORRECT.

Q.   AND THAT'S SIX DAYS BEFORE YOU ENTERED INTO YOUR PLEA THAT TALKS ABOUT THE 5K1.1 LETTER; CORRECT?

A.   CORRECT.

Q.   OKAY.

SO ON AUGUST 12TH, 1997, WHEN YOU SIGNED THE PLEA LETTER WHERE IT TALKED ABOUT THE 5K1.1, YOU HAD SOME UNDERSTANDING THAT IF YOU WERE COOPERATING WITH THE GOVERNMENT, YOU COULD GET OUT OF THE GUIDELINE SENTENCE; ISN'T THAT RIGHT?

A.   COULD YOU REPEAT THAT?

Q.   OKAY.  YOU WEREN'T JUST GOING TO WALK INTO COURT AND

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 30 of 166
USCA Case #23-3015    Document #2077868    Filed 10/01/2024    Page 303 of 443
Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 61 of 88

61

PLEAD GUILTY AND HAVE THE JUDGE SENTENCE YOU TO LIFE AND HAVE HIM TAKE YOU AWAY?  THAT WOULDN'T HAVE BEEN VERY SMART; RIGHT?

A.  BASICALLY, MY MINDSET WAS FOR THEM TO JUST LET ME GO.  I TOLD THEM I DON'T WANT NO LAWYER.  I SAID, "I DON'T WANT NO LAWYER.  JUST LET ME GO."  THAT'S IT.

Q.  OKAY.  JUST LET YOU GO?

A.  THAT'S IT.

Q.  OKAY.

A.  I MEAN IT WAS JUST THAT CUT AND DRY.

Q.  OKAY.  NOW --

A.  AND THEY EXPLAINED TO ME THAT LEGALLY THEY COULDN'T DO IT LIKE THAT.  THAT I HAD TO BE REPRESENTED BY AN ATTORNEY.

Q.  OKAY.

IF YOU GO UP A FEW PAGES TO PARAGRAPH 14, SIR, ON YOUR AUGUST 12TH LETTER -- DO YOU SEE THAT?

A.  YES.

Q.  AND IF YOU GO ON TO THE NEXT PAGE, IT'S 14, SUBSECTION (B).  CAN YOU GO THERE?

NOW, THE GOVERNMENT MADE SOME OTHER CONCESSIONS -- OTHER AGREEMENTS WITH YOU WHEN YOU SIGNED THIS LETTER; CORRECT?

A.  CORRECT.

Q.  AND IT SAYS:  THE GOVERNMENT, AS PART OF THIS PLEA AGREEMENT, AGREES TO, NUMBER ONE, DISMISS CASE M-5819-97,

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 31 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 354 of 443
Case 1:98-cr-00329-RCL    Document 711    Filed 07/19/01    Page 1 of 78

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,

 VS.                                    :    CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,
          DEFENDANTS.
_____

UNITED STATES
          GOVERNMENT,

   VS.                                  :    CR. NO. 99-348

GARY PRICE,
          DEFENDANT

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MAY 23, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

(Page 354 of Total)

App 207

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 32 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 355 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 2 of 78

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 33 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 356 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 3 of 78

3

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SP. AGT. VINCENT LISI | | | | |
| BY MS. CHATURVEDI | 7 | | | |
| BY MR. DAVIS | | 11 | | |
| BY MR. ZUCKER | | 22 | | |
| JAMES MONTGOMERY | | | | |
| BY MR. ZEIDENBERG | 24 | | | |

(JAMES MONTGOMERY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.)

THE COURT:  GOOD MORNING, MR. MONTGOMERY.

THE WITNESS:  GOOD MORNING, YOUR HONOR.

THE COURT:  YOU ARE STILL UNDER OATH, SIR.

THE WITNESS:  YES.

DIRECT EXAMINATION

BY MR. ZEIDENBERG:

Q.  GOOD MORNING, SIR.

A.  GOOD MORNING.

Q.  COULD YOU PLEASE JUST REMIND US -- STATE YOUR NAME AGAIN FOR THE COURT REPORTER?

A.  MY NAME IS JAMES MONTGOMERY.

Q.  NOW, MR. MONTGOMERY, YOU TESTIFIED SOME MONTHS AGO IN THIS CASE.  AND I JUST HAVE A COUPLE OTHER INCIDENTS THAT I WANT TO ASK YOU ABOUT TODAY.

SPECIFICALLY, I WANT TO DIRECT YOUR ATTENTION BACK TO 1994 -- THE SUMMER OF 1994 -- AND ASK YOU IF YOU WERE FAMILIAR BACK AT THAT TIME WITH SOMEONE BY THE NAME OF LOU OR LOU ENGLISH FROM THE K STREET AREA?

A.  YES.

Q.  WHO WAS LOU?

A.  IT WAS AN INDIVIDUAL THAT LIVED IN THAT NEIGHBORHOOD.

Q.  WAS HE SOMEONE WHO FREQUENTED OR WAS COMMONLY OUT ON K STREET SELLING MARIJUANA?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 35 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 358 of 443
Case 1:98-cr-00329-RCL    Document 711    Filed 07/19/01    Page 25 of 78

25

A.  HE CAME THERE OCCASIONALLY.  NOT DAY IN, DAY OUT.

Q.  OCCASIONALLY, YOU'RE SAYING?

A.  YES.

Q.  NOW, HAD YOU EVER HAD OCCASION TO SPEAK WITH SAM CARSON, "CHIN," ABOUT LOU PRIOR TO LOU BEING SHOT?

A.  YES.

Q.  CAN YOU TELL US ABOUT SOME OF THOSE CONVERSATIONS?

A.  WELL, ONE TIME HE SPOKE TO ME AND HE TOLD ME THAT --

Q.  WHO ARE WE REFERRING TO?  WHEN YOU SAY "HE," WHO ARE YOU REFERRING TO?

A.  "CHIN"

Q.  OKAY.

A.  THAT HE THINKS THAT -- HE SAID THAT HE WAS ALMOST CERTAIN THAT LOU HAD TOLD KEITH HOLMES AND THEM WHERE HIS MOTHER LIVES AT.

Q.  REMIND US AGAIN WHO KEITH HOLMES WAS.

A.  KEITH HOLMES AND "BLOCK" AND THEM -- AND THERE WERE SOME MORE INDIVIDUALS -- THEY HAD SOMETHING TO DO WITH "BOO-BOO" GETTING KILLED -- ONE OF MY FRIENDS NAMED "BOO BOO."

Q.  AND KEITH HOLMES YOU ASSOCIATED WITH WHAT NEIGHBORHOOD?

A.  58TH AND PARADISE.

Q.  OKAY. SO "CHIN" SAID SOMETHING ABOUT LOU TELLING KEITH HOLMES WHERE "CHIN'S" MOTHER LIVED?

A.  YES.

Q.  AND COULD YOU TELL US WHAT SIGNIFICANCE THERE IS, IN

YOUR EXPERIENCE, WITH TELLING PEOPLE IN THE NEIGHBORHOOD WHERE YOU LIVE?  IS THAT INFORMATION THAT IS GENERALLY KEPT PRIVATE?

A. PRETTY MUCH.

Q.  WHY IS THAT?

A.  BECAUSE IT COULD BRING TROUBLE TO YOUR HOME.

Q.  WHAT DID "CHIN" SAY ABOUT LOU TELLING -- WHAT DID "CHIN" TELL YOU ABOUT THE FACT THAT HE THOUGHT LOU HAD TOLD KEITH HOLMES THIS INFORMATION?

A.  HE SAID THAT KEITH HOLMES AND LOU WAS COUSINS AND THAT HE BELIEVED THAT LOU MAY HAVE TOLD KEITH WHERE HIS MOTHER LIVED AT, BUT HE SAID FOR SURE THAT HE KNEW THAT KEITH AND THEM KNEW EXACTLY WHERE HIS MOTHER LIVED AT.

Q.  WAS HE CONCERNED ABOUT THAT?

A.  YES.  I WAS CONCERNED, TOO.

Q.  WHY WERE YOU CONCERNED?

A.  BECAUSE I DIDN'T WANT NOTHING TO HAPPEN TO HIM.

Q.  "CHIN"?

A.  RIGHT.

Q.  DID "CHIN" SAY WHAT HE WANTED TO DO TO LOU?

A.  HE SAID THAT IF I SEE LOU ON THAT SIDE -- ON THE SIDE WHERE -- ON THE 203 SIDE OF SOUTHWEST -- I'M GOING TO PUT IT LIKE THAT.  THAT'S THE BEST WAY I COULD PUT IT.

Q.  OKAY.

A.  THAT LOU DIDN'T HAVE NO REASON TO BE AROUND THERE.  THAT

HE DIDN'T FUCK WITH NOBODY AROUND THERE.  AND IF I SEE HIM AROUND THERE, TO LET HIM KNOW, OR IF I SEE HIM IN A GOOD POSITION, TO HIT HIM.

Q.  AND WHEN YOU SAY "HIT HIM," WHAT DOES THAT MEAN?

A.  KILL HIM.

Q.  AND WOULD YOU HAVE DONE THAT?

A.  MORE THAN LIKELY, YES.

Q.  NOW, I WANT TO DIRECT YOUR ATTENTION TO -- DO YOU REMEMBER THE EVENING IN THE SUMMER OF '94 WHEN LOU GOT SHOT?  I AM NOT ASKING WHAT THE DATE WAS, BUT DO YOU REMEMBER THE OCCASION -- THE INCIDENT ITSELF?

A.  YES.

Q.  AND CAN YOU TELL US WHAT YOU REMEMBER ABOUT THAT EVENING PRIOR TO THE SHOOTING?

A.  WELL, NOT LONG -- I HAD JUST GOT FINISHED SELLING WEED.

Q.  WHERE WERE YOU SELLING YOUR WEED THAT NIGHT?

A.  K STREET IN THE COURT.  IN THE COURTYARD WHERE K STREET IS AT.

Q.  WHAT HAPPENED WHEN YOU FINISHED SELLING YOUR WEED?

A. I WAS OUT THERE.  THERE WAS A FEW OTHER PEOPLE OUT THERE.  I DON'T REMEMBER EVERYONE.  I DON'T REMEMBER EVERY INDIVIDUAL THAT WAS OUT THERE.  "CHIN" AND "POO POO" WASN'T OUT THERE AT FIRST.  THEY CAME OUT THERE.  SO "CHIN" ASKED ME WHAT WAS I DOING.  SO I TOLD HIM, "NOTHING."  AND HE SAID THAT SOMETHING WAS ABOUT TO HAPPEN.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 38 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 361 of 443
Case 1:98-cr-00329-RCL    Document 711    Filed 07/19/01    Page 28 of 78

28

Q.  SOMETHING WAS ABOUT TO HAPPEN?

A.  RIGHT.

Q.  DID HE SAY WHAT IT WAS THAT WAS ABOUT TO HAPPEN?

A.  NO.

Q.  WHAT DID YOU SAY WHEN HE TOLD YOU SOMETHING WAS ABOUT TO HAPPEN?

A.  SO I ASKED HIM WAS HE ALL RIGHT.  HE SAID, "YEAH."  I SAID, "YOU DON'T NEED ME?"  AND HE SAID, "NO."

Q.  SO WHAT DID YOU DO?

A.  SO I LEFT.

Q.  WHERE DID YOU GO?

A.  I WENT UP TO THE GRAND CHINA AND GOT ME SOMETHING TO EAT.

Q.  GRAND CHINA IS A RESTAURANT?

A.  YES.

Q.  HOW DID YOU GET THE GRAND CHINA?

A.  I DROVE UP THERE.

Q.  NOW, DID YOU RETURN BACK TO K STREET A SHORT TIME LATER?

A.  I CAME BACK -- I CAME BACK DOWN K STREET.  I PARKED -- I CAME DOWN.  I PARKED BACK IN THE ALLEY WHERE I NORMALLY PARKED AT.

Q.  AND WHEN YOU GOT OUT THERE, CAN YOU TELL US WHAT YOU SAW?

A.  THE POLICE AND PARAMEDICS AND STUFF WAS OUT THERE, AND LOU WAS LAYING ON THE GROUND, AND THEY WERE WORKING ON HIM.

Q.   DID YOU SEE ANY SIGN OF SAM CARSON OR "CHIN" WHEN YOU GOT BACK THERE?

A.   NO.   NOBODY WASN'T OUT THERE REALLY.   THERE WAS LIKE PEOPLE THAT LIVED AROUND THERE.   I'M TALKING ABOUT LIKE PEOPLE THAT LIVED IN THE HOUSES -- LIKE OLDER PEOPLE OR WHATEVER.

Q.   OKAY.

NOW, THE FOLLOWING DAY DID YOU HAVE A CONVERSATION WITH "CHIN" AND "POO POO" ABOUT WHAT HAD HAPPENED TO LOU ENGLISH?

A.   I WAS TAKING "CHIN" AND "POO POO" BACK AROUND TO THE OTHER SIDE -- AROUND TO THE P STREET SIDE IN SOUTHWEST.

Q.   THIS IS THE DAY AFTER?

A.   RIGHT.

Q.   WHAT HAPPENED?

A.   AND BASICALLY THEY WERE TALKING ABOUT THAT LOU DIDN'T DIE.   AND "POO POO" SAID SOMETHING ABOUT LOU SNITCHING, AND "CHIN" SAID THAT HE DON'T THINK LOU WAS GOING TO SNITCH, BUT HE SAID THAT LOU WAS GOOD AT CREEPING.   THAT HE WAS SNEAKY.

Q.   AND WHAT DID "CHIN" SAY ABOUT THE FACT THAT HE THOUGHT THAT LOU WAS GOOD AT CREEPING?

A.   THAT THERE WAS A POSSIBILITY --

THE COURT:   GOOD AT WHAT?

MR. ZEIDENBERG:   HE'S GOOD AT CREEPING. C-R-E-E-P-I-N-G.

Case 1:98-cr-00329-RCL  Document 1375-5  Filed 04/06/26  Page 40 of 166
USCA Case #23-3015  Document #2077668  Filed: 10/01/2024  Page 363 of 443
Case 1:98-cr-00329-RCL  Document 711  Filed 07/19/01  Page 30 of 78

30

THE COURT:  LOU WAS GOOD AT CREEPING?

MR. ZEIDENBERG:  AND HE WAS SNEAKY.

BY MR. ZEIDENBERG:

Q.  IS THAT CORRECT, MR. MONTGOMERY?

A.  RIGHT.  YES.

Q.  AND WHAT WAS "CHIN'S" CONCERN ABOUT THAT?

A.  THAT LOU MIGHT TRY TO RETALIATE BECAUSE OF WHAT THEY HAD DONE TO HIM.

Q.  WHAT DID "CHIN" SAY, IF ANYTHING, SHOULD BE DONE ABOUT LOU?

A.  I AM NOT SURE IF HE SAID ANYTHING, BUT I KNEW THAT -- I KNEW THAT FROM HIS CONCERN THAT, WITHOUT SAYING IT, IF I AM ABLE TO CATCH LOU -- IT WAS, I MEAN, UNSPOKEN.

MR. BESHOURI:  OBJECTION.  OBJECTION.

MR. ZEIDENBERG:  LET ME ASK A DIFFERENT QUESTION, IF I MAY, YOUR HONOR.

THE COURT:  I THINK HE HAS FINISHED HIS ANSWER. GO AHEAD.

BY MR. ZEIDENBERG:

Q.  IF YOU HAD SEEN LOU AFTER THAT CONVERSATION WITH "CHIN", WHAT WOULD YOU HAVE DONE TO HIM?

A.  IF HE WAS IN A GOOD POSITION, MORE THAN LIKELY -- I AM ALMOST A HUNDRED PERCENT SURE THAT I WOULD HAVE GOT WITH HIM.

Q.  WHEN YOU SAY "GOT WITH HIM"?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 41 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 364 of 443
Case 1:98-cr-00329-RCL    Document 711    Filed 07/19/01    Page 31 of 78

31

A.   I WOULD HAVE KILLED HIM.

Q.   FOR WHAT REASON?

A.   TO MAKE SURE HE DON'T TRY TO GET BACK AT "CHIN" OR TO
MAKE SURE HE DON'T TRY TO GET AT ME BECAUSE HE KNEW ME AND
"CHIN" WAS COOL.

Q.   AND WHY WOULD YOU BE CONCERNED THAT LOU WOULD RETALIATE
AGAINST YOU?   DID YOU HAVE ANYTHING TO DO WITH HIS SHOOTING?

A.   NO, BUT HE KNEW ME AND "CHIN" WAS COOL.   SO HE WOULD VIEW
ME AS HE VIEWED "CHIN", AS A THREAT.

Q.   NOW, I WANT TO TURN YOUR ATTENTION, MR. MONTGOMERY, TO
ANOTHER INCIDENT THE FOLLOWING SUMMER -- LATE SUMMER OF
1996.   DO YOU REMEMBER BEING APPROACHED BY "CHIN" IN THE
LATE SUMMER OF 1996, WHERE HE ASKED YOU ABOUT WHERE YOU HAD
BEEN THE PREVIOUS DAY BECAUSE HE HAD NEEDED YOU?

A.   YES.

Q.   ALL RIGHT.   CAN YOU TELL US ABOUT THAT CONVERSATION?
WHERE DID IT TAKE PLACE AND HOW DID IT START?

A.   I WAS AROUND SECOND STREET, AND ON THE PARTICULAR DAY
WHEN IT HAPPENED, I DIDN'T KNOW NOTHING ABOUT IT AT ALL.
THE NEXT DAY WHEN I SEE "CHIN," HE ASKED ME WHERE WAS I AT
YESTERDAY.   I DON'T RECALL AT THIS TIME WHERE I WAS AT.   BUT
HE SAID THAT HE NEEDED ME BECAUSE SOME "JAKES" HAD GOT HIM
FOR HIS MONEY.

Q.   AND THE TERM "JAKES" -- WHAT DOES THAT MEAN?

A.   SOME JAMAICANS.

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 42 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 365 of 443
Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 1 of 65

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        .   Docket No. CR 98-329
                                 .
            Government,           .   Washington, D.C.
                                 .   May 23, 2001
      vs.                        .   2:43 p.m.
                                 .
VINCENT HILL,                    .   (AFTERNOON SESSION)
JEROME MARTIN,                   .
SAMUEL CARSON,                   .
WILLIAM K. SWEENEY,              .
SEAN COATES,                     .

            Defendants           .

. . . . . . . . . . . . . . . .  .

UNITED STATES OF AMERICA,        .
                                 .
            Government,           .
                                 .   Docket No. CR 99-348
      vs.                        .
                                 .
GARY PRICE,                      .
                                 .
            Defendant.           .
                                 .

. . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 43 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 366 of 443
Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 2 of 65

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 44 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 367 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 3 of 65

3

P R O C E E D I N G S

THE COURT:  Mr. Kiersh.

MR. KIERSH:  Thank you, Your Honor.  Your Honor, I want to raise a Brady violation and move for sanctions.  I don't know if you want to take it up now or -- well, actually I'd like to do it before Mr. Montgomery resumes his testimony, because it relates to Mr. Montgomery.

THE COURT:  Go ahead.

MR. KIERSH:  The Brady violation is this.  For the first time today I was informed through the testimony of Mr. Montgomery that Mr. Montgomery had cooperated with Mr. Switzer in planning to kill Robocop, aka Donnell Whitfield.  It's my client, Mr. Sweeney, who is the only one charged with the murder of Donnell Whitfield.

And this -- I had never heard this before.  I had never been given notice of this before, and I'll go through my analysis and explain why it's Brady.

It's Brady, and I gave the Court a copy of Strickler versus Green, a Supreme Court decision from 1999.  I think it's the most recent Supreme Court interpretation of Brady.  And on page 5 of the opinion, the Supreme Court says there are three essential components of a true Brady violation.  The evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching.  The evidence must have been suppressed by the state either

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 45 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 368 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 4 of 65

4

willfully or inadvertently, and prejudice must have ensued.

I would submit to the Court we've satisfied all of the criteria as set forth in Strickler. My whole theory of defense with respect to murder of Donnell Whitfield, as the Court will recall, is that Reginald Switzer perpetrated that murder. It was Mr. Whitfield and Mr. Seabrooks who Mr. Switzer testified to who had assaulted him in the '80s.

Mr. Switzer very clearly testified that he murdered George Seabrooks in retaliation for an assault that Seabrooks and Whitfield committed against him, and he said that, yeah, he wanted to kill Whitfield, but then he denies doing it. And he also said at one point, he said, I went up to his window. I was looking. I was taking that many steps to actually look in and follow him, but I decided not to shoot him because there were other people around, and I did not want to alert anyone else that I was involved in the planning and the formulation and intent to kill Robocop.

And Mr. Montgomery tells us this morning that he spoke with Mr. Switzer. That Mr. Montgomery was going to retaliate for Mr. Switzer. The term that Mr. Montgomery said was, I will bust his ass, and that they had planned together to kill Robocop, and that's completely consistent with my theory that it was Switzer and not Mr. Sweeney who killed Robocop.

THE COURT: All right. That having been said, show

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 46 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 369 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 5 of 65

5

me where the prejudice is.

MR. KIERSH:  The prejudice is here.  I've been deprived of the opportunity to cross Mr. Switzer on whether or not he had these conversations and took these actions with Mr. Montgomery.

THE COURT:  Call him back.

MR. KIERSH:  And anticipating that the Court was going to say that, I'm going to respond to the Court that I have no interest in calling Mr. Switzer back.  I'm not interested in sponsoring his testimony, even though it would be an adverse witness.  I believe I spent a great deal of time impeaching his credibility.  I believe that he has lied in this court.  I believe he has lied on other occasions.

I have been prohibited from speaking with him directly by his counsel, and I do not want to be put in the position where to clarify my record, my theory of defense based on new information that was brought out for the first time today by having to put this witness on who I have no faith in the truthfulness of his answers.

And my cross-examination of Mr. Switzer would have been different, and my cross-examination of Mr. Montgomery today would have been different.  Mr. Montgomery's testimony today completely contradicts Mr. Switzer's denial of complicity in that murder.  It shows that, in fact, not only did Mr. Switzer said he had the motive, he had the intent.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 47 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 370 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 6 of 65

6

Here we have Mr. Montgomery saying he took the next step. He talked to me about doing it for him. And it also contradicts Mr. Switzer's testimony when he said he went up to the window to track this guy down, and then I backed off of it because I didn't want to alert anybody. Here he is alerting another person to the fact that he wanted to commit this murder.

I believe we've satisfied all of the criteria set forth by the Supreme Court in Strickler, and I've also given the Court a copy, and counsel for the government copies of cases from our Circuit, the D.C. Circuit, in which United States versus Smith, Appeal Number 923220, where our Court of Appeals says where there is a Brady violation, it says, we do not lightly excuse Brady violations.

Because the government's non-disclosures in this case significantly impaired defense counsel's ability to impeach the credibility of a principal prosecution witness. We reverse and remand for a new trial. Now, that's exactly what we have here is that I have been impaired in my ability to impeach the credibility of Mr. Switzer and maybe impeach the credibility of Mr. Montgomery.

And that this is a clear violation because it is exculpatory testimony because it completely -- it not only is impeachment, but the testimony of Mr. Montgomery perfectly fits within the defense theory of someone other than Mr.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 48 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 371 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 7 of 65

7

Sweeney committing this key murder in this indictment. And that if this case were to go all the way to verdict, and if Mr. Sweeney were to be found guilty of the murder of Mr. Whitfield, I would submit to the Court it would require reversal because of the failure of the government to disclose the information.

I would suggest to the Court that the appropriate sanction now is to strike the testimony of Mr. Montgomery on this issue as it relates to Mr. Sweeney and to strike the entire testimony of Bernard Switzer as it relates to Mr. Sweeney in the context of the Donnell Whitfield murder.

THE COURT: I've got your point.

MR. DAVIS: Your Honor, I hate to disrupt your proceedings, but I need to go outside for a meeting. I'm not feeling very good.

THE COURT: You don't look well.

MR. DAVIS: No. Actually I feel like I'm about ready to go under. If I may go out for a moment and get some water.

THE COURT: Sure.

MR. JONES: Need some help? May I help him?

THE COURT: Yes.

(Whereupon, Mr. Davis and Mr. Jones exited the courtroom.)

MR. KIERSH: Just a -- I think I referred to Mr.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 49 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 372 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 23 of 65

23

information on it, but it wouldn't have been accepted by -- probably by that jail thing.

Q.    So did you go to see Draper at the jail?

A.    No.

Q.    Did Chin go?

A.    Yes.

Q.    And after he went, did he tell you about his conversation with Draper?

A.    Chin say that him and Draper father went to see him, and --

THE COURT:  Him and Draper what?

THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see Draper.

THE COURT:  Oh, I see.  Draper's father.  All right.

