**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| United States of America<br><br>    v.<br><br>Samuel Carson, Sean Coates,<br>Jerome Martin, Jr., and William K.<br>Sweeney,<br><br>    Defendants. | Case No. 1:98-cr-329-6-RCL |

———————————

**APPENDIX**

in support of Defendants' Supplemental § 2255 Motion

———————————

———————————

# VOLUME 5 OF 9

## District Court Docket Entries (Trial and Verdict Materials)

Dkt. 363 – Defendant Jerome Martin's Response in Opposition to Government's Motion to Admit Out-of-Court Statements of Murdered Witnesses (August 25, 2000) ........................699

Dkt. 367 – Defendant Sean Coates' Response in Opposition to Government's Motion to Admit Out-of-Court Statements of Murdered Witnesses (August 28, 2000) .................................727

Dkt. 371 – Order Granting Defendant Coates' Motion for Leave to Join Motions Filed by Co-Defendants (Jackson, J.) (August 28, 2000) .........................................................................731

Dkt. 372 – Order Granting Defendant Carson's Motion for Leave to Join Sweeney's Third Motion to Compel Discovery and Related Motions (Jackson, J.) (August 28, 2000) ..........732

Dkt. 396 – Defendant William K. Sweeney's Supplemental Memorandum of Law in Opposition to Government's Motion to Admit Out-of-Court Statements of Murdered Witnesses (September 13, 2000) ......................................................................................................733

Dkt. 409 – Defendant Jerome Martin's Memorandum Identifying Specific Requests Under Adopted Motion to Disclose Identities of Confidential Informants (September 25, 2000) ..740

Dkt. 410 – Defendant Jerome Martin's Memorandum of Specific Items Requested Under Adopted Third Motion to Compel Discovery (September 25, 2000) ..................................744

Dkt. 436 – Order Granting Defendant Martin's Motion for Leave to Join Sweeney's Related Pretrial Motions (Jackson, J.) (September 28, 2000) ...........................................................749

Dkt. 451 – Order Conditionally Granting Government's Motion to Admit Out-of-Court Statements of Murdered Witnesses, Subject to Further Brady Production; Denying Defendants' Motions to Compel and Related Pretrial Motions (Jackson, J.) (September 28, 2000) .................................................................................................................................796

Dkt. 452 – Defendant Samuel Carson's Motion to Adopt Defendant Sweeney's Motion to Admit Maryland Grand Jury Testimony of Two Unavailable Witnesses (November 6, 2000) ......801

Dkt. 481 – Government's Memorandum in Opposition to Defendants Sweeney and Hill's Motions for Admission of Grand Jury Testimony of Unavailable Witnesses (November 16, 2000) .................................................................................................................................804

Dkt. 594 – Defendant Samuel Carson's Motion for Remedy for Government's Failure to Provide Exculpatory and Impeachment Material in a Timely Manner (May 14, 2001) ...................810

Dkt. 597 – Government's Response in Opposition to Defendant Carson's Motion to Preclude
    Statements Allegedly Made by Defendant Sweeney to Robert Smith (May 21, 2001) .......819

Dkt. 760 – Second Retyped Indictment (July 2, 2001)..............................................................842

Dkt. 810 – Verdict Form (August 16, 2001)............................................................................921

FILED

AUG 2 5 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| v. | * | CR. NO. 98-329-02(TPJ) |
| | * | |
| | * | |
| JEROME MARTIN | * | |

*******************************************

### DEFENDANT JEROME MARTIN'S
### OPPOSITION TO THE GOVERNMENT'S MOTION TO
### ADMIT HEARSAY STATEMENTS OF MURDERED WITNESSES

Defendant Martin, through his attorney, Joanne Roney Hepworth, hereby respectfully submits that the Court should deny the Government's motion to admit alleged hearsay statements of murdered witnesses against him on the grounds that: 1) the Government's factual proffer fails to meet the preponderance of evidence standard; 2) the Government cannot show that the murder of Smith was in furtherance and within the scope of an ongoing conspiracy in which the defendant was a member and was reasonably foreseeable as a natural or necessary consequence thereof; 3) the admission of this the number of hearsay witnesses with the broad temporal and geographical scope of the alleged conspiracy is unprecedented and presents a very real danger of governmental abuse. In support of his position Defendant Martin states the following points and authorities:

I.     **THE GOVERNMENT'S FACTUAL PROFFER IS INSUFFICIENT TO MEET ITS
       BURDEN AS TO DEFENDANT MARTIN.**

### A.  KEVIN HART.

#### 1.  Hart's Statement is Unreliable.

The Government seeks to introduce the alleged statement of Kevin Hart in which he allegedly named "Pimp" as his attacker on June 3, 1992.

The Government alleges that Kevin Hart was shot on June 3, 1992 by Defendants Proctor and Martin over his failure to properly secure a stolen car. In discovery, however, the Government has turned over a document in which Mr. Hart allegedly informed MPD Detective Cynthia M. Hooper on the night of this shooting that:

App 699

[P]imp approached him and stated "if I robbed you what would you do?" CW (Kevin Hart) then told Pimp "man go ahead." At that time the suspect AKA: Pimp just started shooting at the complainant who was walking by himself . . . .

*See* Exhibit A. There is no mention of Defendant Proctor, nor any incident involving a car. The defense has information that codefendant Proctor was questioned by police as to whether he was also a victim of an alleged attempted robbery with Hart by "Pimp" on the night of June 3, 1992. Apparently, the Government disbelieves the alleged June 3, 1992 statement of Hart except to the extent that it names "Pimp," who they assume to mean Defendant Jerome Martin, as his assailant. As the Government has not provided the medical records of Mr. Hart as of this date, no assessment of his physical condition at the time of the alleged statements has been possible. There was no photographic identification procedure conducted to verify that the person Hart referred to as "Pimp" was in fact Jerome Martin. In all likelihood, the alias "Pimp" is not entirely unique among criminal elements in the District of Columbia.

Subsequent to June 3, 1992 and up to September 28, 1998, the date the initial indictment was filed in this case, Jerome Martin was never questioned, charged or arrested regarding the assault on Kevin Hart. No specifics on the assertions that Mr. Hart allegedly told his 'friends' that Defendants Martin and Proctor shot him have been given. No other statements of Kevin Hart have been turned over by the Government thus far.

### 2. Evidence of Defendant Martin's Participation or Acquiescence is Insufficient.

The Government's proffer of the evidence to support Defendant Martin's involvement in the murder of Kevin Hart does not rise to even the preponderance standard of proof. The Government's proffer states that it has a single witness who will state that a car driven parallel to a motorcycle on which the killer of Kevin Hart was riding, was allegedly operated by Defendant Martin. Apparently, another witness will say that the killer got off the motorcycle, continuing to shoot Hart and then got into the car allegedly driven by Defendant Martin.

Kevin Hart's body was found sometime around 2 a.m. in the morning in the middle of Delaware Avenue S.W. It had to have been dark at the time of the shooting, thereby making the ability of the single witness to identify the driver of the alleged parallel car, questionable. The logic of the witnesses' account is also questionable. The incident must have taken place quickly, again

-2-

App 700

calling into question the witnesses' ability to observe and identify. The lateness of the hour and the circumstances which would have brought this individual onto the street, if they were in the street, gives one pause in assessing their reliability. The fact that the alleged witnesses, eye-witnessed a murder, but failed to disclose the identities of the murderers for more than six years, also weighs against the credibility of the proffer.

In discovery, the Government has disclosed that within days of this murder the FBI received information concerning this murder from a confidential source. The source identified the shooter as Anthony Chandler, a known associate of Wayne Perry. *See* Exhibit D. The Government has thus far failed to identify the confidential source of this information to the defense. This clearly exculpatory information disclosed within days of the incident casts a long shadow over the Government's proffer herein.

At a hearing on this matter, Jerome Martin could testify that he was nowhere near the scene of this shooting and that he had nothing whatsoever to do with it. Defendant's investigator will testify as to the lack of lighting and visibility in the tree lined area of Delaware Avenue where the shooting occurred. The Government's failure to even question Defendant Martin concerning this shooting for more than six years speaks for itself. The Government's proffer of evidence against Defendant Martin fails to allege sufficient reliable facts to meet the minimal standard of proof required to justify this use of hearsay and it should not be permitted to taint the jury with the proffered alleged statements of Kevin Hart against Defendant Martin. The Government's proffer on this matter fails to satisfy the applicable standard and the testimony should not be admitted against Mr. Martin and if it is admitted against others Mr. Martin requests that he be given a separate trial.

## B. CHRISHAUNA GLADDEN

### 1. The Witness' Proffered Statements Were Not Damaging Against Defendant Martin.

The Government has indicated that Chrishauna Gladden testified before the Grand Jury, concerning the murder of Curtis Edwards. It is indicated that she allegedly saw Defendant Martin and his alleged codefendant in the area where the incident leading to the murder occurred, observed two cars speed away (without Martin), heard gun shots and, days after the murder, allegedly heard Defendant Martin praise his codefendant for "getting his man". Assuming, *arguendo*, the absolute

-3-

App 701

truth of all this, there is still not even enough evidence for a probable cause finding as to Defendant Martin's culpability for this murder. This is hardly a motive for the Defendant to have the witness killed.

### 2. Defendant Martin Was Incarcerated at the Time of the Murder.

The Government acknowledges, as it must, that Defendant Martin was incarcerated at the time of this witness' killing. This would not absolve the defendant of responsibility if he ordered or solicited the murder, but it does preclude his direct participation. The Government alleged in its original indictment, that former codefendant, Paul Franklin, allegedly conspired with Defendant Martin to kill witnesses against him by obtaining a list of witnesses from him at D.C. Jail. *See* Exhibit B. The Government alleged in the superceding indictment that codefendant Coates visited Defendant Martin in jail to obtain the identity of witnesses against him. The Government does not specify how this information was conveyed, but D.C. Jail does not permit contact visits and all conversations are recorded. The Government also does not indicate how Defendant Martin learned the identity of Ms. Gladden as a witness against him. Her presence on the scene was not apparent, nor had her name been revealed by the Government to the Defendant or his attorney. Mr. Martin would testify at a hearing on this motion that he did not know her and had never met her or even heard her name until after her death.

### 3. Prior to his Bond revocation Defendant Martin had Ample Opportunity to Intimidate or Kill a Far more Damaging Witness.

As stated above, Ms. Gladden's testimony was only marginally inculpatory as to Defendant Martin. However, the testimony of another witness, Robin Williams, was much more incriminating. Ms. Williams' testimony, that she saw Defendant Martin hand a gun to his codefendant immediately prior to the shooting, was the central theme of the Government's case. In her trial testimony, however, Ms. Williams relayed that she had twice met with Mr. Martin prior to the trial, while the charges were pending and after he knew that she was a witness for the Government. Robin Williams testified unequivocally that Jerome Martin had in no way threatened or intimidated her during those meetings. As stated in the transcript, Jerome Martin asked her "to go to his lawyer and say what I got to say . . . [H]e never said nothing to me." Tr. at 175, line 22-24, *United States v. Martin* (D.C. Oct. 16, 1996) (F- 8414-94). *See* Exhibit C.

-4-

App 702

The Government's case against Mr. Martin was remarkably poor. It was so poor that, in spite of the charges of first degree murder while armed and two counts of assault with intent to kill while armed, the Government was unable to meet its burden for pretrial detention and Mr. Martin was released on his personal recognizance for more than two years. Defendant Martin had no need to kill witnesses in that case as his attorney won the case handily and the absence of Ms. Gladden did not make any difference.

Ms. Gladden's testimony, as well as all of the Government's evidence, was far stronger against the codefendant, Antonio Knight. The witness was killed while exiting the home of Mr. Knight's girl friend. Mr. Knight is a far more likely suspect in the murder than Jerome Martin.

The credibility and reliability of the Government's "co-conspirator" source[s], indicating that Mr. Martin allegedly communicated directly or indirectly concerning locating and killing witnesses against him, is highly suspect. Obviously, while facing a 'death-penalty' prosecution a person of weak character will say whatever is necessary to save himself. Additionally, the exact nature of the communication described would also be important to know, as Defendant Martin's direction may very well have been to locate the witnesses in order to help his investigator obtain statements as he had with Ms. Williams. The Government's indication that individuals were "asked to locate witnesses with the *understanding that these efforts were being taken in order to kill the prospective witnesses.* Gov't Reply to Defs. Sweeney's and Coates' Opp'n To Admit Out of Ct. Statements made by Murdered Witnesses, at 3, *United States v. Hill* (98-329-01-08 (TPJ)) (emphasis added). This statement implies less than explicit instructions which would be very important in assessing Mr. Martin's culpability as to whether Ms. Gladden's statements should be admitted under this hearsay exception.

The Government conceded that Mr. Martin could not be a direct participant in Ms. Gladden's murder. In fact, they have not so charged him. The Government implicates Defendant Martin primarily because they believe he benefitted from the death. As stated above, the benefit was marginal at best. The murder is inconsistent with Mr. Martin's behavior toward other, more damaging, witnesses in the same case.

At a hearing on this issue the defense will present evidence that neither Mr. Martin nor his attorney knew the identity or location of Ms. Gladden. Outside the presence of the jury, Mr. Martin

-5-

would testify that he had no knowledge of this witness and had no involvement in her death. The Government's proffer on this matter fails to satisfy the applicable standard and the testimony should not be admitted against Mr. Martin. If it is admitted against others, Mr. Martin requests that he be given a separate trial.

## C. ROBERT "BUTCHIE" SMITH

The Government concedes, as it must, that there is no evidence that Jerome Martin had any involvement in the murder of Smith. Furthermore, there is no evidence that Smith's statements had anything to do with Defendant Martin. In fact, Defendant Martin was incarcerated continuously in either local or federal custody from February 1996 through today.[1] Mr. Martin was incarcerated at the time of the underlying "triple murder" in November 1996, as well as on April 30, 1997 when Smith was allegedly killed.

There are, in fact, no details in the Government's proffer which indicate that Defendant Martin even knew Smith. In a catchall section concerning the narcotics activity, the Government states that Smith indicated that among other people, he conducted drug transactions with virtually all of the persons named in the indictment, including Jerome Martin. No details, dates, substances or bases are provided. The Government's proffer on this matter fails to satisfy the applicable standard and the testimony should not be admitted against Mr. Martin. As stated more throughly below, the Government's *Pinkerton* liability argument fails as well. If the statements are admitted against others, Mr. Martin requests that he be given a separate trial.

## LEGAL AUTHORITIES

The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause ensures the reliability of evidence against a defendant by subjecting it to rigorous testing in an adversary proceeding. *See Maryland v. Craig*, 497 U.S. 836, 845. This trial right is designed to assure defendants of a meaningful opportunity to cross-examine the witnesses who testify against them, thereby enhancing the jury's ability to separate fact from fiction. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *United States v. Laboy-Delgado*, 84 F.3d 22, 28 (1st Cir. 1996). The Supreme

---

[1] The prosecution has had Mr. Martin in custody pending trial or serving supervised release violation time continuously except for the month of August 1997.

App 704

Court has repeatedly reminded us that the right to cross-examination lies at the root of the Clause's guarantees. *Chambers v. Mississippi,* 410 U.S. 284, 294-95 (1973) ("The right to cross-examine witnesses ha[s] long been recognized as essential to due process."). *See, e.g., Delaware v. Fensterer,* 474 U.S. 15, 19-20 (1985); *Douglas v. Alabama,* 380 U.S. 415, 418 (1965) ("Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination."); *In re Oliver,* 333 U.S. 257, 273 (1948) (stating among the minimum standards of a fair trial is the defendant's "right to examine the witnesses against him").

Although the right of confrontation is both constitutional and critical to the integrity of the fact-finding process, it may be lost through misconduct. *See Illinois v. Allen,* 397 U.S. 337, 343 (1970) (finding loss of confrontation right where defendant engaged in disruptive behavior and had to be removed from courtroom). In *United States v. White,* the DC Circuit affirmed this rule in this jurisdiction, stating " We have no hesitation in finding, in league with all circuits to have considered the matter, that a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness. *White,* 116 F.3d 903, 911 (D.C. Cir. 1997) (citations omitted). *See United States v. Houlihan,* 92 F.3d 1271, 1279 (1st Cir.1996) (murder); *United States v. Aguiar,* 975 F.2d 45, 47 (2d Cir.1992) (threats); *United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985) (murder); *Steele v. Taylor,* 684 F.2d 1193, 1202 (6th Cir.1982) (stating defendant pimp used influence and control over prostitute to induce her to refuse to testify); *United States v. Thevis,* 665 F.2d 616, 630 (5th Cir. 1982) (murder); *United States v. Balano,* 618 F.2d 624, 628 (10th Cir.1979) (threat); *United States v. Carlson,* 547 F.2d 1346, 1360 (8th Cir.1976) (threat)."

Before the vital right of confrontation can be deemed waived by misconduct, the Government must prove by a preponderance of evidence that the defendant procured the absence of the witness. In *White,* the district court found that the correct burden of proof for the procurement finding was preponderance of the evidence. *See United States v. White,* 838 F.Supp. 618, 623-24 (D.D.C.1993).

The better practice for ascertaining whether a defendant is responsible for the misconduct leading to the absence of the witness would be to hold a pretrial hearing outside the hearing of the jury to determine the issue. *Cf. United States v. Jackson,* 627 F.2d 1198, 1218. Where the defendant, as here, has raised significant factual issues which undermine the Government's proffered evidence

App 705

it should hold a hearing before the court admits evidence of statements by absent declarants on the ground of misconduct waiver. "An evidentiary hearing in the absence of the jury is necessary before a finding of [Confrontation Clause rights] waiver may be made." *United States v. Mastrangelo*, 693 F.2d 269, 273(2nd Cir. 1982) (remanding for hearing); *see also United States v. Aguiar*, 975 F.2d 45, 47 (2nd Cir.1992) (hearing held). At a *Mastrangelo* hearing, the Government's burden is (1) to show that the declarant's unavailability was caused by the defendant's misconduct, and (2) to establish that fact by a preponderance of the evidence. *See Mastrangelo*, 693 F.2d at 273.

Wherefore, defendant Martin submits that the hearsay evidence proffered by the Government should be excluded from his trial unless and until the Government has produced sufficient evidence at a hearing, outside the presence of the jury, to establish his procurement of the absence of the witnesses by a preponderance of the evidence and the defendant has had an opportunity to present his own evidence, outside the presence of the jury, to rebut the preponderance, if shown. The Defendant should be allowed to testify at the pretrial hearing on the issue while preserving his Fifth Amendment rights as to the jury trial.

## II. THE GOVERNMENT CANNOT SHOW THAT THE MURDER OF SMITH WAS IN FURTHERANCE AND WITHIN THE SCOPE OF AN ONGOING CONSPIRACY IN WHICH THE DEFENDANT WAS A MEMBER AND WAS REASONABLY FORESEEABLE AS A NATURAL OR NECESSARY CONSEQUENCE THEREOF

As clearly shown in the Government's motion, Defendant Martin is alleged to have played no role whatsoever in the killing of Robert "Butchie" Smith. Furthermore, the factual proffer related to the "triple murder" clearly establishes that the murder was not within the scope or in furtherance of the alleged conspiracy. Codefendant Sweeney's alleged desire to rob the decedent and the unfortunate ramifications thereof are not conceivably related to the alleged drug conspiracy, notwithstanding the Government's vague, all encompassing language.

The alleged motive for killing Smith was to prevent his testimony concerning the triple murder. This alleged motive had nothing to do with drug sales in Southwest Washington or Defendant Martin. At the time of the killing of Smith and at the time of the triple murder, Martin was incarcerated. In fact, Mr. Martin has been incarcerated almost continuously from February 1996 to

App 706



the present.

The Government argues under the principle of conspiratorial liability, articulated in *Pinkerton v. United States*, 328 U.S. 640 (1946), Defendant Martin is responsible for the murder of Smith as a foreseeable result of the drug conspiracy in which he was allegedly involved, thereby waiving his Confrontation Clause rights and hearsay objections to Smith's out-of-court statements. The Government's reliance on *United States v Cherry*, 211 F.3d 575 (10th Cir. 2000), for this proposition is misplaced. In *Cherry*, the Tenth Circuit held "that participation in an ongoing drug conspiracy *may* constitute a waiver of constitutional confrontation rights *if* the following additional circumstances are present: the wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the drug conspiracy, and such wrongdoing was reasonably foreseeable as a 'necessary or natural' consequence of the conspiracy. *Id.*(emphasis added). The court remanded the case stating:

> [A]lthough the district court found the evidence was 'insufficient to show that by a preponderance of the evidence the Defendant Teresa Price procured the absence of Ebon Sekou Lurks,' it did not discuss whether the evidence that she obtained the car used in Lurks's murder under false pretenses, combined with her apparent proximity to Joshua around the time of the murder, would be sufficient circumstantial evidence to support a finding that she participated in the planning of the murder. We therefore remand for specific findings on whether the Government can meet its burden of showing that Price participated in the planning of Lurks's murder so as to permit a finding of waiver by misconduct.

*Id.* (citations omitted).[2] A codefendant may be deemed to have waived his or her Confrontation Clause rights only if a preponderance of the evidence establishes one of the following circumstances: (1) he or she participated directly in planning or procuring the declarant's unavailability through wrongdoing, or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy. *See United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992). Therefore , the Government's motion should be denied absent such a showing.

---

[2] It should be noted that Subsequent to this ruling, the district court severed Joshua's case from the cases of Price, Cherry, Gibbs, and Parker.

App 707

**III**    **ADMISSION OF THIS NUMBER OF HEARSAY WITNESSES WITH THE BROAD TEMPORAL AND GEOGRAPHICAL SCOPE OF THE ALLEGED CONSPIRACY IS UNPRECEDENTED AND   PRESENTS A VERY REAL  DANGER OF GOVERNMENTAL ABUSE**

No case which has been cited by the Government has considered admission of as many hearsay witnesses as the instant case.  The time span of the alleged witness murders exceeds any other case, known to Defendant Martin, in which said hearsay has been considered.  The geographical scope of the instant conspiracy is greater and more varied than any of the cases cited. The goals and purposes of the alleged conspiracy herein are more vague and ambiguous than any of the cases reviewed for this purpose.

Under these circumstances, there is a danger that the Government could manipulate the charges in an indictment in order to admit the testimony of as many deceased or missing informants against as many defendants as possible.  Clearly, this could  improperly deny defendants their constitutional rights to due process.

Admission of  these alleged statements could set a precedent which would tempt the Government in future prosecutions to structure their conspiracy indictments accordingly.  A danger that the scope of indictments will be tactically  crafted to include as many  alleged dead witnesses as possible for the express purpose of admitting the hearsay statements at the trial.

Defendant Martin has repeatedly asserted that the Indictment herein improperly joins unrelated incidents and irrationally throws them together in an absurdly concocted pattern of alleged activities which has no detectible temporal or geographical logic.  The Indictment's  parameters resemble the  judicial equivalent of Gerrymandering.  It has the  appearance that it was deliberately structured to include the killing of numerous witnesses and alleged cooperators not because there exists a legitimate organization which engages in such activities but rather for the very purpose of utilizing the laws and court rules against such activities.

Wherefore, for reasons stated above and any appearing to the Court at a hearing on the Government's motion, Defendant Martin respectfully requests that the motion be denied.

Respectfully Submitted,

Joanne Roney Hepworth

-10-

App 708

305 H Street, NW
Washington, D.C. 20001
(202)789-0037
Bar #339-226
Attorney for Jerome Martin

## CERTIFICATE OF SERVICE

I, hereby, certify that a copy of the foregoing motion was mailed, postage prepaid, on this the _25th_ day of August, 2000 to:

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

Steven R. Kiersh, Esquire
717 D Street, NW
Suite 400
Washington, D.C. 20004

Paul DeWolfe, Esquire
20 Courthouse Square
Ste. 214
Rockville, MD 20850

Christopher Davis, Esquire
601 Indiana Ave., NW
Washington, DC 20004

Joseph Beshouri, Esquire
419 7th Street, NW
Ste. 201
Washington, DC 20004

Gerald Fisher, Esquire
419 7th Street, NW

App 709

Ste. 201
Washington, DC 20004

Frederick Jones, Esquire
901 6th Street, SW
Ste. 409
Washington, DC 20024

Howard Bramson, Esquire
400 7th Street, NW #700
Washington, DC 20004

Jonathan Zucker, Esquire
601 Indiana Avenue, NW
Suite 910
Washington, DC 20004

_Joanne R. Hepworth_
Joanne R. Hepworth

-12-

App 710

# EXHIBIT A

FILED
#4424
AUG 2 5 2000
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# REPORT OF INVESTIGATION
(Continuation)

P.O. 123A Rev. 4 74

CCN   298

COMPLAINANT-VICTIM

Hart, Kevin                                    A.W.I.K. (Shooting)

On 6/3/92 at approximately 2230 hour the undersigned responded to D.C. General Hospital to interview the complainant. He stated that his assailant is known to him as PIMP, B/M, 5'9" light complex., 150-170pds., in his twenties and hangs in the area of N Street, S.W. Pimp drives a 1992 Gold Ledgen. The complainant has known Pimp all of his life, but does not know Pimp's real name or address. CW stated that Pimp approached him and stated "if I robbed you what would you do?" CW then told Pimp "man go head." At that time the suspect AKA: Pimp just started shooting at the complainant who was walking by himself. CW stated that he wants police protection because Pimp will come into the hospital and kill him. He stated that Pimp is just crazy like that. CW stated that Pimp had no reason to shoot him besides just playing around and acting crazy.

The complainant was admitted to D.C. General Hospital in serious but stable condition. He was treated by Dr. Williams who removed the bullet from his left shoulder, and Dr. Halley of the Hospital Staff. CW is suffering from multiple gunshot wounds to the left shoulder, left chest, right wrist (bullet still enlarged), left leg thigh, and upper left back.

The official on the scene at the hospital was Sgt. Buddy Smallwood. He made notifications to Communications and the Seventh District Watch Commander.

Homicide Detective Susan Blue was notified.

Det. Cynthia M. Hooper   #181/7D

This report is the property of the Metropolitan Police Department, Washington, D.C.
Neither it nor its contents may be disseminated to unauthorized personnel or agencies

# EXHIBIT B

App 713

FILED

AUG 2 5 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

75.   In or about October 1996, within the District of Columbia and the Commonwealth of Virginia, **JEROME MARTIN**, a/k/a "Pimp," **SAMUEL CARSON**, a/k/a "Chin," **PAUL FRANKLIN**, a/k/a "Dirty Meat," and another co-conspirator not indicted herein, conspired to kill the witnesses who were expected to testify in the murder trial of **JEROME MARTIN**, a/k/a "Pimp."

# EXHIBIT C

App 715

FILED

AUG 2 5 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA       :
                              :
        versus                :    Criminal Action Number
                              :
JEROME MARTIN,                 :    F-8414-94
                              :
        Defendant.            :
- - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA       :
                              :
        versus                :    Criminal Action Number
                              :
ANTONIO KNIGHT,                :    F-7931-93
        Defendant.            :
- - - - - - - - - - - - - - - x

                                   Washington, D.C.

        EXCERPT                    Wednesday, October 16, 1996

        The above-entitled action came on for a Jury Trial before the Honorable COLLEEN KOTELLY, Associate Judge, in Courtroom Number 111.

        THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY THE
        COURT, WHO HAS PERSONALLY CERTIFIED THAT
        IT REPRESENTS THE TESTIMONY AND PROCEEDINGS OF
        THE CASE AS RECORDED.

MARIAN J. CALHOUN, RPR-CM,                    (202) 879-1086
Official Court Reporter

1

App 716

# TABLE OF CONTENTS

## Witnesses

On behalf of the Government:

AMEER CULBREATH
    Cross by Mr. Wood                          4
    Cross by Mr. Rochon                        17
    Redirect by Mr. Wainstein                  34
BRETT DOUGLAS SMITH
    Direct by Mr. Wainstein                    85
ROBIN DENICE WILLIAMS
    Direct by Mr. Wainstein                    91
    Cross by Mr. Wood                          124
    Cross by Mr. Rochon                        143
    Redirect by Mr. Wainstein                  160
KEITH WILLIAMS
    Direct by Mr. Wainstein                    207
TYRONE DEAN
    Direct by Mr. Wainstein                    210
    Cross by Mr. Wood                          262
    Cross by Mr. Rochon                        302
    Redirect by Mr. Wainstein                  310
DOUGLAS CHARLES EATMON
    Direct by Mr. Wainstein                    355
    Cross by Mr. Wood                          403
    Cross by Mr. Rochon                        443
    Redirect by Mr. Wainstein                  457
    Recross by Mr. Rochon                      482

App 717

hearsay.

MR. WAINSTEIN: I'll ask her what Mr. Martin asked her.

THE COURT: Now if you want to ask if Mr. Martin said anything to her, that's another issue.

MR. WAINSTEIN: Okay.

MR. ROCHON: I agree it is another issue; the hearsay issue is taken care of.

THE COURT: What's the other issue?

MR. ROCHON: I don't think because I stumbled into that on cross that it gives the United States the right to go into that lock, stock and barrel on direct if it wasn't explored initially on direct. She gives me this non-responsive --

THE COURT: Now you made it appear that Dale or -- I could tell you exactly why she responded this way. You made it appear this she was lying and Dale Harris is an upstanding person who was her Godmother, most people would immediately think: Oh, the Godmother would say something and that she's the one who's telling the tale. So in response to that she pointed out the Godmother who was busy trying to take her over to see you, etc., etc. I don't know that I would say it's totally non-responsive.

You also pursued some other questions. I understand why you did it. The question, assuming that she says that

171

App 718

it was Mr. Martin; if she says it was Ms. Harris, you have to word this in such a way that we don't hear anything about why Ms. Harris was taking her. You want to ask why Mr. Martin was going with her, that's another issue.

MR. WAINSTEIN: I'll ask what Mr. Martin said.

THE COURT: If anything.

MR. ROCHON: I'm afraid it'll get us into potential other crimes stuff we haven't opened the door to. Counsel doesn't seem to know what he's going to get here.

THE COURT: I'm assuming that you do know. You don't?

MR. WAINSTEIN: I know that, that he said he would give her housing, put her someplace else. That's the extent. If he said something else to her, I don't know. But, you know.

THE COURT: Well, in terms of you can't make it, did he ever say anything to you. It's got to be around the issue of why did he ask her in the context of going to the lawyer. If you want to hear this outside the presence of the jury.

