# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Samuel Carson, Sean Coates,<br>Jerome Martin, Jr., and William K.<br>Sweeney,<br><br>Defendants. | Case No. 1:98-cr-329-6-RCL |

---

# APPENDIX
### in support of Defendants' Supplemental § 2255 Motion

---

---

# VOLUME 6 OF 9

## § 2255 Proceedings (Initial Filings and Exhibits)

Dkt. 1017 – Defendant William K. Sweeney's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. § 2255 (February 19, 2008)..................................................................959

Dkt. 1020 – Defendant Sean Coates' Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (February 19, 2008)..................................................................976

Dkt. 1021 – Defendant Jerome Martin's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (February 18, 2008)..................................................................1029

Dkt. 1023 – Defendant Samuel Carson's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (February 28, 2008)..................................................................1046

Dkt. 1088 – Defendant Samuel Carson's Motion for Discovery (April 18, 2012) ....................1052

Dkt. 1094 – Defendant Samuel Carson's Reply Motion for Discovery (July 12, 2012) ..........1059

Dkt. 1104 – Defendant Sean Coates' Motion for Judicial Review (December 3, 2012) ..........1066

Dkt. 1140 – Defendant William K. Sweeney's Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and Incorporated Memorandum of Facts and Law Under Seal (November 28, 2014) ..................................................................1072

Dkt. 1142-2 – Exhibit 7 to Defendant William K. Sweeney's Supplemental Motion to Vacate (November 28, 2014) ..................................................................1074

Dkt. 1142-4 – Exhibit 9 to Defendant William K. Sweeney's Supplemental Motion to Vacate (November 28, 2014) ..................................................................1076

Dkt. 1143-1 – Exhibit 6 to Defendant William K. Sweeney's Supplemental Motion to Vacate (November 28, 2014) ..................................................................1079

RECEIVED
U.S. COURT OF APPEALS
FOR THE D C CIRCUIT

2008 FEB 19 PM 6: 25

FILING DEPOSITORY

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA　　　　　:

　　　　　　　　　　　　　　　　　　:

v.　　　　　　　　　　　　　　　　　:　　Cr. No. 98-CR-00329-4

　　　　　　　　　　　　　　　　　　:

WILLIAM SWEENEY　　　　　　　　　:

_____ :

### MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

### PURSUANT TO 18 USC §2255

Mr. William Sweeney, by and through undersigned counsel, respectfully moves this Honorable Court for relief from the sentence in this case imposed in violation of the Constitution and laws of the United States.

In support of this motion, counsel states:

1.　　This motion is based upon all files, records and proceedings in this case, as well as activity and inactivity outside of the record, and any such other materials as may be subsequently submitted.

2.　　On September 18, 1998, Mr. Sweeney and codefendants were charged by indictment with conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization ("RICO") and various substantial counts.

2.　　On March 25, 1999, Mr. Sweeney was charged by the superceding indictment.

3.　　Mr. Sweeney went to trial with Vincent Hill, Jerome Martin, Sean Coates, Samual Carson and Gary Price.

The defendants were charged with a large-scale narcotics and RICO conspiracy. In furtherance of the conspiracy, Mr. Sweeney was alleged to have engaged in multiple acts of violence; there was no evidence presented at trial that he participated directly in narcotics

- 1 -

App 959

distributions. By way of an overview, it was the prosecution's theory that Mr. Sweeney and the other defendants were lifelong friends who grew up during the 1980s in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage years they began selling drugs. By the early 1990s, the Government claimed, most of them were selling substantial quantities of marijuana, along with less significant quantities of other drugs. Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware Avenue and K Street, SW. The Government charged that the defendants ran these locations as cooperative markets in which they rotated serving marijuana to customers driving into the area from the D.C. Metro area. The prosecution depicted Vincent Hill as the leader of this "crew," and Mr. Sweeney as one of its members.

The Government also asserted that Mr. Sweeney, along with other defendants, engaged in ventures other than drug dealing, both for purposes of self-enrichment and protection. For example, through the testimony of informants and cooperating insiders, evidence was presented that the defendants sometimes committed kidnappings to fund weapons, drugs or living expenses. Witnesses testified that Mr. Sweeney and others were responsible for a number of acts of violence, some planned and others spontaneous.

On August 15, 2001, a jury found Mr. Sweeney guilty of conspiracy to possess with intent to distribute and distribution of controlled substances[1] (count 1rrs), conspiracy to participate in the affairs of a racketeer influenced and corrupt organization ("RICO")[2] (count

---

[1] Counsel would note that there was no evidence of any drug selling by Mr. Sweeney at trial is this matter but Mr. Sweeney's participation in the conspiracy was by way of other alleged crimes of violence.

[2] Again there was no evidence presented of any drug dealing by Mr. Sweeney but instead, other activities that "contributed" to the conspiracy. In addition to the substantive counts charged, which were incorporated as overt acts of Counts 1 and 2, Mr. Sweeney was also charged with other conspiracies to murder individuals and another murder, which was unproven as an overt act and he was found not guilty. *See* Verdict Form, Docket Entry 810.

App 960

2rrs), attempted murder of Anthony Pryor in aid of racketeering (count 11rrs), first degree murder while armed of Donnell Whitfield (count 15rrs), murder of Donnell Whitfield in aid of racketeering (count 16rrs), murder of Alonzo Gaskins in aid of racketeering (count 25rrs), murder of Darnell Mack in aid of racketeering (count 26rrs), murder of Melody Anderson in aid of racketeering (count 27rrs), use of firearm during and in relation to attempted murder of Anthony Pryor (count 28rrs), use of firearm during and in relation to murder of Donnell Whitfield (count 30rrs), use of firearm during and in relation to murder of Alonzo Gaskins (count 35rrs), use of firearm during and in relation to murder of Darnell Mack (count 36rrs), and use of firearm during and in relation to murder of Melody Anderson (count 37rrs), and possession of a firearm during a crime of violence (murder of Donnell Whitfield (count 41rrs).

4.      On February 5, 2002, the Court sentenced Mr. Sweeney as follows:

(A)      As to counts 1rrs, 2rrs , 16rrs , 25rrs , 26rrs , 27rrs:  Mr. Sweeney was sentenced to life imprisonment on each of counts 1rrs, 2rrs, 16rrs, 25rrs, 26rrs and 27rrs; sentences to run concurrently to each other. A supervised release period of 5 years is imposed on each count and is to run concurrently by the counts and concurrently to count 11rrs. A Fine of $500,000.00 is imposed on count 1rrs and is due immediately. It shall be paid through the U.S. Bureau of Prisons Inmate Financial Responsibility Program. A special assessment of $100.00 is imposed on each count and is due immediately.

(B)      Count 11rrs: the deft. is sentenced to 20 years incarceration, to run concurrently with all other counts; followed by a 3 year period of supervised release, to run concurrently with all other counts. A special assessment of $100.00 is imposed and is due immediately.

(C)      Count 28rrs: the deft. is sentenced to 5 years incarceration, to run

App 961

consecutively to all other counts; followed by 5 years supervised release, to run concurrently with all other counts. A special assessment of $100.00 is imposed and is due immediately.

(D) Counts 30rrs, 35rrs, 36rrs, and 37rrs: the deft. is sentenced to 20 years incarceration on each of counts 30rrs, 35rrs, 36rrs and 37rrs; to run consecutively to each other and to all other counts. A five year period of supervised release is imposed on each count, to run concurrently with all other counts. A special assessment of $100.00 is imposed on each count and is due immediately.

(E) On that date, the oral motion of government to vacate counts 15rrs and 41rrs was granted (Count 15rrs merges with count 16rrs and count 41rrs merges with count 30rrs).

5. The United States Court of Appeals for the District of Columbia Circuit affirmed Mr. Sweeney's convictions. *United States v. Carson et al*, 372 U.S. App. D.C. 251; 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en banc denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

6. On February 20, 2007, the Supreme Court denied Mr. Sweeney's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (Feb. 20, 2007).

7. This petition is timely filed because it is filed within one year of the date that the Supreme Court denied Mr. Sweeney's petition for writ of certiorari.

8. There have been no previous post-conviction petitions, applications, motions, or proceedings filed or maintained by Mr. Sweeney in this or any other federal court with respect to the judgment entered in this case.

9. Section 2255 of Title 28 permits a prisoner in custody under sentence of a federal

App 962

court to move the court to vacate, set aside or correct an erroneous sentence. The Supreme Court has read the statute to provide four grounds on which relief may be claimed: (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United States*, 368 U.S. 424, 428 (1962).

10. Mr. Sweeney submits that his convictions in this matter were imposed in violation of his right to counsel and right to effective assistance of counsel, both on the trial and appellate levels. The cause of action for ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364 (1993). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-part test to determine whether a defendant was denied effective assistance of counsel. Under *Strickland*, the defendant must show that (a) counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (b) counsel's performance prejudiced defendant to such an extent that the result of the proceeding was unreliable. *Id.* at 669. With respect to the "deficient performance" prong, the court must examine the entire proceedings and determine "whether, in light of all the circumstances, the [conduct of defendant's trial counsel was] outside the wide range of professionally competent assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690). *Strickland* specifies that an unreliable result means "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The defendant must show that counsel's

- 5 -

performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* at 688. In order to obtain relief, the defendant must make both showings. *Id.* However, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* Appellate counsel has an obligation to raise all cognizable issues on appeal. *Smith v. Murray,* 477 U.S. 527 (1986); *Evitts v. Lucey,* 469 U.S. 387 (1985).

In failing to properly investigate this case, and in failing to call necessary witnesses at trial and to produce documentary evidence at trial, counsel rendered ineffective assistance of counsel as defined in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the standards set forth in *Strickland*, counsel is obligated to conduct pretrial investigation, including locating and interviewing potential defense witnesses, and subpoenaing favorable witnesses to testify at trial. *Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995); *Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994); *Bryan v. Scott*, 28 F.3d 1411 (5th Cir. 1994); *Chambers v. Armontrout*, 907 F.2d 8225 (8th Cir. 1990); *United States v. Gray*, 878 F.2d 720 (3d Cir. 1989); *Tosh v. Lockhart*, 879 F.2d 412 (8th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986); *Thomas v. Lockhart*, 738 F.3d 304 (8th Cir. 1984). This rule applies to expert as well as lay witnesses. *United States v. Tarricone,* 996 F.2d 1414 (2d Cir. 1993). Counsel has a similar obligation to investigate evidence that might favor the defense. *Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993); *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992).

Mr. Sweeney's counsel's performance at trial was deficient because he failed to adequately prepare for trial, failed to adequately interview and prepare witnesses for testimony,

App 964

failed to adequately represent Mr. Sweeney at trial and preserve issues for appeal. His same counsel's performance in handling his appeal was deficient because he failed to raise issues and raise issues in an appropriate manner on appeal. Mr. Sweeney is entitled to relief because his convictions were obtained in violation of his Sixth Amendment right to counsel and to effective assistance of counsel when:

(A) Trial counsel failed call Dr. Jonathan Pincus, a neurologist who examined Mr. Sweeney, to describe Mr. Sweeney's Tourette Syndrome and to refute the witness's testimony that he displayed no symptoms during violent acts and to rebut the importance of witnesses' testimony and the jurors view of Mr. Sweeney and his symptoms in 2001, as his symptoms would be less in court than during stressful events and less severe in 2001 as compared to five to ten years earlier. While defense counsel crossed almost every eyewitness on the barking / tics that Mr. Sweeney exhibited when they knew him or during an alleged incident, other than the defense testimony of Anthony Pryor and Shaheem Johnson, two career criminals, there was no context for this evidence and Mr. Kiersh provided the jury with no explanation for any differences between the witnesses' testimony as well as no explanation for what the jurors saw and heard from Mr. Sweeney during the trial as compared with the eyewitness testimony that one would hear the barks and throat clearing every few minutes or so. Dr. Pincus was announced as a potential witness to the jury and discussed numerous times as a potential witness during the defense case but was not called.

(B) Trial counsel failed to call an alibi witness for the Donnell Whitfield (September 24, 1994) murder, Anthea Henry, who was announced as a potential witness to the jury but declined to be called during the defense case. Courts have found that a

- 8 -

lawyer's failure to investigate potential defense witnesses, as here, combined with the showing of the specific necessity of the importance of the witness' testimony rendered counsel's strategic choice unreasonable and therefore counsel's performance deficient. See, e.g., *Garcia v. Portuondo*, 466 F. Supp. 2d 488 (S.D.N.Y. Dec. 21, 2006)(counsel ineffective in second-degree murder case for failing to adequately investigate and present alibi evidence); *Sanders v. Ratelle*, 21 F.3d 1446, 1457-58 (9th Cir. 1994); *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990), *cert. denied*, 111 S. Ct. 369 (1990); *Tosh v Lockhart*, 879 F.2d 412 (8th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986); *Gomez v. Beto*, 462 F.2d 596, 596-97 (5th Cir. 1972).

    (C)    Failure to Recall Witnesses after *Brady* materials were disclosed late

    (i)    Trial counsel failed to recall Reginald Switzer after the late disclosure of *Brady* materials. The defense theory at trial was that Reginald Switzer had killed Donnell Whitfield aka Robocop in retaliation for having been shot by Whitfield and George Seabrooks in 1989 or 1990 (5/23PM Tr. 4). Indeed, Switzer testified that he had killed Seabrooks in retaliation for the shooting and that he had staked out Whitfield's residence at least twice, while armed, but did not take the opportunity to kill him (5/15PM Tr. 7-8). Trial counsel cross-examined Switzer about his motive to kill Whitfield and his attempts to do so (5/15PM Tr. 30-35) and also elicited that, when Sweeney had a conversation with Switzer about Sweeney's altercation with Whitfield at a nightclub, Switzer told Sweeney not to kill Whitfield because Switzer wanted to kill Whitfield (5/15PM Tr. 40). When Montgomery was recalled after Switzer, he then testified that before Whitfield's murder, Switzer had told him about Switzer's desire to "get"

App 966

Whitfield (5/23.AM Tr. 53) and that Montgomery and Switzer were *in* a car together at the time of this conversation, and they drove past the building where Whitfield was hustling (id.) When they did so, Montgomery claimed that he offered to "go up there and blast [Whitfield's] ass right now," but that Switzer said he did not have a gun with him (5/23.AM Tr. 54). Montgomery further testified that he later told Carson that Switzer wanted him to kill Whitfield for Switzer, and Carson advised him not to do it because Switzer should handle it himself (id.). After a recess, but before cross-examination of Montgomery had begun, Sweeney's counsel moved the court to sanction the government for failing to disclose that "Mr. Montgomery had cooperated with Mr. Switzer in planning to *kill* Robocop, aka Donnell Whitfield" (5/23PM Tr. 3). Counsel declined the opportunity to recall Switzer and engage in this cross-examination. 5/23PM Tr.5. Counsel should have recalled Switzer to cross him on this subject, both to preserve the issue and to further impeach the individual the defense was accusing of the crime.

(ii)     Similarly, trial counsel should have recalled Charlene Wilson to impeach her statement made to Detective Warrener that she had merely heard about the murder of rather than she had actually seen the murder. (5/14PM Tr. 55-56).

(iii)     Finally, trial counsel should have recalled cooperating witness Ronald Sowells. When testifying, Ronald Sowells described an incident where two guys were squeezing people's marijuana bags and then said that they said that they did not want to buy it; he said Sean Coates aka Chin asked for a gun, Sowells

- 9 -

gave him one, Chin chased the guy down, the guy fell and William Bumbrey ran over and shot him. (4/17/01 pm 47-49) After Sowells' testimony, the complainant Roland Brown gave a very different version of events (4/24/01am 41-42) . Trial counsel failed to recall Ronald Sowells to challenge his version of the events.

(D) Trial counsel failed to impeach James Montgomery with prior inconsistent statements made to a defense investigator as well as cross examine him regarding additional bias material.

(E) Trial counsel failed to provide the trial court with any authority for cross examination of John Venable about his arrest for criminal charges that were dismissed during the time between the alleged crime and his testimony at trial as well as the fact that he perfectly matched the description of the person who murdered Morris Hallman, which lead to a search warrant authorizing police to search his house, and locating the gun and ammunition. *E.g.*, *United States v. Anderson,* 881 F.2d 1128 (D.C. Cir 1989) ("district court's denial of cross-examination of a prosecution witness regarding an unrelated murder indictment against her, dismissed without prejudice eleven months before trial, violated appellants' confrontation rights under the Sixth Amendment....for the jury might reasonably have found that the government's ability to reinstate the murder charge furnished the witness with a motive for favoring the prosecution in her testimony"); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *Davis v. Alaska*, 415 U.S. 308, 316-17, 318 (1974); *Alford v. United States*, 282 U.S. 687 (1931).

(F) Failure to request admission of evidence – admission of party opponent (pleading by USA re unreliability of James Montgomery), Grand Jury witnesses' transcripts as well as Wesley Smith and Frederick Miller's testimony, even if

- 10 -

App 968

inadmissible under hearsay rules, given the introduction of this evidence implicated Mr. Sweeney's right to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284 (1973)(holding that the exclusion, under state hearsay rules, of exculpatory testimony that another party had committed the crime, which under the circumstances was likely to be trustworthy and within the rationale of the exception for declarations against penal interest denied him a trial in accord with fundamental standards of due process).

(G)     Failure to make a *Massiah* demand and litigate issues related to jailhouse confessions allegedly made to including but not limited to Charles Bender, Donald Nichols, Eugene Byars, Theodore Watson, Reginald Switzer, and Arthur Rice. *See Watson v United States*, 2008 D.C. App. LEXIS 12 (January 28, 2008)(matter remanded for hearing based on nondisclosure during trial by government regarding witness (the same) Charles Bender) ; *Massiah v. United States*, 377 U.S. 201 (1964).

(H)     Failure to object to the *ex parte* communications between the Court and juror #3 and subsequent failure to raise this issue properly on appeal.  Counsel did not object to not being present for *voir dire* of witness – although asked after the fact for *voir dire* after excused.  Based on these *ex parte* communications, Mr. Sweeney's deliberating jury was reduced to 11.  This was a critical point[3] where Mr. Sweeney, by and through counsel, had a right to be present and provide input into the process.

(I)     Failure to provide an opening statement at the beginning of the case.

(J)     Failure to corroborate jail records with court records which show the same time period of detention, after government counsel crossed the business records custodian

---

[3] A defendant has the right to be informed of the substance of all communications from the jury and has a right to be heard before the court provides a response. *See Rogers v. United States*, 422 U.S. 35 (1975) (right to be present under Fed. R. Crim. P.43); *United States v. United States*

App 969

on the alleged unreliability of the records.

(K)    Failure to properly object and then appeal the court's ruling permitting voluminous use of inadmissible and/or hearsay evidence to establish material facts including, but not limited to (1) the testimony of Medical Examiner Jonathan Arden, who testified as to autopsies he had not conducted, (2) the testimony of police officer regarding fingerprint evidence he had not lifted, examine or compared with the known prints, (3) reputation evidence concerning alleged conspiracy member Wayne Perry, (4) statements of Robert Smith aka Butchie to SA Vincent Lisi, and (5) the constant hearsay testimony, material to the government's case and never proven by competent evidence, that Lil Ty kill Dihru.

11.    In violation of Mr. Sweeney's right to effective assistance on appeal[4], appellate counsel failed to note sections of sealed matters for the Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion, so Mr. Sweeney's convictions in this matter were without judicial review of the undisclosed materials and also not providing a statement of facts.  Counsel would note that without a statement of facts, the court of appeals cannot know the extent of prejudice and therefore can not ascribe levels of error[5].

---

*Gypsum Co.,* 438 U.S. 422, 460 (1978) (discussing the "hazards of *ex parte* communications with a deliberating jury or any of its members")

[4] *See Cirilo-Munoz v. United States* 404 F.3d 527 (1st Cir. 2005); *United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004); *United States v. Skurdal*, 341 F.3d 921 (9th Cir. 2003); *Brown v. United States*, 167 F.3d 109 (2nd Cir. 1999); *Jackson v. Leonardo*, 162 F.3d 81 (2nd Cir. 1998); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998).

[5] The Court of Appeals stated "[f]irst, the appellants object to discrete, allegedly biased rulings by the trial judge which (1) set the timing of disclosure of exculpatory material under *Brady v. Maryland,* 373 U.S. 83 (1963), and of witness statements to the government under the *Jencks* Act, 18 U.S.C. Â§ 3500; (2) denied defense motions to strike jurors for cause; (3) overruled defense objections to hearsay and opinion testimony of government witnesses and excluded as

App 970

Counsel incorporates by reference the requests made in the appellate motion and requests that this Court review the requested materials. In addition, due to the cumulative *Brady* errors, both non disclosure and late disclosure, as well as allegations of prosecutorial misconduct, counsel requests that this Court review in camera the materials sealed by the trial court.

12. Mr. Sweeney is sentenced to consecutive sentences in violation of the Double Jeopardy Clause of the United States Constitution when counsel failed to object to and did not raise on appeal the consecutive sentences Mr. Sweeney received for using a firearm in relation to a crime of violence, Counts 35rrs, 36rrs, and 37rrs, namely the triple homicide. *See Matthews v. United States,* 892 A.2d 1100 (D.C. 2006); *Monroe v. United States*, 600 A.2d 98 (DC 1991); *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999)(holding that multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence); *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987)(imposition of consecutive sentences for 2 violations of 18 USCS § 924 violates Double Jeopardy Clause, since legislative history does not indicate that

---

hearsay testimony of a defense witness; and (4) limited the scope of defense cross-examination. But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). "Almost invariably, they are proper grounds for appeal, not for recusal." *Id.* "In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they . . . can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extra-judicial source is involved." *Id.* The isolated unfavorable rulings the appellants cite in the course of a trial proceeding lasting some nine months do not constitute such "rare circumstances." Nor does the fact that the judge may have ruled in favor of the government more often than he did in favor of the defense, as the appellants contend, by itself show bias. *See Edmond*, 52 F.3d at 1100 ("Appellants do not claim that a greater percentage of government requests than defense requests were granted, but even if that were the case such a disproportion would be insufficient by itself to establish bias." (citing *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985) ("[A] trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant.")). The record here does not show that the judge did so disproportionately or unjustifiably."

