# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Samuel Carson, Sean Coates, Jerome Martin, Jr., and William K. Sweeney,<br><br>    Defendants. | Case No. 1:98-cr-329-6-RCL |

---

# APPENDIX
in support of Defendants' Supplemental § 2255 Motion

---

# VOLUME 7 OF 9

## § 2255 Proceedings (Supplemental Filings – Part 1)

Dkt. 1156 – Defendant William K. Sweeney's Amended Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and Incorporated Memorandum of Facts and Law Under Seal (February 25, 2015) ....................................................................1101

Dkt. 1166 – Defendant Sean Coates' Pro Se Supplemental Claims in Relation to Original Motion Pursuant to 28 U.S.C. § 2255 (February 24, 2015).................................................................1103

Dkt. 1170 – Defendant Samuel Carson's Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. § 2255 (April 9, 2015) ........................................................1112

Dkt. 1174-3 – Government's Ex Parte Submission of Additional Materials to the Court Regarding James Montgomery (April 9, 2015) ....................................................................1157

Dkt. 1182 – Defendant Jerome Martin's Supplement to Motion to Vacate in Light of *Johnson v. United States* (June 23, 2016) ........................................................................................1188

Dkt. 1183 – Defendant Samuel Carson's Supplement to Motion to Vacate After *Johnson v. United States* (June 24, 2016) ........................................................................................1192

Dkt. 1184 – Defendant Sean Coates' Supplement to Motion to Vacate in Light of *Johnson v. United States* (June 27, 2016) ........................................................................................1195

Dkt. 1191 – Defendant Samuel Carson's Supplement to Motion to Vacate After *Johnson v. United States* (June 14, 2017) ........................................................................................1197

Dkt. 1197 – Defendant William K. Sweeney's Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and Incorporated Memorandum of Facts and Law (June 16, 2017) ........................................................................................1211

Dkt. 1198 – Defendant William K. Sweeney's Amended Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and Incorporated Memorandum of Facts and Law (June 16, 2017) ........................................................................................1295

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

   v.     :   Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY, :

   Defendant.  :

**MOTION TO FILE AMENDED SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW UNDER SEAL**

Petitioner William Sweeney, ("Sweeney"), by his attorney Eric H. Kirchman, moves the court to enter an order that Sweeney's Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255, and as reasons states as follows:

1. That at Sweeney's trial the trial court reviewed *in camera* a substantial amount of material and placed that material under Seal.

2. Sweeney was granted access to this Sealed material by of a court order, dated February 15, 2008.

3. While the court granted Sweeney access to the Sealed material it did not Unseal the material.

4. Sweeny's amended supplement to his motion filed pursuant to 18 U.S.C. 2255 relies heavily upon this sealed material in its argument and as Exhibits to his supplement.

5. That as this material has not been unsealed by the court it must be filed under seal.

**WHEREFORE,** Sweeney prays that the court enter an order allowing him to file his supplement to his motion pursuant to 18 U.S.C. 2255, under Seal, and for such other relief as is just and proper.

_____/s/_____
Eric Kirchman
D.C. Fed Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

## CERTIFICATE OF SERVICE

I hereby certify, on this 25th day of February 2015, that a copy of the foregoing was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric H. Kirchman

Copies to: Judge
AUSA — Special Proceedings
Dft.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

　　　　　　　　　　　　　　　　　　:

UNITED STATES OF AMERICA,
　　　　Respondent,　　　　　　　　:

v.　　　　　　　　　　　　　　　　:　　Crim. No. 98-cr-00329- 06-RCL

　　　　　　　　　　　　　　　　　　　　　　　　　　**FILED**

SEAN COATES,　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　　　　　　　　FEB 2 4 2015

　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　Clerk, U.S. District & Bankruptcy
　　　　　　　　　　　oooOooo　　　　　　Courts for the District of Columbia

DEFENDANT'S PRO SE SUPPLEMENTAL CLAIMS IN RELATION TO
THE ORIGINAL MOTION PURSUANT TO 28 U.S.C. § 2255

　　　Comes Now, the Defendant, Sean Coates, and presents the following claims in addition to those previously presented by appointed counsel, Veronice A. Holt, in the original, pending Motion to Vacate, Set Aside Or Correct Sentence Pursuant to 28 U.S.C. § 2255.

SUPPLEMENTAL CLAIM ONE:

**Supporting Facts And Argument.**

　　　The Defendant, Sean Coates was denied his right to effective assistance of counsel and the compulsory process of calling witnesses in his behalf when his appointed trial attorney, Fred Jones, failed Defendant's direct and express order to call to trial for the defense, Dakeisha Ruffin, Defendant's sister and alibi-witness to Defendant's location and presence with her (Ms. Ruffin) at her apartment in Northeast Washington, D.C., as opposed to the Temple Hills, Maryland location and scene of three homicides for which the prosecution charged that Defendant had committed and/or participated in, on November 17, 1996, between 10:00pm and 11:00pm.

　　　In or about January of 1999, well in advance of the commencement of the Defendant's 2001 trial, Defendant's sister, Ms. Ruffin, after Defendant's request for her to do so, contacted Defendant's attorney, Fred Jones, via the telephone and informed Mr. Jones that the Defendant was with her and her infant children at her apartment in D.C. on the night of November 17, 1996, between the hours of 10:00pm and 12:00am. (See Sworn Affidavit of Dakeisha Ruffin-Borders, attached hereto as Exhibit 1). During the telephone conversation, Mr. Jones advised Ms. Ruffin that if she insisted on coming forward with her story about Defendant's presence

RECEIVED
Mail Room

FEB 2 4 2015
App 1103

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

2

with her on the night of the tripple murders, that she may as well be charged by the prosecution as an accessory to those murders. Mr. Jones further instructed Ms. Ruffin to take some time to think about what she really wanted to do, also not to discuss her decision or the case with anyone else, including her brother (the Defendant, Sean Coates), and that he would call her back in several days to discuss her rights and see how she still felt about testifying. Id. However, Mr. Jones did not call back in several days nor sought further contact, interviews or an investigation with Ms. Ruffin, but abandoned Ms. Ruffin altogether as a witness for the defense to the Temple Hills tripple murders, and in doing so, Mr. Jones failed to inform the Defendant, the Court or the Prosecution of his contact with Ms. Ruffin, her story and willingness and availability to appear and give testimony for the defense, which testimony was the highly exculpatory story that Defendant was with her at the time of the tripple murders; the same alibi story that Defendant had himself previously told Mr. Jones about. Instead, Mr. Jones attempted to intimidate Ms. Ruffin with false and misleading advice that she would be prosecuted for the tripple murders, as well, if she testified in her brother's behalf, Mr. Jones intefered with Ms. Ruffin's right to appear before the Court and give truthful testimony, the Defendant's right to call Ms. Ruffin in his behalf, fraudulenltly chilled exculpatory and lawful communications between Ms. Ruffin and the Defendant, and concealed this misconduct from the Defendant, the Court and the Prosecution. Indeed, Mr. Jones lied to the Defendant by informing and reporting to the Defendant that Ms. Ruffin was afraid to come forward and corroborate Defendant's alibi that he was with Ms. Ruffin, in Washington, D.C., at the time of the Temple Hills tripple murders, because Ms. Ruffin feared being charged with being an accomplice to those murders, when in fact, it was Mr. Jones who deliberately suggested and planted such statements and concerns of fearing an accomplice liability prosecution against Ms. Ruffin. (See Statement and Affidavit of Defendant [Sean Coates], attached hereto as Exhibit 2). Here, clearly Mr. Jones acted as a sabotuer of Defendant's alibi defense, and his actions did sabotage Defendant's alibi defense to the Temple Hills Tripple murders, where the only evidence implicating Defendant in the crime was the Prosecution's admitted and habitual liar and fabricator of incriminating evidence, statements and testimony, James Montgomery.

Thus, inarguably, Mr. Jones' performance was deficient, Mr. Jones' actions were incompetent and below the standard required of him under the law, and

3

thus Mr. Jones was ineffective within the plain meaning of Strickland v. Washington, 466 U.S. 688 (1984), to the Defendant's substantial prejudice.

SUPPLEMENTAL CLAIM TWO:

Supporting Facts And Argument.

Here, the Defendant also relies on the facts setforth in the above supplemental Claim One, and thus incorporates them herein in this Supplemental Claim Two section by reference and the attached Exhibits 1 and 2. In addition, the Defendant presents that, in or about December of 1998, he informed his appointed attorney, Fred Jones, that he could not have committed or participated in the Temple Hills tripple murders, as charged by the Prosecution, because he, the Defendant, was in Northeast Washington, D.C. with his sister, Dakeisha Ruffin and her infant children, at 4400 Quarles Street, at just after 10:00pm until 12:00am, when Defendant then departed his sister and her children and went home to bed. Defendant gave Mr. Jones his sister's contact information to verify his alibi and instructed Mr. Jones to call his sister to trial to testify for the defense. Mr. Jones advised the Defendant that he would contact and speak with Ms. Ruffin regarding Defendanat's alibi story. Also, soon after revealing the alibi to Mr. Jones, and still in December of 1998, the Defendant contacted his sister via a written letter, in which he instructed his sister to contact his attorney, Mr. Jones, and relay to Mr. Jones where he (Defendant) and Ms. Ruffin were on the night of November 17, 1996, at between 10:00pm and 12:00am. In the letter, the Defendant provided his sister with Mr. Jones' telephone number. (see Defendant's Statement and Affidavit, attached hereto as Exhibit 2).

During subsequent and multiple inquiries, throughout the year of 1999, regarding Ms. Ruffin's availability to testify and corroboration of Defendant's alibi to the Temple Hills murders, Mr. Jones repeatedly informed Defendant that he had in fact spoken to Ms. Ruffin and that she had confirmed Defendant's alibi for the Temple Hills murders, but that Ms. Ruffin was reluctant to come forward and testify because she was afraid of being accused of being involved in the murders herself. Id. The Defendant, at one point, had informed Mr. Jones that he would call his sister and see what was wrong with her, and, in response, Mr. Jones advised him not to call his sister himself because she was a potential witness and that he (Mr. Jones) would be further talking to his sister to explain her rights with coming forward. Mr. Jones further advised the Defendant

App 1105

4

not to pressure his sister about testifying for the defense because it was his (Mr. Jones) job to talk to witnesses and decide who was fit to testify or not. Id.

Then, in or about October of 2000, just before commencement of Defendant's trial, the Defendant informed Mr. Jones that his sister had been refusing to discuss his criminal case and her alibi testimony with him. Mr. Jones informed the Defendant that his sister more than likely would not agree to be a witness and testify for the defense, as to the alibi for the Temple Hills murders, because she was not represented by an attorney and afraid of being accused of being involved in the crime if she came forward with the alibi. The Defendant then informed Mr. Jones that he would take the stand himself and tell the jury about the alibi and who and where he was, and thus could not have committed or participated in the Temple Hills murders. Mr. Jones then advised Defendant that his testimony would not be believed by the jury or anyone else because his sister would not corroborate the alibi and that would hurt him even more and get him convicted quicker because the jury would think that he was trying to lie his way out of the crime. Id. Based on this reasoning and advice by Mr. Jones, the Defendant did not testify to his alibi regarding the Temple Hills murders. And after jury trial involving the Temple Hills murders, the Defendant, absent the jury ever hearing testimony of his alibi, suffered a guilty verdict on the charged Temple Hills murders.

Here, through his fraud, deceit and misconduct, Mr. Jones interfered with and prevented the Defendant from testifying in his own behalf and presenting the jury with his alibi to the Temple Hills murders, as well as enjoying the benefit of his sister's (Ms. Ruffin) corroborating alibi testimony. To be sure, the Defendant's testimony, contrary to Mr. Jones' advice, was more believable or at least as equally believable as the Prosecution's admitted lier and fabricator, James Montgomery, standing alone, and certainly provable testimony with the corroboration of Ms. Ruffin. Thus, but for Mr. Jones' fraud, deceit, and misconduct in sabotaging his alibi defense to the Temple Hills murders, the Defendant would have testified in his own behalf, if not called his sister (Ms. Ruffin) to perform the task; to put before the jury evidence of his alibi, otherwise unknown to and not considered by the jury. That Mr. Jones operated under a clear conflict and who's performance fell well below the standard of reasonableness, and professional as well as ethical norms, is plain. And that he was thus ineffective to the Defendant in

5

in the giving of his trial advice to Defendant and enforcing and administering and preserving the Defendant's constitutional trial rights, within the plain and simplest meaning of Strickland, to Defendant's substantial detriment, is a fact.

SUPPLEMENTAL CLAIM THREE:

Supporting Facts And Argument.

The Prosecution charged Defendant under the aiding and abetting theory in the Temple Hills tripple murders, relying on James Montgomery's testimony and out of court debriefings with local police agencies and federal authorities, that the codefendants recruited Defendant to assist in the crime: "They went to get Bird [Defendant] because Bird and Lonnie was cool." (Tr. 031401am, p.34). "They told Bird what they were going to do, but Bird did not say anything." Id. "Bird was suppose to go in, but when it was time to get out of the car, Birdie did not get out of the car." Id. "Me [Montgomery] and Drapper ran up to the people and pushed them in the house. One girl ran upstairs. I did not see what the other one did." (Tr. 031401am, p47-48). "I grabbed Darnell Mack and Drapper grabbed Lonnie. Mack was not resisting. He [Mack] said he did not have any money. I lifted up Mack's jacket so he [Drapper] could stun him and Drapper started shooting. I pushed the screen door open with my thumb. I did not see Drapper shoot the girl. Draper got in the car first and then me." (Tr. 031401am, p.53).

Here, the Prosecution's theory of culpability for the Defendant was that the Defendant went to the scene of the murders, drove the gettaway car, and could lure Lonnie ("a close friend") out for the codefendants, and thus the Defendant aided and abetted the other codefendants, Chin, Draper, and Montgomery of the first-degree, premeditated murder of Darnell Mack, Alonzo Gaskins, and Melody Anderson, in Temple Hills, Maryland. And on July 5, 2001, the trial court (the Honorable Judge Thomas P. Jackson), instructed the jury, that with respect to the crimes charged in the indictment, which included murder and use of a fire-arm in the commission of the murders and other violent crimes and drug trafficking offenses, that: "Under aiding and abetting, any person who in some way intentionally participates in the commission of a crime, aids and abetts the principal offender. The law regards him guilty as guilty of the crimes as he would be if he personally committed each of the acts that make up the crime. To find that a Defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the persons who committed

6

the crime, that he participated in the crime as soemthing he wished to bring about, and that he intended his actions to make it succeed...An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequence of the crime in which he intentionally participates. For example, an aider and abettor is legally responsible for the principlal's use of a weapon during an offense if...it was reasonably foreseeable to the aider and abettor that soem type of weapon was required to commit the offense." (Tr. 070501pm, "Min-U-Script" p's. 41-43)(emphasis added).

These aiding and abetting instructions were clearly erroneous and allowed the jury to convict the Defendant of aiding and abetting murder and firearm use as the principal without the Defendant having been found to have psossed the same mental state (mens rea) as the principal required for a conviction of those particular offenses. See e.g., Wilson-Bey v. United States, 903 A.2d 818, 836 (D.C. 2006)(holding new trial required where trial court instructed jury on "natural and probable consequences" and "reasonable foreseeable" liability under aiding and abetting theory which requires specific intent and knowledge to commit murder, the same as the principal); Coleman v. United States, 948 A.2d 534, 552 (D.C. 2006)(extending the Wilson-Bey holding to second-degree murder and striking down the probable consequences and reasonably foreseeable liability theory from aiding and abetting theory of culpability); see also Rosemond v. United States, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014)(reversing for new trial and holding that for § 924(c) conviction under aiding and abetting theory of culpability, jury must have been instructed and find that defendant had specific knowledge and intent that a firearm would be actively employed and used in the nature that the principal intended, striking down the probable consequences and reasonably foreseeable liability theory).

Because, here in the instant case, one cannot say without absolute certainty that the Defendant was not convicted of the Temple Hills tripple murders, other murders, and firearm use offenses in relation to violent acts and drug trafficking crimes, as an aider and abetter as a result of Defendant's knowledge of the probale consequences or reasonable foreseeability of the principal's/codefendant's alleged acts, as opposed to specific intent and knowledge to commit those specific acts and crimes, Defendant's trial must be redone. In fact, the trial court's instructional example that some type of weapon would be used is all that is required for aiding and abetting the firearm use (§ 924(c)) crimes, ensures that a

7

that a new trial is necessary and in order since the § 924(c) counts charged in this case against defendant can only stand and be predicated on the employment and actual use of a firearm, as defined in that statute, as opposed to "some type" of weapon, otherwise the Defendant may have been convicted under § 924(c) counts here based on some other type of weapon instead of the necessary and required firearm.

And here, as well, Defendant's trial attorney, Fred Jones, rendered ineffective assistance to Defendant when he stood by and failed to object to the faulty aiding and abetting instructions and the alternative of "some type" of weapon in its example under the § 924(c) counts, thus failing to ensure a correct and fair verdict on the aiding and abetting theory, firearms counts, and to preserve the instructional errors for appellate review, to the Defendant's significant detriment, thus satisfying Strickland's criteria for relief.

SUPPLEMENTAL CLAIM FOUR:

Supporting Facts And Argument.

At sentencing, all of the Defendant's § 924(c) counts of conviction were ordered ran consecutively to one another; that is, Counts 28, 34, 35, 36, and 37, for a total of 85 consecutive years. This decision of the consecutive execution of the firearm sentences was made by the Court on the premise that, although the § 924(c) counts were all charged in the same indictment and tried at the same time, they were technically viewed as seperate and subsequent convictions from one another, thus mandating, per the statute's penalty section, seperate and escalating, consecutive minimum sentences for each count returned in the verdict following the first count. This practice is called "stacking," which, however, the Sentencing Commission has since asked Congress to eliminate because it is so unjust. See U.S. Sentencing Comm'n Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System ("Mandatory Minimum Report"), at 368 (Oct. 2011). Here, Defendant Coates' stacked firearm sentences are unconstitutional, as well as they are not true recidivism convictions; that is, Defendant Coates did not have a prior conviction under § 924(c) at the time of his instant verdict, thus his firearm sentence is also unfair and overly severe.

To be sure, black defendant's, like Coates, have long been disproportionately subjected to the stacking of § 924(c) convictions arising from the same indictment and trial. See Commission's Report at 363 (stating that black offenders are

8

disproportionately convicted under § 924(c), subject to mandatory minimums at sentencing, and convicted of multiple § 924(c) counts. The Sentencing Commission's Fifteen-Year Report, in 2004, stated that black defendants accounted for 48% of offenders who qualified for a charge under § 924(c), but they represented 56% of those actually charged under the statute and 64% of those convicted under it. See Fifteen Years of Guidelines Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of Booker, 123 YALE L.J.2, 28-29 (2013) (even after controlling for, inter alia, arrest offense, district, age criminal history category, and education level, black men are nearly twice as likely as white defendants to be charged with an offense carrying a mandatory minimum sentence). Thus, in its Report to the Congress on mandatory minimum penalties in the Federal Justice System, the Commission recommended that Congress lower the mandatory prison sentence in the section, make recidivism enhancements applicable only when the first offense was the result of a prior conviction, and allow for concurrent sentences on "stacked" § 924(c) counts. Id. at 368 (Oct. 2011).[1]

And thus here, because Defendant Coates did not truly have a § 924(c) conviction prior to those which occurred at the trial in the instant case, the Defendant had not committed a true recidivism involving a § 924(c) violation and, as such, justice and fairness requires the Court to exercise its authority in such circumstances and vacate the unconstitutional stacking of Defendant Coates' simultaneous § 924(c) convictions and sentences.[2] Indeed, since looking prospectively, and in view of the U.S. Sentencing Commission's Mandatory Minimum Report

---

1 Among the other Sentencing Commission recommendations to Congress about § 924(c), which include a recommendation to lower the sentences for subsequent convictions because they are too harsh, is a recommendation to make them true recidivism enhancements:

Make 924(c) a "true" recidivism statute; Congress should consider amending section 924(c) so that the increased mandatory minimum penalties for "second or subsequent" offense apply only to prior conviction. In those circumstances, the mandatory minimum penalties for multiple violations of 924(c) charged in the same indictment would continue to apply consecutively, but would require significantly shorter sentences for offenders who do not have a prior conviction under section 924(c). This would reduce the potential for overly severe sentences for offenders who have not previously been convicted of an offense under section 924(c), and ameliorate some of the demographic impacts resulting from stacking. U.S. Sentencing Comm'n Report to Congress ("Mandatory Minimum Report"),at 364 (Oct. 2011).

2 Prior to the trial and conviction in the instant case, on Counts 28, 34, 35, 36, and 37; the section 924(c) counts, Defendant Coates had never suffered a conviction for the "use, carry or possession of a firearm during, in relation to, or in furtherance of a crime of violence or drug trafficking offence, in the District of Columbia, or any other state of the United States, or foreign country.

9

recommending to Congress that § 924(c) stacking be eliminated as unconstitutional to balck offenders and overly severe to all, as well as not truly a recidivism statute, the court can reasonably conclude that section 924(c)'s stacking penalty enhancement, as it is now interpreted, no longer has or will no longer have any equity in law.

Wherefore, the Defendant, Sean Coates prays for relief in the form of a new trial, vacation of the stacked § 924(c) counts and resentencing there upon, and that he be appointed competent counsel for the new trial and sentencing where the Defendant and his attorney may be allowed allocution and the presentation of intervening and material facts and law affecting the resentencing.

Respectfully submitted,

Sean Coates, Defendant
Reg. No. 01181-748
USP-Allenwood
P.O. BOX 3000
White Deer, PA 17887

CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing Supplemental Claims were served on the Office of the United States Attorney, at 555 4th Street, N.W., Washington, D.C. 20530, Special Proceedings Division, this 10th day of February, 2015, via forst-class mail, postage prepaid.

Sean Coates, Defendant
Reg. No. 01181-748
USP-Allenwood
P.O. BOX 3000
White Deer, PA 17887

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

**Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255**

Mr. Samuel Carson, by and through undersigned counsel, respectfully moves this Honorable Court for relief from the sentence in this case imposed in violation of the Constitution and the laws of the United States. Mr. Carson, by and through is attorney, Kira Anne West, hereby submits this supplement to his 2255 motion for relief. Mr. Carson raises, in addition to his joinder of the claims made by his co defendants in their 2255 motions and supplements, in as much as they also apply to him, additional claims relating to fundamental violations of his Due Process rights under the United States Constitution.

I. SUMMARY OF ARGUMENT

Mr. Carson (hereinafter "Carson") argues that through a pattern of abuses by the Government, he was denied his Constitutional Rights to Due Process and a fair trial. Additionally, Carson was denied the ability to confront and effectively cross-examine the Government's witnesses against him. Carson alleges that the Government engaged in a pattern of conduct designed to secure testimony at trial they knew or should have known was false and misleading. Furthermore, they paid benefits to witnesses in a manner designed to encourage them to improve their testimony. Carson also alleges that the Government improperly paid witnesses

1

App 1112

for testimony knowing that the funds were not being used in the manner in which they were intended and often did not disclose this at trial. Carson further alleges that the Government deliberately withheld exculpatory materials and failed to turn them over in a timely manner so as to substantially prejudice his case. In some instances, *Brady* evidence was withheld until it was too late to use effectively. In other instances, Brady was withheld completely by *ex parte* and under seal submissions to the Trial Court, which the government used as a shield to evade their Constitutional duty to turn over exculpatory evidence.

Carson also argues that the failure of the Government to adequately secure, retain and make available to him the government's trial exhibits, exhibit list from trial, and a full accounting of the *Brady* and *Giglio* materials turned over at trial, has prejudiced his Constitutional Rights with regard to his ability to support certain claims in this 2255 motion. Moreover, there is no way, at this point in time, for Carson to examine the trial exhibits in support of his claims because the Government cannot locate them or their exhibit list. There is also no comprehensive list of the *Brady/Giglio* disclosures made by the government and no comprehensive list of *the in camera* materials reviewed by the Court for *Brady* material prior to and during trial. Carson's counsel is left to deduce, in many instances, that the things he challenges as *Brady* were, in fact, not turned over. The Government's continued inability to proffer such materials requested by Carson prejudices his ability to assert his claims under the Constitution.

Carson additionally argues that his trial and appellate counsel were ineffective in their representation. Carson alleges that his trial counsel was aware of their own ineffective assistance but failed to withdraw as counsel or request permission from the Court do so. They continued to represent Carson after they determined that they could no longer be effective in their representation. Such belief was based on a perceived judicial bias that rendered them ineffective

2

in their ability to represent Carson.   By choosing to protect their personal interests and avoid judicial sanctions and backlash, the trial counsel for Carson made decisions that prejudiced Carson's case, not for strategic purposes, but merely to avoid conflict with the Judge and sanctions.   Their improperly placed notion that the judicial bias of the Trial Court was insurmountable led to their failure to pursue cross-examination on bias issues, preserve issues for appeal and make requests to recall crucial witnesses.

## II.  PROCEDINGS BELOW

In support of this motion, Carson proffers the following:

1. This motion is based upon all the files, records and proceedings of this case, as well as activity and inactivity outside of the record, and any such other materials as may be subsequently submitted. [1]

2. On September 18, 1998, Carson and his co-defendants were charged by indictment with conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in a racketeering influenced and corrupt organization ("RICO") and various other substantial counts.

3. On March 25, 1999, Carson was charged in a 101 count superseding indictment.[2]

---

[1] This brief is a supplement to the previous 2255 filed by Carson *pro se*.  It also adopts the claims raised by Carson's co-defendants in this case in their 2255 petitions and supplemental petitions.
[2] These charges included violations of:  21 U.S.C. 846, Conspiracy to PWID; 18 USC § 1962(d) & 1963(a), RICO conspiracy; 18 U.S.C. § 1959(a)(1), murder in aid of racketeering activity of Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson; 18 U.S.C. 2, Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i), use of a firearm during and in relation to a crime of violence or a drug trafficking crime; 22 D.C. Code § 2401& § 3202 of First Degree Murders while armed of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas, Anthony Fortune,  & Chrishauna Gladden; 22 D.C. Code § 501 & § 3202 , Assault with intent to kill while armed; 22 D.C. Code 2101 & 3202, kidnapping while armed; & 22 D.C. Code §3204(b), possession of a firearm during a crime of violence.

3

4. Carson went to trial with William Sweeney, Vincent Hill, Jerome Martin, Sean Coates and Gary Price.

5. The defendants were charged with a large-scale conspiracy. As part of this conspiracy it was alleged that Carson participated in various acts of violence in furtherance of the conspiracy.

6. On August 15, 2001, after seven months of trial, Carson was found guilty of all counts.

7. On January 31, 2002, Carson was sentenced to successive terms of life imprisonment without the possibility of supervised release or parole due to the then-mandatory Guidelines (*See* Dkt. #907). He filed a notice of appeal on this same date.

8. The United States Court of Appeals for the District of Columbia Circuit affirmed Carson's convictions. *United States v. Carson et al*, 455 F. 3d 336 (D. C. Cir. 2006), *petition for reh'g and reh'g en banc denied*, 2006 U. S. App. LEXIS 26335 (D.C. Cir., Oct. 23, 2006).

9. On Feb. 20, 2007, the Supreme Court denied Carson's petition for writ of certiorari. *Carson et al v. United States*, 127 S. Ct. 1351 (2007).

10. Carson timely filed his original Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC. 2255. This is his supplement to that motion.

11. At all times pursuant to the appeal of this case and in accordance with the Local Rules 56.2(b) and (c) of this Court, the original trial exhibits were in the custody and control of the U.S. Attorney for the District of Columbia and were to be preserved by that office until final disposition of the case. [3] LCrR 56.2 (b) and (c).

---

[3] The defense counsel's copy of the trial record was delivered to appellate counsel years after the case was tried. Unfortunately, due to no error on the part of appellate counsel, the storage facility that kept approximately 45 boxes of notes and evidence was inadvertently bulldozed by the company that stored the records. There are now only 10 boxes remaining that are in the possession of undersigned counsel.

4

III. POST APPEAL STATURE

12. In February, 2008, Sweeney's defense counsel discovered several sealed documents submitted to the Court during trial for *in camera* review of *Brady* material. Pursuant to a Court order, these documents were unsealed as to Sweeney. Subsequently, the documents were unsealed as to Carson and other co-defendants by this Court.

13. Section 2255 of Title 18 permits a prisoner in custody under sentence of a federal court to move the court to vacate, set aside or correct an erroneous sentence. The Supreme Court has read the statute to provide four grounds on which relief may be sought: (1) the sentence was imposed in violation of the Constitution or the laws of the United States, (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United States*, 368 U. S. 424, 428 (1962).

A. Underlying facts at trial

This prosecution was part of the D.C. government's push to prosecute and rid the city of drug traffickers and the homicides that often followed in the wake of drug trafficking. The government's theory was that Carson, along with several friends, engaged in large scale RICO drug distribution and killing. As in most drug cases, the evidence against Carson was in large part derived from testimony of cooperating co-defendants, namely James Montgomery, a cooperator whose lobotomy severely affected his memory and the un-cross-examined testimony of Robert Butchie Smith, a cooperator who was shot down in the streets, allegedly for being a snitch. Of course, most witnesses that testified at trial against Carson were either profiting from a

5

forthcoming 5K or Rule 35 or substantial monetary payments for "security" or "moving expenses." When this testimony is viewed through the looking glass of truth, the picture becomes quite hazy. In February, 2008, sealed documents that the Government submitted *in camera* and *ex parte* were discovered and unsealed. Herein lies Carson's claim that his trial was so infected by the improper withholding of exculpatory materials and the prosecution's deliberate hiding of such evidence that his conviction cannot stand. Because of this pervasive misconduct, Carson did not get a fair trial. There is a reasonable probability that the outcome of the proceedings would have been different if the defense counsel in this case had been supplied the *Brady* material in a timely manner for use on cross examining the weak and highly biased testimony of their star paid witnesses. As a result, Caron's conviction should be set aside.

IV. CONSTITUTIONAL VIOLATIONS: BRADY ISSUES: 5TH AMDT. DUE PROCESS & 6TH AMDT. CONFRONTATION CLAIMS

A. Background

1. Facts

Throughout the trial and during pretrial proceedings, several of the defendants, including Carson, repeatedly asked the government to turn over all exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).[4] (Tr. 6/16/2000 p. 5-13) (defense counsel asking for *Brady* material on triple murder); (Tr. 9/27/00 p. 78-80) (Carson's counsel asking for *Brady* on Anthony Fortune murder); *Id*. at 200-203. *See* Carson's supplemental motion to compel, Dkt #342 ; Sweeney's Third Motion to Compel Discovery, Dkt #340. The government stated pretrial that it had complied with all of its discovery obligations. (Tr. 9/27/00 p. 130: 17-20). However, at trial, it was clear the government had not adequately searched its files for potential *Brady* material. As

---

[4] *See also*, 1/30/01 PM 4 (defense counsel Zucker *Brady* request for notes of Mayrant murder); 2/1/01 PM 63 (defense request for AUSA notes of Andre Murray). At times, the request for *Jencks* was in reality a request for *Brady* information and only came to light after a witness testified. *Id*. at 5.

6

a result, defense counsel were left to request the documents in session or when the issue arose.

This put the defense at a considerable disadvantage. The Government, rather than turn these

items over once it was clear that they contained *Brady*, submitted them to the court to review *ex*

*parte* and *in camera. See* Ex. 1. (The Court made an exhibit list and added to it throughout the

course of the trial). These sealed materials were kept from the defense and no findings of fact

and conclusions of law were ever made by the trial judge regarding his *Brady* rulings. Not

surprisingly, based upon the one sided proffer by the government, none of the documents were

determined to contain *Brady* material. There was simply an oral ruling that the items did not

contain *Brady* material and the defense was shut out of the process. The Court mistakenly

believed that it could not order *Brady* to be turned over and misapplied the Brady standard to this

inquiry. The Court stated so during a pretrial hearing "I can't order Brady material turned over,

and Brady material is that which is reasonably likely to be, quote, exculpatory, close quote." (Tr.

6/16/2000 p.23-24). This systematic withholding throughout the trial is documented in part on

the Court's exhibit list. *Id*.

Long after the appeal of the convictions in 2005, one of the lawyers appointed by the Court

to write the 2255 found several exhibits that were put under seal during the trial. A review of

these exhibits shows that the government had within its possession, before and during the trial of

the case, a great deal of *Brady* material that should have been turned over to the defense. The

following discussion of some of these exhibits show how important these materials would have

been at the trial.[5]

---

[5] The following is a list of the exhibits that were placed under seal during trial and discovered by
2255 counsel in 2008. Some are included in the attached Exhibits 1-11, but not in the following
order: (1. Andre Murray letters to AUSA Wainstein (heavily redacted); 2. Andre Murray notes; 3.
Robert Butchie Smith 302; 4. Court exhibit 2 - AUSA Notes on Switzer; 5. Court exhibit 4,
AUSA notes on Andre Murray; 6. Court exhibit 5, Theodore Watson file; 7. Court exhibit 8-

7

2. The Law

The *Brady* rule is a rule of disclosure, not admissibility. The Supreme Court held in *Brady* that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three steps in a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 119 S.Ct. 1936, 1948 (1999). Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). A *Brady* violation is demonstrated by showing that the undisclosed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). This Court reviews an alleged due process violation under *Brady* for a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963).

Thus, the government is obligated to disclose not only exculpatory evidence but also evidence that might tend to impeach the credibility of key government witnesses. *See Brady,* 373 U.S. at 83; *Giglio*, 405 U.S. at 150. Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. The Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985) disavowed any

Charles Bender 302, 8. Court exhibit 11-Arthur Rice 302; 9. Eugene Byars 302 -Court exhibit 9; 10. Governments motion to move defendants(note: not on the Court's Exhibit list); 11. AUSA notes on James Montgomery; 12. Additional materials James Montgomery-Agent Lisi notes; 13. Notes; 14. Court exhibit 10-Ronald Sowells 302; 15. Use of anonymous jury(note: not on Court Exhibit list); 16. Court exhibit 5File of Theodore Watson-; *See* Court Exhibit list, Exhibit 1 to this supplemental motion.

8

difference between exculpatory and impeachment evidence for *Brady* purposes. Furthermore, disclosure of documents and tangible objects that are material to the preparation of the defense may be required under the rule of *Brady* without an additional showing that the request is reasonable. *United States v. McVeigh*, 954 F. Supp. 1441, 1446 (D. Colo. 1997).

*Bagley's* touchstone of materiality is defined as the reasonable probability of a different result. *Kyles,* 514 U.S. at 434. The critical question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial. This is understood as a trial resulting in a verdict worthy of confidence. *Id.* Materiality in terms of suppressed evidence should be considered collectively, not item by item. *Id*. at 436. Once there has been a *Bagley* error, it cannot subsequently be found harmless. *Id*. at 435.

Carson believes that the government purposely hid *Brady* material by submitting it to the Court as a gatekeeper rather than complying with its obligations under the law. At the behest of the Government, this process that the district court undertook was improper and prejudicial. Although the trial court viewed the evidence in question *in camera*, the court failed to keep the required transcribed record of the *in camera* proceedings. *See In re Sealed Case*, 151 F.2d 1059 (D.D.C. 1998). Moreover, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record has been released to the defense indexing the material presented to the Court that matches up with the documents released by the Clerk's office in 2008.[6] The prosecution never made a record as to why they were turning over certain

---

[6] Several documents turned over by the clerk in 2008 as part of the sealed exhibits are not listed on the Court's exhibit list as having been sealed. However, review of the trial transcript shows that in the case of the Theodore Watson file, it was in fact sealed after a request by defense

9

documents to the court for *in camera* inspection and in some cases they were compelled to submit documents to the Court record after having determined that no *Brady* was present.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998). Failure to turn over this *Brady* material kept Carson's counsel from effectively confronting the witnesses against him. Evidentiary errors are reviewed for abuse of discretion. *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993).

B. Sealed documents and ex parte submissions

1. Government's ex parte motion to change confinement of defendants

Trial counsel for William Sweeney, Steven Kiersh,[7] asked the Court repeatedly for *Brady* material with regard to the prior statements of Robert Butchie Smith, another Government cooperator. (Tr. 5/29/01 AM 77-end & Tr. 6/16/2000 p. 25-26). On April 2, 1999, in a sealed document,[8] the government filed an "Ex Parte Notice to Change Confinement of All Defendants." Judge Jackson put this motion under seal April 6, 1999. The defense was never given access to this motion. In that motion, the Government identifies "Andre Chappell and Anthony Ricardo Hawkins"[9] as having murdered Robert Butchie Smith. *See* Exhibit 2 @ 12. This is critical evidence because the government's theory at trial was that Carson and Sweeney killed Smith and they were convicted of the murder. Moreover, they were prejudiced by a ruling that allowed the

---

counsel that it be made part of the record. It was not, however, reviewed in camera by the Judge, over the objection of defense counsel Zucker. (Tr. 2/13/01 AM p. 6-7).
[7] According to an interview of Mr. Keirsch on 1/18/12, the defense attorneys never were told about the contents of any documents in any i*n camera* exhibits. *See also* affidavit of Lexi Negin.
[8] This document was not assigned an exhibit number nor does it appear on the Court's exhibit list.
[9] These two individuals are never brought up again. This forclosed any opportunity Carson's investigator would have had to have knowledge of them or to investigate them.

statements of Smith to be entered into evidence by Agent Lisi so that there was not an effective way to cross-examine them. Had defense counsel known about this motion, and the fact that the Government believed others were responsible for the death of Robert Butchie Smith, defense counsel could have had their investigators try to find these two individuals and follow leads on whoever else wanted Smith dead. Furthermore, Agent Lisi could have been cross-examined on this subject and/or prevented from testifying as Smith at trial. However, at trial this information was withheld and the government argued that Agent Lisi be allowed to bring in Smith's statements under the theory was that Carson killed Smith and therefore Smith's statements should come in under FRE 804(B)(6).[10] The Court agreed and held that Smith's un-cross-examined statements could all come in through Agent Lisi, and they did. Had these names been provided to the defense and thoroughly investigated, the Court would have been hard pressed to find that Carson killed Smith by a preponderance of the evidence. The only testimony that it was Carson who killed Smith was the uncorroborated testimony of James Montgomery, their star witness with a history of lying and who lacked credibility on many levels. (Tr. 5/23/01 PM 22-33).

This information was clearly *Brady* material in that the government, at that time, thought someone other than Sam Carson killed Robert Smith. This information would have also impeached Montgomery's version of events. In the pretrial hearing on September 27, 2000 regarding the Government's request to have Smith's statements come in at trial through agent Lisi, the government represented directly to the Court that no other suspects wanted Smith dead in this case and that if that information existed it would be considered *Brady* and should be turned over. (Tr. 9/27/00 p. 200-202). The Court agreed. However, this is exactly what the government failed to turn over to the defense at trial. The prejudice extends not only to the admission of the

---

[10] The Court found by a preponderance of the evidence that Carson had waived his objections to Mr. Smith's hearsay statements when he killed this witness. (Tr. 5/29/01 AM p.88-89).

11

testimony of Smith through Lisi at trial, but to the inability to present the defense Carson would

have presented at trial.

An earlier pretrial discussion between the Court, Carson's counsel, and the prosecutor

illustrate how this is clearly *Brady* material. At a pretrial hearing, Carson's counsel asked for the

name of a person who overheard Mr. Martin say that he (Martin) was responsible for the killing

of Anthony Fortune. The prosecutor, Mr. Zeidenberg, refused to give him the name. Carson's

counsel argued:

> MR. BESHOURI: …I ought to be able to investigate it. I ought to be able to be in a position to present it. That means I need to be able to talk to that witness—that witness who heard Mr. Martin.
> THE COURT: I don't know what more you need to be given in the way of Brady information. The Government has informed you—has acknowledged there is a witness who will be called at trial and who will testify that at one point—or who is alleged to have said, whether he testifies to it or not, at one point that he was responsible for a particular homicide.
> Now if they had further evidence of some description corroborative that the individual was, in fact, responsible for that homicide, then I suppose that could qualify as Brady material, but you already know all that Brady requires in the absence of the existence of any such other evidence.
> *Id.* at 78-81.

Here, the Court acknowledges that if there is evidence that someone else committed a

murder, that it's *Brady,* but the Court does not order the Government to turn it over. Instead the

Court goes on, presciently:

> THE COURT: It is incumbent upon the government to reveal evidence which is exculpatory of your client, but the government is in control of that evidence. And you would not know about it but for the fact that the government makes you privy to that information.
> *Id*. at 82.

After further discussion, the AUSA agrees to give information regarding a separate

murder, but is allowed to make the decision as to all other Brady information.

2. Court Sealed Exhibit #4 –Interview Notes of Andre Murray

12

In addition to the information that Andre Chappell and Anthony Ricardo Hawkins killed Butchie, the sealed Court Exhibit #4, AUSA notes of an interview with Andre Murray demonstrate that he stated that "Fat Petey" was rumored to have killed Butchie Smith as well to get back at Draper for murdering his brother, Keith Johnson. *See* Sealed Court Exhibit #4, Exhibit # 3 to this Motion. The rumor that Petey Johnson aka "Fat Petey" killed Smith was further bolstered by Agent Lisi's own testimony at trial confirming at trial that Petey Johnson was picked up by police as a possible witness to Smith's murder and was present at the time of the murder. (Tr. 5/30/01 AM p. 19-20).

The information indicating this additional suspect in the murder of Smith was never turned over to the defense or disclosed to the defense at trial despite repeated requests for this very type of information. Withholding this information prejudiced the defense in their ability to argue against the wholesale admission of Smith's testimony and the forfeiture of the defendants' confrontation clause and hearsay objections to that testimony. It would have also been very valuable impeachment testimony of Agent Lisi as to his failure to consider Petey Johnson as a suspect, question him as a suspect and follow leads supplied by Andre Murray. All this points to the tunnel vision Lisi and the Government had to make a case against the defendants at any cost.

Notably, the Government's case against Carson for the murder of Smith was weak and supplied completely by cooperating witness, James Montgomery.[11] Montgomery was a known liar and had admitted to several murders and a lifetime of crime. Significantly, his testimony about Carson's participation in the murder of Smith was largely uncorroborated and premised on a theory that Carson and Montgomery were working together to kill Smith. However, at trial the testimony was that Carson acted alone and did not even tell Montgomery his plans or the fact that

---

[11] This was so even though an Assistant United States Attorney (Oscar Mayers) in a superior court case previously described him saying "this man is unreliable." (Tr. 6/16/2000 p.17).

13

he had accomplished their joint mission.  It is well accepted that testimony of a cooperating witness must be "viewed with great caution."  *United States v. Curry*,  187 F.3d 762, 766 (7th Cir. 1999).  In this case, James Montgomery's testimony was all the Government needed because his credibility was bolstered enormously by the systematic removal of all other versions of events. The jury was forced to believe Montgomery as the only evidence available because all other evidence was withheld suggesting that Smith was killed by someone other than Carson.  The withholding of the information regarding other people believed to have the opportunity and motive to kill Smith is a prime example of the pattern of deceit that infected this trial from start to finish.

The resulting prejudicial effect of the government's withholding of the valuable *Brady* materials as they relate to the Smith murder was significant and casts into doubt the fairness of the verdict reached in this case.  The Government cannot shield itself from it's known *Brady* obligations by claiming that they submitted the materials *in camera* for inspection when it is clear they represented to the Court, on the record, false statements regarding their knowledge of the lack of other persons thought to have motive and opportunity to kill Smith.  This evidence amounted to more than mere speculation and would have formed the basis for effective cross-examination of Montgomery, Lisi and Andre Murray, as well as formed the basis for challenging the government's motion to admit Smith's statements pursuant to Rule of Evidence 804(b)(6).

3. James Montgomery sealed information - the murder of Timothy Benton

James Montgomery was the Government's star witness. Thus, defense counsel asked the Court for any *Jencks* on Montgomery, specifically, the 302s and notes of Agent Lisi.   (Tr. 3/7/01 (PM) 52-52). The Court stated that it had earlier reviewed this information and that it contained no *Brady* material.  *Id*. at 91.   However, the notes did contain valuable impeachment evidence.

14

Court exhibit #7, attached as Exhibit 4.[12] (Tr. 3/6/01 p. 1 PM).

On 3/22/99, Special Agent Lisi testified in the Federal Grand Jury as to what James Montgomery told him about the Benton murder. (GRJ–77, p. 29-35). Lisi testified that Montgomery told him that "Poo Poo" (aka Maurice Proctor) had killed Benton. Lisi further testified that two weeks later, Montgomery called him and said he had more to tell him. *Id.* at 35.[13]

At trial, the story changed. Montgomery testified that he (Montgomery) and Proctor had killed Benton. (Tr. 3/13/01 p. 30-36).

A third story exists that sheds even more doubt as to Montgomery's credibility. Again, it's a story the government didn't want anyone to know about. This story only appears in the notes taken by Agent Lisi of his first interview with James Montgomery. These are the same notes submitted *in camera* to the Court. These notes show that Montgomery first lied to Agent Lisi about the Timothy Benton murder. Although Montgomery was charged with Benton's murder, Lisi's notes prove that Montgomery lied and substituted Carson for himself (as he was prone to do) as one of Benton's killers. This is significant because it was Carson's theory that Montgomery did this in other crimes he testified about and that this was a pattern of behavior by Montgomery to secure leniency and benefits from the government. It was also his attempt to push the blame for his own crimes on others while being able to give details making him seem credible to his Government handlers.

Significantly, the government is the only party uniquely qualified, and under a Constitutional obligation, to identify *Brady* and turn it over. The Court's procedure for *in camera*

---

[12] Court exhibit #7(Exhibit 4) says AUSA Notes of James Montgomery. However, the actual *in camera* submission appears to be both AUSA and Agent Lisi's notes.
[13] This is based upon the redacted copy of Lisi's Grand Jury testimony supplied by the Government as a result of this Court's order dated 9/23/2013. (Dkt. #1123).

15

inspection was improper with respect to these sealed materials and the Government used it as a shield to hide *Brady* evidence from the defendants and bolster the credibility of their paid witnesses. The Court's complicity in this scheme is confusing at best. What is certain is that the Court abused it's discretion and failed to keep a transcribed record of the *in camera* proceedings, failed to articulate a compelling interest for reviewing the *Brady* materials *in camera*, failed to make findings regarding the requested material, and failed to make a record to the defense indexing the material presented to the Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir 1998). All of these errors prejudiced Carson at trial and on appeal and only served to render the trial unfair and verdict unreliable.

4. Murder of Anthony Fortune – 302s of Bender

Carson and Jerome Martin were both charged and convicted of the murder of Anthony Fortune. At trial, defense counsel was told by the District Judge that the FBI 302's of a testifying witness relating to this murder, Mr. Charles Bender, did not contain *Brady* material. (Tr. 2/05/01 AM p. 84). At trial, both Bender, and another witness, Eugene Byers, testified that Martin confessed to killing Fortune. (Tr. 4/4/01 PM p. 94); (4/9/01 PM p.14).

However, in sealed Court exhibit #8, "302's of Charles Bender", information from a 302 report of Special Agent Kristen Kane taken on 2/17/98, page 5, notes that Bender told the agent and AUSA during the interview that "Pimp" killed Anthony Fortune. *See* Exhibit # 5. Also, sealed Court exhibit #9, the 302 interview of Eugene Byers taken on 5/25/99 says that "pimp then killed Fortune." *See* Exhibit #6. The 302 says in part:

> With regard to the murder of Anthony Fortune, source heard that FORTUNE was gambling in the area of 58th with PIMP (JEROME MARTIN) and BOO BOO. BOO BOO supposedly broke FORTUNE and FORTUNE tried to get his money back. PIMP then killed FORTUNE. FORTUNE had a reputation for robbing a lot of people. PIMP provided this information to the source approximately 4-5 months after the murder. FORTUNE's partner, RODNEY SHORT, was later incarcerated with the source at Lorton and he told the source he was

16

planning to kill PIMP if PIMP was sent to Lorton.  The source warned PIMP about SHORT but PIMP as not sent to Lorton while SHORT was there.

This information is clearly exculpatory as to Martin and Carson.  Had these 302's been turned over, defense counsel could have used this to impeach these witnesses.

Additionally, the only purported eyewitness to the Fortune murder, Charlene Wilson, was shaky at best regarding the identification of the shooter she says she saw.[14]  In fact, she identified Sean Coates in the courtroom as Carson during her testimony.  (Tr. 2/13/01 AM p.16.).  The information in the 302s that was withheld from the defense clearly violated Carson's due process rights as the information was material to Carson's guilt or innocence.

5.  Murder of Steven Dunbar

In sealed court exhibit 8, the notes of either the AUSA or the agent (it's not clear) show that Charles Bender told them that "Art said he killed Steve…"  Bates # 905167.    Exhibit #5.  In Court exhibit #7, the AUSA notes of James Montgomery interview, reflect that "Erik and Art both talked about killing Dunbar."  Exhibit #4.  The same page goes on to say "Vito issued hit b/c he wasn't supposed to be a Wysocki hit."  *Id.*  This is something that Carson's defense team could have investigated and could have cross-examined Agent Lisi on at length.

Defendants contend that the district Court's ruling to exclude these sealed exhibits was in error.  The defendants needed all information regarding the credibility and potential bias of the government's witnesses as well as any information that exculpated  Carson.   This Court has often stated that bias evidence is always relevant.  *Williams v. United States*, 642 A.2d 1317, 1322 (D.C. 1994).  Moreover, Agent Lisi offered his testimony in the form of a narrative.  The

---

[14] Wilson testified at trial that she saw Carson shoot Fortune.  (Tr. 2/13/01 AM p. 24-27).[14] Four months later in the trial, fortuitously, Agent Warrener testified that Wilson previously told him she had HEARD that Sam had killed him (emphasis added).  (Tr. 6/14/01 PM p. 55). This came as a shock to the defense counsel and was only uncovered as a result of cross-examining Agent Warrener.

*McVeigh* court held it impermissible for the government to suppress or secrete information known to them which does not fit into the narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449.  Furthermore, the Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Ritchie,* 480 U.S. at 66.   Robert Smith was an essential government witness and the lack of opportunity for defendant to cross-examine him or view the statements he gave to the government was fatal.  Carson contended that Mr. Smith was an unreliable witness.

With regard to the triple murder, sealed exhibit 7 states that "Chin:  told James not my world get $250k; chin later told J not to believe Bam had paid Draper $50k to hit Gaskins."  See Exhibit #4.  Montgomery later testified that Carson actually was involved in the triple murder yet the AUSA did not correct this false testimony. (Tr. 3/14/01 PM p. 8). There was also mention of another suspect that was "another dude was in kitchen; don't know what happened to him."  This would have been another lead for the investigators on the defense team.

6.  Theodore Watson Dilemma – Watson Case File Withheld from Defense

Another cooperating co-defendant, Theodore Watson testified against the defendants. While incarcerated on a separate federal case out of Greenbelt, Maryland, he became friendly with co-defendant Sweeney and claimed that Sweeney told him everything about his criminal activity including wanting to kill James Montgomery for snitching.  (Tr. 2/8/01, PM  p. 45-70). Thus, his testimony was such that Carson needed to challenge it in any way possible.  However, despite his cooperation, he was not given the 5K he thought he deserved.  This undoubtedly perplexed defense counsel and thus he was cross-examined about why he did not get a 5K from the Government.  Watson's response was that he didn't get the 5K because the prosecutor did not

like him. (Tr. 2/12/01, AM p. 19-21). After hearing this testimony, defense counsel made a request of the Court that the prosecution obtain and review the Watson Greenbelt file for any *Brady* information. *Id.* at 8 & 78.

The next day, the Government obtained the Watson file and represented to the Court that after reviewing the entire file, there was nothing "that suggests any Brady or Jencks material in the file." AUSA Zeidenberg goes on to explain that the Greenbelt AUSA's reason for not giving the 5K "was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 AM at p. 6-7). The defendants requested the letters addressed to the prosecutor from Watson. (Tr. 2/13/01 AM 5-6, 90). The Court denied this request and the Watson file was marked as Sealed exhibit #5 of the Court. *See* Exhibit 7. Although defense counsel asked that the Court review it, the Court refused. (Tr. 2/13/01 AM 5-6, 90).

AUSA Zeidenberg's representation to the Court was way off the mark and highly suspect. Not only did the file contain *Brady* material, it contained several instances of conduct that is *Brady* material. Watson, in an attempt to curry favor with the AUSA who held his fate in his hands, admitted to lying repeatedly in several letters written to her. For instance, in one letter, Watson says to the AUSA: "had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed…there is no denying that during my 30 years in the system, I have lied, connived and schemed to get things done." *See* Exhibit 7, letter dated August 19, 1999. In yet another letter Watson describes himself thusly: "Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth…" *See* p. 1 of 17, undated letter.

19

Not only did Watson admit to being a liar, but the Greenbelt AUSA, Sandra Wilkinson stated in a letter to the Court in Greenbelt that stated in part: "…despite my specific directions to not contact me directly.  Mr. Watson continues to undermine his own credibility as well as his ability to follow directions from the government." *See* Exhibit 7, 2/21/2000 letter to District Judge Messitte.

Had the prosecution turned over this file to defense counsel, or had the Court reviewed the file, Carson's lawyers could have cross examined Watson on his propensity to lie and his reasons therefore.  His credibility was in issue.  Unfortunately, again, these documents remained sealed until 2008, long after trial and appeal. More telling however is the fact that the prosecutor KNEW the contents of these letters and lead the Court to believe there was nothing in the way of *Brady*[15] in the file.  This is extremely problematic because there was virtually no evidence linking Carson to several of the alleged crimes other than the uncorroborated story of James Montgomery.  Given that, Watson's testimony was a much needed fortification of Montgomery's credibility.  The information that Watson was a liar, a manipulator and working the Government system for all he could get was critical impeachment material necessary for the defense to use in order to obtain a fair trial.  As the Supreme Court has made clear, the prosecutor:

"has the responsibility and duty to correct what he knows to be false and elicit the truth…That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for it's impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) quoting *People v. Savvides*, 136 N.E. 2d 853, 854-855 (N.Y. Ct. App. 1956).  Moreover, it is a due process violation when the Government fails to disclose evidence of a witness' perjury.

*United States v. Cuffie,* 80 F.3d 514, 518 (D.C.Cir 1996).

[15] Although undersigned counsel refers to this as "*Brady*" material, it is in the purest sense *Giglio* material; material that would be used to impeach as opposed to exculpate. However, the Supreme Court later held in *United States v. Bagley*, 473 U.S. 667 (1985) that *Brady* and *Giglio* evidence are basically one and the same.

20

C. Other Brady Violations and Government Misconduct

1. Payments to Witnesses regarding the Triple Murder

One significant claim in this 2255 motion for relief stems the investigation and prosecution of the triple murder that was committed in November of 1996. The initial investigation of these murders resulted in the arrest for these charges of another individual, not Mr. Carson and his codefendants. During the initial investigation, *Brady* and *Giglio* materials were created by and/or made known to the federal government in this case in the form of Grand Jury testimony of two witnesses stating that an individual named Dennis Green was responsible for the triple murders. These grand jury statements form the basis for several of the claims asserted here in this brief.

The two witnesses, John Pinckney and Cheree Owens, testified on December 10, 1996 before a PG County grand jury and implicated an individual named Dennis Green in the triple murders and not Mr. Carson or any of his associates. (Government's Brief on Appeal at p. 174). According to the Government, "When Pinckney and Owens came to the police with this information, they were provided with a substantial amount of money for their relocation, which was meant to last several weeks. The couple went through the money in a matter of days and then demanded additional funds." (*Id*. at 175). [16] Police learned that Pinckney and Owens owed Green money for drugs. After further investigation, investigators found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared. (*Id. citing* Joint Appendix 1002 n. 1).

At approximately the same time, December 5, 1996, the Federal Bureau of Investigations arrested Robert Smith. It was at this time that Smith began providing information about the triple

---

[16] There is no evidence that these are the facts but only supposition on the part of the Government.

21

murder to the federal government. (*Id*. at. 182). The Government contends that there is "no reason to believe that the FBI shared any of Smith's statements with Prince George's County as early as December 10, 1996, when Pinckney and Owens testified. *(Id. citing* Agent Lisi 5/29 Tr. 9-10, 12-13).

The United States Attorney's Office in Washington, D.C. indicted Carson for the triple murder based on the testimony of Mr. Smith. The Maryland authorities agreed to dismiss their triple murder charges only under an agreement with the federal Government to bring the charges under the umbrella of a federal RICO indictment. (Carson's Brief on Appeal at p. 138).

At his trial, Carson sought to introduce the grand jury testimony of Pinckney and Owens. However, because these witnesses could not be located at the time of the trial, Carson sought to introduce their grand jury testimony under the former testimony exception to the hearsay rule of the Federal Rules of Evidence, Rule 804(b)(1). Finding that there was "an absence of an identity of motive on the part of the government" in developing this PG county grand jury testimony, the district court ruled that the testimony was not admissible. (Government's Appellate Brief at p. 175). Carson appealed this decision as an abuse of discretion by the trial judge. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony under Fed. R. Evid. 804 (b)(1). In so doing the court stated, "appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities." *United States. v. Carson*, 455 F. 3d 336 at 372. The Appellate Court further stated that "The only evidence the defendants point to is testimony from FBI Special Agent Lisi that "[w]e [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know

22

everything we [had] on the triple murder." *Id*. The court found that this showing was insufficient to show the Maryland grand jury proceeding was merely a "tool" for the federal authorities.

On April 18, 2012 Mr. Carson filed a Motion for Discovery with regard to the record of payments to the witnesses Pinckney and Owens and other documents, including the Grand Jury Testimony of Agent Lisi. (Dkt. #1088). On Sept. 13, 2013 this motion was denied in part and granted in part by this Court. The portion that was denied pertained to the discovery of payments made to Pinckney and Owens and any involvement by the federal government in those payments and relocation of those witnesses. On May 29, 2014, after several attempts and months of searching, counsel for Carson and Carson's investigator, Mr. Vaughan, were able to locate an address of Ms. Owens and drove to her home to speak with her. Ms. Owens agreed to discuss the case with Mr. Vaughan and counsel for Carson at that time. She related at length the process by which the Federal Bureau of Investigation moved her and Mr. Pinckney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder. She said they never heard from the FBI or government counsel after they were moved. Counsel for Mr. Carson and Mr. Vaughan presented Ms. Owens with a prepared affidavit containing her previously made statements and asked her to sign it so that it could be presented with this motion. Ms. Owens indicated that the information was true in the affidavit but that she didn't want to sign it and get involved because she was afraid for her life and is currently under a doctor's care for health related issues. Mr. Vaughan executed an affidavit regarding these facts and it was made a part a new motion filed on October 9, 2014, for Discovery based upon newly

23

discovered evidence. (Dkt. # 1132). Also, attached to that motion were the affidavit of Mr. Vaughan, the Death Certificate of Mr. Pinckney, and the prior statements of Cheree Owens.[17]

The new evidence provided by Ms. Owens demonstrates that the federal government participated in, paid for and facilitated the "disappearance" of these two witnesses. Pinckney and Owens' testimony did not support the federal government's new theory of the triple murder in December 1996 supplied by Robert Butchie Smith, their newest informant and cooperator. The government created the fiction that these first witnesses were unreliable and "seemingly disappeared" a short time after giving their exculpatory testimony. Moreover, they created an illusion that Pinckney and Owens had somehow been proven untrustworthy and that they had tried to abuse the relationship with the government by misusing government funds. There is no evidence in the record to support these claims. The government proffered that "[p]olice learned that Pinckney and Owens owed Green money for drugs. After further investigation, investigators found nothing to corroborate their story, and shortly thereafter Pinckney and Owens disappeared." (Joint Appendix, fn 1002, n.1).

Ms. Owen's version of events is in direct contradiction to the story promoted by the government and used as a tool to support it's motion to have the grand jury transcripts of these unavailable witnesses excluded at trial. The result was a deprivation of Carson's Constitutional Rights to Due Process and his right to present his defense at trial. Moreover, this newly discovered evidence demonstrates that Carson was deprived of valuable impeachment material to combat the testimony of Robert Smith in this case. According to the government, "Smith was 'opened up' as a confidential informant on 12/17/96. From that date until the date of his murder the FBI provided financial assistance in the amount of $12,744.19. This money went to pay rent,

---

[17] All of these documents, the affidavit of Mr. Vaughan, the Death Certificate of Mr. Pinckney, and the prior statements of Cheree Owens are incorporated by reference in this motion.

a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills." (Dkt. #451). Evidence now demonstrates that, even though Smith began cooperating in December of 1996, and began providing information regarding the involvement of the K street crew in various crimes, including the triple murder, the government was still "paying" for testimony provided by Pinckney and Owens. Their theory was totally different from Smith's theory of who committed that crime. It would be easy to infer that these payments to Pinckney and Owens functioned as a "back up" plan in the event that Smith did not improve his testimony over time to the satisfaction of the government in this case.

A pattern of paying for the improvement of witness testimony over time was clearly established, but went unnoticed at trial. The continued payments to Pinckney and Owens would have been highly valuable impeachment material against agent Lisi and others who stamped nearly inscrutable credibility on Smith's testimony. As mentioned earlier, Smith was an unreliable individual with a lengthy criminal history who was engaged in narcotics trafficking in D.C. and Maryland. (Dkt. #340). At the time of his death many persons had a motive to kill Smith for his cooperation. *Id*. The payments by the government to Pinckney and Owens were occurring simultaneously with Smith's cooperation. The cover-up regarding this indicates payments made to Smith were possibly used to secure improvements to his version over time.[18]

The information regarding the federal government's "determination" that Pinckney and Owens were no longer trustworthy was also not made available to Carson. The United States Attorneys Manual, 9-21.100 Eligibility for Witness Security Program states that:

To avoid any unnecessary delay in processing a Program application, government

---

[18] Carson cannot ascertain the exact length of the continued payments to Pickney and Owens or who paid them because the payment records have not been made available. It is possible that the payments to these witnesses extended even after Butchie Smith was murdered, suggesting that these witnesses continued to be believed credible.

App 1136

attorneys should note the following:

> A.  In order to make certain that each application for entry of a witness into the Program is both appropriate and timely, the witness should, prior to his/her acceptance into the Program, either appear and testify before the grand jury or in some other manner have committed himself/herself to providing testimony at trial. This requirement relates to the commitment of the witness to testify, and is intended to ensure that the witness's testimony is available at the time of trial. **It is equally as important a requirement that the prosecutor intend to have the witness testify, and that the witness's testimony be significant and essential to the success of the prosecution.**
>
> B.  The protection and relocation of witnesses and family members are expensive and complicated. In addition, DOJ is obligated to provide for the safety and welfare of a protected witness and family members long after the witness has testified. It is imperative, therefore, that the request for entry of a witness into the Program be made only after the sponsoring attorney has determined that the witness's testimony is significant and essential to the success of the prosecution, as well as credible and certain in coming.

> (emphasis added).

The longer Pinckney and Owens were in the program, the stronger the suggestion is that their testimony was considered significant and essential to the success of the prosecution, as well as credible.  The failure of the Government to disclose the nature and extent of this relationship in a truthful manner casts doubt on the fairness of the verdict in this case and the credibility of the testimony of Robert Smith, who otherwise could not be cross examined.

Carson was also prejudiced because no investigation of these individuals could be independently conducted in a timely manner by his trial counsel.  The government proffered that Pinckney and Owens were "later discredited", and that no more evidence could be found to corroborate their story.[19]  Considering that James Montgomery, the government's star witnesses, a

---

[19] On 6/16/00, a motions hearing was held in which Mr. Kiersch asks for the investigation file of Dennis Green. The Government proffered that Pinckney and Owens had been investigated by police and had not been found truthful. However the Government agreed any materials relating to their testimony would be considered *Brady* and turned over.  *Id*. p. 9. Although defense counsel

26

paid snitch, known and admitted killer, convicted criminal and a person who suffered brain damage, testified at trial to many things with little to no corroboration, it seems unsupportable that this fact alone could have proven these witnesses discredited. Moreover, at trial, Carson's counsel was falsely led to believe that pursuing the lines of questioning regarding Mr. Green would be unsuccessful and that further investigation into Mr. Green would be unprofitable.

The government argued successfully, both at trial and on appeal, that they had nothing to do with Prince George's County investigation and the *Brady* material they created. They distanced themselves from anything that happened in that investigation by claiming that they had no knowledge of the Grand Jury Proceedings until afterwards and that they had no similar motive to examine these witnesses at the time. Instead, however, the new evidence of payments to these witnesses demonstrates that the Federal Government misstated the status of their involvement with these witnesses, assisted in procuring their unavailability, and actively hid this fact for tactical advantage before trial, at trial and on appeal. The misleading information provided by the Government prejudiced Carson from being able to offer the exculpatory his ability to argue in his defense.

The concerns raised here in this 2255 go to the very core of the reliability and credibility of all the witnesses at trial, not just Smith or Pinckney and Owens. The suggestion that *Brady* material was created by a joint investigation but then pushed under the rug under the guise of an "independent" act by PG County prosecutors, calls into question fundamental fairness of the trial against Mr. Carson. It also raises questions as to the reliability of the testimony of Smith, Agent Lisi and every witness that was paid for testimony and told they would suffer penalties of perjury if they lied. Since a large number of civilian government witnesses that appeared in this trial

was given their grand jury testimony, they were never given any proof of this alleged investigation of Pinckney and Owens.

App 1138

were paid, either monetarily, with relocation funds or with favorable plea agreements, the issues surrounding the payments to Pinckney and Owens raise the legitimate inquiry into what, if anything, would have happened to any of the civilian government witnesses if they were found to have lied.   The evidence suggests a pattern by law enforcement to pay for testimony with disregard for its truth.  Witnesses were paid, witnesses lied, and the Government didn't seem to care as long as the right witnesses were there at trial and testified to the right story to convict the people they wanted.   They kept the best version of events, but paid for them all until it was time to choose.

2.  Cash payments for favorable testimony disguised as legitimate expenses

The Government's misconduct in paying for witness testimony and failing to disclose the real nature of the payments in this case deprived Carson of his Constitutional right of Due Process.  The Government conducted itself with intentional disregard for the rights of Mr. Carson when it paid witnesses money for testimony and then, knowing that such witnesses had not used the payments as agreed, failed to reveal the true nature of the payments to defense counsel at trial or actively represented that the money was used for purposes it knew or should have known were false.

The Government has the ability to incentivize witnesses testimony with cash incentives and rewards.  They cannot, however, lie about these payments and characterize them as relocation payments, when in fact, they were not.  In this case that is exactly what the Government did with several key witnesses.  Many, if not most of the witnesses in this case, were paid cash or otherwise incentivized by some form benefit as part of the bargain for their testimony.  The payments in cash were often characterized as various types of expenses, from relocation to witness protection and lodging.   However, at trial, it was revealed that some witnesses were paid

28

for relocation expenses and never moved. The failure to disclose this information prejudiced Carson and the other defendants in their ability to cross-examine these witnesses regarding the funds and the government's complicity in handing out money to witnesses with no strings attached. The prejudice experienced by Carson could not be remedied on the stand with these witnesses given the time constraints imposed by the Court and the substantial effort it would take mid-trial to track down the actual use of the funds by the witnesses. Moreover, the disclosure of this information qualified as *Giglio* that should have been given over to the defendant when known by the government agents and certainly prior to the witnesses taking the stand and being asked about this on cross examination.

3. Failure of government to maintain trial exhibits, documents and case file

Mr. Carson is being denied his right to effective assistance of counsel, as great portions of the trial file and appellate file are unavailable to counsel appointed to investigate and litigate these matters in this 2255 proceeding. While some of the documents are available, the Government has failed to produce for counsel the trial exhibits or exhibit list for review.[20] This denies Carson the opportunity and right to review the record against him and make an effective 2255 claim. Moreover, in challenging the adequacy of the government's performance in discharging their *Brady* and *Giglio* obligations at trial, there is no way to determine with accuracy what disclosures were made.

Counsel for Carson has requested that the government produce an exhibit at trial entered by William Clelland, the crime scene investigator for the triple murder. The government has informed the Court this piece of evidence, the card entered into evidence at trial that was used to

---

[20] Margaret Chriss, opposing counsel for the Government on this brief has searched tirelessly for all exhibits and trial record that undersigned counsel has asked her to locate. Despite her best efforts, a great deal is still missing.

29

identify Sweeney's fingerprint, and any other fingerprint cards taken at the scene, cannot be located.  (Dkt. #1168).   Carson contends that the review of this fingerprint card and the other fingerprint cards in evidence is necessary to determine the nature and extent of the trial counsel's ineffective assistance in failing to question the fingerprint analyst regarding other suspects used as comparisons for the print identification.  Additionally, Carson is now precluded from having the fingerprint cards tested to see if Green, Smith or any other of their known associates fingerprints were, in fact, found at the crime scene but not tested for or disclosed by the government at trial.

V. – INEFFECTIVE ASSISTANCE OF COUNSEL

A.  Legal standard and factual basis

Carson submits that his convictions in this matter were imposed in violation of his right to effective assistance of counsel.  The cause of action of ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial."  *Lockhart v. Fretwell*, 506 U.S. 364 (1933).

The Supreme Court in *Strickland v. Washington*, 466 U. S. 688 recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense" entails that defendants are entitle to be represented by an attorney who meets at least a minimum standard of competence.  *Id.* at 685-687.  "Under Strickland, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Strickland, supra*, at 694).

App 1141

One of the many challenges criminal defense attorneys face in the course of representing a client is appropriately balancing zealous representation against the contempt powers of the court. As a leading authority on this issue, Prof. Louis S. Ravenson notes that "this exercise of contempt power, and even the potential danger for it's exercise, can have a serious chilling effect on the vigor of advocacy." Louis S. Ravenson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power* , Part One, 65 Wash. L. Rev. 477, 481-82 (1990). There is a natural tension caused by the court's need to maintain its authority and the need of an attorney to zealously represent her client.

An attorney's duty to advocate on behalf of a client is directed by constitutional requirements and professional rules of responsibility. In recognizing the conflict this creates, the Supreme Court has vowed to defend the work of zealous advocates from frivolous contempt charges. *Sacher v. United States*, 343 U.S. 1 (1952). The Court writes that "our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers." *Id*. at 9.

The Sixth Amendment of the United States Constitution guarantees defendants a right "to have the Assistance of Counsel for his defense." United States Constitution, Amendment 6. The First Amendment of the United States Constitution protects freedom of speech. United States Constitution, Amendment 1. Taken together, these fundamental protections in the Bill of Rights create a judicial system where attorneys are required to represent the interests of the criminal defendant, and they are allowed to do so using protected speech when the language used is critical of the judicial system or officers of the court.

31

In the case of *Holt v Virginia*, 381 U. S. 131 (1965), two attorneys were convicted of contempt based upon motions filed for change of venue based upon claims of local prejudice and the bias and intimidating conduct of the trial judge.  The United States Supreme Court reversed the conviction noting,

> The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues … And since 'A fair trial and a fair tribunal is a basic requirement of due process', … it necessarily follows that motion for a change of venue to escape a biased tribunal raise constitutional issues both relevant and essential … Consequently, neither [of the two lawyers involved] could consistently with due process be convicted for contempt for filing these motions unless it might be thought that there is something about the language used which would justify the conviction."

*Id.* at p. 136-137,The Court found the motion for change of venue to have been proper and the falseness of the charges irrelevant.  The Court concluded:

> Our conclusion is that these petitioners have been punished by Virginia for doing nothing more than exercising the constitutional right of an accused and his counsel in contempt cases such as this to defend against the charges made.

This position taken by the Supreme Court appears to afford relatively generous latitude in arguing on behalf of clients without fear of contempt charges.  *Raveson, supra*  Note 2.   The Supreme Court has also considered the appeal of an attorney who had been convicted of contempt for telling the presiding judge "we have the right to ask questions, and we propose to do so until some bailiff stops us" in an attempt to preserve important issues for appeal and zealously represent the client."  *In Re McConnell*, 370 U.S. 230, 235 (1962).

> While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as to actually obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases.  An independent judiciary and a vigorous independent bar are both indispensable parts of our system of justice.  To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice, and we think that power did not extend to this case.

32

*Id.* at 235.

In Mr. Carson's case, the attorneys who represented him, Mr. Beshouri and Ms. Negin-Christ, met with judicial prejudice they deemed not only insurmountable, but legally and constitutionally incompatible with a fair trial for their client. On Appeal, Carson's appellate counsel argued that the District Court implemented trial procedures that were restrictive and even punitive at times. (Appellants' Brief at page 76). The District Court curtailed legitimate cross-examination of witnesses as to bias, imposed unreasonable time limitations on cross examinations, demanded that only one counsel be permitted to cross-examine a witness as to bias, and prohibited witnesses who appeared numerous times during trial to be cross-examined about bias more than once. *Id*. The Court would also "interrupt cross-examinations" and urge counsel to "use your time wisely." In practice, counsel were preclude from even doing that. *Id.*

The Appellate record is clear that the Court's seemingly arbitrary rules regarding limiting cross examination "hobbled the defense." *Id.* at 78. In some instances, counsel was not allowed at all to cross-examine witnesses on matters relating to their bias, although inquiry designed to expose bias is almost always relevant. *Id.* In one telling example, Counsel for the defense was given a late disclosure of an FBI report reflecting an oral statement of the witness Charlene Wilson. The report revealed that she was not an eye witness to the murder of Mr. Fortune, but had only heard about it from others. This was inconsistent with her sworn trial testimony in this case in which she claimed to be an eyewitness and to have seen Carson. The FBI report was turned over to defense counsel four months after Wilson left the witness stand. *Id.* at 90. On appeal it was argued that counsel was not able to recall Wilson to the stand to impeach her with this information because of the "time constraints placed upon defense counsel by the judge." Id at 91.

33

In another instance, defense counsel complained that the Government had not disclosed close to a thousand pages of *Jencks* material in sufficient time to be read and understood. The Judge characterized this as "defense counsel's problem" and ordered them to commence cross-examination or forego it. *Id* at 91. The Court also incorrectly told the defense counsel, in ruling against them regarding the government's failure to disclose impeachment materials on Ronald Sowells, that it was their burden to investigate whether there was *Brady* information regarding any witness that the Government had not turned over. *Id.* at 92. Additionally, for closings, the court refused to allow counsel a one day request to prepare, commenting that "given the out of court time for which counsel had billed, they should have been ready for argument" *Id* at 93. All the difficulties faced by defense counsel were further compounded by the Court's unwarranted suggestions that appointed counsel had an "ulterior motive" of trying to provoke a mistrial or unduly prolong the case, for which the court threatened to disallow compensation. *Id* at 75. The implicit threat being that risking one's livelihood and reputation would not be a worthwhile endeavor in zealously defending these clients.

These examples are but some of those listed by counsel in the appellate brief for this case. The most important piece of information is the proffer by counsel that, "[t]he judge's repeated admonitions and threats were intended to **and did have a chilling effect on defense counsel's advocacy**." *Id*. at 96 (emphasis added). On appeal the D.C. Circuit found that the judicial comments did not reach a level of hostility that prevented a fair trial. *U.S. v. Carson*, 455 F. 3d. 336, 372 U.S. App. D.C. 251. The opinion went on to state that "in sum, considering the challenged rulings, procedures and comments, together in the context of a long and difficult trial, we are not persuaded that 'the judge's behavior was not so prejudicial that it denied [the

34

defendant] a fair, as opposed to perfect trial.'" *Id*, (*quoting*, *United States v. Logan*, 998 F. 2d at 1029), (*quoting United States v. Pisani*, 773 F. 2d 397, 402 (2d Cir. 1985). *Id*.

Carson was represented by Mr. E. Joseph Beshouri and Ms. Lexi Negin-Christ at trial. Ms. Negin has supplied an affidavit that is attached to this motion as Exhibit 8.   In this affidavit, Ms. Negin describes the nature of her representation and how she and her co-counsel rendered ineffective assistance to Carson during his trial.  She details how in numerous instances, they failed to move for mistrials, preserve objections, cross-examine important witnesses as to their bias, follow up on defense theories, and recall witnesses shown to have lied on the stand because of the restraints imposed by the Court and for fear of sanctions and "disappointing" the Court.

In addressing the two prong *Strickland* analysis, the above reference facts indicate that Carson's trial counsels' performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U. S. at 687.  The first prong of the test is "necessarily linked to the practice and expectation of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Padilla v Kentucky*, 559 U.S. 356, 366 (2010) (*quoting Stickland, supra,* at 688, 694).  Under that standard, it was unreasonable for Carson's lawyers to forgo making the Constitutionally required effort to preserve the record for appeal by moving for mistrial when necessary, impeaching key witnesses with bias testimony, objecting to the Court's incorrect application of legal standards regarding *Brady* disclosures and forgoing other areas of cross examination for a real or imagined fear of incurring negative treatment by the Court.

Knowing that they possessed a conflict of personal interest, (here it was the attorneys' personal interests which interfered with their zealous representation of Carson), and failing to raise this conflict with the Court and seek disqualification, was not objectively reasonable.  It is

35

one thing to know that the Court is implicitly your employer when you are a CJA lawyer, and quite another to be threatened by that employer with the fear of financial punishment. Carson's attorneys feared being seen as "unreasonable" by their employer and this fear kept them from acting in Carson's best interests. They knew many of the Court's rulings were in error, detrimental to Carson's case and chilled their ability to be effective in their representation of him. In light of these facts, counsel had a duty to zealously challenge the application of these rules or inform the client that they had no intention of fighting zealously for his defense and seek to withdraw from the case. At the very least, counsel had the duty to preserve the record every time such a rule was imposed by objecting in some fashion or moving for a mistrial if warranted. Their failure to put aside personal interest for fear of risking a professional reputation or personal financial security deprived Carson of the right to counsel guaranteed by the Sixth Amendment.

The facts of this case demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694. Given the admission by Carson's counsel that they did not pursue many relevant and material areas on cross examination, it is now necessary to examine some specific instances how this prejudiced the defense and denied Mr. Carson of both a fair trial.

B. Specific Failures by Counsel and the Resulting Prejudicial Effect

1. Failure to Cross Examine Fingerprint Experts Regarding Alternative Suspects

Counsel for Carson was ineffective in failing cross-examine the fingerprint examiner Elores Clark regarding the suspect Dennis Green. No inquiry was made by defense counsel into whether Green's fingerprints had been run as a match to the eight separate fingerprint cards collected at the scene. During Ms. Clark's cross-examination she was asked what other suspects

36

were used as comparisons against the fingerprints submitted in this case and used in making the fingerprint report.  At that point there was an objection by the government and a bench conference ensued.  During the bench conference it was revealed that the government agents gave the fingerprint examiner a list of suspects to compare the fingerprint card against.  On that list were the names of the various defendants.  Mr. Dennis Green's name was not one that list.  The bench conference ended with a ruling that the defendants would be allowed to cross-examine the witness regarding other suspects in this case or other known matches.[21] (Tr. 4/02/01 PM p.77).

In a case replete with examples of the Court ruling unfavorably for the defense, here is an instance when the Court led the charge in helping defense counsel pursue a very important line of questioning.  Having been prevented from offering the grand jury testimony of Pinckney and Owens at trial, the next best thing would have been to cross examine the fingerprint examiner about other suspects, especially Dennis Green. The fingerprints were first examined in February of 1997, nearly three months after the triple murder and the date the fingerprints were taken from the crime scene.[22]   (Tr. 4/02/01 PM p. 71) During those three months, while the fingerprint cards presumably sat in PG County offices, Mr. Dennis Green, was arrested for the triple murder based

---

[21]  THE COURT: Throughout this case there has been the suggestion that there is someone other than those who have been implicated by the only eye witness to testify to it.
MR. ZEIDENBERG: That's fine, Your Honor. I don't care. I don't mean to argue with Your Honor.
THE COURT: I think they ought to be able to pursue that.
MR. ZEIDENBERG: I made my objection.
MR. DAVIS: I would ask Your Honor to give some type of cautionary instruction, because there is absolutely no evidence linking Mr. Hill to this at all, there is just nothing. As a matter of fact, I believe -- what's the date on that, the date that this incident took place, do you remember?
THE COURT: I think you are entitled to bring out the fact that there was no match.
MR. DAVIS: Well, Your Honor, I can't question this lady about why he was on there. And it could have been on a whim, it could have been on anything, and that's the problem. She knows nothing about it. All she knows is –
THE COURT: There have been other suspects in this case. I think it's a legitimate area of inquiry.
MR. DAVIS: I would object for those reasons.
 THE COURT: Objection overruled.
(Tr. 4/02/01 PM p. 77)

[22] From the trial testimony it appears all prints were lifted that same day of the murder, but because counsel for the government cannot locate that actual card in evidence for review this remains a question that is unanswered.

37

upon a complaint filed on January 6, 1997. (Complaint PG County, Dennis Green, signed by

Detective Deloatch, Attached as Exhibit 9)  It was unreasonable for Carson's counsel not to

question the fact that the government agents never checked for Dennis Green's fingerprints at the

crime scene.[23]   Additionally, the fingerprints were not run until February of 1997 and then only

out of the federal government's desire to make a case against Carson and his co-defendants.

According to the testimony at trial, one fingerprint was found linking Sweeney to the crime.  (Tr.

4/02/01 p. 49).  However, at least eight fingerprint cards were submitted from the crime scene and

each card could have contained more than one fingerprint.  (Tr. 4/02/01 p. 57-58).   Any of those

cards could have contained the prints of Dennis Green or his associates, or any other suspects, but

the Federal Bureau of Investigation never asked to run Green or his associates as comparisons.

(Tr. 4/02/01 p. 78).  The only known comparisons run by the fingerprint examiner were for

Sweeney, Montgomery, Carson, Coates, Hill and Maurice Anthony Proctor. *Id*.  Carson's

Counsel should have extensively cross-examined the fingerprint examiner, the evidence collector,

Agent Lisi and the agents who submitted the comparison list regarding these additional suspects.

Moreover, defense counsel was aware at the time of the fingerprint testimony that a witness for

the defense, Wesley Smith, was told by Butchie Smith that he (Butchie) was cheated out of

$60,000 while gambling in the triple murder house in Temple Hills.  About a week after the triple

murder,  Butchie also told Wesley that "I took care of Darnell Mack and those guys."  (Tr.

6/06/01 AM, p. 26-34; Tr. 6/11/01 PM p.9-27; Tr. 6/13/01 AM) p. 72-77).   Cleary there were

multiple suspects considered for the triple murder.  Competent and effective counsel would have

---

[23] This does not even factor into the equation the fact that the government went to great efforts to hide the details of Pinckney and Owens' relocation during that time period and the payments made to them that were not disclosed.  Moreover, without explanation, Pinckney and Owens were dismissed as credible witnesses and the sole focus of the government agents in this case were the defendants, as evidenced by the suspects they submitted for comparisons.

38

tailored their questioning to show the bias in the government's investigation against Carson and his co-defendants.

2. Failure to Recall Charlene Wilson

Counsel was ineffective when they failed to recall Charlene Wilson to the stand after discovering that she was not an eyewitness to the murder of Anthony Fortune as she had testified to earlier during trial. The circumstances surrounding Charlene Wilson's testimony alone demonstrate how material the impeachment of this witnesses would have been to the outcome of this case. Given "Wilson's status as the only witness to the alleged crime, there is no colorable argument to be made that the potentially significant cross-examination was not "material." (Appellate Brief at page 147).

Initially, the Government's failure to disclose the *Brady* material regarding Ms. Wilson created surprise for defense. Agent Warrener asked to use his report to refresh his recollection and having done so, the Court ordered it to be turned over to defense over the objection of the Government. (Tr. 6/14/01 PM p. 44; 48-49). When defense counsel reviewed his report, it was revealed for the first time that Ms. Wilson's initial statement regarding the Fortune murder was that she had HEARD Carson committed the murder and had not in fact been an eyewitness. Once this devastating contradiction in her testimony was discovered, counsel for Carson acted unreasonably by failing to make a proper objection to preserve the record and to attempt to recall Ms. Wilson for impeachment. Defense counsel stated that they could not do so because of the time constraints placed upon them by the Court. (Appellants Brief p. 147). This is an unreasonable explanation. The attempt alone, and possible denial, would have preserved this important point on the record for appeal.

3. Failure to cross-examine witnesses on use of payments by the government

39

Trial counsel for Carson also failed to adequately question government witnesses when they admitted on the stand that they were paid by the government for undisclosed purposes in connection with their testimony. There was a strong indication from the start of the case that most witnesses were paid in some form of cash or other incentive (plea agreements) for favorable testimony. In fact, the first government civilian witness to take the stand in this case, Reginald Switzer, testified that his family was paid thousands of dollars for relocation due to a security concern and that nearly two and a half years later, at the time of trial, his mother still lived on K Street and had not yet moved.[24] (Tr. 1/30/01 p. 33). Once this witness admitted to receiving funds from the government and failing to use those funds for the purpose stated in the government's *Giglio* disclosure, several things should have happened: First, a reasonable attorney would have cross examined this witness extensively on why the funds had not been used for moving, who paid the funds, whether there was a receipt for the funds, how the amount was calculated, and what the money was actually spent on. Second, defense counsel should have moved for a continuance and asked to review the witness file of the government including the FBI about the payment information in question. Third, a record should be made that the *Giglio* disclosure by the Government was not accurate and falsely represented that the funds had been used for relocation. Finally, every government witness in this case should be asked the same questions

Counsel was ineffective in failing to seek sanctions against the Government for mischaracterization of those payments as relocation expenses when they knew or should have known that Mr. Switzer had never moved. Incredibly, Mr. Switzer's payment situation was not unique.

---

[24] The Government *Giglio* disclosure indicate that Mr. Switzer's wife and mother were paid $6,100 for relocation due to a security concern. Exhibit 10.

For example, Cinema Hawkins was paid $750 for relocation expenses.  *See* Exhibit 11. She was never asked if she used those funds to relocate.  Moreover, no questions were pursued as to why her payment for relocation was so small in comparison to others who never even moved, such as Switzer.  Charlene Wilson was also paid $4,900 for moving expenses by the government to relocate but did not do so for over four years.  (Tr. 2/13/01 AM p. 40 & PM p. 33).   Eugene Byers' sister, was paid $5,592.53 for moving expenses in connection with his testimony and he testified he had no idea about this payment.  (Tr. 4/09/01 PM p. 57-58).

This line of cross-examination would have been material impeachment evidence to show bias on the part of these witnesses and control by the government over these witnesses.  This pattern of conduct evidences an implicit agreement with these witnesses to testify favorably for the prosecution in exchange for the government turning a "blind eye" towards the use of those funds.   In order to be effective, once counsel knew that the government had failed to disclose the actual use of the cash payments, they needed to investigate the actual use of funds by all witnesses and the degree to which the government made, and failed to disclose, the implicit agreement that the cash could be spent in any way the witness wanted.

4.  Other Instances of Ineffective Assistance

a)  Counsel was ineffective in failing to follow up on information supplied by Carson at trial that he had a rental car during the time period he was accused of borrowing a car for the murder of Robert Smith.  Documents showing that he was in possession of a rental car would rebut testimony that he needed to borrow a car on the day in question.  Records are no longer retained by the rental car company for the date in question.

b)  Carson also argues that Counsel was ineffective in failing to pursue arguments regarding Montgomery's mental impairments and medical health history that could effect his

41

memory or ability to be manipulated by government agents. Trial counsel failed to make a timely showing for a need for an expert witness to address this issue and present information showing that Mr. Montgomery was an individual who, due to mental slowness, was easily manipulated by people who showed him attention, friendship or who held a position of power over him. The defense team was denied access to Montgomery's witness protection file and medical information, but their failure to then question the witness regarding his memory and propensity to be easily manipulated by powerful individuals, such as FBI Case Agent and the government prosecutors, was unreasonable and counsel's failure to point this out through cross examination and through the use of expert testimony rose to the level of Constitutional ineffectiveness.

c) Caron's trial counsel was ineffective for failing to object at trial to the improper in camera inspection procedure adopted by the Court with regard to sealed *Brady* materials. This procedure prejudiced Carson and allowed the Court to be used as a tool of the Government in their scheme to withhold exculpatory material from the defense. It has been held that *in camera* proceedings should only be used where there is a compelling interest to do so. *In re Sealed Case*, 151 F. 2d 1059 (D. C. Cir. 1998). The proper procedure for conducting *in camera* proceedings was not followed in this case. Trial Counsel for Carson failed to make an objection on the record and challenge the improper procedure by the Court. There was no compelling reason for these documents to be submitted *in camera* and *ex parte* to the Court and failure to object to this was ineffective on the part of counsel. Furthermore, counsel failed to request findings be made on the record and a full index of the documents submitted for *in camera* review be disclosed to the defense. This conduct prejudiced Carson's ability to present his case at trial and on appeal.

42

d) Appellate Counsel was also ineffective in failing to seek appellate review the Trial Court's rulings regarding the sealed materials. In denying defendants' motion to Allow Counsel to Review Certain portions of the Trial Record, The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) instructed counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28//2003 [Case No. 02-3015, ECF No. 769196]. As evidence by the numerous instances of *Brady* material contained in the sealed documents and discussed supra, challenging them would have proved successful on appeal. However, Appellate counsel failed to pursue this claim on direct appeal. Had the petitioners raised the issue on appeal, the Court of Appeals would have reviewed the materials *in camera*. *Id.* The violations would have then come to light and demonstrated the pattern of abuse that was perpetrated by the Government in this case and the fundamentally unfair resulting verdict. The result would have been a reversal on appeal. Failure to raise these issues was unreasonable on the part of appellate counsel and the deficiency so prejudiced Carson that counsel's assistance was unconstitutionally ineffective. [25]

<u>Conclusion</u>

Carson did not receive a fair trial. The Government systematically hid *Brady* and *Giglio* evidence. The District Court abused his discretion by finding that there was no *Brady* evidence in the sealed documents and failed to keep an adequate list of what was presented and considered by

---

[25] Counsel also incorporates by reference the claims raised by co-defendants in their post conviction petitions related to trial and appellate counsel's ineffectiveness, based on actions and omissions, as due to the fact that in this group prosecution, actions and inactions by other counsel affected the case against and defense of Carson. Moreover, any other Constitutional errors raised by co-defendants, in as much as they apply to Carson as well, are incorporated by reference herein.

43

him. Witnesses were paid for their testimony. Defense trial counsel was ineffective.  Therefore, Carson requests discovery and an evidentiary hearing on this motion and seeks leave to supplement the issues when discovery is received.

Wherefore, for the foregoing reasons, both singularly and in the aggregate, for the reasons set forth in legal memorandum and exhibits and for such other reasons as may be subsequently submitted or may appear at the hearing in this matter, counsel and Mr. Carson respectfully ask that the Court set aside his conviction.

Respectfully submitted,

_____/s/_____
KIRA ANNE WEST
Bar No. 993523
1325 G Street NW, Suite 500
Washington, D.C. 20005
(202) 236-2042
Email: kiraannewest@gmail.com

ATTORNEY FOR SAMUEL CARSON

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2015, a copy of this pleading was served by email to Government counsel of record, Ms. Margaret Chriss, as this filing is filed under seal.

_____/s/_____
KIRA ANNE WEST

44

45

App 1156

FILED

SEP 1 4 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA : 

        v. :

Vincent Hill, a/k/a "Vito" :     Criminal No. 98-329-01-06 (TPJ)
Jerome Martin, a/k/a "Pimp" :
Samuel Carson, a/k/a "Chin" :
William Kyle Sweeney, :     <u>Under Seal</u>
      a/k/a "Draper" :
Maurice Proctor, :
      a/k/a "PooPoo" :
Sean Coates, a/k/a "Birdy" :

---

Gary Price, a/k/a "Harry O" :
       :     Criminal No. 99-348-01 (TPJ)
    Defendants. :
       :     <u>Under Seal</u>
       :

---

**Government's Ex Parte Submission of Additional Materials to the Court Regarding
<u>James Montgomery</u>**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits the additional notes of Special Agent Vincent Lisi and Assistant

United States Attorney Peter R. Zeidenberg in connection with interviews of James Montgomery.

Pursuant to the Court's order of June 16, 2000, the government has previously provided

the "investigative files" pertaining to James Montgomery to the Court for its inspection. At the

time of its initial submission, the government was collecting the notes regarding James

Montgomery from Special Agent Vincent Lisi (Appendix A) and Assistant United States Attorney

Peter R. Zeidenberg (Appendix B). Those notes have been collected and are now being submitted

for the Court's review.

Respectfully submitted,

WILMA A. LEWIS
United States Attorney

PETER R. ZEIDENBERG
Assistant United States Attorney
Bar No. 440-803
(202) 353-8831
555 4th Street, N.W.
Washington, D.C. 20001

ANJALI CHATURVEDI
Assistant United States Attorney
Bar No. 446-177
(202) 353-8827
555 4th Street, N.W.
Washington, D.C. 20001

9.14.00

2

App 1158

App 1159

# Appendix A

Lillie Cols → to pilot

Boo → you cont @ 670

Slug →

Norris → stays sharpe → Chris said hill
So quicker than Boo/Slidon.

Norris T → snatty but playful

Norris was Going to Give the gun
to Clarence to cue to kill TMP

200
Norris + Boo on Slug
1000    2000
2000  (OR) 1000
1000

Link → Norris was Going to Give the gun
to Clarence to cue to kill TMP

Yusef → need to be under Norris wing

Boo Norris slug were
going to City Richmond
Washington to kill TMP

(Clarence)

Mary →

Eric Gordon →

WDDZIE had TMP get passes on
him for it for A CAUSE

Norris says he was trying to get
someone to kill Loozie

Loozie →

Loozie →

DEA ~ WELCH
202-884-0558

Loozie going TMP, Quarane - looking for PACINO Has
Loozie, TMP, Quarane - looking for PACINO but up
Quarane best up in real BAD.
Loozie 12sec
Impala Garden
Loozie →

FILED

SEP 1 4 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

App 1160

App 1161

Dodzie said him ! Woozie were close
when young.

went looking for Woozies father @
Goodhope / Minnesota — kill him

He was backing Woozie et al.

Rosie / Tiffany should know Alot.

Marcate was banging Michelle Gordon.

Killvony - close to Marcate — lives @ the top of
Good Hope Road.

Maurice busts Pacino in the head of a gun

Raymond
Rojay
Andre Franks →
Sydney Murdock.
Meanie (poo-poo's Brother)
} Getting coke from
DAVP
Carson.

John Fogle "Jug"
Jason Ferguson
} partners. @ 2nd street sw.



Chin → Lou
_____

I learned about it that night summer 94/4
John people about these - summer 94/4.
said the conffell @ lcor - because he
is him to Keith Hollen es.
Lou Kate whose sam limos

Poo-Poo + Sam had guns.

Same night - went to rand Chin. Came
back Sam tyed up. Police were out there.
asked what happend - samebody said Lou got SHOT.
Next day- Sam Chin Chin said he didn't die
Chin said he didn't think Lou would snitch but
Lou was sneaky. in Car with Sam / POO-POO

Poo- Poo was worried about telling the Police.
Chris' Hand was broken from fighting a dude
Names Maggie in Barry Farms. - Soft Cast. couldn't take
it off.

App 1162

① _____ upp _____ _____ _____ stabbed.

② _____ for a few _____ when they did the drive-by
on a motorcycle - _____ - little 250 Honda
left at _____ . Police took it.

MD. Police impounded Cadillac _____ near Free-State cycles
had to get a release order - Car was _____ _____ _____
poss. P.G. Co. - pulled out in front of P.G. Plaza -
used MARK JOHNSON'S name to JAY _____ , got car.
locked up in _____ . THEY took it from _____ _____

Car _____ _____ TIM-TOM _____ .

James, I.S., Ant, Pou-Pou — went to B_____ Farms in _____
Station wagon to kill K.K. - after Stone _____ .

not Lawrence Davis
ERIC SAID _____ shoot because a girl was w/ him.

THEN TO OLD-TOWN _____ looking for some dude _____ was s_____ to

App 1163

7/24/00  J.

ANJ, ST, V.

KATRINA CARSON - possibly
rented the MINI-VAN
possibly returned it the
next DAY. Turquoise.
enterprise or budget
she Lives in Greenbelt.

talk to ___ 3.5 hours from 1st St A-1/1st Alley
FFART Dove (Shorter) from JAMES
Creek was DAVE CARSONS partner

James 12/2

Step poe's mother

Get info for them

tags, etc.

Draper also had an

investigator.

took Draper to see Amy

Kemp when D was in

the prison —

met him at D.C. Jail

& Gave him some $

App 1165

Sam's cousin Trina - maybe
rented the van for Carson
the III

* Draper called Bird.
From his cell phone
when they were on the
way.

App 1166

1/23   PACINO

MARK (BEA)

700.800
little WAYNE        SNATCHED the
Draper            olD MAN

        dion't know what to do -
   got Chir - got Bea's van.
   Bent him  to death.

Foocu  GAVe whtey's noter 50K

    II  →  BIRDIE  wore  ABERCOMBIE
                        & FITCH
                         pullover.
                         lined
                         DARK color

Draper →

   wArner Bro's sweatshirt - characters
   on the front.

App 1167

KIM SAID when Proper:
Jace robbed the old guy,
they took some
Dope from him.

A1

3/4/79   PACINO

TRIPLE →

Chin & Draper go to Vegas
for fields. They come back
Chin & Draper said they
saw Lonnie in alot of
money. ($50K)
    Draper had a female
at a travel agency in D.C.
Chin said so.
    Thinks Chin got his
ticket there.

Chin was also talking about
Ban & Lonnie having problems

App 1169



App 1170



App 1171

Park near the house;
watch it.
One of the girls had a
white neon. Before they
got in to car together,
one of the girls went to
a neon.

Darrel Mack
Lonnie            came out of
2 Girls           house

Draper said they were going
to eat on funk
Draper said Lonnie goes to
a Hotel near Branch Ave &
the Beltway so they went
there & looked for Kera



car. But wasn't there
So they go back to
DeDon's house to see if
the car was there. It
wasn't. While sitting
there, BIRD came up
with the idea of
covering the tags with
other tags. Took tags
from a car near DeDon's house.
They went to Jim's
mothers & got skull caps.
Cut the eyes out
→ Dresses mothers house
Put them on in her
parking lot James
Put them on

App 1173



The cover ~~troops~~
were ~~thrown~~ in a wooded
area near Alabama
Ave.
(just one tree on the
back)
Hillcrest Gym

Pulling away through
a car was following.
D.Roper wanted to shoot at
them. Chin said no,
they lost the car

Go back to D.Davis ~~house~~
after switching tags

App 1174

Stun Gun was Draper's.
He Bought it on
Central Ave. at a
SPY SHOP

In the VAN, Draper
had the Glock 40
At 1st James had the
stun gun. Came in
As Bird.

S24# 's wealtech there Addressed
Parked on same side of
street. One of the
Neighbors Came out;
Smoked A cigarette. Everyone

Got down, but the
van was started.
When the guy went back
in they moved the van
to the opposite side of
the st.

⊕
Chie. Jin.
Bird

Dragon

Saw the car coming
from Iverson st.

Once they parked,
Chie pulled out, forgot

to turn the lights on

Lonnie's car parks in
front, sees him walk
to the rear of the car.
Thinks he hesitates
because the lights of the
van were off.

Chip turns the lights on
& drives away from them

Chip drove

Lonnie

App 1177



App 1178

the house... as witness
is getting out of the
van to... Head,
Draper... but, started
... in the lead. —He
fired more than one.
James... back to
van. Bird comes out
not far behind Draper.

...they cross into Mr... Loop
... weapon...
...Blue-Jr EBB. He
was shot in,

※ earlier that day, James
went by i knocked on the
door. to see i B was home

App 1179



Bird Bird Abercrombie Fitch
phillovers.

~~Took Sutland Okuy~~.

Hid the gun in an
Alley near ~~there~~ Anne lives.

Then go to Drapers Canada
mothers
home.

While here, Draper had
Blood on him so he washed
himself with Bleach.

Then talk about it.

While in the van Chi

asks what happened
B said he didnt
Know. He was trying
to shock D-Don.

B- Heard gunfire, lookin up
Draper was shooting.

B. said there was a dude
in there before they got in
there.

B said Draper almost
shot him when he shot
D-Don.
Draper said Lonnie

was reaching, the never likes D-DON ANYWAY because he acted all big.

Proper was wearing Blue Jeans, Black Sweatshirt that said Players on it, multi colored stitch leather Some coat over top.

AT House: Try to figure out what happens Jimis pissed because he lost out on $180 K

App 1182

Hanless gets gun from Alley.
Hanless is in ___ ___
a ___ in 1450
block of ___ ___
left of ___ ___
___ ___ Regina brings
it & tries to sell it
to Chin.

Draper went to get gun from
Alley - it was gone. He told
Chin. Chin told him Jim
hid it. When Jim took Draper to
get it it was gone. After a
couple of days Regina tries to
sell the gun to Chin. He told
her it was his gun & Chin
gives it to Draper.
Draper said the gun belongs to Steve cousin

Stay at Drapers house,
45-60 minutes.

Talk about making another
move on a dude named
Frankly ___ ___ App 1183

hid it. When Jim took Draper to get it it was gone. After a couple of DAYS REGINA tries to sell the gun to Chin. He told her it was his gun & Chin Gives it to Draper

Draper said the gun belongs to Stevie cousin

STAY AT Drapers house, 45-60 minutes.

Talk about making another MovIE of a Dude names Freddy. Draper & Chin Knew Freddy.

Everyone said don't let Vito know.

Butchie.

After Draper cuts lockes up, Chin Goes to see him. THInks he went with Drapers father.

App 1184

Chin said Draper said Butchie was the only one he told - so he must be the witness.

He said that Butchie told on everyone so they had to get him before Everyone got locked.

If Butchie cuts it, their problems are over.

Chin starts clocking Butchie down S.W.

App 1185

On one occasion,
Chin Holly Shane to
wait on S. Capp near
the Taxi lot

Jim waits in Blue car.
He walks though Alley.
He had on A hoodie.
He comes back & says
he wasn't there.

1st Drone though & see him
there. Go to Chins
house to get the hoodie
& gun. Go back.

Plan was to hit him
& throw gun in River

App 1186



then hang out in @
37th all DAY.

After Butchie got hit,
James thought either
Chin did it or got
Pug on BJ. to do it.

Steve Dunbar

Lucky Bank paid James Bond
to come home, so he
hung with them when he
came out.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 98-329-2 (RCL)** |
| | : | |
| **JEROME MARTIN, JR., SAMUEL** | : | |

**SUPPLEMENT TO MOTION TO VACATE IN LIGHT OF
*JOHNSON v. UNITED STATES***

Comes now the Defendant, Jerome Martin, by and through counsel, Michael E. Lawlor, Lawlor & Englert, LLC, and hereby supplements his previously filed motion pursuant to 28 U.S.C. § 2255 with a claim in light of the Supreme Court's ruling in *Johnson v. United States*, 135 S. Ct. 2551 (2015).

Mr. Martin was convicted of one count of using a firearm during and in relation to a "crime of violence" in violation of 18 U.S.C. § 924(c) (Count 31 of the second retyped indictment, July 2, 2001).[1] Specifically, the count alleged that the underlying "crime of violence" for the § 924(c) charge was Count 18, which charged Mr. Martin with attempted murder (under 22 D.C. Code Sections 501 and 3202) in aid of

---

[1] Mr. Martin was also convicted of: conspiracy to distribute and possession with intent to distribute controlled substances (Count 1); conspiracy to participate in a Racketeer Influenced Corrupt Organization (Count 2); First degree murder while armed (Count 8); assaulting, resisting and interfering with a police officer with a dangerous weapon (Count 9); violent crime in aid of racketeering (Count 18); distribution of a controlled substance (Counts 49, 53, 55); and possession with intent to distribute a controlled substance (Count 64).

1

App 1188

racketeering. However, post-*Johnson*, attempted murder categorically fails to qualify as a "crime of violence." Therefore, Mr. Martin is now innocent of the § 924(c) offense, and his conviction for that offense is void.

The relevant portion of § 924(c) defining a "crime of violence" has two clauses. The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause.[2] The § 924(c) residual clause is materially indistinguishable from the Armed Career Criminal Act (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) that the Supreme Court in *Johnson* struck down as void for vagueness. It follows that the § 924(c) residual clause is likewise unconstitutionally vague. Hence, an attempted murder offense cannot qualify as a "crime of violence" under the § 924(c) residual clause. Likewise, attempted murder categorically fails to qualify as a "crime of violence" under the remaining § 924(c) force clause. Therefore, the "crime of violence" element of § 924(c) cannot be satisfied here, and a conviction cannot be constitutionally

---

[2]     Under § 924(c)(3), "crime of violence" is defined as follows:

(3)     For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –

(A)     has as an element the use, attempted use, or threatened use of physical force against the person or property of another [known as the force clause], or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense [known as the residual clause.]

sustained under the statute.

As a result, Mr. Martin's § 924(c) conviction 1) violates due process, 2) violates the laws of the United States and results in a fundamental miscarriage of justice, and 3) was entered in excess of this Court's jurisdiction. Therefore, he is entitled to relief under 28 U.S.C. § 2255(a).

Mr. Martin's claim is timely under 28 U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision in *Johnson* – a ruling which established a "newly recognized" right that is "retroactively applicable to cases on collateral review." Therefore, Mr. Martin respectfully requests that this Court grant his § 2255 motion and vacate his conviction.

Due to time constraints, counsel cannot at this time fully brief the issues presented in this pleading. Nonetheless, counsel will supplement this argument together with the supplemental memorandum of law on the claims Mr. Martin raised in his initial motion to vacate.

Respectfully submitted,

/s

Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
301.474.3404

3

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of June 2016, a copy of the foregoing motion was delivered to the following via ECF:

Margaret Chriss, Esquire
Office of the United States Attorney
555 Fourth Street, NW
Washington, DC 20530

Kira Anne West
1325 G Street, NW
Suite 500
Washington, DC 20005
Counsel for Mr. Carson

Eric Hans Kirchman
KIRCHMAN & KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Counsel for Mr. Sweeney

Veronice Annette Holt
VERONICE A. HOLT, ESQ.
3003 Van Ness Street, N.W.
Washington, DC 20008-4808
Counsel for Mr. Coates

/s
Michael E. Lawlor

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

## SUPPLEMENT TO MOTION TO VACATE AFTER <u>JOHNSON</u> DECISION

Pursuant to the Rules Governing Section 2255 cases, Defendant Samuel Carson

hereby files this SUPPLEMENT TO MOTION TO VACATE through his counsel, Kira

Anne West, and hereby supplements his previously filed motion pursuant to 28 U.S.C. §

2255 with a claim in light of the Supreme Court's ruling in <u>Johnson v. United States</u>, 135

S. Ct. 2551 (2015). Mr. Carson was convicted at trial in 2001 of violations of the

following statutes: 21 U.S.C. §846, Conspiracy to PWID; 18 USC §§ 1962(d) &

1963(a), RICO conspiracy; 18 U.S.C. §1959(a)(1), murder in aid of racketeering activity

(Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson); 18

U.S.C. §2, Aiding and Abetting; 18 U.S.C. §924(c)(1)(A)(i), use of a firearm during and

in relation to a crime of violence or a drug trafficking crime; 22 D.C. Code §2401 &

§3202, First Degree Murder while armed (Maurice Hallman, Leonard Hyson, Teresa

Thomas, Terita Lucas, Anthony Fortune, & Chrishauna Gladden); 22 D.C. Code §501 &

§3202, Assault with intent to kill while armed; 22 D.C. Code §2101 & §3202,

kidnapping while armed; and, 22 D.C. Code §3204(b), possession of a firearm during a

crime of violence. [1]

---

[1] On 1/04/2001, Dkt #517, the Government filed a "RETYPED INDICTMENT" for SAMUEL CARSON.
It renumbered the charges to: Former count 1s is now count 1rs. Former count 2s is now count 2rs. Former

1

App 1192

Mr. Carson challenges his conviction for using a firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c).   Mr. Carson's claim is timely under 28 U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision in Johnson – a ruling which established a "newly recognized" right that is "retroactively applicable to cases on collateral review." Therefore, Mr. Carson respectfully requests that this Court grant his § 2255 motion and vacate his conviction. Due to time constraints, counsel cannot at this time fully brief the issues presented in this pleading. Nonetheless, counsel will supplement this argument at a later date.

Respectfully submitted,

_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

---

count 5s is now count 4rs. Former count 6s is now count 5rs. Former count 7s is now count 6rs. Former count 8s is now count 7rs. Former count 23s is now count 13rs. Former count 29s is now count 16rs. Former count 30s is now count 17rs. Former count 42s is now count 26rs. Former count 43s is now count 27rs. Former count 44s is now count 28rs. Former count 45s is now count 29rs. Former count 46s is now count 30rs. Former count 47s is now count 31rs. Former count 48s is now count 32rs. Former count 49s is now count 33rs. Former count 50s is now count 34rs. Former count 51s is now count 35rs. Former count 53s is now count 36rs. Former count 54s is now count 37rs. Former count 55s is now count 38rs. Former count 56s is now count 39rs. Former count 57s is now count 40rs. Former count 58s is now count 41rs. Former count 61s is now count 42rs. Former count 62s is now count 43rs. Former count 63s is now count 44rs. Former count 64s is now count 45rs. Former count 65s is now count 46rs. Former count 66s is now count 47rs. Former count 67s is now count 48rs. Former count 68s is now count 49rs. Former count 71s is now count 50rs. Former count 72s is now count 51rs. Former count 73s is now count 52rs. Former count 74s is now count 53rs. Former count 75s is now count 54rs. Former count 76s is now count 55rs. Former count 78s is now count 56rs. Former count 79s is now count 57rs. Former count 80s is now count 58rs.

**Certificate of Service**

I hereby certify that on this 24th day of June,  2016, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:

/s/_____
Kira Anne West

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### UNITED STATES OF AMERICA

UNITED STATES OF AMERICA     :

                      :

      v.                  :          CASE NO. **1:98-CR-329 (RCL)**

                      :

SEAN COATES

## SUPPLEMENT TO MOTION TO VACATE
## IN LIGHT OF *JOHNSON v. UNITED STATES*

Comes now the Defendant, Sean Coates, by and through counsel, Veronice A. Holt, Esq and hereby supplements his previously filed motion pursuant to 28 U.S.C. § 2255 with a claim in light of the Supreme Court's ruling in ***Johnson v. United States***, 135 S. Ct. 2551 (2015). Mr. Coates challenges his convictions for using a firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c). This motion will be supplemented by October 26, 2016, in accordance with the June 2, 2016, Standing Order .

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of June 2016, a copy of the foregoing motion was delivered to the following via ECF:

Margaret Chriss, Esquire
Office of the United States Attorney

555 Fourth Street, NW
Washington, DC 20530

Kira Anne West
1325 G Street, NW
Suite 500
Washington, DC 20005
Counsel for Mr. Carson

Eric Hans Kirchman
KIRCHMAN & KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Counsel for Mr. Sweeney

Michael E. Lawlor
Lawlor & Englert, LLC
6304 Ivy Lane
Suite 608
Greenbelt, Maryland 20770
Counsel for Jerome Martin


_____

Veronice  A. Holt, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      §
     §
V.      §      CASE NO. 1:98-CR-329-03 (RCL)
     §
SAMUEL CARSON      §


**SUPPLEMENTAL BRIEF TO MOTION TO VACATE AFTER <u>JOHNSON</u>
DECISION**

Pursuant to the Rules Governing Section 2255 cases, Defendant Samuel Carson

hereby files this SUPPLEMENTAL BRIEF TO MOTION TO VACATE through his

counsel, Kira Anne West, and hereby supplements his previously filed motion pursuant to

28 U.S.C. § 2255 with a claim in light of the Supreme Court's ruling *in Johnson v.*

*United States*, 135 S. Ct. 2551 (2015).   On June 24, 2016, Mr. Carson filed through his

counsel a supplement to the § 2255 within one year of the Supreme Court's decision in

*Johnson* and stated that he would be filing additional briefing in this regard.[1]  This is that

supplemental brief. Unfortunately, the Supreme Court has not yet rendered the opinion in

*Dimaya v. Lynch*, No. 15-1498.

Mr. Carson was convicted  at trial in 2001 of violations of the following statutes:

21 U.S.C. §846, Conspiracy to PWID; 18 USC §§ 1962(d) & 1963(a), RICO conspiracy;

18 U.S.C. §1959(a)(1), violent crime/murder in aid of racketeering activity in violation of

27 M.D. Code §§407 and 410 (Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack &

---

[1] Undersigned counsel filed an unopposed motion to file out of time this supplemental
brief on May 9, 2017. <u>See</u> Dkt # 1189.

1

App 1197

Melody Anderson); 18 U.S.C. §2, Aiding and Abetting; 18 U.S.C. §924(c)(1)(A)(i), use

of a firearm during and in relation to a crime of violence or a drug trafficking crime; 22

D.C. Code §2401 & §3202[2], First Degree Murder while armed (Maurice Hallman,

Leonard Hyson, Teresa Thomas, Terita Lucas, Anthony Fortune, & Chrishauna

Gladden); 22 D.C. Code §501 & §3202, Assault with intent to kill while armed; 22 D.C.

Code §2101 & §3202, kidnapping while armed; and, 22 D.C. Code §3204(b),

possession of a firearm during a crime of violence. [3]

Mr. Carson challenges his conviction for using a firearm during a "crime of

violence" in violation of 18 U.S.C. § 924(c).[4] Mr. Carson's claim is timely under 28

U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision

in *Johnson* – a ruling which established a "newly recognized" right that is "retroactively

applicable to cases on collateral review." It appears after review of the PSR, the verdict

---

[2] The indictment charges a crime of violence, specifically, Murder in aid of racketeering activity of Darnell Mack in Count 33, of 27 M.D. Code, Sections 407 and 410. See page 89-90, Superseding indictment, 3/25/99, Dkt #142.

[3] On 1/04/2001, Dkt #517, the Government filed a "RETYPED INDICTMENT" for SAMUEL CARSON. It renumbered the charges to: "Former count 1s is now count 1rs. Former count 2s is now count 2rs. Former count 5s is now count 4rs. Former count 6s is now count 5rs. Former count 7s is now count 6rs. Former count 8s is now count 7rs. Former count 23s is now count 13rs. Former count 29s is now count 16rs. Former count 30s is now count 17rs. Former count 42s is now count 26rs. Former count 43s is now count 27rs. Former count 44s is now count 28rs. Former count 45s is now count 29rs. Former count 46s is now count 30rs. Former count 47s is now count 31rs. Former count 48s is now count 32rs. Former count 49s is now count 33rs. Former count 50s is now count 34rs. Former count 51s is now count 35rs. Former count 53s is now count 36rs. Former count 54s is now count 37rs. Former count 55s is now count 38rs. Former count 56s is now count 39rs. Former count 57s is now count 40rs. Former count 58s is now count 41rs. Former count 61s is now count 42rs. Former count 62s is now count 43rs. Former count 63s is now count 44rs. Former count 64s is now count 45rs. Former count 65s is now count 46rs. Former count 66s is now count 47rs. Former count 67s is now count 48rs. Former count 68s is now count 49rs. Former count 71s is now count 50rs. Former count 72s is now count 51rs. Former count 73s is now count 52rs. Former count 74s is now count 53rs. Former count 75s is now count 54rs. Former count 76s is now count 55rs. Former count 78s is now count 56rs. Former count 79s is now count 57rs. Former count 80 is now count 58rs." Unfortunately, this renumbered system of counts does not line up with the verdict form or the PSR.

[4] The standard of review is for plain error, that is, (1) whether an error occurred, (2) it was a clear error, (3) the error affected appellants' substantial rights, and (4) the error seriously affected the fairness of the proceedings. *United States v. Sheffield*, 832 F.3d 296, 311 (DC Cir. 2016).

2

App 1198

form, the superseding indictment, and the pacer order of sentencing that there are at least five challengeable 924(c) convictions, some of which are predicated on RICO murder/RICO assault and others of which are likely predicated on them because of language in the original indictment. Three are addressed here. Mr. Carson argues that all his 924(c) convictions based on a crime of violence are invalid because RICO murder/assault, which are really based on the Maryland murder/assault statute, are not crimes of violence.

**Carson's convictions on Counts 35[5], 36, and 37[6], for use of a firearm during a crime of violence, must be set aside, because First Degree Murder under the Maryland Criminal Code does not qualify as a crime of violence.**

### A. Convictions at Issue

On the whole, Carson was charged and convicted on several counts and found not guilty on a few counts. There are several 924(c) convictions, some of which are predicated on RICO murder/RICO assault and some that are not. After an exhaustive review of the PSR, original, superseding and retyped indictments, transcript review of the jury charge, the verdict form[7] and pacer entries, it is unclear exactly which counts those are. However, we argue that the Maryland 924(c) counts are invalid because RICO

---

[5] According to the "retyped indictment", docket entry 517, former count 29 is now count 16rs. Undersigned counsel could not find this count. It may be a part of a later "retyped indictment" filed on 10/03/2001(after the jury verdict). See Dkt # 760.

[6] These are the numbered counts on the verdict form which correspond with counts 48(64), 49(65) and 50(66) of the superseding indictment of 3/25/99. These counts do line up with the counts listed in the PSR as 924(c) offenses as counts 35, 36, and 37. A docket entry(with no number) for 1/31/2002 describing Carson's sentencing lists numerous counts as dismissed including counts 47, 48 and 49.

[7] See Dkt #810.

3

murder/assault, which are predicated on the Maryland murder/assault are not crimes of violence.[8]

The crime of violence referenced in Counts 35, 36, and 37 of the final superseding indictment, Dkt. #142, was Murder in Aid of Racketeering the activity (being the murder of) of Alanzo Gaskins, Darnell Mack and Melody Anderson, also known throughout the proceedings as the "triple murder." Carson was charged and convicted of RICO Murder under 27 Maryland Code Sections 407 and 410, also known as Chapter 2-201, and Title 18 U.S.C. Section 1959(a)(1).

Carson was sentenced to "Life on Counts 1rss2rrs, 22rrs, 25rrs, 26rrs and 27rrs; all counts to run concurrently…; and sentenced on counts…35rrs, 36rrs, and 37rrs to 20 years, to run consecutively to each other and to counts 4rrs-8rrs." The convictions on counts 35, 36 and 37 must be set aside as well as any other counts that can be determined to have as their basis an alleged crime of violence, that being Maryland first degree murder.

### B. Statutes Involved

18 USC §924(c)(1)(A), in pertinent part, provides:

. . . any person who, during and in relation to a crime of violence. . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence. . . . . .
> (I) be sentenced to a term of imprisonment of not less than 5 years;
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

---

[8] A 924(c) offense cannot be based upon a D.C. Code offense. *See United States v. Brown,* 58 F.Supp. 3d 115 (D.D.C 2014)(J. Leon). Therefore, those counts in which Carson was convicted of 924(c) offenses based upon a D.C. Code violation are not addressed here.

App 1200

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 USC §924(c)(3) defines "crime of violence" as follows:

(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and-
(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The Armed Career Criminal Act (ACCA), referred to in numerous cases relied on *infra,* relevantly defines "violent felony" in 18 U.S.C. §924(e)(2)(B), as follows:

"any crime punishable by imprisonment for a term exceeding one year . . . that --
(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

18 USC Section 924(c)(3)(A) is referred to as the force clause. Section 924(c)(3)(B) is referred to as the residual clause. Section 924(c)(3)(A) is identical to the force clause in the ACCA (Section 924(e)(2)(B)(i)). Section 924(c)(3)(B) is not identical but very similar to the residual clause in the ACCA (Section 924(e)(2)(B)(ii). We address each in turn.

Carson's 924(c) convictions were charged in conjunction with 18 U.S.C. Section 1959(a)(1), known as violent crime in aid of racketeering, and First Degree Murder in Maryland.

**C. Maryland first-degree murder is not a crime of violence under § 924(c)'s force clause because it does not require the use, attempted use, or threatened use of violent physical force.**

5

In determining whether an offense qualifies as a "crime of violence" under the "force" clause of 18 USC Section 924(c), that is, 924(c)(3)(A), sentencing courts must employ the categorical approach. *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013)(so concluding with respect to the language in the ACCA, that is , Section 924(e)(2)(B)(i), which - as set out just above - defines "violent felony" identically to the definition of "crime of violence" in 924(c)(3)(A)); *United States v. Redrick*, 841 F.3d 478, 481-82 (D.C. Cir. 2016)(examining the "violent felony" definition in 924(e)(2)(B)(i) in the course of employing the categorical approach); *United States v. Royal*, 731 F.3d 333, 340-42 (4th Cir. 2013)(same).

Although *Descamps* involved the categorical approach as applied to the ACCA, that is, 18 USC 924(e)(2)(B)(i), this same categorical approach applies in determining whether an offense qualifies as a "crime of violence" under 18 U.S.C. § 924(c)), because, as noted above, "crime of violence" is defined identically. *See United States v. Fuertes*, 805 F.3d 485, 497-500 (4th Cir. 2015)(employing categorical approach in addressing §924(c)).

This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps*, 133 S. Ct. at 2283 (citation omitted); *Redrick, supra,* at 481-482 ; *Royal*, 731 F.3d at 341-42. In addition, as this Court wrote in *Redrick,* at 482,

> Normally, in asking whether a prior crime qualifies as a violent felony, we look at the state or federal statute under which a defendant has been convicted and ask simply whether the *elements* of the prior crime meet the Act's definitions of a violent felony. If a prior conviction is based on a statute that sweeps more broadly than this federal definition -- let us say, a conviction could be based on a minor battery -- such a conviction cannot qualify as a violent felony under the force

6

clause. *See, e.g.,* [*Curtis Johnson v. United States,* 559 U.S. 133, 141 (2010)] ; *Descamps v. United States,* 133 S. Ct. 2276, 2281, 186 L. Ed. 2d 438 (2013).

As a result, post-*Curtis Johnson* and *Descamps*, for an offense to qualify as a "crime of violence" under the "force" clause, the offense must have an element the use, attempted use, or threatened use of "physical force" against another person. 18 U.S.C. § 924(c)(3)(A). And "physical force" means "*violent* force—that is force capable of causing physical pain or injury to another person." *Curtis Johnson v. United States*, *supra,* at 140(emphasis in original); *Redrick*, *supra,* at 481 (following *Curtis Johnson* in an ACCA, that is, 18 U.S.C, §§924(e) case).

In certain limited circumstances, when a statute of conviction "list[s] elements in the alternative, and thereby define[s] multiple crimes," *i.e.*, the statute is "divisible," the Court may use a "modified categorical approach." *Mathis*, 136 S. Ct. at 2249. Under this modified approach, "a sentencing court [may] look[] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id*. Importantly, however, this approach may be used only for statutes "that list[] multiple elements disjunctively," as opposed to those that "instead . . . enumerate[] various factual means of committing a single element." *Id*.; *see id.* at 2253 ("[A] statute's listing of disjunctive *means* does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction." (emphasis added)); *Descamps*, 133 S. Ct. at 2282 ("[S]entencing courts may *not* apply the modified categorical approach when the crime of which the defendant was convicted as a single, indivisible set of elements." (emphasis added)). Thus, a court may *not* apply "the modified categorical approach to determine the means by which [a defendant] committed

7

his prior crimes[:]" "the modified approach serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque." *Mathis*, 136 S. Ct. at 2253.

As detailed below, Maryland first-degree murder fails to qualify as a "crime of violence." The Maryland statute defines first-degree murder as a murder that is:

> (1) a deliberate, premeditated, and willful killing; (2) committed by lying in wait; (3) committed by poison; or (4) committed in the perpetration of or an attempt to perpetrate (i) arson in the first degree; (ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that: 1. is not parcel to a dwelling; and 2. contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco; (iii) burglary in the first, second, or third degree; (iv) carjacking or armed carjacking; (v) escape in the first degree from a State correctional facility or a local correctional facility; (vi) kidnapping under § 3-502 or § 3-503(a)(2) of this article; (vii) mayhem; (viii) rape; (ix) robbery under § 3-402 or § 3-403 of this article; (x) sexual offense in the first or second degree; (xi) sodomy; or (xii) a violation of § 4-503 of this article concerning destructive devices.
>     Md. Code Ann., Crim. Law § 2-201.

Despite the alternative methods of committing murder in Maryland, murder is a single common law offense divided into degrees by statute. *Sifrit v. State*, 857 A.2d 88, 100 (Md. 2004); *Burch v. State*, 696 A.2d 443, 454 (Md. 1997). The first-degree murder statute is indivisible as it simply sets forth alternative methods of committing a single offense. "[A] conviction of first degree murder may be proved *either* by showing deliberation, wilfulness and premeditation (premeditated murder), or by showing a homicide committed in the perpetration, or attempted perpetration, of one of the enumerated felonies (felony murder). There is but one offense–murder in the first degree–but that offense may be committed in more than one way. . . . There is no requirement . . . that a charging document must inform the accused of the specific theory on which the State will rely." *Ross v. State*, 519 A.2d 735, 737 (Md. 1987). The constitutionality of such a procedure was addressed in *Schad v. Arizona*, 501 U.S. 624

8

(1991). There, the Supreme Court upheld against a due process challenge a general verdict of guilt as to first degree murder, where "the Arizona Supreme Court has effectively decided that, under state law, premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element." *Id.* at 637, 645.

First-degree murder in Maryland is not categorically a crime of violence under the force clause because the statute sweeps within it much conduct that does not include "as an element the use, attempted use, or threatened use," 18 U.S.C. Section 924(c)(3)(A), of violent physical force. For example, a person can commit first degree murder, that is, "a deliberate, premeditated, and willful killing," Md. Code Ann., Crim Law, §2-201(1), in many ways that do not require violent physical force, such as by poisoning, trickery, or withholding life-saving medication or sustenance. Murder by poisoning is also first-degree murder under Maryland law as set out separately in Md. Code Ann. Crim Law, §2-201(3). Likewise, many offenses such as burglary and escape that result in death, Md. Code Ann. Crim. Law, §§2-201(4), count as first-degree murder under Maryland law.

As mentioned just above, "(i)f a prior conviction is based on a statute that sweeps more broadly than this ("violent felony") definition … such a conviction cannot qualify as a violent felony under the force clause." *Redrick, supra,* at 482. "[W]hen a statute allows for both violent and nonviolent means of commission, the offense is not a categorical crime of violence.". *Fuertes*, *supra,* at 498. *See Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006) (New York reckless assault with a dangerous weapon statute failed to qualify as a "crime of violence" under the 18 U.S.C. §16(a) force clause

9

–which is identical to the §924(c) force clause – because it did not have an element requiring the "intentional employment of physical force.")

Mr. Carson was sentenced on January 31, 2002. He did not raise the foregoing issue in the District Court.    There was no procedural default because it was impossible for his counsel to know about this issue. First, *Redrick* and *Sheffield, supra*, relied on here, were both decided in 2016, and how Maryland First Degree murder was to be analyzed in this context had never (as far as undersigned counsel knows) been addressed.   Second, given that the residual clause would have remained available, *see infra*, until *Johnson v. United States,* 135 S.Ct.2551 (2015),  was decided on June 26, 2015, the argument would have been futile. And *Welch v. United States*, 136 S.Ct. 1257 (2016), where the Court ruled that *Johnson* applied retroactively, was not decided until April 18, 2016, almost a year later.  Third, the district court had no jurisdiction over the §924(c) count because the charge affirmatively alleged conduct that post-Johnson is outside the sweep of §924(c). *See United States v. Brown,* 752 F.3d 1344, 1352 (11th Cir. 2014).   Finally, as long as the error is plain as of the time of direct appellate review, the error is "plain" within the meaning of Rule 52(b), F.R.Crim.P., even though it was not brought to the trial court's attention.  *Henderson v. United States*, 133 S.Ct. 1121, 1124-25 (2013).   In consequence, as in *Henderson*,  *Redrick*, and *Sheffield*, the error here is clear error that substantially affected Carson's rights and seriously affected the fairness of the proceedings.

**D.  Section 924(c)(3)'s residual clause is unconstitutionally vague and thus cannot support a conviction under the statute.**

Since Maryland murder, given that it can be accomplished by non-violent means, fails to qualify as a "crime of violence" under § 924(c)(3)'s force clause, the remaining

10

question is whether the offense can qualify as a "crime of violence" under § 924(c)(3)'s residual clause. Three binding authorities, *Johnson v. United States,* 135 S.Ct.2551 (2015), *United States v. Sheffield*, 832 F.3d 296 (D.C.Cir. 2016), and *Redrick, supra*, address analogous residual clauses. As noted above, the clause in the ACCA, §924(e)(2)(B)(ii) reads: "(B) the term 'violent felony' means any crime ... that – ... (ii) ... otherwise involves conduct that presents a serious potential risk of physical injury to another ..." The Court in *Johnson* found this clause unconstitutionally vague. 135 S.Ct. at 2563. *Redrick*, another ACCA case, noted that the *Johnson* court had done so. *Id.*\*4. The residual clause at issue in *Sheffield* was in then Sentencing Guideline 4B1.1(b), which defined a "crime of violence" again as one that "otherwise involves conduct that presents a serious risk of physical injury to another." The Circuit Court also found this clause unconstitutionally vague. *Sheffield, supra,* at 312-313.

The statutory phrase at issue in this case is essentially the same as the ACCA and Sentencing Guideline 4B1.1(b) residual clauses. To be sure, 18 U.S.C. § 924(e)(2)(B)(ii), Guideline 4B1.1(b), and 18 U.S.C. § 924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA and Guideline 4B1.1 is a "serious risk of potential physical injury to another," and the risk at issue in Section 924(c) is a "substantial risk that physical force against the person or property of another may be used," this difference is too minor to distinguish this case from *Johnson*, *Sheffield*, or *Redrick.* In consequence, the residual clause in § 924(c)(3)(B) cannot be used to support a conviction under § 924(c).

Carson did not raise the residual clause issue in the District Court at his sentencing. At that time, however, the issue was settled contrary to his present

11

argument because *Johnson*, overruling, among other cases *James v. United States*, 550 U.S. 192 (2007), was not decided until June 26, 2015. And, as previously noted, in *Welch v. United States*, 136 S.Ct. 1257 (2016), where the Court ruled that *Johnson* applied retroactively, was not decided until April 18, 2016. So, the error here is a clear error that substantially affected Carson's rights and seriously affected the fairness of the proceedings.

In certain limited circumstances, when a statute of conviction "list[s] elements in the alternative, and thereby define[s] multiple crimes," *i.e.*, the statute is "divisible," the Court may use a "modified categorical approach." *Mathis*, 136 S. Ct. at 2249. Under this modified approach, "a sentencing court [may] look [] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id*. Importantly, however, this approach may be used only for statutes "that list[] multiple elements disjunctively," as opposed to those that "instead . . . enumerate[] various factual means of committing a single element." *Id*.; *see id.* at 2253 ("[A] statute's listing of disjunctive *means* does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction." (emphasis added)); *Descamps*, 133 S. Ct. at 2282 ("[S]entencing courts may *not* apply the modified categorical approach when the crime of which the defendant was convicted as a single, indivisible set of elements." (emphasis added)). Thus, a court may *not* apply "the modified categorical approach to determine the means by which [a defendant] committed his prior crimes[:]" "the modified approach serves—and serves solely—as a tool to

12

identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque." *Mathis*, 136 S. Ct. at 2253.

Wherefore, Mr. Carson respectfully requests that his 924(c) convictions be vacated.

Respectfully submitted,

_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

13

## Certificate of Service

I hereby certify that on this 12th day of June, 2017, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter and a copy sent to Mr. Carson as well.


/s/_____
Kira Anne West

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal. No. 98-CR-00329-4 (RCL) |
| WILLIAM KYLE SWEENEY, | : | |
| Defendant. | : | |

### SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, ("Sweeney") a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, respectfully supplements his motion, pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the sentence he received in this case. As grounds for his Motion, Sweeney states as follows:

This motion is based upon all files, records and proceedings in this case.

On September 18, 1998, an indictment was returned against Sweeney and his codefendants. On March 25, 1999, a 101-count superseding indictment was filed, charging Sweeney and his codefendants with violations of 21 U.S.C. §846, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances ("Narcotics Conspiracy"); 18 U.S.C. §1962(d), Conspiracy to Participate in a Racketeer Influenced Corrupt Organization ("RICO Conspiracy"); 22 D.C. Code §§2401 and 3202, First Degree Murder While Armed; 22 D.C. Code §§501 and 3202, Assault with Intent to Kill While Armed; 18 U.S.C. §1959, Violent Crime in Aid of Racketeering Activity; 22 D.C. Code §§2101 and 3202, Kidnapping While Armed; 22 D.C. Code §505(b), Assaulting a Police Officer; 18 U.S.C. §924(c)(1), Use of a Firearm; 22 D.C. Code §3204(b), Possession of a Firearm During a Crime of Violence; 21 U.S.C. §841(a)(1), Possession

App 1211

with Intent to Distribute and Distribution of Controlled Substances; 22 D.C. Code §105, Aiding and Abetting; and, 18 U.S.C. §2, Aiding and Abetting.[1]

On August 15, 2001, after a seven-month trial, Sweeney was convicted of conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization, attempted murder in aid of racketeering, first degree murder while armed (for the murder of Donnell Whitfield), four counts of murder in aid of racketeering (for the murder of Donnell Whitfield, and the triple-murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson), five counts of use of a firearm, and possession of a firearm during a crime of violence. Petitioner Sweeney was found not guilty as to the charge of first-degree murder while armed of Glenn Jenkins, and related offenses.

On February 5, 2002, the Court sentenced Sweeney as follows:

Six concurrent terms of life imprisonment were imposed on the Narcotics Conspiracy count, the RICO Conspiracy count, and the four counts of murder. A supervised release period of five years was imposed on each of those counts, to run concurrently, along with a fine of $500,000.00 and a special assessment of $600.00.

As to Count 35[2] (Use of a Firearm in the RICO Assault of Anthony Pryor), a term of five years incarceration was imposed, to run consecutively to all other counts, and to be followed by five years of supervised release to run concurrently with all other counts. A special assessment of $100.00 was also imposed as to this count.

---

[1] A Retyped Indictment was filed on January 4, 2001. All count numbers referred to in this motion shall refer to the counts as numbered in the Retyped Indictment.
[2] This charge is listed as "Count 28" on the jury's verdict form, as well as on the ECF docket.

App 1212

As to each of Counts 40, 45, 46, and 47[3] (Use of a Firearm in the RICO Murders of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson), Sweeney was sentenced to 20 years incarceration, to run consecutively to each other and to all other counts. A five-year period of supervised release was imposed on each count, to run concurrently with all other counts, and a special assessment of $100.00 was imposed on each count.

On July 21, 2006, the United States Court of Appeals for the District of Columbia Circuit affirmed Sweeney's conviction. *United States v. Carson, et al*, 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en bank denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir. Oct. 23, 2006).

On February 20, 2007, the Supreme Court denied Sweeney's petition for writ of certiorari. *Carson, et al v. United States*, 127 S. Ct. 1351 (2007).

On February 19, 2008, Sweeney timely filed his original Motion to Vacate, Set Aside or Correct Sentence, pursuant to 28 U.S.C. §2255. At the time the motion was filed, significant portions of the trial and appellate records were unavailable to counsel appointed to investigate and litigate matters in Sweeney's §2255 proceeding, which hampered counsel's ability to effectively litigate the issues. Sweeney sought leave of the Court to supplement his original §2255 motion, as additional material was made available. This is that supplement.[4]

---

[3] The verdict form and ECF docket list these charges as "Counts 30, 35, 36, and 37," respectively.

[4] Counsel incorporates by reference the claims raised in Mr. Sweeney's original §2255 motion, as well as the claims raised by Mr. Sweeney's codefendants in their post-conviction petitions (original and supplemental). Because this case was tried in a group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

3

For the reasons set forth below, Petitioner Sweeney prays that this Court set aside his convictions and sentence in this case.[5]

## MEMORANDUM OF FACTS AND LAW

Sweeney moves the Court to vacate his convictions and sentences on all counts on the grounds that they were obtained by denial of, and in violation of his Constitutional rights. The ultimate legal standard for motions brought pursuant to §2255 is prescribed by statute:

> If the court finds that . . . the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate. 28 U.S.C. §2255.

## BACKGROUND

In this case, Sweeney, along with his codefendants, was charged with a large-scale narcotics and RICO conspiracy. It was the prosecution's theory that Sweeney, along with his codefendants were a group of lifelong friends who grew up in the Greenleaf Gardens neighborhood of Southwest Washington, D.C. The Government alleged that as Sweeney, and his codefendants entered their teenage years, they began selling drugs. By the early 1990's, the Government alleged that a large-scale drug operation had been developed in the neighborhood, through which Sweeney, and his codefendants were selling substantial quantities of marijuana. The government also alleged that Sweeney, and his codefendants engaged in acts of violence, both for

---

[5] Pursuant to the pertinent instructions accompanying the Model Form for Motions Under 28 U.S.C. §2255, prescribed by the Rules Governing Section 2255 Cases in the United States District Courts, we have set forth in our memorandum the pertinent facts and applicable law in support of our motion. However, in discussing the facts relating to our legal claims, we do not mean to suggest that an evidentiary hearing on these claims is unnecessary. To the contrary, because our allegations involve factual, as well as legal issues, a full hearing on this motion is required.

4

purposes of self-enrichment and self-preservation (to protect themselves from both rival drug dealers and prosecution by the Government).

The bulk of the Government's evidence against Sweeney was supplied by the testimony of Government cooperators and jailhouse informants – in pursuit of substantial assistance and other relief from the consequences of their own criminal acts. The self-interested and often conflicting testimony of these witnesses was suspect at best.[6] As an example of the quality of these witnesses is Donald Nichols, a jailhouse informant and a witness who provided some of the Government's only evidence of Sweeney's involvement in drug dealing. At trial Nichols admitted that on previous occasions he had lied in order to gain his freedom. (Tr. 2/26/01 (AM) at p. 63).

The key part of the Government's case against Sweeney came from the admission of substantial hearsay statements made by Robert "Butchie" Smith. These statements of Smith were introduced, pursuant to Federal Rule of Evidence 804(b)(6). The Government called James Montgomery (a cooperating witness) and Federal Bureau of Investigation ("FBI") Agent Vincent Lisi (the Case Agent who lead the FBI's investigation) to testify as to statements allegedly made by Smith which statements incriminated Sweeney.

The Government alleged in its case that Smith was a relative of Sweeney, and was leading a double life as a drug dealer and Government informant. According to the

---

[6] The majority of these witnesses testified that prior to trial they gave false testimony under oath, or false statements to law enforcement, on numerous occasions. *See* Testimony of Reginald Switzer, Trial Tr. 1/25/01 (AM) at pp. 40-1, 62-4; Trial Tr. 1/30/01 (AM) at pp. 75-6; Testimony of James Montgomery, Trial Tr. 3/12/01 (PM) at pp. 27-30; Trial Tr. 3/15/01 (AM) at pp. 53-58; Trial Tr. 3/15/01 (PM) at pp. 3-33; Testimony of Charles Bender, Trial Tr. 4/4/01 (PM) at pp. 33-4; Testimony of Ronald Sowells, Trial Tr. 4/18/01 (AM) at pp. 30-2, 83-5; Testimony of Arthur Rice, Trial Tr. 4/25/01 (PM) at pp. 30:25, 31-33; Testimony of Paul Franklin, Trial Tr. 5/1/01 (PM) at pp. 31, 65-6; Testimony of Demetrius Hunter, Trial Tr. 5/7/01 (PM) at pp. 57-9; Testimony of John Venable, Trial Tr. 5/14/01 (PM) at p. 7.

5

Government, Smith implicated Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

These hearsay statements of Smith, a substantial number of which were testified to through the bolstering voice of an FBI Agent and were the keystone of the Government's case against Sweeney. Smith's hearsay statements were relied upon heavily by the Government in its closing argument, and to bring about the conviction of Sweeney in this case.[7]

Apart from the testimony of cooperating criminals seeking favors from the Government in exchange for their testimony, and the hearsay statements of Robert Smith, the Government's case against Sweeney was weak.

With regard to the triple murder in Temple Hills, the only physical evidence linking Sweeney to the house in which the crime was committed was a palm print on the front door of the home. While this piece of evidence might, at first appear to hurt Sweeney's case on closer examination the print was explained. The Government's fingerprint expert testified that there is no way to date prints, and stated that Sweeney's print could have been left on the door at any time. (Tr. 4/2/01 (PM) at pp. 72-3). More importantly it was made clear at trial that the house at which the murders occurred was used as a gambling house, and Sweeney had visited the house a number of times in order to gamble. (Tr. 6/6/01 (PM) at pp. 48-61).

Moreover, Shaheem Johnson, testified at trial that he had seen Sweeney in the house on a previous occasion (Johnson testified that he did not know Sweeney at the

---

[7] *See* Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

6

App 1216

time, but that Sweeney had stood out and could be identified as a result of his Tourette Syndrome). (Tr. 6/12/01 (PM) at pp. 86:9-14, 87:15-21).

In addition the testimony of Cinama Hawkins, the Government's eyewitness and the sole survivor of the triple murder, was impeached at trial by the testimony of Prince George's County Police Officer Robert Taylor, the first person that Hawkins came into contact with after fleeing the Temple Hills house once the killers had left. Officer Taylor testified that when he interviewed Ms. Hawkins at the scene, with the facts and circumstances of the events that evening still fresh in her mind, described both of the murders as being six (6) feet tall. (Tr. 6/12/01 at pp. 59-68). Sweeney could never have been mistaken as six feet tall.

James Montgomery was used by the Government to implicate Sweeney in the triple murder. Montgomery testified that he was there with Sweeny on the night of the murders and was a participant in the crime, yet he was never able to provide a consistent statement of the events of the crime he claimed to have participated in. Montgomery's testimony at trial was inconsistent with prior statements that he had given to law enforcement and with his grand jury testimony. (Tr. 3/14/02 (AM) at pp. 51-3; 3/15/01 (PM) at pp. 16-32; 6/27/01 (PM) at pp. 22-23).

Turning now to the Government's case against Sweeney for the murder of Donnell Whitfield. The Government's case on this charge was also weak, as it relied mainly on the testimony of John Venable, whose credibility was impeached by his conflicting grand jury testimony. (Tr. 5/14/01 (PM) at pp. 9-18, 28-9, 34-5).

As will be demonstrated herein, the Government's case against Sweeney was weak. This combined with the ineffective assistance of counsel that Sweeney received at

7

both trial and on appeal, the trial court's errors and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Sweeney was convicted, and sentenced to multiple life sentences, at a trial and in appeal that was fundamentally unfair. Accordingly, relief must be granted.

## GROUNDS FOR RELIEF

### A. *BRADY* AND *GIGLIO* MATERIAL WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS[8]

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the United States Attorney's Criminal Resource Manual ("USAM") describes the Department's policy for disclosure of exculpatory and impeachment information. *See, e.g.* USAM §9-5.001.

Prior to trial in this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Federal Rule of Criminal Procedure 16, Sweeney requested that the government produce all material in its possession to which he was entitled under *Brady*, the Jencks Act, and *Giglio*.[9]

---

[8] The withholding of this material at trial was the result of both prosecutorial misconduct and error by the trial court. Petitioner Sweeney challenges his convictions on both of those grounds with respect to the suppressed material.

[9] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). In holding that favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. Accordingly, Petitioner refers to such evidence collectively as "*Brady* material" throughout this brief. The Jencks Act, 18 U.S.C. § 3500 ("Jencks Act"), provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate to the witness's

8

Prior to and during trial, the Government repeatedly assured the Court and the defendants that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense. *See e.g.*, Oral Argument Transcript, 9/27/00 at p. 130:17-20. Evidence that was not turned over to Sweeny before or during the trial, or during the time that Sweeny's appeal was pending, reveals that the Government's repeated assurances were wrong. The suppressed evidence contains a substantial amount of *Brady* material all of which was withheld from the defense throughout the course of the trial and appeal in this case. This systematic withholding of favorable evidence material to the defense violated Sweeney's right to due process, and rendered the entire proceeding unfair and Sweeney's convictions unreliable.

## 1. PETITIONER HAS CAUSE FOR RAISING THE SUPPRESSED *BRADY* EVIDENCE ISSUE IN HIS §2255 MOTION

Throughout trial in this case, the Government maintained a practice of submitting material to the Court *ex parte* and under seal. The justification offered by the Government for doing so was most often "security concerns." As a result, there is a large amount of material to which the defense never had access, and consequently, never had the benefit of using to challenge the Government's case at trial or on appeal.

It was not until one week prior to the running of the statute of limitations on Sweeney's filing his post-conviction motion, when Sweeney was granted access to all of the material that had been suppressed by the Government and the trial court. On February 13, 2008, prior *habeas* counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket [#1015]. In the motion, counsel requested the Court to

---

testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, the court is required to strike the testimony of the witness. 18 U.S.C. § 3500(d).

order that all papers and proceedings in this matter be unsealed and that counsel be provided with a copy thereof.

On February 15, 2008, the Court granted that motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in this case to counsel for Sweeney. Order, dated February 15, 2008 (TFH) [#1016].

On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. § 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the Court's order.

On December 20, 2012, undersigned counsel was appointed to represent Sweeney in this matter. Upon joining the case, undersigned counsel obtained approximately 15 boxes of material related to this matter from prior counsel. The boxes contained, *inter alia*, material from trial counsel, transcripts, and some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008, Order. The documents in the boxes were not indexed, organized, or labeled in any discernable fashion. Undersigned counsel has undertaken a lengthy review of the material contained in the boxes, and discovered a trove of suppressed *Brady* material.

In *Strickler v. Greene*, 527 U.S. 263 (1999), based on facts very similar to those here, the Supreme Court found that the petitioner had demonstrated cause for his procedural default of a *Brady* claim. In *Strickler*, after exhausting both his direct and collateral state appeals, the petitioner discovered exculpatory material that had been suppressed by the government pursuant to the federal *habeas* court's order granting petitioner access to all of the police and prosecutions files in the case. *Id.* at 278. The Court held that the petitioner had established cause for failing to raise his *Brady* claim

10

App 1220

earlier, because prior to the federal *habeas* court's order, the prosecution had represented that petitioner had already received all discoverable material and the petitioner had no access to the material. *Id.* at 289. Here, given the facts that (1) the Government repeatedly represented at trial that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense; (2) notwithstanding those representations, discoverable *Brady* material was withheld from Petitioners and placed under seal by the trial court; and (3) Petitioner Sweeney only obtained access to the material by court order unsealing the record in this case after all direct appeals had been exhausted, Petitioner Sweeney has clearly established cause for failing to raise his *Brady* claim prior to his *habeas* proceeding. *See id.*

## 2. FAVORABLE EVIDENCE WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS

A thorough review of the previously sealed material revealed that throughout the course of trial in this case, the Government repeatedly withheld exculpatory, impeachment, and bias evidence from the defense, in violation of Petitioner Sweeney's right to due process and a fair trial. This systematic withholding of favorable evidence by the Government, with the consent of the trial court, is more than enough to significantly "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted). Accordingly, the interests of justice warrant relief, and vacate Sweeney's convictions.

## 3. SUPPRESSED EVIDENCE RELATING TO THEODORE WATSON

Theodore Watson was a key witness for the Government, having implicated Sweeney, and his codefendants in a number of crimes. Watson was one of several cooperating witnesses presented by the government.

11

Watson was a defendant in a criminal case in the United States District Court of Maryland, located in Greenbelt, Maryland. As a result of this charge Watson was being held at the Northern Neck Regional Jail at the same time that Sweeney was also being held there. During this time Watson claimed, and testified at Sweeney's trial, that Sweeney told him about his involvement, among other things, in kidnapping, murder and drugs and he further wanted to have Montgomery killed for cooperating with the Government. (Trans 2-8-01, P.M. page 45 to 70) As such Watson's creditability became a central issue for the defense at trial.

Watson in order to reduce the sentence for the crime he had been charged with in Maryland and to obtain a § 5K1.1 recommendation from the Government entered into an agreement with the U.S. Attorney's Office in Greenbelt. This was done pursuant to a plea agreement in *United States v. Theodore Watson*, No. 99-069 (PJM), in the District of Maryland, Watson was obligated to fulfill certain cooperation requirements in exchange for the possibility of receiving a § 5K1.1 recommendation from the Government. *See* Ex. 1 (Watson Plea Agreement, pp. 5-6 at ¶ 6).

Watson cooperated with the Government in Greenbelt but at his sentencing, on February 4, 2000, the Government refused to file a § 5K1.1 letter on Watson's behalf or request a reduction in his sentence, despite Watson's fervent argument that a § 5K1.1 letter and reduction in his sentence was merited given his extensive cooperation with the Government. The court unmoved by Watson's protests, imposed a sentence of 105-months on Watson.

At trial in Sweeney's case, following Watson's testimony on direct examination, the defense, naturally cross-examined Watson as to why the U.S. Attorney's Office in

12

Greenbelt had refused to file a §5K1.1 letter on his behalf when he had cooperated with that office.  Watson attempted to explain the U.S. Attorney's Office  refusal as being the result of Ms. Wilkinson, the Assistant U.S. Attorney assigned to his case, simply not liking him.

As is shown by the following colloquy on cross-examination:

**Q.**  You have already told us that you met with Ms. Wilkinson, correct?
**A.**  Correct.
**Q.**  And that you gave her your information, correct?
**A.**  Correct.
**Q.**  And you did not get the 5K1 letter for substantial assistance, correct?
**A.**  Correct.
**Q.**  Okay.  My question is do you know why you did not get the 5K1 letter from Ms. Wilkinson?
**A.**  Yes.
**Q.**  What was the reason?
**A.**  She made it very clear she did not like me and she didn't want to give me anything.
**THE COURT**:  I am sorry?
**THE WITNESS:**  She made it very clear that she did not like me and she did not want to give me anything.
**BY MR. KIERSH**:
**Q.**  Okay.  And when you tell us that she made it very clear that she did not like you, what did she say that led you to formulate the belief that she did not like you?
**A.**  Number one was her attitude toward me, and my attorneys had told me, "Ms. Wilkinson doesn't like you, and she doesn't want to give you anything.  She doesn't want to hear anything from you.  She doesn't want to talk to you about anything.  The only time she wants to see you is at trial."

(Tr. 2/12/01 (AM) at pp. 19-21).

Watson, later attempted to provide a reason why Wilkinson might not like him tried to make it appear that Wilkinson was angry with him as a result of him having made her look bad in front of another Assistant U.S. Attorney, as shown by the following exchange:

**BY MR. KIERSH**:
**Q.**  Sir, what was the substance of the conversation that day?

13

**A.** Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler. Sandra Wilkinson was the district attorney who was prosecuting my case. When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team. And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly." And I explained to her some things that happened in her case – two of the cases she was prosecuting. And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?" And I looked at Ms. Wilkinson and I looked at my attorney. I said, "I told you this months ago before you did that." She just looked at Ms. Wilkinson, and that was the end of it.

(Tr. 2/12/01 (AM) at p. 44).

At the conclusion of the court proceedings on February 12, 2001, the defense

made the following request:

**MR. DAVIS**: And I would ask that the United States Attorney's Office review that file.
**THE COURT**: If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file. Other than that --
**MR. DAVIS**: Thank you, your Honor.
**THE COURT**: -- that's the extent of the government's obligation. Okay?

(Tr. 2/12/01 (AM) at p. 78).

The following day the Government obtained Watson's file from the U.S.

Attorney's Office in Greenbelt, and the following exchanges occurred:

**MR. ZEIDENBERG (AUSA)**: I believe we are, your Honor. Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature**. Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have

14

the file, and I don't know if the Court wishes to have it to peruse.  There are letters --

**THE COURT**:  You mean the file from Greenbelt?

**MR. ZEIDENBERG**:  Yes.  There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

**THE COURT**: Do you want to have it made part of the court record?

**MR. KIERSH**:  Yes, your Honor.

**THE COURT**:  All right.

**MR. KIERSH**:  I ask that it be placed under seal and made a part of the record.
\*\*\*

**THE COURT**:  Number 5.  All right.  Number 5.  **I do not intend to review it in camera.**

**MR. ZUCKER**:  That would be my request.

(Tr. 2/13/01 (AM) at pp. 6-7) (emphasis added).

Despite the Government's assurances, the material contained within the Greenbelt file goes directly to the credibility of Watson as a witness.  The prosecutor, in this case, after having reviewed Watson's Greenbelt file, told the trial court that the reason that Watson had not been given a §5K1.1 letter by Ms. Wilkinson, ". . . was simply because she didn't believe his cooperation was of a significant enough nature to qualify.  There was nothing to suggest that it was not worthy of belief or it was incredible.  There was nothing of that nature."  (Tr. 2/13/01 (AM) at p. 6).  The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible was at best an error in judgment, and at worst, a calculated lie.

The Greenbelt file was included in the material obtained by counsel when the record was unsealed in this case.  A review of that file revealed that it indeed contains a copious amount of evidence that Watson chronically lied and schemed in pursuit of a departure, and contrary to the representations of the Government at trial, that the Government was well aware of his untrustworthy nature.  The file contains several

15

lengthy letters, from Watson to the AUSA in Greenbelt, which detail the many occasions

on which he lied to investigators.  For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second opportunity" to cooperate and help myself.  I abysmally apologize for the asinine [sic] way I conducted myself when the option was presented to me.  Had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed… There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done."

*See* Ex. 2 (Greenbelt file, Letter from Watson, dated August 19, 1999, at pp. 1, 4).

Another letter reveals that not only was the Greenbelt AUSA (Ms. Wilkerson) well aware

that Watson was a liar, but also that she hesitated to continue cooperation with him due to

his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the first conference and thereafter.  Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth regardless of my reasoning… Before I attempt to put the matter in its real perspective and sequence, again I would like to touch briefly on your view towards me as a liar… I believe that I have stated to you that "yes," I have lied [,] schemed and connived at times to obtain my way or freedom… In reference to me attempting to secure assistance on my own in an effort to help myself, Ms. Wilkerson, you advised [my attorneys] that you did not want to hear or discuss anything for or about me, and you did not want to see me until trial.

*See id.* (Greenbelt File, undated 17-page letter, at pp. 1, 2, and 12).    A third letter,

written just after his sentencing hearing, at which the Government declined to file a

departure letter and he was sentenced to 105 months incarceration, reveals Watson's

desperation and willingness to do anything in pursuit of a reduction in sentence:

> I could have made a lot of cases from the street, but that was not to be. But with your blessings, I wish to try to do as much as possible from within.  I do have pertinent information for other prosecutors at the moment.  One case involving a multi-kilo drug dealer and "hit man."  *I will cooperate and do exactly as you say.*  I just hope and pray that I do and give enough to be afforded a sizable downward departure.

16

*See id.* (Greenbelt File, Letter dated February 4, 2000, at pp. 5-6) (emphasis added).

Further, Ms. Wilkinson, the Greenbelt AUSA, wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well and his ability to follow directions from the government." *See id.* (Greenbelt File, Ms. Wilkinson's letter, dated February 21, 2000) (emphasis added).

The refusal of the Government to give Watson a §5K1.1 letter and the statement that Mr. Watson continues to undermine his own credibility is explained by the next letter in the Greenbelt file, which is a 15 page handwritten letter from Watson to Ms. Wilkerson. In this letter Watson writes, "I would like to touch briefly on your harshness towards me as a liar at the first conference and thereafter. Ms. Wilkerson, again, I apologize and **confess that at our first conference, I lied** and somewhat distorted the truth regardless of my reasoning." *See id.* (Greenbelt File, 15 page Watson Letter at p. 1) (emphasis added). Watson, in the same letter, again addressing the point that Ms. Wilkerson thinks he is a liar, writes:

> ". . . again I would like to touch briefly on your view towards me as a liar
> 1) I believe that I have stated to you that "yes", I have lied schemed and connived at times to obtain my way or freedom. * * * I also stated this to an F.B.I. agent from the D.C. office when interviewed twice on an unrelated matter, his response to me was. "we all lie." Even though I knew this from personal experience, I was very surprised to hear a F.B.I. agent make that statement.
> 2) The majority of political are noted liars. There are the top heads of our states and county who were proven wrong doers and liars, Vice Pres. Spiro Agnew, President Richard Nixon, and President William Clinton, just to

App 1227

name a few.  There is no way I am comparing myself with these figures other than a liar is liar regardless of who they are.

3) Ms. Wilkerson, perhaps you have not experienced it, but I am sure that you have heard of agents and or government witnesses testifying falsely under oath, and the misconduct of prosecutors.") * * *  (page 2)

4)  * * * I cannot say whether or not you have ever lied in your life, and if you have not, then you are truly blessed.  And, if not, then there is some discrepancy and contradiction in the Bible because God says in Romans 3:4 . . . .God is true even though every human being is a liar . . . . * * *

5) Again, human beings by nature instinctively lie to avoid prosecution, loss of life, freedom, bodily harm, harm to love ones, to acquire or maintain jobs or status, embarrassment and etc.  Please, Ms. Wilkerson, ask yourself if you would lie under these or any other adverse conditions? Heads and leaders of our country have. (Page 4-5)

*See id.* at pp. 1-2, 4-5.  Watson's admission that he lied to Ms. Wilkinson and his further statements that lying is an instinctive part of human nature, and is understood by God, goes to and impeaches his credibility and reliability as a witness.

The jury should have heard that the reason that Ms. Wilkinson did not like Watson, and the reason, that she did not want to give him anything and the reason he did not get the 5K letter is that Watson lied to her in the first meeting that he had with her. This is the only inference that one can take from Watson's handwritten letter in which he admits he lied to her and his lies are the reason for Ms. Wilkerson not liking Watson.

Once the Government had reviewed Watson's Greenbelt file, it should have taken steps to correct the testimony of Watson as to the reason he was not given a §5K1.1 letter in Greenbelt.  It was not because Ms. Wilkinson did not like him (I am sure she does not like many of the people to whom she had given §5K1.1 letters) and it was not because Watson had made Ms. Wilkinson look bad in front of another AUSA, but was in fact the result of Watson lying to her and that Watson wrote letters in which he states that he sees nothing wrong with lying to help himself out of a tight spot.  Watson even went so far as to quote the Bible to justify his having lied to Ms. Wilkinson.

18

Instead of doing this, the Government simply told the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). In order to make such a statement the Government had to ignore the facts that Ms. Wilkinson wrote to the court in Greenbelt that Watson continues to undermine his own credibility and that Watson admitted that he had lied to Ms. Wilkinson.

The principle that the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

As the Supreme Court has made clear:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (*quoting People v. Savvides,* 136 N. E. 2d 853, 854-855 (N.Y. Ct. App. 1956)).

In *Brady,* 373 U.S. at 87, the Supreme Court held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See also* Ex. 3 (American Bar Association, Project on Standards for

Criminal Justice, Prosecution Function and the Defense Function § 3-3.11(a)). When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. *Napue,* 360 U.S. at 269.

When as in this case " . . . the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.[7] In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair,[8] and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103-104 (1976)

Here, the Government's good faith is even in doubt as the Government suppressed Watson's Greenbelt file by misrepresenting the contents of the file to both the trial court and to the defense. Had the Government accurately reported to both the court and the defense, that Ms. Wilkinson had written to the court in Greenbelt that Watson continued to undermine his own credibility, and that Watson admitted that he had lied to her, and that Watson viewed lying as a natural and justifiable method to get out of trouble, the trial court would have ordered the file to be disclosed to the defense. Once the file was disclosed to the defense Watson would have been cross-examined as to the contents of his letters, his views on telling lies, and the true reason he was not given a §5K1.1 letter in Greenbelt.[10]

---

[10] It would have been better had the Government just produced the Greenbelt file to the court and remained silent as to its contents and allowed the court to make its own determination as to the significance of the file. The reliance of the court as to the truth of the representations made by the Government, concerning

App 1230

The reliance of the court, as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."

Further, the Government should have turned the Greenbelt file over to the defense as *Brady* material after it had reviewed it, because the material contained therein went directly to Watson's credibility as a witness.  The course of action pursued by the Government can have only one explanation, that the Government did not want the file disclosed to the defendant because it did not want the jury to hear that Watson lied to the U.S. Attorney's Office in Greenbelt – and the Government did not want the jury to hear Watson's views on lying.

As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."  A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice…

*Brady,* 373 U.S. at 87-88 (internal citations omitted).

Watson's testimony in this case was of great importance to the Government.  Not only did Watson claim that Sweeney had confessed to him his participation in a number

---

the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."  (Tr. 2/13/01 (AM) at pp. 6-7).

21

App 1231

of crimes, but more importantly Watson's testimony lends creditability to the testimony

of James Montgomery.  Montgomery's testimony might have been some of the most

damaging evidence introduced against Sweeney at this trial.

Montgomery was a cooperating witness that had lied to the Government,

misrepresented his involvement in crimes to the Government and was otherwise a witness

unworthy of belief.

Montgomery's conduct, character and background made it important for the

Government to find evidence with which to bolster the credibility of Montgomery.

This the Government did by having Watson testify as follows:

> **Q.** What was Mr. Sweeney's response when you said that?
> **A.** You know, I still don't think they have anything on me, you know.
> **Q.** Did he tell you what his concerns were about the case against him?
> **A.** Yes.
> **Q.** What was that?
> **A.** A certain fellow by the name of James Montgomery.
> **Q.** What did he tell you about James Montgomery?
> **A.** That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.
> **Q.** If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization –
> **A.** Mr. Sweeney brought Mr. Montgomery into the organization.  Is that okay?
> **A.** Yes, thank you.  And what did Mr. Sweeney say about that?
> **A.** Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.
> **Q.** Who is flipping on --
> **A.** Mr. Montgomery is turning on Mr. Sweeney to save himself.
> **Q.** Did Mr. Sweeney ask you any advice about that?
> **A.** Yes.

App 1232

**Q.** What did Mr. Sweeney ask you about that?

**A.** He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would they, the jury or whatever, try to work in his favor. I told him no, I didn't think so because it doesn't usually work like that. I said usually the first person that testifies is usually what they go with. And if they got you targeted as the ring leader then that makes the difference.

**Q.** What was Mr. Sweeney's response?

**A.** Yeah, I figured as much.

**THE COURT**: I'm sorry?

**THE WITNESS**: Yes, I figured as much.

**BY MR. ZEIDENBERG**:

**Q.** Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?

**A.** He was suppose to testify against him.

**Q.** Did you have any conversation about that fact?

**A.** Yes. He was talking that Montgomery is going to testify against him. And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know. And he said, we been trying to get to that mother fucker but the feds got him hid away too well.

**Q.** Did he say where they had been looking for him?

**A.** No.

(Trans 2-8-01, pm, pages 61-64)

The effect of this evidence on the jury would have been to lend credibility to Montgomery as a witness against Sweeney. As the only reason that Sweeny would want to have a witness killed would be if that witness's testimony was accurate and it would hurt Sweeney at trial.

The evidence in the Greenbelt file overwhelmingly demonstrates that Watson was known by prosecutors to be dishonest, and had a powerful self-interest to do or say anything the Government wanted in his pursuit of a reduced sentence. The Government's claim to the Court that the Greenbelt file contained nothing to indicate Watson's untrustworthiness was a misrepresentation of the highest order. The failure to provide the contents of the Greenbelt file to the defense was plainly violative of the Government's discovery obligations, and Petitioner Sweeney's right to a fair trial.

23

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 4. SUPPRESSED EVIDENCE RELATING TO JAMES MONTGOMERY

James Montgomery was an essential witness for the Government.  His testimony implicated the defendants in a number of criminal acts.  Again, as with the majority of the Government's witnesses, the defense questioned Montgomery's credibility.  Montgomery himself had admitted to, been implicated in, or been convicted of a number of violent crimes.  These crimes included assault with a deadly weapon, numerous murders, and assault on a police officer while armed.  The Government had promised Montgomery leniency in exchange for his testimony; in fact, Montgomery ultimately received a five (5) year sentence for committing seven (7) murders.

On March 7, 2001, trial counsel requested Agent Lisi's notes related to his interviews of James Montgomery.  (Tr. 3/7/01 at p. 52).  The trial court ruled that Agent Lisi's notes did not contain *Brady* material. *Id.* at p. 91.  The recently unsealed material revealed Agent Lisi's notes regarding Montgomery.  The notes contain valuable impeachment evidence as to Montgomery. Specifically, the notes reveal that Montgomery lied to Agent Lisi in his interview with regard to the murder of Timothy Benton.   Maurice Proctor and James Montgomery were charged with Benton's murder. Agent Lisi's notes reveal that Montgomery lied, and substituted Carson for himself as one of the perpetrators of the Benton murder.   This valuable impeachment evidence could have been used by the defense to further discredit Montgomery by demonstrating his proclivity for lying to protect himself from criminal prosecution, through the false incrimination of others.  The suppression of the favorable evidence contained in Agent

App 1234

Lisi's notes, which as discussed, *infra*, was material to Petitioner Sweeney's guilt and violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 5. SUPPRESSED EVIDENCE RELATING TO CHARLES BENDER

On February 5, 2001, trial counsel for the defense asked the court to review the FBI's 302 reports generated from the FBI's interviews with one of the Government's witnesses, Charles "L.A." Bender. Trial counsel wanted to know whether Bender's testimony on the stand was consistent with the statements he gave to the Government. (Tr. 2/5/01 (A.M.) at p. 84). The trial court ruled that Bender's testimony was consistent with the information in the 302 reports, and denied the defense access to that material. The newly unsealed record reveals, however, that the Bender 302 reports contained *Brady* material, which was unconstitutionally withheld from Petitioners at trial. Indeed, in one of the Bender 302 reports, Bender stated that codefendant Jerome Martin confessed to Bender that he (Martin) killed Anthony Fortune. *See* Ex. 4 (Bender 302 Report). As an initial matter, this report was exculpatory *Brady* material as to codefendant Carson, who was charged with the murder of Fortune. This was significant

App 1235

to Petitioner Sweeney as well, as the Government's theory tied Sweeney to Carson in several murders. Further, the 302 report was valuable impeachment evidence, as it contradicted the Government's theory of the prosecution and could have been used to impeach Bender's testimony at trial. The suppression of the exculpatory and impeachment evidence contained in the Bender 302 report, which as discussed, *infra*, was material to Petitioner Sweeney's guilt, violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 6. SUPPRESSED EVIDENCE RELATING TO ARTHUR RICE

On April 24, 2001, trial counsel requested the FBI 302 reports generated from the interview of Government witness Arthur Rice. (Tr. 4/24/01 (PM) at p. 3). Arthur Rice was a jailhouse informant, whom the Government alleged was an associate of Petitioners. The trial court reviewed the FBI 302, dated January 26, 1999, and ruled that it contained no *Brady* material. *Id.* The recently unsealed material reveals that the opposite is true. Rice's 302 reveals that he told Case Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that defendant Martin, along with Carson, killed Leonard "Slick" Hyson and Maurice Hallman. In fact, Rice told the investigators that he was

26

present at the time of the murder, heard the gunshots, and then observed Martin and

Carson fleeing the scene. *See* Ex. 5 (Arthur Rice 302 Report). This evidence is favorable

to the defense because it contradicts the Government's theory of the case, which was that

it was James Montgomery who participated in the Hallman/Hyson murders with Carson.

The evidence could have been used to impeach Montgomery, who testified that he was

one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM) at pp. 55-62). The Rice 302

report was favorable to the defense, as it was both exculpatory and impeached the

credibility of the Government's witnesses; thus, as discussed *infra*, because it was also

material, the suppression of this evidence violated Petitioner Sweeney's right to a fair

trial. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense. This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 7. SUPPRESSED EVIDENCE RELATING TO ANDRE MURRAY

On February 1, 2001, trial counsel requested material from the Government relating

to Andre Murray, a cooperating witness for the Government, with whom the Detective had a

long history of dealings. (Tr. 2/1/01 (AM) at p. 65-66). The trial court ruled that the defense

was not entitled to the evidence under the Jencks Act. *Id.* The unsealed record, however,

exposed the fact that a Government Agent's notes also contained *Brady* material.

Specifically, the Government Agent's notes reveal that Andre Murray told the Government

App 1237

that Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for

killing Petey Johnson's brother, Keith Johnson. Sweeney was charged with the murder of

Keith Johnson. The Government Agent's notes contained evidence that someone other than

Sweeney was responsible for Robert Smith's death; therefore, the notes should have been

produced as *Brady* evidence.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the defense.

This failure deprived Sweeney of due process as the information was material to Sweeney's

guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 8. SUPPRESSED EVIDENCE RELATING TO THE MURDER OF ROBERT "BUTCHIE" SMITH AND THE GOVERNMENTS' FEDERAL RULE OF EVIDENCE 804(B)(6) MOTION.

The cornerstone of the Government's theory of Petitioner Sweeney's purported

liability in the conspiracy came from the admission of hearsay statements made by

Robert "Butchie" Smith, which were introduced through FBI Agent Vincent Lisi (the

Case Agent who lead the FBI's investigation).[11] The Government alleged that Robert

"Butchie" Smith was a relative of Petitioner Sweeney, and was leading a double life as a

drug dealer and informant. According to the prosecution, Smith implicated Petitioner

---

[11] As stated earlier, Petitioner Sweeney was convicted at trial of, *inter alia*, Count 2 in the indictment, the "RICO Conspiracy." Petitioner Sweeney received a life sentence for this conviction. In convicting Petitioner Sweeney of the RICO conspiracy count, the jury found Racketeering Act 50, the conspiracy to commit murder of Robert Smith a/k/a "Butchie," between on or about April 1997 and on or about June 17, 1997, to have been proven.

28

Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

At trial, the court allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights. Without having the opportunity to cross-examine Smith, his testimony, much of which was delivered through the bolstering voice of an FBI Agent, was the linchpin of the Government's case against Petitioner Sweeney. Indeed, this testimony was relied upon heavily by the Government in closing argument, and used to seal the Government's case.[12]

At the time of Robert Smith's murder, Petitioner Sweeney was in custody at the Prince George's County Detention Center. The Government's theory was that Petitioner Sweeney arranged for the murder of Robert Smith, a paid government informant, because he suspected that Smith was providing information to the police about criminal activity involving Petitioner Sweeney.

In addition to a multitude of requests in various forms, prior to and since, Petitioner Sweeney's Third Motion to Compel Discovery [#340], filed July 17, 2000, and specifically sought the information pertaining to Robert Smith to which he was entitled under *Brady*.

The Government sought, and was granted permission, pursuant to Federal Rule of Evidence 804(b)(6) to have FBI Special Agent Lisi, testify to certain incriminating statements allegedly made by Sweeney to his uncle Robert "Butchie" Smith.

---

[12] See Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

App 1239

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County Detention Center and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**MS. CHATURVEDI**: Certainly, your honor. If I could just address this briefly. Again, it is sort of a leap of faith. If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive. That is one leap of faith.

**THE COURT**: Sure.

**MS. CHATURVEDI**: And the second one is is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith. There is no such evidence. If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals. The *Winfield* case, which is the most most recent case on that point, says you can't just draw a blank. You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that. I will provide --

**THE COURT**: I Agree. There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

30

**MS. CHATURVEDI**: Right. And we don't have any such information. And we recognize that if we did have such information and that steps had been taken to give that, that would be Brady information. That would have been disclosed as Brady information.
**THE COURT**: Yes.

(Trans. 9-27-00, pp. 200-202).

Ms. Chaturvedi's statement that the Government had no information that someone other than the defendants in this case had been implicated in the murder of Smith was incorrect.

The Government was aware, as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of Smith.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by Judge Jackson on April 6, 1999.[13] *See* Ex. 6 (Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants). The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

In the *Ex Parte* Notice, the government states, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." *See* Ex. 6 at p. 12.[14]

---

[13] None of the material obtained pursuant to the Court's Order to unseal appear on the docket sheet in the above-captioned matter.

[14] The Government's motion does not elaborate on the evidence in its possession that led to the identification of these to individuals as those responsible for Smith's murder. Accordingly, Mr. Sweeney requests additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the Government based its statement would clearly be discoverable under *Brady*, and likely provide further evidence that the Government's misrepresentations and

App 1241

The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

The Government further suppressed the information contained within the material admitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the hand written notes relating to an interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson. *See* Ex. 7 (Handwritten Andre Murray Interview Notes).

The notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother] Wit. did not hear Draper return to advise Gooch he had killed Keith. He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother Keith.

This information was never provided to the defense despite the defense's requests for such information and the Government's assurance to the trial court and the defense that if it had such information it would turn it over to the defendants.

---

discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound. Mr. Sweeney hereby requests any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith. The facts as alleged above provide "good cause" to allow discovery of the requested material. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 ("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.") The facts above demonstrate that "good cause" has been shown; therefore, discovery is warranted. *Bracy* at 908-09.

32

The significance of the Government's suppression of the motive of Petey Johnson to kill Smith becomes more significant when one looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but as a possible suspect?
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called somebody to alert them that "Butchie" was there. (Trans. 5-30-01 (AM), pages 19-20).

The Government withheld from the defense evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder; Johnson also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the Government, of an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again had the Government disclosed the information in its possession, that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

The Government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith is further shown when during cross-examination of Agent Lisi by defense counsel, the Government objected when Agent Lisi was asked whether any suspects other than Sweeney had been developed as leads in Robert Smith's

33

murder. (Tr. 5/30/01 (AM), pp. 45-49). At sidebar, the Government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney. If Mr. Kiersh wants him to repeat it, that is fine." *Id.* at pp. 47-48.

The Government was quite sure that the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder as this material had not been turned over to the defense.

The defense was deprived of the opportunity to investigate this information or to attempt to use it in opposition to the Government's motion to admit the statements of Smith.

The Government through its action in keeping this information from the defense put the defense in the position of having no evidence whatsoever to counter the Government's argument that no one other than the defendants in this case had any reason to kill Smith.

The defense being unable to present any serious opposition to the Government's motion to admit the statements of Smith, the trial court granted the motion.

The Government's need to withhold evidence that could implicate others in the murder of Smith is further shown by the weakness of the Government's evidence implicating the defendants in that murder.

The evidence relied upon, by the Government, in support of its motion to admit the statements of Smith was the testimony of Montgomery, as follows:

34

The Government first had Montgomery testify as to what he knew about the

murder of Smith which went as follows:

    A.  Chin [defendant Carson] told me that Draper [defendant Sweeney] wanted me and him to come to see him.  So I told him -- I told Chin that I wasn't going to see him, and I didn't have proper ID.  I had an ID with my proper information on it, but it wouldn't have been accepted by -- probably by that jail thing.

    Q.  So did you go to see Draper at the jail?

    A.  No.

    Q.  Did Chin go?

    A.  Yes.

    Q.  And after he went, did he tell you about his conversation with Draper?

    A.  Chin say that him and Draper father went to see him, and --

    THE COURT:  Him and Draper what?

    THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see Draper.

    THE COURT:  Oh, I see.  Draper's father.  All right.

    THE WITNESS:  And said that he asked Draper distinctively who did you tell anybody about what had happened?  And he said that Draper admitted to him that he told Butchie, and that Butchie was cooperating with the Feds.

    BY MR. ZEIDENBERG:

    Q.  Did Chin say what had to be done or what should be done about Butchie?

    A.  So Chin told me that if they had no Butchie -- without Butchie, they don't have no case.  They wouldn't have no case.

    Q. And when you were talking about a case, what case was it that you were all concerned about?

    A.  The triple murder.

    Q.  Now, did you and Chin make attempts together to find and kill Butchie?

    A.  Yes.

    Q.  Can you tell the ladies and gentlemen about that?

    A.  Sometimes when we used to -- when we would go to this carry-out, Leo's --

    Q.  Where is that located?

    A.  It's on N Street.

    Q.  I'm sorry?

    A.  South Capitol and N.

    * * *

    A.  That's near the area where Butchie would more than likely be, as far as when he was in Southwest.  So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

    Q.  What were you going to do if you saw Butchie?

    A.  Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean.  We're from

App 1245

Southwest and he is -- he knowed the same people we know, so we couldn't just walk right up to him just like that and do anything to him.

Q. What were you hoping to find? What were you hoping to do?

A. To catch him in a nice position.

Q. What is a nice position?

A. To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q. Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A. We was in my car.

Q. Can you tell us about that?

A. We rode through housing -- I mean, through Half Street, and Butchie was out there. He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car. And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q. What's a gut-buster?

A. Like elastic velcro, like a waistband.

Q. And what's the purpose of that?

A. To hold the gun.

Q. What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A. It was a black sweatsuit.

Q. What did he do with it?

A. He was putting in on while I was driving.

Q. Where was he putting it on?

A. In the car.

Q. What car did you have?

A. Oldsmobile 98.

Q. Where did you go once Chin got back in the car with his gun and his sweatsuit?

A. We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street. And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk. It's like a little car dealership thing right there. So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q. Now, was there a discussion between you and Chin about an escape route you were going to take?

A. When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th. And that was going to be our alibi.

Q. And that was a plan you discussed before Chin got out of the car?

A. Right.

Q. And again, the purpose in going up and ending up at 37th Place was going to be what?

A. Our alibi.

Q. What happened when Chin got out of the car?

36

A. He went around there, and he came back, and he said that Butchie was gone. When he got back in the car the first thing I said, I said, what happened? Because I didn't hear the gunshots or nothing. So I said, what happened? And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q. Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A. Yes.

Q. Where were you the day that Butchie was killed, starting in the afternoon?

A. On Second Street.

Q. Second Street, Southwest?

A. Yes.

Q. And what were you doing there?

A. Selling weed.

THE COURT: What was the date?

MR. ZEIDENBERG: I'm sorry?

THE COURT: What was the date?

MR. ZEIDENBERG: I didn't refer to the date. It is June 16, 1997.

THE COURT: June 16th?

MR. ZEIDENBERG: Yes.

THE COURT: All right. Go ahead. I'm sorry.

BY MR. ZEIDENBERG:

Q. Where were you -- you were on Second Street?

A. Yes.

Q. And what were you doing?

A. Selling weed.

Q. Now, at some point did you see Chin?

A. Chin came out of his house and came and got my car keys.

Q. Did you give it to him?

A. Yes.

Q. Did you ask him why he needed your car?

A. No.

Q. Was it uncommon for Chin to come by and take your car?

A. No. I mean, he would get it all the time, whenever.

Q. Now, did he tell you where he was going?

A. No.

Q. Now, sometime later, after Chin -- did he leave with your car?

A. Yes.

Q. Okay. Sometime later did you come to find out that there had been a shooting over on Half Street?

A. Yes.

Q. And at some point did you learn that that was Butchie?

A. Yes.

Q. What did you do when you found out that Butchie had been killed?

A. I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q. And where did you ride to?

37

A. To the corner of Half and O Street.

Q. What did you see when you got there?

A. There was a lot of marked and unmarked police cars and a lot of people was out there.

Q. Was Butchie's body still on the ground?

A. I didn't see his body. I seen like the crime scene tape and stuff like that. I didn't go all the way down there because it was a lot of polices down there.

Q. I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A. Yes.

Q. How did you feel when you heard that Butchie was killed?

A. I was happy.

Q. How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A. It was of great concern.

Q. Why is that?

A. Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a witness as to what Draper told him.

Q. Now, after you went to the scene did you return back to Second Street?

A. Yes.

Q. And at some point later that evening did Chin return?

A. Yes.

Q. Can you tell us about that?

A. He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first. So when I seen him going into the alley, so I was walking down -- I was walking down towards that direction. So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q. Your term was what?

A. I said, you know them peoples got hit.

Q. You used the term peoples?

A. That's what I said. I said, you know them peoples got hit. He was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys.

Q. Did he seem at all surprised when you told him about that?

A. No. And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q. I'm sorry?

A. He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q. Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A. Yes.

Q. Can you tell us about that?

App 1248

A.   In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.   How do you know that?

A.   Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.   Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.   No, that was all he said.

Q.   What did you understand that to mean, why you shouldn't go up to Capers?

A.   My knowledge would be that Craig might be able to   identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.   Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.   Would you repeat your question?

Q.   After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.   I was feeling good pretty much.  To a certain extent I was feeling good.

Q.   Did you think you were in the clear?

A.   To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG:  I have no further questions, Your Honor.

(5-23-01, p.m., pages 22-33)

It is interesting to note that when Montgomery was with Carson, and according to Montgomery, with the express purpose of killing Smith that they did not do so as there were people around.  Montgomery's testimony is that on the day that Smith was killed Carson did not ask him to go with him on this mission, as he had before, but according to Montgomery, he went on his own.  Moreover Montgomery was not with Carson when Carson allegedly killed Smith.

Most surprising of all of Montgomery's claims is that after Carson allegedly killed Smith, Carson did not tell Montgomery he had done so.  In fact, according to Montgomery, Montgomery brought it up to Carson that Smith had been killed, in the following exchange:

App 1249

[Montgomery] A.   I said, you know them peoples got hit.

Q.   You used the term peoples?

A.   That's what I said.  I said, you know them peoples got hit.  [Carson] was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

If in fact Carson had killed Smith, why was he unwilling to tell Montgomery he had done so?  Especially when they had, if Montgomery is to be believed, hunted Smith on numerous occasions, planned how Smith would be approached, where the car would be stopped, an escape route and a place to get rid of the gun, and they were always together when they allegedly went to kill Smith.

This all changes when Smith is killed -- Carson suddenly goes out alone, and never tells Montgomery that he killed Smith.  Instead, Montgomery brings up the subject of Smith's murder to Carson.

Moreover, if Montgomery is telling the truth about the statements allegedly made by Carson after Smith's death, that "trust me, we're all right," that would be true no matter who killed Smith.

While the evidence withheld by the Government from the defense appears not be admissible in its own right there is still a *Brady* violation in this case.

> The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. We have never squarely ruled on this question, *but cf. United States v. Hemmer,* 729 F.2d 10, 16n. 3 (1st Cir.) *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir. 1983) yet given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6-8, 116 S.Ct. 7, 133 L.Ed2d 1 (1995) implicitly assumes this is so.

40

App 1250

Whether the intake note at issue in this case undermines confidence in the verdict is a more difficult question. The clear implication of Jan Smith's note is that someone where Matthew made the prior allegations, told her that the allegations were false. If the defense had known about the note before trial, it presumably could have traced those who could testify as to the circumstances of the allegations and the basis for believing them to be false. Whether the evidence would convincingly establish that Matthew had lied is hard to know but surely the episode most likely would have been investigated and the implication that someone at Hampstead believed it false is strong.

If strong evidence of a prior false accusation exists, it would be very powerful. could easily have created the reasonable doubt necessary to acquit Ellsworth in what was otherwise largely a credibility contest. The lack of any significant corroborating evidence makes this case unusual and heightens the concern about any *Brady* violation. Nevertheless, it would be very odd for us to require a new trial because of a wrongly withheld lead unless the lead would, or would likely, have led to valuable new evidence which was itself arguably admissible. However unlikely it might be after eight years, the state would be entitled to retry Ellsworth if the writ were granted; yet such a remedy would be incongruous unless evidence existed that might alter the result at such a trial. Habeas doctrine is flexible enough for us to condition a grant of the writ on the outcome of a further inquiry into where the lead, even though wrongly withheld, would have taken Ellsworth. *Cf. Manko v. United States,* 87 F.3d 50, 55 (2nd Cir. 1996); Stewart v. Coalter, 48 F.3d 610, 617 (1st Cir.) *cert. denied,* 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

If there exists admissible evidence that Matthew made demonstrably false accusations and Ellsworth was not otherwise aware of these allegations at the time of the first trial, a new trial is required. If admissible evidence of false accusations never existed, the writ should be denied. If it did or may well have existed but has been lost because of the *Brady* violation and the ensuing delay in discovery of this fact, Ellsworth may have a good claim to a new trial, *cf. California v. Trombetta,* 467 U.S., 486-88, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

*Ellsworth v. Warden,* 333 F3d 1, 5-6 (1st Cir. 2003).

As a result of the court sealing the information relating to others implicated in the murder of Smith from counsel, there was never an opportunity for the defense to challenge the government's Rule 804(b)(6) motion, investigate the matter of Andre

41

Chappell and Anthony Ricardo Hawkins, or their relation to Carson or any of the other codefendants.

Furthermore, the Government at trial stopped short of explaining or putting on evidence as to how, or who actually killed Mr. Smith. Andre Chappell or Anthony Ricardo Hawkins was not mentioned at all during trial, either by the agents, the prosecutors, or any Witness. *See* Ex. 8 (Affidavit of William Sweeney).

In light of the evidence put forward by the Government at trial for the murder of Smith, for all that is known the evidence that Andre Chappell or Anthony Ricardo Hawkins killed Smith could have been just as strong as the evidence that implicated the defendants.

This is simply another reason that the court should require the Government to produce the evidence that it has linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith and then conduct a full evidentiary hearing on this issue.

As a result of the actions of the Government in withholding the evidence in its possession, the Government should be required to turn over to the defense all evidence in its possession related to its investigation into the murder of Smith, and into Petey Johnson relating to the murder of Smith. In addition, the Government should have to turn over to the defense all evidence that relates to the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once the Government has done so, and the defense has had an opportunity to investigate the information a hearing should be held.

App 1252

Moreover, the granting of the Government's motion to admit the statements of Smith also precluded the defense from offering evidence that implicated Smith in the Triple murder in Prince George's County.

The defense had a witness, Wesley Smith, who would have testified that Robert Smith told him that he, Robert Smith, had been cheated out of $60,000.00, while gambling at the house in Temple Hills where the triple murder occurred, and that he was going back there to take care of the "guys in the house," meaning Gaskin and Mack.

Robert Smith told Wesley Smith, a week after the triple murder occurred that, "I took care of Darnell Mack and those guys." (Tr. 6/6/2001 (AM), pp. 26-34; Tr. 6/11/2001 (PM), 9-27; Tr. 6/13/2001 (AM), pp. 72-77).

This evidence would have contradicted Montgomery version of the triple murder and would have further impeached Montgomery's credibility.

It also would have been a defense in this case.

Petitioner Sweeney has demonstrated that the evidence concerning Andre Murray's statement that Petey Johnson wanted to kill Smith, combined with his presence at the time and place of the murder of Smith and the information linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith, is all evidence that would be material to the determination of the Government's motion, pursuant to Rule 804(b)(6), to admit the statements of Smith through Agent Lisi.

"Once a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way. The proper course in that case 'is for the district court to order production of the evidence or the witness and leave to the Government the choice of whether to comply with that

43

order.' *United States v. Moussaoui,* 382 F.3d 453, 474 (2004). "If the government refuses to produce the information at issue—as it may properly do—the result is ordinarily dismissal." *United States v. Rivera,* 412 F.3d 562, 569 (4th Cir. 2005)(internal citation omitted).

This should be the procedure that should be followed in this case. It cannot be disputed that evidence which inculpated individuals unrelated to Petitioner Sweeney in the murder of Robert Smith was favorable to the defense; thus, the material should have been turned over to the defense. As discussed, *infra*, this evidence was material to Petitioner Sweeney's guilt; therefore, the suppression of the material violated his right to due process. *Brady*, 373 U.S. at 87.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt, would have been used by the defense in opposition to the Government's motion to admit the hearsay statements of Smith and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 9. THE *BRADY* EVIDENCE WAS MATERIAL TO PETITIONER'S GUILT, AND PETITIONERS WERE PREJUDICED BY ITS SUPPRESSION

The standards for establishing materiality and prejudice are interchangeable as applied to a *Brady* claim. *See Strickler*, 527 U.S. at 289-90 (prejudice); *Kyles*, 514 U.S. at 434 (materiality). To establish materiality and prejudice, Petitioner Sweeney need not

show that he would more likely than not have received a different verdict with the benefit of the suppressed evidence; the question is rather, whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Strickler*, 527 U.S. at 289-90 (*quoting Kyles*, 514 U.S. at 434). The suppressed evidence should be considered collectively, not item by item. *See Kyles*, 514 U.S. at 434. Here, the cumulative impact of the pervasive suppression of *Brady* material renders the verdict unworthy of confidence – simply put, Petitioner Sweeney did not receive a fair trial.

As the Supreme Court has long recognized, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination…" *Lee v. United States*, 343 U.S. 747, 757 (1952). At trial, the central theme of the defense was the lack of credibility of the Government's witnesses. Accordingly, the suppressed evidence as detailed above, taken collectively, could have been used to cast doubt upon the credibility of several of the Government's key witnesses – delivering death by a thousand cuts to the Government's case.

Further, the suppression of the newly discovered evidence relating to Robert Smith prejudiced Petitioner Sweeney in particular, as it could have been used to defeat the Government's motion to admit Smith's hearsay statements through Agent Lisi's testimony. At trial, the court had allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights.[15]

---

[15] Federal Rule of Evidence 804(b)(6) provides, "*Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or

App 1255

The "Greenbelt File" related to Theodore Watson was also material, and its suppression likewise prejudiced Petitioner Sweeney. Like Agent Lisi's testimony and Robert Smith's statements, Watson's testimony in this case was of great importance to the Government, as he claimed that Petitioner Sweeney had confessed to him participation in a number of crimes. The letters contained in the file could have been used by the defense to seriously undermine Watson's credibility as a witness at trial, exposed his bias and the powerful influence of the Government, by using his very own words against him. The materiality of the "Greenbelt File," and the prejudice caused by its suppression, are demonstrated by the fact that it could have been used as a powerful discrediting of Watson as a key witness.

As shown above, the Government's withholding of several of the examples of newly discovered evidence, even taken alone, would be sufficient to vacate Sweeney's conviction. Together, there can be no doubt that the suppressed *Brady* evidence rendered Petitioner Sweeney's trial fundamentally unfair, and produced a verdict that is no longer worthy of confidence. Accordingly, relief must be granted.

**10. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER THE GOVERNMENT TO PRODUCE TO THE DEFENSE THE INFORMATION CONTAINED WITHIN, AND THE INFORMATION THAT SUPPORTED THE GOVERNMENT'S CONCLUSIONS IN ITS *EX PARTE* NOTICE TO THE COURT REGARDING CHANGE IN LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS, DATED APRIL 2, 1999, AND THE INFORMATION CONTAINED WITHIN COURT EXHIBIT NUMBER 4.**

The trial court abused its discretion in sealing material relating to others that had motive to kill Robert "Butchie" Smith. The Government was granted permission by the trial court, pursuant to Federal Rule of Evidence 804(b)(6), to have FBI Special Agent

---

acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

Lisi testify to certain incriminating statements allegedly made by Sweeney to his uncle, Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County jail and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**THE COURT**: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO – THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

**MS. CHATURVEDI**: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

**THE COURT**: YES.

(Trans. 9-27-00, pages 200-202).

47

However, as argued herein, the Government knew that its statement that there was no information that others had motive to kill Smith was not true. The trial court also had been provided information that there were others that had motive to kill Smith and did not order the Government to provide this information to the defense.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by the trial court on April 6, 1999. *See* Ex. 7. The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999. The Government alleged in the *Ex Parte* Notice that the, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.

As the trial court recognized in its exchange with the Government on September 27, 2000, this information would be material that must be provided to the defense pursuant to *Brady*. Yet, the trial court after having recognized that the information concerning others, not only having a motive to murder Smith, but information that Chappell and Hawkins had in fact murdered Smith did not require the Government to turn this information over to the defense. This was an abuse of discretion on the part of the trial court. This information directly contradicted the theory upon which the

48

Government relied upon in its motion to admit, pursuant to Federal Rule of Evidence 804(b)(6) the statements of Smith.

It was the Government's theory that Carson had murdered Smith at the request of Sweeney. Yet the information in possession of the trial court was that the Government believed that Chappell and Hawkins had murdered Smith and Carson had not murdered Smith.

Moreover the Government's belief that Chappell and Hawkins had killed Smith directly contradicts Montgomery who testified at trial that Carson had murdered Smith.

The trial court when addressing the defendants' lawyers' concerns about the change of the locations of the defendants, stated, in part, that "I have reviewed the Government's *in camera* submission as to the reasons for the dispersions of the defendants to various points of detention, and I am satisfied that the order was eminently justified." (Trans. 5-21-99, page 8) The trial court went on the state that "Their conditions of detention they largely brought on themselves." (Trans. 5-21-99, page 9)

It seems strange that this information, which the trial court found sufficient to ratify the Government's decision to move the defendants, it did not find important enough to order the Government to turn over to the defense. The only explanation is that the trial court abused its discretion by failing to order that this information be produced to the defense as required by *Brady*. The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

In addition, the Government submitted to the trial court, for *in camera* review, a detective's handwritten notes relating to an interview of Andre Murray (who testified for

49

the Government at trial) in which Murray discussed with law enforcement the murder of

Keith Johnson. *See* Ex. 6.

As described earlier, the notes of that interview state, in part:

"Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother] Wit. did not hear Draper return to advise Gooch he had killed Keith. He just heard Gooch give the order.
The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for

having killed his brother. Once more the trial court did not order this information to be

turned over to the defense after the trial court had reviewed it *in camera.*

As argued herein, the trial court recognized that information that people other

than the defendants in this case had a motive to kill Smith was *Brady* and as such had to

be turned over to the defense, yet when the trial court was presented this information,

instead of ordering the government to provide it to the defense, the Court simply had it

marked as Court Exhibit number 4 and made part of the record under seal.

The significance of trial court's failure to order the Government to produce this

material, detailing the motive of Petey Johnson to kill Smith becomes more significant

when on looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but also as a possible suspect?
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called

50

somebody to alert them that "Butchie" was there. (Tr. 5-30-01 (AM), pages 19-20).

The abuse of discretion on the part of the trial court deprived the defense of evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder, also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the trial court, an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again, had the trial court ordered the Government disclosed the information in its possession that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

Moreover, the information contained within this material would have also refuted any inference or suggestion that Petey Johnson had contacted Carson and told him where Smith was so that Carson could murder Smith. It seems unlikely that Petey Johnson would have assisted Carson and Sweeney in killing Smith when Petey Johnson believed that Sweeney had killed his brother.

This is the impression the Government attempted to create when Agent Lisi testified that "So [Petey Johnson] may have called somebody to alert them that "Butchie" was there."

The information contained within the detective's notes could have been used to cross-examine Agent Lisi that Johnson, who was present at the time and place that Smith

51

was murdered, would have been unlikely to assist Sweeney and Carson in killing Smith since Johnson had his own motive to want to kill Smith.

The trial court abused its discretion in this case by failing to order the Government to produce the information, which the trial court had already concluded would constitute information required to be produced to the defense under *Brady,* contained within the detective's notes, and Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999. If the defense had had this information it could have used it in its opposition to the Government's motion to admit Smith's statement pursuant to Federal Rule of Evidence 804(b)(6), to contradict the testimony of Montgomery and Agent Lisi.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 11. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY, GIGLIO*, AND THE JENCKS ACT MATERIAL REQUIRES SWEENEY'S CONVICTIONS BE VACATED

As argued herein, Sweeney was deprived of access to materials to which he was entitled pursuant to *Brady, Giglio*, and the Jencks Act.

To show that one is entitled to relief for such depravation:

> "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

App 1262

Had Sweeney been able to present to the jury and to investigate the *Brady, Giglio*, and the Jencks Act material that was withheld from him, the Government's theory of the case would have been undermined, and some of its important witnesses impeached. In addition, the defense would have had arguments with which to oppose the Government's motion to admit Robert "Butchie" Smith's statements through Agent Lisi and Montgomery.

Further, the nondisclosure to the defendant of all the suppressed information, to which he was entitled, including the information contained within the sealed court exhibits concerning statements made by the Government's witnesses as set forth herein, could have been used by the defense to demonstrate that the Government's agents were so intent on building a case against the trial defendants that the Government agents communicated this, either consciously or unconsciously, to the people that they were interviewing resulting in statements incriminating the trial defendants. The defense could have argued to the jury that this resulted in those being interviewed changing the facts and the participants in crimes in order to implicate the trial defendants in crimes and thereby please the Government.

**12**. **THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY* AND THE GOVERNMENT'S *NAPUE* VIOLATION REQUIRES SWEENEY'S CONVICTION BE VACATED**

As argued herein Sweeny was deprived of information that should have been turned over to the defense as *Brady* material. The Government, with regard to Watson, was guilty of a *Napue* violation as argued above. Assuming arguendo that each of the violations standing alone is not sufficient to grant Sweeney relief the violations taken together do require that Sweeny's convictions be vacated.

App 1263

The court should take the following approach in dealing with these violations:

> The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley,* 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes v. Brown,* 399 F.3d 972, 985 (9th Cir. 2005) (internal quotation marks omitted).[12] We have gone so far as to say that "'`if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Id* at 978 (quoting *United States v. Wallach,* 935 f.2d 445, 456 (2nd Cir. 1991)). Nonetheless, *Napue* does not create a "*per se* rule of reversal." *Id.* at 984. Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge.  The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes,* 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd,* 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.
> *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir. 2008)

As has been argued herein Sweeney was deprived of substantial *Brady* material all of which was material to his guilt and he was also subject to a *Napu* violation. The inability of the defense to attack Watson's credibility had a direct effect on the

54

verdict in this case. Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### B. SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has been deprived of his Sixth Amendment right to effective assistance if "counsel's representation fell below an objective standard of reasonableness" and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under *Strickland*, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, "[w]hen a defendant challenges a conviction; the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. As detailed below, counsel was constitutionally ineffective at various stages of trial, as well as on appeal, and in various ways when representing Petitioner Sweeney.[16]

### 1. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO,* AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in

---

[16] Mr. Sweeney was represented both at trial and on appeal, by Steven R. Kiersh, Esq.

order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal. *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was unable to adequately challenge the suppression of the sealed material on appeal because counsel needed access to the sealed portion of the trial record in order to establish the materiality of the undisclosed evidence – an essential element of the prospective claim on appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's claim still prevails, as the prejudice here is clear. Had appellate counsel raised this critical issue on appeal, the Court of Appeals would have reviewed the material *in camera* and found that *Brady* and Jencks Act violations had indeed occurred, and were widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196] ("appellants must identify [in their appellate brief] the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

56

App 1266

occurred."); 18 U.S.C. § 3500(c); *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992).  As detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to the erroneous rulings.   Had the Court of Appeals reviewed the material, and discovered the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error was more likely than not to result in reversal on appeal.  Appellate counsel's failure to challenge this critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466 U.S. at 687.[17]

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 2. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK REVIEW BY THE TRIAL COURT OF THEODORE WATSON'S GREENBELT FILE.

Assuming arguendo that the Government did not improperly suppress Watson's Greenbelt file, Sweeney's trial counsel was constitutionally deficient in failing to ask the court to review said file.

During the cross examination of Watson, Kiersh attempted to impeach Watson by attempting to discover the reasons why the Government failed to a give Watson a §5K1.1 letter.  Watson explained the failure of the government to provide him with a §5K1.1

---

[17] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material.  Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material.  No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court.  Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material.  *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998).  The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

57

letter by stating that Ms. Wilkerson, the Assistant U.S. Attorney assigned to his case, simply did not like him. (Tr. 2-12-01 (AM), pp. 19-21).

Pressed further on this point Watson explained that Ms. Wilkerson's disliked him because he had pointed out, in front of another U.S. Attorney, that Wilkerson had failed to advise another Assistant U.S. Attorney about information that Watson had, which failure by Wilkerson had caused that other U.S. Attorney to offer lenient plea deals to the defendants in that case. (Tr. 2-12-01 (AM), p. 44).

Kiersh, and for that matter the defense as a whole, lacking any information with which to contradict Watson, during cross-examination was forced to accept Watson's answers to his questions on cross-examination.

A co-defendant's attorney apparently dissatisfied with the cross-examination of Watson, at the conclusion of the testimony on February 12, 2001, asked that the Government review Watson's Greenbelt file to determine if there was any discoverable material contained within said file concerning Watson, as set forth below.

> **MR. DAVIS**: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.
>
> **THE COURT**: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, *BRADY* MATERIAL IN THEIR FILE. OTHER THAN THAT --
>
> **MR. DAVIS**: THANK YOU, YOUR HONOR.
>
> **THE COURT**: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION. OKAY?

(Tr. 2-12-01 (AM), p. 78).

58

App 1268

In response to the court's direction, the Government not only called the U.S. Attorney's office in Greenbelt, the Government obtained and reviewed Watson's Greenbelt file.

The Government brought Watson's Greenbelt file to court and represented to both the court and the defense, that Watson's Greenbelt file did not contain anything that even " . . . suggests any *Brady* or Jencks material in the file." Following the Government's representations the following took place:

> **THE COURT**:  YOU MEAN THE FILE FROM GREENBELT?
>
> *\* \* \**
>
> **THE COURT**:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?
>
> **MR. KIERSH**:  YES, YOUR HONOR.
>
> **THE COURT**:  ALL RIGHT.
>
> **MR. KIERSH**:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.
>
> **THE COURT**:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?
>
> **THE DEPUTY CLERK**:  I BELIEVE SO, YOUR HONOR.
>
> **MR. ZUCKER**:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --
>
> **THE COURT**:  WAIT A MINUTE.
>
> **THE DEPUTY CLERK**:  NUMBER 5, YOUR HONOR.
>
> **THE COURT**:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  **I DO NOT INTEND TO REVIEW IT IN CAMERA.**

59

App 1269

MR. ZUCKER:  THAT WOULD BE MY REQUEST.

THE COURT:  ALL RIGHT.  ARE WE READY FOR THE JURY?

(Tr. 2-13-01(AM), pp. 6-7).

Kiersh, instead of asking the trial court to review the Greenbelt file to determine if it contained any *Brady, Giglio* or *Jencks* material just asked that the file be made part of the record and placed under seal.  One wonders what was the point of having Watson's file made part of the record in the case if no one, other than the Government, was going to review the file.

The Government's production of Watson's Greenbelt file is, in and of its self, curious as the court simply asked the Government to call the U.S. Attorney's office in Greenbelt to determine if the filed contained anything that might be characterized as *Brady.*  The court further stated that this was the extant of the Government's obligation.

The only reason for the Government to have produced Watson's Greenbelt file would be if the Government were unsure if the file contained *Brady* material.

Another case discussing the obligations of the Government to produce material to the defense stated:

> Although the notes are not subject to disclosure under the Jencks Act, fundamentals of due process require the government to produce them if the evidence they contain is exculpatory or would be of value in impeaching government witnesses. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). Uncertain whether the notes were exculpatory or of impeachment value, the government properly submitted them to the district court for *in camera* inspection. *Pennsylvania v. Ritchie,* 480 U.S. 39, 58-62, 107 S.Ct. 989, 1002-03, 94 L.Ed.2d 40 (1987). *United States v. Mora,* 994 F.2d 1129, 1139 (5th Cir. 1993).

60

App 1270

Therefore the only reason for the Government would have produced Watson's Greenbelt file, to the court, was if the Government was uncertain whether or not it contained *Brady* or *Giglio*. But there was no way the Government could have been uncertain as the information was without doubt *Brady* and *Giglio*.

As argued herein, Watson's Greenbelt file contained *Brady* and *Giglio* material.

Sweeney suffered prejudice as a direct result of his trial counsel failing to request that the trial court review Watson's Greenbelt file.

The material contained within Watson's Greenbelt file would have directly contradicted Watson's claims that the reason he was not given a §5K1.1 letter was the result of personal animus on the part of the Assistant U.S. Attorney and would have shown instead that it was the result of Watson lying to the Government.

Defense counsel's failure to seek review by the trial court of the Greenbelt file, which review would have resulted in the *Brady* and *Giglio* material contained therein being disclosed to the defense, permitted Watson to maintain his version of events during cross examination. As a result of defense counsel not having the material in the Greenbelt file, the jury instead of seeing Watson impeached as a liar, willing to say anything to help himself, the jury saw Watson maintain his version of events, and his credibility, in the face of cross-examination by several lawyers unable to contradict his claims.

Moreover, defense counsel, by failing to request that the trial court review Watson's Greenbelt file foreclosed the possibility of having the file reviewed on appeal, as defense counsel agreed with the trial court that Watson's Greenbelt file did not need to be reviewed by the court.

App 1271

Tacit recognition of the inability to obtain appellate review of the Greenbelt file is in the omission of any reference to Watson, much less Watson's Greenbelt file, in the Appellate brief filed in this case.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 3. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872]. In their motion, counsel sought access to sealed portions of the trial record in order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal. *See Strickland,* 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984). Counsel was unable to adequately challenge the suppression of the sealed material on appeal because

App 1272

counsel needed access to the sealed portion of the trial record in order to establish the materiality of the undisclosed evidence – an essential element of the prospective claim on appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's claim still prevails, as the prejudice here is clear. Had appellate counsel raised this critical issue on appeal, the Court of Appeals would have reviewed the material *in camera* and found that *Brady* and Jencks Act violations had occurred, and were widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196] ("appellants must identify [in their appellate brief] the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact occurred."); 18 U.S.C. § 3500(c); *United States v. v. Williams-Davis,* 90 F.3d 490, 514 (D.C. Cir. 1996); *United States v. Brooks,* 966 F.2d 1500, 1505 (D.C. Cir. 1992). As detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to the erroneous rulings. Had the Court of Appeals reviewed the material, and discovered the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error would have resulted in reversal on appeal. Appellate counsel's failure to challenge this critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466 U.S. at 687.[18]

---

[18] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material. Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the in camera proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly,

63

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

**4. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO JAMES MONTGOMERY**

In § 10, of pages 13-15, of appellate counsel's Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record, which was denied by the D.C. Circuit, counsel argued that the trial court's ruling was erroneous with regard to the material the court sealed relating to Montgomery. The motion argued that the trial court's ruling that the material it sealed was not *Brady, Giglio,* or Jencks material was erroneous. Appellate counsel further argued that F.B.I. Special Agent Lisi's notes contained *Brady* or Jencks material.

Now that Petitioner Sweeney has access to the material that the trial court sealed with regard to James Montgomery, he is able to use that material to demonstrate the prejudice that he suffered as a result of his appellate counsel failing to seek appellate review of the trial court's holding in his appellate brief as instructed by the D.C. Circuit in its order denying the motion to unseal.

The material sealed by the trial court contains impeachment evidence related to the murder of Timothy Benton. Agent Lisi's handwritten notes reveal that Montgomery described the murder of Benton, and identified Carson and Proctor as the perpetrators. The notes state as follows:

> 1994 Chin [Carson] borrowed Grey Cadillac
> Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.

---

the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

64

App 1274

Tim owed Poo-Poo $
Chin was driving
Poo-Poo shot Tim from
Behind, he just sat there like he was DAZED

Ex. 9 (Agent Lisi's Notes of James Montgomery Interview).

Critically, it was Maurice Proctor and James Montgomery who were charged with the murder of Timothy Benton. What Montgomery did in his interview was substitute Carson for himself. The probative value of Montgomery's statement was priceless for its impeachment value. Defense counsel could have utilized that materially false and misleading narrative, contained within the Agent's notes, to further support the argument that Montgomery was not only a liar, but an incorrigible liar. *See* Tr. 3/15/01 (AM), pp. 10-13.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

**5. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ARTHUR RICE**

Appellate counsel's failure to seek appellate review of the trial court's ruling with regard to the sealed material relating to Arthur Rice constituted ineffective assistance. At trial, the Court had reviewed the FBI 302 pertaining to Arthur Rice dated January 27, 1999, and stated that it contained no information that would permit it to be characterize as *Brady* material, and that it was clearly not Jencks material. (Tr. 4/24/01 (PM), p. 3). The trial court failed to state a reason why the 302 did not constitute a Jencks statement and information that should be disclosed to defense counsel.

65

App 1275

If appellate counsel had raised the foregoing, and a proper review of Rice's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion. The cumulative effect of all the errors is such that there is a reasonable probability that, had the evidence not been sealed and instead released to the defense, the results of the proceedings would have been different.

Arthur Rice was a jailhouse witness who was allegedly an associate of the defendants. Even though Rice did not testify as to who committed the murder of Leonard "Slick" Hyson, and Maurice Hallman, the previously sealed FBI 302 reveals that Rice told Agents Vincent Lisi and Kevin White, in the presence of AUSA Kenneth Wainstein, that defendants Martin and Carson killed Hyson and Hallman. *See* Ex. 5 (Arthur Rice 302 at p. 5).

The foregoing contradicts the government's theory of prosecution that Carson and James Montgomery were the individuals who killed Hallman and Hyson. Montgomery also testified, corroborating the government's theory of prosecution, placing himself as one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM), pp. 55-62).

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 6. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ANDRE MURRAY

As with all of the other materials place under seal by the trial court in this case Petitioner Sweeney's appellate counsel failed to include a request to have the appellate court review the rulings of the trial court which sealed the material.

During trial, Montgomery testified that he and Carson killed Hallman and Hyson, and prior to that, Hallman had a shoot-out with some New Yorkers. The previously sealed detective notes of interviews with Arthur Murray reveal that Murray stated that some New Yorkers killed Hallman and Hyson. This contradicts Montgomery's testimony regarding who killed Hallman and Hyson, while at the same time; Montgomery's testimony corroborates Murray's statement because Montgomery was fully aware that Hallman had a shoot-out with some New Yorkers. *See* Ex. 10 (Detective Notes of Arthur Murray Interview Regarding Hallman and Hyson Murder). Once again, all this contradiction might have left doubt in the jury's minds, towards the credibility of Montgomery, who was the government's key witness.

**7. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CALL EXPERT WITNESS AT TRIAL**

At the outset of this case, Petitioner Sweeney and his immediate family advised trial counsel that Petitioner Sweeney had been diagnosed with Tourette Syndrome ("TS"). Tourette syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics. Tics often become more severe with excitement or anxiety and lessen during calm, focused activity. *See* Tourette Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke at the National Institute of Health, http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm (last visited November 28, 14).

In preparation for trial, trial counsel retained expert witness Jonathan Pincus, M.D., a distinguished professor in the field of neurology. Dr. Pincus has been qualified

App 1277

as an expert and testified on numerous occasions, in state and federal courts. Dr. Pincus reviewed all of Petitioner Sweeney's available medical records, and on December 10, 1999, conducted a clinical evaluation of Petitioner Sweeney, during which he determined that Petitioner Sweeney suffers from Tourette Syndrome. At trial, Dr. Pincus would have explained the nature and symptoms of Tourette Syndrome to the jury, and described the individual characteristics in Petitioner Sweeney's case. Further, Dr. Pincus would have told the jury that Petitioner Sweeney's tic symptoms during trial would typically be less pronounced than those displayed by him five to ten years prior. Most importantly, Dr. Pincus would have testified that in his opinion, a high-stress event (such as a violent incident) would typically trigger the display of more pronounced tic symptoms in Petitioner Sweeney. *See* Ex. 11 (Dr. Pincus Affidavit).

This testimony was critical to Petitioner Sweeney's defense, as it would have served as exculpatory evidence with regard to the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson, in Temple Hills, Maryland.[19] Dr. Pincus' testimony would have corroborated the testimony of several other witnesses who testified that Sweeney could be easily identified by his disorder. James Montgomery, who was with Petitioner Sweeney on the night of the murder, testified that Sweeney's T.S. was highly active and noticeable that night. (Tr. 3/14/01 (AM) at p. 45; 3/14/01 (PM) at pp. 74-77; 3/15/01 (PM) at p. 81). Dorene Key also testified of that she was aware for years that Petitioner Sweeney has T.S., and that his symptoms are noticeable. (Tr. 4/23/01 (PM) at p. 50). Dwight Deloach, the arresting officer in the triple murder, also testified

---

[19] As described *supra*, it was clear from the record that the Government's case against Petitioner Sweeney was weak: the credibility of nearly all of their witnesses was impeached by their admissions of prior commissions of perjury, or providing false statements to law enforcement. Further, their testimony often conflicted with that given by other witnesses, as well as with other evidence.

68

that Petitioner Sweeney's T.S. symptoms were noticeable. (Tr. 4/24/01 (AM) at pp. 23-4). Anthony Pryor, the alleged victim of a kidnapping and attempted murder, testified that he was fully aware of Petitioner Sweeney's T.S., and that if Sweeney had been when of the perpetrators, Pryor would have recognized him by his T.S. symptoms. (Tr. 6/11/01 (AM) at p. 25). Finally, Shaheem Johnson testified that even though he did not know Petitioner Sweeney personally, Sweeney was easily recognizable because of his disorder. (Tr. 6/12/01 (PM) at pp. 68-9).

Critically, the witness to the triple murder, Cinama Hawkins, testified that neither of the assailants displayed any of the physical or verbal tics that are typical of Tourette Syndrome.[20] (Tr. 4/2/01 (AM) at p. 75; 4/2/01 (PM) at p. 7). There is a reasonable probability, given Ms. Hawkins' description of the triple murder assailants, that Dr. Pincus' testimony would have provided the jury with reasonable doubt that Petitioner Sweeney committed the triple murder. Accordingly, trial counsel's failure to call Dr. Pincus at trial rendered his assistance constitutionally ineffective under *Strickland*. *See Strickland*, 466 U.S. at 695.

## 8. SWEENEY'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN CO-COUNSEL PURSUANT TO THE TRIAL COURT'S ORDER

Petitioner Sweeney, along with co-defendant Carson, were both indicated for capital crimes in this case. They were, therefore, pursuant to 18 U.S.C. § 3005, each appointed two attorneys to represent them in this case.

18 U.S.C. § 3005 states in part:

---

[20] The exculpatory nature of Dr. Pincus' testimony would have been bolstered by the testimony that in Ms. Hawkins' original description of the assailants, which she gave to the investigating officer at the scene, she described both men as about six feet tall. (Trial Tr. 6/12/01 at pp. 60-61, 65, 70-72). Mr. Sweeney is not nearly that tall.

App 1279

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (2000).

Not only was Sweeney entitled to have two attorneys represent him as a result of the indictment in this case, but also the trial court was obligated to inform him of this right.

> Cunningham contends that, in any event, the trial court should have advised him of his right under 18 U.S.C. § 3005 to have a second counsel appointed. An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith v. United States,* 353 F2d 838, 846-47, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

Sweeney was, however, never advised of his right to have two attorneys represent him in this case by the trial court. At Petitioner Sweeney's arraignment on October 2, 1998, the Court responded to a request, by Sweeney's then-attorney Mr. O'Toole, to have the court appoint a particular attorney to represent Sweeney along with Mr. O'Toole. The Court stated, "I have asked Mr. Kramer to make an appointment of the second counsel to assist you, and Mr. Kramer will make that decision." (Tr. 10/2/1998, pp. 11-12).

Thereafter at the conclusion of the October 2, 1998, arraignment the trial court stated ". . . I note the presence of Mr. Kramer here in court and the obligation he has just incurred to make at least two appointments." (Tr. 10/2/1998, p. 20).

70

App 1280

Even though the trial court appointed two attorneys to represent Sweeney, the court at no point ever advised or otherwise informed Sweeny of his right to be represented by two attorneys, pursuant to 18 U.S.C. § 3005.

Eventually Steven Kiersh and Paul DeWolfe were appointed to represent Sweeney in this case before the Attorney General had decided whether or not to seek the death penalty against Sweeney.

By December 1999, the Attorney General had chosen not to seek the death penalty against Sweeney and Carson. During a hearing on December 16, 1999, the issue of the continued representation of Sweeney and Carson by two attorneys each was addressed by the trial court.

At this hearing the trial court stated "Well, one of the consequences of the decision made by the Attorney General not to seek the death penalty is that this case is no longer a capital case, and the law no longer authorizes two counsels for any defendant. * * *" (Tr. 12/19/99, pp. 12-13).

It was error for the trial court to find that the decision of the Attorney General not to seek the death penalty in this case, ended Sweeny's entitlement to two attorneys. As the clear language of 18 U.S.C. § 3005 states, the entitlement to two attorneys is determined at the time of indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in the case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime* ..." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a

71

capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001)

Mr. Kiersh, instead of arguing that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys, simply remained silent on this issue at the hearing.

Moreover, the trial court's misstatement of the law that Sweeney was no longer entitled to two attorneys deprived him of his rights pursuant to 18 U.S.C. § 3005, and, therefore, prejudice should be presumed from the trial court's error. *See Smith v. United States,* 353 F2d 838, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

One of the attorneys for Carson did, however, address the issue of the continued representation of Carson by two attorneys, but instead of arguing that this right attached upon indictment for a capital crime, pursuant to 18 U.S.C. § 3005, argued that:

> Your Honor, in this case we are talking about a ten-year conspiracy with anywhere from five to eight homicides and numerous other complicated violent charges against individual defendants.
>
> This is as complex a case as I think we can run into. It may not be Microsoft, but as a criminal case goes, it doesn't get too much more complicated that this in the United States District Court here. And I think that this court can look at this case and decide that it merits two attorneys for some of the defendants, particularly the ones who they were considering capital defendants, because of the number and the nature and the time period of the charges against them. And I would ask the court to do so . . .."

(Tr. 12/19/99, p. 13-14).

72

App 1282

The trial court did not rule on the issue of continued representation by two attorneys for Carson and Sweeney at that time but asked that additional information be submitted addressing this issue.

Thereafter by way of a letter, filed with the trial court on January 3, 2000, written by Carson's counsel and signed by said attorney on behalf of Sweeney's counsel, set out the justification for the continued need for two attorneys to represent both Sweeney and Carson.  The main ground advanced in the January 3, 2000, letter was the "extremely difficult" nature of the case as it pertained to Carson and Sweeney.  This is simply arguing the rationale that supports the need for 18 U.S.C. §3005.  As "[t]he provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower.  *See Crum v. Hunter,* 151 F.2d 359 (10th Cir. 1945) *cert. denied*, 325 U.S. 850, 66 S.Ct 1117, 90 L.Ed. 1623 (1946); *see also Smith,* 353 F.2d at 846-47.

Another justification contained within the letter for the continued representation of Sweeney and Carson by two attorneys each, was that:

> Dismissal of the capital attorneys is not likely to result in significant cost savings.  Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them.  If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel.

Ex. 12 (December 28, 1999, Letter, at p. 2).

The trial court, after considering the matter agreed and by way of an order, dated January 4, 2000, determined that Sweeny's and Carson's cases were " . . . 'extremely

73

difficult cases where . . . in the interest of justice' appointment of co-counsel is appropriate." (Order (TPJ), dated January 4, 2000 [#252]).

Sometime thereafter, Paul DeWolfe, one of Sweeney's attorneys, was appointed as the Public Defender for Maryland, and withdrew as co-counsel for Sweeney.

On September 8, 2000, (a little over two months before jury selection was to begin) the trial court and Sweeney's remaining attorney all believed, that the interests of justice required that Sweeney be represented by two attorneys, otherwise why would the trial court have appointed attorney Leonard L. Long, Jr., to replace Mr. DeWolfe, as one of Sweeney's attorneys.

The Government, on October 24, 2000, filed, under seal, a motion to disqualify attorney Long, as one of Sweeney's attorneys. At a hearing on November 13, 2000, (jury selection began in this case on November 15, 2000) the trial court granted the government's motion and removed attorney Long as co-counsel for Sweeney. (Tr. 11/13/00, p. 13).

After the trial court disqualified Long, at the November 13, 2000, hearing, Sweeney's remaining attorney Mr. Kiersh argued that:

> **Mr. Kiersh**: You Honor, if I can make some other related representations, not with respect to Mr. Long, but **this creates a very significant prejudice to me and my ability to go forward**. I am not moving for a continuance right now, but I am just thinking this through.
> When we were in court at the motions hearing back in September, the Government requested that an agent be allowed to sit at their table. I asked the court if my investigator, who has been with me on this case working around the clock for the past two years on this case – if he could be seated with me at the table. And the court said, "Well, that is a problem because if I allow you to do it, then everyone else is going to ask to have their investigators."
> I have gone to each defense attorney individually and said, "Would you waive any request to have your investigators to be

present?" And they all have. They all said they don't want their investigators to be present. I am the only one making that request. And if Mr. Long is now being removed from the case, I am terribly handcuffed on what I can do.

**The Court**: Why?

**Mr. Kiersh**: Because so much of this case is directed at Mr. Sweeney. We have cabinets and cabinets filled with information. That's why Mr. Long came into it. Having my investigator there, who knows this case inside out, would be not only of assistance, but necessary, given the amount of evidence the Government is going to be directed towards Mr. Sweeney and what I have to do to be able to sit there and confront it. I am having a very able co-counsel being removed from the case, and replacing him with my investigator doesn't seem to me to prejudice anyone.

**The Court**: Well, there may be an occasion at which it would be appropriate for you to have your investigator there. I don't think your investigator has to be there for the duration of the case and certainly not at this stage of the case.

\* \* \*

**Mr. Kiersh**: Very well. And then I would also note for the record on behalf of Mr. Sweeney our objection to Mr. Long being disqualified from the case.

(Tr. 11/13/2000, pp. 13-15) (emphasis added).

Following the removal of Mr. Long as co-counsel for Sweeney and with jury selection set to begin in two days, Mr. Kiersh did not seek a continuance of the trial of this case. This is particularly surprising in that Kiersh had told the trial court that the removal of attorney Long created "**a very significant prejudice to me and my ability to go forward.**" (Tr. 11/13/2000, pp. 13-15) (emphasis added). One would have thought he would have been more concerned about the prejudice to Mr. Sweeney, but maybe that is what he meant.

Mr. Kiersh had for approximately eleven months before the removal of Mr. Long worked with another lawyer on Sweeney's case. Yet two days before jury selection begins Kiersh is now representing Sweeney alone, and instead of asking the court to appoint another attorney to assist him, in a case that the trial court had already determined

75

App 1285

that as a result of the extreme difficulty of the case the interests of justice required that Sweeney be represented by two attorneys.

Moreover, during the hearing on the removal of Mr. Long, Mr. Kiersh failed to argue that Sweeny was entitled to two attorneys pursuant to 18 U.S.C. § 3005, as Sweeney had been indicted for a capital offense.

In addition, the trial court did not advise Sweeney, at the time that it removed Mr. Long, of Sweeney's right under 18 U.S.C. § 3005 to be represented by two attorneys. *See Smith,* 353 F.2d at 846-47.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to address that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 9. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR THE FAILURE TO REQUEST A CONTINUANCE TO OBTAIN CO-COUNSEL

While Sweeney's remaining trial counsel recognized the "**very significant prejudice"** that was caused by the trial court's removal of his co-counsel, he took no steps to remedy the prejudice that the removal of Mr. Long created. Instead of asking for a continuance and for appointment of co-counsel to assist him in an extremely difficult case which the interests of justice required that Sweeney be represented by two attorneys, he asked simply that his investigator be allowed to sit with him at counsel table and when that request was deferred by the trial court, Kiersh merely went forward with the case in spite of the prejudice that his client would suffer as a result of Mr. Kiersh having to learn

76

and manage the "cabinets and cabinets filled with information," which was one of the reasons why the court had seen fit to appoint two attorneys to represent Sweeney in the case.

Mr. Sweeney suffered prejudice in this case by Mr. Kiersh's failure to seek a continuance to obtain co-counsel in this case. The trial court had already made a finding the case was too difficult for one attorney and that the interests of justice required that Sweeney be represented by two attorneys in this case. Kiersh himself recognized that Sweeney was prejudiced by the removal of Mr. Long, yet he failed to request a continuance or that the court conforms with its order of January 4, 2000, and appoint another attorney to replace Mr. Long.

Moreover Kiersh, by failing to request that Sweeney continued to be represented by two attorneys, as is his right under 18 U.S.C. § 3005, deprived Sweeney of this right, all of which resulted in prejudice to Sweeney.

In addition, Kiersh failed to argue at any point in the case that Sweeney's right to be represented by two attorneys attached at the time of his indictment for a capital offense and that the subsequent decision of the Attorney General not to seek the death penalty was irrelevant to his right to be represent by two attorneys.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to deal with that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

77

App 1287

## 10. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO ARGUE THAT HE WAS ENTITLED TO TWO ATTORNEYS PURSUANT TO 18 U.S.C. §3005

Petitioner Sweeney's attorneys should have argued at both the December 16, 1999, and at the November 13, 2000, hearings that the clear language of 18 U.S.C. §3005 states that the entitlement to two attorneys is determined at the time of the indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in a case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime...*" (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001).

Mr. Kiersh failed to argue at any point in this case that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys.

This failure resulted in Kiersh not properly advising Sweeney that he had a right to be represented by two attorneys in this case and not bringing to the trial court's attention the authority that supports the right of Sweeney to be represented by two attorneys throughout this case.

As a result of Kiersh's failure in this regard, Sweeney was forced to go to trial, in an extremely difficult case in which the interests of justice required that he be represented by two attorneys, with only one attorney. Moreover the attorney that Sweeny was forced

78

App 1288

to go to trial with had stated, two days before jury selection began, that he had suffered "a very significant prejudice" by the removal of co-counsel.

In sum, Petitioner Sweeney has shown that trial counsel's error clearly deprive him of a statutory right to representation by co-counsel, but he has also shown that throughout trial and on appeal, counsel's errors were so serious as to deprive Sweeney of a fair trial. Counsel's conduct, especially as it was hampered by the removal of co-counsel on the eve of trial, so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Accordingly, relief must be granted.

### 11. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AT TRIAL AND FOR NOT CHALLENGING ON APPEAL THE TRIAL COURT'S IMPROPER *IN CAMERA* PROCEDURE USED WITH RESPECT TO THE SEALED MATERIAL

Counsel for Petitioner Sweeney was ineffective for not objecting at trial and for not challenging on appeal the improper *in camera* procedure used by the trial court with respect to the material that it reviewed under seal. Throughout the trial, the Court reviewed material submitted to it by the Government *ex parte* and under seal. The D.C. Circuit has recognized that "*in camera*, *ex parte* submissions 'generally deprive one party to a proceeding of a full opportunity to be heard on an issue,' and thus should only be used where a compelling interest exists." In re *Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998) (*citing* In re *John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In re *John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)). Further, in *In re Sealed Case*, the D.C. Circuit instructed that once the compelling interest in keeping the material secret has been demonstrated, the proper procedure for conducting *in camera*, *ex parte* proceedings includes keeping a transcribed record of what transpired in any *in camera* proceeding, in

App 1289

order to preserve the excluded party's ability to contest decisions made on the basis of the sealed material.

At trial in this case, although the trial court viewed the sealed *ex parte Brady* evidence submitted by the Government *in camera*, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material, and further, failed to keep a transcribed record of the *in camera* proceedings. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair. Accordingly, counsel should have raised this issue on appeal.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 12. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CUMULATIVE ERROR DOCTRINE

Assuming arguendo that no single error on the part of Sweeney's counsel denied him effective assistance of counsel, counsel's errors, when taken as a whole, denied Sweeney effective assistance of counsel.

From a review of the law of this circuit it does not appear that this court has decided if the prejudice prong of the *Strickland* test for ineffective assistance of counsel can be met as a result of the cumulative errors of counsel.

The 7th Circuit has approved of this doctrine stating:

80

> In order to obtain relief under *Strickland,* it is not sufficient that a petitioner can point to her attorney's deficient performance. In addition, she must be able to demonstrate that the complained of deficiency resulted in prejudice, or, as discussed above, a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland,* 466 U.S. at 694, 104 S.Ct at 2068, and was fundamentally unfair or unreliable. *Lockhart,* ___ U.S. at ___, 113 S.Ct. at 842-43. In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test. *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947 (7th Cir. 1986; *Montgomery,* 846 F2d. at 416.

*Williams v. Washington,* 59 F.3d. 673, 682 (7th Cir. 1995).

The 9th Circuit has also found that the prejudice can be found from the cumulative

errors of counsel holding that:

> We offered the cautionary comment that [i]f counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense — prejudice may result from the cumulative impact of multiple deficiencies. *Id.* Thus, the law in this Circuit is clear that where an allegation of ineffective assistance by counsel is premised on specific acts or omissions of counsel, the allegation must be buttressed by a showing of injury or prejudice to the defendant. And even where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be "cumulative" or focus on one discrete blunder in itself prejudicial.

*Ewing v. Williams,* 596 F.2d 391, 395-396 (9th Cir. 1979).

The 2nd Circuit has also approved of this doctrine stating that:

> Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together. *See Strickland v. Washington,* 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984). "The state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre,* 846 F.2d 862, 865 (2nd Cir. 1988). Even if Rodriguez's claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of

App 1291

questionable circumstances in this case, before a federal court intervenes, the state court should be given an opportunity to carefully review all of Rodriguez's claims together to determine whether collateral relief may be appropriate.

*Rodriguez v. Hoke,* 928 F.2d 534, 538 (2nd Cir. 1991).

Counsel failed to challenge on appeal the ruling of the trial court denying access to material of which Sweeney was entitled to under *Brady*, *Giglio* and the Jencks Act; failed to seek review by the trial court of Theodore Watson's Greenbelt file; failed to call an expert witness to testify concerning Sweeney's Tourette's Syndrome; failed to request the appointment of a second attorney; failed to seek a continuance after removal of co-counsel on the eve of jury selection; failed to argue that Sweeney was, by law entitled to be represented by two attorneys at trial and the other errors set forth herein. Sweeney's counsel's errors at trial and on appeal had the cumulative effect of creating a "reasonable probability" that in the absence of counsel's errors the result of the proceedings would have been different.

### C. THE TRIAL COURT DENIED SWEENEY HIS RIGHT TO BE REPRESENTED BY TWO ATTORNEYS

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys. Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys. Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

82

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a result of the trial court improperly advising him that, once the Attorney General declined to pursue the death penalty against Sweeney, he lost his right to be represented by two attorneys. Further, when the trial court removed Mr. Long, Sweeney, as a result of the trial court's previous decision, would not have known to insist on his entitlement to two attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then does not address the prejudice.

## CONCLUSION

As demonstrated above, when viewed in the light of the weakness in the Government's case against Petitioner Sweeney, given the combination of the ineffective assistance of counsel, the trial court's error, and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Petitioner Sweeney was convicted, and sentenced to multiple life sentences, by a trial that was fundamentally unfair. Accordingly, relief must be granted.

83

App 1293

Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, Petitioner

Sweeney requests that an evidentiary hearing be conducted, at which proof may be

offered concerning the issues raised in his motion(s) and memorandum.  After an

evidentiary hearing is held, the Court should vacate Petitioner Sweeney's convictions and

sentence, and grant such other relief, as it deems appropriate.

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

_____/s/_____
Shana Madigan
D.C. Bar No. 1015317
Attorney for William K. Sweeney
The Law Office of Shana Madigan
6205 Massachusetts Avenue
Bethesda, Maryland 20816
(202) 270-3989

## CERTIFICATE OF SERVICE

I hereby certify, on this 28th day of November 2014, that a copy of the foregoing
was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

App 1294

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :

    v.        :    Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,   :

    Defendant.    :

## AMENDED SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

### Table of Contents

Proceedings in the case            4

Background of the case            7

**GROUNDS FOR RELIEF**

**A. Brady and Giglio material was suppressed in violation of petitioner's right to due process**           **11**

1. Petitioner has cause for rising the suppresses Brady issues and errors of the court in this proceeding          12

2. Favorable evidence was suppressed in violation of the petitioner's due process rights           14

3. Suppressed evidence and failure to correct misleading and false testimony of Theodore Watson          14

4. The Government suppressed evidence relating to James Montgomery, or in the alternative the court abused its discretion by failing to turns over the same evidence to the defense          27

5. The Government suppressed evidence relating to Charles Bender, or in the alternative the court abused its discretion by failing to turns over the same evidence to the defense          28

6. The Government suppressed evidence relating to Arthur Rice, or in the alternative the court abused its discretion by failing to turns over the same evidence to the defense          30

App 1295

7. The Government suppressed evidence relating to Andre Murray, or in the alternative the court abused its discretion by failing to turns over the same evidence to the defense
31

8. Evidence was suppressed relating to the murder of Robert "Butchie" Smith and the Government's Federal Rule of Evidence 804(b)(6) Motion
32

9. Suppressed Brady evidence was material to the petitioner's guilt and the petitioner was prejudiced but its suppression
49

10. The trial court abused its discretion in failing to turn over to, or order the Government to produce to the defense the information contained within their Ex Parte Notice to the Court Regarding Change in Location and Andre Murrays Interview notes which both contain evidence that other might have killed Robert "Butchie" Smith and could have been used to rebut the Government's case in chief and its 804(b)(6) motion
51

11. The cumulative effect of depriving the petitioner of access to Brady, Giglio and Jencks Act material requires the petitioner's convictions to be vacated
57

12. The cumulative effect of depriving the petitioner of access to Brady and the Government's Napue violation requires the petitioner's convictions to be vacated
58

**B. Sixth Amendment Ineffective Assistance of Counsel**     **60**

1. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure of challenge on appeal the trial court's Brady, Giglio and Jenck's Act rulings with regard to specific portions of the sealed record.
60

2. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to seek review by the trial court of Theodore Watson's Greenbelt File.
62

3. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to seek appellate review of the trial court's ruling with regard to sealed material relating to James Montgomery.
67

4. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to seek appellate review of the trial court's ruling with regard to sealed material relating to Charles Bender.
68

App 1296

5. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to seek appellate review of the trial court's ruling with regard to sealed material relating to Arthur Rice. 69

6. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to seek appellate review of the trial court's ruling with regard to sealed material relating to Andre Murray. 70

7. Trial counsel was ineffective for failing to object at trial, and for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material. 71

8. Petitioner was deprived of his Sixth Amendment right to effective assistance by the failure to call an expert witness at trial. 73

9. Petitioner's trial counsel was ineffective for failing to retain co-counsel, pursuant t the trial court's order. 75

10. Petitioner was deprived of his Sixth Amendment right to effective assistance by trial counsel's failure to request a continuance to obtain co-counsel. 82

11. Petitioner was deprived of his Sixth Amendment right to effective assistance by trial counsel's failure to argue that the petitioner was entitled to two attorneys pursuant to 18 U.S.C. 3005. 83

12. Appellate counsel was ineffective for not raising that the court committed prejudicial error by misinforming the petitioner of his right to two counsel pursuant to 18 USC 3005. 85

13. Appellate counsel was ineffective for not raising that the court committed prejudicial error by misinforming the petitioner of his right to two counsel pursuant to 18 USC 3005. 86

14. Petitioner was deprived of his Sixth Amendment right to effective assistance under the cumulative error doctrine. 87

15. Sweeney hereby adopts codefendant Coates' issue and arguments, raised in his 2255 motion and supplements thereto with regard to the stacking of the 18 U.S.C. § 924(c) counts in this case. 89

16. Sweeney hereby adopts codefendant Carson's arguments and issues raised in his 2255 motion and supplements thereto, in their entirety. 89

App 1297

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

            v.                    :            Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,      :

          Defendant.          :

### AMENDED SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, ("Sweeney") a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, respectfully amends his supplement to his motion, pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the sentence he received in this case. As grounds for his Motion, Sweeney states as follows:

This motion is based upon all files, records and proceedings in this case.

On September 18, 1998, an indictment was returned against Sweeney and his codefendants. On March 25, 1999, a 101-count superseding indictment was filed, charging Sweeney and his codefendants with violations of 21 U.S.C. §846, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances ("Narcotics Conspiracy"); 18 U.S.C. §1962(d), Conspiracy to Participate in a Racketeer Influenced Corrupt Organization ("RICO Conspiracy"); 22 D.C. Code §§2401 and 3202, First Degree Murder While Armed; 22 D.C. Code §§501 and 3202, Assault with Intent to Kill While Armed; 18 U.S.C. §1959, Violent Crime in Aid of Racketeering Activity; 22 D.C. Code §§2101 and 3202, Kidnapping While Armed; 22 D.C. Code §505(b), Assaulting a Police Officer; 18 U.S.C. §924(c)(1), Use of a Firearm; 22 D.C. Code §3204(b),

4

App 1298

Possession of a Firearm During a Crime of Violence; 21 U.S.C. §841(a)(1), Possession with Intent to Distribute and Distribution of Controlled Substances; 22 D.C. Code §105, Aiding and Abetting; and, 18 U.S.C. §2, Aiding and Abetting.[1]

On August 15, 2001, after a seven-month trial, Sweeney was convicted of conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization, attempted murder in aid of racketeering, first degree murder while armed (for the murder of Donnell Whitfield), four counts of murder in aid of racketeering (for the murder of Donnell Whitfield, and the triple-murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson), five counts of use of a firearm, and possession of a firearm during a crime of violence. Petitioner Sweeney was found not guilty as to the charge of first-degree murder while armed of Glenn Jenkins, and related offenses.

On February 5, 2002, the Court sentenced Sweeney as follows:

Six concurrent terms of life imprisonment were imposed on the Narcotics Conspiracy count, the RICO Conspiracy count, and the four counts of murder. A supervised release period of five years was imposed on each of those counts, to run concurrently, along with a fine of $500,000.00 and a special assessment of $600.00.

As to Count 35[2] (Use of a Firearm in the RICO Assault of Anthony Pryor), a term of five years incarceration was imposed, to run consecutively to all other counts, and to be followed by five years of supervised release to run concurrently with all other counts. A special assessment of $100.00 was also imposed as to this count.

---

[1] A Retyped Indictment was filed on January 4, 2001. All count numbers referred to in this motion shall refer to the counts as numbered in the Retyped Indictment.
[2] This charge is listed as "Count 28" on the jury's verdict form, as well as on the ECF docket.

App 1299

As to each of Counts 40, 45, 46, and 47[3] (Use of a Firearm in the RICO Murders of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson), Sweeney was sentenced to 20 years incarceration, to run consecutively to each other and to all other counts. A five-year period of supervised release was imposed on each count, to run concurrently with all other counts, and a special assessment of $100.00 was imposed on each count.

On July 21, 2006, the United States Court of Appeals for the District of Columbia Circuit affirmed Sweeney's conviction. *United States v. Carson, et al*, 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en bank denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir. Oct. 23, 2006).

On February 20, 2007, the Supreme Court denied Sweeney's petition for writ of certiorari. *Carson, et al v. United States*, 127 S. Ct. 1351 (2007).

On February 19, 2008, Sweeney timely filed his original Motion to Vacate, Set Aside or Correct Sentence, pursuant to 28 U.S.C. §2255. At the time the motion was filed, significant portions of the trial and appellate records were unavailable to counsel appointed to investigate and litigate matters in Sweeney's §2255 proceeding, which hampered counsel's ability to effectively litigate the issues. Sweeney sought leave of the Court to supplement his original §2255 motion, as additional material was made available. This is that supplement.[4]

---

[3] The verdict form and ECF docket list these charges as "Counts 30, 35, 36, and 37," respectively.
[4] Counsel incorporates by reference the claims raised in Mr. Sweeney's original §2255 motion, as well as the claims raised by Mr. Sweeney's codefendants in their post-conviction petitions (original and supplemental). Because this case was tried in a group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

6

For the reasons set forth below, Petitioner Sweeney prays that this Court set aside his convictions and sentence in this case.[5]

## MEMORANDUM OF FACTS AND LAW

Sweeney moves the Court to vacate his convictions and sentences on all counts on the grounds that they were obtained by denial of, and in violation of his Constitutional rights. The ultimate legal standard for motions brought pursuant to §2255 is prescribed by statute:

> If the court finds that . . . the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate. 28 U.S.C. §2255.

## BACKGROUND

In this case, Sweeney, along with his codefendants, was charged with a large-scale narcotics and RICO conspiracy. It was the prosecution's theory that Sweeney, along with his codefendants were a group of lifelong friends who grew up in the Greenleaf Gardens neighborhood of Southwest Washington, D.C. The Government alleged that as Sweeney, and his codefendants entered their teenage years, they began selling drugs. By the early 1990's, the Government alleged that a large-scale drug operation had been developed in the neighborhood, through which Sweeney, and his codefendants were selling substantial quantities of marijuana. The government also alleged that Sweeney, and his codefendants engaged in acts of violence, both for

---

[5] Pursuant to the pertinent instructions accompanying the Model Form for Motions Under 28 U.S.C. §2255, prescribed by the Rules Governing Section 2255 Cases in the United States District Courts, we have set forth in our memorandum the pertinent facts and applicable law in support of our motion. However, in discussing the facts relating to our legal claims, we do not mean to suggest that an evidentiary hearing on these claims is unnecessary. To the contrary, because our allegations involve factual, as well as legal issues, a full hearing on this motion is required.

7

purposes of self-enrichment and self-preservation (to protect themselves from both rival drug dealers and prosecution by the Government).

The bulk of the Government's evidence against Sweeney was supplied by the testimony of Government cooperators and jailhouse informants – in pursuit of substantial assistance and other relief from the consequences of their own criminal acts. The self-interested and often conflicting testimony of these witnesses was suspect at best.[6] As an example of the quality of these witnesses is Donald Nichols, a cooperating witness and a witness who provided some of the Government's only evidence of Sweeney's involvement in drug dealing. At trial Nichols admitted that on previous occasions he had lied in order to gain his freedom. (Tr. 2/26/01 (AM) at p. 63).

The key part of the Government's case against Sweeney came from the admission of substantial hearsay statements made by Robert "Butchie" Smith. These statements of Smith were introduced, pursuant to Federal Rule of Evidence 804(b)(6). The Government called James Montgomery (a cooperating witness) and Federal Bureau of Investigation ("FBI") Agent Vincent Lisi (the Case Agent who lead the FBI's investigation) to testify as to statements allegedly made by Smith which statements incriminated Sweeney.

The Government alleged in its case that Smith was a relative of Sweeney, and was leading a double life as a drug dealer and Government informant. According to the Government, Smith implicated Sweeney in the triple murder in Temple Hills, Maryland,

---

[6] The majority of these witnesses testified that prior to trial they gave false testimony under oath, or false statements to law enforcement, on numerous occasions. *See* Testimony of Reginald Switzer, Trial Tr. 1/25/01 (AM) at pp. 40-1, 62-4; Trial Tr. 1/30/01 (AM) at pp. 75-6; Testimony of James Montgomery, Trial Tr. 3/12/01 (PM) at pp. 27-30; Trial Tr. 3/15/01 (AM) at pp. 53-58; Trial Tr. 3/15/01 (PM) at pp. 3-33; Testimony of Charles Bender, Trial Tr. 4/4/01 (PM) at pp. 33-4; Testimony of Ronald Sowells, Trial Tr. 4/18/01 (AM) at pp. 30-2, 83-5; Testimony of Arthur Rice, Trial Tr. 4/25/01 (PM) at pp. 30:25, 31-33; Testimony of Paul Franklin, Trial Tr. 5/1/01 (PM) at pp. 31, 65-6; Testimony of Demetrius Hunter, Trial Tr. 5/7/01 (PM) at pp. 57-9; Testimony of John Venable, Trial Tr. 5/14/01 (PM) at p. 7.

a conspiracy to kill Government witness Kenneth Adams as well as in the murder of Donnell "Robocop" Whitfield.

These hearsay statements of Smith, a substantial number of which were testified to through the bolstering voice of an FBI Agent and were the keystone of the Government's case against Sweeney. Smith's hearsay statements were relied upon heavily by the Government in its closing argument, and to bring about the conviction of Sweeney in this case.[7]

Apart from the testimony of cooperating criminals seeking favors from the Government in exchange for their testimony, and the hearsay statements of Robert Smith, the Government's case against Sweeney was weak.

With regard to the triple murder in Temple Hills, the only physical evidence linking Sweeney to the house in which the crime was committed was a palm print on the front door of the home. While this piece of evidence might, at first appear to hurt Sweeney's case on closer examination the print was explained. The Government's fingerprint expert testified that there is no way to date prints, and stated that Sweeney's print could have been left on the door at any time. (Tr. 4/2/01 (PM) at pp. 72-3). More importantly it was made clear at trial that the house at which the murders occurred was used as a gambling house, and Sweeney had visited the house a number of times in order to gamble. (Tr. 6/6/01 (PM) at pp. 48-61).

Moreover, Shaheem Johnson, testified at trial that he had seen Sweeney in the house on a previous occasion (Johnson testified that he did not know Sweeney at the

---

[7] *See* Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

9

time, but that Sweeney had stood out and could be identified as a result of his Tourette Syndrome).  (Tr. 6/12/01 (PM) at pp. 86:9-14, 87:15-21).

In addition the testimony of Cinama Hawkins, the Government's eyewitness and the sole survivor of the triple murder, was impeached at trial by the testimony of Prince George's County Police Officer Robert Taylor, the first person that Hawkins came into contact with after fleeing the Temple Hills house once the killers had left.  Officer Taylor testified that when he interviewed Ms. Hawkins at the scene, with the facts and circumstances of the events that evening still fresh in her mind, described both of the murderers as being six (6) feet tall.  (Tr. 6/12/01 at pp. 59-68).  Sweeney could never have been mistaken as six feet tall.

James Montgomery was used by the Government to implicate Sweeney in the triple murder.  Montgomery testified that he was there with Sweeny on the night of the murders and was a participant in the crime, yet he was never able to provide a consistent statement of the events of the crime he claimed to have participated in.  Montgomery's testimony at trial was inconsistent with prior statements that he had given to law enforcement and with his grand jury testimony.  (Tr. 3/14/02 (AM) at pp. 51-3; 3/15/01 (PM) at pp. 16-32; 6/27/01 (PM) at pp. 22-23).

Turning now to the Government's case against Sweeney for the murder of Donnell Whitfield.  The Government's case on this charge was also weak, as it relied mainly on the testimony of John Venable, whose credibility was impeached by his conflicting grand jury testimony.  (Tr. 5/14/01 (PM) at pp. 9-18, 28-9, 34-5).

As will be demonstrated herein, the Government's case against Sweeney was weak.  This combined with the ineffective assistance of counsel that Sweeney received at

10

App 1304

both trial and on appeal, the trial court's errors and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Sweeney was convicted, and sentenced to multiple life sentences, at a trial and appeal that was fundamentally unfair. Accordingly, relief must be granted.

## GROUNDS FOR RELIEF

## A. *BRADY* AND *GIGLIO* MATERIAL WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS[8]

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the United States Attorney's Criminal Resource Manual ("USAM") describes the Department's policy for disclosure of exculpatory and impeachment information. *See, e.g.* USAM §9-5.001.

Prior to trial in this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Federal Rule of Criminal Procedure 16, Sweeney requested that the government produce all material in its possession to which he was entitled under *Brady*, the Jencks Act, and *Giglio*.[9]

---

[8] The withholding of this material at trial was the result of both prosecutorial misconduct and error by the trial court. Petitioner Sweeney challenges his convictions on both of those grounds with respect to the suppressed material.

[9] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). In holding that favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. Accordingly, Petitioner refers to such evidence collectively as "*Brady* material" throughout this brief. The Jencks Act, 18 U.S.C. § 3500 ("Jencks Act"), provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate to the witness's

App 1305

Prior to and during trial, the Government repeatedly assured the Court and the defendants that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense. *See e.g.*, Oral Argument Transcript, 9/27/00 at p. 130:17-20. Evidence that was not turned over to Sweeny before or during the trial, or during the time that Sweeny's appeal was pending, reveals that the Government's repeated assurances were wrong. The suppressed evidence contains a substantial amount of *Brady* material all of which was withheld from the defense throughout the course of the trial and appeal in this case. This systematic withholding of favorable evidence material to the defense violated Sweeney's right to due process, and rendered the entire proceeding unfair and Sweeney's convictions unreliable.

## 1. PETITIONER HAS CAUSE FOR RAISING THE SUPPRESSED *BRADY* EVIDENCE AND COURT ERRORS IN HIS §2255 MOTION

Throughout trial in this case, the Government maintained a practice of submitting material to the Court *ex parte* and under seal. The justification offered by the Government for doing so was most often "security concerns." As a result, there is a large amount of material to which the defense never had access, and consequently, never had the benefit of using to challenge the Government's case at trial or on appeal.

It was not until one week prior to the running of the statute of limitations on Sweeney's filing his post-conviction motion, when Sweeney was granted access to all of the material that had been suppressed by the Government and the trial court. On February 13, 2008, prior *habeas* counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket [#1015]. In the motion, counsel requested the Court to

---

testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, the court is required to strike the testimony of the witness. 18 U.S.C. § 3500(d).

order that all papers and proceedings in this matter be unsealed and that counsel be provided with a copy thereof.

On February 15, 2008, the Court granted that motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in this case to counsel for Sweeney. Order, dated February 15, 2008 (TFH) [#1016].

On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. § 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the Court's order.

On December 20, 2012, undersigned counsel was appointed to represent Sweeney in this matter. Upon joining the case, undersigned counsel obtained approximately 15 boxes of material related to this matter from prior counsel. The boxes contained, *inter alia*, material from trial counsel, transcripts, and some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008, Order. The documents in the boxes were not indexed, organized, or labeled in any discernable fashion. Undersigned counsel has undertaken a lengthy review of the material contained in the boxes, and discovered a trove of suppressed *Brady* material.

In *Strickler v. Greene*, 527 U.S. 263 (1999), based on facts very similar to those here, the Supreme Court found that the petitioner had demonstrated cause for his procedural default of a *Brady* claim. In *Strickler*, after exhausting both his direct and collateral state appeals, the petitioner discovered exculpatory material that had been suppressed by the government pursuant to the federal *habeas* court's order granting petitioner access to all of the police and prosecutions files in the case. *Id.* at 278. The Court held that the petitioner had established cause for failing to raise his *Brady* claim

13

earlier, because prior to the federal *habeas* court's order, the prosecution had represented that petitioner had already received all discoverable material and the petitioner had no access to the material. *Id.* at 289. Here, given the facts that (1) the Government repeatedly represented at trial that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense; (2) notwithstanding those representations, discoverable *Brady* material was withheld from Petitioners and placed under seal by the trial court; and (3) Petitioner Sweeney only obtained access to the material by court order unsealing the record in this case after all direct appeals had been exhausted, Petitioner Sweeney has clearly established cause for failing to raise his *Brady* claim prior to his *habeas* proceeding. *See id.* The cause for failing to raise these *Brady* claims on direct appeal also applies to the courts errors in this motion

## 2. FAVORABLE EVIDENCE WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS

A thorough review of the previously sealed material revealed that throughout the course of trial in this case, the Government repeatedly withheld exculpatory, impeachment, and bias evidence from the defense, in violation of Petitioner Sweeney's right to due process and a fair trial. This systematic withholding of favorable evidence by the Government, with the consent of the trial court, is more than enough to significantly "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted). Accordingly, the interests of justice warrant relief, and vacate Sweeney's convictions.

## 3. SUPPRESSED EVIDENCE RELATING TO THEODORE WATSON AND FAILURE TO CORRECT FALSE AND MISLEADING TESTIMONY RELATING TO THEODORE WATSON

App 1308

Theodore Watson was a key witness for the Government, having implicated Sweeney, and his codefendants in a number of crimes. Watson was one of several cooperating witnesses presented by the government.

Watson was a defendant in a criminal case in the United States District Court of Maryland, located in Greenbelt, Maryland. As a result of this charge Watson was being held at the Northern Neck Regional Jail at the same time that Sweeney was also being held there. During this time Watson claimed, and testified at Sweeney's trial, that Sweeney told him about his involvement, among other things, in kidnapping, murder and drugs and he further wanted to have Montgomery killed for cooperating with the Government. (Trans 2-8-01, P.M. page 45 to 70) As such Watson's creditability became a central issue for the defense at trial.

Watson in order to reduce the sentence for the crime he had been charged with in Maryland and to obtain a § 5K1.1 recommendation from the Government entered into an agreement with the U.S. Attorney's Office in Greenbelt. This was done pursuant to a plea agreement in *United States v. Theodore Watson*, No. 99-069 (PJM), in the District of Maryland, Watson was obligated to fulfill certain cooperation requirements in exchange for the possibility of receiving a § 5K1.1 recommendation from the Government. *See* Ex. 1 (Watson Plea Agreement, pp. 5-6 at ¶ 6).

Watson cooperated with the Government in Greenbelt but at his sentencing, on February 4, 2000, the Government refused to file a § 5K1.1 letter on Watson's behalf or request a reduction in his sentence, despite Watson's fervent argument that a § 5K1.1 letter and reduction in his sentence was merited given his extensive cooperation with the

15

Government.  The court unmoved by Watson's protests, imposed a sentence of 105-months on Watson.

At trial in Sweeney's case, following Watson's testimony on direct examination, the defense, naturally cross-examined Watson as to why the U.S. Attorney's Office in Greenbelt had refused to file a §5K1.1 letter on his behalf when he had cooperated with that office.  Watson attempted to explain the U.S. Attorney's Office   refusal as being the result of Ms. Wilkinson, the Assistant U.S. Attorney assigned to his case, simply not liking him.

As is shown by the following colloquy on cross-examination:

**Q.**  You have already told us that you met with Ms. Wilkinson, correct?
**A.**  Correct.
**Q.**  And that you gave her your information, correct?
**A.**  Correct.
**Q.**  And you did not get the 5K1 letter for substantial assistance, correct?
**A.**  Correct.
**Q.**  Okay.  My question is do you know why you did not get the 5K1 letter from Ms. Wilkinson?
**A.**  Yes.
**Q.**  What was the reason?
**A.**  She made it very clear she did not like me and she didn't want to give me anything.
**THE COURT**:  I am sorry?
**THE WITNESS:**  She made it very clear that she did not like me and she did not want to give me anything.
**BY MR. KIERSH**:
**Q.**  Okay.  And when you tell us that she made it very clear that she did not like you, what did she say that led you to formulate the belief that she did not like you?
**A.**  Number one was her attitude toward me, and my attorneys had told me, "Ms. Wilkinson doesn't like you, and she doesn't want to give you anything.  She doesn't want to hear anything from you.  She doesn't want to talk to you about anything.  The only time she wants to see you is at trial."

(Tr. 2/12/01 (AM) at pp. 19-21).

16

App 1310

Watson, later attempted to provide a reason why Wilkinson might not like him tried to make it appear that Wilkinson was angry with him as a result of him having made her look bad in front of another Assistant U.S. Attorney, as shown by the following exchange:

> **BY MR. KIERSH**:
> **Q.** Sir, what was the substance of the conversation that day?
> **A.** Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler. Sandra Wilkinson was the district attorney who was prosecuting my case. When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team. And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly." And I explained to her some things that happened in her case – two of the cases she was prosecuting. And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?" And I looked at Ms. Wilkinson and I looked at my attorney. I said, "I told you this months ago before you did that." She just looked at Ms. Wilkinson, and that was the end of it.

(Tr. 2/12/01 (AM) at p. 44).

At the conclusion of the court proceedings on February 12, 2001, the defense made the following request:

> **MR. DAVIS**: And I would ask that the United States Attorney's Office review that file.
> **THE COURT**: If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file. Other than that --
> **MR. DAVIS**: Thank you, your Honor.
> **THE COURT**: -- that's the extent of the government's obligation. Okay?

(Tr. 2/12/01 (AM) at p. 78).

The following day the Government obtained Watson's file from the U.S. Attorney's Office in Greenbelt, and the following exchanges occurred:

> **MR. ZEIDENBERG (AUSA)**: I believe we are, your Honor. Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the

17

U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature**. Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have the file, and I don't know if the Court wishes to have it to peruse. There are letters --

**THE COURT**: You mean the file from Greenbelt?

**MR. ZEIDENBERG**: Yes. There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

**THE COURT**: Do you want to have it made part of the court record?

**MR. KIERSH**: Yes, your Honor.

**THE COURT**: All right.

**MR. KIERSH**: I ask that it be placed under seal and made a part of the record. **\*\*\***

**THE COURT**: Number 5. All right. Number 5. **I do not intend to review it in camera.**

**MR. ZUCKER**: That would be my request.

(Tr. 2/13/01 (AM) at pp. 6-7) (emphasis added).

Despite the Government's assurances, the material contained within the Greenbelt file goes directly to the credibility of Watson as a witness. The prosecutor, in this case, after having reviewed Watson's Greenbelt file, told the trial court that the reason that Watson had not been given a §5K1.1 letter by Ms. Wilkinson, ". . . was simply because she didn't believe his cooperation was of a significant enough nature to qualify. There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible was at best an error in judgment, and at worst, a calculated lie.

18

The Greenbelt file was included in the material obtained by counsel when the record was unsealed in this case. A review of that file revealed that it indeed contains a copious amount of evidence that Watson chronically lied and schemed in pursuit of a departure, and contrary to the representations of the Government at trial, that the Government was well aware of his untrustworthy nature. The file contains several lengthy letters, from Watson to the AUSA in Greenbelt, which detail the many occasions on which he lied to investigators. For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second opportunity" to cooperate and help myself. I abysmally apologize for the asinine [sic] way I conducted myself when the option was presented to me. Had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed… There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done."

*See* Ex. 2 (Greenbelt file, Letter from Watson, dated August 19, 1999, at pp. 1, 4). Another letter reveals that not only was the Greenbelt AUSA (Ms. Wilkerson) well aware that Watson was a liar, but also that she hesitated to continue cooperation with him due to his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the first conference and thereafter. Ms. Wilkerson, again I apologize and confess that at our first conference, I lied and somewhat distorted the truth regardless of my reasoning… Before I attempt to put the matter in its real perspective and sequence, again I would like to touch briefly on your view towards me as a liar… I believe that I have stated to you that "yes," I have lied [,] schemed and connived at times to obtain my way or freedom… In reference to me attempting to secure assistance on my own in an effort to help myself, Ms. Wilkerson, you advised [my attorneys] that you did not want to hear or discuss anything for or about me, and you did not want to see me until trial.

*See id.* (Greenbelt File, undated 17-page letter, at pp. 1, 2, and 12). A third letter, written just after his sentencing hearing, at which the Government declined to file a

19

departure letter and he was sentenced to 105 months incarceration, reveals Watson's

desperation and willingness to do anything in pursuit of a reduction in sentence:

> I could have made a lot of cases from the street, but that was not to be. But with your blessings, I wish to try to do as much as possible from within. I do have pertinent information for other prosecutors at the moment. One case involving a multi-kilo drug dealer and "hit man." *I will cooperate and do exactly as you say.* I just hope and pray that I do and give enough to be afforded a sizable downward departure.

*See id.* (Greenbelt File, Letter dated February 4, 2000, at pp. 5-6) (emphasis added).

Further, Ms. Wilkinson, the Greenbelt AUSA, wrote a letter on February 21,

2000, to the court in Greenbelt concerning Watson, in which, among other things, she

stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a

second lengthy letter regarding the information he believes he has – despite my specific

directions to not contact me directly. **Mr. Watson continues to undermine his own**

**credibility** as well and his ability to follow directions from the government." *See id.*

(Greenbelt File, Ms. Wilkinson's letter, dated February 21, 2000) (emphasis added).

The refusal of the Government to give Watson a §5K1.1 letter and the statement

that Mr. Watson continues to undermine his own credibility is explained by the next letter

in the Greenbelt file, which is a 15 page handwritten letter from Watson to Ms.

Wilkerson. In this letter Watson writes, "I would like to touch briefly on your harshness

towards me as a liar at the first conference and thereafter. Ms. Wilkerson, again, I

apologize and **confess that at our first conference, I lied** and somewhat distorted the

truth regardless of my reasoning." *See id.* (Greenbelt File, 15 page Watson Letter at p. 1)

(emphasis added). Watson, in the same letter, again addressing the point that Ms.

Wilkerson thinks he is a liar, writes:

> ". . . again I would like to touch briefly on your view towards me as a liar

20

1) I believe that I have stated to you that "yes", I have lied schemed and connived at times to obtain my way or freedom. * * * I also stated this to an F.B.I. agent from the D.C. office when interviewed twice on an unrelated matter, his response to me was. "we all lie." Even though I knew this from personal experience, I was very surprised to hear a F.B.I. agent make that statement.

2) The majority of political are noted liars. There are the top heads of our states and county who were proven wrong doers and liars, Vice Pres. Spiro Agnew, President Richard Nixon, and President William Clinton, just to name a few. There is no way I am comparing myself with these figures other than a liar is liar regardless of who they are.

3) Ms. Wilkerson, perhaps you have not experienced it, but I am sure that you have heard of agents and or government witnesses testifying falsely under oath, and the misconduct of prosecutors.") * * * (page 2)

4) * * * I cannot say whether or not you have ever lied in your life, and if you have not, then you are truly blessed. And, if not, then there is some discrepancy and contradiction in the Bible because God says in Romans 3:4 . . . .God is true even though every human being is a liar . . . . * * *

5) Again, human beings by nature instinctively lie to avoid prosecution, loss of life, freedom, bodily harm, harm to love ones, to acquire or maintain jobs or status, embarrassment and etc. Please, Ms. Wilkerson, ask yourself if you would lie under these or any other adverse conditions? Heads and leaders of our country have. (Page 4-5)

*See id.* at pp. 1-2, 4-5. Watson's admission that he lied to Ms. Wilkinson and his further statements that lying is an instinctive part of human nature, and is understood by God, goes to and impeaches his credibility and reliability as a witness.

The jury should have heard that the reason that Ms. Wilkinson did not like Watson, and the reason, that she did not want to give him anything and the reason he did not get the 5K letter is that Watson lied to her in the first meeting that he had with her. This is the only inference that one can take from Watson's handwritten letter in which he admits he lied to her and his lies are the reason for Ms. Wilkerson not liking Watson.

Once the Government had reviewed Watson's Greenbelt file, it should have taken steps to correct the testimony of Watson as to the reason he was not given a §5K1.1 letter in Greenbelt. It was not because Ms. Wilkinson did not like him (I am sure she does not

21

like many of the people to whom she had given §5K1.1 letters) and it was not because Watson had made Ms. Wilkinson look bad in front of another AUSA, but was in fact the result of Watson lying to her and that Watson wrote letters in which he states that he sees nothing wrong with lying to help himself out of a tight spot.  Watson even went so far as to quote the Bible to justify his having lied to Ms. Wilkinson.

Instead of doing this, the Government simply told the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature."  (Tr. 2/13/01 (AM) at p. 6).  In order to make such a statement the Government had to ignore the facts that Ms. Wilkinson wrote to the court in Greenbelt that Watson continues to undermine his own credibility and that Watson admitted that he had lied to Ms. Wilkinson.

The principle that the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

As the Supreme Court has made clear:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (*quoting People v. Savvides,* 136 N. E. 2d 853, 854-855 (N.Y. Ct. App. 1956)).

In *Brady,* 373 U.S. at 87, the Supreme Court held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See also* Ex. 3 (American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3-3.11(a)). When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. *Napue,* 360 U.S. at 269.

When as in this case " . . . the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103-104 (1976)

Here, the Government's good faith is even in doubt as the Government suppressed Watson's Greenbelt file by misrepresenting the contents of the file to both the trial court and to the defense. Had the Government accurately reported to both the court and the defense, that Ms. Wilkinson had written to the court in Greenbelt that Watson continued to undermine his own credibility, and that Watson admitted that he had lied to her, and that Watson viewed lying as a natural and justifiable method to get out of trouble, the trial court would have ordered the file to be disclosed to the defense. Once

23

the file was disclosed to the defense Watson would have been cross-examined as to the contents of his letters, his views on telling lies, and the true reason he was not given a §5K1.1 letter in Greenbelt.[10]

The reliance of the court, as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."

Further, the Government should have turned the Greenbelt file over to the defense as *Brady* material after it had reviewed it, because the material contained therein went directly to Watson's credibility as a witness. The course of action pursued by the Government can have only one explanation, that the Government did not want the file disclosed to the defendant because it did not want the jury to hear that Watson lied to the U.S. Attorney's Office in Greenbelt – and the Government did not want the jury to hear Watson's views on lying.

As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available,

---

[10] It would have been better had the Government just produced the Greenbelt file to the court and remained silent as to its contents and allowed the court to make its own determination as to the significance of the file. The reliance of the court as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera." (Tr. 2/13/01 (AM) at pp. 6-7).

would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice…

*Brady,* 373 U.S. at 87-88 (internal citations omitted).

Watson's testimony in this case was of great importance to the Government. Not only did Watson claim that Sweeney had confessed to him his participation in a number of crimes, but more importantly Watson's testimony lends creditability to the testimony of James Montgomery. Montgomery's testimony might have been some of the most damaging evidence introduced against Sweeney at this trial.

Montgomery was a cooperating witness that had lied to the Government, misrepresented his involvement in crimes to the Government and was otherwise a witness unworthy of belief.

Montgomery's conduct, character and background made it important for the Government to find evidence with which to bolster the credibility of Montgomery.

This the Government did by having Watson testify as follows:

> **Q.** What was Mr. Sweeney's response when you said that?
> **A.** You know, I still don't think they have anything on me, you know.
> **Q.** Did he tell you what his concerns were about the case against him?
> **A.** Yes.
> **Q.** What was that?
> **A.** A certain fellow by the name of James Montgomery.
> **Q.** What did he tell you about James Montgomery?
> **A.** That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.
> **Q.** If you could just fill in the he there and tell us that again, Mr. Watson. In other words, when he said he brought him into the organization –
> **A.** Mr. Sweeney brought Mr. Montgomery into the organization. Is that okay?

25

     **A.**  Yes, thank you.  And what did Mr. Sweeney say about that?

**A.**  Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.

     **Q.**  Who is flipping on --

     **A.**  Mr. Montgomery is turning on Mr. Sweeney to save himself.

     **Q.**  Did Mr. Sweeney ask you any advice about that?

     **A.**  Yes.

     **Q.**  What did Mr. Sweeney ask you about that?

**A.**  He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would they, the jury or whatever, try to work in his favor.  I told him no, I didn't think so because it doesn't usually work like that.  I said usually the first person that testifies is usually what they go with.  And if they got you targeted as the ring leader then that makes the difference.

     **Q.**  What was Mr. Sweeney's response?

     **A.**  Yeah, I figured as much.

     **THE COURT**:  I'm sorry?

     **THE WITNESS**:  Yes, I figured as much.

     **BY MR. ZEIDENBERG**:

**Q.**  Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?

     **A.**  He was suppose to testify against him.

     **Q.**  Did you have any conversation about that fact?

**A.**  Yes.  He was talking that Montgomery is going to testify against him.  And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know.  And he said, we been trying to get to that mother fucker but the feds got him hid away too well.

     **Q.**  Did he say where they had been looking for him?

     **A.**  No.

(Trans 2-8-01, pm, pages 61-64)

The effect of this evidence on the jury would have been to lend credibility to Montgomery as a witness against Sweeney.  As the only reason that Sweeny would want to have a witness killed would be if that witness's testimony was accurate and it would hurt Sweeney at trial.

26

App 1320

The evidence in the Greenbelt file overwhelmingly demonstrates that Watson was known by prosecutors to be dishonest, and had a powerful self-interest to do or say anything the Government wanted in his pursuit of a reduced sentence.  The Government's claim to the Court that the Greenbelt file contained nothing to indicate Watson's untrustworthiness was a misrepresentation of the highest order.  The failure to provide the contents of the Greenbelt file to the defense was plainly violative of the Government's discovery obligations, and Petitioner Sweeney's right to a fair trial.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.  Furthermore the Government had a duty to correct Watson's misleading and false testimony.

**4. THE GOVERNMENT SUPPRESSED EVIDENCE RELATING TO JAMES MONTGOMERY, OR IN THE ALTERNATIVE THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THAT THIS MATERIAL BE TURNED OVER TO THE DEFENSE**

James Montgomery was an essential witness for the Government.  His testimony implicated the defendants in a number of criminal acts.  Again, as with the majority of the Government's witnesses, the defense questioned Montgomery's credibility.  Montgomery himself had admitted to, been implicated in, or been convicted of a number of violent crimes.  These crimes included assault with a deadly weapon, numerous murders, and assault on a police officer while armed.  The Government had promised Montgomery leniency in exchange for his testimony; in fact, Montgomery ultimately received a five (5) year sentence for committing seven (7) murders.

On March 7, 2001, trial counsel requested Agent Lisi's notes related to his interviews of James Montgomery.  (Tr. 3/7/01 at p. 52).  The trial court ruled that Agent Lisi's notes did not contain *Brady* material.  *Id.* at p. 91.  The recently unsealed material

27

revealed Agent Lisi's notes regarding Montgomery. The notes contain valuable impeachment evidence as to Montgomery. Specifically, the notes reveal that Montgomery lied to Agent Lisi in his interview with regard to the murder of Timothy Benton. Maurice Proctor and James Montgomery were charged with Benton's murder. Agent Lisi's notes reveal that Montgomery lied, and substituted Carson for himself as one of the perpetrators of the Benton murder (Exhibit 4, Agent Lisi's notes of the interview of James Montgomery) This valuable impeachment evidence could have been used by the defense to further discredit Montgomery by demonstrating his proclivity for lying to protect himself from criminal prosecution, through the false incrimination of others. The suppression of the favorable evidence contained in Agent Lisi's notes, which as discussed, *infra*, was material to Petitioner Sweeney's guilt and violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

**5. THE GOVERNMENT SUPPRESSED EVIDENCE RELATING TO CHARLES BENDER, OR IN THE ALTERNATIVE THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THAT THIS MATERIAL BE TURNED OVER TO THE DEFENSE**

On February 5, 2001, trial counsel for the defense asked the court to review the FBI's 302 reports generated from the FBI's interviews with one of the Government's

28

witnesses, Charles "L.A." Bender.  Trial counsel wanted to know whether Bender's testimony on the stand was consistent with the statements he gave to the Government. (Tr. 2/5/01 (A.M.) at p. 84).  The trial court ruled that Bender's testimony was consistent with the information in the 302 reports, and denied the defense access to that material. The newly unsealed record reveals, however, that the Bender 302 reports contained *Brady* material, which was unconstitutionally withheld from Petitioners at trial.  Indeed, in one of the Bender 302 reports, Bender stated that codefendant Jerome Martin confessed to Bender that he (Martin) killed Anthony Fortune.  *See* Ex. 5 (Bender 302 Report).  As an initial matter, this report was exculpatory *Brady* material as to codefendant Carson, who was charged with the murder of Fortune.  This was significant to Petitioner Sweeney as well, as the Government's theory tied Sweeney to Carson in several murders.  Further, the 302 report was valuable impeachment evidence, as it contradicted the Government's theory of the prosecution and could have been used to impeach Bender's testimony at trial. The suppression of the exculpatory and impeachment evidence contained in the Bender 302 report, which as discussed, *infra*, was material to Petitioner Sweeney's guilt, violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense.  This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

App 1323

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 6. THE GOVERNMENT SUPPRESSED EVIDENCE RELATING TO ARTHUR RICE OR IN THE ALTERNATIVE THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THAT THIS MATERIAL BE TURNED OVER TO THE DEFENSE

On April 24, 2001, trial counsel requested the FBI 302 reports generated from the interview of Government witness Arthur Rice. (Tr. 4/24/01 (PM) at p. 3). Arthur Rice was a jailhouse informant, whom the Government alleged was an associate of Petitioners. The trial court reviewed the FBI 302, dated January 26, 1999, and ruled that it contained no *Brady* material. *Id.* The recently unsealed material reveals that the opposite is true. Rice's 302 reveals that he told Case Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that defendant Martin, along with Carson, killed Leonard "Slick" Hyson and Maurice Hallman. In fact, Rice told the investigators that he was present at the time of the murder, heard the gunshots, and then observed Martin and Carson fleeing the scene. *See* Ex. 6 (Arthur Rice 302 Report). This evidence is favorable to the defense because it contradicts the Government's theory of the case, which was that it was James Montgomery who participated in the Hallman/Hyson murders with Carson. The evidence could have been used to impeach Montgomery, who testified that he was one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM) at pp. 55-62). The Rice 302 report was favorable to the defense, as it was both exculpatory and impeached the credibility of the Government's witnesses; thus, as discussed *infra*, because it was also material, the suppression of this evidence violated Petitioner Sweeney's right to a fair trial. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

30

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 7. THE GOVERNMENT SUPPRESSED EVIDENCE RELATING TO ANDRE MURRAY, OR IN THE ALTERNATIVE THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THAT THIS MATERIAL BE TURNED OVER TO THE DEFENSE

On February 1, 2001, trial counsel requested material from the Government relating to Andre Murray, a cooperating witness for the Government, with whom the Detective had a long history of dealings. (Tr. 2/1/01 (AM) at p. 65-66). The trial court ruled that the defense was not entitled to the evidence under the Jencks Act. *Id.* The unsealed record, however, exposed the fact that a Government Agent's notes also contained *Brady* material. Specifically, the Government Agent's notes reveal that Andre Murray told the Government that Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for killing Petey Johnson's brother, Keith Johnson (Exhibit 7, Andre Murray interview notes, page 1). Sweeney was charged with the murder of Keith Johnson. The Government's Agent's notes contained evidence that someone other than Sweeney was responsible for Robert Smith's death; therefore, the notes should have been produced as *Brady* evidence.

Also in the newly unsealed Andre Murray Interview notes on December 22, 1997, Murray explains that Jakie "Boy" Burks had some New Yorkers kill Hallman and Hyson. (Exhibit 7, Andre Murray Interview Notes, page 2) Looking at this as a whole, Murray's

31

statement undermines and contradicts that Montgomery and Carson killed Hall and Hyson as testified to by Montgomery during trial. It further contradicts Arthur Rice's testimony that he saw Martin and Carson fleeing the scene, which also contradicts Montgomery's testimony. Contradiction is useful in impeaching a witness that has testified at trial and can help create reasonable doubt necessary in the minds of the jurors. As a result of this material being suppressed by the Government and the trial court abusing its discretion deprived the defense of the opportunity to use this information at trial.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 8. SUPPRESSED EVIDENCE RELATING TO THE MURDER OF ROBERT "BUTCHIE" SMITH AND THE GOVERNMENTS' FEDERAL RULE OF EVIDENCE 804(b)(6) MOTION.

The cornerstone of the Government's theory of Petitioner Sweeney's purported liability in the conspiracy came from the admission of hearsay statements made by Robert "Butchie" Smith, which were introduced through FBI Agent Vincent Lisi (the Case Agent who lead the FBI's investigation).[11] The Government alleged that Robert "Butchie" Smith was a relative of Petitioner Sweeney, and was leading a double life as a

---

[11] As stated earlier, Petitioner Sweeney was convicted at trial of, *inter alia*, Count 2 in the indictment, the "RICO Conspiracy." Petitioner Sweeney received a life sentence for this conviction. In convicting Petitioner Sweeney of the RICO conspiracy count, the jury found Racketeering Act 50, the conspiracy to commit murder of Robert Smith a/k/a "Butchie," between on or about April 1997 and on or about June 17, 1997, to have been proven.

32

drug dealer and informant. According to the prosecution, Smith implicated Petitioner Sweeney in the triple murder in Temple Hills, Maryland, a conspiracy to kill Government witness Kenneth Adams, as well as in the murder of Donnell "Robocop" Whitfield, Keith Johnson, and the attempted murder and kidnapping of Anthony "Wysoki" Pryor.

At trial, the court allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights. Without having the opportunity to cross-examine Smith, his testimony, much of which was delivered through the bolstering voice of an FBI Agent, was the linchpin of the Government's case against Petitioner Sweeney. Indeed, this testimony was relied upon heavily by the Government in closing argument, and used to seal the Government's case.[12]

At the time of Robert Smith's murder, Petitioner Sweeney was in custody at the Prince George's County Detention Center. The Government's theory was that Petitioner Sweeney arranged for the murder of Robert Smith, a paid government informant, because he suspected that Smith was providing information to the police about criminal activity involving Petitioner Sweeney.

In addition to a multitude of requests in various forms, prior to and since, Petitioner Sweeney's Third Motion to Compel Discovery [#340], filed July 17, 2000, and specifically sought the information pertaining to Robert Smith to which he was entitled under *Brady*.

---

[12] See Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

App 1327

The Government sought, and was granted permission, pursuant to Federal Rule of Evidence 804(b)(6) to have FBI Special Agent Lisi, testify to certain incriminating statements allegedly made by Sweeney to his uncle Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County Detention Center and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**MS. CHATURVEDI**: Certainly, your honor. If I could just address this briefly. Again, it is sort of a leap of faith. If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive. That is one leap of faith.
**THE COURT**: Sure.
**MS. CHATURVEDI**: And the second one is is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith. There is no such evidence. If the defense is trying to raise third-party culpability, there has to be more than mere speculation.
Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals. The *Winfield* case, which is the most most recent case on that point, says you can't just draw a

34

blank. You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that. I will provide --

**THE COURT**: I Agree. There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

**MS. CHATURVEDI**: Right. And we don't have any such information. And we recognize that if we did have such information and that steps had been taken to give that, that would be Brady information. That would have been disclosed as Brady information.

**THE COURT**: Yes.

(Trans. 9-27-00, pp. 200-202).

Ms. Chaturvedi's statement that the Government had no information that someone other than the defendants in this case had been implicated in the murder of Smith was incorrect.

The Government was aware, as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of Smith.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by Judge Jackson on April 6, 1999.[13] *See* Ex. 8 (Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants). The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

---

[13] None of the material obtained pursuant to the Court's Order to unseal appear on the docket sheet in the above-captioned matter.

App 1329

In the *Ex Parte* Notice, the government states, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." *See* Ex. 6 at p. 12.[14]

The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

The Government further suppressed the information contained within the material admitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the hand written notes relating to an interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson. *See* Ex. 7 (Handwritten Andre Murray Interview Notes, page 1).

The notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother]  Wit. did not hear Draper return to advise Gooch he had killed Keith.  He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 7, page 1

---

[14] The Government's motion does not elaborate on the evidence in its possession that led to the identification of these to individuals as those responsible for Smith's murder.  Accordingly, Mr. Sweeney requests additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the Government based its statement would clearly be discoverable under *Brady*, and likely provide further evidence that the Government's misrepresentations and discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound. Mr. Sweeney hereby requests any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith.  The facts as alleged above provide "good cause" to allow discovery of the requested material. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 ("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.")  The facts above demonstrate that "good cause" has been shown; therefore, discovery is warranted. *Bracy* at 908-09.

36

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother Keith.

This information was never provided to the defense despite the defense's requests for such information and the Government's assurance to the trial court and the defense that if it had such information it would turn it over to the defendants.

The significance of the Government's suppression of the motive of Petey Johnson to kill Smith becomes more significant when one looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay. And you questioned him not just as a witness, but as a possible suspect?
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called somebody to alert them that "Butchie" was there. (Trans. 5-30-01 (AM), pages 19-20).

The Government withheld from the defense evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder; Johnson also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the Government, of an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

37

Once again had the Government disclosed the information in its possession, that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

The Government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith is further shown when during cross-examination of Agent Lisi by defense counsel, the Government objected when Agent Lisi was asked whether any suspects other than Sweeney had been developed as leads in Robert Smith's murder. (Tr. 5/30/01 (AM), pp. 45-49). At sidebar, the Government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney. If Mr. Kiersh wants him to repeat it, that is fine." *Id.* at pp. 47-48.

The Government was quite sure that the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder as this material had not been turned over to the defense.

The defense was deprived of the opportunity to investigate this information or to attempt to use it in opposition to the Government's motion to admit the statements of Smith.

The Government through its action in keeping this information from the defense put the defense in the position of having no evidence whatsoever to counter the Government's argument that no one other than the defendants in this case had any reason to kill Smith.

38

The defense being unable to present any serious opposition to the Government's motion to admit the statements of Smith, the trial court granted the motion.

The Government's need to withhold evidence that could implicate others in the murder of Smith is further shown by the weakness of the Government's evidence implicating the defendants in that murder.

The evidence relied upon, by the Government, in support of its motion to admit the statements of Smith was the testimony of Montgomery, as follows:

The Government first had Montgomery testify as to what he knew about the murder of Smith which went as follows:

A.  Chin [defendant Carson] told me that Draper [defendant Sweeney] wanted me and him to come to see him.  So I told him -- I told Chin that I wasn't going to see him, and I didn't have proper ID.  I had an ID with my proper information on it, but it wouldn't have been accepted by -- probably by that jail thing.
Q.  So did you go to see Draper at the jail?
A.  No.
Q.  Did Chin go?
A.  Yes.
Q.  And after he went, did he tell you about his conversation with Draper?
A.  Chin say that him and Draper father went to see him, and --
THE COURT:  Him and Draper what?
THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see Draper.
THE COURT:  Oh, I see.  Draper's father.  All right.
THE WITNESS:  And said that he asked Draper distinctively who did you tell anybody about what had happened?  And he said that Draper admitted to him that he told Butchie, and that Butchie was cooperating with the Feds.
BY MR. ZEIDENBERG:
Q.  Did Chin say what had to be done or what should be done about Butchie?
A.   So Chin told me that if they had no Butchie -- without Butchie, they don't have no case.  They wouldn't have no case.
Q. And when you were talking about a case, what case was it that you were all concerned about?

A.  The triple murder.
Q.  Now, did you and Chin make attempts together to find and kill Butchie?
A.  Yes.
Q.  Can you tell the ladies and gentlemen about that?

App 1333

A. Sometimes when we used to -- when we would go to this carry-out, Leo's --

Q. Where is that located?

A. It's on N Street.

Q. I'm sorry?

A. South Capitol and N.

* * *

A. That's near the area where Butchie would more than likely be, as far as when he was in Southwest. So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

Q. What were you going to do if you saw Butchie?

A. Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean. We're from Southwest and he is -- he knowed the same people we know, so we couldn't just walk right up to him just like that and do anything to him.

Q. What were you hoping to find? What were you hoping to do?

A. To catch him in a nice position.

Q. What is a nice position?

A. To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q. Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A. We was in my car.

Q. Can you tell us about that?

A. We rode through housing -- I mean, through Half Street, and Butchie was out there. He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car. And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q. What's a gut-buster?

A. Like elastic velcro, like a waistband.

Q. And what's the purpose of that?

A. To hold the gun.

Q. What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A. It was a black sweatsuit.

Q. What did he do with it?

A. He was putting in on while I was driving.

Q. Where was he putting it on?

A. In the car.

Q. What car did you have?

A. Oldsmobile 98.

Q. Where did you go once Chin got back in the car with his gun and his sweatsuit?

A. We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street. And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk. It's like a little car dealership thing right

App 1334

there. So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q. Now, was there a discussion between you and Chin about an escape route you were going to take?

A. When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th. And that was going to be our alibi.

Q. And that was a plan you discussed before Chin got out of the car?

A. Right.

Q. And again, the purpose in going up and ending up at 37th Place was going to be what?

A. Our alibi.

Q. What happened when Chin got out of the car?

A. He went around there, and he came back, and he said that Butchie was gone. When he got back in the car the first thing I said, I said, what happened? Because I didn't hear the gunshots or nothing. So I said, what happened? And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q. Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A. Yes.

Q. Where were you the day that Butchie was killed, starting in the afternoon?

A. On Second Street.

Q. Second Street, Southwest?

A. Yes.

Q. And what were you doing there?

A. Selling weed.

THE COURT: What was the date?

MR. ZEIDENBERG: I'm sorry?

THE COURT: What was the date?

MR. ZEIDENBERG: I didn't refer to the date. It is June 16, 1997.

THE COURT: June 16th?

MR. ZEIDENBERG: Yes.

THE COURT: All right. Go ahead. I'm sorry.

BY MR. ZEIDENBERG:

Q. Where were you -- you were on Second Street?

A. Yes.

Q. And what were you doing?

A. Selling weed.

Q. Now, at some point did you see Chin?

A. Chin came out of his house and came and got my car keys.

Q. Did you give it to him?

A. Yes.

Q. Did you ask him why he needed your car?

A. No.

Q. Was it uncommon for Chin to come by and take your car?

A. No. I mean, he would get it all the time, whenever.

41

Q. Now, did he tell you where he was going?

A. No.

Q. Now, sometime later, after Chin -- did he leave with your car?

A. Yes.

Q. Okay. Sometime later did you come to find out that there had been a shooting over on Half Street?

A. Yes.

Q. And at some point did you learn that that was Butchie?

A. Yes.

Q. What did you do when you found out that Butchie had been killed?

A. I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q. And where did you ride to?

A. To the corner of Half and O Street.

Q. What did you see when you got there?

A. There was a lot of marked and unmarked police cars and a lot of people was out there.

Q. Was Butchie's body still on the ground?

A. I didn't see his body. I seen like the crime scene tape and stuff like that. I didn't go all the way down there because it was a lot of polices down there.

Q. I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A. Yes.

Q. How did you feel when you heard that Butchie was killed?

A. I was happy.

Q. How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A. It was of great concern.

Q. Why is that?

A. Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a witness as to what Draper told him.

Q. Now, after you went to the scene did you return back to Second Street?

A. Yes.

Q. And at some point later that evening did Chin return?

A. Yes.

Q. Can you tell us about that?

A. He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first. So when I seen him going into the alley, so I was walking down -- I was walking down towards that direction. So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q. Your term was what?

A. I said, you know them peoples got hit.

Q. You used the term peoples?

42

App 1336

A. That's what I said. I said, you know them peoples got hit. He was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys.

Q. Did he seem at all surprised when you told him about that?

A. No. And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q. I'm sorry?

A. He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q. Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A. Yes.

Q. Can you tell us about that?

A. In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q. How do you know that?

A. Because Chin told me. He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q. Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A. No, that was all he said.

Q. What did you understand that to mean, why you shouldn't go up to Capers?

A. My knowledge would be that Craig might be able to identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q. Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A. Would you repeat your question?

Q. After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A. I was feeling good pretty much. To a certain extent I was feeling good.

Q. Did you think you were in the clear?

A. To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG: I have no further questions, Your Honor.

(5-23-01, p.m., pages 22-33)

It is interesting to note that when Montgomery was with Carson, and according to

Montgomery, with the express purpose of killing Smith that they did not do so as there

were people around. Montgomery's testimony is that on the day that Smith was killed

43

Carson did not ask him to go with him on this mission, as he had before, but according to Montgomery, he went on his own. Moreover Montgomery was not with Carson when Carson allegedly killed Smith.

Most surprising of all of Montgomery's claims is that after Carson allegedly killed Smith, Carson did not tell Montgomery he had done so. In fact, according to Montgomery, Montgomery brought it up to Carson that Smith had been killed, in the following exchange:

> [Montgomery] A. I said, you know them peoples got hit.
> Q. You used the term peoples?
> A. That's what I said. I said, you know them peoples got hit. [Carson] was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys.

If in fact Carson had killed Smith, why was he unwilling to tell Montgomery he had done so? Especially when they had, if Montgomery is to be believed, hunted Smith on numerous occasions, planned how Smith would be approached, where the car would be stopped, an escape route and a place to get rid of the gun, and they were always together when they allegedly went to kill Smith.

This all changes when Smith is killed -- Carson suddenly goes out alone, and never tells Montgomery that he killed Smith. Instead, Montgomery brings up the subject of Smith's murder to Carson.

Moreover, if Montgomery is telling the truth about the statements allegedly made by Carson after Smith's death, that "trust me, we're all right," that would be true no matter who killed Smith.

While the evidence withheld by the Government from the defense appears not be admissible in its own right there is still a *Brady* violation in this case.

The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. We have never squarely ruled on this question, *but cf. United States v. Hemmer,* 729 F.2d 10, 16n. 3 (1st Cir.) *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir. 1983) yet given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6-8, 116 S.Ct. 7, 133 L.Ed2d 1 (1995) implicitly assumes this is so. Whether the intake note at issue in this case undermines confidence in the verdict is a more difficult question. The clear implication of Jan Smith's note is that someone where Matthew made the prior allegations, told her that the allegations were false. If the defense had known about the note before trial, it presumably could have traced those who could testify as to the circumstances of the allegations and the basis for believing them to be false. Whether the evidence would convincingly establish that Matthew had lied is hard to know but surely the episode most likely would have been investigated and the implication that someone at Hampstead believed it false is strong.

If strong evidence of a prior false accusation exists, it would be very powerful. could easily have created the reasonable doubt necessary to acquit Ellsworth in what was otherwise largely a credibility contest. The lack of any significant corroborating evidence makes this case unusual and heightens the concern about any *Brady* violation. Nevertheless, it would be very odd for us to require a new trial because of a wrongly withheld lead unless the lead would, or would likely, have led to valuable new evidence which was itself arguably admissible. However unlikely it might be after eight years, the state would be entitled to retry Ellsworth if the writ were granted; yet such a remedy would be incongruous unless evidence existed that might alter the result at such a trial. Habeas doctrine is flexible enough for us to condition a grant of the writ on the outcome of a further inquiry into where the lead, even though wrongly withheld, would have taken Ellsworth. *Cf. Manko v. United States,* 87 F.3d 50, 55 (2nd Cir. 1996); Stewart v. Coalter, 48 F.3d 610, 617 (1st Cir.) *cert. denied,* 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

If there exists admissible evidence that Matthew made demonstrably false accusations and Ellsworth was not otherwise aware of these allegations at the time of the first trial, a new trial is required. If admissible evidence of false accusations never existed, the writ should be denied. If it did or may well have existed but has been lost

45

> because of the *Brady* violation and the ensuing delay in discovery of this fact, Ellsworth may have a good claim to a new trial, *cf. California v. Trombetta,* 467 U.S., 486-88, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

*Ellsworth v. Warden,* 333 F3d 1, 5-6 (1st Cir. 2003).

As a result of the court sealing the information relating to others implicated in the murder of Smith from counsel, there was never an opportunity for the defense to challenge the government's Rule 804(b)(6) motion, investigate the matter of Andre Chappell and Anthony Ricardo Hawkins, or their relation to Carson or any of the other codefendants.

Furthermore, the Government at trial stopped short of explaining or putting on evidence as to how, or who actually killed Mr. Smith. Andre Chappell or Anthony Ricardo Hawkins was not mentioned at all during trial, either by the agents, the prosecutors, or any Witness. *See* Ex. 9 (Affidavit of William Sweeney).

In light of the evidence put forward by the Government at trial for the murder of Smith, for all that is known the evidence that Andre Chappell and Anthony Ricardo Hawkins killed Smith could have been just as strong as the evidence that implicated the defendants.

This is simply another reason that the court should require the Government to produce the evidence that it has linking Andre Chappell and Anthony Ricardo Hawkins to the murder of Smith and then conduct a full evidentiary hearing on this issue.

As a result of the actions of the Government in withholding the evidence in its possession, the Government should be required to turn over to the defense all evidence in its possession related to its investigation into the murder of Smith, and into Petey Johnson relating to the murder of Smith. In addition, the Government should have to turn over to

App 1340

the defense all evidence that relates to the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once the Government has done so, and the defense has had an opportunity to investigate the information a hearing should be held.

Moreover, the granting of the Government's motion to admit the statements of Smith also precluded the defense from offering evidence that implicated Smith in the Triple murder in Prince George's County.

The defense had a witness, Wesley Smith, who would have testified that Robert Smith told him that he, Robert Smith, had been cheated out of $60,000.00, while gambling at the house in Temple Hills where the triple murder occurred, and that he was going back there to take care of the "guys in the house," meaning Gaskin and Mack.

Robert Smith told Wesley Smith, a week after the triple murder occurred that, "I took care of Darnell Mack and those guys." (Tr. 6/6/2001 (AM), pp. 26-34; Tr. 6/11/2001 (PM), 9-27; Tr. 6/13/2001 (AM), pp. 72-77).

Even though this is not a claim of ineffective assistance of counsel, counsel missed the mark on direct appeal, as to why the court precluded Wesley Smith as a defense witness.  Counsel argue the reliability of Wesley Smith, but the trial court stated, "I am going to adhere to my earlier ruling.  It's inadmissible." (Tr. 6/13/2001, AM, page 77.)

The rational underlying the trial court's early ruling excluding the testimony of Wesley Smith was not his reliability, but was instead as a result of the trial court's finding that Sweeney was involved in the murder of Robert "Butchie' Smith.  (Tr. 6/11/2001, PM, page 19)

App 1341

This evidence would have contradicted Montgomery version of the triple murder and would have further impeached Montgomery's credibility.

It also would have been a defense in this case.

Petitioner Sweeney has demonstrated that the evidence concerning Andre Murray's statement that Petey Johnson wanted to kill Smith, combined with his presence at the time and place of the murder of Smith and the information linking Andre Chappell and Anthony Ricardo Hawkins to the murder of Smith, is all evidence that would be material to the determination of the Government's motion, pursuant to Rule 804(b)(6), to admit the statements of Smith through Agent Lisi.

"Once a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way. The proper course in that case 'is for the district court to order production of the evidence or the witness and leave to the Government the choice of whether to comply with that order.' *United States v. Moussaoui,* 382 F.3d 453, 474 (2004). "If the government refuses to produce the information at issue—as it may properly do—the result is ordinarily dismissal." *United States v. Rivera,* 412 F.3d 562, 569 (4th Cir. 2005)(internal citation omitted).

This should be the procedure that should be followed in this case. It cannot be disputed that evidence which inculpated individuals unrelated to Petitioner Sweeney in the murder of Robert Smith was favorable to the defense; thus, the material should have been turned over to the defense. As discussed, *infra*, this evidence was material to Petitioner Sweeney's guilt; therefore, the suppression of the material violated his right to due process. *Brady*, 373 U.S. at 87.

48

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense, which is argued herein at section 10. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt, would have been used by the defense in opposition to the Government's motion to admit the hearsay statements of Smith and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

## 9. THE *BRADY* EVIDENCE WAS MATERIAL TO PETITIONER'S GUILT, AND PETITIONERS WERE PREJUDICED BY ITS SUPPRESSION

The standards for establishing materiality and prejudice are interchangeable as applied to a *Brady* claim. *See Strickler*, 527 U.S. at 289-90 (prejudice); *Kyles*, 514 U.S. at 434 (materiality). To establish materiality and prejudice, Petitioner Sweeney need not show that he would more likely than not have received a different verdict with the benefit of the suppressed evidence; the question is rather, whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Strickler*, 527 U.S. at 289-90 (*quoting Kyles*, 514 U.S. at 434). The suppressed evidence should be considered collectively, not item by item. *See Kyles*, 514 U.S. at 434. Here, the cumulative impact of the pervasive suppression of *Brady* material renders the verdict unworthy of confidence – simply put, Petitioner Sweeney did not receive a fair trial.

As the Supreme Court has long recognized, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to

broad latitude to probe credibility by cross-examination…" *Lee v. United States*, 343 U.S. 747, 757 (1952). At trial, the central theme of the defense was the lack of credibility of the Government's witnesses. Accordingly, the suppressed evidence as detailed above, taken collectively, could have been used to cast doubt upon the credibility of several of the Government's key witnesses – delivering death by a thousand cuts to the Government's case.

Further, the suppression of the newly discovered evidence relating to Robert Smith prejudiced Petitioner Sweeney in particular, as it could have been used to defeat the Government's motion to admit Smith's hearsay statements through Agent Lisi's testimony. At trial, the court had allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights.[15]

The "Greenbelt File" related to Theodore Watson was also material, and its suppression likewise prejudiced Petitioner Sweeney. Like Agent Lisi's testimony and Robert Smith's statements, Watson's testimony in this case was of great importance to the Government, as he claimed that Petitioner Sweeney had confessed to him participation in a number of crimes. The letters contained in the file could have been used by the defense to seriously undermine Watson's credibility as a witness at trial, exposed his bias and the powerful influence of the Government, by using his very own words against him. The materiality of the "Greenbelt File," and the prejudice caused by

---

[15] Federal Rule of Evidence 804(b)(6) provides, "*Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

50

its suppression, are demonstrated by the fact that it could have been used as a powerful

discrediting of Watson as a key witness.

As shown above, the Government's withholding of several of the examples of

newly discovered evidence, even taken alone, would be sufficient to vacate Sweeney's

conviction. Together, there can be no doubt that the suppressed *Brady* evidence rendered

Petitioner Sweeney's trial fundamentally unfair, and produced a verdict that is no longer

worthy of confidence. Accordingly, relief must be granted.

**10. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER THE GOVERNMENT TO PRODUCE TO THE DEFENSE THE INFORMATION CONTAINED WITHIN, AND THE INFORMATION THAT SUPPORTED THE GOVERNMENT'S CONCLUSIONS IN ITS *EX PARTE* NOTICE TO THE COURT REGARDING CHANGE IN LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS, DATED APRIL 2, 1999, AND THE ANDRE MURRAY INTERVIEW NOTES WHICH BOTH CONTAINED EVIDENCE THAT OTHERS MIGHT HAVE KILLED ROBERT "BUTCHIE" SMITH, AND COULD HAVE BEEN USED TO REBUT THE GOVERNMENT'S CASE IN CHIEF AND ITS 804(b)(6) MOTION**

The trial court abused its discretion in sealing material relating to others that had

motive to kill Robert "Butchie" Smith. The Government was granted permission by the

trial court, pursuant to Federal Rule of Evidence 804(b)(6), to have FBI Special Agent

Lisi testify to certain incriminating statements allegedly made by Sweeney to his cousin,

Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That*

*Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party

that wrongfully caused — or acquiesced in wrongfully causing — the declarant's

unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting

with Sweeney in the Prince George's County jail and being told by Sweeney that Smith

51

had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

**Upon hearing counsel's argument, the trial court stated, "I would think if the Government has any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as Brady Material." (Oral argument, September 27, 2000, at 127: 10-13)   The trial court went on to grant the part of Sweeney's motion regarding Robert Smith,  See id. At 137: 14-24**

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**THE COURT**:  I AGREE.  THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO – THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

**MS. CHATURVEDI**:  RIGHT.  AND WE DON'T HAVE ANY SUCH INFORMATION.  AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION.  THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

**THE COURT**:  YES.

(Trans. 9-27-00, pages 200-202).

However, as argued herein, the Government knew that its statement that there was no information that others had motive to kill Smith was not true.  The trial court also had

52

been provided information that there were others that had motive to kill Smith and did not order the Government to provide this information to the defense.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by the trial court on April 6, 1999. *See* Ex. 8. The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999. The Government alleged in the *Ex Parte* Notice that the, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.

As the trial court recognized in its exchange with the Government on September 27, 2000, this information would be material that must be provided to the defense pursuant to *Brady*. **(Oral argument, September 27, 2000, at 127: 10-13)** Yet, the trial court after having recognized that the information concerning others, not only having a motive to murder Smith, but information that Chappell and Hawkins had in fact murdered Smith did not require the Government to turn this information over to the defense. This was an abuse of discretion on the part of the trial court. This information directly contradicted the theory upon which the Government relied upon in its motion to admit, pursuant to Federal Rule of Evidence 804(b)(6) the statements of Smith.

53

It was the Government's theory that Carson had murdered Smith at the request of Sweeney. Yet the information in possession of the trial court was that the Government believed that Chappell and Hawkins had murdered Smith and Carson had not murdered Smith.

Moreover the Government's belief that Chappell and Hawkins had killed Smith directly contradicts Montgomery who testified at trial that Carson had murdered Smith.

The trial court when addressing the defendants' lawyers' concerns about the change of the locations of the defendants, stated, in part, that "I have reviewed the Government's *in camera* submission as to the reasons for the dispersions of the defendants to various points of detention, and I am satisfied that the order was eminently justified." (Trans. 5-21-99, page 8) The trial court went on the state that "Their conditions of detention they largely brought on themselves." (Trans. 5-21-99, page 9)

It seems strange that this information, which the trial court found sufficient to ratify the Government's decision to move the defendants, it did not find important enough to order the Government to turn over to the defense. The only explanation is that the trial court abused its discretion by failing to order that this information be produced to the defense as required by *Brady*. The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

In addition, the Government submitted to the trial court, for *in camera* review, of handwritten notes relating to a law enforcement interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson. *See* Ex. 7, page 1.

54

As described earlier, the notes of that interview state, in part:

"Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother]  Wit. did not hear Draper return to advise Gooch he had killed Keith.  He just heard Gooch give the order.
The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."
Ex. 7, page 1.

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother.  Once more the trial court did not order this information to be turned over to the defense after the trial court had reviewed it *in camera.*

As argued herein, the trial court recognized that information that people other than the defendants in this case had a motive to kill Smith was *Brady* and as such had to be turned over to the defense, yet when the trial court was presented this information, instead of ordering the government to provide it to the defense, the Court simply had it marked as Court Exhibit number 4 and made part of the record under seal.

The significance of trial court's failure to order the Government to produce this material, detailing the motive of Petey Johnson to kill Smith becomes more significant when on looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay.  And you questioned him not just as a witness, but also as a possible suspect?
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed.  So he may have called somebody to alert them that "Butchie" was there. (Tr. 5-30-01 (AM), pages 19-20).

55

App 1349

The abuse of discretion on the part of the trial court deprived the defense of evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder, also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the trial court, an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again, had the trial court ordered the Government disclosed the information in its possession that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

Moreover, the information contained within this material would have also refuted any inference or suggestion that Petey Johnson had contacted Carson and told him where Smith was so that Carson could murder Smith. It seems unlikely that Petey Johnson would have assisted Carson and Sweeney in killing Smith when Petey Johnson believed that Sweeney had killed his brother.

This is the impression the Government attempted to create when Agent Lisi testified that "So [Petey Johnson] may have called somebody to alert them that "Butchie" was there."

The information contained within the handwritten notes relating to a law enforcement interview of Andre Murray could have been used to cross-examine Agent Lisi that Johnson, who was present at the time and place that Smith was murdered, would

56

have been unlikely to assist Sweeney and Carson in killing Smith since Johnson had his own motive to want to kill Smith.

The trial court abused its discretion in this case by failing to order the Government to produce the information, which the trial court had already concluded would constitute information required to be produced to the defense under *Brady,* contained within the handwritten notes relating to a law enforcement interview of Andre Murray, and the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999. If the defense had had this information it could have used it in its opposition to the Government's motion to admit Smith's statement pursuant to Federal Rule of Evidence 804(b)(6), to contradict the testimony of Montgomery and Agent Lisi.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceeding would have been different. But this error combined with the other errors in this case makes the probability of a different result even stronger that the results of the proceeding would have been different.

**11. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO
*BRADY, GIGLIO*, AND THE JENCKS ACT MATERIAL REQUIRES
SWEENEY'S CONVICTIONS BE VACATED**

As argued herein, Sweeney was deprived of access to materials to which he was entitled pursuant to *Brady, Giglio*, and the Jencks Act.

To show that one is entitled to relief for such depravation:

"A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable

57

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."
*Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Had Sweeney been able to present to the jury and to investigate the *Brady, Giglio*, and the Jencks Act material that was withheld from him, the Government's theory of the case would have been undermined, and some of its important witnesses impeached. In addition, the defense would have had arguments with which to oppose the Government's motion to admit Robert "Butchie" Smith's statements through Agent Lisi and Montgomery.

Further, the nondisclosure to the defendant of all the suppressed information, to which he was entitled, including the information contained within the sealed court exhibits concerning statements made by the Government's witnesses as set forth herein, could have been used by the defense to demonstrate that the Government's agents were so intent on building a case against the trial defendants that the Government agents communicated this, either consciously or unconsciously, to the people that they were interviewing resulting in statements incriminating the trial defendants. The defense could have argued to the jury that this resulted in those being interviewed changing the facts and the participants in crimes in order to implicate the trial defendants in crimes and thereby please the Government.

12. **THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY* AND THE GOVERNMENT'S *NAPUE* VIOLATION REQUIRES SWEENEY'S CONVICTION BE VACATED**

As argued herein Sweeny was deprived of information that should have been turned over to the defense as *Brady* material. The Government, with regard to Watson, was guilty of a *Napue* violation as argued supra pages **11-25,** above. Assuming arguendo

58

App 1352

that each of the violations standing alone is not sufficient to grant Sweeney relief the

violations taken together do require that Sweeny's convictions be vacated.

The court should take the following approach in dealing with these violations:

> The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley,* 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes v. Brown,* 399 F.3d 972, 985 (9th Cir. 2005) (internal quotation marks omitted).[12] We have gone so far as to say that "`if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Id* at 978 (quoting *United States v. Wallach,* 935 f.2d 445, 456 (2nd Cir. 1991)). Nonetheless, *Napue* does not create a "*per se* rule of reversal." *Id.* at 984. Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge.  The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes,* 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd,* 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir. 2008)

As has been argued herein Sweeney was deprived of substantial *Brady*

material all of which was material to his guilt and he was also subject to a *Napue*

59

violation. The inability of the defense to attack Watson's credibility had a direct effect on the verdict in this case. Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### B. SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has been deprived of his Sixth Amendment right to effective assistance if "counsel's representation fell below an objective standard of reasonableness" and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under *Strickland*, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case;" rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, "[w]hen a defendant challenges a conviction; the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. As detailed below, counsel was constitutionally ineffective at various stages of trial, as well as on appeal, and in various ways when representing Petitioner Sweeney.[16]

### 1. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No.

---

[16] Mr. Sweeney was represented both at trial and on appeal, by Steven R. Kiersh, Esq.

App 1354

751872].  In their motion, counsel sought access to sealed portions of the trial record in order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.  The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion.  *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal.  *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984).  Counsel was unable to adequately challenge the suppression of the sealed material on appeal because counsel needed access to the sealed portion of the trial record in order to establish the materiality of the undisclosed evidence – an essential element of the prospective claim on appeal.  *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's claim still prevails, as the prejudice here is clear.  Had appellate counsel raised this critical issue on appeal, the Court of Appeals would have reviewed the material *in camera* and found that *Brady* and Jencks Act violations had indeed occurred, and were widespread.  *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196] ("appellants must identify [in their appellate brief] the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed

App 1355

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact occurred."); 18 U.S.C. § 3500(c); *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992).  As detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to the erroneous rulings.   Had the Court of Appeals reviewed the material, and discovered the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error was more likely than not to result in reversal on appeal.  Appellate counsel's failure to challenge this critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466 U.S. at 687.[17]

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 2. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK REVIEW BY THE TRIAL COURT OF THEODORE WATSON'S GREENBELT FILE.

Assuming arguendo that the Government did not improperly suppress Watson's Greenbelt file, Sweeney's trial counsel was constitutionally deficient in failing to ask the court to review said file.

During the cross examination of Watson, Kiersh attempted to impeach Watson by attempting to discover the reasons why the Government failed to a give Watson a §5K1.1

---

[17] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material.  Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material.  No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court.  Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material.  *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998).  The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

App 1356

letter. Watson explained the failure of the government to provide him with a §5K1.1 letter by stating that Ms. Wilkerson, the Assistant U.S. Attorney assigned to his case, simply did not like him. (Tr. 2-12-01 (AM), pp. 19-21).

Pressed further on this point Watson explained that Ms. Wilkerson's disliked him because he had pointed out, in front of another U.S. Attorney, that Wilkerson had failed to advise another Assistant U.S. Attorney about information that Watson had, which failure by Wilkerson had caused that other U.S. Attorney to offer lenient plea deals to the defendants in that case. (Tr. 2-12-01 (AM), p. 44).

Kiersh, and for that matter the defense as a whole, lacking any information with which to contradict Watson, during cross-examination was forced to accept Watson's answers to his questions on cross-examination.

A co-defendant's attorney apparently dissatisfied with the cross-examination of Watson, at the conclusion of the testimony on February 12, 2001, asked that the Government review Watson's Greenbelt file to determine if there was any discoverable material contained within said file concerning Watson, as set forth below.

> **MR. DAVIS**: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.
>
> **THE COURT**: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, *BRADY* MATERIAL IN THEIR FILE. OTHER THAN THAT --
>
> **MR. DAVIS**: THANK YOU, YOUR HONOR.
>
> **THE COURT**: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION. OKAY?

(Tr. 2-12-01 (AM), p. 78).

63

App 1357

In response to the court's direction, the Government not only called the U.S. Attorney's office in Greenbelt, the Government obtained and reviewed Watson's Greenbelt file.

The Government brought Watson's Greenbelt file to court and represented to both the court and the defense, that Watson's Greenbelt file did not contain anything that even " . . . suggests any *Brady* or Jencks material in the file." Following the Government's representations the following took place:

> **THE COURT**:  YOU MEAN THE FILE FROM GREENBELT?
>
> **\* \* \***
>
> **THE COURT**:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?
>
> **MR. KIERSH**:  YES, YOUR HONOR.
>
> **THE COURT**:  ALL RIGHT.
>
> **MR. KIERSH**:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.
>
> **THE COURT**:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?
>
> **THE DEPUTY CLERK**:  I BELIEVE SO, YOUR HONOR.
>
> **MR. ZUCKER**:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --
>
> **THE COURT**:  WAIT A MINUTE.
>
> **THE DEPUTY CLERK**:  NUMBER 5, YOUR HONOR.
>
> **THE COURT**:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  **I DO NOT INTEND TO REVIEW IT IN CAMERA.**

64

**MR. ZUCKER**:  THAT WOULD BE MY REQUEST.

**THE COURT**:  ALL RIGHT.  ARE WE READY FOR THE JURY?

(Tr. 2-13-01(AM), pp. 6-7).

Kiersh, instead of asking the trial court to review the Greenbelt file to determine if it contained any *Brady, Giglio* or *Jencks* material just asked that the file be made part of the record and placed under seal.  One wonders what was the point of having Watson's file made part of the record in the case if no one, other than the Government, was going to review the file.

The Government's production of Watson's Greenbelt file is, in and of its self, curious as the court simply asked the Government to call the U.S. Attorney's office in Greenbelt to determine if the filed contained anything that might be characterized as *Brady.*  The court further stated that this was the extant of the Government's obligation.

The only reason for the Government to have produced Watson's Greenbelt file would be if the Government were unsure if the file contained *Brady* material.

Another case discussing the obligations of the Government to produce material to the defense stated:

> Although the notes are not subject to disclosure under the Jencks Act, fundamentals of due process require the government to produce them if the evidence they contain is exculpatory or would be of value in impeaching government witnesses. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). Uncertain whether the notes were exculpatory or of impeachment value, the government properly submitted them to the district court for *in camera* inspection. *Pennsylvania v. Ritchie,* 480 U.S. 39, 58-62, 107 S.Ct. 989, 1002-03, 94 L.Ed.2d 40 (1987). *United States v. Mora,* 994 F.2d 1129, 1139 (5th Cir. 1993).

App 1359

Therefore the only reason for the Government would have produced Watson's Greenbelt file, to the court, was if the Government was uncertain whether or not it contained *Brady* or *Giglio*. But there was no way the Government could have been uncertain as the information was without doubt *Brady* and *Giglio*.

As argued herein, Watson's Greenbelt file contained *Brady* and *Giglio* material.

Sweeney suffered prejudice as a direct result of his trial counsel failing to request that the trial court review Watson's Greenbelt file.

The material contained within Watson's Greenbelt file would have directly contradicted Watson's claims that the reason he was not given a §5K1.1 letter was the result of personal animus on the part of the Assistant U.S. Attorney and would have shown instead that it was the result of Watson lying to the Government.

Defense counsel's failure to seek review by the trial court of the Greenbelt file, which review would have resulted in the *Brady* and *Giglio* material contained therein being disclosed to the defense, permitted Watson to maintain his version of events during cross examination. As a result of defense counsel not having the material in the Greenbelt file, the jury instead of seeing Watson impeached as a liar, willing to say anything to help himself, the jury saw Watson maintain his version of events, and his credibility, in the face of cross-examination by several lawyers unable to contradict his claims. (For more details see supra pages 11-24 and Exhibit 2 (Watson's Greenbelt file))

Moreover, defense counsel, by failing to request that the trial court review Watson's Greenbelt file foreclosed the possibility of having the file reviewed on appeal, as defense counsel agreed with the trial court that Watson's Greenbelt file did not need to be reviewed by the court.

App 1360

Tacit recognition of the inability to obtain appellate review of the Greenbelt file is in the omission of any reference to Watson, much less Watson's Greenbelt file, in the Appellate brief filed in this case.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 3. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO JAMES MONTGOMERY

In § 10, of pages 13-15, of appellate counsel's Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record, which was denied by the D.C. Circuit, counsel argued that the trial court's ruling was erroneous with regard to the material the court sealed relating to Montgomery. The motion argued that the trial court's ruling that the material it sealed was not *Brady, Giglio*, or Jencks material was erroneous. Appellate counsel further argued that F.B.I. Special Agent Lisi's notes contained *Brady* or Jencks material.

Now that Petitioner Sweeney has access to the material that the trial court sealed with regard to James Montgomery, he is able to use that material to demonstrate the prejudice that he suffered as a result of his appellate counsel failing to seek appellate review of the trial court's holding in his appellate brief as instructed by the D.C. Circuit in its order denying the motion to unseal.

The material sealed by the trial court contains impeachment evidence related to the murder of Timothy Benton. Agent Lisi's handwritten notes reveal that Montgomery described the murder of Benton, and identified Carson and Proctor as the perpetrators. The notes state as follows:

1994 Chin [Carson] borrowed Grey Cadillac

67

Said he 12 Poo-Poo [Proctor] killed Tim [Benton] in it.
Tim owed Poo-Poo $
Chin was driving
Poo-Poo shot Tim from
Behind, he just sat there like he was DAZED

Ex. 9 (Agent Lisi's Notes of James Montgomery Interview).

Critically, it was Maurice Proctor and James Montgomery who were charged with the murder of Timothy Benton. What Montgomery did in his interview was substitute Carson for himself. The probative value of Montgomery's statement was priceless for its impeachment value. Defense counsel could have utilized that materially false and misleading narrative, contained within the Agent's notes, to further support the argument that Montgomery was not only a liar, but an incorrigible liar. *See* Tr. 3/15/01 (AM), pp. 10-13.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

## 4. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO CHARLES BENDER

Appellate counsel's failure to seek appellate review of the trial court's ruling with regard to the sealed material relating to Charles Bender constituted ineffective assistance. At trial counsel wanted to know whether Bender's testimony was consistent with his prior statements to the Government. (Tr. 2/5/2001, AM, page 84) The trial court ruled that Bender's testimony was consistent with the information in the 302 reports, and denied the defense access to this material.

Bender's prior statements to the Government have now been provided to the defense and this material reveals Bender's prior inconsistent statements. Bender had

App 1362

earlier told the Government that Jerome Martin had confessed to Bender that Martin had killed Anthony Fortune. Exhibit 5 (Bender's 302) This material is *Brady* Material and is exculpatory as to co-defendant Carson, who was charged with the murder of Fortune. This would also have benefited Sweeney in that he and Carson were accused by the Government of having been involved together in other murders.

If appellate counsel had raised the foregoing, and a proper review of Murry's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. The cumulative effect of all the errors, raised before and after this argument, makes it more likely that there is a reasonable probability that the outcome of the appellate proceedings would have been different.

## 5. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ARTHUR RICE

Appellate counsel's failure to seek appellate review of the trial court's ruling with regard to the sealed material relating to Arthur Rice constituted ineffective assistance. At trial, the Court had reviewed the FBI 302 pertaining to Arthur Rice dated January 27, 1999, and stated that it contained no information that would permit it to be characterize as *Brady* material, and that it was clearly not Jencks material. (Tr. 4/24/01 (PM), p. 3). **The trial court failed to state a reason why the 302 did not constitute a Jencks statement and information that should NOT be disclosed to defense counsel.**

If appellate counsel had raised the foregoing, and a proper review of Rice's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion. The cumulative effect of all the errors is such that there is a reasonable probability that, had the evidence not been sealed and instead released to the defense, the results of the proceedings would have been different.

Arthur Rice was a jailhouse witness who was allegedly an associate of the defendants. Even though Rice did not testify as to who committed the murder of Leonard "Slick" Hyson, and Maurice Hallman, the previously sealed FBI 302 reveals that Rice told Agents Vincent Lisi and Kevin White, in the presence of AUSA Kenneth Wainstein, that defendants Martin and Carson killed Hyson and Hallman. *See* Ex. 6 (Arthur Rice 302 at p. 5).

The foregoing contradicts the government's theory of prosecution that Carson and James Montgomery were the individuals who killed Hallman and Hyson. Montgomery also testified, corroborating the government's theory of prosecution, placing himself as one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM), pp. 55-62).

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 6. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ANDRE MURRAY

As with all of the other materials place under seal by the trial court in this case Petitioner Sweeney's appellate counsel failed to include a request to have the appellate court review the rulings of the trial court which sealed the material.

70

For instant, in the notes from one of Andre Murray's interview, he stated Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for killing Petey Johnson's brother, Keith Johnson. Ex. 7, Andre Murray notes, p. 1, Sweeney was charged with the murder of Keith Johnson, which might have been supported by Murray's notes, but with overwhelming contradiction in the government's case, this would have created reasonable doubt with the murder of Keith Johnson. One of the facts that can't be ignored, is that the main evidence against Sweeney last Smith's statements testified to by Agent Lisi, and these notes would have been helpful to make such testimony not credible, or admissible at all.

During trial, Montgomery testified that he and Carson killed Hallman and Hyson, and prior to that, Hallman had a shoot-out with some New Yorkers. Andre Murray's previously sealed notes of his interview with law enforcement, reveal that Murray stated Jaki "Boy" Burks had some New Yorkers killed Hallman and Hyson. This contradicts Montgomery's testimony regarding who killed Hallman and Hyson, while at the same time; Montgomery's testimony corroborates Murray's statement because Montgomery was fully aware that Hallman had a shoot-out with some New Yorkers. (*See* Ex. 7, page 2 of handwritten notes of a law enforcement interview of Arthur Murray Regarding Hallman and Hyson Murder). Once again, all this contradiction might have left doubt in the jury's minds, towards the credibility of Montgomery, who was the government's key witness.

**7. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AT TRIAL AND FOR NOT CHALLENGING ON APPEAL THE TRIAL COURT'S IMPROPER *IN CAMERA* PROCEDURE USED WITH RESPECT TO THE SEALED MATERIAL**

71

Counsel for Petitioner Sweeney was ineffective for not objecting at trial and for not challenging on appeal the improper *in camera* procedure used by the trial court with respect to the material that the court reviewed and then placed under seal. Throughout the trial, the Court reviewed material submitted to it by the Government *ex parte* and under seal. The D.C. Circuit has recognized that "*in camera, ex parte* submissions 'generally deprive one party to a proceeding of a full opportunity to be heard on an issue,' and thus should only be used where a compelling interest exists." In re *Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998) (*citing* In re *John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In re *John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)). Further, in *In re Sealed Case*, the D.C. Circuit instructed that once the compelling interest in keeping the material secret has been demonstrated, the proper procedure for conducting *in camera, ex parte* proceedings includes keeping a transcribed record of what transpired in any *in camera* proceeding, in order to preserve the excluded party's ability to contest decisions made on the basis of the sealed material.

At trial in this case, although the trial court viewed the sealed *ex parte Brady* evidence submitted by the Government *in camera*, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material, and further, failed to keep a transcribed record of the *in camera* proceedings. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence,

72

App 1366

and rendered the trial fundamentally unfair.  Accordingly, counsel should have raised this issue on appeal.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

**8. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CALL EXPERT WITNESS AT TRIAL**

At the outset of this case, Petitioner Sweeney and his immediate family advised trial counsel that Petitioner Sweeney had been diagnosed with Tourette Syndrome ("TS").  Tourette syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics.  Tics often become more severe with excitement or anxiety and lessen during calm, focused activity.  *See* Tourette Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke at the National Institute of Health,

http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm  (last visited February 25, 15).

In preparation for trial, trial counsel retained expert witness Jonathan Pincus, M.D., a distinguished professor in the field of neurology.  Dr. Pincus has been qualified as an expert and testified on numerous occasions, in state and federal courts.  Dr. Pincus reviewed all of Petitioner Sweeney's available medical records, and on December 10, 1999, conducted a clinical evaluation of Petitioner Sweeney, during which he determined that Petitioner Sweeney suffers from Tourette Syndrome.  At trial, Dr. Pincus would have explained the nature and symptoms of Tourette Syndrome to the jury, and described the individual characteristics in Petitioner Sweeney's case.  Further, Dr. Pincus would have

73

App 1367

told the jury that Petitioner Sweeney's tic symptoms during trial would typically be less

pronounced than those displayed by him five to ten years prior. Most importantly, Dr.

Pincus would have testified that in his opinion, a high-stress event (such as a violent

incident) would typically trigger the display of more pronounced tic symptoms in

Petitioner Sweeney. *See* Ex. 10 (Dr. Pincus Affidavit).

This testimony was critical to Petitioner Sweeney's defense, as it would have

served as exculpatory evidence with regard to the triple murder of Alonzo Gaskins,

Darnell Mack, and Melody Anderson, in Temple Hills, Maryland.[18] Dr. Pincus'

testimony would have corroborated the testimony of several other witnesses who testified

that Sweeney could be easily identified by his disorder. James Montgomery, who was

allegedly with Petitioner Sweeney on the night of the murder, testified that Sweeney's

T.S. was highly active and noticeable that night. (Tr. 3/14/01 (AM) at p. 45; 3/14/01

(PM) at pp. 74-77; 3/15/01 (PM) at p. 81). Dorene Key also testified that she was aware

for years that Petitioner Sweeney has T.S., and that his symptoms are noticeable. (Tr.

4/23/01 (PM) at p. 50). Dwight Deloach, the arresting officer in the triple murder, also

testified that Petitioner Sweeney's T.S. symptoms were noticeable. (Tr. 4/24/01 (AM) at

pp. 23-4). Anthony Pryor, the alleged victim of a kidnapping and attempted murder,

testified that he was fully aware of Petitioner Sweeney's T.S., and that if Sweeney had

been one of the perpetrators, Pryor would have recognized him by his T.S. symptoms.

(Tr. 6/11/01 (AM) at p. 25). Finally, Shaheem Johnson testified that even though he did

---

[18] As described *supra*, it was clear from the record that the Government's case against Petitioner Sweeney was weak: the credibility of nearly all of their witnesses was impeached by their admissions of prior commissions of perjury, or providing false statements to law enforcement. Further, their testimony often conflicted with that given by other witnesses, as well as with other evidence.

App 1368

not know Petitioner Sweeney personally, Sweeney was easily recognizable because of his disorder. (Tr. 6/12/01 (PM) at pp. 68-9).

Critically, the witness to the triple murder, Cinama Hawkins, testified that neither of the assailants displayed any of the physical or verbal tics that are typical of Tourette Syndrome.[19] (Tr. 4/2/01 (AM) at p. 75; 4/2/01 (PM) at p. 7). There is a reasonable probability, given Ms. Hawkins' description of the triple murder assailants, that Dr. Pincus' testimony would have provided the jury with reasonable doubt that Petitioner Sweeney committed the triple murder. Accordingly, trial counsel's failure to call Dr. Pincus at trial rendered his assistance constitutionally ineffective under *Strickland*. *See Strickland*, 466 U.S. at 695.

### 9. SWEENEY'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN CO-COUNSEL PURSUANT TO THE TRIAL COURT'S ORDER

Petitioner Sweeney, along with co-defendant Carson, were both indicated for capital crimes in this case. They were, therefore, pursuant to 18 U.S.C. § 3005, each appointed two attorneys to represent them in this case.

18 U.S.C. § 3005 states in part:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (2000).

---

[19] The exculpatory nature of Dr. Pincus' testimony would have been bolstered by the testimony that in Ms. Hawkins' original description of the assailants, which she gave to the investigating officer at the scene, she described both men as about six feet tall. (Trial Tr. 6/12/01 at pp. 60-61, 65, 70-72). Mr. Sweeney is not nearly that tall.

App 1369

Not only was Sweeney entitled to have two attorneys represent him as a result of the indictment in this case, but also the trial court was obligated to inform him of this right.

In *Smith v. United States,* 353 F2d 838 (D.C. Circuit 1965), the defendant,

> Cunningham contends that, in any event, the trial court should have advised him of his right under 18 U.S.C. § 3005 to have a second counsel appointed. An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith v. United States,* 353 F2d 838, 846-47, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

Sweeney was, however, never advised of his right to have two attorneys represent him in this case by the trial court. At Petitioner Sweeney's arraignment on October 2, 1998, the Court responded to a request, by Sweeney's then-attorney Mr. O'Toole, to have the court appoint a particular attorney to represent Sweeney along with Mr. O'Toole. The Court stated, "I have asked Mr. Kramer to make an appointment of the second counsel to assist you, and Mr. Kramer will make that decision." (Tr. 10/2/1998, pp. 11-12).

Thereafter at the conclusion of the October 2, 1998, arraignment the trial court stated ". . . I note the presence of Mr. Kramer here in court and the obligation he has just incurred to make at least two appointments." (Tr. 10/2/1998, p. 20).

Even though the trial court appointed two attorneys to represent Sweeney, the court at no point ever advised or otherwise informed Sweeny of his right to be represented by two attorneys, pursuant to 18 U.S.C. § 3005.

76

App 1370

Eventually Steven Kiersh and Paul DeWolfe were appointed to represent Sweeney in this case before the Attorney General had decided whether or not to seek the death penalty against Sweeney.

By December 1999, the Attorney General had chosen not to seek the death penalty against Sweeney and Carson.  During a hearing on December 16, 1999, the issue of the continued representation of Sweeney and Carson by two attorneys each was addressed by the trial court.

At this hearing the trial court stated "Well, one of the consequences of the decision made by the Attorney General not to seek the death penalty is that this case is no longer a capital case, and the law no longer authorizes two counsels for any defendant. * * *" (Tr. 12/19/99, pp. 12-13).

It was error for the trial court to find that the decision of the Attorney General not to seek the death penalty in this case, ended Sweeny's entitlement to two attorneys.  As the clear language of 18 U.S.C. § 3005 states, the entitlement to two attorneys is determined at the time of indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in the case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime* ..." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001)

App 1371

Mr. Kiersh, instead of arguing that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys, simply remained silent on this issue at the hearing.

Moreover, the trial court's misstatement of the law that Sweeney was no longer entitled to two attorneys deprived him of his rights pursuant to 18 U.S.C. § 3005, and, therefore, prejudice should be presumed from the trial court's error. *See Smith v. United States,* 353 F2d 838, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

One of the attorneys for Carson did, however, address the issue of the continued representation of Carson by two attorneys, but instead of arguing that this right attached upon indictment for a capital crime, pursuant to 18 U.S.C. § 3005, argued that:

> Your Honor, in this case we are talking about a ten-year conspiracy with anywhere from five to eight homicides and numerous other complicated violent charges against individual defendants.
>
> This is as complex a case as I think we can run into. It may not be Microsoft, but as a criminal case goes, it doesn't get too much more complicated than this in the United States District Court here. And I think that this court can look at this case and decide that it merits two attorneys for some of the defendants, particularly the ones who they were considering capital defendants, because of the number and the nature and the time period of the charges against them. And I would ask the court to do so . . .."

(Tr. 12/19/99, p. 13-14).

The trial court did not rule on the issue of continued representation by two attorneys for Carson and Sweeney at that time but asked that additional information be submitted addressing this issue.

Thereafter by way of a letter, filed with the trial court on January 3, 2000, written by Carson's counsel and signed by said attorney on behalf of Sweeney's counsel, set out

78

the justification for the continued need for two attorneys to represent both Sweeney and Carson.  The main ground advanced in the January 3, 2000, letter was the "extremely difficult" nature of the case as it pertained to Carson and Sweeney.  This is simply arguing the rationale that supports the need for 18 U.S.C. §3005.  As "[t]he provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower.  *See Crum v. Hunter,* 151 F.2d 359 (10th Cir. 1945) *cert. denied*, 325 U.S. 850, 66 S.Ct 1117, 90 L.Ed. 1623 (1946); *see also Smith,* 353 F.2d at 846-47.

Another justification contained within the letter for the continued representation of Sweeney and Carson by two attorneys each, was that:

> Dismissal of the capital attorneys is not likely to result in significant cost savings.  Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them.  If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel.

Ex. 11 (December 28, 1999, Letter, at p. 2).

The trial court, after considering the matter agreed and by way of an order, dated January 4, 2000, determined that Sweeny's and Carson's cases were " . . . 'extremely difficult cases where . . . in the interest of justice' appointment of co-counsel is appropriate."  (Order (TPJ), dated January 4, 2000 [#252]).

Sometime thereafter, Paul DeWolfe, one of Sweeney's attorneys, was appointed as the Public Defender for Maryland, and withdrew as co-counsel for Sweeney.

On September 8, 2000, (a little over two months before jury selection was to begin) the trial court and Sweeney's remaining attorney all believed, that the interests of

justice required that Sweeney be represented by two attorneys, otherwise why would the

trial court have appointed attorney Leonard L. Long, Jr., to replace Mr. DeWolfe, as one

of Sweeney's attorneys.

The Government, on October 24, 2000, filed, under seal, a motion to disqualify

attorney Long, as one of Sweeney's attorneys. At a hearing on November 13, 2000, (jury

selection began in this case on November 15, 2000) the trial court granted the

government's motion and removed attorney Long as co-counsel for Sweeney. (Tr.

11/13/00, p. 13).

After the trial court disqualified Long, at the November 13, 2000, hearing,

Sweeney's remaining attorney Mr. Kiersh argued that:

> **Mr. Kiersh**: You Honor, if I can make some other related representations, not with respect to Mr. Long, but **this creates a very significant prejudice to me and my ability to go forward**. I am not moving for a continuance right now, but I am just thinking this through.
>
> When we were in court at the motions hearing back in September, the Government requested that an agent be allowed to sit at their table. I asked the court if my investigator, who has been with me on this case working around the clock for the past two years on this case – if he could be seated with me at the table. And the court said, "Well, that is a problem because if I allow you to do it, then everyone else is going to ask to have their investigators."
>
> I have gone to each defense attorney individually and said, "Would you waive any request to have your investigators to be present?" And they all have. They all said they don't want their investigators to be present. I am the only one making that request. And if Mr. Long is now being removed from the case, I am terribly handcuffed on what I can do.
>
> **The Court**: Why?
>
> **Mr. Kiersh**: Because so much of this case is directed at Mr. Sweeney. We have cabinets and cabinets filled with information. That's why Mr. Long came into it. Having my investigator there, who knows this case inside out, would be not only of assistance, but necessary, given the amount of evidence the Government is going to be directed towards Mr. Sweeney and what I have to do to be able to sit there and confront it. I am having a very able co-counsel being

removed from the case, and replacing him with my investigator doesn't seem to me to prejudice anyone.

**The Court**: Well, there may be an occasion at which it would be appropriate for you to have your investigator there. I don't think your investigator has to be there for the duration of the case and certainly not at this stage of the case.

* * *

**Mr. Kiersh**: Very well. And then I would also note for the record on behalf of Mr. Sweeney our objection to Mr. Long being disqualified from the case.

(Tr. 11/13/2000, pp. 13-15) (emphasis added).

Following the removal of Mr. Long as co-counsel for Sweeney and with jury selection set to begin in two days, Mr. Kiersh did not seek a continuance of the trial of this case. This is particularly surprising in that Kiersh had told the trial court that the removal of attorney Long created "**a very significant prejudice to me and my ability to go forward.**" (Tr. 11/13/2000, pp. 13-15) (emphasis added). One would have thought he would have been more concerned about the prejudice to Mr. Sweeney, but maybe that is what he meant.

Mr. Kiersh had for approximately eleven months before the removal of Mr. Long worked with another lawyer on Sweeney's case. Yet two days before jury selection begins Kiersh is now representing Sweeney alone, and instead of asking the court to appoint another attorney to assist him, in a case that the trial court had already determined that as a result of the extreme difficulty of the case the interests of justice required that Sweeney be represented by two attorneys.

Moreover, during the hearing on the removal of Mr. Long, Mr. Kiersh failed to argue that Sweeny was entitled to two attorneys pursuant to 18 U.S.C. § 3005, as Sweeney had been indicted for a capital offense.

81

In addition, the trial court did not advise Sweeney, at the time that it removed Mr. Long, of Sweeney's right under 18 U.S.C. § 3005 to be represented by two attorneys. *See Smith,* 353 F.2d at 846-47.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to address that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

See Affidavit of Sweeney attached hereto as Exhibit No %.

**10. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR THE FAILURE TO REQUEST A CONTINUANCE TO OBTAIN CO-COUNSEL**

While Sweeney's remaining trial counsel recognized the "**very significant prejudice"** that was caused by the trial court's removal of his co-counsel, he took no steps to remedy the prejudice that the removal of Mr. Long created. Instead of asking for a continuance and for appointment of co-counsel to assist him in an extremely difficult case which the interests of justice required that Sweeney be represented by two attorneys, he asked simply that his investigator be allowed to sit with him at counsel table and when that request was deferred by the trial court, Kiersh merely went forward with the case in spite of the prejudice that his client would suffer as a result of Mr. Kiersh having to learn and manage the "cabinets and cabinets filled with information," which was one of the reasons why the court had seen fit to appoint two attorneys to represent Sweeney in the case.

Mr. Sweeney suffered prejudice in this case by Mr. Kiersh's failure to seek a continuance to obtain co-counsel in this case. The trial court had already made a finding the case was too difficult for one attorney and that the interests of justice required that Sweeney be represented by two attorneys in this case. Kiersh himself recognized that Sweeney was prejudiced by the removal of Mr. Long, yet he failed to request a continuance or that the court conforms with its order of January 4, 2000, and appoint another attorney to replace Mr. Long.

Moreover Kiersh, by failing to request that Sweeney continued to be represented by two attorneys, as is his right under 18 U.S.C. § 3005, deprived Sweeney of this right, all of which resulted in prejudice to Sweeney.

In addition, Kiersh failed to argue at any point in the case that Sweeney's right to be represented by two attorneys attached at the time of his indictment for a capital offense and that the subsequent decision of the Attorney General not to seek the death penalty was irrelevant to his right to be represent by two attorneys.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to deal with that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

See Affidavit of Sweeney attached hereto as Exhibit No %.

**11. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO ARGUE THAT HE WAS ENTITLED TO TWO ATTORNEYS PURSUANT TO 18 U.S.C. §3005**

83

Petitioner Sweeney's attorneys should have argued at both the December 16, 1999, and at the November 13, 2000, hearings that the clear language of 18 U.S.C. §3005 states that the entitlement to two attorneys is determined at the time of the indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in a case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime...*" (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001).

Mr. Kiersh failed to argue at any point in this case that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys.

This failure resulted in Kiersh not properly advising Sweeney that he had a right to be represented by two attorneys in this case and not bringing to the trial court's attention the authority that supports the right of Sweeney to be represented by two attorneys throughout this case.

As a result of Kiersh's failure in this regard, Sweeney was forced to go to trial, in an extremely difficult case in which the interests of justice required that he be represented by two attorneys, with only one attorney. Moreover the attorney that Sweeny was forced to go to trial with had stated, two days before jury selection began, that he had suffered "a very significant prejudice" by the removal of co-counsel.

84

In sum, Petitioner Sweeney has shown that trial counsel's error clearly deprive him of a statutory right to representation by co-counsel, but he has also shown that throughout trial and on appeal, counsel's errors were so serious as to deprive Sweeney of a fair trial.  Counsel's conduct, especially as it was hampered by the removal of co-counsel on the eve of trial, so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  Accordingly, relief must be granted.

See Affidavit of Sweeney attached hereto as Exhibit No %.

**12. APPELLANT WAS INEFFECTIVE THE TRIAL COURT DENIED SWEENEY HIS RIGHT TO BE REPRESENTED BY TWO ATTORNEYS**

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys.  Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys.  Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised

App 1379

Cunningham of his rights under § 3005.  We presume prejudice
from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a result of the trial court improperly advising him that, once the Attorney General declined to pursue the death penalty against Sweeney, he lost his right to be represented by two attorneys.  Further, when the trial court removed Mr. Long, Sweeney, as a result of the trial court's previous decision, would not have known to insist on his entitlement to two attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then does not address the prejudice.

**13. APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THAT THE COURT COMMITTED PREJUDICIAL ERROR BY MISINFORMING THE PETITIONER OF HIS RIGHT TO TWO COUNSEL PURSUANT TO 18 USC 3005.**

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys.  Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys.  Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as

86

App 1380

one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of

his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005. We presume prejudice from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a

result of the trial court improperly advising him that, once the Attorney General declined

to pursue the death penalty against Sweeney, he lost his right to be represented by two

attorneys. Further, when the trial court removed Mr. Long, Sweeney, as a result of the

trial court's previous decision, would not have known to insist on his entitlement to two

attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then

does not address the prejudice.

## 14. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CUMULATIVE ERROR DOCTRINE

Assuming arguendo that no single error on the part of Sweeney's counsel denied

him effective assistance of counsel, counsel's errors, when taken as a whole, denied

Sweeney effective assistance of counsel.

From a review of the law of this circuit it does not appear that this court has

decided if the prejudice prong of the *Strickland* test for ineffective assistance of counsel

can be met as a result of the cumulative errors of counsel.

The 7th Circuit has approved of this doctrine stating:

> In order to obtain relief under *Strickland,* it is not sufficient that a petitioner can point to her attorney's deficient performance. In

87

App 1381

addition, she must be able to demonstrate that the complained of deficiency resulted in prejudice, or, as discussed above, a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland,* 466 U.S. at 694, 104 S.Ct at 2068, and was fundamentally unfair or unreliable. *Lockhart,* ___ U.S. at ___, 113 S.Ct. at 842-43. In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test. *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947 (7th Cir. 1986; *Montgomery,* 846 F2d. at 416.

*Williams v. Washington,* 59 F.3d. 673, 682 (7th Cir. 1995).

The 9th Circuit has also found that the prejudice can be found from the cumulative

errors of counsel holding that:

> We offered the cautionary comment that [i]f counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense — prejudice may result from the cumulative impact of multiple deficiencies. *Id.* Thus, the law in this Circuit is clear that where an allegation of ineffective assistance by counsel is premised on specific acts or omissions of counsel, the allegation must be buttressed by a showing of injury or prejudice to the defendant. And even where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be "cumulative" or focus on one discrete blunder in itself prejudicial.

*Ewing v. Williams,* 596 F.2d 391, 395-396 (9th Cir. 1979).

The 2nd Circuit has also approved of this doctrine stating that:

> Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together. *See Strickland v. Washington,* 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984). "The state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre,* 846 F.2d 862, 865 (2nd Cir. 1988). Even if Rodriguez's claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of questionable circumstances in this case, before a federal court intervenes, the state court should be given an opportunity to

88

App 1382

carefully review all of Rodriguez's claims together to determine whether collateral relief may be appropriate.

*Rodriguez v. Hoke,* 928 F.2d 534, 538 (2nd Cir. 1991).

Counsel failed to challenge on appeal the ruling of the trial court denying access to material of which Sweeney was entitled to under *Brady*, *Giglio* and the Jencks Act; failed to seek review by the trial court of Theodore Watson's Greenbelt file; failed to call an expert witness to testify concerning Sweeney's Tourette's Syndrome; failed to request the appointment of a second attorney; failed to seek a continuance after removal of co-counsel on the eve of jury selection; failed to argue that Sweeney was, by law entitled to be represented by two attorneys at trial and the other errors set forth herein. Sweeney's counsel's errors at trial and on appeal had the cumulative effect of creating a "reasonable probability" that in the absence of counsel's errors the result of the proceedings would have been different.

**15. SWEENEY HEREBY ADOPTS CODEFENDANT COATES' ISSUE AND ARGUMENTS, RAISED IN HIS 2255 MOTION AND SUPPLEMENTS THERETO WITH REGARD TO THE STACKING OF THE 18 U.S.C. § 924(c) COUNTS IN THIS CASE.**

Sweeney hereby adopts codefendant Coates' issue and arguments, raised in his 2255 motion and supplements thereto with regard to the stacking of the 18 U.S.C. § 924(c) counts in this case.

**16. SWEENEY HEREBY ADOPTS CODEFENDANT CARSON'S ARGUMENTS AND ISSUES RAISED IN HIS 2255 MOTION AND SUPPLEMENTS THERETO, IN THEIR ENTIRETY.**

Sweeney hereby adopts codefendant Carson's arguments and issues raised in his 2255 motion and supplements thereto, in their entirety.

89

App 1383

## CONCLUSION

As demonstrated above, when viewed in the light of the weakness in the Government's case against Petitioner Sweeney, given the combination of the ineffective assistance of counsel, the trial court's error, and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Petitioner Sweeney was convicted, and sentenced to multiple life sentences, by a trial that was fundamentally unfair. Accordingly, relief must be granted.

Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, Petitioner Sweeney requests that an evidentiary hearing be conducted, at which proof may be offered concerning the issues raised in his motion(s) and memorandum. After an evidentiary hearing is held, the Court should vacate Petitioner Sweeney's convictions and sentence, and grant such other relief, as it deems appropriate.

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

_____/s/_____
Shana Madigan
D.C. Bar No. 1015317
Attorney for William K. Sweeney
The Law Office of Shana Madigan
6205 Massachusetts Avenue
Bethesda, Maryland 20816
(202) 270-3989

App 1384

## CERTIFICATE OF SERVICE

I hereby certify, on this 25th day of February 2015, that a copy of the foregoing was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

91