# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America<br><br>    v.<br><br>Samuel Carson, Sean Coates,<br>Jerome Martin, Jr., and William K.<br>Sweeney,<br><br>    Defendants. | Case No. 1:98-cr-329-6-RCL |

---

## APPENDIX
in support of Defendants' Supplemental § 2255 Motion

---

## VOLUME **8** OF **9**

**§ 2255 Proceedings (Supplemental Filings – Part 2)**

Dkt. 1229 – Defendant William K. Sweeney's Supplement to Amended Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and Incorporated Memorandum of Facts and Law (October 31, 2018) ...........................................................1386

Dkt. 1233 – Defendant Jerome Martin's Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (November 21, 2018)............................................1389

Dkt. 1242 – Defendant William K. Sweeney's Motion for Discovery (November 9, 2019) ...1427

Dkt. 1273 – Defendant Samuel Carson's Second Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. § 2255 (July 1, 2020) ..........................................1433

Dkt. 1277 – Defendant William K. Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. § 2255 (July 14, 2020) .....................................................................................................................................1571

Dkt. 1280-1 – Affidavit of Jenifer Wicks (October 6, 2020)......................................................1595

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

      v.                      :         Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,      :

     Defendant.          :

## SUPPLEMENT TO DEFENDANT SWEENEY'S AMENDED SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, supplements his previously file Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law and states as follows:

## SWEENEY'S SENTENCE OF LIFE IMPRISONMENT ON COUNT ONE, IS CRUEL AND UNUSUAL PUNISHMENT AND VIOLATES THE 8TH AMENDMENT TO THE U.S. CONSTITUTION.

In Count One Sweeney was convicted of conspiracy to distribute and possess with intent to distribute a controlled dangerous substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. The jury further found that the amount of drugs was 1,000 kilograms or more of marijuana. As a result of this conviction Sweeney was sentenced to life in prison.

As the Sentencing Reform Act of 1984 abolished parole for persons convicted after November 1, 1987, Sweeny's sentence of life in prison is the equivalent to a sentence of life without parole.

Sweeney was born during 1976 and would, therefore, not have attained the age of 18 years until 1994.

The jury convicted Sweeney of being involved in a drug distribution conspiracy, which is alleged to have begun in 1988, when Sweeney would have been at most 12 years old.

For at least six years of the alleged 11 years of the conspiracy Sweeny would have been a juvenile.

That the jury made no findings as to when, any of the alleged 1,000 kilograms or more of marijuana for which Sweeny was found to be responsible for passed through the conspiracy, it only found an aggregate amount.

All, or most of the marijuana, for which Sweeny was found to be responsible, could have passed through the conspiracy while Sweeney was a minor.

Sweeny was convicted for conduct which is alleged to have begun when he was 12 years old and given a life sentence.

> This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime. *Roper,* 543 U.S., at 574, 125 S.Ct. 1183. *Graham v. Florida*, 560 U.S. 48, 75-76 (2010)

*Miller v. Alabama*, 567 U.S. 460 (2012) would expand this prohibition to include homicide as well.

Sweeny was sentenced to life in prison for a nonhomicide offense that is alleged to have occurred, at least in part, when he was a minor.

It is, therefore, cruel and unusual punishment and a violation of the 8th Amendment to the U.S. Constitution to have sentenced Sweeney to life for conducted that he is alleged to have committed as a juvenile.

The life sentence as to Count One should be vacated.

**DEFENDANT SWEENEY HEREBY ADOPTS HEREIN ALL ARGUMENTS RAISED IN CODEFENDANT'S MARTIN SUPPLEMENT TO MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 BY A PERSON IN FEDERAL CUSTODY.**

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

## CERTIFICATE OF SERVICE

I hereby certify, on this 31st day of October 2018, that a copy of the foregoing served by the court's efiling system on all counsel of records, and to:

**Pamala Satterfield, Esquire**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric Kirchman

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 98-329-2 RCL |
| | : | |
| JEROME MARTIN, JR., | : | |
| | : | |
| *Petitioner.* | : | |

## SUPPLEMENT TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255 BY A PERSON IN FEDERAL CUSTODY

The Petitioner, Jerome Martin, by and through counsel, Michael E. Lawlor, moves this Court for relief from his convictions and sentences which were obtained in violation of the United States Constitution. Mr. Martin joins in the claims made by his co-defendants to the extent they apply to him. In addition, he files this Supplement to his previously filed Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody.

## I. PROCEDURAL HISTORY

Petitioner, Jerome Martin, and codefendants Vincent Hill, Samuel Carson, William Sweeney, and Sean Coates, were initially charged on September 18, 1998, by indictment for numerous offenses including drug conspiracy, participation in a

App 1389

Racketeering Influenced and Corrupt Organization (RICO), and numerous other offenses.

On March 25, 1999, the government filed a 101-count superseding Indictment. Martin was charged with: conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (Count 1, narcotics conspiracy); racketeering influenced corrupt organization in violation of 18 U.S.C. §1962(d) (Count 2, RICO conspiracy); first-degree murder of Anthony Fortune, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 9); numerous charges relating to a shootout with police on September 10, 1991 (Counts 10-19);[1] first-degree murder of Maurice Proctor, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 20); and

---

[1]Count 10—assault with intent to kill while armed (Keith Bradley), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 11—assault with intent to kill while armed (Jimmy Thomas), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 12—assault with intent to kill while armed (Ofc. Adrian Treadwell), in violation of 22 D.C. Code §§105, 501 and 3202; Count 13—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, 505(b); Count 14—assault with intent to kill while armed (Ofc. Edward McDonald), in violation of 22 D.C. Code §§105, 501 and 3202; Count 15—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, and 505(b); Count 16—assault with intent to kill while armed (Ofc. Marc Little), in violation of 22 D.C. Code §§105, 501 and 3202; Count 17—assaulting, resisting and interfering with a police officer with a dangerous weapon (Ofc. Marc Little), in violation of 22 D.C. Code §§105, and 505(b); Count 18—assault with intent to kill while armed (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, 501 and 3202; Count 19—assaulting, resisting and interfering with a police office with a dangerous weapon (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, and 505(b).

numerous charges regarding the shooting of James Coulter (Counts 37, 38, 58, 67);[2] and several drug-related charges (Counts 84, 88, 90, 101).[3]

Trial commenced on November 15, 2000, and jury deliberations began on July 9, 2001.

The superseding indictment was retyped before submission to the jury (Dkt No. 760, filed July 2, 2001). Martin was found guilty and sentenced as follows:

| Re-typed Count | | Sentence |
|---|---|---|
| 1 | Conspiracy to distribute narcotics 1988 through March 1999 | Life concurrent w/Count 2 Fine $500,000 |
| 2 | RICO– conspiracy 1988 through March 1999 | Life concurrent w/Count 1 |
| 8 | First degree murder while armed, Aiding and abetting (August 6, 1991, Anthony Fortune) | 240 months to life consecutive to Counts 1 and 2 |

---

[2] Count 37—assault with intent to kill James Coulter, in violation of 22 D.C. Code §§501 and 3202; Count 38—attempted murder in aid of racketeering activity (James Coulter), in violation of 18 U.S.C. §1959(a)(3) & (5); Count 58—use of a firearm (assault on James Coulter), in violation of 18 U.S.C. §§2 and 924(c); Count 67—possession of a firearm during a crime of violence or dangerous offense (assault on James Coulter), in violation of 22 D.C. Code §§105 and 3204(b).

[3] Count 84—distribution of marijuana on November 15, 1995, in violation of 21 U.S.C. §841(a)(1); Count 88—distribution of marijuana on December 6, 1995, in violation of 21 U.S.C. §841(a)(1) ; Count 90—distribution of marijuana on December 13, 1995, in violation of 21 U.S.C. §841(a)(1); Count 101—possession with intent to distribute marijuana on February 1, 1996, in violation of 18 U.S.C. §2 and 21 U.S.C. §§841(a)(1) and 841(b)(1)(D).

| 9 | Assault or Impede Officer w/weapon Aiding and abetting September 10, 1991 | 40-120 months consecutive to Counts 1, 2, and 8 |
|---|---|---|
| 18 | Attempted murder VICAR (May 30, 1995, James Coulter) | 240 months concurrent |
| 31 | Use of firearm on James Coulter May 30, 1995, RICO assault | 60 months consecutive to Counts 1, 2, 8, 9 |
| 49, 53 55, 64 | Distribution of marijuana | 60 months on each of four counts concurrent with each other and all other counts |

On direct appeal, the defendants jointly argued that: the Court erred in dismissing a juror after deliberations had begun and ordering the remaining 11 jurors to continue to verdict; and the Court was biased against appellants. Martin and Carson also argued that murders charged under D.C. Code §22-2401 were mis-joined with the narcotics conspiracy and RICO conspiracy charges.[4] The defendants additionally challenged their sentences under *United States v. Booker*, 543 U.S. 220 (2005) because the guidelines were mandatory at the time they were sentenced. The United States Court of Appeals for the District of Columbia Circuit affirmed all convictions and

---

[4] Sweeney, Carson, and Coates also argued that their right to confront witnesses was violated when Agent Vincent Lisi was permitted to testify about statements made by a deceased witness; Carson and Sweeney claimed that the Court erred in refusing to admit the transcript testimony of two witnesses who had testified before a Maryland grand jury investigating the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson.

sentences. *See United States v. Carson et al.*, 455 F.3d 336 (D.C. Cir. 2006), *petition for rehearing and rehearing en banc denied.*

The United States Supreme court denied *certiorari* on February 20, 2007. *Carson et al. v. United States*, 549 U.S. 1246 (2007).

On February 18, 2008, Martin filed, *pro se*, a Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. §2255 (Dkt. No. 1021).

On June 23, 2016, undersigned counsel filed a Supplement to Motion to Vacate in Light of *Johnson v. United States*, 135 S.Ct. 2551 (2015).

## II. FACTS RELATING TO MARTIN'S CONVICTIONS

The government charged Martin and others with a large-scale narcotics and racketeering conspiracy to which it attributed numerous murders and other acts of violence. The facts underlying Martin's convictions may be grouped broadly into: events involving the drug and RICO conspiracies generally, including a shootout in which Martin and others unwittingly engaged four police officers; the murder of Anthony Fortune; and the attempted murder of James Coulter. As to the individual distributions of marijuana, Martin conceded that he sold marijuana on the four occasions alleged by the government, but contended that he sold them as an individual and was not part of any conspiracy. (Tr. 1/9/01 AM p. 33-34).

### Narcotics and RICO Conspiracy

The government claimed that from 1988 through March 1999, Vincent Hill led a conspiracy to distribute primarily marijuana, but also crack cocaine and PCP, in the 200 block of K Street, SW, and surrounding areas (Retyped Indictment p. 3-5, Dkt. No. 760). The government alleged that Hill protected his territory from other drug dealers by beating them with sticks or using firearms to settle disputes. (Dkt. No. 760. at 22-23).

The government alleged that Martin began selling marijuana in the 200 block of K Street, SW, and, in 1991, extended his activity to crack cocaine sales in the area of 37th Place, SE. (Dkt. No. 760 p. 23). Anthony Fortune, a member of a rival group from the 58th Street neighborhood, had robbed Martin and others at gunpoint. According to the government, Martin and Samuel Carson retaliated by killing Fortune. *Id.* A feud ensued between the two groups, resulting in increased violence and drive-by shootings. Martin, Carson, and others, were alleged to have engaged in a shootout on September 10, 1991, with four individuals who, unbeknownst to defendants, were police officers who happened to be in the neighborhood. *Id.* at 24.

Much of the evidence was supplied by cooperators who were complicit in the drug dealing and violence in the neighborhood. Chief among them were James Montgomery, who admitted to multiple murders in addition to drug and RICO conspiracies and was facing life without parole (Tr. 3/7/01 PM p. 74-75), and Donald

Nichols, who was also facing life in prison without the possibility of parole (Tr. 2/27/01 PM p. 83).

The government's witnesses testified that people took turns selling on the street--out of respect for each other and not because of any agreement. (Testimony of Reginald Switzer, Tr. 1/24/01 PM p. 23-24, 26; Testimony of Paul Franklin Tr. 5/2/01 PM p. 69). Hill sold most of the $50 bags of marijuana while others sold $20 bags. *Id.* at 24. Hill would tell outsiders trying to sell marijuana to leave. *Id.* Government witnesses also admitted that Martin did not answer to anyone and came and went as he pleased as far as selling marijuana. (Testimony of Paul Franklin Tr. 5/2/01 PM p. 67-68).

Martin was also charged with four counts of distribution of marijuana. Martin conceded that he was guilty of those four distributions (Tr. 1/9/01 AM p. 33; Tr. 7/2/01 PM p. 51), but maintained that he was not part of a drug conspiracy.

### Uncharged Overt Acts and Violent Crimes in Aid of Racketeering (VICAR)

The government introduced evidence of several murders that were not charged in the indictment but were included as racketeering or overt acts to the conspiracy. Martin was alleged to have encouraged Antonio Knight to shoot Curtis Edwards who was driving in a car with tinted windows and was suspected to be from 58th Street. (Dkt. No. 760 p. 35). The government alleged that Martin directed co-conspirators to kill Chrishauna Gladden, who he believed was a witness against him in a murder trial

in the Superior Court of the District of Columbia. (Dkt. No. 760 p. 24). James Montgomery testified that he and Carson sought out Gladdon to kill her and prevent her from testifying against Martin in the Curtis Edwards' murder. Montgomery testified that he saw Carson shoot and kill Gladden (Tr. 3/13/01 PM p. 38-39, 59-61). Arthur Rice testified that Carson was looking for Gladden because she was a witness against Martin in his murder case. (Tr. 4/25/01 PM p. 46-47).

### Murder of Anthony Fortune

Anthony Fortune was shot and killed on August 6, 1991. The government alleged that Martin grew up in the Southwest neighborhood with the other co-defendants. Subsequently, Martin's friend moved to 37th Place, SE, and Martin began frequenting that neighborhood and selling drugs there. (Tr. 1/8/01 PM p. 14-15). Anthony Fortune disliked Martin encroaching on his neighborhood and robbed him on one occasion. On August 6, 1991, Martin, Carson, and others were playing a craps game on the street when Fortune approached. According to the government, Carson asked Martin whether he should shoot Fortune and then shot and killed Fortune. *Id.* at 15-16.

The government's only eye-witness to the murder was Charlene Wilson. Wilson testified that on the night of Fortune's murder, she visited a friend, Regina[5] Knight, who lived in the building at the street where Fortune was shot. (Tr. 2/13/01 AM p.

[5] This witness testified that her name was "Reena Knight" Tr. 6/21/01 PM p.41).

13-14). She remembered there were approximately a dozen people in Knight's apartment, including Martin and Carson. *Id.* at 14-17. There was a discussion about disliking Fortune because he robbed people. However, she could not recall what any particular person said. *Id.* at 19-22.

Later that evening, Wilson accompanied a friend outside to wait for a ride. *Id.* at 24. Across the street, Fortune was participating in a craps game. *Id.* at 56-57. She saw a group of five people, including Carson and Martin, exit the building, *Id.* at 24. Approximately five to seven minutes later, she heard gunshots and saw Carson walking toward Fortune, shooting. *Id.* at 25; Tr. 2/13/01 PM p. 44. Fortune had robbed the craps game and was walking toward his car when he was shot. (Tr. 2/13/01 AM p. 25). After shooting Fortune, Carson ran down the street and got into a white Astro Van. According to Wilson, Martin was the driver of the van. *Id.* at 26-27. On cross-examination, Wilson clarified that she did not actually see Fortune robbing anyone at the craps game but had heard from others that Fortune had committed a robbery at the craps game. (Tr. 2/13/01 PM p. 7).

Wilson did not initially tell police that she witnessed the shooting, claiming that she feared for her safety. (Tr. 2/13/01 AM p. 31-32). Her ire was roused, however, because drug dealers refused her demand to stop putting drugs in her mailbox and she risked losing her housing. *Id.* at 31-33. It was then, months later, that she gave police information about the Fortune murder. *Id.* The government paid her approximately

$3,600 for information about the Fortune murder, *id.* at 35-37, 47, and possibly paid another $4,900 for moving expenses (Tr. 2/13/01 PM p. 33).

FBI Agent Chris Warrener testified that it was about three or four months after the FBI began paying Wilson for information, that she started talking about the Fortune shooting. (Tr. 6/14/01 PM p. 30-31). In his report documenting Wilson's statement about Fortune's murder, Warrener wrote that Wilson had *heard* about the details of Fortune's murder and did not say that she actually witnessed the shooting. *Id.* at 55. Warrener explained that it was a writing style he used to protect witnesses and that Wilson said she did witness the shooting. *Id.* at 60. Nonetheless, Warrener confirmed that no arrests were made in the Fortune murder case for many years after Wilson provided the information. *Id.* at 59.

Other government witnesses testifying about the Fortune murder were not eye-witnesses but testified about circumstantial evidence or statements allegedly made by Carson or Martin. Officer Tyrone Best testified that a day or so after learning about Fortune's murder, he saw that Martin's right hand appeared to have two hash marks which could have been made by the slide of a weapon. (Tr. 3/6/01 PM p. 70). Many witnesses testified pursuant to a plea agreement and expected to benefit from a reduced sentence in exchange for their testimony.

Donald Nichols testified that Martin told him that Fortune tried or did rob a craps game and that Martin said he shot Fortune (Tr. 2/15/01 PM p. 58-59). Nichols

was facing a sentence of up to life in prison without the possibility of parole. (Tr. 2/27/01 AM p. 83).

James Montgomery, who was facing life in prison, testified that Carson told him that Martin won most of the money at the craps game and Fortune said that Martin could not quit but had to give some of the money back. Carson whispered in Martin's ear, asking if he should kill Fortune. Carson did not say how Martin responded, but Carson retrieved a gun from his car and shot Fortune. (Tr. 3/12/01 PM p. 34-35).

Charles Bender testified that Martin said that Fortune was making motions like he was going to rob the craps game and that Martin said he punished him. Bender understood that to mean that Martin killed Fortune. (Tr. 4/4/01 AM p. 85-87). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Bender pleaded guilty to RICO conspiracy and admitted to murder, armed robbery, and narcotics distribution. He was awaiting sentencing and was hoping to be released. (Tr. 4/4/01 AM, p. 50-54).

Eugene Byars testified that, while incarcerated, he was receiving medical care at D.C. General Hospital and saw Martin there. Martin told him that Fortune was trying to take advantage of them while gambling and that Martin shot Fortune. (Tr. 4/9/01 PM p. 13-14). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Byars was facing a sentence of up to 60 years. (Tr. 4/9/01 PM, p. 41-42).

Arthur Rice testified that Fortune was from 58th Place and was nicknamed "Cookie Monster" because he would take people's property. (Tr. 4/25/01 AM p. 35-36). Rice believed for a time that Martin had shot Fortune but later found out that Carson had killed Fortune. Rice testified that he said to Carson, "man, all that time I thought it was [Martin], and come to find out it was you, man." Carson started laughing and said "well now you know." (Tr. 4/25/01 AM p. 40-41).

Reena Knight, a witness for Martin, testified that Martin was married to her niece and was a friend of her son. On the evening Fortune was shot, she recalled that Martin and others were in her apartment. (Tr. 6/21/01 PM p. 42-44). She testified that Martin was not with anyone else that evening. She did not know Carson and did not recognize a photograph of him. *Id.* at 44-46.

### *Assault with intent to kill James Coulter*

The government's theory was that Hill and Martin believed that Coulter was cooperating with law enforcement and wanted him dead. On May 30, 1995, Martin shot Coulter at Hill's behest and wounded him. (Tr. 1/8/01 PM p. 37). At trial, there were no eye-witness to the shooting and no physical evidence connecting Martin to the shooting. The government presented numerous witnesses who claimed that Hill or Martin made inculpatory statements. These witnesses expected a reduced sentence in their own cases in exchange for their testimony.

The government presented several witnesses to show that Hill thought Coulter was cooperating with police. Cindy Perkins, who was Coulter's girlfriend, testified that a few days after the shooting, Hill gestured toward her and said, "little hot bitch . . . She's hot just like her boyfriend."[6] (Tr. 1/30/01 PM p. 54-57, 62).

Donald Nichols testified that in 1995, Hill made general comments saying that Coulter was "hot." Nichols interpreted Hill to be suggesting that Coulter should be killed (Tr. 2/15/01 PM p. 62). After Coulter was shot, he heard Hill talking to Martin and say something to the effect of, "you should have used two guns, and what the fuck the gun had to jam for." *Id.* at 62. Nichols further testified that after Martin was arrested for shooting Coulter, Martin asked Nichols to take his lawyer's investigator to get a statement from Coulter. (Tr. 2/15/01 PM p. 63-64). Coulter told Nichols that he did not know who the shooter was so there was no reason to give a statement; Coulter did not want to go to court and did not want to get involved. (Tr. 2/15/01 PM p. 63-64; Tr. 2/26/01 PM p. 22-23).

Martin also asked Nichols to get Michael Floyd to testify about what he saw that night, but Floyd did not want to get involved with the FBI. *Id.* at 65. According to Nichols, Martin asked him to show Coulter and Floyd to Martin's uncle, Dino, presumably so that Dino could do some harm to Floyd. *Id.* at 65, 69. Despite the government's intimation that Martin was seeking to harm witnesses, Nichols admitted

---

[6] "Hot" was a term used to mean cooperating with police.

that Martin only wanted statements and did not ask him to harm anyone. (Tr. 2/26/01 PM p. 23). Nichols was facing a sentence of up to life without parole and was hoping for a reduction in sentence in exchange for his cooperation with the government. (Tr. 2/26/01 PM p. 83).

Eugene Byars claimed that that Martin said he started shooting Coulter at a craps game. Coulter tried to run, so Martin ran behind him and continued to shoot, but the gun jammed. (Tr. 4/9/01 PM p. 22-23). Byars testified that when he saw Martin in D.C. Jail, he jokingly said, "Creeko [Coulter], what's up?" Martin said don't play with him, he's going to kill his ass.[7] (Tr. 4/9/01 PM p. 24).

Paul Franklin testified that after Coulter had been shot, Martin asked him (Franklin) to see if Coulter and Michael Floyd were going to testify in court. Franklin testified that by telling Coulter that Martin asked if he was coming to court, Martin was sending a message to Coulter to not testify. (Tr. 5/2/01 PM p. 55). Coulter gave Franklin a phone number to give to Martin, but Martin complained that the phone number was fake. Martin then told Franklin to visit Coulter with his uncle, Dino. Franklin believed Dino wanted to see what Coulter looked like so he could kill him. (Tr. 5/2/01 PM p. 56). According to Franklin, Michael Floyd told him to tell Martin that he was not going to court. (Tr. 5/2/01 PM p. 56).

---

[7] James Coulter's nickname was "Creeko." *See* Tr. 5/22/01 AM p. 9.

Cross-examination brought out Franklin's bias against Martin. Franklin admitted that he was jealous of Martin because Martin had a relationship with his son's mother. Franklin was often teased about whether or not his son was fathered by Martin. On one occasion, Franklin punched Martin for teasing him. (Tr. 5/2/01 PM p. 60-61).

Michael Smith testified that he first met Martin in jail in 1998, three years after the Coulter shooting. Smith knew both Coulter and Michael Floyd. Martin wanted Floyd to make a statement saying that he did not know who shot Coulter because it was a person with a drawstring and had a pistol at the craps game. (Tr. 5/22/01 AM p. 17-19). Smith told Martin that he would contact Floyd but, not wanting to get involved, did not do so. *Id.* at 20-21. A week later, Martin said, "I'm fucked up at your man—I talked to your man on the phone and that bitch ass nigger hung the phone up on me and started crying, and if it wasn't for him Creeko [Coulter] would be dead, I should have hit him in his head." (Tr. 5/22/01 AM p. 22). Martin said that Floyd owed him a favor because if it wasn't for Floyd getting in the way, Coulter would be dead. (Tr. 5/22/01 AM p. 22). This contradicted Donald Nichols' testimony that Coulter was not killed because the gun jammed. Smith was facing up to 20 years of imprisonment for heroin distribution and carrying a pistol without a license. (Tr. 5/22/01 AM p. 32).

On cross examination, defense counsel sought to establish it was unlikely that Martin would speak to Smith about criminal conduct. Smith testified that he was not from the neighborhoods that Martin frequented and was not friends with Martin. They were total strangers until they had the conversations in jail. (Tr. 5/22/01 PM p. 40-43). Smith then testified that Martin "never told me he shot Creeko [Coulter]. He never said that to me, never." (Tr. 5/22/01 PM p. 42).

Smith admitted that he had in the past been convicted of numerous drug offenses. At the time of his testimony, he had been convicted of four counts of heroin distribution and was awaiting sentencing. His convictions were serious enough to keep him in jail for the rest of his life. (Tr. 5/22/01 PM p. 25-26). Nevertheless, after he testified against Martin before in grand jury, he was released and remained free while awaiting sentencing. *Id.* at 50. Despite the possibility of receiving 240 years of imprisonment, he hoped for a sentence of probation in exchange for his testimony. (Tr. 5/22/01 PM p. 31-32).

Agent Vincent Lisi testified that on June 5, 1995, he was in the 200 block of K Street with Detective Neal Trugman and Detective Steve Kirschner. (Tr. 5/23/01 AM p. 7). They saw Vincent Hill who yelled to Detective Trugman something to the effect that, "oh yeah, Truman [sic]. By the way, all your snitches are going to die." *Id.* at 8. Hill repeated, "you heard me. All your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John

Doe, whose [sic] in room 2299 . . . he shouldn't be alive right now." *Id.* Lisi testified that Hill was referring to Coulter, who had been shot and was hospitalized as "John Doe." *Id.* at 9. A few hours later, Lisi received a phone call from Coulter's girlfriend, who was very upset. As a result, the government relocated her and her family. *Id.* at 10.

James Montgomery testified that he was in jail at the time Coulter was shot. (Tr. 5/23/01 AM p. 45). After he was released in June 1995, he recalled a time when he, Coates, Carson, and Martin were sitting outside. Montgomery asked everyone, including Martin, for money, but they were all broke. (Tr. 5/24/01 PM p. 38). Martin, specifically, did not give Montgomery any money. Montgomery claimed that Martin started talking about the Coulter shooting and said, "They keep fucking with me . . . they keep trying to push it on me." (Tr. 5/23/01 *Id.* at 47). "He said that they are trying to say that he had something to do with 'Creeko' getting shot. And he was like, 'they can't prove it. I had a mask on.'" *Id.* Defense counsel cross-examined Montgomery on a critical difference in Agent Lisi's report of Montgomery's statement to law enforcement—that Martin said, "mother fucker had a mask on" (Tr. 5/24/01 PM p. 40). This was in contrast to Montgomery's trial testimony that Martin said, "I had a mask on."

Montgomery testified extensively in Martin's trial about facts the government used to establish a conspiracy and also testified about numerous acts of violence.

Montgomery himself admitted to involvement in numerous murders, including the murders of Maurice Hallman and Leonard Hyson (Tr. 3/12/01 PM p. 3). He not only admitted to several murders but also admitted to falsely accusing someone of murder to benefit himself. For example, after he escaped from a halfway house and was charged with assault on a police officer while armed, Montgomery called law enforcement and falsely accused Wayne Perry of three murders. (Tr. 3/12/01 PM p. 27-30).

## III. ARGUMENT

### A. Introduction

28 U.S.C. §2255 permits a person in federal custody to bring a motion to vacate, set aside, or correct a sentence on the grounds that: the sentence was imposed in violation of the Constitution or laws of the United States; the Court lacked jurisdiction to enter the judgment; the sentence exceeded the maximum allowed by law; or the judgment or sentence is otherwise subject to collateral review. A hearing is to be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255(b).

In this case, Martin's claims center on prosecutorial misconduct and ineffective assistance of counsel regarding the murder of Anthony Fortune and the shooting of James Coulter. Because those offenses formed the basis for his drug and RICO

conspiracy convictions, he is entitled to a new trial on the conspiracies as well as the counts related to the Fortune and Coulter incidents.

### B. The Government Withheld Evidence of Martin's Innocence in the Anthony Fortune Murder and Violated his Right to Due Process.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. Later, the Court recognized that the prosecution had a duty to disclose favorable evidence even without a defense request. *See United States v. Agurs*, 427 U.S. 97 (1976). The state's duty to disclose exculpatory evidence is to ensure that a defendant receives a fair trial. *See Brady*, 373 U.S. at 87 ("[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). *See also United States v. Bagley*, 473 U.S. 667, 675 (1985) (stating that the *Brady* rule is "based on the requirement of due process . . . [T]he prosecutor is . . . to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").

Three elements must be satisfied to prevail on a *Brady* claim:

(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.

*Strickler v. Green*, 527 U.S. 263, 280-82 (1999); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010). Favorable evidence includes evidence affecting a witness's credibility. *See United States v. Walter Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999) (stating that "[e]vidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*'s, disclosure obligation") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (stating that the prosecutor has the same duty to disclose impeachment as exculpatory evidence).

Evidence is "suppressed" even if withheld unintentionally. *See Strickler*, 527 U.S. at 288 (quoting *United States v. Agurs*, 427 U.S. 97, 110 (1976)). The prosecution must disclose the evidence in a timely manner, "to allow the defense to use the favorable material effectively in the preparation and presentation of its case . . . " *United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2009) (quoting *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976)).

Evidence is material, requiring a new trial, if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682). The Supreme Court has explained that the test is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence" in its outcome. *Kyles*, 514 U.S. at 435; *Strickler*, 427 U.S. at

290. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Kyles*, 514 U.S. at 434. This Court has held, "to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie*, 198 F.3d at 909.

When there are multiple nondisclosures, this Court must consider the cumulative effect of the nondisclosures. "The effect of each nondisclosure must not only be considered alone, but the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently material to justify a new trial." *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995) (quotations and citation omitted).

Years after the trial in this case, defense counsel Joanne Hepworth located a witness, Steven Thomas, who was an eye-witness to Anthony Fortune's murder. Thomas was interviewed by Hepworth's investigator. Thomas stated he was present at the Fortune shooting; that he knew what Martin looked like; and that the shooter was not Martin. Thomas stated that the shooter had a very dark complexion, was stocky, and taller than Martin. Thomas further stated that police officers interviewed him on the evening of the shooting and that he gave the same description of the

shooter to police. This was exculpatory information that should have been disclosed to defense counsel.

The government's theory was that Carson shot and killed Fortune at Martin's urging and left the scene in a van driven by Martin. Thomas's description of the shooter as having a very dark complexion ruled out both Martin and Carson as the shooter. This was exculpatory evidence directly encompassed by *Brady* and its progeny.

The evidence was suppressed by the government. Evidence is "suppressed" even if withheld unintentionally. "[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" *Strickler, supra*, at 288 (quoting *Agurs, supra*, at 110). Accordingly, the prosecutor is responsible for disclosing *Brady* information in police files. *See In re Sealed Case, supra*, at 896 (stating that, "prosecutors in this District are responsible for disclosing Brady information contained in MPD files, 'given the close working relationship between the Washington Metropolitan police and the U.S. Attorney'").

Thomas stated that he gave his description of the shooter to law enforcement officers on the night of the shooting. Yet defense counsel never received information about this witness or the substance of what he told police. It matters not whether it

was suppressed willfully or inadvertently—only that the government possessed this information failed to give it to Martin in time for him to use it. *See Strickler*, 527 U.S. at 288.

There is a reasonable probability that, had the government fulfilled its obligation to disclose the information, the result of the trial would have been different. Trial counsel would have interviewed Thomas and called him as a witness to testify. Charlene Wilson was the government's only eye-witness to the Fortune shooting. She testified that she saw Carson shoot Fortune and then run down the street and enter a van driven by Martin. Her view of the driver was fleeting at best. Thomas's testimony would have directly contradicted the government's theory.

As detailed further in section C, Wilson was not a credible, reliable witness. She did not report the information to the police for several months; she was paid for giving information to the police; and she testified about events as if she had witnessed them even though she had only heard about it from others.

Certainly, there is a reasonable probability of a different result. The United States Court of Appeals for the D.C. Circuit has noted the following about "reasonable probability" in the context of a *Brady* claim:

> What is a "reasonable probability"? Probability is often expressed in terms of percentages, with 100% representing certainty. We know, because the Supreme Court has told us, that a "reasonable probability" can be less than 50.01%. In other words, to reverse a conviction for a Brady violation, it does not have to be more likely than not that the

defendant would have been acquitted had the evidence been disclosed. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. We are also sure that a "reasonable probability" is somewhat greater than 1%. How much greater? Enough, the Supreme Court says, to "undermine confidence in the verdict," *id.* at 435, 115 S.Ct. 1555, which may lead us in a circle: one cannot be confident of the outcome when there is a "reasonable" probability that it may be wrong, and a "reasonable" probability is one high enough to undermine confidence in the outcome.

*Bowie*, 198 F.3d at 909.

Here, the government failed to disclose evidence critical to Martin's defense. As the D.C. Circuit recognized in *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996), the "focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." Furthermore, "we must look not to the ways defense counsel was able to impeach . . . [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Here, because of the government's non-disclosure, Charlene Wilson's testimony was allowed to stand unchallenged. Thomas's description of the shooter that was contrary to the government's case would have put the case in such a different light as to undermine confidence in the outcome. *See Kyles*, 514 U.S. at 435. Thus, a new trial is required.

**C.** **The Government's Refusal to Produce James Coulter to Testify as a Defense Witness Violated Martin's Right to Present a Defense and Right to Compulsory Process.**

There can be no question that the right to present witness testimony is fundamental to our criminal justice system. The right to present a defense is guaranteed by the Due Process clause of the Fifth Amendment. "Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). As the Supreme Court has stated,

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Webb v. Texas*, 409 U.S. 95 (1972).

The right to present witnesses in one's defense is grounded in the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The right to compulsory process is integral to the right to present a defense.

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and

> public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("[t]he right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense"). *See also Washington*, 388 U.S. at 19; *Taylor*, 484 U.S. at 409 (stating, "[t]he right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words"). "The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge." *Government of the Virgin Islands v. Mills*, 956 F.2d 443, 445 (3d Cir. 1992). *See also, Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (acknowledging that to the extent a statute operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to present a defense is diminished).