THE WITNESS:  And said that he asked Draper distinctively who did you tell anybody about what had happened?  And he said that Draper admitted to him that he told Butchie, and that Butchie was cooperating with the Feds.

BY MR. ZEIDENBERG:

Q.    Did Chin say what had to be done or what should be done about Butchie?

A.    So Chin told me that if they had no Butchie -- without Butchie, they don't have no case.  They wouldn't have no case.

Q.    And when you were talking about a case, what case was it that you were all concerned about?

24

A.    The triple murder.

Q.    Now, did you and Chin make attempts together to find and kill Butchie?

A.    Yes.

Q.    Can you tell the ladies and gentlemen about that?

A.    Sometimes when we used to -- when we would go to this carry-out, Leo's --

Q.    Where is that located?

A.    It's on N Street.

Q.    I'm sorry?

A.    South Capitol and N.

Q.    N as in Nancy?

A.    Yes.    South Capitol and N.

Q.    Okay.

A.    That's near the area where Butchie would more than likely be, as far as when he was in Southwest.    So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

Q.    What were you going to do if you saw Butchie?

A.    Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean.    We're from Southwest and he is -- he knowed the same people we know, so we couldn't

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 51 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 374 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 25 of 65

25

just walk right up to him just like that and do anything to him.

Q.    What were you hoping to find?  What were you hoping to do?

A.    To catch him in a nice position.

Q.    What is a nice position?

A.    To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q.    Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A.    We was in my car.

Q.    Can you tell us about that?

A.    We rode through housing -- I mean, through Half Street, and Butchie was out there.  He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car.  And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q.    What's a gut-buster?

A.    Like elastic velcro, like a waistband.

Q.    And what's the purpose of that?

A.    To hold the gun.

Q.    What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A.    It was a black sweatsuit.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 52 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 375 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 26 of 65

26

Q.    What did he do with it?

A.    He was putting in on while I was driving.

Q.    Where was he putting it on?

A.    In the car.

Q.    What car did you have?

A.    Oldsmobile 98.

Q.    Where did you go once Chin got back in the car with his gun and his sweatsuit?

A.    We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street.  And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk.  It's like a little car dealership thing right there.

So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q.    Now, was there a discussion between you and Chin about an escape route you were going to take?

A.    When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th.  And that was going to be our alibi.

Q.    And that was a plan you discussed before Chin got out of the car?

A.    Right.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 53 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 376 of 443
Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 27 of 65

27

Q.   And again, the purpose in going up and ending up at 37th Place was going to be what?

A.   Our alibi.

Q.   What happened when Chin got out of the car?

A.   He went around there, and he came back, and he said that Butchie was gone.  When he got back in the car the first thing I said, I said, what happened?  Because I didn't hear the gunshots or nothing.  So I said, what happened?  And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q.   Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A.   Yes.

Q.   Where were you the day that Butchie was killed, starting in the afternoon?

A.   On Second Street.

Q.   Second Street, Southwest?

A.   Yes.

Q.   And what were you doing there?

A.   Selling weed.

        THE COURT:  What was the date?

        MR. ZEIDENBERG:  I'm sorry?

        THE COURT:  What was the date?

        MR. ZEIDENBERG:  I didn't refer to the date.  It is June 16, 1997.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 54 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 377 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 28 of 65

28

THE COURT:  June 16th?

MR. ZEIDENBERG:  Yes.

THE COURT:  All right.  Go ahead.  I'm sorry.

BY MR. ZEIDENBERG:

Q.    Where were you -- you were on Second Street?

A.    Yes.

Q.    And what were you doing?

A.    Selling weed.

Q.    Now, at some point did you see Chin?

A.    Chin came out of his house and came and got my car keys.

Q.    Did you give it to him?

A.    Yes.

Q.    Did you ask him why he needed your car?

A.    No.

Q.    Was it uncommon for Chin to come by and take your car?

A.    No.  I mean, he would get it all the time, whenever.

Q.    Now, did he tell you where he was going?

A.    No.

Q.    Now, sometime later, after Chin -- did he leave with your car?

A.    Yes.

Q.    Okay.  Sometime later did you come to find out that there had been a shooting over on Half Street?

A.    Yes.

Q.    And at some point did you learn that that was Butchie?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 55 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 378 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 29 of 65

29

A.    Yes.

Q.    What did you do when you found out that Butchie had been killed?

A.    I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q.    And where did you ride to?

A.    To the corner of Half and O Street.

Q.    What did you see when you got there?

A.    There was a lot of marked and unmarked police cars and a lot of people was out there.

Q.    Was Butchie's body still on the ground?

A.    I didn't see his body.  I seen like the crime scene tape and stuff like that.  I didn't go all the way down there because it was a lot of polices down there.

Q.    I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A.    Yes.

Q.    How did you feel when you heard that Butchie was killed?

A.    I was happy.

Q.    How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A.    It was of great concern.

Q.    Why is that?

A.    Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 56 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 379 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 30 of 65

30

witness as to what Draper told him.

Q.    Now, after you went to the scene did you return back to Second Street?

A.    Yes.

Q.    And at some point later that evening did Chin return?

A.    Yes.

Q.    Can you tell us about that?

A.    He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first. So when I seen him going into the alley, so I was walking down -- I was walking down towards that direction. So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q.    Your term was what?

A.    I said, you know them peoples got hit.

Q.    You used the term peoples?

A.    That's what I said. I said, you know them peoples got hit. He was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 232

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 57 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 380 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 31 of 65

31

Q.    Did he seem at all surprised when you told him about that?

A.    No.  And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q.    I'm sorry?

A.    He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q.    Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A.    Yes.

Q.    Can you tell us about that?

A.    In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.    How do you know that?

A.    Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.    Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.    No, that was all he said.

Q.    What did you understand that to mean, why you shouldn't go up to Capers?

A.    My knowledge would be that Craig might be able to

32

identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.    Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.    Would you repeat your question?

Q.    After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.    I was feeling good pretty much.  To a certain extent I was feeling good.

Q.    Did you think you were in the clear?

A.    To a certain extent I felt as though I was in the clear.

            MR. ZEIDENBERG:  I have no further questions, Your Honor.

            MR. KIERSH:  May I proceed, Your Honor?

            THE COURT:  You may.

            MR. KIERSH:  Good afternoon, ladies and gentlemen.

            THE JURORS:  Good afternoon.

                        CROSS EXAMINATION

BY MR. KIERSH:

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 59 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 382 of 443
Case 1:98-cr-00329-RCL    Document 972    Filed 03/11/03    Page 57 of 65

57

cold outside.

Q.   You were arrested in July of that year.

A.   It was cold outside during that period.

Q.   So it would have had to have been in the early part of the year?  Because you were arrested July 30 of that year, correct?

A.   I agree that I was arrested at the end of July, and I know that it was cold outside during the time when we was trying to get at Boo, when we was trying to get a lot of those guys.

Q.   If you're not certain, that's fine, Mr. Montgomery.  Let me move to the next question.  Are you clear or not about --

A.   I'm trying to be certain.  I mean, I'm trying to be as clear to you as possible.  Let me put it like this.  I know it was a cold season.  It probably was like cold from '96 going to '97.  Let me put it to you like that.

Q.   And when was it that you wanted to do harm to Ronnie Horns, the testimony you gave today about that?

A.   It was after Chin got shot.

Q.   And Chin got shot in -- Sam Carson got shot January of 1997, right?

A.   I'm not sure.  I know it was cold outside.

Q.   Now, Mr. Montgomery, it wasn't until a few months after you admitted to the first degree murder of Chrishauna Gladden that you first mentioned to Agent Lisi anything about the

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 60 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 383 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 1 of 102

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C. |
| | . May 29, 2001 |
| vs. | . 2:20 p.m. |
| | . |
| VINCENT HILL, | . (AFTERNOON SESSION) |
| JEROME MARTIN, | |
| SAMUEL CARSON, | |
| WILLIAM K. SWEENEY, | |
| SEAN COATES, | |
| | |
| Defendants | |

. . . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,

            Government,

    vs.

GARY PRICE,

            Defendant.

. . . . . . . . . . . . . . . . . .

FILED

MAR 11 2003

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

Docket No. CR 99-348

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                            ANJALI CHATURVEDI, AUSA
                            U.S. Attorney's Office
                            555 Fourth Street, N.W.
                            Washington, D.C.  20001

For the Defendant Hill:     CHRISTOPHER DAVIS, ESQ.
                            601 Indiana Avenue, N.W.
                            Suite 910
                            Washington, D.C.  20004

For the Defendant Martin:   JOANNE HEPWORTH, ESQ.
                            305 H Street, N.W.
                            Second Floor
                            Washington, D.C.  20001

App 236

974

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 61 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 384 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 2 of 102

2

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.   20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.   20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.   20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.   20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.   20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

App 237

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 62 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 385 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 12 of 102

12

under which he would be speaking with you, did he continue then after hearing that to tell you about conversations he had with a number of people, but specifically William Sweeney?

A.   Yes, he did.   At first we started talking about drug things, his sources of supply of marijuana, how he got into selling marijuana.   We went through, you know, how his drug operation worked, and then he told me that he knew about quite a few murders and crimes of violence that had been committed by Mr. Sweeney and some of his associates.

Q.   When you -- well, at that point were you interested in hearing about what Mr. Smith knew that Mr. Sweeney had told him?

A.   Yes.   It was kind of -- while I was talking to him, he didn't want to come out and tell me everything he knew.   He wanted to give me --

MR. ZUCKER:   Objection.   The witness can say what the person he's speaking with said.   He cannot say what he was thinking.

THE COURT:   Well, that's correct.

BY MS. CHATURVEDI:

Q.   Did Mr. Smith tell you -- well, what did Mr. Smith tell you?

A.   He told me of crimes that had been committed and gave me kind of a thumbnail sketch of the crimes.   For instance, he would say something to the effect that, well, the triple,

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 63 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 386 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 13 of 102

13

Donnell Mack's murder.  He said Shorty and them did that.

I said, what do you mean by Shorty and them?  And he said Shorty and James Montgomery.  And I said, okay, what else about it.  And he says, well, I know about that.  So he let me know that he knew the details about that murder, and he did that with several different murders.

Q.    Did you press him at that moment to go through --

A.    No.

Q.    -- to identify the other people or other facts that he knew about those crimes of violence?

A.    No, it wasn't the time.  It was kind of feeling each other out.  Although, he, as I said, showed that he was willing to provide this information.  He was still -- he wasn't very comfortable in doing so, so I didn't push him on it.

Q.    Now, while you were speaking with Mr. Smith this first night upon his arrest, can you tell the ladies and gentlemen and of the jury how you were recording, if you will, what information Mr. Smith was providing you?

A.    The first night, the first time that we sat down and talked, when we were talking about the drug things, I would sit and ask him some questions, and he would go through it, and I would sit and listen.  Then I would say, well, let me go back and make sure I understand this and take some notes regarding the drug matters.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 64 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 387 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 14 of 102

14

And then when it got time for the violence, he was a little more uneasy, and he told me about them.  I didn't want to take any notes or make him feel more uneasy about it that might quiet him down.  So regarding the violence, I don't think I took many notes, if at all, about the violence when I was talking to him.

Q.   December 5, 1996, when Mr. Smith was arrested, was he released on his own at that point?

A.   The following day he was released.

Q.   Did there come a time then on December 12, 1996 when his case was called into court, into U.S. District Court?

A.   Yes, it was.

Q.   What happened at that court hearing?

A.   One of our main concerns, and his main concern was trying to make sure that nobody on the street thought that he was cooperating.  And we tried to figure out a way to best do it so that any suspicions would be alleviated, that nobody would think that he was, in fact, cooperating.

So on that date he came into court with his lawyer, and the government dismissed in open court the charges against him, and the Court from what -- I wasn't in the courtroom, but it was with the idea that the person who made the undercover purchases wasn't willing to testify against him; therefore, the charges were dropped.

So the charges were dropped.  He agreed to that with the

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

26

with other people directly; is that fair to say?

A.    Yes, ma'am.

Q.    And can you tell us whether or not Mr. Smith told you whether he distributed marijuana directly to William Sweeney?

A.    Yes, he did.

Q.    To Sean Coates?

A.    Yes, ma'am.

Q.    And to Vincent Hill?

A.    Yes, ma'am.

Q.    Among others?

A.    Yes, there were others, but, yes, to those three.

Q.    Did Mr. Smith tell you how he also sold cocaine?

A.    Yes.

Q.    What did he tell you about that?

A.    He tried to shy away from cocaine, because the time that it carried was significantly more.  However, he would, common term, flip cocaine.  He wouldn't keep an inventory of it.  If he knew somebody wanted cocaine or crack, he had the means to get it and knew the people to get it, so he would go to them.

If somebody wanted, let's say, half a kilo, he could go get the half a kilo at a favorable price to him, might sell it and make $500 to $1,000 on half a key.  So he would make the money just by playing middleman for the person who did keep the inventory.  But he generally wouldn't keep the inventory himself.

27

And he said that likewise as with the Jamaicans that he dealt with, they had the access to the cocaine.  They didn't like to deal in it as much, but, you know, they would have it at times.

Q.   Close to the time that you arrested Mr. Smith, did he indicate to you after he was arrested that he had ventured into selling some heroin?

A.   Yes.

Q.   What did he tell you about the heroin?

A.   He said that the heroin was coming from Mr. Sweeney, that Mr. Sweeney --

Q.   Mr. Sweeney meaning?

A.   William Sweeney, yes.  An associate of his, Stephon Mason, had acquired a very significant heroin distributor. And he was getting heroin from Mr. Sweeny.

Q.   And where were they selling the heroin?

A.   In Potomac Gardens.

Q.   I want to turn your attention now to the subject matter of violence, crimes of violence that Mr. Smith talked to you about?

A.   Yes, ma'am.

Q.   Was there a conversation or a number of conversations I guess I should say that you had with Mr. Smith in which Mr. Smith told you about conversations he had had with William Sweeney about the murder of someone by the name of Keith

29

wasn't certain as to what rental car company was used.

Q.    Now, that name, Kirk Ivory Newton, did that name later assist you in, in fact, arresting Mr. Sweeney when he was arrested and charged in connection with the kidnapping of Wysocki and the triple murder?

A.    Yes, because we knew that the name Kirk Ivory Newton was being used by Mr. Sweeney as an alias.  There were various jails in the area that we believed he might be visiting, so that information was given to the jails, and they were told that if somebody comes in with this name, detain them, and that the FBI would be there to see if that was, in fact, William Sweeney, and that's how we ultimately arrested him.

Q.    Did Mr. Smith tell you about conversations he had with Mr. Sweeney involving the shooting of an individual by the name of Michael Jones?

A.    Yes, but he didn't know the name Michael Jones.  What he told me was that, he said that back in 1992, Meechie, and that's just the name he gave me, Meechie was charged with shooting somebody from Condon Terrace.

Q.    Let me just stop you for a second.  When you say he told you, this is what Mr. Smith told you?

A.    Yes, ma'am.

Q.    And the source of his knowledge was what?

A.    Mr. Sweeney.

Q.    All right.  I'm sorry to interrupt.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 68 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 389 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 30 of 102

30

A.    That's okay.  So Mr. Smith is telling me that Mr. Sweeney told him that Meechie got charged with shooting a person from Condon Terrace, and that one of the persons or the victims was cooperating against Mr. -- was cooperating against Meechie. So that Mr. Sweeney went to an area in Southeast near Mississippi Avenue to kill the person who was testifying or who was going to testify against Meechie.

And Mr. Smith was under the impression that the person did die, that there actually was a murder.  And he said that Mr. Sweeney went down there, chased a person through the alley and it was some place near Mississippi Avenue, caught up with him, shot him, and stood over him and shot him some more.  And it was Mr. Smith's understanding that the person died.

And I tried going back and finding this crime, and this is an example of where I'd call him and ask him a question, and I'm trying to find -- I said, hey, you know, tell me about that again.  And then he told me that, yeah, he said, it was Draper or Shorty are the words he used and Birdy and he knew Birdy.

He said Birdy was with Draper when they went down there, and he said Birdy also shot somebody during the same event. So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones. However, Michael Jones did not die.  Let me back up.  Match exactly.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 69 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 390 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 31 of 102

31

It matched up -- all the facts matched up with the shooting of Michael Jones. However, there was only one victim. So, you know, he was trying to recount to me the conversation that was relayed to him, and he told me that he thought that two people were shot, but he said that Draper and Birdy were the two that went down there to do the shooting.

Q. In the course of speaking with Robert Smith, did he also inform you about a conversation that he had had with William Sweeney about a witness by the name of Kenny Adams?

A. Yes. This is whenever I was away in 1997. I was speaking to him on the phone. And he was -- I don't want to use -- he was excited telling me about a witness named Little Wayne. He said, man, there's this dude, Little Wayne, that's testifying against Poo-Poo. He said, you better move that guy, because Draper and those guys found out where he's at. He said, supposedly they got him hiding out in Centreville, Virginia, and those guys have been clocking him.

That's what he used clocking. He said, Draper and them been clocking him, and he said, they're going to kill that little dude. You better move him real quick before they get to him.

Q. Had anyone told you about any effort to get, well, Wayne Wayne or Little Wayne? What's his real name?

A. Kenny Adams.

Q. At that point had you had any information that efforts

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 70 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 391 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 32 of 102

32

were being made to locate and harm Kenny Adams?

A.    No, and I knew that Kenny Adams was cooperating.  I knew he'd been released.  I didn't know where he was staying at that time.  I called another FBI agent who was dealing directly with Kenny Adams.  I said, hey, is Little Wayne out in Centreville?

He said, yeah, he's out in Centreville.  And then I relayed the information to him that Mr. Smith told me.  So then they made the appropriate or took the appropriate steps to have Little Wayne moved.

Q.    In that same conversation you had with Robert Smith about Draper and them, the phrase you used, clocking Little Wayne, did Mr. Smith tell you anything that William Sweeney had told him about an employee at Superior Court?

A.    Yes.  He told me that there was a female at the Superior Court who would get information and pass it along to Mr. Sweeney and that this female had access to computers and it was Mr. Smith's understanding that she could even manipulate the computer system to make charges disappear.  I don't know how that could happen, but that was his understanding.

And whenever I asked him, do you know how they got -- found Little Wayne out there?  He said, I'm not sure, maybe it's the female, but he had no idea if it was the female or not, but he knew that there was a female with access to sensitive information in Superior Court.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 71 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 392 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 33 of 102

33

Q.    Did Mr. Smith tell you about conversations he had with William Sweeney about the kidnapping of Wysocki, Anthony Pryor?

A.    Yes, he did.

Q.    What did Mr. Smith tell you that Mr. Sweeney had told him?

A.    He said that Mr. Sweeney, and these are the words that Mr. Hill used, he said, Draper, Vito, Birdy, Poo-Poo and Sam went to kidnap Wysocki.  And he said that they were waiting for him out in Maryland.  I think he said Montgomery County, Maryland, but he said they were sitting waiting for him to come out of the house, and as they were coming out of the house, they went to grab him, and he fought with them and struggled and started to get away and they shot him in the back with a .45.

After they shot him in the back with a .45, they threw him in the trunk of a car, and he says, they're driving away and the trunk of the car caved in somehow, and Wysocki was able to escape.

And he said that Draper and the others were very upset with Birdy because it was his car that was used when the trunk caved in.  So they blamed him for that.  And he said because of that and he said other things that happened over the years, that they wanted to kill Birdy for.

Q.    Did Mr. Sweeney indicate to Mr. Smith whether or not he,

34

Mr. Sweeney, knew that he was wanted for that kidnapping?

A.   Yes.   There came a time in 1997 when an arrest warrant was obtained for Mr. Sweeney for that kidnapping of Wysocki, Anthony Pryor.   Mr. Sweeney had told Mr. Smith that, yeah, he found out that he was wanted, that they had a warrant for him for Wysocki's kidnapping.   But he said he wasn't worried, because he sent his investigator to interview Wysocki and that, I think he said he saw him twice maybe and got a statement from him, and that Wysocki said that he didn't know who shot him.   They were wearing masks and he couldn't identify them.

So Mr. Sweeney told Mr. Smith that he wasn't very concerned about that, but he did know that he was wanted.

Q.   Did Mr. Sweeney tell Mr. Smith about Mr. Sweeney's involvement in the murder of Donnell, Robocop, Whitfield?

A.   Yes.   He told us that Mr. Sweeney had bumped into Robocop while they were at the Mirage nightclub one night.

Q.   I'm going to interrupt you again just one second.   This is what Mr. Sweeney told Mr. Smith?

A.   Yes.

Q.   Mr. Smith didn't observe this himself?

A.   No.

Q.   Okay.

A.   I don't think he observed any of this.   This is just what he was told by Mr. Sweeney.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 73 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 394 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 35 of 102

35

Q.    All right.

A.    Mr. Sweeney said that he was at the Mirage nightclub and had somehow bumped into Robocop and they had got into some kind of altercation.  Sometime after that Mr. Smith said that he was at 211 I Street, and he saw Mr. Sweeney and Erik Jones in the house.

They were talking.  Mr. Smith left.  He came back sometime later to 211 I Street, and he said those two were there again.  They told him how they had just come back from killing Robocop.  And they said that they went up there together.  That Draper got out of the car, shot Robocop, and then left the area.

And then he told us that what happened was the gun that he had used to shoot Robocop --

Q.    The gun that who used?

A.    Draper or Mr. Sweeney had used to kill Robocop, he was worried about it, that it would come back to the murder.  So there is an individual named -- they call him Colonel Klink. His real name I think is William Howard Young.

Anyway, he said that Colonel Klink, everybody on the streets has used him as an expert on guns.  He knows all about guns.  So Mr. Sweeney gave the gun to Colonel Klink and said, hey, can you fix this for me so it won't come back as being the murder weapon.  So he said that he changed the barrel in it, but he didn't change all the parts, and therefore, the

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 74 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 395 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 38 of 102

38

(End of bench conference.)

THE COURT:  Please rephrase your question.

BY MS. CHATURVEDI:

Q.    Agent Lisi, did Mr. Sweeney tell Mr. Smith where it was that Robocop had been murdered?

A.    Yes, in Sursum Corda.

Q.    Did Mr. Sweeney, Draper, talk to Robert Smith about the triple murder that happened out in PG County?

A.    Yes, he did.

Q.    What did Mr. Sweeney tell Mr. Smith about that?

A.    He told him that the whole plan started after Mr. Sweeney had gone to Las Vegas to see the Tyson-Holyfield fight.  While he was there he had seen Lonnie or Alonzo Gaskins, with a lot of money.

And to back up a little bit, we asked Mr. Smith a little bit about the trip, and Mr. Smith told us that he was the one who even introduced somehow Mr. Sweeney to the real estate agent who booked the trip for them.

Q.    The real estate agent?

A.    I'm sorry, travel agent.  The travel agent.  He said he introduced Mr. Sweeney to the travel agent and the travel agent was able to book the trip for Mr. Sweeney and others who went to Las Vegas to see the fight.

As I said, while they were there, Mr. Sweeney saw Lonnie win quite a bit of money.  So when he came home, he decided he

App 250

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 75 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 396 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 39 of 102

39

was going to try to kidnap him and rob him for his money. He said on the night that they went out there, Mr. Sweeney, James Montgomery, Sam Carson, and Sean Coates went in a minivan.

They sat on the house for several hours. At some point they went in the house. He said they only had one gun, and that Draper was the one who had the gun. He said it was a Glock .40 caliber that was used.

I think he said that there's a laser sight on it, too. And he said Mr. Sweeney had the Glock .40 caliber and James Montgomery had a stun gun that he was going to use to try to stun one of the people inside the house.

They went in the house to try to kidnap Lonnie, and something went bad, and Mr. Sweeney said that Darnell Mack mouthed off, and that he had to kill him. So he said he shot the two guys inside the house, and then on the way out of the house, he said there was a female standing there, and he said, she was just like frozen, like she was in shock and she couldn't move. And he said he walked out and looked at her and just shot her in the head and left her there.

Q.   In the course of speaking with Robert Smith, from the time you first talked to him on December 5, 1996, until he was murdered in June of 1997, did Mr. Smith ever tell you that he was in fear with respect to his safety?

A.   Yes.   There was nothing specific.

THE COURT:   Let me interrupt you for a minute.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 76 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 397 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 41 of 102

41

(Jury Out.)

THE COURT:  Did you have something you wanted to bring up?

(Recess.)

THE COURT:  All set?  Bring them in.

(Jury In.)

THE DEPUTY CLERK:  Jury panel is all present, Your Honor.

THE COURT:  All right.  Thank you, Marshal.  You might want to start your line of inquiry again.  I interrupted you.

MS. CHATURVEDI:  Yes, sir.

BY MS. CHATURVEDI:

Q.    Agent Lisi, in the course of speaking with Mr. Smith starting in December of 1996 up until the time he was murdered, did Mr. Smith ever express to you any fears he had about his safety?