MR. ROCHON: I do.

MR. WAINSTEIN: Your Honor, let's go forward. I'm going to ask her what did he say to you when you went on these trips. Did he indicate why you were going. Did he indicate where you were going. And let her answer that.

172

MR. ROCHON: Then we live with the answer.

THE COURT: We live with the answer.

MR. WAINSTEIN: We'll live with the answer and Mr. Rochon has opened the door.

MR. ROCHON: I said we'll live with the answer.

THE COURT: We'll live with the answer in terms of what reason Mr. Martin gave for going to, if any, for going to his lawyer's, period.

MR. ROCHON: At the appropriate time I'll be asking for an instruction that it's perfectly appropriate to pursue -- have a witness come to a lawyer's office. That's the course of the defense investigation.

THE COURT: At the end.

(On record).

BY MR. WAINSTEIN:

Q     Thank you, ma'am. I was asking when we broke, Dale Harris is otherwise known as -- you know her as Baywan (phonetic)?

A     Baywan.

Q     What relationship did she have to Mr. Martin?

A     They're just friends.

Q     Now you were talking about earlier and Mr. Rochon was asking questions about visits that you had to Mr. Rochon's office, I think twice.

A     Yes.

App 720

Q    Who did you go to Mr. Rochon's office with?

A    Pimp and Dale Harris.

Q    And who was it suggested going to Mr. Rochon's office?

A    Baywan.

Q    Now at any time during those visits -- you say you went with Jerome Martin and Ms. Harris?

A    Baywan.

Q    Baywan.  Did Mr. Martin talk to you during those trips down there?

A    He didn't really say nothing at all.  Baywan was saying --

MR. WOOD:  Objection; hearsay.

THE COURT:  Without going into what Ms. Harris said.

A    He didn't say nothing.

Q    Did he at any time in any of those trips talk to you --

MR. ROCHON:  Objection.  She just said what he said.

BY MR. WAINSTEIN:

Q    Did he say --

THE COURT:  Wait just a second.

MR. WAINSTEIN:  Let me ask this.

THE COURT:  Just a second.  I've given the ruling in terms of what was said and you have asked the question.

174

MR. WAINSTEIN: I'm just going --

THE COURT: If you're asking the same question another way, then the answer is no.

BY MR. WAINSTEIN:

Q Did any words come from Mr. Martin's mouth throughout the time of those two trips?

MR. ROCHON: Your Honor, asked and answered.

The witness is shaking her head, Your Honor.

A No.

Q Did he say absolutely nothing throughout those times?

A No, he didn't say nothing really to me. Because I went to him.

Q All right. Did you talk to him when you went to him?

MR. ROCHON: Your Honor, counsel is trying mightily. If we're going to have any more.

THE COURT: In terms of what she said. In this point you asked it in the context of the trip.

Q So what about when you went to him. Did he say anything to you when you went to him?

A No, he just told me to go to his lawyer and say what I got to say but I'd never got in touch with the lawyer. He never said nothing to me.

Q He, being the lawyer or he, being Mr. Martin?

A    Mr. Martin never said nothing to me.

App 723

# EXHIBIT D

App 724

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

Case 1:98-cr-00329-RCL Document 1337 Filed 08/25/00 Page 30 of 263

FILED

AUG 2 5 2000

CR 98-329-02

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## REPORT OF INVESTIGATION

P.D. 123 Rev. 1/74

| COMPLAINANT/ VICTIM — | DATE OF OCCURRENCE |
|---|---|
| Kevin L. Hart | August 6, 1992 |

| TYPE OF CASE | CCN | FILE NO. |
|---|---|---|
| Homicide Shooting | 430-115 | H.O.#92:1091 |

NARRATIVE: GIVE A SYNOPSIS OF CASE INVESTIGATION SUBSEQUENT TO THE LAST REPORT. WITH PERSONS INTERVIEWED. NEW LEADS. AND OTHER INFORMATION ON CASE PROGRESS.

S/A DONNIE ACKERMANN, FBI WFO C-16, 252-7934, says that he has a source who contacted him concerning this case at the end of last week. The source said that ANTHONY CNADLER, ERIC JONES and ANTOINE GAITHERS were involved.

CHANDLER is identified as the shooter. The source said that the victim was shot about seven times.

ACKERMANN does not know the source's basis of knowledge, but the source "swears" by this information. ACKERMANN will attempt to gain more information from the source in a follow-up interview. He does say that CHANDLER, JONES and GAITHERS are associated in some fashion with the WAYNE PERRY organization.

No identifiable record was found for JONES (AKA: IRKY-BURK (phonetic)) or GAITHERS (AKA: GUS) through WALES, but ACKERMANN speaks of them as if they have records. CHANDLER's record is under PDID: 370-676, DOB: 10/28/68. There are a number of DCDC entries, but nothig indicating any convictions.

Investigation continues...

| CASE STATUS: | ☑ OPEN | ☐ CLOSED | ☐ OTHER (Explain) | PAGE 1 OF 1 PAGES |
|---|---|---|---|---|

| INVESTIGATOR'S SIGNATURE CORBOY | DATE August 11, 1992 |
|---|---|

| SUPERVISOR'S SIGNATURE | DATE |
|---|---|

This report is the property of the Metropolitan Police Department, Washington, D.C.

Neither it nor its contents may be disseminated to unauthorized personnel or agencies.



RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

AUG 25 AM 10: 29

NANCY M.
MAYER-WHITTINGTON
CLERK

App 726

FILED

AUG 2 8 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FILED

JUL 2 4 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | " | |
| | " | |
| | " | **CASE # 98-329-6** |
| | " | **(TPJ)** |
| **V** | " | |
| | " | |
| | " | |
| **SEAN COATES** | " | |

**OPPOSITION TO GOVERNMENT'S MOTION TO ADMIT
OUT OF COURT STATEMENTS MADE BY
MURDERED WITNESSES**

COMES NOW, defendant , Sean Coates, by and through his attorney, Frederick D. Jones, III, and respectfully moves this Honorable Court to deny the government's motion to admit out of court statements allegedly made by murdered witnesses, Kevin Hart, Chrisauna Gladden, and Robert " Butchie " Smith.

The government seeks to have these statements admitted against all defendants pursuant to Fed. R. Evid. 804(b)(6) and various case law on the grounds of defendants' "..deliberate wrongdoing or acquiescence.." in procuring the unavailability of the witness. We deny any such wrongdoing on the part of defendant, Coates and move this court to bar the admittance of said statements at trial against Mr. Coates. In support thereof, defendant states as follows:

**ARGUMENT**

The government's argument for admittance of these statements is based on a number of decisions of other jurisdictions that take a broad view against whom and when hearsay statements of murdered witnesses may be admitted over objections. **United States v Emery,** 186 F 3d 921,927 (8th Cir.1999 ); **United States v. Cherry,** 211 F 3d 575 ( 10th Cir. 2000 ); **United States v. Houlihan,** 92 F 3d 1271,1278-1282 (1st Cir. 1996 ). The government argues that in this case, the three witness murders were in " furtherance , within the scope and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." Further, despite the fact that there was no evidence that Mr. Coates and some others took any direct action to kill the three witnesses, the defendants membership in the drug conspiracy,alone, made them liable under Fed. R. Evid.804(b)(6) and **Pinkerton v. United States,** 328 U.S.640 (1946) to a waiver of their

constitutional right of confrontation and thier right to object to hearsay statements. We disagree with the government's position as does the case law in this jurisdiction . **United States v. White,**116 F 3d 903,911-916 ( D.C. Cir. 1997 ). The government advances the theory of vicarious liability based primarily on **Pinkerton** for determining that a co-conspirator's actions can be imputed to another for the purpose of waiving the later's confrontation right and hearsay objections.

In **White,** the court rejected the more expansive views of other jurisdictions in determining the waiver issue as against those co-conspirators who's sole basis for waiver under 804(b)(6) thier membership in the underlying drug conspiracy. The **White** court held that the "mere failure to prevent the murder or mere participation in the alleged drug conspiracy at the heart of the case, must surely be insufficient to constitute a waiver of a defendant's constitutional confrontation rights." The court went on to state that there must be a showing of participation in either the planning or execution of the murder before waiver applies. In this case , we have no showing by the government of Coates' participation in planning or executing the murders sufficient to meet the preponderance burden required , therefore, no waiver under 804(b)(6).

If , for the sake of this argument, we accpet the preponderance burden in determining the waiver issue, the government has failed to present evidence of Coates' participation in either the planning or execution of the murders sufficient to reach that preponderance burden. On an issue of such gravity , we believe, however, that the burden of proof required for a finding of a waiver of a constitutional right such as this should be beyond a reasonable doubt and not a mere preponderance.

The government contends that under the circumstances of this drug conspiracy the murder of all three of these potential witnesses was reasonably foreseeable and within the scope of the conspiracy. We disagree. Based on the marijuana conspiracies the government has described, murdering witnesses was not a contemplated activity of the conspiracy that would make such activity within the scope of that rather limited operation nor should such drastic action be reasonably foreseeable to co-conspirators not actually engaged in the murders.. The government has failed to present evidence demonstarting that the murder of witnesses was within the scope of the conspiracy or reasonably foresereable as a natural consequence of operating in the conspiracy. It appears from the facts of this case, that it is more likely that the witness murders were the independant acts of one or two individuals, and were carried out without the knowlege of the other co-conspirators.

To admit the hearsay statements of these witnesses at trial would end in a particularly odious result. Reliability of statements is always at issue at trial, under these circumstances there is vertually no way of testing the reliability issue when the court allows an unsworn statement into evidence through a non-declarant. In this case, we presume the government will introduce these statements through the testimony of it's chief investigator, Special Agent, Lisi of the FBI.. Take for example the numerous statements made by "Butchie" Smith. Here, we have what appears to be a proffesional "snitch" who feeds the FBI information for personal gain.. Mr. Coates' counsel will have no opportunity to cross examine the declarant to test the statements validity or the declarant's motives. If the government's motion is granted, this will obviously

result in the jury accepting these statements as truth, since they will come in without benifit of challenge through cross-examination. There is no evidence that Mr. Coates knew anything about the alleged confessions of Mr. Sweeney to his uncle  The government does not suggest that Coates had any notion that a co-conspirator was planning or wanted to murder Smith. Under these circumstances how can he be held to have "acquiesced " in the murder as per Fed. R. Evid. 804(b)(6). The same lack of knowlege and participation by Coates applies in both witnesses Hart and Gladden. The government mentions Coates visiting defendant Martin in jail to get the names of potential witnesses in Martin's case, however, it appears  that Coates did not obtain any names from Martin.  If Coates was given any names, the government does not contend that Coates recieved any nor do they claim he turned over any names to co-conspirators.  In any event, the evidence proffered against Coates in this matter fail to rise to the preponderance level required to find a waiver. There has been no evidence offered making Coates liable under 804 (b)(6).

The prejudice to Mr. Coates arrising out of admitting these statements in trial against him or anyone else at a joint trial far outweigh any probative value and should, therefore, not be admitted. If the court finds that the statements should not be admitted against him, but other codefendants, then we submit severance is warranted of Coates from those against whom the statement will be admitted.

WHEREFORE, the foregoing reasons and those that may adduced at a hearing on the matter , defendant, Sean Coates , respectfully request that this Honorable Court deny the government's motion to admit said statements against Mr. Coates and bar the admittance of those same statements at any joint trial including Mr. Coates.

Respectfully submitted,
Frederick D. Jones, III, Esquire
Bar # 175224
901 6th Street S.W. Suite 409
Washington, D.C. 20024
(202) 484-8172 Phone & Fax

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was mailed, postage prepaid and faxed on this _23rd_ day of _July_ ,2000, to the following :

Peter Zeidenberg, Esq.
Assistant U.S. Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Joanne R. Hepworth, Esq.
305 H Street, N.W.
Washington, D.C. 20001

Anjali Chaturvedi, Esq.
Assistant U.S. Attorney
555 4th street, N.W.
Washington, D.C. 20001

John Carney, esq.
601 Indiana Ave. N.W. Ste.900
Washington, D.C. 20004

Steven R. Kiersh, Esq.
717 D. Street, N.W. Suite 400
Washington, D.C. 20004

Joseph Conte, Esq.
601 Indiana Ave. N.W. Ste 900
Washington, D.C. 20004

Paul DeWolfe, Esq.
20 Courthouse Square, Ste. 214
Rockville, MD. 20850

Christopher Davis, Esq.
601 Indiana Ave. N.W.
Washington, D.C. 20004

Joseph Beshouri, Esq.
419 7th Street, N.W. Ste. 201
Washington, D.C. 20004

Gerald Fisher, Esq.
419 7th Street, N.W. Ste. 201
Washington, D.C. 20004

Howard Bramson, Esq.
400 7th Street, N.W. Ste. 700
Washington, D.C. 20004

Jonathan Zucker, Esq.
601 Indiana Ave. N.W. Ste. 910
Washington, D.C. 20004

Frederick D. Jones, III

App 730

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      "

                            "

                            "     **CRIMINAL # 98-329-6(TPJ)**

         V.                "

                            "

                            "

**SEAN COATES**                  "

**FILED**

AUG 2 8 2000

         **ORDER**       NANCY MAYER-WHITTINGTON, CLERK
                                   U.S. DISTRICT COURT

This matter having come before the Court on defendant, Sean Coates' Motion To Adopt And Join Motions Filed By Codefendants. Upon full consideration of the matter and the record herein, it is this _____ day of _____ 2000, hereby

**ORDERED**, That the defendant's motion to adopt and join is granted.

Thomas Penfield Jackson
United States District Court Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Criminal Division

UNITED STATES OF AMERICA  )
                            )
      v.                  )       Crim. No. 98-329 (TPJ)
                            )
                            )
SAM CARSON              )

**FILED**

AUG 2 8 2000

ORDER

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

Upon consideration of defendant Sam Carson's Motion to Adopt, the lack of opposition thereto, and for good cause shown, it is this _28th_ day of _August,_ 2000,

ORDERED that the Motion be and is hereby GRANTED.

SO ORDERED.

HONORABLE THOMAS P. JACKSON

_____
DATE

copies to:
Joseph Beshouri, Esquire
Gerald Fisher, Esquire
419 - 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 - 4th Street, N.W.
Washington, D.C. 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 - 4th Street, N.W.
Washington, D.C. 20001

App 732

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP 1 3 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES          )
                       )
v.                     )          **Criminal No. 98-329**
                       )          **(TPJ)**
WILLIAM SWEENEY        )
                       )

### SUPPLEMENTAL MEMORANDUM OF LAW
### IN OPPOSITION TO THE GOVERNMENT'S MOTION TO
### ADMIT OUT OF COURT STATEMENTS OF
### <u>MURDERED WITNESSES</u>

Defendant, by and through undersigned counsel, Steven R. Kiersh, respectfully

sets forth to this Honorable Court as follows:

1.) **It is imperative that the Trial Court conduct a fact finding inquiry outside**
<u>**the presence of the jury.**</u>

In the event that the Court makes a preliminary legal determination that a waiver

of a Constitutional right to confrontation can occur by a defendant's misconduct, William

Sweeney urges this Court to conduct an extensive fact finding inquiry outside the

presence of the jury to determine whether the United States has satisfied its factual

foundation for the admission of the out of court statements.

Defendant urges the Court to consider the recently decided case of **United**

**States v. Cherry,** 217 F. 3d. 811(10th Cir. June 12, 2000). Therein, five defendants

were charged in a drug conspiracy. Much of the Government's evidence was to come

from a single witness who was murdered prior to trial. The evidence in support of

admitting the out of court statements of the murdered witness suggested that only one

of the defendants procured the unavailability of the witness.

In analyzing the factual circumstances therein, the Court framed the issue



presented as whether, and under what circumstances, waiver of the right of confrontation can be imputed to an individual not directly involved in the procurement of the witnesses' unavailability. The Court ruled that participation in a conspiracy may result in a waiver of Constitutional confrontation rights only if the following circumstances are present:

> a.) The wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the drug conspiracy; **AND**
>
> b.) The wrongdoing was reasonably foreseeable as a natural and necessary consequence of the conspiracy.

The Court remanded the matter to the trial court to make specific findings regarding the standards identified above.

When the case was remanded, the Tenth Court specifically instructed the trial court to make findings pertaining to whether codefendant Price participated in the planning or carrying out of Lurk's (witness) murder by the codefendant.

The situation presented herein is identical to that presented in **Cherry**. However, herein there are three murdered witnesses whose statements the Government seeks to introduce.

> a.) Kevin Hart: There is absolutely no evidence that William Sweeney had any knowledge or involvement in this murder. Accordingly, statements of this witness can not be admitted against Mr. Sweeney.
> b.) Chrishuana Gladden: There is absolutely no evidence that William Sweeney had any knowledge or involvement in this murder. Accordingly, statements of this witness can not be admitted against Mr. Sweeney.
> c.) Robert Smith: The indictment alleges that William Sweeney conspired to kill Robert Smith.

The only witness whose statements pertain to William Sweeney are those

attributed to Robert Smith. Before his statements are admitted, a hearing must be held to ascertain whether the statements are credible and whether there is a factual foundation that Smith's murder was in furtherance of the conspiracy.

## 2.) **The hearing regarding the statements should be held prior to trial.**

It is clear that an evidentiary hearing outside the presence of the jury is a necessary requirement for admitting the statements. This trial will be lengthy and complex. As a practical matter, as many legal issues as possible should be decided pretrial in order to have an orderly and fair trial. A terrible injustice will occur if the United States addresses these statements in opening statement and is then precluded from introducing them because of an inadequate factual foundation.

The method for preventing prejudice is to conduct a pretrial evidentiary hearing to assess whether a factual foundation exists for the admission of the hearsay statements of murdered witnesses

## 3.) **William Sweeney is entitled to a severance if the Court admits all of the hearsay statements of the murdered witnesses**

The prejudice of the hearsay statements can not be overstated. The prejudice is further compounded by the inability of defendant to confront and challenge the credibility of the statements. As stated herein, William Sweeney is not in any manner connected to the murders of Hart and Gladden. However, he will be prejudiced by admission of the statements as they will be attributed by inference as a purported member of the conspiracy.

In **Cherry**, those defendants who were deemed not to have any involvement in the murder of the witness were severed from those who were deemed to be involved.

The same mechanism to avoid prejudice should apply herein. Accordingly, William

Sweeney should have his trial severed if the statements of Hart and Gladden are

deemed admissible.

Respectfully submitted,

Steven R. Kiersh #323329
717 D Street, NW
Suite 400
Washington, D.C. 20004
(202)347-0200

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **WILLIAM SWEENEY** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of defendant's Supplemental

Memorandum Of Law In Opposition To The Government's Motion To Admit Out Of

Court Statements Of Murdered Witnesses was mailed, postage prepaid, on this the

12th day of September, 2000 to:

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington D.C. 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20001

Paul DeWolfe, Esquire
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

Christopher Davis, Esquire
601 Indiana Avenue, NW
#910
Washington, D.C. 20004

Joanne Hepworth, Esquire
305 H Street, NW 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Gerald Fisher, Esquire
419 7th Street, NW
Suite 201.
Washington, D.C. 20004

Frederick Jones, Esquire
901 6th Street, SW
#409
Washington, D.C. 20024

Jonathan S. Zucker, Esquire
601 Indiana Avenue, NW
Suite 910
Washington, D.C. 20004

Howard Bramson, Esquire
400 7th Street, NW
Washington, D.C. 20004

Steven R. Kiersh

U.S. DISTRICT COURT

7TH SEP 13 AM 9: 20

NANCY H.
MAYER-WHITTINGTON
CLERK

App 739

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**       *

            *

            *

**v.**             *     **CR. NO. 98-329-02(TPJ)**

            *

            *

**JEROME MARTIN**             *

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

FILED

SEP 2 5 20..

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## DEFENDANT MARTIN'S MEMORANDUM OF SPECIFIC REQUESTS UNDER ADOPTED MOTION TO DISCLOSE IDENTITIES OF EACH CONFIDENTIAL INFORMANT REGARDLESS OF WHETHER THEY WILL BE CALLED AT TRIAL

Defendant Martin, by and through his attorney, Joanne Roney Hepworth, respectfully submits the following list of individuals identified in the discovery on whom he requests that the Court order the the Government to provide identity and location information as material to the defense and/or as *Brady* material, which the Government has declined to provide:

1. Several witnesses identified in Detective Ackerman's affidavit in support of search warrant for Yoakum Parkway apartment who, when interviewed by the WMPD and FBI in connection with the shooting of Anthony Fortune, stated "Several guns were drawn and Fortune was shot five times."

2 . A witness, identified by Det. Kenneth Rodgers in his Affidavit in Support of Arrest Warrant on 12/4/91, who observed the white van driving down the street. Two subjects getting out of the van and shooting at two other guys. The witness identified one of the subjects who was doing the shooting as Jerome Martin.

3. A source from the area identified by Invesigator . Delauder who, when interviewed on September 18, 1991 indicated that he had witnessed the "shoot out" on September 10, 1991 and gave inconsistant statements regarding the role and location of defendant Martin.

4. Any other informant not listed herein who gave exculpatory and/or inconsistant statements or information regarding Defendant Martin in any act alleged or charged in the indictment herein.

Respectfully Submitted,

*Joanne R. Hepworth* (signature)

Joanne Roney Hepworth
305 H Street, NW
Washington, D.C. 20001
(202)789-0037
(Fax)408-1606

## CERTIFICATE OF SERVICE

I, hereby, certify that a copy of the foregoing motion was telefaxed, on this the ___25th___ day of September, 2000 to:

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

I, hereby, certify that a copy of the foregoing motion was hand delivered, on this the ___26th___ day of September, 2000 to:

Steven R. Kiersh, Esquire
717 D Street, NW
Suite 400
Washington, D.C. 20004

Christopher Davis, Esquire
601 Indiana Ave., NW
Washington, DC 20004

Joseph Beshouri, Esquire
419 7th Street, NW
Ste. 201
Washington, DC 20004

Lexi Christ, Esquire

-2-

App 741

App 742

419 7th Street, NW
Ste. 201
Washington, DC  20004

Frederick Jones, Esquire
901 6th Street, SW
Ste. 409
Washington, DC  20024

Howard Bramson, Esquire
400 7th Street, NW #700
Washington, DC  20004

Jonathan Zucker, Esquire
601 Indiana Avenue, NW
Suite 910
Washington, DC  20004

Joanne R. Hepworth

U.S. DISTRICT
DIST. ...

'00 SEP 25 FM 3: 42

NANCY M.
MAYER-WHITTINGTON
CLERK

FILED

SEP 2 5 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| v. | * | CR. NO. 98-329-02(TPJ) |
| | * | |
| | * | |
| JEROME MARTIN | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DEFENDANT MARTIN'S MEMORANDUM
## OF SPECIFIC ITEMS REQUESTED UNDER HIS
## ADOPTED THIRD MOTION TO COMPEL DISCOVERY

Defendant Martin, by and through his attorney, Joanne Roney Hepworth, respectfully requests that the Court require the Government to provide discovery of the following items which, as of present, the Government has declined to provide:

**Brady Material:**

A.    Pursuant to *Brady v. Maryland*, Defendant Martin requests that the Court require that the Government turn over any evidence, including but not limited to, source names, addresses, phone numbers, relationship of source to the decedent or victim and the Defendant, any further investigation of the source, including, but not limited to, police/FBI notes, reports, radio runs and videos, and any other information regarding inconsistant statements, including , but not limited to, the following :

1.    Det. Kenneth Rodgers stated in his Affidavit in Support of Arrest Warrant, on 12/4/91, that he had interviewed a **witness** that observed a van driving with two subjects shooting out of the van. The source allegedly named Defendant Martin as one of the shooters in the van.

2.    In a Report of Investigation, dated 9/18/91, law enforcement interviewed a **source** which stated that he observed Defendant Martin in a white van (that allegedly was involved in the Sept. 10, 1991 shooting on 60th ST. and E. Capitol Streets). The source contradicts

App 744



himself and continued to state to the investigator that he also saw Defendant Martin and James Montgomery on a motorcycle during the same alleged incident.

B. The Government has yet to turn over the name, address, phone numbers, relationship of source to decedent and Defendant, any further investigation of the source, including, but not limited to, police/FBI notes, reports, radio runs and videos, and any other information regarding the confidential source that stated that Chandler, Jones and Gaithers were responsible for the Hart murder (OA 20).

**Materials Requested Pursuant to Rule 16.**

A. Disclosure of the description given of the individuals alleged to have assaulted police officers on September 10, 1991, the exact location of the person giving the description and any obstructions or impairments to their visibility.

B. As material to the preparation of the defense, defendant requested any and all information known to the government concerning the criminal history and reputation for violence of Anthony Fortune.

C. As material to the preparation of the defense, defendant requested the Tag Number, make, model, year, owner name, address, phone number and VIN number of:

(1) The motorcycle allegedly involved in the September 10, 1991 AWIK;

(2) any other vehicle in which the Defendant is alleged to have ridden and is relevant to the incidents of this indictment, information on which is in the knowledge, possession or control of the government.

WHEREFORE, for the reasons stated herein, Defendant Martin's adopted 'Third Motion to Compel Discovery,' and any reasons put forth at a hearing on this matter, Defendant Martin requests that this Court compel the Government to provide the items named above.

Respectfully Submitted,

Joanne Roney Hepworth
305 H Street, NW

-2-

App 745

Washington, D.C. 20001
(202)789-0037
(Fax)408-1606

## CERTIFICATE OF SERVICE

I, hereby, certify that a copy of the foregoing memorandum was telefaxed, on this the ___25___ day of September, 2000 to:

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20001

I, hereby, certify that a copy of the foregoing memorandum was hand delivered, on this the ___26___ day of September, 2000 to:

Steven R. Kiersh, Esquire
717 D Street, NW
Suite 400
Washington, D.C. 20004

Christopher Davis, Esquire
601 Indiana Ave., NW
Washington, DC 20004

Joseph Beshouri, Esquire
419 7th Street, NW
Ste. 201
Washington, DC 20004

Lexi Christ, Esquire
419 7th Street, NW
Ste. 201
Washington, DC 20004

-3-

App 746

App 747

Frederick Jones, Esquire
901 6th Street, SW
Ste. 409
Washington, DC  20024

Howard Bramson, Esquire
400 7th Street, NW #700
Washington, DC  20004

Jonathan Zucker, Esquire
601 Indiana Avenue, NW
Suite 910
Washington, DC  20004

Joanne R. Hepworth

-4-

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

7[] SEP 25 PM 3: 44

NANCY M.
MAYER-WHITTINGTON
CLERK

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **CR. NO. 98-329(TPJ)** |
| | * | |
| | * | |
| **JEROME MARTIN** | | **FILED** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

AUG 28 2000

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## ORDER

Upon consideration of Defendant Martin's Motion To Adopt Motions Filed By Codefendants, it is hereby ORDERED that said Motion is GRANTED.

And the following motions filed by codefendants shall apply to Defendnat Martin:

**MOTION FOR PRETRIAL HEARING TO DETERMINE THE EXISTENCE OF A CONSPIRACY AND TO DETERMINE THE ADMISSIBILITY OF CO-CONSPIRATORS STATEMENTS.**

- **MOTION FOR IN CAMERA REVIEW OF GRAND JURY TESTIMONY TO DETERMINE THE EXISTENCE OF A RACKETEERING ENTERPRISE.**

- **MOTION FOR PRETRIAL PRODUCTION OF STATEMENTS OF PERSONS WHO WILL NOT BE CALLED AS WITNESSES AT TRIAL.**

- **MOTION FOR A PRETRIAL HEARING TO DETERMINE THE ADMISSIBILITY OF VIDEO AND AUDIO TAPES.**

- **MOTION TO DISCLOSE IDENTITIES OF EACH CONFIDENTIAL INFORMANT REGARDLESS OF WHETHER THEY WILL BE CALLED AT TRIAL.**

- **MOTION FOR PRETRIAL IDENTIFICATION AND PRODUCTION OF JENKS MATERIAL.**

- **MOTION FOR AN ORDER DIRECTING THE GOVERNMENT TO GIVE NOTICE OF ITS INTENTION TO RELY UPON OTHER CRIMES EVIDENCE REGARDLESS OF WHETHER THE PRIOR BAD ACTS WERE ALSO**

UNCHARGED ACTS IN FURTHERANCE OF THE CONSPIRACY.

- **MOTION FOR NOTICE OF GOVERNMENT'S INTENTION TO USE RESIDUAL HEARSAY EXCEPTION UNDER RULE 803(24) AND INCORPORATED MEMORANDUM.**

- **MOTION FOR NOTICE OF GOVERNMENT'S INTENTION TO USE RESIDUAL HEARSAY EXCEPTION UNDER RULE 804(B)(5) AND INCORPORATED MEMORANDUM.**

- **MOTION TO IDENTIFY WITNESSES WITH JUVENILE ADJUDICATION'S AND PENDING JUVENILE PROCEEDINGS AND TO INSPECT JUVENILE FILES PURSUANT TO DAVIS V. ALASKA.**

- **MOTION TO DISMISS COUNTS FORTY-EIGHT, FORTY-NINE, FIFTY AND TO STRIKE OVERT ACTS AND RACKETEERING ACT 70 (A)-(G) OF COUNT TWO OF THE INDICTMENT AND TO STRIKE ALL REFERENCES TO THE TRIPLE MURDER IN TEMPLE HILLS, MARYLAND.**

- **MOTION FOR CHANGE IN LOCATION OF CONFINEMENT PENDING TRIAL.**

- **THIRD MOTION TO COMPEL DISCOVERY**

Defendant Martin, moves to adopt and join the following motions filed by Codefendant Carson:

- **DEFENDANT'S MOTION FOR NOTICE OF GOVERNMENT'S INTENTION TO USE RESIDUAL HEARSAY EXCEPTION UNDER FRE 807.**

- **DEFENDANT'S MOTION FOR DISCOVERY OF STATEMENTS OF CODEFENDANTS CAN CO-CONSPIRATORS AND MEMORANDUM IN SUPPORT.**

- **DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF EVIDENCE SUBJECT TO SUPPRESSION UNDER FED. R. CRIM. P. 12(b)(3).**

- **MOTION FOR DISMISSAL OF COUNTS, TO COMPEL DISCLOSURE OF EXCULPATORY EVIDENCE, AND FOR ADDITIONAL SANCTIONS DUE TO VIOLATIONS OF *BRADY v. MARYLAND*.**

- **SAMUEL CARSON'S MOTION FOR BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT THEREOF.**

Further, Defendant Martin, moves to adopt and join the following motion filed by Codefendant Vincent Hill:

App 750

- **DEFENDANT'S MOTION FOR DISCOVERY AND INSPECTION CONCERNING GOVERNMENT'S USE OF INFORMANTS, OPERATIVES AND COOPERATING INDIVIDUALS AND MOTION FOR DISCLOSURE OF EXCULPATORY EVIDENCE AND NOTICE TO THE GOVERNMENT OF EXCULPATORY EVIDENCE REQUESTED CONCERNING GOVERNMENT'S USE OF INFORMANTS, OPERATIVES AND COOPERATING INDIVIDUALS.**

JUDGE THOMAS P. JACKSON
UNITED STATES DISTRICT COURT
8/28/00



RECEIVED

AUG 2 2 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Case 1:98-cr-00329-RCL Document 1345-7 Filed 04/06/06 Page 58 of 263

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| v. | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **WILLIAM SWEENEY** | ) | |
| | ) | |

### MOTION TO ADMIT INTO EVIDENCE THE MARYLAND GRAND JURY TESTIMONY OF TWO UNAVAILABLE WITNESSES WHO WERE INTRODUCED BY THE STATE'S ATTORNEY FOR PRINCE GEORGE'S COUNTY

Defendant, by and through undersigned counsel, Steven R. Kiersh and Leonard Long, does hereby set forth to this Honorable Court as follows:

1.) This pleading relates to two individuals who have provided exculpatory information regarding William Sweeney in the context of the triple murder in Temple Hills, Maryland which is a subject of this indictment. The two witnesses, John Pinckney and Cheree Owens, can not be located and thus are unavailable to testify at trial.