App 971

Congress foresaw how court should determine number of crimes of violence that have occurred in single criminal transaction); *Bruce v. United States, 471 A.2d 1005*(D.C. 1984).

13.     Mr. Sweeney's convictions were imposed in violation of his right to counsel of choice and right to effective assistance of counsel, specifically by the Court refusing to appoint counsel (Kenneth Robinson) who had been retained for the triple homicide in Prince George's County (the center of the case against Mr. Sweeney) and later disqualifying defense counsel who was appointed with prior second counsel moved to withdrawal due to a career change.  This egregious error was compounded by counsel's failure to immediately appeal, *see United States v. Garcia,* 517 F.2d 272 (5th Cir. 1975) (citing *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541 (1949)), or subsequently appeal the Court's pretrial denial of Mr. Sweeney's right to counsel – denial of  Mr. Sweeney's Motion for Appointment of Counsel (Kenneth Robinson) and the November 13, 2000 order granting the government's motion to disqualify[6] Leonard Long as counsel for Mr. Sweeney.  The government had further exacerbated the problem when it moved to disqualify[7] Leonard Long, a mere three weeks before trial, without justifiable reason and in interference with Mr. Sweeney's rights, based on a theory of conflict regarding Leonard Long's previous representation of Stephon Mason, who was a possible codefendant as an accessory after the fact for a murder (of Keith Johnson) Mr. Sweeney was not charged with in this case.  This resulted in Mr. Sweeney proceeding to trial with one counsel, after the Court had found that his

---

[6] Mr. Long was allegedly conflicted due to his prior representation of Stephon Mason.  Both Mr. Sweeney and Mr. Mason would waive this potential conflict and since there was no actual conflict, the discharge of Mr. Long was based on a non issue.  As such, this was error and in violation of Mr. Sweeney's Sixth Amendment rights.  See *Harling v. United States,* 387 A.2d 1101 (DC 1978)(holding that once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney, over the objections of both the defendant and his counsel); *see also English v. State*, 259 A.2d 822, 826 (MD 1969); *McKinnon v. State*, 526 P.2d 18 (Alaska 1974); *Smith v. Superior Court of Los Angeles County*, 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65 (1968) (*en banc*).

App 972

matters necessitated two attorneys to stay appointed, even after the death penalty was taken out of the case. This then was compounded by the failure of counsel to request any remedial measure such as additional second counsel or a continuance.

14. Mr. Sweeney's convictions were obtained in violation of his right to present a defense, secured by his rights under the Due Process Clause of the United States Constitution, when between counsel's ineffective attempts, the government's opposition, and the court's rulings, the testimony that exculpated Mr. Sweeney from both the Donnell Whitfield murder, Glenn Jenkins murder (that he was acquitted of) and triple homicide was not admitted in the Court, namely, (1)the sworn statements of Cheree Owens and John Pinkney in the Prince George's County Grand Jury implicating Dennis Green and his friends in the triple homicide, (2) the proferred testimony of Wesley Smith, to whom Robert Smith aka Butchie confessed involvement in the triple homicide, and (3) the testimony of Frederick Miller, regarding Little Ty's confession to killing Glenn Jenkins. Counsel compounded the problem by not raising this issue, the violation of Mr. Sweeney's constitutional right, on appeal.

15. Mr. Sweeney has been denied his right to effective assistance of counsel, as great portions of the trial file and appellate file are unavailable to counsel appointed to investigate and litigate matters in this 18 USC § 2255 proceeding. While counsel does have *some* of the materials provided in discovery and during trial, most were not provided by previous counsel and counsel will therefore need leave of this Court to supplement with additional material as it becomes available (and likewise may withdrawal some claims after review of the now unknown materials are provided) but Mr. Sweeney is also prejudiced without possible remedy, as apparently defense work product has also been lost, which may irreparably harm Mr. Sweeney in attempting to litigate his ineffective claim and other post conviction matters in this case.

- 15 -

App 973

16.     In reviewing the files and records that are currently available Counsel for Mr. Sweeney believes that the prosecutors engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony, in violation of Mr. Sweeney's constitutional rights, but counsel needs further investigation as well as a complete set of discovery, *Jencks*, *Brady*[8] and *Giglio* provided to trial counsel.  Initially, counsel raises the following matters in this category:

(i)     Suppression of information impeaching James Montgomery's credibility – noteably the basis for the government's admission of his unreliability in 1991 and its subsequent assessment of his unreliability pertaining to the homicide of Paul Ridley (information conveyed to and assessed by the government *before* Mr. Sweeney's trial) as litigated in the *United States v. Steven Dewitt*, who was locked up for the murder of Paul Ridley for a decade, when apparently the government had learned but did not believe James Montgomery's information that Sam Carson had confessed the murder to him.

(ii)     Prosecutorial misconduct in obtaining testimony by any means necessary, including but not limited to procuring Arthur Rice's testimony by misrepresentation and bending of the procedural rules in his Rule 35 motion for reduction and the initial and then two subsequent plea agreements with James Montgomery after he lied and violated previous plea agreements.  *Mooney v Holohan* 294 U.S. 103 (1935)(Government has an obligation to the truth).

(iii)     procuring "jailhouse" confessions in violation of Mr. Sweeney's Sixth

---

[8] Counsel speaks of materials disclosable under *Brady v. Maryland*, 373 U.S. 83 (1963) and subsequent caselaw, noteably, *United States v. Agurs*, 427 U.S. 971 (1976), *United States v. Bagley*, 473 U.S. 667 (1985); *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

App 974

Amendment rights. *See Massiah v. United States*, 377 U.S. 201 (1964).

17. Counsel also incorporates by reference the claims raised by co-defendants in their post conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions and omissions, as due to the fact that in this group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

18. Mr. Sweeney requests discovery and an evidentiary hearing on this motion and seeks leave to supplement the issues when discovery is received or provided access to transcripts currently unavailable to counsel.

WHEREFORE, for the foregoing reasons, both singularly and in the aggregate, for the reasons set forth in legal memorandum and exhibits and for such other reasons as may be subsequently submitted or may appear at a hearing in this matter, counsel and Mr. Sweeney ask that the Court grant this motion.

Respectfully submitted,

/s/

JENIFER WICKS
Bar No. 465476

Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W.
Suite 250A
Washington, D.C. 20001
(202) 393-3004
Facsimile (202) 478-0867

- 17 -

App 975

Copies to: Judge
AUSA – Special Proceedings
Dft.

*Reassigned to Chief Judge Hogan on 2/25/08.*
*TFH*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| **v.** | : |
| | : |
| **SEAN COATES** | :    Cr. No. 98-329 ~~(TPJ)~~ (TFH) |
| | : |
| **Defendant.** | : |
| | : |

Cr. No. 98-329 ~~(TPJ)~~ (TFH)

**FILED**

FEB 19 2008

Clerk, U.S. District and
Bankruptcy Courts

## MOTION PURSUANT TO 28 U.S.C. § 2255 TO
## VACATE, SET ASIDE OR CORRECT SENTENCE

## INTRODUCTION

Defendant, Sean Coates, by and through his Counsel, Veronice A. Holt,

Esq., hereby moves, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct

his judgment and his sentence on the grounds that: 1) Trial Counsel, Frederick

Jones,[1] was totally ineffective throughout the entire proceeding; 2) the

---

[1]    Counsel has not spoken to Mr. Jones concerning this matter. Counsel has learned that in late 2007, Mr. Jones withdrew his appearance in representing Glendale Earl Lee in *United States v. Suggs et al* 07-cr-00152-ESH because of illness and moved to Arizona. There are several references to Mr. Jones having health problems during the trial and this may account for his poor performance. At one point, Mr. Jones needs to recess the trial to pass a kidney stone. At another point he mention the need to go to the hospital weekly to give a blood sample. Finally during closing Mr. Jones notes that he has had a cold for six months.

Mr. Jones: your honor, this is the time each week that I have to go down to G. W. I have never been late before. I just want to alert the court that

App 976

Government intentionally failed to disclose *Brady* information and otherwise engaged in misconduct; and 3) Appellate Counsel failed to appeal the admission of an identification of Coates fingerprint by hearsay testimony; and 4) both Trial and Appellate Counsel failed to inform the Court that Coates three convictions for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or about November 17, 1996 merged. Trial Counsel, Frederick Jones, was clearly unprepared for trial. Most importantly, Mr. Jones failed to exercise Mr. Coates Sixth Amendment right to confront the evidence and the witnesses against him. For the most part, he did not cross examine witnesses at all. On the occasions, that he did, he simply winged it for a few minutes and then sat down without challenging the witnesses substantive testimony. Mr. Jones made promises in open statement that he did not keep, failed to make a hearsay objection to fingerprint evidence that was admitted without a copy of the

---

I have to go down and give some blood. So I will be right back as soon as I can.

"Excuse me. I'll tell you one thing. This old man has had a cold ever since we started this thing. I have been carrying it throughout. As a matter of fact, colds have been going around these two tables here, but, nonetheless, fresh air is soon to be found." (Tr.070301 am p.33)

2

App 977

fingerprint or expert opinion regarding the print, consistently allowed hearsay evidence to be put before the jury without objection, and failed to make arguments on the law and facts that any competent lawyer would have recognized the need to make. He filed only one original pretrial pleading.[2] That pleading was a supplement to a pleading filed by a co-defendant and it failed to make a critical legal argument. In six months of testimony, Mr. Jones did not introduce a single exhibit and only on one occasion completed an impeachment by presenting a document. Mr. Jones did not make any discovery requests and appeared confused about the scope of the charges against his client. The first substantive witness to give testimony against Mr. Coates was Yusef Simmons. Simmons testified about a kidnapping for which Coates had been adjudicated as a juvenile. Although Jones had mentioned this incident in opening statement, he appeared to be surprised when Simmons was called as a witness until he was informed that this was an overt act charged in the indictment. Jones then proceeded to cross examine Simmons as if Simmons were making this up.

Mr. Jones failed to preserve his client's files and records. The documents

---

[2]    Jones did file joinders to motions filed by other counsel.

3

App 978

that Jones turned over to Appellate Counsel did not include any discovery.[3]

Mr. Coates further asserts that the Government withheld critical *Brady* information. The Government at all times knew that a critical government witness, James Montgomery, had accused co-defendant William Kyle Sweeney of a murder that another person, Steven Dewitt, had been convicted by a jury of and had been incarcerated on for 10 years. Because this evidence would have sharply challenged Montgomery's testimony, the Government chose to withhold it until after the convictions in this case.

Coates, further asserts that the Government engaged in willful misconduct. The Government knew it had admissibility problems with the fingerprint attributed to the kidnapping of Anthony Pryor. It therefore improperly elicited the fingerprint evidence through rank hearsay and did not put on any foundational evidence or a fingerprint expert to testify to whether the fingerprint matched.

---

[3]Counsel has obtained a copy of the numbered discovery produced by overt act from another attorney involved in this matter. Counsel has also obtained FBI Agent Lisi's Grand Jury testimony, but does not have *Jencks* or *Giglio* for any other witness. Counsel has not been able to obtain a copy of a relevant videotape, Government's Exhibit V-35. Subsequent to filing this case, Counsel will requests an opportunity to obtain the missing records through discovery and to examine the FBI 302's that were sealed during the trial and to obtain certain records, for example medical records that should have been a part of the discovery in this case or obtained through defense subpoena.

4

Coates also asserts that the Government knowingly elicited false testimony regarding his involvement in the June 20th shooting of Michael Jones. Counsel has reviewed the discovery provided with respect to this incident and the Government simply did not have a good faith basis for the testimony it elicited placing Mr. Coates as being involved in this incident. More importantly, the government did not have a good faith basis for suggesting that Michael Jones was a victim of the June 20, 1992 shooting. Jones was neither shot nor shot at. He was a witness to the shooting of Jermaine Hall. Although the jury found this Racketeering Act (No.25) unproved, it added ballast to the assertion that Mr. Coates was involved in the conspiracy to kill Michael Jones and shooting Michael Jones on June 28, 1992.

Both Trial Counsel and Appellate Counsel were ineffective in their failure to assert that Mr. Coates three convictions for Use of Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple) Counts 35, 36, and 37 merged. Mr. Coates received a total sentence of 60 years for these counts. He should have received 20. The total sentence that Mr. Coates received for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking was 85 years. These 85 years were cited

5

App 980

by the Court of Appeals in denying Mr. Coates *Coles* remand[4].

## I. PROCEDURAL HISTORY

Sean Coates was arrested on October 2, 1998 and charged in a multiple

count indictment, commonly referred to as the "K Street Case". On August 16,

---

[4]

" Finally, we turn to the appellants' challenges to their sentences under *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Coles,* 403 F.3d 764 (D.C. Cir. 2005). Appellants argue that the district court erred under Booker when it imposed their sentences and that our decision in Coles requires us to remand their case to the district court because, they assert, the record is insufficient to determine if the district court's errors were prejudicial. We conclude that a remand is not required and affirm each appellant's sentence.***[38] In setting these sentences, the district court treated the Guidelines as mandatory. It made no statements regarding what it might have done were the Guidelines only advisory, nor did it provide alternative sentences. None of the appellants objected. At issue before us is whether the district court's sentencing of the appellants is consistent with *United States v. Booker*, 543 U.S. 220 (2005), and this Court's subsequent application of Booker.***[38] No remand is needed for Carson, Coates, and Sweeney because the Violent Crime in Aid of Racketeering statute (VICAR), 18 U.S.C. Â§ 1959(a)(1), and not the Guidelines, mandates that each of them receives a life sentence for their convictions.

[38] ...Coates received concurrent life sentences for each federal offense of narcotics conspiracy, RICO conspiracy, and three counts of murder in aid of racketeering. [He] also received a 20-year concurrent sentence for the federal offense of attempted murder in aid of racketeering, as well as a statutorily-mandated 5-year consecutive sentence for the federal offense of use of a firearm during and in relation to attempted murder, and 20 years each on four additional counts of use of a firearm during and in relation to murder.

App 981

2001, the jury returned the following verdicts against Sean Coates.

Count 2:    RICO

        Racketeering Acts

| | |
|---|---|
| Racketeering Act 1: | Marijuana Conspiracy 1988 through 1999 |
| Racketeering Act 27: | Conspiracy to murder Michael Jones from June 20-June 28, 1992 |
| Racketeering Act 28: | Assault with Intent to Murder while Armed - Michael Jones on June 28, 1992 |
| Racketeering Act 33: | Kidnapping while armed of Norman Yusuf Simmons April 28, 1990 |
| Racketeering Act 35: | AWIMW/A Ronald Sowells, October 30, 1996 |
| Racketeering Act 39: | Kidnapping W/A Anthony Pryor October 22, 1993 |
| Racketeering Act 49: | Attempted Robbery W/A Alonzo Gaskins, Darnell Mack, and Melody Anderson, November 17, 1996 |
| | First-degree Felony Murder W/A of Alonzo Gaskins, November 17, 1996 |
| | First-Degree Felony Murder of Darnell Mack |
| | First-degree Felony Murder W/A of Melody Anderson |

7

App 982

COUNT 11:    Attempted Murder in aid of Racketeering Activity of Anthony Pryor, October 30, 1996

COUNT 23:    AWIKW/A Ronald Sowells on or about October 30, 1996

COUNT 24:    Attempted Murder in Aid of Racketeering Activity of Ronald Sowells, October 30, 1996

COUNT 25:    Murder in Aid of Racketeering Activity of Alonzo Gaskins, November 17, 1996

COUNT 26:    Murder in Aid of Racketeering Activity of Darnell Mack, November 17, 1996

COUNT 27:    Murder in Aid of Racketeering Activity of Melody Anderson, November 17, 1996

COUNT 28:    Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About October 22, 1993 (Anthony Pryor)

COUNT 34:    Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About October 30, 1996 (Ronald Sowells)

COUNT 35:    Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple)

COUNT 36:    Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple)

COUNT 37:    Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple)

App 983

COUNT 45:     Possession of a Firearm during a Crime of Violence on Dangerous Offense on or about October 30, 1996[5]

The Court of Appeals for the District of Columbia denied Coates' appeal on July 21, 2006. **United States v. Carson** 455 F.3d 336, (D.C. Cir. 2006) The Supreme Court denied his petition for certiorari on February 20, 2007, Order List 02/20/2007.

## II. THE EVIDENCE RELATED TO SEAN COATES AND TRIAL COUNSEL'S FAILURE TO CONFRONT THE EVIDENCE

## 1. DRUG CONSPIRACY

Mr. Jones' first blunder came in the cross examination of the first witness, Agent Lisi. Agent Lisi had pointed out various co-defendants making sales on videotapes. He did not show a picture of Jones. On cross Jones pointed out that Coates was not doing anything illegal in any of the videos Lisi had shown the jury. (Tr.012301 am p.14) In redirect, the government was permitted to introduce evidence of a video of a person who Lisi identified as Coates going to a stash (Tr.012301 p.33-35) Mr. Jones did not cross examine Agent Lisi on the video. Therefore, the jury would accept the fact that the video was exactly what

---

[5]     The following Rico Acts were found not proven: 1) Act 1 Cocaine and PCP; 2) Act 26 AWIMW/A Jermaine Hall and Michael Jones; 3) Act 29 First-degree Murder Glenn Jenkins; and 4) Act 31 AWIMW/A In Kentucky Courts neighborhood.

App 984

Lisi said it was – a photo of Sean Coates engaged in criminal activity.

Mr. Jones and Sean Coates[6] had previously viewed the videotapes and Coates had informed Jones that the person on the tape was not him. Coates believed that the individual on the tape was Sam Marbury.[7] The face of the person on the tape was not shown. The person on the tape was going over the fence. He was not holding drugs. Jones did not request an opportunity to recross on this new evidence. He did not challenge the identity of the person on the tape. This videotape was the only "hard" evidence that Coates was a part of the drug conspiracy. No drugs were ever seized from him. He did not make any sales to undercover agents. Jones, having "opened the door" for Lisi's identification of Coates failed to challenge the identification and thus conceded his client's presence on the videotape and his strongest argument that he was not a part of the drug dealing conspiracy. [8]

---

[6]     Mr. Coates sworn statement will follow.

[7]     Sam Marbury is an actual identifiable party and is twice mentioned in the transcript Tr.031901 am p.28; Tr.312101 am p.65; Tr. 050701 am p.25; Tr050801 am p.16; Tr.070201 am.

[8]     Donald Nichols also identified the person on the videotape introduced during Agent Lisi's redirect as being Mr. Coates making a sale in a video. (Tr.01/26/01 am p.11) Counsel has not viewed the videotape because Mr. Jones did not turn over discovery items to appellate counsel. Counsel has not

10

Ronald Switzer testified that Coates and Vincent Hill were the people out there making big money in 1996 and 1997 (Tr.012501 p.m. p.6 - 9). Mr. Jones, having blundered his cross examination of Agent Lisi, chose not to cross examine Switzer. "I have nothing your honor." (Tr.013001 am p.18) Thus Switzer's testimony regarding Coates remained uncontradicted.

Donald Nichols "Hard Rock" made an in-court identification of Sean Coates – identifying him by his nickname "Birdy". Nichols said that he knew Birdy from when he was five or six. (Tr.021401 pm p.81) Nichols identified Coates as one of the people who would be out selling on a typical day. (Tr.021501 am p.31-32) Jones did not cross examine Nichols. Thus Nichols' testimony remained uncontradicted. "No questions." (Tr.02201 pm p.54)

James Montgomery testified that in 1989, Montgomery, Chin, Meechie, Bird, Art, Eric, and Poo Poo were selling drugs around Delaware and 203 P Street. 0301201 p.38. He denied having any conversation with Vincent Hill about who was permitted to sell drugs in area. When Montgomery came home in '95, business was bad but Bird still seemed to have money.

"I was coming down K Street. I caught the subway downthere, and I don't

------

been able to contact Mr. Jones

11

App 986

think they knew I was home, and I walked up on them,[9] and I told them that I was -- my words to them was that I'm fucked up, letting them know that I need some money. They told me that you can't -- they said, everybody fucked up. You came home at the wrong time, like that. Q. And what did you interpret that to mean? What did you understand them to mean? *** they didn't have no money to give me." (Tr.031301 pm 15-16)

Q.   Did you notice at that time whether or not Birdy appeared to have any money?

A.   He still had his car. He still had his Q. Then like a few days later -- I had eventually got some money. I borrowed some money from Squirmy, and like a few days later, me and Bird was talking. They was having a -- there's going to be a cabaret somewhere sitting downtown, and Bird had all this Versace stuff in his trunk, and he was showing – *** All this Versace stuff, clothes, like shirts and jeans and stuff like that. So in my mind I was like, man, just the other day you told me you was fucked up, you know, meaning that he was broke. (Tr.031301 pm 16)

Mr. Jones did not cross examine Montgomery on his testimony about Sean "Birdy" Coates being out their selling drug in 1989. (Tr.043001 am 9-59) Despite Montgomery having handed Jones a motive for him to lie about Sean Coates, Jones never confronted him about it. He had a perfect line of questioning that could have exploited the fact that Montgomery was not a big time drug dealer. He was a stick up boy who ran around sticking his gun in people's face and who spent most of the relevant period incarcerated. Now that

---

[9]   Chin, Bird, and Pimp.

12

App 987

his crimes had come back to haunt him, he was trying to implicate Coates to get from under.