In this case, the government charged Martin with shooting and wounding James Coulter, but did not produce Coulter to testify. Coulter had previously stated to a defense investigator that Martin did not shoot him or that he did not know who had shot him. Defense counsel attempted to subpoena Coulter to testify, believing that his

testimony would exonerate Martin. Counsel was unable to locate Coulter and sought the government's assistance in serving a subpoena. The government represented that it had no knowledge of Coulter's whereabouts and Coulter never testified. Yet the government was able to locate Coulter when needed for its own purposes.

Martin was convicted of shooting Coulter in the guilty verdicts rendered on August 7, 2001. Approximately six months later, on February 13, 2002, Coulter was arrested and charged in this district with a drug offense in violation of 21 U.S.C. §841(a)(1) in case no. 02-mj-00104-AK.[8] According to the docket in that case, Magistrate Judge Alan Kay ordered Coulter to be temporarily detained "to permit revocation of conditional release, deportation or exclusion." There is no evidence that Coulter is subject to deportation or exclusion and therefore only "revocation of conditional release" was applicable. The order suggests that Coulter was being supervised at the time, such that he would be subject to revocation of conditional release. If Coulter was being supervised, the government would have been able to locate him for trial. Even if Coulter was not being supervised, the government was able to locate him for its own case. The government's representation that it would not be able to serve a subpoena on Coulter for Martin's trial constituted prosecutorial misconduct.

[8] The docket sheet to case no. 02-mj-00104-AK states that the magistrate's case merged into criminal case no. 02-074. However, that criminal case number does not appear on the public docket.

Some courts have held that the government may be compelled to grant immunity to a potential defense witness where the government's refusal is an abuse of discretion under the Immunity Act. *See United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004); s*ee also United States v.* Abbas, 74 F.3d 506, 511-12 (4th Cir. 1996) (holding that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality); *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991) (recognizing that government's grant of immunity to government witness while denying immunity to a contradictory defense witness would deny the defendant a fair trial).

Actions by the government tending to make a witness unavailable to the defense may constitute prosecutorial misconduct warranting a new trial. *United States v. Lord*, 711 F.2d 887 (9th Cir. 1983) (remanding for an evidentiary hearing where the record suggested that prosecutorial misconduct caused a witness to invoke his Fifth Amendment privilege against self-incrimination and denied the defendant a fair trial); *cf. United States v. Quinn*, 728 F.3d 243, 248 (3d Cir. 2013) (stating that government refusing to immunize a witness in order to keep clearly exculpatory and essential testimony from trial without a strong countervailing reason constitutes a type of prosecutorial misconduct).

Here, Coulter was a crucial witness for the defense. The government represented that it did not know how to find Coulter. Yet, the government was able

to arrest Coulter just months after Martin was convicted. The government's misrepresentation deprived Martin of his right to present a defense and his right to a fair trial.

### D. Trial Counsel Was Ineffective For Failing to Recall Charlene Wilson to Impeach Her Testimony that She had Witnessed Fortune's Shooting.

A defendant's Sixth Amendment right to counsel includes the right to effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5, (2003); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000); *Strickland v. Washington*, 466 U.S. 668, 685-86, (1984); *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002). Therefore, a defendant is entitled to reasonably competent counsel who gives advice within the range of competence required in criminal cases. *See Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Strickland*, 466 U.S. at 687; *United States v. Mohammed*, 863 F.3d 885 (D.C. Cir. 2017).

To prevail on a claim of ineffective assistance of counsel, a petitioner must meet the two-prong requirement set forth in *Strickland* and show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Id.*, 466 U.S. at 687. To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. There is a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Mohammed*, 863 F.3d at 889 (D.C. Cir. 2017).

While deference is accorded to trial counsel's reasonable trial strategies, such strategies must, at the outset, be reasonable. *See, e.g., Huynh v. King*, 95 F.3d 1052, 1057-58 (11th Cir. 1996) (holding that purposeful strategy of trial counsel was unreasonable); *Holsomback v. White*, 133 F.3d 1382, 1387-88 (11th Cir. 1998) (holding that trial counsel's failure to investigate was unreasonable and therefore his failure to introduce medical evidence was not based on an informed tactical decision); *Berryman v. Norton*, 100 F.3d 1089 (3d Cir. 1996) (holding that trial counsel's decisions were unreasonable because they were not supported by adequate investigation or sound trial strategy and the defendant was prejudiced).

First and foremost, counsel must make an informed decision taking into consideration the state of the law and its consequences. *See Kimmelman v. Morrison*, 477 U.S. 365 (1986) (concluding that trial counsel's failure to conduct discovery and consequent failure to file a timely motion to suppress evidence constituted deficient performance).

In this case, the government's key witness in the Fortune murder, Charlene Wilson, testified that she saw Carson shoot Fortune and enter a van driven by Martin. Approximately four months later in the trial, Agent Chris Warrener testified that Wilson began providing information to the FBI in mid-August 1992, approximately

one year after the Fortune shooting. (Tr. 6/14/01 PM p. 28). She initially provided information about drug activity without payment, and then the FBI began paying Wilson for information shortly thereafter. *Id.* at 28-29. Warrener testified that Wilson was supporting two children and was struggling financially. *Id.* at 29. Warrener did not indicate that there was any limit to how much money he would pay her, and she may have had the impression that some types of information would be more valuable than others. (Tr. 6/14/01 PM p. 30). According to Warrener, approximately three or four months after she first approached the F.B.I with information, and after she began receiving payments, she began speaking to police about the Fortune murder. *Id.* at 30-31.

Because Warrener used his 302 report to refresh his recollection during his testimony, a copy was provided to the defense over the government's objection. (Tr. 6/14/01 PM p. 48). Defense counsel discovered that Warrener had written in his report that Wilson had *heard* the information about Fortune's murder—not that she had witnessed it first-hand as she had testified. (Tr. 6/14/01 PM p. 55). Upon cross-examination about this point, Warrener acknowledged that the report said that Wilson had only heard about the Fortune murder. Warrener contended that he had phrased the report in that way to protect Wilson's identity. *Id.* at 55-56. He testified, however, that when he took Wilsons's statement, he did not intend for her to testify at trial and

he wrote the information in the form of an investigative insert to protect her identity. *Id.* at 35, 55-56.

Warrener's report also provided new information about how long Wilson waited before she began talking about the Fortune murder. Warrener's report showed that Wilson first began providing information about the shooting on January 28, 1993, more than 16 months after Fortune's death. (Tr. 6/14/01 PM p. 56).

Having obtained a copy of Warrener's report, trial counsel discovered evidence to contradict Wilson's claim that she witnessed Fortune's shooting. Counsel failed, however, to use this information to Martin's advantage. Counsel should have, but failed, to recall Wilson for cross-examination and establish whether she had only heard about the events she had testified to earlier. There was no strategic or tactical reason not to recall the witness after obtaining the 302. The jury had already heard Wilson testify that Carson was the shooter and that Martin drove Carson away after the shooting. That testimony stood virtually unchallenged. Agent Warrener's report indicated that Wilson was not an eye-witness as she had claimed.

Trial counsel also should have cross-examined Wilson about how long she waited before giving information to police. Whereas previously it was thought that Wilson began providing information about the shooting a few months after the shooting, Warrener's report showed that it was more than 16 months—a year longer

than previously thought. This was an additional area of cross-examination counsel could have used to defeat Wilson's credibility.

There is a reasonable probability that, had trial counsel recalled Wilson to cross-examine her with the new evidence, the result of the trial would have been different. Warrener's report stating that she had only heard about the shooting was not the first time Wilson claimed to have seen something she had only heard about. During her testimony, she said that while she was standing outside, there was a craps game going on across the street and that Fortune had robbed the craps game.

> Q.   At what point did you notice Tony Fortune being out there?
>
> A.   While I was standing out there with Regina, he was walking towards his car. There was a crapgame [sic] going on across the street where he had robbed and was on his way to his car.

Tr. 2/13/01 AM p. 25. The next day, Wilson admitted that she did not actually see Fortune commit a robbery.

> Q.   Did you see Anthony Fortune rob someone at that crap game?
>
> A.   No, I didn't see it. *It was told.*

(Tr. 2/13/01 PM p. 7) (emphasis added). In her testimony, Wilson did not distinguish between what she saw and what she heard from someone else. In the above excerpt, she testified as if she witnessed all the events first-hand. Cross-examination revealed that she did not witness Fortune committing a robbery but had only heard about it. With new evidence that Wilson did not see everything she reported, it was incumbent

on trial counsel to recall Wilson and examine her further about what she had actually witnessed and what she had heard from others.

The additional information that Wilson had waited more than a year to provide information about the shooting further lessened her credibility. It was telling that police did not act on Wilson's information. Even after Wilson told Warrener that she saw Carson shoot Fortune and get into a car driven by Martin, the police did not arrest anyone in connection with Fortune's murder for many years. (Tr. 6/14/01 PM p. 58-59). Given Wilson's importance in the government's case, trial counsel was ineffective for failing to pursue additional opportunities to cross-examine her.

### E. Trial Counsel Was Ineffective For Failing to Investigate and Present Evidence that Martin Did Not Shoot Coulter.

Adequate investigation by trial counsel is fundamental to a defendant's right to effective assistance of counsel. "Only when reasonable investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987). "In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, (2003).

Here, Coulter was shot while playing craps in the company of other people. Yet no eye-witnesses testified for the government or the defense. After Martin's trial, his

family retained an investigator to pursue witnesses to the Coulter shooting. The investigator located and interviewed Michael Floyd, who was playing craps next to Coulter at the time the gunman approached the group. Michael Floyd stated that a man ran up and pulled out a gun; he believed there was about to be a robbery. He ran, and Coulter ran past him. Michael Floyd further stated that he had known Martin for approximately four years and that the gunman was not Martin. *Id.*

Martin's investigator furthermore talked to Juan Floyd who was also present when Coulter was shot. Juan saw the gunman's face and recognized him as someone he knew by name of Avery. Juan Floyd believed that Avery shot Coulter because of a financial dispute. *Id.*

Trial counsel was ineffective for failing to conduct an adequate pre-trial investigation. "[A]n attorney must, at a minimum, 'conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial.'" *Sneed v. Smith*, 670 F.2d 1348, 1353 (4th Cir. 1982) (quoting *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir. 1968)). Furthermore, "[c]ounsel must ordinarily 'investigate possible methods for impeaching prosecution witnesses.'" *See Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998) (quoting *Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986)).

There is a reasonable probability that, had trial counsel conducted an adequate investigation and presented the testimony of Michael Floyd and Juan Floyd at trial,

Martin would not have been convicted of shooting Coulter. The government's evidence against Martin consisted of cooperator testimony about inculpatory statements made by Hill or Martin. There was no physical evidence connecting Martin to the shooting and the government did not present a single witness who was on the scene of the shooting.

Michael Floyd and Juan Floyd were eye-witnesses to the shooting. Their testimony that Martin was not the shooter, and that Juan Floyd recognized the shooter as Avery, would have been powerful evidence in Martin's defense. Given the government's weak circumstantial case against Martin, there is a reasonable probability that Martin would not have been convicted of shooting Coulter if this evidence had been presented in his trial.

### F.    A New Trial is Required on Martin's Drug Conspiracy and RICO Conspiracy Convictions.

The government presented the murder of Antonio Fortune and shooting of James Coulter as evidence of Martin's participation in a drug conspiracy and a RICO conspiracy. The Fortune murder was charged as an overt act of the drug conspiracy (Second Retyped Indictment, Dkt No. 760 p. 9), and the government alleged that the Fortune murder started a violent feud between Hill's group and a rival group of drug dealers. *Id.* p. 23. The Fortune murder was also charged as a racketeering act supporting the RICO conspiracy charge. (See Racketeering Act 23, *id.* p. 33). The

Coulter shooting was similarly charged as an overt act of the drug conspiracy, *id.* p. 13, and as a racketeering act. (See Racketeering Act 44, *id.* p. 46). In closing arguments, the government emphasized that violence, including the murder of Fortune, was connected to "beefs" between rival drug groups. (Tr. 6/26/01 PM p. 72-74).

The indictment alleged that Martin shot Coulter "for the purpose of gaining entrance to and maintaining and increasing his position in . . . an enterprise engaged in racketeering activity . . . " *id.* p. 65. The government alleged that Martin shot Coulter at Vincent Hill's behest, because Coulter was seen talking to a homicide detective and was believed to be cooperating with police. Tr. 1/8/01 PM p. 36-37.

The drug conspiracy and RICO conspiracy convictions rest on the violent acts of the Fortune murder and Coulter shooting. Because of Martin's convictions arising out of the Fortune murder and Coulter shooting were obtained in violation of the Constitution, his convictions for drug conspiracy and RICO conspiracy cannot stand. A new trial is required on those counts.

## IV. CONCLUSION

For the forgoing reasons, Martin requests a new trial and sentencing.

Respectfully submitted,

/s_____
Michael E. Lawlor
6305 Ivy Lane
Suite 700
Greenbelt, Maryland 20770

301.474.0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November 2018, a copy of the foregoing was delivered via ECF to all interested parties.

/s_____
Michael E. Lawlor

App 1426

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :

      v.          :          Criminal. No. 98-CR-00329-4 (RCL)

                    :

WILLIAM KYLE SWEENEY,

                    :

          Defendant

**DEFENDANT, WILLIAM K. SWEENEY'S MOTION FOR DISCOVERY**

Defendant, William Sweeney, ("Sweeney"), by his attorney Eric H. Kirchman, moves the court

pursuant to Rule 6 of the Rules Governing Section 2225 proceedings to enter an order permitting

discovery in this case, and for reasons states as follows:

1. Rule 6(a) provides in part that a court may, for good cause, authorize a party to

conduct discovery.

2. Good cause is shown "where specific allegations before the court show reason to

believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . .

entitled to relief." *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997) (internal quotation marks

omitted). Good cause is shown even if the movant's allegations support "only a theory . . . [that]

is not supported by any solid evidence" at the time of the discovery request. *Id.* at 908. Indeed,

"[i]t may well be  . . . that [the movant] will be unable to obtain evidence sufficient to" establish

the claim, but if specific allegations are made which suggest that the movant may be able to

demonstrate a right to relief, "good cause" is established, and the district court has a duty to

allow discovery. *Id.* at 908-09.

3. On August 15, 2001, after a trial that lasted 7 months, Sweeny was convicted of 14

counts including Count 2, Rico Conspiracy. In convicting Sweeney of this count the jury found

App 1427

Racketeering Act 50, a conspiracy to murder Robert Smith a/k/a Butchie, ("Smith") between on or about April 1997, and on or about June 17, 1997, to have been proven. The murder of Smith was one of the cornerstones of the government's theory of Sweeny's alleged liability in the conspiracy.

4. At the time of Smith's murder, Sweeny was in confined at the Prince George's County Detention Center. The government's theory was Sweeney arranged for the murder of Smith, a paid government informant, because of he suspected that Smith was providing the police about criminal activity allegedly involving Sweeney.

4. Prior to the trial of this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Fed. R. Crim. P. 16(1), Sweeney further requested that the government produce all material in its possession to which he was entitled under *Brady, Jencks* and *Giglio.*

5. Sweeny's Third Motion to Compel Discovery [340], filed on July 17, 2000, sought the information pertaining to Smith to which he was entitled under Brady. At a pretrial hearing on September 27, 2000, the court heard argument on that motion. (Transcript 123-38, September 27, 2000) At the hearing Sweeney argued that as a paid informant, Smith had provided the government with information about the criminal activity of a wide range of people, many of whom could have had no connection to Sweeney or the other people or events involved in this case. All of those people would have had the same motive that the government attributed to Sweeney to murder Smith. The court's response to this argument was that "I think that if the government has any evidence – any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as Brady material. The court went on to grant part of Sweeny's motion with regard to Smith. Moreover at this

hearing the government represented that it had no evidence that implicated someone other than the defendants in this case (Transcript 125-137, September 27, 2000)

6. One week prior before the statute of limitations on Sweeny's post-conviction motion was set to expire, on February 13, 2008, prior counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket (1015). In the motion, counsel asked the the court to order all court papers and proceedings in this matter be unsealed to allow counsel to be provided with a copy, as needed for effective representation of Sweeny in his post-conviction proceeding. On February 15, 2008, the court granted the motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in the matter to counsel for Sweeney. (Order dated February 15, 2008 1016).

7. On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the court's order.

8. One of the previously sealed documents in this matter obtained by counsel is the government's Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 12, 1999, which was placed under seal, by the court, on April 6, 1999. This ex parte pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney and Proctor from the pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

9. The reason given by the government in its motion was that "Investigation of [the Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Contrary to the government's representation to

the court at the hearing on the motion during September 2000, it appears that the government had evidence as early as 1999, that pointed to 2 people other than Sweeney in the murder of Smith.

10. The government has never produced to the defense any material related to Chappell or Hawkins, disregarding the court's admonition that if the government "has any evidence – any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as Brady material."

11. Sweeny is entitled to the information that the government has with regard to Andre Chappell and Anthony Ricardo Hawkins related to the murder of Smith.

12. The facts set forth herein demonstrate the good cause necessary to permit discovery of the requested material. If the government had evidence that Chappell and Hawkins were involved in the murder of Smith, as it claimed in its motion, Sweeny could use this evidence to show that entitled to relief to relief in his post-conviction proceeding, to show that the government violated its obligations under Brady.

13. Sweeney's attorney emailed the attorney for the Government seeking the Government's position on this motion but did not receive a reply.

**WHEREFORE,** Sweeney prays that the court enter an order requiring the government to produce all the information that it has that relates to Chappell and Hawkins involvement in the murder of Smith, and for such other and further relief as is just and proper.

_____/s/_____
Eric Kirchman
D.C. Fed Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

**CERTIFICATE OF SERVICE**

I hereby certify, on this 9th day of November 2019, that a copy of the foregoing was served on all parties entitled to notice in this case by the court's filing system and to:

**Pamela S. Satterfield, Esquire**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric H. Kirchman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        :

       v.             :        Criminal. No. 98-CR-00329-4 (RCL)

                  :

WILLIAM KYLE SWEENEY,         :

      Defendant

## ORDER

**Upon consideration** of William K. Sweeney's Motion For Discovery, good cause having been shown, it is by the court this _____ day of _____, 2015:

**ORDERED,** that William K. Sweeny be, and the same hereby is granted leave to file an Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. **§2255.**

 

 

_____
Royce C. Lamberth
JUDGE, United States District Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        §
                                    §
V.                                   §            CASE NO. 1:98-CR-329-03 (RCL)
                                    §
SAMUEL CARSON                 §

**SECOND SUPPLEMENTAL MOTION TO VACATE CONVICTION UNDER 28
U.S.C. § 2255**

Pursuant to the Rules Governing § 2255 cases, Defendant Samuel Carson hereby

files this SECOND SUPPLEMENTAL MOTION TO VACATE through his counsel,

Kira Anne West, and hereby files a supplement to his pending motion to set aside

judgment in this case pursuant to 28 U.S.C. § 2255. On June 24, 2016 and June 12, 2017,

Mr. Carson timely filed through his counsel supplements to the pending §2255 within

one year of the Supreme Court's decision in *Johnson v. United States*, 135 S.Ct. 2551

(2015).[1] As explained below, Mr. Carson's convictions under 18 U.S.C. §924(c) (counts

29, 33, 35, 36, 37, 40 and 44)[2] must be vacated in light of the Supreme Court's decision

---

[1] In *Johnson,* the Supreme Court held that the residual clause of the Armed Career
Criminal Act (ACCA) was unconstitutionally vague. The *Johnson* decision was made
retroactive on collateral review by *Welch v. United States,* 136 S.Ct. 1257 (2016).

[2] This is undersigned counsel's "best guess" if you will with regard to the 924(c)counts
from the verdict form. ECF No. 810. As previously explained, the indictment in this case
was renumbered. Undersigned counsel has ordered a copy of the renumbered indictment
and the actual jury instructions that went back with the jury from the Clerk's office. They
are stored offsite and therefore undersigned counsel has not yet received them. With the
discrepancy in the numbers, undersigned counsel will move to supplement this motion to
confirm the correct count numbers from the renumbered indictment in conjunction with
the jury instructions and the verdict form.

1

App 1433

in *United States v. Davis*, ___ U.S. ___, 139 S.Ct. 2319 (2019), which held that the residual clause of 18 U.S.C. §924(c)(3)(B) was unconstitutionally vague. *Id.* at 2324.

Upon the vacatur of Mr. Carson's § 924(c) convictions, he should be resentenced on all remaining counts under the sentencing package doctrine. *See Dean v. United States*, 137 S. Ct. 1170, 1176 (2017); *United States v. Townsend*, 178 F.3d 558 (D.C. Cir.1999).

## INTRODUCTION

As previously noted in his first *Johnson* Supplement,  Mr. Carson was convicted at trial in 2001 of violations of the following statutes:  21 U.S.C. § 846, Conspiracy to PWID; 18 USC §§ 1962(d) & 1963(a), RICO conspiracy; 18 U.S.C. § 1959(a)(1), violent crime/murder in aid of racketeering activity in violation of 27 M.D. Code §§ 407 and 410 (Chrishuahna Gladden, Alonzo Gaskins & Darnell Mack & Melody Anderson); 18 U.S.C. § 2, Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(i), use of a firearm during and in relation to a crime of violence or a drug trafficking crime; 22 D.C. Code § 2401 & § 3202[3], First Degree Murder while armed (Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas, Anthony Fortune,  & Chrishauna Gladden); 22 D.C. Code §501 & §3202, Assault with intent to kill while armed; 22 D.C. Code  § 2101 & § 3202, kidnapping while armed; and,  22 D.C. Code § 3204(b), and possession of a firearm during a crime of violence. [4] He was sentenced to multiple life terms with mandatory

---

[3] The indictment charges multiple crimes of violence, for example, Murder in aid of racketeering activity of Darnell Mack in Count 33, of 27 M.D. Code, §§407 and 410. See page 89-90, Superseding indictment, 3/25/99, Dkt #142. At issue in this brief are only the gun counts.

[4] On 1/04/2001, Dkt #517, the Government filed a "RETYPED INDICTMENT" for SAMUEL CARSON. Undersigned counsel has ordered this from the Clerk's office but has not yet received it. According to the docket sheet,  the government renumbered the charges to: "Former count 1s is now count 1rs. Former count 2s is now count 2rs. Former count 5s is now count 4rs. Former count 6s is now count 5rs. Former count 7s

App 1434

consecutive terms of imprisonment required by 18 U.S.C. §924(c) for carrying a firearm during a crime of violence for several separate types of offenses:

1. first degree murder while armed of Anthony Fortune, (count 9s) & Maurice Hallman, (count 5s) Teresa Thomas and Terita Lucas(counts7s & 8s) and Chrishauna Gladden (count 44s), a violation of Title 22 D.C. Code §§105, 2401 and 3202;

2. attempted murder in aid of racketeering activity (VICAR) of Anthony Pryor (count 22s), Ulysses English (count 30s), Kimberly Richardson (count 32s), and Ronald Sowells, (count 47s)[5] ; a violation of Title 18 United States Code §§ 1959(a)(3)&(5);

3. assault with intent to kill while armed of Ulysses English, (count 29s) and Roland Brown (count 23s) and Popa Mark Phillip (count 42s), Ronald Sowells (count 46s), a violation of Title 22 D.C. Code §§ 105, 501 and 3202;

4. Use of a firearm and RICO assault(predicate offenses), Ulysses English, (Count 54s), Popa Mark Phillip, Chrishuana Gladden, Ronald Sowells, Alonzo Gaskins, Darnell Mack, Melody Anderson, (counts 61s- 66s), in violation of 18 U.S.C. § 924(c);

---

is now count 6rs. Former count 8s is now count 7rs. Former count 23s is now count 13rs. Former count 29s is now count 16rs. Former count 30s is now count 17rs. Former count 42s is now count 26rs. Former count 43s is now count 27rs. Former count 44s is now count 28rs. Former count 45s is now count 29rs. Former count 46s is now count 30rs. Former count 47s is now count 31rs. Former count 48s is now count 32rs. Former count 49s is now count 33rs. Former count 50s is now count 34rs. Former count 51s is now count 35rs. Former count 53s is now count 36rs. Former count 54s is now count 37rs. Former count 55s is now count 38rs. Former count 56s is now count 39rs. Former count 57s is now count 40rs. Former count 58s is now count 41rs. Former count 61s is now count 42rs. Former count 62s is now count 43rs. Former count 63s is now count 44rs. Former count 64s is now count 45rs. Former count 65s is now count 46rs. Former count 66s is now count 47rs. Former count 67s is now count 48rs. Former count 68s is now count 49rs. Former count 71s is now count 50rs. Former count 72s is now count 51rs. Former count 73s is now count 52rs. Former count 74s is now count 53rs. Former count 75s is now count 54rs. Former count 76s is now count 55rs. Former count 78s is now count 56rs. Former count 79s is now count 57rs. Former count 80 is now count 58rs." Unfortunately, this renumbered system of counts does not line up with the verdict form or the PSR.

[5] Count 22s lists the following violations of law: title 22 D.C. Code §§ 103, 105, 105a,106, 501,503,2101, 2401, 2901, and 3202 and title 27 Maryland Code, §§12, 337, 407, 410, 486, and 488. See p. 73 of superseding indictment, March 25, 1999.

3

App 1435

5. Possession of a firearm during crime of violence or dangerous offense,( predicate AWIK 22 D.C. Code §§ 501 and 3202, Roland Brown(count 68s); Ulysses English (count 72s); Chrishuana Gladden (count 79s)(predicate first degree murder while armed 22 D.C. Code §§ 2401 and 3202) .

*See* Superseding indictment, ECF No. 142.[6]

Mr. Carson's additional claim is timely under 28 U.S.C. § 2255(f)(3) because he filed it within one year of the Supreme Court's decision in *Davis* – a ruling which established a "newly recognized" right that is "retroactively applicable to cases on collateral review." It appears after review of the PSR, the verdict form, the superseding indictment, the docket sheet, portions of the defense file that are still intact, and the pacer order of sentencing that there are multiple challenges to the § 924(c) convictions, some of which are predicated on RICO murder/RICO assault and VICAR.

The crimes of violence referenced in counts 29, 32, 33, 34, 35, 36, and 37 are summarized *supra*. Mr. Carson was given multiple life sentences and the gun counts were "stacked" and included 5 years supervised release. *See* Docket sheet. The convictions on these counts must be set aside as well as any other counts that can be determined to have as their basis an alleged crime of violence. Post-*Davis*, these crimes fail to qualify as a "crime of violence" therefore, Mr. Carson's § 924(c) convictions are void.

---

[6] These count numbers do NOT line up with the verdict form. Suffice it to say, when undersigned counsel receives the final version of the retyped indictment, the numbers will be redone. However, the jury charge read to the jury identifies the counts Mr. Carson was charged with "using a firearm during and in relation to a crime of violence" …in counts 29, 32, 33, 34, 35, 36, and 37. See Trans. 7/5/01 AM, pps 27-35. *See* Transcript, 7/05/01.AM, Exhibit 1. Therefore, these are most likely the correct counts. Also, the verdict form lists the counts as follows: 1.Attempted murder in aid of racketeering, counts 29 & 34; 2. Murder in aid of racketeering, counts 33, 35, 36 and 37; 3. AWIK, counts 40 and 45 and 4. First degree murder while armed, count 44. ECF No. 810, *See* Verdict form Exhibit. 2. These are the counts in question for purposes of this motion.

App 1436

The relevant portion of § 924(c) defining a "crime of violence" has two clauses. The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause. Because the Supreme Court in *Davis* held that the § 924(c) residual clause is unconstitutionally void in violation of the Due Process Clause, the residual clause can no longer qualify Mr. Carson's predicate offenses as "crimes of violence."

As a result, Mr. Carson's § 924(c) convictions 1) violate the Due Process Clause and 2) violate the United States laws and results in a fundamental miscarriage of justice. Therefore, Mr. Carson is entitled to a vacatur of his unlawful § 924(c) convictions under 28 U.S.C. § 2255(a). Some of Mr. Carson's convictions were based on D.C. assault with intent to kill while armed and Maryland assault with intent to murder in aid of racketeering in violation of §§ 18 U.S. C. §§1959(a)(3) and (a)(5). These are not crimes of violence-rendering counts 33, 35, 36, 37, 40, 44 and 45 void. *See cf. United States v. Brown*, 249 F. Supp. 3d 287 (D.D. C. 2017)(finding North Carolina assault with intent to kill while armed is not a violent felony under the Armed Career Criminal Act).

Thus, Mr. Carson respectfully requests that this Court vacate his § 924(c) convictions and resentence him on the remaining counts of conviction under the sentencing package doctrine. *See Dean v. United States*, 137 S. Ct. 1170, 1176 (2017); *United States v. Townsend*, 179 F.3d 558 (D.C. Cir. 1999).

## ARGUMENT

**1. After *Johnson* and *Davis*, Mr. Carson's § 924(c) convictions for use of a firearm in murder in aid of racketeering, attempted murder in aid of racketeering (counts 45s, 48s, 49s 50s) & (counts 29, 33, 35, 36 & 37 on the**

5

**verdict form)[7] and first degree murder while armed (count 44 on verdict form) cannot be sustained because DC and Maryland first-degree murder are not crimes of violence under § 924(c)'s force clause because it does not require the use, attempted use, or threatened use of violent physical force and can be committed by act of omission.**

Mr. Carson's § 924(c) convictions for using a firearm during and in relation to a "crime of violence" (Counts 33, 35, 36, & 37) are void because the "crime of violence" element cannot be satisfied here. The predicate offense of D.C. first degree murder or Maryland first degree murder in aid of racketeering do not qualify as a "crime of violence" as a matter of law.

Here, Mr. Carson was charged with using and carrying a firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c) in the above mentioned counts. *See* ECF No. 142, p. 91.The crime of violence in count 29 was attempted murder in aid of racketeering. In counts 33, 35, 36 and 37 it was murder in aid of racketeering activity; and in count 44 it was first degree murder while armed. Under § 924(c)(3), "crime of violence" is defined as follows:

> (3) For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
>
>> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

---

[7] Counts 29, 33, 35, 36, & 37 on the verdict form, Exhibit 2.

6

App 1438

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The first clause – § 924(c)(3)(A) – is the force clause.  The other – § 924(c)(3)(B) – is the residual clause.  Because the Supreme Court in *Davis* held that the § 924(c) residual clause is unconstitutionally vague in violation of the Due Process Clause, it goes without saying that Mr. Carson's § 924(c) convictions cannot be sustained under the § 924(c) residual clause.

Likewise, D.C. first degree murder and Maryland first degree murder in aid of racketeering are not a "crimes of violence" under the remaining force clause (§ 924(c)(3)(A)) because they can be committed by an act of omission.  In *United States v. Mayo*, 901 F.3d 218 (3rd Cir. 2018),  the Court rejected the Government's argument and held that the predicate offense of aggravated assault was not a crime of violence and could be committed by failure to provide food or medical care and therefore did not have the element of use of physical force. *Id.* at 229,  *citing United States v. Resendiz-Moreno*, 705 F.3d 203, 205 (5th Cir 2013). This is what's required under *Johnson*. Likewise, in *United States v. Williams*, 353 F. Supp.3d 14 (D.D. C 2019)(J. Friedman), the Court held that the offense of involuntary manslaughter is not categorically a crime of violence reasoning that it too could be done without physical force. *Id.* at 20-21.  Finally, in *United States v. Scott,* 954 F.3d 74 (2nd Cir. 2020), the Court held that first degree manslaughter could be committed by act of omission  therefore could not be a predicate offense for sentence enhancements under the ACCA.

**A.      The categorical approach applies to the § 924(c) force clause.**

7

App 1439

As the Fourth Circuit held in *United States v. Fuertes,* 805 F.3d 485, 498 (4th Cir. 2015)[8], to determine whether an offense qualifies as a "crime of violence" under the § 924(c) force clause, the district court must "employ the categorical approach or the modified categorical approach." *Id.* (internal quotation marks omitted). The statutory text of the § 924(c) force clause alone demands this categorical framework. Indeed, as the Fourth Circuit reinforced in *Simms*, 914 F.3d at 233, 239, 241, and the Supreme Court confirmed in *Davis,* 139 S. Ct. at 2328*,* the words "offense" and "elements" in § 924(c)(3)(A) mandate the categorical framework. Under this approach, courts can only "look to whether the statutory elements of the offense [of conviction] necessarily require the use, attempted use, or threatened use of physical force." *Simms*, at 233. "This approach is 'categorical' because the courts consider only the crime as defined, not the particular facts in the case." *Id.*

For the limited purpose of "help[ing] to implement the categorical approach," in a "narrow range of cases," a federal sentencing court may look at a short list of judicial documents (authorized by *Shepard v. United States,* 544 U.S. 13, 26 (2005)) to determine whether the defendant "necessarily" was necessarily convicted of an offense that qualifies as a "crime of violence." *Descamps v. United States*, 570 U.S. 254, 261, 262 (2013). This approach, known as the modified categorical approach, is also driven by the elements.

In *Descamps,* the Supreme Court clarified that a federal court may apply the modified categorical approach only if the relevant crime at issue is divisible. *Id.* at 260. An offense is divisible if it has alternative elements, and thus creates multiple crimes –

---

[8] Overruled in part by *United States v. Davis*, 139 S.Ct. 2319 (2019).

App 1440

some of which constitute a "crime of violence" and some of which do not. *Id.* at 260-61. If a statute is divisible, a federal sentencing court may review *Shepard* documents only to determine "which of the statute's alternative elements" necessarily formed the basis of the defendant's conviction. *Id.* at 262.[9] In this way, the modified categorical approach "acts not as an exception [to the categorical approach] but instead as a tool. It retains the categorical approach's central feature: a focus on the elements rather than the facts, of a crime." *Id.* at 263.