A.    Yes.  There was nothing specific, no specific threats that were ever made to him, but he told me many times, he said, man, I'm telling you, he said, if anything ever happens to me, it's Shorty.  He said, anything happens, if he ever found out what I was doing, he'd have no problem killing me, and he told me that many times.  If anything ever happens to me, it's Shorty.  Just look at him first.

Q.    Shorty being, of course?

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 77 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 398 of 443
Case 1:98-cr-00329-RCL    Document 974    Filed 03/11/03    Page 42 of 102

42

A.    Draper or Mr. Sweeney.

Q.    And can you tell the ladies and gentlemen of the jury if there was a time that Mr. Smith's cooperation was acknowledged in a public document?

A.    His information, the information that he -- the information about the triple murder was put in the charging document in PG County.  His name wasn't put in there, but all of the information that he had provided us was put in there, and they also put in there something to the fact that it was an FBI confidential informant, FBI Washington Field Office, things of that nature.

Q.    I neglected to ask you this.  Other than saying to you that if anything happened to him, to look to Shorty, did Mr. Smith ever express to you any fears about anyone else who Mr. Smith told you about in the course of your six months speaking with him?

A.    No, he never expressed any problems or problems with anybody else or concerns about anybody else.

Q.    On June 16, 1997, Agent Lisi, did you receive a call about a shooting done in broad daylight in the 1300 block of Half Street, Southwest?

A.    Yes, ma'am.

Q.    How many times had that victim been shot in that shooting?

A.    I believe 11.

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 78 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 399 of 443
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 43 of 102

43

Q.   Who was it that was murdered?

A.   Robert Smith.

        MS. CHATURVEDI:  No further questions, Your Honor.

        MR. KIERSH:  Your Honor, may I inquire?

        THE COURT:  You certainly may.

                        CROSS-EXAMINATION

BY MR. KIERSH:

Q.   Good afternoon, Agent.

A.   Good afternoon.

Q.   Agent Lisi, you said that Butchie was not known as a violent person; is that right?

A.   Yes, sir.

Q.   You said that you had no problem letting him out on the street?

A.   Correct.

Q.   Is that right?

A.   I said correct.

Q.   Okay.  That was what distinguished him from someone else in terms of your agreeing not to ask that he be held without bond pending trial?

A.   I think that's one of the factors that's considered.

Q.   Okay.  Now, --

A.   I mean, yeah, it's one of the factors that's considered.

Q.   And just to remind the jury, because we'll go back and forth on this, Robert Smith was also known as Butchie,

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 79 of 166

USCA Case #93-3085    Document #2077668 Case 1:98-cr-00329-RCL Document 713    Filed 07/19/01/2024    Page 400 of 443 Page 1 of 915

Clerks File

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,                    :
                                           :
                                           :
 VS.                                       :    CR. NO. 98-329
                                           :
VINCENT HILL,                              :
JEROME MARTIN,                             :          FILED
SAMUEL CARSON,                             :
WILLIAM K. SWEENEY,                        :        JUL 1 9 2001
SEAN COATES,                               :
            DEFENDANTS.                     :    NANCY MAYER WHITTINGTON, CLERK
                                           :         U.S. DISTRICT COURT
UNITED STATES                              :
            GOVERNMENT,                    :
                                           :
 VS.                                       :    CR. NO. 99-348
                                           :
GARY PRICE,                                :
            DEFENDANT                       :
                                           :

                                WASHINGTON, D. C.
                                MAY 30, 2001
                                (10:37 A.M.)


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE THOMAS P. JACKSON




COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 80 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 401 of 443
Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 2 of 115

2

```
FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                ANJALI CHATURVEDI, AUSA
                                555 4TH ST., N.W.
                                WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
                                601 INDIANA AVE., N.W.
                                #910
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                305 H STREET, N.W.
                                2ND FLOOR
                                WASHINGTON, D. C.  20001


FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                LEXI NEGIN-CHRIST, ESQ.
                                419 7TH STREET, N.W.
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
                                717 D STREET, N.W.
                                SUITE 400
                                WASHINGTON, D. C.  20004


FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
                                901 6TH STREET, S.W.
                                #409
                                WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                601 INDIANA AVE., N.W.
                                #901
                                WASHINGTON, D. C.  20004
```

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 81 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 402 of 443
Case 1:98-cr-00329-RCL    Document 713    Filed 07/19/01    Page 3 of 115

3

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SP. AGT. VINCENT LISI | | | | |
| BY MR. KIERSH | 7 | | | 109 |
| BY MR. DAVIS | | 57 | | |
| BY MR. ZUCKER | | 98 | | 110 |
| BY MS. CHATURVEDI | | | 106 | |

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 82 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 403 of 443
Case 1:98-cr-00329-RCL    Document 713    Filed 07/19/01    Page 19 of 115

19

THE COURT: I SUPPOSE HIS THESIS IS THAT MICHAEL FARRAR MIGHT HAVE BEEN A SUSPECT IN "BUTCHIE'S" MURDER.

MS. CHATURVEDI: I WILL LET THE AGENT ANSWER, YOUR HONOR.

THE COURT: I BEG YOUR PARDON?

MS. CHATURVEDI: I WILL LET THE AGENT ANSWER.

BY MR. KIERSH:

Q. YOU DON'T RECALL PICKING HIM UP AND QUESTIONING HIM?

A. NO, SIR, I DON'T.

Q. OKAY.

HOW ABOUT PETEY JOHNSON?

A. I WILL TELL YOU RIGHT NOW, I NEVER AFTER "BUTCHIE'S" MURDER, PICKED UP MICHAEL FARRAR AND INTERVIEWED HIM.

Q. HOW ABOUT PETEY JOHNSON? DID YOU PICK HIM UP?

A. YES, SIR, BECAUSE IT WAS BELIEVED HE WAS A WITNESS.

Q. TO ROBERT SMITH'S MURDER?

A. YES, SIR.

Q. OKAY. AND YOU QUESTIONED PETEY JOHNSON ABOUT ROBERT SMITH'S MURDER?

A. YES, SIR.

Q. OKAY. AND YOU QUESTIONED HIM NOT JUST AS A WITNESS, BUT AS A POSSIBLE SUSPECT?

A. I WOULD SAY AS A WITNESS AND MAYBE SOMEBODY -- IT WAS JUST A HUNCH THAT HE WAS THERE AND THEN HE WALKED AWAY, WE BELIEVED, AT THE TIME "BUTCHIE" WAS KILLED. SO HE MAY HAVE

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 83 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 404 of 443
Case 1:98-cr-00329-RCL    Document 713    Filed 07/19/01    Page 20 of 115

20

CALLED SOMEBODY TO ALERT THEM THAT "BUTCHIE" WAS THERE.

Q.  AND YOU DON'T SEE PETEY JOHNSON'S FACE UP ON THAT PHOTO BOARD, DO YOU?

A.  NO, SIR.

Q.  AND YOU DIDN'T SEE PETEY JOHNSON COME INTO THIS COURTROOM TO TESTIFY IN THIS CASE, DID YOU?

A.  NO, SIR.

Q.  OKAY.

NOW, WHEN YOU WENT OUT TO THIS HOUSE IN MARYLAND THAT BOTH ROBERT SMITH AND MICHAEL FARRAR WERE EITHER LIVING AT OR HAD ACCESS TO, DID YOU RECOVER THE CASH FROM THE HOUSE?

A.  NO.  WHAT HAPPENED WAS MYSELF AND ANOTHER AGENT DROVE TO THE GENERAL AREA AND LET MR. SMITH OUT.  HE WENT TO THE HOUSE, RECOVERED THE ITEMS AND BROUGHT THEM BACK TO US.  I NEVER WENT INSIDE THE HOUSE BECAUSE WE DIDN'T WANT ANYBODY IN THE HOUSE TO SEE US OR KNOW THAT WE WERE THERE.

Q.  WHO RECOVERED THE EVIDENCE?

A.  ROBERT SMITH.

Q.  OKAY.  AND HE BROUGHT IT BACK OUT TO YOU?

A.  YES, SIR.

Q.  OKAY. DID HE BRING YOU THE CASH?

A.  YES, SIR.

Q.  ALL OF THE $5,000.00?

A.  I THINK IT WAS $5,005.00.

LLA 2341

35

A. WHY WOULD HE? NO, SIR, BECAUSE HE WOULDN'T COME IN AND SAY HE SOLD MORE DRUGS THAN HE DID. HE IS FACING MORE TIME THAT WAY.

Q. YOU JUST TOLD US THAT THE MORE INFORMATION YOU HAVE FOR YOUR 5K, THE BETTER YOU'RE GOING TO DO ON YOUR 5K.

A. I SAID THAT ULTIMATELY WAS EXPLAINED TO HIM, BUT WHENEVER WE FIRST SAT DOWN AND DEBRIEFED HIM ON THAT FIRST DAY, WE DIDN'T GET INTO THAT DISCUSSION.

Q. NOW, YOU TOLD US YESTERDAY THAT THE ONLY REFERENCE TO THE TRIPLE MURDER IS IN YOUR NOTES OF DECEMBER 6TH, CORRECT? YOUR 302?

A. MY 302. I DON'T BELIEVE I TOOK ANY NOTES ON THAT.

Q. OKAY. BUT THAT'S THE ONLY TIME IN YOUR 302 THAT THE TRIPLE MURDER IN MARYLAND IS REFERENCED, CORRECT?

A. I BELIEVE SO, YES, SIR.

Q. OKAY. AND YOU ALSO TOLD US YESTERDAY THAT UP UNTIL THE TIME THAT "BUTCHIE" MENTIONED THE TRIPLE MURDER, DECEMBER 6TH, 1996, THERE WERE NO REAL SUSPECTS IN THE TRIPLE MURDER?

A. THAT I KNEW OF, THAT'S CORRECT.

Q. OKAY.

PRIOR TO DECEMBER 6TH, 1996, WHEN YOU SPOKE WITH "BUTCHIE", WERE YOU INVOLVED IN THE INVESTIGATION OF THE TRIPLE MURDER?

A. NO, SIR.

Q. OKAY. BUT YOU KNEW ABOUT AN INVESTIGATION?

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 85 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 405 of 443
Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 45 of 115

45

MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  IT'S BEYOND THE SCOPE.

THE COURT:  SUSTAINED.

BY MR. KIRSCH:

Q.  NOW, OTHER THAN -- AFTER ROBERT SMITH WAS SHOT AND KILLED IN JUNE OF '97, OTHER THAN PETEY JOHNSON, DID YOU SPEAK WITH ANYONE ELSE, EITHER AS A SUSPECT OR AS A POTENTIAL WITNESS, REGARDING THIS EVENT?

A.  YES, SIR.

Q.  WHO WAS THAT?

A.  RICHARD --

MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  THIS IS BEYOND THE SCOPE AGAIN AS TO WHO HE SPOKE WITH TO SOLVE THAT CRIME.  THE MURDER IS NOT CHARGED IN THIS CASE, YOUR HONOR.

THE COURT:  ALL RIGHT.  IT'S PROBABLY BEYOND THE SCOPE.

MR. KIERSH:  MAY I APPROACH THE BENCH?

THE COURT:  YES, YOU MAY.  YOU CAN COME FORWARD AND TELL ME WHY YOU THINK IT'S WITHIN THE SCOPE.

(BENCH CONFERENCE.)

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 86 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 406 of 443
Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 46 of 115

46

(BENCH CONFERENCE.)

MR. KIERSH:  THE LAST PIECE OF EVIDENCE OR INFORMATION ELICITED FROM THIS WITNESS ON DIRECT WAS THAT ROBERT SMITH SAID, "I WAS AFRAID OF WILLIAM SWEENEY."

THE COURT:  OKAY.

MR. KIERSH:  SO THIS IS DIRECTLY RELEVANT.  THE FACT THAT THEY ARE ARRESTING OTHER PEOPLE OR QUESTIONING OTHER PEOPLE, IT CONTRADICTS THIS FEAR OF WILLIAM SWEENEY. THEY ARE LOOKING AT OTHER PEOPLE FOR HAVING COMMITTED THIS OFFENSE.

THE COURT:  YOU ALREADY DEALT WITH PETEY JOHNSON AND MICHAEL FARRAR AND ALL OF THESE OTHER PEOPLE.

MR. KIERSH:  THERE ARE OTHER PEOPLE WHO HE SPOKE TO AS BEING POSSIBLE SUSPECTS.  SO IT IS DIRECTLY RELEVANT TO CONTRADICTING THIS SUPPOSED FEAR OF WILLIAM SWEENEY.  HE SAID THAT'S THE ONLY PERSON WHO ROBERT SMITH EXPRESSED FEAR ABOUT.  THEN WHY ARE THEY ARRESTING OTHER PEOPLE?  THERE MUST BE A REASON.

THE COURT:  WHAT DO YOU MEAN ARRESTING OTHER PEOPLE?

MR. KIERSH:  HE IS QUESTIONING OTHER PEOPLE ABOUT SMITH'S MURDER.  IF SMITH IS TO BE BELIEVED THAT THE ONLY PERSON HE FEARED WAS WILLIAM SWEENEY, YOU DON'T NEED TO TALK TO ANYBODY ELSE.

THE COURT:  IT DOESN'T PRECLUDE HIS QUESTIONING

Case 1:98-cr-00329-RCL Document 1375-5 Filed 04/06/26 Page 87 of 166
USCA Case #23-3015 Document #2077668 Filed: 10/01/2024 Page 407 of 443
Case 1:98-cr-00329-RCL Document 713 Filed 07/19/01 Page 47 of 115

47

OTHER PEOPLE.

MR. KIERSH: IT CONTRADICTS THE VERACITY OF THAT STATEMENT, JUDGE. IT IS TOTALLY RELEVANT AND IT'S COMPLETELY ON POINT.

MS. CHATURVEDI: YOUR HONOR, I THINK MR. KIERSH IS MAYBE MISUNDERSTANDING WHAT AGENT LISI IS SAYING. AND I THINK WE'RE GOING TO JUST GET INTO A LINE OF INQUIRY THAT IS INAPPROPRIATE. HE WAS QUESTIONING OTHER PEOPLE ABOUT WILLIAM SWEENEY DOING THE MURDER. IT WASN'T THAT THERE WERE OTHER SUSPECTS.

THE COURT: WHY CAN'T YOU BRING THAT OUT ON REDIRECT?

MS. CHATURVEDI: YOUR HONOR, WE COULD, BUT THE CASE IS --

MR. KIERSH: WHY DON'T I JUST REPHRASE THE QUESTION: WERE THESE OTHER PEOPLE QUESTIONED AS SUSPECTS?

MS. CHATURVEDI: THAT'S FINE. IF HE SAYS THEY WERE NOT QUESTIONED AS SUSPECTS, YOUR HONOR, I THINK THEN WE SHOULD GET OFF OF THIS POINT.

THE ONLY SUSPECT -- IF MR. KIERSH WANTS TO HEAR IT AGAIN -- THE ONLY SUSPECT IN AGENT LISI'S MIND THAT ORDERED THAT MURDER WAS WILLIAM SWEENEY. IF MR. KIERSH WANTS HIM TO REPEAT IT, THAT IS FINE, BUT TO IDENTIFY WITNESSES BY NAME -- POTENTIAL WITNESSES IN THE MURDER OF ROBERT SMITH, WHEN THAT MURDER IS NOT CHARGED, IT PUTS THOSE PEOPLE

UA 2368

App 263

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 88 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 408 of 443
Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 48 of 115

48

AT RISK TREMENDOUSLY, I THINK, IF THEY ARE WITNESSES TO THAT MURDER.

THE COURT:  WHY ARE THEY AT RISK CERTAINLY FROM ANYBODY RELATED TO THIS CASE?

MS. CHATURVEDI:  WELL, IF THAT MURDER GETS CLOSED, YOUR HONOR -- IT IS STILL AN OPEN CASE.  NO ONE HAS BEEN CHARGED WITH THE MURDER ITSELF.  FOR AGENT LISI TO SAY WHO HE TALKED WITH AND WHAT THOSE PEOPLE TOLD HIM ABOUT WHY THEY THINK WILLIAM SWEENEY WAS INVOLVED IN THAT MURDER I THINK PUTS THEM AT RISK.  AND IT IS NOT CHARGED.  IT'S AN UNCHARGED MURDER.

THE COURT:  ALL RIGHT.  YOU SAID THAT.

MR. KIERSH:  A CONSPIRACY TO MURDER.  I MEAN I AGREE WITH MS. CHATURVEDI THAT THE ACTUAL MURDER IS NOT CHARGED.

THE COURT:  ALL RIGHT.

MR. KIERSH:  YOU KNOW WHAT?  I AM NOT GOING TO SPEND A LONG TIME ON THIS.  I WILL JUST ASK HIM IF THERE ARE OTHER SUSPECTS.

THE COURT:  ASK HIM IF THERE ARE OTHER SUSPECTS.

MR. KIERSH:  THAT'S IT.

(END OF BENCH CONFERENCE.)

LLA 2369

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 89 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 409 of 443
Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 49 of 115

49

(END OF BENCH CONFERENCE.)

BY MR. KIRSCH:

Q. AGENT LISI, THE QUESTION IS AFTER ROBERT SMITH WAS MURDERED, DID YOU QUESTION OTHER SUSPECTS IN HIS MURDER?

A. SUSPECTS? YES.

Q. AND HOW MANY OTHER SUSPECTS?

A. ONE.

Q. OKAY. IS THAT OTHER SUSPECT DEPICTED ON THE PHOTO BOARD?

A. NO, SIR.

Q. NOW, IN YOUR NOTES THAT YOU WROTE -- AND, AGAIN, IF YOU NEED TO TAKE A LOOK AT IT, JUST LET ME KNOW. YOU TALKED ABOUT STEPHON'S COUSIN SAYING HE GOT A GUN FROM DRAPER THAT WAS USED IN THE TRIPLE, A .40 CALIBER WITH A LASER SIGHT. DO YOU REMEMBER THAT?

A. YES, SIR.

Q. OKAY. NOW, STEPHON'S COUSIN, WHO YOU'RE REFERENCING IN THIS NOTE, IS JOHNNIE PROCTOR, ISN'T THAT RIGHT?

A. I CAME TO LEARN IT WAS JOHNNIE PROCTOR, YES.

Q. OKAY. NOW, JOHNNIE PROCTOR -- REMINDING THE LADIES AND GENTLEMEN OF THE JURY -- IS THE SAME JOHNNIE PROCTOR WHO JAMES MONTGOMERY HAD FALSELY ACCUSED OF BEING INVOLVED IN THE TRIPLE MURDER WHEN HE SPOKE TO THE PRINCE GEORGE'S COUNTY POLICE, ISN'T THAT RIGHT?

MS. CHATURVEDI: OBJECTION. IT'S BEYOND THE

HA 2270

*Clerks File*

1



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
    GOVERNMENT,    :

                   :

 VS.               :     CR. NO. 98-329

                   :

VINCENT HILL,       :

JEROME MARTIN,      :

SAMUEL CARSON,      :

WILLIAM K. SWEENEY, :

SEAN COATES,        :

       DEFENDANTS.   :

                   :

UNITED STATES       :

    GOVERNMENT,     :

                   :

 VS.               :     CR. NO. 99-348

                   :

GARY PRICE,         :

      DEFENDANT     :

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JUNE 26, 2001
(9:43 A.M.)
(A. M. SESSION)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:       PHYLLIS MERANA
                        6816 U. S. DISTRICT COURT
                        3RD & CONSTITUTION AVE., N.W.
                        WASHINGTON, D. C. 20001

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 91 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 420 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 2 of 91

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

24

CERTAINLY NEVER WANTED TO END UP IN A COURTROOM LIKE THIS ONE. THEY CERTAINLY NEVER WANTED TO HAVE LAW-ABIDING CITIZENS LIKE YOU FOLKS JUDGE THEIR ACTIONS.

FOR OVER TEN YEARS, THEY TRIED TO OBSTRUCT THE VERY THING THAT THIS SOCIETY IS FOUNDED UPON, JUSTICE. BECAUSE OF THEM, WITNESSES WERE MURDERED. BECAUSE OF THEM, WITNESSES WERE THREATENED AND INTIMIDATED. BECAUSE OF THEM, WITNESSES WERE TOLD TO LIE.

BECAUSE OF THEM, YOU DID NOT SEE CHRISHAUNA GLADDEN WALK INTO THIS COURTROOM. BECAUSE OF THEM, YOU DID NOT SEE ROBERT "BUTCHIE" SMITH WALK IN THAT DOOR AND TESTIFY ON THAT WITNESS STAND.

SO AS I TALK TO YOU DURING THE COURSE OF THIS TRIAL AND I TELL YOU WHAT CHRISHAUNA GLADDEN WOULD HAVE SAID AND I REMIND YOU WHAT ROBERT SMITH WOULD HAVE SAID, PLEASE PAUSE AND REFLECT ON THE FACT THAT THE REASON YOU DIDN'T HEAR FROM THEM YOURSELVES IS BECAUSE THE K STREET CREW MURDERED THEM.

NOW, WHAT COULD CHRISHAUNA GLADDEN -- WHAT COULD SHE HAVE SAID? IF SHE HAD COME INTO THIS COURTROOM, SHE WOULD HAVE POINTED A FINGER AT JEROME MARTIN, "PIMP." AND SHE WOULD HAVE SAID, LADIES AND GENTLEMEN, HAD SHE HAD THE CHANCE, THAT SHE HAD INFORMATION -- EVIDENCE REGARDING THE MURDER OF CURTIS EDWARDS AND THE SHOOTING OF KEITH JONES AND RICHARD BURTON.

25

IF ROBERT SMITH HAD BEEN PERMITTED TO TESTIFY -- IF HE HAD NOT BEEN MURDERED, HE WOULD HAVE TOLD YOU ABOUT A LOT OF THINGS THAT HIS NEPHEW, WILLIAM SWEENEY, "DRAPER," TOLD HIM.

ROBERT SMITH COULD HAVE COME INTO THIS COURTROOM, AND HE WOULD HAVE TOLD YOU THAT HIS NEPHEW, "DRAPER," CONFESSED TO HIM THAT DRAPER WAS RESPONSIBLE FOR THE TRIPLE MURDER, THAT DRAPER WAS RESPONSIBLE FOR THE MURDER OF "ROBOCOP," AND THAT DRAPER WAS RESPONSIBLE FOR THE KILLING OF "WHITEY," THAT "DRAPER" WAS RESPONSIBLE FOR ASSISTING IN LOCATING AND TRYING TO KILL WITNESSES IN THE CASE AGAINST CLIFTON EDWARDS, "MEECHIE", AND THAT DRAPER CONFESSED TO "BUTCHIE" THAT, IN FACT, "DRAPER" HAD PARTICIPATED IN THE KIDNAPPING OF "WYSOCKI."

AND "BUTCHIE" WOULD HAVE TOLD YOU HIMSELF THAT "DRAPER" MADE EFFORTS TO TRY TO KILL KENNETH ADAMS, YET ANOTHER GOVERNMENT WITNESS.  BUT THE REASON YOU DIDN'T HEAR THE WORDS FROM THEM IS BECAUSE THOSE WITNESSES WERE MURDERED.

FOR OVER TEN YEARS THE VIOLENCE CONTINUED ON AND ON.  THE EFFORTS TO OBSTRUCT JUSTICE WENT ON AND ON.  FOR SO MANY YEARS, LADIES AND GENTLEMEN, THESE MEN REMAINED LARGELY UNTOUCHED.

AND BECAUSE OF WHO THEY WERE, AND PERHAPS EVEN BECAUSE OF WHO THEY BELIEVE THEY STILL ARE, THEY MAY THINK

App 268

Case 1:98-cr-00329-RCL Document 1375-5 Filed 04/06/26 Page 94 of 166
USCA Case #23-3015 Document #2077668 Filed: 10/01/2024 Page 422 of 443
Case 1:98-cr-00329-RCL Document 723 Filed 07/19/01 Page 29 of 91

29

OPPOSED TO THEIR FULL NAME.

NOW, IN TERMS OF THE WITNESSES THAT TESTIFIED, WE BROUGHT YOU IN THIS COURTROOM THEIR FRIENDS. WE BROUGHT YOU THEIR ASSOCIATES. WE BROUGHT YOU THEIR FAMILY.

WHAT DO I MEAN WHEN I SAY THAT? YOU HEARD ON THAT WITNESS STAND FROM MEMBERS OF THE K STREET CREW -- MEMBERS OF THE K STREET CREW, WHO THEMSELVES HAVE PLED GUILTY AND ADMITTED THEIR INVOLVEMENT IN CRIMINAL ACTIVITY.

NOW, THERE'S NO DOUBT ABOUT IT. PEOPLE WITH PLEA AGREEMENTS ARE CRIMINALS. THEY HAVE, BY THEIR NATURE, COMMITTED CRIMES.