2.) When the Maryland triple murder was prosecuted in the Circuit Court for Prince George's County, both Pinckney and Owens were called by the State's Attorney to testify before the grand jury on December 10, 1996 ( less than one month following the commission of the triple murders). Cheree Owens testified that prior to the past Thanksgiving she had been living in Temple Hills, Maryland with her fiancé John Pinckney. A man by the name Dennis Green came to her home and began talking on the telephone. She overheard Green say that "**Me (sic) just took three people out of the street.**" Afterwards, Owens told Green that he could no longer come to her house.

1

Green replied by demanding $200.00 in cash from Owens. Their dispute, over the course of the next few days, escalated with Green trying to kick her back door in. She said that he had a weapon and he and a friend were firing a weapon.

Cheree Owens was asked to adopt as truthful a nine page statement that she provided to the police prior to her appearance before the grand jury. She adopted the statement which in relevant part read as follows:

> **Q: In response to the telephone conversation between Dennis Green and the unknown person, what was Dennis' exact words?**
>
> **A: Man you should had come around here yesterday. Cause we went up the street and had to take these people out already. The person he was talking to asked who were we and he said me, Khalis and Frank and the rest of the guys. That is when I learned about a killing around here.**
>
> **Q: Did Dennis say why they killed these people?**
>
> **A: No.**
>
> **Q: When was this telephone conversation?**
>
> **A: Almost two weeks after the killing. That is when he stayed over night at my house.**

3.) John Pinckney also appeared before the Maryland grand jury. Pinckney acknowledged talking to the police about the triple homicide which is a subject of this indictment. The homicides occurred right down the street from the home he shared with Cheree Owens.

Pinckney addressed his activities with Dennis Green (the man who Owens testified was talking about murders). Pinckney testified that he was involved in drug running with Dennis Green. He further testified that after Green left his home, Ms.

2

App 754

Owens was shaking and crying. His testimony included the following statement. **"And so after he (Green) had left, she told me what he had said on the cell phone while he was upstairs in one of the bedrooms, and that it had something to do with the homicide down the street."**

4.) Defendant submits that the respective grand jury testimony of Cheree Owens and John Pinckney is relevant and material as follows:

> **a.) It demonstrates that Dennis Green, a person entirely unknown to Mr. Sweeney, was a suspect in the investigation of the triple murders;**
> **b.) It demonstrates that Dennis Green acknowledged responsibility for the triple murders and provides a motive for the murders;**
> **c.) It demonstrates that Dennis Green was involved in narcotics trafficking, possessed weapons, and used threats to intimidate individuals. This is the type of conduct that can very easily lead to murder.**

5.) The Grand Jury testimony of the unavailable witnesses is clearly exculpatory and should be admitted into evidence for consideration by the jury.

6.) The United States Marshal has been unable to locate either Mr. Pinckney or Ms. Owens

7.) Attached to this Pleading are the following Exhibits to this Motion.

> **a.) Grand jury testimony of John Pinckney;**
> **b.) Grand jury testimony of Cheree Owens;**
> **c.) Statement of Cheree Owens;**
> **d.) Returns of service from the U.S. Marshal evidencing an inability To locate either Pinckney or Owens;**
> **e.) Statement of charges against Dennis Green.**

---

Footnote #1: In September, 1999, Defendant's investigator was able to locate Pinckney and Owens. They could not be subpoened because there was no pending trial date. They told the investigator substantially the same story as is in the respective Grand Jury transcripts. The investigator could not again locate them.

3

App 755

**WHEREFORE**, the foregoing considered, Defendant prays this Honorable Court

for an Order authorizing the admission of the grand jury testimony of John Pinckney

and Cheree Owens into evidence.

Respectfully submitted,

Steven R. Kiersh # 323329
717 D Street, NW
Suite 400
Washington, D.C. 20004
(202)347-0200

/s/sek

Leonard Long
1818 11th Street, NW
Washington, D.C. 20001

4

App 756

**FILED**

NOV 0 2 2000

NANCY MAYER WHITT...
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA )
)
v.                        )        **Criminal No. 98-329**
)        **(TPJ)**
WILLIAM SWEENEY           )
)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ADMIT INTO EVIDENCE THE MARYLAND GRAND JURY TESTIMONY OF TWO UNAVAILABLE WITNESSES WHO WERE INTRODUCED BY THE STATE'S ATTORNEY FOR PRINCE GEORGE'S COUNTY, MARYLAND

Federal Rule of Evidence 804(b)(1) provides that grand jury testimony of an unavailable witness may be received in evidence as an exception to the hearsay rule. The rule very clearly allows the admission of the grand jury testimony if the Declarant is unavailable as a witness and the testimony is being offered at the same or similar hearing if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination. **See United State** v. **Young Bros., Inc.,** 728 F.2d. 652, (5th Cir. 1983).

In **United States** v. **Miller,** 284 U.S., App. D.C. 245, 904 F. 2d. 65 (1990), this Circuit had the opportunity to squarely address the admissibility of grand jury testimony. Therein, at the Defendant's trial he sought to call a witness who had testified before the grand jury. The trial court appointed counsel for the subpoenaed witness who then asserted his Fifth Amendment privilege and refused to testify at trial. The trial court denied the Defendant's motion to Motion to admit the grand jury testimony.

5

App 757

The determination of whether the subpoenaed witness had made a knowing and intelligent waiver of his privilege before the grand jury was deemed irrelevant. The Court pronounced that Federal Rule of Evidence 801(b)(1) was applicable regardless of a grand jury waiver. **"[T]he hearsay exception for former testimony of an unavailable witness is firmly rooted in our jurisprudence."** Id. at 904 F. 2d. 68, citations omitted.

In ultimately concluding that it was reversible error for the trial court not to admit the grand jury testimony, the Court emphasized as follows: **"Before the grand jury and at trial, Matarazzo's (subpoenaed witness) testimony was to be directed to the same issue-- the guilt or innocence of Morris and Ross (Defendants)."** Id. At 904 F. 2d. 68.

When the testimony of Ms. Owens and Mr. Pinckney was presented to the grand jury, it was done so by prosecuting officials for precisely the same charge which is a central part of the indictment herein. The State of Maryland agreed to dismiss the triple murder charges pursuant to an agreement with the United States to bring the charges under the umbrella of the RICO indictment pending before this Court.

Defendant is unable to ascertain the whereabouts of Owens and Pinckney. Accordingly, they are unavailable to testify at trial of this indictment.

The material, relevant and exculpatory grand jury testimony of Cheree Owens and John Pinckney must be received into evidence in order for William Sweeney to receive due process of law. The evidence found in the grand jury transcripts goes directly to the guilt or innocence of William Sweeney and must be introduced as part of

6

the overall body of evidence for jury consideration.

Steven R. Kiersh

Leonard Long

7

App 759

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| WILLIAM SWEENEY | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify true and correct copy of the Motion To Admit Into Evidence The

Maryland Grand Jury Testimony Of Two Unavailable Witnesses Who Were Introduced

By The State's Attorney For Prince George's County, Maryland and Memorandum of

Points of Authorities in Support of Motion To Admit Into Evidence The Maryland Grand

Jury Testimony Of Two Unavailable Witnesses Who Were Introduced By The State's

Attorney For Prince George's County, Maryland  was mailed, postage prepaid, on this

2nd day of ~~October~~ *November*, 2000 to:

Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington D.C. 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20001

8

App 760

Christopher Davis, Esquire
601 Indiana Avenue, NW
#910
Washington, D.C. 20004

Joanne Hepworth, Esquire
305 H Street, NW 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Gerald Fisher, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Frederick Jones, Esquire
901 6th Street, SW
#409
Washington, D.C. 20024

Howard Branson, Esquire
400 7th Street, NW
Washington, D.C. 20004

Jonathan S. Zucker, Esquire
601 Indiana Avenue, NW
Suite 910
Washington, D.C. 20004

Steven R. Kiersh

9

App 761

S-E-C-R-E-T

IN THE CIRCUIT COURT

FOR PRINCE GEORGE'S COUNTY, MARYLAND

IN RE:

Special Investigation        Grand Jury No. 56,192

_____/

TRANSCRIPT OF PROCEEDINGS

Grand Jury Room

County Courthouse

Upper Marlboro, Maryland

Tuesday, December 10, 1996

The Grand Inquest for the State of

Maryland for the Body of Prince George's County, was

convened at 9:30 o'clock a.m., Betty C. Ford,

Foreman, presiding.

PRESENT:

(A quorum of twenty-one members of the

Grand Jury was present.)

JOHN MALONEY, Assistant State's

Attorney for Prince George's County.

W. C. LYNN, Clerk-Reporter to the

Grand Jury.

S-E-C-R-E-T

FILED

NOV 0 2 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



DEFENDANT'S
EXHIBIT

App 762

P-R-O-C-E-E-D-I-N-G-S

MR. MALONEY:  Call Mr. Pinkney.

(Whereupon, the witness entered the room.)

THE FOREMAN:  Will you raise yhour right hand and be sworn?

You do solemnly promise and declare under the penalties of perjury that the testimony you shall give the grand inquest of the State of Maryland for the Body of Prince George's County shall be the truth, the whole truth, and nothing but the truth?

MR. PINKNEY:  I do.

JOHN ANTHONY PINKNEY having been firwst duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MALONEY:

Q    Say your name and spell your name for the record.

A.    My name is John Anthony Pinkney.

Q.    Spell your last name.

A.    P-I-N-K-N-E-Y.

Q.    How old are you?

A.    Thirty-two.

Q.    And is Cheree your fiance?

App 763

P-R-O-C-E-E-D-I-N-G-S

MR. MALONEY: Call Mr. Pinkney.

(Whereupon, the witness entered the room.)

THE FOREMAN: Will you raise yhour right hand and be sworn?

You do solemnly promise and declare under the penalties of perjury that the testimony you shall give the grand inquest of the State of Maryland for the Body of Prince George's County shall be the truth, the whole truth, and nothing but the truth?

MR. PINKNEY: I do.

JOHN ANTHONY PINKNEY

having been firwst duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MALONEY:

Q      Say your name and spell your name for the record.

A.      My name is John Anthony Pinkney.

Q.      Spell your last name.

A.      P-I-N-K-N-E-Y.

Q.      How old are you?

A.      Thirty-two.

Q.      And is Cheree your fiance?

App 764

A.    Yes, sir.

Q.    And where were you living until the month of November?

A.    At 2717 Iverson Street, Temple Hills, Maryland.

Q.    You understand that this is a Prince George's County Grand Jury investigating a homicide that occurred on November 17, 1996, and that every statement that you make and anything you say to this Grand Jury must be truthful?

A.    Yes, sir.

Q.    You understand that anything you say that is not truthful, you could be prosecuted for perjury. You could be sentenced up to 10 years, a fine, or both, is that correct?

A.    Yes, sir.

Q.    You understand that you are not a target of this investigation, and you do not have a right to remain silent.

Do you understand that?

A.    Yes, sir.

Q.    You also have a right if something you said would tend to incriminate you, you could ask to remain silent, to step outside, or see an attorney.

Do you understand that?

4

A.      Yes, sir.

Q.      Did you give a statement to the police in the last couple of days?

A.      Yes, sir.

Q.      Yesterday, in fact.

        I am showing you two different statements, one given at 1800 hours, and another one at 1345, the one at 1345 being a two page statement.

        Is that the statement that you made?

A.      Yes, it is.

Q.      Did you tell the police the truth about what occurred in the last couple of weeks?

A.      Yes, sir.

Q.      Did you know about a triple homicide that occurred in your neighborhood?

A.      Yes, sir.

Q.      How far away is that from your house?

A.      Right down the street from it, to be exact.

Q.      And that occurred --

A.      I live on 27.  That that happened on 25th avenue or 23rd.

Q.      And that was on Sunday, November 17th, that it was made public, is that correct?

A.      The 17th, yes, sir.

App 766

Q. And I want you to be frank with members of the Grand Jury.

What type of activities were you involved in with a person named Dennis Green?

A. I was in drug running.

Q. What were you doing?

A. The only thing I would do is set him up to that person, introduce him to that person, and they would do that from there.

Q. They were doing the sale and you were doing the introductions?

A. Right.

Q. Did Dennis every stay at your house?

A. Stayed once.

Q. Was he ever alone there with your fiance before you came home?

A. Yes, he was.

Q. Had you told him he could stay there?

A. Yes, I did.

Q. Did you come home later on that night?

A. Yes, I did.

Q. And did you ask Cheree if there was something wrong with her?

A. When I got home, she was shaking and crying, and stuff, and I asked her what was wrong

App 767

with her, and she said I couldn't tell you right now. I will tell you in the morning. I will wait until he leaves.

And so after he had left, she told me what he had said on the cell phone while he was upstairs in one of the bedrooms, and that it had something to do with the homicide down the street.

And he had heard her coming up the steps, and told one of his friends on the phone that I hit you back later. He knew she was coming up the steps.

Q. And did you ever say anything to Dennis?

A. That morning, when he left, he left early that morning, the next morning, he came back to ask me if he could stay gain, and I told him he could not stay at my house anymore, and for him to stop coming around my house and knocking go on my door. That is all I said to him.

I didn't tell him the reason, or anything else. I just told him to stop knocking on my door.

Q. How long did you know Dennis?

A. I knew Dennis's father. We grew up together, probably like 22 years.

7

Q.      Did any incidents occur after this happened?

A.      Yes.  Threats.  They coming up to my house, they kicked in my back door.  Two of his other buddies came through the front door, said let's go outside and talk, and I go outside to talk to them.

I would rather them hit me instead of my fiance.  Because she is pregnant right now, and I am frightened for them, too.  And when I opened the front door, and talked to them --

Q.      Who do you mean by them?

A.      California, Dennis and Free.

Q.      What is California's role in this, as far as you know from the drug trade?

A.      California is the head man of the organization.  Whatever he says goes, and they have to do.

Q.      I am sorry.  I interrupted you.

A.      And so I went out front and started talking to Dennis, and Dennis said, I hope your fiance not say anything to anybody.  I hate to have what happened down the street to happen to you, too.

Q.      Were there any incidents with them firing guns?

A.      Yes.  One time, we had just gotten the

townhouse, and we came home from the mall, and we heard this thumping sound, and I noticed they trying to get in the back door, and I pushed the refrigerator against the back door so they can't get in. That same day, he came back --

Q. He being?

A. Dennis, and this other guy. At this time he had a different guy with him named Craig, and Craig was standing on this side of the door, not thinking that I wouldn't look out the window to see him on the side.

He raised his shirt up like this, (indicating) and denims said, man, you all going to have to start paying me some money for what y'all know, and I said man, we don't owe you no money, and he said, whatever, man. I'm not bullshitin', man. There is going to be a lot of dead motherfuckers when I get through.

I said whatever, and shut the door.

Q. When Craig raised his shirt, what did you see?

A. I seen a 9 millimeter.

Q. California and Dennis, do think carry guns?

A. They stay strapped all the time.

PRINCE GEORGE'S COUNTY POLICE DEPARTMENT

STATEMENT OF VICTIM/WITNESS/SUSPECT

DATE: 12-8-96   TIME: _____

NT OF: Owens, Cheree Lynnette (Morgan)

ADDRESS: 2717 Iverson St. Temple Hills   PHONE: none

BUSINESS ADDRESS: —   PHONE: _____

SEX/RACE/DOB: F|B|6·23·67   POB: Wash DC.   HEIGHT: 5-06

WEIGHT: _____ HAIR: _____ EYES: _____ SSN: _____

DRIVER'S LICENSE NO: _____ TYPE OF OFFENSE: _____

STATEMENT TAKEN BY: Spivey 967   LOCATION: _____

STATEMENT: 3 weeks ago I Cheree L. Owens over heard a telephone Conversation with Dennis and some body else. Dennis said man you should have came Around Here we took 3 people out up the street. The person Dennis was talking to must have Asked Dennis who is we. Because he said Me, Coleaf Freak and us. Dennis said man you should have come around here yesterday. So I Cheree L. Owens started up the steps in the house and Dennis said MAN I hit you back I hit you back later. So then I Cheree asked Dennis Did John say he could spend the night he said ya. Dennis said he saw John at the store and John told him he could stay. So then John came home and I asked him did he say Dennis could stay over tonight and John said he did tell him that why. And I Cheree said I will tell you when Dennis leave. The Next day Dennis left and I told John what I heard Dennis say on

I HAVE READ THE ABOVE STATEMENT CONSISTING OF _____ PAGE(S). THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____
SIGNATURE

WITNESSED BY

DEFENDANT'S EXHIBIT
C

P.G.C. FORM #2998   3/84

Case 98-cv-00232-RCL   Document 134-7   Filed 04/06/06   Page 77 of 263

NAME: Owens, Cherie      CCN: _____

STATEMENT: the telephone. So then later that day John told Dennis that he couldn't to over the house No More. So then 2 weeks ago Dennis came over the house and told me he won't $200.00 dollars and I said I don't have NO $200.00 dollars to give you then dennis said you will give it to Me if I Do something to John. then I seen Dennis 2 days ago and Dennis said Now I want $270.00 dollars And I said for what. he said because I said so. That night Dennis and Coleaf and the Rest Of there Friends Kicked in My Back Door to My house and Broke the Bottom lock and the wood to the door. Me and John then Moved the Ice Box in front of the back door. then we started packing all of the stuffs in the house. Doing the time we all packing we here them out side of the house. then Dennis and Coleaf and the Rest of them say I'm going to Kill a whole lot of Mother Fuckers around here befor its all over with the they shot there guns in the air.

Q. How does John know Dennis?
A. He told me that he grew up with Dennis' fath

Q. How often would Dennis come to your house?
A. He would come to use the bathroom every now and then — he only spent the night once. Thats when I heard that conversation.

_Cherie A. Owens_

WITNESSED BY      SIGNATURE

App 772

Case 1:98-cr-00329-RCL  Document 1375-07  Filed 10/04/2026  Page 278 of 263

NAME: Owens, Terrell                          CCN: _____

STATEMENT: Dennis, Kaleef + Freak?

A. Dennis B/M/dark Skinned 5-08/5-09/
20-21 always wears black leather
Jacket - blue jeans - timberland boots

Kaleef - B/M/24-25/5-08 5-09/ wears navy
blue coat with the hood + fur around it
sometimes wears black timberlands or
sometimes wears brn timberlands.

Freak B/M/19-20/5-00 509/ smaller
than Kaleef + Dennis / Plaits in head /
black leather jacket / jeans / don't know
what shoes he wears wearing.

all of them carry guns but not
on their person all the time - they
will hide them in the bushes or someplace
close to where they are hangins out
so they can see them + get to them.
Dennis + Kaleef both carry 9mm
Freak - sawed off shotgun

There is another guy that they hang out
with named J.B. B/M/ 5-09 / med build
J.B + Freak share the shotgun

App 773

Case 1:98-cr-00023-RCL Document 134-7 Filed 10/00/06 Page 229 of 263

NAME: Owen, Cheree          CCN:

STATEMENT: Q What kind of cars do they drive?

A. ① gray Cadillac old 4dr with tinted windows
② red/gray Dodge Shadow
③ burgundy Bronco? 4dr, no back window looks new

I think the cars all belong to Kaleef. The others don't own cars that I know of

Q Is there anything else you can add?
A. This morning Dennis Bang on my Door and didn't leave untill people looked out the window. then I ~~us~~ went to the telephone to Call the police And the boy Freak walk up and Called Dennis And told him to walk up to the mall them up here. Thats when I walked to a nother pay phone and called the police.

WITNESSED BY          SIGNATURE

P.G.C. FORM #2998A 5/84          TIME TERMINATED:

Case 1:98-cr-00329-RCL Document 347 Filed 04/20/06 Page 80 of 263

NAME: OWENS, Cherre                    CCN:

STATEMENT: Q. Why did you and John Barricade your Selves inside your residence?

A. Because Dennis had seen me Coming from the telephone both and to me that if I Didn't give him the Money that he was going to beet Face up and Face is John. and then him a Coleaf and Freak Came over My house on Sunday Morning. and Dennis Started putting on the door and banging on the door saying I Know yall Mother Fuckers her me but thats Alright yall got to Come out. So me and John Started peer So we Could Move because things was getting out of hands. And then last week they had already Kicked My back door in.

Q. What did Dennis want the money for? ($200⁰⁰)

A. He did not say. I said what do you want me to give you $200⁰⁰ for. I Told him that I did not have $200⁰⁰ to give him. Then He walked off.

Q. When was This?

A. This was Friday 12-06-96 in the Evening

Q. What Happened on Sat 12-07-96, when you Saw Dennis?

A. He said, you did not give me the two Hundred dallors ($200⁰⁰), Today it is $270⁰⁰. " You are going to want to give

_____          _____
WITNESSED BY                  SIGNATURE

App 775

9

Q.    What kind of guns?

A.    JB, he carries a sawed off shotgun in his sleeve. The others carry a 9.

Q.    Who is JB?

A.    He is one of Dennis's friends. There are about 15 of them together.

Q.    Were any shots fired near your house?

A.    Yes. That next day, I would say Saturday, Saturday night we was coming from the pay phone, and we seen a bunch of them in the cut, and you could see through the fence, and there is just a bunch of them over there dressed up in black, and when I see Dennis, I ran in the house and let my fiance in, and after we got in, a couple of hours later, we heard something go pop, pop, and she asked me what that is, and I said that is gunshots.

Get down, that is gunshots, and we stayed in the house, cut off all the lights, and we had on the TV, but down real low.

Q.    Have you stayed barricaded in your house in --

A.    Barricaded. Boxes all over. We live in fear in our own house.

Q.    And you haven't been back there since the weekend?

A.    No, sir.

MR. MARLONEY:  I don't have any further questions.

Anyone else have any questions?

We are going to excuse you.  If anything comes up that you realize was incorrect or misstated you must notify me immediately.

Do you understand that?

THE WITNESS:  Yes, sir.

MR. MARLONEY:  Thank you for coming in.

(Witness excused.)

— — —

S-E-C-R-E-T

IN THE CIRCUIT COURT

FOR PRINCE GEORGE'S COUNTY

IN RE:

Special Investigation          Grand Jury No. 56, 192

_____/

TRANSCRIPT OF PROCEEDINGS

Grand Jury Room

County Court House

Upper Marlboro, Maryland

Tuesday, December 10, 1996

The Grand Inquest for the State of Maryland for the Body of Prince George's County, was convened at 98:30 o'clock a.m., BETTY C. FORD, Foreman, presiding.

PRESENT:

(A quorum of twenty-one members of the grand jury was present.

JOHN MALONEY, ESQ., Assistant State's Attorney for Prince George's County.

W. C. LYNN, Clerk-Reporter to the Grand Jury.

S-E-C-R-E-T



DEFENDANT'S EXHIBIT

App 778

P-R-O-C-E-E-D-I-N-G-S

MR. MALONEY: Call Ms. Owens.

(Whereupon, the witness entered the room.)

THE FOREMAN: Will you raise your right hand and be sworn?

You do solemnly promise and declare under the penalties of perjury that the testimony you shall give the Grand Inquest of the State of Maryland for the Body of Prince George's County shall be the truth, the whole truth, and nothing but the truth?

MS. OWENS: I do.

CHEREE LENETTE OWENS having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MALONEY:

Q. Say your name and spell your name for the record.

A. Cheree C-H-E-R-E-E Lenette Owens.

Q. And how old are you?

A. Twenty-nine.

Q. And until the last couple of days where have you been living?

A. From hotel to hotel.

Q.   Prior to that, where were you living?

A.   2717 Iverson Street.

Q.   Where is that?

A.   Temple Hills, Maryland.

Q.   Who were you living there with?

A.   My fiance.

Q.   You understand that this is a Prince George's County Grand Jury that is going to be investigating the homicides that occurred in Temple Hills in 1996, and that anything you say must be truthful?

A.   Yes.

Q.   You understand that you do not have a right not to testify, but if there is something that would in some way incriminate yourself, you could ask to remain silent.

Do you understand that?

A.   Yes.

Q.   You understand that you are not a party to this investigation in any means, but that everything you say is under oath and under the threat of perjury, which could be a 10 year sentence or fine, or both?

A.   Yes.

Q.   And you have to answer questions put

4

forth by me and other people here in the Grand Jury.

Do you understand that?

A. Yes.

Q. First of all, who is John Pinkney?

A. My fiance.

Q. And do you know a person named Dennis Green?

A. Yes.

Q. How did you know him?

A. Through John.

Q. And did there come a time, some days before Thanksgiving, that you saw Dennis Green?

A. Yes.

Q. Describe what happened.

A. Dennis came to my house and asked me could he come in. I let him in. He was on the telephone, talking to one of his friends.

Q. And who else was in the -- is it a townhouse?

A. Yes.

Q. Who else was there?

A. Just me and Dennis.

Q. And what, if anything, did you hear?

A. He told whoever he was talking to on the telephone that they should have came around there

and they must have asked him why, and he said because me just took three people out of the street.

Q.    Did you hear anything else?

A.    And whoever he was talking to must have asked him who is we. He said me, California, and Free, and the rest of the guys.

_ Who _

Q.    Do you know who the rest of the guys are?

A.    I know of California and Free, but I don't know them.

Q.    Showing you what is a statement made by you, apparently a nine page statement.

Look at that.

Is this the statement that you made to the police yesterday?

A.    Yes, it is.

Q.    And is that a truthful statement that you gave to them?

A.    Yes, it is.

Q.    Okay.

MR. MALONEY:    For the record, I am showing a statement given 12-8-96 by Cheree Lenette Owens, and signed by her.

we are
am getting this son

BY MR. MALONEY:

Q.    Describe what happened after you

App 782

heard these statements.

A. I went up the steps to ask him did John say he could spend the night, and whoever he was talking to on the phone, he said I will hit you back later, as to saying he couldn't talk no more right now.

Q. Did you talk to Dennis then?

A. Yes. I asked him did John say he could spend the night, and he said yeah, and I just went back downstairs and waited for John to come home.

Q. Did you tell John what happened the next day?

A. I told him after Dennis left the next day.

Q. Tell us what has happened since then.

A. Since then, I told John, John told him that he wasn't allowed to come in our house no more. So recently Dennis started asking me for money. First, it was $200, and then, when I told him that I didn't have $200 to give him, the next day, he told me, since I didn't give him the $200, it went to $270. And if I didn't give it to him, that they was going to do something to John, and that if I still didn't give it to him, after they beat John up, that

you know what would come next.

Q. Who was saying that?

A. Dennis.

Q. And when did he say that to you?

A. He told me that Saturday. This Saturday that just passed.

Q. Did there come a time when something happened to your back door?

A. Dennis and Free came around. I saw them coming to the door, so I went upstairs to get John, because John was in the shower, and they didn't knock on the door.

It was like they was going to walk around the house, and they went around the back, and they kicked my back door, and the door flew open, and the alarm went off.

Q. Did anything else occur then?

A. Yes. We put our refrigerator in front of the back door and started packing our stuff, because I didn't want to stay there no more.

Q. And just showing you the last paragraph of page two of your statement there, look at that. The part that you wrote.

A. Up here?

Q. Yes.

Q. Was there a time when they were firing guns off?

A. Yes.

Q. Describe what they said when they were doing that?

A. Dennis came around and banged on my door, and I didn't answer that door, so he left and went back around the corner with his friends, and they had been standing on the side of the house, like they watching the side of my house and stuff, and he was loud about what he was saying.

I know you motherfuckers are here, but you all got to come out.

Q. And was this a separate incident than the one you described before?

A. That was Sunday morning.

Q. This last Sunday morning?

A. Then, when they left, I went to the pay phone and called the police.

Q. Did they say anything about anyone else going to die before this was over?

A. He said after I finish with you all, a whole lot of motherfuckers going to wind up dead around here.

Q. Did you ever see any weapons?

A.    Yes.  The day that Dennis was on the telephone.

Q.    What did you see?

A.    He was laying on this little mattress on the floor in the little room, and he was talking on the cell phone, and he had the gun laying on the floor beside him.

MR. MALONEY:  At this time, I don't have any more questions for this witness.

If anyone else does.

All right.  I am going to excuse you. You are subject to being recalled.  Do you understand that?

THE WITNESS:  Yes.

MR. MALONEY:  If anything you said today you realize later was incorrect, or wrong, you must notify me immediately so we can correct that. Do you understand that?

THE WITNESS:  Yes.

BY THE GRAND JURORS:

Q.    When you overheard the conversation, and you said you didn't tell John the next day until Dennis was gone, and John told Dennis that he wasn't allowed to come to the house anymore, did he tell you what you had overheard?