Charles Bender "L.A." testified that in 1994 and 1995, to the best of his recollection, He, Vito, Harry O, Dirty Meat, Birdy, Switzer, "Gus," his brother Antoine Bender and Bill Hill were out in the 200 block of K Street SW. (Tr.040401 am p.56) "I have no questions, Your Honor." (Tr.040501 pm p.62)

Ronald Sowells ("Manute")was charged in the L Street case. ( Tr.041701 pm p.5) He started selling marijuana when he came home in 1993. Business was prosperous. Sowells testified that there were 30 or 40 people out there selling marijuana in the alley; including, Hodges, Ben, Morris, Hallman, Birdy, Draper and Chin. (Tr.041701 pm p.25) Sales started to slow down and in '94 or '95, they moved out of the alley to Delaware and K. Vito, Chin, Draper, Harry O, Bird were selling on K street. (Tr.041701 pm p.31) Vito appeared to be running the strip. When Vito was out there, everyone would let him sell his weed. When they were selling on K street, they would rotate. (17 pm 36) Sowells said that he frequently sold with Birdy. (Tr.041701 pm p.40) Jones cross examined Sowells, but he did not question him about his allegations of drug dealing. (Tr.041801 pm p.30-51)

13

Paul Franklin "Dirty Meat" testified about marijuana sales in Southeast. He identified Birdy as someone who has known for 15 years and had a "cool" relationship with. (Tr.050101 am, p.53) Franklin identified Bird as one of the people selling marijuana in the area of the alley, Delaware and K streets. In addition to the Defendants, he said that Rock, Switzer and James Montgomery were out there. (Tr.050101 am p.70) Franklin testified that they sold drugs in "rotation". (01 am p.78) Franklin also said that he "bagged up" weed at Birdy's Mother house in Kenilworth. (Tr.050101 am p.81) In cross examination of Franklin, Jones attempted to show that Coates primary reason for being on K street was to gamble. When Franklin resisted him, Jones asked Franklin it he had anything to do with the murder of Sibley Hamilton. Franklin denied it. Jones rested his cross and the never again visited the issue in the trial.[10]

---

[10]

Q. As part of your plea agreement, you were required to inform the government of all of your criminal activities, isn't that correct?
A. Correct.
Q. Now, did you inform them about a young man by the name of Sibley Hamilton?
A. Who?
Q. Sibley Hamilton.
A. I can't recall if I did.
Q. Do you know a man by the name of Sibley Hamilton?
A. Yes.
Q. As a matter of fact, did you have something to do with his murder?

14

Demetrius Hunter, from L Street, identified Birdy as someone he knew from Southwest. (Tr.050301 pm p.69) According to him he occasionally sold weed for Birdy and Draper in '94 and '95. (Tr.050301 pm p.77) Jones cross examined Hunter about his drug dealing. He did not challenge Hunter's assertion that he sold weed for Birdy and Draper in '94 and '95.

## 2. *KIDNAPPING OF YUSEF SIMMONS*

On January 22, 2001, Mr. Zeidenberg made clear his intent to elicit Yusef Simmons testimony regarding the kidnapping for which Sean Coates had been adjudicated as a juvenile.[11]

---

A.    No, I didn't.
Q.    Back in 1990?
A.    No, I didn't.
Q.    Mr. Jones: The Court's indulgence.
The Court: Sure.
Mr. Jones:  I have no further questions, your honor. (Tr.050101 am p.18)

[11]

Mr. Zeidenberg:    And the other thing, your honor, is I have trial testimony from a juvenile trial of a witness that we are going to be calling, and I just would ask the court to order that disclosed. It is jencks, however, because it was a juvenile trial. I wanted the court's authority to release it.

The Court:    You may release it. Yes.

Mr. zeidenberg:    Thank you.

Mr. Jones:    I would object to that on behalf of Mr. Coates. I am going to object to any reference to this juvenile proceeding that took place when Mr. Coates was years of age. It violates all of the
—

15

Fourteen days later when the Government called Simmons on February 5, 2001, Jones, again, appeared to be caught off guard.

JONES:      Your Honor, on behalf of Mr. Coates, I'm asking the Court to bar this testimony of Mr. Simmons.  It's a matter that occurred when Mr. Coates was 17 years old, some years ago, Your Honor.  It has nothing to do with this conspiracy trial. To let this testimony in –

THE COURT:  I don't know what testimony he's going to give.

JONES:      Well, he's giving testimony about a kidnapping that Mr. Coates was charged with and tried in a juvenile court in the District of Columbia back in 1990, and as far as I'm concerned, Your Honor, it violates all the laws against confidentiality as far as juvenile offenses are concerned.  It's a situation that does not purport to be, as far as I can see from the evidence, it doesn't have anything to do with this case at all, and we would object to the idea.  What it amounts to, Your Honor, is propensity evidence.

THE COURT:  What is its relevance?

MS. CHATURVEDI:   A couple of things, Your Honor. First of all, it's not charged as a substantive count.  It's just a racketeering count.  It's charged in the indictment.  It is part of this conspiracy in that Mr. Simmons was kidnapped, it's our allegation, and Mr. Simmons was a member of the L Street group.  He was kidnapped by Sean Coates and others who were part of the K Street group.  It goes

---

| The Court: | It, nevertheless, is *Jencks* material. |
| Mr. Jones: | Well, we object to Mr. Yusef Simmons coming in and testifying at all about that juvenile matter. |
| The Court: | Well, let's deal with the testimony when the testimony is presented. |
| Mr. Jones: | Okay. (Tr. 012201 am p.62) |

16

App 991

directly to show the animosity between K Street and L Street, which by our calculation began in 1990. The greater escalation occurred in 1996. But this is one of the events, precipitating events that caused a conflict between K Street and L Street.

THE COURT:     Okay. And Coates was, in fact, 17 at the time?

MS. CHATURVEDI:     That's right, Your Honor. I actually -- Mr. Jones and I have talked about this issue prior to this discussion at the bench, and I've provided him with two cases that discuss the propriety of the --

THE COURT:     I think it's admissible. (Tr.020501 pm p.25-26)

The prosecution began its examination of Simmons by talking about events in 1996 during the war between L Street and K Street. Jones objected and the Court stated that his objection was frivolous.[12] Thereafter, Jones rarely objected:[13]

---

[12]

Jones:     I object to this line of questioning. Judge, we're talking about 1996 and she is ostensibly bringing this man in to talk about a kidnapping that occurred back in 1990. I don't know the relevance of this."

Court:     She perhaps has not gotten to the subject of the kidnapping. I don't know. The witness may have other relevant testimony to offer. What is the nature of your objection?

Jones:     My objection is relevance, Your Honor. We're talking about brothers being murdered. We are talking about everything other than what she brought him in here to talk about.

Court:     I don't know what she brought him in here to talk about and either do you. Your objection is overruled. It's a frivolous objection and you know it. Now, let's proceed. (Tr.020501 pm p.35-36)

[13]     Jones made one more frivolous objection when Simmons testified that after Coates was no longer on the scene the gunman said "Where's your

17

App 992

App 993

During his direct, Simmons provided detailed testimony about his abduction at gunpoint and being put in a car driven by Sean Coates. Simmons was put in another car and never saw Coates after that. The demand for money was made after Coates was no longer there. Despite the prior adjudication and the fact that the police had been called, Jones began his cross-examination by referring to the "so-called kidnapping back in 1990". Jones got Simmons to admit that in his original statement, he did not name Coates as someone who was involved. Jones did not identify introduce the relevant portion of the statement. (Tr.020601 am p. 70-71) Jones did get Simmons to admit that the kidnapping was just about money. It had nothing to do with K street. (Tr.020601 am p.71-72)

## 3. ATTEMPTED MURDER OF RONALD SOWELLS

Prior to Sowells taking the witness stand, Detective Robert Mitchell testified that on October 30, 1996, he was called to interview the victim of a shooting at 1100 Howard Rd. Mr. Sowells told him that Bird who hung out in the 200 Blk of Delaware Southwest. "I ask him did he know his real name , and he told me

money." His objection was based on hearsay. The statement was clearly part of the *res gestae.* The objection was overruled. (Tr.020601 am p.28)

18

the guy's name was Sean Coates." (Tr.041701 am 38)  Detective Mitchell's partner went to the hospital with him, but he did not go into the room while the statement was being taken.   The Detective took notes, but they were not verbatim.  (Tr.041701 am 40)

Mitchell was asked by Counsel for Carson whether he had sought an arrest warrant for Coates.  His answer was no.  (Tr.0417 am p.47) Jones had lots of good fodder for cross. Mitchell had an established crime scene, the forensic evidence was recovered and he said he had an identification by name.  Under the circumstances there could not be any rational basis for an identification. Police officers are required to preserve statements of identification.  Why had Dectective Mitchell not done so.  Jones did not even inquire whether Mitchell recorded this information in his police notebook.  As usual, there was no examination about the crime scene or the witnesses ability to observe the incident.

Sowells[14] testified that he saw Birdy driving his Q45 in the opposite

---

[14]     According to Sowells although the people from K Street and L Street did not get along and he was associated with Woozie and L Street, he hung out with the people from K Street.  It was all a plot to rock them to sleep so they could kill Vito, Chin, Draper, and Pimp.  (Tr.041701 pm p.51) Woozie and people from L street thought Vito and Chin had something to do with Patcho getting killed, Hallman getting killed, Yusef getting kidnapped and Donnell

19

App 994

direction. He blew his horm and waived. Birdy saw him and sped off. He was going to going to tell Birdy to stay out of it and mind his business. When Birdy sped off, he knew he was scared. (Tr.011801 am p.13) Sowells went to the barber shop, drove down Pennsylvania Ave and picked up his brother. He was going to drop his brother off at the Anacostia Metro. His brother got out of the car. When he was pulling out, he saw Birdie "pulling up". "He was at an angle trying to block the car in so I couldn't back out." The prosecutor asked what happened after Birdie pulled up behind him, The door kind of slid open. Birdie was in the passenger seat. The car pulled back to the side. He knew that Birdie was about to shoot. As Birdie was about to shoot, Sowells sat back and after Birdie shot and got close, he shot back three or four times (Tr.041801 am p,16) Birdie was no longer in the Q45. He was in something like a Dodge Stratus. He was shot twice in the arm. "As he was pulling up some more, he just started shooting." The car Birdie was in was pulled off.

Although Sowells story provides rich fodder for cross-examination, Jones, as usual did not examine Sowells on his story. He did not inquire about the

---

Burroughs getting killed. (Tr.041701 pm p.52) Sowells and Vincent Hill could not stand each other. (Tr.041701 pm p.59) According to Sowells, when Vito got shot, Price saw a guy hop in his car and he went back and told. (Tr.041701 pm. p,59).

App 995

placement of objects on the crime scene. He ask nothing about the medical records even thought there is a glaring disparity between the testimony of Mitchell and Sowells. Sowell's story would depend upon a tremendous coincidence. Coates see him while are driving his Q45. Sowells picks he brother up and gives him a ride to the metro. Thus Sowell was someplace he did not intend to be. Yet, Coates has changed cars, located him at this coincidental location and come prepared to ambush him. That does not make sense.

The government did not present any pictures of Sowells injuries. There was no medical testimony about his injury. As a former prosecutor, Mr. Jones should know that when the prosecutor leaves out this type of evidence, he is spinning his facts.

Although there was a glaring disparity between Detective Mitchell's testimony and Sowell's regarding the interview, Jones never explored that discrepancy. Detective Mitchell had said that he waited until after Sowells' surgery. Sowells' testified that he did not have surgery – "that they ain't never take the bullets out." (Tr.041801 pm p.49) He said that the Detective's interviewed him while they were doing the x-ray. [15]

_____

[15] Further undercutting his credibility, Sowells admitted lying about seeing who shot Kim Richardson, seeing Kevin Hart get shot, and seeing Joey Simmons

21

Jones starts his cross-examination (Tr.041801 pm p.30-53) by asking about how much money Sowells' made dealing drugs. Thus, he gave the impression that he was running away from the witness rather than cross examining him. Jones then elicited that at the time of the shooting, Birdy and Sowells were fine with each other.

Sowell said on direct that you pulled up next to him and started shooting. Jones got Sowells to say that the first shot came through the back which would be consistent with the window. (18 pm 37) Mr, Jones ask Sowells whether he told FBI agent McCauley that he was not able to identify the two black males that

_____

get killed. (Tr.041801 am p.22-24) Sowells described an incident where two guys were squeezing people's marijuana bags and then said that they said that they did not want to buy this shit. Chin asked for a gun. Sowells gave him one. Chin chased the guy down. The guy fell. William Bumbrey ran over and shot him. (Tr.041701 pm p.47-49)

Roland Brown, the man who Sowells testified was shot because he was squeezing marijuana bags and then did not buy them, testified about the incident. His version of events was very different from Sowells. He took a urine by the tennis courts and then went to buy marijuana. He was approached by a gentleman with marijuana who asked him why did he piss on the street. Somebody said kill them niggers. His friend told him to run and he ran and a hail of gunfire let loose. He got hit between L and M and fell. Some one with a coat on ran up behind him and shot him in the shoulder. He was shot six times and remained in the hospital 43 days. (Tr.042401 am p.41-42) Brown did not know who shot him. (Tr.042401 am p.48)

22

App 997

were in the car shooting. He denied saying it. (18 am 40) Jones did not show him the document to refresh his recollection.[16]

Jones then becomes accusatory and accused Sowells of lying. He ended his cross-examinationup by saying improperly "I'm not going to waste the juror's time." (18 pm 51)

Montgomery said he loaned Bird his gun so that they could go after Ron Sowells. Montgomery said Bird gave the gun back after the shooting and Montgomery threw it in the river. According to Montgomery, Bird told him that Manute was sitting in the Anacostia subway station and Bird pulled up on Manute and blasted him. Chin later complained because Bird did not finish Manute off. (Tr.031201 pm p.90) Jones not ask the obvious questions to undergird a defense that Montgomery committed the offense. The weapon was Montgomery. He was the last person in possession of it. Montgomery is about the same height and complexion as Coates. [17]

---

[16]    Counsel anticipates that she will have additional points to make once she obtains the discovery, *Jencks*, and medical records for this incident.

[17]    Lisi also testified regarding the Sowells shooting. Montgomery took him to the waterfront to find the gun. He saw the harbor police retrieve the gun. (Tr.041701 am p.15-16) Joe Welsh from the Harbor Patrol testified that he recovered the .30 carbine from the river. Jones asked one question – whether Montgomery was there. (Tr.041701 am p.81-82) The answer was no.

23

## 4.   KIDNAPING OF ANTHONY "WYSOCKI" PRYOR

Sergeant DeLoatch testified that he was assigned to investigate the kidnapping of Anthony Pryor, "Wysocki". The kidnapping occurred in Oxon Hill. He went to the home of Doreen Key and looked out her window and saw the dumpster in the alley. (Tr.042301 pm p.90-91) Key gave a physical description of Draper, said that she knew him four years and that he cleared his throat a lot. (Tr.042301 pm p.95-98) In cross examination, Kiersh established that Sweeney's fingerprints were not recovered from the car. (Tr.042401 am 17).   Jones examined DeLoatch about the location of the car. (24 am 30) In redirect, the prosecutor was permitted over a non specific objection by Jones to elicit that the prints belonged to Sean Coates. (Discussed further below)

## 5.   MURDER OF ALONZO GASKINS, DARNELL MACK AND MELODY ANDERSON, "THE TRIPLE"

Keith Slaughter testified about the processing of the crime scene for Sowells shooting. The tan Chevrolet was in front of the metro station. The rear driver's window was shot out. (Tr.041701 am p.62)   He seized a Taurus handgun, a magazine, (from a Book Bag) 9 mm shell casings and .30 carbine shell casings. (Tr.041701 am p.58-61) The nine millimeters came from inside the car. (Tr.041701 am p.65) The .30 carbine casings were found outside the car. Slaughter did not prepare a crime scene diagram.   One of the 9 millimeters was recovered from the drivers seat. He does not know where the other's came from. (Tr.041701 am p.67) There were no bullet holes in the body of the car. The shell casings were within 8 to ten feet of the station wagon. (Tr.041101 am p.69) Chaturvedi showed the witness a photograph with one of the 9 mm.

24

According to Montgomery, initially Chin did not want Bird on the triple because Bird did not ever want to do anything – he always wants to be the driver. (Tr.031401 am p,17) Chin, Draper and Montgomery had 2 to 4 conversations about doing Lonnie. Montgomery said if we are going to do, this let's do. They did not have any guns. Draper went and got a .40 caliber Glock and a stun gun. After Chin Draper, and Montgomery spent some time looking for Lonnie, they went to get Bird because Bird and Lonnie was cool. (Tr.0314 am p.34) Bird did not know what they had planned when they went to get him. Draper played a joke and pretended to shoot Bird. They told Bird what they were going to do. He does not remember Bird saying anything. Bird, Chin, Draper, and Montgomery were sitting in the van when Lonnie, Darnell Mack and the 3 girls came out. Mack was a close friend of Vito, Lonnie, Darnell and the girls got in a car and left.

Montgomery, Chin, Draper and Bird went back to Montgomery's house and Montgomery made 4 masks out of black skull caps, one for each of them. Montgomery and Birdie took a tag off a car and put it on the van. Birdie was supposed to go in, but when it was time to get out of the car, Birdie did not get out of the car. Montgomery and Draper ran up to the people and pushed them in the house. One girl ran upstairs. He did not see what the other one did. (Tr.031401 am p.47-48) Montgomery grabbed Darnell Mack and Draper grabbed Lonnie. Mack was not resisting. He said he did not have any money. Montgomery lifted up Mack's jacket so he could stun him and Draper started shooting. He pushed the screen door open with his thumb. He did not see Draper shoot the girl. Draper got to the car first and then Montgomery. (Tr.031401 am p.53).

Montgomery testified that he was mad about Draper shooting. Draper claimed that Lonnie was reaching. Chin believed that Draper hit Lonnie or Darnell for Boo and Bam, drug dealers. (Tr.031401 am p.73)

Chin said that Draper told him that the only person that he had told about the murder in Temple Hills (the Triple) was Butchie. Chin said that they had to hit Butchie and that there would be no case. On July 31, 1997, Montgomery and Chin were arrested for the Temple Hill's murders. The police told them that they definitely had Draper. Montgomery in a hand written statement told the police that Draper was the only person who got out of the car, and that shortly after, they heard gunshots. He said that Bird, Chin, and himself remained in the

25

car. He went to the grand jury in PG on August 5, 1997 and testified that the statement he gave the PG police was true. Montgomery was charged in District of Columbia and Lisi explained to him that they had videotapes of him making drug transactions on K Street.

When he went to the grand jury, he lied about the guns in the 60th and East Capitol shooting. (Tr.031401 pm p, 27) After he pled to the narcotics conspiracy, he was released and the government supported him. (Tr.301401 pm p.28) Lisi would come to visit Montgomery and Montgomery told him about T.T. and Terita and Chrissy. He provided more information because he was concerned that if he withheld anything people could snitch on him. Bird could tell them about the Triple. Raymond could tell about Maurice and Slick. He then entered the second plea agreement (14 am 30-33). He was concern that Poo-poo would say that he was the shooter in Tim-Tim's case so that Poo-poo could get his time back.

In November of 1999, Montgomery told Lisi and Chateverdi that he had not been in the house during the Triple. He said that Bird went in. About a month latter, Montgomery called Ziedenburg and told him that he did go in the house. (Tr.031401 pm p.41). The government again asked to have his release revoked, but Judge Jackson allowed him to remain on release. Montgomery went into witness protection. He left witness protection and came back to D.C. He understood that witness protection was voluntary. After leaving the program, Montgomery's release was revoked. (Tr.0314101 pm 43)

While Montgomery and Chin were in the cellblock, Chin told him that he knew what Montgomery had told the detectives. Chin was angry that Montgomery put them on the scene. Chin said that if he got out, he was going "to hit heads". (Tr.031401 pm p.45)

Mr. Jones began his cross examining Montgomery about Coates' daughter. He is shut down by the Judge when he says "And you know Birdie is crazy about 'Shanese'." (Tr.032101 am p.25) He brought up the point about Coates having "feminine ways", but that was not meant to suggest that you were homosexual. (Tr.032101 am p.28) Montgomery said he was not sure whether he told the government that you would snitch. (Tr.032101 am p.30).

Jones received permission from the Court to go over some things that had Montgomery had already been questioned about. (Tr.032101 am p.30) So he was not constricted by the Court's earlier rule limiting repetition. Jones then

26

App 1001

repeats the fact that Coates was eligible for the death penalty. (21 am 41) Jones questioned Montgomery about the admitted lie he had told in Maryland – that Coates went into the house with Sweeney and not him. According to Jones, Chaturvedi had stressed to him "that it didn't matter whether I went in or stayed outside of the house. The point is it happened. I stressed to them that no one was supposed to get killed. So it happened in the commission of another crime. And whether we had guns or not, that all of us was liable to the same degree." (Tr.042101 am p.41)

Jones had Montgomery say again that from his perspective he was not involved in a conspiracy. (Tr.032101 am p.55) Jones sat down without laying a finger on Montgomery.

## 6. FEUD WITH CONDON TERRACE

Sean Coates[18] was charged with three racketeering acts related to the feud

between Condon Terrace and Southwest:

| | | |
|---|---|---|
| Racketeering Act 26: | AWIMW/A Jermaine Hall and Michael Jones (Not proven) | |
| Racketeering Act 27: | Conspiracy to murder Michael Jones from June 20-June 28, 1992 (Proven) | |
| Racketeering Act 28: | Assault with Intent to Murder while Armed - Michael Jones on June 28, 1992 | |

Several witnesses testified to the feud between Condon Terrace and

Southwest. At least two possible motives were put forward for the feud.[19] With

---

[18] Coates was the only defendant charged with these offenses. Thus his counsel could not expect to benefit from spillover from his codefendants' cases.