And to be clear, under the modified categorical approach, a court cannot lawfully make a "crime of violence" finding unless the *Shepard* documents establish with "certainty" that the defendant was "necessarily" convicted of elements constituting a "crime of violence." *Shepard*, 544 U.S. at 21-22, 23. "[P]lausibility or even likelihood" that the defendant was convicted of elements constituting a "crime of violence" will not suffice. *United States v. Clay*, 627 F.3d 959, 967 (4th Cir. 2010). This "demand for certainty" avoids "evidentiary inquiries into the factual basis for the conviction" that the categorical framework forbids. *Shepard*, 544 U.S. at 21, 22. <u>This stringent standard comports with "[t]he point of the categorical inquiry" which "is not to determine whether the defendant's conduct *could* support a conviction for a crime of violence, but to determine whether the defendant was *in fact convicted* of a crime that qualifies as a crime of violence.</u>" *Fuertes*, 805 F.3d at 498 (citation omitted).

As detailed below, Maryland first-degree murder fails to qualify as a "crime of violence." The Maryland statute defines first-degree murder as a murder that is:

---

9    These documents are the charging document, the terms of the plea agreement or transcript of colloquy between judge and defendant, a judge's factual findings in a bench trial, jury instructions, and comparable judicial records. *Shepard*, 544 U.S. at 13, 20, 26.

(1) a deliberate, premeditated, and willful killing; (2) committed by lying in wait; (3) committed by poison; or (4) committed in the perpetration of or an attempt to perpetrate (i) arson in the first degree; (ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that: 1. is not parcel to a dwelling; and 2. contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco; (iii) burglary in the first, second, or third degree; (iv) carjacking or armed carjacking; (v) escape in the first degree from a State correctional facility or a local correctional facility; (vi) kidnapping under § 3-502 or § 3-503(a)(2) of this article; (vii) mayhem; (viii) rape; (ix) robbery under § 3-402 or § 3-403 of this article; (x) sexual offense in the first or second degree; (xi) sodomy; or (xii) a violation of § 4-503 of this article concerning destructive devices.

Md. Code Ann., Crim. Law § 2-201.

### A. Maryland

Despite the alternative methods of committing murder in Maryland, murder is a single common law offense divided into degrees by statute. *Sifrit v. State*, 857 A.2d 88, 100 (Md. 2004); *Burch v. State*, 696 A.2d 443, 454 (Md. 1997). The first-degree murder statute is indivisible as it simply sets forth alternative methods of committing a single offense. "[A] conviction of first degree murder may be proved *either* by showing deliberation, wilfulness and premeditation (premeditated murder), or by showing a homicide committed in the perpetration, or attempted perpetration, of one of the enumerated felonies (felony murder). There is but one offense–murder in the first degree–but that offense may be committed in more than one way. . . . There is no requirement . . . that a charging document must inform the accused of the specific theory on which the State will rely." *Ross v. State*, 519 A.2d 735, 737 (Md. 1987). The constitutionality of such a procedure was addressed in *Schad v. Arizona*, 501 U.S. 624 (1991). There, the Supreme Court upheld against a due process challenge a general verdict of guilt as to first degree murder, where "the Arizona Supreme Court has effectively decided that, under state law, premeditation and the commission of a felony

10

App 1442

are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element." *Id.* at 637, 645.

First-degree murder in Maryland is not categorically a crime of violence under the force clause because the statute sweeps within it much conduct that does not include "as an element the use, attempted use, or threatened use," 18 U.S.C. Section 924(c)(3)(A), of violent physical force. For example, a person can commit first degree murder, that is, "a deliberate, premeditated, and willful killing," Md. Code Ann., Crim Law, §2-201(1), in many ways that do not require violent physical force, such as by poisoning, trickery, or withholding life-saving medication or sustenance. Murder by poisoning is also first-degree murder under Maryland law as set out separately in Md. Code Ann. Crim Law, §2-201(3). Likewise, many offenses such as burglary and escape that result in death, Md. Code Ann. Crim. Law, §§2-201(4), count as first-degree murder under Maryland law.

As noted above, "(i)f a prior conviction is based on a statute that sweeps more broadly than this ("violent felony") definition … such a conviction cannot qualify as a violent felony under the force clause." *Redrick, supra,* at 482. "[W]hen a statute allows for both violent and nonviolent means of commission, the offense is not a categorical crime of violence.". *Fuertes*, *supra,* at 498. *See Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006) (New York reckless assault with a dangerous weapon statute failed to qualify as a "crime of violence" under the 18 U.S.C. §16(a) force clause –which is identical to the §924(c) force clause – because it did not have an element requiring the "intentional employment of physical force.")

B. D.C.

11

The D.C. statute defines Murder in the first degree as:

> Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate an offense punishable by imprisonment in the penitentiary, or without purpose to do so kills another in perpetrating or in attempting to perpetrate any arson, as defined in § 22-301 or § 22-302, first degree sexual abuse, first degree child sexual abuse, first degree cruelty to children, mayhem, robbery, or kidnaping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, or in perpetrating or attempting to perpetrate a felony involving a controlled substance, is guilty of murder in the first degree.

22 D.C. Code § 2101. (formerly cited as D.C. ST 1981 §22-2401).

There are two ways to prove first degree murder in D.C.:

- To prove first-degree premeditated murder, Government must show beyond a reasonable doubt that defendant acted with **(1)premeditation** and **(2) deliberation**
  - "Premeditation" required for first-degree premeditated murder requires proof that defendant gave thought before acting to idea of taking human life and reached definite decision to kill. D.C.Code 1981, §§ 22–**2401**, 22–**3202**
  - "Deliberation" required for first-degree premeditated murder requires proof that defendant acted with consideration and reflection upon preconceived design to kill, turning it over in his mind, giving it a second thought. D.C.Code 1981, §§ 22–**2401**, 22–**3202**
    - Premeditation and deliberation required for first-degree premeditated murder may be inferred from facts and circumstances surrounding killing. D.C.Code 1981, §§ 22–**2401**, 22–**3202**.

*See Thacker v. United States*, 599 A.2d 52 (D.C. 1991).

- The essential elements of **felony-murder while armed** are that defendant,
  - (1) while perpetrating or attempting to perpetrate a specified felony while armed
  - (2) inflicted injury on victim from which he died
    - requirement of underlying felony operates as mechanism by which jury can infer state of mind required for first-degree murder. D.C.Code 1973, §§ 22–**2401**, 22–**3202**.

12

App 1444

*See Head v. United States*, 451 A.2d 615 (1982).

In terms of felony murder, it can be argued that counts 35, 36 and 37 (verdict form counts) were predicated on felony murder, that is robbery. *See* ECF 142 pps. 88-90. Felony murder does not require the intentional, reckless or even negligent use of force. Therefore, it is not a qualifying offense under the 924(c) force clause. From the way the indictment is written, the predicate of these counts could have been felony murder and these convictions are now void. *See United States v. Begay* , 943 F.3d 1033, 1038-1040 (9th Cir. 2019)(holding 2nd degree murder is not a crime of violence); *United States v. Vederoff,* 914 F.3d 1238 (9th Cir. 2019) holding 2nd degree murder is not a crime of violence). *See also*: Felony murder committed in course of certain enumerated felonies, including robbery, is murder in the first degree, notwithstanding the fact that the killing may have been reckless or merely accidental. Code 1957, Art. 27, section 410. *Brooks v. State,* 655 A.2d 1311 ( Md. 1995).

**_Davis_ held that Section 924(c)(3)'s residual clause is unconstitutionally vague and thus cannot support a conviction under the statute.**

Since Maryland murder, given that it can be accomplished by non-violent means, fails to qualify as a "crime of violence" under § 924(c)(3)'s force clause, the remaining question is whether the offense can qualify as a "crime of violence" under § 924(c)(3)'s residual clause. After *Davis*, it cannot. Undersigned counsel is not aware of any D.C. cases that discussion the act of murder by omission. The only questions then, then, is whether Mr. Carson's § 924(c) convictions can be sustained under the elements clause—*i.e.*, does D.C. assault with intent to kill while armed have as an element the use

13

App 1445

or threatened use of violent physical force?[10]

## THE MODIFIED CATEGORICAL APPROACH

In certain limited circumstances, when a statute of conviction "list[s] elements in the alternative, and thereby define[s] multiple crimes," *i.e.*, the statute is "divisible," the Court may use a "modified categorical approach." *Mathis*, 136 S. Ct. at 2249. Under this modified approach, "a sentencing court [may] look [] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id.* Importantly, however, this approach may be used only for statutes "that list[] multiple elements disjunctively," as opposed to those that "instead . . . enumerate[] various factual means of committing a single element." *Id.*; *see id.* at 2253 ("[A] statute's listing of disjunctive *means* does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction." (emphasis added)); *Descamps*, 133 S. Ct. at 2282 ("[S]entencing courts may *not* apply the modified categorical approach when the crime of which the defendant was convicted as a single, indivisible set of elements." (emphasis added)). Thus, a court may *not* apply "the modified categorical approach to determine the means by which [a defendant] committed his prior crimes[:]" "the modified approach serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing

---

[10] In (*Curtis*) *Johnson v. United States*, 559 U.S. 133 (2010), the Supreme Court interpreted the phrase "physical force" to mean "*violent* force—that is, force capable of causing pain or injury to another person." *Id.* at 140 (emphasis in original). Subsequently, the Supreme Court clarified that the physical force element can be satisfied where the force is enough to "overcome a victim's resistance." *Stokeling v. United States*, 139 S. Ct. 544, 548 (2019).

renders one (or more) of them opaque." *Mathis*, 136 S. Ct. at 2253. ). In other words, "[i]f the law defines the crime in such a way that it can be committed using either violent or non-violent force, then the crime is not a ['crime of violence'], even if the defendant actually used violent force in committing the crime." *United States v. Haight*, 892 F.3d 1271, 1279 (D.C. Cir. 2018). For the reasons discussed below, none of Mr. Carson's predicate offenses require violent force.

### 1. D.C. assault with intent to kill while armed is no longer a crime of violence.

Lastly, Mr. Carons's § 924(c) convictions in counts 40 and 45 (verdict form numbers) are void. These counts charged Mr. Carson with possession of a firearm during a "crime of violence." *See* Superceding Indictment, ECF No. 142 at pps. 94-95. The "crimes of violence" in these counts were the alleged assault with intent to kill while armed of Ulysses English(count 72) and Ronald Sowells (count 80) in violation of 22 D.C. Code §§ 501 and 3202.[11] The predicate offense of D.C. assault with intent to kill while armed is not a crime of violence.

In the District of Columbia, the crime of assault with intent to kill consists of two elements: (1) a simple assault (2) with the intent to kill. *See* Pattern Jury Instruction 4.09 (1996); D.C. Code § 22-501 (1984). Simple assault, in turn, requires proof of three elements: (1) "an actual attempt, with force or violence, to injure another" [known as "attempted-battery assault"], "or a menacing threat, which may or may not be accompanied by a specific intent to injure, on the part of the defendant" [known as "intent-to-frighten assault]; (2) "the apparent present ability to injure the victim"; and (3)

---

[11] The current versions are available at D.C. Code §§ 22-401 and 22-4502, respectively.

15

"intent to perform the acts which constitute the assault." *Williamson v. United States*, 445 A.2d 975, 978 (D.C. 1982); D.C. Pattern Jury Instruction 4.06 (1996).

If an individual commits assault with intent to kill "when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machinegun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic, or other false knuckles)," he has committed assault with intent to kill *while armed*— "AWIKWA"— and is subject to additional penalties. *See* D.C. Code 22-3202 (1981) (emphasis added) (titled "Committing Crime When Armed – Added Punishment").[12]

The above elements fail to qualify as a "crime of violence" because none of them require "*violent* force—that is, force capable of causing pain or injury to another person." *Johnson (2010)*, 559 U.S. at 140 (emphasis in original); *Stokeling*, 139 S. Ct. at 553. Beginning with the first element, the government previously conceded that simple assault does not require the use of violent force. *See United States v. Butler*, 253 F.Supp.3d 133, 144 (D.D.C. 2017) ("With respect to the requisite use of force, the Government concedes that D.C. simple assault does not require the use of violent force contemplated by the ACCA because it may be carried out through the mere use of a menacing threat."). The government correctly made this concession.

While the "attempted-battery" assault contains the terms "force or violence," case law establishes that those terms can be met with nonviolent, offensive touching:

> It is also worth noting that although our cases state that attempted-battery assault requires an intent to cause bodily injury by making an attempt to batter with "force or violence," those terms do not necessarily import their everyday meaning when used in this context. Many assault cases do

---

[12] The current version is available at D.C. Code § 22-4502.

16

involve violent actions and actual physical injury, but nonviolent acts that are offensive in nature and involve no physical injury also can be assaultive in character. This is because simple assault 'is designed to protect not only against physical injury, but against all forms of offensive touching, and even the mere threat of such touching.' Thus, unwanted sexual contact, spitting on a person, and jostling or touching in the course of a theft from the person, have been found sufficient to constitute assault.

*Buchanan v. United States*, 32 A.3d 990, 1003-04 (D.C. 2001) (citations omitted); *see also Ray v. United States*, 575 A.2d 1196 (D.C. 1990) (assault for spitting on another person); *Harris v. United States*, 201 A.2d 532, 534 (D.C. 1964) (pick pocketer's jostling of victim and fumbling with his trouser cuff was sufficiently offensive to constitute injury needed for assault); *Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (assault statute "is designed to protect . . . against all forms of offensive touching").

The D.C. Circuit has long recognized that "it is not true that whatever a state happens to mean by 'force' [in the phrase 'by force and violence'] will invariably correspond to the meaning of that term which Congress drafted into § 924(e)." *United States v. Mathis*, 963 F.2d 399, 408 (D.C. Cir. 1992). Rather, the court looks to the state judicial interpretations of the terms to see if they require violent force. *See id.*; *Johnson*, 559 U.S. at 138 (noting that the Court is "bound by the [state] Court's interpretation of state law, including its determination of the elements of" the statute). In *Matthis*, for example, the D.C. Circuit analyzed D.C.'s robbery statute which, on its face, included the element that the defendant "by force or violence" take a thing of value from the person of another. *Id.* at 408. Pursuant to judicial interpretation, however, the force of violence element could be met "when the only force used is that necessary to lift a wallet from the pocket." *Id.* at 409. Because of this, the court determined that the offense was not a "violent felony" within the meaning of the Armed Career Criminal Act, 18 U.S.C. §

17

924(e).  *Id.*  The same conclusion follows here.

Moreover, the "intent-to-frighten" assault does not require use, attempted use, or threatened use of physical force.  In fact, it requires no force at all.  "Intent-to-frighten assault [] requires proof that the defendant intended either to cause injury or *to create apprehension in the victim by engaging in some threatening conduct;* an actual battery need not be attempted."  *Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986) (emphasis added).  By this standard, it is enough that such conduct "could induce in the victim a well-founded apprehension of peril."  *Anthony v. United States*, 361 A.2d 202, 204 (D.C. 1978); *see also United States v. Butler*, 253 F.Supp.3d 133, 144 (D.D.C. 2017) (government conceding the mere use of a menacing threat would not require the use of violent force contemplated by the ACCA).

Turning to the second element, as discussed above, the addition of an intent to kill does nothing to change the analysis, as it is simply a mental state, which does not require any actual or threatened physical force. 18 U.S.C. § 924(c)(3)(A); *cf. United States v. Brown*, 249 F.Supp.3d 287 (D.D.C. 2017) (finding North Carolina AWIKWA, which requires "(1) an assault; (2) with a deadly weapon; (3) with intent to kill," was not a violent felony under the ACCA); *see also cf.*, *United States v. Martinez*, Case No. 07-cr-0236, 2017 WL 5635444, at *4 (D. Colo. Feb. 1, 2017) (finding Nevada second degree murder, which required "malice aforethought," was not a crime of violence because it could be violated in several ways short of strong physical force, such as "nagging a person known to have heart trouble with some death-producing exertion, advising a blind man at the edge of precipice that all is clear, or failing to rescue an infant who is drowning face-down in a bathtub, when failure to rescue springs from a wish that the

18

child were dead.").

Indeed, this element can be satisfied if a defendant merely admits he had the intent to kill—an act that would clearly not involve force. *See Jones v. United States*, 516 A.2d 929 (D.C. 1987) ("Intent being a state of mind, unless admitted by the defendant, it must be shown by circumstantial evidence 'because there is no way of fathoming and scrutinizing the human mind.'" (internal citation omitted)). And an intent to kill element can be satisfied where a defendant admits he had the intent to kill, but his actions were, in fact, incapable of injuring another person. *See, e.g., Weeks v. State*, 834 S.W.2d 559, 561 (Tex. App. 1992) (upholding an attempted murder conviction that required a specific intent to kill, where an HIV-positive defendant stated he was "HIV-4" and spit on an officer because "[t]he record reflects that appellant believed he could kill the complainant by spitting his HIV infected saliva on him," even though HIV cannot be spread by saliva).[13]

Finally, the addition of the armed sentencing enhancement does not alter the holding. Under D.C. law, the defendant must only have the weapon readily available without any active use of the weapon. *Jamison v. United States*, 670 A.2d. 373, 275 (D.C. 1996). It does not require the defendant to even display the weapon or announce its presence. *Id.*; *see also Broadie v. United States*, 925 A.2d 605, 617-18 (D.C. 2007) (explaining that § 22-4502 "does not require the use of or the intent to use a weapon in the commission of [robbery]; it requires mere availability of a weapon" (emphasis in original) (internal quotation marks omitted)); *Clyburn v. United States*, 48 A.3d 147, 15 (D.C. 2012) (explaining that "readily available" means "in close proximity or easily

---

[13] *See HIV Transmission*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/hiv/basics/transmission.html (last visited Feb. 3, 2020).

19

accessible" during commission of the offense). The armed element therefore does not require force or the threat of force.

The Ninth Circuit made this exact finding when analyzing similar statutes. *See United States v. Parnell*, No. 14-30208 (9th Cir. April 12, 2016) (finding that Massachusetts first degree robbery with a dangerous weapon statute fails to qualify as a "violent felony" under the ACCA "force" clause because it can be violated without use of the weapon; the statute only required the weapon to be readily available, not that the defendant actively use the weapon); *United States v. Werle,* 815 F.3d 614 (9th Cir. 2016) (holding that a Washington State rioting statute—which required the use of *de minimis* force while armed with a deadly weapon—did not constitute an ACCA violent felony because the statute only required that the weapon be readily available, not that the defendant actively use the weapon); *see also United States v. Redrick*, 841 F.3d 478, 484 (D.C. Cir. 2016) (holding that if an element requires the "use" of a dangerous weapon, it carries a threat of physical force, and is therefore a crime of violence; but indicating that if the use of the dangerous weapon can be satisfied in the absence of the victim's awareness of the weapon, then the crime does not necessarily require the "violent force" to constitute a crime of violence).

With regard to counts 40 and 45, Mr. Carson's *Shepard* documents, the predicate for this offense seems to be assault with intent to kill. *See* ECF No. 142 pps. 94-95. These are listed D.C. Code offenses and cannot be the predicate offense for a 924(c) charge. *See United States v. Brown*, 58 F. Supp. 3d 115 (D.D.C. 2014), *rev'd on other grounds,* 892 F.3d 385 (D.C. Cir. 2018)(a D.C. Code offense cannot predicate a 924(c) charge and thus the counts were dismissed).

20

Therefore, D.C. AWIKWA is not a crime of violence.[14]  Because of this, Mr.

Carson's § 924(c) convictions in counts  40 and 45 are now void.

Wherefore, Mr. Carson respectfully requests that his 924(c) convictions be vacated.


Respectfully submitted,


_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

---

[14] D.C. AWIKWA is not a crime of violence for a second independent reason: it can be committed with a reckless *mens rea—i.e.*, without the *intentional* use, attempted use, or threatened use of violent force that the elements clause requires.  The D.C. Court of Appeals has made clear that D.C.'s assault with intent to kill can be accomplished with the same *mens rea* as voluntary manslaughter.  *Logan v. United States*, 483 A.2d 664, 672-73 (D.C. 1984) ("a person who commits an assault with a specific intent to kill—but who acts with adequate provocation, justification, or excuse—may be charged and convicted under § 22–501 despite the fact that, had the victim of the assault died, a charge of manslaughter, not murder, would have been appropriate[.]").  *Id.* at 672-73.  And the D.C. Court of Appeals has held that voluntary manslaughter can be committed recklessly.  *See Boykins v. United States*, 702 A. 2d 1242, 1251 (D.C. 1997) ("[W]here the accused was aware of the risk of harm, but acted in conscious disregard of it, the killing is murder of voluntary manslaughter, and where the accused is not aware of the risk of harm, but should have been, the killing will be involuntary manslaughter."); *Cf. Vines v. United States*, 70 A.3d 1170, 1180 (D.C. 2013) ("a conviction for ADW can be sustained by proof of reckless conduct alone.").  Because D.C. AWIKWA can be committed with a reckless *mens rea*, it categorically fails to constitute "crime of violence."

Mr. Carson recognizes that *United States v. Haight,* 892 F.3d 1271 (D.C. Cir. 2018) forecloses this argument.  *See id.* at 1281 (holding that "the use of violent force includes the reckless use of such force.").  However, the Supreme Court's granted certiorari in *Walker v. United States*, No. 19373 (Nov. 15, 2019) to determine "[w]hether a criminal offense that can be committed with a *mens rea* of recklessness can qualify as a 'violent felony' under the Armed Career Criminal Act, 18 U.S.C. 924(e)(2)(B)(i)."  Mr. Carson thus makes this argument to preserve the issue in the event that *Haight* is overturned.

App 1453

22

App 1454

**Certificate of Service**

       I hereby certify that on this 1st day of July, 2020, a true and correct copy of the foregoing Defendant's supplemental Johnson/Davis motion was served via the ECF system on the other counsel registered with ECF in this matter and a copy sent to Mr. Carson as well.

/s/_____
Kira Anne West

23

App 1455

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES,
                GOVERNMENT,          :
                                     :
 VS.                                 :     CR. NO. 98-329
                                     :
VINCENT HILL,                        :
JEROME MARTIN,                       :
SAMUEL CARSON,                       :
WILLIAM K. SWEENEY,                  :
SEAN COATES,                         :
                DEFENDANTS.          :
_____:
UNITED STATES                        :
                GOVERNMENT,          :
                                     :
   VS.                               :     CR. NO. 99-348
                                     :
GARY PRICE,                          :
                DEFENDANT            :
_____:

                              WASHINGTON, D. C.
                              JULY 9, 2001
                              (10:20 A.M.)

               TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE.,
N.W.
                             WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA

                                       ANJALI CHATURVEDI, AUSA

                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.

                                       601 INDIANA AVE., N.W.

                                       #910
                                       WASHINGTON, D. C. 20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.

                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C. 20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.

                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C. 20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.

901 6TH STREET, S.W.
#409
WASHINGTON, D. C. 20024

FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
601 INDIANA AVE., N.W.
#901
WASHINGTON, D. C. 20004

I-N-D-E-X

JUDGE'S CHARGE TO THE JURY (CONTINUED.)        PAGE 6

E X H I B I T S

MARTIN'S                      IN EVIDENCE

63                            73

4

P-R-O-C-E-E-D-I-N-G-S

THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL CARSON, WILLIAM SWEENEY, AND SEAN COATES, AND CRIMINAL 99-348, UNITED STATES VERSUS GARY PRICE.

PETER ZEIDENBERG AND ANJALI CHATURVEDI FOR THE

GOVERNMENT.

CHRISTOPHER DAVIS FOR THE DEFENDANT SWEENEY.

JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

MR. BESHOURI AND ALEXANDRA NEGIN-CHRIST FOR THE DEFENDANT CARSON.

STEVEN KIERSH FOR THE DEFENDANT SWEENEY.

FRED JONES FOR THE DEFENDANT COATES.

JONATHAN ZUCKER FOR THE DEFENDANT PRICE.

(DEFENDANTS AND COUNSEL WERE PRESENT.)

MR. ZEIDENBERG:  GOOD MORNING, YOUR HONOR.

MR. KIERSH:  GOOD MORNING, YOUR HONOR.

MR. ZUCKER:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING, COUNSEL.

LET'S BRING THE JURY IN.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

(JURY IN.)

(JURY IN.)

THE DEPUTY MARSHAL:  THE JURY PANEL IS ALL

PRESENT, YOUR HONOR.

THE COURT: THANK YOU, MARSHAL.

GOOD MORNING, LADIES AND GENTLEMEN. WELCOME BACK.

THE JURORS: GOOD MORNING.

THE COURT: I AM GOING TO PICK UP WHERE I LEFT OFF LAST THURSDAY.

JUDGE'S CHARGE TO THE JURY (CONTINUED.)

THE COURT: RACKETEERING ACT 33 OF COUNT TWO CHARGES THAT ON OR ABOUT APRIL 28TH, 1990, IN THE DISTRICT OF COLUMBIA, THE DEFENDANT SEAN COATES AND UNINDICTED CO-CONSPIRATORS KIDNAPPED NORMAN YUSEF SIMMONS WITH THE INTENT TO HOLD AND DETAIN HIM FOR RANSOM OR REWARD.

UNDER DISTRICT OF COLUMBIA LAW, TO CONVICT A DEFENDANT OF KIDNAPPING, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT:

THAT THE DEFENDANT INTENTIONALLY SEIZED, CONFINED ABDUCTED, OR CARRIED AWAY THE COMPLAINANT AGAINST HIS WILL.

TO ACT INTENTIONALLY, ONCE AGAIN, MEANS TO ACT CONSCIOUSLY, VOLUNTARILY AND ON PURPOSE, AND NOT MISTAKENLY, ACCIDENTALLY OR INADVERTENTLY; AND

SECOND, THAT THE DEFENDANT HELD OR DETAINED,

App 1462

OR

ACTED WITH THE SPECIFIC INTENT TO HOLD OR DETAIN, THE

COMPLAINANT FOR RANSOM OR REWARD.

6

IF

THE

THE GOVERNMENT MUST PROVE THAT THE DEFENDANT SEIZED OR DETAINED THE COMPLAINANT BY USE OF COERCION. THE COMPLAINANT SUBMITTED TO SUCH SEIZURE OR DETENTION, GOVERNMENT MUST PROVE THAT THE COMPLAINANT DID SO INVOLUNTARILY.

MAY BE

ACTS OF COERCION MUST BE COMMITTED WITH THE SPECIFIC INTENT TO CONFINE THE COMPLAINANT. COERCION MENTAL OR PHYSICAL COERCION.

THAT,

COATES,

RACKETEERING ACT 39(B) OF COUNT TWO CHARGES ON OR ABOUT OCTOBER 22, 1993, IN THE STATE OF MARYLAND, DEFENDANTS VINCENT HILL, WILLIAM SWEENEY, AND SEAN WHILE ARMED WITH PISTOLS, KIDNAPPED ANTHONY PRYOR.

UNDER MARYLAND LAW, TO CONVICT A DEFENDANT OF KIDNAPPING WHILE ARMED WITH A DANGEROUS WEAPON, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT:

THAT THE DEFENDANT CONFINED OR DETAINED THE COMPLAINANT AGAINST HIS WILL;

THAT THE DEFENDANT USED FORCE OR THREAT OF FORCE

TO ACCOMPLISH THE CONFINEMENT OR DETENTION;

THAT THE DEFENDANT MOVED THE COMPLAINANT FROM ONE

PLACE TO ANOTHER;

THAT THE DEFENDANT MOVED THE COMPLAINANT WITH THE

INTENT TO CARRY OR CONCEAL THE COMPLAINANT; AND

THAT THE DEFENDANT COMMITTED THE CRIME BY USING A

DANGEROUS WEAPON, WHICH IS DEFINED AS AN OBJECT CAPABLE OF

7

CAUSING DEATH OR SERIOUS BODILY HARM.

RACKETEERING ACTS 39(A) AND 49(A) OF COUNT TWO CHARGE THAT, ON OR ABOUT THE DATES SET FORTH IN THE INDICTMENT, IN THE STATE OF MARYLAND, SOME OF THE DEFENDANTS ATTEMPTED TO ROB INDIVIDUALS WHILE ARMED. THE ALLEGED VICTIMS INCLUDED ANTHONY PRYOR, ALONZO GASKINS, DARNELL MACK, AND MELODY ANDERSON.

UNDER MARYLAND LAW, TO CONVICT A DEFENDANT OF ATTEMPTED ARMED ROBBERY, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT:

THAT THE DEFENDANT TOOK A SUBSTANTIAL STEP, BEYOND MERE PREPARATION, TOWARD THE COMMISSION OF THE CRIME OF ARMED ROBBERY; AND

THAT THE DEFENDANT INTENDED TO COMMIT THE CRIME OF ARMED ROBBERY.

UNDER MARYLAND LAW, THE ESSENTIAL ELEMENTS OF THE CRIME OF ARMED ROBBERY, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE DEFENDANT TOOK THE PROPERTY FROM THE COMPLAINANT'S PRESENCE AND CONTROL;

THAT THE DEFENDANT TOOK THE PROPERTY BY FORCE OR THREAT OF FORCE;

THAT THE DEFENDANT INTENDED TO STEAL THE PROPERTY, THAT IS, TO DEPRIVE THE COMPLAINANT OF THE PROPERTY PERMANENTLY; AND

8

THAT THE DEFENDANT COMMITTED THE ROBBERY BY USING A DANGEROUS WEAPON, WHICH IS DEFINED AS AN OBJECT CAPABLE OF CAUSING DEATH OR SERIOUS BODILY HARM.

RACKETEERING ACTS 38 AND 39(C) OF COUNT TWO CHARGE

THAT, ON OR ABOUT THE DATES SET FORTH IN THE INDICTMENT, IN

THE STATE OF MARYLAND, SOME OF THE DEFENDANTS ASSAULTED

INDIVIDUALS WITH THE INTENT TO MURDER THEM.  THE ALLEGED

VICTIMS INCLUDED OFFICER ALFRED MOSS AND ANTHONY PRYOR.

UNDER MARYLAND LAW, TO CONVICT A DEFENDANT OF

ASSAULT WITH INTENT TO MURDER WHILE ARMED, THE GOVERNMENT

MUST PROVE BEYOND A REASONABLE DOUBT:

THAT THERE WAS AN ASSAULT UPON THE VICTIM;

THAT THE DEFENDANT COMMITTED THE ASSAULT; AND

THAT THE ASSAULT WAS COMMITTED WITH THE INTENT TO

MURDER THE VICTIM, THAT IS, IT WAS COMMITTED WITHOUT LEGAL

JUSTIFICATION, EXCUSE, OR A PROPER MITIGATING CIRCUMSTANCE.

UNDER MARYLAND LAW, AN "ASSAULT" IS DEFINED AS AN

INTENTIONAL ATTEMPT BY FORCE OR VIOLENCE TO INFLICT INJURY

UPON ANOTHER PERSON COUPLED WITH THE APPARENT PRESENT

ABILITY TO INFLICT SUCH AN INJURY.

IN ORDER TO CONVICT A DEFENDANT OF ASSAULT WITH

INTENT TO MURDER, THE GOVERNMENT MUST PROVE BEYOND A

REASONABLE DOUBT THAT THE DEFENDANT HAD THE SPECIFIC INTENT

TO KILL THE VICTIM.  THE SPECIFIC INTENT TO KILL NEED NOT BE

SHOWN DIRECTLY, BUT MAY BE SHOWN OR INFERRED FROM THE

9

CIRCUMSTANCES.  THE INTENT TO KILL MAY BE INFERRED FROM THE

EVIDENCE SHOWING AN INTENT TO INFLICT GRIEVOUS BODILY HARM,

SUCH AS FIRING A DEADLY WEAPON AT A VITAL PART OF THE

VICTIM'S BODY.  THE INTENT CANNOT BE INFERRED FROM THE MERE

FACT OF THE ASSAULT, ALTHOUGH THE CHARACTER OF THE ASSAULT

AND THE USE OF A DEADLY WEAPON ARE FACTORS TO BE CONSIDERED.

RACKETEERING ACTS 49(B) THROUGH (F) OF COUNT TWO

CHARGE THAT, ON OR ABOUT NOVEMBER 17, 1996, IN THE STATE OF

MARYLAND, THE DEFENDANTS SAMUEL CARSON, WILLIAM SWEENEY AND

SEAN COATES, WHILE ARMED WITH PISTOLS, MURDERED ALONZO

GASKINS, DARNELL MACK AND MELODY ANDERSON.  THE DEFENDANTS

ARE CHARGED WITH BOTH FIRST-DEGREE PREMEDITATED MURDER AND

FIRST-DEGREE FELONY MURDER.

UNDER MARYLAND LAW, TO CONVICT A DEFENDANT OF

FIRST-DEGREE PREMEDITATED MURDER, THE GOVERNMENT MUST

App 1467

PROVE

BEYOND A REASONABLE DOUBT:

THAT THE CONDUCT OF THE DEFENDANT CAUSED THE DEATH

OF THE VICTIM; AND

THAT THE KILLING WAS WILLFUL, DELIBERATE, AND

PREMEDITATED.

"WILLFUL" MEANS THAT THE DEFENDANT ACTUALLY

INTENDED TO KILL THE VICTIM.  "DELIBERATE" MEANS THAT THE

DEFENDANT WAS CONSCIOUS OF THE INTENT TO KILL.

"PREMEDITATED" MEANS THAT THE DEFENDANT THOUGHT ABOUT THE

KILLINGS AND THAT THERE WAS ENOUGH TIME BEFORE THE KILLING,

THOUGH IT MAY ONLY HAVE BEEN BRIEF, FOR THE DEFENDANT TO

CONSIDER THE DECISION WHETHER OR NOT TO KILL AND ENOUGH TIME

TO WEIGH THE REASONS FOR AND AGAINST THE CHOICE.  THE

PREMEDITATED INTENT TO KILL MUST BE FORMED BEFORE THE

KILLING.