BUT, LADIES AND GENTLEMEN, THOSE PEOPLE -- THOSE CRIMINALS THAT YOU HEARD FROM ARE THE PEOPLE WHO WERE IN THE BEST POSITION TO TELL YOU HOW THIS CREW OPERATED BECAUSE THEY WERE WITH THE DEFENDANTS WHEN THE PLANS WERE MADE. THEY WERE WITH THE DEFENDANTS WHEN THE CRIMES WERE COMMITTED. AND THEY ARE THE TYPE OF PEOPLE THAT THESE MEN CONFIDED IN AFTER CRIMES WERE COMMITTED AND CONFIDED IN AS TO WHAT HAD HAPPENED DURING THE COURSE OF THE CRIME.

JUDGE JACKSON WILL BE GIVING YOU AN INSTRUCTION ABOUT HOW TO CONSIDER THE TESTIMONY OF A WITNESS WITH A PLEA AGREEMENT. THE LAW REFERS TO THOSE TYPES OF PEOPLE AS CO-CONSPIRATORS OR ACCOMPLICES.

YOU HAVE HEARD A LOT OF WORDS USED TO DESCRIBE PEOPLE WITH PLEA AGREEMENTS: "SNITCHES" AND "HOT." YOU CAN

App 269

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 95 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 423 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 33 of 91

33

BEING LOCATED WAS SO THAT THEY COULD BE KILLED.

THESE PLEA AGREEMENTS, LADIES AND GENTLEMEN, ARE NOT JUST A SLAP ON THE WRIST. FOR THOSE FOUR MEN I JUST DESCRIBED FOR YOU, EACH AND EVERY ONE OF THEM IS LOOKING AT A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

EACH OF THOSE COOPERATING WITNESSES KNOWS THAT IF THEY LIE, THEY LOSE THAT PLEA AGREEMENT, AND THEY GO IMMEDIATELY TO SENTENCING BEFORE THE JUDGE THAT HEARD THEIR TESTIMONY.

THOSE COOPERATING WITNESSES KNOW THAT IF THEY LIE, THEY LOSE WHAT YOU HAVE HEARD REPEATEDLY IN THIS COURTROOM, THAT 5K LETTER, ANY CHANCE THAT THEY WOULD HAVE A BREAK ON SENTENCING. THEY LOSE THAT.

SO FOR THEM, THE STAKES ARE HIGH BECAUSE EACH AND EVERY ONE OF THEM IS LOOKING AT A POTENTIAL SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

NOW, WITH RESPECT TO HAVING COOPERATING WITNESSES TESTIFY, IN THIS INSTRUCTION THAT JUDGE JACKSON WILL BE GIVING YOU, YOU WILL BE TOLD THAT YOU CAN DECIDE THIS CASE BASED SOLELY ON WHAT THE COOPERATING WITNESSES TOLD YOU -- THE CREW MEMBERS.

YOU CAN JUST STOP AND REFLECT ON WHAT THEY SAID IN THIS COURTROOM AND DECIDE THAT'S ENOUGH. JUST THOSE FOUR MEN ALONE, THAT'S ENOUGH. THESE DEFENDANTS ARE GUILTY.

YOU CAN DO THAT. WE GAVE YOU MORE. WE GAVE YOU

34

EVIDENCE WHICH I AM GOING TO REFER TO YOU THROUGHOUT THIS CLOSING ARGUMENT AS JUST CORROBORATION -- SUPPORT -- EVIDENCE WHICH YOU CAN LOOK AT AND CONSIDER AND DECIDE WHETHER OR NOT THESE COOPERATING WITNESSES HAVE TOLD YOU THE TRUTH.

NOW, SOMETIMES THE CORROBORATION OR THE SUPPORT COMES FROM ANOTHER COOPERATING WITNESS. TWO PEOPLE THAT WERE INVOLVED IN THE SAME INCIDENT OR HEARD ABOUT THE SAME INCIDENT, AND THEY BOTH DESCRIBE IT -- THAT'S CORROBORATION.

SOMETIMES, OF COURSE, YOU HEARD FROM JUST ORDINARY CITIZENS, PEOPLE WHO JUST, QUITE FRANKLY, HAPPENED TO BE IN THE WRONG PLACE AT THE WRONG TIME. THEY SAW SOMETHING AND REPORTED IT -- PEOPLE LIKE DORENE KEY.

DO YOU REMEMBER HER? SHE IS THE WOMAN WHO BACK IN OCTOBER OF 1993 WAS LOOKING OUT HER SECOND-STORY BEDROOM WINDOW AND SAW DRAPER, WHO SHE KNEW FOR MANY YEARS FROM THE NEIGHBORHOOD. SHE SAW "DRAPER" TRYING TO GET RID OF THINGS IN THE BACK OF A CAR THAT HAD NO TRUNK. DO YOU REMEMBER HER?

CHARLENE WILSON, BACK IN 1991, WHILE LIVING ON 58TH PLACE -- 58TH STREET -- EXCUSE ME -- NORTHEAST, WAS OUTSIDE AND SAW SAM CARSON KILL TONY FORTUNE.

YOU HAVE SUPPORT, LADIES AND GENTLEMEN, FROM PEOPLE LIKE CINAMA HAWKINS, WHO TO THIS DAY DOES NOT KNOW WHO MURDERED HER BEST FRIEND. BUT THE TESTIMONY THAT SHE

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 97 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 425 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 37 of 91

37

AN ATTACK ON ONE OF THEM WAS AN ATTACK ON ALL OF THEM. THEY WOULD COME TOGETHER WHEN ANY ONE OF THEM NEEDED HELP. THEY WOULD COME TOGETHER TO ENRICH THEMSELVES, AND THEY WOULD COME TOGETHER TO ATTACK.

NOW, WHEN I SAY THAT THEY WANTED TO ENRICH THEMSELVES, I MENTIONED EARLIER THAT THE WAY THIS CREW ENRICHED THEMSELVES -- THE ONE THAT YOU HEARD ABOUT THE MOST -- THE MOST REGULAR ONE WAS SELLING MARIJUANA.

YOU KNOW FOR OTHERS IT INVOLVED SELLING COCAINE AND P.C.P. AND ALSO FOR SOME OF THEM IT INVOLVED KIDNAPPING AND ROBBERIES.

I AM GOING TO START WITH THE DISTRIBUTION OF MARIJUANA. I AM GOING TO START WITH THE DISTRIBUTION OF NARCOTICS BECAUSE THAT WAS THE BREAD AND BUTTER OF THIS GROUP. THAT IS HOW THEY MADE THEIR MONEY REGULARLY FROM 1989 TO THE TIME THAT THEY WERE TAKEN OFF THE STREET.

AND WHEN I TAKE YOU BACK TO THE 1980'S WHERE THIS STARTED, REMEMBER 203 N STREET, THE BUILDING THAT WAS DESCRIBED TO YOU. YOU HAVE SEEN IT IN A NUMBER OF PHOTOGRAPHS.

IN THAT BUILDING, THERE WAS A TUNNEL. AND INSIDE OF THAT TUNNEL, YOU'VE HEARD THAT THERE WAS AN OPERATION THAT WAS FOCUSED AND THAT WAS CENTERED AND THAT WAS PROFITABLE. AND THAT OPERATION WAS STARTED BY AND CONTROLLED BY TWO MEN: VINCENT HILL AND WAYNE PERRY.

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 98 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 426 of 443
Case 1:98-cr-00329-RCL   Document 723   Filed 07/19/01   Page 38 of 91

38

WAYNE PERRY, YOU KNOW, IS PRESENTLY SERVING FIVE CONSECUTIVE LIFE SENTENCES IN THE FEDERAL CORRECTIONS INSTITUTION IN FLORENCE, COLORADO.  AND BACK IN THE LATE '80'S, WAYNE PERRY AND VINCENT HILL GOT TOGETHER.  AND THEY GOT TOGETHER AND THEY TOOK ADVANTAGE OF SOMETHING.  THEY TOOK ADVANTAGE OF THEIR REPUTATION.

YOU KNOW THAT BOTH OF THEM, VINCENT HILL AND WAYNE PERRY, HAD THE REPUTATION.  THEY HAD THE MONEY.  THEY HAD THE POWER.  THEY HAD THE GIRLS.  THEY HAD THE CARS.  THEY HAD IT ALL.

AND THE YOUNG MEN THAT CAME UP BEHIND THEM, PEOPLE LIKE REGINALD SWITZER AND PAUL FRANKLIN -- THEY LOOKED UP TO THEM.  AND SO VINCENT HILL AND WAYNE PERRY TOOK ADVANTAGE OF THAT.  AND WHAT THEY DID IS THEY ENLISTED THESE MEN TO WORK FOR THEM.

VINCENT HILL, YOU MAY RECALL, EMPLOYED OR CONTROLLED REGINALD SWITZER, PAUL FRANKLIN, AND EUGENE BYARS AT A VERY YOUNG AGE, 11, 12 AND 13 YEARS OLD.

THESE YOUNG BOYS WORKED FOR VINCENT HILL.  THEY WOULD BE THE LOOKOUTS.  THEY WOULD BE OUT ON THE STREET MAKING SURE THAT IF THE POLICE CAME BY, SELLERS WERE NOTIFIED.

THESE YOUNG BOYS CARRIED WALKIE-TALKIES AROUND WITH THEM, SUPPLIED BY VINCENT HILL, SO THAT THEY COULD ALERT ONE ANOTHER AS TO THE ACTIVITY THAT WAS GOING ON DOWN

App 273

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 99 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 427 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 39 of 91

39

AND AROUND 203 N STREET.

BUT AS HAPPENS OVER LIFE, PEOPLE GROW UP. REGINALD SWITZER, PAUL FRANKLIN AND THE OTHERS, WHILE THEY CONTINUED TO SELL WITH VINCENT HILL, THEY DIDN'T SELL FOR VINCENT HILL.  AND THEY EXPANDED.

YOU KNOW THAT AT THE BEGINNING, IN THE LATE 1980'S, WHAT WAS BEING SOLD MOST REGULARLY WAS SOMETHING CALLED "LOVE BOAT," MARIJUANA LACED WITH P.C.P.  IT WAS BEING SOLD IN LITTLE TINFOILS.

BUT AS THIS OPERATION OR THIS ENTERPRISE DEVELOPED, IT EXPANDED, AND COCAINE BECAME THE NEXT DRUG OF CHOICE.

AND HEARING ABOUT WHO IT WAS THAT WAS INVOLVED WITH THE COCAINE SALES, YOU NEED LOOK NO FURTHER THAN THE TABLE TO MY RIGHT.

YOU HEARD THAT STARTING IN THE 1990'S AND CONTINUING, ALTHOUGH DIMINISHING OVER TIME, THE DEFENDANTS WERE ENGAGED IN THE SALE OF COCAINE.  THEY SOLD THE COCAINE AT 203 N STREET.  THEY SOLD THE COCAINE AT FIRST AND P AND SECOND AND P, SOUTHWEST.  AND SOME OF THEM WENT OVER ON THE OTHER SIDE OF N STREET AND SOLD COCAINE AT THE CORNER OF DELAWARE AND L AND DELAWARE AND K.

AND, AGAIN, THE OPERATION ROLLED ON.  YOU LEARNED THAT AS THE DEFENDANTS MOVED FROM 203 N STREET OVER TO THE OTHER SIDE, TOWARDS DELAWARE AND K, THERE WAS ALREADY AN

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 100 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 428 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 49 of 91

49

JEROME MARTIN AND VINCENT HILL WOULD BE OUT THERE THE SAME DAY. YOU SAW A NUMBER OF TAPES THAT SHOWED THEM BOTH OUT THERE THE SAME DAY.

THINK ABOUT A DAY LIKE THAT. VINCENT HILL IS MAKING SOME SALES. JEROME MARTIN IS MAKING OTHER SALES. "REASON FORESEEABILITY" COMES INTO PLAY HERE.

MY FRIEND, STANDING TO MY LEFT, IS MAKING MONEY SELLING MARIJUANA. IS IT REASONABLY FORESEEABLE TO ME THAT I AM GOING TO KNOW THAT HE IS SELLING? YES. AND AS A RESULT OF THAT, LADIES AND GENTLEMEN, THE LAW SAYS THAT I AM RESPONSIBLE FOR WHAT HE SOLD.

JEROME MARTIN IS RESPONSIBLE FOR WHAT VINCENT HILL SOLD. VINCENT HILL IS RESPONSIBLE FOR WHAT JEROME MARTIN SOLD. HAND-IN-HAND. THEY'RE A TEAM.

THE SAME IS TRUE WITH DRAPER AND SEAN COATES. BOTH OF THOSE MEN WERE PART OF THE ROTATION BACK IN THE I STREET ALLEY. BOTH OF THEM WERE OUT THERE ON K STREET SELLING MARIJUANA HAND-TO-HAND.

BOTH OF THEM WERE PART OF THIS CREW -- THIS CREW, WHERE BEING A MEMBER OF IT ALLOWED YOU TO PROFIT. IT ALLOWED YOU TO STAND WHERE YOU WANTED TO STAND AND SELL MARIJUANA.

SO FOR EACH AND EVERY ONE OF THEM, THEY ARE RESPONSIBLE FOR WHAT THE OTHER MEMBERS SOLD, AND THEY ARE ALSO RESPONSIBLE FOR WHAT OTHER CO-CONSPIRATORS -- OTHER

PEOPLE -- OTHER MEMBERS OF THIS CREW SOLD.

MR. ZUCKER: OBJECTION.

MS. CHATURVEDI: THERE IS AN OBJECTION, YOUR HONOR.

MR. ZUCKER: I OBJECTED, JUDGE.

THE COURT: OVERRULED.

MS. CHATURVEDI: REGINALD SWITZER, JAMES MONTGOMERY, DONALD NICHOLS, PAUL FRANKLIN, BILL HILL, ANTON GETHERS AND PAUL TAYLOR -- ALL OF THEM WERE MEMBERS OF THIS CREW, THIS K STREET CONSPIRACY.

SO THAT CONCEPT OF "REASONABLE FORESEEABILITY" GOES OUTSIDE OF THIS ROOM. IT GOES TO EACH AND EVERY MEMBER OF THAT CONSPIRACY. THAT'S WHAT WE'RE TALKING ABOUT WHEN WE SAY "REASONABLE FORESEEABILITY."

IN 1992 THROUGH 1994, YOU KNOW THAT MOST OF THE DRUG SALES OCCURRED BACK IN THE I STREET ALLEY. AND I WANT YOU TO THINK ABOUT HOW MANY POUNDS OF MARIJUANA WE'RE TALKING ABOUT WHEN THESE CONSPIRATORS, WHEN THESE CO-DEFENDANTS, WHEN THESE COOPERATING WITNESSES CAME INTO THE COURTROOM AND TOLD YOU ABOUT THE NUMBERS.

YOU HEARD THAT IN 1992 TO 1993 -- THOSE TWO YEARS ALONE -- PEOPLE WERE SELLING IN THE I STREET ALLEY.

NOW, I JUST MENTIONED THE NAMES OF THE MEN WHO YOU HEARD ABOUT WHO SOLD IN THE I STREET ALLEY. BY MY COUNT, I MENTIONED 13. BUT I AM GOING TO LIMIT IT TO TEN BECAUSE THE

CERTAINLY NEVER WANTED TO END UP IN A COURTROOM LIKE THIS ONE.  THEY CERTAINLY NEVER WANTED TO HAVE LAW-ABIDING CITIZENS LIKE YOU FOLKS JUDGE THEIR ACTIONS.

FOR OVER TEN YEARS, THEY TRIED TO OBSTRUCT THE VERY THING THAT THIS SOCIETY IS FOUNDED UPON, JUSTICE.  BECAUSE OF THEM, WITNESSES WERE MURDERED.  BECAUSE OF THEM, WITNESSES WERE THREATENED AND INTIMIDATED.  BECAUSE OF THEM, WITNESSES WERE TOLD TO LIE.

BECAUSE OF THEM, YOU DID NOT SEE CHRISHAUNA GLADDEN WALK INTO THIS COURTROOM.  BECAUSE OF THEM, YOU DID NOT SEE ROBERT "BUTCHIE" SMITH WALK IN THAT DOOR AND TESTIFY ON THAT WITNESS STAND.

SO AS I TALK TO YOU DURING THE COURSE OF THIS TRIAL AND I TELL YOU WHAT CHRISHAUNA GLADDEN WOULD HAVE SAID AND I REMIND YOU WHAT ROBERT SMITH WOULD HAVE SAID, PLEASE PAUSE AND REFLECT ON THE FACT THAT THE REASON YOU DIDN'T HEAR FROM THEM YOURSELVES IS BECAUSE THE K STREET CREW MURDERED THEM.

NOW, WHAT COULD CHRISHAUNA GLADDEN -- WHAT COULD SHE HAVE SAID?  IF SHE HAD COME INTO THIS COURTROOM, SHE WOULD HAVE POINTED A FINGER AT JEROME MARTIN, "PIMP."  AND SHE WOULD HAVE SAID, LADIES AND GENTLEMEN, HAD SHE HAD THE CHANCE, THAT SHE HAD INFORMATION -- EVIDENCE REGARDING THE MURDER OF CURTIS EDWARDS AND THE SHOOTING OF KEITH JONES AND RICHARD BURTON.

CONSPIRACY SOLD OVER A THOUSAND KILOGRAMS OF MARIJUANA.  A THOUSAND KILOGRAMS IS 2200 POUNDS.  WE HAVE PROVED THAT.

I WANT TO USE ONE MORE MATH EXAMPLE JUST TO MAKE MY POINT COMPLETELY CLEAR.  1994 TO 1996 -- THAT IS THE YEARS WHERE THE VIDEOTAPE WAS INVOLVED.  LET'S SAY YOU GO BACK AND WHEN YOU DELIBERATE, YOU THINK, "BOY, THOSE NUMBERS MS. CHATURVEDI GAVE ME, THOSE ARE HUGE."

I AM GOING TO CUT IT ALL IN HALF.  1994 TO 1996, CUT IT IN HALF.  AS OPPOSED TO TEN PEOPLE SELLING MARIJUANA, LET'S MAKE IT FIVE.  AND AS OPPOSED TO IT BEING A POUND AND HALF OF MARIJUANA EACH PERSON WAS SELLING, LET'S JUST MAKE IT THREE-QUARTERS OF A POUND.  AND RATHER THAN SAYING THESE PEOPLE WERE SELLING SEVEN DAYS A WEEK, LET'S CUT IT DOWN TO FIVE.

WHEN YOU TAKE THOSE NUMBERS, FIVE PEOPLE, THREE-QUARTERS OF A POUND A DAY, THAT'S 3 3/4 POUNDS A DAY TOTAL FOR THE GROUP.  OVER A WEEK, THAT'S 18.75 POUNDS.  OVER A MONTH, THAT'S 75 POUNDS.  75 POUNDS TIMES 12 MONTHS, THAT'S 900 POUNDS PER YEAR.  AND IF WE JUST LIMIT OURSELVES TO '94, '95 AND '96, THAT'S 2700 POUNDS RIGHT THERE ALONE.

THAT'S THREE YEARS THAT WE'RE TALKING ABOUT.  ALL WE HAVE TO SHOW IS 2200 POUNDS.  AND BY THIS ESTIMATION, WE HAVE EXCEEDED THAT.  WE HAVE SURPASSED IT.

SO WHEN YOU'RE DELIBERATING ABOUT THE AMOUNTS OF

54

MARIJUANA SOLD BY THIS GROUP, THINK ABOUT THE EVIDENCE THAT YOU HAVE HEARD AND THE FACT THAT WE DIDN'T JUST COME CLOSE TO THAT NUMBER.  WE WENT FAR ABOVE IT.

NOW, LADIES AND GENTLEMEN, I AM NOT GOING TO DWELL ON THE COCAINE AND P.C.P. ALL THAT MUCH BECAUSE THERE WASN'T ALL THAT MUCH TESTIMONY ABOUT IT.  BUT FOR VINCENT HILL, SAM CARSON, WILLIAM SWEENEY, JEROME MARTIN AND SEAN COATES, THEY ARE ALSO CHARGED WITH THE DISTRIBUTION OF MORE THAN FIFTY GRAMS OF CRACK COCAINE AND P.C.P.

AND YOU KNOW THAT THEY WERE ENGAGED IN SELLING THOSE TWO DRUGS, AS WELL AS MARIJUANA, BECAUSE YOU HEARD IT FROM THE WITNESS STAND.

LIKE I SAID, THE CRACK COCAINE AND THE P.C.P. DEVELOPED MOSTLY AT 203 N STREET.  THE COCAINE TRAVELED ONTO THE OTHER SIDE -- MADE ITS WAY OVER TO DELAWARE AND K STREET.  BUT WHAT YOU HEARD MOST ABOUT IT WAS THAT SAM CARSON -- HE WAS INTO CRACK COCAINE.  HE SOLD OUNCES OF CRACK COCAINE DURING THE COURSE OF THIS CONSPIRACY.

YOU HEARD FROM JAMES MONTGOMERY.  WHILE JAMES MONTGOMERY WAS IN A HALFWAY HOUSE AT ONE POINT, HIS GOOD FRIEND, SAM CARSON, GAVE HIM AN OUNCE OF CRACK COCAINE SO JAMES COULD MAKE SOME MONEY WHILE HE WAS IN CUSTODY. REMEMBER JAMES MONTGOMERY TOLD YOU THAT A COUNSELOR ACTUALLY FOUND THAT COCAINE, AND JAMES SNATCHED IT AND RAN OUT THE DOOR AND ENDED UP BEING ON ESCAPE STATUS FOR AWHILE.

PAUL FRANKLIN TOLD YOU THAT WILLIAM SWEENEY SUPPLIED HIM WITH CRACK COCAINE.  YOU HEARD THAT VINCENT HILL SUPPLIED PEOPLE OVER AT 203, FIRST AND P AND SECOND AND P WITH CRACK COCAINE.

YOU HEARD FROM DONALD NICHOLS, "HARD ROCK," THAT WHEN HE CAME HOME IN THE EARLY 1990'S, THAT THE PERSON WHO HE WENT TO TO FIND OUT HOW MUCH CRACK WAS GOING FOR -- HOW MUCH YOU COULD BUY IT FOR WAS JEROME MARTIN.

YOU HEARD FROM REGINALD SWITZER HIMSELF THAT DURING A FIVE-YEAR PERIOD IN THE EARLY 1990'S, THAT REGINALD SWITZER HIMSELF SOLD CRACK COCAINE, AND THAT ON A WEEKLY BASIS HE WAS MAKING $3,000.00 TO $7,000.00 IN PROFIT, SELLING THREE TO SEVEN OUNCES OF CRACK COCAINE ON HIS OWN.

AND, AGAIN, A LITTLE BIT OF MATH.  AN OUNCE IS 28 GRAMS.  WE HAVE TO PROVE TWO OUNCES, FIFTY GRAMS OR MORE, THAT THIS CONSPIRACY IS RESPONSIBLE FOR.  WE HAVE DONE THAT AS WELL.

SO, LADIES AND GENTLEMEN, WHEN YOU PUT IT ALL TOGETHER -- WHEN YOU PUT TOGETHER THE AMOUNT OF MONEY THAT THEY MADE, THE WAY THAT THEY MADE IT, THE SYSTEM THAT THEY DEVELOPED -- THE K STREET CREW DEVELOPED OVER TIME TO MAKE SURE THAT THE MONEY STAYED HIGH -- YOU KNOW THAT THIS GROUP CAME TOGETHER WITH A CLEAR PURPOSE.

THEY HAD STRUCTURE, THEY HAD ORDER, AND THEY HAD A DESIRE TO MAKE MONEY.  THEY ENRICHED THEMSELVES.

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 106 of 166
USCA Case #23-3015   Document #2077668   Filed 10/01/2024   Page 431 of 443
Case 1:98-cr-00329-RCL   Document 723   Filed 07/19/01   Page 79 of 91

79

AND IN THE COURSE OF DISCUSSING THIS PLAN, SAM CARSON TOLD JAMES MONTGOMERY EXACTLY WHAT HAD HAPPENED UP AT THAT CRAPS GAME.  SAM CARSON TOLD JAMES MONTGOMERY THAT HE, SAM CARSON, HAD SHOT AND KILLED JEROME MARTIN. (SIC.)

LET ME USE THIS INCIDENT TO DISCUSS ANOTHER TOPIC THAT I HAVE ON HERE, AIDING AND ABETTING.  YOU WILL SEE WHEN YOU DELIBERATE THAT BOTH JEROME MARTIN AND SAM CARSON ARE BOTH CHARGED WITH THE MURDER OF TONY FORTUNE.