App 786

A.     No.  He told him it was creating problems between us, and he didn't want him to come over there no more.

BY MR. MALONEY:

Q.     Did John ask you that night what was wrong with you?

A.     Yes.  But I told him I would tell him when Dennis leaves.

Q.     Do you think that Dennis heard you, or knows that you heard him on the phone?

A.     I think he knows now, because John told him he wasn't allowed in the house no more, and I think that is why all of this stuff escalated like it did.

MR. MALONEY:  Thank you very much.

(Witness excused.)

— — —

App 787

Case 1:98-cv-00329-CCL Document 134-7 Filed 01/04/2006 Page 93 of 263

NAME: OWENS, Clarae                          CCN: _____

STATEMENT: it to me after I beat face up
and you going to want to give it to
me because you know whats going to happen
after That. He Then just walk off
Q. Do you Think he is Cable of
carrying out This Threat?
A. Because Everybody around know that
They, Khalil, Dennis, Fraat and JB
will Rob you, beat you and Take
you Money.
Q. Have you known Them to Shoot anybody?
A. No, Not until after That Telephone Conversation,
with Dennis and this other person.
Q. Have They ever pull a gun on you
and Threatened you in the past?
A. No, They just Threatened me with
Their mouth's on Sat 12-07-96. This
is when he told me that he was going
to beat face up.
Q. Who was at The door on Sunday
Morning?
A. Dennis Khalis and Fraat.
Q. Did They have guns Then?
A. I don't know, I did not look out
of The window.
Q. Have you ever Seen Them with guns?

Det. D.J. _____ 8135                    _____ L. Owens

App 788

Case 1:98-cr-00329-RCL　Document 1475-07　Filed 11/01/06　Page 374 of 426

NAME: Owens, Charlee　　CCN: _____

STATEMENT: A. Yes

Q. Who all have guns?

A. Dennis, Khalis and J.B.

Q. What types of Guns?

A. Dennis has a 9mm, Khalis has a 9mm and J.B. has a Sawed off Shotgun with gray tape on the handle.

Q. How do you know They have guns?

A. Because I have seen the guns on them.

Q. How long have you known these guys?

A. I met them toward the Beginning of Nov, 1996. Because John use to hang with them to get drunk. John introduced them to me. Dennis use to come by my house all the time to us the bathroom.

Q. Are these guys selling drugs in your Neighborhood?

A. Yes all of Them.

Q. If you would have given Dennis The money he asked for, Do you Think That This would have stopped them from beating up John?

A. No.

Q. Are you afraid of These guys?

A. Yes, Very much.

Q. Do you Think That They would hurt or kill you?

Wit. O.S. _____　　　(signature) _____

App 789

Case 1:98-cv-03029-CCL Document 137-7 Filed 10/02/06 Page 385 of 263

NAME: Owens, Cheree          CCN:

STATEMENT: A. yes.

Q. In reference to the Telephone Conversation between Dennis and the Unknown person, What was Dennis exact words?

A. Man you should had came around here yesterday. Cause we went up the street and had to Take three people out already. The person he was talking to asked who were we and he said me, Khalis and Freak and the rest of the guys. That is when I learned about a killing around there.

Q. Did Dennis say why they killed these people?

A. No

Q. When was this Telephone Conversation?

A. Almost two weeks; after the killing. This is when he stayed over night at my house.

Q. Do you or John owe them (Khalis, Dennis J.R and Freak) any money, If so why?

A. No.

Q. Have you or John accepted any Merchandise from them in the past? (money or drugs)

A. No

Q. When Dennis made that comment in reference

WITNESSED BY _____          SIGNATURE (Cheree L. Owens)

P.G.C. FORM #2993A  5/84          TIME TERMINATED: _____

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
See Instructions for "Service of Process by the U.S. Marshal"
on the reverse of this form.

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| United States | 98cr329(TPJ) |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| William Kyle Sweeney | Subpoena |

**SERVE** ➤ **AT**

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC., TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
John Anthony Pinckney

ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code)
2813 Gainesville Street SE Washington, DC

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW:

Steven R. Kiersh
717 D Street NW
Suite 400
Washington, DC
20004

| | |
|---|---|
| Number of process to be served with this Form - 285 | |
| Number of parties to be served in this case | |
| Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available For Service):

Fold

DOB: 10/26/64
SS#: 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

Fold

| Signature of Attorney or other Originator requesting service on behalf of: | ☐ PLAINTIFF ☒ DEFENDANT | TELEPHONE NUMBER (202)347-0200 | DATE |
|---|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY — DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. (Sign only first USM 285 if more than one USM 285 is submitted) | Total Process | District of Origin No. 16 | District to Serve No. 16 | Signature of Authorized USMS Deputy or Clerk | Date 10/6/00 |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☒ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above (See remarks below)

| Name and title of individual served (if not shown above) | ☐ A person of suitable age and discretion then residing in the defendant's usual place of abode. |
|---|---|
| Address (complete only if different than shown above) | Date of Service 10/19/00  Time 10:40 ☐ am ☒ pm |
| | Signature of U.S. Marshal or Deputy  Regald Bradshaw |

| Service Fee $45 | Total Mileage Charges (including endeavors) 2.60 | Forwarding Fee — | Total Charges $47.60 | Advance Deposits | Amount owed to U.S. Marshal or | Amount of Refund |
|---|---|---|---|---|---|---|

REMARKS: LANDLORD TYLER LAWLOR REPORTED THAT SUBJECT WAS EVICTED FROM THE PROPERTY IN FEBRUARY 2000 NO FURTHER INFORMATION AVAILABLE RB

**NOTE**

DEFENDANT'S EXHIBIT
d

| PRIOR EDITION MAY BE USED | **3. NOTICE OF SERVICE** | FORM USM-285 (Rev. 12/15/80) |
|---|---|---|

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
See Instructions for "Service of Process by the U.S. Marshal"
on the reverse of this form.

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| United States | 98cr329(TPJ) |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| William Kyle Sweeney | Subpoena |

**SERVE** ➡

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC., TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

Cheree Lenette Owens

**AT**

ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code)

2813 Gainesville Street SE Washington, DC 2622

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW:

Steven R. Kiersh
717 D St NW
Washington, DC
Suite 400
20004

| | |
|---|---|
| Number of process to be served with this Form - 285 | 1 |
| Number of parties to be served in this case | |
| Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available For Service):

Fold

DOB: 6/23/67    SS#: 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

Mothers address: 4425 Arnold Road
Suitland, MD 20746
#102

Fold

Signature of Attorney or other Originator requesting service on behalf of:    ☐ PLAINTIFF  ☒ DEFENDANT

TELEPHONE NUMBER (202) 347-0200    DATE

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY — DO NOT WRITE BELOW THIS LINE**

I acknowledge receipt for the total number of process indicated.
(Sign only first USM 285 if more than one USM 285 is submitted)

| Total Process | District of Origin No. | District to Serve No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|
| | | | | 10-16-00 |

I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☒ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above (See remarks below)

Name and title of individual served (if not shown above)

☐ A person of suitable age and discretion then residing in the defendant's usual place of abode.

Address (complete only if different than shown above)

| Date of Service | Time | am / pm |
|---|---|---|
| 10/19/00 | 10:40 | |

Signature of U.S. Marshal or Deputy

| Service Fee | Total Mileage Charges (including endeavors) | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal or | Amount of Refund |
|---|---|---|---|---|---|---|
| $44 | 2.60 | — | $47.60 | | | |

REMARKS:
LANDLORD TYLER LAWSON REPORTS THAT SUBJECT WAS EVICTED FROM PROPERTY IN FEBRUARY 2000 NFI RFD

**NOTE**

DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S          (City/County)

LOCATED AT (COURT ADDRESS)
MAIN ST., UPPER MARLBORO, MD.

DC Case No. E00061797    RELATED CASES:

COMPLAINANT/APPLICANT

DETECTIVE DWIGHT S. DELOATCH

Name          (Print)
8400 BARLOWE RD.

Address          (Number and Street)
LANDOVER, MD. 20785    772-4925

City, State, and Zip Code          Telephone
MD0172100          1035

Agency, Sub-Agency, and I.D. #    (Officer Only)

DEFENDANT

GREEN, DENNIS STANLEY

Name          (Print)
4443 23rd. PKWY

Address          (Number and Street)
Temple Hills, Md.

City, State, and Zip Code          Telephone

CC#

DEFENDANT'S DESCRIPTION: Driver's License #............... Sex M Race B Ht 5-7 Wt 210

Hair B Eyes Brn Complexion dark Other................ D.O.B. 06-16-76 ID................

APPLICATION FOR STATEMENT OF CHARGES          Page 1 of _____

I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about November 28, 1996

at 2717 Iverson St., Temple Hills, Prince George's County, Maryland, the above named Defendant

(Concise statement of facts showing that there is probable cause to believe that a crime has been committed and that the Defendant has committed it):

On November 26, 1996, the defendant stayed overnight at victims John Pinckney and Cheree Owens residence at 2717 Iverson St., Temple Hills, Prince George's County, Maryland. On this date, Ms. owens heard the defendant talking on the telephone to an unknown person. The defendant told the unknown person that "you should have came around here, we (khalis He Herring and Freak) took three people out up the street. On November 17, 1996, three people were killed in the 3900 block of 25th Ave., Temple Hills, Maryland. On November 29, 1996

(Continued on attached............pages) (DC/CR 1A)

I solemnly affirm under the penalties of perjury that the contents of this Application are true to the best of my knowledge, information and belief.

January 06, 1997
Date

Officer's Signature

I have read or had read to me and I understand the Notice on the back of this form.

Date

Applicant's Signature

Subscribed and sworn to before me this .....6..... day of ..........Jc u e....., 19....97....

Time: ...5:3...P..M    Judge/Commissioner............. I.D. 5824

I understand that a charging document has been issued and that I must appear for trial ☐ on .................
Date
at .......................  ☐ when notified by the Clerk, at the Court location shown at the top of this form.
Time

Applicant's Signature

☐ I declined to issue a charging document because of lack of probable cause.

Date          Commissioner    I.D.

Witnesses' Names and Addresses:

Name          Number and Street/Agency/Sub-agency/I.D.          City, State, Zip

Name          Number and Street/Agency/Sub-agency/I.D.          City, State, Zip

Name          Number and Street/Agency/Sub-agency/I.D.          City

DEFENDANT'S EXHIBIT
App 793



**DISTRICT COURT OF MARYLAND FOR.** PRINCE GEORGE'S                    (City/County)

| LOCATED AT (COURT ADDRESS) | DISTRICT COURT CASE NUMBER |
|---|---|
| MAIN ST., UPPER MARLBORO, MD. | JE 000 67797 |

DEFENDANT'S NAME (LAST, FIRST, M.I.)

GREEN, DENNIS STANLEY

### APPLICATION FOR STATEMENT OF CHARGES (CONTINUED)   Page ___ of 2

the defendant and a person known only by the first name of craig, approached Mr. Pinckney at his residence.  The defendant told Mr. Pinckney that he wanted two hundred dollars from him for them not to say anything about the telephone conversation that Ms. owens over heard between the defendant and an unknown person.  If he (Mr. Pinckney) did not give him the money, he (defendant) would hate to see what happened to the people up the street "happen to them."  Craig then pulled up his sirt and showed Mr. Pinckney a handgun that he had in his waistband.

On December 06, 1996, the defendant approached Ms. owens and told her that he wanted two hundred dollars ($200.00) or he was going to beat up Mr. Pinckney, in order for them to be quiet.

On December 07, 1996, the defendant approached Ms. Owens and stated that he now needed two hundred seventy dollars ($270.00), because they did not honor the two hundred do: request.  Also, on this date, later that evening, the defendant and a person known to the victims as Freak, kicked the back door in to the victim's residence, damaging the door fra and the locks to the door.  The defendant and Freak was not able to entered the residence because the victims had barricade themselves inside their residence.  The defendant told the victims that they had to come out sometime.

On December 08, 1996, the victims contacted this police department and was removed from their residence and placed in a witness protection program for their personal safety.

| | |
|---|---|
| January 06, 1997 | ~signature~ |
| Date | Applicant's Signature |

| TRACKING NUMBER |
|---|
| 97R971-57896 |

DC/CR 1A (Rev. 8/94)

App 794



RECEIVED
U.S. DISTRICT COURT
DIST. OF COLUMBIA

AD NOV -2 PM 12: 48

NANCY M.
MAYER-WHITTINGTON
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,                              )
                                            )
                                            )
                                            )
     v.                                     )  Criminal No. 98-329-01 (TPJ)
                                            )
VINCENT K. HILL, et al.,                    )
                                            )
          Defendants.                       )
                                            )
_____         )
                                            )
UNITED STATES,                              )
                                            )
                                            )
                                            )
     v.                                     )  Criminal No. 99-348-03 (TPJ)
                                            )
GARY PRICE,                                 )
                                            )
          Defendant.                        )
                                            )
_____         )

**FILED**

SEP 2 8 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ORDER

In accordance with the proceedings in open court at the motions hearing of September 26 and 27, 2000, and upon consideration of the evidence taken and the representations of counsel, for the reasons advanced by the government or set forth on the record, it is this 28th day of September, 2000,

ORDERED, that the government's motions to quash defendant Carson's subpoenas duces tecum addressed to the acting chief of human resources at the U.S. Department of Agriculture and to the medical examiners office [#197, #193] are denied as moot; and it is

FURTHER ORDERED, that the government's motion for an anonymous jury [#289] is granted, subject to conditions to be determined at a later date; and it is

FURTHER ORDERED, that the government's motion to admit out-of-court statements of murdered witnesses [#314] is granted as to the statements of Robert Smith and Kevin Hart, subject to the condition that the government disclose any and all evidence in its possession which

App 796

may impeach the out-of-court statements of Smith and/or Hart or may indicate that persons other than defendants attempted or had reason to murder Smith and/or Hart, and is denied as moot as to the statements of Chrishuana Gladden; and it is

FURTHER ORDERED, the defendants' joint motion to strike all racketeering counts and counts under the Violent Crime in Aid of Racketeering Statute, 18 U.S.C. § 1959 et seq., [#338] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Sweeney's motion to dismiss counts 48, 49, and 50, and to strike overt acts and racketeering act 70(a)-(g) of Count 2 and to strike all references to the triple murder in Maryland [#307] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss the indictment for prejudicial pre-accusatorial delay, violations of the statute of limitations, and Speedy Trial Act provisions [#337] is granted as to Counts 10, 11, 12, 13, 14, 15, 16, 18, and 19, on statute of limitations grounds only, and denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss Counts 1 and 2 on Fifth and Sixth Amendment grounds [#336] is denied; and it is

FURTHER ORDERED, the defendant Carson's motion for dismissal of counts, to compel disclosure of exculpatory evidence, and for sanctions [#329] is denied; and it is

FURTHER ORDERED, that defendant Carson's and Martin's motions to strike all aliases from the indictment [#330, #335] are denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to identify witnesses with juvenile adjudications and pending juvenile proceedings and to inspect juvenile files [#311] is denied without prejudice as moot; and it is

2

App 797

FURTHER ORDERED, that defendant Sweeney's motion to disclose identities of each confidential informant regardless of whether the informant will be called as a witness at trial [#303] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial identification and production of Jencks material [#302] is denied as moot, provided that the government shall disclose Jencks and Giglio materials relating to a witness the Friday before the week in which the witness testifies; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial production of statements of persons who will not be called as witnesses at trial [#308] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion for discovery of statements of co-defendants and co-conspirators [#326] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order directing the government to give notice of its intention to rely upon other crimes evidence [#310] is denied without prejudice, to the extent that notice has not otherwise been furnished; and it is

FURTHER ORDERED, that defendant Carson's motion for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 807 [#325] and defendant Sweeney's motions for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 804(b)(5) [#304] and 803(24) [#309] are denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine the admissibility of the testimony of each of the government's proposed expert witnesses [#230] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for in camera review of grand jury testimony to determine existence of racketeering enterprise [#301] is denied; and it is

3

App 798

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine existence of conspiracy and admissibility of co-conspirators' statements [#312] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion to compel disclosure of evidence subject to suppression under Fed. R. Crim. P. 12(b)(3) [#328] is denied as moot; and it is

FURTHER ORDERED, that defendant Carson's motion for bill of particulars [#327] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's third motion to compel discovery [#340] is granted to the extent that the government must disclose the above-mentioned evidence regarding Robert Smith and is denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to suppress evidence from the seizure that occurred on or about September 14, 1991, [#334] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress physical evidence seized from the November 1, 1994, search at 211 I Street, SE, [#306] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress identification testimony from February 19, 1997, [#344] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's second motion to suppress identification testimony [#378] is denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress custodial statements made on or about April 20, 1997, [#305] is denied; and it is

FURTHER ORDERED, defendant Martin's motion to suppress statements [#333] is denied as moot as to the statements made January 24, 1992, October 27, 1992, and June 9, 1994,

4

App 799

and denied on the merits as to the statements made on or about August 7, 1991, and September 16, 1997; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress evidence and statements from the April 21, 1992, search [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress identification from February 3, 1997 [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for change in location pending trial [#296] is granted to the extent that defendant will be incarcerated in D.C. Jail or elsewhere in the metropolitan area during trial; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order granting leave to serve subpoenas on two assistant United States attorneys [#291] is denied; and it is

FURTHER ORDERED, that defendant Coates' motion for reconsideration of motion for severance [#366] and all other defendants' oral renewed motions for severance are denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion to compel disclosure of exculpatory evidence (filed September 26, 2000) is denied; and it is [# 412]

FURTHER ORDERED, that defendant Carson's supplemental motion for bill of particulars of unindicted crimes which the government intends to prove at trial (filed September 27, 2000) is denied; and it is [#414]

FURTHER ORDERED, that defendant Proctor's motion to compel discovery (filed September 27, 2000) is denied without prejudice.

Thomas Penfield Jackson
U.S. District Judge

FILED

NOV 0 6 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :

    :    Crim. No. 98-329 (TPJ)

    :

v.    :

    :

SAMUEL CARSON, et al.    :

**Defendants**    :

## SAMUEL CARSON'S MOTION TO ADOPT WILLIAM SWEENEY'S MOTION TO ADMIT INTO EVIDENCE THE MARYLAND GRAND JURY TESTIMONY OF TWO UNAVAILABLE WITNESSES WHO WERE INTRODUCED BY THE STATE'S ATTORNEY FOR PRINCE GEORGE'S COUNTY

Samuel Carson, by and through his undersigned counsel, respectfully moves this Honorable Court to adopt and conform to the motion previously filed by William Sweeney captioned "Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's Attorney for Prince George's County."

Respectfully submitted,

*Joseph E. Beshouri by jnc*

Joseph E. Beshouri
419 Seventh St., N.W., Suite 201
Washington, D.C. 20004
(202) 842-0420

*Lexi Negin Christ*

Lexi Negin Christ
419 Seventh St., N.W., Suite 201
Washington, D.C. 20004
(202) 638-6700

Counsel for Samuel Carson

452

App 801

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 98-329 (TPJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **SAMUEL CARSON, et al.** | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants Carson's foregoing Motion to Adopt was mailed, postage prepaid, on this the _16th_ day of _November_, 2000 to:

Assistant United States Attorney Anjali Chaturvedi
Office of the United States Attorney
555 4th Street, N.W.
Washington D.C. 20001

Assistant United States Attorney Peter Zeidenberg
Office of the United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Christopher Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Steven R. Kiersh, Esq.
717 D Street, NW
Fourth Floor
Washington, D.C. 20004

Leonard Long, Esq.
1818 11th Street, N.W.
Washington, D.C. 20001


Howard Bramson, Esq.
400 7th Street, N.W.
Washington, D.C. 20004

Jonathan S. Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C.

Lexi Negin Christ

NOV 1 ⌐ FILED

NANCY MAYER
U.S. DIS. NOV 16 2000

MARC: ...WHITTINGTON, CLERK
... ...... COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :    Criminal No. 98-329 (TPJ)

    :

v.    :

    :

VINCENT HILL, ET. AL.    :
    Defendants.    :

---

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS SWEENEY AND HILL'S MOTIONS FOR ADMISSION OF GRAND JURY TESTIMONY OF UNAVAILABLE WITNESSES

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby requests that this Court deny the motions of defendants Sweeney and Hill to admit the grand jury testimony of unavailable witnesses. In support of this opposition, the government states as follows:

1.    Defendants Sweeney, Carson and Coates have been charged in connection with the triple murder that occurred in Temple Hills, Maryland on November 17, 1996. That homicide was originally investigated by the Prince George's County Police Department, along with the State's Attorney's Office in Prince George's County. Initially, the investigators had no identifying eyewitnesses to this murder and had no strong investigative leads. Within several weeks, investigators identified John Pinckney and Cheree Owens as potential witnesses. Pinckney and Owens told investigators that they overheard a telephone conversation by an individual named Dennis Green in which Green claimed responsibility for what sounded like the triple murder in Temple Hills. Both Pinckney and Owens were put into the grand jury and testified regarding Dennis Green and his alleged involvement in the triple homicide. At the time Pinckney and Owens testified, the

investigators had no reason to believe that either Pinckney or Owens were lying.[1] After testifying in the grand jury in Prince George's County, both Pinckney and Owens seemingly disappeared. Defendant Sweeney is now seeking to admit the testimony of both Pinckney and Owens.

2.      Defendant Hill is also seeking to admit the testimony of an unavailable witness, named Michael Jenifer, who testified on March 20, 1990, regarding the murder of Larry "Patcho" Wright, a homicide that defendant Hill is now alleged to have committed. At the time Mr. Jenifer testified, however, one Tyrone Brawner was charged with having committed the murder of Mr. Wright. Mr. Jenifer professed to have no knowledge of the murder of Larry Wright, but claimed that he was in the company of Vincent Hill for virtually the entire day that Mr. Wright was killed. Mr. Jenifer was subsequently killed in November 3, 1990[2], and defendant Hill is seeking the admission of Mr. Jenifer's grand jury testimony.

**Argument**

The precise argument advanced by defendants Sweeney and Hill -- that exculpatory grand jury testimony of an unavailable witness should be admissible by the defense – was made in United States v. Salerno, 505 U.S. 317 (1992). In Salerno, a RICO prosecution, the defendants sought to introduce

---

[1]This view quickly changed. The police soon came to believe that they were being used by Pinckney and Owens. This belief was based on the fact that Pinckney and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then demanded additional funds. The police also learned that Pinckney and Owens owed Dennis Green – the person they implicated in the triple murder -- money for drugs. After investigating more fully, the police found nothing to corroborate the stories of Pinckney and Owens. A short time later, Pinckney and Owens seemingly disappeared.

[2]The government is unaware of the circumstances surrounding the murder of Mr. Jenifer. The defense has not suggested that Mr. Jenifer was killed because of his status as a potential witness in the murder of Larry Wright.

the exculpatory grand jury testimony of unavailable witnesses.[3]    The Court first looked to Rule

804(b)(1), which states, in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is
> unavailable as a witness:
>     Former Testimony. – Testimony given as a witness at another
> hearing . . . if the party against whom the testimony is now offered .
> . . had an opportunity and similar motive to develop the testimony by
> direct, cross, or redirect examination.

The Salerno Court held that the grand jury testimony that the defense sought to introduce was

inadmissible absent a showing that the government had a "similar motive" in "developing" the

testimony at issue.  Salerno at 322.  The defendants here cannot make such a showing.  In the case

of defendant Sweeney, the government had absolutely no motive to impeach either Pinckney or

Owens.  On the contrary, at the time the witnesses were presented to the grand jury, the government

believed they were being truthful.  Certainly the government had no reason to believe at that time that

the witnesses were falsely implicating Mr. Green.  Thus, there was absolutely no motive for the

assistant state's attorney to cross-examine either witness when they testified in the grand jury.

Similarly, the government had no motive to cross-examine Mr. Jenifer when he testified that

he was with Vincent Hill at the time of the murder of Larry Wright.  As pointed out previously,

Vincent Hill was not charged with Mr. Wright's murder at the time of the testimony of Mr. Jenifer;

an individual name Tyrone Brawner was charged with this offense.  There was no reason for the

prosecutor to attempt to impeach or attack Mr. Jenifer's testimony when that testimony did not

exculpate the individual was at that time being prosecuted for Larry Wright's murder.

---

[3]In Salerno, the witnesses were unavailable because they asserted their Fifth Amendment
privilege.

Because the defendants have failed to establish that the government had a similar motive to develop the grand jury testimony of the proffered witnesses, the admission of this testimony is barred by Fed. R. 804(b)(1).

WHEREFORE, it is respectfully requested that defendants' motion be denied.

Respectfully submitted,

WILMA A. LEWIS
UNITED STATES ATTORNEY

By: _____
PETER R. ZEIDENBERG
Assistant United States Attorney
D.C. Bar #440-803
555 4th Street, N.W.
Washington, D.C. 20001
(202)353-8831

By: _____
ANJALI CHATURVEDI
Assistant United States Attorney
D.C. Bar # 446-177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by mail upon the attorneys for the defendants as set forth below, this _16_<sup></sup>day of November, 2000.

Steven R. Kiersh, Esq.
1825 K Street, N.W.
Suite 901
Washington, D.C. 20006

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
307 G Street, N.W.
Washington, D.C. 20001

Howard Bramson, Esq.
717 D Street, N.W., #300
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker
601 Indiana Avenue, N.W. # 910
Washington, D.C. 20004

PETER R. ZEIDENBERG
Assistant United States Attorney

Steven R. Kiersh, Esq.
1825 K Street, N.W.
Suite 901
Washington, D.C. 20006

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
307 G Street, N.W.
Washington, D.C. 20001

Howard Bramson, Esq.
400 7th Street, N.W., #400
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker
601 Indiana Avenue, N.W. # 910
Washington, D.C.  20004

FILED

MAY 1 4 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES        )
                       )
                       )
v.                     )      **Criminal No. 98-329**
                       )      **(TPJ)**
SAMUEL CARSON      )
                       )

## MOTION FOR REMEDY FOR GOVERNMENT'S FAILURE TO PROVIDE EXCULPATORY IMPEACHMENT MATERIAL IN A TIMELY MANNER RELATING TO WITNESS DEMETRIUS HUNTER

Samuel Carson, through undersigned counsel, respectfully moves this Court for remedies for the government's failure to provide exculpatory impeachment material in a timely manner relating to the testimony of witness Demetrius Hunter. In support of his motion he states:

1. Demetrius Hunter, a cooperating government witness, testified at trial that he observed Sam Carson shoot Ulysses English. During his direct testimony, Mr. Hunter testified that he observed Mr. Carson come out of a courtyard with a gun in his hand. Mr. Hunter testified that he then observed Mr. Carson alone shoot someone he knew as "Lou". The government never elicited what **type** of weapon Mr. Hunter observed Mr. Carson use to shoot "Lou". At the time of Mr. Hunter's direct testimony, the government was well aware that Mr. Hunter had previously stated that he observed Mr. Carson use a **revolver** to shoot Mr. English. This information, which is directly contrary to the physical evidence recovered at the crime scene[1], was <u>not</u> provided to

---

[1] Subsequent to the testimony of Mr. Hunter, the government presented a Crime Scene Search Officer who responded to the scene of the Ulysses English shooting. Officer Lund testified that numerous shell casings were found in a "path" leading to where the victim fell. The facts as provided in discovery and as presented at trial demonstrate that the shooter used a semi-automatic weapon, which leaves shell casings, to shoot Mr. English.

1

App 810

the defense prior to or during Mr. Hunter's testimony.[2]

2. Without knowing that Mr. Hunter had previously made a statement that was in such complete contradiction with the physical evidence from the Ulysses English shooting, the thrust of Mr. Carson's cross-examination of Mr. Hunter with respect to this particular incident focused on his motives to lie and the implication that he fabricated his testimony. Certainly, the information that Mr. Hunter claims to have seen Mr. Carson use a **revolver**, which **does not** leave shell casings, in an incident where shell casing are found literally in a path leading to where the victim fell, would have served to challenge most effectively, and in a more compelling manner, Mr. Hunter's claim that he was present at the time of Mr. English's shooting.

3. Similarly, because the information was not provided to the defense in a timely fashion, Mr. Carson did not have the opportunity to effectively cross-examine the Crime Scene Search Officer regarding the import of finding shell casings at the scene of Mr. English's shooting.

4. The most opportune moment to demonstrate to the jury that the physical evidence from the crime scene is in complete contradiction to Mr. Hunter's testimony was during the testimony of Mr. Hunter and the Crime Scene Search Officer. That moment is gone forever.

5. A day after the testimony of Mr. Hunter and the Crime Scene Search Officer the government provided to Mr. Carson notes of FBI Agent Kristin Kane dated January 28, 1998, which reveal that Mr. Hunter told her that he saw Mr. Carson use a **revolver** to shoot "Lou" and that the sound of the gunshots were **"slow & loud"**. It is unclear to Mr. Carson why these notes were not provided as Jencks material prior to the witness's testimony as they appear to be a contemporaneous and a verbatim recitation of Mr. Hunter's account of the Ulysses English

---

[2] Prior to trial Mr. Carson made written general continuing requests for <u>Brady</u> material.

App 811

shooting.[3]

6. The government has been in possession of this information that contradicts the physical crime scene evidence since January of 1998, but that valuable information has **never** been provided to Mr. Carson.

7. The Court should fashion a remedy to Mr. Carson for the government's failure to timely disclose compelling information that the government's witness has lied – or at the very least has claimed to have seen something that is in complete contradiction to the physical evidence in the incident.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   THE GOVERNMENT'S FAILURE TO PROVIDE THE INFORMATION IN A TIMELY MANNER VIOLATES MR. CARSON'S DUE PROCESS RIGHTS TO A FAIR TRIAL

The prosecution has an **affirmative duty** to disclose to the defendant evidence favorable to him. Brady v. Maryland 373 U.S. 83 (1963). The Supreme Court has made very clear that there is no difference between information that is exculpatory and evidence that impeaches the witness's testimony. United States v. Bagley, 473 U.S. 667 (1985).