[19] James Montgomery testified to a fistfight at a club, Cherry's. A guy threaten to slap Clifton Edwards (Meechie). Montgomery said that he, "Chin,

27

App 1002

respect to the June 20, 1992 shooting of Montgomery testified that Meechie told him that he had a pistol, Poo-Poo had a pistol and Bird had a machine gun, and that he was going to kill Bird when he came home because Bird did not shoot. (Tr.031201 pm p. 75-76)

The government had absolutely no factual basis to infer that Sean Coates was involved in the January 20 or had a machine gun. The discovery documents show that there was never an allegation of anyone having a machine gun  During direct, Montgomery admitted that he did not want Meechie to pled guilty because he was a co-defendant with Meechie in another case.[20] (Tr.031201 pm p.77)

_____

Bird, Erik, Hard Rock, Morris, Crawford" were the people he remembered being there. (Tr.031201 pm p.72-73) Arthur Rice testified that a guy named Motor from Condon Terrace actually punched Meechie in his face. Montgomery also testified about the 1993 murder of Dihru (Wayne Perry's nephew) by Condon Terrace but this occurred in 1993. (Tr.031201 pm p.74-75)

Eric Gray testified that at the courthouse during a case involving Michael Jones in the summer of 1992 people from Condon Terrace got into a fight with Irky Berk, Draper, Skinny Pimp and Sam. (050801 pm p.13-15)

[20]     In addition to pleading to shooting Jermaine Hall, Clifton Edwards pled guilty to UUV in case number F-6465-92. Edwards admitted that he was driving a car without the owner's permission which was stopped on November 13, 1991. Montgomery was in the front passenger seat when the car was stopped. (Tr.052593 p.11-13)

28

Arthur Rice was not sure when the incident happened, but after the incident Meechie got locked up. He said that he spoke to Meechie and Birdy about a shooting at a Exxon station on South Capital – said some dudes was up there in a Accura and either Meechie or Birdy chased them, one of there guns jammed, but the guys got away. (Tr.042501 pm 47-49)

Arthur Rice testified about Michael Jones being shot on June 28, 1992. According to him, after the June 20th incident, Meechie call and spoke with Birdy and himself. Meechie said that a dude name Michael Jones is testifying against him. Rice testified that Birdy knew where to go. They went somewhere around Condon Terrace.[21] According to Rice, Birdy and Gus walked up to Michael Jones. They shot at him. Without objection, the government elicited from Rice that after Mike survived, Meechie pled guilty. (Tr.042401 pm p.55)

Also without a hearsay or confrontation clause objection, the Government admitted Edward's plea (Ex M78) proffer into evidence without objection. The Government deleted a portion of the proffer as agreed to by Edwards which

---

[21] Actually Michael Jones was shot in Congress Heights at 10th Place and 4th Street.

29

would strongly suggest only one person was involved in the June 20 shooting. [22]

(Tr.043001 pm p.23-24)

Mr. Jones entire cross-examination regarding Arthur Rice's testimony about the Condon Terrace shootings was as follows:

BY MR. JONES:

Q. Good morning, Mr. Rice.
A. Good morning.
Q. My name is Jones. I represent "Birdie."
A. All right.
Q. Sean Coates.
A. Yes.
Q. Now, Mr. Rice, you have talked a lot about -- well, you mentioned a few incidents in which you observed "Birdie," and one of them which sticks in my mind is the incident involving Mike -- this guy named Mike?
A. Yes, sir.
Q. Now, in what neighborhood did that shooting take place?
A. Southeast.
Q. Southeast. There is no other -- you can't break it down any further than that?
A. Over there towards Condon terrace, over there by fourth street and 10th Place. That area over there.
Q. Now, you said you posted up at some street?
A. Yes.
Q. What street did you post up at?
A. I can't recall.
Q. You don't recall?
A. No, sir.

---

[22] Mr. Kiresh (Sweeney's lawyer) objected because he thought that Edwards was a member of L street. He was confusing Clifton Edwards with Demetrius Hunter also nicknamed Meechie. (Tr.043001 pm 21)

30

App 1005

Q. Now, you indicated, sir, that you saw "Birdie", Sean Coates, stand over top of this man named Mike and pump bullets into him?

A. Yes, sir.

Q. Now, that, sir, is a lie, isn't that correct?

A. No, sir. (Tr.043001 am p.9-10)

Also Agent Lisi testified to the following statement made by Co-Defendant

Sweeney to Michael "Butchie" Smith.

Q. Did Mr. Smith tell you about conversations he had with Mr. Sweeney involving the shooting of an individual by the name of Michael Jones?

A. Yes, but he didn't know the name Michael Jones. What he told me was that, he said that back in 1992, Meechie, and that's just the name he gave me, Meechie was charged with shooting somebody from Condon Terrace.

Q. Let me just stop you for a second. When you say he told you, this is what Mr. Smith told you? (Tr.052901 pm p.29-30)

A. Yes, ma'am.

Q. And the source of his knowledge was what?

A. Mr. Sweeney.

Q. All right. I'm sorry to interrupt.

A. That's okay. So Mr. Smith is telling me that Mr. Sweeney told him that Meechie got charged with shooting a person from Condon Terrace, and that one of the persons or the victims was cooperating against Mr. -- was cooperating against Meechie. So that Mr. Sweeney went to an area in Southeast nearMississippi Avenue to kill the person who was testifying or who was going to testify against Meechie. And Mr. Smith was under the impression that the person did die, that there actually was a murder. And he said that Mr. Sweeney went down there, chased a person through the alley and it was some place near Mississippi Avenue, caught up with him, shot him, and stood over him and shot him some more. And it was Mr. Smith's understanding that the person died. And I tried going back and finding this crime, and this is an example of where I'd call him and ask him a question, and I'm trying to find -- I said, hey, you know, tell me about that again. And then he told me that, yeah, he said, it was Draper or Shorty are the words he used and Birdy and he knew Birdy. He said Birdy

31

was with Draper when they went down there, and he said Birdy also shot somebody during the same event. So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones. However, Michael Jones did not die. Let me back up. Match exactly. (Tr.052901 pm p.29-30)

Although not a single question had been asked about Condon Terrace, Mr. Jones when asked whether he had cross, responded: "Your honor, most of the questions have been asked. At this point, I don't think I am going to have any questions." (TR053001 am p.89)[23]

---

[23] Mr. Jones did call a witness, a police officer who testified that Michael Jones said that Wayne Perry shot him. (Tr.061401 pm p.22-23)

32

App 1007

### III.  COUNSEL'S OTHER FAILURES

### 1.  *Opening Statement*

Mr. Jones' opening statement is obviously off the cuff.  It is less than seven transcript pages.  (Tr.010901 pm p.10-16)   The first three pages are just generalized statements that do nothing to refute the charges.  Jones explicitly states "... there's not going to be any physical evidence linking [Sean Coates] to any crime." (p.11)

Jones then implied that he will present an alibi defense for the triple.  "The evidence will show that Sean Coates wasn't even there."[24]  Jones said he is going to cross examine Mr. Montgomery.  (p.14) With respect to Michael Jones, Mr. Jones informs the jury that they will hear that Michael Jones said that William Perry shot him. (p.4) He makes no mention of the other Condon Terrace shooting.  Jones told the jury that they would hear about a gun that Coates pled to years ago.  "And you will hear another set of facts describing the incident when he was a juvenile."  (p.14 ) Jones does not mention the marijuana or RICO conspiracies.  Jones did not mention the shooting of Ronald Sowells or the kidnapping of Anthony Pryor.

---

[24]       Jones did intend to present an alibi witness, Coates' sister, but he did not.

33

## 2. *Jones Trial Preparation and Representation of Mr. Coates at Trial*

Current Counsel does not have Mr. Jones' files to access his trial preparation. Further, as set forth above, Counsel does not currently have access to Mr. Jones. There is, however, information in the record which points to the paucity of Jones preparation. First there is the issue of his failure to make discovery request. Perhaps he anticipated that with so many lawyers, it would not be necessary.

The problem with that thought process is illustrated by the Condon Terrace allegations. Defendant Coates was the only defendant who had to defend against the Condon Terrace allegations. The Bates Stamp numbered discovery related to Condon Terrace is 900215-900353. That discovery relates solely to the June 20, 1992 shooting of Michael Jones. There was no discovery related to the June 28, 1992, the Racketeering Act that was found proven. In trial, Jones did not mention the June 28, 1992 shooting in his opening. He obviously did not have a plan for cross examination and simply had Rice repeat his testimony without challenging it.

Likewise with Ronald "Manute" Sowells. Jones did not mention this crime in his opening statement. Sowells was potentially the most dangerous witness

34

App 1009

against Mr. Coates. AUSA Zeidenberg said in opening statement:

> "Well, you know what's going to happen to Ronald Sowells. On October 30, 1996, Sean Coates and Sam Carson find out Ronald Sowells is in the neighborhood at the Anacostia Metro. They go back to Southwest, get a gun. Carson is driving. Coates is in the passenger seat, pulls up alongside the car where Ronald Sowells is, blasts Ronald Sowells from right next door, shoots him in his side. He lives, and he will come in, and he will testify, **as will other witnesses**, that the shooter was Sean Coates, and it was Sam Carson that was with him. (Tr.010801 pm p.24-25)"

The discovery documents that are available to Current Counsel do not include any documents regarding Sowells. Defendant Coates joined motion previously filed by his codefendants including their motion for pretrial identification procedures. (Docket Entry 313 06/06/2000) The government did not present any evidence regarding a pretrial identification of Coates by Sowells. Mr. Zeidenberg did not mention that Sowells had made an identification of Coates to Detective Mitchell. When Mitchell took the stand and testified to the identification, Mr. Jones did not make any objection. More importantly, Mr. Jones apparently failed to notice that the Government did not move Sowells medical records into evidence. That should have been a red flag. Generally, the Government will want the jury to know how badly the complainant was injured. When these records are not produced, it is a red flag for the defense. Even when they are produced, many defense counsel routinely obtain their own copies of

35

these records to make sure nothing has been omitted. Even if he did not receive the records in discovery, after the conflict between Sowells and Detective Mitchell's testimony regarding the circumstances of the identical became clear, Jones should have immediately ask the Court to execute a subpoena for the medical records.[25] Counsel for Carson later introduced the records in his case. (Tr.062501 am p.39)[26]

Mr. Jones most egregious error of pretrial preparation was going to trial unaware of the fact that the Government claimed to have matched his client's fingerprint to a print taken from the car that Anthony "Wysocki" Pryor had been kidnapped. Surely, he was unaware because he told the jury in opening that there would be no physical evidence linking his client to any of the crimes.

---

[25] There is an indication in the record that the Government was in possession of these records. Counsel for Proctor requested medical records which he did not receive from his predecessor. Mr. Zeidenberg responded:

> "We literally have a dozen binders of the materials that were turned over two years ago. And, since that time, we have a box, for instance, of medical records that are probably several thousand pages. *** he can come over to our office and review the discovery binders, and if there is something specific that he sees that he doesn't have, obviously, we'll make a copy." (Tr.092700 p.165)

[26] Carson put on a very aggressive defense to this Racketeering Action and it was found not proven.

36

Discovery Document 300475 disclosed to the defense that a Brown 1983 Cadillac, license number unknown, VIN 1 G6AD698D9214743 was towed to a Prince Georges County Impound at 7600 Barlowe Rd. Landover. The report says that the owner of the victim is unknown.

Document 300484 and 300485 relate to the fingerprint examination of the Cadillac. Document Number 300484 is a Prince Georges County Police Department Evidence Report which states that of the Cadillac "...which had previously been fumed for latent fingerprints utilizing cyanocrylate ester pm 10/22/93, was fumed for the presence of any developed latents with none of value being obtained.

Document 300485 is a mostly illegible copy of the Request for Latent Fingerprints. Coates name can barely be made out in the report section but whether or not there was a match is illegible. In redirect examination of Sargeant Deloatch, found an opportunistic moment to elicit the following.

Q. Sergeant Deloatch, you were asked about some fingerprints that were taken -- latent prints that were taken from the car compared to known prints.
A. Yes.
Q. Do you recall being asked about that?
A. Yes.
Q. Do you recall whose known prints were found on the car?

37

App 1012

Mr. Jones: Objection, your honor.

The Court: Overruled.

The witness: Coates.

Mr. Zeidenberg: Sean Coates'?

The witness: Yes.

Mr. Zeidenberg: No further questions, your honor.(Tr.042401 am 30-31)

Mr. Jones did not make a proper objection, hearsay and no foundation. Indeed despite the criticality of this evidence, he did not even asks to approach the bench to explain his objection. Here is on of those examples where it is clear that Mr. Jones is winging it – not acting with the skill and knowledge that would be expected of a lawyer trying a case of this magnitude. The court inquires whether there is anything further. Rather than approach the bench and ask the Court to strike that evidence if the Government does not produce the foundational evidence, Mr. Jones proceeds to reinforce the notion that this is his client's finger print:

Mr. Jones:

Q.    You have indicated that it's your understanding that Mr. Coates' prints were
      found on the car?
A.    Yes.
Q.    Those prints were found on the outside of that automobile, isn't that

38

App 1013

correct?

A.   I'm not sure.

Q.   Isn't it a fact that those prints were found on the right rear taillight?

A.   Now, that you mention that, yes.  Yes, it is. (Tr.042401 am p.31)

At this point, Mr. Jones has not only failed his duty as an advocate.  He has become his client nemesis.  Rather than making proper objections, he is supplying information to affirm the Government's case against his client.

In his cross examination of Sergeant DeLoacth about the ownership of the Cadillac and where was it, Jones elicited clearly false testimony from Deloatch and made no effort to correct DeLoatch's suggestion that the Cadillac was given back to the owner was clearly false and unsupported by the evidence.

By Mr. Jones:

Q.   Good morning, Mr. Deloatch, or Sergeant.

A.   Good morning.

Q.   Sergeant, where is that car, the Cadillac?

A.   Where is it now?

Q.   Yes.

A.   ***It was probably given back to the owner.  I know we impound it and we take it to the impound lot.***  And the officer that was involved in the case back in '93 should have contacted the owner so the owner could pick the car up.  Where it is now, I couldn't tell you.

Q.   Have you ever seen the car?

A.   No.

Mr. Jones:  I have no further questions. (Tr.042401 am p.30)

According to the incident report, the owner of the vehicle was unknown.

39

App 1014

No record of the car being returned to its owner was produced in discovery. [27]

Finally, Jones did not participate in the discussion of jury instructions.

### 3. Michael "Butchie" Smith

Agent Lisi's rendition of Michael Butchie Smith statements was obviously prejudicial to Mr. Coates. Since Coates was not alleged to have any involvement in the death of Butchie, the question as to him was whether his conduct resulted in a waiver. Smith's motion merely rehashed what the Government and the other defendants had said. He did not look at the issue from the perspective of his Client's rights. The question for Mr. Coates was whether he had made a waiver. The law from the Supreme Court is quite clear. "There is a presumption against the waiver of constitutional rights. . . and for a waiver to be effective it must be clearly established that there was `an intentional relinquishment or abandonment of a known right or privilege.' **Johnson v. Zerbst,** 304 U.S. 458, 464." Jones did not cite or argue *Johnson*' applicability.

As the transcript further establishes Mr. Jones, as usual, misunderstood the nature of the evidence that the government intended to present.

---

[27] The points made herein about Mr. Jones disastrous trial preparation and performance are meant to be representational and not exclusive.

40

App 1015

Mr. Jones:  But in their statements, your honor, they list Coates as a participant in the triple homicide. and I just want to know what he is going to say before he gets up there and says it.  I mean if he says that Sweeney told him that Coates was part of that -- in the 302 it says James Montgomery and Draper and Others.  And that's always been what we have been under the impression of.  "And others."  This is page 3 of the 302's, your honor.

The Court:  that's fine.  Ask him about his 302's and what is the explanation for this glaring omission.  A set forth above, Agent Lisi testified to something different.   Mr. Jones did not cross examine the glaring omission or admit the statement in evidence.  Jones said that most of his questions have been asked.  He does not think he will asks any questions.  (Tr.052901 pm. p.89  During closing argument Mr. Jones did not mentioned Butchie.

## 4.    *Failure to Object to Continuous Hearsay Solicitation by Government*

Trial counsel continuously failed to object to hearsay solicitations by the

Government.  For example, to bolster its case about the feud between Condon

Terrace and K Street, the Government elicited this hearsay testimony about the

murder of Wayne Perry's nephew from James Montgomery.

By Mr. Ziedenberg:

Q.    Okay.  Now, are you familiar with someone named Dihru?
A.    Yes.
Q.    Who is Dihru?
A.    Dihru is Darryl Young.
Q.    And was he a friend of -- where was he from?
A.    Southwest.
Q.    Was he related to someone else from Southwest?
A.    Yeah.

41

App 1016

Q.    Who was he related to?
A.    Wayne.
Q.    Wayne Perry?
A.    Yes.
Q.    Now, directing your attention to around 1993, was Dihru killed?
A.    To my knowledge.  I was locked up.
Q.    What was your understanding of who was responsible – what part of the city was responsible for his murder?
A.    Condon Terrace.
Q.    Now, you said you were incarcerated in 1993?
A.    Yes.
Q.    How long had you been incarcerated, was that since November of '91?
A.    Yes." (Tr.031201 pm p.74-75)

Without objection, the plea of Clifton "Meechie" Edwards was admitted into evidence.   Even before **Crawford v. Washington,** competent lawyers in theDistrict of Columbia routinely made hearsay objections to these plea proffers.[28]

As another example, the prosecutor asked Sowells what was his understanding of where Joey Simmons got killed and whether Simmons was armed. Without objection Sowells testified behind Harry's O's house and he was armed. There was absolutely no foundation laid for Sowell's having personal knowledge of this fact or having even learned it from a co-conspirator. (Tr.041701 p.79)

---

[28]    See for example **Morten v. United States**, 856 A.2d 595 (D.C. 2004)

42

App 1017

## 5. *Closing Argument*

Having consistently failed to challenge the evidence against Coates at trial, Jones gave a rambling closing statement in which much of what he had to say barely passed the giggle test given the seriousness of the allegations. He suggested that Montgomery's testimony against Coates was motivated by Montgomery's perception that Coates had "feminine ways" Tr.070301 am p.19) He adopted the argument put forward by codefendants that special agent Lisi driving through the K street area and, "lo and behold, Vincent Hill and some others have the nerve to talk to them. They have the nerve to be argumentative and nasty with them. They didn't show them the proper respect."(Tr.070301 am p.11)

As to the Triple, Jones argued:

"Well, he figures that out by saying, well, yeah, as a matter of fact, he helped me change the tags. We went and stole some tags from a car and put it on the van. That, you see, gets him involved. Aiding and abetting. That's it. He takes a part in the actual crime itself. But, look, did anybody bring anybody in here to tell you about a police report filed for a missing tag or stolen tag? No. Nothing. Just Montgomery."

There was an obvious defense to Montgomery's pointing the finger at Coates. Montgomery's fingerprints were at the crime scene. He was death penalty eligible. The only way for Montgomery to improve his situation was to

43

point the finger at someone who was not placed at the scene by incriminating physical evidence. By the time that Montgomery told his story, it is impossible to corroborate or disprove the underlying details – such as the car.

Montgomery's allegations against Coates on the Triple were not compelling. He could not even say with certainty that Coates knew what the plan was.

As to Butchie, there was reasonable doubt that he actually did point the finger at Coates. After Michael Smith cooperated, Sweeney and Montgomery were initial charged with the Triple, not Coates. More importantly, Coates was not allege to be involved in the hunt for Smith. If Coates was involved in the Triple, he would have had a motive to be involved in the hunt for Smith. More importantly, Montgomery had an enormous reason to eliminate Smith. Revenge. These, and many other inferences favorable to Coates, could have been drawn by any lawyer of reasonable competence.

Having failed to make a proper argument to the Court for exclusion of the fingerprint, Jones then argued to the jury that the fingerprint should not have been admitted. In making his argument, he improved the government's evidence.

44

App 1019

"...then they talk about a fingerprint that is supposed to be on Sean Coates' own car -- on the outside of the car. But who did you hear that from? The **crime scene search officer**. You didn't hear it from the fingerprint expert. The fingerprint expert from Maryland didn't come in here and tell you anything about any fingerprint. And I objected to the fact that they tried to elicit this information from the crime scene search officer. **He has no business testifying about a fingerprint**. But that's what you got."[29]

The fingerprint evidence came from Sgt. Deloatch, the detective investigating the kidnapping of Wysocki, not a crime scene officer.

## IV. INEFFECTIVENESS OF APPELLATE COUNSEL

### 1. Failure to Appeal Admission of Fingerprint by Hearsay Evidence without foundation

Although, the admission of the fingerprint was readily recognizable as rank hearsay that did not fit within any exception of the hearsay rule, Appellate Counsel did not appeal the overruling of the objection on appeal.

### 2. Failure to Obey Court's Order Related to Sealed Portions of Transcript

In the Court of Appeals, Defendants' moved to review the sealed portions of the record in order to mount a challenge to the District's Court's *Brady* rulings. By order dated 28, 2003, the Court entered an order denying their request and directing them to:

---

[29]     Here again, these examples are representative.

App 1020

"...identify the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or *Jencks* act violation has in fact occurred.\*\*\*Any future arguments concerning the district court's application of *Brady* and or the *Jencks* Act should be presented in appellant's brief, rather than by motion."

Rather than comply with the Court's order, Appellate Counsel included a section in its Brief titled "The Court's response to *Brady* and *Jencks* Request was Lackadaisical."

### 3. *Failure to Raise Issue of Ineffectiveness on Appeal*

On appeal, Appellate Counsel relied on structural issues (except the issues related to Robert Smith) that had almost no chance of success and were indeed dismissed *per curiam*. Appellate Counsel chose to attack the Court as biased but failed to address the glowing deficiencies of trial counsel that were obvious in the record. Jones failure to move to strike the fingerprint identification as rank hearsay was obviously deficient performance, but Appellate Counsel failed to address it. With respect to the issues regarding Robert Smith, Appellate Counsel cited **Johnson v. Zerbst**, **supra**, but did not assert that the Court below rendered its opinion without argument on its applicability because the Trial Counsel failed to raise the issue.