UNDER MARYLAND LAW, TO CONVICT A DEFENDANT OF

FIRST-DEGREE FELONY MURDER WHILE ARMED, THE GOVERNMENT MUST

PROVE BEYOND A REASONABLE DOUBT:

App 1468

THAT THE DEFENDANT OR ANOTHER PERSON PARTICIPATING IN THE CRIME WITH THE DEFENDANT ATTEMPTED TO COMMIT THE FELONY OF ROBBERY;

THAT THE DEFENDANT OR ANOTHER PARTICIPATING IN THE CRIME KILLED THE VICTIM;

THAT THE ACT RESULTING IN THE DEATH OF THE VICTIM OCCURRED DURING AN ATTEMPTED COMMISSION OF THE ROBBERY OR ESCAPE FROM THE IMMEDIATE SCENE OF THE ATTEMPTED ROBBERY;

AND

THAT THE DEFENDANT OR ANOTHER PERSON PARTICIPATING IN THE CRIME USED A DANGEROUS WEAPON WHILE ATTEMPTING TO COMMIT THE FELONY ROBBERY.

IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE DEFENDANT INTENDED TO KILL THE VICTIM. THE CRIME OF ATTEMPTED ARMED ROBBERY IS DEFINED ABOVE IN MY INSTRUCTIONS AND YOU ARE TO REFER TO THOSE INSTRUCTIONS IN CONSIDERING THESE RACKETEERING ACTS.

11

IN CONSIDERING THIS CHARGE AS TO EACH OF THE

DEFENDANTS, YOU SHOULD APPLY THE CONCEPT OF ACCOMPLICE LIABILITY.  WHEN TWO OR MORE PERSONS PARTICIPATE IN A CRIMINAL OFFENSE, EACH PERSON IS RESPONSIBLE FOR THE COMMISSION OF THE OFFENSE AND FOR ANY OTHER CRIMINAL ACTS DONE IN FURTHERANCE OF THE COMMISSION OF THE OFFENSE OR ESCAPE THEREFROM.

AN ACCOMPLICE IS A PERSON WHO AS A RESULT OF HIS STATUS AS A PARTY TO AN OFFENSE IS CRIMINALLY RESPONSIBLE FOR THE CRIMES COMMITTED BY ANOTHER.  THIS RESPONSIBILITY, KNOWN AS ACCOMPLICE LIABILITY, TAKES TWO FORMS:  (1) RESPONSIBILITY FOR THE PLANNED OR PRINCIPAL OFFENSE, WHICH IN THIS CASE IS ATTEMPTED ROBBERY, AND (2) RESPONSIBILITY FOR ANY OTHER CRIMINAL ACTS INCIDENTAL TO THE COMMISSION OF THE PRINCIPAL OFFENSE.

IN ORDER FOR A DEFENDANT TO BE GUILTY OF THE PRINCIPAL OFFENSE, ATTEMPTED ROBBERY, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT PARTICIPATED IN THE PRINCIPAL OFFENSE, EITHER AS AN ACTUAL PERPETRATOR OR BY AIDING AND ABETTING THE PERPETRATOR OF THE PRINCIPAL OFFENSE.

IN ORDER FOR THE DEFENDANT TO BE GUILTY OF OTHER

CRIMINAL ACTS INCIDENTAL TO THE COMMISSION OF THE PRINCIPAL

OFFENSE, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT

THAT THE DEFENDANT IS GUILTY OF THE PRINCIPAL OFFENSE EITHER

12

BY ACTUALLY COMMITTING THE ACTUAL OFFENSE OR BY AIDING AND

ABETTING THE PERPETRATOR OF THE PRINCIPAL OFFENSE, AND (2)

THE CRIMINAL ACTS INCIDENTAL TO THE COMMISSION OF THE

PRINCIPAL OFFENSE WERE COMMITTED DURING THE COURSE OF OR IN

FURTHERANCE OF THE PRINCIPAL OFFENSE OR ESCAPE THEREFROM.

THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE

DEFENDANT INTENDED TO COMMIT THE CRIMES INCIDENTAL TO THE

PRINCIPAL OFFENSE OR THAT HE KNEW THAT HIS CO-DEFENDANT WAS

GOING TO COMMIT THE CRIMES INCIDENTAL TO THE COMMISSION OF

THE PRINCIPAL OFFENSE.

IF TWO OR MORE PEOPLE, ACTING TOGETHER, ARE

COMMITTING OR ATTEMPTING TO COMMIT THE CRIME OF ROBBERY

AND

ONE OF THEM, IN THE COURSE OF THE FELONY AND IN FURTHERANCE

OF THE COMMON PURPOSE TO COMMIT THE ARMED ROBBERY OR ESCAPE

THEREFROM, KILLS A HUMAN BEING, BOTH THE PERSON WHO

COMMITTED THE KILLING AND THE PERSON OR PERSONS WHO AIDED

AND ABETTED IN THE FELONY ARE GUILTY OF FELONY MURDER.

WITH RESPECT TO THE OTHER RACKETEERING ACTS

ALLEGED IN COUNT TWO, THE INSTRUCTIONS TO FOLLOW WILL

EXPLAIN THE ELEMENTS OF SUBSTANTIVE CHARGES OF FIRST-DEGREE

MURDER WHILE ARMED, ATTEMPTED MURDER, ASSAULT WITH INTENT TO

KILL WHILE ARMED, ASSAULTING A POLICE OFFICER, DISTRIBUTION

OF CONTROLLED SUBSTANCES, POSSESSION WITH INTENT TO

DISTRIBUTE CONTROLLED SUBSTANCES, UNLAWFUL USE OF A FIREARM,

AND UNLAWFUL POSSESSION OF A FIREARM.

13

YOU SHOULD APPLY THOSE INSTRUCTIONS IN CONSIDERING

WHETHER THE GOVERNMENT HAS PROVEN BEYOND A REASONABLE DOUBT

THAT ONE OR MORE OF THE DEFENDANTS AGREED TO THE COMMISSION

OF THE RACKETEERING ACTS SPECIFIED IN COUNT TWO.

IF YOU FIND THAT A DEFENDANT IS GUILTY OF THE RICO CONSPIRACY CHARGED IN COUNT TWO, YOU SHOULD INDICATE ON THE VERDICT FORM THE TWO OR MORE RACKETEERING ACTS YOU FIND THAT A DEFENDANT YOU HAVE FOUND GUILTY AGREED TO PERSONALLY COMMIT OR THAT HE AGREED THAT ANOTHER RICO CO-CONSPIRATOR WOULD COMMIT IN FURTHERANCE OF THE CONSPIRACY.

THE REMAINING COUNTS IN THE EARLIER INDICTMENT, NO. 98-329, CHARGE VIOLATIONS OF BOTH FEDERAL AND DISTRICT OF COLUMBIA CRIMINAL STATUTES OTHER THAN THE NARCOTICS CONSPIRACY AND THE RICO CONSPIRACY. AS YOU EXAMINE THESE COUNTS OF THE INDICTMENT, YOU WILL NOTICE THAT IN SOME OF THESE COUNTS THAT THEIR FACTUAL BASIS MAY CORRESPOND TO CERTAIN OF THE OVERT AGENTS ALLEGED IN COUNT ONE AND TO THE RACKETEERING ACTS ALLEGED IN COUNT TWO. THIS IS NOT UNUSUAL IN A CASE SUCH AS THIS. THE SAME CONDUCT MAY VIOLATE THE NARCOTICS CONSPIRACY STATUTE, RICO, AND OTHER FEDERAL AND DISTRICT OF COLUMBIA LAWS AT ONE TIME. IT IS NEITHER INCONSISTENT NOR IMPROPER FOR THE GOVERNMENT TO USE PART OR

ALL OF THE SAME BODY OF EVIDENCE TO PROVE A DEFENDANT'S

GUILT OF NARCOTICS CONSPIRACY, RICO CONSPIRACY, AND OTHER

RELATED AND UNDERLYING SEPARATE FEDERAL AND DISTRICT OF

14

COLUMBIA OFFENSES.

IN CONSIDERING THESE COUNTS, YOU SHOULD RECALL MY

JURY INSTRUCTION NUMBER 39 ON "VICARIOUS GUILT."  THOSE

INSTRUCTIONS DESCRIBE THE CIRCUMSTANCES WHERE A DEFENDANT

MAY BE FOUND GUILTY OF A CRIME CHARGED IN THE INDICTMENT

EVEN IF THE CRIMINAL ACT ITSELF WAS COMMITTED BY SOMEONE

ELSE.

IN COUNTS 3, 4, 5, 6, 7, 8, 10, 15 AND 21 OF THE

INDICTMENT, ONE OR MORE OF THE DEFENDANTS ARE CHARGED WITH

FIRST-DEGREE MURDER WHILE ARMED.  THESE CHARGES ARISE FROM

THE ALLEGED MURDERS OF LARRY WRIGHT, MAURICE HALLMAN,

LEONARD HYSON, TERESA THOMAS, TERITA LUCAS, ANTHONY FORTUNE,

GLENN JENKINS, DONNELL WHITFIELD, AND CHRISHAUNA GLADDEN.

COUNT 3 ALLEGES THAT THE DEFENDANT VINCENT HILL,

WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND PREMEDITATED MALICE, KILLED LARRY WRIGHT BY SHOOTING HIM WITH A PISTOL ON OR ABOUT JUNE 29, 1989.

COUNT 4 ALLEGES THAT THE DEFENDANT SAMUEL CARSON, WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND PREMEDITATED MALICE, KILLED MAURICE HALLMAN BY SHOOTING HIM WITH A PISTOL ON OR ABOUT DECEMBER 19TH, 1989.

COUNT 5 ALLEGES THAT DEFENDANT SAMUEL CARSON, WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND PREMEDITATED MALICE, KILLED LEONARD HYSON BY SHOOTING HIM WITH A PISTOL ON OR ABOUT DECEMBER 19TH, 1989.

15

COUNT 6 ALLEGES THAT THE DEFENDANT SAMUEL CARSON, WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND PREMEDITATED MALICE, KILLED TERESA THOMAS BY SHOOTING HER WITH A PISTOL ON OR ABOUT MARCH 22, 1991.

COUNT 7 ALLEGES THAT THE DEFENDANT SAMUEL CARSON, WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND

PREMEDITATED MALICE, KILLED TERITA LUCAS BY SHOOTING HER

WITH A PISTOL ON OR ABOUT MARCH 22, 1991.

COUNT 8 ALLEGES THAT DEFENDANT JEROME MARTIN --

DEFENDANTS JEROME MARTIN AND SAMUEL CARSON, WHILE ARMED WITH

A PISTOL, PURPOSELY AND WITH DELIBERATE AND PREMEDITATED

MALICE, KILLED ANTHONY FORTUNE BY SHOOTING HIM WITH A PISTOL

ON OR ABOUT AUGUST 6, 1991.

COUNT 10 ALLEGES THAT THE DEFENDANTS WILLIAM

SWEENEY AND SEAN COATES, WHILE ARMED WITH A PISTOL,

PURPOSELY AND WITH DELIBERATE AND PREMEDITATED MALICE,

KILLED GLENN JENKINS BY SHOOTING HIM WITH A PISTOL ON OR

ABOUT JULY 7TH, 1993.

COUNT 16 ALLEGATIONS THAT THE DEFENDANT WILLIAM

SWEENEY, WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH

DELIBERATE AND PREMEDITATED MALICE, KILLED DONNELL WHITFIELD

BY SHOOTING HIM WITH A PISTOL ON OR ABOUT SEPTEMBER 26,

1994.

COUNT 21 ALLEGES THAT THE DEFENDANT SAMUEL CARSON,

WHILE ARMED WITH A PISTOL, PURPOSELY AND WITH DELIBERATE AND

App 1476

16

PREMEDITATED MALICE, KILLED CHRISHAUNA GLADDEN BY SHOOTING HER WITH A PISTOL ON OR ABOUT OCTOBER 5, 1996.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF FIRST—DEGREE MURDER WHILE ARMED, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT —— THE ELEMENTS OF FIRST—DEGREE MURDER ARE:

1. THAT THE DEFENDANT CAUSED THE DEATH OF ANOTHER;

2. THAT HE DID SO WITH THE SPECIFIC INTENT TO KILL;

3. THAT HE DID SO AFTER PREMEDITATION AND DELIBERATION; AND

4. THAT, AT THE TIME OF THE OFFENSE, HE WAS ARMED WITH A FIREARM.

"SPECIFIC INTENT TO KILL" MEANS PURPOSE OR CONSCIOUS INTENTION TO CAUSE DEATH.

"PREMEDITATION" MEANS FORMING AN INTENT TO DESIGN OR KILL —— AN INTENT OR DESIGN TO KILL. TO PREMEDITATE IS TO GIVE THOUGHT, BEFORE ACTING, TO TAKING A HUMAN LIFE, AND THEN TO REACH A DEFINITE DECISION TO KILL.

"DELIBERATION" MEANS CONSIDERING AND REFLECTING ON THE PRECONCEIVED DESIGN TO KILL, TURNING IT OVER IN THE

MIND, AND GIVING IT SECOND THOUGHT.

ALTHOUGH PREMEDITATION -- THAT IS THE FORMATION OF

A DESIGN TO KILL -- MAY BE INSTANTANEOUS -- LET ME START

AGAIN.

17

ALTHOUGH PREMEDITATION, THAT IS, THE FORMATION OF

A DESIGN TO KILL, MAY BE INSTANTANEOUS, AS QUICK AS THOUGHT

ITSELF, IT IS NECESSARY THAT AN APPRECIABLE TIME ELAPSE

BETWEEN THE FORMATION OF THE DESIGN AND THE FATAL ACT,

WITHIN WHICH THERE IS, IN FACT, DELIBERATION.

THE LAW REQUIRES NO PARTICULAR PERIOD OF TIME. IT

NECESSARILY VARIES ACCORDING TO THE CIRCUMSTANCES OF EACH

CASE.  CONSIDERATION OF THE MATTER MAY CONTINUE OVER A

LONG -- PROLONGED PERIOD -- HOURS, DAYS OR EVEN LONGER.

THEN AGAIN, IT MAY COVER A SPAN OF MINUTES OR LESS.

AFTER FORMING AN INTENT TO KILL, IF ONE DOES NOT

ACT INSTANTLY, BUT PAUSES AND ACTUALLY GIVES SECOND THOUGHT

AND CONSIDERATION TO THE INTENDED ACT, HE HAS, IN FACT,

DELIBERATED.  IT IS THE FACT OF DELIBERATION THAT IS THE

ESSENTIAL -- IT IS THE FACT OF DELIBERATION THAT IS

App 1478

ESSENTIAL, NOT THE LENGTH OF TIME IT MAY HAVE GONE ON.

IN COUNTS 11, 14, 16, 18, 20, 22, 24, 25, 26 AND 27 OF THE INDICTMENT, ONE OR MORE DEFENDANTS ARE CHARGED WITH COMMITTING VIOLENT CRIMES IN AID OF RACKETEERING ACTIVITY, NAMELY, MURDER, ATTEMPTED MURDER, ATTEMPTED ARMED ROBBERY, AND KIDNAPPING WHILE ARMED. THESE CHARGES ARISE FROM THE ALLEGED MURDERS OF DONNELL WHITFIELD, CHRISHAUNA GLADDEN, ALONZO GASKINS, DARNELL MACK, AND MELODY ANDERSON; THE ALLEGED ATTEMPTED MURDERS OF ULYSSES ENGLISH, JAMES COULTER, POPA MARK PHILLIP AND RONALD SOWELLS; AND THE

18

ALLEGED KIDNAPPING, ATTEMPTED ROBBERY AND ATTEMPTED MURDER OF ANTHONY PRYOR.

COUNT 11 ALLEGES THAT THE DEFENDANTS VINCENT HILL, WILLIAM SWEENEY AND SEAN COATES, WHILE ARMED WITH PISTOLS, ASSAULTED AND ATTEMPTED TO KIDNAP, ROB AND MURDER ANTHONY PRYOR ON OR ABOUT OCTOBER 22, 1993.

COUNT 14 ALLEGES THAT THE DEFENDANT SAMUEL CARSON,

WHILE ARMED WITH A PISTOL, ATTEMPTED TO MURDER AND ASSAULTED

ULYSSES ENGLISH WITH A DANGEROUS WEAPON ON OR ABOUT JUNE 26,

1994.

COUNT 16 ALLEGES THAT THE DEFENDANT WILLIAM

SWEENEY, WHILE ARMED WITH A PISTOL, UNLAWFULLY, WILLFULLY,

KNOWINGLY, AND WITH DELIBERATE AND PREMEDITATED MALICE,

KILLED DONNELL WHITFIELD ON OR ABOUT SEPTEMBER 26, 1994.

COUNT 18 ALLEGES THAT THE DEFENDANT JEROME MARTIN,

WHILE ARMED WITH A PISTOL, ATTEMPTED TO MURDER AND ASSAULTED

JAMES COULTER WITH A DANGEROUS WEAPON ON OR ABOUT MAY 30,

1995.

COUNT 20 ALLEGES THAT THE DEFENDANT SAMUEL CARSON,

WHILE ARMED WITH A PISTOL, ATTEMPTED TO MURDER AND ASSAULTED

POPA MARK PHILLIP WITH A DANGEROUS WEAPON ON OR ABOUT AUGUST

30, 1996.

COUNT 22 ALLEGED THAT THE DEFENDANT SAMUEL CARSON,

WHILE ARMED WITH A PISTOL, UNLAWFULLY, WILLFULLY, KNOWINGLY,

AND WITH DELIBERATE AND PREMEDITATED MALICE, KILLED

19

CHRISHAUNA GLADDEN ON OR ABOUT OCTOBER 5, 1996.

COUNT 24 ALLEGES THAT THE DEFENDANTS SAMUEL CARSON AND SEAN COATES, WHILE ARMED WITH A PISTOL, ATTEMPTED TO MURDER AND ASSAULTED RONALD SOWELLS WITH A DANGEROUS WEAPON ON OR ABOUT OCTOBER 30, 1996.

IN COUNTS 25, 26 AND 27, THE DEFENDANTS SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES, ARE CHARGED WITH COMMITTING VIOLENT CRIMES IN AID OF RACKETEERING ACTIVITY, NAMELY MURDER.

COUNT 25 RELATES TO THE MURDER OF ALONZO GASKINS ON OR ABOUT NOVEMBER 17, 1996.

COUNT 26 RELATES TO THE SPECIFIC MURDER OF DARNELL MACK ON OR ABOUT NOVEMBER 17, 1996.

COUNT 27 RELATES TO THE MURDER OF MELODY ANDERSON ON OR ABOUT NOVEMBER 17, 1996.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

1. THAT THERE EXISTED, AS CHARGED IN THE

INDICTMENT, AN ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY,

AS I HAVE DEFINED THAT TERM FOR YOU;

2. THAT THE DEFENDANT MURDERED, ATTEMPTED TO MURDER, KIDNAPPED, OR ROBBED ANOTHER LIVING PERSON; AND

3. THAT THE MURDER, ATTEMPTED MURDER, KIDNAPPING, OR ATTEMPTED ARMED ROBBERY THAT I HAVE JUST REFERRED TO WAS

20

UNDERTAKEN FOR THE PURPOSE OF GAINING ENTRANCE TO, OR INCREASING, OR MAINTAINING THE DEFENDANT'S POSITION IN THE ENTERPRISE OR FOR THE PURPOSE OF RECEIVING MONEY FROM THE ENTERPRISE.

THE FIRST ELEMENT THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE ENTERPRISE ALLEGED IN THE INDICTMENT EXISTED. I HAVE ALREADY DISCUSSED THE ENTERPRISE IN CONNECTION WITH COUNT TWO, AND YOU SHOULD APPLY THOSE INSTRUCTIONS HERE AS WELL.

YOU MUST ALSO FIND THAT THIS ENTERPRISE ENGAGED IN RACKETEERING ACTIVITIES. I HAVE DEFINED THAT TERM FOR YOU AS WELL, AND YOU SHOULD NOT -- AND YOU SHOULD APPLY IT

IN

THESE INSTRUCTIONS.

THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE

BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT COMMITTED

THE MURDER, ATTEMPTED MURDER, KIDNAPPING, OR ATTEMPTED ARMED

ROBBERY SPECIFIED IN THE COUNT.

WITH RESPECT TO COUNTS 16 AND 22, THE GOVERNMENT

MUST PROVE BEYOND A REASONABLE DOUBT THAT, IN THE DISTRICT

OF COLUMBIA, ON OR ABOUT THE DATES SET FORTH IN THE

INDICTMENT, THE NAMED DEFENDANT, WHILE ARMED WITH A PISTOL,

UNLAWFULLY, WILLINGLY, KNOWINGLY AND WITH DELIBERATE AND

PREMEDITATED MALICE, KILLED THE INDIVIDUAL IDENTIFIED

THEREIN.

I HAVE ALREADY INSTRUCTED YOU ON THE OFFENSE OF

21

FIRST DEGREE-MURDER IN VIOLATION OF DISTRICT OF COLUMBIA

LAW.  YOU SHOULD REFER TO THOSE INSTRUCTIONS AT THIS POINT

IN YOUR DELIBERATIONS AS WELL.

WITH RESPECT TO COUNTS 25, 26 AND 27, THE

GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT IN THE

STATE OF MARYLAND, ON OR ABOUT NOVEMBER 17, 1996, DEFENDANTS

SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES, WHILE ARMED

WITH A PISTOL, UNLAWFULLY -- LET ME START THAT OVER AGAIN.

WITH RESPECT TO COUNTS 25, 26 AND 27, THE

GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT IN THE

STATE OF MARYLAND, ON OR ABOUT NOVEMBER 17, 1996, DEFENDANTS

SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES, WHILE ARMED

WITH A PISTOL, UNLAWFULLY, WILLFULLY, KNOWINGLY AND WITH

DELIBERATE AND PREMEDITATED MALICE, AND IN THE PERPETRATION

OF, OR AN ATTEMPT TO PERPETRATE, THE CRIME OF ROBBERY,

KILLED THE INDIVIDUALS IDENTIFIED THEREIN.

I HAVE ALREADY INSTRUCTED YOU ON THE OFFENSES OF

FIRST-DEGREE PREMEDITATED MURDER AND FIRST-DEGREE FELONY

MURDER UNDER MARYLAND LAW.  YOU SHOULD REFER TO THOSE

INSTRUCTIONS HERE AS WELL.

WITH RESPECT TO COUNT 11, THE GOVERNMENT MUST

PROVE BEYOND A REASONABLE DOUBT THAT, IN THE STATE OF

MARYLAND, ON OR ABOUT OCTOBER 22, 1993, DEFENDANTS VINCENT

HILL, WILLIAM SWEENEY AND SEAN COATES, WHILE ARMED WITH

PISTOLS, ASSAULTED AND ATTEMPTED TO KIDNAP, ROB, AND MURDER

ANTHONY PRYOR. I HAVE ALREADY INSTRUCTED YOU ON THE OFFENSES OF ASSAULT WITH INTENT TO MURDER, KIDNAPPING WHILE ARMED, AND ATTEMPTED ARMED ROBBERY UNDER MARYLAND LAW. YOU SHOULD REFER TO THOSE INSTRUCTIONS AS WELL.

WITH RESPECT TO COUNTS 14, 18, 20 AND 24, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT, ON OR ABOUT THE DATES SET FORTH IN THE INDICTMENT, THE NAMED DEFENDANT OR DEFENDANTS, WHILE ARMED WITH A PISTOL, ASSAULTED AND ATTEMPTED TO MURDER THE INDIVIDUAL IDENTIFIED THEREIN. IN THE INSTRUCTIONS TO FOLLOW, I WILL INSTRUCT YOU ON THE OFFENSE OF ASSAULT WITH INTENT TO KILL WHILE ARMED IN VIOLATION OF DISTRICT OF COLUMBIA LAW. YOU SHOULD REFER TO THOSE INSTRUCTIONS HERE AS WELL.

THE LAST ELEMENT THAT I WILL INSTRUCT YOU ON FOR THIS OFFENSE OF VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY IS THE ONE THAT REQUIRES THE GOVERNMENT TO PROVE

App 1485

BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED FOR THE

PURPOSE OF (1) A PROMISE OR AGREEMENT TO PAY SOMETHING OF

VALUE FROM THE ENTERPRISE OR (2) GAINING ENTRANCE TO,

MAINTAINING, OR INCREASING HIS POSITION -- LET ME START THAT

AGAIN.

THE LAST ELEMENT THAT I WILL INSTRUCT YOU ON FOR

THIS OFFENSE OF VIOLENT CRIME IN AID OF RACKETEERING

ACTIVITY IS THE ONE THAT REQUIRES THE GOVERNMENT TO PROVE

BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED FOR THE

23

PURPOSE OF (1) A PROMISE OR AGREEMENT TO PAY SOMETHING OF

VALUE FROM THE ENTERPRISE OR (2) GAINING ENTRANCE TO,

MAINTAINING, OR INCREASING HIS POSITION IN THAT ENTERPRISE.

THE WORDS "PROMISE OR AGREEMENT TO PAY SOMETHING

OF PECUNIARY VALUE FROM THE ENTERPRISE" SHOULD BE GIVEN

THEIR ORDINARY MEANING, THAT IS, THE DEFENDANT UNDER

CONSIDERATION BELIEVED THAT HE WOULD DERIVE SOMETHING

VALUABLE FROM THE ENTERPRISE FOR HAVING COMMITTED THE CRIME.

TO ESTABLISH THAT THE CRIME OF VIOLENCE WAS COMMITTED FOR THE PURPOSE OF "GAINING ENTRANCE TO, MAINTAINING, OR INCREASING" POSITION IN THE ENTERPRISE, THE GOVERNMENT MUST PROVE THAT THE DEFENDANT'S GENERAL PURPOSE IN COMMITTING THE CRIME WAS TO GAIN ENTRANCE TO, INCREASE, OR MAINTAIN HIS POSITION IN THE ENTERPRISE.  SELF-PROMOTION NEED NOT HAVE BEEN THE DEFENDANT'S ONLY OR EVEN HIS PRIMARY CONCERN, IF IT WAS COMMITTED AS AN INTEGRAL ASPECT OF MEMBERSHIP IN THE ENTERPRISE.

THE MOTIVE REQUIREMENT IS THUS SATISFIED IF THE DEFENDANT COMMITTED THE VIOLENT CRIME BECAUSE HE KNEW IT WAS EXPECTED OF HIM BY REASON OF HIS MEMBERSHIP IN THE ENTERPRISE, OR THAT HE COMMITTED IT IN FURTHERANCE OF THAT MEMBERSHIP, OR BECAUSE IT WOULD ENHANCE HIS POSITION OR PRESTIGE WITHIN THE ENTERPRISE.  THESE EXAMPLES ARE BY WAY OF ILLUSTRATION AND ARE NOT INTENDED TO BE EXHAUSTIVE.

ALL RIGHT.  LADIES AND GENTLEMEN.  WE'LL TAKE A

24

BRIEF RECESS.

(RECESS WAS TAKEN.)

(AFTER RECESS.)

THE DEPUTY MARSHAL: THE JURY PANEL, YOUR HONOR.

(JURY IN.)

THE DEPUTY MARSHAL: THE JURY PANEL IS ALL PRESENT, YOUR HONOR.

THE COURT: THANK YOU, MARSHAL.

BEAR WITH ME, LADIES AND GENTLEMEN. IT WOULDN'T BE MUCH LONGER.

IN COUNTS 12, 13, 17, 19 AND 23 OF THE INDICTMENT, ONE OR MORE OF THE DEFENDANTS ARE CHARGED WITH THE OFFENSE OF ASSAULT WITH INTENT TO KILL WHILE ARMED OR WITH AIDING AND ABETTING THE OFFENSE. THESE CHARGES ARISE FROM ALLEGED ASSAULTS UPON PEOPLE IDENTIFIED AS ROLAND BROWN, ULYSSES ENGLISH, JAMES COULTER, POPA MARK PHILLIP, AND RONALD SOWELLS. THE DEFENDANTS CHARGED IN COUNTS 19 AND 23 ARE ALSO CHARGED WITH AIDING AND ABETTING IN THE OFFENSE.

COUNT 12 ALLEGES THAT THE DEFENDANT SAMUEL CARSON, WHILE ARMED WITH A PISTOL, ASSAULTED ROLAND BROWN WITH INTENT TO KILL HIM ON OR ABOUT OCTOBER 28, 1993.

COUNT 13 ALLEGES THAT THE DEFENDANT SAMUEL

CARSON,

WHILE ARMED WITH A PISTOL, ASSAULTED ULYSSES ENGLISH WITH

INTENT TO KILL HIM ON OR BOUT JUNE 26, 1994.

COUNT 27 ALLEGES THAT THE DEFENDANT JEROME MARTIN,

WHILE ARMED WITH A PISTOL, ASSAULTED JAMES COULTER WITH

INTENT TO KILL HIM ON OR ABOUT MAY 30, 1995.

COUNT 19 ALLEGES THAT THE DEFENDANT SAMUEL CARSON,

WHILE ARMED WITH A PISTOL, ASSAULTED POPA MARK PHILLIP WITH

INTENT TO KILL HIM ON OR ABOUT AUGUST 30, 1996.

AND COUNT 23 ALLEGES THAT DEFENDANTS SAMUEL CARSON

AND SEAN COATES, WHILE ARMED WITH A PISTOL, ASSAULTED RONALD

SOWELLS WITH INTENT TO KILL HIM ON OR ABOUT OCTOBER 30,

1996.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF ASSAULT

WITH INTENT TO KILL WHILE ARMED, EACH OF WHICH THE

GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE DEFENDANT MADE AN ASSAULT ON THE

COMPLAINANT;

THAT HE DID SO WITH THE SPECIFIC INTENT TO

KILL

THE COMPLAINANT; AND

THAT AT THE TIME OF THE OFFENSE, THE DEFENDANT WAS

ARMED WITH A PISTOL OR FIREARM.

TO PROVE THE FIRST ELEMENT OF THIS OFFENSE, THE

GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT THE

DEFENDANT MADE AN ATTEMPT OR EFFORT, WITH FORCE OR VIOLENCE,

TO INJURE ANOTHER PERSON; THAT AT THE TIME HE MADE THAT

ATTEMPT OR EFFORT, HE HAD THE APPARENT PRESENT ABILITY TO

INJURE THAT PERSON; AND THAT THE ATTEMPT OR EFFORT WAS MADE

VOLUNTARILY, ON PURPOSE AND NOT BY ACCIDENT OR MISTAKE.

"SPECIFIC INTENT TO KILL" MEANS PURPOSE OR

CONSCIOUS INTENTION TO CAUSE DEATH.

CERTAIN COUNTS OF THE EARLIER INDICTMENT CHARGE

ONE OR MORE OF THE DEFENDANTS WITH COMMITTING CRIMES AGAINST

PERSONS, NAMED AND UNNAMED IN THE INDICTMENT, WHO DID NOT

TESTIFY DURING THE TRIAL OF THIS CASE.  THE REASON WHY THESE

COMPLAINANTS OR ALLEGED VICTIMS DID NOT TESTIFY IS NOT

OF

YOUR CONCERN.

TESTIMONY CONCERNING THESE ALLEGED INCIDENTS OFTEN

CAME FROM PERSONS WHO TESTIFIED AS COOPERATORS OR PERSONS

WHO ENTERED INTO PLEA AGREEMENTS WITH THE GOVERNMENT.  I

HAVE PREVIOUSLY INSTRUCTED YOU AS TO THE FACTORS YOU MAY

CONSIDER IN JUDGING THE CREDIBILITY OF THESE WITNESSES. YOU

ARE TO TAKE INTO ACCOUNT ALL OF THESE CONSIDERATIONS IN

DETERMINING WHETHER THE GOVERNMENT HAS PROVED BEYOND A

REASONABLE DOUBT THE ALLEGATIONS CONTAINED IN THOSE COUNTS

PERTAINING TO VICTIMS WHO DID NOT TESTIFY OR WHO WERE NOT

IDENTIFIED IN THE INDICTMENT.

IF YOU ARE NOT SATISFIED BEYOND A REASONABLE DOUBT

THAT THE ALLEGED CRIMES OCCURRED OR THAT THE PERSONS NAMED

OR UNNAMED WERE THE VICTIMS, YOU MUST FIND THE DEFENDANTS

CHARGED IN THOSE COUNTS NOT GUILTY.

IN COUNT 9 OF THE INDICTMENT, THE DEFENDANT JEROME

MARTIN IS CHARGED WITH ASSAULTING, RESISTING, AND

INTERFERING WITH AN OFFICER WITH A DANGEROUS WEAPON AND WITH

27

AIDING AND ABETTING THE OFFENSE.  THIS CHARGE ARISES FROM AN ALLEGED ASSAULT WITH A FIREARM OF OFFICER MARC LITTLE ON OR ABOUT SEPTEMBER 10TH, 1991.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF ASSAULT ON A POLICE OFFICER, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE COMPLAINANT WAS A MEMBER OF A POLICE FORCE OPERATING IN THE DISTRICT OF COLUMBIA;

THAT THE DEFENDANT ASSAULTED, RESISTED, OPPOSED, IMPEDED, INTIMIDATED OR INTERFERED WITH THE COMPLAINANT;

THAT THE DEFENDANT DID SO WHILE THE COMPLAINANT WAS ENGAGED IN THE PERFORMANCE OF HIS OFFICIAL DUTIES;

THAT AT THE TIME THE DEFENDANT DID SO, HE KNEW OR HAD REASON TO BELIEVE THAT THE COMPLAINANT WAS A MEMBER OF A POLICE FORCE OPERATING IN THE DISTRICT OF COLUMBIA; AND

THAT THE DEFENDANT ACTED VOLUNTARILY AND ON PURPOSE, AND NOT BY MISTAKE OR ACCIDENT.

IN COUNTS 28 THROUGH 37 OF THE INDICTMENT, ONE OR MORE OF THE DEFENDANTS ARE CHARGED WITH USING OR

CARRYING A

A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING OFFENSE.

IN COUNT 28, THE DEFENDANTS VINCENT HILL, WILLIAM SWEENEY AND SEAN COATES ARE CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO CRIMES OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT OCTOBER 22, 1993, IN

28

AND A

CONJUNCTION WITH THE ATTEMPT TO KIDNAP, ROB, AND MURDER AND THE ASSAULT WITH A DANGEROUS WEAPON OF ANTHONY PRYOR AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 11.