NOW, THE EVIDENCE HAS BEEN THROUGHOUT THIS TRIAL THAT IT WAS SAM CARSON THAT ACTUALLY PULLED THE TRIGGER.  HE'S THE ONE THAT ACTUALLY PUT THE BULLETS INTO TONY FORTUNE.  HE'S THE ONE THAT ACTUALLY DID THE ACT -- THE DIRECT ACT THAT CAUSED THE DEATH OF TONY FORTUNE.

BUT UNDER THE LAW, LADIES AND GENTLEMEN, THERE IS SOMETHING CALLED AIDING AND ABETTING.  AIDING AND ABETTING -- A PERSON THAT IS AN AIDER AND ABETTOR IS A PERSON THAT HELPS MAKE THE CRIME SUCCEED.  IT'S THE PERSON WHO MAKES SURE THAT EVERYONE ELSE AROUND THE SHOOTER IS TAKEN CARE OF.  IT'S THE PERSON WHO OFTENTIMES THINKS OF A PLAN, APPROVES THE PLAN, DRIVES THE SHOOTER THERE, AND DRIVES THE SHOOTER AWAY.

THAT PERSON ISN'T PULLING THE TRIGGER, BUT THE LAW SAYS THAT IF YOU ARE WITH A CRIME -- IF YOU, BY YOUR ACTIONS, WANT THAT CRIME TO SUCCEED, YOU ARE JUST AS GUILTY AS THE PERSON WHO PULLED THE TRIGGER.  THE LAW MAKES NO

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 107 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 432 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 80 of 91

80

DISTINCTION.  NONE.

THE WORDS THAT WE USE ARE AIDER AND ABETTOR AND PRINCIPAL.  A PRINCIPAL IS A PERSON THAT PULLS THE TRIGGER. THE AIDER AND ABETTOR IS THE PERSON THAT HELPS.

AND YOU KNOW BACK IN AUGUST OF 1991 THAT JEROME MARTIN WAS THE AIDER AND ABETTOR.  AND I USE THAT WORD AND I AM GOING TO REPEAT THAT WORD BECAUSE YOU HAVE AIDING AND ABETTING COMING UP A NUMBER OF TIMES DURING THE COURSE OF THIS TRIAL, BUT THAT DOESN'T LESSEN FOR A MOMENT THE RESPONSIBILITY THAT RESTS ON JEROME MARTIN'S SHOULDERS.

HE WAS THE ONE THAT WAS UPSET WITH TONY FORTUNE AT THAT CRAPS GAME.  HE WAS THE ONE THAT WHEN SAM CARSON SAYS TO JEROME MARTIN, "DO YOU WANT ME TO TAKE CARE OF THIS PIECE OF SHIT?" YOU KNOW THAT JEROME MARTIN WANTED HIM TO, OF COURSE.

JEROME MARTIN WAS THE ONE TO BENEFIT FROM THAT CONDUCT, AND JEROME MARTIN MADE SURE THAT SAM CARSON GOT AWAY.  HE DROVE HIM FROM THAT SCENE.

SO SAM CARSON AND JEROME MARTIN, ARE LIKE THIS. (CROSSING FINGERS.)  AND IT IS THOSE RELATIONSHIPS -- THOSE BONDS BETWEEN THOSE TWO MEN THAT IF SOMEBODY STEPS TO JEROME MARTIN, SAM CARSON IS GOING TO BE RIGHT THERE.  IT IS THAT BOND THAT YOU HEARD OF DURING THE COURSE OF THIS TRIAL THAT THESE MEN RELIED ON.  THEIR BOND.

AND LET ME GO BACK JUST A LITTLE BIT AND A LITTLE

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 108 of 166
USCA Case #23-3015    Document #2077668    Filed 10/01/2024    Page 433 of 443
Case 1:98-cr-00329-RCL    Document 723    Filed 07/19/01    Page 83 of 91

83

THE MEMBERS OF THE K STREET CREW WENT LOOKING -- THEY WENT HUNTING FOR GUYS BY THE NAME OF "PEE-WEE." YOU HEARD "SUGARSPOON," YOU HEARD KEITH HOLMES, AND YOU HEARD "BLOCK." YOU HEARD A NUMBER OF NAMES OF MEN ASSOCIATED WITH 58TH.

ON SEPTEMBER 10TH, 1991, ANOTHER EFFORT WAS MADE. ON SEPTEMBER 10TH, 1991, YOU HEARD THAT JAMES MONTGOMERY, JEROME MARTIN, SAM CARSON, AND OTHER GUYS FROM 37TH GOT TOGETHER, WENT OVER TO 58TH AND GOT IN A SHOOT-OUT. THEY WERE SHOOTING AT GUYS FROM 58TH, BUT WHEN THE POLICE CAME UP AND WERE TRYING TO DO THEIR JOB, THEY SHOT AT THE POLICE.

SEPTEMBER 10TH, 1991. HOW DID YOU LEARN ABOUT WHAT HAPPENED OUT IN THE AREA OF 58TH AND 60TH AND EAST CAPITOL AND BLAINE THAT DAY?

WELL, YOU LEARNED WHAT HAPPENED THAT DAY BECAUSE ONE OF THE PARTICIPANTS OF THAT CRIME TOLD YOU ALL ABOUT IT, JAMES MONTGOMERY -- JAMES MONTGOMERY, WHO HAS ADMITTED HIS GUILT TO HIS ROLE IN THE SHOOTING ON SEPTEMBER 10TH, 1991. JAMES MONTGOMERY CAME TO THE COURTROOM AND HE TOLD YOU THAT ON SEPTEMBER 10TH, THEY HAD A PLAN TO GO UP TO 58TH LOOKING FOR "SUGARSPOON" AND "PEE-WEE" OR WHOEVER ELSE THEY COULD FIND.

THERE WAS A VAN, AN MPV VAN THAT JEROME MARTIN HAD. SAM CARSON WAS IN THE VAN. JEROME MARTIN AND JAMES MONTGOMERY WERE ON A MOTORCYCLE. JAMES MONTGOMERY, DRIVING. JEROME MARTIN, "PIMP," ON THE BACK.

AN ATTACK ON ONE OF THEM WAS AN ATTACK ON ALL OF THEM. THEY WOULD COME TOGETHER WHEN ANY ONE OF THEM NEEDED HELP. THEY WOULD COME TOGETHER TO ENRICH THEMSELVES, AND THEY WOULD COME TOGETHER TO ATTACK.

NOW, WHEN I SAY THAT THEY WANTED TO ENRICH THEMSELVES, I MENTIONED EARLIER THAT THE WAY THIS CREW ENRICHED THEMSELVES -- THE ONE THAT YOU HEARD ABOUT THE MOST -- THE MOST REGULAR ONE WAS SELLING MARIJUANA.

YOU KNOW FOR OTHERS IT INVOLVED SELLING COCAINE AND P.C.P. AND ALSO FOR SOME OF THEM IT INVOLVED KIDNAPPING AND ROBBERIES.

I AM GOING TO START WITH THE DISTRIBUTION OF MARIJUANA. I AM GOING TO START WITH THE DISTRIBUTION OF NARCOTICS BECAUSE THAT WAS THE BREAD AND BUTTER OF THIS GROUP. THAT IS HOW THEY MADE THEIR MONEY REGULARLY FROM 1989 TO THE TIME THAT THEY WERE TAKEN OFF THE STREET.

AND WHEN I TAKE YOU BACK TO THE 1980'S WHERE THIS STARTED, REMEMBER 203 N STREET, THE BUILDING THAT WAS DESCRIBED TO YOU. YOU HAVE SEEN IT IN A NUMBER OF PHOTOGRAPHS.

IN THAT BUILDING, THERE WAS A TUNNEL. AND INSIDE OF THAT TUNNEL, YOU'VE HEARD THAT THERE WAS AN OPERATION THAT WAS FOCUSED AND THAT WAS CENTERED AND THAT WAS PROFITABLE. AND THAT OPERATION WAS STARTED BY AND CONTROLLED BY TWO MEN: VINCENT HILL AND WAYNE PERRY.

WAYNE PERRY, YOU KNOW, IS PRESENTLY SERVING FIVE CONSECUTIVE LIFE SENTENCES IN THE FEDERAL CORRECTIONS INSTITUTION IN FLORENCE, COLORADO.  AND BACK IN THE LATE '80'S, WAYNE PERRY AND VINCENT HILL GOT TOGETHER.  AND THEY GOT TOGETHER AND THEY TOOK ADVANTAGE OF SOMETHING.  THEY TOOK ADVANTAGE OF THEIR REPUTATION.

YOU KNOW THAT BOTH OF THEM, VINCENT HILL AND WAYNE PERRY, HAD THE REPUTATION.  THEY HAD THE MONEY.  THEY HAD THE POWER.  THEY HAD THE GIRLS.  THEY HAD THE CARS.  THEY HAD IT ALL.

AND THE YOUNG MEN THAT CAME UP BEHIND THEM, PEOPLE LIKE REGINALD SWITZER AND PAUL FRANKLIN -- THEY LOOKED UP TO THEM.  AND SO VINCENT HILL AND WAYNE PERRY TOOK ADVANTAGE OF THAT.  AND WHAT THEY DID IS THEY ENLISTED THESE MEN TO WORK FOR THEM.

VINCENT HILL, YOU MAY RECALL, EMPLOYED OR CONTROLLED REGINALD SWITZER, PAUL FRANKLIN, AND EUGENE BYARS AT A VERY YOUNG AGE, 11, 12 AND 13 YEARS OLD.

THESE YOUNG BOYS WORKED FOR VINCENT HILL.  THEY WOULD BE THE LOOKOUTS.  THEY WOULD BE OUT ON THE STREET MAKING SURE THAT IF THE POLICE CAME BY, SELLERS WERE NOTIFIED.

THESE YOUNG BOYS CARRIED WALKIE-TALKIES AROUND WITH THEM, SUPPLIED BY VINCENT HILL, SO THAT THEY COULD ALERT ONE ANOTHER AS TO THE ACTIVITY THAT WAS GOING ON DOWN

39

AND AROUND 203 N STREET.

BUT AS HAPPENS OVER LIFE, PEOPLE GROW UP. REGINALD SWITZER, PAUL FRANKLIN AND THE OTHERS, WHILE THEY CONTINUED TO SELL WITH VINCENT HILL, THEY DIDN'T SELL FOR VINCENT HILL. AND THEY EXPANDED.

YOU KNOW THAT AT THE BEGINNING, IN THE LATE 1980'S, WHAT WAS BEING SOLD MOST REGULARLY WAS SOMETHING CALLED "LOVE BOAT," MARIJUANA LACED WITH P.C.P. IT WAS BEING SOLD IN LITTLE TINFOILS.

BUT AS THIS OPERATION OR THIS ENTERPRISE DEVELOPED, IT EXPANDED, AND COCAINE BECAME THE NEXT DRUG OF CHOICE.

AND HEARING ABOUT WHO IT WAS THAT WAS INVOLVED WITH THE COCAINE SALES, YOU NEED LOOK NO FURTHER THAN THE TABLE TO MY RIGHT.

YOU HEARD THAT STARTING IN THE 1990'S AND CONTINUING, ALTHOUGH DIMINISHING OVER TIME, THE DEFENDANTS WERE ENGAGED IN THE SALE OF COCAINE. THEY SOLD THE COCAINE AT 203 N STREET. THEY SOLD THE COCAINE AT FIRST AND P AND SECOND AND P, SOUTHWEST. AND SOME OF THEM WENT OVER ON THE OTHER SIDE OF N STREET AND SOLD COCAINE AT THE CORNER OF DELAWARE AND L AND DELAWARE AND K.

AND, AGAIN, THE OPERATION ROLLED ON. YOU LEARNED THAT AS THE DEFENDANTS MOVED FROM 203 N STREET OVER TO THE OTHER SIDE, TOWARDS DELAWARE AND K, THERE WAS ALREADY AN

40

OPERATION IN BUSINESS.  THAT OPERATION, LADIES AND GENTLEMEN, WAS IN THE I STREET ALLEY.

YOU HEARD THAT BACK IN THAT ALLEY -- THAT ALLEY BETWEEN I AND K STREET, RIGHT NEXT TO DELAWARE AVENUE -- BACK THERE THERE WAS MARIJUANA.  AND ONCE THESE DEFENDANTS CAME TO LEARN THE VALUE OF SELLING MARIJUANA, THEY JOINED THAT OPERATION -- ALL OF THEM.  VINCENT HILL, WILLIAM SWEENEY, SAM CARSON, JEROME MARTIN, SEAN COATES AND GARY PRICE JOINED THE GROUP THAT WAS SELLING IN THE I STREET ALLEY, THE GROUP THAT INCLUDED WAYNE PERRY'S NEPHEW, "DIHRU."

IT INCLUDED MORE PEOPLE THAN THAT.  IT INCLUDED, YOU HEARD, REGINALD SWITZER, DONALD NICHOLS AND PAUL FRANKLIN.

I WANT TO PAUSE FOR A SECOND BECAUSE I KNOW YOU HAVE HEARD SO MANY NAMES.  YOU HAVE SEEN SO MANY PEOPLE TESTIFY.  DONALD NICHOLS, WHOSE PHOTOGRAPH IS UP ON THE BOARD -- REMEMBER HIM?  HE IS THE GENTLEMAN WHO CAME AND TESTIFIED.  HE HAD EYEGLASSES ON WHEN HE TESTIFIED.  HE TESTIFIED ABOUT TWO OR THREE DAYS BACK IN MARCH OF THIS YEAR.

PAUL FRANKLIN.  REMEMBER HIS NICKNAME WAS "DIRTY MEAT."  HE DESCRIBED FOR YOU THE SELLING THAT WENT ON IN THAT I STREET ALLEY.

YOU ALSO HEARD FROM TWO OTHER INDIVIDUALS, RONALD

41

SOWELLS AND DEMETRIUS HUNTER. DEMETRIUS HUNTER IS A YOUNG MAN IN HIS EARLY TWENTIES, WHOSE NICKNAME IS "MEECHIE". HE TESTIFIED HE WAS INCARCERATED. HE WAS WEARING A RED JUMPSUIT, AND HE HAD A WHITE KUFIE ON WHEN HE WAS TESTIFYING.

RONALD SOWELLS HAD ON A BLUE JUMPSUIT. HE IS THE GENTLEMAN THAT CAME IN FROM THE ARLINGTON COUNTY JAIL WHEN HE WAS TESTIFYING. HE IS A TALL GUY. HIS NICKNAME IS "MANUTE."

ALL OF THEM DESCRIBED FOR YOU WHAT WENT ON BACK IN THE I STREET ALLEY, HOW BUSINESS WAS GOOD, AND HOW YOU CAN TURN OR "FLIP," AS THEY SAID, A POUND OF MARIJUANA JUST LIKE THAT. (SNAPPING FINGERS.)

WHILE THEY WERE BACK IN THE I STREET ALLEY, EVEN THOUGH BUSINESS WAS GOOD, THERE CAME A TIME WHEN THEY LEFT. AND YOU HEARD THE REASON THAT THEY LEFT WAS BECAUSE "DIHRU," WAYNE PERRY'S NEPHEW, WAS MURDERED.

AND ONCE WAYNE PERRY'S NEPHEW WAS MURDERED AND THE K STREET CREW CAME TO BELIEVE IT WAS CONDON TERRACE THAT WAS RESPONSIBLE, THERE WAS CONCERN, BECAUSE WHILE THEY WERE BACK IN THE I STREET ALLEY, THERE WAS A CHANCE THAT THEY COULD BE CAUGHT OFF-GUARD. FEAR OF RIDE-BYS IS WHAT DROVE THEM OUT ONTO K STREET -- OUT INTO THE 200 BLOCK OF K STREET INTO THAT COURTYARD THAT YOU HAVE SEEN TOO MANY PICTURES -- I CAN'T EVEN COUNT THEM -- AND DOWN TO THE CORNER OF K AND

42

DELAWARE.

AND IT WAS THERE, LADIES AND GENTLEMEN, OUT IN THE STREET ALL HOURS OF THE DAY, ALL HOURS OF THE NIGHT, THAT FROM 1994 UNTIL THE TIME THAT THEY WERE CHARGED, THAT THIS K STREET CREW GOT THE MOST MONEY THAT THEY DID.

YOU HEARD THAT OUT ON K STREET THAT ALL OF THESE DEFENDANTS WERE JOINED BY THE COOPERATORS THAT I HAVE MENTIONED:  REGINALD SWITZER, JAMES MONTGOMERY, DONALD NICHOLS AND PAUL FRANKLIN.  THERE WERE OTHERS, OF COURSE. ANTON GETHERS, "GUS"; PAUL TAYLOR, "SOUTH"; AND BILL HILL, VINCENT HILL'S BROTHER.

THIS GROUP, AS YOU CAME TO LEARN, WAS VERY ORGANIZED OUT ON K STREET.  AND THE MONEY WAS GOOD.

IT COST A THOUSAND DOLLARS TO BUY A POUND OF MARIJUANA.  WHEN THAT POUND OF MARIJUANA WAS SOLD, THE PROFIT WOULD BE ANOTHER THOUSAND DOLLARS.  THEY MADE $2,000.00 OFF OF SELLING A POUND OF MARIJUANA.  SO THERE WOULD BE A THOUSAND-DOLLARS PROFIT OFF A POUND OF MARIJUANA.

THINK ABOUT IT.  OUTSIDE ALL DAY WITH YOUR FRIENDS, PEOPLE THAT YOU GREW UP WITH AND PEOPLE THAT YOU LIKED, AND MAKING THAT KIND OF MONEY.

AND THERE WAS ORDER TO IT.  PAUL FRANKLIN, WHEN HE WAS ASKED ON THE WITNESS STAND -- HE SAID "ROTATION. THAT'S WHAT WE, THE K STREET CREW -- THAT'S WHAT WE CALLED IT."

THERE WERE RULES THAT YOU KNOW WERE ENFORCED,

RULES THAT INCLUDED THAT ONLY THEY COULD DECIDE WHO WOULD SELL WITH THEM.

YOU HEARD THAT VINCENT HILL WOULD TAKE A BAT TO WOMEN TO GET THEM OFF HIS STREET.  HE DID THE SAME TO HIS BROTHER, AND HE DID IT MORE THAN ONCE.

YOU HEARD THAT DOWN ON K STREET WHEN THEY WERE SELLING MARIJUANA, THEY WOULD SELL IT IN WHAT WERE CALLED "DUBS," $20.00 BAGS, THE SMALLER BAGS THAT I HAVE UP HERE.

VINCENT HILL, IF SOMEBODY WANTED A $50.00 BAG, HE WAS TYPICALLY THE PERSON THAT WOULD BE WAVED TO TO MAKE THE $50.00 SALES.

RULES.  ORDER.  IF THE POLICE CAME INTO THE BLOCK, WHOEVER WOULD SEE THE POLICE OFFICER OF THE CREW WOULD LET THEM KNOW.  "5-0.  F.B.I.  POLICE."  AND EVERYTHING WOULD SHUT DOWN AND EVERYONE WOULD GO OFF.

THEY WEREN'T THAT WORRIED, YOU KNOW, BECAUSE, OF COURSE, IT WAS ONLY MISDEMEANOR CHARGES THAT THEY KNEW TO EXIST FOR MARIJUANA.  AND THEY WEREN'T THAT WORRIED BECAUSE THEY NEVER KEPT THE MARIJUANA ON THEM.  THEY KEPT IT IN A STASH.

AND THEY WEREN'T THAT WORRIED, LADIES AND GENTLEMEN -- YOU KNOW THAT'S TRUE -- BECAUSE PAUL FRANKLIN SAID TO YOU, "WE -- MEANING THE K STREET CREW -- "HAD OUR QUOTA AND THE POLICE HAD THEIRS."  SO IF THE POLICE DID COME BY AND TAKE SOMEONE'S STASH, WELL, THEY WOULD JUST WAIT

44

UNTIL THE POLICE WENT AWAY, AND THEY WOULD COME BACK OUT, THE SAME DAY, THE SAME SPOT. NO PROBLEM.

YOU SAW A VIDEOTAPE OF THAT. IT REALLY HAPPENED. THIS WAS THEIR BUSINESS. HOW DO YOU KNOW THAT THIS IS THE WAY THE K STREET CREW OPERATED? BECAUSE IN ADDITION TO WHAT THE WITNESSES DESCRIBED TO YOU, YOU SAW PHOTOGRAPHS AND YOU SAW VIDEOTAPES.

(SHOWING PHOTOGRAPH.)

TO THE LEFT, GARY PRICE. THE NEXT MAN IS A POTENTIAL BUYER. THE NEXT MAN, JEROME MARTIN. AND TO THE FAR RIGHT, VINCENT HILL. WORKING TOGETHER, LADIES AND GENTLEMEN.

MR. ZUCKER: YOUR HONOR, COULD I JUST ASK FOR THAT EXHIBIT NUMBER? IT WAS NOT IDENTIFIED.

THE COURT: I CAN'T HEAR YOU.

MR. ZUCKER: I JUST ASK FOR THE EXHIBIT NUMBER OF THE PHOTOGRAPH SHOWN. IT WAS NOT IDENTIFIED.

MS. CHATURVEDI: SP-6-76.

I DON'T INTEND TO GO THROUGH THE EXHIBIT NUMBERS, MR. ZUCKER.

SP-6-77 IS THE NEXT ONE IN THAT SERIES, LADIES AND GENTLEMEN. THOSE PHOTOGRAPHS THAT YOU SAW SHOW GARY PRICE, JEROME MARTIN AND VINCENT HILL ENGAGED IN THE DISTRIBUTION OF MARIJUANA TOGETHER.

AND WHEN I SAY "TOGETHER," YOU SAW THAT DAY, AFTER

45

DAY, AFTER DAY THESE MEN CONTINUED TO DISTRIBUTE AND POSSESS WITH THE INTENT TO DISTRIBUTE MARIJUANA.

WHEN I SAY "THESE MEN," LADIES AND GENTLEMEN, LET ME POINT OUT THAT THE PHOTOGRAPHS OF THE COOPERATING WITNESSES -- PEOPLE LIKE DONALD NICHOLS AND REGINALD SWITZER ALSO EXIST IN THESE PHOTOGRAPHS.

AND THE REASON THAT THAT'S IMPORTANT, SEEING COOPERATING WITNESSES IN THE PHOTOGRAPHS -- THE REASON WHY THAT'S SO IMPORTANT IS BECAUSE THAT SUPPORTS WHAT THE COOPERATING WITNESSES TOLD YOU HAPPENED.

THEY ARE NOT JUST SAYING WHAT THEY HEARD FROM SOMEPLACE ELSE. THEY ARE NOT LOOKING AT PHOTOGRAPHS OF OTHER PEOPLE AND SAYING, "I THINK THAT'S WHAT THEY ARE DOING." THEY LOOKED AT THESE PHOTOGRAPHS AND SAID, "THAT'S ME OUT THERE. THIS IS WHAT I WAS DOING, AND I WAS DOING IT WITH THEM. NOT JUST THAT ONE DAY, MS. CHATURVEDI. I WAS DOING IT FOR TEN YEARS. I WAS PART OF THIS K STREET CREW."

AND YOU HEARD FROM OFFICER ABDALLA ABOUT HOW THE OPERATION WORKED. AND IN LISTENING TO OFFICER ABDALLA, YOU HAVE COME TO LEARN, AS YOU HAVE FROM THE OTHER TESTIMONY, THAT EACH PERSON OUT THERE HAD A ROLE TO PLAY.

REMEMBER WHAT DEMETRIUS HUNTER, "MEECHIE," REFERRED TO VINCENT HILL AS? DON CORLEONE, THE GODFATHER. HE RAN THE SHOW. HE MADE SURE THOSE RULES WERE ENFORCED. HE MADE SURE THAT ONLY THESE MEN WERE ALLOWED TO SELL OUT ON

K STREET.

BUT HE WASN'T ALONE. NO GOOD BUSINESSMAN OPERATES ALONE. HE HAD HIS CREW. WHEN TRAFFIC WAS TIGHT ON K STREET, WHICH WAS MORE OFTEN THAN NOT -- YOU REMEMBER KEEPING CARS GOING IN AND OUT QUICKLY WAS IMPORTANT. YOU REMEMBER THAT AUDIOTAPE THAT YOU HEARD WHERE VINCENT HILL SAID "MEAT" HAD THE CARS ALL JAMMED UP.

AND YOU SAW THE VIDEO FROM THAT DAY, AND YOU SAW WHO HELPED VINCENT HILL OUT. GARY PRICE. GARY PRICE WAS WAVING ONE TRUCK IN AND GETTING ANOTHER CAR OUT BECAUSE THE BUSINESS HAD TO BE QUICK -- IN AND OUT. THAT WAS THE WAY TO MAKE SURE THAT EVERYONE WAS HAPPY. THAT THE PROFITS WERE THERE AND THAT EVERYONE COULD SHARE IN THEM EQUALLY.