Recently, the Supreme Court in Kyles v. Whitley, 514 U.S. 419 (1995), reversed a conviction in a capital murder prosecution because of the government's failure to abide by its affirmative obligation to provide to the defense favorable evidence that by a "reasonable probability", not a preponderance, would have resulted in a different result at trial. In Kyles, the government failed to provide to defense prior out-of-court statements of government

---

[3] The Jencks Act defines three different types of statements which must be produced:  (1) a written statement made by the witness and signed or otherwise adopted or approved by him; (2) a **substantially verbatim recital of an oral statement** made by the witness; or (3) a statement

3

App 812

eyewitnesses who testified at trial, even though the defense was in possession of a prior inconsistent trial testimony. The Supreme Court noted that the prior statements "would have fueled a withering cross-examination, destroying the confidence in [the eyewitness's] story and raising a substantial implication that the prosecutor had coached him to give it." 514 U.S. at 443.

In a demonstration of how **any and all** prior inconsistent statements could constitute Brady, the Court noted that the fact that the defense had use of prior inconsistent trial testimony for cross-examination was not sufficient to satisfy the government's Brady obligations. 514 U.S. at 443, fn. 14. The Court noted, "inconsistencies between the two bodies of trial testimony provided opportunities for chipping away on cross-examination but not for the assault that was warranted." Id.

The government cannot seriously contend that this information, which it has had in its possession for over three years, is not exculpatory impeachment material. The fact that the government did not provide this information to Mr. Carson **prior to** the testimony of the witness is troubling and raises a serious concern that other such Brady information has not been provided to the defense when it should have been. Simply put, the government's failure to timely produce the information noted above suggests that the government cannot alone be entrusted with making determinations as to what information qualifies as Brady and what does not. Especially in a complex case of this magnitude and duration, the defendant respectfully submits that it should be of grave concern to the Court to learn that the government has possessed exculpatory evidence that it has withheld from the defense.

---

made to a grand jury. 18 U.S.C § 3500(e)(emphasis added)

4

App 813

## II. THE COURT MUST FASHION APPROPRIATE REMEDIES TO ENSURE THAT MR. CARSON RECEIVES A FAIR TRIAL

As a remedy for the untimely disclosure of this evidence, Mr. Carson requests that the Court require the government to recall Mr. Hunter and Crime Scene Search Officer Lund for cross-examination and that the Court instruct the jury that the government's failure to provide certain information to the defense in a timely manner necessitates the need for the witnesses to be recalled.

In addition, Mr. Carson requests that the Court require the government to collect **all** notes of the interviews of witnesses in this case and to provide them to the defense. The production of this material during trial, when proper remedies for other violations can still be fashioned, is considered necessary to ensuring the fairness of Mr. Carson's trial. Although counsel is aware that this Court has expectations that the government is both cognizant and compliant with its Brady obligations, it remains that the government has demonstrated that it does not have the same view of what material serves to impeach or exculpate as does the Supreme Court. Providing the defense with the notes of interviews of its witnesses in this case is necessary for the Court to be confident that the government's affirmative duty to provide exculpatory and impeachment materials to Mr. Carson has been met.

WHEREFORE, for the above-stated reasons and any other that the Court deems just and proper, Mr. Carson moves this Court to (1) require the government to recall Demetrius Hunter and Crime Scene Search Officer Lund, (2) instruct the jury that the witnesses are being recalled due to the government's failure to provide certain information in a timely manner, and (3) order

App 814

that the government produce all notes taken during all witness interviews to the defense.

Respectfully submitted,

Joseph E. Beshouri
419 Seventh St., N.W., Suite 201
Washington, D.C.  20004
(202) 842-0420

Lexi Negin Christ
Hansen & Christ, P.C.
419 Seventh St., N.W., Suite 201
Washington, D.C.  20004
(202) 638-6700

Counsel for Samuel Carson

App 815

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **SAMUEL CARSON** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants Carson's Motion for Remedies Due to Government's Failure to Provide Exculpatory Impeachment information in a Timely Manner, was hand-delivered on this the __14__ day of __May__, 2001 to:

Assistant United States Attorney Anjali Chaturvedi
Office of the United States Attorney
555 4th Street, N.W.
Washington D.C. 20001

Assistant United States Attorney Peter Zeidenberg
Office of the United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Christopher Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Steven R. Kiersh, Esq.
717 D Street, NW
Fourth Floor
Washington, D.C. 20004

App 816

Jonathan S. Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C.

_____
Lexi Negin Christ

8



RECEIVED

MAY 14   9 17 AM '01

t. l                 . TON

U.S              TRT
                   SIA

FILED

MAY 21 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cr. No. 98-329-01-06 (TPJ) |
| | ) | |
| VINCENT HILL, aka Vito, | ) | |
| JEROME MARTIN, aka Pimp, | ) | |
| SEAN COATES, aka Birdie, | ) | |
| WILLIAM SWEENEY, aka Draper | ) | |
| SAM CARSON, aka Chin | ) | |
| | ) | |
| Defendants | | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 99-348-01 (TPJ) |
| | ) | |
| GARY PRICE, aka Harry-O | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT CARSON'S MOTION TO PRECLUDE STATEMENTS ALLEGEDLY MADE BY CODEFENDANT WILLIAM SWEENEY TO ROBERT SMITH WHICH INCRIMINATE SAMUEL CARSON

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its opposition to defendant Carson's motion to preclude the government from eliciting statements allegedly made by codefendant William Sweeney to Robert Smith which incriminate Samuel Carson (hereinafter "defendant Carson's motion"). As grounds for the opposition, the government submits the following points and authorities.

### PROCEDURAL HISTORY

On June 5, 2000, the government filed a pleading captioned Motion to Admit Out-of-Court Statements Made by Murdered Witnesses. Following the motions hearing in September 2000, the

597

App 819

Court ruled that the government's motion was granted and that the statements made by Robert Smith to law enforcement were admissible.[1] Now, almost one year after the government filed its pleading, and almost eight months after the Court made its ruling, defendant Carson moves to preclude reference to Sam Carson in any of the statements made by William Sweeney to Robert Smith. It is noteworthy that defendant Carson has waited until the eve of the admission of the objected-to testimony before seeking relief from the Court. In this untimely pleading, defendant Carson completely fails to address the authority cited in the government's motion to admit out of court statements made by murdered witnesses, specifically United States v. Cherry, 217 F.3d 811 (10th Cir. 2000) and Fed. R. Evid. 804(b)(6). The case and rule are on point regarding the admission of statements made by murdered witnesses where a defendant has procured the unavailability of the witness. In addition, defendant Carson fails to cite any change in facts or any additional legal authority to warrant reconsideration of the Court's earlier order. Given the untimely filing of his pleading, the government submits that defendant Carson's motion should be denied summarily. Even if the Court were to reach the merits of the motion, however, the claims made are without basis in law or in fact.

## FACTUAL HISTORY

The superseding indictment describes the criminal activities of an organization of which defendant Carson was a member, referred to as the "K Street Crew." The overall purpose of this organization was to enrich itself and its members by committing various criminal acts. The government's evidence has shown that this criminal organization was involved in the distribution

---

[1] Attached as Appendix A is the Court's order dated September 28, 2000, granting the government's motion to admit out-of-court statements of murdered witnesses.

App 820

of illegal drugs, as well as a vast array of violent crimes, including murder, attempted murder, kidnapping, and robbery. This organization made a steady and sizable income from the distribution of illegal drugs, primarily marijuana, which it sold in and around the intersection of K Street and Delaware Avenue, S.W., as well as 37th Place, S.E.[2] In order to protect its illegal business operation and its members, the organization established and promoted a well-earned reputation for killing at the slightest provocation. That reputation enabled it to sell drugs where it wanted to with little interference from any potential rival crews. Based on its reputation and standing as a violent, criminal organization, members robbed potential drug buyers and other drug dealers, and used violence or the threat of violence to intimidate would-be rivals.

While violent drug gangs are no rarity in this city, one particular aspect of the violence perpetrated by this organization distinguishes it from other criminal groups in the city. As set forth in the indictment, the K Street Crew engaged in repeated, persistent, and methodical efforts to obstruct prosecution of their criminal activities by intimidation and the occasional execution of potential witnesses. It is this conduct which the instant pleading addresses. Specifically, we will focus our discussion on the murder of Robert "Butchie" Smith.

On April 30, 1997, Robert "Butchie" Smith, a member of the organization, pled guilty to conspiracy to distribute and possess with intent to distribute 100 kilograms or more of cannabis, 50 grams or more of cocaine and cocaine base, and heroin. Both prior to the entry of the plea, as well

---

[2]In 1991, defendant Jerome Martin and several other members of the K Street Crew expanded their drug operations to the area of 37th Place, S.E. Several of defendant Martin's friends' families were relocated from public housing in the Southwest area to the 37th Place, S.E. area. Defendant Martin and other members of the organization took advantage of the connections to the new neighborhood and expanded the organization's operation to include this area as well as the 200 Block of K Street, S.W.

3

App 821

as after entering into the plea, Smith provided law enforcement with detailed information concerning crimes committed by members of the organization, particularly Sweeney, his nephew. Not only did Smith engage in long-standing narcotics dealings with Sweeney, but Sweeney also described other crimes of violence in which he and others participated. A recitation of the topics of discussion between Smith and Sweeney can be found at page 6, infra.

While the United States Attorney's Office in Washington, D.C. (USAO-DC), in conjunction with the Washington Field Office of the Federal Bureau of Investigation (WFO-FBI) was investigating the K Street Crew, the Prince George's County Police Department was conducting its own investigation into the triple murder. In an effort to assist Prince George's County law enforcement, the WFO-FBI provided them with information they had developed regarding these incidents. The authorities in Prince George's County issued an arrest warrant for Sweeney in which the charged offense was the kidnapping of Anthony Pryor, another incident which Sweeney described to Smith. Without first discussing the matter with the USAO-DC or the WFO-FBI, once Prince George's County police had Sweeney in custody, they questioned him about the triple murder. At Sweeney's initial appearance on April 21, 1997, the statement of probable cause filed by the State's Attorney's Office in P.G. County included information about the triple murder. The statement plainly stated that the source of the information about the triple murder came from an WFO-FBI confidential source and that information the source provided was known only to investigators and perpetrators of the offense. In addition, the statement indicated that Sweeney bragged about the murders to the confidential informant.[3]

---

[3] Thus far, the government has submitted this information via proffer. During the week of May 21, 2001, Special Agent Vincent Lisi will be providing oral testimony regarding Mr. Smith's connection to law enforcement and the events leading up to his murder.

4

App 822

Once the probable cause statement was made public, Sweeney immediately recognized that Smith was cooperating with law enforcement. As James Montgomery has testified, Sweeney confided in Carson that the only person that he (Sweeney) had told about the facts of the triple murder in P.G. County was Smith. Subsequently, Sweeney, Montgomery, and Carson conspired to kill Smith in order to escape liability for the triple murder.[4] Carson and Montgomery tried to kill Smith – believing that if Smith were murdered, they would escape liability for the triple murder. Carson and Montgomery devised a plan in which Montgomery would drop Carson off from a car nearby where they had seen Smith on Half Street, S.W. Carson would shoot Smith and run back to the car. Carson and Montgomery would then drive over the South Capitol Street bridge where Carson would toss the gun used to kill Smith. Carson and Montgomery would then go to the area of 37th Place, S.E. and establish an alibi. Following this plan, Carson was dropped off in the area of South Capitol Street, S.W. by Montgomery in an attempt to locate and kill Smith. On one occasion, Carson did spot Smith in Southwest on Half Street. Carson retrieved a gun and sweatshirt from his home and returned to kill Smith but Smith left before Carson returned.

The continued efforts ultimately proved to be successful for Carson and Sweeney. On June 16, 1997, the day Smith was murdered, Carson took a car belonging to an individual from Southwest. Soon after leaving the area of 2nd and P Streets, S.W., Smith was shot nine times, including six times in the head in the 1300 block of Half Street, S.W. Carson then returned to the area of 2nd and P Streets, S.W. soon thereafter and stated that the car should not go back into the area of 1300 block of Half Street. S.W. Also, upon his return, Carson stated that they were really

---

[4] Racketeering Act 60.

5

App 823

"alright" now – meaning that the witness who could implicate them in the triple murder had been killed.

Following the murder of Smith, Sweeney was incarcerated along with Charles "L.A." Bender. Bender testified that Sweeney confessed that Robert Smith was killed because he was "snitching." Sweeney went on to say that "family or not," Smith had to be dealt with. Bender indicated that he understood Sweeney's comments to mean that Sweeney believed that Smith had to die. In addition, Sweeney expressed his frustration about Robert Smith to Reginald Switzer. Sweeney stated that Smith was a "bitch ass nigger." Switzer then learned from co-conspirator Erik Jones that the only people who were aware of the location of the murder weapon used to kill Donnell "Robocop" Whitfield – inside a television set in Sweeney's grandmother's house – were Sweeney and Smith.

### Statements made Robert "Butchie" Smith to Law Enforcement[5]

The testifying agent would speak about the following statements made by Smith to law enforcement:[6]

---

[5] The government has disclosed the following information about Robert Smith. Smith's convictions:(1) 1982 misdemeanor petit larceny, (2) 1992 shoplifting, and (3) 1990 PWID Cocaine (on supervised release at time of arrest). Smith was arrested on December 5, 1996 in connection with federal narcotics charge on a warrant. That same month, the indictment was dismissed against Smith. On April 30, 1997, Smith pled guilty to conspiracy to distribute and possess with intent to distribute 100 kilograms or more of cannabis, 50 grams or more of cocaine and cocaine base, and heroin. In addition, we have disclosed that Smith was "opened up" as a confidential informant on December 17, 1996. From that date until the date of his murder, the FBI provided financial assistance in the amount of $12,744.19. This money went to pay rent, a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills. Finally, we provided defense counsel with a number of FBI FD-302s, as well as notes of Special Agent Vincent Lisi regarding information provided by Robert Smith.

[6] The government submits that the agent who will be testifying about Smith's statements will not be bound by the recitation contained in the instant pleading. There may be additional details not mentioned in the pleading which will be elicited at trial.

6

App 824

### The Triple Murder

Sweeney confessed his role in the triple murder in which Lonnie Gaskins, Darnell Mack, and Melody Anderson were murdered in November 1996. Smith recounted in detail to law enforcement on more than one occasion that Sweeney told him that Sweeney, Carson, Coates, and James Montgomery participated in the triple murder. In addition, Sweeney told Smith the events which led to the triple murder. As recounted by Sweeney to Smith, Gaskins and Sweeney both were in Las Vegas to watch a boxing match involving Evander Holyfield. Sweeney even detailed from where it was that he got the airline tickets in order to attend the boxing match – the Dream Shop in Georgetown. Sweeney had seen Gaskins win money at the casino in Las Vegas. Sweeney stated that the intention was to rob Gaskins, whom Sweeney knew had recently won a lot of money from gambling in Las Vegas, Nevada at the casinos. Sweeney knew to find Gaskins at a "craps joint" that Darnell Mack ran in Prince George's County. According to Smith, Sweeney indicated that Montgomery and Sweeney were the two who entered the house, while Carson and Coates remained outside in the van – a van which was rented under William Sweeney's aunt's name. Sweeney stated that he had a .40 caliber Glock semi-automatic pistol, while Montgomery carried a stun gun. Sweeney acknowledged that he shot and killed Gaskins, Mack, and Anderson, and that they got no money. In addition, Sweeney stated that they could not leave any witnesses – and thus he had to murder all three victims.

### The Murder of Donnell "Robocop" Whitfield

Sweeney also told Smith about his September 1994 role in shooting and killing Donnell "Robocop" Whitfield. On the day that Whitfield was killed, Smith was with Sweeney and Jones at Ethel Sweeney's house in Arthur Cappers. Sweeney said words to the effect that he and Jones were going to kill Whitfield because Whitfield had smacked Sweeney previously. The same day, Sweeney reported to Smith that he and Jones killed Whitfield in Sursum Corda. Erik Jones drove the car to the location. After the shooting, Sweeney told Smith that he (Sweeney) had given the gun which was used to "Clink" (William Howard Young) who knew how to change the barrel of the weapon. In addition, Sweeney told Smith that Clink had not changed all the necessary parts in order to avoid a ballistics comparison, so the gun came back as the murder weapon. Sweeney informed Smith that he killed Robocop because of a dispute between him and Robocop which resulted in Robocop smacking Sweeney at a nightclub.

### The Kidnapping of Anthony "Wysocki" Pryor

With respect to the Pryor kidnapping, Sweeney told Smith that he, Vincent Hill, Coates, Proctor, and Carson tried to abduct and rob "Wysocki" (Anthony Pryor), but he refused to cooperate and was therefore shot. According to Sweeney, Wysocki was leaving a residence in Montgomery Co., Maryland, and they were waiting for him. When they tried to abduct him, he fought and ran and was shot in the back with a .45 caliber pistol. The group then took him and placed him in the trunk of Coates's car, but the car was old and beat up, so the trunk flew open and Wysocki escaped. Sweeney told Smith that they were very upset about Wysocki getting away and blamed Coates for

7

App 825



it. Sweeney indicated that because of this mishap, as well as others committed by Coates, Sweeney and others wanted to kill Coates on several occasions. Sweeney also informed Smith that he knew that he was wanted by the FBI for kidnapping Wysocki. Sweeney told Smith that he was not worried about the case because his investigators had visited Wysocki at the Petersburg prison twice and obtained statements from Wysocki in which Wysocki claimed that he could not identify the people who kidnapped him because they were wearing masks. Sweeney stated that he knew that Wysocki also told his investigators that he did not think that Sweeney was involved.

### The Murder of Keith "Whitey" Johnson

Sweeney also told Smith about another murder for which he is not presently charged in the indictment. Regarding the murder of Keith "Whitey" Johnson, Sweeney told Smith that he and two others -- whom he identified -- were responsible for that murder. Sweeney stated that the perpetrators were driving a green rental van at the time, which had been rented by a sister of the one of the co-conspirators. Sweeney indicated that he was listed as an extra driver on the rental agreement, and he used an alias on that form – the alias of Kirk Ivory Newton.

### The Shooting of Michael Jones

Another incident for which Sweeney has not been charged, but where others have been is the shooting of Michael Jones on August 28, 1992. Sweeney told Smith that Clifton "Meechie" Edwards shot someone and was arrested for this shooting. Subsequent to Edwards' arrest, Sweeney and Coates chased down an individual off Mississippi Avenue, S.E. who was a witness to the shooting that Clifton Edwards was charged with into an alley where Sweeney shot at the witness and struck him. Smith thought that Sweeney had killed this person in this attack. In addition, Sweeney told Smith that the witness against Edwards was targeted because it was believed that he was cooperating with law enforcement.

### Statements About Narcotics Activity

Smith also recounted to law enforcement information about drug activity in which he was engaged. Smith indicated that among other people, he conducted drug transactions involving marijuana, cocaine, and heroin with co-conspirators Sweeney, Jones, Coates, Reginald Switzer, Gary Price, Paul Taylor, Jerome Martin, and Arthur Rice.

### Statements Regarding Fears on the Part of Robert Smith

On more than one occasion, Smith informed law enforcement that if anything ever happened to him, that William Sweeney (whom Smith referred to often as "Shorty" or "Draper") did it. The

8

government will seek to elicit this statement since the defense has suggested that a third party was responsible for Smith's murder.[7]

ARGUMENT AND AUTHORITY

Carson makes a fundamental error in his argument. Carson states that if the statements by Sweeney to Smith are admitted against Sweeney, Carson reserves his rights to object to the statements if Sweeney's statements to Smith include reference to defendant Carson as violative of his confrontation clause rights under Bruton[8] or alternatively, as inadmissible hearsay. Defendant Carson is in complete error regarding this legal issue. The case authority is clear that if the government can show by a preponderance of the evidence that defendant Carson participated directly in planning or procuring Smith's unavailability through wrongdoing the statements made by Smith are admissible against defendant Carson for all purposes. By participating in the murder of Smith, defendant Carson waived both his confrontation clause rights and hearsay objections. United States v. White, 116 F.3d 903, 912 ("More commonly, however, courts have taken the view of the trial court here, see White, 838 F.Supp. at 621, that misconduct leading to the loss of confrontation rights also necessarily causes the defendant to forfeit hearsay objections") (D.C. Cir. 1997). See also United States v. Dhinsa, 243 F.3d 635, 651 ("this Court, as well as a majority of our sister circuits, have also applied the waiver-by-misconduct rule in cases where the defendant has wrongfully procured the witnesses' silence through threats, actual violence or murder.") (2d Cir. 2001).

---

[7] We have provided defense counsel with information regarding an early 1990/1991 shooting in which Smith was shot. The government is not aware of any information which ties the 1990/1991 shooting to Smith's murder in 1997.

[8] Bruton v. United States, 391 U.S. 123 (1968).

9

App 827

As set forth in the <u>White</u> case, it is understandable the reasons why a defendant would waive his confrontation clause rights and hearsay objections if the government can show by a preponderance of the evidence that the defendant has caused the witness's absence:

> It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. Simple equity supports a forfeiture principle, as does a common sense attention to the need for fit incentives. The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross-examine him. And where a defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct. We have no hesitation in finding, in league with all circuits to have considered the matter, that a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness.

<u>White</u>, 116 F.3d at 911 (citations omitted).

<u>Federal Rule Evidence 804(b)(6)</u>

Federal Rule of Evidence 804(b)(6), which took effect December 1, 1997, is entitled "Forfeiture by wrongdoing." The rule codifies a hearsay exception applicable to "statement[s] offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). The rule was "added to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness." <u>See</u> 1997 Advisory Committee Notes. This "recognizes the need for a prophylactic rule to deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.'" <u>Id.</u>, quoting <u>United States</u> v. <u>Mastrangelo</u>, 693 F.2d at 273. Specifically, Fed. R. Evid. 804(b)(6) states:

10

App 828

**Hearsay exceptions**: The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> (6) **Forfeiture by wrongdoing.** A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

In reviewing the federal cases that have addressed Fed. R. Evid. 804(b)(6), it is clear that the rule simply codified what has long been recognized in the circuits regarding the admission of statements by witnesses whom the defendant murdered. In United States v. Emery, 186 F.3d 921, 927 (8th Cir. 1999), cert. denied, 120 S.Ct. 968 (2000), the United States Court of Appeals for the Eight Circuit, reiterated the "general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or a potential witness." In Emery, the government introduced substantial proof that the defendant murdered a witness (Christine Elkins) who was cooperating with federal law enforcement. The evidence of the defendant's role in the witness' death included that the defendant

> . . . recruited others to help him kill Ms. Elkins, that they discussed the plan for the murder as well as various options for the disposal of the body, that [the defendant] lured Ms. Elkins into a house and prevented her from leaving while another man beat her, that [the defendant] beat her in the head with a flashlight while another man held her, and that [the defendant] disposed of her body by sinking her and her car in the Missouri River.

Id. at 927. The government proffered its evidence regarding the murder. At trial the evidence was admitted under Fed. R. Evid. 804(b)(6) in the presence of the jury contingent upon proof of the underlying murder by a preponderance of the evidence. Id. at 926.[9] Moreover, the Court held that

---

[9] The defendant voiced an objection to the trial court's decision to permit the statements be brought before the jury without a preliminary hearing outside the presence of the jury. Id. at 926. On appeal, the Court agreed with the trial court, stating that the appropriate procedure for assessing whether statements under Fed. R. Evid. 804(b)(6) should be admitted is the procedure used by trial courts regarding the admission of co-conspirator statements where such

11

App 829

"the rule [804(b)(6)] contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence." Id. Thus, all of the statements made by the murdered regarding the relevant crimes were admissible.

In Cherry v. United States, 217 F.3d 811 (10th Cir. 2000), the Tenth Circuit considered the issue of what constitutes "engaged or acquiesced in wrongdoing" under Fed. R. Evid. 804(b)(6). Simply stated, the Court held that if the government could show that a defendant participated directly in planning or procuring the declarant's unavailability through wrongdoing the statement by the absent declarant could be admitted against the defendant because the defendant engaged in the wrongdoing which secured the declarant's unavailability. Cherry, 217 F.3d at 820.[10]

The Second Circuit has also recently discussed the waiver-by-misconduct doctrine in the Dhinsa case. In Dhinsa, the defendant was convicted for his role in planning and ordering the murders of two individuals whom Dhinsa targeted because of each decedent's active or potential cooperation with the police. Dhinsa, 243 F.3d at 644. The two individuals murdered had given statements to law enforcement implicating Dhinsa in various crimes of violence and financial schemes to defraud the public. At trial, the government admitted out-of-court statements by the two decedents through numerous prosecution witnesses. The statements were admitted as proof of

_____

determinations of admissibility are made during the trial in order to avoid "repetition" which would be "necessarily inherent with a preliminary hearing [which] would amount to a significant waste of judicial resources." Id.

[10] Fed. R. Evid. 804(b)(6) also addresses a defendant's acquiescence in the wrongdoing which results in the unavailability of the witness. In interpreting what constitutes acquiescence, the Court in Cherry stated that acquiescence in the murder of a witness could be shown where the "wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." Cherry, 217 F.3d at 820. Since Carson directly participated in the murder of Smith by conspiring to kill him, we do not need to rely on the acquiescence prong of Rule 804(b)(6).

12

Dhinsa's involvement in the murders of the declarants. On appeal, the Second Circuit affirmed the convictions. The Court further held that Dhinsa's claim that he reserved his confrontation clause rights notwithstanding the fact that he procured the absence of the witnesses was in error. Dhinsa argued that for the statements of the murdered witnesses to be admitted, they must be shown to be trustworthy under Lilly v. Virginia, 527 U.S. 116 (1999) (plurality opinion). Under Lilly, for a statement to be trustworthy, it must fall within a firmly rooted hearsay exception or contain particularized guarantees of trustworthiness as to be deemed reliable. The Court in Dhinsa, rejected the argument stating that

> Implicit in the application of the Lilly test is a presumption that the defendant has not waived his confrontation rights with respect to the declarant's statements. However, '[o]nce the confrontation right is lifted from the scales by operation of the accused's waiver of that right,' the district court is not required to assess independently the reliability of those statements under the rubric set forth in Lilly.

Dhinsa, 243 F.2d at 655 (citation omitted).

<u>Admission of Statements Against Defendant Carson</u>

The evidence has shown and as the week progresses, will continue to show, that Carson participated directly in planning and/or procuring the unavailability of Smith by murdering him. As such, Smith's statements which implicate Carson should be admitted at trial.[11]

---

[11] Even if the Court were to consider defendant Carson's claim that the statements made by Smith must clear any confrontation clause hurdles, the government succeeds again. The statements by Sweeney to Smith can be deemed either (1) statements against Sweeney's penal interest; and/or (2) statements which contain "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability. Lilly, 527 US at 124-125. See also Williamson v. United States, 512 U.S. 594, 606-607 (1994) (Scalia, J., concurring) ("a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible hearsay merely because the declarant names another person or implicates a possible codefendant. For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some

13

App 831

# CONCLUSION

Based upon the foregoing, the government respectfully requests this Honorable Court permit the government to admit the statements made by the murdered witness Robert "Butchie" Smith.[12]

Accordingly, defendant Carson's motion to preclude the admission of the statements should be denied.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
Bar No. 451-058

Peter R. Zeidenberg
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

---

of the other actors and thereby inculpating himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest.")

In United States v. Robbins, 197 F.3d 829, 839-840 (7th Cir. 1999) the Court held that the admission of codefendant's out-of-court statement, inculpating both codefendant and defendant did not violate defendant's rights under confrontation clause since the statement possessed sufficient indicia of reliability to warrant its admission. Specifically, the statement was made voluntarily in conversation between codefendant and his fiancee, statement inculpated defendant and codefendant equally, and reliability was supported by circumstantial evidence. In Robbins, the trial court gave a limiting instruction as to the use of the statement; however, the Seventh Circuit made clear that the limiting instruction was not warranted since the statement was admissible both against the declarant and the codefendant under the Federal Rules of Evidence. Id. at 840.

[12] No pretrial hearing is necessary to allow for the admission of the requested statements. See Emery v. United States, 186 F.3d at 926 (no error found where trial court admitted statements of murdered witnesses during the trial contingent upon the proof of the underlying murder by a preponderance of the evidence since trial court followed the recognized practice of admitting co-conspirator statements at trial conditionally subject to proof by a preponderance of the evidence that the defendant and declarant were coconspirators).

14

App 832

Bar No. 440-803
(202)353-8831

*Anjali Chaturvedi*

Anjali Chaturvedi
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
Bar No. 446-177
(202)353-8827

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by hand upon the attorneys for the defendants on this ___ day of May, 2001.