46

## V.    INEFFECTIVENESS BY TRIAL AND APPELLATE COUNSEL

Coates was convicted of three counts of Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or about November 17, 1996 (Count's 34, 35, and 36). He was sentenced to 240 months on counts to be served consecutive to each other and all other counts. Although it is uniformly held that gun possession that is uninterupted merges, Trial Counsel did not raise this issue at sentencing or file a motion to correct the sentence. Matthews v. United States, No. 03-CF-432 (D.C. 2006); **Bruce v. United States,** 471 A.2d 1005 (DC 1984); **Monroe v. United States,** 600 A.2d 98 (DC 1991); **United States v Chalan** 812 F2d 1302 (1987, 10th Cir.). Appellate Counsel did not seek remand to merge the counts.

## VI.   PROSECUTORIAL MISCONDUCT

In reviewing the files and records that are currently available Counsel for Coates believes that the prosecutors engaged in deliberate misrepresentations and other misconduct but needs further investigation and a complete set of discovery, Giglio, Jencks and the sealed 302s. For example, the prosecution had asked Coates to stipulate to the fingerprints in reference to Anthony Pryor. In light of the earlier report saying no fingerprints of value and the claim that the car

47

had been disposed of, it is not surprising that the Government was concerned about getting the fingerprint admitted. When Coates refused to stipulate, it purposefully violated the rules of evidence and admitted the fingerprint identification as pure rank hearsay with no intention to later lay the foundation.

Counsel believes the Government made deliberate misrepresentations regarding the Condon Terrace counts.  For example the Government put on evidence regarding a fight between Condon Terrace and Southeast in summer of 1992 while Michael Jones was there for a court hearing in June of 1992. [30] It

[30]

Q. Was there a time in the summer of 1992, Mr. Gray, when you were down at the court building, D.C. Superior Court, in  connection with the case involving a friend of yours by the name of Mike?

A. Yes.

Q. Do you know Mike's full name?

A. Michael Jones.

Q. And what neighborhood was Michael Jones from?

A. Condon Terrace.

Q. When you went to the court building in Superior Court, did you go there by yourself or with other people?

A. With other people.

Q. The other people that went with you, what neighborhood were they all from?

A. Condon Terrace.

Q. When you got down there, did you see any people from Southwest?

A. Couple.

Q. Got to keep your voice up.

A. A couple of them.

Q. Okay.  Did anything happen between you and the peoplethat you were

App 1023

should be noted that it was Ms. Chaterverdi who supplied the date in her question. Counsel has reviewed the Superior Court records. According to Superior Court records, Michael Jones had a case pending in 1992, but that case was disposed of on March 20, 1992.

Counsel also notes that there was not one scintilla of evidence pointing to Coates involvement in the June 20, 1992 shooting or that Michael Jones was shot at. The Government asserted that Michael Jones was a victim in order to bolster its case for the shooting on June 28, 1992. Knowing that Michael Jones had said that Wayne Perry had shot him, the government sought to connect Coates to a non-existent earlier attempt on Jones life. Counsel also wants to investigate whether Mr. Ziedenberg had a good faith basis for his representation that Michael Jones told the police in the hospital that it was one of Wayne Perry's boys and Wayne Perry who shot Michael Jones.

The testimony of Detective Mitchell that Sowells named Coates on the date

---

      with versus the people that were from Southwest?
A.     We was about to get in a beef. ***
A.     I say, we was about to get in a beef.
Q.     What was about to happen? What was happening?
A.     A lot of arguments, this and that, and before, you know, we got into it, there, you know, police got involved with it.
(Tr.050801 p,9-10)

49

App 1024

of the shooting as his assailant makes absolutely no sense and Counsel intends to further investigate this as an instance of misconduct.

Finally, James Montgomery had told the Government that Sam Carson had killed Paul Ridley. Another man Steven R. DeWitt had been convicted of this murder and been incarcerated for 10 years. The fact that Montgomery was accusing Carson of a murder for which someone else had been convicted had the potential to seriously undermine Montgomery's credibility and the Government's. Although this was clearly *Brady,* the government elected to withhold this information until after the conviction of Coates.

### *MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE*

Mr. Coates was charged with the most serious offenses possible, four murders, two kidnappings, several shootings, RICO conspiracy and a Marijuana Conspiracy. He did not select his counsel. His counsel was appointed by the Court and clearly here, Counsel did not function in the manner required by the Sixth Amendment right to Counsel.

> "***Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding.*** The right to counsel plays a crucial role in the adversarial system embodied in the Sixth

50

App 1025

Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 276 (1942); see *Powell v. Alabama, supra,* at 68-69.\*\*\*

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.\*\*\*

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.\*\*\* When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.\*\*\* The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. *See Powell v. Alabama,* 287 U.S., at 68-69. \*\*\* Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is \*\*\*simply to ensure that criminal defendants receive a fair trial." **Strickland v. Washington**, 466 U.S. 668, ___ 1984)

Appellate Counsel was likewise ineffective for failure to raise on appeal

clear errors in the proceedings below. **Cirilo-Munoz v. United States** 404 F.3d

51

App 1026

527 (1st Cir. 2005); **United States v. Reinhart**, 357 F.3d 521 (5th Cir. 2004); **United States v. Skurdal**, 341 F.3d 921 (9th Cir. 2003); **Brown v. United States**, 167 F.3d 109 (2nd Cir. 1999); **Jackson v. Leonardo,** 162 F.3d 81 (2nd Cir. 1998); and **Roe v. Delo**, 160 F.3d 416 (8th Cir. 1998)

Mr. Coates further asserts that the government breached its obligation to the truth under **Mooney v Holohan** 294 U.S. 103 (1935); failed to disclose exculpatory information of **Kyles v. Whitley**, 115 S.Ct. 1555 (1995), **Brady v. Maryland,** 373 U.S. 83 (1963), **United States v. Agurs**, 427 U.S. 971 (1976), United States v. Bagley, 473 U.S. 667 (1985); **Strickler v. Greene**, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) and deliberately engaged in misconduct.

## CONCLUSION

For the foregoing reasons and for such other reasons as should appear from supplementation of the record, that this Court should grant a hearing, vacate Mr. Coates convictions on each and every count and vacate his sentence.

Respectfully submitted,

/s/

Veronice A. Holt, Esq. 183756
W111 3003 Van Ness, NW
Washington, D.C. 20008
(202) 244 - 2659

52

202-244-2659 tel
202-244-6242 fax
veroniceholt@msn.com

## ***CERTIFICATE OF SERVICE***

I HEREBY CERTIFY that on February 19 , 2008, a copy of the foregoing Motion Pursuant To 28 U.S.C. § 2255 To Vacate, Set Aside Or Correct Sentence wash and delivered to the office of Assistant United States Attorney Robert D. Okun, Chief, Special Proceedings Division, Room 10-836, 555 4th Street, N.W., Washington, D.C. 20530.

VERONICE A. HOLT

App 1028

Copies to: Judge
AUSA – Special Proceedings
Dft.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )          Crim. No. 98-329 (~~TPJ~~) *TFH*
                                   )
       v.                          )
                                   )          **FILED**
JEROME MARTIN,                     )
                                   )          FEB 1 8 2008
                Defendant          )
                                   )          Clerk, U.S. District and
                                                  Bankruptcy Courts

## MOTION TO VACATE, SET ASIDE, CORRECT SENTENCE PURSUANT TO 28 U.S.C. SECTION 2255

For the reasons set forth below, defendant Jerome Martin respectfully requests that the court vacate, set aside or correct his sentence. This motion is made pursuant to 28 U.S.C. section 2255.

## FACTS

### A. Procedural History

On September 18, 1998, Jerome Martin was charged along with several co-defendants in a multi-count indictment alleging a narcotics conspiracy, racketeering conspiracy, murder and other violent crimes, narcotics trafficking, and weapons offenses. A superseding indictment was filed on March 25, 2999. Trial began on November 15, 2000. A second retyped superseding indictment was filed on July 2, 2001, containing all the counts that were submitted to the jury. In July and August, 2001, the jury returned guilty verdicts against all defendants. Jerome Martin was convicted of Count 1, narcotics conspiracy, Count 2, RICO conspiracy, Count 8, first-degree murder while armed of Anthony Fortune, Count 9, assaulting a police officer with a dangerous weapon, Count 17, assault with intent to kill while armed of James Coulter, Count 18, attempted

App 1029

murder of James Coulter in aid of racketeering, Count 31, use of firearm during and in relation to attempted murder of James Coulter, Count 42, possession of firearm during crime of violence against James Coulter, and Counts 49, 53, 55, 64, related to marijuana trafficking.

Martin was sentenced under the then-existing mandatory determinate Federal guidelines system. Pursuant to that system the Probation Office calculated a sentencing guideline mandating life imprisonment and Martin was sentenced to that term.

On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed Martin's convictions. *United States v. Carson, et al.,* 372 U.S. App. D.C. 251, 455 F.3d 336 (2006).

The United States Supreme Court denied Martin's petition for writ of certiorari on February 20, 2007. *Samuel Carson, et al. v. United States,* Docket No. 06-9046.

## B. The Government's Evidence[1]

Martin and others were charged with a large-scale narcotics and RICO conspiracy. In furtherance of the conspiracy, Martin was alleged to have engaged in extensive narcotics trafficking and multiple acts of violence. By way of an overview, it was the prosecution's theory that Martin and the other defendants were lifelong friends who grew up during the 1980s in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage years they began selling drugs. By the early 1990s, the Government claimed, most of them were selling substantial quantities of marijuana, along with less significant quantities of other drugs. Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware

---

[1]Only such evidence as is necessary for an understanding of the issues raised in this Motion is recited herein.

2

App 1030

Avenue and K Street, SW. The Government charged that Martin and the other defendants ran these locations as cooperative markets in which they rotated serving marijuana to customers driving into the area from the D.C. Metro area. The prosecution depicted Vincent Hill as the leader of this "crew," and Martin as one of its members.

Government law enforcement witnesses testified to sales of marijuana by Martin in 1995 and early 1996 in the 200 block of K Street, SW, some of which were preserved on audio or videotapes. According to cooperating witnesses, Martin sold marijuana on K Street regularly during 1993 and 1994, and 1996 through 1998.

The Government also asserted that Martin and the other defendants engaged in ventures other than drug dealing, both for purposes of self-enrichment and protection. For example, through the testimony of informants and cooperating insiders, evidence was presented that Appellants sometimes committed kidnappings to fund weapons, drugs or living expenses. Witnesses testified that Martin and others were responsible for a number of acts of violence, some planned and others spontaneous. Martin, the other defendants, and their allies, in particular a group from 37th St., SE, which Martin was said to have organized, engaged in frequent confrontations ("beefs") with competing factions. Several witnesses attested to fights, drive-by shootings, and occasional homicides between the K St. And 37th St. members, on the one hand, and groups operating out of Condon Terrace and L St., SW (these being gangs of drug dealers that frequently warred with Martin and the others over control of territory). Other witnesses recounted instances where persons who had disrespected members of the K St. Group, such as the so-called 58th St. crew, were attacked.

Martin and the others were alleged to have resorted to force and violence where believed

3

App 1031

necessary to prevent rival drug dealers from operating in their territory. Sometimes this extended to acts intended to punish suppliers believed to have knowingly supplied inferior drugs or to have shortchanged some of them in transactions.

The Government claimed that Martin's marijuana selling in the 200 block of K Street, SW was related to several acts of violence occurring on 37th Street, S.E. and 58th Street, N.E., one of which was the killing of Anthony Fortune. Every Government witness who testified about the Fortune killing attributed it to a personal dispute between Martin and Fortune, and most attributed the dispute to Fortune trying to rob or actually robbing Martin at a craps game. Charlene Wilson, the only eyewitness to testify, said that Carson did the shooting, and that Martin drove Carson from the scene. Some cooperating witnesses testified that Carson admitted shooting Fortune, while others claimed that Martin did so. They, too, variously ascribed a singular motive for the shooting: a dispute arising from a crap game.

According to the Government's evidence, the Fortune shooting triggered a dispute between Martin and the 58th Street group. In that dispute, the 58th Street group killed Curtis Buchmon in retaliation for Fortune's killing. Martin and Buchmon were very close, and after his killing, Martin, Carson and Montgomery allegedly went gunning for the 58th Street group. There was a shootout between them and the 58th Street group, during which the police arrived. Martin and his associates exchanged gunfire with the police. Edwards, Burton and Jones came into the 37th Street area in a car with tinted windows, and Martin assumed they were with the 58th Street group. Concerned about a drive-by shooting, he gave Antonio Knight a gun, and Knight shot into the car, killing Edwards and wounding Burton and Jones.

Testimony was presented that accused Martin and the others of involvement in murders

4

App 1032

or shootings which supposedly were undertaken to track down or silence persons believed (correctly or otherwise) to be potential Government witnesses in prosecutions or grand jury investigations against members of the organization. One of the persons Martin was accused of shooting was James Coulter. According to the Government, in 1995, Vincent Hill complained to Martin and others that Coulter was "hot," and needed to be killed. On May 30, 1995, Coulter was shot. A cooperating witness was on the corner of Delaware and K Street when he heard Hill and Martin talking about Coulter's shooting. Hill told Martin that Martin should have used two guns, and asked why the gun jammed. Some time later, another cooperating witness overheard Martin talking with Coates and Carson about Coulter's shooting. Martin said that they were trying to say he had something to do with Coulter getting shot but they could not prove it because he had a mask on. Martin complained to another informant that he had tried to shoot Coulter at a crap game but his gun jammed.

After Martin was arrested for Coulter's shooting, he reportedly asked an informant to talk to Coulter and have Coulter give his investigator a statement about the shooting. The informant talked to Coulter twice at Martin's request; Coulter refused to give a statement, but said he was not going to come to court. Martin also asked the informant to contact a witness to the shooting, which the informant did. When neither man would give a statement, at Martin's request the informant showed Martin's uncle where Coulter and the eyewitness lived. Martin also asked an acquaintance who was in jail at the same time as Martin to contact the eyewitness and ask him to say that he did not know who shot Coulter, but that it was someone with a sweatshirt and a pistol at a crap game. Martin said that the eyewitness owed him a favor because his head was in the way when Martin shot Coulter, and if it was not for the witness, Coulter would be dead . Coulter

5

App 1033

gave a statement to a former attorney representing Martin that he did not see who shot him.

### C.  Constitutional Violations

#### 1.  Withholding of Exculpatory Evidence

The centerpiece of the Government's case against Martin was not drug trafficking, but violence - the shooting of Fortune and the 58th Street beef, and the shooting of Coulter as a potential witness.   Martin recently located a witness about whom he was unaware at the time of the trial of this case who was an eyewitness to the shooting of Anthony Fortune and who can testify under oath that the Government's twin theories that Martin shot Coulter himself, or that he had Carson do so, are wrong.   The witness, Steven Thomas, knows that Martin did not shoot Fortune.   He also describes Fortune's shooter as very dark complected, taller than Martin (whom he knows) and heavy set, which would eliminate Carson, who is light-complected, tall and thin, as the shooter.   Equally importantly, Steven Thomas was interviewed by police on the very evening of the Fortune shooting, and he told them the description of the man he had seen doing the shooting.   The police knew on the eve of the shooting that an eyewitness described the shooter as someone other than Martin or Carson.   The defense was never provided Steven Thomas' name, address or the exculpatory information he gave police.   The Affidavit of George Steel, the private investigator who interviewed Steven Thomas, is attached hereto as Exhibit A.

#### 2.  Impeding the Presentation of Martin's Defense

At the trial of this case, counsel for Jerome Martin sought to compel Coulter's attendance at the trial.   Based upon the sworn statement Coulter gave a former attorney for Martin, Martin did not shoot Coulter.   Counsel had a good-faith basis for believing that Coulter would exonerate Martin if he could be subpoenaed to testify at the trial.   The   Government represented

6

App 1034

that it did not know Coulter's whereabouts, or even if he was alive, at the time of the trial. The trial ended with verdicts in July and August, 2001. Just a few months later, sometime before February, 2002, the Government indicted Coulter in a major narcotics conspiracy in this court. Coulter was arrested on February 13, 2002. *United States v. James Christopher Coulter,* 02-mj-00104-AK (2/14/02). On February 14, 2002, the case before the magistrate judge was terminated because it merged into criminal case No. 02-074. Proceedings in the criminal case against Coulter are not available on PACER, and are presumably under seal. Martin intends to file a Motion with this court to unseal the proceedings, because the complaint and indictment in the case will likely reveal that the government was investigating Coulter for the months prior to his arrest in February 13, 2002 and that when the government represented to the trial court that Coulter had disappeared and could be dead, they knew his whereabouts, knew that he was alive and well, and subject to subpoena or writ of habeas corpus ad testificandum. The docket report from 02-mj-00104-AK is attached hereto as Exhibit B.

## ARGUMENT

### INTRODUCTION

A motion filed under 28 U.S.C. section 2255 must allege that (1) the judgment was imposed in violation of the Constitution, or (2) the judgment was imposed by a court lacking jurisdiction, or (3) the sentence imposed exceeded the statutory maximum, or (4) the judgment was otherwise subject to collateral attack. The suppression of evidence favorable to the accused is a ground for relief under the statute; likewise, prosecutorial misconduct is a ground if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States,* 334 F.3d 140, 148 (1st Cir. 2003).

7

App 1035

## I.   THE GOVERNMENT VIOLATED MARTIN'S RIGHT TO DUE PROCESS OF LAW BY WITHHOLDING EVIDENCE OF HIS INNOCENCE OF THE ANTHONY FORTUNE MURDER.

Suppression of evidence favorable to an accused and material to guilt or innocence is a violation of Martin's right to due process of law, guaranteed by the Fifth Amendment to the United States Constitution. *Brady v. Maryland*, 373 U.S. 83 (1963). If the evidence suppressed is material, that is, its suppression undermines confidence in the outcome of the trial, a new trial is warranted. *United States v. Bagley*, 473 U.S. 667 (1985). The question is not whether a different verdict would more likely than not have resulted if the suppressed evidence had been available to the defense, but whether in the absence of the evidence, Martin received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 4343 (1995). Materiality of evidence is assessed cumulatively, not item by item. *Id.* at 436.

There are three components of a *Brady* violation: (1) the withheld evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263 (1999). The government's duty to disclose evidence extends beyond material in the possession of the prosecution. The prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police. *Kyles v. Whitley*, 514 U.S. at 437.

The petitioner need not show that after discounting inculpatory evidence in light of the undisclosed evidence, there would not be enough evidence to convict. The possibility of acquittal on a criminal charge does not imply an insufficient evidentiary basis for a conviction. The law makes it easier to obtain a new trial where the government engineered an unfair trial by

8

App 1036

withholding material exculpatory to the accused. *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005), citing *Kyles v. Whitley*, 415 U.S. at 434-35.

The "reasonable probability" standard can be problematic, as noted by our circuit in *United States v. Bowie*, 198 F.3d 905, 908-09 (D.C. Cir. 1999):

> "What is a 'reasonable probability'? Probability is often expressed in terms of percentages, with 100% representing certainty. We know, because the Supreme Court has told us, that a 'reasonable probability' can be less than 50.01%. In other words, to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed. *See Kyles*, 514 U.S. at 434. We are also sure that a 'reasonable probability' is somewhat greater than 1%. How much greater? Enough, the Supreme Court says, to 'undermine confidence in the verdict,' *id. at 435,* which may lead us in a circle: one cannot be confident of the outcome when there is a 'reasonable' probability that it may be wrong, and a 'reasonable' probability is one high enough to undermine confidence in the outcome."

Another circuit explained it thusly: The "sufficient to undermine confidence in the outcome" formula means that reversal will be warranted even if there is less than an even chance that the withheld evidence would produce an acquittal. The petitioner is not required to show that a different outcome is certain with the presentation of the evidence. The value of the withheld evidence is evaluated in context of the entire record to determine materiality. *Conley v. United States*, 415 F.3d at 188. Put another way, the petitioner need only show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (*en banc*), citing *Kyles v. Whitley*, 514 U.S. at 435.

Once the court finds a *Brady* violation, meaning that non-disclosure of the evidence is so serious that there is a reasonable probability that the suppressed evidence would have produced a

9

App 1037

different result, the court must grant a new trial. *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *In re Sealed Case*, 285 F.3d 887, 892 (D.C. Cir.1999).

In the instant case, the only direct evidence linking Martin to the murder of Anthony Fortune came from a witness named Charlene Wilson. Ms. Wilson claimed to be an eyewitness to the shooting, that Sam Carson shot Fortune and that Martin drove Carson from the scene of the murder. Very late in the trial, well after Wilson testified, the defense stumbled on withheld *Brady* material, in the form of the notes of a police officer who had interviewed Wilson right after the shooting. To that officer, Wilson said she heard about the murder later but was not actually present at the scene. The police officer attempted to explain Wilson's contradictory statements by saying that he created a false report to shield Wilson's identity. In addition to Wilson's contradictory versions of events, the government called several informants who claimed that Martin confessed to shooting Fortune, that Carson confessed to shooting Fortune, and that one goaded the other to do the deed.

In Steven Thomas' statement, we have an unrelated eyewitness who exonerates Martin as the shooter and who identifies the perpetrator in a way that eliminates Carson as the shooter. The evidence is clearly material, applying the case law developed by the Supreme Court and by our circuit. According to Thomas, his evidence was made known to the police on the night of the Fortune murder. The evidence was therefore in the government's possession as early as the night of the shooting. The evidence was never made available to the defense. Because the evidence was withheld, Martin was precluded from calling a witness who would have testified that he and Carson were innocent of the shooting. The evidence creates a reasonable probability, a probability sufficient to undermine confidence in the verdict, that a different result

10

would have obtained at trial had the evidence been available. The government used the Anthony Fortune shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy. Had evidence of Martin's innocence of the Fortune shooting been available to the jury, the result of the entire proceedings, not just the count involving Fortune, would have been different. Martin is entitled to a new trial.