IN COUNT 29, THE DEFENDANT SAMUEL CARSON IS CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT JUNE 26, 1994, IN CONJUNCTION WITH THE ATTEMPT TO MURDER AND ASSAULT WITH A DANGEROUS WEAPON OF ULYSSES ENGLISH AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY,

AS CHARGED IN COUNT 14.

IN COUNT 30, THE DEFENDANT WILLIAM SWEENEY IS CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT SEPTEMBER 26, 1994, IN CONJUNCTION WITH THE MURDER OF DONNELL WHITFIELD AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 16.

IN COUNT 31, THE DEFENDANT JEROME MARTIN IS CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT MAY 30, 1995, IN CONJUNCTION WITH THE ATTEMPT TO MURDER AND ASSAULT WITH A DANGEROUS WEAPON OF JAMES COULTER AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 18.

IN COUNT 32, THE DEFENDANT SAMUEL CARSON IS

29

CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME, ON OR ABOUT AUGUST 30, 1996, IN CONJUNCTION WITH THE ATTEMPT TO MURDER AND ASSAULT WITH A DANGEROUS WEAPON OF POPA MARK

App 1494

PHILLIP AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 20.

IN COUNT 33, THE DEFENDANT SAMUEL CARSON IS CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT OCTOBER 5, 1996, IN CONJUNCTION WITH THE MURDER OF CHRISHAUNA GLADDEN AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 22.

IN COUNT 34, THE DEFENDANTS SAMUEL CARSON AND SEAN COATES ARE CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT OCTOBER 30, 1996, IN CONJUNCTION WITH THE ATTEMPT TO MURDER AND ASSAULT WITH A DANGEROUS WEAPON OF RONALD SOWELLS AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 24.

IN COUNT 35, DEFENDANTS SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES ARE CHARGED WITH USING AND CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT NOVEMBER 17, 1996, IN CONJUNCTION WITH THE MURDER OF ALONZO GASKINS AS A VIOLENT

CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT

30

25.

IN COUNT 36, DEFENDANTS SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES ARE CHARGED WITH USING AND CARRYING OR A FIREARM, DURING AND IN RELATION TO A CRIME OF VIOLENCE IN A DRUG-TRAFFICKING CRIME ON OR ABOUT NOVEMBER 17, 1996, IN CONJUNCTION WITH THE MURDER OF DARNELL MACK AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 26.

IN COUNT 37, DEFENDANTS SAMUEL CARSON, WILLIAM SWEENEY AND SEAN COATES ARE CHARGED WITH USING AND CARRYING OR A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME ON OR ABOUT NOVEMBER 17, 1996, IN CONJUNCTION WITH THE MURDER OF MELODY ANDERSON AS A VIOLENT CRIME IN AID OF RACKETEERING ACTIVITY, AS CHARGED IN COUNT 27.

COUNTS 28 THROUGH 37 ALSO CHARGE THE DEFENDANT OR

DEFENDANTS NAMED IN THOSE COUNTS WITH AIDING AND ABETTING.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF USING OR CARRYING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR A DRUG-TRAFFICKING CRIME, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE DEFENDANT USED OR CARRIED A FIREARM;

THAT THE DEFENDANT DID SO KNOWINGLY AND INTENTIONALLY, AND

THAT THE DEFENDANT DID SO DURING AND IN RELATION

31

TO A DRUG-TRAFFICKING CRIME, OR A CRIME OF VIOLENCE, OR BOTH.

BECAUSE THIS FIREARM COUNT MUST HAVE OCCURRED "DURING AND IN RELATION TO A DRUG-TRAFFICKING CRIME OR A CRIME OF VIOLENCE," AND BECAUSE THE UNDERLYING CRIMES RELIED IN UPON IN EACH OF THESE FIREARMS COUNTS ARE OTHER COUNTS THE INDICTMENT, YOU MUST FIRST UNANIMOUSLY AGREE THAT A DEFENDANT IS GUILTY OF THE PARTICULAR UNDERLYING COUNT AS ALLEGED IN THE INDICTMENT.  FOR EXAMPLE, IF THE COUNT CHARGES THE DEFENDANT WITH USING A FIREARM DURING AN

ASSAULT

WITH INTENT TO KILL WHILE ARMED, YOU MUST FIRST HAVE

UNANIMOUSLY AGREED THAT THE DEFENDANT IS GUILTY OF ASSAULT

WITH INTENT TO KILL WHILE ARMED.

THE TERM "DURING" AS USED ABOVE MEANS AT SOME

POINT IN THE COURSE OF THE CRIME OF VIOLENCE, REGARDLESS OF

HOW SHORT A PERIOD, WHEREAS "IN RELATION TO" MEANS THAT

THERE MUST BE A RELATION BETWEEN THE FIREARM AND THE

UNDERLYING NARCOTICS OFFENSE OR CRIME OF VIOLENCE.

AS TO THE OTHER TWO ELEMENTS -- THAT IS, THAT THE

DEFENDANT USED OR CARRIED A FIREARM, AND THAT HE DID SO

KNOWINGLY AND INTENTIONALLY -- YOU ARE FURTHER INSTRUCTED AS

FOLLOWS:

YOU ARE INSTRUCTED THAT THE WORD "USE" MEANS

ACTIVE EMPLOYMENT OF THE FIREARM.  A DEFENDANT USES A

FIREARM WHEN HE ACTIVELY EMPLOYS IT IN SOME WAY THAT IS

32

RELATED TO THE DRUG-TRAFFICKING CRIME OR CRIME OF VIOLENCE

THAT HE IS COMMITTING.  "USE" MAY INCLUDE BRANDISHING,

DISPLAYING, STRIKING WITH, FIRING OR ATTEMPTING TO FIRE, OR

MAKING REFERENCE TO A FIREARM IN THE DEFENDANT'S POSSESSION.

HOWEVER, MERE PRESENCE OF A FIREARM AT THE SCENE OF THE CRIME WITHOUT ACTIVE EMPLOYMENT OF THAT KIND IS NOT SUFFICIENT TO CONSTITUTE USE OF THAT FIREARM.

YOU ARE FURTHER INSTRUCTED THAT THE WORD "CARRY" MEANS TO BEAR ON OR ABOUT ONE'S PERSON.  A FIREARM IS CARRIED ON OR ABOUT ONE'S PERSON IF IT IS LOCATED IN SUCH PROXIMITY TO THE PERSON AS TO BE CONVENIENT OF ACCESS OR WITHIN REACH.  THUS, THE PHRASE "CARRIES A FIREARM" IS NOT LIMITED TO CARRYING OF FIREARMS ON THE PERSON, RATHER IT IS ALSO SATISFIED BY PROOF OF DOMINION AND CONTROL AND READY ACCESSIBILITY TO A GUN DURING THE DRUG-TRAFFICKING CRIME OR CRIME OF VIOLENCE THAT THE DEFENDANT IS COMMITTING.

FOR EXAMPLE, IT WOULD APPLY TO A PERSON WHO KNOWINGLY POSSESSES AND CONVEYS A FIREARM IN A VEHICLE, INCLUDING IN THE LOCKED GLOVE COMPARTMENT OR TRUNK OF A CAR WHICH THE PERSON OCCUPIES.

THE TERM "FIREARM" INCLUDES ANY WEAPON THAT WILL OR IS DESIGNED TO OR MAY READILY BE CONVERTED TO EXPEL A PROJECTILE BY THE ACTION OF AN EXPLOSIVE.

THE GOVERNMENT NEED NOT PROVE THAT THE FIREARM

LOADED OR OPERABLE. UNLOADED AND INOPERABLE PISTOLS CAN BE A BASIS FOR A VIOLATION OF THIS SECTION IF THE OTHER ELEMENTS OF THE OFFENSE ARE MET.

COUNTS 38 THROUGH 45 OF THE INDICTMENT CHARGE ONE OR MORE OF THE DEFENDANTS WITH POSSESSION OF A FIREARM DURING A CRIME OF VIOLENCE OR DANGEROUS OFFENSE.

IN COUNT 38, DEFENDANTS WILLIAM SWEENEY AND SEAN COATES ARE CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT JULY 7, 1993, AS ALLEGED IN COUNT 10, NAMELY, THE FIRST-DEGREE MURDER WHILE ARMED OF GLENN JENKINS.

IN COUNT 39, THE DEFENDANT SAMUEL CARSON IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT OCTOBER 28TH, 1993, AS ALLEGED IN COUNT 12, NAMELY, THE ASSAULT WITH INTENT TO KILL WHILE ARMED OF ROLAND BROWN.

IN COUNT 40, DEFENDANT SAMUEL CARSON IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A

App 1500

CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT JUNE 26, 1994, AS ALLEGED IN COUNT 13, NAMELY, THE ASSAULT WITH INTENT TO KILL WHILE ARMED OF ULYSSES ENGLISH.

IN COUNT 41, THE DEFENDANT WILLIAM SWEENEY IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT SEPTEMBER 26, 1994, AS ALLEGED IN COUNT 15, NAMELY, THE FIRST-DEGREE MURDER WHILE ARMED OF DONNELL WHITFIELD.

34

IN COUNT 42, THE DEFENDANT JEROME MARTIN IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR A DANGEROUS CRIME ON OR ABOUT MAY 30TH, 1995, AS ALLEGED IN COUNT 17, NAMELY, THE ASSAULT WITH WITH INTENT TO KILL WHILE ARMED OF JAMES COULTER.

IN COUNT 43, THE DEFENDANT SAMUEL CARSON IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT AUGUST 30TH, 1996, AS ALLEGED IN COUNT 19, NAMELY, THE ASSAULT WITH INTENT TO KILL WHILE ARMED OF POPA MARK PHILLIP.

App 1501

IN COUNT 44, THE DEFENDANT SAMUEL CARSON IS CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT OCTOBER 5, 1996, AS ALLEGED IN COUNT 21, NAMELY, THE FIRST-DEGREE MURDER WHILE ARMED OF CHRISHAUNA GLADDEN.

IN COUNT 45, THE DEFENDANTS SAMUEL CARSON AND SEAN COATES ARE CHARGED WITH POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME ON OR ABOUT OCTOBER 30, 1996, AS ALLEGED IN COUNT 23, NAMELY, THE ASSAULT WITH INTENT TO KILL WHILE ARMED OF RONALD SOWELLS.

COUNTS 38 THROUGH 45 ALSO CHARGE THE DEFENDANT OR DEFENDANTS NAMED IN THOSE COUNTS WITH AIDING AND ABETTING.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS CRIME, EACH OF WHICH THE GOVERNMENT

35

MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE DEFENDANT POSSESSED A PISTOL OR

FIREARM

OR AN IMITATION THEREOF;

THAT THE DEFENDANT POSSESSED THE PISTOL OR FIREARM

OR IMITATION THEREOF, WHILE COMMITTING A CRIME OF VIOLENCE

OR DANGEROUS CRIME, AND

THAT THE DEFENDANT POSSESSED THE PISTOL OR FIREARM

OR IMITATION THEREOF, KNOWINGLY AND INTENTIONALLY, THAT IS,

CONSCIOUSLY, VOLUNTARILY, AND ON PURPOSE, NOT MISTAKENLY,

ACCIDENTALLY OR INADVERTENTLY.

YOU ARE FURTHER INSTRUCTED THAT A FIREARM IS ANY

WEAPON THAT WILL EXPEL A BULLET OR OTHER PROJECTILE BY MEANS

OF AN EXPLOSIVE.

YOU ARE ADVISED THAT THE CRIMES OF MURDER,

ATTEMPTED MURDER, ASSAULT WITH INTENT TO KILL WHILE ARMED,

ARMED ROBBERY AND KIDNAPPING WHILE ARMED ARE EACH CRIMES OF

VIOLENCE.

BECAUSE THIS FIREARMS COUNTS MUST HAVE OCCURRED

DURING THE COMMISSION OF A CRIME OF VIOLENCE OR DANGEROUS

CRIME, AND BECAUSE THE UNDERLYING CRIMES RELIED UPON IN EACH

OF THESE FIREARMS COUNTS ARE OTHER COUNTS OF THE INDICTMENT,

YOU MUST FIRST UNANIMOUSLY AGREE THAT A DEFENDANT IS GUILTY

OF THE PARTICULAR UNDERLYING COUNT AS ALLEGED IN THE INDICTMENT.

FOR EXAMPLE, IF THE COURT CHARGES THE DEFENDANT

36

WITH POSSESSION OF A FIREARM DURING AN ASSAULT WITH INTENT

TO KILL WHILE ARMED, YOU MUST FIRST HAVE UNANIMOUSLY AGREED

THAT THE DEFENDANT IS GUILTY OF ASSAULT WITH INTENT TO KILL

WHILE ARMED.  IF YOU ARE NOT CONVINCED THAT THE GOVERNMENT

HAS PROVEN BEYOND A REASONABLE DOUBT ALL OF THE ELEMENTS OF

THE UNDERLYING CHARGE AS THAT PARTICULAR OFFENSE HAS BEEN

DEFINED, THEN YOU MUST FIND THE DEFENDANT NOT GUILTY OF THIS

OFFENSE.

IN COUNTS 46 THROUGH 62 OF THE INDICTMENT,

DEFENDANTS VINCENT HILL AND JEROME MARTIN ARE CHARGED WITH

DISTRIBUTION OF CONTROLLED SUBSTANCES AND WITH AIDING AND

ABETTING IN THE OFFENSE OF DISTRIBUTION OF CONTROLLED SUBSTANCES.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF DISTRIBUTION OF A CONTROLLED SUBSTANCE, EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, ARE:

THAT THE DEFENDANT DISTRIBUTED OR PARTICIPATED IN THE DISTRIBUTION OF A SUBSTANCE CONTAINING A DETECTABLE AMOUNT OF THE CONTROLLED SUBSTANCE; AND

THAT THE DEFENDANT DID SO KNOWINGLY AND INTENTIONALLY. THIS MEANS CONSCIOUSLY, VOLUNTARILY AND ON PURPOSE, AND NOT MISTAKENLY, ACCIDENTALLY OR INADVERTENTLY.

YOU ARE INSTRUCTED AS A MATTER OF LAW THAT CANNABIS, COCAINE BASE AND PHENCYCLIDINE ARE ALL CONTROLLED SUBSTANCES. YOU MUST DECIDE WHETHER OR NOT THE MATERIAL IN

37

QUESTION DID, IN FACT, CONTAIN A CONTROLLED SUBSTANCE. IN SO DOING, YOU MAY CONSIDER ALL THE EVIDENCE IN THE CASE THAT MAY AID IN THE DETERMINATION OF THAT ISSUE, INCLUDING EXPERT TESTIMONY, THE TESTIMONY OF ANY NONEXPERT WITNESS, OR

EXHIBITS EITHER TO SUPPORT OR DISPUTE THE ALLEGATION THAT

THE MATERIAL IN QUESTION WAS A CONTROLLED SUBSTANCE.

THE GOVERNMENT NEED NOT PROVE THAT A DEFENDANT DISTRIBUTED ANY PARTICULAR NUMERICAL QUANTITY OF THE CONTROLLED SUBSTANCE, BUT IT MUST PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT DISTRIBUTED A DETECTABLE OR MEASURABLE AMOUNT OF A CONTROLLED SUBSTANCE.

THE TERM "DISTRIBUTE" MEANS THE ACTUAL, CONSTRUCTIVE, OR ATTEMPTED TRANSFER OF POSSESSION OF A CONTROLLED SUBSTANCE TO ANOTHER PERSON.  IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE DEFENDANT RECEIVED OR EXPECTED TO RECEIVE ANYTHING OF VALUE IN RETURN FOR THE TRANSFER OR ATTEMPTED TRANSFER OF A CONTROLLED SUBSTANCE.

IT IS ALSO NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE DEFENDANT KNEW THE PRECISE NATURE OF THE CONTROLLED SUBSTANCE THAT WAS DISTRIBUTED.  THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT, HOWEVER, THAT THE DEFENDANT DID KNOW THAT HE DISTRIBUTED SOME TYPE OF CONTROLLED SUBSTANCE.

IN COUNTS 63 AND 64, DEFENDANTS VINCENT HILL AND JEROME MARTIN ARE CHARGED WITH POSSESSION WITH INTENT TO

38

DISTRIBUTE CONTROLLED SUBSTANCES AND WITH AIDING AND

ABETTING IN THE OFFENSE OF POSSESSION WITH INTENT TO

DISTRIBUTE CONTROLLED SUBSTANCES.

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF

POSSESSION WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE,

EACH OF WHICH THE GOVERNMENT MUST PROVE BEYOND A REASONABLE

DOUBT, ARE:

THAT A DEFENDANT POSSESSED A SUBSTANCE CONTAINING

A DETECTABLE AMOUNT OF A CONTROLLED SUBSTANCE;

THAT THE DEFENDANT DID SO KNOWINGLY AND

INTENTIONALLY.  THIS MEANS CONSCIOUSLY, VOLUNTARILY AND ON

PURPOSE, AND NOT MISTAKENLY, ACCIDENTALLY OR INADVERTENTLY,

AND

THAT WHEN THE DEFENDANT POSSESSED THE CONTROLLED

SUBSTANCE, HE HAD THE SPECIFIC INTENT TO DISTRIBUTE IT, THAT

IS, THE ACTUAL OR CONSTRUCTIVE TRANSFER OF POSSESSION OF IT

TO ANOTHER PERSON.

ONCE AGAIN, YOU MUST DECIDE WHETHER OR NOT THE

MATERIAL IN QUESTION DID, IN FACT, CONTAIN A CONTROLLED

SUBSTANCE, BEARING IN MIND THAT, AS A MATTER OF LAW,

CANNABIS, COCAINE BASE AND PHENCYCLIDINE ARE ALL CONTROLLED

SUBSTANCES.  IN DOING SO, YOU MAY CONSIDER ALL THE EVIDENCE

IN THE CASE THAT MAY AID IN THE DETERMINATION OF THAT ISSUE.

WITH RESPECT TO THE MEANING OF THE TERM

"POSSESSION," YOU ARE ALSO INSTRUCTED AGAIN THAT THE LAW

39

RECOGNIZES TWO KINDS OF POSSESSION: ACTUAL POSSESSION AND

CONSTRUCTIVE POSSESSION.  A PERSON HAS ACTUAL POSSESSION OF

SOMETHING IF HE HAS DIRECT PHYSICAL CONTROL OVER IT.  HE HAS

CONSTRUCTIVE POSSESSION OF SOMETHING WHEN HE DOES NOT HAVE

DIRECT PHYSICAL CONTROL OVER IT, BUT KNOWINGLY HAS BOTH THE

POWER AND THE INTENT AT A GIVEN TIME TO CONTROL IT, EITHER

BY HIMSELF OR THROUGH THE AGENCY OF ANOTHER PERSON.

POSSESSION MAY ALSO BE SHARED WITH ONE OR MORE

OTHER PEOPLE, IN WHICH CASE POSSESSION IS SAID TO BE JOINT,

RATHER THAN SOLE, BUT IT REMAINS POSSESSION NONETHELESS.

TO PROVE POSSESSION, THE GOVERNMENT MUST PROVE

BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD ACTUAL OR

CONSTRUCTIVE POSSESSION OF THE ITEM, ALONE OR WITH SOMEONE

ELSE.

TO PROVE THE THIRD ELEMENT OF THIS OFFENSE, THE

GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT THE

DEFENDANT POSSESSED THE CONTROLLED SUBSTANCE WITH THE

SPECIFIC INTENT TO DISTRIBUTE IT.

THE GOVERNMENT IS REQUIRED TO PROVE THAT THE

DEFENDANT POSSESSED WITH INTENT TO DISTRIBUTE A DETECTIBLE

OR MEASURABLE AMOUNT OF A CONTROLLED SUBSTANCE.  THE

GOVERNMENT IS NOT REQUIRED TO PROVE THE QUANTITY OF THE

CONTROLLED SUBSTANCE AS ALLEGED IN THE INDICTMENT, AND IT IS

NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE DEFENDANT

KNEW THE PRECISE NATURE OF THE CONTROLLED SUBSTANCE THAT WAS

40

POSSESSED WITH INTENT TO DISTRIBUTE.  THE GOVERNMENT MUST

PROVE BEYOND A REASONABLE DOUBT, HOWEVER, THAT THE DEFENDANT

DID KNOW THAT HE POSSESSED WITH INTENT TO DISTRIBUTE

SOME TYPE OF A CONTROLLED SUBSTANCE.

LET ME TURN TO THE DEFENDANTS' THEORIES AS TO WHY THEY SHOULD BE ACQUITTED. I SHOULD POINT OUT THAT THE DEFENDANTS HAVE THE RIGHT TO SUCH AN INSTRUCTION AND THAT YOU ARE TO CONSIDER WHAT I AM ABOUT TO TELL YOU IN CONNECTION WITH MY ENTIRE INSTRUCTIONS TO YOU.

THE DEFENDANTS CONTEND THAT THEY ARE NOT GUILTY OF THE CRIMES CHARGED IN THE INDICTMENT. THEY ASSERT THAT THERE WAS NO NARCOTICS CONSPIRACY AND NO RICO CONSPIRACY. IF THE EVIDENCE PROVES THE EXISTENCE OF ANY CONSPIRACIES AT ALL, THEY WERE CONSPIRACIES AMONG OTHER PERSONS, NOT THE DEFENDANTS.

AS TO THE OTHER CRIMES ALLEGED IN THE INDICTMENTS, EACH DEFENDANT CONTENDS THAT THE CRIMES WITH WHICH HE IS CHARGED WERE EITHER NOT COMMITTED AT ALL, OR THEY WERE COMMITTED BY OTHERS, INCLUDING ONE OR MORE OF THE WITNESSES FOR THE GOVERNMENT.

MEMBERS OF THE JURY, THAT CONCLUDES MY FORMAL INSTRUCTIONS TO YOU AS TO THE SPECIFIC CRIMES CHARGED IN THESE INDICTMENTS. BEFORE YOU BEGIN YOUR DELIBERATIONS, HOWEVER, THERE ARE A FEW GENERAL MATTERS RELATING TO

YOUR

DELIBERATIONS UPON WHICH I MUST ALSO INSTRUCT YOU.

41

UPON RETIRING TO THE JURY ROOM, YOU WILL SELECT
ONE FROM AMONG YOUR NUMBER TO ACT AS THE FOREPERSON. THE
FOREPERSON WILL PRESIDE OVER YOUR DELIBERATIONS AND WILL BE
YOUR SPOKESPERSON BEFORE THE COURT IN THE EVENT THERE IS ANY
MATTER ABOUT WHICH YOU WISH TO COMMUNICATE WITH ME.

THE VERDICTS MUST REPRESENT THE CONSIDERED
JUDGMENT OF EACH JUROR. IN ORDER TO RETURN VERDICTS, IT IS
NECESSARY THAT EACH JUROR AGREE TO THE VERDICTS. YOUR
VERDICTS, IN OTHER WORDS, MUST BE UNANIMOUS.

YOU SHOULD FEEL FREE, HOWEVER, TO CONSIDER AND
DELIBERATE ON THE COUNT OR COUNTS AGAINST EACH DEFENDANT IN
ANY ORDER THAT YOU PREFER. THERE IS NO REQUIREMENT THAT YOU
CONSIDER THE CHARGES AGAINST A SPECIFIC DEFENDANT IN ANY
PARTICULAR ORDER OR, INDEED, THAT YOU CONSIDER THE
DEFENDANTS THEMSELVES IN ANY PARTICULAR ORDER, SO LONG AS
YOU REACH A UNANIMOUS VERDICT ON ALL COUNTS AS TO EACH

App 1511

DEFENDANT.

A VERDICT MUST REPRESENT THE CONSIDERED JUDGMENT OF EACH JUROR.  AS YOU KNOW, YOUR VERDICT ON EACH COUNT MUST BE UNANIMOUS.  EACH JUROR MUST AGREE ON IT.

IT IS YOUR DUTY, AS JURORS, TO CONSULT WITH ONE ANOTHER AND TO DELIBERATE WITH A VIEW TO REACHING AN AGREEMENT, IF YOU CAN DO SO WITHOUT DOING VIOLENCE TO YOUR OWN INDIVIDUAL JUDGMENT.  EACH OF YOU MUST DECIDE THE CASE FOR HIMSELF OR HERSELF, BUT YOU MUST DO SO ONLY AFTER AN

42

IMPARTIAL CONSIDERATION OF THE EVIDENCE, CONSIDERING THE EVIDENCE IN THE CASE WITH YOUR FELLOW JURORS.

IN THE COURSE OF YOUR DELIBERATIONS, DO NOT HESITATE TO RE-EXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINIONS IF CONVINCED THAT YOUR OPINIONS ARE WRONG.  ON THE OTHER HAND, DO NOT SURRENDER YOUR HONEST CONVICTION AS TO THE WEIGHT OR EFFECT OF THE EVIDENCE SOLELY BECAUSE OF THE OPINIONS OF YOUR FELLOW JURORS OR MERELY TO RETURN A VERDICT.  REMEMBER AT ALL TIMES THAT YOU ARE NOT PARTISANS.

YOU ARE JUDGES OF THE FACTS.

I AM NOT, AT THE OUTSET, SENDING THE EXHIBITS THAT THAT HAVE BEEN RECEIVED IN EVIDENCE WITH YOU AS YOU RETIRE FOR YOUR DELIBERATION.  HOWEVER, YOU ARE ENTITLED TO SEE ANY OR ALL OF THESE EXHIBITS AS YOU CONSIDER YOUR VERDICT.

I SUGGEST THAT YOU BEGIN YOUR DELIBERATIONS AND THEN, IF IT WOULD BE HELPFUL TO YOU, YOU MAY ASK FOR ANY OR ALL OF THE EXHIBITS SIMPLY BY SENDING A NOTE FROM YOUR FOREPERSON TO ME THROUGH ONE OF THE MARSHALS.

THE GOVERNMENT'S EXHIBITS THAT HAVE BEEN ENTERED INTO EVIDENCE ARE LABELED WITH LETTERS AND NUMBERS.  THE SYSTEM OF LABELING AND NUMBERING EXHIBITS IS SIMPLY TO HELP THE PARTIES ORGANIZE THE PRESENTATION OF THE CASE.  YOU ARE TO ATTACH NO PARTICULAR SIGNIFICANCE TO THE SYSTEM EMPLOYED TO LABEL CERTAIN EXHIBITS WITH LETTERS AND NUMBERS OR TO THE FACT THAT SOME EXHIBITS ARE NOT IN SEQUENCE.

43

IF IT BECOMES NECESSARY DURING YOUR

DELIBERATIONS

TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE BY THE MARSHAL, SIGNED BY YOUR FOREPERSON, OR BY ONE OR MORE OF YOUR MEMBERS.  NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH THE COURT BY ANY MEANS OTHER THAN A SIGNED WRITING, AND I WILL NEVER TRY TO COMMUNICATE WITH ANY MEMBER OF THE JURY ON ANY SUBJECT TOUCHING THE MERITS OF THE CASE, EXCEPT IN WRITING OR ORALLY HERE IN OPEN COURT.

BEAR IN MIND ALSO THAT YOU ARE NEVER TO REVEAL TO ANY PERSON -- NOT EVEN TO ME -- HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, ON THE QUESTION OF GUILT OR INNOCENCE OF ANY OF THE DEFENDANTS, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT.

I INSTRUCTED YOU EARLIER DURING THIS TRIAL THAT YOU ARE TO IGNORE ANY REPORTS IN THE NEWSPAPER OR ON RADIO OR TELEVISION CONCERNING THIS CASE.  WHILE YOU DELIBERATE, THERE MAY BE REPORTS IN THE NEWSPAPER OR ON RADIO OR TELEVISION RELATING TO THE CASE.  AND, AGAIN, AS I INSTRUCTED EARLIER, PLEASE MAKE SURE THAT YOU DO NOT READ, LISTEN TO, OR WATCH ANY OF THESE REPORTS.

YOU MUST DECIDE THIS CASE SOLELY ON THE

EVIDENCE PRESENTED IN THIS COURTROOM. YOU MUST CONSIDER ONLY EVIDENCE THAT MEETS CERTAIN STANDARDS IN REACHING YOUR VERDICT. FOR EXAMPLE, A WITNESS MAY HAVE TESTIFIED ABOUT EVENTS THAT HE HIMSELF HAS SEEN OR HEARD, BUT, EXCEPT AS I HAVE HELD TO BE ADMISSIBLE AS AN EXCEPTION TO THE HEARSAY RULE, HE GENERALLY MAY NOT TESTIFY ABOUT MATTERS THAT OTHERS MAY HAVE TOLD HIM.

ALSO, WITNESSES MUST BE SWORN TO TELL THE TRUTH AND MUST BE SUBJECT TO CROSS-EXAMINATION. NEWS REPORTS ABOUT THIS CASE ARE NOT SUBJECT TO ANY OF THESE STANDARDS. AND IF YOU READ, LISTEN TO, OR WATCH THESE REPORTS, YOU MAY BE EXPOSED TO MISLEADING OR INACCURATE INFORMATION THAT UNDULY FAVORS ONE SIDE OF THE CASE AND TO WHICH THE OTHER SIDE IS UNABLE TO RESPOND. THEREFORE, YOU MUST COMPLETELY DISREGARD ANY PRESS, TELEVISION, OR RADIO REPORTS THAT YOU MAY READ, SEE OR HEAR. SUCH REPORTS ARE NOT EVIDENCE, AND

YOU SHOULD NOT BE INFLUENCED IN ANY MANNER WHATSOEVER BY SUCH PUBLICITY.

AS I INDICATED EARLIER, A FORM OF VERDICT HAS BEEN PREPARED FOR YOUR CONVENIENCE. YOU WILL TAKE THESE FORMS TO THE JURY ROOM, AND WHEN YOU HAVE REACHED UNANIMOUS AGREEMENT AS TO YOUR VERDICTS AS TO EACH DEFENDANT, YOU WILL HAVE YOUR FOREPERSON FILL IN, DATE AND SIGN EACH FORM TO STATE THE VERDICT UPON WHICH YOU UNANIMOUSLY AGREE, AND THEN YOU WILL RETURN WITH YOUR VERDICT TO THE COURTROOM.

I AM GOING TO PROVIDE YOU WITH A COPY OF MY JURY INSTRUCTIONS. DURING YOUR DELIBERATIONS, YOU MAY, IF YOU WANT, REFER TO THESE INSTRUCTIONS. ALTHOUGH YOU MAY REFER TO ANY PARTICULAR PORTION OF THE INSTRUCTIONS, YOU ARE TO

45

REMEMBER TO CONSIDER THE INSTRUCTIONS AS A WHOLE, AND YOU MAY NOT FOLLOW SOME AND IGNORE OTHERS.

THE FACT THAT YOU HAVE BEEN PROVIDED WITH A COPY

OF MY INSTRUCTIONS SHOULD NOT DISCOURAGE YOU FROM MAKING AN

INQUIRY REGARDING THE MEANING OF THESE INSTRUCTIONS, IF

NECESSARY.  AND YOU WILL RETURN THE INSTRUCTIONS TO ME WHEN

YOUR VERDICT IS RENDERED.

LADIES AND GENTLEMEN, I WILL BE SENDING ONE COPY

OF THE VERDICT FORM, THE JURY INSTRUCTIONS AND THE

INDICTMENT TO YOU.  I WILL MAKE ADDITIONAL COPIES AS YOU

FIND THEM NECESSARY.  ALL YOU NEED TO DO IS TO NOTIFY --

HAVE YOUR FOREPERSON NOTIFY ME THAT YOU WOULD LIKE TO HAVE

ADDITIONAL COPIES, AND THEY WILL BE AVAILABLE.

SIMILARLY, AS I SAY, I WILL NOT SEND ALL THE

EXHIBITS IN.  I WILL SEND THEM IN AS YOU ASK FOR THEM. WE

WILL DO THE BEST WE CAN TO IDENTIFY THE EXHIBITS THAT YOU

WISH TO SEE BY YOUR REQUEST, IF YOU DO NOT KNOW WHAT THE

EXHIBIT NUMBER IS.  AND THAT WOULD BE ENTIRELY

UNDERSTANDABLE.  OTHERWISE, WE WILL COLLECT AS MANY EXHIBITS

AS MIGHT POSSIBLY MEET YOUR DESCRIPTION OF WHAT IT IS THAT

YOU WOULD LIKE TO EXAMINE AND SEND THOSE IN.

IF YOU WISH TO SEE FIREARMS, YOU WILL HAVE TO

SPECIFICALLY LET ME KNOW.  I WANT TO MAKE SURE THAT THE

FIREARMS HAVE ALL BEEN CLEARED BY THE MARSHALS BEFORE THEY

GO BACK TO THE JURY ROOM.

46

I DO NOT BELIEVE WE HAVE ANY LIVE AMMUNITION IN

EVIDENCE IN THIS CASE.  I WOULD NOT SEND LIVE AMMUNITION AND

A FIREARM BACK TO YOU AT THE SAME TIME.  OTHER THAN THAT,

YOU MAY SEE ANYTHING THAT YOU WISH TO SEE AT ANY TIME.

IF YOU WISH TO LISTEN TO THE TAPE RECORDINGS, WE

WILL EITHER ARRANGE TO HAVE A TAPE PLAYER SENT IN TO YOU OR

WE WILL BRING YOU BACK OUT HERE TO THE COURTROOM AND PLAY IT

FOR YOU OUT HERE.

IN GENERAL, WITH REGARD TO YOUR DELIBERATIONS, IT

IS MY INTENTION TO HAVE YOU DELIBERATE TO THE CLOSE OF

PROCEEDINGS TODAY.  I WILL EXCUSE YOU AT THE CLOSE OF THOSE

PROCEEDINGS TODAY.  YOU MAY THEN RESUME YOUR DELIBERATIONS

TOMORROW MORNING WITHOUT FORMALLY REPORTING IN TO COURT.

AS SOON AS ALL OF YOU ARE PRESENT -- AND YOU MUST

ALL BE PRESENT -- ALL JURORS MUST BE PRESENT BEFORE ANY

DELIBERATIONS TAKE PLACE, BUT ONCE ALL JURORS ARE

PRESENT, THEN THE FOREPERSON CAN COMMENCE DELIBERATIONS WITHOUT ANY FURTHER CEREMONY. WE WILL NOT BRING YOU INTO THE COURT AND FORMALLY CONVENE YOU EACH MORNING.