AND SO WHEN I TALK ABOUT THESE DEFENDANTS ENRICHING THEMSELVES, THINK ABOUT HOW THEY ALL CAME TOGETHER. THINK ABOUT THE EVIDENCE THAT YOU HAVE, WHICH INCLUDES THE FACT THAT GARY PRICE, "HARRY O", ADMITTED THAT HE WAS A MARIJUANA DEALER. HE PLED GUILTY.

JEROME MARTIN, "PIMP", DID THE SAME THING. HE ADMITTED BEFORE A JUDGE THAT HE DISTRIBUTED MARIJUANA. IT'S LINKS IN A CHAIN, A CHAIN THAT SHOWS THIS GROUP WORKED TOGETHER COLLECTIVELY WITH THE GOAL OF MAKING PROFITS AND ENRICHING THEMSELVES.

WHAT KINDS OF PEOPLE WOULD COME DOWN TO K STREET TO BUY MARIJUANA? YOU HEARD THAT THERE WERE PEOPLE THAT

CAME AS FAR AWAY AS VIRGINIA, MARYLAND, WEST VIRGINIA AND PENNSYLVANIA TO BUY MARIJUANA. YOU SAW THE TAGS ON THE BACKS OF THE CARS THAT SUPPORTS THAT.

YOU HEARD ALSO THAT THERE WERE PROFESSIONALS. YOU SAW GOVERNMENT EMPLOYEE CARS AND TRUCKS COMING DOWN, PEOPLE BUYING MARIJUANA. ALL TYPES OF PEOPLE FROM ALL TYPES OF PLACES. THE EVIDENCE WAS PRESENTED TO YOU THROUGHOUT THE COURSE OF THIS TRIAL.

YOU WERE ALSO TOLD A GREAT DEAL ABOUT HOW MUCH MONEY WAS MADE BY THESE PEOPLE THAT SOLD MARIJUANA. AND I WANT TO TOUCH UPON A CONCEPT THAT JUDGE JACKSON IS GOING TO SPEAK WITH YOU ABOUT LATER. BUT IT'S A CONCEPT CALLED "REASONABLE FORESEEABILITY."

WHEN PEOPLE ARE PART OF A GROUP -- PART OF A CONSPIRACY, AS WE SUBMIT THAT THESE MEN ARE, EACH OF THEM DOES NOT HAVE TO SELL A THOUSAND KILOGRAMS OF MARIJUANA. YOU HEARD THAT FROM A NUMBER OF THE COOPERATORS. WHAT HAS TO HAPPEN -- WHAT HAS TO BE SHOWN IS THAT THE GROUP -- THE ENTIRE CONSPIRACY IS RESPONSIBLE FOR SELLING A THOUSAND KILOGRAMS OF MARIJUANA.

AND IN COMING TO THAT CONCLUSION, THERE IS THIS TERM "REASONABLE FORESEEABILITY." AND THAT MEANS THAT EACH OF THE DEFENDANTS IS RESPONSIBLE FOR HOW MUCH THE OTHER MEMBERS SOLD, SO LONG AS IT WAS REASONABLY FORESEEABLE TO THEM THAT THE OTHER CREW MEMBERS WOULD BE SELLING MARIJUANA.

App 280k

48

SO, FOR EXAMPLE, "BUTCHIE" -- REMEMBER "BUTCHIE" WAS SOMEONE THAT YOU HEARD SUPPLIED A NUMBER OF THE DEFENDANTS WITH MARIJUANA. YOU HEARD THAT HE SUPPLIED GARY PRICE, "HARRY O".

NOW, WHEN "HARRY O" GOES TO "BUTCHIE" AND GETS POUNDS OF MARIJUANA FOR HIMSELF, IS IT REASONABLY FORESEEABLE TO "HARRY O" -- TO GARY PRICE -- THAT "BUTCHIE" WOULD BE SELLING MARIJUANA TO OTHER MEMBERS OF THIS CONSPIRACY? AND IF THE ANSWER TO THAT QUESTION IS "YES," GARY PRICE IS RESPONSIBLE FOR THAT AMOUNT, WHICH IS REASONABLY FORESEEABLE TO HIM, THE SAME WAY THAT SAM CARSON, "CHIN", IS GOING TO BE RESPONSIBLE FOR THE AMOUNT OF MARIJUANA THAT VINCENT HILL SOLD.

AND YOU KNOW THAT SAM CARSON WAS OUT THERE SELLING MARIJUANA. YOU HEARD THAT HE SOLD MOSTLY AT NIGHT, AND OFTENTIMES HAD A DISGUISE, A WIG OF SORTS, TO KEEP HIM OUT OF EVERYONE'S VIEW.

HE WASN'T OUT THERE ON THE DAY-TO-DAY VIDEOTAPES LIKE YOU SAW, BUT YOU KNOW HE WAS SELLING MARIJUANA, AND YOU KNOW HE WAS PART OF THIS CREW.

SO FOR SAM CARSON, THE QUESTION IS WAS IT REASONABLY FORESEEABLE TO HIM THAT ANOTHER MEMBER OF THIS CREW, VINCENT HILL, WAS SELLING MARIJUANA. IF THE ANSWER TO THAT IS "YES," THEN SAM CARSON IS RESPONSIBLE FOR THE AMOUNT OF MARIJUANA THAT VINCENT HILL SOLD.

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 121 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 434 of 443
Case 1:98-cr-00329-RCL    Document 983    Filed 03/11/03    Page 1 of 72



1

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C.<br>. June 26, 2001 |
| vs. | . 2:18 p.m. |
| VINCENT HILL,<br>JEROME MARTIN,<br>SAMUEL CARSON,<br>WILLIAM K. SWEENEY,<br>SEAN COATES, | . (AFTERNOON SESSION) |
| Defendants | . |

**FILED**

**MAR 1 1 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | . |
| Government, | . |
| | . Docket No. CR 99-348 |
| vs. | . |
| GARY PRICE, | . |
| Defendant. | . |

### TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001



BEVERLY J. BYRNE, OFFICIAL COURT REPORTER        I IA 2625

Case 1:98-cr-00329-RCL   Document 1375-5   Filed 04/06/26   Page 122 of 166
USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 435 of 443
Case 1:98-cr-00329-RCL   Document 983   Filed 03/11/03   Page 2 of 72

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

18

while he was locked up called down to his grandmother's house and had a conversation with Arthur Rice and with Sean Coates. And in the course of that conversation Jermaine Hall made it clear what was to happen to Michael Jones.

So when Sean Coates gets off the phone, ladies and gentlemen, Sean Coates tells Arthur Rice, we got to go take care of this witness. And where do they go from there? Arthur Rice told you that he and Raymond Washington and Gus and Birdy went up looking for Michael Jones.

And let me add one more person. Robert Smith, Butchie, told Agent Lisi that Draper had confessed to him that Draper had gone along as well, too. And you heard from Agent Lisi that Arthur Rice had said the same thing.

So these men, these defendants, go up looking to kill a witness. June 28, 1992, Michael Jones is in a back alley being chased down and gunned down by Sean Coates. Amazingly enough, Michael Jones survived.

And as a result of that, because Meechie's family failed him, you heard that Clifton Edwards had to take a plea to that shooting that he did just a week before of Jermaine Hall.

1992, June of 1992, that was a shooting directly as a result of the beef with Condon Terrace, and one year later the beef lived on. You know that in July of 1993, Glen Jenkins was murdered by William Sweeney, Draper, and Sean

19

Coates, Birdy.

And recall if you will why it was that Glen Jenkins, who had nothing to do with anything regarding that beef, nothing at all, why it was that Glen Jenkins was murdered. You know why he was murdered because you know what happened the day before the murder of Glen Jenkins.

You know on July 6, 1993, down in the 200 block of K Street, Reginald Switzer and Paul Franklin were shot, and that they believed, along with their friends, that the people responsible for that shooting were Condon Terrace.

Paul Franklin told you, in fact, the day after he was shot on this very day, July 7, 1993, he was laid up in the hospital. And while he was in the hospital, he got a visit. He had a visit from his good friend, Sean Coates. And Sean Coates said to him, don't worry about it. Me and Shorty went over there and took care of that for you.

And Paul Franklin told you what he took that to mean. He told you that what he took that to mean was that Draper, whose other nickname you know is Shorty, and Birdy, Sean Coates, had gone over to Condon Terrace and been involved in a retaliation shooting.

Paul Franklin told you that, in fact, he learned that Glen Jenkins had been murdered, and I think he used a phrase at one point with me, Paul Franklin, saying, it doesn't take a rocket scientist. Put two and two together, ladies and

gentlemen, and you know that that murder of Glen Jenkins was the direct result of the beef with Condon Terrace.

Now, I told you what Paul Franklin interpreted that statement to mean. Don't worry about it. Me and Shorty went over there and took care of that for you. But the ultimate question is how do you look at that statement? And when you stop and reflect on what Birdy said, what Sean Coates said to his good friend, Paul Franklin, think about what, in fact, did happen to Glen Jenkins.

You know that on July 7, 1993, Glen Jenkins was in his own neighborhood minding his own business with his own friends. You know that it was raining that night. And from what the medical examiner told you, you heard that Glen Jenkins could have run some distance, over 130 feet, with those gunshot wounds in his legs from which he died.

You ask yourself if that murder has something to do with the beef with Condon Terrace. You ask yourself if the statement that Birdy made was nothing more than a confession, telling his good friend, we helped you out. An attack on one was an attack on all of them.

Ladies and gentlemen, again, with the murder of Glen Jenkins, we don't know who it was between Draper, William Sweeney and Birdy, Sean Coates who actually fired the bullets that killed Glen Jenkins. There is evidence of two types of guns being used for that murder, but we don't know which

21

bullet actually went into Glen Jenkins.

But it doesn't matter.  They were both in Condon Terrace on July 7, 1993 to exact revenge for the shooting of their friends the day before.  They are both, William Sweeney and Sean Coates, responsible for the murder of Glen Jenkins.

There were some beefs you heard of that were inherited over time.  Donnell Whitfield, Robocop, he was murdered over in Sursum Corda, and you heard about Robocop, a couple of things about him.

One was that Wayne Perry didn't like him.  Wayne Perry whose photograph I've placed up there now.  Wayne Perry had a problem with Robocop.  One reason not to like him.

You also heard that Robocop had shot Reginald Switzer.  Reginald Switzer, part of the family.  Reason number two not to like Robocop.

But it was reason number three that would prove to be deadly, because reason number three was simply this.  He shoved Draper at a nightclub.  And when you put all those things together, that was reason enough for William Sweeney to murder Robocop.

And what is it that you heard about the murder of Donnell Whitfield which was committed in September, 1994?  You know that there was an eyewitness, Robocop's cousin, John Venable.  John Venable came into this courtroom, and in a solemn and sincere tone told you that he lost something very

precious to him in September of 1994, he lost his cousin.

John Venable had seen his cousin earlier in the day, but that in the afternoon at some point Robocop went outside to do some gambling. And John Venable described for you that as he looked out from his window up here (indicating), he looked out onto a breezeway.

He heard gunshots, and as his attention was drawn to this breezeway from where he heard the gunshots, he saw someone running. And the person that he saw running had a gun in his hand. And the person that he saw running was someone that he had known since he was eight or nine years old, William Sweeney.

John Venable saw William Sweeney jump into that car and drive off. John Venable didn't know exactly what had happened, so he went downstairs. He goes into that breezeway, the breezeway that you saw photographs of, and in there, ladies and gentlemen, he found his cousin dying.

John Venable had every reason in the world to keep his mouth shut. For although John Venable was his blood, John Venable's life was threatened.

Remember if you will, the gestures made by Erik Jones, Irky Berk, after John Venable witnessed this crime. Didn't take much more than that. John Venable received phone calls threatening his life and his family's life. And John Venable had a lot of family, 11 siblings he told you about,

23

all of whom, including his mother, lived in Sursum Corda after this murder.

John Venable had every reason to stay quiet. But he didn't. He knew what he had seen. He knew William Sweeney had the gun in his hand. He knew William Sweeney killed his cousin. But he was afraid.

So rather than immediately say, I saw William Sweeney do it, he put William Sweeney there, hoping, hoping and praying that the police would put the connection together. Of course, that didn't happen. And over time John Venable gained some strength. He and his family were moved from Sursum Corda.

And once he felt safe, he did something which would lead to charges being filed against William Sweeney. John Venable said, you know what? It isn't that I just saw William Sweeney there. I saw him running there right after the gunshots with a gun in his hand. He's the killer.

Ladies and gentlemen, ask yourself if John Venable has any reason whatsoever to say William Sweeney did it if that isn't the way it happened. John Venable's cousin was murdered, and John Venable saw it. And he came into this courtroom, and he faced the man that he believes killed his cousin and said, that's William Sweeney.

And you have more than the testimony of John Venable, although you could convict on that alone. You have

24

more, ladies and gentlemen, because I mentioned to you just a few minutes ago, there was an execution of a search warrant at 211 I Street.

Search warrant was done in November of 1994, and it was done by members of the FBI, and it was done when William Sweeney was in that house, and from that search warrant, we got the murder weapon, the gun that William Sweeney used to kill Donnell Whitfield, a perfect match.

And, of course, again, I can stop, and I can get another board, and I can move on, but there's more evidence than that, because William Sweeney confessed what he had done to Robocop to his uncle.

If Robert Smith had been permitted to be alive to come into this courtroom, you would have heard it from Robert Smith, Butchie's, lips. But the information came to you anyway, because Robert Smith told Agent Lisi, yeah, Draper told me, told me that he killed Robocop.

And it wasn't just Butchie alone who was telling you that. You know that William Sweeney spoke with Reginald Switzer, Charles Bender, L.A., and Arthur Rice. He told each and every one of these men that he had killed Robocop.

Arthur Rice not only spoke to William Sweeney about the murder of Robocop, Arthur Rice spoke to his good friend, Erik Jones, Irky Berk, whose picture is also on that board in the bottom right-hand corner. Irky Berk, who you know is Art

Case 1:98-cr-00329-RCL    Document 1375-5    Filed 04/06/26    Page 130 of 166
USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 436 of 443
Case 1:98-cr-00329-RCL    Document 983    Filed 03/11/03    Page 29 of 72

29

cousin, T.T. She sees the blood, and she sees a baby, and no one is moving.

Crystal turns and runs down the hallway, grabs her child, runs out that door, and she's thinking, they must be playing, they must be playing, they must be playing, can't be happening. But it was. Because when the police showed up and wanted to find out what was going on, they took Crystal back.

Crystal goes into the apartment with them, and she's thinking T.T. is down in the living room, her bedroom, and one of the officers goes into Terita and Crystal's bedroom, that bedroom with the door open, and the officer comes out holding baby, C.J., and says, there's a body in there, Terita.

Both girls dead. You heard from the officers that came to process that crime scene that the children, the babies, had blood all over them. They had brain matter in their hair. But amazingly enough, they were fine. They were just left there overnight in their mother's blood.

From that crime scene, ladies and gentlemen, and in speaking with Wanda Edwards and Crystal Bobbitt and Renee Brown, the police had some evidence. But that case you heard remained open for several years. Not until James Montgomery came forward were the police able to fit those clues and find the support needed to come to the conclusion which the evidence supports, which is that Sam Carson murdered those girls.



Clerks File

1

UNITED STATES DISTRICT COURT **FILED**
FOR THE DISTRICT OF COLUMBIA

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES,
　　　　GOVERNMENT,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
VS.　　　　　　　　　　　　　　　　:　CR. NO. 98-329
　　　　　　　　　　　　　　　　　　　:
VINCENT HILL,　　　　　　　　　　　:
JEROME MARTIN,　　　　　　　　　　　:
SAMUEL CARSON,　　　　　　　　　　　:
WILLIAM K. SWEENEY,　　　　　　　　:
SEAN COATES,　　　　　　　　　　　　:
　　　　DEFENDANTS.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
UNITED STATES　　　　　　　　　　　:
　　　　GOVERNMENT,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
VS.　　　　　　　　　　　　　　　　:　CR. NO. 99-348
　　　　　　　　　　　　　　　　　　　:
GARY PRICE,　　　　　　　　　　　　:
　　　　DEFENDANT　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:

WASHINGTON, D. C.
JUNE 27, 2001
(1:10 P.M.)
(P. M. SESSION)
(VOLUME A)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:　　　　　　PHYLLIS MERANA
　　　　　　　　　　　　　　　6816 U. S. DISTRICT COURT
　　　　　　　　　　　　　　　3RD & CONSTITUTION AVE., N.W.
　　　　　　　　　　　　　　　WASHINGTON, D. C. 20001

724

2



FOR THE GOVERNMENT:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             555 4TH ST., N.W.
                             WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:      CHRISTOPHER DAVIS, ESQ.
                             601 INDIANA AVE., N.W.
                             #910
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:    JOANNE HEPWORTH, ESQ.
                             305 H STREET, N.W.
                             2ND FLOOR
                             WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:    JOSEPH BESHOURI, ESQ.
                             LEXI NEGIN-CHRIST, ESQ.
                             419 7TH STREET, N.W.
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:   STEVEN R. KIERSH, ESQ.
                             717 D STREET, N.W.
                             SUITE 400
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:    FREDERICK JONES, ESQ.
                             901 6TH STREET, S.W.
                             #409
                             WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:     JONATHAN ZUCKER, ESQ.
                             601 INDIANA AVE., N.W.
                             #901
                             WASHINGTON, D. C.  20004

3

I-N-D-E-X

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT      PAGE 6

YOU LEARNED DURING THE COURSE OF THIS TRIAL THAT "BUTCHIE" WAS A COOPERATING WITNESS, AND YOU CAME TO LEARN DURING THE COURSE OF THIS TRIAL THAT HIS NEPHEW, WILLIAM SWEENEY, "DRAPER," FOUND OUT THAT FACT AS WELL, AND THAT AS A RESULT OF "DRAPER" FINDING OUT OR BELIEVING THAT "BUTCHIE" WAS A COOPERATING WITNESS, WILLIAM SWEENEY SET A BALL IN MOTION THAT WOULD LEAD TO THE DEATH -- THE MURDER OF ROBERT SMITH BY SAM CARSON.

YOU HEARD THAT WILLIAM SWEENEY, EVEN THOUGH HE WAS RELATED TO ROBERT SMITH, MADE IT ABUNDANTLY CLEAR THAT THE LOYALTY THAT THE TWO MEN HAD BETWEEN "DRAPER" AND SWEENEY -- IT STOPPED THE MINUTE THAT ROBERT SMITH, "BUTCHIE," STARTED COOPERATING.

YOU HEARD THE PHRASE, "FAMILY OR NOT, HE HAD TO GO."

AND, IN FACT, IT'S TRUE THAT ROBERT SMITH WAS COOPERATING. AS YOU HEARD, ROBERT SMITH TOLD AGENT LISI ABOUT A NUMBER OF CONVERSATIONS THAT HE, "BUTCHIE," HAD HAD WITH DRAPER -- CONVERSATIONS WHERE "DRAPER" CONFESSED NOT ONLY HIS OWN ROLE IN THE TRIPLE HOMICIDE, BUT ACKNOWLEDGED THAT HE WAS THERE WITH SAM CARSON, SEAN COATES AND JAMES MONTGOMERY.

YOU HEARD ALSO THAT "DRAPER" ADMITTED TO HIS UNCLE THAT HE HAD KILLED "ROBOCOP"; THAT HE HAD KILLED "WHITEY"; THAT, IN FACT, HE HAD PARTICIPATED IN THE KIDNAPPING OF

ANTHONY PRYOR, "WYSOCKI," AND THAT WHEN "DRAPER" COMMITTED THAT KIDNAPPING OF "WYSOCKI," HE WAS ACCOMPANIED BY SEAN COATES, SAM CARSON AND VINCENT HILL.

"DRAPER" ALSO TOLD HIS UNCLE "BUTCHIE" THAT HE, "DRAPER," ALONG WITH OTHERS, WERE FOLLOWING KENNY ADAMS, ANOTHER GOVERNMENT WITNESS, AND THAT THE PLAN WAS TO FIND AND LOCATE KENNY ADAMS WITH THE INTENTION OF KILLING HIM.

SO, YES, OF COURSE, ROBERT SMITH WAS A COOPERATING WITNESS, JUST LIKE "DRAPER" THOUGHT. AND, YES, OF COURSE, "BUTCHIE" WOULD HAVE TOLD YOU ALL ABOUT THOSE CONVERSATIONS.

"BUTCHIE" TOLD AGENT LISI SOMETHING ELSE IN THE COURSE OF ALL OF THOSE MEETINGS. OVER, AND OVER, AND OVER AGAIN, UNTIL IT PROBABLY RANG IN AGENT LISI'S EARS, "BUTCHIE" TOLD AGENT LISI, "IF ANYTHING HAPPENS TO ME -- IF ANYTHING HAPPENS, IT'S `SHORTY,'" HIS NEPHEW, "DRAPER."

LADIES AND GENTLEMEN, YOU HEARD FROM JAMES MONTGOMERY THAT HE CAME TO FIND OUT THROUGH SAM CARSON THAT "BUTCHIE" WAS A COOPERATOR. AND A CONCERN AROSE THAT SINCE "BUTCHIE" KNEW SO MUCH ABOUT THIS TRIPLE MURDER, THAT HE HAD TO BE KILLED.

JAMES MONTGOMERY AND SAM CARSON HAD A PLAN -- A PLAN TO FIND AND KILL "BUTCHIE" AND THEN TO TAKE THE GUN THAT THEY WOULD USE TO MURDER HIM, THROW IT OVER THE SOUTH CAPITOL STREET BRIDGE AND HEAD OVER TO 37TH WHERE THEY WOULD HAVE AN ALIBI.

AND ON JUNE 16, 1997, YOU LEARNED THAT PLAN WAS PUT INTO EFFECT.  THAT ON JUNE 16, 1997, SAM CARSON TOOK JAMES MONTGOMERY'S CAR.  THAT THAT SAME DAY, JAMES MONTGOMERY CAME TO LEARN THAT ROBERT SMITH, IN FACT, HAD BEEN MURDERED AT HALF AND O STREETS, SOUTHWEST.

AND WHEN SAM CARSON RETURNED WITH JAMES MONTGOMERY'S CAR, HE TOLD JAMES MONTGOMERY TWO THINGS.  "ONE, DON'T TAKE THAT CAR BACK UP TO HALF AND O STREET, AND, TWO, WE'RE ALL RIGHT.  NO MORE `BUTCHIE.'  NO MORE WITNESSES."

AND PERHAPS THEY THOUGHT THAT DAY THEIR PROBLEMS WERE OVER BECAUSE THEY HAD MURDERED THE WITNESS THAT THEY WERE SO CONCERNED ABOUT.

ROBERT BERNARD SMITH SUSTAINED SEVEN GUNSHOT WOUNDS TO THE HEAD, LADIES AND GENTLEMEN -- SEVEN GUNSHOT WOUNDS TO THE HEAD, AND A NUMBER OF THOSE GUNSHOT WOUNDS YOU HEARD ABOUT HAD STIPPLING ON THEM, AND YOU KNOW THAT FACT MEANS THAT THE DISTANCE BETWEEN THE PERSON HOLDING THAT GUN AND ROBERT SMITH WAS LESS THAN THIS -- WITHIN TWO FEET OR LESS.  (INDICATING.)  IT WAS AN EXECUTION IN THE MIDDLE OF THE DAY, IN THE MIDDLE OF OUR CITY.

AND, LADIES AND GENTLEMEN, YOU KNOW THAT ONCE ROBERT SMITH WAS MURDERED, WE WERE DENIED THE OPPORTUNITY TO BRING ROBERT SMITH INTO THIS COURTROOM.

AND IT IS THAT PATTERN OF KILLING WITNESSES THAT

10

YOU HEARD SO MUCH ABOUT.  BUT LET ME PAUSE ONE MORE TIME ON THE MURDER OF ROBERT SMITH AND REMIND YOU OF SOME QUESTIONS THAT WERE ASKED OF AGENT LISI WHEN HE TESTIFIED.

MR. KIERSH ASKED AGENT LISI, "WELL, YOU DIDN'T VIDEOTAPE ROBERT SMITH'S CONVERSATIONS.  YOU DIDN'T AUDIOTAPE THOSE CONVERSATIONS, DID YOU?  YOU DIDN'T PRESERVE IT IN ANY WAY SO THAT THE JURY COULD HEAR FROM ROBERT SMITH'S OWN LIPS WHAT HE HAD TO SAY?"

AND RECALL WITH ME, IF YOU WILL, WHAT AGENT LISI SAID IN RESPONSE.  "NO, I DIDN'T DO THAT BECAUSE I FULLY EXPECTED ROBERT SMITH TO BE HERE."