Steven R. Kiersh, Esq.
717 D Street, N.W.
Suite 400
Washington, D.C. 20004

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Lexi Negin Christ, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

15

App 833

App 834

Jonathan Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C. 20004

Anjali Chaturvedi
Assistant United States Attorney

# Appendix A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,                    )
                                  )
                                  )
v.                                ) Criminal No. 98-329-01 (TPJ)
                                  )
VINCENT K. HILL, et al.,          )
                                  )          **FILED**
Defendants.                  )
_____ )          SEP 2 8 2000
                                  )
UNITED STATES,                    )     NANCY MAYER WHITTINGTON, CLERK
                                  )          U.S. DISTRICT COURT
                                  )
v.                                ) Criminal No. 99-348-03 (TPJ)
                                  )
GARY PRICE,                       )
                                  )
Defendant.                   )
_____ )

ORDER

In accordance with the proceedings in open court at the motions hearing of September 26

and 27, 2000, and upon consideration of the evidence taken and the representations of counsel,

for the reasons advanced by the government or set forth on the record, it is this 28th day of

September, 2000,

ORDERED, that the government's motions to quash defendant Carson's subpoenas duces

tecum addressed to the acting chief of human resources at the U.S. Department of Agriculture

and to the medical examiners office [#197, #193] are denied as moot; and it is

FURTHER ORDERED, that the government's motion for an anonymous jury [#289] is

granted, subject to conditions to be determined at a later date; and it is

FURTHER ORDERED, that the government's motion to admit out-of-court statements of

murdered witnesses [#314] is granted as to the statements of Robert Smith and Kevin Hart,

subject to the condition that the government disclose any and all evidence in its possession which

App 836

may impeach the out-of-court statements of Smith and/or Hart or may indicate that persons other than defendants attempted or had reason to murder Smith and/or Hart, and is denied as moot as to the statements of Chrishuana Gladden; and it is

FURTHER ORDERED, the defendants' joint motion to strike all racketeering counts and counts under the Violent Crime in Aid of Racketeering Statute, 18 U.S.C. § 1959 et seq., [#338] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Sweeney's motion to dismiss counts 48, 49, and 50, and to strike overt acts and racketeering act 70(a)-(g) of Count 2 and to strike all references to the triple murder in Maryland [#307] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss the indictment for prejudicial pre-accusatorial delay, violations of the statute of limitations, and Speedy Trial Act provisions [#337] is granted as to Counts 10, 11, 12, 13, 14, 15, 16, 18, and 19, on statute of limitations grounds only, and denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss Counts 1 and 2 on Fifth and Sixth Amendment grounds [#336] is denied; and it is

FURTHER ORDERED, the defendant Carson's motion for dismissal of counts, to compel disclosure of exculpatory evidence, and for sanctions [#329] is denied; and it is

FURTHER ORDERED, that defendant Carson's and Martin's motions to strike all aliases from the indictment [#330, #335] are denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to identify witnesses with juvenile adjudications and pending juvenile proceedings and to inspect juvenile files [#311] is denied without prejudice as moot; and it is

App 837

FURTHER ORDERED, that defendant Sweeney's motion to disclose identities of each confidential informant regardless of whether the informant will be called as a witness at trial [#303] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial identification and production of <u>Jencks</u> material [#302] is denied as moot, provided that the government shall disclose <u>Jencks</u> and <u>Giglio</u> materials relating to a witness the Friday before the week in which the witness testifies; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial production of statements of persons who will not be called as witnesses at trial [#308] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion for discovery of statements of co-defendants and co-conspirators [#326] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order directing the government to give notice of its intention to rely upon other crimes evidence [#310] is denied without prejudice, to the extent that notice has not otherwise been furnished; and it is

FURTHER ORDERED, that defendant Carson's motion for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 807 [#325] and defendant Sweeney's motions for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 804(b)(5) [#304] and 803(24) [#309] are denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine the admissibility of the testimony of each of the government's proposed expert witnesses [#230] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for <u>in camera</u> review of grand jury testimony to determine existence of racketeering enterprise [#301] is denied; and it is

3

App 838

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine existence of conspiracy and admissibility of co-conspirators' statements [#312] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion to compel disclosure of evidence subject to suppression under Fed. R. Crim. P. 12(b)(3) [#328] is denied as moot; and it is

FURTHER ORDERED, that defendant Carson's motion for bill of particulars [#327] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's third motion to compel discovery [#340] is granted to the extent that the government must disclose the above-mentioned evidence regarding Robert Smith and is denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to suppress evidence from the seizure that occurred on or about September 14, 1991, [#334] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress physical evidence seized from the November 1, 1994, search at 211 I Street, SE, [#306]  is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress identification testimony from February 19, 1997, [#344] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's second motion to suppress identification testimony [#378] is denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress custodial statements made on or about April 20, 1997, [#305] is denied; and it is

FURTHER ORDERED, defendant Martin's motion to suppress statements [#333] is denied as moot as to the statements made January 24, 1992, October 27, 1992, and June 9, 1994,

App 839

and denied on the merits as to the statements made on or about August 7, 1991, and September 16, 1997; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress evidence and statements from the April 21, 1992, search [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress identification from February 3, 1997 [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for change in location pending trial [#296] is granted to the extent that defendant will be incarcerated in D.C. Jail or elsewhere in the metropolitan area during trial; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order granting leave to serve subpoenas on two assistant United States attorneys [#291] is denied; and it is

FURTHER ORDERED, that defendant Coates' motion for reconsideration of motion for severance [#366] and all other defendants' oral renewed motions for severance are denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion to compel disclosure of exculpatory evidence (filed September 26, 2000) is denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion for bill of particulars of unindicted crimes which the government intends to prove at trial (filed September 27, 2000) is denied; and it is

FURTHER ORDERED, that defendant Proctor's motion to compel discovery (filed September 27, 2000) is denied without prejudice.

Thomas Penfield Jackson
U.S. District Judge

App 840

App 841

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

GRAND JURY SWORN IN JULY 22, 1998

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Criminal No. 98-329(TPJ) |
| : | |
| v. : | Grand Jury Original |
| : | |
| **VINCENT HILL,** : | Violations: |
| a/k/a "Vito," : | |
| : | 21 U.S.C. §846 |
| **JEROME MARTIN,** : | (Conspiracy to Distribute |
| a/k/a "Pimp," : | and Possess with Intent to |
| : | Distribute Controlled |
| **SAMUEL CARSON,** : | Substances) |
| a/k/a "Chin," : | |
| : | 18 U.S.C. §1962(d) |
| **WILLIAM KYLE SWEENEY,** : | (Conspiracy to Participate |
| a/k/a "Draper," : | in a Racketeer Influenced |
| : | Corrupt Organization) |
| **SEAN COATES,** : | |
| a/k/a "Birdy," : | 22 D.C. Code §§2401, 3202 |
| : | (First Degree Murder While |
| : | Armed) |

FILED

JUL 2 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

22 D.C. Code §§501, 3202
(Assault with Intent to
Kill While Armed)

18 U.S.C. §1959
(Violent Crime in Aid of
Racketeering Activity)

22 D.C. Code §§2101, 3202
(Kidnaping While Armed)

22 D.C. Code §505(b)
(Assaulting a Police Officer)

18 U.S.C. §924(c)(1)
(Use of a Firearm)

22 D.C. Code §3204(b)
(Possession of a Firearm
During a Crime of Violence)

App 842

```
:     21 U.S.C. §841(a)(1)
:     (Possession With Intent to
:     Distribute and Distribution of
:     Controlled Substances)
:
:     22 D.C. Code §105
:     (Aiding and Abetting)
:
:     18 U.S.C. §2
:     (Aiding and Abetting)
```



*SECOND RETYPED*

## INDICTMENT

THE GRAND JURY CHARGES THAT:

## COUNT ONE

## NARCOTICS CONSPIRACY

### A.    The Conspiracy

From on or about sometime in at least 1988, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including March 1999, in the District of Columbia and elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other, with co-conspirators not indicted herein, and with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute the following:

2

App 843

(1) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance, and the amount of said mixtures and substances was 1000 kilograms or more, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vii).

(2) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic controlled substance, and the quantity of said mixtures and substances was fifty (50) grams or more, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii).

(3) Phencyclidine (PCP), a Schedule III controlled substance, and mixtures and substances containing a detectable amount of phencyclidine (PCP), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

B. Goals of the Conspiracy

The conspiracy had the following goals and objectives:

(1) It was a principal goal of the conspiracy for the defendants and co-conspirators to obtain as much money and other things of value as possible through the trafficking of controlled substances, namely marijuana, cocaine base, also known as crack cocaine, PCP and other drugs, in the District of Columbia, Maryland, Virginia and elsewhere.

(2) It was a further goal of the conspiracy to commit acts of robbery, kidnaping, murder and other acts of violence for the

3

App 844

following purposes, among others: to enrich the members of the conspiracy; to create, maintain and control a market place for the distribution of its controlled substances; to enforce discipline among members of the conspiracy; to collect monies owed to members of the conspiracy; to protect the conspiracy and its members from detection, apprehension and prosecution by law enforcement; to intimidate and prevent persons from testifying as witnesses in criminal prosecutions against members of the conspiracy; to prevent, thwart, and retaliate against acts of violence perpetrated by rivals against the conspiracy and its members; and to promote and enhance the reputation and standing of the enterprise and its members.

### C. Ways, Manner and Means To Accomplish the Conspiracy

The ways, manner and means by which the defendants and co-conspirators operated their illegal drug trafficking organization, include, but are not limited to, the following:

(1) The members of the conspiracy knowingly and intentionally distributed and possessed with intent to distribute marijuana, cocaine base, also known as crack, PCP and other illegal drugs, and aided and abetted such distribution and possession with intent to distribute. The locations at which members of the conspiracy conducted their illegal narcotics business included areas within the Greenleaf Gardens housing complex in Southwest Washington, D.C. --including, but not limited to, the 200 block of K Street, S.W.,

4

App 845

the 900 and 1000 blocks of Delaware Avenue, S.W., and the 900 block of 3rd Street, S.W.-the 1500 block of Canal Street, S.W., the 200 blocks of 37th Street and 37th Place, S.E.

(2)  It was part of the conspiracy that the defendants would and did play different roles in the conspiracy, take upon themselves different tasks and participate in the conduct of the organization through various criminal acts.  The defendants made themselves and their services available at various times throughout the life of the conspiracy and participated in certain drug trafficking ventures as required to promote and protect the distribution operation.  The roles assumed by some defendants were interchangeable at various times throughout the conspiracy.  Some of the roles assumed and carried out by the defendants included, among others, holder, helper, packager, lookout, supplier of drugs, organizer, intermediary, courier, driver, enforcer, protector, street seller and runner.

(3)  It was further part of the conspiracy that marijuana, crack cocaine, PCP and other illegal drugs were stored, prior to distribution to street sellers, runners, and customers, in and around designated stash locations.  The defendants used these stash locations to store illegal drugs and weapons in order to prevent them from being found by the police or rivals and to hide their connection to members of the organization.  Some of these stash locations were also used for processing, cutting, packaging, and

5

distributing the organization's marijuana, crack cocaine, PCP and other illegal drugs.

(4) It was further part of the conspiracy that the defendants and co-conspirators used telephones, cellular and portable telephones, and beepers/pagers to facilitate their illegal narcotics business; that is, making telephone calls to communicate with each other, their suppliers and their customers, to direct or facilitate acts of violence in furtherance of the conspiracy, and to protect against the detection of the conspiracy by law enforcement officials.

(5) It was further part of the conspiracy that the defendants and co-conspirators possessed, carried and used firearms, including semi-automatic pistols, machine pistols, and revolvers, to protect their drug trafficking operation from theft, robbery and competition from rival sellers, and to do violence in furtherance of the conspiracy. These weapons were possessed, carried and used for various reasons, including, but not limited to: to ensure the personal safety of the members of the organization; to protect the organization's illegal drugs, including marijuana and crack cocaine, and the proceeds of drug distribution; to intimidate rival drug dealers from distributing illegal drugs in the areas of Washington, D.C. that the organization claimed to control; to rob rival drug dealers of their drugs and monies in order to prevent them from competing for illegal drug sales in the organization's

App 847

area; to rob customers of monies used to purchase illegal drugs; to retaliate against rival drug dealers for harm caused to members of the organization; and to ensure that drug distribution activities were controlled by the defendants and their co-conspirators.

(6) It was further part of the conspiracy that the defendants and co-conspirators engaged in acts of violence, including murder, armed robbery, kidnaping and armed assaults and threatened acts of violence to protect themselves, to eliminate rival sellers, to retaliate for acts of violence against members of the organization, to prevent potential witnesses from cooperating with law enforcement agencies investigating the drug organization, to prevent potential witnesses from testifying against members of the organization at criminal proceedings, to conceal the conspiracy from law enforcement authorities, to promote and perpetuate the organization's distribution operation and to enhance the organization's reputation.

(7) It was further part of the conspiracy that members caused third parties to purchase and/or register automobiles and to rent apartments used by members of the conspiracy, a practice designed to conceal from law enforcement authorities the connection between the members of the conspiracy and their automobiles and apartments.

(8) It was further part of the conspiracy that its members took efforts to avoid detection, investigation by law enforcement

App 848

authorities and conviction for criminal charges against any members of the organization.

### D. Overt Acts

In furtherance of the conspiracy and in order to effect the objects thereof, the defendants, co-conspirators not indicted herein, and others who are known and unknown to the Grand Jury, in various combinations, directly and indirectly, within the District of Columbia, Maryland, Virginia and elsewhere, committed overt acts, including, but not limited to, the following:

1. On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright, by shooting him with a pistol.

2. On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman and Leonard Hyson, by shooting them with pistols.

3. On or about April 28, 1990, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Norman Yusef Simmons and held him for ransom.

8

App 849

4. Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to kill them.

5. Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to kill them.

6. On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas and Terita Lucas, by shooting them with a pistol.

7. On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol.

8. On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols,

9

App 850

assaulted Ofc. Adrian Treadwell, Ofc. Edward McDonald, Ofc. Marc Little and Ofc. Alvin Ray with intent to kill them.

9. On or about October 26, 1991, in the area of 8th Street and Massachusetts Avenue, N.E., in the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, possessed a loaded .45 caliber semi-automatic pistol.

10. On or about January 23, 1992, inside of Apartment 21, 241 37th Place, S.E., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a loaded 9mm semi-automatic pistol and a bullet-proof vest.

11. On or about April 7, 1992, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with a dangerous weapon, that is, an automobile, assaulted Ofc. Alfred Moss of the Prince George's County Police Department with intent to kill him.

12. On or about April 22, 1992, in the area of the 900 block of the Southeast Freeway, in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a loaded "Tec-9" 9mm semi-automatic pistol.

13. On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Jermaine Hall and Michael Jones with intent to kill them.

10

App 851

14. Between on or about June 20, 1992 and June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, conspired to kill Michael Jones to prevent him from implicating and testifying against a co-conspirator not indicted herein, regarding the shooting of Jermaine Hall on June 20, 1992.

15. On or about June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Michael Jones with intent to kill him.

16. On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, assaulted Curtis Edwards, Richard Burton and Keith Jones with intent to kill them, and thereby killed Curtis Edwards, by shooting him with a pistol.

17. On or about October 27, 1992, in the area of 300 Yoakum Parkway, in Alexandria, Virginia, **JEROME MARTIN, a/k/a "Pimp,"** possessed a 9mm semi-automatic Intratec pistol, a 12-gauge Mossberg shotgun, and a loaded 9mm Beretta pistol with an obliterated serial number.

18. On or about January 7, 1993, in the area of Half and T Streets, S.W., in the District of Columbia, **SEAN COATES, a/k/a "Birdy",** possessed a loaded Glock 9mm semi-automatic pistol.

11

App 852

19. On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol.

20. On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy"** and other co-conspirators not indicted herein, while armed with pistols, attempted to kidnap, rob and murder Anthony Pryor.

21. On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Roland Brown with intent to kill him.

22. On or about April 9, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, conspired to kill Steven Dunbar.

23. On or about April 9, 1994, within the District of Columbia, co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Steven Dunbar by shooting him with a pistol.

24. On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted Ulysses English with intent to kill him.

12

App 853

25. On or about September 21, 1994, within the District of Columbia, co-conspirators not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Phillip Clayborne, by shooting him with a pistol.

26. On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield, by shooting him with a pistol.

27. On or about November 1, 1994, inside of 211 I Street, S.E., in the District of Columbia, **WILLIAM SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, possessed a loaded 9mm semi-automatic Makarov pistol, a loaded 9mm semi-automatic Beretta pistol and a loaded 9mm semi-automatic Star pistol.

28. On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to kill him.

29. On or about June 6, 1995, in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** obstructed justice by threatening to kill an individual **HILL** believed to be assisting the government in its investigation into the criminal activities of **HILL** and his co-conspirators.

30. On or about September 27, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL,**

13

a/k/a "Vito," possessed with intent to distribute a mixture and substance containing marijuana.

31. On or about October 4, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

32. On or about November 2, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

33. On or about November 3, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana, during which **HILL** identified a co-conspirator not indicted herein as a person who could sell marijuana to the buyer in the future.

34. On or about November 15, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

35. On or about November 16, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing

14

marijuana, during which transaction **HILL** and **JEROME MARTIN, a/k/a "Pimp,"** spoke with the buyer about future purchases of marijuana.

36. On or about November 28, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

37. On or about November 29, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana in the presence of **JEROME MARTIN, a/k/a "Pimp,"** who explained to the buyer how to repackage and resell the marijuana.

38. On or about December 6, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

39. On or about December 8, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while in the company of co-conspirators not indicted herein, distributed a mixture and substance containing marijuana.

40. On or about December 13, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

App 856

41. On or about December 13, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

42. On or about December 13, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana.

43. On or about December 15, 1995, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and co-conspirators not indicted herein, distributed a mixture and substance containing marijuana.

44. In or about 1996 and 1997, within the District of Columbia and the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein, drove to Centerville, Virginia in search of Kenneth Adams, in order to find and kill Kenneth Adams to prevent him from testifying in the murder trial of a co-conspirator not indicted herein.

45. On or about February 1, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** possessed with intent to distribute a mixture and substance containing marijuana.

16

App 857

46.  On or about February 14, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** distributed a mixture and substance containing marijuana, during which transaction **HILL** provided the buyer with his pager number (202-519-9153) so that the buyer could arrange future drug purchases from **HILL.**

47.  On or about February 20, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

48.  On or about February 26, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

49.  On or about February 26, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** distributed a mixture and substance containing marijuana.

50.  On or about March 5, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

App 858

51. On or about March 15, 1996, in the area of the 200 block of K Street, S.W., in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** and a co-conspirator not indicted herein, distributed a mixture and substance containing marijuana.

52. On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to kill him.

53. In or about October 1996, within the District of Columbia and the Commonwealth of Virginia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, conspired to kill the witnesses who were expected to testify in the murder trial of **JEROME MARTIN, a/k/a "Pimp."**

54. On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol.

55. On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to kill him.

18

App 859

56. On or about November 13, 1996, a co-conspirator not indicted herein, possessed a loaded Glock .40 caliber semi-automatic pistol as he fled from police officers who were attempting to stop him.

57. On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, and in perpetrating and attempting to perpetrate the crime of attempted armed robbery, killed Alonzo Gaskins, Darnell Mack and Melody Anderson, by shooting them with a pistol.

58. On or about November 21, 1996, in the area of 11th Street, S.E., and Interstate 295, in the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** led police officers on a high-speed automobile chase and then assaulted a police officer with a loaded Browning 9mm semi-automatic pistol.

59. Between in or about April 1997 and on or about June 17, 1997, within the District of Columbia and the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, conspired to murder Robert Smith, a/k/a "Butchie," in order to prevent Smith from implicating them in the triple murder they committed in Temple Hills on November 17, 1996.

App 860

(**Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances**, in violation of Title 21, United States Code, Section 846)

## COUNT TWO

### RICO CONSPIRACY

A.    The Enterprise

1.    From in or about sometime in 1988, up through and including in or about March 1999, defendants **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, were members and associates of a drug trafficking organization which was based in the District of Columbia and elsewhere and which operated in various locations including, but not limited to, areas within the Greenleaf Gardens housing complex in Southwest Washington, D.C.-- including, but not limited to, the 200 block of K Street, S.W., the 900 and 1000 blocks of Delaware Avenue, S.W., and the 900 block of 3rd Street, S.W.--the 1500 block of Canal Street, S.W., the 200 blocks of 37th Street and 37th Place, S.E.   The organization constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.   The enterprise engaged in, and the activities of the enterprise affected, interstate and foreign commerce, and the activities of the enterprise were conducted in the District of Columbia, Maryland, Virginia and elsewhere.

20

App 861

2.    A principal goal of the organization was to obtain as much money and other things of value through the trafficking of controlled substances, including marijuana, cocaine base, also known as crack cocaine, and PCP.  It was a further goal of the enterprise to commit acts of robbery, kidnaping, murder and other acts of violence for the following purposes, among others:  to enrich the enterprise and its members; to create, maintain and control a market place for the distribution of its controlled substances; to enforce discipline among members of the enterprise; to protect the enterprise and its members from detection, apprehension and prosecution by law enforcement; to intimidate and prevent persons from testifying as witnesses in criminal prosecutions against members of the conspiracy; to prevent, thwart, and retaliate against acts of violence perpetrated by rivals against the enterprise and its members; and to promote and enhance the reputation and standing of the enterprise and its members.

21

App 862

### B.   Roles of the Defendants

The defendants have performed, or agreed to perform, the following roles and have committed, or agreed to commit, the following crimes--among others that are charged in later sections of this indictment--in furtherance of the enterprise:

### VINCENT HILL a/k/a "Vito"

3.    **VINCENT HILL** was one of the leaders of the organization. Prior to his arrest and incarceration in 1996, he consistently sold quantities of marijuana in concert with his co-conspirators in the area of the Greenleaf Gardens public housing complex.  In addition to providing marijuana in wholesale amounts to co-conspirators and other individuals, he and co-conspirators worked together to sell retail amounts to customers who met him on the street.  **HILL** and his co-conspirators centered their street-level distribution in the area surrounding the intersection of Delaware Avenue and K Street, S.W.  **HILL** and his co-conspirators considered that distribution spot reserved for the use of himself and the co-conspirators, and they guarded against incursions by other drug sellers who tried to do business in that area without permission from **HILL** and the co-conspirators.  On occasion, **HILL** resorted to beating competitors with sticks or bats when they did not follow his orders to leave the area.  **HILL** also used firearms to settle disputes between himself and his co-conspirators and rival drug dealers.  On June 29, 1989, he shot and killed Larry Wright in the area of First and

22

App 863

O Streets, S.W. On October 22, 1993, he planned and participated with co-conspirators in the attempted robbery and shooting of another drug dealer named Anthony Pryor.

### JEROME MARTIN a/k/a "Pimp"

4. **JEROME MARTIN** grew up in Southwest Washington, D.C. and has been associated with most of the co-conspirators since his childhood. Since approximately 1989, he has routinely engaged in drug distribution--including street-level sales of marijuana in the area of the 200 block of K Street, S.W.--carried firearms and resorted to violence to fend off real or perceived threats to himself and his co-conspirators. In approximately 1991, **MARTIN** and several of his co-conspirators expanded their narcotics operation over to the area of 37th Place, S.E. After being introduced to that neighborhood by a friend who had moved there from Southwest, D.C. and getting acquainted with the local narcotics dealers, **MARTIN** quickly became one of the leading distributors of crack cocaine in the area. He and his co-conspirators set up a network of street-level dealers who sold crack cocaine for them. This narcotics business netted **MARTIN** handsome profits which permitted him to buy luxury automobiles and to live in a luxury apartment.

On August 6, 1991, **MARTIN** and co-conspirator **SAMUEL CARSON** initiated a violent feud with a group of drug dealers in the 58th Street neighborhood when they killed a member of that group named Anthony Fortune in retaliation for Fortune having earlier robbed

23

MARTIN and others at gunpoint. The ensuing feud resulted in a series of shootings between MARTIN and his co-conspirators who were involved in drug distribution in the 37th Place neighborhood and friends of Anthony Fortune from the 58th Street neighborhood. Over the next year, members of the rival groups routinely drove through their rivals' neighborhood and shot people who happened to be standing outside. On September 10, 1991, for example, MARTIN, CARSON and several co-conspirators drove through the 58th Street neighborhood and shot at two rivals. In the process, they got into a shootout with four policemen who happened to be nearby when the co-conspirators opened fire on their targets.

MARTIN also went to extreme efforts to avoid prosecution and conviction for the crimes he committed in furtherance of this conspiracy. When tried for a murder arising during the feud with the 58th Street group, MARTIN directed co-conspirators to murder persons he suspected were witnesses against him. At his request, co-conspirators staked out the houses of several prospective witnesses and murdered one witness--Ms. Chrishauna Gladden--four days prior to the commencement of MARTIN'S trial.

24

App 865

## SAMUEL CARSON a/k/a "Chin"

5. **SAMUEL CARSON** associated closely with the co-conspirators, and participated in numerous acts of violence in furtherance of the conspiracy. He participated with **JEROME MARTIN** in the murder of Anthony Fortune and the drive-by shooting that was part of the ensuing feud with Fortune's friends from the 58th Street neighborhood. He also sought to help his co-conspirators avoid prosecution for their crimes by executing the witnesses against them. In 1995, he and co-conspirators **WILLIAM KYLE SWEENEY** and **SEAN COATES** tried to locate and kill Kenneth Adams, who was a witness in the murder trial of co-conspirator **MAURICE PROCTOR**. On October 5, 1996, he killed Chrishauna Gladden at **MARTIN'S** behest, four days before she was scheduled to testify in the trial of a case in which **MARTIN** was charged with murder. Carson also participated in other shootings and murders that were committed in furtherance of the racketeering conspiracy, as charged in this and subsequent counts of this indictment, between 1991 and his arrest and incarceration in 1997.

## WILLIAM KYLE SWEENEY a/k/a "Draper"

6. **WILLIAM KYLE SWEENEY** actively distributed narcotics and participated in numerous shootings and robberies in concert with the co-conspirators in this case and in furtherance of the conspiracy. He routinely carried firearms and used them to commit robberies in order to enrich himself and his co-conspirators, to

25

App 866

kill persons he perceived as a threat to himself or his co-conspirators and to enhance the reputation of the membership of the conspiracy. **SWEENEY** committed a number of shootings in furtherance of this conspiracy, including shootings that were directed at persons from the Condon Terrace neighborhood of Southeast Washington, D.C. who were feuding with **SWEENEY** and his co-conspirators; the kidnaping, shooting and attempted robbery of Anthony Pryor on October 22, 1993; the murder of Donnell Whitfield on September 26, 1994; and the murder and attempted robbery of three persons in Temple Hills, Maryland on November 17, 1996.

### SEAN COATES a/k/a "Birdy"

7.    **SEAN COATES** was a central member of the conspiracy, and he consistently participated in narcotics distribution with the co-conspirators and committed violent acts related to the conspiracy. For example, on April 28, 1990, he and co-conspirators kidnaped Norman Yusef Simmons in order to collect ransom from Simmons' brother, who was a successful rival drug dealer. On June 28, 1992, he participated in the attempted murder of Michael Jones, who was a witness against co-conspirator Clifton Edwards. On October 22, 1993, he joined **SWEENEY** and other co-conspirators in the abduction, attempted robbery and shooting of Anthony Pryor, another rival drug dealer. On October 30, 1996, **COATES** ambushed and fired two gunshots into Ronald Sowells-a member of a rival gang--as retaliation for Sowells' alleged participation in the shooting of

26

co-conspirator **VINCENT HILL** on July 10, 1996. On November 17, 1996, he participated in the robbery and triple murder of three victims in Temple Hills, Maryland.

C.    The RICO Conspiracy

8.    From in or about sometime in at least 1988, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including March 1999, in the District of Columbia, Virginia, Maryland and elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** together with other persons known and unknown, being persons employed by and associated with the enterprise described above, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly and intentionally did combine, conspire, confederate and agree with each other, and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Section 1961(1) and 1961(5), consisting of the following:

(a) offenses involving distribution and possession with intent to distribute controlled substances, including marijuana, cocaine base, also known as crack cocaine, and PCP, in violation of Title

App 868

21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2;

(b) conspiracy to distribute and to possess with intent to distribute controlled substances, including marijuana, cocaine base, also known as crack cocaine, and PCP, in violation of Title 21, United States Code, Section 846; and

(c) acts and threats involving murder, kidnaping and robbery, in violation of Title 22, D.C. Code, Sections 103, 105, 105a, 106, 501, 503, 2101, 2401, 2901, 2902, 3202 and 3204(b); Title 18, United States Code, Section 1959; and Title 27, Maryland Code, Sections 12, 337, 407, 410, 486, and 488.

9. It was further part of the conspiracy that each defendant agreed that a co-conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

D. The Pattern of Racketeering Activity

10. The pattern of racketeering activity through which the defendants conspired to conduct and participate in the conduct of the affairs of the enterprise consisted of racketeering acts set forth below, which are set forth in the corresponding overt acts (OA) of Count One and the corresponding counts of this indictment, which are realleged and incorporated by reference herein:

App 869

**Racketeering Act 1**        <u>Act Involving Distribution of a</u>
                              <u>Controlled Substance</u>
                              <u>(Conspiracy)</u>

From on or about sometime in 1988, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including September 1998, in the District of Columbia and elsewhere, the defendants, **VINCENT HILL, a/k/a "Vito," JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other, with co-conspirators not indicted herein, and with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute narcotic controlled substances, in violation of Title 21, United States Code, Section 846, as set forth more fully in Count One of this indictment.

**Racketeering Acts 2-20**    <u>Acts Involving Distribution of a</u>
                              <u>Controlled Substance</u>
                              <u>(Distribution)</u>

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below did, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally distribute a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance,

29

App 870

as more fully set forth in the specified overt acts of Count One,

which are realleged and incorporated by reference herein:

| Rack. Act | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|---|---|---|---|---|
| 2 | **VINCENT HILL** | Dist. Marijuana (October 4, 1995) | OA 31 | 21 U.S.C. §841 (a)(1) |
| 3 | **VINCENT HILL** | Dist. Marijuana (November 2, 1995) | OA 32 | 21 U.S.C. §841 (a)(1) |
| 4 | **VINCENT HILL** | Dist. Marijuana (November 3, 1995) | OA 33 | 21 U.S.C. §841 (a)(1) |
| 5 | **VINCENT HILL JEROME MARTIN** | Dist. Marijuana (November 15, 1995) | OA 34 | 21 U.S.C. §841 (a)(1) |
| 6 | **VINCENT HILL** | Dist. Marijuana (November 16, 1995) | OA 35 | 21 U.S.C. §841 (a)(1) |
| 7 | **VINCENT HILL** | Dist. Marijuana (November 28, 1995) | OA 36 | 21 U.S.C. §841 (a)(1) |
| 8 | **VINCENT HILL** | Dist. Marijuana (November 29, 1995) | OA 37 | 21 U.S.C. §841 (a)(1) |
| 9 | **JEROME MARTIN** | Dist. Marijuana (December 6, 1995) | OA 38 | 21 U.S.C. §841 (a)(1) |
| 10 | **VINCENT HILL** | Dist. Marijuana (December 8, 1995) | OA 39 | 21 U.S.C. §841 (a)(1) |
| 11 | **JEROME MARTIN** | Dist. Marijuana (December 13, 1995) | OA 40 | 21 U.S.C. §841 (a)(1) |
| 12 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 41 | 21 U.S.C. §841 (a)(1) |
| 13 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 42 | 21 U.S.C. §841 (a)(1) |
| 14 | **VINCENT HILL** | Dist. Marijuana (December 15, 1995) | OA 43 | 21 U.S.C. §841 (a)(1) |

App 871

| 15 | **VINCENT HILL** | Dist. Marijuana (February 14, 1996) | OA 46 | 21 U.S.C. §841 (a)(1) |
| 16 | **VINCENT HILL** | Dist. Marijuana (February 20, 1996) | OA 47 | 21 U.S.C. §841 (a)(1) |
| 17 | **JEROME MARTIN** | Dist. Marijuana (February 26, 1996) | OA 48 | 21 U.S.C. §841 (a)(1) |
| 18 | **JEROME MARTIN** | Dist. Marijuana (February 26, 1996) | OA 49 | 21 U.S.C. §841 (a)(1) |
| 19 | **VINCENT HILL** | Dist. Marijuana (March 5, 1996) | OA 50 | 21 U.S.C. §841 (a)(1) |
| 20 | **VINCENT HILL** | Dist. Marijuana (March 15, 1996) | OA 51 | 21 U.S.C. §841 (a)(1) |

**Racketeering Acts 21-22**  <u>Acts Involving Distribution of a Controlled Substance (Possession with Intent to Distribute)</u>

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally did possess with intent to distribute a mixture and substance containing a detectable amount of a Schedule I or II controlled substance, as more fully set forth in the specified overt acts of Count One, which are realleged and incorporated by reference herein:

31

App 872

| Rack. Act | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|---|---|---|---|---|
| 21 | **VINCENT HILL** | PWID Marijuana (September 27, 1995) | OA 30 | 21 U.S.C.§841 (a)(1) |
| 22 | **JEROME MARTIN** | PWID Marijuana (February 1, 1996) | OA 45 | 21 U.S.C.§841 (a)(1) |

**Racketeering Acts 23-50**   Acts and Threats Involving
                             Murder, Kidnaping and Robbery

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below in Acts 23-50, in violation of Title 22, D.C. Code, Sections 103, 105, 105a, 106, 501, 503, 2101, 2401, 2901, 2902, 3202 and 3204(b); Title 18, United States Code, Section 1959; and Title 27, Maryland Code, Sections 12, 337, 407, 410, 486, and 488, did commit acts and threats involving murder, kidnaping and robbery, as set forth below.