**II.     THE GOVERNMENT IMPEDED THE PRESENTATION OF MARTIN'S DEFENSE ON THE CHARGE OF SHOOTING JAMES COULTER.**

The government violated Martin's right to Due Process of law when it impeded his counsel from procuring the testimony of James Coulter at the trial of this case. Defense counsel could not locate Coulter to subpoena him to trial, and petitioned the trial court for assistance in securing his presence. The government claimed to have no knowledge of Coulter's whereabouts. The government even suggested to the trial court that Coulter was deceased. On information and belief, around the time the government was making these representations to the court and counsel, Coulter was the subject of a prosecution by the United States Attorney's Office, and a federal Grand Jury investigation into narcotics trafficking. He was indicted for narcotics trafficking and arrested on February 13, 2002, six months after verdicts in the case. *See, United States v. James C. Coulter*, 02-mj-00104-AK, consolidated with Criminal Number 02-074. According to the docket sheet in 02-mj-00104-AK, the government sought detention after Coulter's arrest on February 13, to "permit revocation of conditional release, deportation or exclusion." Since there is no evidence that Coulter is an alien, in his case the revocation would have been based on the fact that he was on conditional release. The government would necessarily have known of the case in which he was on conditional release, since the government

11

would be the prosecuting authority in that case.[2]

Because the representations of the government at the trial of the instant case that it lacked knowledge of Coulter's whereabouts, and that he could be deceased, were false, and because the government's conduct prevented petitioner from securing Coulter's testimony at trial, the govern-ment violated petitioner's Due Process rights. Prosecutorial misconduct is a ground for relief under 28 U.S.C. section 2255 if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States,* 334 F.3d 140, 148 (1st Cir. 2003).

Coulter gave petitioner's counsel a signed, witnessed statement that Martin did not shoot him. Based upon that statement, Martin would have called Coulter to testify in his defense if he could have located him and placed him under subpoena, or if he was incarcerated, petitioned the court for a writ of habeas corpus ad testificandum. The government's conduct prevented Martin from presenting exculpatory evidence. If that evidence had been available, it is unlikely the jury would have convicted Martin of the four counts in the indictment related to Coulter. As with the Anthony Fortune shooting, the government used the Coulter shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy. Had evidence of Martin's innocence of the Coulter shooting been available to the jury, the result of the entire proceedings would have been different. Martin is entitled to a new trial as a result of the government's conduct which deprived him of Due Process of law.

## CONCLUSION

For all the above reasons, and any others that may appear to the court at a hearing on this

[2]A check of PACER reveals that the criminal case with which the magistrate case was consolidated is not available for public inspection. Petitioner will seek discovery, including an Order from this court unsealing the court records to permit the full development of this claim.

12

Motion, petitioner respectfully requests, pursuant to 28 U.S.C. section 2255, that the court

vacate, set aside or correct his sentence and grant him a new trial.

Respectfully submitted,

Jerome Martin, *Pro Se*
Federal Register Number 18894-083
USP Hazelton
PO Box 2000
Bruceton Mills, WV   26525

## CERTIFICATE OF SERVICE

I, Jerome Martin, appearing *pro se* in the instant case, DO HEREBY CERTIFY

that I have this day served a copy of the foregoing Motion to Vacate, Set Aside or Correct

Sentence Pursuant to 28 U.S.C. section 2255, by depositing a copy in the United States Mail,

postage prepaid, addressed to Jeffrey Taylor, United States Attorney, 555 4th Street, NW,

Washington, DC 20530, this the — day of February, 2008.

Jerome Martin, *Pro Se*

13

App 1041

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Crim. No. 98-329 (TPJ)** |
| **v.** | ) | |
| | ) | |
| JEROME MARTIN, | ) | |
| | ) | |
| **Defendant** | ) | |

## A F F I D A V I T

I, George Steel, do hereby aver and say, upon penalty of perjury, that:

1. My name is George Steel. I reside in Frederick, Maryland. I am a private investigator and I work in the District of Columbia on cases where I am retained by the parties and on cases where I am appointed by the courts.

2. I am a former detective with the Metropolitan Police Department of the District of Columbia.

3. I was retained to conduct a post-conviction investigation in the case of *United States v. Jerome Martin.*

4. In the course of my investigation, I interviewed Steven Thomas, who resides in Maryland.

5. Mr. Thomas advised me of the following:

a. He knows Jerome Martin and knew Anthony Fortune.

b. In August 1991, he was present on 58th Street in Washington, D.C. when Anthony Fortune was shot and killed.

c. He saw the person who shot Anthony Fortune. He knows Jerome Martin and knows that Jerome Martin was not the person who shot Fortune.

d. The person who shot Fortune was very dark-complected, stocky and taller than Jerome Martin.

e. On the evening of the Fortune shooting, police officers interviewed him as an

eyewitness to the shooting. He described the shooter to the officers and gave them the same information about the shooter that he gave to me. He was never called by the government to testify about Fortune's killing.

I swear upon penalty of perjury that the foregoing information is true and accurate to the best of my knowledge.

This the 18 day of February, 2008.

George Steel

App 1043

CLOSED

## U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:02-mj-00104-AK-1

Case title: USA v. COULTER                    Date Filed: 02/14/2002

Assigned to: Magistrate Judge Alan Kay

**Defendant (1)**

**JAMES CHRISTOPHER COULTER**
*TERMINATED: 02/14/2002*

**Pending Counts**                    **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                 **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                        **Disposition**

Complaint filed in violation of 21:841(a)(1)

**Plaintiff**
**UNITED STATES OF AMERICA**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2002 | | DEFENDANT JAMES CHRISTOPHER COULTER arrested. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 1 | MAGISTRATE COMPLAINT and Affidavit filed against JAMES CHRISTOPHER COULTER in violation of 21:841(a)(1). (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | PDID AND DATE OF BIRTH for JAMES CHRISTOPHER COULTER : PDID #: 386-197 DOB: 1/10/69 (jdc) (Entered: 02/15/2002) |

App 1044

Case 1:98-cv-03209-RCL Document 137-28   Filed 02/18/08  Page 89 of 144

| 02/14/2002 | | Prison Registration Number for JAMES CHRISTOPHER COULTER : Reg.#: 24717-016. (jdc) (Entered: 02/15/2002) |
|---|---|---|
| 02/14/2002 | | INITIAL APPEARANCE on magis complaint for JAMES CHRISTOPHER COULTER held before Magistrate Judge Alan Kay : Attorney appearance for JAMES CHRISTOPHER COULTER by Tony Axam. Detention hearing set for 9:30 2/15/02 for JAMES CHRISTOPHER COULTER ., Defendant committed/commitment issued. Pro-typist, Inc.; Tape & Lines: Courtroom 7) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | DEFENDANT(S) JAMES CHRISTOPHER COULTER ordered held without bond by Magistrate Judge Alan Kay . (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 2 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention pending hearing pursuant to Bail Reform Act (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 3 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention to permit revocation of conditional release, deportation or exclusion (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | Magistrate case closed as to JAMES CHRISTOPHER COULTER. Merged into criminal case no. 02-074. (erd) (Entered: 02/19/2002) |
| 02/15/2002 | | DETENTION HEARING before Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : Bond set to HWOB. Criminal indictment has been filed against the defendant and assigned to Judge Robertson. Defendant committed/commitment issued. Court Reporter: Courtroom 7 (jdc) (Entered: 02/15/2002) |
| 02/15/2002 | 4 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : committing defendant to the custody of the U.S. Attorney General. (N) (jdc) (Entered: 02/15/2002) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02 18 2008 12 31 32 | | |
| **PACER Login:** jh0114 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1 02-mj-00104-AK |
| **Billable Pages:** 1 | **Cost:** | 0.08 |

App 1045

Copies to: Judge
AUSA – Special Proceedings
Dft.

AO 243
REV 6/82

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

United States District Court

District
District of Columbia

| Name of Movant | Prisoner No. | Docket No. |
|---|---|---|
| SAMUEL CARSON | 01182-748 | 98-329 TPJ |

Place of Confinement
USP LEWISBURG

(include name upon which convicted)

UNITED STATES OF AMERICA     V.     SAMUEL CARSON

(full name of movant)

**FILED**

**FEB 2 8 2008**

Clerk, U.S. District and
Bankruptcy Courts

MOTION

1. Name and location of court which entered the judgment of conviction under attack ____ District of Columbia

Circuit, Washington D.C.

2. Date of judgment of conviction ____ January 30, 2002

3. Length of sentence ____ Life and 220 Years

4. Nature of offense involved (all counts) ____ Drug conspiracy in violation of 21 U.S.C. §846

Rico Conspiracy in violation 18 U.S.C. §1962(d); and VICAR in violation

18 U.S.C. § 1959

5. What was your plea? (Check one)
   (a) Not guilty ☒☒
   (b) Guilty ☐
   (c) Nolo contendere ☐

If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

**N/A**

6. Kind of trial: (Check one)
   (a) Jury ☒☒
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☐ No ☒☒

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

(2)

App 1046

AO 243
REV 6/82

9. If you did appeal, answer the following.

   (a) Name of court ____ D.C. Court of Apppeals _____

   (b) Result ____ Affirmed _____

   (c) Date of result ____ July 21, 2006 _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

   (a) (1) Name of court _____ N/A _____

     (2) Nature of proceeding

     (3) Grounds raised _____ N/A _____

N/A

     (4) Did you receive an evidentiary hearing on your petition, application or motion?
       Yes ☐ No ☐

     (5) Result _____ N/A _____

     (6) Date of result _____

   (b) As to any second petition, application or motion give the same information:
     N/A
     (1) Name of court _____ N/A _____

     (2) Nature of proceeding _____

     (3) Grounds raised _____ N/A _____

(3)

App 1047

AO 243
REV 6/82

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____ N/A _____

(6) Date of result _____

(c) As to any third petition, application or motion, give the same information:

(1) Name of court _____

(2) Nature of proceeding _____ N/A _____

(3) Grounds raised_____

_____

_____                                    N/A

_____

___

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result _____ N/A _____

(6) Date of Result

(d) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

(1) First petition, etc.      Yes ☐ No ☐
(2) Second petition, etc.     Yes ☐ No ☐          N/A
(3) Third petition, etc.      Yes ☐ No ☐

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

___

N/A

___

12. State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(4)

App 1048

AO 243
REV 6/82

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: **The Petitioner Was Deprived His Sixth Amendment Right To Effective Assistance of Counsel**

Supporting FACTS (tell your story *briefly* without citing cases or law:

**A) Failure to Investigate; B) Failure to Object to Inadmissable Evidence**

**See Attached Memorandum of Law and Facts**

B. Ground two: **Sentence Imposed in Violation of The United States Constitution**

Supporting FACTS (tell your story *briefly* without citing cases or law): 

**See Attached Memorandum of Law and Facts**

C. Ground three: **Newly Discovered Evidence Establishes That The Petitioner Was Denied His Fifth Amendment Right To Due Process**

Supporting FACTS (tell your story *briefly* without citing cases or law): 

**See Attached Memorandum of Law and Facts**

(5)

App 1049

AO 243
REV 6/82

D  Ground four _____

N/A

Supporting FACTS (tell your story *briefly* without citing cases or law) _____

N/A

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

     Ineffective assistance of counsel claims are to be raised on appeal; appellate counsel ineffective for not raising sentencing issues; New evidence established due process violations.

14  Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒

15  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:    Joseph Beshouri and Lexi Negin-Christ 419 7th Street N.W.

(a) At preliminary hearing
Washington, D.C. 20004

(b) At arraignment and plea ___ Same

(c) At trial ___ Same

(d) At sentencing ___ Same

(6)

App 1050

AO 243
REV 6/82

(e) On appeal — Paul Rosenzweig 214 Massachusetts Avenue., N.E. Washington D.C. 20002; /

Edward Sussman 601 Pennsylvania Ave., N.W. South Building, Washington D.C. 20004 (Certiorari)

(f) In any post-conviction proceeding _____

N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes XX No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No XX

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

N/A

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No XX

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____ N/A _____

Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

_February 18, 2008_
(date)

Samuel Carson
Signature of Movant

App 1051

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

## DEFENDANT CARSON'S MOTION FOR DISCOVERY

Pursuant to Rule 6 of the Rules Governing Section 2255 cases, Defendant Carson hereby requests this Honorable Court to order discovery in this matter.  The Supreme Court has said that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is …entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry."  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) ellipsis in original; quoting *Harris v. Nelson,* 394 U.S. 286, 300 (1969).

In support of the motion, Mr. Carson offers the following:

1.  Mr. Carson was convicted of 21 counts of the indictment in this matter including Counts 35, 36 and 37 involving the use of a firearm in relation to the murder of Alonzo Gaskins (35), Darnell Mack (36) and Melody Anderson (37).  The murder of these individuals will hereinafter be referred to as the "triple murder" for purposes of this motion.
2.  As part of the investigation of the triple murder that took place in late November, 1996, witnesses were brought to testify before a Prince George's County (hereinafter PG County) grand jury and also interviewed by PG County Police Officers.  Federal Officers also questioned at least one individual, and possibly more, regarding the triple murder investigation
3.  As part of the triple murder investigation, two witnesses, John Pickney and Cheree Owens, testified on December 10, 1996 before a PG County grand jury regarding the triple murder.  In this testimony Pickney and Owens implicated an individual named Dennis Green in the triple murders and not Mr. Carson or any of his associates. (Government's Brief on Appeal at p. 174).
4.  "When Pickney and Owens came to the police with this information, they were provided with a substantial amount of money for their relocation, which was

1

App 1052

meant to last several weeks. The couple went through the money in a matter of days and then demanded additional funds." (Id at 175).

5. Police learned that Pickney and Owens owed Green money for drugs. After further investigation, investigators found nothing to corroborate their story, and shortly thereafter Pickney and Owens disappeared. (Id. citing Joint Appendix 1002 n. 1).

6. At approximately the same time, the federal government, by and through the Federal Bureau of Investigations (FBI), arrested Robert Smith on December 5, 1996. It was at this time that Smith began providing information about the triple murder to the federal government. (Id at. 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pickney and Owens testified. (Id. citing Agent Lisi 5/29 Tr. 9-10, 12-13).

7. On Friday, November 22, 1996, 18 days prior to the testimony of Pickney and Owens, The Washington Post published a story regarding the investigation of the triple murder. In that story Prince George's County Police Chief John S. Farrell stated that, "agents from the FBI and the Drug Enforcement Administration have joined the probe into two incidents that appear linked—a triple homicide in Temple Hills on Sunday and a fatal drive-by shooting nearby of a Waldorf man on Wednesday." (See Attachment A, Washington Post, November 22, 1996, Metro Section, "Prince George's Police Seek Clues to Five Killings; U.S. Joins Probe of Four That Appear Linked.")

8. At some point, according to the federal government, "investigators had determined that Pickney and Owens were likely using police and prosecutors for their own gain." (Government's Brief on Appeal at 182.)

9. The United States Attorney's Office in Washington, D.C. (USAODC) indicted Mr. Carson for the triple murder based in part on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138)

10. There appears to be no record of a prosecution of Pickney and Owens for obstruction of justice or theft of government funds that was brought by Maryland state authorities or federal authorities.

11. At his trial, Mr. Carson sought to introduce the grand jury testimony of Pickney and Owens indicating that another person, not Mr. Carson and his associates, was responsible for the triple murders. However, because these witnesses could not be located at the time of the trial, Mr. Carson sought to introduce their grand jury testimony under Rule 804 of the Fed. R. Evid., "Exception to the Rule Against Hearsay – When the Declarant is Unavailable as a Witness."

12. Rule 804(b)(1) provides, in pertinent part, that testimony is not hearsay if it "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and is now offered against a party who had – or, in a civil case, whose predecessor in interest had--- an opportunity and similar motive to develop it by direct, cross -, or redirect examination." Fed. Rule Evid. 804(b)(1).

13. Finding that there was "an absence of an identity of motive on the part of the government," in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175).

14. Mr. Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." (*United States. v. Carson*, 455 F. 3d 336 at 372).

15. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know everything we [had] on the triple murder." (Id.). The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

Mr. Carson hereby requests any and all documents relating to the triple murder investigation by the FBI, DEA and PG County Police Department. In doing so, Mr. Carson seeks to demonstrate a deep connection between the Maryland authorities and the United States government throughout the investigation of Mr. Carson and his associates, including, but not limited to the triple murder in Maryland. Mr. Carson hopes to show, through the use of these documents, that the Maryland authorities acted with the full knowledge of the United States when paying Pickney and Owens when locking in their testimony in the grand jury, disregarding this testimony once it was in conflict with another theory that helped build a larger case against Mr. Carson and his associates, and failing to pursue charges against Pickney and Owens or seek reimbursement for funds paid to these individuals.

Mr. Carson requests the following documents as part of this motion:

1. Any cooperation agreements between the government (PG County or federal Government) and the witnesses Pickney and Owens. Also any payment receipts or records documenting funds paid to these witnesses. Specifically, documents

3

showing the source of funds paid to Pickney and Owens for their testimony in the triple murder case and the dates of such payments, the terms and conditions of these payments and the stated purposes for these payments.

2. Any documents relating to the dismissal of the triple murder in PG County including any government documents stating the official reasons for no longer seeking prosecution for this matter in PG County. Additionally, Mr. Carson seeks the identity of the "investigators" who determined that "Pickney and Owens were likely using the police and prosecutors for their own gain." (Government's Appellate Brief at 175).

3. Agent Lisi's grand jury testimony with reference to the triple murder, including but not limited to any testimony given in PG County, if any exists, as well as his testimony given to the grand jury in DC seeking indictment of the triple murder as part of the indictment charged in this case.

4. Testimony of any other federal agents in the PG County grand jury in connection with the triple murder indictment in that jurisdiction. Also, any testimony by PG County Police in the PG County grand jury that references FBI operations or cooperation, DEA cooperation or any other federal involvement in the investigation of the triple murder.

5. Any FBI 302s, DEA 6s and PG County police reports relating to the triple murder beginning as early as October 1996. This includes a request for the names of agents working on this investigation for and United States Federal Government Agencies. This would include any reports generated during the investigation prior to the testimony of Pickney and Owens as well as those generated after Smith was arrested and began cooperating with the federal authorities regarding the triple murder. Additionally, Mr. Carson requests any FBI 302s that discuss the existence of Pickney and Owens, their testimony in the PG County grand jury and whether this was discussed with Smith at the time of his multiple debriefings. This would also include rough notes of the debriefing sessions in which this topic was discussed.

6. Mr. Carson requests any PG County police reports or FBI 302s generated in this matter after the case was dismissed in favor of the federal prosecution. Specifically, this would include any 302s generated on the whereabouts of Pickney and Owens and any attempt, or lack thereof, to charge them with perjury or obstruction of justice for presenting false testimony in a grand jury proceeding. This would also include any attempts to recover the funds paid to them in connection with their "relocation" and/or testimony in the PG grand jury.

7. Any agreements between the Federal Government and the State of Maryland regarding the dismissal of charges in Maryland in favor of the RICO indictment in Federal District Court in Washington, D.C. This would include any and all formal and informal agreements discussed by both parties attesting to this arrangement.

8. Mr. Carson seeks access to and/or a copy of the original trial and court exhibits in this case. A copy of the Government's exhibit list from the trial is also requested.

The documents requested by Mr. Carson have several possible functions. First, they

may reveal the existence of a united purpose between the government entities, PG County

4

and USAODC and FBI, such that these entities should be treated as possessing a similar motive in developing the testimony at the time of the grand jury. Payment records and FBI 302s may show deep involvement by the federal government in not only procuring the testimony of Pickney and Owens, but also contributing to the unavailability of these witnesses for trial by payment of funds to these individuals for the purpose of relocation and the subsequent failure to pursue charges against these individuals once it was determined they had provided false testimony in exchange for these payments. Secondly, they may serve to show that evidence of the relationship between these entities was improperly withheld from Mr. Carson at the time of trial, thereby severely hampering his ability to present this exculpatory evidence in his defense, thus resulting in a violation of his Constitutional rights.

If such claims can be established, Mr. Carson may then be entitled to relief. Any claim by the government that this evidence was not produced at trial because of privilege or immateriality raises serious Brady concerns and such evidence would be considered "new evidence" for purposes of any 2255 motion. Moreover, if the evidence was produced at the time of trial, and tended to establish the needed relationship between the entities, its existence, and trial and appellate counsel's failure to use it, may form a basis for Mr. Carson's possible claims regarding ineffective assistance of counsel.

In an effort to the find these documents in the record undersigned counsel for Mr. Carson has:

1. Reviewed the files received from Mr. Carson's previous attorneys appointed on this case, including one red well of documents and correspondence from the previous court appointed attorney for this 2255 motion. Additionally, an exhaustive review of a warehouse room full of documents in the possession of appellate counsel was conducted and several boxes of documents were obtained, none of which included the documents sought by Mr. Carson.

5

2. An exhaustive review was conducted of the entire record at the United States District Court Clerk's Office.

3. Undersigned counsel met with Mr. Carson's trial counsel, Mr. Joe Beshouri. Mr. Beshouri did not recall specifically whether such materials were turned over at trial, but felt that they would be in the possession of appellate counsel if they had indeed been turned over by the government.

4. Undersigned counsel has consulted counsel for the government, AUSA Margaret Chriss, regarding discovery. Government's counsel was uncertain whether discovery of the requested documents would be appropriate or within the scope of informal discovery. She suggested a more formal discovery request be made in the form of a discovery motion with the court. This motion serves as a formal discovery request for the documents Mr. Carson seeks.