AND WE WILL CONTINUE THAT ROUTINE UNTIL YOU HAVE REACHED A VERDICT -- VERDICTS.

I URGE YOU NOT TO BE EMBARRASSED OR RELUCTANT IN ANY WAY TO REQUEST FURTHER INSTRUCTIONS OR TO ASK FURTHER EXPLANATIONS OF ANY OF THE INSTRUCTIONS THAT I HAVE ALREADY GIVEN YOU. IF YOU FIND YOURSELVES CONFUSED IN ANY WAY, I AM

47

MORE THAN ANXIOUS TO TRY TO HELP. SO PLEASE SIMPLY SEND A NOTE OUT LETTING ME KNOW THAT YOU NEED SOME FURTHER INFORMATION AND I WILL, IN CONSULTATION WITH COUNSEL, FIND A WAY TO RESPOND TO YOUR INQUIRY.

COUNSEL, APPROACH THE BENCH.

(BENCH CONFERENCE.)

48

(BENCH CONFERENCE.)

THE COURT: THE RECORD WILL REFLECT THAT ALL EARLIER OBJECTIONS HAVE BEEN RENEWED BY ALL COUNSEL, AND THE OBJECTIONS HAVE BEEN OVERRULED TO THE EXTENT THAT THEY WERE

App 1520

NOT ACCOMMODATED IN THE INSTRUCTIONS AS ACTUALLY GIVEN.

IT NOW OCCURS TO ME THAT WE CAN DISMISS THE TWO ALTERNATES.

MR. DAVIS:  YOUR HONOR, ONE OF THE INSTRUCTIONS I DON'T THINK WE HAD A FORMAL AGREEMENT ON.  THAT WAS PAGE 104, THE DISTRIBUTION INSTRUCTION.  I HAD OBJECTED TO THE LACK OF THE REQUIREMENT THAT THE GOVERNMENT PROVE REMUNERATION TO THE JURY BEYOND A REASONABLE DOUBT.  AND I NOTE THAT THAT WAS NEVER INCLUDED IN THE INSTRUCTION.  AND I WANT TO SPECIFICALLY MAKE THAT OBJECTION FOR THE RECORD AT THIS POINT.

THE COURT:  ALL RIGHT.  I KNOW YOU HAVE MADE IT, AND I OVERRULED IT.  I DO NOT BELIEVE THAT IT IS THE LAW.  AND I DON'T NEED TO HAVE YOU REITERATE ANY OTHER SPECIAL INSTRUCTION.

MR. DAVIS:  THE REASON I DID THAT IS BECAUSE MR. ZEIDENBERG HAD INDICATED THEY WERE GOING TO CHECK WITH THEIR OFFICE.  AND I NEVER HEARD BACK ON THAT.

WHILE WE'RE HERE, ON PAGE 3 OF THE VERDICT SHEET I JUST NOTICED SOMETHING OVER THE WEEKEND.  IT DOES NOT --

AT

THE TOP, IT SAYS (A) AND IT SAYS (B).  IT DOES NOT INCLUDE

49

LESS THAN FIVE GRAMS OF CRACK.  AND I WOULD REQUEST THAT THAT BE INCLUDED IN THERE.  THAT'S CONSISTENT WITH THE ACTUAL JURY INSTRUCTIONS AT PAGE 61.

THE LAW CLERK:  JUDGE, I CHANGED THAT.

THE COURT:  ALL RIGHT.  THERE IS A PARAGRAPH (C).

MR. DAVIS:  THERE IS A PARAGRAPH (C)?  I DIDN'T HAVE THAT IN MINE.  I MUST HAVE ONE OF THE OLD ONES.

THE COURT:  ALL RIGHT.  LET'S MAKE SURE WE'RE ALL IN ACCORD AS TO WHO THE ALTERNATES ARE.  JURORS NUMBER 19 AND 20, 0072 AND 0761.

THE DEPUTY CLERK:  I HAVE 761 AND I HAVE GOT 060.

MR. KIERSH:  060 AND 761.

THE DEPUTY CLERK:  THAT'S WHAT I'VE GOT.

MR. KIERSH:  060 AND 761.

THE COURT:  060?

MR. KIERSH:  AND 761.  THE SEATS ARE NOW MIXED UP FROM WHAT WE ORIGINALLY HAD BECAUSE WE PUT THE PEOPLE UP

App 1522

--

MR. ZEIDENBERG: WHAT SEATS?

MR. KIERSH: I THINK IT'S 9 AND 14.

MR. DAVIS: THAT'S MY UNDERSTANDING, TOO.

MR. KIERSH: YES. IT IS CURRENTLY SEAT 9 AND CURRENTLY SEAT 14.

MS. CHATURVEDI: RIGHT.

MR. KIERSH: WE'RE IN AGREEMENT, JUDGE. IT'S THE THE JURORS IN SEATS 9 AND 14.

50

MS. CHATURVEDI: ACTUALLY, WE HAVE 10 AND 14.

MR. ZEIDENBERG: YOUR HONOR, WHILE WE'RE WORKING ON THAT, CAN I JUST INQUIRE ABOUT THE SCHEDULING? IS THE COURT GOING TO HAVE THE -- FIRST OF ALL, ARE YOU GOING TO ASK US TO COME BACK BEFORE THE JURY IS DISMISSED AT THE END OF THE DAY, OR ARE YOU GOING TO DISMISS THEM?

THE COURT: I WILL DISMISS THEM MYSELF.

MR. ZEIDENBERG: YOU ARE NOT ASKING COUNSEL TO COME BACK?

THE COURT: ACTUALLY, WHAT I WANT YOU TO DO IS TO

HANG AROUND THE COURTHOUSE ALL AFTERNOON. WE'RE LIKELY TO GET NOTES.

MR. KIERSH: CAN WE BE TEN MINUTES AWAY?

THE COURT: YES. YES.

MR. KIERSH: I AM TEN MINUTES AWAY.

MR. DAVIS: WE ALL HAVE OFFICES VERY CLOSE BY.

MR. ZEIDENBERG: AND THE OTHER THING, YOUR HONOR, IS THE COURT GOING TO HAVE THEM COME IN BEFORE 10:00 O'CLOCK TO BEGIN THEIR DELIBERATIONS? MARSHAL ADAMS INDICATED HE COULD HAVE HIM HERE EARLIER.

THE COURT: I WOULD BE INCLINED TO DO THAT, BUT I AM GOING TO TAKE IT UP WITH THEM AGAIN. THEY HAVE ALL ADJUSTED THEIR SCHEDULES TO CONFORM TO A 10:00-TO-4:30 DAY.

MR. ZEIDENBERG: I WOULD ASK IF THEY COULD BE INQUIRED OF SOONER RATHER THAN LATER AS TO THEIR FRIDAY

51

SCHEDULE AND LET THEM KNOW THAT IS AT LEAST AN OPTION TO THEM.

THE COURT: I WILL ASK THEM AT THE CLOSE OF BUSINESS TODAY WHEN I SEND THEM HOME AND ASK THEM TO LET ME

KNOW THE FIRST THING TOMORROW MORNING.

MR. ZEIDENBERG: VERY WELL.

THE COURT: I CAN ANTICIPATE THAT THEY ARE GOING

TO SAY "NO."

MR. KIERSH: SO DO WE HAVE AN AGREEMENT ON THE

ALTERNATES?

MR. ZEIDENBERG: I DON'T THINK SO. MR. LELAND IS

GOING TO CHECK HIS NOTES.

MR. KIERSH: OKAY.

MR. BESHOURI: YOUR HONOR, I DO HAVE ONE OBJECTION

TO ONE THING IN THE INSTRUCTIONS.

THE COURT: 060 AND 0761. SEAT 9 IS 0060?

THE LAW CLERK: YES.

THE COURT: AND 761 IS 14?

MS. CHATURVEDI: THAT'S RIGHT, YOUR HONOR.

THE COURT: THE GENTLEMAN AT THE END OF THE ROW.

MR. ZEIDENBERG: YES.

THE COURT: ALL RIGHT. IF WE'RE ALL AGREED THAT

IT'S 0060 AND 0761, I WILL EXCUSE THEM.

MR. KIERSH: RIGHT.

MR. ZEIDENBERG: RIGHT.

52

THE COURT: DO YOU WANT TO SAY SOMETHING?

MS. HEPWORTH:  YES.  I JUST HAVE A COUPLE OF OBJECTIONS I WANT TO PUT ON THE RECORD.

THE COURT:  ARE THEY OBJECTIONS YOU HAVE NOT ALREADY MADE?

MS. HEPWORTH:  YES.  YES. JUST ONE.

THE COURT:  GO AHEAD.

MS. HEPWORTH:  IN INSTRUCTION NUMBER 47 AS TO ELEMENTS OF THE ASSAULT WITH INTENT TO KILL WHILE ARMED, THE COURT DID NOT STATE THAT IT IS AN ESSENTIAL PART OF THE GOVERNMENT'S PROOF TO PROVE THAT IT HAPPENED WITHIN THE DISTRICT OF COLUMBIA.  AND IT'S A DISTRICT OF COLUMBIA CODE OFFENSE.

THAT WAS MY ONLY OBJECTION.  I HAVE A COUPLE OF THE THINGS AS TO THE EXHIBITS, BUT WE CAN DO THAT OUTSIDE THE PRESENCE OF THE JURY.

THE COURT:  YES, WE CAN.

RACKETEERING ACTS?

MS. HEPWORTH:  THAT'S INSTRUCTION NUMBER 47.

THE COURT:  ASSAULT WITH INTENT TO KILL WHILE ARMED?

MS. HEPWORTH: CORRECT.

THE COURT: OKAY. ALL RIGHT. I WILL ADD THAT.

MR. BESHOURI: YOUR HONOR, I WON'T REITERATE OBJECTIONS ALREADY MADE AT THE CHARGING CONFERENCE, BUT AS

53

TO INSTRUCTIONS THAT THE COURT JUST GAVE, NUMBER 29, THE ONE ABOUT PLEA AGREEMENTS OF ACCOMPLICES AND SO FORTH, THAT PHRASE -- THE MOST IMPORTANT PHRASE OF THE INSTRUCTION, THAT THE JURY MUST SCRUTINIZE WITH GREAT CARE AND VIEW SUCH EVIDENCE WITH PARTICULAR CAUTION -- THE COURT DID NOT SAY "GREAT CARE." THE COURT SAID "CARE."

THE COURT: ALL RIGHT.

MR. BESHOURI: I CONFIRMED IT WHEN LOOKING AT THE TRANSCRIPT TODAY BECAUSE I WASN'T SURE, AND BECAUSE IT IS SUCH AN IMPORTANT PART OF THE CASE FOR THE GOVERNMENT, I WOULD ASK THE COURT TO REPEAT THAT INSTRUCTION EMPHASIZING -- NOT EMPHASIZING, BUT INCLUDING "GREAT CARE" AS OPPOSED TO JUST SIMPLY "CARE."

THE COURT: I AM NOT GOING TO ADD AN ADJECTIVE TO

AN INSTRUCTION OF THAT NATURE.

MR. BESHOURI: IS THE COURT GOING TO HAVE THE ALTERNATES STANDS BY IN CASE THEY ARE NEEDED?

THE COURT: NO. MY UNDERSTANDING IS THAT --

MR. BESHOURI: I DON'T MEAN STAND BY IN THE COURTHOUSE.

THE COURT: MY RECOLLECTION IS THAT -- WELL, I HAVE NO RECOLLECTION. WHAT DO YOU UNDERSTAND THE LAW IS?

MR. BESHOURI: MY UNDERSTANDING IS THAT THEY SHOULD BE TOLD THAT THERE MAY BE CIRCUMSTANCES WHERE THEY MIGHT BE CALLED BACK TO PARTICIPATE IN DELIBERATIONS.

54

THE COURT: I THINK ONLY WITH THE CONSENT OF THE PARTIES.

MR. KIERSH: AND I OBJECT TO IT ON BEHALF OF MR. SWEENEY. ONCE THEY ARE DISMISSED, THEY'RE OUT. I DON'T WANT ANY OTHER OUTSIDE INFLUENCES.

MS. CHATURVEDI: YOUR HONOR, I WOULD SIMPLY ASK, BEFORE THE ALTERNATES ARE EXCUSED, IF YOUR HONOR CAN ASK THE JURORS GENERALLY IF THERE ARE ANY PROBLEMS OR CONCERNS

OR

ANYTHING LIKE THAT BEFORE WE GET RID OF THE ALTERNATES TO

MAKE SURE THAT IF THEY HAVE ANY CONCERNS --

THE COURT:  NO.  I DON'T WANT TO INVITE ANYBODY

TO THINK THAT NOW IS A GOOD TIME --

MR. ZEIDENBERG: TO GET OUT.

THE COURT:  -- TO BUG OUT.

MS. CHATURVEDI:  OKAY.

MR. ZEIDENBERG:  VERY WELL.

THE COURT:  ALL RIGHT.

(END OF BENCH CONFERENCE.)

55

(END OF BENCH CONFERENCE.)

THE COURT:  LADIES AND GENTLEMEN, I AM REMINDED

THAT MY INSTRUCTION NUMBER 47, WHICH IS AN INSTRUCTION

ON

WHILE

COLUMBIA

CASE

YOU

JURORS

PARTICIPATION

LOUNGE.

THROUGHOUT

WILL

YOUR

THE SUBSTANTIVE CRIME OF ASSAULT WITH INTENT TO KILL

ARMED -- IT CHARGES A VIOLATION OF THE DISTRICT OF

CODE AND, THEREFORE, AN ELEMENT OF THAT OFFENSE WOULD BE

THAT THAT HAS TO HAVE OCCURRED WITHIN THE DISTRICT OF

COLUMBIA.

NOW, HAVING REACHED THE POINT AT WHICH THIS

IS BEING SUBMITTED TO YOU, I AM ABLE TO EXCUSE THOSE OF

WHO ARE ALTERNATE JURORS IN THIS CASE.

JUROR NUMBER 0060 AND JUROR NUMBER 0761 ARE

ALTERNATES.  THE REMAINDER OF YOU ARE REGULARS.  SO

NUMBERS 0060 AND O761 ARE EXCUSED FROM FURTHER

IN THIS CASE AND SHOULD CHECK OUT THROUGH THE JURY

I AM DEEPLY REGRETFUL THAT I DO NOT KNOW YOUR

NAMES AT THIS POINT BECAUSE I WOULD LIKE TO THANK YOU

PERSONALLY FOR THE -- THERE IS NO OTHER WORD FOR IT --

VALIANT SERVICE THAT YOU HAVE RENDERED.  YOU HAVE BEEN

CONSCIENTIOUS AND ATTENTIVE AND HAVE BEEN WITH US

THE CONSIDERABLE LENGTH OF THIS TRIAL.  AND WHILE YOU

NOT BE PARTICIPATING IN THE DELIBERATIONS ON THE CASE,

App 1530

PRESENCE HERE HAS BEEN REASSURING TO ME AND TO EVERYONE ELSE TO KNOW THAT YOU WERE AVAILABLE IN THE EVENT OF A CALAMITY OF ONE OF THE REGULAR JURORS.  AND ON BEHALF OF THE COURT

56

AND THE COMMUNITY, I THANK YOU PROFOUNDLY FOR YOUR SERVICE.

PLEASE CHECK OUT THROUGH THE JURY LOUNGE AS YOU LEAVE AND EXPLAIN THAT YOU HAVE BEEN RELIEVED OF FURTHER SERVICE IN THIS CASE.

AND THE REMAINDER OF YOU CAN RETURN TO THE JURY ROOM AND BEGIN YOUR DELIBERATIONS.

(JURY LEAVING COURTROOM TO DELIBERATE AT 12:10 A.M.)

(JURY OUT.)

57

(JURY OUT.)

THE COURT: YES, MA'AM.

MS. CHATURVEDI: YOUR HONOR, ON FRIDAY FOR A GOOD PORTION OF THE DAY, MR. WEST AND MYSELF AND OUR PARALEGAL WENT THROUGH ALL THE GOVERNMENT EXHIBITS TO MAKE SURE THAT WE WERE IN ACCORDANCE WITH WHAT HAD BEEN ADMITTED INTO EVIDENCE. I THINK WE'RE MISSING ABOUT FIVE OR SIX PHOTOGRAPHS THAT WE'RE ENDEAVORING TO LOCATE. THEY HAVE JUST BEEN MISFILED.

THE COURT: I'M SORRY. YOU ARE MISSING WHAT?

MS. CHATURVEDI: FIVE OR SIX PHOTOGRAPHS THAT WE

BELIEVE WERE LIKELY JUST MISFILED AND HOPE TO HAVE THOSE TO

MR. WEST AND IN THE COURTROOM OVER THE LUNCH HOUR.

ALL THE OTHER EXHIBITS THAT HAVE BEEN INTRODUCED,

WITH THE EXCEPTION OF THE DRUGS AND THE GUNS, YOUR HONOR,

ARE ALL SITTING ON THE FLOOR HERE AGAINST THE JURY RAILING.

AND IT WAS BROUGHT TO OUR ATTENTION THAT THE

GOVERNMENT NEVER FORMALLY MOVED IN THE BOARDS UPON WHICH THE

PHOTOGRAPHS ARE LAID.  WE HAVE CHANGED THE COVER FROM THE "K

STREET CREW" BACK TO THE BLACK BORDER, BUT GIVEN HOW THEY

ARE PRESENTED, I WOULD ASK PERMISSION THAT IF THE JURORS DO

WANT THE PHOTOGRAPHS, THAT THEY BE GIVEN TO THEM IN THE

FORMAT THAT THEY ARE DISPLAYED PRESENTLY IN THE COURTROOM.

I THINK THAT WOULD ASSIST THEM IN TERMS OF IDENTIFYING WHO

IS WHO BY NAME AND NICKNAME AND WOULD KEEP THEM ALL IN A

58

CENTRAL LOCATION.

THE COURT:  I THINK IT WOULD, TOO.  I AM

ANTICIPATING AN OBJECTION.

MR. KIERSH:  I OBJECT ON BEHALF OF MR. SWEENEY.

THE COURT:  BUT I THINK IN EXAMINING THE PHOTOGRAPHS, ALL OF WHICH ARE IN EVIDENCE, IN THE ORDER IN WHICH THEY WERE PRESENTED AND IN THE FORMAT IN WHICH THEY WERE PRESENTED IS LIKELY TO BE LESS CONFUSING TO THEM THAN IT WOULD BE OTHERWISE.  SO IF THEY ASK FOR THE PHOTOGRAPHS, THEY WILL GO IN IN THAT FORM.

MS. CHATURVEDI:  YOUR HONOR, WE ALSO HAVE --

MR. KIERSH:  YOUR HONOR, JUST ON THAT POINT -- I DON'T MEAN TO INTERRUPT.

THE COURT:  THE RECORD SHOULD REFLECT THAT THE LEGEND "K STREET CREW" HAS BEEN OBLITERATED.

MR. KIERSH:  UNDERNEATH MR. SWEENEY'S PHOTOGRAPH THEY HAVE HIS NAME AND THEY HAVE HIS NICKNAMES.  THROUGHOUT THE SIX MONTHS OF THIS TRIAL HE WAS DEPICTED AS WILLIAM SWEENEY.  UNDERNEATH IT SAID "DRAPER."  THEN WHEN WE GOT TO CLOSING ARGUMENTS, THIS WAS ADDED.

MR. ZEIDENBERG:  IT IS THE SAME.

MS. CHATURVEDI:  WE DIDN'T CHANGE ANYTHING.

MR. KIERSH:  MY RECOLLECTION IS IT ONLY SAID "DRAPER" UNDERNEATH HIM AND THE OTHER NICKNAME,

"SHORTY,"

WAS ADDED IN CLOSING ARGUMENT.

59

THE COURT: OH, NO. HE HAS BEEN REFERRED TO AS

"SHORTY" ON A NUMBER OF OCCASIONS.

MR. KIERSH: I KNOW HE HAS BEEN REFERRED TO, BUT I

DON'T BELIEVE IT WAS WRITTEN THAT WAY.

MS. CHATURVEDI: I AM HAPPY TO FIND THE TRANSCRIPT

PAGE IF MR. KIERSH DISAGREES, BUT THAT IS THE EXACT SAME

LABEL THAT AGENT LISI USED BACK IN JANUARY WHEN HE

IDENTIFIED EACH OF THOSE PHOTOGRAPHS AND THE NAME AND

NICKNAMES ASSOCIATED WITH EACH INDIVIDUAL.

MR. KIERSH: IF IT IS NOT, THAT WOULD JUST BE AN

ADDED OBJECTION I WOULD HAVE.

THE COURT: ALL RIGHT.

MS. CHATURVEDI: YOUR HONOR, ADDITIONALLY, WE HAVE

A TAPE RECORDER THAT I AM GOING TO LEAVE WITH MR. WEST FOR

THE JURORS' USE IF THEY WANT TO USE IT IN THE JURY ROOM. IT

CAN BE PLAYED, OBVIOUSLY, IN THE COURTROOM AS WELL, BUT I AM

GOING TO LEAVE IT HERE.

AND I UNDERSTAND THAT MS. CHRIST WANTS AN OPPORTUNITY TO LOOK THROUGH ALL THE GOVERNMENT EXHIBITS TO MAKE SURE THAT SHE IS IN ACCORDANCE WITH THE EXHIBITS, WHICH WE HAVE NO PROBLEM DOING. IF OTHER OF THE DEFENSE COUNSEL WANT TO DO THAT AS WELL, OUR PARALEGAL WILL BE GOING THROUGH EACH OF THEM IN THE MANNER THAT WE HAVE KEPT THEM ORGANIZED SO THAT WE MAINTAIN SOME SEMBLANCE OF ORGANIZATION.

THE COURT: ALL RIGHT.

60

MS. CHATURVEDI: BUT COUNSEL ARE INVITED, IF THEY'D LIKE TO AT THIS POINT, TO GO THROUGH THEM WITH OUR PARALEGAL.

MR. KIERSH: THE LAWYERS CAN STAY 15 MINUTES AWAY FROM THE COURTHOUSE DURING THE PROCESS OF DELIBERATIONS? IS THAT CORRECT?

THE COURT: USE SOME COMMON SENSE ABOUT IT. I WANT TO BE ABLE TO GET YOU IN FAIRLY SHORT ORDER THIS AFTERNOON. PARTICULARLY THIS AFTERNOON. AND AS TIME

PASSES, I THINK THERE WILL BE LESS NECESSITY FOR DOING SO,

BUT I WOULD EXPECT BEFORE THE AFTERNOON IS OVER, WE'RE GOING

TO HAVE AT LEAST ONE INQUIRY FROM THE JURY.

IF I CAN GET YOU ON REASONABLY SHORT NOTICE -- AND

I WILL SAY TEN TO FIFTEEN MINUTES -- I HAVE NO OBJECTION TO

YOUR RETURNING TO YOUR OFFICE OR ANY PLACE IN THAT PROXIMITY

TO THE COURTHOUSE.  IF I END UP THAT I HAVE A DELAY IN

GETTING YOU BACK HERE IN THE COURTHOUSE, I AM GOING TO MAKE

YOU STAY AROUND.

MR. KIERSH:  VERY WELL.

THE COURT:  SO IT'S TO YOUR OWN ADVANTAGE TO FIND

SOME WAY TO BE REASONABLY ACCESSIBLE.

MR. KIERSH:  YOUR HONOR, WILL THE JURY BE HAVING

LUNCH FROM 12:30 TO 2:00 ON A REGULAR BASIS SO WE KNOW

DURING THAT PERIOD IF WE NEED TO BE SOMEWHERE ELSE, WE CAN

BE?

61

THE COURT:  IT IS ENTIRELY UP TO THEM.  IF THEY

WANT TO HAVE LUNCH AND GO RIGHT BACK TO WORK, THEY CAN GO

RIGHT BACK TO WORK.  SO I WOULD NOT COUNT ON HAVING AN HOUR

AND A HALF AT NOONTIME.

MR. KIERSH:  VERY WELL.

MR. JONES:  YOUR HONOR, WILL 4:30 BE THE CLOSING

TIME?

THE COURT:  I AM GOING TO DELAY IT A LITTLE BIT.

I AM GOING TO MAKE IT MAYBE A QUARTER TO 5:00 OR SOMETHING

LIKE THAT.

MR. JONES:  SO WE CAN SAY THAT AT 5:00 O'CLOCK IT

IS SAFE TO SAY THAT --

THE COURT:  BY 5:00 O'CLOCK.  I WILL SEND THEM OUT

NOT LATER THAN 5:00 O'CLOCK.

MR. JONES:  THANK YOU, YOUR HONOR.

MR. ZUCKER:  IS THERE ANY HOUR DURING THE NOONTIME

BREAK THAT WE CAN BE HELD HARMLESS IF WE WANT TO GO OUTSIDE

OUR OFFICES SOMEWHERE?

THE COURT:  WELL, YOU CAN FIGURE THAT THEY ARE

USUALLY GOING TO GO LUNCH AT ABOUT 12:30.  AND MY GUESS IS

FROM 12:30 TO 1:30, THEY'RE GOING TO BE --

MR. ZUCKER: ALL RIGHT. FROM 12:30 TO 1:30, WE

COULD BE HARMLESS. AND THEN AT 1:30, 15 MINUTES.

THE COURT: YES.

MR. ZUCKER: FAIR ENOUGH. THANKS.

62

MS. HEPWORTH: YOUR HONOR, JUST AN EXHIBIT ISSUE.

EARLIER WE OBJECTED TO THE WRITING ON THE GOVERNMENT'S NARCOTICS EVIDENCE. AND THE COURT INDICATED THAT IF THE JURY ASKED FOR IT, YOU WOULD ORDER A REDACTION OF THE WRITING. AND WE WOULD LIKE THAT DONE IF THE JURY ASKS FOR IT. IF NOT, OF COURSE, IT DOESN'T MATTER.

MS. CHATURVEDI: YOUR HONOR, THAT'S NOT MY RECOLLECTION AT ALL. THE HEAT-SEALS, AS YOUR HONOR MAY RECALL, ARE ALL PACKAGED IN SUCH A WAY THAT THERE ARE MARKINGS AS TO WHERE THE DRUGS WERE RECOVERED AND FROM WHICH DEFENDANT THEY CAME FROM.

FOR US TO GO THROUGH AND REDACT THEM MEANS WE WOULD HAVE TO OPEN UP ALL OF THAT MARIJUANA. IT WOULD BE PHYSICALLY OUT OF THE HEAT-SEAL IN WHICH IT IS CONTAINED.

OTHER THAN IDENTIFYING THE LOCATION, THE AMOUNT AND THE NAME

OF THE DEFENDANT FROM WHOM IT WAS PURCHASED, THERE IS NO

OTHER NARRATION OR DESCRIPTION OF THE INTERACTION THAT

OCCURRED.

WE HAVE, BECAUSE WE ASSUMED THAT THE JURY WOULD

NOT BE INTERESTED IN LOOKING AT THE DRUG EVIDENCE, KEPT IT

AT THE F.B.I. AND WILL BE GIVING MR. WEST A PAGER NUMBER IN

CASE THE JURY WANTS TO LOOK AT EACH OF THOSE INDIVIDUAL

HEAT-SEALS.

THE COURT:  ALL RIGHT.  I AM NOT GOING TO HAVE ANY

HEAT-SEALS OPENED UP.


63

MS. HEPWORTH:  YOUR HONOR, FIRST OF ALL, MY

RECOLLECTION IS A LOT OF THE WRITING IS MOST OBJECTIONABLE.

FIRST OF ALL, I AM MAKING THIS OBJECTION AS TO JEROME

MARTIN.  OKAY.  AS TO JEROME MARTIN, I THINK THERE ARE THREE

OR FOUR EXHIBITS.  THOSE EXHIBITS WOULD NOT BE AN OVERALL

HARDSHIP FOR THE GOVERNMENT TO BLOCK OUT WHATEVER PORTIONS

OF THE HEAT-SEAL IS WRITING ON THE HEAT-SEAL OR WRITING

THAT'S VISIBLE THROUGH THE HEAT-SEAL IN ORDER TO KEEP

App 1540

THE

JURY FROM HAVING THAT HEARSAY EVIDENCE THAT IS, IN MY

OPINION, CONTRADICTED BY THE EVIDENCE.  AND I DON'T BELIEVE

IT'S APPROPRIATE.

THE COURT:  I DON'T RECALL ANY EVIDENCE WHICH

CONTRADICTED THE TEXT OF ANY HEAT-SEAL.

MS. HEPWORTH:  YOUR HONOR, I DON'T BELIEVE THE

COURT LOOKED AT ANY OF THE HEAT-SEALS.  AND I LOOKED AT ALL

OF THE HEAT-SEALS.  MUCH OF IT SAYS -- AND, PARTICULARLY,

ONE VERY CONTROVERSIAL, I BELIEVE, SALE OF MARIJUANA THAT IS

ATTRIBUTED TO MY CLIENT IS NOT -- SHOULD NOT BE ATTRIBUTABLE

TO MY CLIENT.  THERE IS ALSO A POSSESSION WITH INTENT TO

DISTRIBUTE THAT IS CONTESTED THAT IS ATTRIBUTED TO MY

CLIENT, AND THE EVIDENCE DOES NOT, IN MY OPINION, SUPPORT

THAT.  BUT WHETHER IT DID OR IT DIDN'T, THAT IS HEARSAY

EVIDENCE.  IT IS INADMISSIBLE AND IT SHOULD BE REDACTED.

THE COURT:  WELL, SOMEBODY HAS TESTIFIED TO IT.

MS. HEPWORTH:  NOT NECESSARILY IN THE WAY THAT IT

64

IS WRITTEN ON THE HEAT-SEAL, FOR ONE THING.

THE COURT: THAT IS SOMETHING YOU SHOULD HAVE POINTED OUT IN THE COURSE OF CROSS-EXAMINATION. I DON'T REMEMBER ANY TESTIMONY WHICH INDICATED THAT THERE WAS AN ERRONEOUS LABEL ON ANY OF THE NARCOTICS EVIDENCE.

MS. HEPWORTH: YOUR HONOR, NO ONE TESTIFIED AS TO THE WRITING ON THE HEAT-SEAL -- THE ONE THAT I AM SPEAKING OF.

THE COURT: WHAT I AM SAYING IS THAT THE TESTIMONY AS TO THE CIRCUMSTANCES OF ITS ACQUISITION WAS ENTIRELY CONSISTENT WITH WHAT APPEARS ON THE LABEL, SO FAR AS I KNOW.

MS. HEPWORTH: DID THE COURT LOOK AT THAT?

THE COURT: I DON'T RECALL ANY TESTIMONY TO SUGGEST THAT THE LABELS WERE IN ERROR.

MS. HEPWORTH: THERE WAS NO TESTIMONY AS TO --

THE COURT: MR. HEPWORTH, IF YOU FELT THAT THE LABEL WAS IN ERROR, THEN IT WAS INCUMBENT UPON YOU TO DRAW THAT FACT OUT FROM THE WITNESS WHO AUTHENTICATED THE EXHIBIT.

MS. HEPWORTH: YOUR HONOR, ALL OF THE DRUG EVIDENCE CAME IN THROUGH ONE WITNESS. THAT WAS KANE -- SPECIAL AGENT KANE. THERE WAS NO INDICATION AS TO WHO FOUND

WHAT, OR WHO WROTE THOSE HEAT-SEALS, OR ANYTHING ELSE.

CROSS-EXAMINING HER AS TO THOSE WOULD HAVE BEEN NOT RELEVANT

TO HER KNOWLEDGE OR TO HER ACTIVITY DURING THE SEIZURE.

65

THE COURT:  ALL RIGHT.  I AM NOT GOING TO HAVE ANY

HEAD-SEALS OPENED.

MR. DAVIS:  YOUR HONOR, I AM GOING TO JOIN IN

THAT, BUT I DON'T THINK WE NEED TO WORRY ABOUT IT UNTIL THEY

REQUEST IT.  IF THEY REQUEST IT, PERHAPS WE CAN HAVE THEM

IDENTIFY THE EXHIBIT THEY WANT AND WE CAN SHOW IT TO THEM OR

SOMEONE CAN SHOW THEM IN THE COURTROOM RATHER THAN HAVING

THE BAGS GO BACK.

THE COURT:  I THINK THE BAGS WILL GO BACK.  I

THINK VIRTUALLY ANYTHING WILL GO BACK.  THE ONLY EXCEPTION

THAT I AM GOING TO MAKE IS LIVE AMMUNITION AND FIREARMS

SIMULTANEOUSLY.

MR. BESHOURI:  YOUR HONOR, WE HAVE PREPARED A

MASTER LIST OF WHO TESTIFIED ON WHAT DAY.  SO IN THE EVENT

THE JURY WANTS TO SEE A PIECE OF TESTIMONY, WE DO HAVE THIS

App 1543

FOR REFERENCE.  AND DEPENDING UPON THE CIRCUMSTANCES, THIS COULD BE SUBMITTED TO THEM AS WELL, IF THEY ARE ASKING FOR TRANSCRIPTS.  BUT I WOULD NOT DO THAT UNTIL AND UNLESS THEY DO REQUEST THEM.

THE COURT:  THAT MAY TURN OUT TO BE VERY HELPFUL.  I DON'T KNOW.  I HAVE GOT ALL THESE TRANSCRIPTS HERE.  I AM NOT GOING TO SEND THEM BACK UNTIL THEY INDICATE THAT THEY WANT TO LOOK AT THE TRANSCRIPTS.  AND IT MAY BE THAT WE CAN SATISFY THEIR CURIOSITY BY SENDING LESS THAN ALL.

MR. BESHOURI:  RIGHT.

66

THE COURT:  AND IF YOU HAVE GOT A CATALOG OF TESTIMONY BY WITNESS AND DATE, THAT MAY BE HELPFUL.

MR. BESHOURI:  VERY WELL.  WE'LL HOLD ONTO THIS.

THE COURT:  ALL RIGHT.