AND ISN'T THAT WHAT WE EXPECT IN THE SYSTEM OF OUR JUSTICE THAT WE HAVE IN THIS COUNTRY?  WE EXPECT PEOPLE LIKE ROBERT SMITH TO WALK IN IN FRONT OF ALL OF YOU FOLKS, GO UP ONTO THAT WITNESS STAND, RAISE HIS RIGHT HAND AND FOR YOU TO DECIDE.

SO WHEN YOU'RE LOOKING TO BLAME SOMEONE FOR THE ABSENCE OF ROBERT SMITH, LOOK NO FURTHER.  LOOK ACROSS THE ROOM.  THEY ARE THE REASONS YOU DIDN'T HEAR FROM ROBERT SMITH.  THEY ARE THE ONES WHO WERE TOO SCARRED TO LET ROBERT SMITH WALK INTO THE COURTROOM.  THEY WERE COWARDS.

AND IF THEY HAD HAD A CHANCE, THEY WOULD HAVE MURDERED JAMES MONTGOMERY BECAUSE ONCE JAMES MONTGOMERY, LADIES AND GENTLEMEN, BECAME A COOPERATING WITNESS, SAM CARSON AND WILLIAM SWEENEY KNEW THAT THEY WERE SUNK.

11

YOU HEARD THAT SAM CARSON TALKED TO BOTH EUGENE BYARS AND DONALD NICHOLS ABOUT HIS CONCERNS ABOUT JAMES MONTGOMERY TESTIFYING -- JAMES MONTGOMERY, A WITNESS SAM CARSON IDENTIFIED, SAYING, "YEAH," HE HAD BEEN INVOLVED IN THIS MURDER -- THE MURDER OF "LONNIE" GASKINS AND DARNELL MACK, AND THAT BECAUSE JAMES MONTGOMERY CRACKED, HE WAS CONCERNED.

WILLIAM SWEENEY SAID MORE THAN THAT. WILLIAM SWEENEY, WHILE IN CUSTODY, SPOKE WITH DEMETRIUS HUNTER "MEECHIE"; CHARLES BENDER, L.A.; AND ALSO THAT ELDERLY GENTLEMAN THAT I REFERRED TO YOU YESTERDAY, THEODORE WATSON.

AND WHAT DID WILLIAM SWEENEY SAY TO THEODORE WATSON? ONE OF THE THINGS HE SAID, YOU HEARD, WAS WILLIAM SWEENEY SAID, "YEAH, WE HAD TO LAY DOWN SOME BITCHES." THAT'S HOW WILLIAM SWEENEY DESCRIBED IT.

AND HE SAID THAT IF THEY COULD HAVE FOUND JAMES MONTGOMERY, THEY'D HAVE KILLED HIM, BUT THE FEDS HAD HIM WRAPPED TOO TIGHT.

WE DID. JAMES MONTGOMERY, YOU HEARD, WAS IN THE WITNESS PROTECTION PROGRAM TO KEEP HIM ALIVE SO THAT, IN FACT, YOU WERE ABLE TO SEE JAMES MONTGOMERY, AND YOU CAN LOOK AT HIM AND EVALUATE HIS TESTIMONY, JUST LIKE OUR SYSTEM OF JUSTICE DEMANDS.

AND YOU KNOW THAT THEY WOULD HAVE KILLED JAMES MONTGOMERY, LADIES AND GENTLEMEN, BECAUSE IT WAS A

12

PATTERN -- A PATTERN THAT THEY HAD TO FIND WITNESSES -- TO

FIND THEM EITHER TO INTIMIDATE THEM TO GET THEM TO LIE OR TO

KILL THEM.

AND WHEN I SAY "PATTERN," I MEAN BECAUSE THIS

BEHAVIOR DIDN'T HAPPEN JUST ONCE. LET'S GO BACK TO THE

MURDER OF CURTIS EDWARDS.

MS. HEPWORTH: YOUR HONOR, I APOLOGIZE. MAY WE

APPROACH WITH THIS?

THE COURT: YES.

(BENCH CONFERENCE.)

13

(BENCH CONFERENCE.)

MS. HEPWORTH: I REALLY DO APOLOGIZE, YOUR HONOR, BUT THIS BOARD SAYS THAT CURTIS EDWARDS WAS MURDERED AT 37TH AND -- I CAN'T SEE EXACTLY WHAT IT SAYS, BUT NONE OF THAT IS IN EVIDENCE. THE TESTIMONY --

MS. CHATURVEDI: YOUR HONOR, THESE BOARDS WERE IN THE COURTROOM YESTERDAY. MS. HEPWORTH DIDN'T BRING IT TO MY ATTENTION YESTERDAY. AND, FURTHERMORE, THIS IS EVIDENCE THAT HAS ALL BEEN PUT BEFORE THIS JURY ABOUT THE MURDER OF CURTIS EDWARDS.

THE COURT: YOU'RE TELLING ME THERE IS EVIDENCE TO SUPPORT WHAT'S ON THE BOARD?

MS. CHATURVEDI: ABSOLUTELY, YOUR HONOR.

MS. HEPWORTH: NO, THERE ISN'T, YOUR HONOR. THERE WAS NO TESTIMONY --

THE COURT: THE OBJECTION IS OVERRULED. THE JURY'S RECOLLECTION WILL CONTROL.

MS. HEPWORTH: BUT THERE WAS NO TESTIMONY.

THE COURT: YOU CAN ARGUE THAT THE BOARD IS INACCURATE.

(END OF BENCH CONFERENCE.)

14

(END OF BENCH CONFERENCE.)

THE COURT:  MS. CHATURVEDI, CAN YOU MOVE THAT SO I CAN OBSERVE YOU WHILE YOU ARE MAKING YOUR ARGUMENT.

MS. CHATURVEDI:  YES, SIR.  IS THAT BETTER?

THE COURT:  EITHER STEP FORWARD OF IT OR STAY BEHIND IT.  BUT AS IT STANDS RIGHT NOW, IT BLOCKS MY VIEW OF YOU COMPLETELY.

MS. CHATURVEDI:  IS THAT BETTER?

THE COURT:  THANK YOU.

MS. CHATURVEDI:  LADIES AND GENTLEMEN, THINK BACK, IF YOU WILL, TO THE MURDER OF CURTIS EDWARDS, THE MURDER COMMITTED BY JEROME MARTIN.

BACK IN 1992, YOU KNOW THAT THE "BEEF" BETWEEN 58TH AND 37TH WAS AT A HIGH.  AND YOU KNOW THAT BACK IN 1992, JEROME MARTIN WAS UP ON THE CIRCLE, 37TH AND RIDGE ROAD, WHEN A CAR CAME UP, A CAR WITH TINTED WINDOWS.  AND WHEN THAT CAR MADE ITS WAY TO THE TOP OF THE CIRCLE, JEROME MARTIN HAD SOMETHING TO SAY ABOUT IT.  "WHO'S GOING TO TAKE CARE OF THAT?  WHO'S GOING TO DO SOMETHING?"

AND AT THAT MOMENT JEROME MARTIN STEPPED UP AND HE HANDED A GUN -- HE HANDED A GUN OVER TO HIS GOOD FRIEND AND CREW MEMBER ANTONIO KNIGHT, "PUG".  AND WITH THAT GUN, YOU CAME TO LEARN ANTONIO KNIGHT TOOK IT AND SHOT AND KILLED CURTIS EDWARDS AND INJURED KEITH JONES AND RICHARD BURTON.

AND AS I TOLD YOU YESTERDAY, THE FACT THAT JEROME

15

MARTIN HANDED THAT GUN OVER TO ANTONIO KNIGHT MAKES HIM

GUILTY OF THAT MURDER BECAUSE HE WAS THE AIDER AND ABETTOR

IN THE COMMISSION OF THAT MURDER AND THE TWO SHOOTINGS.

NOW, YOU CAME TO LEARN IN THE COURSE OF THIS

TRIAL, AS WELL, THAT WHILE THE MURDER OCCURRED IN 1992,

JEROME MARTIN WAS NOT TRIED FOR THAT MURDER UNTIL 1996.

FROM FEBRUARY OF 1996 UNTIL THE TRIAL IN OCTOBER

OF 1996, JEROME MARTIN REMAINED IN CUSTODY.  AND WHEN HE WAS

IN CUSTODY, THERE WAS WORK TO BE DONE.  WITNESSES.  WHICH

WITNESSES DID YOU HEAR ABOUT?

YOU CAME TO LEARN, LADIES AND GENTLEMEN, THAT

THERE WERE A NUMBER OF PEOPLE, INCLUDING CHRISHAUNA GLADDEN,

ANOTHER WOMAN BY THE NAME OF ROBIN, "FLIP," "DEBOO" -- ALL

OF THEM WITNESSES TO THE CRIMES COMMITTED BY JEROME MARTIN

AND THE MURDER OF CURTIS EDWARDS.

AND ONCE MR. MARTIN WAS INCARCERATED, HE TURNED TO

THOSE PEOPLE WHO HE HAD TURNED TO TIME AND TIME BEFORE, HIS

CREW, HIS FAMILY.

HE SAID WHILE HE WAS INCARCERATED, IN TALKING TO

CHARLES BENDER, "L. A.," THAT THERE WAS A BITCH THEY HAD TO

GET AT.

HE SAID ALSO TO EUGENE BYARS IN THE COURSE OF

BEING INCARCERATED THAT HE HAD GOTTEN ONE WITNESS TO CHANGE

HIS STORY, A WITNESS WHO HAD A MOLE ON HIS NECK.  THAT

WITNESS YOU CAME TO LEARN, IN FACT, WAS A GUY BY THE NAME OF

16

"DEBOO" WHO DID HAVE A MOLE ON HIS NECK AND WHO, BY THE WAY, DID CHANGE HIS STORY.

BUT THERE WAS MORE WORK TO BE DONE THAN THAT. JEROME MARTIN CALLED HIS GOOD FRIEND, PAUL FRANKLIN, "DIRTY MEAT." AND HE GAVE HIM A LIST -- A LIST OF NAMES THAT INCLUDED ROBIN AND "FLIP."

AND YOU LEARNED, LADIES AND GENTLEMEN, THAT PAUL FRANKLIN, WITH THOSE NAMES, TURNED TO SAM CARSON AND JAMES MONTGOMERY TO CARRY OUT HIS WISHES, WHICH WERE TO KILL THE WITNESSES.

PAUL FRANKLIN DESCRIBED FOR YOU A NUMBER OF OCCASIONS WHERE HE WOULD GO WITH JAMES MONTGOMERY AND SAM CARSON, LOOKING TO FIND ROBIN OR "FLIP," KNOWING THAT THE PURPOSE IN LOCATING THOSE PEOPLE WAS TO KILL THEM.

SAM CARSON DIDN'T RELY SIMPLY ON INFORMATION COMING FROM PAUL FRANKLIN. SAM CARSON TURNED TO OTHERS TO ASSIST IN THIS OPERATION OF HIS.

YOU HEARD IT BEING DESCRIBED BY "CHIN" AS A FULL-TIME JOB. SAM CARSON TURNED TO ARTHUR RICE AND DONALD NICHOLS.

DONALD NICHOLS WAS BEEN DANCING AT A NIGHTCLUB WITH A YOUNG LADY, WHO HE LATER CAME TO FOUND OUT WAS A WITNESS AGAINST "PIMP." AND WHAT DID SAM CARSON TELL DONALD NICHOLS TO DO? "GET HER SOMEPLACE ON HER OWN." GET HER SOMEPLACE ON HER OWN SO `CHIN' COULD KILL HER.

SAM CARSON TURNED ALSO TO ARTHUR RICE AND SAID TO ARTHUR RICE, KNOWING THAT ARTHUR RICE HUNG OUT AT 37TH, "HEY, WHEN YOU GO UP THERE, THERE IS THIS GIRL -- THIS GIRL WHO LIVES AT THE TOP OF THE CIRCLE. YOU TAKE A LEFT, GO DOWN SOME HOUSES, AND IT'S ON THE RIGHT, RIGHT BY THE STEPS. THAT GIRL -- SHE IS A WITNESS AGAINST `PIMP.' KILL HER. AND IF YOU DON'T KILL HER, MAKE SURE YOU KNOW WHO SHE IS AND TELL ME SO I CAN KILL HER." THAT WAS THE JOB.

WELL, ULTIMATELY YOU KNOW WHO SAM CARSON TURNED TO. SAM CARSON TURNED TO HIS CLOSE FRIEND, JAMES MONTGOMERY. AND ON OCTOBER 5TH, 1996, FOUR DAYS BEFORE THE TRIAL WAS TO BEGIN AGAINST JEROME MARTIN, SAM CARSON AND JAMES MONTGOMERY WENT TO THE SAFEWAY AT THE WATERSIDE MALL WHERE THEY GOT SOME FOOD AND THEY GOT SOME GARDEN GLOVES. AND THEY HAD A GUN.

AND THEY WENT UP TO 37TH, AND THEY HID IN A VACANT HOUSE. AND YOU HEARD THAT WHILE THEY HID IN THAT VACANT HOUSE, THEY WAITED FOR HOURS PATIENTLY.

AND AT ONE POINT DURING THAT EVENING, "BIG JIM," ONE OF THE GUYS FROM 37TH, JOINED THEM. AND WHEN "BIG JIM" JOINED THEM, A CAR CAME UP.

YOU SEE THERE WAS TO BE A PARTY THAT NIGHT AND "CHRISSY" WAS TO ATTEND THE PARTY. SO WHEN THAT CAR PULLED UP AND THE THREE GIRLS GOT OUT, "BIG JIM" KNEW WHO THEY WERE FROM THE NEIGHBORHOOD.

AS THE GIRLS GET OUT OF THE CAR, "BIG JIM" SAYS "RASHIDA, TRINA, AND CHRISSY."  "BIG JIM" LEAVES.  "CHIN" AND JAMES HAD BUSINESS.  AND THEY WAITED SOME MORE.

YOU HEARD HOW THE GIRLS WENT INTO THE HOUSE, AND YOU HEARD THAT THEY CAME OUT, FIRST CHRISSY, THEN TRINA AND THEN RASHIDA.

JAMES MONTGOMERY WAS PEERING OUT OF A CRACK IN THAT WINDOW, AND "CHIN" SAID, "TELL ME WHEN."  AND AS RASHIDA LOCKED THE DOOR SO THAT THEY COULDN'T GO BACK INSIDE, JAMES MONTGOMERY YELLED, "GO.  GO.  GO."

SAM CARSON RAN OUT OF THAT HOUSE AND STRAIGHT TO CHRISHAUNA GLADDEN.  HE SHOT HER WHILE SHE STOOD, AND WHEN SHE FELL, HE SHOT HER SOME MORE.  AND OFF THEY RAN.

AND REMEMBER, IF YOU WILL, LADIES AND GENTLEMEN, HOW IT WAS THAT WITNESSES DESCRIBED THE SHOOTER.  THAT HE WAS WEARING A DARK-COLORED TOP, BUT THAT HE HAD SOMETHING WHITE -- A WHITE HOOD AROUND HIS HEAD.

AND REMEMBER, IF YOU WILL, THAT AN EXECUTION OF A SEARCH WARRANT OCCURRED AT THE HOME OF JEROME MARTIN.

MS. HEPWORTH:  OBJECTION.

MS. CHATURVEDI:  I AM SORRY.  AT THE HOME OF SAM CARSON ON PEARL DRIVE.  THE F.B.I. SEARCHED SAM CARSON'S HOME, AND LOOK WHAT THEY FOUND.

FOUR DAYS AFTER CHRISHAUNA GLADDEN'S MURDER, THE GOVERNMENT WENT TO TRIAL IN THE CASE OF UNITED STATES VERSUS

19

JEROME MARTIN, AND HE WAS ACQUITTED. JUSTICE DENIED. BUT NOT ENTIRELY, BECAUSE YOU KNOW THAT JAMES MONTGOMERY HAS ADMITTED HIS ROLE IN THE MURDER OF CHRISHAUNA GLADDEN.

YOU KNOW THAT DONALD NICHOLS AND PAUL FRANKLIN HAVE COME BEFORE YOU AND HAVE COME BEFORE THE JUDGE WHO IS GOING TO SENTENCE THEM AND ADMITTED THAT THEY, THEMSELVES, WERE RESPONSIBLE FOR ASSISTING IN LOCATING WITNESSES IN A MURDER TRIAL OF JEROME MARTIN.

AND YOU NOW HAVE THE OPPORTUNITY, LADIES AND GENTLEMEN, TO HOLD THE OTHER TWO PEOPLE RESPONSIBLE IN CONNECTION WITH THE MURDER OF CHRISHAUNA GLADDEN, THOSE TWO PEOPLE BEING JEROME MARTIN AND SAM CARSON.

YOU KNOW, LADIES AND GENTLEMEN, THAT SOMETIMES IN WONDERING HOW TO CONSIDER A COOPERATING WITNESS, YOU HAVE TO LOOK AT WHAT THEY SAID TO YOU -- JUST THE WORDS THEMSELVES.

THINK ABOUT WHAT JAMES MONTGOMERY DID WHEN HE CAME HERE AND, MORE IMPORTANTLY, THINK ABOUT WHAT HE PLED GUILTY TO.

JAMES MONTGOMERY COULD HAVE SAID, "YOU KNOW WHAT? I WASN'T THERE. `CHIN' TOLD ME ABOUT IT. `CHIN' TOLD ME ABOUT IT AFTERWARDS. THAT'S HOW I KNOW. I WASN'T THERE."

HE COULD HAVE TOLD, "YOU KNOW WHAT? SAM TOLD ME BEFOREHAND HE WAS GOING TO DO IT, BUT I DIDN'T GO."

WHAT HE DID AND SAID, LADIES AND GENTLEMEN, IS HE TOLD YOU THAT HE IS JUST AS RESPONSIBLE AS THE MAN WHO

20

PULLED THE TRIGGER.  HE WAS AN AIDER AND ABETTOR IN THE MURDER OF CHRISHAUNA GLADDEN.  HE IS JUST AS RESPONSIBLE AS SAM CARSON FOR PULLING THAT TRIGGER.

AND MORE THAN THAT, HE HAS ADMITTED HIS GUILT BEFORE A UNITED STATES DISTRICT COURT FEDERAL JUDGE, AND HE IS LOOKING AT A POSSIBLE SENTENCE OF LIFE WITHOUT PAROLE FOR THAT CRIME ALONE.

SO IN EVALUATING JAMES MONTGOMERY, THINK ABOUT THE FACT THAT HE HAS ADMITTED HIS OWN RESPONSIBILITY IN THIS CONDUCT AND THINK ABOUT THE CONSEQUENCES THAT HE FACES FOR WHAT HE DID IN OCTOBER OF 1996.

NOW, YOU KNOW, LADIES AND GENTLEMEN, SOMETIMES WITNESSES -- PEOPLE WERE SHOT AT BECAUSE THEY WERE PERCEIVED TO BE WITNESSES.  AND ONE SUCH PERSON WAS JAMES COULTER, "CREEKO".

IN 1995, JEROME MARTIN SHOT JAMES COULTER, "CREEKO", IN THE HOPES OF MURDERING HIM.

NOW, JEROME MARTIN DIDN'T THINK HE WOULD BE CAUGHT BECAUSE HE HAD A MASK ON.  BUT THAT WASN'T INSURANCE ENOUGH. JEROME MARTIN, AFTER HE WAS LOCKED UP AND CHARGED IN CONNECTION WITH THE SHOOTING OF JAMES COULTER, TURNED TO WHO ELSE?  TO HIS FRIENDS.  HE TURNED TO PAUL FRANKLIN AND DONALD NICHOLS.  AND HE TOLD THEM THAT THEY HAD TWO TASKS -- TWO PEOPLE TO LOCATE, BOTH "CREEKO" AND ANOTHER WITNESS TO THAT SHOOTING, MICHAEL FLOYD.

AND YOU LEARNED, LADIES AND GENTLEMEN, THAT WHAT DONALD NICHOLS AND PAUL FRANKLIN WERE TOLD WERE A COUPLE THINGS. ONE WAS, "FIRST, GET THOSE TWO WITNESSES TO TALK TO MY LAWYER," HOPING TO GET A STATEMENT OR SOMETHING LIKE THAT TO HELP HIM OUT.

BUT ULTIMATELY WHAT JEROME MARTIN TOLD THEM TO DO WAS "GET THOSE WITNESSES WITH MY UNCLE `DINO.' TAKE `DINO' TO SEE `CREEKO' AND MICHAEL FLOYD SO THAT `DINO' CAN KILL THEM."

AND HE DIDN'T STOP THERE. HE DIDN'T RELY EXCLUSIVELY ON HIS CREW MEMBERS -- JEROME MARTIN. OH, NO. HE TURNED TO SOMEONE ELSE WHILE HE WAS IN CUSTODY. HE TURNED TO A MAN BY THE NAME OF MICHAEL SMITH.

MICHAEL SMITH YOU MAY RECALL, WAS SOMEONE WHO HAS A TRUCK-DRIVING LICENSE. HE TESTIFIED DURING THE COURSE OF THE TRIAL, AND HE TOLD YOU THAT HE DIDN'T KNOW JEROME MARTIN VERY WELL, BUT THAT HE, MICHAEL SMITH, HAD GROWN UP IN CAPPERS AND, IN FACT, KNEW "DRAPER," WILLIAM SWEENEY.

SO JEROME MARTIN APPROACHES HIM WHILE THEY ARE IN CUSTODY AND SAID, "HEY, ISN'T YOUR FRIEND MICHAEL FLOYD? CALL HIM UP AND TELL HIM TO SAY THAT HE DOESN'T KNOW WHO SHOT HIM. TELL HIM TO GIVE A STATEMENT TO HELP ME OUT."

MICHAEL SMITH KIND OF BRUSHES IT OFF. HE DOESN'T FOLLOW UP. JEROME MARTIN COMES BACK ANGRY. HE SAYS, "YOU KNOW WHAT? I CALLED MICHAEL FLOYD. I CALLED MICHAEL FLOYD.

22

HE HUNG UP ON ME. HE OWES ME." JEROME MARTIN SAYS, "HE OWES ME," BECAUSE MICHAEL FLOYD HAD GOTTEN IN THE WAY WHEN JEROME MARTIN WAS SHOOTING "CREEKO". "I COULD HAVE GOT HIM. HE OWES ME."

NOW, WHEN YOU STOP AND THINK, "WELL, WHAT EVIDENCE DO YOU HAVE, MS. CHATURVEDI, AS TO WHY IT WAS THAT "CREEKO" WAS SHOT AND WHY DID THEY GO AFTER "CREEKO"? WELL, YOU NEED TO LOOK NO FURTHER THAN DOWN THERE AT VINCENT HILL.

YOU HAD HEARD THE COMMENT THAT VINCENT HILL MADE TO SPECIAL AGENT VINCENT LISI, DETECTIVE STEVE KIRSCHNER AND DETECTIVE NEAL TRUGMAN OUT IN THE MIDDLE OF K STREET IN THE MIDDLE OF THE DAY.

YOU HEARD VINCENT HILL PROCLAIM LOUDLY AND PROUDLY, "ALL OF YOUR SNITCHES ARE GOING TO DIE. YOU KNOW THAT JOHN DOE THAT'S OVER IN ROOM 2299 -- HE SHOULD BE DEAD RIGHT NOW."

THAT'S WHAT VINCENT HILL SAID. AND YOU HEARD FROM AGENT LISI THAT, IN FACT, JAMES COULTER, WHO WAS RECOVERING FROM THESE GUNSHOT WOUNDS, WAS LISTED AS A "JOHN DOE" TO PROTECT HIM.

AND JUST LIKE VINCENT HILL SAID, JAMES COULTER WAS IN THAT ROOM, 2299. HOW DID VINCENT HILL KNOW THAT? AND WHAT DO YOU THINK VINCENT HILL'S INTENTIONS WERE WHEN HE MAKES A COMMENT LIKE, "ALL OF YOUR SNITCHES ARE GOING TO DIE"? IS THERE ANY DOUBT IN YOUR MIND WHAT THE GOAL WAS OF

23

THIS CONSPIRACY?

AND YOU KNOW THAT JEROME MARTIN AND VINCENT HILL EXPRESSED FRUSTRATIONS ABOUT THIS SHOOTING, THAT THE GUN HAD JAMMED. THE GUN USED TO SHOOT "CREEKO" HAD JAMMED.

AND DONALD NICHOLS TOLD YOU THAT HE WAS OUT ONE DAY WITH VINCENT HILL AND JEROME MARTIN, AND THEY WERE DEBATING THIS. AND VINCENT HILL SAYS TO JEROME MARTIN, "WHY DID THAT GUN HAVE TO JAM? YOU SHOULD HAVE HAD TWO GUNS WITH YOU. YOU SHOULD HAVE KILLED HIM," BECAUSE THEY THOUGHT HE WAS TELLING.

NOW, YOU ALSO KNOW, LADIES AND GENTLEMEN, THAT IN THE COURSE OF LOCATING TO KILL WITNESSES AND MAKING EFFORTS TO KILL WITNESSES, IT DID NOT MATTER IF THE PERSON THEY WERE TARGETING WAS A FRIEND, OR AN ENEMY, OR FAMILY.