A number of the acts and threats involving murder, kidnaping and robbery through which the defendants conspired to conduct and participate in the conduct of the affairs of the racketeering enterprise related to violent feuds between the defendants' enterprise and other criminal groups in and around the District of Columbia. This indictment charges the defendants with committing racketeering acts of murder, kidnaping and robbery in relation to four separate feuds. In addition, it charges the defendants with "General Racketeering Acts"--acts of murder, kidnaping and robbery committed in furtherance of the racketeering enterprise that are

32

App 873

not related to these three feuds. The acts and threats involving murder, kidnaping and robbery are set forth in Racketeering Acts 24 through 53.

THE 37TH PLACE/58TH STREET FEUD

**Racketeering Act 23**

On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol on or about August 6, 1991, thereby causing injuries from which Anthony Fortune died on or about August 6, 1991, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

**Racketeering Act 24**

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 24:

(a)  On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Keith Bradley, a/k/a "PeeWee," with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(b)  On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Jimmy Thomas, Jr., a/k/a "Sugarspoon," with intent to

33

App 874

murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(c) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Adrian Treadwell with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(d) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Edward McDonald with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(e) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Marc Little with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(f) On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Officer Alvin Ray with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

34

App 875

## Racketeering Act 25

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 25:

(a) On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Curtis Edwards, by shooting him with a pistol on or about August 29, 1992, thereby causing injuries from which Curtis Edwards died on or about August 29, 1992, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

(b) On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Richard Burton with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(c) On or about August 29, 1992, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Keith Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

*THE SOUTHWEST/CONDON TERRACE FEUD*

## Racketeering Act 26

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 26:

35

App 876

(a)  On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Jermaine Hall with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

(b)  On or about June 20, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, assaulted Michael Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

## Racketeering Act 27

Between on or about June 20, 1992 and June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, unlawfully, wilfully, and knowingly did conspire and agree with each other to commit the crime of first degree murder while armed (premeditated) of Michael Jones in order to prevent Michael Jones from implicating and testifying against a co-conspirator not indicted herein regarding the shooting of Jermaine Hall on June 20, 1992, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 27 was for the co-conspirators to murder Michael Jones to prevent him from testifying against the co-conspirator not indicted herein.  In furtherance of this conspiracy and to effect the object thereof,

36

App 877

**SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1) After the arrest of the co-conspirator not indicted herein on June 20, 1992, the co-conspirators discussed over the telephone the fact that Michael Jones was a witness against the co-conspirator not indicted herein and agreed that they needed to kill Michael Jones to prevent the co-conspirator not indicted herein from being convicted for the shooting of Jermaine Hall.

(2) On or about June 28, 1992, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, drove to the area of the 1000 block of Mississippi Avenue, S.E. where they spotted Michael Jones.

(3) On or about June 28, 1992, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, approached Michael Jones, chased him down and shot him multiple times.

## Racketeering Act 28

On or about June 28, 1992, within the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted Michael Jones with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

37

App 878

**Racketeering Act 29**

On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol on or about July 7, 1993, thereby causing injuries from which Glenn Jenkins died on or about July 7, 1993, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

*THE SOUTHWEST/KENTUCKY COURTS FEUD*

**Racketeering Act 30**

Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities are unknown to the Grand Jury with intent to murder them, in violation of 22 D.C. Code Sections 105, 503 and 3202.

**Racketeering Act 31**

Between in or about 1991 and on or about June 20, 1992, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, assaulted persons in the Kentucky Courts neighborhood of Southeast Washington, D.C. whose identities

38

App 879

are unknown to the Grand Jury with intent to murder them, in violation of 22 D.C. Code Sections 105, 503 and 3202.

*THE K STREET/L STREET FEUD*

**Racketeering Act 32**

On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright, Jr., by shooting him with a pistol on or about June 29, 1989, thereby causing injuries from which Larry Wright, Jr. died on or about June 29, 1989, in violation of 22 D.C. Code Sections 2401 and 3202.

**Racketeering Act 33**

On or about April 28, 1990, in the District of Columbia, **SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Norman Yusef Simmons, with intent to hold and detain Norman Yusef Simmons for ransom, reward and otherwise, in violation of 22 D.C. Code Sections 105, 2101 and 3202.

**Racketeering Act 34**

In or about July 1996, in the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of members of a rival criminal group which operated in the area of

App 880

L Street, S.W., in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 34 was for the conspirators to retaliate against the members of the criminal group from L Street, S.W. for their alleged responsibility for the July 6, 1996, murder of an individual's brother.

In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin,"** and co-conspirators not indicted herein, committed the following overt act in the District of Columbia:

(1) On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, participated in the shooting of Ronald Sowells, a recognized member of the L Street criminal group.

## Racketeering Act 35

On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

### *GENERAL RACKETEERING ACTS*

## Racketeering Act 36

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 36:

40

App 881

(a)  On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Maurice Hallman died on or about December 19, 1989, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

(b)  On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Leonard Hyson, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Leonard Hyson died on or about December 19, 1989, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

## Racketeering Act 37

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 37:

(a)  On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Teresa Thomas died on or

41

App 882

about March 22, 1991, in violation of 22 D.C. Code Sections 2401 and 3202.

(b)  On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Terita Lucas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Terita Lucas died on or about March 22, 1991, in violation of 22 D.C. Code Sections 2401 and 3202.

## Racketeering Act 38

On or about April 7, 1992, in the state of Maryland, **SAMUEL CARSON,** while armed with a dangerous weapon, that is, an automobile, assaulted Ofc. Alfred Moss of the Prince George's County Police Department with intent to murder him, in violation of 27 M.D. Code Section 12.

## Racketeering Act 39

The defendants named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 39:

(a)  On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, did attempt, by violence and by putting in fear, to take and carry away money or other valuable

42

App 883

property from the person of Anthony Pryor, in violation of 27 M.D. Code, Sections 486 and 488.

(b)  On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, seized, confined, kidnaped, abducted and carried away Anthony Pryor, with intent to hold and detain Anthony Pryor, in violation of 27 M.D. Code, Section 337.

(c)  On or about October 22, 1993, in the state of Maryland, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and other co-conspirators not indicted herein, while armed with pistols, assaulted Anthony Pryor with intent to murder him, in violation of 27 M.D. Code, Section 12.

Racketeering Act 40

On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Roland Brown with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

Racketeering Act 41

On or about April 9, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, unlawfully, willfully, and knowingly did conspire and agree with each other and with others to commit the crime of first degree

43

App 884

murder while armed (premeditated) of Steven Dunbar, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 41 was to murder Steven Dunbar. In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1) Prior to the murder of Steven Dunbar on the evening of April 9, 1994, two co-conspirators not indicted herein had a conversation in which they agreed to murder Steven Dunbar that night and one of the co-conspirators not indicted herein told the other co-conspirator not indicted herein that Dunbar was sitting up the street.

(2) Moments prior to the murder of Steven Dunbar on the evening of April 9, 1994, a co-conspirator not indicted herein produced two handguns and gave one to the other co-conspirator not indicted herein for the purpose of murdering Steven Dunbar.

(3) Moments prior to the murder of Steven Dunbar, **SAMUEL CARSON, a/k/a "Chin,"** arranged for a co-conspirator not indicted herein to wait in a parked car nearby where Steven Dunbar was sitting so that that co-conspirator could be ready to drive the murder weapons away from the scene after the murder was committed.

(4) While a co-conspirator not indicted herein waited nearby, a co-conspirator not indicted herein walked up behind

44

App 885

Steven Dunbar in the 200 block of K Street, S.W., Washington, D.C., and murdered Dunbar by shooting him approximately seven times.

(5) Within seconds after the co-conspirator not indicted herein shot Steven Dunbar, co-conspirators not indicted herein, opened fire on an eyewitness to the murder named Rogest Webb in order to prevent Rogest Webb from implicating and testifying against the co-conspirators in the murder of Steven Dunbar.

(6) After the co-conspirator not indicted herein shot Steven Dunbar, he handed the murder weapon to a co-conspirator not indicted herein.

(7) After the co-conspirator not indicted herein handed the murder weapon to another co-conspirator not indicted herein, they both went into an alley and met other co-conspirators.

(8) A co-conspirator not indicted herein then took the two handguns from the co-conspirator not indicted herein and ran to the car that was waiting nearby.

(9) The co-conspirator not indicted herein who had been told by **SAMUEL CARSON, a/k/a "Chin,"** to park nearby then drove the co-conspirator not indicted herein who was carrying the two handguns away from the area.

Racketeering Act 42

On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted

App 886

Ulysses English with intent to murder him, in violation of 22 D.C. Code Sections 503 and 3202.

## Racketeering Act 43

On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield by shooting him with a pistol on or about September 26, 1994, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994, in violation of 22 D.C. Code Sections 105, 2401 and 3202.

## Racketeering Act 44

On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to murder him, in violation of 22 D.C. Code Sections 503 and 3202.

## Racketeering Act 45

Between in or about 1996 and in or about 1997, within the District of Columbia and the Commonwealth of Virginia, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein, unlawfully, wilfully, and knowingly did conspire and agree with each other to commit the crime of first degree murder while

46

App 887

armed (premeditated), in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 45 was for the conspirators to eliminate those people who were expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor a/k/a "PooPoo," Criminal Case No. F9885-94, in the District of Columbia Superior Court, by killing the witnesses prior to their testimony.

In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and another co-conspirator not indicted herein committed the following overt acts in the District of Columbia and the Commonwealth of Virginia:

(1) **CARSON, SWEENEY** and a co-conspirator not indicted herein discussed a plan whereby they would kill Kenneth Adams, an individual who was expected to testify at the trial of a co-conspirator.

(2) **CARSON, SWEENEY, COATES** and a co-conspirator not indicted herein drove to an address in Centerville, Virginia which **SWEENEY** believed to be the residence of Kenneth Adams in order to find and kill Kenneth Adams.

(3) **CARSON, SWEENEY** and a co-conspirator not indicted herein drove to the area of Kenneth Adams' residence in Centerville, Virginia and stashed a gun in a nearby wooded area in

47

order to facilitate future attempts to hunt for and kill Kenneth Adams.

Racketeering Act 46

On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to murder him, in violation of 22 D.C. Code Sections 105, 503 and 3202.

Racketeering Act 47

In or about October, 1996, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp," SAMUEL CARSON, a/k/a "Chin," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, unlawfully, willfully, and knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of persons who were expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp," Criminal Case No. F8414-94, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 47 was for the conspirators to eliminate those people who were expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp," Criminal

48

Case No. F8414-94, in the District of Columbia Superior Court, by killing them prior to their testimony.

In furtherance of this conspiracy and to effect the object thereof, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** and other co-conspirators not indicted herein, committed the following overt acts in the District of Columbia:

(1) Shortly before the trial, **SAMUEL CARSON, a/k/a "Chin,"** told a co-conspirator not indicted herein that he needed to "bust" a woman who lived on 37th Place, S.E. because that woman was scheduled to testify at "Pimp's trial."

(2) **SAMUEL CARSON, a/k/a "Chin,"** enlisted the support of a co-conspirator not indicted herein in eliminating the witnesses at "Pimp's trial," telling him that they had to approach eliminating the witnesses like a job and that they had to do whatever was necessary to kill the witnesses.

(3) On several occasions in 1996, **SAMUEL CARSON, a/k/a "Chin,"** and that co-conspirator not indicted herein waited outside the witnesses' homes in an attempt to locate and ambush them.

(4) On or about October 5, 1996--four days before the trial of United States v. Jerome Martin, a/k/a "Pimp," Criminal Case No. F8414-94--**SAMUEL CARSON, a/k/a "Chin,"** and that co-conspirator not indicted herein spoke to an associate and learned that Chrishauna Gladden, one of the potential witnesses on the list

49

App 890

that **JEROME MARTIN, a/k/a "Pimp,"** had provided was attending a party at a house on 37th Place, S.E.

(5) On or about October 5, 1996, **SAMUEL CARSON, a/k/a "Chin,"** and that co-conspirator not indicted herein waited in an abandoned house across the alley from the house where the party was taking place until Chrishauna Gladden emerged from the house. When Chrishauna Gladden walked out the door, **SAMUEL CARSON, a/k/a "Chin,"** ran out of the abandoned house and shot Ms. Gladden to death.

## Racketeering Act 48

On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol on or about October 5, 1996, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996, in violation of 22 D.C. Code Sections 2401 and 3202.

## Racketeering Act 49

The defendant named below committed the following acts, each of which alone constitutes the commission of Racketeering Act 49:

(a) On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, did attempt, by violence and by

App 891

putting in fear, to take and carry away money or other valuable property from the persons of Alonzo Gaskins, Darnell Mack and Melody Anderson, in violation of 27 M.D. Code, Sections 486 and 488.

(b)  On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a) of Racketeering Act 49, killed Alonzo Gaskins by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(c)  On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a)  of Racketeering Act 49, killed Darnell Mack by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(d)  On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"**

51

App 892

SEAN COATES, a/k/a "Birdy," and a co-conspirator not indicted herein, while armed with a pistol, in perpetrating or attempting to perpetrate the crime of attempted armed robbery as set forth in Paragraph a) of Racketeering Act 49, killed Melody Anderson by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Section 410.

(e)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein,  while armed with a pistol, purposely and with deliberate and premeditated malice, killed Alonzo Gaskins by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

(f)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein,  while armed with a pistol, purposely and with deliberate and premeditated malice, killed Darnell Mack by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

App 893

(g)   On or about November 17, 1996, in the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Melody Anderson by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Section 407.

## Racketeering Act 50

Between in or about April 1997 and on or about June 17, 1997, within the District of Columbia and the state of Maryland, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, knowingly did conspire and agree with each other and with others to commit the crime of first degree murder while armed (premeditated) of Robert Smith, a/k/a "Butchie," in order to prevent Robert Smith from implicating them in the murders of Alonzo Gaskins, Darnell Mack and Melody Anderson on November 17, 1996, in violation of 22 D.C. Code Sections 105a, 2401 and 3202.

The object of the conspiracy charged in Racketeering Act 50 was for the conspirators to prevent Robert Smith from implicating and testifying against them regarding the triple murder on November 17, 1996.   In furtherance of this conspiracy and to effect the object thereof, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY,**

53

App 894

a/k/a "Draper," and a co-conspirator not indicted herein, committed the following overt acts in the District of Columbia and the state of Maryland:

(1) At some point after his arrest on April 20, 1997, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** told **SAMUEL CARSON, a/k/a "Chin,"** that he had admitted to Robert Smith, a/k/a "Butchie," that they had committed the triple murder on November 17, 1996 and asked **SAMUEL CARSON, a/k/a "Chin,"** to kill Smith.

(2) At some point after that conversation, **SAMUEL CARSON, a/k/a "Chin,"** told a co-conspirator not indicted herein that they needed to kill Robert Smith, and that they would not have to worry about being implicated in the November 17, 1996 triple murder once Robert Smith was dead.

(3) At some point after **SAMUEL CARSON, a/k/a "Chin,"** solicited the co-conspirator not indicted herein to murder Robert Smith, those two men spotted Robert Smith on Half Street, S.W., Washington, D.C.

(4) After spotting Robert Smith, **SAMUEL CARSON, a/k/a "Chin,"** and the co-conspirator not indicted herein drove to Carson's house, where Carson retrieved a gun and a hooded sweatshirt.

(5) **SAMUEL CARSON, a/k/a "Chin,"** and the co-conspirator not indicted herein then devised a plan whereby the following would take place: (a) the co-conspirator would drop **SAMUEL CARSON, a/k/a**

54

App 895

"Chin," off near where they had spotted Robert Smith; (b) **SAMUEL CARSON, a/k/a "Chin,"** would shoot Robert Smith to death and run back to the car; (c) the co-conspirator not indicted herein would then drive over the South Capitol Street bridge from which they would throw the gun in the river; and (d) they would continue on to the area of 37th Street, S.E. where they would establish an alibi for themselves by standing outside and being seen by other persons who could later say that they were in that area and not around Half Street, S.W. on the day of Robert Smith's murder.

(6)  In accordance with their plan, the co-conspirator not indicted herein dropped **SAMUEL CARSON, a/k/a "Chin,"** in the 1400 block of South Capitol Street, S.W.

(7)  **SAMUEL CARSON, a/k/a "Chin,"** walked through an alley from the 1400 block of South Capitol Street, S.W. toward where they had seen Robert Smith on Half Street, S.W.

(8)  **SAMUEL CARSON, a/k/a "Chin,"** came back to the car a short time later, telling the co-conspirator not indicted herein that he had been unable to commit the murder as Robert Smith was no longer on Half Street, S.W.

(**Conspiracy to Participate in Racketeer Influenced Corrupt Organization**, in violation of Title 18, United States Code, Section 1962(d))

55

App 896

*JUNE 29, 1989 MURDER OF LARRY WRIGHT*

## COUNT THREE

### FIRST-DEGREE MURDER WHILE ARMED OF LARRY WRIGHT

On or about June 29, 1989, within the District of Columbia, **VINCENT HILL, a/k/a "Vito,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Larry Wright by shooting him with a pistol on or about June 29, 1989, thereby causing injuries from which Larry Wright died on or about June 29, 1989.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

*DECEMBER 19, 1989 MURDERS OF MAURICE HALLMAN AND LEONARD HYSON*

## COUNT FOUR

### FIRST-DEGREE MURDER WHILE ARMED OF MAURICE HALLMAN

On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Maurice Hallman, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Maurice Hallman died on or about December 19, 1989.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

56

App 897

## COUNT FIVE

### FIRST-DEGREE MURDER WHILE ARMED OF LEONARD HYSON

On or about December 19, 1989, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Leonard Hyson, by shooting him with a pistol on or about December 19, 1989, thereby causing injuries from which Leonard Hyson died on or about December 19, 1989.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

*MARCH 22, 1991 MURDERS OF TERESA THOMAS AND TERITA LUCAS*

## COUNT SIX

### FIRST-DEGREE MURDER WHILE ARMED OF TERESA THOMAS

On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Teresa Thomas, by shooting her with a pistol on or about March 22, 1991, thereby

57

App 898

causing injuries from which Teresa Thomas died on or about March 22, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

### COUNT SEVEN

### FIRST-DEGREE MURDER WHILE ARMED OF TERITA LUCAS

On or about March 22, 1991, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Terita Lucas, by shooting her with a pistol on or about March 22, 1991, thereby causing injuries from which Terita Lucas died on or about March 22, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

### *AUGUST 6, 1991 MURDER OF ANTHONY FORTUNE*

### COUNT EIGHT

### FIRST-DEGREE MURDER WHILE ARMED OF ANTHONY FORTUNE

On or about August 6, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, purposely and with deliberate and premeditated malice, killed Anthony Fortune, by shooting him with a pistol on or about August 6, 1991, thereby causing injuries from which Anthony Fortune died on or about August 6, 1991.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

58

App 899

*SEPTEMBER 10, 1991 SHOOTING AT 60TH AND EAST CAPITOL STREETS*

## COUNT NINE

### ASSAULTING, RESISTING AND INTERFERING WITH OFC. LITTLE WITH A DANGEROUS WEAPON

On or about September 10, 1991, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** and co-conspirators not indicted herein, without justifiable and excusable cause, and with deadly and dangerous weapons, that is, pistols, did assault, resist, oppose, impede, and interfere with Marc Little, a member of a police force operating in the District of Columbia, knowing him to be a police officer, while Marc Little was engaged in and on account of the performance of his official duties.

(**Assaulting, Resisting and Interfering with a Police Officer with a Dangerous Weapon**, in violation of Title 22, D.C. Code, Sections 105 and 505(b))

*JULY 7, 1993 MURDER OF GLENN JENKINS*

## COUNT TEN

### FIRST-DEGREE MURDER WHILE ARMED OF GLENN JENKINS

On or about July 7, 1993, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and co-conspirators not indicted herein, while armed with pistols, purposely and with deliberate and premeditated malice, killed Glenn Jenkins, by shooting him with a pistol on or about July 7, 1993,

App 900

thereby causing injuries from which Glenn Jenkins died on or about July 7, 1993.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

*OCTOBER 22, 1993 KIDNAPING AND SHOOTING OF ANTHONY PRYOR*

**COUNT ELEVEN**

**ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF ANTHONY PRYOR**

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) At all times relevant to this Indictment, the racketeering enterprise, as more fully described in paragraphs One through Ten of Count Two of this Indictment, which are realleged and incorporated by reference as though set forth fully herein, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.

(2) At all times relevant to this Indictment, the above-described enterprise, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846,

60

App 901

and acts involving murder, kidnaping and robbery, in violation of Title 22, D.C. Code, Sections 103, 105, 105a, 106, 501, 503, 2101, 2401, 2901 and 3202 and Title 27, Maryland Code, Sections 12, 337, 407, 410, 486, and 488.

(3) On or about October 22, 1993, in the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **VINCENT HILL, a/k/a "Vito," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and others unknown to the Grand Jury unlawfully, willfully and knowingly, while armed with pistols, attempted to kidnap and murder, and assaulted Anthony Pryor with a dangerous weapon resulting in serious bodily injury, in violation of 27 M.D. Code, Sections 12, 337, 486 and 488.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

*OCTOBER 28, 1993 SHOOTING OF ROLAND BROWN*

### COUNT TWELVE

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF ROLAND BROWN

On or about October 28, 1993, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted

App 902

herein, while armed with pistols, assaulted Roland Brown with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

*JUNE 26, 1994 SHOOTING OF ULYSSES ENGLISH*

### COUNT THIRTEEN

## ASSAULT WITH INTENT TO KILL WHILE ARMED OF ULYSSES ENGLISH

On or about June 26, 1994, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** while armed with a pistol, assaulted Ulysses English with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

### COUNT FOURTEEN

## ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF ULYSSES ENGLISH

The defendant named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about June 26, 1994, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing his position in the enterprise, an

62

App 903

enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** unlawfully, willfully and knowingly, while armed with a pistol, attempted to murder and assaulted Ulysses English with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(3)&(5))

*SEPTEMBER 26, 1994 MURDER OF DONNELL "ROBOCOP" WHITFIELD*

## COUNT FIFTEEN

### FIRST-DEGREE MURDER WHILE ARMED OF DONNELL WHITFIELD

On or about September 26, 1994, within the District of Columbia, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Donnell Whitfield by shooting him with a pistol on or about September 26, 1994, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 105, 2401 and 3202)

## COUNT SIXTEEN

### MURDER IN AID OF RACKETEERING ACTIVITY OF DONNELL WHITFIELD

The defendants named below committed the following violent crime in aid of racketeering activity:

63

App 904

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about September 26, 1994, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **WILLIAM KYLE SWEENEY, a/k/a "Draper,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, while armed with a pistol, killed Donnell Whitfield, by shooting him with a pistol, thereby causing injuries from which Donnell Whitfield died on or about September 26, 1994, in violation of 22 D.C. Code, Sections 105, 2401 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(1))

64

App 905

*MAY 30, 1995 SHOOTING OF JAMES "CREEKO" COULTER*

## COUNT SEVENTEEN

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF JAMES COULTER

On or about May 30, 1995, within the District of Columbia, **JEROME MARTIN, a/k/a "Pimp,"** while armed with a pistol, assaulted James Coulter with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 501 and 3202)

## COUNT EIGHTEEN

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF JAMES COULTER

The defendant named below committed the following violent crime in aid of racketeering activity:

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about May 30, 1995, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing his position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **JEROME MARTIN, a/k/a "Pimp,"** unlawfully, willfully and knowingly, while armed with a pistol, attempted to murder and assaulted James Coulter with a dangerous

App 906

weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(3)&(5))

*AUGUST 30, 1996 SHOOTING OF POPA MARK PHILLIP*

## COUNT NINETEEN

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF POPA MARK PHILLIP

On or about August 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with pistols, assaulted Popa Mark Phillip with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 105, 501 and 3202)

## COUNT TWENTY

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF POPA MARK PHILLIP

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about August 30, 1996, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and

66

App 907

maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, unlawfully, willfully and knowingly, while armed with pistols, attempted to murder and assaulted Popa Mark Phillip with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 105, 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

*OCTOBER 5, 1996 MURDER OF CHRISHAUNA GLADDEN*

**COUNT TWENTY-ONE**

**FIRST-DEGREE MURDER WHILE ARMED OF CHRISHAUNA GLADDEN**

On or about October 5, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, while armed with a pistol, purposely and with deliberate and premeditated malice, killed Chrishauna Gladden, by shooting her with a pistol on or about October 5, 1996, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996.

(**First-Degree Murder While Armed**, in violation of Title 22, D.C. Code, Sections 2401 and 3202)

App 908

## COUNT TWENTY-TWO

### MURDER IN AID OF RACKETEERING ACTIVITY
### OF CHRISHAUNA GLADDEN

The defendant named below committed the following violent crime in aid of racketeering activity:

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about October 5, 1996, within the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, while armed with a pistol, killed Chrishauna Gladden, by shooting her with a pistol, thereby causing injuries from which Chrishauna Gladden died on or about October 5, 1996, in violation of 22 D.C. Code, Sections 2401 and 3202.

(**Violent Crime in Aid of Racketeering Activity,** in violation of Title 18, United States Code, Section 1959(a)(1))

App 909

*OCTOBER 30, 1996 SHOOTING OF RONALD SOWELLS*

## COUNT TWENTY-THREE

### ASSAULT WITH INTENT TO KILL WHILE ARMED OF RONALD SOWELLS

On or about October 30, 1996, within the District of Columbia, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** while armed with a pistol, assaulted Ronald Sowells with intent to kill him.

(**Assault with Intent to Kill While Armed**, in violation of Title 22, D.C. Code, Sections 105, 501 and 3202)

## COUNT TWENTY-FOUR

### ATTEMPTED MURDER IN AID OF RACKETEERING ACTIVITY OF RONALD SOWELLS

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about October 30, 1996, in the District of Columbia, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin,"** and **SEAN COATES, a/k/a "Birdy,"** unlawfully, willfully and

69

App 910

knowingly, while armed with a pistol, attempted to murder and assaulted Ronald Sowells with a dangerous weapon resulting in serious bodily injury, in violation of 22 D.C. Code, Sections 105, 501 and 3202.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Sections 2 and 1959(a)(3)&(5))

*NOVEMBER 17, 1996 TRIPLE MURDER*

**COUNT TWENTY-FIVE**

**MURDER IN AID OF RACKETEERING ACTIVITY**
**OF ALONZO GASKINS**

The defendants named below committed the following violent crime in aid of racketeering activity:

(1)  Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)  On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

70

App 911

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Alonzo Gaskins, by shooting him with a pistol, thereby causing injuries from which Alonzo Gaskins died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

### COUNT TWENTY-SIX

### MURDER IN AID OF RACKETEERING ACTIVITY OF DARNELL MACK

The defendants named below committed the following violent crime in aid of racketeering activity:

(1) Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2) On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

71

App 912

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Darnell Mack, by shooting him with a pistol, thereby causing injuries from which Darnell Mack died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

<u>COUNT TWENTY-SEVEN</u>

<u>MURDER IN AID OF RACKETEERING ACTIVITY</u>
<u>OF MELODY ANDERSON</u>

The defendants named below committed the following violent crime in aid of racketeering activity:

(1)   Paragraphs One and Two of Count 11 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(2)   On or about November 17, 1996, within the state of Maryland, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, as set forth more fully in Count Two of this indictment, **SAMUEL CARSON, a/k/a "Chin," WILLIAM KYLE SWEENEY, a/k/a "Draper," SEAN COATES, a/k/a "Birdy,"** and a co-conspirator not indicted herein, unlawfully, willfully, knowingly, and with deliberate and premeditated malice, and in the

72

App 913

perpetration of, or attempt to perpetrate, the crime of robbery, while armed with a pistol, killed Melody Anderson, by shooting her with a pistol, thereby causing injuries from which Melody Anderson died on or about November 17, 1996, in violation of 27 M.D. Code, Sections 407 and 410.