5. Undersigned counsel is also unable to locate the original trial exhibits and court exhibits in this case despite reviewing the entire record at the clerk's office.

Accordingly, this discovery request is the only method left to obtain these documents at this time and constitutionally protect Mr. Carson's rights. In light of the foregoing, the undersigned counsel asks that this Court grant Defendant Carson's Motion and order the requested discovery needed to adequately prepare his 2255 challenge.

Respectfully submitted,


_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

6

**Certificate of Service**

I hereby certify that on this 16th day of April 2012, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:

/s/ _____
Kira Anne West

App 1058

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

**DEFENDANT CARSON'S REPLY MOTION FOR DISCOVERY**

Pursuant to Rule 6 of the Rules Governing Section 2255 cases, Defendant Carson

hereby requests this Honorable Court to order discovery in this matter. The Supreme

Court has said that "where specific allegations before the court show reason to believe

that the petitioner may, if the facts are fully developed, be able to demonstrate that he is

…entitled to relief, it is the duty of the court to provide the necessary facilities and

procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)

ellipsis in original; quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969).

The evidence before this Court is more than pure conjecture or wishful thinking

on the part of Defendant. It is uncontroverted that the two individuals placed in front of a

grand jury in Prince George's County testified that other persons, not Defendant Carson,

were involved in the triple murders for which is he tried and convicted. The facts show

that these testifying individuals were paid a large sum of money for testimony in this case

by the government. Whether this was given as compensation for their testimony,

relocation expenses or "pay off" money to make them disappear after their testimony was

no longer convenient to the government's theory of the case is unclear. Which

government entity provided those funds, signed off on their disbursement and authorized

1

the payments is also unclear.  Why these individuals faced no consequences for their allegedly false testimony is also a mystery.

Based upon the record currently available to Defendant Carson, and additional information submitted to this court showing a joint investigation ongoing at the time of the Grand Jury testimony, discovery is warranted to further show severe Brady violations occurred in this case, which materially impacted Mr. Carson's defense at trial. Defendant has reason to believe that, according to the timeline currently in the record, the following facts demonstrate a threshold showing that Discovery is warranted in this case and if ordered, would give rise to facts demonstrating he is entitled to relief.

1. The triple murder was committed late November of 1996.

2. On November 22, 1996, Prince George's County Police Chief, John S. Farrell, told the Washington Post that this investigation was a joint investigation of the Federal Bureau of Investigations (FBI), Drug Enforcement Administration, and the Prince George's County Police Department.

3. On December 5, 1996, The FBI, arrested Robert Smith and began questioning him concerning criminal activities and the K Street organization.

4. On December 10, 1996, two witnesses, Pickney and Owens, were placed in front of a Grand Jury and testified at that time that other persons, not Defendant Carson were responsible for the triple murder.

5. The Government gave these individuals a large sum of money that they used up in a short period of time and then came back to ask for more.

2

6. There is no evidence that once it was determined that these individuals had lied to the Grand Jury, as believed by the Government, that they were ever prosecuted for perjury or even asked to return the money given to them in connection with this testimony.

7. Mr. Carson was subsequently indicted for these triple murders based on testimony supplied by Robert Smith, the FBI's cooperating witness.

8. Regardless of the time in which the Federal Government fully learned from Smith this evidence upon which it relied upon to seek indictment, it at the very least, knew or should have known through its own "joint investigation" that a differing theory of events had been reported by other witnesses in Prince George's County.

9. Once Carson was indicted on these charges, the Federal government was aware at that time of Brady material with regard to this charge in the indictment as pertaining to Carson.

10. The government's responsibility to provide that Brady material attached at this time and failure to do so created a delay which materially hindered the Defendant's ability to locate those witnesses at the time of his trial so that they could testify in person. The Government had years to seek out and investigate the theory's credibility and dismiss it as unreliable if that was indeed the case. Instead, the federal government presumably did nothing. It distanced itself from the Prince George's County investigation when it was inconsistent to it's own theory of events (when the evidence showed someone else responsible other than Carson).

3

11.    Finally, at trial evidence of the government's failure to prosecute Pickney

and Owens and their payments for "relocation" are tantamount to the

government being responsible for the unavailability of these witnesses at

trial.  Using this unavailability to shield themselves from the evidence of

their own creation by claiming a fictional divide in the investigation at

the time of the Grand Jury violates Mr. Carson's constitutional rights.

Discovery is sought in this case to show that Mr. Carson's rights under the

Constitution were violated when he was denied the true information surrounding the

testimony of these individuals and their payments made by the government in connection

with such testimony.   Moreover, this evidence may help to form his claim of ineffective

assistance of counsel against his trial and appellate counsel.    The Government argues

that such evidence would be used only to try and revisit the ruling by the District Court

regarding the use of such testimony at trial.  This is incorrect.  Mr. Carson believes a

much larger problem exists with regard to the disclosure of Brady Material in this case

and specifically as it pertains to this triple murder evidence.  Discovery is needed to

support this claim in his §2255 motion.

Defendant Carson believes that there is a fundamental fairness that has been

breached by the Government in this case.   The inconvenient fact is that PG County

created Brady evidence that directly impacted a bigger case they sought somewhere else

against bigger fish, Mr. Carson and his associates.  That however, did not excuse them

from the duty to turn that material over in a timely manner and deal with it properly.  If

disclosure had happened promptly, these witnesses might have been located in time to

testify at the time of trial.  They could have presented their testimony and been

impeached with whatever investigative work the government had done regarding their false testimony. The lack of such investigative work, or consequences for these witnesses' believed false testimony, would also have been probative to the case on several levels. It would have spoken volumes about the manner in which the "paid" witnesses in this case were expected to behave and the consequences they faced for lying. Since most, if not all of the government witnesses in the case were paid, this would have had a huge impact at trial. More directly, the evidence would have called more scrutiny upon the reliability of Mr. Smith's version of events regarding the triple murder.

Mr. Carson's constitutional rights have been directly impacted by the very federal government that claims it had nothing to do with the PG County Grand Jury testimony. The government claims that once the grand jury testimony happened, and they weren't there to be a party to it, their obligations ended. That is not the case, especially in light of their continuing financial and investigatory involvement in the triple murder investigation and their continuing Brady responsibilities. This arbitrary line in time did not forever cut off the federal government's responsibilities to protect the constitutional rights of Mr. Carson. What Mr. Carson seeks here is the opportunity to examine the documents surrounding this triple murder. At this juncture, it is clear Mr. Carson has presented the threshold showing needed to allow discovery of these documents.

Respectfully submitted,

_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

5

App 1064

**Certificate of Service**

       I hereby certify that on this 12th day of July 2012, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:

/s/ _____
Kira Anne West

7
App 1065

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SEAN COATES, et al.,
     Defendant,

vs                                    Criminal No. 98-329-6(RCL)

UNITED STATES OF AMERICA,
     Respondant.

**FILED**

DEC - 3 2012

Clerk, U.S. District & Bankruptc
Courts for the District of Columbi

### DEFENDANT'S REQUEST FOR JUDICIAL REVIEW

Now Comes, Sean Coates, hereinafter, Defendant, pro se., to respectfully request a judicial review of the Federal Bureau of Prisons (BOP) justification for an administrative separation order on this Defendant and his co-defendants Samuel Carson, Vincent Hill, William Sweeney and Jerome Martin.

### STANDARD OF REVIEW

In this cause, Defendant is proceeding pro se. A pro se litigant's pleadings are to be construde liberally and held to a less stringent standard than formal pleadings drafted by lawyers. See Haines v. Kerner, 404 U.S. 519,520-21, 30 L.Ed.2d 652, 92 S.Ct. 594(1972); see also Estelle v. Gamble, 429 U.S. 97,106, 50 L.Ed.2d 251, 97 S.Ct. 285(1976). A court should make a reasonable attempt to read the pleadings to state a valid claim on which the defendant could prevail, despite the defendant's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with the pleading requirements

1

RECEIVED
Mail Room

DEC - 3 2012

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

App 1066

CASE HISTORY

In 2002, the district court sentence the defendants to lengthy terms of imprisonment. Each recieved at least a life sentence. Each also received consecutive sentences beyond life imprisonment. In setting these sentences, the district court made no statements regarding these defendants' being separated from each other within the BOP. In July 2008, the defendants attempted to have the BOP remove any separation orders between them in order that they be able to collaberate their legal issues. This motion was denied by Judge Thomas F. Hogan, due to the lack of jurisdiction. In July 2012, this Defendant again filed a motion to this Court requesting the courts assistance in have the BOP remove all separations orders between the defendants in this case. On July 13, 2012, the Honorable Royce C. Lamberth, Chief Judge, US District Court ORDERED that the defendant's motion is denied without prejudice to appropriate judicial review following exhaustion of administrative remedies. On October 9, 2012, this Defendant exhausted all of the BOP administrative remedies and therefore presents this cause of action.

JUDICIAL REVIEW

This court has long noted the general presumption that agency action is subject to judicial review unless Congress manifests "clear and convincing evidence' of intent to foreclose such review, id. at 758 [citing Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681(1967)), and reviewed the legislative history of enacting legislation, the Sentencing Reform Act of 1984. Id. That Act, in the

2

App 1067

court's view, manifested congressional intent to preclude judicial review of adjudications, but not rulemaking. Id. at 759: see also H. Rep. No. 98-1030, 98th Cong.2d Sess. 149(1984), reprinted in 1984 U.S.C.C.A.N. 3182,3332 (stating that judicial of rulemaking, but not "adjudications[s] of specific cases," is available).

## ARGUMENT

In this case, the defendant[s] challenges the BOP's lack of justification to support a administrative separation order between these co-defendants. The Defendants' complaint involves a challenge to a BOP administrative action. Therefore, the Court's review is limited to the administrative record. Camp vs Pitts, 411 U.S. 138, 142, 3G L.Ed. 2d 109, 93 S.Ct. 1241(1973). The BOP's adminstrative record, in this case, fails justify why the defendants should be separated. Having completely exhausted all adminstrative remedies, the Defendant's "need to determine whether a formal BOP separation order exist," Parrott v United States, 536 F.3d 629(7thCir.2008)) is of utmost importance.

In accordance with BOP Policy Statement OPI: CPD Number 5180.05(8)(b) when addressing the need for and notification of a inmate separation order reads in pertinent part:

> b. Notification. The case manager shall ensure that the affected inmate is notified in writing as promptly as possible of the classification and the basis for it. Witness security cases will be notified through a commitment interview. The notice of the basis may be limited in the interest of security or safety...The inmate shall sign for and receive a copy of the separation notification form...Any subsequent modification of a CIM assignment or removal from the CIM system requires separate notificaiton to the inmate.

In this case, none of the defendants were given notification that a BOP administrative separation order was put in place.

3

App 1068

Moreover, BOP Policy Statement OPI: CPD/PSB Number 5324.09(e), states, "[E]very 30 days, the facility shall afford each inmate a review to determine whether there is a continuing need for separation." This Defendant now claims that he has been incarcerated in the BOP for 10 years and had never been reviewed concerning the separation between him and his co-defendants.

Its quintessentially clear that the BOP has failed to comply with its own policies in this case in terms of providing the administrative documentation necessary and required to justify separating this Defendant from his co-defendants. The BOP has failed to provide sufficient informatio to establish that this Defendants or his co-defendants should not be confined in the same institution. 28 C.F.R. §524.72(f) provides direction for the BOP in determining the need to separate inmates institutionally wide. The factors the BOP considers in classifying an individual to this (Separation) assignment include, whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals... inmates who have provided authorities with information concerning the unauthorized or illegal activites of others; or inmates with a history of disrupting operations and security in federal penal institutions. In light of these factors, this Defendant claims that he nor his co-defendants qualify to be separated from each other. Further, the BOP has not provided nor maintain an administrative record to support or to justify this continued separation between this Defendant and his co-defendants'. 28 C.F.R. §524 - Central Inmate Monoring system Assignment category makes clear that the prison classification has the

4

authority to modify an inmate custody classification pursuant to 28 C.F.R. §§524.10-14 & 5-1.11(d). This Defendant has constantly respectfully requested that the BOP exercise its authority and remove the improper separations orders by way of cancellation. Thus far, the BOP has failed to respond. This lack of response from an agency of the United States of America provided the fodder for this instant motion to this Honorable Court.

WHETHER BOP ADMINISTRATIVE SEPARATIONS HENDER DEFENDANT'S REHABILITATION

As presented before this Defendant and his co-defendants are serving life-extinguishing sentences. This Defendant avers that under normal circumstances the BOP will allow a inmate to transfer to different federal facilities. These transfers (409's) are generally based upon the conduct of that inmate while at the facility they seek transfer. Most facilities require 18 months to 1 year clear conduct in order to be considered for such a transfer. This Defendant as well as the other defendants have attempted to be transfered to other federal facilities after maintaining 18 months or more of clear conduct, have been denied transfers due mostly because the the BOP's administrative separation order between the defendants in this cause. Inmates serving life sentences have little to look forward to with the exception of being able to be transferred to a federal facility that would provide a more comfortable setting for him or her to spend their remaining years, and to be at a facility that would allow for them to recieve visits from family and loved ones. Clearly, the BOP separations, without justification, serves no useful purpose and only henders the rehabilitative efforts of the defendants.

App 1070

## CONCLUSION

If I may, this Defendant respectfully request this Honorable Court to conduct a Judicial Review of the Administrative policies of the Federal Bureau of Prisons that require this Defendant to be separated from his co-defendants. Further, if this Court determines there is no justification for such separations, Defendant respectfully request the Court to recommend that the BOP cancel the separation order between these co-defendants.

Respectfully Submitted,

Sean Coates, Pro Se
Fed.No. 01181-748
USP Allenwood - POB 3000
White Deer, Pa. 17887

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was mailed first class postage prepaid to the Office of the U.S. Attorney, U.S. District Court, 555 4th Street, NW, WDC 20001, on this 29 day of November 2012.

Sean Coates, #01181-748
USP Allenwood - POB 3000
White Deer, Pa., 17887

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

           v.               :        Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,      :

        Defendant.      :

### MOTION TO FILE SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW UNDER SEAL

Petitioner William Sweeney, ("Sweeney"), by his attorney Eric H. Kirchman, moves the court to enter an order that Sweeney's Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255, and as reasons states as follows:

1. That at Sweeney's trail the court reviewed *in camera* a substantial amount of material and placed that material under Seal.

2. Sweeney was granted access to this Sealed material by of a court order, dated February 15, 2008.

3. While the court granted Sweeney access to the Sealed material it did not Unseal the material.

4. Sweeny's supplement to his motion filed pursuant to 18 U.S.C. 2255 relies heavily upon this sealed material in its argument and as Exhibits to his supplement.

5. That as this material has not been unsealed by the court it must be filed under seal.

**WHEREFORE,** Sweeney prays that the court enter an order allowing him to file his supplement to his motion pursuant to 18 U.S.C. 2255, under Seal, and for such other relief as is just and proper.

_____/s/_____
Eric Kirchman
D.C. Fed Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

## CERTIFICATE OF SERVICE

I hereby certify, on this 28th day of November 2014, that a copy of the foregoing was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric H. Kirchman



7

## Murder of Keith Johnson

Keith owed about $50,000 to Gooch.
Gooch employed Draper to kill Keith Johnson = "Whitey"
    Keith = Fat Petey Johnson's brother
Gooch owns J&G Restaurant at 12th & Pennsylvania, S.E.
    (Right next to Potomac Gardens.)

Wit. used to do little jobs - shake people down
    for money + rob people - for Gooch.
    Wit + Draper used to work for Gooch.
Wit. met Gooch thru Wayne Perry.

Wit. heard Gooch telling Draper to kill Keith.
Wit. did not hear Draper return to advise
Gooch he killed Keith. He just heard Gooch
    give the order.

The word is that Fat Petey started
messing w/ Bobbie + killed Bobbie to get
back at Draper ⟹ mere rumor.

App 1075



# 9

App 1076



1994 Chip Borrowed
Grey Cadillac
Said he ; Poo-Poo killed
Tim. Tim in it.
Tim owes Poo-Poo $
Chip was driving
Poo-Poo shot Tim from
Behind, he just Sat
there like he was Dazed

Cadillac — Raymond knocked
on Jelani — Jelani shot
At the car — thought Raymond
was driving it. Boo was
driving

App 1077

Title was in Rojay's name

Chir realized he was fucked up. they pushed him out of the car. Chir was driving away & saw Tim moving on the road so he drove back & they shot him again.

Chir said they wiped the car down but said don't drive it down Campus

App 1078

# EXHIBIT

# 6

Exhibit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
APR 2 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America

     v.

Vincent Hill, a/k/a "Vito"       Criminal No. 98-329 (TPJ)
Jerome Martin, a/k/a "Pimp"
Samuel Carson, a/k/a "Chin"
William Kyle Sweeney,        (UNDER SEAL)
   a/k/a "Draper"
Maurice Proctor,
   a/k/a "Poo-Poo"

GOVERNMENT'S EX PARTE NOTICE TO THE COURT REGARDING CHANGE IN
LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits an ex parte pleading with the Court which sets forth in greater detail the security concerns which gave rise to the movement of the above-named defendants.

On September 22, 1999, the federal indictment in this matter was unsealed. The grand jury returned an 87-count indictment charging the above-named defendants and five additional co-defendants with a conspiracy to distribute and possess with intent to distribute controlled substances, conspiracy to participate in a racketeer influenced corrupt organization, first-degree murder while armed, assault with intent to kill while armed, the commission of a violence crime in aid of racketeering activity, kidnaping while armed, assaulting a police officer, possession of a firearm during a crime of violence, and the possession with

App 1080

intent to distribute and distribution of controlled substances.[1] The above-named defendants were subsequently arraigned on the indictment before the Honorable Magistrate Judge John Facciola. The defendants were ordered detained pending trial and were committed to the custody of the Attorney General, pursuant to 18 U.S.C. 3142(I).

At the March 26, 1999, arraignment/status hearing, this Court requested that the government submit an ex parte pleading which addressed the bases upon which the above-named defendants were moved from the D.C. Jail to the Northern Neck Regional Jail in Warsaw, Virginia.[2] As set forth in the government's notice to the court of change in the conditions of the defendants' confinement (hereinafter "government's notice"), specific safety concerns have led to the movement of defendants Hill, Martin, Carson, Sweeney, and Proctor. Pursuant to the Court's request, the government hereby supplements the bases for the movement as follows:

I. History of Intimidation/Retaliation Against Witnesses by Member of the Southwest Crew

A. Murder of Witness Chishauna Gladden and Attempts to Murder Other Witnesses to Knight and Martin's Murder of Curtis Edwards

1. On August 29, 1992, Antonio Knight and Jerome Martin, Jr. murdered Curtis Edwards in the area of the 200 block of 37th Street, SE. Edwards was murdered because he was a passenger in a

---

[1] On Friday, March 26, 1999, a superseding indictment was unsealed in this matter which added numerous crimes of violence and three additional co-defendants.

[2] The defendants were moved from the D.C. Jail to Northern Neck Regional Jail on or about March 9, 1999.

2

App 1081

unfamiliar car with dark tinted windows that had driven through what Martin considered to be Martin's area. During the investigation of that murder, Chrishauna Gladden, Robin Williams, Tyrone Dean, Carla Washington and Douglas Eatmon were developed as witnesses. Antonio Knight and Jerome Martin, Jr. were charged with Edward's murder. Several trial dates were set and ultimately continued by the Court, and the case remained pending for over one year. For the majority of the time during which the case was pending, both Martin and Knight were held at the D.C. Jail without bond.

2. While the case was pending, confidential sources informed the Federal Bureau of Investigation (FBI) that Martin and Knight were trying to identify and harm potential witnesses against them. Because of this, Chrishauna Gladden, Robin Williams, Carla Washington and Tyrone Dean were moved from the area by the FBI for their safety.

3. On October 5, 1996, three days prior to Martin and Knight's scheduled trial date for Edward's murder, Chrishauna Gladden, one of the government's principal witnesses in the Edwards case, was murdered as she stepped out of a house in the 200 block of 37th Street, SE, where she had been attending a party. Martin and Knight were eventually tried and acquitted of all charges relating to Curtis Edwards' murder.

4. Further investigation by the FBI has revealed the following regarding attempts to kill witnesses to Martin and Knight's murder of Curtis Edwards: On November 5, 1997, W-1 entered

3

into a plea agreement with the Government, and pleaded guilty in the United States District Court for the District of Columbia to one count of participating in a Racketeering Influenced Corrupt Organization. As part of his guilty plea, W-1 acknowledged and accepted responsibility for his participation in the murder of Chrishauna Gladden.

5. W-1 has agreed to fully cooperate with the Government's investigation of the SOUTHWEST CREW and any other criminal matters of which he has knowledge. As part of that cooperation, W-1 has informed law enforcement that while Jerome Martin, Jr. and Antonio Knight were detained on First Degree Murder charges for killing Curtis Edwards, he was approached by Paul Lejohn Franklin.[3] Franklin told W-1 that he had spoken to Martin, and that Martin needed some witnesses who were going to testify against him in the Curtis Edwards murder trial killed. Franklin provided the names of the witnesses to W-1 and told him where they lived.

6. Franklin also informed law enforcement that he had a conversation with Jerome Martin, Jr. regarding who were the witnesses in Martin's murder trial. Franklin told Sam Carson the names of the witnesses as told to him by Martin. On one occasion, Franklin was in the Barry Farms area and saw one of the people whom Martin had identified as a witness. Franklin informed W-1 and Sam Carson of this sighting. W-1 and Carson then went to the Barry Farms area.

---

[3] Franklin was charged in the original indictment in the above-captioned matter. He entered into a plea agreement in the fall of 1998.