ALL RIGHT.  THANK YOU, COUNSEL.  WE'LL STAND IN RECESS.

(RECESS WAS TAKEN.)

67

(JURY OUT.)

(4:15 P.M.)

THE COURT:  ALL RIGHT, COUNSEL.  WE HAVE A NOTE

FROM THE JURY SIGNED BY JUROR NUMBER 1 AS THE FOREPERSON

OF

THE JURY. THEY ARE REQUESTING EVIDENCE. "ALL BLUE BOOKS

WITH STILL PHOTOS." ARE WE ALL AGREED THAT WE KNOW WHAT

THOSE ARE?

MR. ZEIDENBERG: YES.

MR. KIERSH: NO OBJECTION.

THE COURT: ALL VIDEOTAPES (EDITED AND UNEDITED.)

DO THEY HAVE A VIDEO RECORDER IN THERE, MR. WEST, OR ACCESS

TO ONE?

THE DEPUTY CLERK: NOT YET.

THE COURT: ARE WE GOING TO ORDER ONE UP?

THE DEPUTY CLERK: WE'RE GETTING ONE.

THE COURT: ALL RIGHT.

"D.E.A. LAB REPORTS (SHOWING AMOUNTS OF ALL DRUGS

ACTUALLY CONFISCATED FROM THESE DEFENDANTS.) AND (4)

TRANSCRIPTS (ALL THAT ARE AVAILABLE AT THIS TIME.)"

I GUESS THE ONLY THING THAT MIGHT BE CONTROVERSIAL

WOULD BE THE TRANSCRIPTS, BUT I BELIEVE -- I AM INFORMED

THAT ALL OF THEM HAVE BEEN REDACTED OF BENCH CONFERENCES AND

THAT THE TRANSCRIPTS ARE READY TO GO BACK. IF THEY WANT

THEM ALL, WE MAY AS WELL SEND THEM BACK.

MS. NEGIN-CHRIST: DID YOUR HONOR WANT TO ASK THEM

68

ABOUT WHETHER THEY WANTED THEM INDEXED OR WAIT UNTIL THEY

ASK?

THE COURT: WAIT UNTIL THEY ASK.

ALL RIGHT. IT'S MY INTENTION TO EXCUSE THEM FOR

THE DAY, AFTER I BRING THEM IN HERE, AND ASK THEM TO RETURN

AT 9:30 TOMORROW MORNING.

MR. ZEIDENBERG: YOUR HONOR, JUST OUT OF AN

ABUNDANCE OF CAUTION, IF YOU COULD INQUIRE WHEN THEY REFER

TO THE TRANSCRIPTS -- IF YOU COULD JUST ASCERTAIN IF THEY

ARE REFERRING, WHICH I ASSUME THEY ARE, TO THE TRIAL

TRANSCRIPTS.

THE COURT: AS OPPOSED TO TRANSCRIPTS OF

AUDIOTAPES?

MR. ZEIDENBERG: YES. I MEAN I ASSUME THAT THEY

WANT THE TRIAL TRANSCRIPTS.

THE COURT: OKAY.

MR. ZEIDENBERG: BUT JUST TO BE CLEAR ON THAT --

THE COURT: SURE. ALL RIGHT. LET'S BRING THEM

IN.

MR. KIERSH: YOUR HONOR, REAL QUICKLY.

THE COURT: WAIT A MINUTE.

MR. KIERSH: WITH RESPECT TO THE INDEX, THEY ARE

NOT GOING TO KNOW TO ASK FOR AN INDEX BECAUSE THEY DON'T

KNOW THAT AN INDEX OF WITNESSES EXISTS. BUT THAT INDEX --

AT LEAST IN MY GETTING READY FOR M.J.O.A.'S AND EVERYTHING

69

ELSE IN THIS CASE -- AND CLOSINGS -- THAT INDEX WAS

INVALUABLE TO ME. AND IT COULD SAVE SO MUCH TIME.

THE COURT: WELL, HAVE YOU SHOWN IT TO

MR. ZEIDENBERG?

MR. ZEIDENBERG: I HAVEN'T SEEN IT.

MR. KIERSH: OKAY. WE WILL SHOW IT TO HIM.

THE COURT: WHY DON'T YOU SHOW IT TO HIM. MAYBE

THEY CAN GET IT TOMORROW IF YOU'RE AGREED THAT IT CAN GO IN.

MR. KIERSH: VERY WELL. AND ARE YOU GOING TO ASK

THE JURY TODAY IF THEY ARE GOING TO WANT TO SIT ON FRIDAYS?

THE COURT: YES.

MR. KIERSH:  VERY WELL.

THE COURT:  ALL RIGHT.  LET'S BRING THEM IN.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

(JURY IN.)

70

(JURY IN.)

THE DEPUTY MARSHAL:  THE JURY IS ALL PRESENT, YOUR HONOR.

THE COURT:  THANK YOU, SIR.

LADIES AND GENTLEMEN, I HAVE A NOTE FROM YOUR FOREPERSON, JUROR NUMBER 1, 0652, WHICH IS REQUESTING CERTAIN EVIDENCE WHICH HAS BEEN ADMITTED.

App 1549

FIRST, "ALL BLUE BOOKS WITH STILL PHOTOS." WE'RE

ALL AGREED THAT THOSE SHOULD GO IN TO YOU.

"ALL VIDEOTAPES (EDITED AND UNEDITED.)"

THOSE, TOO, WILL GO IN TO YOU. WE'RE ARRANGING TO

HAVE A V.C.R. SET UP FOR YOU IN THE JURY ROOM TOMORROW, AND

YOU SHOULD BE ABLE TO VIEW THEM AT YOUR LEISURE.

"D.E.A. LAB REPORTS SHOWING AMOUNTS OF ALL DRUGS

ACTUALLY CONFISCATED FROM THESE DEFENDANTS." THOSE, TOO, WE

WILL LOCATE AND SEND IN DIRECTLY.

AND "TRANSCRIPTS (ALL THAT ARE AVAILABLE AT THE

TIME)." WE ARE PRETTY SURE THAT WE HAVE TRANSCRIPTS

AVAILABLE FOR THE TRIAL RIGHT UP THROUGH THE CONCLUSION.

I TAKE IT YOU ARE REFERRING TO TRANSCRIPTS OF

TESTIMONY. IS THAT CORRECT?

THE JURORS: YES.

THE COURT: AS DISTINGUISHED FROM TRANSCRIPTS OF

AUDIOTAPES?

THE JURORS: YES.

71

THE COURT: TRANSCRIPTS OF TESTIMONY. ALL

RIGHT.

WE WILL BE SENDING THOSE IN.

THIS IS A LOT OF MATERIAL, LADIES AND GENTLEMEN.

WE WILL SEND IT IN. IF YOU FIND YOURSELVES CROWDED OUT OF ROOM IN THERE, LET US KNOW, AND WE'LL TAKE SOME OF IT OUT AND SEND IT BACK IN TO YOU IN INSTALLMENTS, WHICH MIGHT BE EASIER TO HANDLE. BUT WE WILL BRING IT ALL IN TO YOU DIRECTLY TOMORROW.

I AM GOING TO EXCUSE YOU FOR THE DAY TODAY, AND I AM GOING TO ASK YOU TO RETURN AT 9:30 TOMORROW. THE MARSHAL WILL MAKE ARRANGEMENTS TO PICK YOU UP AT A TIME WHICH WILL ENABLE YOU TO COMMENCE YOUR DELIBERATIONS AT 9:30.

AND, MR. FOREMAN, I ADVISE YOU NOT TO LET DELIBERATIONS COMMENCE UNTIL ALL OF YOU ARE PRESENT. UNDERSTOOD?

THE FOREMAN: YES.

THE COURT: ALL RIGHT, SIR.

I NOW ASK YOU, ONCE AGAIN, IF, FOR PURPOSES OF EXPEDITING YOUR RESOLUTION OF THE CASE, YOU WOULD LIKE TO SIT ON FRIDAY. YOU DON'T HAVE TO ANSWER RIGHT NOW, BUT I WOULD APPRECIATE YOUR TELLING ME TOMORROW AS SOON AS YOU

CAN

WHETHER OR NOT YOU WOULD WANT TO SIT ON FRIDAY -- DELIBERATE

ON FRIDAY, AND IF SO, I WILL MAKE ARRANGEMENTS FOR YOU TO DO

SO.

IF THERE ARE NO QUESTIONS, WE WILL HAVE THIS

72

EVIDENCE AVAILABLE FOR YOU THE FIRST THING TOMORROW MORNING.

AND YOU ARE EXCUSED FOR THE EVENING.

(JURY OUT.)

App 1552

73

(JURY OUT.)

THE COURT: ALL RIGHT. THANK YOU, COUNSEL. YOU ARE EXCUSED FOR THE DAY AS WELL. AND PLEASE REMAIN AVAILABLE ON SHORT NOTICE TOMORROW.

MS. HEPWORTH: I HAVE ONE BRIEF MATTER. THERE WAS AN ITEM -- DEFENDANT MARTIN'S EXHIBIT NUMBER 63. THE COURT HAD RESERVED. THE GOVERNMENT WANTED AN OPPORTUNITY TO REVIEW THE TRANSCRIPT. MS. CHATURVEDI CALLED ME AND INDICATED THAT THEY DO NOT OBJECT TO THIS EXHIBIT. SO I WOULD MOVE IT IN AT THIS TIME.

THE COURT: DEFENDANT MARTIN'S 63?

App 1553

MS. HEPWORTH: YES.

THE COURT: WHICH IS A TRANSCRIPT OF?

MS. HEPWORTH: IT IS AN EXCERPT OF A TRANSCRIPT

FROM THE TRIAL OF UNITED STATES VERSUS MARTIN IN THE

SUPERIOR COURT, THE TESTIMONY OF KENNETH RODGERS.

THE COURT: ALL RIGHT. MARTIN'S 63 IS ADMITTED.

(WHEREUPON, DEFENDANT

MARTIN'S EXHIBIT NUMBER 63

WAS RECEIVED IN EVIDENCE.)

THE COURT: ARE COUNSEL SATISFIED THAT EVERYTHING

THAT NEEDS TO BE REDACTED FROM THESE TRANSCRIPTS IS OUT?

MR. ZEIDENBERG: YES, YOUR HONOR.

MR. ZUCKER: IN ALL CANDOR, I HAVEN'T HAD A CHANCE

TO REVIEW THEM, AND I WON'T BE ABLE TO.

74

THE COURT: CAN YOU THINK OF ANYTHING THAT YOU

DEFINITELY WANT TO HAVE REDACTED?

MR. ZUCKER: WELL, I THINK EVERYBODY AGREES THAT

ALL BENCH CONFERENCES WERE SUPPOSED TO BE REDACTED.

THE COURT: WELL, THEY ARE.

App 1554

MR. ZUCKER:  RIGHT.  WE HAVEN'T CHECKED.  IT IS

JUST A QUESTION OF MAN HOURS, JUDGE.

THE COURT:  THEY ARE GOING TO GO IN TO THEM THE

FIRST THING TOMORROW MORNING.  YOUR OPPORTUNITY NOW IS TO

EXAMINE THEM.

MR. ZUCKER:  I WOULD JUST ASK CO-COUNSEL IF YOU

WANT TO STAY HERE AND LOOK THROUGH THEM.

HAVE YOU HAD A CHANCE TO LOOK THROUGH THEM?

MR. ZEIDENBERG:  I HAVE NOT, BUT I AM SATISFIED.

THE COURT:  WELL, BOTH COURT REPORTERS HAVE

DILIGENTLY WORKED TO TAKE OUT THE MATERIAL WHICH IS SUBJECT

TO REDACTION, BUT --

MR. ZUCKER:  AND WE'VE FOUND THEM VERY COMPETENT

IN THE PAST.  AND I DON'T SUSPECT THERE IS ANY PROBLEM.

THE COURT:  WELL, THEN YOU CAN EITHER RELY ON THEM

OR YOU CAN TAKE THE OPPORTUNITY NOW TO REVIEW THE

TRANSCRIPTS.

MR. ZUCKER:  A MOMENT TO CONSULT.

(COUNSEL CONFERRING.)

MR. ZUCKER:  THE GENERAL CONSENSUS IS JUST TO RELY

75

ON THE COURT REPORTERS.

THE COURT: VERY WELL. ALL RIGHT.

ALL RIGHT. YOU NEED NOT REPORT TO COURT TOMORROW MORNING, BUT, ONCE AGAIN, BE AVAILABLE ON RELATIVELY SHORT NOTICE.

MR. ZEIDENBERG: AT THE END OF DAY, YOUR HONOR, IF THE JURY DOESN'T HAVE ANY QUESTIONS, WILL THE COURT JUST DISMISS THEM, OR DO WE NEED TO COME BACK AT 4:30?

THE COURT: YOU DO NOT NEED TO COME BACK. I WILL DISMISS THEM, UNLESS THERE IS SOME PROBLEM.

MR. ZEIDENBERG: VERY WELL.

THE COURT: BUT I EXPECT THAT THERE ARE GOING TO BE SOME QUESTIONS.

MR. ZEIDENBERG: I WILL BE AVAILABLE. I JUST WANTED TO KNOW WHETHER THE COURT WANTS US HERE AUTOMATICALLY AT 4:45.

THE COURT: NO. NO.

MR. ZEIDENBERG: VERY WELL.

MR. ZUCKER: HOW DO YOU WANT TO MAKE INQUIRY ABOUT

FRIDAY JUST SO THAT WE CAN SCHEDULE OUR LIVES?

THE COURT:  I BEG YOUR PARDON?

MR. ZUCKER:  HOW DO YOU WANT TO MAKE THE INQUIRY?

MR. KIERSH:  HE ASKED THE JURORS.

THE COURT:  I ASKED THEM TO LET ME KNOW THE FIRST

THING TOMORROW.  AND WE WILL TRY TO LET YOU KNOW.


76

MR. ZUCKER:  I APPRECIATE IT.

THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

MR. ZUCKER, WOULD YOU APPROACH THE BENCH OFF THE

RECORD.

(MR. ZUCKER AT THE BENCH OFF THE RECORD.)

(WHEREUPON, AT 4:25 P.M., THE ABOVE-ENTITLED

MATTER WAS ADJOURNED.)




CERTIFICATE OF REPORTER

THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO

BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.


_____

PHYLLIS MERANA

App 1558

# EXHIBIT 2

### 3. SAMUEL CARSON, a/k/a "Chin"

**Count One** Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 52-63, 103-06)   ▮ J#1

Guilty: ✓                    Not Guilty: _____

#### Controlled Substances

(A) Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: ✓                    Not Proven: _____

(B) Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven: _____                    Not Proven: ✓

(C) Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven: _____                    Not Proven: ✓

If you find the defendant guilty of Count One, narcotics conspiracy, then you must answer the following questions relating to the amount of drugs for which the defendant is responsible, including those drugs that he actually distributed or possessed with intent to distribute, and those drugs distributed or possessed with intent to distribute by co-conspirators which the defendant knew or reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy:

#### Cannabis, also known as Marijuana

(A) 1000 kilograms or more of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven: ✓                    Not Proven: _____

If you are unable to find unanimously that the quantity of marijuana was 1000 kilograms or more, then you should consider whether the drug quantity was:

16

App 1560

(B) 100 kilograms or more but less than 1000 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____ Not Proven:__■__ J#1

If you are unable to find unanimously that the quantity of marijuana was 100 kilograms or more but less than 1000 kilograms, then you should consider whether the drug quantity was:

(C) 50 kilograms or more but less than 100 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____ Not Proven:__■__ J#1

If you are unable to find unanimously that the quantity of marijuana was 50 kilograms or more but less than 100 kilograms, then you should consider whether the drug quantity was:

(D) Less than 50 kilograms of mixtures and substances containing a detectable amount of cannabis, also known as marijuana.

Proven:_____ Not Proven:__■___ J#1

### Cocaine Base, also known as Crack Cocaine

(A) 50 grams or more of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____ Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 50 grams or more, then you should consider whether the drug quantity was:

(B) 5 grams or more but less than 50 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____ Not Proven:_____

If you are unable to find unanimously that the quantity of cocaine base was 5 grams or more but less than 50 grams, then you should consider whether the drug quantity was:

17

App 1561

(C) Less than 5 grams of mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine.

Proven:_____          Not Proven:_____

**Count Two**  Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from in at least 1988, and continuing thereafter up to and including March 1999.

Guilty: ✓          Not Guilty:_____

In order to find the defendant guilty of this Count, you must unanimously find that the defendant agreed to commit at least two of the racketeering acts listed below.  You should make unanimous findings with respect to each of the racketeering acts listed below by marking "Proven" or "Not Proven." (See Final Jury Instructions, pp. 64-81)

**Racketeering Act 1**  Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in at least 1988, and continuing thereafter up to and including March 1999. (See Final Jury Instructions, pp. 64-81, 52-63)

(A)  Mixtures and substances containing a detectable amount of cannabis, also known as marijuana, a Schedule I controlled substance.

Proven: ✓          Not Proven:_____

(B)  Mixtures and substances containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II narcotic drug controlled substance.

Proven:_____          Not Proven: ✓

(C)  Mixtures and substances containing a detectable amount of phencyclidine (PCP), a Schedule III controlled substance.

Proven:_____          Not Proven: ✓

**Racketeering Act 23**  First-degree murder while armed of Anthony Fortune on or about August 6, 1991.  (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓          Not Proven:_____

18

App 1562

**Racketeering Act 2-14**

(A) Assault with intent to murder while armed of Keith Bradby, a/k/a "Pee Wee," on or about September 10, 1991. (See Final Jury Instructions pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

(B) Assault with intent to murder while armed of Jimmy Thomas, Jr., a/k/a "Sugarspoon," on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

(C) Assault with intent to murder while armed of Officer Adrian Treadwell on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

(D) Assault with intent to murder while armed of Officer Edward McDonald on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

(E) Assault with intent to murder while armed of Officer Marc Little on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

(F) Assault with intent to murder while armed of Officer Alvin Ray on or about September 10, 1991. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓           Not Proven:_____

**Racketeering Act 3-14** Conspiracy to commit murder of members of L Street group in or about July 1996. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓           Not Proven:_____

**Racketeering Act 3-15** Assault with intent to murder while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven:_____           Not Proven: ✓

App 1563

**Racketeering Act 36**

(A) First degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓   Not Proven: _____

(B) First-degree murder while armed of Leonard Tyson, a/k/a "Stick," on or about December 19, 1989. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓   Not Proven: _____

**Racketeering Act 37**

(A) First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓   Not Proven: _____

(B) First-degree murder while armed of Terita Lucas on or about March 22, 1991. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓   Not Proven: _____

**Racketeering Act 38**   Assault with intent to murder while armed with a dangerous weapon of Officer Alfred Moss on or about April 7, 1992. (See Final Jury Instructions, pp. 64-69, 77)

Proven: _____   Not Proven: ✓

**Racketeering Act 40**   Assault with intent to murder while armed of Roland Brown on or about October 28, 1993. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: _____   Not Proven: ✓

**Racketeering Act 41**   Conspiracy to commit murder of Steve Dunbar on or about April 9, 1994. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: _____   Not Proven: ✓

**Racketeering Act 42**   Assault with intent to murder while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ✓   Not Proven: _____

200

App 1564

**Racketeering Act 45** Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Maurice Proctor a/k/a "Boo-Boo", between in or about 1996 and in or about 1997. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓          Not Proven: ____

**Racketeering Act 46** Assault with intent to murder while armed of Popa Mark Phillip on or about August 30, 1996. (See Final Jury Instructions, pp. 64-69, 70-71)

Proven: ____          Not Proven: ✓

**Racketeering Act 47** Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of United States v. Jerome Martin, a/k/a "Pimp", in or about October 1996. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓          Not Proven: ____

**Racketeering Act 48** First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996. (See Final Jury Instructions, pp. 64-69, 83-85)

Proven: ✓          Not Proven: ____

**Racketeering Act 49**

(A) Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 76)

Proven: ✓          Not Proven: ____

(B) First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓          Not Proven: ____

(C) First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓          Not Proven: ____

221

(D) First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 79-80)

Proven: ✓          Not Proven: _____

(E) First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

Proven: _____          Not Proven: ✓

(F) First-degree premeditated murder while armed of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

Proven: _____          Not Proven: ✓

(G) First-degree premeditated murder while armed of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 64-69, 78)

Proven: _____          Not Proven: ✓

**Racketeering Act 50** Conspiracy to commit murder of Robert Smith, a/k/a "Butchie," between in or about April 1997 and on or about June 17, 1997. (See Final Jury Instructions, pp. 64-69, 72-73)

Proven: ✓          Not Proven: _____

**Count Four** First-degree murder while armed of Maurice Hallman, a/k/a "Mo," on or about December 19, 1989. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty: _____

**Count Five** First-degree murder while armed of Leonard Hyson, a/k/a 'Slick," on or about December 19, 1989. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty: _____

**Count Six** First-degree murder while armed of Teresa Thomas, a/k/a "T.T.," on or about March 22, 1991. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty: _____

**Count Seven** First-degree murder while armed of Terita Lucas on or about March 22, 1991. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty: _____

22

**Count Eight**  First-degree murder while armed of Anthony Fortune on or about August 31. (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twelve**  Assault with intent to kill while armed of Roland Brown on or about October 28, 1993.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

**Count Thirteen**  Assault with intent to kill while armed of Ulysses English, a/k/a "Lou," on or about June 26, 1994.  (See Final Jury Instructions, pp. 91-92)

Guilty: ✓          Not Guilty:_____

**Count Fourteen**  Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou," on or about June 26, 1994.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty: ✓          Not Guilty:_____

**Count Nineteen**  Assault with intent to kill while armed of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

**Count Twenty**  Attempted murder in aid of racketeering activity of Popa Mark Phillip on or about August 30, 1996.  (See Final Jury Instructions, pp. 86-90, 91-92)

Guilty:_____          Not Guilty: ✓

**Count Twenty-One**  First-degree murder while armed of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twenty-Two**  Murder in aid of racketeering activity of Chrishauna Gladden on or about October 5, 1996.  (See Final Jury Instructions, pp. 86-90, 83-85)

Guilty: ✓          Not Guilty:_____

**Count Twenty-Three**  Assault with intent to kill while armed of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996.  (See Final Jury Instructions, pp. 91-92)

Guilty:_____          Not Guilty: ✓

23

App 1567

**Count Twenty-Four** Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute," on or about October 30, 1996. (See Final Jury Instructions, pp. 86-90, 92)

Guilty:_____      Not Guilty:__✓__

**Count Twenty-Five** Murder in aid of racketeering activity of Alonzo Gaskins on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__      Not Guilty:__■ J#1__

**Count Twenty-Six** Murder in aid of racketeering activity of Darnell Mack on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__      Not Guilty:_____

**Count Twenty-Seven** Murder in aid of racketeering activity of Melody Anderson on or about November 17, 1996. (See Final Jury Instructions, pp. 86-90, 78-80)

Guilty:__✓__      Not Guilty:_____

**Count Twenty-Nine** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about June 26, 1994 (Attempted murder in aid of racketeering activity of Ulysses English, a/k/a "Lou"). (See Final Jury Instructions, pp. 95-99)

Guilty:__✓__      Not Guilty:_____

**Count Thirty-Two** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about August 30, 1996 (Attempted murder in aid of racketeering activity of Popa Mark Phillip). (See Final Jury Instructions, pp. 95-99)

Guilty:_____      Not Guilty:__✓__

**Count Thirty-Three** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 5, 1996 (Murder in aid of racketeering activity of Chrishauna Gladden). (See Final Jury Instructions, pp. 95-99)

Guilty:__✓__      Not Guilty:_____

**Count Thirty-Four** Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about October 30, 1996 (Attempted murder in aid of racketeering activity of Ronald Sowells, a/k/a "Manute"). (See Final Jury Instructions, pp. 95-99)

Guilty:_____      Not Guilty:__✓__

24

App 1568

**Count Thirty-Five**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Alonzo Gaskins).  (See Final Jury Instructions, pp. 95-99)

Guilty:__✓____          Not Guilty:_____

**Count Thirty-Six**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Darnell Mack).  (See Final Jury Instructions, pp. 95-99)

Guilty:__✓____          Not Guilty:_____

**Count Thirty-Seven**  Use of a firearm during and in relation to a crime of violence or a drug trafficking crime on or about November 17, 1996 (Murder in aid of racketeering activity of Melody Anderson).  (See Final Jury Instructions, pp. 95-99)

Guilty:__✓____          Not Guilty:_____

**Count Thirty-Nine**  Possession of a firearm during a crime of violence or dangerous offense on or about October 28, 1993 (Assault with intent to kill while armed of Roland Brown).  (See Final Jury Instructions, pp. 100-02)

Guilty:_____          Not Guilty:__✓____

**Count Forty**  Possession of a firearm during a crime of violence or dangerous offense on or about June 26, 1994 (Assault with intent to kill while armed of Ulysses English, a/k/a "Lou").  (See Final Jury Instructions, pp. 100-02)

Guilty:__✓____          Not Guilty:_____

**Count Forty-Three**  Possession of a firearm during a crime of violence or dangerous offense on or about August 30, 1996 (Assault with intent to kill while armed of Popa Mark Phillip).  (See Final Jury Instructions, pp. 100-02)

Guilty:_____          Not Guilty:__✓____

**Count Forty-Four**  Possession of a firearm during a crime of violence or dangerous offense on or about October 5, 1996 (First-degree murder while armed of Chrishauna Gladden).  (See Final Jury Instructions, pp. 100-02)

Guilty:__✓____          Not Guilty:_____

App 1569

**Count Forty-Five** Possession of a firearm during a crime of violence or dangerous offense on or about October 30, 1996 (Assault with intent to kill while armed of Ronald Sowells, a/k/a "Mamute"). (See Final Jury Instructions, pp. 100-02)

Guilty:_____          Not Guilty:__✔__

App 1570

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

WILLIAM SWEENEY

Crim. No. 98-329-4 (RCL)

**WILLIAM SWEENEY'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS
MOTIONS TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 18
U.S.C. § 2255**

William K. Sweeney, petitioner, by his attorney replies to the Government's Opposition

to his Motions to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255, and states

as follows:

**THE CLAIMS MADE IN MR. SWEENEY'S SUPPLEMENTS ARE NOT TIME
BARRED**

**The Collateral Proceedings**

In May 2007, the Court appointed Jenifer Wicks as counsel to represent Mr. Sweeney in

post-conviction collateral proceedings.  Dkts. 1010, 1011.  On February 13, 2008, Mr. Sweeney,

through counsel, filed a motion to access material that had been filed *ex parte* and sealed by the

District Court during the course of the trial.  *See* Dkts. 1015.  On February 15, 2008—five days

before the expiration of one year since the denial of certiorari—the Court granted Mr. Sweeney's

motion and ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this

matter to counsel for Mr. William Sweeney."  Dkt. 1016.  That same day, Ms. Wicks went to the

Clerk's Office, order in hand, looking for the documents, but the Clerk's Office was not able to

locate them.  *See* Ex. 1 (Nov. 2015 Wicks Letter).

On February 19, 2008, Mr. Sweeney timely filed a motion to vacate his convictions pursuant to 28 U.S.C. § 2255.  *See* Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. § 2255 ("Initial Petition"), Dkt. 1017.  Three of his co-defendants also sought post-conviction collateral relief at this time.  *See* Dkts. 1023 (Carson 2255), 1020 (Coates 2255), 1021 (Martin 2255).

While Mr. Sweeney did not yet have the benefit of access to the sealed documents, Mr. Sweeney's Initial Petition included the following claim: the prosecution "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information."  Initial Petition at 16.  Mr. Sweeney explicitly reserved the right to supplement his petition when his counsel got access to additional documents.  *See* Initial Petition at 15, 17.[1]

Over the next two years, Ms. Wicks—at Mr. Sweeney's insistence—repeatedly returned to the Clerk's Office to inquire about the missing documents.  *See* Ex. 1 (Nov. 2015 Wicks Letter) (describing how she went to the Clerk's Office three or four times); *see also, e.g.*, Ex. __ (Mar. 2008 Sweeney Letter) at 2 ("Have you had a chance to pursue the judges latest order?"); Ex. 2 (Oct. 9, 2008 Sweeney Letter) at 2 ("[D]id you retrieve all the documents the court unsealed[?]"); Ex. 5 (Oct. 19, 2008 Sweeney Letter) at 4 ("Did you retrieve the unsealed documents that the court afforded us the opportunity to obtain?').  It was not until June 2010, however, that the Clerk's Office located the previously sealed documents, which included the documents that underpin the

---

[1] Mr. Sweeney's Initial Petition also raised the argument that his trial counsel was ineffective in failing effectively to navigate the issues created by the government's *Brady* violations.  *See* Initial Petition at 5, 8, 12-13.

habeas claim made by Mr. Sweeney in his Initial Petition that the government violated his rights at trial through the non-disclosure of *Brady* material.   *See* Ex. 1 (Nov. 2015 Wicks Letter).

Over time, Mr. Sweeney's and Ms. Wicks' relationship began to deteriorate.  Mr. Sweeney grew increasingly frustrated with Ms. Wicks' failure to communicate with him about a supplemental petition, interview witnesses, investigate additional facts that could bolster his claims for relief, and correct factual errors in his original petition.  *See, e.g.*, Ex. 10 (Mar. 2008 Sweeney Letter) at 1-2; Ex. 2 (Oct. 9, 2008 Sweeney Letter) at 1-2; Ex. 5 (Oct. 19, 2008 Sweeney Letter) at 3-4; Ex. 3 (Feb. 2010 Sweeney Letter) at 1; Ex. 4 (Apr. 2010 Sweeney Letter) at 2-3.  Mr. Sweeney wrote no fewer than nine letters asking Ms. Wicks to file a supplemental petition promptly and complaining about the fact that she had not returned his or his family's calls, and how, when she did answer, she hung up on him.[2]

Ms. Wicks informed the Court that she had experienced personal and family illness that left her mentally and physically unable to work and asked for extensions of time to file a

---

[2] *See, e.g.*, Ex. 2 (Oct. 9, 2008 Sweeney Letter) ("You've shown repudiation and disrespect for me with hanging up the phone or worst [sic] not answering, or ignoring my calls.");  Ex. 5 (Oct. 19, 2008 Sweeney Letter) ("It is your obligation to represent this case zealously and competently.  This includes effective and sufficient *communication* and all concerns I might present.  Frankly, as this date, you have shown lengthy disrespect to my phone calls; especially the dates you hung up on me with absolutely disregard to any consideration I might suggest to my case.");  Ex. 3 (Feb. 2010 Sweeney Letter) ("Hopefully, this letter will convince you of how important it is to me that you prepare and send me a "draft" of an amended and/or supplemental motion to my pending § 2255. I ask that this be completed without further delay.");  Ex. 4 (Apr. 2010 Sweeney Letter) ("I am very dissatisfied and frustrated because you continually force me to ask you the same questions pertaining to . . . the drafting of any supplemental pleadings on my behalf.  Members of my family have also made several attempts to contact you to no avail.");  Ex. 6 ("Mar. 2011 Sweeney Letter") ("I've wrote you at least five (5) letters since December and you have yet responded to any of them.  I've called your office on numerous times and has left you many messages with Ms. Sharon Chavnis as well as left messages on your voice mail.  I've also had my family call your office and leave messages with Ms. Chavis for you, but all to no avail.  I haven't spoken with you since October of last year, which has now been five (5) months.  What we are now going through is a repeat of what we went through in 2009 and again in 2010 at which time you assured me that it wouldn't happen again.").

supplemental habeas petition on Mr. Sweeney's behalf due to these illnesses and the defendants' difficulties in accessing the record. *See* Dkts. 1056 (September 1, 2010 request for an extension of time to file supplement until November 22, 2010), 1062 (November 21, 2010 request for extension of time to file supplement until February 22, 2011), 1065 (February 2, 2011 request for extension of time to file supplement until May 30, 2011), 1067 (April 11, 2011 request for an extension of time to file supplement until November 30, 2011), 1070 (April 20 motion to join motion at Dkt. 1067), 1080 (November 27, 2011 motion for an extension of time to file until July 30, 2012); *see also* Ex. 7 (Feb. 2011 Wicks Letter) (mentioning illness). The Court granted each of these requests. *See* Dkts. 1057 (order granting extension until November 22, 2010 signed September 3, 2010), 1064 (order granting extension until February 22, 2011 signed November 23, 2010), 1066 (order granting extension until May 30, 2011 signed February 2, 2011), 1073 (order granting extension until November 30, 2011 signed May 27, 2011), 1074 (same), 1081 (order granting extension until July 30, 2012 signed December 5, 2011). In none of the orders from the Court granting extensions did the Court give any indication that the statute of limitations would run independent of the Court's order or otherwise even reference the statute of limitations. Rather, the Court granted each extension without any reservation.

During this period, Mr. Sweeney continued to write detailed letters to Ms. Wicks about the arguments he wanted her to make—including on August 9, 2010, when, after having received the previously sealed materials located by the Clerk's Office in June 2010, he laid out in impressive detail the *Brady* material that makes up the bulk of his current claims. *See* Ex. 8 (Aug. 2010 Sweeney Letter) at 1-5. Eventually, the relationship between Ms. Wicks and Mr. Sweeney deteriorated to the point where Ms. Wicks moved to withdraw. *See* Dkt. 1082; *see also* Ex. 6 (Mar. 2011 Sweeney Letter) at 4 ("I think it's time for you to really consider whether or not you can give

my case the time required or is this where we go our separate ways?").  (Mr. Sweeny has attempted to obtain an affidavit from Ms. Wicks with regard to her efforts to obtain the sela material from the clerk's office and her communication with Mr. Sweeney but at the time of filing, as a result of an illness, she has been unable to provide one.  Once the affidavit is obtained it will be provided)

On December 16, 2011, the Court granted Ms. Wicks' motion and referred the case to the Office of the Federal Public Defender ("FPD") for appointment of counsel to represent Mr. Sweeney.  Dkt. 1083.  In December 2012, Eric Kirchman and Shana Madigan were appointed as CJA counsel to represent Mr. Sweeney.  Dkts. 1105, 1110.  They inherited fifteen boxes of unindexed material.