LET ME TURN YOUR ATTENTION TO THE EFFORTS TO TRY TO KILL KENNETH ADAMS. SAM CARSON, WILLIAM SWEENEY AND SEAN COATES ALL TOOK EFFORTS TO TRY TO KILL KENNY ADAMS.

WHO WAS KENNY ADAMS? YOU KNOW THAT KENNY ADAMS HAD BEEN CHARGED, ALONG WITH MAURICE PROCTOR AND A GUY BY THE NAME OF "SLUG," IN THE MURDER OF AN INDIVIDUAL BY THE NAME OF PHIL CLAYBORNE. THE THREE MEN HAD BEEN CHARGED IN CONNECTION WITH THAT MURDER OF MR. CLAYBORNE.

LET ME JUST PAUSE THERE FOR A SECOND. MR. CLAYBORNE, HIMSELF, WAS A WITNESS AGAINST ONE OF THE ASSOCIATES KNOWN TO THEM, TYRONE BRISCOE.

24

SO KENNY ADAMS KILLS A WITNESS.  KENNY ADAMS GETS CHARGED WITH MAURICE PROCTOR AND "SLUG."  AND THEN KENNY ADAMS AND "SLUG" DECIDE TO PLEAD GUILTY AND COOPERATE.  AND THEY ARE RELEASED FROM CUSTODY.  THEY ARE NO LONGER AT THE JAIL WITH MAURICE PROCTOR.

AND MAURICE PROCTOR TELLS "L.A." BENDER, WHO YOU HEARD TESTIFY -- THE MAN WITH THE BRAIDS THAT WERE TURNED UP -- HE SAYS TO HIM, "WELL, NOW WE HAVE GOT TO KILL THEM."

AND, OF COURSE, AS YOU HEARD OVER AND OVER AGAIN, LADIES AND GENTLEMEN, BECAUSE MAURICE PROCTOR WAS LOCKED UP AT THE TIME -- "POO POO" WAS LOCKED UP -- HE HAD TO TURN TO THE OUTSIDE, TO HIS FRIENDS.

YOU HEARD FROM ARTHUR RICE, WHO WAS LOCKED UP WITH MAURICE PROCTOR, THAT THEY WOULD SPEAK ON THE TELEPHONE WITH SAM CARSON.

SAM CARSON TOLD MAURICE PROCTOR THAT HE HAD A LINE -- HE HAD A WAY OF TRYING TO GET TO KENNY ADAMS.  HE THOUGHT HE WAS OUT IN VIRGINIA, AND THEY WERE GOING AT HIM.

YOU LEARNED THAT SAM CARSON WAS NOT ALONE IN THESE EFFORTS TO KILL KENNY ADAMS.  YOU HEARD THAT SAM CARSON, SEAN COATES, WILLIAM SWEENEY, AND JAMES MONTGOMERY MADE REPEATED ATTEMPTS TO GO OUT TO CENTREVILLE, VIRGINIA, LOOKING TO KILL KENNY ADAMS.

SAM CARSON HAD SAID THEY HAD SOMEONE IN THE COURTHOUSE HELPING THEM.  OVER AND OVER THEY MADE THESE

25

EFFORTS. AND YOU KNOW THAT THESE EFFORTS OCCURRED BECAUSE YOU HEARD FROM JAMES MONTGOMERY THAT ON ONE OF THESE EFFORTS, WHEN THEY HAD GONE OUT THERE, THEY WENT LOOKING FOR A GUN THAT THEY HAD STASHED OUT IN CENTREVILLE.

THEY DIDN'T WANT TO KEEP GOING BACK AND FORTH IN AND OUT OF THE CITY WITH A GUN. SO THEY KEPT IT HIDDEN OUT THERE. SO EARLY ONE MORNING, WHEN THEY WENT OUT THERE TO GET THE GUN WITH THE INTENTION OF USING IT ON KENNY ADAMS, THE GUN WAS GONE.

AND SO JAMES MONTGOMERY AND SAM CARSON DROVE BACK INTO THE CITY. AND JAMES MONTGOMERY TOLD YOU THAT THEY WERE STOPPED THAT TIME. WHEN THEY WERE STOPPED THAT DAY, THE POLICE ISSUED TICKETS TO THEM BECAUSE THEY WEREN'T WEARING A SEATBELT.

AND YOU KNOW THAT'S RIGHT BECAUSE YOU HAVE THE TICKET. ON APRIL 23RD, 1997, SAM CARSON WAS ISSUED A TICKET FOR FAILURE TO WEAR A SEATBELT, AND THAT TICKET WHICH YOU CAN LOOK AT ALL YOU WANT, SHOWS THAT THEY WERE ON I-66, HEADED FROM VIRGINIA TO THE DISTRICT.

THAT IS THE KIND OF SUPPORT, LADIES AND GENTLEMEN, THAT YOU HAVE IN DECIDING THE TRUTH IN THIS CASE.

IF THAT WASN'T ENOUGH -- ALTHOUGH OF COURSE IT IS -- THERE'S MORE. THERE'S MORE BECAUSE THERE WAS ROBERT SMITH, "BUTCHIE."

REMEMBER WHAT AGENT LISI TOLD YOU. AGENT LISI

26

TOLD YOU THAT ROBERT SMITH INFORMED HIM THAT DRAPER WAS "CLOCKING" KENNY, MEANING, OF COURSE, THEY WERE LOOKING TO KILL HIM.

DRAPER HAD A CONNECTION IN THE SUPERIOR COURT -- A WAY TO GET AN ADDRESS IS WHAT "BUTCHIE" TOLD AGENT LISI.

AGENT LISI, AT THE TIME, DIDN'T EVEN KNOW WHERE KENNY ADAMS WAS. SO HE HEARS FROM "BUTCHIE." THEY ARE "CLOCKING" HIM. THEY ARE GOING OUT TO VIRGINIA. AND AGENT LISI LOOKS INTO IT.

"BUTCHIE" IS RIGHT. HOW COULD "BUTCHIE" KNOW UNLESS DRAPER TOLD HIM? SUPPORT.

AND THERE'S MORE BECAUSE YOU KNOW THAT JAMES MONTGOMERY, HIMSELF, TOOK AGENT LISI TO THE VERY HOUSE WHERE KENNY ADAMS LIVED, THAT HOUSE THAT WAS DESCRIBED TO YOU THAT HAD CHRISTMAS DECORATIONS OUTSIDE, KENNY ADAMS' HOUSE. THEY HAD IT.

THE F.B.I. WAS TRYING TO HIDE KENNY ADAMS, AND THEY FOUND HIM, BUT THEY FAILED IN KILLING HIM. KENNY ADAMS WAS NOT KILLED.

AND YOU HEARD THAT AFTER THEY FAILED, THE ADVICE THAT "DRAPER" GAVE WAS "POO POO" SHOULD TAKE A PLEA. "WE COULDN'T GET AT YOUR WITNESS. YOU SHOULD TAKE A PLEA."

I HAVE SAID THIS TO YOU BEFORE. I WISH I COULD STOP WITH SOMETHING LIKE THIS. BUT ROBERT SMITH, AND CHRISHAUNA GLADDEN, AND KENNY ADAMS, AND "CREEKO" WERE NOT

27

THE ONLY WITNESSES THAT THIS CREW ATTACKED.

THEY HAD A HIT LIST.  THE NAMES ON THIS LIST, LADIES AND GENTLEMEN -- THE PEOPLE THAT THEY KILLED OR THEY TRIED TO KILL -- THAT'S WHAT WE KNOW ABOUT.  THESE ARE JUST THE NAMES WE KNOW ABOUT FROM THIS TRIAL.

I TOLD YOU ALREADY OF THEIR EFFORTS TO KILL JAMES MONTGOMERY -- THEIR DESIRE -- THEIR STRONG AND FIRM DESIRE TO KILL JAMES MONTGOMERY.  AND YOU STOP AND ASK YOURSELVES IF THEY HAD THE CHANCE, DO YOU THINK THEY WOULD HAVE?

THEY DID KILL ROBERT SMITH.  AND YOU HEARD WHAT VINCENT HILL SAID ABOUT REGINALD SWITZER TO EUGENE BYARS. THAT VINCENT HILL WANTED TO PUT A KNIFE IN REGINALD SWITZER'S HEART BECAUSE HE THOUGHT REGINALD SWITZER WAS COOPERATING.

AND VINCENT HILL SAID, "YOU KNOW THE WAY TO GET AT PAUL FRANKLIN IS TO GET AT HIS FAMILY," BECAUSE PAUL FRANKLIN WAS COOPERATING.

OF COURSE THEY MADE EFFORTS TO GET KENNY ADAMS AND "SLUG," WITNESSES IN THE CASE AGAINST MAURICE PROCTOR, ONE OF THE K STREET CREW MEMBERS.

YOU HEARD ALSO ABOUT A GUY BY THE NAME OF KYLE KNIGHT -- THAT SAM CARSON BELIEVED THAT KYLE KNIGHT WAS COOPERATING WITH THE GOVERNMENT BECAUSE KYLE KNIGHT HAD BEEN RELEASED AFTER BEING CHARGED IN A VERY SERIOUS CASE.  AND, OF COURSE, THAT MEANT TO SAM CARSON THAT KYLE KNIGHT MUST BE

sm

TCB

ORIGINAL

1

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,         :
                                  :
          Government,             :
                                  :     Case No.
     v.                           :     CR 98-329
                                  :
VINCENT HILL,                     :
JEROME MARTIN,                    :
SAMUEL CARSON,                    :
WILLIAM K. SWEENEY,               :
SEAN COATES,                      :
                                  :
          Defendants.             :     **FILED**
                                  :
- - - - - - - - - - - - - - - - - x     **JUL 1 9 2001**
                                  :
UNITED STATES OF AMERICA,         :     NANCY MAYER WHITTINGTON, CLERK
                                  :        U.S. DISTRICT COURT
          Government,             :
                                  :
     v.                           :     Case No.
                                  :     CR 99-348
GARY PRICE,                       :
                                  :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - - x

                              Washington, D.C.
                              Tuesday, July 3, 2001
                              2:10 p.m.
                              (P.M. SESSION)


              TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE THOMAS P. JACKSON
       UNITED STATES DISTRICT JUDGE, and a jury


COURT REPORTER:          THOMAS C. BITSKO
                         Miller Reporting Company
                         735-8th Street, S.E.
                         Washington, D.C.  20003
                         (202)  546-6666

App 308

2

APPEARANCES:

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA<br>ANJALI CHATURVEDI, AUSA<br>555 4th Street, N.W.<br>Washington, D.C. 20001 |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ.<br>601 Indiana Ave., N.W.<br>Washington, D.C. 20004 |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ.<br>305 H Street, N.W.<br>2nd Floor<br>Washington, D.C. 20001 |
| For the Defendant Carson: | JOSEPH BESHOURI, ESQ.<br>LEXI NEGIN-CHRIST, ESQ.<br>419 7th Street, N.W.<br>Washington, D.C. 20004 |
| For the Defendant Sweeney: | STEVEN R. KIERSH, ESQ.<br>717 D Street, N.W.<br>Suite 400<br>Washington, D.C. 20004 |
| For the Defendant Coates: | FREDERICK JONES, ESQ.<br>901 6th Street, S.W.<br>#409<br>Washington, D.C. 20024 |
| For the Defendant Price: | JONATHAN ZUCKER, ESQ.<br>601 Indiana Ave., N.W.<br>#901<br>Washington, D.C. 20004 |

sm  .

kidnapping.  They say you can't believe James Montgomery because he's the witness in the case.  Well, as you can see, you could take James Montgomery right out of this.  Forget him.  Forget Reginald Switzer, forget Arthur Rice, forget Manute, forget Rochester.  Based just on Dorean Key and Robert "Butchie" Smith, because they completely forget what Butchie told him, what Agent Lisi testified about.  Butchie told Agent Lisi that Draper was involved in that kidnapping, with Vincent Hill, Sean Coates.  Now, isn't that remarkable?  He said there were five people involved.  Maurice Proctor also involved.

What does Sherry Harris see out her window?  She sees four people, four people, and it's an interesting point, because one of the reasons to doubt that Mr. Kiersh gives you, he says, "You don't need to get any further, because you heard from the victim himself, you heard from Wysocki, and Wysocki told you that he knows Draper and he knows Vito, and they didn't do it."

And I'm going to spend just a couple minutes talking to you about Wysocki and what the really shows you, because I'll tell you something, ladies and gentlemen, that man was terrified.  He

wanted to see an innocent man convicted?

Another question: You know that the murder weapon was found in a television set, in the back of a television set in the home of William Sweeney's grandmother. How did Switzer get the gun into that TV set and why?

Here's a question that Mr. Kiersh completely ignored, completely, because there isn't an answer that he could give you that's consistent with his client's innocence. He told you--strike that.

Agent Lisi testified that Butchie Smith, Robert "Butchie" Smith, a man murdered June 16, 1997, before he was killed, Butchie told Agent Lisi that Draper had told him that he had killed Robocop. He had done it, and he also told Agent Lisi something else. He said the gun had the barrel switched. I switched the barrel so they wouldn't trace it. But the guy that switched the barrel did something wrong. He didn't change all of the right parts, and now, basically, I'm screwed.

Those aren't the words he used, but essentially, that was the import of it. He's in trouble. He got caught. Even though the parts had

sm .

Michael Jones is with his cousins. They're in a different part of town. He's set upon by gunmen, who chase him through the alley, shoot him down like a dog, and then stand over, and shoot into his body repeatedly. He lives.

I want you to ask yourselves a couple questions about that. Do you believe that that was a coincidence, a coincidence that on June 20th he's a witness to his friend's getting shot, and that eight days later he's shot down in the street like a dog? Do you think that's a random act of violence, or do you think that that was a hit, a hit put on him by Meechie, and that Meechie called Birdy and his other crew members to help him out of a jam?

Mr. Jones says, "It was Wayne Perry who did it." Well, if you'll check your notes, you'll see Wayne Perry was incarcerated at the time of this shooting. Wayne Perry did not do it. Wayne Perry's boys did it, because as you heard, they grew up at the knee of Wayne Perry and wanted to emulate him, and in fact did.

I got another question for you about this. How did Butchie, Robert Smith, know about this shooting? How did he know that Sean Coates did it,

sm      •

and the details, where it happened, why it happened, how it happened? How did he know if Draper hadn't told him?

Assault with intent to kill Ronald Sowells, Manute. Have a number of questions I'd like you to ask yourselves about this. There was a lot of talk about it, but no one seemed to come up with an answer that I understood at least. Maybe you did. But I think it's a fair question. Why did Manute Sowells, while at the hospital, suffering from two gunshot wounds, why did he identify that man, Sean Coates, Birdy, from 203 N Street, as being the shooter? Why? What motive did he have to falsely implicate him? You heard how the shooting happened, the cars were right next to each other. He identified Birdy that day, at the time of the shooting, before he'd even been operated on, he identified Birdy as the shooter. Why? Because he had seen him earlier in the day drive by, and he said, "Well, I saw him in a car. I'll just say it was Birdy?"

If James Montgomery did it--now, think about this, ladies and gentlemen--James Montgomery came in and told you all the details about this. He told you how Carson and Coates came up to him,

Clerks File

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,                 :
                                        :
 VS.                                    :        CR. NO. 98-329
                                        :
VINCENT HILL,                           :
JEROME MARTIN,                          :
SAMUEL CARSON,                          :
WILLIAM K. SWEENEY,                     :
SEAN COATES,                            :
            DEFENDANTS.                 :
                                        :
UNITED STATES                           :
            GOVERNMENT,                 :
                                        :
 VS.                                    :        CR. NO. 99-348
                                        :
GARY PRICE,                             :
            DEFENDANT                   :

FILED
JUL 1 9 2001
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JULY 5, 2001
(10:15 A.M.)
(A. M. SESSION.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                    PHYLLIS MERANA
                                   6816 U. S. DISTRICT COURT
                                   3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

App 314

WHERE KENNY ADAMS LIVED.

ANOTHER POINT THAT WASN'T USED OR REFERRED TO AT ALL BY THE DEFENSE, HOW DID "BUTCHIE", ROBERT SMITH, KNOW ABOUT THIS ATTEMPT ON KENNY ADAMS' LIFE?  REMEMBER, THAT'S THE REASON KENNY ADAMS IS STILL ALIVE TODAY BECAUSE "BUTCHIE" CALLED AGENT LISI.  AGENT LISI WAS OUT OF THE COUNTRY.  HE GETS A PAGE.  HE SPEAKS TO "BUTCHIE." "BUTCHIE" SAYS, "YOU'D BETTER MOVE HIM BECAUSE THEY ARE GOING TO KILL HIM.  THEY FOUND OUT WHERE HE LIVES."

AND, SURE ENOUGH, THEY HAD FOUND OUT WHERE HE LIVED.  HOW DID "BUTCHIE" KNOW THIS IF HE HADN'T BEEN TALKING TO DRAPER?

AND, FINALLY, ABOUT THAT TICKET, MR. BESHOURI COMPLAINED THAT WE DID NOT HAVE SUFFICIENT CORROBORATION. AND HE SAID, FOR INSTANCE, THE TRIPLE MURDER, WE SHOULD HAVE BROUGHT IN THE GUY OUT ON THE STREET WHO WAS SMOKING A CIGARETTE, WHO COULD HAVE TESTIFIED THERE WAS ACTUALLY A GREEN VAN OUT ON THE STREET THAT NIGHT.

THAT'S THE KIND OF CORROBORATION HE SAYS YOU ALL NEED TO PROVE BEYOND A REASONABLE DOUBT, OR WE NEED TO PROVE BEYOND A REASONABLE DOUBT THESE DEFENDANTS' GUILT.

WOULD THAT HAVE HELPED YOU, KNOWING THAT THERE WAS ACTUALLY A VAN OUT ON THE STREET, OR IS THIS THE TYPE OF EVIDENCE THAT HELPS YOU AND THAT PROVES CONCLUSIVELY AND BEYOND ANY DOUBT THAT JAMES MONTGOMERY WAS TELLING THE TRUTH

HAVE JUST SAID, "SURE I HAVE BEEN GAMBLING THERE. I DIDN'T KILL ANYBODY." BUT, INSTEAD, BECAUSE OF HIS GUILT, BECAUSE HE KNEW HE HAD DONE IT, HE LIED TO THE POLICE.

HOW DID "BUTCHIE" AND JAMES MONTGOMERY BOTH KNOW THAT SWEENEY AND CARSON WENT TO VEGAS TOGETHER FOR THE TYSON/HOLYFIELD FIGHT, AND WHY DID BOTH SWEENEY AND CARSON MENTION THAT THEY HAD SEEN "LONNIE" GASKINS THERE?

YOU KNOW BEYOND ANY QUESTION THAT SWEENEY AND CARSON WERE IN VEGAS FOR THE TYSON/HOLYFIELD FIGHT, JUST AS JAMES MONTGOMERY TOLD YOU AND JUST AS "BUTCHIE" SMITH TOLD AGENT LISI.

HOW DID THEY KNOW THAT FACT IF THEY HADN'T BEEN TOLD? AND WHY WOULD BOTH SWEENEY AND CARSON MENTION THE ADDITIONAL FACT -- SURE THEY MAY SAY, "WE WENT OUT FOR THE FIGHT." THAT IS SOMETHING THAT FRIENDS WOULD TALK ABOUT WITH ONE ANOTHER, BUT WHY WOULD THEY ADD THE ADDITIONAL FACT, "GUESS WHO WE SAW THERE, MAN? LONNIE GASKINS. AND HE WAS WINNING BIG."

WHY WOULD THEY MENTION THAT FACT IF THEY WEREN'T ALREADY TARGETING HIM. AND I SUGGEST TO YOU YOU KNOW THAT "LONNIE" GASKINS WAS THERE.

AGAIN, YOU WANT CORROBORATION? THEY SAY, "WE WANT TO KNOW ABOUT SOMEONE WHO SAW THE VAN OUT ON THE STREET." INSTEAD, WE BRING THE GAMBLING RECORDS FROM THE CASINO IN VEGAS THAT SHOWS THAT THEY WERE GAMBLING WITHIN A STONE'S

44

THROW OF ONE ANOTHER.  THEIR RESPONSE:  "YEAH, BUT YOU CAN'T PROVE THAT THEY WERE AT THE SAME TABLE AT THE SAME TIME."  NO, WE CAN'T.

WHAT DO YOU THINK?  IS IT JUST A COINCIDENCE THAT MONTGOMERY AND "BUTCHIE" SAY THEY WERE GAMBLING AND SAW GASKINS THERE AND, IN FACT, THEY WERE IN THE SAME CASINO WITHIN A FEW TABLES OF EACH OTHER THAT SAME NIGHT?

WHY WOULD "BUTCHIE" FALSELY IMPLICATE HIS OWN NEPHEW, SWEENEY, IN THIS MURDER?  REMEMBER, "BUTCHIE" IS NOT A SUSPECT.  HE GETS ARRESTED.  HE GETS ARRESTED FOR DEALING DRUGS.  HE SAYS, "I KNOW ABOUT A TRIPLE MURDER."

HE IS NOT BEING PRESSED.  HE IS NOT BEING QUESTIONED ABOUT HIS OWN INVOLVEMENT.  "I KNOW WHO DID IT."  MR. BESHOURI ALLUDES TO THIS.  HE SAID, "THAT FIRST NIGHT, HE GAVE TWO NAMES."  HE DOESN'T WANT TO REMIND YOU WHO THE TWO NAMES ARE.  THE TWO NAMES HE GIVES ARE "DRAPER," WHO HAD THE GLOCK .40, AND JAMES MONTGOMERY, WHO HAD A STUN GUN.

AND HE GOES ON TO SAY HOW DRAPER RAN OUT OF THE HOUSE AND SHOT THE GIRL OUT ON THE PORCH IN THE HEAD AS HE WAS LEAVING.  HOW DID HE KNOW THAT?  AND WHY WOULD HE IMPLICATE FALSELY HIS OWN NEPHEW OUT OF THE WHOLE UNIVERSE OF PEOPLE THAT HE COULD HAVE IDENTIFIED?  IF FOR SOME REASON -- WHATEVER REASON IT IS -- HE DECIDES, "I AM JUST GOING TO MAKE UP A STORY ABOUT THE TRIPLE MURDER," WHY WOULD HE PICK HIS OWN NEPHEW?  AND IS IT JUST A COINCIDENCE THAT

45

HIS OWN NEPHEW'S FINGERPRINT IS FOUND ON THE DOOR AND HIS OWN NEPHEW'S GAMBLING RECORDS SHOW THAT HE WAS IN VEGAS THE WEEK BEFORE WITH THE VICTIM?  DOES THAT STRIKE YOU AS A TREMENDOUSLY UNUSUAL COINCIDENCE?

HOW IS IT AND WHY IS IT THAT JAMES MONTGOMERY AND ROBERT "BUTCHIE" SMITH ALL GIVE THE SAME FOUR NAMES OF PEOPLE INVOLVED IN THE TRIPLE:  "DRAPER," CARSON, "BIRDIE", AND MONTGOMERY?  THE FOUR NAMES THAT MONTGOMERY GIVES ARE THE SAME FOUR NAMES THAT "BUTCHIE" GIVES.

REMEMBER THE SEQUENCE.  IT'S NOT AS MR. KIERSH SUGGESTED, THAT THESE DEFENDANTS GOT LOCKED UP BECAUSE OF JAMES MONTGOMERY.  JAMES MONTGOMERY GOT LOCKED UP WITH SAM CARSON.  THEY GOT LOCKED UP BECAUSE "BUTCHIE" HAD GIVEN THE INFORMATION FIRST.  "BUTCHIE" CAME FORWARD.  THAT LED TO THE ARREST OF ALL THE DEFENDANTS.

OKAY.  THAT'S THE SEQUENCE OF EVENTS.  ASK YOURSELVES IS THIS THE LIKELY SCENARIO?  JAMES MONTGOMERY GOT TOGETHER WITH `BUTCHIE' AHEAD OF TIME BECAUSE THIS IS THE ONLY OTHER SCENARIO, RIGHT?  THERE IS NO WAY THEY JUST HAPPENED TO GUESS THE SAME FOUR PEOPLE.

SO WHAT MUST HAVE HAPPENED, ACCORDING TO THE DEFENSE THEN, IS THAT "BUTCHIE" AND MONTGOMERY GOT TOGETHER, AND THIS IS WHAT THEY SAID.  "BUTCHIE" SAID, "LISTEN, IF YOU GET CAUGHT, YOU JUST SAY THAT" -- STRIKE THAT.  "BUTCHIE" SAYS, "WHAT I WILL DO IF I GET CAUGHT OR IF I GET IN