(**Violent Crime in Aid of Racketeering Activity**, in violation of Title 18, United States Code, Section 1959(a)(1))

## COUNTS 28-37

## USE OF A FIREARM

On or about the dates set forth below, in the District of Columbia, the defendants named below did knowingly, willfully and unlawfully use and carry a firearm during and in relation to a crime of violence and a drug trafficking crime, which are felonies prosecutable in a court of the United States, as set forth below and as further described in counts and overt acts of Count One of this indictment which are realleged and incorporated as if fully set forth herein:

| CT | DATE | DEFENDANTS | PREDICATE OFFENSE | FOUND IN COUNT NO. |
|----|------|------------|-------------------|--------------------|
| 28 | 10-22-93 | **VINCENT HILL WILLIAM SWEENEY SEAN COATES** | RICO Assault 18 U.S.C. §1959 (Anthony Pryor: Victim) | 11 |
| 29 | 6-26-94 | **SAMUEL CARSON** | RICO Assault 18 U.S.C. §1959 (Ulysses English: Victim) | 14 |

73

App 914

| 30 | 9-26-94 | **WILLIAM SWEENEY** | RICO Murder 18 U.S.C. §1959 (Donnell Whitfield: Decedent) | 16 |
|----|---------|---------------------|------------------------------------------------------------|----|
| 31 | 5-30-95 | **JEROME MARTIN** | RICO Assault 18 U.S.C. §1959 (James Coulter: Victim) | 18 |
| 32 | 8-30-96 | **SAMUEL CARSON** | Rico Assault 18 U.S.C. §1959 (Popa Mark Phillip: Victim) | 20 |
| 33 | 10-5-96 | **SAMUEL CARSON** | RICO Murder 18 U.S.C. §1959 (Chrishauna Gladden: Decedent) | 22 |
| 34 | 10-30-96 | **SAMUEL CARSON SEAN COATES** | RICO Assault 18 U.S.C. §1959 (Ronald Sowells: Victim) | 24 |
| 35 | 11-17-96 | **SAMUEL CARSON WILLIAM SWEENEY SEAN COATES** | RICO Murder 18 U.S.C. §1959 (Alonzo Gaskins: Decedent) | 25 |
| 36 | 11-17-96 | **SAMUEL CARSON WILLIAM SWEENEY SEAN COATES** | RICO Murder 18 U.S.C. §1959 (Darnell Mack: Decedent) | 26 |
| 37 | 11-17-96 | **SAMUEL CARSON WILLIAM SWEENEY SEAN COATES** | RICO Murder 18 U.S.C. §1959 (Melody Anderson: Decedent) | 27 |

(**Use of a Firearm**, in violation of Title 18, United States Code, Sections 2 and 924(c))

App 915

## COUNTS 38-45

## POSSESSION OF A FIREARM DURING CRIME OF VIOLENCE OR DANGEROUS OFFENSE

On or about the dates set forth below, in the District of Columbia, the defendants named below did possess a firearm, that is, a pistol or imitation thereof, while committing the specified crimes of violence and dangerous crimes as set forth in the specified counts of this indictment which are realleged and incorporated by reference as if fully set forth herein:

| CT | DATE | DEFENDANTS | PREDICATE OFFENSE | FOUND IN COUNT NO. |
|----|------|-----------|-------------------|--------------------|
| 38 | 7-7-93 | **WILLIAM SWEENEY** **SEAN COATES** | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Glenn Jenkins: Decedent) | 10 |
| 39 | 10-28-93 | **SAMUEL CARSON** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Roland Brown: Victim) | 12 |
| 40 | 6-26-94 | **SAMUEL CARSON** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Ulysses English: Victim) | 13 |
| 41 | 9-26-94 | **WILLIAM SWEENEY** | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Donnell Whitfield: Decedent) | 15 |

75

App 916

| 42 | 5-30-95 | **JEROME MARTIN** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (James Coulter: Victim) | 17 |
| 43 | 8-30-96 | **SAMUEL CARSON** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Popa Mark Phillip: Victim) | 19 |
| 44 | 10-5-96 | **SAMUEL CARSON** | First Degree Murder While Armed 22 D.C. Code §§ 2401 and 3202 (Chrishauna Gladden: Decedent) | 21 |
| 45 | 10-30-96 | **SAMUEL CARSON SEAN COATES** | Assault With Intent To Kill While Armed 22 D.C. Code §§ 501 and 3202 (Ronald Sowells: Victim) | 23 |

(**Possession of Firearm During Crime of Violence or Dangerous Offense**, in violation of Title 22, D.C. Code, Sections 105 and 3204(b))

## COUNTS 46-62

### DISTRIBUTION OF CONTROLLED SUBSTANCES

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below did, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally distribute a mixture and substance containing a detectable amount of marijuana, a Schedule

76

App 917

II controlled substance, as more fully set forth in the specified

overt acts of Count One, which are realleged and incorporated by

reference herein:

| Ct. | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|------|------------------------------|-------------------------|-----------|-----------|
| 46 | **VINCENT HILL** | Dist. Marijuana (October 4, 1995) | OA 31 | 21 U.S.C. §841 (a)(1) |
| 47 | **VINCENT HILL** | Dist. Marijuana (November 2, 1995) | OA 32 | 21 U.S.C. §841 (a)(1) |
| 48 | **VINCENT HILL** | Dist. Marijuana (November 3, 1995) | OA 33 | 21 U.S.C. §841 (a)(1) |
| 49 | **VINCENT HILL JEROME MARTIN** | Dist. Marijuana (November 15, 1995) | OA 34 | 1 U.S.C. §841 (a)(1) |
| 50 | **VINCENT HILL** | Dist. Marijuana (November 16, 1995) | OA 35 | 21 U.S.C. §841 (a)(1) |
| 51 | **VINCENT HILL** | Dist. Marijuana (November 28, 1995) | OA 36 | 21 U.S.C. §841 (a)(1) |
| 52 | **VINCENT HILL** | Dist. Marijuana (November 29, 1995) | OA 37 | 21 U.S.C. §841 (a)(1) |
| 53 | **JEROME MARTIN** | Dist. Marijuana (December 6, 1995) | OA 38 | 21 U.S.C. §841 (a)(1) |
| 54 | **VINCENT HILL** | Dist. Marijuana (December 8, 1995) | OA 39 | 21 U.S.C. §841 (a)(1) |
| 55 | **JEROME MARTIN** | Dist. Marijuana (December 13, 1995) | OA 40 | 21 U.S.C. §841 (a)(1) |
| 56 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 41 | 21 U.S.C. §841 (a)(1) |
| 57 | **VINCENT HILL** | Dist. Marijuana (December 13, 1995) | OA 42 | 21 U.S.C. §841 (a)(1) |
| 58 | **VINCENT HILL** | Dist. Marijuana (December 15, 1995) | OA 43 | 21 U.S.C. §841 (a)(1) |

App 918

| 59 | **VINCENT HILL** | Dist. Marijuana (February 14, 1996) | OA 46 | 21 U.S.C. §841 (a)(1) |
| 60 | **VINCENT HILL** | Dist. Marijuana (February 20, 1996) | OA 47 | 21 U.S.C. §841 (a)(1) |
| 61 | **VINCENT HILL** | Dist. Marijuana (March 5, 1996) | OA 50 | 21 U.S.C. §841 (a)(1) |
| 62 | **VINCENT HILL** | Dist. Marijuana (March 15, 1996) | OA 51 | 21 U.S.C. §841 (a)(1) |

(**Distribution of Controlled Substances**, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D))

## COUNTS 63-64

### POSSESSION WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES

On or about the dates set forth below, in the District of Columbia, Maryland and elsewhere, the defendants named below, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2, unlawfully, knowingly and intentionally did possess with intent to distribute a mixture and substance containing a detectable amount of marijuana, a Schedules II controlled substance, as more fully set forth in the specified overt acts of Count One, which are realleged and incorporated by reference herein:

App 919

| Ct. | Defendant or Co-Conspirator | Nature of Offense/Date | Overt Act | Violation |
|-----|------------------------------|------------------------|-----------|-----------|
| 63 | **VINCENT HILL** | PWID Marijuana (September 27, 1995) | OA 30 | 21 U.S.C. §841 (a)(1) |
| 64 | **JEROME MARTIN** | PWID Marijuana (February 1, 1996) | OA 45 | 21 U.S.C. §841 (a)(1) |

(**Possession with Intent to Distribute Controlled Substances**, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia

79

App 920

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos. 98-329 & 99-348 (TPJ) |
| | ) | |
| VINCENT HILL | ) | |
| JEROME MARTIN | ) | |
| SAMUEL CARSON | ) | |
| WILLIAM SWEENEY | ) | |
| SEAN COATES | ) | |
| GARY PRICE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

FILED

AUG 1 6 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## VERDICT FORM

### WE, THE JURY, UNANIMOUSLY FIND AS FOLLOWS:

#### 1. **VINCENT HILL, a/k/a "Vito"**

**Count One** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 52-63, 103-06)

Guilty: ✓        Not Guilty:_____

#### Controlled Substances

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: ✓        Not Proven:_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____        Not Proven: ✓

App 921

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____          **Not Proven:**_✓_

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

## Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_✓_          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

2

App 922

## Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**\_\_\_\_\_          **Not Proven:**\_\_\_\_\_

**Count Two**  Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓          **Not Guilty:**\_\_\_\_\_

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓          **Not Proven:**\_\_\_\_\_

3

App 923

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____ **Not Proven:**_✓_____

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____ **Not Proven:**_✓_____

**Racketeering Act 2** Distribution of marijuana on or about October 4, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 3** Distribution of marijuana on or about November 2, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 4** Distribution of marijuana on or about November 3, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 5** Distribution of marijuana on or about November 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 6** Distribution of marijuana on or about November 16, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 7** Distribution of marijuana on or about November 28, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

**Racketeering Act 8** Distribution of marijuana on or about November 29, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:**_✓____ **Not Proven:**_____

4

App 924

**Racketeering Act 10**   Distribution of marijuana on or about December 8, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 12**   Distribution of marijuana on or about December 13, 1995 (co-conspirator Bill Hill aided and abetted distribution).  (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 13**   Distribution of marijuana on or about December 13, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 14**   Distribution of marijuana on or about December 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 15**   Distribution of marijuana on or about February 14, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 16**   Distribution of marijuana on or about February 20, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 19**  Distribution of marijuana on or about March 5, 1996.  (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 20**  Distribution of marijuana on or about March 15, 1996. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓          **Not Proven:** _____

**Racketeering Act 21**  Possession with intent to distribute marijuana on or about September 27, 1995.  (See Final Jury Instructions, pp. 64-69, 105-06)

**Proven:** ✓          **Not Proven:** _____

5

App 925

**Racketeering Act 32**  First-degree murder while armed of Larry Wright, Jr., a/k/a "Patcho," on or about June 29, 1989.  (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓　　　　　　Not Proven:_____

**Racketeering Act 39**

(A)  Attempted armed robbery of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 76)

Proven:_____　　　　　　Not Proven: ✓

(B)  Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 75)

Proven:_____　　　　　　Not Proven: ✓

(C)  Assault with intent to murder while armed  of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 77)

Proven:_____　　　　　　Not Proven: ✓

**Count Three**  First-degree murder while armed of Larry Wright, Jr., a/k/a "Patcho," on or about June 29, 1989.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓　　　　Not Guilty:_____

**Count Eleven**  Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 86-90, 75-77)

Guilty:_____　　　　Not Guilty: ✓

**Count Twenty-Eight**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki").  (See Final Jury Instructions, pp. 95-99)

Guilty:_____　　　　Not Guilty: ✓

**Count Forty-Six**  Distribution of marijuana on or about October 4, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓　　　　Not Guilty:_____

App 926

**Count Forty-Seven**   Distribution of marijuana on or about November 2, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Forty-Eight**   Distribution of marijuana on or about November 3, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Forty-Nine**   Distribution of marijuana on or about November 15, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty**   Distribution of marijuana on or about November 16, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty-One**   Distribution of marijuana on or about November 28, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty-Two**   Distribution of marijuana on or about November 29, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty-Four**   Distribution of marijuana on or about December 8, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty-Six**   Distribution of marijuana on or about December 13, 1995 (co-conspirator Bill Hill aided and abetted distribution).  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

**Count Fifty-Seven**   Distribution of marijuana on or about December 13, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:____

7

App 927

**Count Fifty-Eight** Distribution of marijuana on or about December 15, 1995. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Fifty-Nine** Distribution of marijuana on or about February 14, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty** Distribution of marijuana on or about February 20, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-One** Distribution of marijuana on or about March 5, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-Two** Distribution of marijuana on or about March 15, 1996. (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-Three** Possession with intent to distribute marijuana on or about September 27, 1995. (See Final Jury Instructions, pp. 105-06)

Guilty: ✓          Not Guilty:_____

App 928

### 2. <u>JEROME MARTIN, a/k/a "Pimp"</u>

**<u>Count One</u>** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (<u>See</u> Final Jury Instructions, pp. 52-63, 103-06)

**Guilty:** ✓    **Not Guilty:** _____

### <u>Controlled Substances</u>

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓    **Not Proven:** _____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:** _____    **Not Proven:** ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:** _____    **Not Proven:** ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### <u>Cannabis, also known as Marijuana</u>

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓    **Not Proven:** _____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

App 929

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____          Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____          Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____          Not Proven:_____**

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____          Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____          Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

10

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____     **Not Proven:**___ J#1

**Count Two** Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓     **Not Guilty:**_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓     **Not Proven:**_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____     **Not Proven:** ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____     **Not Proven:** ✓

**Racketeering Act 5** Distribution of marijuana on or about November 15, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓     **Not Proven:**_____

**Racketeering Act 9** Distribution of marijuana on or about December 6, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** ✓     **Not Proven:**_____

11

App 931

**Racketeering Act 11**  Distribution of marijuana on or about December 13, 1995. (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** √        **Not Proven:**_____

**Racketeering Act 17**  Distribution of marijuana on or about February 26, 1996 (buyer Tobias Carrington).  (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** √        **Not Proven:**_____

**Racketeering Act 18**  Distribution of marijuana on or about February 26, 1996 (buyer James Bellflower).  (See Final Jury Instructions, pp. 64-69, 103-04)

**Proven:** √        **Not Proven:**_____

**Racketeering Act 22**  Possession with intent to distribute marijuana on or about February 1, 1996.  (See Final Jury Instructions, pp. 64-69, 105-06)

**Proven:** √        **Not Proven:**_____

**Racketeering Act 23**  First-degree murder while armed of Anthony Fortune on or about August 6, 1991.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:** √        **Not Proven:**_____

**Racketeering Act 24**

(A)  Assault with intent to murder while armed of Keith Bradley, a/k/a "PeeWee," on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** √        **Not Proven:**_____

(B)  Assault with intent to murder while armed of Jimmy Thomas, Jr., a/k/a "Sugarspoon," on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** √        **Not Proven:**_____

(C)  Assault with intent to murder while armed of Officer Adrian Treadwell on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** √        **Not Proven:**_____

12

App 932

(D) Assault with intent to murder while armed of Officer Edward McDonald on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

(E) Assault with intent to murder while armed of Officer Marc Little on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

(F) Assault with intent to murder while armed of Officer Alvin Ray on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

### Racketeering Act 25

(A) First-degree murder while armed of Curtis Edwards on or about August 29, 1992. (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven: ✓_____**        **Not Proven:_____**

(B) Assault with intent to murder while armed of Richard Burton on or about August 29, 1992. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

(C) Assault with intent to murder while armed of Keith Jones on or about August 29, 1992. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

**Racketeering Act 44** Assault with intent to murder while armed of James Coulter, a/k/a "Creeko," on or about May 30, 1995. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven: ✓_____**        **Not Proven:_____**

**Racketeering Act 47** Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp", in or about October 1996. (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven: ✓_____**        **Not Proven:_____**

13

App 933

**Count Eight**   First-degree murder while armed of Anthony Fortune on or about August 6, 1991.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓             Not Guilty:_____

**Count Nine**   Assaulting, resisting, and interfering with Officer Marc Little with a dangerous weapon on or about September 10, 1991.  (See Final Jury Instructions, pp. 94)

Guilty: ✓             Not Guilty:_____

**Count Seventeen**   Assault with intent to kill while armed of James Coulter, a/k/a "Creeko," on or about May 30, 1995.  (See Final Jury Instructions, pp. 91-92)

Guilty: ✓             Not Guilty:_____

**Count Eighteen**   Attempted murder in aid of racketeering activity of James Coulter, a/k/a "Creeko," on or about May 30, 1995.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty: ✓             Not Guilty:_____

**Count Thirty-One**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about May 30, 1995 (Attempted murder in aid of racketeering activity of James Coulter, a/k/a "Creeko").  (See Final Jury Instructions, pp. 95-99)

Guilty: ✓             Not Guilty:_____

**Count Forty-Two**   Possession of a firearm during a crime of violence or dangerous offense on or about May 30, 1995 (Assault with intent to kill while armed of James Coulter, a/k/a "Creeko").  (See Final Jury Instructions, pp. 100-02)

Guilty: ✓             Not Guilty:_____

**Count Forty-Nine**   Distribution of marijuana on or about November 15, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓             Not Guilty:_____

**Count Fifty-Three**   Distribution of marijuana on or about December 6, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓             Not Guilty:_____

14

App 934

**Count Fifty-Five**   Distribution of marijuana on or about December 13, 1995.  (See Final Jury Instructions, pp. 103-04)

Guilty: ✓          Not Guilty:_____

**Count Sixty-Four**   Possession with intent to distribute marijuana on or about February 1, 1996.  (See Final Jury Instructions, pp. 105-06)

Guilty: ✓          Not Guilty:_____

15

App 935

## 3. SAMUEL CARSON, a/k/a "Chin"

**Count One** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999.  (See Final Jury Instructions, pp. 52-63, 103-06)    J#1

**Guilty:** ✓      **Not Guilty:**_____

### Controlled Substances

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓      **Not Proven:**_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as·crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____      **Not Proven:** ✓

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____      **Not Proven:** ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A)  1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓      **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

16

App 936

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____ J#1

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____ J#1

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____          Not Proven:_____ J#1

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

17

App 937

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____**        **Not Proven:_____**

**Count Two**  Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty: ✓**        **Not Guilty:_____**

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below.  You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven."  (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven: ✓**        **Not Proven:_____**

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:_____**        **Not Proven: ✓**

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:_____**        **Not Proven: ✓**

**Racketeering Act 23**  First-degree murder while armed of Anthony Fortune on or about August 6, 1991.  (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven: ✓**        **Not Proven:_____**

18

App 938

**Racketeering Act 24**

(A)  Assault with intent to murder while armed of Keith Bradley, a/k/a "PeeWee," on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

(B)  Assault with intent to murder while armed of Jimmy Thomas, Jr., a/k/a "Sugarspoon," on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

(C)  Assault with intent to murder while armed of Officer Adrian Treadwell on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

(D)  Assault with intent to murder while armed of Officer Edward McDonald on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

(E)  Assault with intent to murder while armed of Officer Marc Little on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

(F)  Assault with intent to murder while armed of Officer Alvin Ray on or about September 10, 1991.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:** ✓          **Not Proven:**_____

**Racketeering Act 34**  Conspiracy to commit murder of members of L Street group in or about July 1996.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:** ✓          **Not Proven:**_____

**Racketeering Act 35**  Assault with intent to murder while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996.  (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:**_____          **Not Proven:** ✓

19

App 939

### Racketeering Act 36

(A) First-degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓             Not Proven:_____

(B) First-degree murder while armed of Leonard Hyson, a/k/a "Slick," on or about December 19, 1989. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓             Not Proven:_____

### Racketeering Act 37

(A) First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓             Not Proven:_____

(B) First-degree murder while armed of Terita Lucas on or about March 22, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓             Not Proven:_____

**Racketeering Act 38**  Assault with intent to murder while armed with a dangerous weapon of Officer Alfred Moss on or about April 7, 1992. (See Final Jury Instructions, pp. 64-69, 77)

Proven:_____             Not Proven: ✓

**Racketeering Act 40**  Assault with intent to murder while armed of Roland Brown on or about October 28, 1993. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____             Not Proven: ✓

**Racketeering Act 41**  Conspiracy to commit murder of Steve Dunbar on or about April 9, 1994. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven:_____             Not Proven: ✓

**Racketeering Act 42**  Assault with intent to murder while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓             Not Proven:_____

20

App 940

**Racketeering Act 45**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997.  (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓_____          Not Proven:_____

**Racketeering Act 46**  Assault with intent to murder while armed of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____          Not Proven: ✓_____

**Racketeering Act 47**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp", in or about October 1996.  (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓_____          Not Proven:_____

**Racketeering Act 48**   First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓_____          Not Proven:_____

**Racketeering Act 49**

(A)  Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓_____          Not Proven:_____

(B)  First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓_____          Not Proven:_____

(C)  First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓_____          Not Proven:_____

21

App 941

(D) First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:**✓      **Not Proven:**____

(E) First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____      **Not Proven:**✓

(F) First-degree premeditated murder while armed of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____      **Not Proven:**✓

(G) First-degree premeditated murder while armed of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**____      **Not Proven:**✓

**Racketeering Act 50** Conspiracy to commit murder of Robert Smith, a/k/a "Butchie," between in or about April 1997 and on or about June 17, 1997. (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:**✓      **Not Proven:**____

**Count Four** First-degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989. (See Final Jury Instructions, pp. 83-85)

**Guilty:**✓      **Not Guilty:**____

**Count Five** First-degree murder while armed of Leonard Hyson, a/k/a "Slick," on or about December 19, 1989. (See Final Jury Instructions, pp. 83-85)

**Guilty:**✓      **Not Guilty:**____

**Count Six** First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991. (See Final Jury Instructions, pp. 83-85)

**Guilty:**✓      **Not Guilty:**____

**Count Seven** First-degree murder while armed of Terita Lucas on or about March 22, 1991. (See Final Jury Instructions, pp. 83-85)

**Guilty:**✓      **Not Guilty:**____

22

App 942

**Count Eight**   First-degree murder while armed of Anthony Fortune on or about August 6, 1991.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twelve**  Assault with intent to kill while armed of Roland Brown on or about October 28, 1993.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

**Count Thirteen**   Assault with intent to kill while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994.  (See Final Jury Instructions, pp. 91-92)

Guilty: ✓          Not Guilty:_____

**Count Fourteen**   Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou," on or about June 26, 1994.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty: ✓          Not Guilty:_____

**Count Nineteen**   Assault with intent to kill while armed of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

**Count Twenty**  Attempted murder in aid of racketeering activity of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty:_____          Not Guilty: ✓

**Count Twenty-One**   First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twenty-Two**  Murder in aid of racketeering activity of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 86-90, 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twenty-Three**  Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

23

App 943

**Count Twenty-Four**  Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty:_____          Not Guilty:__✓__

**Count Twenty-Five**  Murder in aid of racketeering activity of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__          Not Guilty:____ J#1

**Count Twenty-Six**  Murder in aid of racketeering activity of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__          Not Guilty:_____

**Count Twenty-Seven**  Murder in aid of racketeering activity of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__          Not Guilty:_____

**Count Twenty-Nine**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about June 26, 1994 (Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou").  (See Final Jury Instructions, pp. 95-99)

Guilty:__✓__          Not Guilty:_____

**Count Thirty-Two**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about August 30, 1996 (Attempted murder in aid of racketeering activity of Popa Mark Phillip).  (See Final Jury Instructions, pp. 95-99)

Guilty:_____          Not Guilty:__✓__

**Count Thirty-Three**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 5, 1996 (Murder in aid of racketeering activity of Chrishauna Gladden).  (See Final Jury Instructions, pp. 95-99)

Guilty:__✓__          Not Guilty:_____

**Count Thirty-Four**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 30, 1996 (Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute").  (See Final Jury Instructions, pp. 95-99)

Guilty:_____          Not Guilty:__✓__

24

App 944

**Count Forty-Five**  Possession of a firearm during a crime of violence or dangerous offense on or about October 30, 1996 (Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute").  (See Final Jury Instructions, pp. 100-02)

**Guilty:**_____          **Not Guilty:**__✓__

App 945

### 4. WILLIAM SWEENEY, a/k/a "Draper"

**Count One**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999.  (See Final Jury Instructions, pp. 52-63, 103-06) J#1

**Guilty:** ✓          **Not Guilty:** J#1

### Controlled Substances

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓          **Not Proven:**_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____          **Not Proven:** ✓

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____          **Not Proven:** ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A)  1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓          **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

27

App 946

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**        **Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**        **Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**        **Not Proven:_____**

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____**        **Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____**        **Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

28

App 947

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:**_____          **Not Proven:**_____

**Count Two**  Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

**Guilty:** ✓          **Not Guilty:**_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below. You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓          **Not Proven:**_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotics drug controlled substance.

**Proven:**_____          **Not Proven:** ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 29**  First-degree murder while armed of Glenn Jenkins on or about July 7, 1993. (See Final Jury Instructions, pp. 64-69, 83-85)

**Proven:**_____          **Not Proven:** ✓

**Racketeering Act 30**  Assault with intent to murder while armed of persons in the Kentucky Courts neighborhood between in or about 1991 and on or about June 20, 1992. (See Final Jury Instructions, pp. 64-69, 70-71)

**Proven:**_____          **Not Proven:** ✓

29

App 948

**Racketeering Act 31** Assault with intent to murder while armed of persons in the Kentucky Courts neighborhood between in or about 1991 and on or about June 20, 1992 (committed with co-defendant Sean Coates). (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____      Not Proven: ✓

**Racketeering Act 39**

(A) Attempted armed robbery of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓      Not Proven:_____

(B) Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 75)

Proven: ✓      Not Proven:_____

(C) Assault with intent to murder while armed of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993. (See Final Jury Instructions, pp. 64-69, 77)

Proven: ✓      Not Proven:_____

**Racketeering Act 43** First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓      Not Proven:_____

**Racketeering Act 45** Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓      Not Proven:_____

**Racketeering Act 49**

(A) Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓      Not Proven:_____

30

App 949

**Count Fifteen** First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994. (See Final Jury Instructions, pp. 83-85)

**Guilty:** ✓          **Not Guilty:**

**Count Sixteen** Murder in aid of racketeering activity of Donnell Whitfield, a/k/a "Robocop," on or about September 26, 1994. (See Final Jury Instructions, pp. 86-90, 83-85)

**Guilty:** ✓          **Not Guilty:**

**Count Twenty-Five** Murder in aid of racketeering activity of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

**Guilty:** ✓          **Not Guilty:**

**Count Twenty-Six** Murder in aid of racketeering activity of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

**Guilty:** ✓          **Not Guilty:**

**Count Twenty-Seven** Murder in aid of racketeering activity of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

**Guilty:** ✓          **Not Guilty:**

**Count Twenty-Eight** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki"). (See Final Jury Instructions, pp. 95-99)

**Guilty:** ✓          **Not Guilty:**

**Count Thirty** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about September 26, 1994 (Murder in aid of racketeering activity of Donnell Whitfield, a/k/a "Robocop"). (See Final Jury Instructions, pp. 95-99)

**Guilty:** ✓          **Not Guilty:**

**Count Thirty-Five** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Alonzo Gaskins). (See Final Jury Instructions, pp. 95-99)

**Guilty:** ✓          **Not Guilty:**

32

App 950

**Count Thirty-Six** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Darnell Mack). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Seven** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Melody Anderson). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Eight** Possession of a firearm during a crime of violence or dangerous offense on or about July 7, 1993 (First-degree murder while armed of Glenn Jenkins). (See Final Jury Instructions, pp. 100-02)

Guilty:_____          Not Guilty: ✓

**Count Forty-One** Possession of a firearm during a crime of violence or dangerous offense on or about September 26, 1994 (First-degree murder while armed of Donnell Whitfield, a/k/a "Robocop"). (See Final Jury Instructions, pp. 100-02)

Guilty: ✓          Not Guilty:_____

33

App 951

### 5. SEAN COATES, a/k/a "Birdy"

**Count One** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 52-63, 103-06)

**Guilty:** ✓       **Not Guilty:**_____

### Controlled Substances

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

**Proven:** ✓       **Not Proven:**_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

**Proven:**_____       **Not Proven:** ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

**Proven:**_____       **Not Proven:** ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓       **Not Proven:**_____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

34

App 952

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**          **Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**          **Not Proven:_____**

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:_____**          **Not Proven:_____**

## Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____**          **Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

**Proven:_____**          **Not Proven:_____**

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

35

App 953

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

**Count Two**   Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

Guilty:__✓__          Not Guilty:_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below.  You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven."  (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**   Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven:__✓__          Not Proven:_____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven:__✓__

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven:_____          Not Proven:__✓__

**Racketeering Act 26**

(A)  Assault with intent to murder while armed of Jermaine Hall on or about June 20, 1992.  (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____          Not Proven:__✓__

36

App 954

(B)  Armed kidnaping of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 75)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

(C)  Assault with intent to murder while armed of Anthony Pryor, a/k/a "Wysocki," on or about October 22, 1993.  (See Final Jury Instructions, pp. 64-69, 77)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

**Racketeering Act 45**  Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor, a/k/a "PooPoo", between in or about 1996 and in or about 1997.  (See Final Jury Instructions, pp. 64-69, 72-73)

**Proven:**\_\_\_\_\_           **Not Proven:** ✓

**Racketeering Act 49**

(A)  Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 76)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

(B)  First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

(C)  First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

(D)  First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 79-80)

**Proven:** ✓           **Not Proven:**\_\_\_\_\_

(E)  First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996.  (See Final Jury Instructions, pp. 64-69, 78)

**Proven:**\_\_\_\_\_           **Not Proven:** ✓

38

App 955

**Count Twenty-Eight**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 22, 1993 (Attempted murder in aid of racketeering activity of Anthony Pryor, a/k/a "Wysocki"). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Four**   Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 30, 1996 (Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Five** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Alonzo Gaskins). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Six**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Darnell Mack). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Seven**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Melody Anderson). (See Final Jury Instructions, pp. 95-99)

Guilty: ✓          Not Guilty:_____

**Count Thirty-Eight**  Possession of a firearm during a crime of violence or dangerous offense on or about July 7, 1993 (First-degree premeditated murder while armed of Glenn Jenkins). (See Final Jury Instructions, pp. 100-02)

Guilty:_____          Not Guilty: ✓

**Count Forty-Five**  Possession of a firearm during a crime of violence or dangerous offense on or about October 30, 1996 (Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 100-02)

Guilty: ✓          Not Guilty:_____

App 956

## 6. GARY PRICE, a/k/a "Harry-O"

**Count One** Conspiracy to distribute and possess with intent to distribute cannabis, also known as marijuana, a Schedule I controlled substance from on or about sometime in September 1994 and continuing thereafter up to and including September 1999. (See Final Jury Instructions, pp. 52-63, 103-06)

**Guilty:** ✓       **Not Guilty:** _____

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** ✓       **Not Proven:** _____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** _____       **Not Proven:** _____

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:** _____       **Not Proven:** _____

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

41

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

**Proven:**_____          **Not Proven:**_____

Date: _8/16/01_

_Juror #1_
Foreperson

J#1 = INITIALS USED
      AT CORRECTIONS

42

App 958