4

App 1083

7. With respect to Carson's commitment to assisting Martin, Carson explained to W-1 that they had to treat getting rid of the witnesses against Martin like a full-time job. According to Carson, they had to do whatever was necessary to kill the witnesses. Once, Carson called W-1 at 4:00 A.M. and told W-1 that they had to go to watch a witness' house. Carson had the addresses of Robin Williams (even though she had been relocated from her prior residence by the FBI for her safety) and Tyrone Dean's mother, and at different times, they surveilled those homes, looking for an opportunity to kill the witnesses as they came from or arrived at the residences.

8. Carson and W-1 also rode around the area of the 200 block of 37th Street, SE on several occasions in an effort to find and kill Chrishauna Gladden. On October 5, 1996, just three days before Martin and Knight were scheduled to be tried for killing Curtis Edwards, Carson and W-1 drove to the area of the 200 block of 37th Street, SE, where they were told by a close associate of Jerome Martin named Steven Chadwick that Chrishauna Gladden would be attending a party in the neighborhood that evening. Later that evening, Carson and W-1 returned to the 200 block of 37th Street armed with a handgun and a police scanner to monitor police activity in the area. Chadwick accompanied W-1 and Carson to an abandoned house and pointed out the location of the party that Gladden would be attending. Chadwick then waited with W-1 and Carson and pointed out Gladden when she arrived. W-1 and Carson waited in the abandoned home, and when Gladden left the home where

5

App 1084

the party was being held, Carson ran from the abandoned home and shot her multiple times.

9. After murdering Gladden, W-1 and Carson drove to Robin Williams' apartment and hid in some bushes near her front door, hoping to kill her, as well. However, they heard over their police scanner that police cars had been dispatched to the area, so they left.

10. W-2 is an associate of Antonio Knight and Jerome Martin, Jr. While the Curtis Edwards murder charges against Martin and Knight were pending, W-2 had a pending felony charge in D.C. Superior Court, and agreed to provide an "off-the-record" debriefing with the government in an attempt to negotiate a plea bargain. In April 1996, W-2 provided information about several different criminal matters, and much of the information provided by W-2 was corroborated through other investigative means. W-2 provided no information that was proven to be false.

11. During the debriefing, W-2 advised it knew that Steven Chadwick was trying to locate and harm witnesses that were to testify against Martin and Knight. On one occasion, W-2 and Chadwick were near the 2000 block of 37th Street, SE, when Carla Washington, a government witness in the Edwards case, walked near them. As Chadwick saw Washington, he said something to the effect, "There goes that hot bitch right there." Chadwick then asked another individual, known to W-2 as "Mighty", if he "got that location yet", and Mighty said that Washington lived on 48th or 49th Street. In fact, Washington had been relocated by the FBI to

66

App 1085

a residence on 49th Street, NE, Washington, D.C. Chadwick then said that he had to hurry up and "pay her a visit."

12. On a separate occasion, W-2 was in the 2000 block of 37th Place, SE when an investigator for Martin's defense attorney arrived there and said he was looking for "Flip," which is Tyrone Dean's nickname. After Chadwick spoke to the investigator, he told W-2 that "Flip" must be "telling." A day or two after the investigator visited the area, Chadwick came from a house in the 200 block of 37th Place, SE (the same house from which Chrishauna Gladden came when she was murdered) and said he had just spoken to Knight, and that "Flip" was "hot". Chadwick said that he was going to "get that nigger", which W-2 took to mean kill him. A day or two later, W-2 was with Chadwick near the 200 block of 37th Street, SE, when Chadwick commented that "Flip" was presently at his mother's house, and Chadwick was waiting for Sam (Carson) so they could take care of business. When Carson arrived, Chadwick went into an apartment which was known by W-2 to be used by Chadwick to store firearms. After a very short period of time, Chadwick exited the apartment and left with Carson. After some time, Chadwick and Carson returned, and Chadwick commented to W-2 that nobody was home at Flip's mother's house.

13. W-3 was incarcerated with Jerome Martin, Jr. during the time in which the Edwards murder case was pending against Martin and Knight. While incarcerated, Martin wrote W-3 a letter, telling him that he was not worried about his pending murder charge because Sam (Carson) is taking care of "that" for him. W-3 took this to

77

App 1086

mean that Carson was going to kill a witness for him. After W-3 and Martin were released from the D.C. Jail, they encountered each other on the street. Martin, in the presence of Carson, told W-3 that he beat his murder charge because Carson stopped a witness from coming to court. While Martin was saying that, Carson smiled and said that Martin is "his man".

14. W-3 and Martin were again incarcerated at the D.C. Jail for a second time. Martin then told W-3 that "James" (Montgomery) is telling on "Sam" (Carson), and Martin is going to kill Montgomery when he sees him on the streets.

15. W-4 has been incarcerated at the D.C. Jail for over a two year period, and while incarcerated, has had conversations with Martin and Knight regarding the murder charges that were brought against them. According to W-4, he was in the presence of Maurice Proctor, Vincent Hill, Martin and Knight when Martin and Knight were discussing a female who was to testify against them. According to Martin and Knight, they were going to get someone to kill the girl to prevent her from testifying.

16. In the first week of February, 1999, W-11 participated in an "off-the-record" debriefing with the government. This person has since pled guilty to his criminal activity in the SOUTHWEST CREW. W-11 said that he was at the East Side nightclub one evening and met a woman there (Christauna Gladden). Subsequent to that meeting, Sam Carson asked W-11 if he got the woman's telephone number, and asked how W-11 had "left it with her." Carson wanted W-11 to get in touch with the woman, make arrangements to meet her

88

alone, and then take her to Carson or some place that was pre-determined by Carson. W-11 inferred from the manner in which Carson was speaking that he was going to kill the woman.

17. W-12 was interviewed by law enforcement in January 1999. W-12 informed the government that he was approached by Sam Carson. Carson told W-12 that if W-12 saw "that girl" around 37th Place (the street on which Gladden resided), to call him and let him know. Specifically, Carson described exactly where Chrishauna Gladden resided. Carson wanted W-12 to pass the message onto an individual named "Big Jim." Carson made it clear that this was in reference to Jerome Martin Jr.'s trial. W-12 then saw Martin in the D.C. Jail. Martin told W-12 that he did not think "that girl" would make it to court but that Carson was taking too much time. Martin asked W-12 why W-12 did not take care of the girl.

## B. Murder of Witness Phillip Clayborne

1. On February 2, 1994, SOUTHWEST CREW associates Tyrone Briscoe and Aaron Miller shot and killed Kenneth Morgan and Leonard Shaw in the 1500 block of 2nd Street, SW over a drug dispute. Phillip Clayborne was identified as a witness to the murders, and he cooperated with the detectives assigned the case. Clayborne's cooperation led to the eventual arrest of Tyrone Briscoe and Aaron Miller for the double murder.

2. On September 21, 1994, Phillip Clayborne was shot and killed as he exited a carry-out in the 1200 block of South Capitol Street, SW, Washington, DC. Maurice Proctor, Kenneth Adams, a.k.a. "Little Wayne", and Tyrone Briscoe were later charged with

99

App 1088

Clayborne's murder. After further investigation, Kenneth Adams, Christopher Galloway and a juvenile each pleaded guilty to his role in the murder of Phillip Clayborne and agreed to cooperate with the government. Proctor and Briscoe were tried and convicted in D.C. Superior Court for the Clayborne murder. Although Briscoe was incarcerated at the time of Clayborne's murder, evidence introduced at the trial showed that he ordered the murder from the D.C. Jail by placing phone calls to Christopher Galloway, and that Clayborne was murdered because it was known that he was a witness against Briscoe and Miller for the February 2, 1994, double murder.

C. Attempts To Kill Witness Kenneth Adams

1. Subsequent to his plea of guilty and his agreement to cooperate with the government in the investigation and prosection of the February 2, 1994, double homicide, Kenneth Adams was released from the D.C. Jail and he and his family were relocated by the FBI from the D.C. area for their safety. While the trial of Proctor and Briscoe for the murder of witness Phillip Clayborne was pending, attempts/plans were made to kill Adams.

2. Prior to the trial of Proctor and Briscoe for the murder of witness Phillip Clayborne, the government gained the cooperation of W-5, by way of a plea agreement. W-5 was a supplier of marijuana to the SOUTHWEST CREW, and he had very close ties to some of the members. Most significantly, W-5 is the uncle of William Sweeney, and the two maintained a close relationship. Through his cooperation, W-5 advised law enforcement that Sweeney and other members of the SOUTHWEST CREW were trying to kill "Little Wayne"

10

App 1089

(Kenneth Adams) because he was to testify against "Poo-Poo" (Maurice Proctor) at an upcoming murder trial. Although Sweeney was never charged with Clayborne's murder, Adams told investigators that Sweeney assisted him and others in disposing of the murder weapon used against Clayborne. According to W-5, Sweeney had a contact within the police department or court system that could provide addresses of people for him. Sweeney used that contact to locate Adams, who had been relocated by the FBI for his safety. W-5 specifically told law enforcement that Sweeney had Adams' address in Centerville, VA, and they were waiting for the right time to kill him. Adams and his family were, in fact, living in Centerville, VA.

3. As part of his cooperation, W-1 informed law enforcement that he accompanied Carson on several occasions to a townhouse in Centerville, VA, where they surveilled Adams. According to W-1, their plan was to learn Adams' habits and schedule, so that they could kill him at the most opportune time. In addition to Carson and W-1 watching Adams, Sweeney and Sean Coates also accompanied them to the Centerville, VA residence on several occasions. Sweeney even went as far as secreting a handgun in a wooded area near Adams' home so that he would not have to travel with it and risk getting caught by the police.

D. **Assault With Intent to Murder of Suspected Government Informant James Coulter**

1. On May 30, 1995, James Coulter, a.k.a. Creeko, was shot several times while in Southeast Washington, D.C. Coulter survived the shooting and was placed in protective custody within the D.C.

11

App 1090

General Hospital.

2. While Coulter was hospitalized, Vincent Hill spoke to law enforcement officers in the 2000 block of K Street, SW, Washington, D.C. Hill made reference to Coulter as being an informant and mentioned the exact room in which Coulter was being kept at the D.C. General Hospital and the fact that he was in protective custody. Hill went on to say that Coulter deserved what he got.

E. Current and Recent Efforts to Influence Testimony or Eliminate Witness by Members of the Southwest Crew

Murder of Government Witness Robert Smith

1. On June 16, 1997, Robert Smith (W-5) was shot and killed while in the 1300 block of Half Street, SW, Washington, D.C. Investigation of that murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith. As noted above, Smith had entered into a cooperation agreement with the government, and he was to provide testimony against Sweeney in more than a half dozen murders, to include a triple murder in Prince Georges County, MD. Investigation has shown that Sweeney theorized that Smith was cooperating with the government, so Sweeney had him killed.

2. On April 20, 1997 Sweeney was arrested for the above mentioned triple murder. Subsequent to Sweeney's arrest for that triple murder, Carson spoke to W-11 about having Smith killed because he was "telling" on Sweeney. On several occasions, Carson telephonically contacted W-11, asking if Smith was in the area so that Carson could kill, or have him killed.

122

App 1091

33. One day, W-11 and Carson were driving on Half Street, S.W., and saw Smith in the block. W-11 and Carson went to Carson's house where Carson put on a hooded sweatshirt and got a handgun. W-1 and Carson drove to the area of the 1400 block of South Capitol Street where W-1 parked and waited while Carson walked through an alley toward where they had seen Smith. The plan was for Carson to kill Smith and run to the car. Carson was unsuccessful in locating Smith on that occasion.

4. W-7 is an individual who, on March 6, 1998, pled guilty to a firearms violation in U.S. District Court, District of Columbia and agreed to cooperate with the Government in the investigation of the SOUTHWEST CREW. W-7 was told by William Sweeney's father, that he and his son had Smith killed because he was testifying against the younger Sweeney in the triple murder. The elder Sweeney went on to explain to W-7 how they came to realize that Smith was cooperating with the Government.

5. Subsequent to W-7's arrest for a firearms violation on December 20, 1997, he was approached by the elder Sweeney, who was acting at the behest of his son, and was asked to testify on behalf of the younger Sweeney at the triple murder trial. The elder Sweeney went on to explain to W-7 that if he would agree to give perjurious testimony, "they" would have a crack addict come forward and accept responsibility for the handgun with which W-7 was arrested. Subsequent to that meeting, an investigator for the younger Sweeney visited W-7 and fabricated the fictitious testimony.

App 1092

<u>Threats Against Suspected Government Witness James Montgomery</u>

On September 10, 1991, Martin, W-1, Carson, and several others attempted to do a drive-by shooting on members of a rival drug organization near the area of 60th and Blaine Streets, NE, Washington, D.C. W-1 drove Martin to the area on a motorcycle, while the rest of the group went in a mini-van which was purchased by Martin and placed in his name. When the group reached the targeted area and began to shoot at several individuals, the police happened upon the scene, and Martin began to shoot at them. The police returned fire, but no one was hit by either the police officers or the group led by Martin.

7. On September 9, 1997, based on information provided by W-1 and other corroborating evidence, Martin was charged for his role in that shooting, and detained at D.C. Jail pending trial. Upon his arrest for this offense, Martin commented to the law enforcement personnel that it must be James Montgomery who is "telling" on him. Since that time, Martin and Carson have made comments to others regarding retaliation against Montgomery.

8. Martin told W-3 that "James" is telling on "Sam", and Martin is going to kill James if he sees him on the street. Carson commented to W-3 that he is upset by Montgomery "telling" on him because he treated Montgomery like a son. Carson then said that he is going to kill Montgomery or have Raymond Washington,[4] another known SOUTHWEST CREW member and close associate of Carson, kill

---

[4] Raymond Washington was charged in the superseding indictment as a participant in the crimes of violence and drug activity. An arrest warrant remains outstanding for Washington.

144

him. When W-33 and Martin were incarcerated together for the second time, W-? was told by Martin that "Creeko" is telling on Martin.

9.   In July, 1998, W-6, a citizen of Southwest, Washington, D.C., was interviewed regarding another murder committed by the SOUTHWEST CREW, and during that interview, W-6 advised that "it" has heard from Raymond Washington and others that James Montgomery is cooperating with the FBI against members of the SOUTHWEST CREW, and people are trying to kill him because of it.  Washington told W-6 that Montgomery is being hidden by the FBI in Florida.  W-6 further advised that "it" has heard that there is a contract out on Montgomery.

**Efforts to Intimidate and Influence Witness Against Jerome Martin, Jr. in the Shooting of Government Witness James Coulter**

10.   On April 9, 1998, based on identifications made by James Coulter and two other witnesses, Martin was charged with the May 30, 1995 shooting of suspected government informant Coul  : Since being charged with that crime, Martin has consistently attempted to threaten and intimidate witnesses and to obstruct justice by coercing others to perjure themselves for him at trial.

11.   On several occasions in or about June, 1998, Coulter was approached by Martin's wife, Lorraine Knight, a.k.a. "LA-LA", who was upset with Coulter because she believed he was to testify against Martin.  Knight told Coulter that he was the only reason that Martin was incarcerated, and Coulter should make a statement to Martin's investigator, stating it was not Martin who shot him.

12.   Also in or about June, 1998, Coulter was approached by

155

App 1094

Michael Floyd, who witnessed Coulter's shooting. Floyd told Coulter that he had spoken to Martin on the telephone (from jail), and that Martin wanted Floyd to testify that it was not Martin who shot Coulter. When Floyd told Martin that he did not want to get involved in the matter, Floyd said Martin threatened him.

13. In the week of July 20, 1998, Coulter was approached by Paul LeJohn Franklin and another male who is unknown to Coulter regarding Coulter's possible testimony against Martin. Franklin suggested to Coulter that it would be a mistake for him to testify against Martin, and he urged Coulter to visit Martin at the D.C. Jail to further discuss the matter, or to make a written statement to Martin's investigator, saying it was not Martin who shot him.

14. The day after Coulter was approached by Franklin, he was again confronted by Lorraine Knight. Knight again expressed her concerns that Coulter was going to testify against Martin, making statements to the effect that she needed Martin home to help take care of her child.

15. In the first week of August, 1998, law enforcement conducted an "off the record" debriefing with an individual who is currently incarcerated at the D.C. Jail. This person (hereafter referred to as W-10) knows Martin, Michael Floyd and Coulter. On several occasions, the most recent being in or about the beginning of August of 1998, Martin spoke to W-10 about the shooting of Coulter. Martin admitted having committed the shooting and described his attempts to have Michael Floyd testify on his behalf at the trial. According to what Martin told W-10, Martin recently

1166

App 1095

contacted Lorraine Knight by telephone (from the jail) and had her bring Michael Floyd to the phone. When Floyd was on the phone, Martin explained to him that he wanted Floyd to testify on his behalf, saying it was not Martin who shot Coulter. Martin told W-10 that when Floyd expressed his disinterest in doing that for Martin, Martin became very upset, and began to verbally assault Floyd. Floyd then hung up the telephone on Martin. Martin then explained to W-10 that Floyd owes him that favor because when Martin tried to shoot Coulter, Coulter, along with many others who were near him, to include Floyd, ran. While running, Floyd physically got in the way of Martin shooting Coulter. Rather than shoot Floyd, who was between Martin and Coulter, Martin waited for him to get out of the way, thus preventing Martin from killing Coulter. According to Martin, Floyd should falsely testify for him at trial because he did not also shoot him that evening.

16. Martin told W-10 that an individual nicknamed "Uddie" was present when he shot Coulter, and Martin has convinced Uddie to testify that it was not Martin who committed the crime. In order to contact Uddie, Martin told W-10 that he called one of his associates in the Southwest area (from the jail), and he had that person bring Uddie, who was involved in a crap game in the neighborhood, to the telephone. Martin then discussed his plan with Uddie who agreed to go along with it.

17. In addition, W-11 visited Martin at the D.C. Jail and spoke with him regarding the shooting of Coulter. Martin told W-11 that he was trying to get Michael Floyd to testify on his behalf

177

App 1096

and to say that he was present when Coulter was shot, and that it was not Martin who shot him. Martin told W-11 that Floyd would not testify for him, and that Floyd hung up the telephone on Martin when he spoke to Floyd about it. Martin was very upset that Floyd would not testify for him, and Martin asked W-11 to kill Floyd. When W-11 refused, Martin told him that Martin has a cousin named "Dino" who had just been released from prison, and Martin wanted W-11 to point out Floyd to Dino so that Dino could kill him.

### Recent Efforts by Jerome Martin, Jr. to Contact Witnesses

18. W-11 stated that he called a woman named Katrice Haines at her grandmother's house in the 200 block of K Street, S.W., and she brought Scotland Tolbert (aka "Fat Scotty") to the telephone. Tolbert told W-11 to tell Vincent Hill that he had been trying to "tail the joker" but that the police were following him. W-11 said that Tolbert was supposed to be responsible for killing witnesses for Hill and the others, but members of the SOUTHWEST CREW were getting upset with Tolbert because he was not carrying out the killings.

19. After the original indictment was returned, when the co-defendants were incarcerated at the D.C. Jail, Hill told W-11, along with the other co-defendants in the case that since they could not locate a former co-defendant named Paul Franklin (aka "Dirty Meat"), that they should try to kill one of Franklin's family members in order to send a message about cooperating with the government.

18

<u>Recent Evidence Seized From Carson's Cell Regarding Witness Identities</u>

20. On February 19, 1999, members of the Department of Corrections conducted a search of the cell in which defendant Carson was housed. Subsequent to the recovery of these items by jail administrators, the FBI secured a search warrant in order to review the items which were seized. Included among the items seized was a three-page list of witness names (attached as Appendix A). The list makes reference to a number of individuals who are potential witnesses in this case. In addition, the list makes mention of locating the family members of potential witnesses.

II. <u>The Means to Conspire to Intimidate and Contact Witnesses</u>

A. <u>The Cellphone</u>

1. In addition to the above-described list of witnesses and family members, when officials entered Carson's cell, they found him talking on a cellular telephone that had been illegally smuggled into the institution.[5] Investigation into this matter has revealed that Sweeney contacted a woman named Ashia Malvin and asked her to arrange for a defense investigator to bring a cellular telephone to him in the jail. W-11 told law enforcement that the investigator was paid by defendant Sweeney to bring the cellular telephone to the jail. W-11 indicated that cellular telephone was shared between Sweeney and Carson. In addition, the other

---

[5] The telephone was activated on December 12, 1998. While a thorough investigation into the telephone records is not complete, the government does know that the telephone has been used regularly. Specifically, during one seven-day period, 350 telephone calls were made using the cellular telephone.

19

App 1098

incarcerated co-defendants were aware of the existence of the cellular telephone in the jail. W-11 indicated that Sweeney would be able to make arrangements for additional cellular telephones to be brought into the jail for the other co-defendants.

**B.   Separation between Defendants**

1.   In addition, a separation request was placed between defendants Carson and Martin. Notwithstanding this, these two men have had several conversations together. W-11 informed law enforcement that during these conversations, which also included the other above-named codefendants, the defendants discussed efforts to contact and intimidate witnesses.

**III.   The Plan to Escape**

1.   In February 1999, a reliable confidential informant who is presently incarcerated at the D.C. Jail and who has provided reliable information to law enforcement on countless occasions, told law enforcement that it had a conversation with Maurice Proctor while the two were incarcerated at the D.C. Jail. During that conversation, Proctor told the informant that Proctor, Hill, and "the Southwest guys" were planning an escape from the jail. Proctor stated that "they" know that "they" were looking at life and that "they" would not take it.

App 1099

## IV. Conclusion

Given the conduct in which the defendants have engaged, and the threat to the safety of others at the D.C. Jail, along with the numerous government witnesses, it is clear the transfer of the above-named defendants by the U.S. Marshall Service was necessary.

Respectfully submitted,

WILMA A. LEWIS
United States Attorney

Kenneth L. Wainstein
Assistant United States Attorney

Peter R. Zeidenberg
Assistant United States Attorney

Anjali Chaturvedi
Assistant United States Attorney

App 1100