On December 20, 2012 and May 17, 2013, the Court held status hearings regarding the defendants' habeas petitions.  By this time, Sweeney's codefendants Mr. Carson and Mr. Martin also had new counsel.  Dkts. 1058 (September 7, 2010 motion to withdraw from Mr. Carson's counsel Mr. Edward Sussman), 1060 (November 5, 2010 appearance by Mr. Carson's new counsel Ms. Kira West), 1076 (June 21, 2011 motion to withdraw from Mr. Martin's counsel Mr. Frances D'Antuono), 1086 (March 8, 2012 appearance by Mr. Martin's new counsel Mr. Michael Lawlor).  At these hearings, the Court heard from defense counsel about the difficulties they were having getting access to the record in this case and their intention to file supplements to their clients' initial habeas petitions.

The Court, in recognition of the volume of work new defense counsel had before them, declined to set a deadline to file the supplements during those hearings.  Instead, it set a further hearing on August 29, 2013 to discuss a schedule.  *See* 5/17/2013 Hr'g Tr. at 19, Dkt. 1219.  On August 29, 2013, the Court held that status conference, and, on September 3, 2013, and about eight-and-a-half months after Mr. Kirchman and Ms. Madigan entered their appearances, it granted

the oral motion of Defendants Sweeney, Martin, Carson, and Coates to set May 29, 2014 as the deadline for them to file supplemental petitions. Dkts. 1122, 1219. On May 29, 2014, the Court granted the four defendants an additional six-month extension. Dkt. 1128. On November 28, 2014, consistent with the deadline set by the Court, Mr. Sweeney filed a supplement to his Initial Petition, raising the claims presently before the Court.

On November 26, 2014, the Court signed an order—filed five days later—granting Mr. Sweeney and the other defendants an extension until February 25, 2015 to file any further supplements. Dkt. 1149. On February 25, 2015, Mr. Sweeney filed a second supplemental petition, which, as the government concedes, raises "for the most part, the same claims that he raised in his first supplemental November 28, 2014, pleading." Dkt. 1255 ("Gov. Omnibus Br.") at 28.

Having never filed an opposition to Mr. Sweeney's Initial Petition in 2008 or to his supplemental petitions in late 2014 and early 2015, on March 18, 2020, the government filed an omnibus opposition. Dkt. 1255. The government's opposition makes no argument on the merits related to nearly all of the specific claims made by Mr. Sweeney in the supplemental petitions. Rather, it argues the merits of the claims made in the Initial Petition twelve years earlier and argues that that the specific claims in the supplemental petitions, while filed in accordance with the deadlines set by the Court, are untimely, because they do not "relate back" to his initial habeas petition.[3]

The "untimely" claims that do not relate back, according to the government, include essentially all of the *Brady* and related ineffective assistance of counsel claims detailed in his first

---

[3] The government's brief concedes that the first supplemental petition is "timely." Gov. Omnibus Br. 26. Nonetheless, the government argues that most of the claims in that petition are untimely under the relation back doctrine.

supplemental petition, which was filed after he was finally provided access to the previously sealed *Brady* material. Despite the fact that Mr. Sweeney explicitly raised *Brady* violations and ineffective assistance of trial counsel in vindicating his rights under *Brady* in his Initial Petition, the Government argues that because he could not at that point make those claims with specificity, because he had no access to the *Brady* materials, the subsequent specific *Brady* claims do not relate back to the more general *Brady* claim in the Initial Petition. See Gov. Omnibus Br. 32, 74.

## STATEMENT OF LAW

AEDPA's one-year statute of limitations begins to run on the date a defendant's conviction becomes final or the date "on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(1)-(4). However, defendants are permitted to file supplemental petitions to support their timely filed petitions as long as the claims in the supplemental petitions "relate back" to their timely ones consistent with Federal Rule of Civil Procedure 15. *See United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002).

In addition, AEDPA's one-year limit is equitably tolled when the petitioner diligently pursued his rights, but was prevented from filing a timely petition by extraordinary circumstances. *See United States v. McDade*, 699 F.3d 499, 505 (D.C. Cir. 2012). Extraordinary circumstances include serious attorney negligence, court-ordered extensions of the deadline to file the habeas petition, and unsettled law pertaining to relation-back and equitable tolling. *See id.* at 503–06 (attorney negligence); *Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013) (extension grants); *Prieto v. Quarterman*, 456 F.3d 511, 513 (5th Cir. 2006) (same); *York v. Galetka*, 314 F.3d 522, 528 (10th Cir. 2003) (unsettled equitable tolling law); *Williams v. Filson*, 908 F.3d 546, 561 (9th Cir. 2018) (unsettled relation back law).

**ARGUMENT**

**I.      MR. SWEENEY'S *BRADY* AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS RELATE BACK TO HIS INITIAL 2255 MOTION.**

The Government argues that some of the claims raised in Mr. Sweeney's supplements are barred by limitations as they do not relate back to his initial filing. The Government, however, does not take the time to explain how the claims it argues are time barred did not arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in Mr. Sweeney's initial filing.

In that original filing Mr. Sweeney made a claim that the Government, "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" relating to James Montgomery, Arthur Rice and "jailhouse confessions." Initial Petition at 16. (The Government has labeled this as Claim A17 in its Opposition)

Mr. Sweeney's supplement of November 28, 2014, raises these claims of prosecutorial misconduct, jailhouse confessions, and suppression of *Brady* information, just in more detail. (The Government has labeled these as Claim A19 through A25 in its Opposition)

The Government argues that the following claims of Mr. Sweeney's, which arise out of his claims of prosecutorial misconduct and the Government's failure to disclose *Brady* material to the defense are untimely. These clams are as follows: failing to disclose *Brady* information with regard to: Theodore Watson's Greenbelt file, in which there was evidence that Watson had lied to the U.S. Attorney in Greenbelt and his lies were the reason he was not given a 5K1 letter and the prosecutors telling the court that there was nothing in the file that Watson would cast doubt on Watson's credibility (A19); failing to disclose James Montgomery's *Brady* information contained with the notes of Special Agent Lisi concerning the murder of Timothy Benton (A20); failing to

disclose the *Brady* information contained within the F.B.I. 302's relating to Charles Bender's statements to F.B.I. agents that Jerome Martin confessed to the murder of Anthony Fortune (A21); failing to disclose the *Brady* information relating to Arthur Rice statements contained with the F.B.I. 302's where Rice stated that he was present at the murder of Leonard "Slick" Hyson and Maurice Hallman which would have impeached Montgomery (A22); failing to disclose the *Brady* information contained within a detective's notes that cooperating witness Andre Murray had told the police that Petey Johnson had killed Robert "Butchie" Smith to get back at Mr. Sweeney (A23); failing to disclose the *Brady* information related to the murder of Robert "Butchie" Smith (A24); failing to disclose the *Brady* information contained within the Government's *Ex Parte* Notice to the Court Regarding Change of Location of Confinement, which stated that the Government had information that people other than the defendants in this case had a motive to murder Robert "Butchie" Smith (A25).

Mr. Sweeney had also set forth in his original filing the claim that his appellate counsel was ineffective for failing "to note sections of sealed matters for the [appellate] court to review." (The Government has labeled this as Claim A12 in its Opposition.) As with his *Brady* claims, Mr. Sweeney's supplement of November 28, 2014, raises these claims but in more detail. The claims in the supplemental filing, that the Government contends do not relate back to the original filing, are that appellate counsel failed to seek appellate review of sealed material related to James Montgomery (A29), failed to seek appellate review of sealed material related to Arthur Rice (A30), failed to seek appellate review of sealed material related to Andre Murray (A31).

An amendment to a section 2255 motion is "permitted to relate back [to the original filing] only when 'the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'" *United*

*States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002) (quoting Fed. R. Civ. P. 15(c)(2)). A proposed amendment does not relate back when it "makes claims or is based on occurrences 'totally separate and distinct, in both time and type from those raised in [the] original motion.'" *Id.* (quoting *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir.2000)) "[W]here the prisoner's amendment seeks merely to elaborate upon his earlier claims, this effort should not generally be barred by the statute of limitations." *Id.*; *see also Dean v. United States,* 278 F.3d 1218, 1222, (11th Cir. 2002) ("When the nature of the amended claim supports specifically the original claim, the facts there alleged implicate the original claim, even if the original claim contained insufficient facts to support it. One purpose of an amended claim is to fill in facts missing from the original claim."); *United States v. Duffus*, 174 F.3d 333, 337 (3d Cir.1999) ("Certainly the court could have permitted an amendment to clarify a claim initially made.").

The claims advanced by Mr. Sweeney in his supplements all arise out of the conduct, transaction or occurrence set forth in his initial motion. The *Brady* claims all relate to the Government's misconduct and failure to turn over *Brady* information to the defense. What Mr. Sweeney has done in his supplements is to elaborate upon his earlier claims.[4]

The Government in addressing Mr. Sweeney's *Brady* claims, (A.17), in its opposition states "Sweeney does not elaborate on or further develop these arguments in any of his supplemental filings". Gov. Omnibus Br. at 71. To make such a statement the Government has to ignore the arguments that Mr. Sweeney made in the what the Government has labeled Claims A19, A20, A21, A22, A23, A24, and A25. In these claims, had the Government looked closely, it

---

[4] Mr. Sweeney is entitled to advance his cumulative errors claim as it arises out of the same set of facts as set out in his initial filing and which are expanded and elaborated in his supplemental filings. This is simple a new legal theory which applies to the same conduct, transaction or occurrence that Sweeney has set out in his initial filing.

would have found the elaboration and development of the arguments it claims are missing. In Claims A19, A20, A21, A22, A23, A24, and A25 Mr. Sweeney develops and elaborates on the claim raised in Claim A17.

Instead of addressing these claims on the merits the Government has just decided to argue that they are time barred. Moreover the Government has failed to argue why it believes the claims raised in Claims A19, A20, A21, A22, A23, A24, and A25 are totally separate and distinct, in both time and type from those raised in the original motion. The Government has concluded that they are and we must accept its conclusion.

The same applies to the claims that appellate counsel failed to seek appellate review of sealed material which the Government labels as Claim A12. Once again, the Government ignores Mr. Sweeney's supplements where in Claims A29, A30 and A31 he elaborates on the original argument. Once again, these Claims arise out of the original claim contained within A12 and are all related to the same conduct, transaction, or occurrence set forth therein. Mr. Sweeney in his supplements simply elaborates and develops the claim he had made in his initial filing that his appellate counsel had failed to raise on appeal.

The Government appears to discount Mr. Sweeney's claims raised in Claim A19 through A25 and A29 through A31 because these claims argue facts that were in the sealed material. This, however, ignores the fact that Mr. Sweeney raised the claims of the Government suppressing *Brady* material and engaging in prosecutorial misconduct and the failure of his appellate counsel to raise the issue of the seal material on appeal in his initial filing and Mr. Sweeney, in his supplements develops and supports the claims with arguments and facts that were contained within the sealed material.

In *Mayle v. Felix*, the Supreme Court explained that "relation back" is permitted pursuant to Federal Rule of Civil Procedure 15 when "the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see also* Fed. R. Civ. P. 15(c)(1)(B) (relation back permitted where the amended pleading "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—*or attempted to be set out*—in the original pleading") (emphasis added). The Supreme Court in *Mayle v. Felix* specifically cited *Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003), as an appropriate application of this doctrine. *See Mayle*, 545 U.S. at 664 n.7.

In *Mandacina*, the defendant's initial habeas petition contained "only generalized assertions that evidence obtained by the . . . Police Department was withheld" in violation of *Brady*. *Mandacina*, 328 F.3d at 1000. The defendant's amended petition, filed several years later, complained about the suppression of a particular police report. *Id.* at 1001. Nevertheless, the Eighth Circuit concluded that the amended petition related back to the original petition. *Id.* The Supreme Court endorsed this view. *See Mayle*, 545 U.S. at 664 n.7.

Similarly, Mr. Sweeney's Initial Petition laid out in general terms the precise claim that is a centerpiece of his supplemental petitions: the prosecutors "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure . . . of *Brady* information." Initial Petition at 16; *see also id.* at 13 ("[D]ue to the cumulative *Brady* errors . . . counsel requests that this Court review in camera the materials sealed by the trial court."). This alone means that each of the *Brady* and related ineffective assistance counsel claims in the supplemental petitions elaborating on this general claim once additional information—the previously sealed documents—was available to Mr. Sweeney, relate back to the

general claims in his Initial Petition that his rights at trial were violated through the non-disclosure of *Brady* materials.

The government demands far greater specificity from Mr. Sweeney's Initial Petition than the claim he explicitly raised. But the relation back doctrine does not require that, especially where, as here, the information necessary to make those claims was unknown to the petitioner at the time of the initial petition. With respect to the *Brady* claims, Mr. Sweeney had not had access to the *Brady* material when the Initial Petition was filed. With respect to the ineffective assistance of counsel claims, Mr. Sweeney could not fully brief the prejudice, for example, he experienced from his counsel's failure to seek appellate review of the district courts' rulings on previously sealed *Brady* material and his counsel's failure to object and seek appellate review of the district court's *in camera* procedure to review that material until Mr. Sweeney had access to it himself.

## II. THE STATUTE OF LIMITATIONS ON MR. SWEENEY'S *BRADY* AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS DID NOT BEGIN TO RUN UNTIL AT LEAST AUGUST 2010, WHEN THE UNDERLYING FACTS COULD BE PRESENTED TO THE COURT WITH REASONABLE DILIGENCE.

Section 2255(f)(4) says that the one-year statute of limitations commences on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." The government guesses that it could have taken 90 or 120 days after the Court's order to get to access to the *Brady* material in question. Gov. Omnibus Br. 32 n.21. Unfortunately, that optimism is misplaced. It took over two years. As discussed above, the Clerk's Office did not make the previously sealed *Brady* materials available to Mr. Sweeney's counsel until June 2010. Acting diligently, Mr. Sweeney had articulated the *Brady* claims to his counsel with considerable specificity by August 2010. Thus, had his counsel acted diligently, the claims

could have been presented to the Court shortly thereafter. August 2010, therefore, is the earliest

that the one-year limitations period for these claims commenced.[5]

On the same date the Court issued its unsealing order, Ms. Wicks went to the Clerk's Office

asking for the sealed documents, but the Clerk's Office could not find them. She returned again

and again—at Mr. Sweeney's persistent insistence—over the course of two years asking for the

documents. *See* Ex. 1 (Nov. 2015 Wicks Letter). It was not until June 2010, however, that the

Clerk's Office located the over one thousand pages of documents, including the *Brady* material

that supports Mr. Sweeney's current claims, and turned them over to Ms. Wicks. *See* Ex. 1 (Nov.

2015 Wicks Letter).

Thus, the statute of limitations could not have begun to run until Ms. Wicks and Mr.

Sweeney got access to the materials and had a reasonable period of time to review those materials

to ascertain the facts underlying the *Brady* claims. Acting with diligence, Mr. Sweeney reviewed

the materials provided by the Clerk's Office and wrote a letter to Mr. Wicks laying out many of

the most critical facts that undergird his current supplemental petition. *See* Ex. 8 (Aug. 2010

Sweeney Letter). Had Ms. Wicks acted with diligence, she could have presented the Court with

those claims shortly thereafter. Instead, starting just three weeks after Mr. Sweeney himself had

laid out the *Brady* claims in detail to his counsel, on September 1, 2010, Ms. Wicks sought and

---

[5] The Government concedes that the statute of limitations did not begin running on the claims arising from this *Brady* material until, at the absolute earliest, the Court's order on February 15, 2020 granting Mr. Sweeney access to the sealed documents and likely not for an additional 90 or 120 days after that, presumably to allow the Clerk's Office time to comply with the unsealing order and for Mr. Sweeney to review the materials. *See* Gov. Omnibus Br. 31 n. 21. Thus, the government concedes, the statute of limitations did not begin to run until some point between February 15, 2008 and June 15, 2008 (120 days). *Id.* But the reality is that it was another two years before Mr. Sweeney through the exercise of reasonable diligence was able to access the materials. Allowing 60 days for those materials to be reviewed to ascertain the facts underlying the *Brady* claims, the statute of limitations would start running in August 2010.

obtained a series of extensions from the Court, through when she withdrew from the case in December 2011.

## III. THE ONE-YEAR LIMITATIONS PERIOD WAS EQUITABLY TOLLED BY THE GROSS NEGLIGENCE OF COUNSEL AND THE COURT'S EXTENSION ORDERS.

The one-year AEDPA limitations period was tolled by Ms. Wicks' extraordinary negligence, the Court's extension orders, and the delay in appointing new counsel.

### 1. The statute was tolled from August 2010 through December 2011 when Ms. Wicks withdrew.

#### a. Ms. Wicks' extraordinary negligence and Mr. Sweeney's diligence in pursing his rights tolled the statute of litigations.

Section 2255's one-year statute of limitations is non-jurisdictional and subject to equitable tolling upon a showing of diligence and extraordinary circumstances. *See United States v. McDade*, 699 F.3d 499, 503–06 (D.C. Cir. 2012). Serious attorney negligence by petitioner's counsel, as opposed to mere "garden variety" negligence, is an extraordinary circumstance. *Id.*; *United States v. Rice*, 727 F. App'x 697, 701 (D.C. Cir. 2018) (per curiam) (no extraordinary circumstance where Ms. Wicks, the same lawyer who represented Mr. Sweeney in this case, merely miscalculated the deadline to file the habeas petition). In *United States v. McDade*, the D.C. Circuit found equitable tolling was warranted where the defendant researched and gathered evidence in support of his claim, told his counsel what he hoped to be included in his petition, expressed his desire to file the petition expeditiously, requested counsel send him a draft of the motion, and his counsel failed to comply. 699 F.3d at 501-05. In *Holland v. Florida*, the Supreme Court suggested that equitable tolling was likewise warranted where counsel failed to communicate with his client over a period of years despite repeated pleas for information. 560 U.S. 631, 652 (2010) (indicating that tolling was very likely warranted, but remanding to the lower court to decide that question in the first instance).

The record here is unequivocal. Mr. Sweeney repeatedly and diligently took steps to preserve his legal rights. He identified relevant legal precedent for Ms. Wicks. *See* Ex. 3 (Feb. 2010 Sweeney Letter) at 2-3. He highlighted witnesses for her to speak to, records for her to review, and even went so far as to review reams of unsealed material to identify *Brady* evidence himself. *See, e.g.*, Ex. 9 (Mar. 2009 Sweeney Letter) at 1-2 (listing parts of the record where material was placed under seal); Ex. 8 (Aug. 2010 Sweeney Letter) at 1-5 (describing *Brady* material). Mr. Sweeney wrote up detailed notes and theories of relief that he sent to Ms. Wicks for inclusion in his supplemental petition. *See* Ex. 2 (Oct. 9, 2008 Sweeney Letter); Ex. 5 (Oct. 19, 2008 Sweeney Letter); Ex. 4 (Apr. 2010 Sweeney Letter); Ex. 8 (Aug. 2010 Sweeney Letter); Ex. 3 (Feb. 2010 Sweeney Letter). He also emphasized the importance of filing his supplemental petition promptly and requested she send him a draft. *See* Ex. 3 (Feb. 2010 Sweeney Letter) at 1; Ex. 4 (Apr. 2010 Sweeney Letter) at 1; Ex. 6 (Mar. 2011 Sweeney Letter). Ms. Wicks, however, failed to act on his requests. Over a period of years, she failed to return his calls and the calls of his family members, and even hung up on him on multiple occasions. *See* supra n.3; *Holland*, 560 U.S. at 653 (equitable tolling is appropriate where a lawyer "abandons" her client). Ms. Wicks' extraordinary failure to pursue Mr. Sweeney's claims despite his own diligence in seeking to have her do so warrants tolling for the period she represented him.

### b. Even if not tolled by Ms. Wicks' gross negligence, the statute was tolled by the Court's orders granting her extensions of time.

Courts have the authority to grant extensions to a petitioner's deadline to file his habeas petition before it has expired. *See United States v. Thomas*, 713 F.3d 165, 173-74 (3d Cir. 2013). Where they do, the petitioner's deadline is tolled. *See Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013); *Prieto v. Quarterman*, 456 F.3d 511, 513 (5th Cir. 2006); Federal Habeas Manual § 9A:111; *Cf. United States v. Baxter*, 761 F.3d 17, 30–31 (D.C. Cir. 2014) (equitable tolling

inapplicable where petitioner allowed limitations period to lapse before moving for an extension of time).

In *Sossa v. Diaz*, the Ninth Circuit concluded that a magistrate judge's orders extending the deadline for a defendant to file his petition were misleading because the orders did not make clear that they were not intended to extend the statute of limitations. 729 F.3d at 1233-35. Therefore, the limitations period was tolled until the expiration of the Court's extension. *Id.* at 1235. The Fifth Circuit reached the same conclusion in *Prieto v. Quarterman*. 456 F.3d at 513. As in *Sossa* and *Prieto*, the Court's extension orders contain no disclaimer that they did not extend the statute of limitations. *See also Duarte v. Williams*, No. 2:12-CV-01305-JAD-PAL, 2016 WL 4473415, at *3 (D. Nev. Aug. 23, 2016) (absence of admonishment that have an obligation to calculate statute of limitation independent of court orders tolled statute of limitations).

In fact, the text of the Court's orders here are similar to the orders in *Sossa* and *Prieto*. *Compare Sossa*, 729 F.3d at 1231 ("Petitioner shall file his [First Amended Petition for Writ of Habeas Corpus] no later than June 9, 2008"); *and Prieto*, 456 F.3d at 514 ("Petitioner's writ of habeas corpus shall be filed no later than September 6, 2002."); *with* Dkt. 1057 ("[I]t is . . . ORDERED that Defendant Sweeney file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than November 22, 2010."); Dkt. 1064 ("[I]t is . . . ORDERED that defendant Sweeney file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than February 22, 2011."); Dkt. 1066 ("[I]t is . . . ORDERED that Defendants Carson and Sweeney file any supplements to their respective Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than May 30, 2011."); Dkt. 1073 ("[I]t is . . . ORDERED that Defendants Carson, Sweeney and Coates file any supplements to their respective Motions to Vacate, Set Aside or

Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than November 30, 2011."); *and* Dkt. 1081 ("[I]t is . . . ORDERED that Defendants Carson, Sweeney and Coates file any supplements to their respective Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than July 30, 2012."). By extending the filing deadline without stating that the limitations period would continue to run, the Court's extension orders tolled the statute of limitations.[6]

The government's brief argues that, when it consented to those extensions, it reserved the right to argue that Mr. Sweeney's petition was untimely. But whether the government has the right to raise that argument is a separate question from whether it should prevail on it.[7]

Indeed, the fact that despite the government's explicitly stating that it might oppose any subsequent filing on the grounds of timeliness, the Court nonetheless did not include in its orders any indication that Mr. Sweeney was obligated to calculate statute of limitation independent of court orders, only adds weight to the argument that these orders tolled statute of limitations. The fact that the government set forth its possible position and the Court failed to adopt that position,

---

[6] All of Ms. Wicks' extension requests were filed before the expiration of the Court's previous deadline. However, two of the Court's extension orders were signed after the expiration of the previous deadline. *See* Dkts. 1064 (order signed by the Court on November 23, 2010 extending the November 22, 2010 deadline set by Dkt. 1057); 1081 (order signed by the Court on December 5, 2020 extending the November 30, 2011 deadline set by Dkt. 1073). To the extent the statute of limitations began running again in the window in which the extension requests were pending but before the Court ruled, that period was extremely limited—a matter of a single day in the first instance and six days in the second. In aggregate, no more than a month elapsed during which the limitations period was not tolled from the commencement of the limitations period, the date Mr. Sweeney laid out the *Brady* claims in his August 9, 2010 letter to Ms. Wicks, to Ms. Wicks' withdrawal from the case in December 2011.

[7] The *Sossa* Court noted that the government should "object to an extension of time beyond the statutory deadline if it intends to seek dismissal of the petition as untimely." *Sossa*, 729 F.3d at 1235. But this comment did not change the fact that what the court found decisive was the language in the magistrate judge's extension order, not whether the government had objected.

or even reference it in its orders, only provided further assurance to Mr. Sweeney and his counsel that the extensions the Court was granting would toll the limitations period. The Court's extensions, entered prior to the expiration of the statute of limitations (indeed just a few weeks after the facts underlying the *Brady* claims were known to Mr. Sweeney and with diligence could have been presented to the Court), reasonably led Mr. Sweeney and his counsel to believe that if they filed his supplemental petitions by the deadlines set by the Court, those petitions would be timely.

**2. The statute was further tolled from December 2011 through December 2012 by the delay in the appointment of new counsel.**

Tolling is also warranted for the period following Ms. Wicks' withdrawal when no new counsel was appointed to represent him. The Court granted Ms. Wicks' motion to withdraw and referred the case to the FPD for appointment of new counsel in December 2011. Dkt. 1083. But new CJA counsel was not identified and did not enter an appearance for another full year, until December 2012. *See Jurado v. Wong*, No. 08-CV-1400 JLS (JMA), 2009 WL 3320494, at *5 (S.D. Cal. Oct. 14, 2009) (equitable tolling granted where there was a delay in appointing counsel).

**3. The Court's orders extending the deadline for Mr. Sweeney to file his petition during Mr. Kirchman's and Ms. Madigan's representation of him further equitably tolled the statute of limitations.**

As set forth above, the statute was tolled until Mr. Kirchman and Ms. Madigan were appointed to represent Mr. Sweeney in December 2012. The Court did not set a new deadline for the filing of Mr. Sweeney's supplement immediately given the sheer volume of work Mr. Kirchman and Ms. Madigan had to do to get up to speed on the case. Instead, a little less than nine months later and well before the expiration of the previously tolled one-year limitations period, the Court set May 29, 2014 as the deadline for Mr. Sweeney to file his supplemental petition. Dkt.

1122. In the following months, the Court signed orders granting two additional extensions before the expiration of the previous extensions. Dkts. 1128, 1149.

Those orders again provided blanket extensions of the filing deadline with no reservation allowing the limitations period to continue running. Again, the text of the Court's orders was similar to the orders in *Sossa* and *Prieto*. *Compare Sossa*, 729 F.3d at 1231 ("Petitioner shall file his [First Amended Petition for Writ of Habeas Corpus] no later than June 9, 2008"); *and Prieto*, 456 F.3d at 514 ("Petitioner's writ of habeas corpus shall be filed no later than September 6, 2002."); *with* Dkt. 1122 ("[T]he defendants shall file the supplements to their pending § 2255 motions by May 29, 2014."); Dkt. 1128 ("[T]he Defendants will file a Memorandum of Law in Support of Motion to Vacate Sentence, pursuant to 28 U.S.C. § 2255, within 6 months of this Order."); *and* Dkt. 1149 ("[T]he Defendants Sweeney and Coates will file a Memorandum of Law in Support of Motion to Vacate Sentence, pursuant to 28 U.S.C. § 2255, no later than Feb. 25, 2015."). The Court's extensions again tolled the statute of limitations.

In any event, the government has taken the position that the time for filing Mr. Sweeney's supplemental petition expired before the first extension was granted to Mr. Kirchman and Ms. Madigan, during Ms. Wicks' representation of Mr. Sweeney. *See* Gov. Omnibus Br. 32, 74. As discussed above, this is incorrect, because it fails to take into account that Mr. Sweeney did not have access to the *Brady* materials until June 2010, Ms. Wicks' gross negligence, or the extension orders she obtained. Having relied solely on the flawed argument that the statute expired during Ms. Wicks' representation, however, the government has never taken the position that the statute of limitations *continued to run* during the Court-ordered extensions granted to Mr. Kirchman and Ms. Madigan, to which the government consented. Accordingly, even if the fact that the government noted that it was reserving the right to object could somehow override a court order

that provided a blanket extension without any indication that the extension might not toll the limitations period, the position the government reserved (its argument that the limitations period previously expired, not that it would expire during the prospective court-ordered extensions) did not affect the extensions of the limitations period. Mr. Sweeney's petition is timely.

## IV. THE UNSETTLED RELATION-BACK AND TOLLING CASE LAW ALSO EQUITABLY TOLLED THE STATUTE OF LIMITATIONS.

Unsettled case law about the time for filing a habeas petition is an extraordinary circumstance that justifies equitable tolling of the statute of limitations. *York v. Galetka*, 314 F.3d 522, 528 (10th Cir. 2003) (unsettled law about whether the AEDPA one-year deadline would be equitably tolled during the period in which the defendant's second federal habeas petition was pending justified tolling); *Williams v. Filson*, 908 F.3d 546, 560-61 (9th Cir. 2018) (equitable tolling was appropriate where the case law about whether the petitioner's subsequent claims would "relate back" to his initial habeas petition was unsettled and noting that the district court's scheduling order and approval of two extension requests only made sense if it understood the law to permit petitioner's supplemental petition to relate back to his initial one).

Here, the Court should find, for the reasons stated above, that his prior attorney's gross negligence, the Court's extension orders, and the delay in the appointment of new counsel equitably tolled the statute of limitations. Alternatively, the Court should find that Mr. Sweeney's claim is timely because it relates back to his Initial Petition. If this Court does not reach either of those conclusions, however, it should recognize that, at a minimum, the case law in these areas is unsettled and therefore that the limitations period is tolled on that basis. Mr. Sweeney's habeas petition is therefore timely for this reason as well.

## V. BRADY/INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS

1. **Appellate counsel failed to raise the issue of sealed material in Mr. Sweeney's appellate brief.**

The Government, in regard to Claim A12, A26 and A46, argues that Mr. Sweeney's contention that his appellate counsel was ineffective for failing to note sections of sealed matters to be reviewed on appeal should be denied because appellate counsel did precisely that.

The Government is incorrect that Mr. Sweeney's appellate counsel failed to include any argument in the brief asking the appellate court to review any of the material sealed by the trial court. While as the Government points out appellate counsel attempted to have the court unseal the material it had sealed, he was unsuccessful. Appellate counsel's failing is in having ignored the appellate court's instruction that he should raise the issue of the sealed material in Mr. Sweeney's appellate brief.

By failing to do so Mr. Sweeney was denied appellate review of the actions of the trial judge in sealing so much material that contained information that should have been turned over to the defense as *Brady*. Now, after having had an opportunity to review the sealed material and the significance of the material as argued in the supplements to Mr. Sweeney's 2255 motion, one can see the prejudice that Mr. Sweeney has suffered as a result of failure of his appellate counsel to raise the issue of the sealed material in the brief.

**2. Mr. Sweeney is not procedurally barred from raising his *Brady* and *Massiah* claims.**

The Government argues that Mr. Sweeney is procedural barred from raising his claim identified as A17, because he has failed to explain why these claims were not included in his appellate brief and by failing to raise these claims in his appellate brief he is procedural barred from raising them now.

To begin with the reason that these arguments were not included in Mr. Sweeney's appellate brief is that the information on which these arguments are based was under seal and Mr.

Sweeney was unaware of exactly what was contained in the material that had been placed under seal.

The Government is attempting to profit from its misconduct in this case. It wrongfully withheld Brady material from Mr. Sweeney before, during, and after trial, and during Mr. Sweeney's appeal. Mr. Sweeney did not obtain access to the sealed material until after he had already lost his appeal. Yet the Government now argues that he is procedural barred from advancing this claim.

The cause for Mr. Sweeney's failure to raise any of these claims on appeal is that the information that Sweeney need to raise these claims on appeal was kept from him by the misconduct of the Government in failing to turn over *Brady* material to the defense.

The prejudice is adequality set forth in the supplements that Mr. Sweeney has filed to his initial motion filed herein.

## CONCLUSION

The government has chosen not to argue the merits of Mr. Sweeney's *Brady* and related ineffective assistance of counsel claims, but, rather, it rests its opposition to those claims on timeliness and procedural bar grounds alone. If the Court finds that Mr. Sweeney's claims are timely and not procedurally barred, it should grant Mr. Sweeney's requested relief: vacatur of Mr. Sweeney's convictions.

_____/s/_____
Eric H. Kirchman
D.C. Fed Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify, on this 14th day of July 2020, that a copy of the foregoing was served on all parties entitled to notice in this case by the court's filing system and to:

Pamela S. Satterfield, Esquire
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric H. Kirchman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :

      v.          :          Criminal. No. 98-CR-00329-4 (RCL)

W'LLIAM KYLE SWEENEY,          :

    Defendant.          :

### AFFIDAVIT OF JENIFER WICKS

This Affidavit is made upon personal knowledge, and I believe that I am competent to testify to the facts set forth herein.

1. Upon my motion, the court ordered the clerk of the court to allow me to see all of the documents filed under seal in this case on February 15, 2008. I requested this order so I could view the exhibits sealed by the court during trial.

2. I filed a petition pursuant to Section 2255 on behalf of Mr. Sweeney on February 19, 2008.

3. Prior to me filing the 2255 petition Mr. Sweeney had discussed with me, and had written to me on November 18, 2007, asking that I raise every issue in his case as he did not want to procedurally barred from raising an issue later.

4. I have reviewed correspondence from dated March 16, 2008, October 9, 2008, October 19, 2008, March 26, 2009, February 26, 2008, and April 29, 2010, in which Mr. Sweeney wrote to me generally inquiring if I had obtained the sealed exhibits and been able to review them and would the delay in obtaining the documents result in him being time barred as to any issue. During this time, he and I also discussed this during phone conferences. Over this period of time, I believed and advised Mr. Sweeney that

App 1595

he would not be time barred as any helpful information in the materials sealed by the Court as the documents would relate back to the timely filed *Brady* claims in the 2255 petition that I had filed.

6. I went to the clerk's office numerous times between February 2008 and June 2010 requesting the sealed materials in the case. I kept going back because the clerk's office had not provided me with the sealed court exhibits from trial -I finally obtained the sealed court exhibits on June 17, 2010.

THE PURSUANT TO 28 U.S.C. § 1746, I SWEAR THAT I AM THE PERSON REFERRED TO ABOVE AND I DECLARE UNDER PENALTY OF Perjury THAT FOREGOING IS TRUE AND CORRECT.

Date: 9/27/2020

_____
Jenifer Wicks

App 1596