# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Samuel Carson, Sean Coates, Jerome Martin, Jr., and William K. Sweeney,<br><br>Defendants. | Case No. 1:98-cr-329-6-RCL |

---

# APPENDIX
in support of Defendants' Supplemental § 2255 Motion

---

---

# VOLUME 9 OF 9

## Court of Appeals Materials and Remand Orders

Dkt. 1363 – Order Granting Unopposed Motion to Remand Record to District Court for Consideration of Supplemental Brady Disclosures; Holding Appeals in Abeyance (D.C. Cir.) (July 30, 2025) ...................................................................................................1597

Dkt. 1364 – Order Granting Unopposed Motion to Remand Record to District Court for Consideration of Supplemental Brady Disclosures; Holding Appeals in Abeyance (D.C. Cir.) (July 30, 2025) ...................................................................................................1598

Dkt. 1365 – Order Granting Unopposed Motion to Remand Record to District Court for Consideration of Supplemental Brady Disclosures; Holding Appeals in Abeyance (D.C. Cir.) (July 30, 2025) ...................................................................................................1599

Dkt. 1366 – Order Granting Unopposed Motion to Remand Record to District Court for Consideration of Supplemental Brady Disclosures; Holding Appeals in Abeyance (D.C. Cir.) (July 30, 2025)  ..................................................................................................1600

Dkt. 1367 – Parties' Joint Proposed Schedule for Supplemental § 2255 Proceedings on Remand (November 21, 2025) .................................................................................................1601

Dkt. 1372 –  Order Granting Parties' Joint Proposed Schedule for Supplemental § 2255 Proceedings on Remand (Lamberth, J.) (December 17, 2025)...........................................1602

Docket Sheet, *United States v. Coates*, No. 21-3072 (D.C. Cir.) ............................................1603

Brief of Appellants, *United States v. Coates*, Nos. 21-3072, 21-3073, 21-3078, 22-3016 & 23-3015 (D.C. Cir. Sept. 28, 2024)....................................................................................1618

Brief for Appellee, United States v. Coates, Nos. 21-3072, 21-3073, 21-3078, 22-3016 & 23-3015 (D.C. Cir. Apr. 4, 2025)......................................................................................1769

Unopposed Motion to Remand the Record and to Stay the Deadline for Defendants-Appellants' Reply Brief, United States v. Coates, No. 21-3072 (D.C. Cir. May 27, 2025)....................1935

Clerk's Order, United States v. Coates, No. 21-3072 (D.C. Cir. May 29, 2025) .....................1942

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-3072**                                         **September Term, 2024**

**1:98-cr-00329-RCL-2**
**1:98-cr-00329-RCL-3**
**1:98-cr-00329-RCL-4**
**1:98-cr-00329-RCL-6**

**Filed On:**  July 30, 2025

United States of America,

       Appellee

    v.

Sean Coates, also known as Birdy,

       Appellant

-----------------------------

Consolidated with 21-3073, 21-3078,
22-3016, 23-3015

**BEFORE:**    Henderson, Wilkins, and Garcia, Circuit Judges

### O R D E R

Upon consideration of the unopposed motion to remand the record, it is

**ORDERED** that the motion be granted and the record be remanded so appellants can present to the district court in the first instance arguments about the supplemental Brady disclosures made in April and May 2025 and for the district court to make factual findings concerning those disclosures.  It is

**FURTHER ORDERED** that these consolidated cases be held in abeyance pending further order of the court.  The parties are directed to file motions to govern future proceedings within 30 days after resolution of the proceedings on remand.

The Clerk is directed to transmit a copy of this order to the district court.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Selena R. Gancasz
Deputy Clerk

App 1597

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 21-3072**                                **September Term, 2024**

1:98-cr-00329-RCL-2
1:98-cr-00329-RCL-3
1:98-cr-00329-RCL-4
1:98-cr-00329-RCL-6

**Filed On:** July 30, 2025

United States of America,

      Appellee

    v.

Sean Coates, also known as Birdy,

      Appellant

-----------------------------

Consolidated with 21-3073, 21-3078,
22-3016, 23-3015

      **BEFORE:**   Henderson, Wilkins, and Garcia, Circuit Judges

### O R D E R

Upon consideration of the unopposed motion to remand the record, it is

**ORDERED** that the motion be granted and the record be remanded so appellants can present to the district court in the first instance arguments about the supplemental Brady disclosures made in April and May 2025 and for the district court to make factual findings concerning those disclosures. It is

**FURTHER ORDERED** that these consolidated cases be held in abeyance pending further order of the court. The parties are directed to file motions to govern future proceedings within 30 days after resolution of the proceedings on remand.

The Clerk is directed to transmit a copy of this order to the district court.

**Per Curiam**

        **FOR THE COURT:**
        Clifton B. Cislak, Clerk

    BY:    /s/
        Selena R. Gancasz
        Deputy Clerk

App 1598

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 21-3072**                                   **September Term, 2024**

**1:98-cr-00329-RCL-2**
**1:98-cr-00329-RCL-3**
**1:98-cr-00329-RCL-4**
**1:98-cr-00329-RCL-6**

**Filed On:** July 30, 2025

United States of America,

        Appellee

    v.

Sean Coates, also known as Birdy,

        Appellant

------------------------------

Consolidated with 21-3073, 21-3078,
22-3016, 23-3015

      **BEFORE:**   Henderson, Wilkins, and Garcia, Circuit Judges

### O R D E R

Upon consideration of the unopposed motion to remand the record, it is

**ORDERED** that the motion be granted and the record be remanded so appellants can present to the district court in the first instance arguments about the supplemental Brady disclosures made in April and May 2025 and for the district court to make factual findings concerning those disclosures. It is

**FURTHER ORDERED** that these consolidated cases be held in abeyance pending further order of the court. The parties are directed to file motions to govern future proceedings within 30 days after resolution of the proceedings on remand.

The Clerk is directed to transmit a copy of this order to the district court.

### Per Curiam

                **FOR THE COURT:**
                Clifton B. Cislak, Clerk

         BY:    /s/
                Selena R. Gancasz
                Deputy Clerk

App 1599

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 21-3072**                                    **September Term, 2024**

**1:98-cr-00329-RCL-2**
**1:98-cr-00329-RCL-3**
**1:98-cr-00329-RCL-4**
**1:98-cr-00329-RCL-6**

**Filed On:** July 30, 2025

United States of America,

       Appellee

   v.

Sean Coates, also known as Birdy,

       Appellant

------------------------------

Consolidated with 21-3073, 21-3078,
22-3016, 23-3015

     **BEFORE:**   Henderson, Wilkins, and Garcia, Circuit Judges

### O R D E R

Upon consideration of the unopposed motion to remand the record, it is

**ORDERED** that the motion be granted and the record be remanded so appellants can present to the district court in the first instance arguments about the supplemental Brady disclosures made in April and May 2025 and for the district court to make factual findings concerning those disclosures. It is

**FURTHER ORDERED** that these consolidated cases be held in abeyance pending further order of the court. The parties are directed to file motions to govern future proceedings within 30 days after resolution of the proceedings on remand.

The Clerk is directed to transmit a copy of this order to the district court.

### Per Curiam

           **FOR THE COURT:**
           Clifton B. Cislak, Clerk

      BY:   /s/
           Selena R. Gancasz
           Deputy Clerk

App 1600

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

SEAN COATES,

     *Defendant.*

Case No. 1:98-cr-329-6-RCL

**ORDER**

The parties are **ORDERED** to submit a proposed schedule within 30 days for further proceedings herein to address the supplemental *Brady* disclosures made in April and May 2025, per the D.C. Circuit's [1366] instructions.

**IT IS SO ORDERED.**

Date:   11-21-25

Royce C. Lamberth
United States District Judge

1

App 1601

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

SAMUEL CARSON; SEAN COATES;
JEROME MARTIN, JR.; AND WILLIAM
K. SWEENEY,

   *Defendants.*

Case No. 1:98-cr-329-6-RCL

## [PROPOSED] ORDER

The record in this case was remanded for Defendants Samuel Carson; Sean Coates; Jerome Martin, Jr.; and William K. Sweeney (collectively, "Defendants") to present to this Court in the first instance arguments about the supplemental *Brady* disclosures made by counsel for the United States of America (the "Government") in April and May 2025. *See* Dkt. No. 1366. This Court directed the parties to submit a proposed schedule for further proceedings to address such disclosures. Dkt. No. 1367.

Accordingly, upon the agreement of the parties and as approved by this Court, it is hereby **ORDERED** that Defendants shall file any supplemental 28 U.S.C. § 2255 motion(s) by April 3, 2026; the Government shall file any response thereto by July 2, 2026; and Defendants shall file any reply by August 31, 2026.

**IT IS SO ORDERED.**

Date: _12/17/25_

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge

App 1602

**General Docket**
**United States Court of Appeals for District of Columbia Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 21-3072 | **Docketed:** 11/09/2021 |

**Nature of Suit:** 2510 Prisoner Petition-Vacate Sentence
USA v. Sean Coates
**Appeal From:** United States District Court for the District of Columbia
**Fee Status:** IFP

**Case Type Information:**
   **1)** 28 U.S.C. Sec. 2255
   **2)** Federal
   **3)**

**Originating Court Information:**
   **District:** 0090-1 : 1:98-cr-00329-RCL-6                     **Lead:** 1:98-cr-00329-RCL-6
   **Court Reporter:** Beverly Byrne
   **Court Reporter:** Janice Dickman, Court Reporter
   **Court Reporter:** Phyllis Merana
   **Court Reporter:** Theresa Sorensen
   **Court Reporter:** Bryan Wayne
   **Trial Judge:** Royce C. Lamberth, U.S. Senior District Judge
   **Date Filed:** 09/18/1998
   **Date Order/Judgment:**              **Date NOA Filed:**
   10/27/2021                            11/02/2021

**Prior Cases:**
   None

**Current Cases:**

| Lead | Member | Start | End |
|---|---|---|---|
| Consolidation | | | |
| 21-3072 | 21-3073 | 11/09/2021 | |
| 21-3072 | 21-3078 | 11/22/2021 | |
| 21-3072 | 22-3016 | 03/16/2022 | |
| 21-3072 | 23-3015 | 08/03/2023 | |

| | |
|---|---|
| **Panel Assignment:**    Not available | |

| | |
|---|---|
| United States of America | Elizabeth Gabriel, Assistant U.S. Attorney |
|           Plaintiff - Appellee | Direct: 202-514-5095 |
| | Email: elizabeth.gabriel@usdoj.gov |
| | [COR NTC Gvt US Attorney] |
| | U.S. Attorney's Office |
| | (USA) Appellate Division |
| | Firm: 202-252-6829 |
| | 601 D Street, NW |
| | Washington, DC 20530 |
| | |
| | Chrisellen Rebecca Kolb, Assistant U.S. Attorney |
| | Direct: 202-252-6833 |
| | Email: Chrisellen.R.Kolb@usdoj.gov |
| | [COR NTC Gvt US Attorney] |
| | U.S. Attorney's Office |

App 1603

(USA) Appellate Division
Room 8104
Firm: 202-252-6829
601 D Street, NW
Washington, DC 20530

Daniel Joseph Lenerz, Attorney
Direct: 202-252-7027
Email: daniel.lenerz@usdoj.gov
[COR NTC Gvt US Attorney]
U.S. Attorney's Office
(USA) Appellate Division
Suite 8229
Firm: 202-252-6829
601 D Street, NW
Washington, DC 20530

USAO Appellate Counsel
Email: USADC.ECFAppellate@usdoj.gov
[NTC Gvt US Attorney]
U.S. Attorney's Office
(USA) Appellate Division
Firm: 202-252-6829
601 D Street, NW
Washington, DC 20530

v.

Sean Coates, also known as Birdy
               Defendant - Appellant

Mark Lanpher
Direct: 202-508-8120
Email: mark.lanpher@aoshearman.com
[COR LD NTC CJA Appeals Counsel]
Allen Overy Shearman Sterling US LLP
Firm: 202-683-3800
1101 New York Avenue, NW
Washington, DC 20005

Katherine Stoller
Direct: 212-848-5441
Email: katherine.stoller@aoshearman.com
[COR LD NTC CJA Appeals Counsel]
Allen Overy Shearman Sterling US LLP
Firm: 212-610-6300
599 Lexington Avenue
New York, NY 10022

Jacob Coate
Direct: 202-974-1702
Email: jcoate@cgsh.com
[COR NTC CJA Appeals Counsel]
Cleary Gottlieb Steen & Hamilton LLP
Firm: 202-974-1500
2112 Pennsylvania Avenue, NW

Suite 1000
Washington, DC 20037

United States of America,

                Plaintiff - Appellee

      v.

Sean Coates, also known as Birdy,

                Defendant - Appellant

App 1606

| | | |
|---|---|---|
| 11/09/2021 | ☐ | 28 U.S.C. 2255 CASE docketed. [COA Status: COA not requested] [21-3072] [Entered: 11/09/2021 03:26 PM] |
| 11/09/2021 | ☐ 📄<br>165 pg, 21.98 MB | NOTICE OF APPEAL [1921673] seeking review of a decision by the U.S. District Court in 1:98-cr-00329-RCL-6 filed by Sean Coates. Appeal assigned USCA Case Number: 21-3072. [21-3072] [Entered: 11/09/2021 03:27 PM] |
| 11/09/2021 | ☐ 📄<br>1 pg, 39.54 KB | CLERK'S ORDER [1921676] filed holding case in abeyance. Case 21-3072 held in abeyance pending COA decision in 1:98cr329-RCL from U.S. District Court. The Clerk is directed to transmit a copy of this order to the district court. [21-3072] [Entered: 11/09/2021 03:43 PM] |
| 11/09/2021 | ☐ 📄<br>1 pg, 37.76 KB | CLERK'S ORDER [1921692] filed consolidating cases 21-3073 (Consolidation started 11/09/2021) with 21-3072 [21-3072, 21-3073] [Entered: 11/09/2021 04:09 PM] |
| 11/22/2021 | ☐ 📄<br>1 pg, 38.23 KB | CLERK'S ORDER [1923548] filed consolidating cases 21-3078 (Consolidation started 11/22/2021) with 21-3072 [21-3072, 21-3073, 21-3078] [Entered: 11/22/2021 04:00 PM] |
| 03/16/2022 | ☐ 📄<br>1 pg, 38.64 KB | CLERK'S ORDER [1939361] filed consolidating cases 22-3016 (Consolidation started 03/16/2022) with 21-3072 [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 03/16/2022 04:33 PM] |
| 04/08/2022 | ☐ 📄<br>126 pg, 2.06 MB | SUPPLEMENT [1943098] to case opening document of decision of U.S. District Court [1939355-2] filed by Samuel Carson [Service Date: 04/14/2022 ] [22-3016] [Entered: 04/14/2022 11:25 AM] |
| 06/06/2022 | ☐ 📄<br>150 pg, 11.4 MB | NOTICE [1949342] received from the Clerk of the U.S. District Court for certificate of appealability [COA Status: COA denied] [21-3073, 21-3072] [Entered: 06/06/2022 10:32 AM] |
| 06/06/2022 | ☐ 📄<br>140 pg, 11.37 MB | NOTICE [1949344] received from the Clerk of the U.S. District Court for certificate of appealability [COA Status: COA denied] [21-3072] [Entered: 06/06/2022 10:34 AM] |
| 06/06/2022 | ☐ 📄<br>116 pg, 525.25 KB | NOTICE [1949346] received from the Clerk of the U.S. District Court that leave to proceed in forma pauperis in the district court is granted for Sean Coates [Case Number 21-3072: IFP] [21-3072] [Entered: 06/06/2022 10:36 AM] |
| 06/06/2022 | ☐ 📄<br>145 pg, 11.39 MB | NOTICE [1949350] received from the Clerk of the U.S. District Court for certificate of appealability [COA Status: COA denied] [21-3072, 21-3078] [Entered: 06/06/2022 10:53 AM] |
| 06/06/2022 | ☐ 📄<br>150 pg, 130.97 MB | NOTICE [1949353] received from the Clerk of the U.S. District Court for certificate of appealability [COA Status: COA denied] [21-3072, 22-3016] [Entered: 06/06/2022 11:04 AM] |
| 06/06/2022 | ☐ 📄<br>2 pg, 47.03 KB | CLERK'S ORDER [1949361] filed removing case from abeyance; directing party to file initial submissions: APPELLANT docketing statement due 07/06/2022. APPELLANT certificate as to parties due 07/06/2022. APPELLANT statement of issues due 07/06/2022. APPELLANT underlying decision due 07/06/2022. APPELLANT transcript status report due 07/06/2022. APPELLANT procedural motions due 07/06/2022. APPELLANT dispositive motions due 07/21/2022; directing party to file initial submissions: APPELLEE |

certificate as to parties due 07/06/2022. APPELLEE procedural motions due 07/06/2022. APPELLEE dispositive motions due 07/21/2022; directing party to file appointment of counsel motion: APPELLANT motion for appointment of counsel due 07/06/2022. Failure to respond shall result in dismissal of the case for lack of prosecution. The Clerk is directed to send this order to appellant by whatever means necessary to ensure receipt. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 06/06/2022 11:55 AM]

| 06/06/2022 | 2 pg, 578.83 KB | LETTER [1949369] sent to warden sending Clerk order initial submissions for appellant/petitioner [1949361-3]. Prisoner acknowledgment of receipt from Warden due 07/06/2022. [21-3072] [Entered: 06/06/2022 12:07 PM] |

| 06/06/2022 | 2 pg, 579.33 KB | LETTER [1949372] sent to warden sending Clerk order initial submissions for appellant/petitioner [1949361-3]. Prisoner acknowledgment of receipt from Warden due 07/06/2022. [21-3078] [Entered: 06/06/2022 12:10 PM] |

| 06/06/2022 | 2 pg, 579.1 KB | LETTER [1949373] sent to warden sending Clerk order initial submissions for appellant/petitioner [1949361-3]. Prisoner acknowledgment of receipt from Warden due 07/06/2022. [22-3016] [Entered: 06/06/2022 12:13 PM] |

| 06/27/2022 | 3 pg, 3.1 MB | MOTION [1952845] to extend time to file initial submissions filed by Jerome Martin, Jr. in 21-3078 (Service Date: 06/23/2022 by US Mail) Length Certification: 2 pages. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 06/29/2022 03:52 PM] |

| 06/30/2022 | 2 pg, 43.69 KB | CLERK'S ORDER [1953073] filed considering motion to extend time [1952845-2] in 21-3072; extending Clerk order initial submissions for appellant/petitioner [1949361-3] APPELLANT docketing statement due 07/27/2022. APPELLANT certificate as to parties due 07/27/2022. APPELLANT statement of issues due 07/27/2022. APPELLANT underlying decision due 07/27/2022. APPELLANT procedural motions due 07/27/2022. APPELLANT dispositive motions due 08/11/2022. Next APPELLANT transcript status report due 07/27/2022; extending Clerk order initial submissions for appellee/respondent [1949361-4] APPELLEE certificate as to parties due 07/27/2022. APPELLEE procedural motions due 07/27/2022. APPELLEE dispositive motions due 08/11/2022; extending Clerk order appoint counsel [1949361-5] APPELLANT motion for appointment of counsel due 07/27/2022, Failure to respond shall result in dismissal of the case for lack of prosecution; The Clerk is directed to send this order to appellant by whatever means necessary to ensure receipt. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 06/30/2022 03:58 PM] |

| 06/30/2022 | 2 pg, 102.11 KB | UNOPPOSED MOTION [1953096] to extend time to file petition to 07/29/2022 filed by William Kyle Sweeney [Service Date: 06/30/2022 ] Length Certification: 348 Words. [21-3073] (Kirchman, Eric) [Entered: 06/30/2022 07:21 PM] |

| 07/01/2022 | 2 pg, 578.83 KB | LETTER [1953128] sent to warden sending Clerk order [1953073-4]. Prisoner acknowledgment of receipt from Warden due 08/01/2022. [21-3072] [Entered: 07/01/2022 08:54 AM] |

| 07/01/2022 | 2 pg, 579.36 KB | LETTER [1953130] sent to warden sending Clerk order [1953073-4]. Prisoner acknowledgment of receipt from Warden due 08/01/2022. [21- |

3078] [Entered: 07/01/2022 08:57 AM]

| | | |
|---|---|---|
| 07/01/2022 | 2 pg, 579.13 KB | LETTER [1953131] sent to warden sending Clerk order [1953073-4]. Prisoner acknowledgment of receipt from Warden due 08/01/2022. [22-3016] [Entered: 07/01/2022 08:59 AM] |
| 07/01/2022 | 1 pg, 39.08 KB | CLERK'S ORDER [1953242] filed granting motion to extend time [1953096-2] in 21-3073; extending Clerk order initial submissions for appellant/petitioner [1949361-3] in 21-3073 APPELLANT motion for certificate of appealability due 07/29/2022 [21-3073, 21-3072, 21-3078, 22-3016] [Entered: 07/01/2022 02:31 PM] |
| 07/01/2022 | 3 pg, 119.57 KB | UNOPPOSED MOTION [1953243] to exceed word limits in petition filed by William Kyle Sweeney in 21-3073 Length Certification: 344. [21-3073, 21-3072, 21-3078, 22-3016] (Kirchman, Eric) [Entered: 07/01/2022 02:35 PM] |
| 07/06/2022 | 1 pg, 446.83 KB | DOCKETING STATEMENT [1953740] filed by William Kyle Sweeney [Service Date: 07/06/2022 ] [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 04:39 PM] |
| 07/06/2022 | 6 pg, 109.1 KB | STATEMENT OF ISSUES [1953743] filed by William Kyle Sweeney [Service Date: 07/06/2022 ] [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 04:41 PM] |
| 07/06/2022 | 75 pg, 31.95 MB | UNDERLYING DECISION IN CASE [1953747] submitted by William Kyle Sweeney [Service Date: 07/06/2022 ] [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 04:47 PM] |
| 07/06/2022 | 2 pg, 77.6 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [1953750] filed by William Kyle Sweeney [Service Date: 07/06/2022 ] [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 05:03 PM] |
| 07/06/2022 | 2 pg, 286.5 KB | TRANSCRIPT STATUS REPORT [1953753] filed by William Kyle Sweeney [Service Date: 07/06/2022 ]. Status of Transcripts: transcripts needed for the appeal have been ordered, but not all transcripts have been received. Next APPELLANT transcript status report due 08/05/2022. [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 05:14 PM] |
| 07/06/2022 | 3 pg, 120.19 KB | CORRECTED UNOPPOSED MOTION [1953755] to exceed word limits in petition filed by William Kyle Sweeney [Service Date: 07/06/2022 ] Length Certification: 344 Words. [21-3073]--[Edited 07/07/2022 by AH] (Kirchman, Eric) [Entered: 07/06/2022 05:34 PM] |
| 07/06/2022 | 3 pg, 118.14 KB | MOTION [1953756] to appoint counsel filed by William Kyle Sweeney (Service Date: 07/06/2022 by CM/ECF NDA) Length Certification: 140. [21-3073] (Kirchman, Eric) [Entered: 07/06/2022 06:01 PM] |
| 07/06/2022 | 17 pg, 28.18 MB | MOTION [1953912] for certificate of appealability filed by Samuel Carson (Service Date: 07/05/2022 by US Mail) Length Certification: 15 pages. [22-3016] [Entered: 07/07/2022 03:41 PM] |
| 07/07/2022 | 3 pg, 45.19 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [1953843] filed by USA in 21-3072, 21-3078, 22-3016, 21-3073 [Service Date: 07/07/2022 ] [21-3072, 21-3078, 22-3016, 21-3073] (Kolb, Chrisellen) [Entered: 07/07/2022 12:54 PM] |
| 07/07/2022 | 97 pg, 120.28 MB | MOTION [1954131] for certificate of appealability and to appoint counsel filed by Sean Coates in 21-3072 (Service Date:07/01/2022 by US Mail) Length Certification: 19 pages. [21-3072, 21-3073, 21-3078, 22-3016]-- |

[RELIEF ADDED--Edited 11/30/2022 by LMC] [Entered: 07/08/2022 02:01 PM]

07/12/2022 · 2 pg, 47.17 KB · ENTRY OF APPEARANCE [1954434] filed by Daniel J. Lenerz on behalf of Appellee USA in 21-3072, 21-3073, 21-3078, 22-3016. [21-3072, 21-3073, 21-3078, 22-3016] (Lenerz, Daniel) [Entered: 07/12/2022 09:12 AM]

07/13/2022 · 6 pg, 78.22 KB · UNOPPOSED MOTION [1954884] to extend time to file response to 09/27/2022 filed by USA in 21-3072, 21-3073, 22-3016, 21-3078 [Service Date: 07/13/2022 ] Length Certification: 551 words. [21-3072, 21-3073, 22-3016, 21-3078] (Lenerz, Daniel) [Entered: 07/13/2022 03:54 PM]

07/14/2022 · 1 pg, 38.96 KB · CLERK'S ORDER [1955026] filed considering motion to extend time [1954884-2]; directing response to motion certificate of appealability [1954131-2] in 21-3072, directing response to motion certificate of appealability [1953912-2] in 22-3016. Appellee's consolidated response to all appellants' motions for certificates of appealability due on 09/27/2022 [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 07/14/2022 11:47 AM]

07/22/2022 · 1 pg, 40.78 KB · PER CURIAM ORDER [1956026] filed it is ORDERED that the motion for appointment of counsel be granted and that Eric H. Kirchman enter an appearance on behalf of appellant William Sweeney. It is FURTHER ORDERED that the motion to exceed the word limit be denied. Before Judges: Wilkins, Katsas and Rao. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 07/22/2022 10:00 AM]

07/25/2022 · 37 pg, 47.69 MB · MOTION [1956643] for certificate of appealability filed by Jerome Martin, Jr. (Service Date: 07/27/2022 by CM/ECF NDA) Length Certification: 36 pages. [21-3078] [Entered: 07/27/2022 11:30 AM]

07/27/2022 · 3 pg, 219.11 KB · MOTION [1956595] for reconsideration of order [1956026-2] filed by William Kyle Sweeney in 21-3073 (Service Date: 07/27/2022 by CM/ECF NDA) Length Certification: 455. [21-3073, 21-3072, 21-3078, 22-3016] (Kirchman, Eric) [Entered: 07/27/2022 08:40 AM]

07/28/2022 · 1 pg, 39.33 KB · PER CURIAM ORDER [1956936] filed denying motion for reconsideration [1956595-2]. Before Judges: Wilkins, Katsas and Rao. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 07/28/2022 05:30 PM]

07/29/2022 · 522 pg, 19.81 MB · PETITION [1957141] Certificate of Appealability filed by Appellant William Kyle Sweeney in 21-3073 [Service Date: 07/29/2022 by CM/ECF NDA] Length Certification: 5198. [21-3073, 21-3072, 21-3078, 22-3016] (Kirchman, Eric) [Entered: 07/29/2022 06:52 PM]

08/01/2022 · 1 pg, 1.77 MB · DOCKETING STATEMENT [1957700] filed by Jerome Martin, Jr. in 21-3078 [Service Date: 08/03/2022 ] [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/03/2022 12:44 PM]

08/01/2022 · 1 pg, 1.09 MB · ENTRY OF APPEARANCE [1957701] filed by Jerome Martin. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/03/2022 12:46 PM]

08/01/2022 · 1 pg, 1.13 MB · TRANSCRIPT STATUS REPORT [1957702] filed by Jerome Martin, Jr. in 21-3078 [Service Date: 08/03/2022 ]. Status of Transcripts: Final - No transcripts are needed for the appeal. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/03/2022 12:47 PM]

| | |
|---|---|
| 08/01/2022 ☐ ▤<br>3 pg, 5.02 MB | MOTION [1957703] to appoint counsel filed by Jerome Martin, Jr. in 21-3078 (Service Date: 08/03/2022 by Clerk, CM/ECF NDA) Length Certification: 2 pages. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/03/2022 12:49 PM] |
| 08/01/2022 ☐ ▤<br>1 pg, 54.76 KB | MOTION [1957704] to adopt petition for COA filed by Jerome Martin, Jr. in 21-3078 (Service Date: 08/03/2022 by CM/ECF NDA, Clerk) Length Certification: 1 page. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/03/2022 12:51 PM] |
| 08/12/2022 ☐ ▤<br>3 pg, 2.77 MB | RECEIPT [1959238] received from Samuel Carson [signed for on 07/29/2022] for documents [1953131-2] sent to Appellant Samuel Carson [22-3016] [Entered: 08/15/2022 08:58 AM] |
| 08/16/2022 ☐ ▤<br>5 pg, 3.56 MB | MOTION [1959577] to adopt petition for certificate of appealability, to appoint counsel filed by Samuel Carson in 22-3016 (Service Date: 07/27/2022 by US Mail) Length Certification: 3 pages. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/16/2022 03:34 PM] |
| 08/18/2022 ☐ | FIRST CLASS MAIL RETURNED [1959830] marked "RTS". Mail [1953128-2] had been sent to Party Sean Coates in 21-3072. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 08/18/2022 11:32 AM] |
| 09/05/2022 ☐ ▤<br>523 pg, 19.89 MB | MOTION [1962105] for leave to file amended petition filed by William Kyle Sweeney in 21-3073 (Service Date: 09/05/2022 by CM/ECF NDA) Length Certification: 5199. [21-3073, 21-3072, 21-3078, 22-3016] (Kirchman, Eric) [Entered: 09/05/2022 08:23 PM] |
| 09/05/2022 ☐ ▤<br>521 pg, 18.39 MB | AMENDED PETITION [1975628] for Certificate of Appealability lodged by Appellant William Kyle Sweeney in 21-3073 [Service Date: 09/05/2022 by CM/ECF NDA] Length Certification: 5,199 words. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 11/30/2022 05:14 PM] |
| 09/20/2022 ☐ ▤<br>7 pg, 109.36 KB | MOTION [1965107] to extend time to file response to 10/25/2022 filed by USA in 21-3072, 21-3073, 21-3078, 22-3016 (Service Date: 09/20/2022 by CM/ECF NDA, US Mail) Length Certification: 752 words. [21-3072, 21-3073, 21-3078, 22-3016] (Lenerz, Daniel) [Entered: 09/20/2022 02:34 PM] |
| 09/23/2022 ☐ ▤<br>4 pg, 3.4 MB | MOTION [1965790] to adopt petition for certificate of appealability filed in 21-3073, filed by Jerome Martin, Jr. in 21-3078 (Service Date: 09/23/2022 by US Mail, CM/ECF NDA) Length Certification: 3 pages. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 09/23/2022 12:17 PM] |
| 09/26/2022 ☐ ▤<br>2 pg, 2.24 MB | MOTION [1966718] to adopt petition for certificate of appealability filed in 21-3073, filed by Samuel Carson in 22-3016 (Service Date: 09/29/2022 by CM/ECF NDA) Length Certification: 1 page. [22-3016, 21-3072, 21-3073, 21-3078] [Entered: 09/29/2022 01:54 PM] |
| 10/06/2022 ☐ ▤<br>1 pg, 39.07 KB | CLERK'S ORDER [1967923] filed considering motion to extend time [1965107-2]; appellee's consolidated response to all appellants' motions/petitions for certificates of appealability now due on 10/25/2022 [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 10/06/2022 04:45 PM] |
| 10/21/2022 ☐ ▤<br>28 pg, 234.35 KB | RESPONSE IN OPPOSITION [1970079] to motion certificate of appealability [1953912-2], motion certificate of appealability [1954131-2], motion certificate of appealability [1956643-2], motion for leave to file [1962105-2], motion to adopt motion [1966718-2], motion to adopt motion [1965790-2], motion to adopt motion [1959577-2], motion to |

appoint counsel [1959577-3], motion to adopt motion [1957704-2] filed by USA in 21-3072, 21-3073, 21-3078, 22-3016 [Service Date: 10/21/2022 by CM/ECF NDA, US Mail] Length Certification: 5,200 words. [21-3072, 21-3073, 21-3078, 22-3016] (Lenerz, Daniel) [Entered: 10/21/2022 12:51 PM]

10/28/2022   30 pg, 6.01 MB

REPLY [1971163] filed by William Kyle Sweeney in 21-3073 to response [1970079-2] [Service Date: 10/28/2022 by CM/ECF NDA] Length Certification: 2110. [21-3073, 21-3072, 21-3078, 22-3016] (Kirchman, Eric) [Entered: 10/28/2022 10:29 PM]

11/02/2022   8 pg, 11.84 MB

REPLY [1971991] filed by Samuel Carson in 22-3016 to response [1970079-2] [Service Date: 10/27/2022 by US Mail] Length Certification: 6 pages. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 11/03/2022 12:04 PM]

11/09/2022   11 pg, 11.23 MB

REPLY [1973130] filed by Sean Coates to response [1970079-2] [Service Date: 11/04/2022 by US Mail] Length Certification: 9 pages. [21-3072] [Entered: 11/10/2022 11:48 AM]

11/10/2022   9 pg, 11.45 MB

REPLY [1973711] filed by Jerome Martin, Jr. in 21-3078 to response [1970079-2] [Service Date: 11/06/2022 by US Mail] Length Certification: 1223 words. [21-3078, 21-3072, 21-3073, 22-3016] [Entered: 11/15/2022 12:09 PM]

12/23/2022   2 pg, 44.67 KB

PER CURIAM ORDER [1978935] filed ORDERED that the motion for leave to file an amended motion for certificate of appealability be granted. The Clerk is directed to file appellant Sweeney's lodged amended motion for certificate of appealability. It is FURTHER ORDERED that the motions to adopt the arguments of co-appellants be granted. It is FURTHER ORDERED that the motions for certificates of appealability be granted (SEE ORDER FOR DETAILS). It is FURTHER ORDERED that the motions to appoint counsel be granted and that these cases be referred to the Office of the Federal Public Defender for the appointment of appellate counsel for appellants Carson, Coates, and Martin, pursuant to the court's Criminal Justice Act Plan. The Clerk is directed to enter a briefing schedule once all counsel enter their appearances. Before Judges: Millett, Pillard and Pan. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 12/23/2022 11:20 AM]

12/23/2022

PER ABOVE ORDER lodged amended motion [1975628-2] is filed [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 12/23/2022 11:25 AM]

03/10/2023   1 pg, 40.17 KB

CLERK'S ORDER [1989599] filed appointing counsel David B. Smith for Samuel Carson in 22-3016; directing party to file entry of appearance due March 27, 2023. [22-3016] [Entered: 03/10/2023 12:20 PM]

03/10/2023   1 pg, 70.1 KB

ENTRY OF APPEARANCE [1989665] filed by David B. Smith on behalf of Appellant Samuel Carson. [22-3016] (Smith, David) [Entered: 03/10/2023 03:22 PM]

04/11/2023   1 pg, 40.59 KB

PER CURIAM ORDER [1994257] filed appointing John Longstreth as counsel for Jerome Martin Jr. in 21-3078. Before Judges: Wilkins. [21-3078] [Entered: 04/11/2023 02:48 PM]

04/19/2023   1 pg, 1.2 MB

ENTRY OF APPEARANCE [1995394] filed by John Longstreth and co-counsel Jonathan M. Cohen on behalf of Appellant Jerome Martin, Jr.. [21-3078] (Longstreth, John) [Entered: 04/19/2023 09:57 AM]

| | | |
|---|---|---|
| 04/20/2023 | 15 pg, 174.76 KB | MOTION [1995543] to hold case in abeyance filed by USA in 21-3072, 21-3073, 21-3078, 22-3016 (Service Date: 04/20/2023 by US Mail, CM/ECF NDA) Length Certification: 694 words. [21-3072, 21-3073, 21-3078, 22-3016] (Coleman, Nicholas) [Entered: 04/20/2023 09:35 AM] |
| 04/26/2023 | 1 pg, 41.25 KB | PER CURIAM ORDER [1996516] filed appointing Mark Lanpher as counsel for Sean Coates in 21-3072. Before Judges: Wilkins. [21-3072, 21-3073, 21-3078, 22-3016] [Entered: 04/26/2023 11:13 AM] |
| 04/27/2023 | 1 pg, 72.51 KB | ENTRY OF APPEARANCE [1996911] filed by Mark Lanpher and co-counsel Katherine Stoller, Jacob M. Coate on behalf of Appellant Sean Coates. [21-3072] (Lanpher, Mark) [Entered: 04/27/2023 06:35 PM] |
| 04/28/2023 | 5 pg, 174.16 KB | UNOPPOSED MOTION [1997114] to extend time to file response to 05/15/2023 filed by Jerome Martin, Jr. in 21-3078 Length Certification: 6 pages. [21-3072, 21-3073, 21-3078, 22-3016] (Longstreth, John) [Entered: 04/28/2023 04:32 PM] |
| 05/01/2023 | 1 pg, 39.41 KB | CLERK'S ORDER [1997222] filed granting motion to extend time [1997114-2] in 21-3072, 21-3073, 21-3078, 22-3016, granting motion to extend time [1997118-2] in 23-3015. The response to the government's motion to hold No. 21-3072, et al., in abeyance, and the response to the government's motion to transfer in No. 23-3015, are now due May 15, 2023. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 05/01/2023 10:04 AM] |
| 05/11/2023 | 1 pg, 1.19 MB | ENTRY OF APPEARANCE [1998858] filed by John Longstreth and co-counsel Tre A. Holloway on behalf of Appellant Jerome Martin, Jr. in 21-3078. [21-3072, 21-3073, 21-3078, 22-3016] (Holloway, Tre) [Entered: 05/11/2023 02:47 PM] |
| 05/15/2023 | 8 pg, 160.48 KB | *JOINT* RESPONSE IN OPPOSITION [1999265] to motion [1995543-2] combined with a MOTION to establish briefing schedule filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 05/15/2023 by CM/ECF NDA] Length Certification: 8 pages. [21-3072, 21-3073, 21-3078, 22-3016] (Longstreth, John) [Entered: 05/15/2023 04:51 PM] |
| 05/23/2023 | 9 pg, 137.12 KB | RESPONSE IN OPPOSITION [2000439] to motion to establish briefing schedule [1999265-2] filed by USA in 21-3072, 21-3073, 21-3078, 22-3016 [Service Date: 05/23/2023 by CM/ECF NDA] Length Certification: 1221 words. [21-3072, 21-3073, 21-3078, 22-3016] (Coleman, Nicholas) [Entered: 05/23/2023 01:03 PM] |
| 05/30/2023 | 9 pg, 226.01 KB | *JOINT* REPLY [2001276] filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Samuel Carson in 22-3016, Jerome Martin, Jr. in 21-3078 to response and RESPONSE IN SUPPORT filed to Cross Motion [1999265-2] [Service Date: 05/30/2023 by CM/ECF NDA] Length Certification: 1,239 words. [21-3072, 21-3073, 22-3016, 21-3078] (Longstreth, John) [Entered: 05/30/2023 08:54 PM] |
| 07/05/2023 | 4 pg, 110.21 KB | MOTION [2006459] for compensation filed by Samuel Carson (Service Date: 07/05/2023 by CM/ECF NDA) Length Certification: 366 words. [22-3016] (Smith, David) [Entered: 07/05/2023 04:57 PM] |
| 07/27/2023 | 2 pg, 44.62 KB | PER CURIAM ORDER [2009870] filed granting motion to authorize interim voucher payments [2006459-2]. Before Judges: Wilkins. [22-3016] [Entered: 07/27/2023 02:06 PM] |

| | |
|---|---|
| 08/03/2023<br>2 pg, 50.75 KB | PER CURIAM ORDER [2010832] filed granting motion ifp in this Court [1992372-2] in 23-3015 [Case Number 23-3015: IFP], consolidating cases 23-3015 (Consolidation started 08/03/2023) with 21-3072; referring petition for leave to file motion under 28 U.S.C. 2255 [1984733-2] and referring motion to transfer case [1995540-2] to the merits panel to which this case is assigned. Denying motion to hold case in abeyance [1995543-2] in 21-3072, 21-3073, 21-3078, 22-3016. Denying motion to establish briefing schedule [1999265-2] in 21-3072, 21-3073, 21-3078, 22-3016. Directing parties to address in their briefs isssues stated in the order. Directing party to file briefing format - Proposed formats due 09/05/2023 Before Judges: Wilkins, Walker and Pan. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 08/03/2023 10:19 AM] |
| 09/05/2023<br>9 pg, 189.7 KB | RESPONSE [2015310] to order [2010832-2], [2010832-3], [2010832-4] filed by Jerome Martin, Jr. in 23-3015 (Service Date: 09/05/2023 by CM/ECF NDA) Length Certification: 9 pages. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Longstreth, John) [Entered: 09/05/2023 02:48 PM] |
| 11/21/2023<br>3 pg, 86.42 KB | PER CURIAM ORDER [2028051] filed upon consideration of the joint briefing proposal [2015310-2], it is ORDERED that the following briefing schedule and format will apply in these consolidated cases: APPELLANTS Joint Brief and APPENDIX due 03/11/2024. APPELLEE Brief due on 07/12/2024. APPELLANTS Joint Reply Brief due 09/13/2024 (SEE ORDER FOR DETAILS). Before Judges: Millett, Pillard and Garcia. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 11/21/2023 10:21 AM] |
| 02/21/2024<br>6 pg, 84.74 KB | *JOINT* MOTION [2041695] to extend time to file brief to 06/11/2024 filed by William Kyle Sweeney in 21-3073 (Service Date: 02/21/2024 by CM/ECF NDA) Length Certification: 255. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Kirchman, Eric) [Entered: 02/21/2024 07:10 PM] |
| 02/23/2024<br>1 pg, 40.13 KB | CLERK'S ORDER [2041991] filed granting motion to extend time [2041695-2]; extending Special Panel order [2028051-3], setting briefing schedule: APPELLANT Brief due 06/11/2024. APPENDIX due 06/11/2024. APPELLEE Brief due on 10/15/2024. APPELLANT Reply Brief due 12/13/2024 [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 02/23/2024 10:12 AM] |
| 02/23/2024<br>1 pg, 45.43 KB | LETTER [2042001] sent to warden sending Clerk order [2041991-3]. Prisoner acknowledgment of receipt from Warden due 03/25/2024. [21-3072] [Entered: 02/23/2024 10:32 AM] |
| 04/03/2024<br>3 pg, 277.38 KB | RECEIPT [2048212] received from illegible [signed for on 03/11/2024] for documents [2042001-2] sent to Appellant Sean Coates [21-3072] [Entered: 04/04/2024 08:10 AM] |
| 06/04/2024<br>6 pg, 88.96 KB | *CONSENT* UNOPPOSED MOTION [2057815] to extend time to file brief to 07/26/2024 filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016, 23-3015 [Service Date: 06/04/2024 ] Length Certification: 548. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Kirchman, Eric) [Entered: 06/04/2024 11:50 AM] |
| 06/06/2024<br>1 pg, 39.74 KB | CLERK'S ORDER [2058200] filed granting motion to extend time [2057815-2]; extending Clerk order [2041991-3], setting briefing |

| | | |
|---|---|---|
| | | schedule: APPELLANT Brief due 07/26/2024. APPENDIX due 07/26/2024. APPELLEE Brief due 12/02/2024. APPELLANT Reply Brief due 01/27/2025 [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 06/06/2024 12:32 PM] |
| 07/18/2024 | 6 pg, 87.52 KB | *CONSENT* UNOPPOSED MOTION [2065435] to extend time to file brief to 08/29/2024 filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016, 23-3015 [Service Date: 07/18/2024 ] Length Certification: 480 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Kirchman, Eric) [Entered: 07/18/2024 04:16 PM] |
| 07/19/2024 | 1 pg, 40.33 KB | CLERK'S ORDER [2065601] filed granting appellants' consent motion to extend time [2065435-2], The following revised briefing schedule will now apply: APPELLANT Joint Brief due 08/29/2024. APPENDIX due 08/29/2024. APPELLEE Brief due on 01/06/2025. APPELLANT Joint Reply Brief due 03/03/2025 [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 07/19/2024 02:17 PM] |
| 08/22/2024 | 6 pg, 74.38 KB | *CONSENT* UNOPPOSED MOTION [2071362] to extend time to file brief to 09/27/2024 filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 08/22/2024 ] Length Certification: 471. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Kirchman, Eric) [Entered: 08/22/2024 11:43 AM] |
| 08/22/2024 | 1 pg, 40.18 KB | CLERK'S ORDER [2071498] filed granting appellant's consent motion to modify the briefing schedule [2071362-2], The following revised briefing schedule will now apply: APPELLANT Brief due 09/27/2024. APPENDIX due 09/27/2024. APPELLEE Brief due on 02/06/2025. APPELLANT Reply Brief due 04/04/2025 [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 08/22/2024 06:09 PM] |
| 09/28/2024 | 5 pg, 141.95 KB | MOTION [2077237] to extend time to file brief to 09/30/2024 filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 (Service Date: 09/28/2024 by CM/ECF NDA) Length Certification: 218 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Longstreth, John) [Entered: 09/28/2024 06:03 AM] |
| 09/28/2024 | 149 pg, 816.1 KB | APPELLANT BRIEF [2077238] filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 09/28/2024 ] Length of Brief: 29,789 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Longstreth, John) [Entered: 09/28/2024 06:05 AM] |
| 09/28/2024 | 151 pg, 862.52 KB | *CORRECTED* APPELLANT BRIEF [2077239] LODGED by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 09/28/2024 ] Length of Brief: 29,789 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015]--[MODIFIED EVENT FROM FILED TO LODGED--Edited 09/30/2024 by LMM] (Longstreth, John) [Entered: 09/28/2024 06:20 AM] |
| 09/28/2024 | 1842 pg, 121.21 MB | APPENDIX [2077240] lodged by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Volumes: 5] [Service Date: 09/28/2024 ] [21-3072, 21-3073, 21-3078, 22-3016, 23-3015]--[MODIFIED EVENT FROM FILED TO |

LODGED--Edited 09/30/2024 by LMM] (Longstreth, John) [Entered: 09/28/2024 06:46 AM]

09/30/2024 — 2 pg, 116.44 KB — NOTICE [2077289] to advise of nonopposition filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 09/30/2024 ] [21-3072, 21-3073, 21-3078, 22-3016] (Longstreth, John) [Entered: 09/30/2024 10:54 AM]

09/30/2024 — 1 pg, 39.02 KB — CLERK'S ORDER [2077481] filed granting appellants' motion to accept brief out of time [2077237-2]; The Clerk is directed to file appellants' lodged corrected brief [2077239-2], The Clerk is directed to file the lodged appendix [2077240-2] [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 09/30/2024 04:37 PM]

10/01/2024 — 151 pg, 863.11 KB — *CORRECTED* APPELLANT BRIEF [2077665] filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 10/01/2024 ] Length of Brief: 29,818 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Longstreth, John) [Entered: 10/01/2024 02:41 PM]

10/01/2024 — 1875 pg, 129.36 MB — *CORRECTED* APPENDIX [2077668] filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Volumes: 5] [Service Date: 10/01/2024 ] [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Longstreth, John) [Entered: 10/01/2024 02:54 PM]

10/07/2024 — 1 pg, 1.11 MB — ENTRY OF APPEARANCE [2078689] filed by Elizabeth Gabriel on behalf of Respondent USA in 23-3015. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Gabriel, Elizabeth) [Entered: 10/07/2024 04:07 PM]

01/29/2025 — 6 pg, 72.32 KB — UNOPPOSED MOTION [2097193] to extend time to file brief to 04/04/2025 filed by USA in 21-3072, 21-3073, 21-3078, 22-3016, 23-3015 [Service Date: 01/29/2025 ] Length Certification: 284 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Gabriel, Elizabeth) [Entered: 01/29/2025 11:31 AM]

01/31/2025 — 1 pg, 40.2 KB — CLERK'S ORDER [2097768] filed granting appellee's unopposed motion to extend time [2097193-2], The following revised briefing schedule will now apply: APPELLEE Brief due on 04/04/2025. APPELLANT Reply Brief due 06/03/2025 [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 01/31/2025 11:13 AM]

04/04/2025 — 166 pg, 1.09 MB — APPELLEE BRIEF [2109456] filed by USA in 21-3072, 21-3073, 21-3078, 22-3016, 23-3015 [Service Date: 04/04/2025 ] Length of Brief: 28,081. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Gabriel, Elizabeth) [Entered: 04/04/2025 02:46 PM]

04/04/2025 — 668 pg, 36.62 MB — SUPPLEMENTAL APPENDIX [2109460] lodged by USA in 21-3072, 21-3073, 21-3078, 22-3016, 23-3015. [Volumes: 2] [Service Date:04/04/2025 ] [21-3072, 21-3073, 21-3078, 22-3016, 23-3015]--[Edited 04/04/2025 by LMM-MODIFIED EVENT FROM FILED TO LODGED] (Gabriel, Elizabeth) [Entered: 04/04/2025 02:49 PM]

04/07/2025 — 6 pg, 77.76 KB — MOTION [2109609] to supplement the appendix filed by USA in 21-3072, 21-3073, 21-3078, 22-3016, 23-3015 (Service Date: 04/07/2025 by CM/ECF NDA) Length Certification: 124 words. [21-3072, 21-3073,

| | | |
|---|---|---|
| | | 21-3078, 22-3016, 23-3015] (Gabriel, Elizabeth) [Entered: 04/07/2025 01:08 PM] |
| 04/21/2025 | ☐ 📄 1 pg, 38.98 KB | CLERK'S ORDER [2111895] filed granting the government's motion to supplement appendix [2109609-2]; The Clerk is directed to file the lodged supplemental appendix [2109460-2]. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 04/21/2025 11:10 AM] |
| 04/21/2025 | ☐ | PER ABOVE ORDER lodged appendix [2109460-2] is filed [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 04/21/2025 11:14 AM] |
| 05/27/2025 | ☐ 📄 7 pg, 154.03 KB | UNOPPOSED MOTION [2117544] to remand record, to modify briefing schedule filed by Sean Coates in 21-3072, William Kyle Sweeney in 21-3073, Jerome Martin, Jr. in 21-3078, Samuel Carson in 22-3016 [Service Date: 05/27/2025 ] Length Certification: 807 words. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] (Holloway, Tre) [Entered: 05/27/2025 02:45 PM] |
| 05/29/2025 | ☐ 📄 1 pg, 39.26 KB | CLERK'S ORDER [2118055] filed, on the court's own motion, that the deadlines established in the court's January 31, 2025 order be suspended pending further order of the court. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 05/29/2025 02:27 PM] |
| 07/30/2025 | ☐ 📄 1 pg, 40.38 KB | PER CURIAM ORDER [2127923] filed ORDERED that the motion to remand the record [2117544-2] be granted and the record be remanded. It is FURTHER ORDERED that these consolidated cases be held in abeyance pending further order of the court. The parties are directed to file motions to govern future proceedings within 30 days after resolution of the proceedings on remand. The Clerk is directed to transmit a copy of this order to the district court. Before Judges: Henderson, Wilkins and Garcia. [21-3072, 21-3073, 21-3078, 22-3016, 23-3015] [Entered: 07/30/2025 11:53 AM] |

ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

In the

# United States Court of Appeals

### for the District of Columbia Circuit

_____

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants.*

_____

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)

_____

## BRIEF OF APPELLANTS

_____

(Counsel listed on inside cover)

App 1618

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### a.    Parties

The parties in the district court included the United States of America and Samuel Carson; Sean Coates; Paul Franklin; Vincent Hill; William Hill; Donald Nichols; Jerome Martin, Jr.; Maurice Proctor; William K. Sweeney; Reginald Switzer; and Raymond Washington.  The parties before this Court include the United States of America and Samuel Carson ("Carson"); Sean Coates ("Coates"); Jerome Martin, Jr. ("Martin"); and William K. Sweeney ("Sweeney") (collectively, "Appellants").[1]

### b.    Rulings Under Review

This consolidated collateral appeal is taken from the district court's decision denying Appellants' motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences, *United States v. Martin*, No. 98-cr-00329, 2021 WL 4989983 (D.D.C. Oct. 27, 2021) (Judge Royce C. Lamberth), and involves various issues and rulings made during the course of the underlying criminal trial proceedings in *United States v. Hill* (D.D.C. No. 98-cr-00329) (Judge Thomas Penfield Jackson) and on direct appeal in *United States v. Carson* (D.C. Cir. Nos. 02-3015, 02-3016, 02-3017,

---

[1] No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is necessary, because no Appellant is a corporation or similar entity.

App 1620

02-3018, 02-3019, 02-3046) (Judges Karen LeCraft Henderson, A. Raymond Randolph, and Thomas B. Griffith), which culminated in a per curiam opinion by that panel reported as *United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006).

### c.     Related Cases

The only related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C) are those identified above as part of the "Rulings Under Review." There are no other related cases or any that are currently pending before this Court.

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION...............................................................1

STATEMENT OF THE ISSUES.................................................................2

STATUTES AND REGULATIONS..............................................................3

STATEMENT OF THE CASE.....................................................................6

I.    The Government's Expansive Allegations of Conspiracy ...........................6

II.   The Government's Case Relied Heavily on the Testimony of Cooperating Witnesses and Jailhouse Informants, Including One Whose Testimony Was Put in as Hearsay Based on the Testimony of Other Cooperating Witnesses .................................................................9

      A.    Cooperating Witness James Montgomery .........................................11

            1)    The "Butchie" Smith murder .................................................12

            2)    The triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson...........................................................14

            3)    The Anthony Fortune murder .................................................15

            4)    The murder of Teresa Thomas and Terita Lucas.....................16

            5)    The murder of Leonard Hyson and Maurice Hallman..............17

            6)    The murder of Chrishauna Gladden.........................................17

            7)    The attempted murder of Ulysses English................................18

            8)    The shoot-out with the D.C. police...........................................19

      B.    Special Agent Vincent Lisi .................................................21

      C.    Jailhouse Informant Theodore Watson .................................................23

      D.    Jailhouse Informant Charles Bender .................................................24

      E.    Jailhouse Informant Arthur Rice.................................................25

III.  The Government's Withholding of *Brady* Material Undermined the Defense's Ability to Impeach Key Prosecution Witnesses...........................26

IV.   The Direct Appeal.................................................................31

V.    The § 2255 Proceedings in the District Court .................................................33

A.      Procedural History and the Eventual Unsealing of *Brady*/*Giglio* Materials................................................................33

B.      *Brady*/*Giglio* Arguments Raised in Appellants' § 2255 Motions..............................................................................37

      1)   Watson: The government withheld information about its serious doubts as to Watson's credibility and lied about it..................38

      2)   Montgomery: The government hid evidence of ever-shifting stories. .............................................................40

      3)   Butchie Smith: The government hid evidence of other suspects in the Butchie Smith murder while falsely stating it had none.42

      4)   Pinckney and Owens: The government misrepresented its relationship with Pinckney and Owens to keep them from testifying about another suspect in the triple murders..............43

      5)   Bender: The government failed to disclose evidence that would have allowed impeachment of Charles Bender. ......................44

      6)   Wilson: The government withheld evidence of Martin's innocence in the Anthony Fortune murder. ...........................44

C.      The District Court's § 2255 Decision ................................46

VI.   The § 2255 Proceedings in This Court .........................................46

SUMMARY OF THE ARGUMENT .......................................................46

ARGUMENT ......................................................................................49

I.    The Government's Repeated Withholding of Exculpatory Information Submitted to the Trial Court Under Seal Violated Appellants' Due Process Rights..........................................................................49

A.      Standards of Review.......................................................49

B.      The prosecution repeatedly and improperly withheld exculpatory material information from the defense by sealing the material under false pretenses. .........................52

C.      The sealed material included ample and classic *Brady* material. ............................................................................54

      1)   Documents regarding alternative theories ..............................55

      2)   Documents regarding acknowledged lies by government witnesses ...........................................................66

3)      Information regarding government benefits provided to witnesses ...............................................................................73

D.      The trial court's failure to meaningfully address the government's repeated failures to make disclosures required under *Brady/Giglio* and the Jencks Act provides further grounds for relief. ...........................................76

E.      The evidence strongly supports the conclusion that the *Brady* violations were willful. ...........................................83

F.      The pattern of withholding evidence prejudiced all Appellants. .................................................................85

G.      The district court failed to properly address the merits of Appellants' § 2255 claims. ............................................90

II.    Appellants Were Deprived of Their Sixth Amendment Right to Effective Assistance of Counsel When Appellate Counsel Failed to Challenge the Trial Court's *Brady*, *Giglio*, and Jencks Act Rulings Concerning Specific Portions of the Sealed Record ...................91

A.      Standards of Review..............................................91

B.      By failing to follow this Court's instructions, appellate counsel failed to function within the range of competence demanded of attorneys in criminal cases. ..........................92

III.   Appellants' Claims Are Properly Before the Court Because They Were Timely Raised Once Discovered and Related Back to Timely § 2255 Motions. ..................................................101

A.      Standards of Review..............................................101

B.      Appellants' subsequent supplemental motions relate back to the timely, specific claims they initially raised.............104

1)      Legal Standard ...........................................104

2)      Each Appellant made sufficiently concrete claims in his original motion to which the later claims relate back. ........106

C.      The supplemental claims are timely, even if they do not relate back, because they arise from newly discovered evidence, were filed within deadlines set by the district court, or were subject to equitable tolling.........................111

1)      Legal Standard ...........................................112

2)      Appellants' claims in the supplemental motions based on the *Brady*/*Giglio* materials were timely filed. ...............................114

3)      The running of the statute of limitations was tolled by orders extending the parties' time to respond or for appointment of counsel. ..................................................................................118

IV.    Carson's Trial Counsel Were Admittedly Ineffective, Having Inappropriately Placed Their Personal Interests Ahead of Their Duties in the Face of Improper Bias by the Trial Court. ........................................124

CONCLUSION ........................................................................................131

CERTIFICATE OF COMPLIANCE ...................................................................133

CERTIFICATE OF SERVICE ..........................................................................134

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Dretke*,
    540 U.S. 668 (2004)...................................................................................23, 112

*Baugh v. Nagy*,
    2022 WL 4589117 (6th Cir. Sept. 30, 2022) .......................................................117

*Bowen v. Maynard*,
    799 F.2d 593 (10th Cir. 1986) ...........................................................................87

*Bracy v. Gramley*,
    520 U.S. 899 (1997)..........................................................................................59

*\*Brady v. Maryland*
    373 U.S. 83 (1963)................................................................................ passim\*\*

*Brecht v. Abrahamson*,
    507 U.S. 619 (1993)..........................................................................................86

*Bull S.A. v. Comer*,
    55 F.3d 678 (D.C. Cir. 1995).............................................................................113

*Bush v. Sec'y, Fla. Dep't of Corr.*,
    888 F.3d 1188 (11th Cir. 2018) .........................................................................85

*Cadet v. Fla. Dept. of Corr.*,
    853 F.3d 1216 (11th Cir. 2017) .......................................................................122

*California v. Trombetta*,
    467 U.S. 479 (1984).........................................................................................82

*Carrillo v. Cnty. of L.A.*,
    798 F.3d 1210 (9th Cir. 2015) .........................................................................62

*Carson v. United States*,
    549 U.S. 1246 (2007)...............................................................................106, 109

*Carter v. Bigelow*,
    787 F.3d 1269 (10th Cir. 2015) .....................................................................112

*Comstock v. Humphries*,
   786 F.3d 701 (9th Cir. 2015) ...........................................................49, 55

*Cone v. Bell*,
   556 U.S. 449 (2009).........................................................................49

*Crivens v. Roth*,
   172 F.3d 991 (7th Cir. 1999) ...........................................................64

*Cuyler v. Sullivan*,
   446 U.S. 335 (1980)................................................................125, 129

*Daniels v. United States*,
   54 F.3d 290 (7th Cir. 1995) ...........................................................129

*Dennis v. United States*,
   384 U.S. 855 (1966).....................................................................77, 83

*DeWitt v. District of Columbia*,
   43 A.3d 291 (D.C. 2012) ................................................................39

*Douglas v. Workman*,
   560 F.3d 1156 (10th Cir. 2009) .................................................88, 117

*Entsminger v. State of Iowa*,
   386 U.S. 748 (1967).........................................................................85

*Evitts v. Lucey*,
   469 U.S. 387 (1985).........................................................................91

*Fuentes v. T. Griffin*,
   829 F.3d 233 (2d Cir. 2016) ...........................................................87

*Giglio v. United States*,
   405 U.S. 150 (1972)............................................................... passim**

*Gonzalez v. Mize*,
   565 F.3d 373 (7th Cir. 2009) .........................................................129

*Hilliard v. United States*,
   317 F.2d 150 (D.C. Cir. 1963).........................................................80

*Hinton v. Alabama*,
  571 U.S. 263 (2014)...............................................................................94

*Holland v. Florida*,
  560 U.S. 631 (2010)..............................................................................121

*Jarrell v. Balkcom*,
  735 F.2d 1242 (11th Cir. 1984) .............................................................62

*Jefferson v. United States*,
  730 F.3d 537 (6th Cir. 2013) ................................................................113

*Jimenez v. Hunter*,
  741 Fed. Appx. 189 (5th Cir. 2018)......................................................122

*Jimerson v. Payne*,
  957 F.3d 916 (8th Cir. 2020) ................................................................112

*In re Keith*,
  2018 WL 8807240 (6th Cir. Oct. 26, 2018) .........................................117

*Kimmelman v. Morrison*,
  477 U.S. 365 (1986)...............................................................................94

*Krupski v. Costa Crociere S.p.A*,
  560 U.S. 538 (2010)......................................................................104, 106

*Kyles v. Whitley*,
  514 U.S. 419 (1995).......................................................50, 64, 78, 84

*Mandacina v. United States*,
  328 F.3d 995 (8th Cir. 2003) ................................................................104

*Mayle v. Felix*,
  545 U.S. 644 (2005)......................................................................102, 105

*Miller v. Angliker*,
  848 F.2d 1312 (2d Cir. 1988) ...........................................................62, 87

*Montgomery v. Bobby*,
  654 F.3d 668 (6th Cir. 2011)(en banc) ................................................117

*Mungin v. Sec'y, Fla. Dep't of Corr.*,
 89 F.4th 1308 (11th Cir. 2024) ...............................................................104

*Napue v. Illinois*,
 360 U.S. 264 (1959).............................................................................50, 51

*Nuckols v. Gibson*,
 233 F.3d 1261 (10th Cir. 2000) ..............................................................87

*On Lee* v. *United States*,
 343 U. S. 747 (1952)..................................................................................23

*Palermo v. United States*,
 360 U.S. 343 (1959)............................................................................27, 77

*Pennsylvania v. Ritchie*,
 480 U.S. 39 (1987) .............................................................................32, 92

*Prieto v. Quarterman*,
 456 F.3d 511 (5th Cir. 2006) .................................................................113

*Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*,
 71 F.4th 51 (D.C. Cir. 2023)...................................................................114

*Ross v. William*s,
 950 F.3d 1160 (9th Cir. 2020) ...............................................................106

*Saunders v. United States*,
 316 F.2d 346 (D.C. Cir. 1963)..................................................................80

*Schiro v. Landrigan*,
 550 U.S. 465 (2007)................................................................................125

*Scott v. United States*,
 890 F.3d 1239 (11th Cir. 2018) .......................................................116, 117

*In re Sealed Case*,
 151 F.2d 1059 (D.C. Cir 1998)...........................................................78, 79

*Slayton v. Am. Exp. Co.*,
 460 F.3d 215 (2d Cir. 2006) ...................................................................106

*Smith v. Robbins*,
  528 U.S. 259 (2000)...............................................................................91

*Smith v. Sec'y of N.M. Dep't of Corr.*,
  50 F.3d 801 (10th Cir. 1995) ..................................................62, 87, 88

*Sossa v. Diaz*,
  729 F.3d 1225 (9th Cir. 2013) ............................................................113

*Strickland v. Washington*,
  466 U.S. 668 (1984)..........................................................91, 94, 97, 126

*\*Strickler v. Greene*,
  527 U.S. 263 (1999)..........................................................49, 62, 112

*Summerlin v. Stewart*,
  267 F.3d 926 (9th Cir. 2001) ...........................................................129

*Turner v. United States*,
  582 U.S. 313 (2017)................................................................................49

*United States v. Abney*,
  812 F.3d 1079 (D.C. Cir. 2016)............................................................92

*United States v. Aguiar*,
  894 F.3d 351 (D.C. Cir. 2018)..............................................................92

*United States v. Agurs*,
  427 U.S. 97 (1976).................................................................64, 77, 86

*United States v. Auten*,
  632 F.2d 478 (5th Cir. 1980) ...............................................................64

*\*United States v. Bagley*,
  473 U.S. 667 (1985)............................................................49-50, 52, 87-88

*United States v. Baxter*,
  761 F.3d 17 (D.C. Cir. 2014)................................................................49

*United States v. Borda*,
  848 F.3d 1044 (D.C. Cir. 2017)..........................................................112

*United States v. Bowie*,
    198 F.3d 905 (D.C. Cir. 1999)....................................................................85

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992)......................................................64, 77, 88

*United States v. Bundy*,
    968 F.3d 1019 (9th Cir. 2020) ...................................................................65

*United States v. Butler*,
    955 F.3d 1052 (D.C. Cir. 2020)...........................................................47, 51

*United States v. Carson*,
    455 F.3d 336 (D.C. Cir. 2006)....................................1, 15, 32, 74, 98

*United States v. Cloud*,
    102 F.4th 968 (9th Cir. 2024) .......................................53, 54, 84, 112

*United States v. Coates*,
    2022 WL 17980232 (D.C. Cir. Dec. 23, 2022) ...................................2

*United States v. Cronic*,
    466 U.S. 648 (1984)...........................................................................98, 125

*United States v. Driscoll*,
    984 F.3d 103 (D.C. Cir. 2021)...................................................................51

*United States v. Flores-Rivera*,
    787 F.3d 1 (1st Cir. 2015).............................................................100, 101

*United States v. Hicks*,
    283 F.3d 380 (D.C. Cir. 2002)............................................................105, 109

*United States v. Innamorati*,
    996 F.2d 456 (1st Cir. 1993).....................................................................87

*United States v. Johnson,*
    592 F.3d 164 (D.C. Cir. 2010)..................................................................100

*United States v. Martin*,
  2021 WL 4989983 (D.D.C. Oct. 27, 2021) .......................................1, 46, 90, 130

*United States v. McDade*,
  699 F.3d 499 (D.C. Cir. 2012).................................................................122

*United States v. N. Am. Reporting, Inc.*,
  740 F.2d 50 (D.C. Cir. 1984).....................................................................80

*United States v. Oruche*,
  484 F.3d 590 (D.C. Cir. 2007).....................................................................83

*United States v. Pasha*,
  797 F.3d 1122 (D.C. Cir. 2015)...................................................................51

*United States v. Poindexter*,
  492 F.3d 263 (4th Cir. 2007) .....................................................................52

*United States v. Rivera*,
  412 F.3d 562 &7 (4th Cir. 2005) .................................................................81

*\*United States v. Robinson*,
  68 F.4th 1340 (D.C. Cir. 2023)...................................................50, 52, 54, 89

*United States v. Rooney*,
  37 F.3d 847 (2d Cir. 1994) .......................................................................86

*United States v. Sayan*,
  968 F.2d 55 (D.C. Cir. 1992)....................................................................126

*United States v. Sedaghaty*,
  728 F.3d 885 (9th Cir. 2013) .....................................................................87

*United States v. Smith*,
  104 F.4th 314 (D.C. Cir. 2024)...................................................................52

*United States v. Thomas*,
  221 F.3d 430 (3d Cir. 2000) ....................................................................104

*United States v. Trevino*,
  89 F.3d 187 (4th Cir. 1996) .......................................................................80

*Valdovinos v. McGrath*,
   598 F.3d 568 (9th Cir. 2010), *vacated sub nom Horel v.
   Valdovinos*, 562 U.S. 1196 (2011), *reaffirmed on remand,* 423 F.
   App'x 720 (9th Cir. 2011) ...................................................................105

*Walberg v. Israel*,
   766 F.2d 1071 (7th Cir. 1985) ......................................................126, 127

*Wearry v. Cain*,
   577 U.S. 385 (2016).....................................................................50, 53, 85

*Winkler v. Keane*,
   7 F.3d 304 (2d Cir. 1993) ...................................................................129

*Winthrop-Redin v. United States*,
   767 F.3d 1210 (11th Cir. 2014) ...........................................................129

*In re Wogenstahl*,
   902 F.3d 621 (6th Cir. 2018) ...............................................................117

*Woodward v. Williams*,
   263 F.3d 1135 (10th Cir. 2001) ...........................................................105

**Statutes and Rules**

18 U.S.C. § 3231 ........................................................................................1

18 U.S.C. § 3500.....................................................................................2, 4

18 U.S.C. § 3500(e)(1).........................................................................96, 97

18 U.S.C. § 3500(e)(2).........................................................................96, 97

25 U.S.C. § 2255(f)(2) ............................................................................101

28 U.S.C. § 1291.......................................................................................2

28 U.S.C. § § 2253 and 2255 ....................................................................2

28 U.S.C § 2254....................................................................................117

28 U.S.C. § 2255................................................................................ passim**

28 U.S.C. § 2255(b) ...............................................................................125

28 U.S.C. § 2255(f)................................................................101, 102

28 U.S.C. § 2255(f)(1) ..........................................................102. 116

28 U.S.C. § 2255(f)(4) ...........................................102, 103, 112, 124

Fed. R. Civ. P. 15(a)..............................................................104, 108

Fed. R. Civ. P. 15(c)........................................................102, 104, 106

Fed. R. Evid. 804(b)(1) ...............................................................74, 76

Fed. R. Evid. 804(b)(6) ...............................................................31, 81

Habeas Corpus Rule 2(c) ................................................................102

**Other Authorities**

Eve B. Primus, *Disaggregating Ineffective Assistance of Counsel Doctrine*, 72 Stan. L. Rev. 1581 (2020) ...........................................125

*The Shadowy World of Jailhouse Informants: Explained* (July 16, 2018), *available at* https://theappeal.org/the-lab/explainers/the-shadowy-world-of-jailhouse-informants-explained/ ...........................................23

\*    authorities on which we chiefly rely

\*\* dispensation is sought from the Court's passim rule as there are dozens of references to *Brady, Giglio*, and §2255 throughout given the nature of this case.

## STATEMENT OF JURISDICTION

This consolidated habeas appeal arises from a federal criminal trial in the U.S. District Court for the District of Columbia over which the trial court exercised subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. After trial and the jury's verdict, App. 712, the trial court sentenced Appellants and entered corresponding written judgments between January 31 and February 13, 2002, from which each Appellant timely appealed.

On direct appeal, a panel of this Court upheld Appellants' convictions and sentences "in toto." *United States v. Carson*, 455 F.3d 336, 338 (D.C. Cir. 2006). Thereafter, each Appellant timely filed various motions for post-conviction relief to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. *See* App. 969-1043. Those motions were supplemented by each Appellant between 2014 and 2018, after Appellants received access to a great deal of material that had been sealed during the trial proceedings and during the pendency of the direct appeals. The district court denied the motions as supplemented in their entirety in October 2021. *See generally United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021), App. App. 1691-1739. In May 2022, the district court also denied Appellants' subsequent requests for certificates of appealability. *See generally United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022). App. 1740-65.

Appellants sought certificates of appealability from this Court, which were granted in part on December 23, 2022. *See United States v. Coates*, 2022 WL 17980232 (D.C. Cir. Dec. 23, 2022). After Martin filed a motion for leave to file a second or successive motion pursuant to 28 U.S.C. § 2255 and related motions, this Court consolidated that motion with the existing appeals and directed the parties to address in their briefs whether the new motion was successive within the meaning of § 2255, and any request to expand the certificate of appealability and the merits of any claim on which appellants request an expanded certificate. Aug. 3, 2023 Order (Doc #2010832 in D.C. Cir. No. 21-3072).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. §§ 2253 and 2255.

## STATEMENT OF THE ISSUES

The issues presented are:

- Whether the government's repeated improper withholding of extensive materials submitted to the trial court under seal, which included substantial information that should have been disclosed to Appellants before trial pursuant to *Brady v. Maryland* 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150, 154 (1972), and the Jencks Act, 18 U.S.C. § 3500, violated Appellants' due-process rights.

- Whether Appellants' counsel on direct appeal was ineffective for failing to take the steps this Court had directed it to take to challenge the trial court rulings that such material need not be turned over.

- Whether the district court erred in denying Appellants' § 2255 motions as time-barred where they were filed timely and were supplemented as Appellants gained access to previously withheld material.

App 1636

- Whether trial counsel for Carson was constitutionally ineffective where they repeatedly failed to act out of fear of drawing the ire of the trial court.

## STATUTES AND REGULATIONS

### 28 U.S.C § 2255

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b) Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

\* \* \*

(d) An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

\* \* \*

App 1637

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

> (1) the date on which the judgment of conviction becomes final;

> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

### 18 U.S.C. § 3500

\*    \*    \*

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver

such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

## STATEMENT OF THE CASE

### I.    The Government's Expansive Allegations of Conspiracy

This case involves conduct occurring over more than a decade at the height of the federal government's War on Drugs.  The government alleged criminal acts spanning from 1988 through 1999 throughout various neighborhoods in the District of Columbia, Maryland, and Virginia.  The government's sweeping indictment painted a sprawling picture that aimed to weave isolated individuals and incidents into a massive conspiracy, creating the meaningful risk that the jurors would lose sight of the weaknesses of the government's case as to any given individual defendant or on a given count.

Appellants, who were teenagers when the events began and were each in their mid-to-late twenties during trial, are currently in federal prison after being convicted of participating in a conspiracy to distribute over 1,000 kilograms of marijuana that included attempted and completed homicides, firearms violations, and assaults. They have each been incarcerated for more than 27 years.

According to the evidence at trial, Appellants were recruited as teenagers during the early and mid-1980s into a drug dealing enterprise run by Vincent Hill. App. 197-203, 221-222, 225, 231-239, 459-462, 481-485.  None of the Appellants was alleged or shown at trial to have been the leader of the enterprise; that was Vincent Hill, who is not a party to this appeal.  App. 482-484, 557-558.  By the time

of trial, however, many of those who had worked with him had become cooperating witnesses against Hill and the Appellants, testifying under plea agreements.

Several of these witnesses testified that they began working with Hill when they were only 11 to 14 years old.  *See, e.g.*, App. 192-193, 197-212, 459-462, 481-485.  Hill supplied marijuana and other drugs to the youths for distribution and gave them walkie-talkies to alert each other when police were in the neighborhood.  App. 558.  Over time, the boys started selling marijuana and other drugs on their own, remaining under Hill's influence.  App. 559.

Over the objections of Appellants, who sought separate trials through motions to sever, their cases were combined with Hill's, and with that of Gary Price who is also not a party to this appeal.  App. 74.  After forcing a joint trial, the trial court instructed the jurors that each Appellant was liable for the activities of fellow defendants within the expansively defined conspiracy and that verdicts could depend entirely on cooperating witnesses' testimonies.  App. 555.

The government relied very heavily throughout trial on testimony from cooperating witnesses and jailhouse informants, as well as hearsay testimony.  The government's heavy reliance on such testimony was clear throughout the trial and especially in its closing arguments, when it urged the jury to convict based on the testimony of "just those four men alone"—referring to the government's star cooperating witness James Montgomery and three others who gave testimony in

hopes of receiving lenient sentences in their separate criminal cases. App. 555. As acknowledged by the government, other evidence in the case was merely "corroboration support" of this testimony, App. 556, leaving the integrity of the verdict tethered to the narratives of those with much to gain and little to lose from testimony favorable to the government.

While the government heavily relied on cooperating witnesses, jailhouse informants, and hearsay testimony, it engaged in a deliberate pattern of withholding and sealing substantial information, including *Brady*/*Giglio* and Jencks Act material, that was highly probative of such testimony's admissibility and credibility. Appellants were unaware of these constitutional violations until almost a decade after they were sentenced, and still today do not and cannot know the full extent of the government's repeated failures to disclose this material, in part because nearly 40 volumes of the trial record have been lost or destroyed without explanation and are not available from the clerk's office or the government. But it is unquestionable that Appellants' lack of access to this material before and during trial substantially hindered their ability to challenge the admissibility of certain evidence and engage in effective cross-examination of the government's most critical witnesses.

The jury ultimately convicted each of the Appellants on charges of narcotics and RICO conspiracies, along with various other offenses. Carson was convicted of the first-degree murder of six individuals, as well as assault with intent to kill,

attempted murder, murders in aid of racketeering, and the related use and possession of firearms.  Coates was convicted of murder in aid of racketeering, attempted murder, and assault with intent to kill, including specific charges related to firearm use and possession.  Martin was convicted of first-degree murder, assault with a dangerous weapon against a police officer, and attempted murder in aid of racketeering, along with firearm-related charges and three counts of marijuana distribution.  Sweeney was convicted of first-degree murder, murder in aid of racketeering, attempted murder in aid of racketeering, and corresponding firearm charges.  App. 712.  Each Appellant is currently serving a life sentence in federal prison.

## II.    The Government's Case Relied Heavily on the Testimony of Cooperating Witnesses and Jailhouse Informants, Including One Whose Testimony Was Put in as Hearsay Based on the Testimony of Other Cooperating Witnesses

As set forth more fully below, time and again at trial crucial aspects of the government's case rested primarily, if not entirely, on the testimony of cooperating witnesses who claimed the Appellants confessed to their crimes or provided incriminating information.  These circumstances made it particularly critical that the Appellants be provided with the evidence in the government's possession that would have allowed the accounts of these witnesses to be challenge – evidence that was repeatedly withheld from them.  Moreover, the broad and sweeping conspiracy charges that the government chose to bring meant that evidence that prejudiced one

of the Appellants readily spilled over to prejudice each of them, as the jury was firmly instructed that evidence as to one co-conspirator could be considered as to others.

The discussion below is organized by cooperating witness and by event — noting as appropriate where certain key *Brady/Giglio* and Jencks Act violations occurred. In recounting testimony and rulings from the trial and various weaknesses in the government's case, Appellants do not seek to reargue points that have already been decided on direct appeal, such as the propriety of the broad conspiracies alleged or whether the evidence presented was sufficient to convict them. The discussion is provided to show the centrality of the *Brady/Giglio* and Jencks Act violations to the case, and the prejudice to each Appellant of violations that may have been directed primarily to the conduct of one. The discussion also shows the great prejudice to the Appellants of the unexplained failure of their counsel on direct appeal to take the steps this Court outlined to present the issue of this withheld *Brady* material in that appeal. Simply put, having chosen to charge such a broad and sprawling conspiracy and to rely so heavily on cooperating witnesses, the government must also accept the consequences of those decisions when it comes to assessing the effects of the *Brady*/*Giglio* and Jencks Act violations in this case and the inadequacy of counsel on direct appeal.

### A.    Cooperating Witness James Montgomery

James Montgomery was a key government witness whose testimony implicated the Appellants in a series of criminal activities.  Despite his extensive criminal record, including admissions to, implications in, or convictions for multiple violent offenses such as assault with a deadly weapon, numerous murders, and assaulting a police officer while armed, Montgomery was freed from incarceration for a three year period after his arrest and received an extraordinarily lenient five-year sentence for his involvement in seven murders, leniency that confirmed his significant motive and interest in providing testimony helpful to the government and put his trustworthiness at the center of the trial.  App. 308-312, 417, 434-45. Montgomery testified about nearly every significant violent act alleged at trial. Montgomery implicated one or more of the Appellants in eight murders and one attempted murder in all, along with a shootout with the D.C. Metropolitan Police Department.  *See* App. 325-331, 334-335, 349-355, 361-375, 378-384, 405-406, 416, 489-496, 508-511.  His testimony was the primary evidence the government presented on several charges, often with limited or no corroboration.  For example, his account was so critical as to two of the murders that the government emphasized at closing: "Not until James Montgomery came forward were the police able to fit those clues and find the support needed to come to the conclusion which the evidence

supports, which is that Sam Carson murdered those girls." App. 558. We discuss each of these acts in turn.

### 1) The "Butchie" Smith murder

Montgomery testified that Appellants were responsible for the murder of Robert "Butchie" Smith, who had been acting as an FBI informant at the time of his murder. That testimony was doubly significant — not only in that it supported a portion of the indictment, but also because it formed the basis of the trial court's findings that all Appellants, either directly or through their participation in the conspiracy, were responsible for Smith's murder, which in turn caused the trial court to permit into evidence numerous hearsay statements Smith had made before his murder.

The FBI had targeted Smith in 1995 as a major marijuana supplier in Southwest D.C. and Smith became an informant after his arrest in December 1996. The government accordingly dismissed charges against him to maintain his informant status. Montgomery testified that Appellants Carson and Sweeney grew concerned that Smith was cooperating with federal authorities, and that after Sweeney disclosed during a jail visit from Carson that he had informed Smith about a murder, Carson responded that without Smith the police would not have a solid case, and that failing to "hit" Smith would likely lead to their arrests. App. 398-401, 504-505.

Montgomery testified that he and Carson then continued to look for Smith but were unable to carry out a shooting.  App. 505-508.  Montgomery continued that on June 16, 1997, he gave Carson his car keys, that Carson left without disclosing his destination, and that shortly thereafter he learned about a shooting on Half Street where Smith was killed.  App. 508-509.  Having tied Carson and Sweeney to the shooting solely through supposed conversations and surmise, Montgomery claimed at trial that "I said, you know them peoples got hit.  He was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys."  App. 510-511.

While Montgomery told this version at trial — confidently explaining that he knew Carson and Sweeney were planning to kill Smith in advance and suggesting that he knew right away they had done it—he had told a much less certain story when being debriefed by the Agent Lisi of the FBI.  Contained within Agent Lisi's notes of his interview with Montgomery, which were sealed by the court and not available to Appellants until nine years after their trial, was the following: "After Butchie got hit, James did not know but thought either Chin [Carson] did it or get Pug or BJ to do it."  App.  1363.  Rather than pinning the murder on Carson, he suggested two others might have done it, and was not definite even as to that (James "did not know

but thought" they might have done it.)   Yet at trial Montgomery was able to offer his far more certain testimony without impeachment from the notes.

Left largely uncontradicted, Montgomery's testimony was thus critical in linking the Appellants to Smith's murder and formed much of the basis for the trial court's decision to allow Smith's hearsay testimony to be presented to the jury.  This is why, from their very first § 2255 filings, Appellants have stated the need for further investigation and complete discovery of the suppression of information about Montgomery's reliability and the government's dealings with him because of concerns about his reliability.  *See e.g.*, App. 966.  The sealed material relevant to these claims was finally turned over to Appellants only after their initial § 2255 motions were filed, far too late to make use of them at trial or even on direct appeal.

### 2) The triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson

Montgomery testified extensively to Appellants' alleged involvement in the November 17, 1996 triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson in Temple Hills, Maryland, allegedly in furtherance of the conspiracy. Montgomery implicated Appellants Carson, Coates, and Sweeney in this crime, while also minimizing his own role.  App. 378-395.

This testimony too, went largely unchallenged at trial, although Montgomery did testify that he had provided untrue grand jury testimony about it.  App. 403-404. The defense was aware at trial and on appeal of testimony before a Maryland grand

jury by two one-time government witnesses, John Pinckney and Cheree Owens, that the triple murders were committed by Dennis Green and not by any of the Appellants.  But because Pinckney and Owens could not be located at the time of trial the defense was unable to present this testimony.  *See United States v. Carson*, 455 F.3d at 377–81.  Although Appellants sought to introduce the grand jury testimony itself, the trial court denied that request, finding that an insufficient connection between federal authorities prosecuting the Appellants and the authorities overseeing the Maryland case had been shown.  *Id.*  Carson's investigator discovered a decade after trial, however, that the government had known where Pinckney and Owens were all along.  *See* pp. 43-44, 73-76 *infra*.

### 3)     The Anthony Fortune murder

Montgomery was also a key witness to the murder of Anthony Fortune, which he claimed Carson admitted to him.  App. 334-336.  Fortune, a resident of the 58th Street Northeast neighborhood, was fatally shot in August 1991 after a dispute arising from a craps game.  App. 334-335.  Montgomery testified that this incident ignited a conflict (or "beef") between members of the "K Street Crew," the organization the government alleged as the basis of the conspiracy and contended had expanded to 37th Place, and persons associated with 58th Street Northeast.  App. 335, 357.  Montgomery claimed that Martin and Fortune had argued during the game and that Carson asked Martin if he should kill Fortune.  App. 335.  According to

Montgomery, Carson then retrieved a firearm from a car and shot Fortune.  App. 336.

Again, Montgomery's testimony was key to this charge.  The only other witness who testified about this dispute was Charlene Wilson, a paid informant who testified to seeing Carson kill Fortune.  App. 280-285.  It was later revealed that FBI Agent Warrener's notes reflected Wilson's initial account as having only "heard" about Fortune's murder, rather than witnessing it firsthand.  App. 547-48.  This crucial contradiction in Wilson's statements was not shared with the defense until four months after her testimony.

### 4)  The murder of Teresa Thomas and Terita Lucas

Montgomery provided key testimony linking Carson to the murders of Teresa Thomas and her sister Terita Lucas on March 12, 1999.  He testified that Thomas, who was romantically involved with Carson and lived with Lucas among other family members, had been entrusted with an AK-47 by Carson and that she had made excuses for not returning the weapon to him amidst rumored tensions between Carson and "Kenny Man," the father of one of Thomas's children.  According to Montgomery, Carson had expressed frustration that Thomas's action could lead to his vulnerability, and Martin accused Carson of "going soft over a broad" who might cause his death using his own gun.  App. 327-328.  Montgomery claimed that when he first asked Carson about the murders, Carson denied involvement.  App. 328-329.

After talking with the police, however, Montgomery claimed that Carson had confessed to him that he had killed the women and took steps to cover up his involvement. App. 329-331. Montgomery had also previously stated that another person, Wayne Perry, had committed the crime. App. 332.

### 5) The murder of Leonard Hyson and Maurice Hallman

Montgomery testified that he and Carson killed Leonard Hyson and Maurice Hallman in the Southwest James Creek Housing area. App. 325-326, 413-414. While negotiating a plea deal in November 1997, however, Montgomery admitted to lying to the government about his involvement in both murders. App. 422. However, the government had notes of a December 22, 1997 interview with Andre Murray, which were sealed and not made available to the defense until years after trial, in which Murray explained that Jakie "Boy" Burks had some New Yorkers kill Hallman and Hyson. App. 1277. Murray's statement undermines and contradicts Montgomery's trial testimony that he and Carson killed Hallman and Hyson. It further contradicts Arthur Rice's testimony that he saw Martin and Carson fleeing the scene. *See* p. 25, *infra*.

### 6) The murder of Chrishauna Gladden

Montgomery testified extensively about the murder of Chrishauna Gladden, whose murder was not charged in the indictment but was included as an overt act in furtherance of the conspiracy and made a key part of the government's case, leading

off its opening statements. App. 176-177.  According to Montgomery, he and Carson sought out Gladden to kill her and prevent her from testifying against Martin in the Curtis Edwards murder trial.  Montgomery testified that he saw Carson shoot and kill Gladden.  App. 368-375.  The government alleged that Martin directed co-conspirators to kill Gladden, believing she was a witness against him in a murder trial in the Superior Court of the District of Columbia.  App. 656.  Arthur Rice, who did not purport to witness the murder, but testified that Carson was looking for Gladden because she was a witness against Martin in his murder case.  App. 475-476.

### 7)   The attempted murder of Ulysses English

Montgomery similarly provided key testimony concerning events leading to the shooting of Ulysses English ("Lou"), a known drug dealer from the 58th Street neighborhood.  According to the government, on the evening of June 26, 1994, Carson instructed Montgomery to either report or confront English if Montgomery saw him selling drugs within Carson's territory.  Carson believed English was operating there and had endangered Carson's family by revealing sensitive information to rivals.  App. 489-491.  Montgomery claimed that on the night of June 26, 1994, Carson ominously indicated that "something was about to happen," App. 492-493,  and that he then left the area to eat and apparently returned to discover a chaotic scene with police and paramedics surrounding a wounded English.  App.

493. Having tied Carson to the shooting solely through a supposed prior conversation, Montgomery then testified that in a conversation the next day, Carson, believing English had not died in the shooting, expressed doubts that English would inform the authorities.  App. 494-496.

### 8)    The shoot-out with the D.C. police

The government also relied heavily on Montgomery's testimony to reconstruct the series of events surrounding a September 10, 1991 shoot-out at 60th and East Capitol Streets after Fortune's murder.  App. 337-343.  According to Montgomery, that day he, Martin, and Carson drove around in Martin's van, looking for rivals from the 58th Street group, but initially found none.  App. 344-346.  He claimed they resumed their search after dark, with Carson driving and Montgomery on a motorcycle, armed and ready for confrontation.  App. 347-348.  The situation escalated, leading to an exchange of gunfire, including by a figure Montgomery described as resembling a security guard or police officer.  App. 349-351.  Montgomery testified that the group fled in the van, discarding their guns during a police chase, which Montgomery later retrieved.  App. 354-356.  The government relied heavily on Montgomery's account in its closing statement, insisting he was a credible eyewitness to the crime.  App. 565.  Yet the only tangible evidence of the alleged shoot-out with the police were Martin's fingerprints in his own van and a bullet traceable to a police weapon found within the vehicle.  Montgomery's

testimony provided the narrative that purportedly connected this evidence to the accused.

* * *

Throughout trial and particularly in its closing statements, the government stressed Montgomery's importance as a key witness, emphasizing his centrality to the prosecution's theory of the case.  The government told the jury that Montgomery and the other "criminals that you heard from are the people who were in the best position to tell you how this crew operated," App. 554, and that "you can decide this case based solely on what the cooperating witnesses told you [about] the crew members.  You can just stop and reflect on what they said in this courtroom and decide that's enough."  App. 555.  *See also* App. 568 (government could not tie Carson to the Thomas and Lucas murders "until James Montgomery came forward").

There was little physical evidence corroborating Montgomery's accounts, and the defense focused on questioning his credibility.  The defense noted he had been untruthful in the past,  cast doubt on his ability to accurately recount the details and timelines associated with the alleged crimes, and noted that when Montgomery admitted involvement in many of these crimes his testimony had the effect of shifting blame onto others to benefit himself.  App. 409, 415-420, 514.  However, while the defense could address Montgomery's motives for tailoring his testimony

to please the government, it was denied substantial *Brady* material that would have allowed it to directly undercut the truthfulness of the testimony, including, for example, Montgomery's identification of others not charged with a murder he attributed to Appellants that was included in withheld notes of the extensive government interviews of Montgomery. *See* p. 40-42, *infra*.

### B.    Special Agent Vincent Lisi

Special Agent Vincent Lisi also played a pivotal role in the government's case. In late 1995 through early 1996, Agent Lisi led the FBI team that established an observation post overlooking a D.C. street corner that Appellants allegedly frequented. App. 184-188. From this vantage point, Agent Lisi and his team conducted video surveillance, recording footage and capturing images of the Appellants (except Sweeney) engaging in what was described as drug activity and gambling. Notably absent from these recordings, however, were any depictions of the violent crimes underpinning the prosecution's case.

Agent Lisi's testimony went far beyond the scope of the surveillance recordings and his personal observations. Of greatest significance, Agent Lisi was permitted to recount hearsay statements from deceased informant Butchie Smith implicating Appellants in multiple crimes underpinning he government's conspiracy theory. This hearsay testimony was permitted based on Montgomery's unreliable testimony outlined above implicating some of the Appellants in supposedly

procuring Smith's unavailability.  App. 529-531.  Lisi testified that, according to Smith, Sweeney had told Smith about his involvement in the triple murder in Temple Hills, Maryland, in the murder of Donnell "Robocop" Whitfield, and in a conspiracy to kill Kenneth Adams and to kidnap Anthony Pryor.  App. 517-519, 522-528, 553. Agent Lisi also testified that Smith, over the course of several briefings, provided information to him about a longstanding and escalating conflict (or "beef") with the Condon Terrace neighborhood.  App. 520-521.

Agent Lisi's hearsay testimony from Smith often served as the only evidence offered on certain charges, aside from Montgomery's account.  Because Smith was allowed to "testify" through Agent Lisi, Appellants had no opportunity to cross-examine him and thus had no meaningful ability to challenge the veracity of the statements relayed by the agent to the trial court and the jury.  Again, *Brady* material that was improperly withheld from Appellants would have allowed Appellants to challenge the admission of this testimony by challenging the narrative that Carson and Sweeney were responsible for Smith's unavailability.  *See* pp. 29-31, 42, *infra*.

### C.    Jailhouse Informant Theodore Watson[2]

Theodore Watson was an inmate and a key government witness who testified against Appellants, implicating them in various crimes, including kidnapping and murder. Watson, who was also facing charges in the U.S. District Court for the District of Maryland, shared a holding facility with Sweeney at the Northern Neck Regional Jail. App. 244-245. There, Sweeney purportedly disclosed details to Watson of criminal activities, such as the kidnapping of Anthony Pryor. Watson claimed that Sweeney had confided in him about these crimes and expressed a desire to have Montgomery killed for cooperating with the government. App. 246-257. These claims made Watson's credibility a central issue for the defense during the

---

[2] Throughout the trial, the prosecution relied on testimony from jailhouse informants. The Supreme Court "has long recognized the 'serious questions of credibility' informers pose," *Banks v. Dretke*, 540 U.S. 668, 702 (2004)(quoting *On Lee v. United States,* 343 U. S. 747, 757 (1952), and legal scholars have explained the particularly unreliable nature of jailhouse informants specifically. *See, e.g.,* Alexandra Natapoff, TheAppeal.org, *The Shadowy World of Jailhouse Informants: Explained* (July 16, 2018), *available at* https://theappeal.org/the-lab/explainers/the-shadowy-world-of-jailhouse-informants-explained/ ("'in-custody informants[]' are a particularly risky and unreliable category of criminal informant. Like all informants, they provide evidence to the government in the hope of receiving a benefit. But they have additional characteristics that make them especially poor witnesses. They are incarcerated, so they are surrounded by a ready-made supply of vulnerable targets who are already suspected of criminal conduct. At the same time, because jailhouse informants are under the control of jail officials, there are many benefits and incentives for which they can exchange information[.]").

trial.  Yet, as outlined below, the government once again withheld key *Brady* information.

The government knew that it had refused to file a motion under Federal Sentencing Guidelines § 5K1.1 to recognize Watson's substantial assistance in a matter pending in Greenbelt, Maryland because it had abundant evidence that Watson had not been truthful, including Watson's own written admissions.  Yet when asked by Appellants' counsel about the matter during trial, the government lied to the court about why the Greenbelt Office had not filed the motion, hiding ample evidence of Watson's untrustworthiness as a witness and limiting defense counsel's ability to cross-examine him effectively.  App. 278-279.  *See* pp. 38-40, 92, *infra*.  Appellants only became aware of this when previously sealed material was made available to them well after trial and appeal and even after their § 2255 motions were initially filed.

### D.    Jailhouse Informant Charles Bender

Charles Bender, another jailhouse informant, was also a key witness.  He claimed that during his incarceration with Martin in 1996 he overheard conversations implicating Martin in soliciting violence against an informant.  App. 449-450.  Bender also testified that Sweeney, in a separate discussion, expressed a resolve to deal with Butchie Smith for "snitching."  App. 442-448.  And he testified

that Sweeney admitted guilt in the murder of Donnell Whitfield following a nightclub altercation.  App. 439-442.

Although Bender's testimony at trial was used to implicate (and ultimately convict of first-degree murder) *both*  Carson and Sweeney, *see* App. 451-454, 562, the long-withheld reports of his conversations with the government (302s) revealed that Bender had previously told the government only that Martin had been responsible for the murder.  App 1369, 1379.  *See* p. 44, *infra.*

### E.    Jailhouse Informant Arthur Rice

Arthur Rice was yet another jailhouse informant who offered his assistance to the government while incarcerated and thus anxious to curry favor with the government.  The government contended that Rice was an associate of Sweeney. Rice had told the government that he was present at the murders of Leonard Hyson and Maurice Hallman and saw Martin and Carson fleeing the scene.  *See* App. 1240. The government presented a different theory at trial through Montgomery's trial testimony that he and Carson, not Martin and Carson, had killed Hallman.  App. 325-326, 413-414.   The government did not disclose to the to the defense Rice's inconsistent statement, instead providing it under seal and relying on an unexplained finding of the trial court that it was not Brady or Jencks Act material.  App. 469.

**III.   The Government's Withholding of *Brady* Material Undermined the Defense's Ability to Impeach Key Prosecution Witnesses.**

Efforts to challenge the credibility of key cooperating witnesses and informants formed the cornerstone of the defense strategy.   These efforts were consistently obstructed by the government's failure to disclose critical *Brady* material, a failure often compounded by the trial court's acquiescence.   Throughout the trial and subsequent appeals, defense counsel vigorously sought access to undisclosed *Brady* and Jencks Act material that they believed existed, but could of course not fully appreciate.   In response, the government consistently assured the trial court that it had met all discovery obligations, and oftentimes submitted materials under seal to the trial court seeking confirmation that they need not be turned over.   In doing so, the government repeatedly misrepresented the contents of the information it filed under seal, failing to acknowledge what was often obvious and powerful *Brady* or Jencks Act material, and the trial court accepted the government's representations and permitted the continued withholding.

On September 14, 2000, the government submitted *ex parte* and under seal a compendium of notes from Special Agent Lisi and AUSA Peter R. Zeidenberg from their meetings with Montgomery.   *See* App.   1333-1363.   Along with sealed transcripts of grand jury testimony from Special Agent Lisi, these materials were never released to the defendants during trial.   App. 321-322 (trial court rules based on an *in camera* review that they are not Brady or Jencks material).   This material

was not disclosed to defense counsel until long after trial, in the § 2255 proceedings now under review.

By submitting the material to the court under seal, the government effectively unloaded its own obligations to disclose exculpatory material onto the trial court, even though *Brady* and Jencks Act obligations are placed on the government and not the court.  This procedure is appropriate only if there is legitimate room for doubt as to the disclosure obligation.  *See Palermo v. United States*, 360 U.S. 343, 354 (1959) (approving the procedure "when it is doubtful whether the production of a particular statement is compelled by the statute").  In this instance as in many others documented elsewhere in this brief, material the government submitted under seal proved unquestionably to be *Brady* and/or Jencks Act material when it was finally disclosed to Appellants.  And as it became clear that the trial court was inclined to accept virtually any representation the government made that the material was not *Brady*, the government faced no disincentive to simply dumping the material on the trial court rather than complying with its obligations.

On September 27, 2000,  at the first hearing on the government's motion to admit Smith's statements as hearsay against the Appellants, the defense requested Brady material including any evidence the government had that others might have wanted to kill Butchie Smith.  App. 145-147.  The government stated it had none,

and the trial court unequivocally stated that if it had any, it should turn it over. App. 144-147.

For months before that hearing, defense counsel had continuously attempted to obtain exculpatory material from the government, with little success. As early as July 2000, Carson noted the government's "repeated violation of *Brady* through disclosure of clearly exculpatory evidence so belatedly that the defense cannot effectively use the evidence at trial." App. 603. These included the Government's unexplained failure to turn over "clearly exculpatory evidence about the Maurice Hallman/Leonard Hyson murders and the Teresa Thomas/Terita Lucas murders until more than two years after the charges were brought against Mr. Carson and his CoDefendants and between five and ten years after the information came into the Government's possession." App. 603. Coates and Martin joined in the motion. App. 82, 84. Sweeney had filed three separate motions, including a motion to obtain discovery of the investigative files pertaining to all of the suspects in the triple homicide. App. 166.

Carson's motion also asked the trial court to "establish[] a mechanism for independent review of the files of the United States Attorney and the law enforcement agencies involved in this case for the presence of information/evidence which may be deemed exculpatory under Brady." App.603 . The trial court denied all of the motions following the government's representations that it had no

information concerning other suspects in Butchie Smith's murder and that any disclosable material would be provided in due course. App. 621.

During trial on February 1, 2001, the defense again requested any evidence the government possessed as to other possible suspects in Smith's murder. App. 223-224. This request included materials obtained from witness Andre Murray. App. 224. The government delayed the matter, then falsely represented to the court that there were no relevant documents. In fact, the government had evidence identifying Andre Chappell and Anthony Ricardo Hawkins as potential suspects, App. 1259. and notes from interviews with Andre Murray suggesting that Petey Johnson, another individual with potential connections to the case, had a motive to kill Smith. App. 1269. Again, this material was placed under seal, and not disclosed to the Appellants until long after trial.

The defense encountered other significant obstacles to obtaining discovery. On January 10, 2001, the trial court stated that it had found no Jencks Act material in Agent Lisi's testimony, even though a prior representation by the government as to the absence of any *Brady* material had proven incorrect. App. 180-183. Trial counsel renewed their request for Agent Lisi's notes of James Montgomery, on March 7, 2001 at the time of Lisi's testimony. App. 303. The government again sought to interpose the court into its own disclosure obligation, and the trial court again refused to require the government to turn over any notes. App. 321-322.

Material unsealed later revealed that Agent Lisi's notes contained valuable impeachment evidence as to Montgomery. *See* pp. 40-42, *infra.*

Other instances of defense counsel renewing efforts to secure potentially exculpatory evidence included making a request for government counsel's notes on cooperating witnesses Andre Murray, Reginald Switzer, and others. App. 215-217. Again, the government sought to cast its disclosure obligations onto the trial court, App. 229-230, and again, once that information was unsealed, it became clear that whatever review the trial court may or may not have done, much of that material should, in fact, have been turned over to the defense. *See* pp. 54-76, *infra.*

Defense counsel also repeatedly urged the government to collect and turn over files from the prosecution of its jailhouse informant Theodore Watson, believing the file could contain *Brady* or Jencks Act material. *See, e.g.*, App. 273-274. The government obtained the files and misrepresented their contents, leading the court to decline even an *in camera* review. App. 278-279. Again, once that information was unsealed, it became clear that it should have been turned over to the defense, contrary to the government's misrepresentations. *See* pp. 54-76, *infra.* This pattern repeated itself throughout the case.

### IV.    The Direct Appeal

Though each of the Appellants believed that the government had likely committed *Brady* and Jencks Act violations throughout trial, their lack of access to the sealed material hamstrung their ability to question the government at trial and on direct appeal.

Appellants filed a motion on June 28, 2002, to access to the sealed material for use in their direct appeal.  The Government stated in opposition that "at trial the defense demanded to know why the defendants were moved to various outlying detention facilities and the government made an *ex parte* proffer to the court, which was sealed.  **Plainly, that portion of the record does not qualify as material relevant to appellant's anticipated appeal, as he frames it."**  App. 160. (emphasis added). However, the material Appellants sought included the statement that "Investigation of [the Butchie Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." App. 1259.   The defense was unable to use this statement at the Rule 804(b)(6) hearing as to whether Agent Lisi could testify as to statements made by Smith on the basis that Appellants (as opposed to Chappell and Hawkins or some other persons) were responsible for Smith's death.

Having reviewed the government's misstatements as to what was contained in the material, this Court instructed counsel to "identify on appeal

specific evidentiary rulings" that they claimed were erroneous, so that the Court could then "undertake its own *in camera* review" of the disputed materials. *United States v. Carson*, No. 02-3015, 2002 WL 31246900, at *1 (D.C. Cir. Oct. 2, 2002). The Court imposed this requirement because "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files." *See id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)). The Court thus instructed appellate counsel to identify the sealed docket entries and citations that might reveal improper withholding.

Appellate counsel failed entirely to heed this Court's instruction. The briefs on direct appeal neglected to identify the relevant docket entries or transcripts. Instead, appellate counsel argued their *Brady* claim at a level of generality that did not enable the detailed review this Court envisioned. For example, counsel were unable to effectively challenge the trial court's plainly erroneous ruling that a statement in the government's possession pointing to other persons as responsible for Smith's murder was not *Brady* material. This Court rejected the direct appeal in toto. *United States v. Carson*, 455 F.3d at 338).

V.    **The § 2255 Proceedings in the District Court**

A.    **Procedural History and the Eventual Unsealing of *Brady*/*Giglio* Materials**

Following their direct appeal, Appellants each filed timely § 2255 motions

and supplemental § 2255 motions, presenting a series of claims under *Brady*, *Giglio*,

and the Jencks Act, among other issues.

Before the deadline for filing Appellants' § 2255 motions, Sweeney filed two

motions seeking access to the documents filed under seal before and during trial.

App 930.  Chief Judge Hogan, who had taken over the docket from Judge Jackson,

granted these motions on February 15, 2008, less than a week before Appellants'

§ 2255 motions were due, and ordered that the Clerk's office provide copies of the

sealed pleadings to Sweeney's counsel.  App. 169.  This was the first time these

records were ordered unsealed, and Sweeney's counsel promptly went to the clerk's

office seeking access to the documents, only to find they were not available.  *See*

App. 1690.

Having been unable to obtain prompt release of the documents, Appellants

had to file their briefs without access to the sealed materials in order to be timely.

Each of the Appellants raised the issue of the government's *Brady/Giglio* and Jencks

Act violations.    For example, Sweeney's motion expressly stated that the

government had "engaged in deliberate misrepresentations and other prosecutorial

misconduct, including but not limited to the nondisclosure . . . of *Brady*

information," and noted the need for "further investigation and complete discovery of *Brady*/Jencks violations, including suppression of information about Montgomery's reliability and [about the government's] deals with him after concerns about his reliability." App 966. This investigation of course included the sealed materials, none of which were yet made available to Appellants' counsel, even though Chief Judge Hogan had ordered them unsealed.

Similar to Sweeney's motion, Martin's motion identified undisclosed *Brady* material that cast doubt on the government's narrative, in particular regarding Martin's alleged involvement in the Fortune murder. This included a police interview with Stephen Thomas — a witness present at the shooting — who did not name Martin, and evidence showing that the government knew James Coulter's whereabouts—contrary to its claims—because they indicted him for another crime shortly after the trial. Coulter, Martin believed, would have testified that Martin did not shoot him. App. 981. Martin noted that information relevant to these issues remained under seal. *Id*. Coates' motion also raised issues of the failure to disclose *Brady* material and related government misconduct, and sought "further discovery into Giglio, Jencks and the sealed 302s." App. 991 Lastly, Carson filed pro se a motion on a form stating that "new evidence established due process violations." App. 989. Each Appellant also raised issues of inadequate assistance of counsel.

Appellants' timely § 2255 motions thus presented evidence of *Brady*/*Giglio* and Jencks Act violations based on the information known to them at the time, but necessarily could not yet address in detail the many matters in the sealed records that Appellants knew existed but had been unable to access, or the degree to which they were prejudiced by the ineffective assistance of counsel in accessing those materials on direct appeal.

Over the next few years, Appellants supplemented their § 2255 motions with information they were still in the process of obtaining from the previously sealed materials. In May 2008, Martin moved to stay his § 2255 motion on the basis that the attorney who prepared it had an undisclosed conflict of interest because she had represented Arthur Rice, who testified against the Appellants at trial. App. ___. [2999] The government responded in November 2008 that it did not oppose a stay, and the matter did not move forward until March 2010, when Judge Lamberth, who had been reassigned the case, ordered the government to respond to the motions by April 5, 2010, except as to Martin. The government received an extension to July 6, 2010 to locate and review the files and transcripts. App. 124.

Sweeney's counsel, Jenifer Wicks, had made numerous attempts since February 2008 to obtain the previously sealed material from the Clerk's office, and it was not until June 17, 2010, when she finally received at least some of these materials, as stated in her affidavit provided to the district court. *See* App. 1690.

These previously sealed documents revealed a trove of suppressed *Brady* material

that Appellants ultimately incorporated into their supplemental motions.[3]

Appellants sought and were granted additional extensions on various grounds

related to counsel's inability to procure access to discovery, *see* 1051-1054 the need

to get trial transcripts,[4] inability to locate key exhibits, and substitutions of counsel.

*See* App. 124-129. Pursuant to these various extensions, supplemental § 2255

motions were filed by Sweeney on November 28, 2014, App. 3093, supplemented

with two affidavits on July 23, 2015, App. 1425, 1689, and refiled June 16, 2017, by

Carson on April 9, 2015, App. 3196, by Coates on June 27, 2016, App. 1471, and

by Martin on November 21, 2018. App. 1651, The government's response, after

---

[3] In denying Appellants' § 2255 filings, the district court misstated when Appellants had received access to the sealed material. The court cited a statement of Carson's counsel Kira West in Carson's supplemental § 2255 filing as conceding that this material was "turned over by the clerk in 2008." App. 1297 (citing ECF 1170 at 9 n.6; *see also* App. 1480 (stating that the material placed under seal at trial was "discovered by 2255 counsel in 2008."). The district court misinterpreted the quoted statement, as confirmed by the attestation of Sweeney's counsel at the time, Jenifer Wicks, who had been the one to actually engage in the efforts to get the documents. *See* App 1690. Although the material was ordered unsealed on February 15, 2008, the clerk's office did not locate and turn it over until June 17, 2010. App. 1690. Even if it had been turned over when ordered, however, the material could not reasonably have been reviewed and used in the initial § 2255 motions filed only five days later.

[4] A number of transcripts have not been located to this day. Carson's appellate counsel, for example, was unable to receive most of trial counsel's copy of the trial record because it had been inadvertently destroyed. *See* App. 1164.

numerous extensions, was filed March 18, 2020.  App.  188.  Replies were filed by

Sweeney on July 14, 2020, App. 190, and Carson on September 14, 2020.  App 190.

### B.    *Brady/Giglio* Arguments Raised in Appellants' § 2255 Motions

As noted above, it was not until February, 2008, when a new district court

judge was assigned to the case, that *Brady* material previously hidden from

Appellants was ordered unsealed, and then two more years passed before Appellants

were first able to see the material in June 2010.  *See* pp. 35-36, *supra*.  When

Appellants were finally able to access these materials over two years later, they

quickly realized that the government had intentionally withheld a trove of

*Brady/Giglio* and Jencks Act material, and informed the government that they would

be filing supplements to their § 2255 motions to address it.  *See* App. 1054.  The

volume of the material, complexity of the trial, and the records that were lost,

misplaced, or destroyed in the decade since the trial, made this a very time-

consuming task.  In short, the material compromised information on key government

witnesses, including its star cooperating witness James  Montgomery, and thus

affected every crime charged.  Below is a summary of the key points set out in

Appellants' various supplemental § 2255 filings.

1)    **Watson: The government withheld information about its serious doubts as to Watson's credibility and lied about it.**

Watson had previously sought a recommendation from the government for a reduced sentence in a case pending in Greenbelt, but the government denied his request because he had been untruthful. *See* pp. 66-72, *infra.* On cross-examination, however, Watson stated that it was actually because the prosecutor "did not like me and didn't want to give me anything." App. 264. The defense requested Watson's case file from Greenbelt to determine if the government had in fact found him not credible. Rather than simply order the government to turn the file over to the defense, the trial court suggested that the request was an improper attempt to have the government do the defense's investigative work and ordered the government to review the file and report back. App. 273-74. The government represented the next trial day that it had done so and that there was "nothing that suggest any Brady or Jencks material in the file" and "nothing to suggest that [Watson's testimony] was not worthy of belief or it was incredible." App. 278. The district judge did not examine the file and instead sealed it based on the government's false representation alone. App. 279.

When the file was unsealed and made available to the defense over a decade later, the government's representations were shown to be knowingly false. The file contains lengthy letters from Watson to the AUSA in Greenbelt that detail and

acknowledge the many occasions on which Watson lied to investigators.  *See e.g.*, App. 1178, 1181 ("Had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed. . . . There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done."  In another letter he admitted again to lying and went on to say "I have stated to you that "yes," I have lied [,] schemed and connived at times to obtain my way or freedom.".  App. 1210.   In another letter, Watson begged for an opportunity to reduce his sentence and promised the prosecutor that he would "cooperate and do exactly as you say." App. 1198.  The prosecutor herself noted that "Mr. Watson continues to undermine his own credibility as well and his ability to follow directions from the government." App. 1203.

The government's misrepresentations prevented the defense from revealing the true reason Watson did not receive a § 5K1.1 letter: the government found him not credible.  The government not only withheld this valuable *Brady/Giglio* and Jencks Act material but also lied to avoid disclosure.  This was not a minor issue or witness; Watson was central to Sweeney's supposed confession and bolstered James Montgomery's damaging testimony.  The government's misrepresentations on this matter could also have been used to cast doubt on the government's representations that it did not send Watson, a federal prisoner, to a state facility for the purpose of obtaining incriminating statements from him, App. 258-260, which the defense

could have offered to show a pattern of untruthful activity by Watson as a repeat jailhouse informant.  App. 266-270.

### 2) Montgomery: The government hid evidence of ever-shifting stories.

The sealed material revealed that the government also hid evidence undermining the credibility of James Montgomery—evidence that the defense had repeatedly sought.  The sealed material included notes of Agent Lisi showing that Montgomery initially lied to Agent Lisi about the murder of Timothy Benton and was ultimately charged himself, along with Maurice Proctor, of the murder for which he fingered Carson.  Agent Lisi's withheld notes reveal this falsity.  *See* App. 1273. ("1994 Chin [Carson] borrowed Grey Cadillac Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.").   Because this information was withheld and not available to the defense until over a decade after trial, the defense was unable to use it to discredit Montgomery by demonstrating his (1) proclivity for lying and (2) ulterior motive to protect himself from criminal prosecution through the false incrimination of others—exactly the conduct the defense asserted Montgomery was engaged when he implicated the Appellants in crime after crime based solely on his own testimony.

The government also sought to protect Montgomery from legitimate attacks on his credibility by suppressing evidence concerning government witness Arthur Rice. On April 24, 2001, defense counsel unsuccessfully requested the FBI 302 interview reports generated from the government's interview of Arthur Rice.  App. 469  Rice

was a jailhouse informant who the government contended was an associate of Sweeney. The unsealed material revealed that Rice told Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that Rice was present at the murders of Leonard Hyson and Maurice Hallman and had witnessed *Martin* and Carson fleeing the scene. *See* App. 1237. The government's theory of the case, however, presented through Montgomery's testimony at trial, was that *Montgomery* and Carson had killed Hallman. App. 325-326, 413-14.

The suppression of Rice's 302 interview notes precluded the defense from pointing out these inconsistent statements from witnesses who had clear motives for trying to curry the government's favor. Initially withheld interview notes from December 22, 1997, in which Andre Murray told prosecutors that Jakie "Boy" Burks had brought some New Yorkers in from out of town to murder Leonard Hyson and Maurice Hallman, further undermined Montgomery's testimony that he and Carson committed the murders, and Rice's statement that he had seen Martin and Carson fleeing from the scene. App. 1277. The government also knew that Montgomery had falsely accused Carson of killing Paul Ridley, a crime for which the government had already convicted Steven DeWitt. *See DeWitt v. District of Columbia*, 43 A.3d 291 (D.C. 2012) (noting that DeWitt was convicted on May 13, 1991).

> **3)   Butchie Smith: The government hid evidence of other suspects in the Butchie Smith murder while falsely stating it had none.**

The undisclosed material from Smith's murder investigation revealed significant evidence pointing to others being responsible for the crime, which would have undercut the government's ability to admit Smith's hearsay testimony. At the September 27, 2000, hearing the government represented that "we don't have any such information" that anyone other than the Appellants wanted Smith murdered. App. 145-147. The trial court had admonished that "if the government has any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as *Brady* material." App. 144. Despite the government's unambiguous statement, and the trial court's clear warning, one of the previously sealed documents revealed that the government had stated expressly that "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." App. 1259. In addition, a collection of interview notes with government informant Andre Murray pointed to another individual, known as Petey Johnson or "Fat Petey," as the real killer. App. 1270. None of this was available to the Appellants until after they gained access to the sealed material after June 2010.

**4)    Pinckney and Owens: The government misrepresented its relationship with Pinckney and Owens to keep them from testifying about another suspect in the triple murders.**

As noted above, the unavailability of Pinckney and Owens to testify at trial meant that their exculpatory evidence regarding the Appellants' lack of involvement in the triple murders could not be introduced.  The government not only denied knowing the whereabouts of Pinckney and Owens but also falsely claimed that they had fled with government funds provided for their relocation shortly after their grand jury testimony.  *See* App. 628

In reality, the payments continued through the trial and direct appeal of this case.  *See* App. 1766-68.  This was discovered when Carson's counsel hired a licensed investigator well after trial  who located Owens in Florida, where she said she had been relocated by the government about seven months after she and Pinckney testified in the Prince George's County case that Dennis Green had committed the triple murders.  The government continued to move Pinckney and Owens at least ten times during the six months after their testimony, paying their expenses, and then finally  moved them to Florida, again paying their expenses and their rent.  App. 1767.  Thus, at the time the government was denying knowledge of Owens and Pinckney's whereabouts, it was simultaneously paying and relocating them.  Carson moved for discovery into these payments and into the government's involvement in the relocation of these witnesses and knowledge of their whereabouts

during the briefing of his Supplemental § 2255 motions, *see* App. 1058, but the motion was not acted upon. *See* App. 131 (request for ruling two years later, no later ruling shown on docket sheet).

> **5)** **Bender: The government failed to disclose evidence that would have allowed impeachment of Charles Bender.**

Charles Bender's testimony at trial significantly influenced the conviction of Carson, Sweeney and Martin for first-degree murder. However, the reports of Bender's earlier conversations with the government showed that Bender had only implicated Martin. App 1369, 1379. This discrepancy between his initial statements and his trial testimony went directly to the reliability of his testimony and is yet another example of a key government witness making a critical change in testimony unbeknownst to the defense at trial and for many years thereafter.

> **6)** **Wilson: The government withheld evidence of Martin's innocence in the Anthony Fortune murder.**

The government's reliance on cooperating witnesses to secure Martin's conviction for the murder of Anthony Fortune was fraught with inconsistencies and, crucially, the withholding of exculpatory evidence. Charlene Wilson's trial testimony, as a paid informant and the sole purported eyewitness presented by the government on the Fortune murder, contradicted ballistic evidence and her initial statement to the FBI. App. 280-290, 545-546. Further undermining the government's narrative, other cooperating witnesses provided differing versions of

Martin's purported involvement, with some claiming he confessed to the shooting, others stating the gun jammed, and one even attributing the murder to Carson. App. 294-295, 465-466, 473, 474. The government's failure to disclose the existence of Steven Thomas, an eyewitness who could have contradicted Wilson's account and exonerated Martin, further exacerbated the due process violation.

The government also suppressed the whereabouts of James Coulter, the victim in the May 30, 1995 shooting for which Martin was charged. The prosecution failed to produce Coulter as a witness and Coulter thus never testified at trial. The prosecution even went as far as to tell the Court that it had no knowledge of Coulter's whereabouts, despite the fact that Coulter was under government supervision at the time and easily locatable. *See* App 575-577. Coulter, who had previously informed a defense investigator that Martin was not the shooter or that he did not know who shot him, would likely have exonerated Martin if he could have been subpoenaed. App. 296-297. The government misled the court regarding its inability to locate Coulter, thus depriving Martin of the opportunity to present exculpatory evidence that could have significantly impacted the outcome of his trial.

### C.    The District Court's § 2255 Decision

The district court did not reach the merits of Appellant's *Brady/Giglio* claims, finding them to be time-barred.  The district court thus denied all Appellants' § 2255 motions in their entirety, *United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021), and denied Appellants' subsequent requests for certificates of appealability, *United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022).

### VI.    The § 2255 Proceedings in This Court

After being denied certificates of appealability by the district court, Appellants sought certificates of appealability from this Court.  This Court granted Appellants' motions in part on December 23, 2022, inviting briefing on two questions:  (1) whether the government's allegedly improper withholding of certain materials submitted to the trial court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the trial court pertaining to that sealed material.  Document #1978935.

### SUMMARY OF THE ARGUMENT

This case is rife with problems.  Appellants, who have each now served approximately 27 years in prison, seek review of the denial of habeas relief for pervasive due process violations that should have never occurred.  Looking back on

App 1680

the record, which is filled with twists, turns, and gaping holes, many of which have only been revealed in the post-conviction years, there is a sense of tragedy.

The government made a lengthy presentation of evidence in this case, but it was not a fair trial given the severity of the government's violations. The government repeatedly withheld key exculpatory evidence and critical material for cross-examination, concealing its non-disclosure behind the trial court's *in camera* review procedures.  The eventual disclosure of the withheld information exposed these procedures as wholly inadequate in identifying the government's misrepresentations about the exculpatory nature of the material, preventing proper redress for its violations.  Worse, all signs point to the government having done so knowingly.

This is not a case in which the government failed to disclose some isolated pieces of *Brady* material held in the offices of some other investigative agency or where a failure of diligence might have led to an isolated administrative snafu.  The government made a repeated choice to err not on the side of disclosure, but on the side of withholding.  Time and again, the prosecution submitted materials under seal to the trial court, claiming there was no *Brady* material, in order to hide its nondisclosure behind the trial court's tacit blessing that it need not be disclosed. Coupled with a hostile trial court judge whose rulings led trial counsel at times to cower and render ineffective assistance rather than face potential personal consequences, this withholding severely hamstrung the defense.

App 1681

Since they were convicted Appellants have sought diligently to understand the *Brady* violations that they suspected had occurred but could not fully assess given that so much evidence had been filed *ex parte* and under seal.  When the full picture finally started to emerge, Appellants were ill-served by ineffective counsel on direct appeal, and the district court improperly relied on those counsel's failures (and other errors of law) to rule that Appellants' § 2255 motions should be rejected as procedurally barred.

What Appellants have continually asked for, but still have not received, is a full and fair assessment of the government's misconduct here and its effect on confidence in the verdicts.  If this Court undertakes that assessment, it will undoubtedly be troubled.  The pervasiveness of the government's conduct and its effect on so many key parts of the government's case easily meets what this Court has described as the "quite easily satisfied" standard that the withheld evidence "reasonably *could* have affected the verdict." *United States v. Butler*, 955 F.3d 1052, 1058 (D.C. Cir. 2020) (emphasis in original).  On this record, the only way to effectively right the government's wrongs is to vacate Appellants' convictions once and for all and order that the indictments be dismissed.  In the alternative, the Court should vacate Appellants' convictions and remand for a new trial, together with an evidentiary hearing to further develop the record of the government's misconduct.

**ARGUMENT**

**I.    The Government's Repeated Withholding of Exculpatory Information Submitted to the Trial Court Under Seal Violated Appellants' Due Process Rights.**

**A.    Standards of Review**

The Supreme Court's landmark *Brady* decision established that fundamental due process requires prosecutors to disclose evidence favorable to the defense and material to the defendant's guilt or punishment.  Evidence is "favorable to the defense" if it is exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 280 (1999), and is "material" if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Turner v. United States*, 582 U.S. 313, 324 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).  Favorable evidence includes both exculpatory evidence, which directly points to innocence, and impeachment evidence, which undermines the credibility of prosecution witnesses. *United States v. Baxter*, 761 F.3d 17, 23–24 (D.C. Cir. 2014).  The Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667 (1985)); *see Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) ("[E]vidence that has any . . . impeachment value is, by definition, favorable.").

With respect to materiality and prejudice, the question is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "In other words, the undisclosed evidence must raise a 'probability sufficient to undermine confidence in the outcome.'" *United States v. Robinson*, 68 F.4th 1340, 1348 (D.C. Cir. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Notably, the applicable "'reasonable probability' standard . . . is not a particularly demanding one," and *Brady* and its progeny require reversal if the undisclosed evidence might have caused "even one juror" to "harbor[] a reasonable doubt as to the defendant's guilt on any count." *Id.* (citations omitted); *see also, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("To prevail on [a] *Brady* claim, [a claimant] . . . must show only that the new evidence is sufficient to 'undermine confidence' in the verdict.") (citation omitted); *Robinson* at 1348 ("Had even one juror harbored a reasonable doubt as to the defendant's guilt on any count, the guilty verdict on that count could not have been returned.").

As this Court recently explained in the related context of alleged violations of *Giglio* and the holding of *Napue v. Illinois*, 360 U.S. 264 (1959), involving the government's knowing presentation of false evidence against a criminal defendant, which is subject to the same "reasonable likelihood" standard:

> That "'reasonable likelihood' standard does not require the defendant to show 'that he more likely than not would have been acquitted' absent the false statements. Rather, the defendant need show only that the false testimony 'undermines confidence' in the verdict. Thus, even if the false testimony '*may* not have affected the jury's verdict,' it is material if the evidence reasonably *could* have affected the verdict."
>
> So understood, the "reasonable likelihood" test "is quite easily satisfied." The standard is "strict" against the government, "not just because [the cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Indeed, we have described the reasonable-likelihood standard as establishing "a veritable hair trigger for setting aside the conviction," and as "mandat[ing] a virtual automatic reversal of a criminal conviction."

*United States v. Butler*, 955 F.3d at 1058 (emphases in original) (citations omitted).[5]

Assessing *Brady* violations, this Court "review[s] *de novo* the prejudice determination made by the district court, considering directly 'any adverse effect that the prosecutor's failure . . . might have had on the preparation or presentation of the defendant's case.'" *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015). The remedy for a *Brady* violation generally is a remand for a new trial;

---

[5] In *Giglio*, the Supreme Court made clear that the nondisclosure of evidence that would impeach the credibility of a key witness "falls within [the general *Brady*] rule." 405 U.S. at 154. A *Napue* violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.

however, dismissal may also be an appropriate remedy in certain circumstances, "where no other remedy would cure prejudice against a defendant." *United States v. Driscoll*, 984 F.3d 103, 109 (D.C. Cir. 2021) (quoting *Pasha*, 797 F.3d at 1129). "To uphold a verdict in light of a *Brady* violation, the evidence must be sufficient to show that there is no reasonable probability that the verdict would have been different." *Robinson*, 68 F.4th at 1348 (citing *Bagley*, 473 U.S. at 682).

This Court reviews *de novo* a district court's legal conclusions in denying a § 2255 motion. *United States v. Smith*, 104 F.4th 314, 321 (D.C. Cir. 2024). "When the district court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment," and the facts must be viewed "in the light most favorable to the § 2255 movant." *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).

**B.  The prosecution repeatedly and improperly withheld exculpatory material information from the defense by sealing the material under false pretenses.**

Throughout the course of the trial proceedings and for several years thereafter, the government withheld substantial volumes of critical information and evidence that was both material and favorable to Appellants. This was not some one-off mistake, but rather appears to have reflected a considered decision to tread close to, and at times over, the lines of due process. Rather than simply turning over the materials to the Appellants before or during trial, the government repeatedly

identified potential *Brady* material in *ex parte* filings under seal, and then sought to use an *in camera* review process to hide its nondisclosure. While it is at times unclear how extensive the trial court's review of this material actually was, that court was not in the position to fully assess the government's nondisclosures, both because it was not as familiar as the government with its own case, but also due to affirmative misrepresentations by the government as to its exculpatory value.

Appellants filed repeated motions and requests to unseal these materials and permit discovery into the *Brady* issues, but were rejected at nearly every turn— making it impossible for them to contemporaneously understand the full scope of what was being hidden. Now, due in part to the government's practices, the passage of time, and incomplete records, there is no assurance that all sealed materials and *Brady* violations have been revealed; but what has been revealed is plainly enough to "undermine confidence" in the outcome of the trial verdicts. *Wearry*, 577 U.S. at 392; *see also, e.g., United States v. Cloud*, 102 F.4th 968, 979–80 (9th Cir. 2024) (clear efforts at suppressing evidence establish a *Brady* violation).

The facts of this case go well beyond the application of *Brady* in the recent D.C. Circuit ruling in *Robinson*. There, where a nurse practitioner was convicted of prescribing a controlled substance without a legitimate medical purpose, this Court found that the prosecution's failure to provide two reports that demonstrated that the defendant had tried to discourage pill-seeking by patients could have raised

sufficient doubts in the eyes of jurors to constitute a *Brady* violation. *Robinson*, 68 F.4th at 1350. The Court found these to be *Brady* violations despite the suppression not rising to the level of "smoking-gun" exculpatory evidence. The *Brady* violations in this case are more numerous, the suppression more blatant and intentional, and the materiality is at least equivalent in degree to those in *Robinson*.

      **C.**    **The sealed material included ample and classic *Brady* material.**

For years, throughout the trial and the direct appeal, the government withheld multiple documents and other information plainly favorable to Appellants. Much of the material significantly undermines the testimony of the government's central witnesses in the case or, at the very least, raises serious questions about their credibility. Broadly, the documents and information can be grouped into three categories: (1) documents revealing evidence of alternative theories of key charged crimes; (2) documents regarding acknowledged lies by government witnesses; and (3) information revealing benefits provided to government witnesses. In each instance, the violations were endemic and willful. All that is needed to establish a *Brady* violation is that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," and the government's actions here easily surpass that threshold. *Cloud*, 102 F.4th at 979 (citation omitted).

### 1)    Documents regarding alternative theories

For witness after witness, the government knowingly withheld prior notes and interview memos that contained indicia that the government's theory at trial was wrong—or at least that there were alternative leads and evidence, and inconsistent accounts, that should have been pursued and subjected to cross-examination. *Comstock*, 786 F.3d at 708–09 ("Once the prosecutor acquires favorable information, [ ] if she . . . fails to communicate it to the defendant, evidence has been suppressed.").

For example, the government refused to disclose, and the trial court refused to unseal, substantial *Brady* information about the murder of Robert "Butchie" Smith, a crime that formed a key aspect of the government's case against all Appellants. Although the government's theory and argument at trial was that this murder was committed by Carson, the government withheld *Brady* information pointing to other suspects.

Specifically, the government withheld and filed under seal at least two separate sets of evidence pointing to other individuals as having been responsible for the murder: (1) conformation that the investigation had identified two separate individuals, Andre Chappell and Anthony Hawkins, as having been responsible for the murder, which the government disclosed to the trial court (but never to the defense) in an *ex parte* motion, App. 1259; and (2) a collection of notes from

interviews with government informant Andre Murray reporting rumors that another individual (Petey Johnson, also referred to as "Fat Petey") had been the person who killed Smith. *see* App. 1270. These statements were particularly material given that Special Agent Lisi testified at trial that Johnson was present at the time of Smith's murder and had initially been picked up by the police as a possible witness to the murder. App. 535-536.

Carson was accused of Smith's murder—a crime that formed, in part, the basis of the racketeering conspiracy against all Appellants. The government, however, did not turn over this highly relevant evidence pointing to other individuals as the killers. Th government instead provided the materials to the trial court, which erroneously found that "they contain nothing that could be characterized as either Jencks Act or *Brady* material," and placed them under seal. *See* App. 229-230. The trial court either overlooked the *Brady* and Jencks Act material or was simply unable to properly evaluate its significance, and its conclusion was entirely incorrect. In any event, the obligation to evaluate and turn over *Brady* material was the government's, and it was not fulfilled. This resulted in a violation of Appellant's due process rights to have that material, which was of obvious value to their defense.

In Sweeney's first Motion to Compel Discovery the defense specifically asked for "[a]ny information which has come to the attention of the government from any source indicating that persons other than the defendant may have caused or have

been responsible for any of the offenses alleged in the indictment." App. 578 (ECF 71), filed February 9, 1999, at 3.  The Government responded that it had "seen the investigative file" and that "there was not any information that would exculpate Mr. Sweeney."  App. 579.[6]

Again, this cannot be excused as an oversight or something that Appellants bear responsibility for not obtaining.  At the very first hearing on the government's motion to admit Smith's statements as hearsay, held on September 27, 2000, the defense requested that the government produce any evidence that it had about others who might have wanted to kill Smith.  App. 145-147.  The government responded, both to the trial court and to the Appellants, that it had no information that anyone other than the trial defendants in the case wanted Smith dead:

> **MS. CHATURVEDI**:  Certainly, your honor.  If I could just address this briefly.  Again, it is sort of a leap of faith.

---

[6]  Four attachments to Sweeney's February 9, 1999 motion detailed prior Brady/discovery requests.  *See e.g.,* App. 588-596 (November 17, 1998 nine-page letter detailing Brady/discovery requests); App. 597-98 (January 19, 1999 letter to AUSA Wainstein making the specific Brady demand related to James Montgomery); App. 599 (January 29, 1999 (letter to AUSA Wainstein reiterating counsels' need to obtain the requested information pertaining to James Montgomery); App, 600-01 (_; February 1, 1999 (record of a telephone conversation with AUSA Wainstein to address the investigative materials related to James Montgomery.  AUSA Wainstein told counsel that he had seen the investigative file and there was not any information that would exculpate Sweeney).  App. 579.  Additional motions included efforts to obtain records from the Bureau of Prisons, see Ex Parte Motion under Seal to Require the Federal Bureau of Prison to Fully Comply with Defendant's Subpoena to Produce the Prison Records of Robert Smith, filed on September 6, 2000.  *See* App. 55.

If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive.  That is one leap of faith.

**THE COURT**:  Sure.

**MS. CHATURVEDI**:  And the second one is[,] is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith.  There is no such evidence.  If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals.  The *Winfield* case, which is the most recent case on that point, says you can't just draw a blank.  You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that.  I will provide --

**THE COURT**:  I Agree.  There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

**MS. CHATURVEDI**:  Right.  **And we don't have any such information.  And we recognize that if we did have such information and that steps had been taken to give that, that would be *Brady* information.**  That would have been disclosed as *Brady* information.

**THE COURT**:  Yes.

App 145-147. (emphasis added).

The government's statement that it had no information that someone other than the defendants had been implicated in the murder of Smith was demonstrably false.  The government was aware, at least as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of

Smith.  On that date, the government filed an *ex parte* notice, which the court sealed on April 6, 1999,[7] in which it stated, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith."  *See* App. 1259. [8]

A separate but related instance of the government's concealment of evidence of an alternate theory as to the Smith murder is found within the material submitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the handwritten notes relating to an interview of Andre Murray (who testified for the

---

[7] None of the material obtained pursuant to the Court's Order to unseal appeared in the docket in the district court until the Appellants obtained access to it in June 2010 and then cited it in their supplemental § 2255 petitions.

[8] The government's motion does not elaborate on the evidence in its possession that led to the identification of these two individuals as those responsible for Smith's murder.  Accordingly, Appellants request that if this Court orders any further proceedings, they include additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the government based its statement would itself be discoverable under *Brady*, and likely provide further evidence that the government's misrepresentations and discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound.  Sweeney requested in the district court any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith, and cited the facts above as "good cause" for discovery of the requested material.  *See Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.")).

government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson.

The notes of that interview state, in part:

> Wit. Heard Gooch telling Draper [Sweeney] to kill Keith [Keith was Petey Johnson's brother] Wit. did not hear Draper return to advise Gooch he had killed Keith. He just heard Gooch give the order.
>
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper – a mere rumor.

App. 1270. According to the long-sealed witness notes, the theory was that Petey Johnson had killed Smith to punish Sweeney for having killed Johnson's brother Keith.

The significance of the government's suppression of the motive of Petey Johnson to kill Smith becomes more significant in light of the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
>
> Q. How about Petey Johnson? Did you pick him up?
>
> A. Yes, sir, because it was believed he was a witness.
>
> Q. To Robert Smith's murder?
>
> A. Yes, sir.
>
> Q. Okay. And you questioned him not just as a witness, but as a possible suspect?
>
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away,

> we believed, at the time "Butchie" was killed.  So he may have called somebody to alert them that "Butchie" was there.

App. 535-536.

Agent Lisi was able to deflect the question as to whether Petey Johnson was a suspect rather than a witness because the government withheld from the defense evidence that Johnson might have had some role in Smith's murder and a motive to kill Smith that he might have told others about.  And the government believed Johnson was present at the time of Smith's murder.

The government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith was further shown during cross-examination of Agent Lisi, when the government objected to questioning about whether any suspects other than Sweeney had been developed as leads in Smith's murder.  App. 537-541.  At sidebar, the government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney.  If Mr. Kiersh wants him to repeat it, that is fine." App. 539.  The government knew the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder because this material had not been turned over to the defense.  *See also* Gov't Omnibus Opp'n, filed Aug, 18, 2000 [ECF 360], at 74-75 (referring to request for

information as to others with a motive to kill Smith as a cooperating witness as a "fishing expedition" and "speculation," and asserting that the government had no such information even though it did).

There is no rational basis on which the government could not consider these credible alternative leads, backed by a government agent, as core *Brady* material in a murder case. Evidence of other suspects is necessarily exculpatory: "*Brady* requires the prosecution to produce evidence that someone else may have committed the crime." *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir. 1984) (citation omitted). *See also Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1225 (9th Cir. 2015) ("[A]lternative suspect evidence . . . [falls] within *Brady*'s scope. "); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 834–35 (10th Cir. 1995) (police report and statements containing information indicating the guilt of an alternative suspect was "material" under *Brady* and "nondisclosure of this evidence altered and affected [the defendant]'s preparation and presentation of his defense at trial"); *Miller v. Angliker*, 848 F.2d 1312, 1321 (2d Cir. 1988) (granting habeas relief on *Brady* claim, noting that "there [cannot] be any question" that evidence that "murders might have been committed by [another suspect] rather than" the defendant was "'clearly' and obvious[ly]' exculpatory of the defendant") (alteration removed).

Regardless of the government's ultimate belief as to its initial theory or as to Murray's accusation, due process mandated that the prosecution share all leads with

the defense.  Appellants had the right to investigate these leads to gather evidence, challenge the admission of Smith's hearsay testimony, or use that evidence for cross-examination.  *Strickler*, 527 U.S. at 280 (holding that suppressed evidence is deemed material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

A second example relates to James Montgomery—who, as noted above, was the government's star cooperating witness and spent 10 days on the witness stand. *See* pp. 11-21, *supra*.  The government never released to the defendants Agent Lisi or AUSA Peter R. Zeidenberg's notes as to their interviews with Montgomery, choosing instead to offload its obligation onto the trial court, whose conclusion that they were not *Brady* or Jencks Act material proved demonstrably wrong once those notes saw the light of day.  *See* pp. 26-27, *supra.*

The notes of the government's meetings with James Montgomery reveal shifting stories, all of which undermine confidence in the accuracy of his eventual trial testimony.  For instance, Agent Lisi's interview notes show that Montgomery changed his story about the murder of Timothy Benton.  At trial, Montgomery vividly recounted that he was driving with Proctor and Benton when Proctor shot Benton in the head.  Montgomery claimed to have pushed Benton out of the car and ran him over, before Proctor got out of the car and shot Benton again.  App. 360-

365. However, notes from later interviews tell a different story—that Montgomery initially implicated Carson as one of the perpetrators. *See* App. 1338.

While the trial court might not have been able to fully grasp the extent to which these notes undermined the government's theory of the case, the government should have recognized the exculpatory value of this material and had no such excuse. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. Thus, the prosecution has a duty and obligation under *Brady* "not only . . . to disclose exculpatory information, but also . . . to search possible sources for information," including "files in the possession of agencies other than the prosecutor's office" and "maintained by branches of government 'closely aligned with the prosecution.'" *United States v. Brooks*, 966 F.2d 1500, 1502–04 (D.C. Cir. 1992). "The prudent prosecutor will resolve doubtful questions in favor of disclosure." *Kyles*, 514 U.S. at 439 (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("The basic import of *Brady* is . . . that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness.") (citation omitted); *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) ("Prosecutors may not simply claim ignorance of *Brady* material.").

As a third example, the government refused to disclose a collection of prior statements by government witness Charles Bender, which again told a very different story of various crimes from what he ultimately recounted at trial.   Bender was a key witness for the government in providing testimony about the Anthony Fortune murder.  Although Bender's testimony at trial was used to implicate (and ultimately convict of first-degree murder) *both* Carson and Martin, *see* App.451-454, 712, long-withheld 302s revealed that Bender had previously told the government that only Martin had been responsible for the murder.  *see* App 1369, 1379.

This discrepancy was favorable and material not only to Carson, but also to the other defendants, whose guilt for the racketeering conspiracy was linked to the Fortune murder, and even to Martin, because they could have used the shifting stories to attack Bender's credibility and that of the investigation more broadly.  *See* p. 44, *supra.  See United States v. Bundy*, 968 F.3d 1019, 1045 (9th Cir. 2020) (affirming dismissal with prejudice of indictment as to four defendants where government withheld exculpatory *Brady* evidence that substantiated allegedly false statements made by two defendants, which were central to the government's case against four defendants).  The discrepancy, once again, should have been plain to the government.  Buried in a stack of 302s filed *ex parte* and under seal without context, the trial court could perhaps be excused for its error in not recognizing it as *Brady* material, but the trial court too had an obligation to at least question what was

in these many sealed prior statements of key government witnesses. That the government failed its obligation is beyond question.

### 2) Documents regarding acknowledged lies by government witnesses

Although the various sealed witness notes and interview memos described above all serve as examples of the government improperly withholding indicia of changing testimony and alternative facts, a separate set of materials arguably stands alone: the government's willful refusal to provide *Brady* material regarding the credibility and motives of cooperating witness Theodore Watson, who had repeatedly acknowledged to the government in writing his own history of duplicity.

As noted above, Watson was a cooperating witness who had been separately convicted in the district court in Greenbelt, Maryland, but who had puzzlingly not received a § 5K1.1 letter from the government outlining his cooperation for sentencing purposes. Cross-examined on the issue at trial, Watson claimed the U.S. Attorney's Office refused him the letter because the prosecutor assigned to the case "made it very clear she did not like me and she didn't want to give me anything." App. 264.

Watson attempted to provide a reason that the prosecutor might not like him, trying to make it appear that she was angry with him for having made her look bad in front of another Assistant U.S. Attorney:

> **Q.** Sir, what was the substance of the conversation that day?
>
> **A.** Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler. Sandra Wilkinson was the district attorney who was prosecuting my case. When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team. And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly." And I explained to her some things that happened in her case – two of the cases she was prosecuting. And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?" And I looked at Ms. Wilkinson and I looked at my attorney. I said, "I told you this months ago before you did that." She just looked at Ms. Wilkinson, and that was the end of it.

App. 271.

At the conclusion of the court proceedings on February 12, 2001, the defense made the following request:

> **MR. DAVIS**: And I would ask that the United States Attorney's Office review that file.
>
> **THE COURT**: If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file. Other than that --
>
> **MR. DAVIS**: Thank you, your Honor.
>
> **THE COURT**: -- that's the extent of the government's obligation. Okay?

App. 274.

The following day, the government represented that it had obtained Watson's file from the U.S. Attorney's Office in Greenbelt, and the following exchanges occurred:

> **MR. ZEIDENBERG (AUSA)**: Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature**. Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have the file, and I don't know if the Court wishes to have it to peruse. There are letters --
>
> **THE COURT**: You mean the file from Greenbelt?
>
> **MR. ZEIDENBERG**: Yes. There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.
>
> **THE COURT**: Do you want to have it made part of the court record?
>
> **MR. KIERSH**: Yes, your Honor.
>
> **THE COURT**: All right.

**MR. KIERSH**: I ask that it be placed under seal and made a part of the record.

\*     \*     \*

**THE COURT**: Number 5. All right. Number 5. **I do not intend to review it in camera.**

**MR. ZUCKER**: That would be my request.

App. 278-279 (emphasis added).

Despite the government's assurances, and the trial court's full reliance on those assurances, the material in the Greenbelt file unquestionably goes directly to Watson's credibility as a witness. The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible appears to go beyond an error in judgment and to have been a deliberate falsehood.

The Greenbelt file was included in the material obtained by counsel after the record was unsealed in this case and the material started to be made available in June, 2010. It contains copious amount of evidence that Watson chronically lied and schemed in pursuit of a sentencing departure, and that, contrary to its representations at trial, that the government was well aware of his untrustworthy nature as Watson referenced it on several occasions. The file contains several lengthy letters from Watson to AUSA Wilkerson in Greenbelt detailing the many occasions on which he lied to investigators. For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second opportunity" to cooperate and help myself. I abysmally apologize for the asinine [sic] way I conducted

> myself when the option was presented to me. **Had I just simply complied and told you the truth at our initial meeting,** I would have avoided the unnecessary mental anguish that entailed. . . . **There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done**."

*See* App. 1178, 1181 (emphasis added). Watson went on to note several prominent politicians who had lied, stating, "There is no way I am comparing myself with these figures other than a liar is liar regardless of who they are." App. 1210.

Another letter reveals that not only was AUSA Wilkerson well aware that Watson was a liar, but also that she hesitated to continue cooperation with him due to his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the first conference and thereafter. Ms. Wilkerson, **again I apologize and confess that at our first conference, I lied and somewhat distorted the truth regardless of my reasoning**. . . . Before I attempt to put the matter in its real perspective and sequence, again **I would like to touch briefly on your view towards me as a liar… I believe that I have stated to you that "yes," I have lied [,] schemed and connived** at times to obtain my way or freedom. . . . In reference to me attempting to secure assistance on my own in an effort to help myself, Ms. Wilkerson, you advised [my attorneys] that you did not want to hear or discuss anything for or about me, and you did not want to see me until trial.

*See* App 1209-1210 (emphasis added). A third letter, written just after his sentencing hearing, at which the government declined to file a departure letter and he was

sentenced to 105 months' incarceration, reveals Watson's desperation and willingness to do anything in pursuit of a sentence reduction:

> I could have made a lot of cases from the street, but that was not to be. But with your blessings, I wish to try to do as much as possible from within. I do have pertinent information for other prosecutors at the moment. One case involving a multi-kilo drug dealer and "hit man." **I will cooperate and do exactly as you say.** I just hope and pray that I do and give enough to be afforded a sizable downward departure.

App. 1198 (emphasis added).

AUSA Wilkinson also wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well and his ability to follow directions from the government." *See* App. 1203 (emphasis added). Watson's repeated admissions that he lied to AUSA Wilkinson and his further statements that lying is an instinctive part of human nature fundamentally impeach his credibility and reliability as a witness.

Once the government had reviewed Watson's Greenbelt file, it should have taken steps to correct the testimony of Watson as to the reason he was not given a § 5K1.1 letter in Greenbelt, and certainly should have disclosed the material to defense counsel. It was not because Wilkinson did not like him, and it was not

because Watson had made Wilkinson look bad in front of another AUSA; it was in fact the result of Watson lying to her and admitting that he saw nothing wrong with lying to help himself out of a tight spot.

Instead of doing this, the government misrepresented to the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." App. 278. That statement, by a government officer representing that the government had reviewed the Greenbelt file, is shocking. The course of action pursued by the government can have only one of two explanations: an astounding lack of diligence, or a deliberate lie. In either case, it was a due process violation. As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . .

*Brady*, 373 U.S. at 87–88 (citations omitted).

The trial court's reliance on the government's representations regarding the contents of the Greenbelt file is made clear by its statement that, "I do not intend to review it in camera." App. 279. The trial court thus did nothing to cure the government's violation. As a result, it would be years before the Appellants learned the truth.

### 3)   Information regarding government benefits provided to witnesses

The last category of withheld *Brady* information is similarly troubling and further contextualizes the misconduct of government counsel with respect to its disclosure obligations throughout trial. The government withheld information related to the improper payments to, and hidden locations of, two one-time government witnesses, John Pinckney and Cheree Owens, whom Appellants were unable to call for their own defense at trial.

Years before the trial in this case, Pinckney and Owens had testified under oath in front of a state-convened grand jury in Prince George's County, Maryland about the triple murder committed in November 1996. App. 149-150. Although Carson, Coates, and Sweeney would each ultimately be convicted of this triple murder at trial (and the crime formed, in part, the basis of the racketeering conspiracy against all Appellants), *see* App. 712, Pinckney and Owens had testified before the

grand jury on December 10, 1996, that Dennis Green—and not any of the Appellants—had committed the triple murders.   App. 149-150.

When Appellants were unable to locate Pinckney and Owens to testify in their defense at trial, the government represented that it too was unable to locate them. Accordingly, Appellants attempted to introduce Pinckney's and Owens's grand jury testimony from the Prince George's County case under the hearsay exception for former testimony of unavailable witnesses.  *See* Fed. R. Evid. 804(b)(1).  *See* App. 617-20, 626.   But the government opposed and argued adamantly against the admission of the grand jury testimony, including on the grounds that Pinckney and Owens were unreliable and untrustworthy, having absconded with government funds (which had purportedly been provided for relocation) shortly after their grand jury testimony.  *See* App. 628.   The trial court ultimately denied Appellants' request to introduce Pinckney's and Owens's testimony, finding that the United States was not a party to the state grand jury proceedings and there was insufficient evidence that the Maryland authorities were used or "effectively controlled" by the federal authorities.   On direct appeal this Court affirmed that finding as not an abuse of discretion.  *See Carson*, 455 F.3d at 376–81.

Once Appellants were finally able to get all of the information, a much different story was revealed.  In 2014, after she was located by a private investigator, Owens explained that the FBI had moved her and Pinckney around to numerous

locations and paid them significant sums of money after their grand jury testimony. Once they were moved, neither Pinckney nor Owens ever heard from the FBI or federal government counsel again. *See* App. 1766-68. In other words, rather than having absconded with government funds and disappeared after their grand jury testimony, unable to be located again (including to testify at trial), it appears that Pinckney and Owens were *deliberately* moved by the federal government, which then either lost track of them or consciously decided not to disclose their location or make efforts to find them.

This bootleg witness-protection charade stood in sharp contrast to the government's protestations and representations at trial, when (in arguing against the admission of their testimony) the government not only (A) painted a picture of Pinckney and Owens as an unreliable and untrustworthy pair who absconded with government funds and could not be found but also (B) expressly and repeatedly disavowed any federal influence or control over the state grand jury process or authorities. *See* App. 628. That tale was patently false. Even if the federal government had reached some kind of behind-the-scenes "determination" that Pinckney and Owens were no longer trustworthy, this was information that the government should have made available to the defense. And the federal government's exercise of control over the physical and financial wellbeing of Pinckney and Owens in the immediate aftermath of their state grand jury testimony

severely undermines the government's insistence in successfully arguing at trial and on appeal that the federal government was not involved in the state grand jury proceedings or investigation into the triple murder, that the state authorities acted alone, and that the federal authorities thus could not be hampered by *Brady* material stemming therefrom. It calls into question whether Pinckney and Owens were actually unable to be called to testify at trial or—if they truly were unavailable— whether their grand jury testimony should have been admitted under Rule 804(b)(1).

The government's tactics in hiding away Pinckney and Owens and its misrepresentations to Appellants and to the trial court precluded Appellants from accessing their testimony, further undermining confidence in the fairness of their trial.

> **D.     The trial court's failure to meaningfully address the government's repeated failures to make disclosures required under *Brady/Giglio* and the Jencks Act provides further grounds for relief.**

The disclosure obligations set out in *Brady*, *Giglio*, the Jencks Act, and the Justice Department's own Criminal Resource Manual ("CRM") § 9-5.00 all fall on the government, and it is the government that is ultimately responsible for any nondisclosure. A trial court acting in a proper supervisory role can, however, help to ensure the government's obligations are met. In this case, the trial court was entirely ineffective in addressing the government's nondisclosures. It allowed the government to file materials under seal rather than disclose them even where the

App 1710

material plainly should have been turned over, and failed to follow the procedures

this Court has set out for *in camera* review where there is some legitimate question

as to the disclosure obligation. While the trial court's errors in judgment and as to

the applicable legal requirements do not excuse the government's misconduct, they

allowed it to continue unchecked and thus bolster Appellants' entitlement to relief.

As set out above, the government repeatedly assured the trial court that it had

met its disclosure obligations, often mispresenting the contents of the materials at

issue. And rather than simply turning over what proved to be—once finally

disclosed to the defense—obvious and powerful *Brady* or Jencks Act material, the

government often chose instead to submit the materials under seal to the trial court.

*See* pp. 26-31*, supra*. This procedure is appropriate only "when it is doubtful

whether the production of a particular statement is compelled." *Palermo*, 360 U.S.

at 354. *See also Dennis v. United States,* 384 U.S. 855, 874–75 (1966) ("The

determination of what may be useful to the defense can properly and effectively be

made only by an advocate.").

The frequent use of the *in camera* procedure in this case as to matters that

were anything but doubtful, rather than simply turning the material over to the

defense, is further evidence of the government's failure to meet its disclosure

obligations. *See Brooks*, 966 F.2d at 1502–04 (emphasizing that it is the prosecutor's

responsibility to identify and disclose *Brady* material). The Supreme Court has

cautioned that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108. Because it is difficult to assess the materiality of evidence before trial, prosecutors are directed to take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439; *see also* CRM § 9-5.001.B.1. The trial court thus should not have received most of the submissions *in camera* to begin with; instead, the material should have been promptly and timely turned over to the defense, and the trial court should have so ordered rather than accepting repeated *in camera* submissions.

Faced with these repeated and in many cases inappropriate submissions, the trial court then compounded the problem by utterly failing to deal with them in any meaningful way. The trial court uniformly declined to direct the government to turn over potentially exculpatory material provided to it for review even when the most cursory review of the material reveals that it undoubtedly should have been turned over. In doing so, the trial court failed to keep a transcribed record of the *in camera* proceedings, failed to articulate a compelling interest for reviewing the *Brady* materials *in camera* to begin with, failed to make findings regarding the requested material, and failed to make a record to the defense indexing the material presented to the trial court, all of which are required by this Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir 1998). Instead, the trial court simply provided conclusory statements that there was "no *Brady,*" and made no other findings. *See, e.g.*, App.

229-30, 278.  And because the trial court kept insufficient documentation indexing the material presented but ultimately not disclosed to Appellants, the full record of these materials was not adequately preserved for this Court's review.

The trial court thus entirely failed to follow the requirements this Court has set out for *in camera* review.  This failure was particularly harmful because, as this Court has recognized, "*in camera*, *ex parte* submissions generally deprive one party to a proceeding of a full opportunity to be heard on an issue, and thus should only be used where a compelling interest exists."  *In re Sealed Case*, 151 F.2d at 1072 (cleaned up).

Had the trial court addressed these issues properly, it would have ordered disclosure.  The government would then have known that it had to make its required disclosures, rather than ignoring them or unloading the material on the trial court where, as the case went on, the government learned it would never be ordered to make such disclosure.  Rather than acting as a check on the government's repeated failures to meet its disclosure obligations, the trial court's actions encouraged them.

There were many instances of the trial court's failure to hold the government to its disclosure obligations.  As laid out at pp. 66-72 above, even the briefest review of the file of Watson's Greenbelt prosecution reveals that Watson repeatedly admitted to lying and that the government refused to grant him credit for testimony that it believed to be false.  Yet the trial court did not review this material to make

any determination as to what it contained and instead relied on the government's false representation that the file did not contain anything that even "suggests any *Brady* or Jencks material." App. 278-279. The trial court thus plainly neglected its "affirmative duty to determine whether any [Jencks Act] statement exists and is in the possession of the Government and, if so, to order the production of the statement." *Saunders v. United States*, 316 F.2d 346, 349 (D.C. Cir. 1963). Its failures to do so were clearly erroneous. *See also United States v. N. Am. Reporting, Inc.*, 740 F.2d 50, 55 (D.C. Cir. 1984) (remanding where the trial court failed "to engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production"); *Hilliard v. United States*, 317 F.2d 150, 151 (D.C. Cir. 1963) ("A trial judge is to conduct such inquiry as may be necessary to determine whether or not the conditions of the [Jencks] statute have been satisfied," remanding where no such inquiry was made); *United States v. Trevino*, 89 F.3d 187, 189-90 (4th Cir. 1996) ("Once the accused has made a plausible showing that the evidence would be both material and favorable, the trial court *must* review the information *in camera* to ascertain its true nature and determine whether it must be disclosed.") (emphasis added).

To take just a few additional examples, the trial court erred in sealing, rather than ordering the disclosure of, material relating to others with a motive to kill Robert "Butchie" Smith, specifically the government's belief that Andre Chappell

and Anthony Ricardo Hawkins had murdered Smith; that Petey Johnson, who was present at the murder of Smith, had a motive to kill Smith as he believed that Sweeney had killed his brother; and that Montgomery did not know that Carson had killed Smith but only thought he might have killed him or that Carson might have had Pug or BJ kill Smith.  App. 1363.  The trial court's suppression of this *Brady* material was especially harmful because it assisted the government's successful effort to allow Agent Lisi to testify to certain incriminating statements allegedly made by Sweeney to Smith under the hearsay exception of Fed. R. Evid. 804(b)(6).  "The government's burden to provide the defense with exculpatory evidence pursuant to [*Brady*] applies to a Rule 804(b)(6) hearing.  . . . a defendant's right to contest the government's Rule 804(b)(6) motion is an integral part of his right to a fair trial." *United States v. Rivera,* 412 F.3d 562, 569 nn. 6 &7 (4th Cir. 2005).

The government contended that Carson had killed Smith after meeting in the Prince George's County jail with Sweeney, who told him that Smith had implicated Sweeney, Carson, and Montgomery in the triple murder in Temple Hills, Maryland. After a September 27, 2000 hearing on the government's motion to admit Smith's statements as hearsay through Agent Lisi, the trial court declined a discovery request that the government produce any evidence it had that others might have wanted to kill Smith after the government stated in opposition that it had no such evidence, and the trial court accepted that representation without more.  App. 145-147.  The

defense was thereby deprived of any opportunity to challenge the government's theory that Sweeney and Carson had killed Smith, and of the opportunity to use the suppressed *Brady* material to cross-examine Agent Lisi and Montgomery at trial.

Trial testimony also disclosed that yet another of the government's witnesses, Ronald Sowells, had lied during his own trial, falsely implicating three people in murders they did not commit. *See* Tr. April 18 2001 at 22-24, 30-32, 83-85. Sowells had told the government about this before trial, but the government had not disclosed it to the defense, which only became aware of it while Sowells was testifying. *See* App. 1277. Rather than addressing the defense's protests that this was simply a further example of the government's ongoing failures to meet its *Brady/Giglio* obligations, the trial court noted that the witness had now acknowledged his prior lies in open court, and then went on to chastise *defense* counsel for supposedly "sit[ting] on [their] hands and do[ing] nothing" to find *Brady* material. *See* Tr. April 18, 2001, at 6.

Of course, the obligation the trial court sought to foist on defense counsel was the responsibility of the prosecution. *See California v. Trombetta*, 467 U.S. 479, 485 (1984) ("Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."). More fundamentally, the trial court's actions made clear to the government that it could avoid its disclosure obligations with

impunity, providing it no incentive to turn over exculpatory material. At most, the government would simply have to provide the material to the trial court, where it knew it would surely lie buried under seal. The trial court's failure to follow required procedures and its clearly erroneous determinations that the government did not have to turn over material it undoubtedly should have disclosed thus assured that the government's repeated disclosure failures would go unaddressed at trial.

The process that led to these repeated failures to disclose *Brady* and Jencks material also demonstrates the wisdom of the teaching in *Dennis* that the trial court is not in the best position to judge the value or usefulness of asserted *Brady* material, especially in a trial of considerable length and complexity. Had defense counsel been provided the material they would have readily seen its value for impeaching the government's witnesses and undermining its theories of the case.

### E.    The evidence strongly supports the conclusion that the *Brady* violations were willful.

Even a single *Brady* violation constitutes a due process violation that can require a new trial. *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion."). But as demonstrated above, this case does not present a one-off or isolated *Brady* infraction. Instead, in these proceedings the government stacked one violation after another, leaving a wealth of undisclosed *Brady* materials in its wake that was kept hidden from Appellants for almost a

decade.    As the Supreme Court has explained, "suppressed evidence [must be] considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

The quantity and severity of *Brady* violations in the present case goes well beyond those of another recent instance where this Court found *Brady* violations to have occurred. *See Robinson*, 68 F.4th at 1350. Here, the sheer number of instances where the government failed to fulfill its obligations under *Brady* shows a willful pattern of total disregard for the due process rights guaranteed under *Brady*. And the sampling of undisclosed *Brady* materials set forth above are almost certainly only a fraction of the total number of *Brady* violations that actually occurred in this case.[9]

---

[9] Appellants—through no fault of their own—are significantly hamstrung in even bringing this appeal, as large portions of the record continue to be unavailable because they have been apparently either lost or destroyed. Despite best efforts and repeated requests to prior defense counsel, the district court clerk, and the government, Appellate counsel has been unable to obtain trial transcripts for nearly forty days of the trial proceedings. Specifically, no transcripts have been located for the following court sessions, which include both testimony and argument sessions: 11/29/2000 PM, 01/08/2001 PM, 02/01/2001 PM, 02/14/2001 PM, 02/21/2001 AM and PM, 02/22/2001 AM and PM, 02/26/2001 PM, 02/27/2001 PM, 02/28/2001 PM, 03/01/2001 PM, 03/06/2001 PM, 03/12/2001 AM, 03/20/2001 PM, 03/21/2001 PM, 04/12/2001 AM and PM, 06/27/2001 PM, 06/28/2001 PM, 07/12/2001 AM, 07/16/2001 AM, 07/17/2001 AM and PM, 07/18/2001 AM and PM, 07/23/2001 AM and PM, 07/24/2001 AM and PM, 07/25/2001 AM and PM, 07/30/2001 AM and PM, 07/31/2001 AM and PM, 08/01/2001 AM and PM, 08/02/2001 AM and PM, 08/06/2001 AM and PM, 08/07/2001 AM, 08/08/2001 AM and PM, 08/09/2001 AM and PM, 08/12/2001 AM and PM, 08/13/2001 AM and PM, 08/14/2001 AM and PM, 08/15/2001 AM and PM, and 08/16/2001 AM and PM. And it is not merely

### F.   The pattern of withholding evidence prejudiced all Appellants.

To prevail on their *Brady* claims, Appellants "need not show that [they each] 'more likely than not' would have been acquitted had the new evidence been admitted"; instead, they "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry*, 577 U.S. at 392.  "[O]ne cannot be confident of the outcome when there is a 'reasonable' probability that it may be wrong." *United States v. Bowie*, 198 F.3d 905, 908–09 (D.C. Cir. 1999).  "[A]

trial court transcripts that have gone missing—there is no complete record of what was in fact filed under seal, and thus no assurance that everything has now been disclosed.

Given the government's documented pattern of *Brady* violations in this case, there can be little doubt the full record would only further shed light on the government's misconduct.  The absence of the transcripts, which are neither available at the clerk's office nor in the government's nor prior defense counsel's possession, is especially prejudicial to Appellants in the context of an appellate review of a pattern of alleged *Brady* violations over the course of a lengthy criminal trial.  *See Entsminger v. State of Iowa*, 386 U.S. 748, 751–52 (1967) (holding that states are required to make transcripts available to indigent defendants to ensure adequate and effective appellate review).  Where a transcript "might be critical to reviewing for alleged trial-court errors[,] affirming a conviction without one might be arbitrary," requiring vacatur of the conviction.  *Bush v. Sec'y, Fla. Dep't of Corr.*, 888 F.3d 1188, 1195–96 (11th Cir. 2018).

Accordingly, to the extent this Court is not satisfied that the convictions should be vacated and the indictments dismissed or that a new trial should be granted, the *Brady* remedy of a remand should be granted at least to the extent necessary to investigate the incomplete records as habeas counsel is now severely handicapped in fulling their duty to provide effective representation and to challenge the validity of Appellants' convictions.

'reasonable probability' can be less than 50.01%.  In other words, to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Id.* at 908–09 (D.C. Cir. 1999).  "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97 (1976).  *See also Cloud,* 102 F.4th at 980)("Whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here.").

The pattern of government misconduct in these proceedings deeply undermines confidence in the verdicts as to each Appellant and every count.  These "especially egregious errors" combined with the government's misrepresentations to the trial court, "so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993); *see United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) (prejudicial spillover requires vacating judgment on all counts when evidence presented in support of an invalidated count was "otherwise . . . inadmissible on the remaining counts" and "presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts").  The handling of multiple pieces of sealed evidence over

the eight-month trial undermines confidence in the entire verdict, far beyond the

withholding of individual pieces of evidence.

The government's *Brady* violations hamstrung Appellants throughout the trial

including these examples:

- They could not pursue alternative evidence, leads, and witnesses that had been hidden from them, which "clearly [would have] impacted the defense's preparation and presentation of its case at trial" and "dramatically altered and limited the effectiveness of [their] defense at trial" given that the knowledge of an alternative investigative lead both "would arguably carry significant weight with the jury in and of itself" and "would also have been useful in 'discredit[ing] the caliber of the investigation or the decision to charge the defendant[s].'" *Smith*, 50 F.3d at 830 (first citing *Bagley*, 473 U.S. at 683; then quoting *Bowen v. Maynard*, 799 F.2d 593 (10th Cir 1986)); *see also, e.g.*, *Fuentes v. T. Griffin*, 829 F.3d 233, 252 (2d Cir. 2016) (finding *Brady* violation when prosecution suppressed evidence that, if disclosed, may have permitted counsel "to develop [a] line of defense further by obtaining in time for trial [material] that was obtainable only after the belated discovery of the withheld [evidence]"); *Miller*, 848 F.2d at 1322–23 (concluding "that the withheld information [suggesting that another person might have committed the crime] was material within the meaning of the *Brady v. Maryland* line of cases"); *cf. United States v. Innamorati*, 996 F.2d 456, 480–81 (1st Cir. 1993) (no *Brady* violation when the defendant did not demonstrate "an avenue of investigation that would have been pursued had [the evidence] been disclosed earlier").

- They could not challenge government witnesses James Montgomery, Charles Bender, or Theodore Watson, among others, with their shifting stories and prior lies. *See United States v. Sedaghaty*, 728 F.3d 885, 903 (9th Cir. 2013) (*Brady* violation when prosecution failed to disclose notes indicating a shifting and possibly untruthful story "in light of the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case"); *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) ("[B]ecause of the value of cross-examination, when the credibility of a prosecution witness is important, impeaching evidence is subject to

*Brady* disclosure."); *Brooks*, 966 F.2d at 1504 (recognizing the importance of prosecution fulfilling its obligation to search for and disclose evidence "that may contain material exculpatory information (undermining the credibility of [the witness], either as a general matter or with special reference to this case)").

- They could not challenge Special Agent Lisi with his apparent bias and investigative tunnel-vision. *See Douglas v. Workman*, 560 F.3d 1156, 1172–73 (10th Cir. 2009) ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'") (quoting *Bagley*, 473 U.S. at 676); *Smith*, 50 F.3d at 830 (recognizing that knowledge of alternative evidence, investigative leads, and witnesses "would also have been useful in 'discredit[ing] the caliber of the investigation or the decision to charge the defendant[s]'") (citation omitted).

Appellants were even hamstrung in their legal arguments. Again, one of the more contentious issues at trial was whether the out-of-court statements of deceased witness Robert "Butchie" Smith could be admitted. Had it been revealed that there were multiple other credible suspects for Smith's murder, *see* pp. 12-14, 29-31, 55-66, *supra,* the trial court may well have held that Smith's statements were inadmissible hearsay. Likewise, had it been revealed that the federal government was gatekeeping prior grand jury testimony (and potential live trial testimony) from two other paid government witnesses and lying about their whereabouts and availability, *see* pp. 43-44, 73-76, *supra,* then the trial court may well have decided that the government could not have it both ways and decline to admit Smith's testimony. Because of the prior *Brady*, *Giglio*, and Jencks Act violations, the due

process impact on Appellants was compounded, and the testimony was admitted unrebutted.

Given the pattern and significance of the *Brady*, *Giglio*, and Jencks Act violations, there is no need to conduct a defendant-by-defendant analysis of how the violations impacted each defendant or each count. The violations went to the heart of the government's case. As a RICO conspiracy case, the government repeatedly pointed to the testimony of its various cooperating witnesses to support all charges, even where individual acts could otherwise be viewed in isolation. For example, during its closing argument, the government argued to the jury: "That person isn't pulling the trigger, but the law says that if you are with a crime – if you, by your actions, want that crime to succeed, you are just as guilty as the person who pulled the trigger. The law makes no distinction. None." App. 563-564. *See also, e.g.*, App. 560-561 ("So for each and every one of them, they are responsible for what the other members sold, and they are also responsible for what other co-conspirators – other people – other members of this crew sold."); App. 569. ("And like I've said before, with respect to the charge of this kidnapping, we don't know who physically got Wysocki up and put him in that trunk. We don't know which of these defendants actually shot him. But it doesn't matter."). And that is precisely why confidence in the full verdicts is undermined—one cannot know what piece of evidence the jury found most persuasive; where, as here, the pattern of *Brady* violations went to the

heart of the government's case and their star witnesses, the prejudice must be presumed.

### G. The district court failed to properly address the merits of Appellants' § 2255 claims.

In rejecting Appellants' habeas motions, the district court did not contend with their various *Brady* arguments, erroneously concluding that the arguments were procedurally barred. The only aspect of Appellants' *Brady* challenges that the district court considered on the merits was that related to the grand jury testimony of Owens and Pinckney. Even there, the district court's analysis was superficial and wrong. The court ruled that the government "met its *Brady* obligations" with respect to Owens and Pinckney by disclosing "(1) Owens's and [Pinckney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinckney]; and (3) the fact that [Pinckney] and Owens absconded with the government's money." *Martin*, 2021 WL 4989983 at *7. The court did not consider the newly discovered evidence from Owens or its impact on the government's representations more broadly to show that the government either knew or should have known of Pinckney and Owens' whereabouts at the time it was representing it did not. Properly viewed, the repeated *Brady* violations can only be understood as a conscious pattern of abuse.

**II.    Appellants Were Deprived of Their Sixth Amendment Right to Effective Assistance of Counsel When Appellate Counsel Failed to Challenge the Trial Court's *Brady*, *Giglio*, and Jencks Act Rulings Concerning Specific Portions of the Sealed Record**

This Court's Certificate of Appealability asked "whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to [the] sealed material [underlying Appellants' Brady claims." Appellate counsel was indeed ineffective, and that ineffectiveness led to Appellants' *Brady* challenges not being raised and addressed effectively on direct appeal, a failing that has led Appellants to spend now almost 20 additional years in prison.

**A.    Standards of Review**

The Sixth Amendment guarantees a criminal defendant the right to "have the assistance of counsel for his defence." U.S. Const. Amend. VI. This right includes the "right to effective assistance of counsel on appeal." *Evitts v. Lucey*, 469 U.S. 387, 397 (1985). The Supreme Court established the basic standard to assess ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984), and it applies to both trial and appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 263 (2000) (holding that "the proper standard for evaluating" claim that appellate counsel was ineffective "is that enunciated in *Strickland. . .*"). The two-prong *Strickland* test requires showings that (1) counsel's performance was "objectively unreasonable," and (2) those deficiencies prejudiced the defense.

*Smith*, 28 U.S. at 263. "As the court resolved in *United States v. Abney*, 812 F.3d 1079, 1086–87 (D.C. Cir. 2016), our review of the denial of a § 2255 motion on the ground of ineffective assistance of counsel is *de novo*." *United States v. Aguiar*, 894 F.3d 351, 355 (D.C. Cir. 2018).

> **B.** **By failing to follow this Court's instructions, appellate counsel failed to function within the range of competence demanded of attorneys in criminal cases.**

On direct appeal to this Court, Sweeney's appellate counsel moved to review materials the trial court sealed for potential *Brady*, *Giglio*, and Jencks Act violations. This Court denied that request in an October 2, 2002 order, and instructed counsel instead to "identify on appeal specific evidentiary rulings" that Appellants claimed were erroneous. The Court, not appellate counsel, would then "undertake its own *in camera* review" of the disputed materials. *See* United States v Carson, No. 02-3015, 2002 WL 31246900, at * 1 (stating that "'[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files.'" (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)).

Despite the Court's unequivocal order, appellate counsel instead filed a motion on May 29, 2003 that, while identifying specific evidentiary rulings as this Court had directed, again requested that counsel be personally allowed to inspect the sealed materials. This was the same request this Court had already denied, citing *Ritchie* as binding precedent that such review had to be undertaken by the court and

not by counsel.  On August 28, 2003, this Court again denied the motion, admonished appellate counsel for not taking direction from its previous order, and restated the legal authority cited in its previous order.  App. 750 ("**As explained in the order filed October 2, 2002**, appellants may not review sealed portions of the trial record in order to mount a challenge to the district court's rulings under" *Brady* and the Jencks Act) (emphasis added).  This Court went on to explain, citing additional precedent as to the impropriety of counsel's request to review the material, that

> [b]ecause appellants seek to review the sealed material themselves, their motion must be denied. Any future arguments concerning the district court's application of Brady and/or the Jencks Act **should be presented in the appellants' brief,** rather than by motion.

*Id*.  (emphasis added).

This Court thus made appellate counsel's path clear.  The specific evidentiary rulings counsel identified could not be the basis for review by counsel—binding precedent foreclosed that request so that it "must be denied."  *Id*.  This Court nonetheless clearly outlined that the proper way forward was to present the identified rulings and related arguments in Appellants' brief.  Nonetheless, while the consolidated appellate brief made general references to *Brady* arguments, it failed to pinpoint specific trial court decisions regarding potential *Brady* materials, thus directly violating this Court's instructions. App. 761-770. Counsel's failure to adhere to the Court's repeated directives effectively blocked Appellants from having

App 1727

their strongest arguments considered on direct appeal.

It cannot be reasonably disputed that appellate counsel's noncompliance with a court order "fell below an objective standard of reasonableness," that standard stated in *Strickland*. The explicit disregard of this Court's directives cannot be considered a reasonable strategic decision, and constitutes an unreasonable error. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance" that is "fundamental to his case" combined with his "failure to perform basic" tasks is a "quintessential example of unreasonable performance"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (deficient performance where failure to act was "not based on 'strategy'" but on counsel's mistake). The government itself acknowledged (and benefited from) this failure on direct appeal, highlighting counsel's non-compliance with the Court's clear instructions.

Appellants' counsel took this tack despite recognizing the potential importance of this material. In the first Motion to Review Sealed Material appellants' counsel argued "The heart of the appeal is the materiality of the undisclosed evidence." App. 1732. The May 29, 2003 renewed motion to review the sealed material likewise stated that the "entire defense may very well be within the FBI 302s that were not released prior to or during trial," as "defendants' entire focus was the lack of credibility of the government's witnesses." Doc. # 751872-1.

Counsel's failure to raise the issue on appeal as this Court directed is

particularly inexplicable because in the renewed motion Appellants' counsel had already listed the specific rulings at issue and presented a colorable claim that *Brady* or Jencks Act materials had been withheld.  This material has been discussed above, but is briefly re-summarized here for convenience.

1. **Theodore Watson.**  On February 13, 2001, after Appellants had asked to view the letters addressed to the prosecutor from Watson for Jencks Act and *Brady* material, the government represented it had reviewed then and here was no Brady or Jencks material. App.  278.  The trial court denied the request, marked the letters as "Courts Exhibit 5," and placed them under seal.  App. 279. The defense also sought communications between the prosecutors and Watson regarding cooperation and leniency, including the reasons he was denied a 5K1 letter, in order to attack his credibility by showing that he was motivated to testify against Appellants by either the explicit or implicit promise of leniency and that the government itself harbored doubts about his credibility.  App. 273-74.

2. **James Montgomery.**  On March 7, 2001, Appellants requested FBI 302s for Montgomery with particular reference to Butchie Smith and Jencks Act material regarding Agent Lisi.  App. 303-306.  The trial court stated the material did not contain information the government was required to disclose, App. 305, and that Agent Lisi's notes did not contain either *Brady* or Jencks Act material.  App. 322, and it allowed the defense access only to redacted versions of the FBI 302s.

3.  **Reginal Switzer.**  On January 30, 2001, Appellants requested during Switzer's testimony the handwritten notes of AUSA Zeidenberg and AUSA Chaturvedi taken during their interview of Switzer, but the trial judge ruled that these notes were not Jencks Act material.  App. 216-17.

4. **Andre Murray.**  On February 1, 2001, Appellants requested material from Detective Fulton regarding the reliability of Murray.  App. 223-24.  The trial court held it was not Jencks Act material because it did not concern events about which Murray testified, despite Appellants' contention that the reliability of one of the government's "star" witnesses was inherently material to their defense and that the notes were adopted or approved by Murray or were substantially verbatim accounts of his interview.  *Id.*  18 U.S.C. *§* 3500(e)(l), (e)(2).   The court also denied a February 1, 2001 request for letters that Murray had written to AUSA Wainstein stating he did not want any "help" from AUSA Zeidenberg,  App. 224. and for notes taken by AUSA Wainstein during his interview with Murray that the trial court found was conceivably *Brady* material but refused to order disclosure of because the source of the information was defendant Hill and not Murray.  App. 223  Defense counsel reviewed its request for Murray's letters to AUSA Wainstein on February 5, 2001, but were allowed only redacted versions that removed references to offenses not related to the case, even though Murray had denied cooperating with the government in relation to those other offenses.

5.    **Arthur Rice.**  On April 24, 2001, Appellants requested the FBI 302's in regard to government witness Arthur Rice. The trial court reviewed the January 27, 1999 302 and stated that it contained no information that would permit it to be characterized as *Brady* material, and that it was clearly not a *Jencks* statement.  App. 469.

The requested FBI 302 qualifies as a statement producible under the Jencks Act if it has been adopted or approved by Mr. Rice, or if it is a substantially verbatim account of Mr. Rice's interview. 18 U.S.C. sec. 3500(e)(l) and (2). The trial court gave no reason why the 302 did not constitute a Jencks statement, and appellate counsel failed to identify this error for direct review.

Prejudice from the failure to pursue these matters on direct appeal is presumed because of the government's and the trial court's actions of placing the material under seal and thus denying Appellants any access to it, and from the fact that the failure precluded the matter from being considered on appeal.  *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed . . . [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).  Even if a showing of prejudice were required, the prejudice here is clear.  Had appellate counsel raised the critical *Brady* issue in the briefs on appeal, this Court would have reviewed the material *in*

*camera* and found widespread *Brady* and Jencks Act violations had indeed occurred, as detailed above.  *See* pp. 54-76, *supra*.

Finally, counsel's failure to raise this issue as this Court had twice directed cannot be excused as a rational strategy to limit the number of appellate issues to the strongest ones.  The opening brief of appeal raised 15 separate arguments in 71,583 words.  App. 751-771. None of these arguments, all of which this Court rejected (including dismissal of a juror during deliberations, judicial bias, confrontation clause challenges, joinder, and sentencing challenges), were stronger than the *Brady* and Jencks Act arguments, which themselves would have been greatly strengthened by access to the sealed material.  Instead, appellate counsel raised three poorly developed *Brady* arguments, with the result that this Court's opinion affirming the convictions on direct appeal contains only one passing reference to *Brady* in the context of "allegedly biased rulings by the trial judge."  *Carson*, 455 F.3d at 355.

Taking each of the three virtually undeveloped *Brady* arguments in turn, the direct appeal briefs first suggested that Brady material that *had* been turned over should have been turned over sooner and that the trial court's failure to do so was evidence of bias.  App. 761-63 (referring to an earlier inconsistent statement of government witness Charlene Wilson as to the Fortune murder that was provided four months after Wilson testified; disclosure of Jencks Act materials within "48 hours of the time the witness would be called to the stand," and the failure to have

been given "well before trial" evidence that another witness had confessed to lying in a debriefing). Framing the issue as bias was particularly ineffective because a bias claim can almost never be based on trial rulings. The second attempt at a *Brady* argument was limited to Carson and Martin's convictions for the Fortune murder and largely rehashed the first argument, with some additional detail and the name of the FBI agent whose cross-examination allowed the defense "four months later" to learn of "the existence of a contrary, undisclosed FBI record of Wilson's prior inconsistent statement." App. 767. The final reference was a sub-argument that the trial court "erred in denying defendant sanctions for *Brady* violations." App. 768-69. This argument was necessarily based on the prior alleged *Brady* issues and again did not relate in any way to the sealed material. Appellate counsel's failure to raise the issue of the material sealed by the trial court under the procedure this Court directed was unreasonable and could not be a strategic choice to advance Appellants' strongest argument.

The record shows a reasonable probability that if the sealed material had been disclosed the trial would have been different in terms of impeachment of the cooperators and the presentation of alternative theories of the case. As this Court has said, the question of materiality is simply whether the withheld evidence, if disclosed to the jury, would have placed the government's case (evidence) "in a different light." *U.S. v. Johnson,* 592 F.3d 164, 172 (D.C. Cir. 2010).

In *United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015), the U.S. Court of Appeals for the First Circuit reversed two convictions on *Brady* grounds where the government withheld material evidence tending to show that its three star witnesses perjured themselves.  The case turned substantially on the credibility of those witnesses, and included a government witness's undisclosed handwritten notes showing that, like Theodore Watson in this case, one of the witnesses was a "fawning, desperate supplicant willing to 'do everything [the prosecutor] said'" to obtain relief.  *Id*. at 19.  The First Circuit held that the letter was "greatly" probative because it would have been "a powerful tool in the hands of any good trial counsel to call into question the credibility of both the key witness and, implicitly, the lead prosecutor." *Id*.

Appellate counsel's failure to follow this Court's express and explicit instructions prevented any effective review of the *Brady* issues on direct appeal.  The error, combined with the meritorious *Brady* claims detailed above, demonstrates clear prejudice to Appellants' case.  Appellate counsel's failure to follow this Court's explicit orders represents a textbook example of deficient performance.  This deficient performance, coupled with the resulting prejudice, necessitates a finding of ineffective assistance of appellate counsel.

### III.    Appellants' Claims Are Properly Before the Court Because They Were Timely Raised Once Discovered and Related Back to Timely § 2255 Motions.

As noted above, in rejecting Appellants' § 2255 motions, the district court did not reach any of the claims detailed above.  Instead, the district court broadly ruled that each Appellant's argument was untimely.  That ruling was incorrect.

### A.    Standards of Review

28 U.S.C. § 2255(f) sets a one-year limitation for filing a motion to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack," and establishes that the limitation will run from the latest of four enumerated circumstances, three of which are relevant here.  The one-year limitations period will start to run from:

- "the date on which the judgment of conviction becomes final," 28 U.S.C. § 2255(f)(1);

- "the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action," *id.* § 2255(f)(2); or

- "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence," *id.* § 2255(f)(4).

App 1735

The movant gets the most favorable of the applicable dates to start the running of the limitations period.  28 U.S.C. § 2255(f).  All Appellants in this case filed timely § 2255 motions that raised the *Brady*, *Giglio*, and Jencks Act issues at the center of this appeal, either directly or by adopting the arguments of their co-defendants.

As described in more detail below, Appellants did not make, and could not have made within the one-year deadline of § 2255(f)(1), the kinds of detailed claims required by Habeas Corpus Rule 2(c), which states that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."  *See generally Mayle v. Felix*, 545 U.S. 644, 655 (2005).  However, the potential harshness of this requirement, which read strictly would bar a habeas petitioner from relief in any circumstances in which the petitioner was unable to obtain wrongfully withheld *Brady* materials until after the statutory deadline, is tempered by two doctrines.

*First*, petitioners who timely file claims can supplement them at a later date, and those claims will be deemed timely if they satisfy the relatively liberal standard applicable to "relation back" under Fed. R. Civ. P. 15(c)(1)(B): "relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims." *Mayle*, 545 U.S. at 659 (citation and internal quotations marks omitted).  In this case, each Appellant filed a timely § 2255 motion raising *Brady* arguments, and the later-filed supplements—which could only be filed after

Appellants had received and investigated the sealed materials—directly related back to (and filled out) those arguments.

*Second*, even where there is not a timely petition to which later filings relate back, as provided by the statute, a petitioner can file a claim based on newly discovered evidence with the one-year statute of limitations running from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). While this analysis is somewhat fact-intensive, the record reflects that all Appellants exercised due diligence to identify such claims.

Any claim of prejudice here from the time it took Appellants to perfect their habeas arguments would ring hollow. Further, as the record amply demonstrates, the running of the statute of limitation period was tolled throughout this period by filing extensions granted by the district court, or by periods in which Appellants were awaiting the appointment of counsel following orders by the court for the appointment of such, or seeking access to sealed material and missing transcripts. All the while, the only reason it took Appellants years to present their arguments is because the government and trial court had improperly withheld and sealed materials in the first place. It is the Appellants that have suffered prejudice, not the government.

**B.** **Appellants' subsequent supplemental motions relate back to the timely, specific claims they initially raised.**

**1) Legal Standard**

Relation back of claims made in § 2255 motions is governed by Federal Rule of Civil Procedure 15. Although this Court has not explicitly decided the question, sister circuits that have considered the issue agree that this is a legal question entitled to *de novo* review under the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A*, 560 U.S. 538 (2010). *See Mungin v. Sec'y, Fla. Dep't of Corr*., 89 F.4th 1308, 1322 n.2 (11th Cir. 2024) (collecting cases).

Under Federal Rule of Civil Procedure 15, an amendment to a pleading "relates back" to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1); *see also United States v. Hicks*, 283 F.3d 380, 387–88 (D.C. Cir. 2002) (applying the "relation back" principles of Rule 15(c) to a § 2255 claim). As this Court stated in *Hicks,* "the 'permissive approach' evinced by Rule 15(a) to the amendment of pleadings applies with equal force to § 2255 motions," 283 F.3d at 386 (quoting *United States v. Thomas,* 221 F.3d 430, 435–36 (3d Cir. 2000)).

The Eighth Circuit has held that even "generalized assertions that evidence obtained by [relevant law enforcement] was withheld" are sufficient to allow more particularized, later claims, to relate back. *See Mandacina v. United States*, 328 F.3d

995, 1000 (8th Cir. 2003); *see also Mayle*, 545 U.S. at 664 n.7 (citing *Mandacina* with approval). The Ninth Circuit reached a similar result in *Valdovinos v. McGrath*, holding that new allegations about the withholding of an anonymous letter and a crime scene photo that both pointed to a different perpetrator related back to previous *Brady* allegations about the withholding of impeachment material and a police station photo line-up because they were of the "same type"—*i.e.*, allegations of "suppressed exculpatory evidence" the "government had in its file." 598 F.3d 568, 575 (9th Cir. 2010), *vacated sub nom. Horel v. Valdovinos*, 562 U.S. 1196 (2011), *reaffirmed on remand,* 423 F. App'x 720 (9th Cir. 2011); *see also Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (allowing relation back when an amendment simply "clarifies or amplifies a claim or theory in the original") (citation and internal quotation marks omitted); *cf. Hicks*, 283 F.3d at 388 ("[I]n cases in which [sufficient notice of the facts and claims giving rise to the proposed amendment] has been afforded, for example where the prisoner's amendment seeks merely to elaborate upon his earlier claims, this effort should not generally be barred by the statute of limitations. Thus, . . . an amendment offered for the purpose of adding to or amplifying the facts already alleged in support of a particular claim may relate back . . . .") (citations omitted).

A petitioner need not succeed in setting out the operative facts for the later filed claims to relate back: he need only attempt to do so. "The central question

under this framework is whether the amended and original petitions share a common core of operative facts, as those facts are laid out in the amended petition and 'attempted to be set out' in the original petition." *Ross v. William*s, 950 F.3d 1160, 1168 (9th Cir. 2020) (quoting Fed. R. Civ. P. 15(c)(1)(B)). The quality of the attempt must be measured against the information available to the petitioner at the time of the original petition. *See Slayton v. Am. Exp. Co.*, 460 F.3d 215, 229 (2d Cir. 2006), (originally pleaded "claim gave adequate notice of the amended complaint's allegation"); *see also Krupski.*, 560 U.S. at 550 (noting remedial purposes of amendments to Rule 15 and "the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits").

### 2)    Each Appellant made sufficiently concrete claims in his original motion to which the later claims relate back.

#### (a)    Sweeney

Sweeney's conviction became final on February 20, 2007, when the Supreme Court denied his petition for certiorari. *See Carson v. United States*, 549 U.S. 1246, 1246 (2007). On February 5, 2008, his counsel filed an emergency motion for access to material the government had filed with the trial court *ex parte* and under seal. On February 15, 2008, the district court ordered the clerk's office to provide "copies of any necessary sealed pleadings in this matter to counsel for William Sweeney." App. 122 [ECF 1016]. That same day, his counsel went to the clerk's office looking

for the documents, but the clerk's office could not find them. *See* App. 1690. Four days later, on February 18, 2008, Sweeney filed a § 2255 motion to vacate his convictions. *See* App. 951-67.

At that time, Sweeney did not have access to the sealed *Brady/Giglio* materials, which he would not begin to be able to access for another two years. Nonetheless, based on what he did know, and incorporating the arguments that he had previously made on his direct appeal, Sweeney made the following arguments: "[P]rosecutors engaged in . . . the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony, in violation of Mr. Sweeney's constitutional rights, but counsel needs further investigation as well as a complete set of discovery, Jencks, *Brady* and *Giglio* provided to trial counsel." App. 966. "In violation of Mr. Sweeney's right to effective assistance on appeal [], appellate counsel failed to note sections of sealed matters for the Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion, so Mr. Sweeney's convictions in this matter were without judicial review of the undisclosed materials[.]" App. 962.

These arguments sufficiently identified the arguments that Sweeney developed in his supplemental motions filed in 2014 and 2015 (and has now raised on this appeal), that: (1) Montgomery lied to prosecutors and withheld evidence that

would have otherwise contradicted his testimony at trial; (2) Watson lied to prosecutors in a separate case, which the government knew about; and (3) the government failed to disclose evidence of alternative suspects in "Butchie" Smith's murder.[10]  *See* pp. 54-76, *supra.*

In each case, the arguments raised by Sweeney in his supplemental motions are encompassed within the claim made in Sweeney's initial 2008 motion that the government had engaged in "the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" in the trial of the case against Sweeney.  Sweeney's motion also noted that "counsel needs further investigation as well as a complete set of discovery, Jencks, *Brady* and *Giglio* provided to trial counsel."  App. 966.   The later claims all fall within the "common core of operative facts" laid out in Sweeney's initial motion.

Finally, the question of whether the later claims "relate back" must be considered in light of the facts of this case.   The government had withheld *Brady/Giglio* and Jencks Act materials and was thus "on notice" of the claims Sweeney could raise even when Sweeney himself was not.  Accordingly, permitting "relation back" here would not prejudice the government.   *Cf. Hicks*, 283 F.3d at

---

[10] These supplements did not require the government's consent or leave of the court because the government had not yet filed a response, and did not do so until 2020. *See* Fed. R. Civ. P. 15(a)(1)(B).

389(relation back not allowed where the amended claim was "completely different from that asserted in the original § 2255 motion," because it "advances an entirely new legal theory that arises from an entirely different set of facts and type of conduct").

### (b)    Martin

Martin's conviction became final on February 20, 2007, the same date as Sweeney's, when the Supreme Court denied his petition for certiorari. *See Carson*, 549 U.S. at 1246.  Martin filed a timely first motion under § 2255 on February 18, 2008.  App. 968-984.    The two claims this motion, that the government withheld evidence exonerating Martin and Carson for murder, and that the government had prevented Martin from calling a helpful witness, were both timely and adequately described, even though they of necessity could not consider or be based on the abundant additional evidence of *Brady/Giglio* and Jencks violations that began to become available in June, 2010.  App. 973-87.  Martin filed a supplemental motion on November 21, 2018.  App. 1651-1688.  All of Martin's claims are accordingly timely.

### (c)    Coates

Coates filed a timely first motion under § 2255 on February 19, 2008.  App. 991-1043.  While Coates, like the other Appellants, did not have access to the sealed materials at that time, he argued that he had received ineffective assistance of trial and appellate counsel and asserted that the government had withheld *Brady*, *Giglio*,

and Jencks Act material, specifically information that would have allowed Appellants to effectively impeach one of the government's key witnesses, James Montgomery, whose key testimony is described in detail above. App. 994. Coates filed a supplemental motions on February 10, 2015. App. 1155-1163.

While Coates's own motions under § 2255 did not in each case list out every aspect of the *Brady*, *Giglio*, and Jencks Act violations now raised, they argued from the outset—and with consistency—that his due process rights had been violated in these fundamental ways, and the district court expressly permitted Coates to join the applications of his co-defendants who made the arguments in more detail. App. 132 [ECFR 1194]. Thus, Coates appropriately, and timely, preserved the claims now presented.

### (d)    Carson

Carson filed his original timely motion under § 2255 pro se on February 18, 2008, and the filing was docketed ten days later. App. 985.[11] The motion raised claims of due process violations and ineffective assistance of counsel . Carson, through his former appellate counsel, thereafter moved to join the petitions filed by

---

[11] This filing was date-stamped February 28, 2008 but signed by Carson on February 18, 2008. The district court noted that there was a factual dispute between Carson and the government as to whether the filing was timely under the "jailhouse mailing rule" but did not decide, assuming for the purposes of the motion that Carson had filed timely. App. 1701 n.4.

Sweeney, Coates and Martin, and for appointment of counsel under the Criminal Justice Act to pursue his post-conviction claims. App. 170.

Carson supplemented his motion on April 9, 2015. App. 1289. In his first supplement, Carson made claims based on the undisclosed *Brady*/*Giglio* materials described above in connection with James Montgomery and Theodore Watson, as well as claims of ineffective assistance of trial counsel and judicial interference. *Id.* Carson further supplemented his motion on July 1, 2020. App. 137.

As with Coates, the district court permitted Carson to join the applications of his co-defendants. App. 131.

> **C.    The supplemental claims are timely, even if they do not relate back, because they arise from newly discovered evidence, were filed within deadlines set by the district court, or were subject to equitable tolling.**

Appellants' supplemental claims are timely, regardless of whether they relate back to the original claims. If the supplemental claims do not relate back, they are still timely because they are based on newly discovered evidence, were filed within deadlines set by the district court, or were equitably tolled. Alternatively, even if the supplemental claims do not relate back to the timely original motions, they are still timely because of the late discovery of the *Brady*/*Giglio* materials and the numerous extensions granted by the district court for filing supplements or appointing counsel.

### 1)    Legal Standard

Section 2255's one-year statute of limitations commences on "the date on which the facts supporting the claim . . . could have been discovered through the exercise of due diligence."  28 U.S.C. § 2255(f)(4).  The prosecution has "an affirmative duty to disclose exculpatory evidence to the defense, even if no request has been made by the accused." *United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017) (citing *Strickler*, 527 U.S. at 280; *Brady*, 373 U.S. at 87).  Defendants have no obligation to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. at 695.  *See also Cloud*, 102 F.4th at 976 ("the Government's obligation is not contingent on a request by the accused").  Thus, the statute of limitations did not begin running until the district court's order granting access to the sealed documents. *See Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015) (statute of limitations begins running a reasonable time after a defendant first gains access to previously undisclosed *Brady* material).

In the case of a *Brady* violation, those facts include whether the prosecution suppressed evidence that was favorable to the accused. *See Jimerson v. Payne*, 957 F.3d 916, 925 (8th Cir. 2020); *see also Strickler v. Greene*, 527 U.S. at 281–82. While Appellants knew evidence had been suppressed, they did not know the contents of what had been suppressed or whether it was favorable to them.  The

government had represented to the trial court it was not favorable. Accordingly, until the *Brady*/*Giglio* materials were both unsealed and in fact available to Appellants, they had an "unsubstantiated suspicion" the government had violated *Brady*, *see Jefferson v. United States,* 730 F.3d 537, 547 (6th Cir. 2013)*,* which is not enough to trigger the running of the statute of limitations.[12]

The time to file a § 2255 motion is also tolled by court-ordered extensions for the filing of necessary papers. *See, e.g.*, *Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013) (magistrate judge's scheduling order tolled statute of limitations) ("No litigant, pro se or otherwise, asks for an extension of time to file an untimely petition."); *Prieto v. Quarterman*, 456 F.3d 511, 513–15 (5th Cir. 2006). Motions for the appointment of counsel also toll the statute of limitations until disposed of by the district court. *See Bull S.A. v. Comer*, 55 F.3d 678, 681 (D.C. Cir. 1995) ("[C]ourts may properly allow tolling where . . . a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon[.]") (citations omitted).

---

[12] None of this undermines Appellants' argument in the previous section that the later filed claims "relate back" to their indisputably timely original motions. Appellants identified with sufficient concreteness the *Brady*/*Giglio* claims that the government was undeniably aware of well before the statute of limitations even started to run.

This Court reviews *de novo* the district court's decision regarding equitable tolling. *See Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*, 71 F.4th 51, 58 (D.C. Cir. 2023).

### 2) Appellants' claims in the supplemental motions based on the *Brady*/*Giglio* materials were timely filed.

Appellants repeatedly asked for the sealed material to be disclosed to them, first at trial and then on appeal. The government represented that the material was not *Brady*, and the district court refused to unseal it. Just days before Appellants' motions were due, the district court finally ordered the materials unsealed, but the clerk's office could not locate the documents until June 2010, as set out in a declaration by Sweeney's counsel, Jenifer Wicks. App. 1690. *See* pp.35-36 & n. 3, *supra*.[13] Given the volume of the materials (more than a thousand pages) and that

---

[13] The district court seemed to accept this clear attestation that Appellants did not receive the *Brady*/*Giglio* materials until June 17, 2010, which was squarely supported by Ms. Wicks' declaration as to her repeated unsuccessful attempts to obtain it before them. App. 1689-90. The district court suggested at another point, however, that another counsel conceded that the materials had been produced in 2008. App. 1694. The cited statement makes no such concession. First, it was made by a counsel, Ms. West, who did not enter the case until November, 2010, and thus unlike Ms. Wicks did not have firsthand knowledge of the matter. App. 125 [ECF 1060] entry of appearance by West on Nov. 10, 2010). Ms. West's statement was part of a larger discussion about the government's failure to produce the *Brady*/*Giglio* materials, and noted that "no record has been released to the defense indexing the material presented to the Court that matches up with the documents released by the Clerk's office in 2008." Nothing in this comment or the related footnote (such as "Several documents turned over by the clerk in 2008 as part of the

Appellants were incarcerated at this time, one hundred and twenty days or until mid-October 2010 is a reasonable time for Appellants to be deemed to have obtained access to the *Brady*/*Giglio* materials such that the statute of limitations could be deemed to be running.

The district court's conclusion that the statute of limitations started running on Appellants' claims based on the *Brady*/*Giglio* materials more than two years before they had access to them, *Martin*, 2022 WL 1618869, at *5, without any discussion of when any Appellant actually obtained those materials or was able to make practical use of them, is not supported by the facts, law, or logic. The district

sealed exhibits are not listed on the Court's exhibit list as having been sealed") conceded or was intended to concede that Appellants (or any of the defendants) had had actually received the *Brady*/*Giglio* materials in 2008, even though the Clerk's office had been ordered to turn them over then.

In fact, as Ms. Wicks averred, Appellants did not obtain access to *any* of the sealed *Brady*/*Giglio* materials until June, 2010. App. 1690. Some appellants did not receive full access for several more years, as some of the documents remained sealed as to them. *See* App. 1153 (2015 filing referencing the materials apparently still under seal: "during a status hearing some time ago before this Honorable Court, undersigned counsel argued that these exhibits [*i.e.*, the ones attached to Sweeney's Supplemental Motion to Vacate] should be unsealed as to all parties to the litigation, not just one party and the Court orally from the bench granted that motion."

To the extent that there was any remaining contention that Appellants were able to obtain any access to the *Brady*/*Giglio* materials before June, 2010, or effective access before October, 2010, and the district court was intending to rely on that fact in making its ruling, the district court should have held a hearing to confirm the matter. The district court held no hearings in connection with Appellants' § 2255 applications.

App 1749

court acknowledged that, for example, Sweeney, despite vigorously challenging the government's efforts to withhold the *Brady*/*Giglio* materials until June 2010, still lacked access to those documents by February 20, 2008, the deadline under § 2255(f)(1). *Id*. at *4. Then, although Sweeney, practically speaking, could not have identified the errors resulting from the *Brady*/*Giglio* violations in his initial motion, the district court denied Sweeney relief because he alleged violations of *Brady*, *Giglio*, and the Jencks Act in his 2008 motion "at a high level of generality." *Id*. at *7.

This demand for the impossible is particularly indefensible in setting the statute of limitations for constitutional claims of government misconduct resulting in life sentences for Appellants. "Because of the nature of a *Brady* violation, the petitioner often cannot learn of such a violation at all, even when acting diligently, unless and until the government discloses it." *Scott v. United States*, 890 F.3d 1239, 1250 (11th Cir. 2018).[14] Were the district court's reasoning correct, the government could insulate any trial result by preventing the defendant from obtaining the relevant *Brady* material until after the "one year" statute under § 2255(f)(1) had run,

---

[14] The Eleventh Circuit in *Scott* ultimately declined to grant relief under § 2255 on the basis that the petitioner's § 2255 motion alleging *Brady* violations was a "second or successive" motion that could not satisfy the stringent requirements of AEDPA for such motions. *See* 890 F.3d at 1243. Because Appellants each filed only one motion for § 2255 purposes, these concerns do not apply to this case.

an outcome that would effectively nullify the writ.  "So imprisoning someone based on the results of an unfair trial and then precluding any remedy at all might well work a suspension of the writ of habeas corpus." *Scott*, 890 F.3d at 1251.

In a case addressing a similar factual scenario in the context of a "second or successive" application under § 2254, the Sixth Circuit held that "[t]he prosecution has a constitutional obligation under *Brady* to provide material exculpatory and impeachment evidence and the defendant is not required to request continuously *Brady* information in order to show due diligence." *In re Keith*, 2018 WL 8807240, at *6 (6th Cir. Oct. 26, 2018) (citing *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011)(en banc)).  Because the petitioner in that case had continually made reasonable and appropriate efforts to obtain the information the government had withheld from him, the appropriate time for the statute of limitations was the date the petitioner obtained the *Brady* material needed to flesh out his claims.  *See Baugh v. Nagy*, 2022 WL 4589117, at *9 (6th Cir. Sept. 30, 2022) (§ 2254 petitioner "could not have discovered [*Brady* material] earlier through due diligence").  Other decisions have reached the same conclusion.  *See, e.g.*, *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018) (given the government's refusal to produce *Brady* timely despite § 2254 petitioner's request, statute of limitations started from time *Brady* material was received); *Douglas v. Workman*, 560 F.3d 1156, 1192 (10th Cir. 2009) (same).

Accordingly, the earliest that the statute of limitations could have started running against any of Appellants' claims in this appeal was from the date that they could have made effective use of the *Brady*, *Giglio*, and Jencks Act materials, or no earlier than October 2010.[15]

### 3) The running of the statute of limitations was tolled by orders extending the parties' time to respond or for appointment of counsel.

The district court's timeliness rulings are particularly hard to square with the fact that, beginning shortly after Appellants filed their original motions in February 2008, both the government and Appellants made numerous applications for extensions of time to respond, each of which the district court consistently granted. On May 7, 2008, Martin moved for a stay of the § 2255 proceedings for the purpose of allowing Martin to amend or supplement his motion, App. 123 [ECF 1028], to which the government responded six months later and did not object. *Id*. [ECF 1036]. In March 2010, the district court ordered the government to respond to Carson's, Coates's, and Sweeney's motions within 30 days. App. 124 [ECF 1042-44]. In April 2010, the government, without opposition, moved for an additional 90 days in which to respond as to those three motions. *Id.* [ECF 1048.] The district

---

[15] As noted below, Appellants were making applications for extension of time starting in May 2008 and continuing throughout this period, meaning that there were overlapping and independent bases for tolling throughout much of this period.

court granted Carson's, Coates's, and Sweeney's motions for an extension of their time April 7, 2010.  *Id.*  In July 2010, the government again moved without opposition for an extension of time, this time for 90 days after Sweeney had filed a supplemental motion, which Sweeney was scheduled to do in October 2010, making the government's response to all three motions due January 3, 2011. [16]  App. 124-25 [ECF 1053]

In September 2010, Sweeney moved to extend his time to file a supplemental motion by 45 days and requested a corresponding extension of the government's time to respond to all three motions.  App. 125 [ECF 1056].  Sweeney's motions were granted.  App. 125 [ECF 1057].  Additional orders granting extensions of time for some or all Appellants were entered on November 23, 2010, App. 125 [ECF 1064]; February 3, 2011, *Id*. [ECF 1066]; May 31, 2011, App. 126 [ECF 1073]; December 6, 2011, *Id.* [ECF 1081];[17] July 24, 2012, App. 127 [ECF 1097];  May 9

---

[16] The government noted in its motion that the application for a stay filed by Martin had been awaiting action by the district court since the government filed its response, stating its lack of opposition to the motion to stay, in November 2008.

[17] The district court noted in its decision that Sweeney did not comply with this deadline set in this order to file a supplemental motion by July 30, 2012.  App. 1760. However, the district court disregarded that Sweeney was without counsel for almost all of this period.  The deadline was set on December 6, 2011, App. 126 [ECF 1081], and Sweeney's then-lawyer's motion to withdraw was granted 10 days later, on December 16, 2011. Id.  [ECF 1083].  New counsel appeared for Sweeney approximately one year later, on December 7, 2012.  App. 127 [ECF 1105].

2013. *Id.* [ECF 1115], September 3, 2013, App. 128 [ECF 1122]; May 29, 2014, *Id.* [ECF 1128]; November 25, 2014, App. 129 [ECF 1137]; December 1, 2014, *Id.* [ECF 1149]; and February 25, 2015, App. 130 [ECF 1158].

On July 14, 2020, Section 2255 counsel for Sweeney filed a 24-page Reply to the Government's Opposition to his motion to vacate addressing in great detail the procedural, equitable tolling, and relation back aspects of the government's argument. *See* App. 1766-1828. Counsel attached to his Reply seven letters from Sweeney, written over several years, which showed where he had repeatedly and diligently taken steps to preserve his legal rights. Sweeney identified relevant legal precedent for his counsel. App. 1797-98. He highlighted witnesses for her to speak to, records for her to review, and reviewed reams of unsealed material to identify Brady evidence himself.[18]

Furthermore, the district court ordered an additional nine-month extension in September 2013 without a mention of this gap. App. 128 [ECF 1122]. In any event, even if this approximately nine-month gap between the appearance of new counsel and the order granting an extension were charged against Sweeney, his supplemental motions would still be timely filed because no other time ran against the statute of limitations before Sweeney filed his supplemental motions, meaning that less than one year of time had passed untolled since the time Sweeney was able to make effective use of the *Brady*/*Giglio* materials.

[18] *See, e.g.,* App. 1824-25 (listing parts of the record where material was placed under seal) App. 1818-22 (describing Brady material). Sweeney wrote letters with detailed notes and theories of relief that he sent to Wicks for inclusion in his supplemental petition. *See* App. 1793-1808, 1818-22 (five separate letters with

Counsel did not act on these requests despite repeated requests from Sweeney and his family. *See* Sweeney Affidavit, ECF No. 1280, at 5. *Cf. Holland v. Florida,* 560 U.S. 631, 653, n.3 (2010) (equitable tolling is appropriate where a lawyer "abandons" her client). *Holland* identifies such conduct as supporting an equitable tolling claim. 560 U.S. at 652.

The district court disposed of Sweeney's equitable tolling argument on the basis that despite his counsel's dereliction, "nothing prevented [Sweeney] from filing the motion pro se." This holding is contrary to *United States v. McDade,* 699 F.3d 499 (D.C. Cir. 2012), where the defendant hired an attorney to perfect his Motion for Relief from Judgment under 28 U.S.C. § 2255 and despite his requests to his counsel to include a claim of attorney error for failure to interview potential impeachment witnesses, "counsel inadvertently omitted this claim." *Id*. at 501. This Court found equitable tolling was warranted because McDade, like Sweeney here, researched and gathered evidence in support of his claim, told his counsel what he hoped to be included in his petition, expressed his desire to file the petition expeditiously, requested counsel send him a draft of the motion, and his counsel

same. He also emphasized the importance of filing his supplemental petition promptly and requested she send him a draft. *See* App. 1796, 1800, 1810-14, 1827-31.

App 1755

failed to comply. 699 F.3d at 501-05.  Indeed Sweeney's diligence was greater here, where he wrote a letter to his attorney in August 2010 "laying out the Brady material 'in impressive detail.'"  App. 1705.

Like McDade, Sweeney was diligent in exercising his rights, conveyed the substance of the arguments to counsel for filing, and his counsel "failed to heed [his] requests until after the § 2255 deadline had passed." 699 F.3d at 505.  Sweeney also filed affidavits from his new counsel outlining all of this,  but the district judge ignored all of the evidence of abandonment.  *See* App. 1790-1828 (ten exhibits outlining the evidence).  In any event, Sweeney's affidavit, which detailed firm assurances from his prior counsel Ms. Wicks unequivocally demonstrates that Sweeney was effectively abandoned by his attorney.  *See* App. 1829-1831.  As such, tolling was appropriate. *See Cadet v. Fla. Dept. of Corr*., 853 F.3d 1216, 1227 & n.2 (11th Cir. 2017) (attorney abandonment is grounds for equitable tolling); *Jimenez v. Hunter,* 741 Fed. Appx. 189, 192 (5th Cir. 2018) (tolling warranted for abandonment).

On April 7, 2017, the district court entered an order summarizing the above history of extensions, noting that all Appellants had filed supplemental motions in addition to the original motions, and granted an additional 30 days for Appellants to file any additional supplemental motions and for the government to file its response within 60 days.  App. 131 [ECF 1188]  On June 19, 2017, the district court granted

Carson's and Coates's motions to join the motions of their co-defendants and further

granted Coates's motion to file a late supplement to his motion, and denied as moot

motions by Martin, Carson, Coates, and Sweeney for extensions to file supplements

as having been addressed by the district court's April 17, 2017 Order.[19]   App 132

[ECF 1194-1195].  Based on difficulties of Martin's counsel, the time for filing his

petition was extended several additional times, and was ultimately filed in

November, 2018.  App. 134 [ECF 1233]  The government filed several requests for

extensions to file its response to the motions and supplements, and did not file that

response until June 11, 2020.  App 136 [ECF 1255].  Appellants filed replies, and

the district court decided the motions on October 27, 2021.  App 138 [ECF 1284],

App. 1691-1739.

---

[19] Throughout this period, Appellants also filed several motions for appointment of counsel, which often sat pending for extended periods and led to additional delays that cannot be held against Appellants.  For instance, on March 17, 2008, Carson moved for appointment of counsel.  App. 123 [ECF 1025].  This motion was granted on May 13, 2009, App. 124 [ECF 1039], and counsel appeared for Carson on November 5, 2010, App 125 [ECF 1060].  On June 27, 2011, the district court permitted Martin's counsel to withdraw and directed that new counsel be appointed to represent him.  App. 126 [ECF 1077].  On March 8, 2012, new counsel appeared for Martin.  *Id.* [ECF 1086].  On December 14, 2011, Sweeney's counsel moved to withdraw and for the appointment of new counsel, *Id.* [ECF 1082]. which was granted on December 16, 2011, *id*. [ECF 1083], with a directive to the Federal Public Defender to identify new counsel for Sweeney.  New counsel appeared for Sweeney approximately one year later, on December 7, 2012.  App.  127 [ECF 1105].

As is clear from the above, the supplemental motions filed by Appellants were all timely, given that, following the production of the *Brady/Giglio* materials beginning in June 2010, equitable tolling effected by the district court's scheduling orders and the periods that certain Appellants were awaiting appointment of counsel after orders appointing counsel had been entered by the district court.  The motions, and supplements thereto, were therefore timely under § 2255(f)(4).

### IV.    Carson's Trial Counsel Were Admittedly Ineffective, Having Inappropriately Placed Their Personal Interests Ahead of Their Duties in the Face of Improper Bias by the Trial Court.[20]

Carson's supplemental § 2255 motion raised not only the suppression of exculpatory evidence in violation of *Brady*, *Giglio*, and the Jencks Act; it also showed that Carson's two court-appointed trial counsel labored under a blatant conflict of interest, which caused them to provide ineffective representation that pervaded the entire trial.    The conflict of interest and their interaction with the suppression of exculpatory evidence were documented by the April 10, 2015

---

[20] While this Court did not include ineffectiveness of trial counsel in initial Certificate of Appealability, it should consider this claim in conjunction with the others raised above.  The record evidence in support of this claim is clear, undisputed, and discrete, as Carson is in a unique position where his trial counsel has acknowledged their own ineffectiveness under oath; and an understanding of this issue (which is rooted in improper bias and conduct of the trial court) provides further context to the manner in which the trial court allowed the government to file document after document under seal without appropriately questioning whether the government was meeting its *Brady* obligations.

affidavit of Lexi Negin Christ, one of Carson's two trial counsel, which was attached to Carson's supplemental § 2255 motion.

Christ's affidavit shows that trial counsel had a conflict of interest that caused them to sacrifice their duty to professionally represent Carson throughout the trial. Together with the suppressed *Brady* issue, the affidavit warranted an evidentiary hearing, which the district court never held. *See* 28 U.S.C. § 2255(b) (requiring an evidentiary hearing "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief"); *Schiro v. Landrigan*, 550 U.S. 465, 474 (2007).

Although the prejudice resulting from these violations is evident, Appellant Carson is not required to demonstrate prejudice in this instance. Under *United States v. Cronic*, no showing of prejudice is necessary when "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658, 662. Where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," as happened here, that renders "the adversary process itself presumptively unreliable." *Id.* at 659.[21] *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980).

---

[21] *See* Eve B. Primus, *Disaggregating Ineffective Assistance of Counsel Doctrine*, 72 Stan. L. Rev. 1581 (2020) (disentangling the four different forms of attorney

Christ's affidavit also shows a conflict of interest between counsel's personal interests in receiving payment through court-approved vouchers under the Criminal Justice Act, and avoiding being ordered to show cause why they should not be held in contempt, like defense counsel for two of their co-defendants already had been. Christ admits that this conflict greatly affected their representation throughout the long trial, thus obviating the need for an additional showing of prejudice. *See, e.g.*, *United States v. Sayan*, 968 F.2d 55, 64–65 (D.C. Cir. 1992) (recognizing that "a conflict between a lawyer and his client may provide the basis of a new trial") (citing *Walberg v. Israel*, 766 F.2d 1071, 1074 (7th Cir. 1985)).

In *Walberg*, the Seventh Circuit ordered a new trial for the defendant even though the evidence of his guilt was "overwhelming." "There [was] no proof" in *Walberg* "that [defense counsel] Clark pulled his punches at trial, [although] he had every incentive to do so." *Id*. at 1074. During a pretrial hearing recess, however, the judge berated defense counsel for vigorously representing Walberg and being ungrateful for all that the judge had done to advance the attorney's career. The judge admonished: "[D]on't ever come to me with your bill on this thing, because I am not

ineffectiveness, explaining that *Strickland*'s two-prong test applies only to one of them: episodic personal ineffectiveness).

going to pay for all these motions [to recuse him] you are bringing up in the Supreme

Court." *Id.* at 1073.

On appeal, Judge Posner wrote: "The appearance was of a judge who had

made up his mind at the start that the defendant was guilty and who proceeded to

intimidate the defendant's lawyer so that the proceeding could be got over with and

Walberg shipped off to prison for many years." *Id.* at 1077–78.  The Seventh Circuit

further explained:

> After the judge's pretrial outburst Clark knew that he
> would have to be on his best behavior at trial if he was to
> have any hope of a subsequent appointment by Judge
> Seraphim—and perhaps if he was to have any hope of
> getting paid for defending Walberg.  And Judge Seraphim
> had indicated that good behavior meant not just avoiding
> unethical conduct but also not pressing too hard, even well
> within ethical boundaries, in favor of an obviously guilty
> defendant.

*Id.* at 1074.

Here, as in *Walberg*, the trial court judge's hostility to Carson's defense

attorneys and the defendant caused them to fear the judge's wrath if they zealously

represented their clients.  Christ's affidavit explains that she and her co-counsel

**deliberately chose not to do what they knew counsel should have done**:

> The contempt charges brought against two of the attorneys
> at trial, and later dropped after trial, as well as the search
> warrant executed against on one of the attorney's offices
> during trial by the prosecution team, had a chilling effect
> on us in the representation of Mr. Carson.  This chilling
> effect caused us to forgo the filing of motions and other

challenges to the Judge's arbitrary rulings regarding time limits, cross examination and use of impeachment evidence.

We were aware that the judge was the one reviewing and approving our payments and that by winning the approval of the judge during the trial would most likely mean our vouchers would be fully paid. Due to the length of the trial, many, if not all the attorneys involved, had to clear their case docket to participate in this trial. Loss of payment for these services would have been a substantial financial burden. The implicit threats by the Court that compensation would be disallowed if the perceived delay tactics placed all the attorneys in the case in a position of conflict of personal interest.

During the trial, I believed that Mr. Beshouri felt that if we were in the good graces with the Judge by being "reasonable" in the judge's eyes during the trial, that the judge's prejudicial rulings, contempt sanctions, and biased comments would be directed at other attorneys. I believed that our strategy was driven by an unreasonable desire to avoid these actions by the judge toward us, rather than defend our client to the best of our abilities.

* * *

The decision to appease the judge, rather than to pursue valid objections, arguments and motions was not a reasonable one and I believe we were ineffective by making that choice.

* * *

Mr. Beshouri and I continued representation of Mr. Carson knowing that the chilling effect had risen to the level where we could no longer be Constitutionally effective in our representation.

App. 1426-27.

As Carson argued in his supplemental § 2255 petition, Carson's counsel had a conflict between their personal interest in getting paid and avoiding being held in contempt and their duty to professionally and effectively represent Carson. Id. They should have raised this conflict of interest with the court and sought to withdraw. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980) (a conflict of interest can be a basis for an ineffective assistance of counsel claim if the defendant proves that "an actual conflict of interest adversely affected his lawyer's performance" and "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief"); *Daniels v. United States*, 54 F.3d 290, 294 (7th Cir. 1995) ("A conflict of interest arises when the defense attorney is required to make a choice advancing his own interests to the detriment of his client's interests" and "[a] conflict may . . . arise when a client's interests are adverse to his lawyer's pecuniary interests."); *Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993) (contingent fee in criminal case created an actual conflict of interest); *Gonzalez v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009) ("An adverse effect is established by showing that 'but for the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different.'"); *Summerlin v. Stewart*, 267 F.3d 926, 935–41 (9th Cir. 2001) (defense counsel was conflicted because he had a romantic "entanglement" with the prosecutor).

The district court made no mention of Christ's affidavit. *See Martin*, 2021 WL 4989983 at *11–12. That omission requires at least a remand with directions to consider the affidavit and hold an evidentiary hearing. *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (court may consider the entire record when determining whether to require an evidentiary hearing).

The failures to provide effective assistance of counsel were especially prejudicial given that, as explained previously, much of the government's case was weak and depended on the testimony of cooperating witnesses and jailhouse informants, especially as to the murder counts and other violent conduct alleged in connection with the conspiracy. Moreover, as also explained previously, much of that testimony was shielded from effective attack by the government's failure to comply with its *Brady/Giglio* and Jencks Act obligations. And it is the life sentences on these weak murder counts that keep Appellants in prison today.

In sum, conflicted trial counsel's failure to do their jobs in a highly complex and lengthy case, combined with the prosecution's massive suppression of exculpatory evidence to deny Carson and his co-defendants a fair trial, is in violation of due process.

**CONCLUSION**

This Court should vacate Appellants' convictions and order that the indictments be dismissed to account for the pattern of prosecutorial misconduct and egregious due process violations that took place here, and the ineffective assistance of counsel.  In the alternative, the Court should vacate Appellants' convictions and remand for a new trial,  together with an evidentiary hearing to further develop the record of the government's misconduct and the effect of the ineffective assistance.


Respectfully submitted,


___/s/ John Longstreth__
John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

___/s/ Mark Lanpher_____
Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

___ /s/ Eric Kirchman___
Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

September 27, 2024

___/s/ David Smith_____
David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Per Curiam Order dated November 21, 2023, which provided for the filing of a joint brief not to exceed 35,000 words, undersigned counsel certify that the attached Joint Brief of Appellants complies with the Court's Order. The word count is 29,789, including all footnotes and legal citations but excluding the table of contents, table of authorities, any certificates of compliance or service, and any other items not required to be included by Fed. R. App. P. 32 (f). The brief was prepared using a Microsoft Word in Times New Roman 14 point type.

.

_____/s/ John Longstreth_____

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2024, I caused a true and

complete copy of the foregoing to be served via the Court's cm/ecf system on the

following:

Chrisellen Rebecca Kolb, Assistant U.S. Attorney
U.S. Attorney's Office
(USA) Appellate Division
Room 8104
601 D Street, NW
Washington, DC 20530
Chrisellen.R.Kolb@usdoj.gov

Daniel Joseph Lenerz, Attorney
U.S. Attorney's Office
(USA) Appellate Division
Suite 8229
601 D Street, NW
Washington, DC 20530
daniel.lenerz@usdoj.gov

_____/s/ John Longstreth_____

ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————————

UNITED STATES OF AMERICA,                          Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN,JR., and SAMUEL CARSON,      Appellants.


———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
* ELIZABETH GABRIEL
MD Bar
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

Cr. Nos. 98-cr-00329 (RCL)

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

### Parties and Amici

The parties to this appeal are appellants, Sean Coates, William K. Sweeney, Jerome Martin, Jr., and Samuel Carson; and appellee, the United States of America.

### Rulings Under Review

This is an appeal from an order by the Honorable Royce C. Lamberth denying appellants' motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. *United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021). Appellants allege that the district court erred in denying their motions, and request that this Court vacate their convictions and dismiss the indictment or remand for a new trial. In a written order issued on May 23, 2022, the district court further explicated its decision denying the § 2255 motions and denied a certificate of appealability. *United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022).

# Related Cases

Appellee is unaware of any related cases.

# STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the attached Addendum.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE........................................ 1

The Trial ....................................................................3

The Murder of Anthony Fortune.......................................4

The Murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson ...................................................................5

The Murder of Robert "Butchie" Smith .............................6

The Trial Court's Review of *Brady*, *Giglio*, and Jencks Act Requests...................................................................8

Post-Conviction Proceedings ...........................................12

    Appellants' § 2255 Claims ..........................................16

        1.   William Sweeney.......................................16

        2.   Samuel Carson ........................................20

        3.   Sean Coates............................................23

        4.   Jerome Martin.........................................24

    The Government's Omnibus Opposition .............................25

        1.   William Sweeney.......................................25

        2.   Samuel Carson ........................................29

        3.   Sean Coates............................................31

        4.   Jerome Martin.........................................32

    The District Court's Ruling .........................................32

        1.   William Sweeney.......................................33

        2.   Samuel Carson ........................................35

3.    Sean Coates................................................................37

4.    Jerome Martin............................................................37

SUMMARY OF ARGUMENT................................................................38

ARGUMENT .............................................................................................41

I.    Appellants' Claims of Government Misconduct Were
Procedurally Barred, Untimely, or Meritless. .........................41

A.    Standard of Review and Legal Principles .........................42

1.    § 2255 Principles .........................................................42

2.    *Brady* and Jencks Act Principles.................................45

B.    Discussion ........................................................................47

1.    Appellants' Initial *Brady* Claims Were
Procedurally Barred.....................................................47

2.    Most of Appellant's Subsequent *Brady* Claims
Were Untimely and Did Not Relate Back to the
Initial Claims. ..............................................................50

a.    The Later Claims Did Not Relate Back................52

b.    Most of the Supplemental Misconduct Claims
Were Untimely. ....................................................58

c.    Appellants Are Not Entitled to Equitable
Tolling...................................................................64

3.    Even If Not Procedurally Barred or Untimely,
Appellants' Government-Misconduct Claims Lack
Merit. ...........................................................................74

a.    Documents Allegedly Revealing Evidence of
Alternative Theories. ...........................................75

b.    Documents Revealing Alleged Lies by
Government Witnesses .........................................88

      c.   Information Regarding Relocation Assistance to Witnesses ........................................................ 97

II.  Appellants' Claim that the Trial Court Erred by Reviewing Submissions In Camera and Placing Them Under Seal is Not Properly Before this Court and Is, In Any Event, Procedurally Barred, Untimely, and Meritless ...................... 103

    A.  The COA Does Not Encompass Appellants' Challenge to the Trial Court's In-Camera-Review Procedures......... 104

    B.  Appellants' Claim is Procedurally Defaulted and Time Barred. .......................................................... 106

    C.  Appellants' Claim of Trial-Court Error is Meritless........ 107

III.  Appellate Counsel Was Not Ineffective in Failing to Challenge on Direct Appeal the Trial Court's Specific Evidentiary Rulings Pertaining to the Sealed Material......... 114

    A.  Standard of Review and Legal Principles ....................... 115

    B.  Discussion ................................................................. 118

IV.  Carson's Claim of Ineffective Assistance of Trial Counsel is Not Properly Before This Court, and In Any Event, Is Untimely and Meritless....................................................... 126

CONCLUSION ................................................................. 137

# TABLE OF AUTHORITIES*

*Andrew v. White*, 62 F.4th 1299 (10th Cir. 2023) ...................................97

*Baldayaque v. United States*, 338 F.3d 145 (2d Cir. 2003) ....................71

*Baldwin County Welcome Center v. Brown*, 466 U.S. 141 (1984) ..........67

*Bousley v. United States*, 523 U.S. 614 (1998).......................................44

*Bracey v. Superintendent Rockview SCI*, 986 F.3d 274
  (3d Cir. 2021) ...................................................................................61, 62

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................8, 113

*Buck v. Davis*, 580 U.S. 100 (2017).......................................................105

*Carson v. United States*, 549 U.S. 1246 (2007)................................14, 48

*Clay v. United States*, 537 U.S. 522 (2003).............................................48

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)...............................................132

*Dodd v. United States*, 454 U.S. 353 (2005)............................................47

*Downs v. McNeil*, 520 F.3d 1311 (11th Cir. 2008).................................70

*Fierro v. Cockrell,* 294 F.3d 674 (5th Cir. 2002) ...................................66

*Flanagan v. Johnson*, 154 F.3d 196 (5th Cir. 1998).............................63

*Ford v. Gonzalez*, 683 F.3d 1230 (9th Cir. 2012) ..................................61

\*   Authorities upon which we chiefly rely are marked with asterisks.

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................8

*Goldberg v. United States*, 425 U.S. 94 (1976) ....................................107

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011)....................................93

* *Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016) ...........................52, 55, 58

*Holland v. Florida*, 560 U.S. 631 (2010).............................................65, 69

*In re Davila*, 888 F.3d 179 (5th Cir. 2018)..............................................61

*In re Sealed Case No. 99-3096*, 185 F.3d 887 (D.C. Cir. 1999)..............78

*In re Sealed Case*, 809 F. App'x 6 (D.C. Cir. 2020) ..............................128

*Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020)....................................64

*Johnson v. United States*, 135 S. Ct. 2551 (2015)............................23, 24

*Johnson v. United States*, 544 U.S. 295, 307 (2005)...................59, 61, 69

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009) .................................53

*Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000) ..............................67

*Lesko v. Secretary Pennsylvania Department of Corrections*,
   34 F.4th 211 (3d Cir. 2022) ...................................................................80

*Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107 (2d Cir. 2000)........64

*Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003)..............57, 58

*Massaro v. United States*, 538 U.S. 500 (2003) .....................................44

*Mayle v. Felix*, 545 U.S. 644 (2005).....................................38, 43, 52, 53

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008)..................54

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ...........................................128

*Napue v. United States*, 360 U.S. 264 (1959)....................................23

*Nix v. Whiteside*, 475 U.S. 157 (1986)................................................115

*Owens v. Boyd*, 235 F.3d 356 (7th Cir.2000)......................................59

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..........................................115

*Palermo v. United States*, 360 U.S. 343 (1959)............................ 108, 123

*Payne v. Stansberry*, 760 F.3d 10 (D.C. Cir. 2014) .............................125

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987)............................... 108, 113

*Prieto v. Quarterman*, 456 F.3d 511 (5th Cir. 2006)..............................67

*Roy v. Lampert*, 465 F.3d 964 (9th Cir. 2006) ......................................69

*S.E.C. v. Banner Fund Intern.*, 211 F.3d 602(D.C. Cir. 2000) ..............41

*Schlueter v. Varner*, 384 F.3d 69 (3d Cir. 2004) ..................................72

*Schmitt v. Zeller*, 354 F. App'x 950 (5th Cir. 2009) ..............................65

*Smith v. Cain*, 565 U.S. 73 (2012)........................................................94

*Smith v. Murray*, 477 U.S. 527 .........................................................116

*Smith v. Robbins*, 528 U.S. 259 (2000) ..............................................116

*Smith v. Stewart*, 140 F.3d 1263 (9th Cir. 1998)...................................77

*Smith v. Vannoy*, 848 F. App'x 624 (5th Cir. 2021)..............................64

*Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004) ..................................79

\* *Strickland v. Washington*, 466 U.S. 668 (1984) ....... 40, 41, 115, 116, 117

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................46

*Turner v. United States*, 582 U.S. 313 (2017) .........................................84

*United States v. Abney*, 812 F.3d 1079 (D.C. Cir. 2016).............. 117, 124

*United States v. Aguiar*, 894 F.3d 351 (D.C. Cir. 2018) .......................118

*United States v. Agurs*, 427 U.S. 97 (1976)...........................................46

*United States v. Ahrensfield*, 698 F.3d 1310 (10th Cir. 2012)...............78

*United States v. Bagley*, 473 U.S. 667 (1985) ................................. 45, 46

*United States v. Baxter*, 761 F.3d 17 (D.C. Cir. 2014)................... 66, 119

*United States v. Bertram*, 762 F. App'x 1 (D.C. Cir. 2019)...................105

*United States v. Borda*, 848 F.3d 1044 (D.C. Cir. 2017)........................79

*United States v. Brinson-Scott*, 714 F.3d 616 (D.C. Cir. 2014) ............115

*United States v. Brodie*, 524 F.3d 259 (D.C. Cir. 2008)................... 45, 46

*United States v. Brooks*, 966 F.2d 1500
  (D.C. Cir. 1992)........................................................ 108, 111, 113, 114

*United States v. Bruce*, 89 F.3d 886 (D.C. Cir. 1996) ..........................133

*United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989).................95

*United States v. Caldwell*, 7 F.4th 191 (4th Cir. 2021) ........................108

*United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963) ........................112

*United States v. Carson*, 455 F.3d 336

(D.C. Cir. 2006)2, 3, 5, 13, 14, 26, 80, 82, 83, 84, 88, 98, 99, 102, 111, ................................................................................. 130, 131, 134

*United States v. Ciampi*, 419 F.3d 20 (1st Cir. 2005).....................43, 129

\* *United States v. Cicero*, 214 F.3d 199
   (D.C. Cir. 2000)..............................................39, 45, 63, 65, 68, 69, 73, 74

*United States v. Cronic*, 466 U.S. 648 (1984)......................................126

*United States v. Derr*, 990 F.2d 1330, 1335–36
   (D.C. Cir. 1993)............................................................. 77, 87, 94, 103

*United States v. Doost*, 3 F.4th 432 (D.C. Cir. 2021)...........................121

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) ..........................130

*United States v. Emor*, 573 F.3d 778 (D.C. Cir. 2009)..........................87

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000)...........43

*United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015)...................120

*United States v. Frady*, 456 U.S. 152 (1982) ...................................44, 45

*United States v. Gray-Burriss*, 791 F.3d 50 (D.C. Cir. 2015) ...............133

*United States v. Green*, 178 F.3d 1099 (10th Cir. 1999)......................101

*United States v. Henderson*, 108 F.4th 899 (D.C. Cir. 2024)..................45

*United States v. Hernandez*, 436 F.3d 851 (8th Cir. 2006).............67, 129

*United States v. Hickey*, 767 F.2d 705 (10th Cir. 1985) ......................111

*United States v. Hicks*, 283 F.3d 380 (D.C. Cir. 2002) ..............43, 52, 54

*United States v. Hsia*, 30 F. App'x 1 (D.C. Cir. 2001) ............................ 78

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ............................ 96

*United States v. Jackson*, 627 F.2d 1198 (D.C. Cir. 1980) ................... 134

*United States v. Kennedy*, 890 F.2d 1056 (9th Cir. 1989) ..................... 77

*United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021) .......................... 113

*United States v. Martin*, 2021 WL 4989983
  (D.D.C. Oct. 27, 2021) 2, 5, 14, 16, 32, 33, 34, 35, 36, 37, 38, 49, 50, 60,
  ......................................................................... 64, 88, 101, 127, 129

*United States v. Martin*, 2022 WL 1618869
  (D.D.C. May 23, 2022) ............................. 3, 8, 12, 34, 54, 57, 61, 68, 125

*United States v. Mason*, 523 F.2d 1122 (D.C. Cir. 1975) ..................... 107

*United States v. McDade*, 699 F.3d 499 (D.C. Cir. 2012) ...................... 73

*United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) ........................ 82

*United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992) ....................... 108

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) ................. 113, 123

*United States v. Mullins*, 22 F.3d 1365 (6th Cir. 1994) ...................... 101

*United States v. North American Reporting, Inc.*, 761 F.2d 735
  (D.C. Cir. 1985) ............................................................................ 109

*United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007) .................. 47, 95

*United States v. Pettigrew*, 346 F.3d 1139 (D.C. Cir. 2003) ................. 44

*United States v. Petty*, 530 F.3d 361 (5th Cir. 2008) ............................ 69

*United States v. Pole*, 741 F.3d 120 (D.C. Cir. 2013)...........................136

\* *United States v. Pollard*, 416 F.3d 48 (D.C. Cir. 2005) ........ 59, 70, 72, 73

*United States v. Robinson*, 68 F.4th 1340 (D.C. Cir. 2023) ....................45

*United States v. Santos*, 486 F. App'x 133 (2d Cir. 2012).......................77

*United States v. Scurry*, 992 F.3d 1060 (D.C. Cir. 2021)........................69

\* *United States v. Shark*, 51 F.3d 1072 (D.C. Cir. 1995) ............... 131, 132

*United States v. Spencer*, 618 F.2d 605 (9th Cir. 1980).........................47

*United States v. Stuart*, 923 F.2d 607 (8th Cir. 1991).........................113

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ...............108

\* *United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998)................ 132, 134

*United States v. Thomas*, 97 F.3d 1499 (D.C. Cir. 1996).......................46

*United States v. Watson*, 717 F.3d 196 (D.C. Cir. 2013).......................119

*United States v. Weaver*, 195 F.3d 52 (D.C. Cir. 1999)........................104

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010).........................96

*Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985)......................... 133, 134

*Waters v. Lockett*, 896 F.3d 559 (D.C. Cir. 2018).. 105, 116, 117, 127, 128

*Watkins v. Stephenson*, 57 F.4th 576 (6th Cir.), *cert. denied sub nom.*
   *Watkins v. Chapman*, 144 S. Ct. 222 (2023) .......................................129

## OTHER REFERENCES

18 U.S.C. § 924(c) ................................................................................................23

18 U.S.C. § 3500 ............................................................................................. 8, 46

18 U.S.C. § 3500(b) ........................................................................................... 112

18 U.S.C. § 3500(c) ........................................................................................... 107

18 U.S.C. § 3500(e) ..................................................................................... 47, 123

18 U.S.C. § 3500(e)(1) ...................................................................................... 123

18 U.S.C. § 3500(e)(2) ...................................................................................... 124

28 U.S.C. § 2244(d) ...........................................................................................61

28 U.S.C. § 2253(c)(1)(B) ................................................................................. 104

28 U.S.C. § 2253(c)(2) ...................................................................................... 104

28 U.S.C. § 2255
    2, 14, 15, 16, 17, 19, 20, 21, 23, 24, 25, 29, 33, 35, 38, 42, 43, 47, 48, 51,
    ......52, 54, 62, 66, 67, 70, 71, 72, 105, 107, 118, 125, 126, 129, 130, 131

28 U.S.C. § 2255(4) ............................................................................................59

28 U.S.C. § 2255(a) ............................................................................................42

28 U.S.C. § 2255(f) ............................................................. 28, 38, 47, 127, 129, 130

28 U.S.C. § 2255(f)(1) ................................................................ 39, 42, 51, 58, 61

App 1783

28 U.S.C. § 2255(f)(4) ....................................30, 35, 38, 39, 42, 58, 59, 62

D.C. Code § 22-4135 ................................................................. 27, 29, 40

D.C. Code § 2254 ............................................................................ 43, 64

Fed. R. App. P. 28(a)(8) ......................................................................... 41

Fed. R. Civ. P. 15(c)(2) .......................................................................... 43

# ISSUES PRESENTED

I.    Whether the district court erred by denying the government-misconduct claims raised in appellants' initial and supplemental 28 U.S.C. § 2255 motions, where these claims were procedurally defaulted, untimely, and/or meritless.

II.    Whether this Court should consider appellants' claim that the trial judge erred by reviewing alleged *Brady* and Jencks Act material in camera and placing the material under seal, where this claim is not encompassed by the certificate of appealability ("COA") and in any event is procedurally barred, untimely, and meritless.

III.    Whether the district court erred by rejecting appellants' challenges to their appellate counsel's representation, where appellants established neither deficient performance nor prejudice arising from their counsel's failure to raise *Brady* claims based on material previously sealed by the trial court.

IV.    Whether this Court should consider Carson's claim of ineffective assistance of trial counsel, where this claim is beyond the scope of the COA, and in any event is untimely and meritless.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————

UNITED STATES OF AMERICA,                          Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN,JR., and SAMUEL CARSON,       Appellants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

BRIEF FOR APPELLEE

———————————

## COUNTERSTATEMENT OF THE CASE

Appellants Sean Coates, William Sweeney, Jerome Martin, Jr., and

Samuel Carson were members of the notorious K Street Crew, a gang

that, in the 1980s and 1990s, engaged in an "organized and massive

business of selling drugs" that "led to an astonishing amount of violence

and a seemingly complete repudiation of civil society and respect for

human life[,]" including the murders of at least 11 people. *United States v. Carson*, 455 F.3d 336, 339 (D.C. Cir. 2006). On September 18, 1998, appellants and several others were charged in a multi-count indictment with narcotics conspiracy, racketeer influenced corrupt organization ("RICO") conspiracy, violent crime in aid of racketeering ("VICAR") offenses, murder and other violent crimes, narcotics trafficking, and weapons possession. *Id.* at 347. Following a nine-month trial before the Honorable Thomas Penfield Jackson, a jury convicted each appellant of, inter alia, narcotics conspiracy, RICO conspiracy, and murder. *See* App. 720-747; *Carson*, 455 F.3d at 382 nn.37-38, 40. Judge Jackson sentenced each appellant to life in prison on multiple counts. *Carson*, 455 F.3d at 382 nn.37-38, 40.

Appellants appealed their convictions and sentences, which this Court affirmed "in toto." *Carson*, 455 F.3d at 339. Appellants then sought post-conviction relief under 28 U.S.C. § 2255, ultimately raising "copious challenges to their convictions." *United States v. Martin*, 2021 WL 4989983, at *1, 4 (D.D.C. Oct. 27, 2021). On October 27, 2021, the Honorable Royce C. Lamberth denied the motions. *Id.* at *1. Appellants

filed timely notices of appeal (App. 138).[1] Judge Lamberth subsequently declined to issue a certificate of appealability ("COA"). *United States v. Martin*, 2022 WL 1618869, at \*7-8 (D.D.C. May 23, 2022).

On December 23, 2022, this Court granted a COA on two questions: "(1) whether the government's allegedly improper withholding of certain materials submitted to the district court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to that sealed material." *United States v. Coates*, No. 21-3072 (Order, December 23, 2022).

## The Trial

This Court described the facts of this case in *Carson*, 455 F.3d at 339:

> This case is a story of mayhem and disorder in and around the 200 block of K Street, Southwest, in the District of Columbia from the 1980s until 1998. Underlying the violence was appellants' organized and massive business of selling drugs, for which they stand convicted of participating in a narcotics conspiracy to distribute over 1,000 kilograms of marijuana.

[1] "App. Br." refers to appellants' brief. "App." refers to the appendix filed with appellants' brief. "Supp. App." refers to the supplemental appendix filed with appellee's brief. "Dkt." refers to documents on the district court docket by number.

According to evidence believed by a jury, that drug business led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for human life. Individual appellants in this case, sometimes acting in concert, stand convicted of the murders of eleven people[.] . . . Some appellants also were convicted for numerous attempted murders, crimes of violence, and firearms offenses. All appellants were convicted for a racketeering conspiracy.

The beginning of the end of the K Street drug network came in late 1995, when the Federal Bureau of Investigation ("FBI" or "Bureau") started a comprehensive investigation into illegal drug sales in the area. . . .

The FBI's investigation lasted three years and suggested a long history of drug-dealing and an extraordinary breadth of violent acts. Crucial to the government's case was testimony from former associates of appellants and nearby residents—testimony that was undoubtedly difficult to obtain given evidence, as discussed below, that some of the appellants have a history of murdering or attempting to murder potential witnesses against them.

As pertinent to this appeal, the evidence also showed the following:

## The Murder of Anthony Fortune

Carson shot and killed Anthony Fortune in August 1991, after a dispute between Martin, Carson, and Fortune in a craps game. Carson described the killing to [James] Montgomery, recalling that he had shot Fortune and after Fortune fell Carson "went over top of him [sic] and hit him some more." A witness saw Martin and Carson earlier, and heard Martin talking about how he "didn't like Tony Fortune robbing people, and [how Fortune] would kill your mother." Later that evening, the witness saw Carson "walking towards Tony Fortune, shooting." Carson "then stood over [the] top of him and shot him."

*Carson*, 455 F.3d at 342. After the shooting, Carson "got into a car driven by Martin and the two drove away. Other witnesses testified that Martin and Carson bragged about shooting Fortune years later." *Martin*, 2021 WL 4989983, at *1 (internal citations omitted). Charles Bender, who was later incarcerated with Martin, testified that Martin told him that he (Martin) had killed Fortune (Supp. App. 516-517).

### The Murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson

A robbery by K Street members resulted in the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Carson, Sweeney, and other K Street members went to Las Vegas in 1996 to see the Evander Holyfield/Mike Tyson boxing match. Carson saw Gaskins win about $50,000 in Las Vegas. Carson, Montgomery, and Sweeney discussed robbing Gaskins, hoping to get $250,000 and divide it three ways. They planned to use money from the Gaskins robbery to kill Thomas Fields and others from a nearby neighborhood on L Street.

Montgomery explained that the group conducted significant surveillance on Gaskins in Temple Hills, Maryland. Then, on the day of the attempted robbery, Sweeney brought a .40 caliber Glock firearm and a stun gun, and after further preparation, the group arrived at Gaskins's craps house. Montgomery and Sweeney jumped out of the group's van, but Coates stayed behind. Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out. When confronted by Montgomery as to why he started shooting everyone, Sweeney claimed that Gaskins was reaching for a weapon, which Montgomery disputed.

*Carson*, 455 A.3d at 344–45.

## The Murder of Robert "Butchie" Smith

K Street members sought to kill yet another government witness in 1997[.] . . . When the FBI opened its investigation in 1995, Robert Smith, one of the main suppliers of marijuana to Southwest, was immediately a focus of the Bureau's inquiry. Smith was arrested after a sting operation and agreed to cooperate, describing for the FBI his drug-related activities and several crimes of violence committed by appellant Sweeney, his relative, and Sweeney's associates. An FBI Special Agent conducting the investigation testified that Smith and the Bureau tried "to make sure that nobody on the street thought that [Smith] was cooperating." That effort proved unsuccessful. After Sweeney was arrested for the triple murders in Temple Hills, he realized, according to Montgomery's testimony, that Smith was the only person he told about the murders. Carson told Montgomery that if the group "hit [Smith], then [the government] don't have no case, but eventually, they was going to come and get us, if we don't hit" Smith. After that, Carson and Montgomery would look for Smith when they were out and about in Southwest. Although they saw him a number of times, he was never alone.

On June 16, 1997, Carson borrowed Montgomery's car. Later, Montgomery heard that Smith had been shot on Half Street, Southwest. Carson returned that evening and, after discussing the fact that Smith had been killed, told Montgomery, "man, trust me, we're all right," and returned Montgomery's car keys. Carson directed Montgomery to stay away "from up Half Street" and "not to drive" the car if he "didn't have to." Smith was shot eleven times, seven of which were in the head.

*Id.* at 346–47.

Smith's murder was not charged as a substantive offense in the indictment, but was included as a predicate act of the RICO conspiracy. At trial, the government introduced Smith's statements to the lead FBI investigator, Special Agent ("SA") Vincent Lisi, including information about narcotics activities in Southwest, as well as information about violent crimes committed by appellants and others, much of which Smith learned from Sweeney (Supp. App. 574-591). These included statements about the shooting of Michael Jones; the attempts to find and kill Kenneth Adams; the kidnaping and shooting of Anthony Pryor; the murder of Donnell Whitfield; and the triple murders of Gaskins, Mack, and Anderson (Supp. App. 582-591).[2]

---

[2] Lisi's testimony about Smith's statements did not provide new information about any violent crimes that had not already been provided by other witnesses, but it did corroborate details of other witnesses' testimony. On direct appeal, this Court rejected hearsay and Confrontation Clause challenges to the admission of Smith's statements. *Carson*, 455 F.3d at 362-367.

## The Trial Court's Review of *Brady*, *Giglio*, and Jencks Act Requests

Both before and during trial, "[appellants'] counsel repeatedly requested *Brady*, *Giglio*, and Jencks Act[3] materials from the government." *Martin*, 2022 WL 1618869, at *3. Due to security concerns, "the government turned over disputed material either in redacted form or by filing it with the trial court under seal." *Id.*

Sweeney, for example, filed several pretrial motions to compel discovery of statements and information pertaining to government cooperator James Montgomery and Robert "Butchie" Smith (App. 576; Supp. App. 001, 021). Carson similarly moved for disclosure of exculpatory and impeachment evidence related to Montgomery (App. 603). Following a motions hearing on June 16, 2000, the district court reviewed the government's investigative file of Montgomery and ordered disclosure of specific *Brady* material pertaining to the Maryland triple murders (Supp. App. 019-020).

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); Jencks Act, 18 U.S.C. § 3500.

At a subsequent pretrial hearing, on September 27, 2000, the trial court ordered the government to turn over all *Brady* and *Giglio* information pertaining to Smith (Supp. App. 290-295).[4] Appellants' counsel complained that they had been given redacted copies of the FBI 302 reports, and asked the court to review in camera the unredacted versions of those reports and all other written statements in the government's possession (Supp. App. 296-298, 301). The court agreed to do so (Supp. App. 298, 301-302). Over the following weeks, the government filed disclosures in accordance with the trial court's order (Supp. App. 035-077).[5]

During trial, the court routinely reviewed documents in the government's possession for potential *Brady* and Jencks Act material at appellants' request. Before the government's first witness, SA Lisi, took the stand, defense counsel complained that they had received his grand

---

[4] In a written order issued the following day, the court specified that the government was to "disclose any and all evidence in its possession which may impeach the out-of-court statements of Smith . . . or may indicate that persons other than defendants attempted or had reason to murder Smith" (Supp. App. 030-031).

[5] The government also made pretrial *Brady* disclosures regarding the murders of Maurice Hallman, Leonard Hyson, Teresa Thomas, Terita Lucas, and Timothy Benton (Supp. App. 013-017).

jury testimony and FBI 302 reports with redactions (Supp. App. 305-312). Sweeney's counsel suggested that the court "conduct a full in camera evaluation" of all grand jury testimony and 302 reports and place those documents under seal (App. 181-182). The court agreed to do so, noting that the Jencks Act "requires it" (App. 183).

On March 12, 2001, Carson filed another motion for production of documents containing alleged *Brady* and Jencks Act information related to James Montgomery (Supp. App. 078). Carson requested that, in the alternative, the court conduct a second ex parte review of the material to determine if it contained impeachment evidence (Supp. App. 082-083). The court did so and determined that all of SA Lisi's FBI 302 reports documenting Montgomery's statements constituted Jencks Act material (Supp. App. 426-427). The court permitted the government to redact certain information raising "security concerns" before turning the material over to the defense (Supp. App. 427-428).[6]

---

[6] The trial court also reviewed Lisi's notes of interviews with Montgomery, and determined that they contained neither *Brady* nor Jencks Act material (App. 321-322).

On April 4, 2001, defense counsel requested that the court review the FBI 302 reports related to Charles Bender for *Brady* and Jencks Act material (Supp. App. 518). The court agreed to do so, noting, "Some 302's, in my judgement, are Jencks material. Some are not." (Supp. App. 519.) The following day, the court indicated that nothing in the 302s was inconsistent with Bender's trial testimony or otherwise required disclosure (Supp. App. 526-527). At Sweeney's request, the court placed the documents under seal and made them part of the record (Supp. App. 527).

A few days later, during the testimony of government cooperator Eugene Byars, the defense again requested that "the same process on any FBI 302s be employed that we've used in the past[,] that the court conduct an in camera review" (Supp. App. 534). The court again did as requested (Supp. App. 534-535).

The court twice reviewed in camera the January 27, 1999, FBI 302 report related to Arthur Rice (App. 469; Supp. App. 543). The court found "nothing in it to permit it to be characterized as *Brady* material," and ruled that "it [wa]s clearly not a Jencks Act statement" (App. 469). Appellants did not challenge this ruling.

Over the course of the trial, the court assigned exhibit numbers to the sealed documents and kept an exhibit list detailing when each document was marked and placed under seal (Supp. App. 123). At no point during trial did appellants raise any objection to the district court's in-camera-review procedure.

## Post-Conviction Proceedings

During the pendency of appellants' direct appeals, Sweeney filed a motion in this Court to review all sealed portions of the trial record to support an argument that the district court erred in ruling that the sealed materials did not contain Jencks or *Brady* information (Supp. App. 090). On October 2, 2002, this Court denied the motion, explaining that it would "undertake its own in camera review of the materials in dispute" if Carson were to identify on appeal "specific evidentiary rulings of the district court [he] claim[ed] were erroneous" (*id.*).

On May 29, 2003, Sweeney, joined by the other appellants, filed another motion asking this Court to review the sealed materials, this time identifying "thirteen sets of sealed materials, explain[ing] their suspicions, and t[ying] those suspicions to suspected *Brady*, *Giglio*, or Jencks Act violations." *See Martin*, 2022 WL 1618869, at *3 (citing

*Carson*, No. 02-3015 (D.C. Cir. May 29, 2003) (Doc. No. 751872)); Supp. App. 092-108. Appellants highlighted materials relating to numerous government witnesses, including SA Lisi, Robert Smith, Reginald Switzer, Andre Murray, Theodore Watson, Charles Bender, James Montgomery, Arthur Rice, Paul Franklin and others (Supp. App. 092-108). On August 28, 2003, this Court again rejected the request, reiterating that appellants would not be permitted to review the material themselves but that the Court would undertake an in camera review if appellants presented "a colorable claim" of a *Brady* or Jencks Act violation (App. 750). The Court advised that "[a]ny future arguments concerning the district court's application of *Brady* and/or the Jencks Act should be presented in the appellants' brief, rather than by motion" (*id.*).

On appeal, appellants did not assert substantive *Brady* or Jencks Act claims related to the sealed material; instead, they alleged belated disclosures related to Charlene Wilson and James Montgomery, and raised a judicial-bias claim that challenged, among other things, the district court's rulings regarding the "timing of disclosure of exculpatory material under *Brady* . . . and of witness statements to the government under the Jencks Act." *Carson*, 455 F.3d at 355.

On July 21, 2006, this Court affirmed appellants' convictions. *Carson,* 455 F.3d at 336. The Court subsequently denied appellants' petition for rehearing or rehearing en banc. On February 20, 2007, the Supreme Court denied appellants' petitions for a writ of certiorari. *Carson v. United States,* 549 U.S. 1246 (2007).

On February 13, 2008, Sweeney, through counsel, filed a motion in the district court for access to the sealed trial material (Supp. App. 111-114). On February 15, 2008, the Honorable Thomas Hogan granted Sweeney's motion and ordered the clerk's office to provide "copies of any necessary sealed pleadings in this matter" to counsel for Sweeney (Supp. App. 116). "The remaining defendants indicated that they received access to these materials at that time." *Martin,* 2021 WL 4989983, at *2 (citing ECF No. 1170 at 9 n.6 (stating that the records were "turned over by the clerk in 2008")); *see also* App. 1295 at n.5 (listing documents that were placed under seal "and discovered by 2255 counsel in 2008"). Between February 18 and 28, 2008, appellants filed motions to vacate their convictions pursuant to 28 U.S.C. § 2255 (App. 951, 968, 985, 991).

Between 2010 and 2013, appellants sought extensions of time in which to file supplements to their respective § 2255 motions (see, eg., Dkt.

1062, 1065, 1067, 1080, 1096, 1101, 1114), which the district court granted (Supp. App. 117-119; Dkt. 1073, 1074, 1097, 1103, 1115). At a status hearing on August 29, 2013, defense counsel requested an additional nine months to file any supplements to their original § 2255 motions (Supp. App. 655-657). The court ordered supplements to be filed by May 29, 2014 (App. 128; Dkt. 1122). Subsequently, the Court granted appellants several additional motions for extension of time (see, e.g., Dkt. 1128, 1137, 1148, 1149).

Between November 2014 and June 2017, appellants filed supplements to their original § 2255 motions (App. 1069, 1155, 1289, 1462, 1466, 1469, 1518, 1564). At a status hearing on August 3, 2018, counsel for Martin indicated his intention to file additional supplements (Supp. App. 660). Carson filed supplements to his § 2255 motion on October 28 and 31, 2018 (Supp. App. 124, 133). Coates filed a motion to join Carson's supplement on October 30, 2018 (Dkt. 1228). Sweeney filed a supplemental § 2255 motion on October 31, 2018 (App. 1648). Martin filed a supplement to his § 2255 motion on November 21, 2018 (App. 1651).

## *Appellants' § 2255 Claims*

Appellants' initial § 2255 motions and numerous supplemental motions raised "nearly ninety claims" "alleging government misconduct, ineffective assistance of counsel, and unconstitutional sentences." *Martin*, 2021 WL 4989983, *1. Below we summarize those claims that are pertinent to the instant appeal.

### 1.    William Sweeney

On February 19, 2008, Sweeney, through counsel Jenifer Wicks, timely filed a § 2255 motion that raised 17 claims alleging ineffective assistance of trial and appellate counsel, trial-court error, and government misconduct (App. 951). As relevant here, Sweeney claimed, inter alia, that:

(1) his appellate counsel was ineffective in failing "to note sections of sealed matters for [this] Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion" (App. 962), and

(2) the government had engaged in misconduct by (a) failing to disclose impeachment information regarding James Montgomery,

namely the government's assessment that Montgomery had previously testified unreliably by implicating Carson in a murder for which Steven DeWitt was convicted in D.C. Superior Court; (b) "procuring Arthur Rice's testimony by misrepresentation" and obtaining Montgomery's testimony "after he lied and violated previous plea agreements"; and (c) "procuring 'jailhouse' confessions" in violation of Sweeney's Sixth Amendment rights (App. 966-967).

In addition, Sweeney generally asserted that "the prosecutors engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" (App. 966). Sweeney noted that his counsel "need[ed] further investigation" to support this belief (*id.*).

Over six years later, on November 28, 2014, Sweeney, through new § 2255 counsel, filed a supplement to his original § 2255 motion (App. 1069). In pertinent part, Sweeney claimed that the government violated *Brady*/*Giglio* by failing to disclose information that was sealed during the

trial but was later released to appellants pursuant to the district court's February 15, 2008, order, including the following:

(1) impeachment information about cooperating witness Theodore Watson that was contained in Watson's prosecution file from another jurisdiction (App. 1079-1092);

(2) statements by James Montgomery to SA Lisi implicating Carson in the murder of Timothy Benton (App. 1092-1093);

(3) statements by cooperating witness Charles Bender that appellant Martin confessed to the 1991 murder of Anthony Fortune (App. 1093-1094);

(4) statements by cooperating witness Arthur Rice that he was present when Martin and Carson killed Leonard Hyson and Maurice Hallman, contradicting Montgomery's trial testimony that he (Montgomery) and Carson had killed Hallman and Hyson (App. 1094-1095);

(5) statements by cooperating witness Andre Murray that Petey Johnson killed Robert "Butchie" Smith in 1997 to get back at Sweeney for allegedly killing Petey's brother, Keith Johnson (App. 1095-1096); and

(6) information that others had a motive to kill, or were thought to have killed, Smith (App. 1096-1112). In support of this claim, Sweeney noted that in a pleading entitled, "Government's Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants," filed under seal on April 2, 1999 (App. 1248), the government represented that it had identified Andre Chappelle and Anthony Hawkins as suspects in Smith's murder.[7]

---

[7] The notice described in detail the security concerns, particularly appellants' history of murdering and intimidating witnesses, that gave rise to the movement of appellants from the D.C. jail to the Northern Neck Regional Jail in Warsaw, Virginia, following their arraignment (App. 1248-1249). Smith's murder was among the incidents recounted (App. 1259-1260).

Years after Sweeney filed his first supplemental § 2255 motion, on November 9, 2019, Sweeney filed a motion for discovery, seeking further information about Chappelle and Hawkins (Supp. App. 127-130). The district court did not rule on this motion before rejecting Sweeney's supplemental claims as untimely. The government currently is in the process of providing appellants' counsel material supporting its early theory that Chappelle and Hawkins were suspects in Smith's murder. This follows an extensive review of the government's trial file. Because the available file appears to be incomplete, the government has been unable to ascertain whether this material was previously provided to the defense.

Sweeney further claimed that his trial counsel was ineffective in failing to object to the trial court's in camera review of the sealed materials (App. 1147-1148). Relatedly, Sweeney argued that his appellate counsel was ineffective in failing to highlight portions of the sealed material for this Court to review on direct appeal (App. 1123-1125), and for failing to challenge the trial court's ultimate rulings regarding the material related to James Montgomery, Arthur Rice, and Andre Murray (App. 1130-1135).[8]

### 2.    Samuel Carson

On February 28, 2008, Carson's pro se § 2255 motion was docketed by the district court (App. 985). The motion stated three claims: (1) "The Petitioner Was Deprived His Sixth Amendment Right to Effective Assistance of Counsel" due to "A) Failure to Investigate[, and] B) Failure to Object to Inadmissible Evidence"; (2) "Sentence Imposed in Violation of The United States Constitution"; and (3) "Newly Discovered Evidence

---

[8] On February 25, 2015, Sweeney filed a second supplemental § 2255 motion raising, for the most part, the same claims that he raised in his November 28, 2014, supplemental motion (Dkt. 1164-1). On October 31, 2018, Sweeney filed a third supplemental motion, raising claims that are not relevant to the instant appeal (App. 1648).

Establishes That The Petitioner Was Denied his Fifth Amendment Right to Due Process" (App. 988). Carson referred to an "Attached Memorandum of Law and Facts" (*id.*); however, no such document was attached to his pro se motion, nor was one ever produced during the course of the § 2255 proceedings in the district court.

On April 9, 2015, Carson, through counsel, filed a supplement to his § 2255 motion (App. 1289), raising in relevant part the following claims:

(1) The government violated *Brady/Giglio* by failing to disclose documents that were filed with and/or submitted to the trial court under seal before and during trial. Carson acknowledged that these documents were made available to the defense by then-Chief Judge Hogan's February 15, 2008, order (App. 1298-1308)[9];

_____

[9] Like Sweeney, Carson relied on the following documents: 1) the government's "Ex Parte Notice to Change Confinement" of appellants, identifying Andre Chappelle and Anthony Hawkins as suspects in the Robert Smith murder; 2) interview notes of Andre Murray, wherein Murray repeated a rumor that Petey Johnson (a.k.a "Fat Petey") was believed to have killed Smith; 3) interview notes that James Montgomery had originally told SA Lisi that Carson killed Timothy Benton; 4) FBI 302 reports noting that Charles Bender indicated that Martin had killed Anthony Fortune; 5) notes that Charles Bender told law enforcement that "Art" killed Steve Dunbar; and 6) the Theodore Watson case file from an unrelated Maryland case, in which Watson allegedly admitted to a prosecutor that he had lied in the past (App. 1298-1308).

(2) The government engaged in misconduct by paying benefits to John Pinkney and Cheree Owens, witnesses who testified in a Maryland grand jury about the 1996 triple murder, "in a manner designed to encourage them to improve their testimony" and facilitate their "disappearance," and by failing to disclose the payments to the defense (App. 1309-1316);

(3) Trial counsel were ineffective for failing to zealously represent Carson because of an alleged conflict between counsel and the trial judge (App. 1318-1324). In an affidavit attached to Carson's motion, trial counsel Lexi Negin-Christ averred that she and her co-counsel faced "insurmountable" judicial bias which prevented them from, inter alia, "effectively cross-examin[ing] witnesses, respond[ing] to late *Brady* disclosures[,] . . . [and] mak[ing] effective strategic decisions" (App. 1425). She claimed that their desire to "appease" the judge caused them to render ineffective assistance to Carson (App. 1427);

(4) Trial counsel was ineffective in failing to object to the trial court's in-camera-inspection procedure for reviewing alleged *Brady* material (App. 1330); and

(5) Appellate counsel was ineffective in failing to seek appellate review of the trial court's rulings regarding the sealed material (App. 1331).[10]

On October 28, 2018, Carson filed a pleading requesting that the district court consider *Napue v. United States*, 360 U.S. 264 (1959), when assessing the issues raised in his previous filings (Supp. App. 133).

### 3.    Sean Coates

On February 19, 2008, Coates, through counsel, timely filed a § 2255 motion (App. 991), raising, inter alia, the following claims:

(1) the government violated *Brady* by allegedly withholding information about James Montgomery's credibility, specifically that Montgomery had accused Carson or Sweeney of a murder for which Steven DeWitt had been convicted (App. 994, 1040);

(2) appellate counsel was ineffective in failing to "obey" this Court's order regarding sealed portions of the trial record, namely its directive to "identify the specific rulings" appellants' believed were

---

[10] On June 24, 2016, and June 14, 2017, Carson filed supplemental § 2255 motions challenging his convictions under 18 U.S.C. § 924(c) in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015) (App. 1466; Dkt. 1192). That claim is not at issue in this appeal.

erroneous, and for failing to raise on appeal a claim of ineffective assistance of trial counsel (App. 1035-1036).[11]

### 4.    Jerome Martin

On February 18, 2008, Martin timely filed a pro se § 2255 motion (App. 934). Martin claimed, inter alia, that:

(1)    the government violated *Brady* by withholding exculpatory evidence regarding the 1991 killing of Anthony Fortune; i.e., that an eyewitness, Steven Thomas, was interviewed by the police and purportedly described the shooter as someone other than Martin and Carson (App. 939, 941-944); and

(2)    the government impeded Martin's ability to call shooting victim James Coulter as a witness by falsely representing to the district court that Coulter could not be found or was possibly deceased (App. 939-940, 944-945).[12]

---

[11] Coates filed pro se supplemental § 2255 motions on February 24, 2015 (App. 1155), and June 27, 2016 (App. 1469), raising new claims. Those claims are not at issue in this appeal.

[12] On June 23, 2016, Martin filed a supplement to his § 2255 motion, raising a claim under *Johnson*, 135 S. Ct. at 2551 (App. 1462). This claim is not raised in the instant appeal. On November 21, 2018, Martin filed a second supplemental motion in which he provided additional detail and

All appellants moved to adopt or join the § 2255 claims raised by their co-appellants (App. 1044, 1291, 1331; Supp. App. 124; Dkt. 1279 (Carson); App. 1471 (Coates); App. 1650, 1071 n.4 (Sweeney); App. 1651 (Martin)).

### *The Government's Omnibus Opposition*

On March 18, 2020, the government filed an omnibus opposition to appellants' § 2255 motions (Supp. App. 135). The government argued that appellants' claims were procedurally barred, time barred, or otherwise meritless (*id.*). As to the issues raised in the instant appeal, the government responded as follows.

### 1.    William Sweeney

Regarding Sweeney's claim that his appellate counsel (who was also trial counsel) failed to note sections of sealed material for this Court to review, the government argued that this claim was meritless because appellate counsel did just that (Supp. App. 195). During the direct appeal, Sweeney's appellate counsel filed a motion in this Court seeking permission to review all sealed portions of the trial record (Supp. App.

argument pertaining to his two original claims about the murder of Anthony Fortune and the shooting of James Coulter (App. 1651). Martin also raised three new claims, none of which are at issue here.

196). When that motion was denied on grounds that Sweeney had not made a "colorable claim" that the material he wished to review contained evidence favorable to him, Sweeney's appellate counsel tried again. In a joint, 17-page "Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record" (Supp. App. 092-108), appellate counsel alleged that the government had suppressed *Brady* information, and specifically sought materials relating to numerous government witnesses, including SA Lisi, Robert "Butchie" Smith, Reginald Switzer, Andre Murray, Theodore Watson, Charles Bender, James Montgomery, Arthur Rice, and others (*id.*).

On August 28, 2003, this Court denied the joint motion, ruling that the appellants "must identify the specific rulings that they believe are erroneous" and instructing that any "future arguments concerning the district court's application of *Brady* and/or the Jencks Act should be presented in the appellants' brief, rather than by motion" (App. 750). Although, on direct appeal, none of the appellants challenged the trial court's rulings on the sealed materials, they incorporated a challenge to the court's *Brady* rulings in their claim of judicial bias. *See Carson*, 455 F.3d at 355 ("appellants object to discrete allegedly biased rulings by the

trial judge which (1) set the timing of disclosure of exculpatory material under *Brady*, . . . and of witness statements under the Jencks Act").

Based on this record, the government argued that Sweeney's complaint about his appellate counsel's performance was unfounded because counsel filed pleadings and advanced arguments seeking to unseal specific matters reviewed by the trial court; he simply was unsuccessful (Supp. App. 197).

The government argued that Sweeney's claims alleging the suppression of *Brady* information about James Montgomery and Arthur Rice were procedurally barred because Sweeney failed to raise them on direct appeal and had not established cause and prejudice to excuse his procedural default (Supp. App. 205). Regarding the alleged *Brady* information pertaining to Montgomery—namely, that the government had found unreliable Montgomery's testimony in a D.C. Superior Court case, *United States v. Steven Dewitt*,[13] No. 1991 FEL 5548—the

[13] Dewitt, who was convicted of murdering Paul Ridley (in a case unrelated to the K Street investigation), pursued a claim under the District of Columbia's Innocence Protection Act, D.C. Code § 22-4135, asserting that he was innocent because Samuel Carson was in fact the culprit (Supp. App. 205). At an evidentiary hearing on DeWitt's claim, Montgomery testified that Carson had admitted to him that he had killed

government argued that this information was available to Sweeney in 2004, during his direct appeal (Supp. App. 206). As to Sweeney's claim that the government engaged in misconduct by obtaining Rice's testimony "by any means necessary," the government asserted that summary denial was appropriate because this claim was vague and conclusory (Supp. App. 207).

As to the claims raised in Sweeney's first and second supplemental motions, filed on November 28, 2014, and February 25, 2015, respectively, the government asserted that they were untimely under 28 U.S.C. § 2255(f) and did not relate back to any timely filed claims (Supp. App. 208). Because those claims were based upon materials that were unsealed by then-Chief Judge Hogan on February 15, 2008, they were time barred as of February 15, 2009 (*id.*).[14]

---

Ridley (Supp. App. 206). In granting DeWitt's motion in 2004, the Superior Court noted that the government "sought to undermine" Montgomery's testimony at the hearing (*id.*).

[14] In reply, Sweeney submitted an affidavit of post-conviction counsel Jenifer Wicks, who asserted that despite her efforts to obtain the unsealed material from the clerk's office between February 2008 and June 2010, she did not gain access to the material until June 17, 2010 (App. 1689-1690).

## 2.    Samuel Carson

The government argued that Carson's original pro se motion was untimely,[15] and meritless in any event because it was vague and conclusory (Supp. App. 214-215). Even if deemed timely and liberally construed as a "placeholder § 2255 motion," the government argued, most of Carson's claims nevertheless failed because, with the possible exception of one claim, none of the later-raised claims related back to the "placeholder" claims (Supp. App. 215-216).

The one possible exception—Carson's supplemental claim alleging the discovery of "new evidence" that the government had paid for and facilitated the "disappearance" of John Pinkney and Cheree Owens—was nonetheless meritless (Supp. App. 217-218). The government noted that the "new evidence" proffered by Carson was a May 29, 2014, interview of Owens by Carson's § 2255 counsel and an investigator, Dale Vaughan. During that interview, Owens purportedly stated that the FBI had

---

[15] The government asserted that the motion, which was docketed by the district court on February 28, 2008, was untimely under the "prisoner mailbox rule" because although Carson's motion was signed on February 18, 2008, there was no evidence as to when he placed it in the prison mail system (Supp. App. 214-215).

"moved her and Mr. Pinkney to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder" (Supp. App. 217 (citing Dkt. 1132, at 2)). Owens refused to sign an affidavit. Vaughan apparently executed an affidavit, but that affidavit was not attached to Carson's April 9, 2015, supplemental motion (Supp. App. 217).

The government argued that although this claim was timely under 28 U.S.C. § 2255(f)(4) because it was filed within one year of the discovery of the evidence, the claim was meritless because (1) Carson had not substantiated it with an affidavit from Vaughan or Owens; (2) Carson's assertion that the government had made Pinkney and Owens "disappear" was a "mischaracterization" of Owens's alleged statements and failed to take into account that other reasons, such as witness safety, might have motivated the payments; (3) as the district court had previously noted, the government was not required to disclose *Giglio* information regarding Pinkney and Owens because they did not testify at appellants' trial; and (4) the evidence of Carson's guilt in the triple murder was strong, and therefore Carson could not establish that the "new evidence" was material (Supp. App. 218).

The government argued that Carson's remaining supplementary claims were untimely (Supp. App. 218-220). For example, his claims of ineffective assistance of trial and appellate counsel should have been filed on or before February 20, 2008 (Supp. App. 219). Similarly, his *Brady*/*Giglio* claims were "time-barred by a number of years" because the sealed documents upon which they were based were provided to the defense pursuant to then-Chief Judge Hogan's February 15, 2008, order; thus, they should have been raised by February 15, 2009 (Supp. App. 216-217).

### 3.    Sean Coates

The government argued that Coates's *Brady* claim regarding Montgomery's testimony in the Steven Dewitt case (the same claim raised by Sweeney) was procedurally barred and meritless for the same reasons as Sweeney's motion (Supp. App. 226).

As to Coates's claim that his appellate counsel rendered ineffective assistance by "fail[ing] to obey [this Court's] order relating to sealed portions of the record," the government argued that this claim was meritless because appellate counsel had in fact challenged the trial

court's response to the *Brady* and Jencks Act requests, and, in any event,

Coates had failed to demonstrate prejudice (Supp. App. 229-230).

### 4.    Jerome Martin

The government argued that Martin's *Brady* claim regarding

Steven Thomas's statements and his claim alleging government

misrepresentation of James Coulter's whereabouts were procedurally

barred and meritless (Supp. App. 235-246).[16] The remainder of Martin's

claims were untimely or meritless (Supp. App. 246-247).

### *The District Court's Ruling*

The district court rejected all of appellants' § 2255 claims on the

basis that they were "time-barred, procedurally defaulted, conclusory, or

meritless." *Martin*, 2021 WL 4989983, at *26. In so concluding, the court

examined each appellant's claims in turn.

---

[16] On the merits, the government noted that the information was not exculpatory; contrary to Martin's assertion, Thomas did not tell police that he saw Fortune's murderer, or describe the assailant (Supp. App. 237). Further, the government did not "thwart the defense's ability to call Coulter as a witness"; Coulter was accessible to the defense, as Martin's counsel's acknowledged that she had information that he was "on the street" (Supp. App. 244). In any event, the government argued, Martin could not show prejudice (Supp. App. 238-241, 246).

### 1.    William Sweeney

The district court found that the claims raised in Sweeney's first § 2255 motion were procedurally defaulted because he failed to raise them on direct appeal and had not shown cause and prejudice to excuse his default. *Martin,* 2021 WL 4989983, at *9.

The district court declined to consider the government-misconduct claims raised in Sweeney's supplemental § 2255 motions because they were "untimely by several years." *Martin*, 2021 WL 4989983, at *8. Among those claims were those alleging *Brady* and *Giglio* violations based on the government's alleged nondisclosure of documents it had submitted to the trial court for in camera review (*e.g.*, statements of James Montgomery about the Timothy Benton murder; the prosecution file on Theodore Watson from another jurisdiction; statements of Charles Bender regarding the Fortune murder; statements of Arthur Rice; statements of Andre Murray about Robert Smith's killer; and information indicating that others had a motive to kill Smith). *Id.* at *8. The court explained: even "assum[ing] that Sweeney's prior counsel could not access the previously sealed evidence at issue until June 17, 2010,

Sweeney had until June 17, 2011 to raise new claims. Because he filed these new claims years after that date, they are untimely." *Id.*

Sweeney's supplemental ineffective-assistance-of-counsel claims were likewise time-barred. *Martin*, 2021 WL 4989983, at *13. Those claims included Sweeney's challenges to appellate counsel's failure to seek review of the sealed material related to James Montgomery, Arthur Rice, Andre Murray, and Charles Bender. *Id.*

The district court rejected on the merits Sweeney's claim that his appellate counsel was ineffective in failing to note specific sections of the sealed materials for this Court to review on direct appeal. *Martin*, 2021 WL 4989983, at *18. Noting that Sweeney "misrepresent[ed] the record," the court found that appellate counsel had in fact moved this Court to review the materials at issue but had simply lost the motion. *Id.*[17]

---

[17] In denying a COA, the district court added to its analysis of this claim. The court concluded that Sweeney's appellate counsel did not perform deficiently by failing to present *Brady* claims based on the sealed material, because, in filing appellants' 200-page brief raising "detailed constitutional and evidentiary arguments," "[a]ppellate counsel may have determined that other claims had a better chance of success." *Martin*, 2022 WL 1618869, at *13. Because "[n]othing on the record or in defendants' briefing show[ed] that no 'sound strategy' supported counsel's decision to leave out this argument," Sweeney's claim lacked merit. *Id.*

## 2.    Samuel Carson

The district court summarily denied the "bare-bones" claims raised in Carson's first, pro se § 2255 motion because Carson "offered no factual support for these claims." *Martin*, 2021 WL 4989983, at *6.[18]

As to the claims raised in Carson's 2015 supplemental motion, the court ruled, in pertinent part, that those claims were time-barred or meritless. The court declined to consider the allegation that the government violated *Brady* by failing to disclose documents that it had submitted to the trial court for in camera review. *Martin*, 2021 WL 4989983, at *7. The district court noted that then-Chief Judge Hogan had unsealed those documents on February 15, 2008, and that "Carson acknowledged that, in 2008, he had access to these records." *Id.* (citing ECF No. 1170 at 9 n.6). Thus, the court reasoned, "[u]nder § 2255(f)(4), Carson could raise claims based on this newly discovered evidence until February 15, 2009." *Id.* Because Carson raised this claim in 2015, "years after the statutory deadline," it was time-barred. *Id.* Further, the court

---

[18] Because it denied the motion on this basis, the district court did not decide whether the motion was untimely under the "prisoner mailbox rule." *Martin*, 2021 WL 4989983, at *6 n.4.

found that it did not relate back to Carson's original claim alleging newly discovered evidence because the original claim "lacked any detail." *Id.*

However, the same could not be said for Carson's *Brady* claim alleging nondisclosure of government payments to Cheree Owens and John Pinkney. *Martin*, 2021 WL 4989983, at *7. The district court concluded that this claim was "neither time-barred nor procedurally defaulted." *Id.*[19] Nonetheless, the court rejected it on its merits. *Id.* The court noted that because Owens and Pinkney did not testify at appellants' trial, the government was only required to disclose *Brady* material. *Id.* The court found that the government had complied with its *Brady* obligations by disclosing: "(1) Owens's and [Pinkney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinkney]; and (3) the fact that [Pinkney] and Owens absconded with the government's money." *Id.* (citing ECF No. 1124 at 7) (alteration in original).

---

[19] The court explained that Carson raised this claim within one year of discovering the evidence (i.e., Owens's May 29, 2014, statements to Carson's investigator). *Martin*, 2021 WL 4989983, at *7.

As to Carson's claims that trial and appellate counsel were ineffective in failing to challenge the trial court's review of the sealed material, the district court found that these claims were time-barred and did not relate back to any timely claims. *Martin*, 2021 WL 4989983, at *12.

### 3.    Sean Coates

The district court rejected the government-misconduct claims raised in Coates's first § 2255 motion on the basis that they were procedurally defaulted, unexcused by a valid showing of cause and prejudice. *Martin*, 2021 WL 4989983, at *10.

As with Sweeney's claim challenging his appellate counsel's alleged failure to identify specific portions of the sealed material for this Court to review, the district court denied Coates's analogous claim for the same reason: during the direct appeal, counsel had in fact challenged the trial court's rulings on the sealed materials. *Martin*, 2021 WL 4989983, at *22.

### 4.    Jerome Martin

The district court ruled that Martin's *Brady* claim alleging that the government withheld Steven Thomas's statements about the Fortune murder was procedurally barred and meritless, and that his due process

claim alleging that the government had prevented Coulter from appearing as a witness was also procedurally barred. *Martin*, 2021 WL 4989983, at *5-6. The court found that Martin had failed to establish either cause or prejudice to overcome his procedural default. *Id.*

## SUMMARY OF ARGUMENT

The district court did not err in denying appellants' 28 U.S.C. § 2255 motions. The court correctly found that appellants' government-misconduct claims were procedurally barred, untimely, or meritless. Sweeney, Coates, and Martin procedurally defaulted their initial, timely claims of government misconduct, and did not establish cause and prejudice to excuse their failure to raise those claims on direct appeal.

Appellants' supplemental misconduct claims were barred by § 2255(f)'s statute of limitations because they were filed years after the one-year limitations period had expired. And because they did not "arise from the same core facts as the timely filed claims," but instead "depend[ed] on events separate in 'both time and type' from the originally raised episodes," *see Mayle v. Felix*, 545 U.S. 644, 659 (2005), the later-raised claims did not relate back to the original claims. Nor did those supplemental claims merit an extension of the limitations period under

§ 2255(f)(4)'s exception for newly discovered evidence, because appellants failed to exercise due diligence in pursuing them. Even assuming subsection (f)(4) allowed for additional tolling, appellants' supplemental motions were nonetheless untimely because they were filed long after the extended deadline.

Further, as the district court correctly found, appellants were not entitled to equitable tolling of the limitations period because they failed to demonstrate that they pursued their rights diligently and that some "extraordinary circumstance" beyond their control prevented timely filing. *See United States v. Cicero*, 214 F.3d 199, 203 (D.C. Cir. 2000). In any event, even if they were not procedurally barred or untimely, appellants' government-misconduct claims were meritless.

This Court should decline to consider appellants' claim that the trial court erred by reviewing submissions in camera and placing them under seal, because this claim is not within the scope of the COA. In any event, the claim is procedurally barred, time barred, and meritless. Appellants failed to raise this challenge on direct appeal despite being aware of the factual basis for the claim, and raised it only after § 2255(f)(1)'s statute of limitations had expired. On its merits, this claim

fails because the trial court followed the appropriate procedures for review of alleged *Brady* and Jencks Act material, and any error was invited.

The district court did not err in rejecting appellants' challenges to appellate counsel's representation. Because appellants did not establish either deficient performance or prejudice arising from their counsel's failure to challenge the district court's evidentiary rulings regarding the sealed material, appellants failed to carry their burden under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Finally, Carson's claim of ineffective assistance of trial counsel is also outside the scope of the COA, and therefore not properly before this Court. In any event, this claim is untimely and meritless. Carson did not allege that his trial counsel labored under a conflict of interest until more than seven years after the February 20, 2008, deadline for filing his § 2255 motion. Even if it were timely, this claim must fail because, under this Court's precedent, Carson cannot show an actual conflict of interest that adversely affected his counsel's performance. Nor can he show that any perceived conflict caused his counsel's performance to fall below

"prevailing professional norms" or resulted in *Strickland* prejudice. 466 U.S. at 688.

## ARGUMENT

### I.    Appellants' Claims of Government Misconduct Were Procedurally Barred, Untimely, or Meritless.

Appellants' "Statement of the Case" is filled with sweeping allegations of government misconduct and unsupported assertions that the government "engaged in a deliberate pattern of withholding and sealing substantial information, including *Brady/Giglio* and Jencks Act material" relating to nearly every cooperating witness (App. Br. 8). In their "Argument" section, however, appellants brief only a subset of those claims. We address those below.[20] For the reasons discussed infra, the district court properly rejected those claims as procedurally barred, untimely, or meritless.

---

[20] This Court has made clear that "it will not address an 'asserted but unanalyzed' argument." *S.E.C. v. Banner Fund Intern.*, 211 F.3d 602, 613-14 (D.C. Cir. 2000). Appellants have forfeited those arguments that they have raised in "less than half-hearted" fashion, as those "fleeting passage[s]" are "insufficient to put [their] objection[s] before this [C]ourt." *Id.* at 613-614; see also Fed. R. App. P. 28(a)(8).

## A.   Standard of Review and Legal Principles

### 1.   § 2255 Principles

Under 28 U.S.C. § 2255, a defendant may move the sentencing court to vacate, set aside, or correct its sentence if the defendant believes that his sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") enacted a one-year period of limitations on the filing of § 2255 motions. Under AEDPA, "the limitation period shall run from the latest of," inter alia, "the date on which the judgment of conviction becomes final," 28 U.S.C. § 2255(f)(1), or "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4).

Claims that are untimely may be considered if they "relate back" to timely filed claims. Federal Rule of Civil Procedure 15 prescribes the manner in which civil pleadings, like § 2255 motions, may be amended and supplemented. *See United States v. Hicks*, 283 F.3d 380, 386 (D.C.

Cir. 2002) (holding that a §2255 motion may be amended under the terms of Rule 15); *see also Mayle*, 545 U.S. at 655 (applying Rule 15 in the §2254 context). "An amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . ." Fed. R. Civ. P. 15(c)(2). "[I]n the habeas corpus context, the Rule 15 'relation back' provision is to be strictly construed, in light of 'Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them].'" *See United States v. Ciampi*, 419 F.3d 20, 23 (1st Cir. 2005) (quoting *Mayle*, 545 U.S. at 125); *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (cautioning that overly broad application of Rule 15(c) "would be tantamount to judicial rescission of AEDPA's statute of limitations period").

"An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit for filing pleadings) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650. Hence, claims raised in an amendment to a § 2255 motion will be

considered timely "only [if] the claims added . . . arise from the same core facts as the timely filed claims, and not [if] the new claims depend on events separate in 'both time and type' from the originally raised episodes." *Id.* at 659.

Where a defendant fails to raise an available challenge on direct appeal, he is procedurally barred from raising that claim in a subsequent collateral attack unless he shows cause for his failure to do so and prejudice as a result of the alleged error. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991); *United States v. Frady*, 456 U.S. 152, 168 (1982); *United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003).[21] To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey*, 499 U.S. at 493-94 (internal quotation omitted). In addition to establishing cause, the defendant must show "'actual prejudice' resulting from the errors of which [he]

[21] This procedural bar does not apply to claims of ineffective assistance of counsel. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

complains." *Frady*, 456 U.S. at 168. That is, the defendant must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170 (emphasis in original).

This Court reviews de novo a district court's decision denying a habeas corpus petition as untimely. *See Cicero*, 214 F.3d at 203. This Court also applies de novo review to questions of procedural default. *See United States v. Henderson*, 108 F.4th 899, 904 (D.C. Cir. 2024).

## 2.    *Brady* **and Jencks Act Principles**

"The *Brady* rule . . . requires prosecutors to 'disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.'" *United States v. Robinson*, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 675 (1985)). "There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008)

(citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "To satisfy the prejudice component, the withheld evidence must be 'material'; that is, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Brodie*, 524 F.3d at 268 (internal quotation and citations omitted). "[T]he omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The Jencks Act, 18 U.S.C. § 3500, requires the government, on the motion of a defendant, to produce any "statement" of a government witness that relates to the subject matter of the witness's testimony, after the witness has testified on direct examination. *See United States v. Thomas*, 97 F.3d 1499, 1501 (D.C. Cir. 1996). A "statement" is defined as:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). "Under the definition in subparagraph (e), notes of a conversation are not generally Jencks Act material (unless they represent a full transcription)." *United States v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007); *United States v. Spencer*, 618 F.2d 605, 606 (9th Cir. 1980) ("notes [that] are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigators' selections, interpretations, and interpolations" are not Jencks Act statements). "Violations of the Jencks Act are subject to harmless-error review." *Oruche*, 484 F.3d at 597.

## B.  Discussion

### 1.  Appellants' Initial *Brady* Claims Were Procedurally Barred.

Under 28 U.S.C. § 2255(f), a defendant generally must file a § 2255 motion within one year of the date on which his conviction becomes final. *See Dodd v. United States*, 454 U.S. 353, 357 (2005) (recognizing that "[i]n most cases, the operative date from which the limitation period is measured will be . . . the date on which the judgment of conviction becomes final"). "Finality attaches when [the Supreme] Court affirms a

conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003).

Here, the Supreme Court denied appellants' petitions for a writ of certiorari on February 20, 2007. *Carson v. United States*, 549 U.S. 1246 (2007). Thus, appellants had one year from that date – until February 20, 2008 – to timely file their § 2255 motions. As discussed supra, in their original § 2255 motions, which were timely filed, appellants raised the following government-misconduct claims:

| Sweeney | (1) Government failed to disclose information undermining Montgomery's credibility, specifically as it related to Montgomery's testimony implicating Carson in the Steven DeWitt case; and (2) government obtained witness testimony, specifically Montgomery's and Rice's testimony, "by any means necessary" (App. 966). |
|---------|-----------------------------------------------------------------------|
| Coates | Same as Sweeney's claim (1) (App. 994, 1040). |
| Martin | (1) Government withheld exculpatory evidence regarding murder of Anthony Fortune, i.e, information that Steven Thomas purportedly described the shooter as someone other than Martin and Carson (App. 939, 941-944); and |

|  | (2) government impeded Martin's ability to call shooting victim James Coulter as a witness (App. 939-940, 944-945). |
|---|---|

The district court correctly concluded that Sweeney's and Coates's claims that the government had violated *Brady* by not disclosing information undermining Montgomery's testimony in the DeWitt case was procedurally barred because the DeWitt proceedings took place in 2004, during the pendency of appellants' direct appeal, and appellants had not established, or even attempted to establish, cause for their failure to raise the claim on appeal. Further, appellants could not demonstrate prejudice; as the court noted, any impeachment material the government possessed specifically "concerned the Dewitt proceedings - not this case." *Martin*, 2021 WL 4989983, at *9.[22]

Martin's government-misconduct claims were also procedurally barred. Martin's claim regarding Steven Thomas rested entirely on an

---

[22] Likewise, Sweeney procedurally defaulted his claim that the government procured witness testimony "by any means necessary," because he failed to raise it on direct appeal and had not shown the requisite cause and prejudice. Moreover, as the district court noted, this blanket assertion was vague and conclusory, and therefore did not merit review. *Martin*, 2021 WL 4989983, at *9.

undated affidavit from Martin's investigator, and Martin had not shown that he did not possess this information during the pendency of his direct appeal. *See Martin*, 2021 WL 4989983, at *5. Martin's claim regarding the government's representations about Coulter's availability was similarly procedurally barred. *See id.* at *6. In neither instance did Martin show cause for the procedural default or prejudice arising from the claimed errors.[23]

### 2. Most of Appellant's Subsequent *Brady* Claims Were Untimely and Did Not Relate Back to the Initial Claims.[24]

Appellants' subsequent *Brady* claims, filed six or more years after their initial § 2255 motions, were properly rejected as untimely. As noted,

---

[23] Regardless of the procedural bar, these claims were meritless. As the district court noted, there was no evidence that Thomas described Anthony Fortune's shooter to the police or the grand jury, and therefore no evidence that the government had violated its *Brady* obligations. *See Martin*, 2021 WL 4989983, at *5. As to Coulter, Martin never provided the court with Coulter's alleged statement purporting to exonerate Martin. *Id.* at *6 n.3. Even assuming such a statement existed, it was unlikely to overcome the strong evidence of Martin's guilt. *See id.*

[24] The only exception was Carson's claim that the government withheld information regarding payments to John Pinckney and Cheree Owens. As the government acknowledged (Supp. App. 217-218) and the district court found, *Martin*, 2021 WL 4989983, at *7, this claim was neither

appellants were required to file their § 2255 motions by February 20, 2008.

Appellants argue that they "could not have made within the one-year deadline of § 2255(f)(1), the kinds of detailed claims required by Habeas Corpus Rule 2(c)" because they did not have access to the sealed materials until after the deadline (App. Br. 102). To avoid § 2255(f)(1)'s time bar, appellants assert that their later claims were timely because (1) they related back to the original, timely filed claims, (2) they fell within the one-year statute of limitations applicable to newly discovered evidence under § 2255(f)(4), and (3) they were entitled to equitable tolling of the limitations period (App. Br. 102-103). None of these grounds is availing.

procedurally defaulted nor time barred because it was raised within one year of the discovery of new evidence – i.e., the May 29, 2014, interview of Owens in which she described the government's efforts to move the couple and the related financial assistance they received. As explained in more detail infra, the district court properly rejected this claim as meritless.

### a.    The Later Claims Did Not Relate Back.

Appellants' supplemental government-misconduct claims did not relate back to their timely filed claims. That is because they did not "arise from the same core facts as the timely filed claims," but instead "depend[ed] on events separate in 'both time and type' from the originally raised episodes." *Mayle*, 545 U.S. at 659.

Carson did not even raise a claim of government misconduct in his initial § 2255 motion. While he alleged, inter alia, that his sentence was imposed in violation of the constitution and that "newly discovered evidence" showed that he was deprived of his Fifth Amendment right to due process (App. 988), he provided no further details and made no mention of *Brady*. Thus, the *Brady* claims he raised seven years later based on the previously sealed materials bore no relation to his initial claims. *See Hicks*, 283 F.3d at 388 ("while amendments that expand upon or clarify facts previously alleged will typically relate back, those that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously"); *Hill v. Mitchell*, 842 F.3d 910, 924 (6th Cir. 2016) (later-raised *Brady* claim did not relate back to original claim that was "completely bereft of specific fact

allegations or evidentiary support and was not tied to any particular theory of relief").

Although Sweeney's initial motion alleged that the government had violated *Brady* by not disclosing impeachment evidence regarding Montgomery's testimony in an unrelated case (the Dewitt case), he made no mention of alleged *Brady* violations connected to the sealed materials, including Montgomery's purported statements about the Timothy Benton murder, the prosecution file on Theodore Watson from another jurisdiction, statements of Charles Bender regarding the Fortune murder, statements of Arthur Rice, statements of Andre Murray about Robert Smith's killer, or information indicating that others had a motive to kill Smith. Although these later claims invoked the legal principles of *Brady* and *Giglio*, they did not share a "common 'core of operative facts'" with the original claim. *See Mayle*, 545 U.S. at 659; *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) ("even an amendment that shares some elements and some facts in common with the original claim does not relate back if its effect is to fault [the opposing party] for conduct different from that identified in the original complaint" (internal quotation marks and citation omitted)). Indeed, they were "based on

occurrences 'totally separate and distinct, 'in both time and type' from [the claim] raised in his original motion." *See Hicks*, 283 F.3d at 388. As the district court correctly noted, to allow relation back under these circumstances would "circumvent the central policy of relation-back doctrine: ensuring an opposing party has 'sufficient notice' about facts and arguments that a party might bring in an amendment." *Martin*, 2022 WL 1618869, at *5 (citing *Hicks*, 283 F.3d at 388); *see also Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008) ("The underlying question is whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint."). Here, the government could not have known that Sweeney would raise *Brady* claims based on the sealed materials in this case when his initial claim only involved an allegation of misconduct stemming from the Dewitt case in D.C. Superior Court.[25]

---

[25] Coates also argued in his first § 2255 motion that the government violated *Brady* by failing to disclose impeachment evidence stemming from Montgomery's testimony in the Dewitt case (App. 994, 1040). Although he did not subsequently raise government-misconduct claims based on the sealed materials, he moved to join appellants' motions raising those claims (App. 1471). Martin likewise moved to join his co-defendants' motions (App. 1651). To the extent Coates and Martin can be

Appellants contend that these supplemental claims were "encompassed" within Sweeney's initial claim that "the government had engaged in 'the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony'" (App. Br. 108). But this broad and unspecified allegation of misconduct does not sweep in any and all subsequent *Brady* claims. "Such a result would eviscerate AEDPA's statute of limitations for *Brady* claims and would run directly contrary to Congress's intent." *Hill*, 842 F.3d at 925.

The Sixth Circuit's decision in *Hill*, 842 F.3d at 910, is instructive. Like appellants, Hill initially made a "sweeping assertion" that the government had "*Brady* material that it [wa]s refusing or unable to produce," and complained that he had "asked to review the prosecutor's and investigating officers' files, but was not allowed to do so." *Id.* at 920. Hill later discovered a police report that allegedly contained *Brady* material, but he then waited over three years to bring it to the district court's attention. *Id.* On appeal, the Sixth Circuit held that the later, specific *Brady* claim did not relate back to the original "catch-all" claim.

deemed to have adopted those claims, they are not entitled to relief for the reasons discussed infra.

*Id.* at 924. Although both motions asserted *Brady* claims, the original claim "was completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief." *Id.* The court explained:

> The original claim did not identify, even in general terms, the nature of any suppressed information believed to be exculpatory or impeaching or how such suppressed information was material to the defense. A claim that the State was suppressing an unspecified *something* is much different from a claim regarding *what*, specifically, the State was suppressing and how it would have benefitted Hill at trial had it been disclosed. . . . Hill's original [c]laim . . . did not even raise a potential claim for relief. Even though Hill asserted that the prosecution was suppressing evidence, the basis for a *Brady* claim is the *evidence that was being suppressed*—not a suspicion that *something* was being suppressed.

*Id.* at 924-925 (emphasis in original). Because the original claim "alleged no operative facts out of which the amended claim could also be deemed to have arisen," the later claim did not relate back. *Id.* at 925. To hold otherwise, the Sixth Circuit explained, would run counter to AEDPA's purpose:

> Applying the relation-back doctrine to such a broad, unsupported claim would also create a greater problem: if a catch-all *Brady* claim, devoid of *Brady* material or specific factual allegations, were sufficient to justify relation back under Rule 15(c), then habeas petitioners could routinely circumvent AEDPA's statute of limitations on *Brady* claims.

> All a petitioner would need to do is include a catch-all *Brady* claim in his original petition (with no *Brady* evidence) and hope that evidence eventually turns up. If evidence did turn up, the petitioner could then file an amended petition at any time, because any subsequent amendment would relate back and skirt AEDPA's statute of limitations.

*Id.*

The same concerns arise in this case. Sweeney's "catch-all" *Brady* claim failed to allege specific facts to which his later claims could relate back. The district court correctly recognized that, as in *Hill*, the "overly broad" *Brady* allegations raised in Sweeney's first motion "did not provide sufficient notice that he would assert *Brady* claims about the sealed materials in a supplement." *Martin*, 2022 WL 1618869, at *7-8. Because Sweeney "merely assert[ed] a suspicion that he *might* discover constitutional violations[,] . . . [they] lack[ed] the specific details . . . that would justify relation back." *Id.* at *8 (emphasis in original).[26]

---

[26] *Mandacina v. United States*, 328 F.3d 995, 1001 (8th Cir. 2003), is not to the contrary. In *Mandacina,* a habeas petitioner originally alleged that the government "failed to properly disclose . . . any and all information related by [the victim] prior to his death in which [the victim] implicated any other person in any criminal activity." 328 F.3d at 1000. The petitioner later amended his motion to include a *Brady* claim about a previously undisclosed police report (the "Borland Report"). The Eighth Circuit held that this claim related back because the report "support[ed] a defense theory that, before he died, [the victim] implicated other

### b. Most of the Supplemental Misconduct Claims Were Untimely.

Because, as explained supra, Carson's and Sweeney's amended *Brady* claims did not relate back to their original pleadings, those claims were untimely, as they were filed several years after the February 20, 2008, limitations deadline applicable under 28 U.S.C. § 2255(f)(1). Appellants contend that the relevant limitations period is governed by § 2255(f)(4), rather than (f)(1), because they did not discover "the facts supporting the claim or claims presented," until after the February 20, 2008, deadline had passed (App. Br. 112). They argue that "the statute of limitations did not begin running until the district court's order granting access to the sealed documents" (*id.*), and that, to be more precise, "October 2010 is a reasonable time for appellants to be deemed to have obtained access to the *Brady/Giglio* materials such that the statute of

---

persons involved in organized criminal activity" with a motive to retaliate against him. *Id.* at 1001. Unlike in this case, "Mandacina's original *Brady* claim was . . . quite specific, in terms of the information alleged to have been suppressed and its materiality to the defense," and "the amended *Brady* claim was a slightly *more* specific iteration of the original *Brady* claim, premised more specifically on the suppression of *names* of suspects identified by Borland." *See Hill*, 842 F.3d at 923 (discussing *Mandacina*, 328 F.3d at 1000-1001) (emphasis in original).

limitations could be deemed to be running" (*id.* at 115). Appellants ignore § 2255 (f)(4)'s due-diligence requirement and, even if correct, still fail to demonstrate that their supplemental claims were timely.

Section 2255 (f)(4)'s "exception for newly discovered facts . . . tolls the deadline to one year from 'the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.'" *United States v. Pollard*, 416 F.3d 48, 54 (D.C. Cir. 2005). "[F]or the purposes of § 2255(4), '[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance.'" *Id.* at 55 (quoting *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir.2000)). "Where," as here, "one 'discovers' a fact that one has helped to generate, . . . whether it be the result of a court proceeding or of some other process begun at the petitioner's behest, it does not strain logic to treat required diligence in the 'discovery' of that fact as entailing diligence in the steps necessary for the existence of that fact." *See Johnson v. United States*, 544 U.S. 295, 307, 310 (2005) (rejecting argument that "§ 2255 petition is timely under paragraph four as long as [petitioner] brings it within a year of learning he succeeded in attacking [a] prior conviction [enhancing his federal

sentence], no matter how long he may have slumbered before starting the successful proceeding").

Here, appellants knew, or through diligence, could have discovered the important facts well before the February 20, 2008, filing deadline. They simply chose not to. Appellants acknowledge that they "knew evidence had been suppressed" and that they "repeatedly asked for the sealed material to be disclosed to them, first at trial and then on appeal" (App. Br. 112, 114).[27] As the district court noted, at trial, defense counsel "raised many *Brady*, *Giglio*, and Jencks Act objections during the government's case in chief." *Martin*, 2022 WL 1618869, at *5 (citing, e.g., 01/30/01 (PM) Tr. 4–6; 02/12/01 (AM) Tr. 5–8; 04/24/01 (PM) Tr. 3). Subsequently, appellants' motion to review the sealed documents during the direct appeal "identified thirteen sets of sealed materials, explained their suspicions, and tied those suspicions to suspected *Brady*, *Giglio*, or Jencks Act violations." *Id.* at *3. Appellants thus "had reason to believe

---

[27] For example, appellants knew, based on Theodore Watson's testimony, that he had written letters to a prosecutor in Greenbelt, Maryland, offering information in exchange for "more lenient treatment" (Supp. App. 400-401). Defense counsel requested disclosure of those letters during trial, but the court denied the request (Supp. App. 402).

they might have meritorious *Brady*, *Giglio*, or Jencks Act claims long before § 2255(f)(1)'s February 20, 2008 deadline." *Martin*, 2022 WL 1618869, at *5. *See In re Davila*, 888 F.3d 179, 189 (5th Cir. 2018) (statute of limitations runs from "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim").

Yet, it was not until February 13, 2008, one week before their § 2255 motions were due, that Sweeney moved the district court to unseal the documents. Appellants offer no explanation for why they waited until the eleventh hour to seek unsealing of documents that, years before, they suspected contained favorable material. Their lack of diligence dooms their late-filed *Brady* claims. *See Johnson*, 544 U.S. at 308 (diligence requires "prompt action on the part of the petitioner as soon as he is in a position to realize that he has an interest in [raising a] challeng[e]"); *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 294 (3d Cir. 2021) ("If there is a reasonable basis for a petitioner to believe additional investigation will yield undisclosed *Brady* material, that petitioner must investigate or else risk the statutory consequences" of 28 U.S.C. § 2244(d).); *Ford v. Gonzalez,* 683 F.3d 1230, 1236 (9th Cir. 2012)

(amended *Brady* claim was untimely where "factual predicate . . . could have been discovered at the time of his trial through the exercise of due diligence").[28]

Appellants contend that the government had the burden of disclosing *Brady* material and that they were not required to seek out such information to show due diligence (App. Br. 117). But the fact that the government has an affirmative obligation to disclose *Brady* evidence does not relieve defendants of their duty to exercise diligence under § 2255(f)(4). While defendants generally are "entitled to presume that prosecutors have . . . shar[ed] all material exculpatory information in their possession," *Bracey*, 986 F.3d at 289, "'where the record demonstrates that the defendant or defense counsel was aware of the potential *Brady* material but failed to pursue investigation of that ultimate claim,' . . . [the] consequences that AEDPA attaches to a lack of due diligence" will apply with full force. *Id.* at 294 (citations omitted).

---

[28] Although appellants made efforts to discover the sealed material during trial and then on appeal, they apparently abandoned those efforts in 2003, when this Court denied their request to review the sealed documents. Nearly five years passed before appellants moved the district court to unseal the documents in 2008, only one week before their § 2255 motions were due.

Even assuming arguendo that appellants did not know, or could not have discovered the evidence supporting their claims through the exercise of due diligence, before the district court unsealed the documents on February 15, 2008, their supplemental *Brady* claims would still be time barred. Appellants had until February 15, 2009, to raise their amended claims. Even under the most generous assessment—assuming appellants did not have access to the documents until June 17, 2010, and could not have reasonably reviewed them until October 2010 (see App. Br. at 114-115)—appellants' motions were due no later than October 2011. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) (there is no "statutory right to an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim").[29] Yet Sweeney did not file his first amended motion until over three years later, on November 28, 2014, with the other appellants

---

[29] Appellants cite no authority for their assertion that they were entitled to an additional 120 days beyond the one-year limitations period because of the "volume of the materials" and the fact that they were incarcerated at the time (App. Br. 114-115). Appellants have not shown that these circumstances were "extraordinary" and therefore justified equitable tolling. *See Cicero*, 214 F.3d at 203. We do not concede that any extra time was warranted, but even assuming arguendo that it was, appellants cannot establish that their claims were timely.

following suit between 2015 and 2018. The district court thus correctly found that the amended claims were "untimely by several years." *Martin*, 2021 WL 4989983, at *8. *See Smith v. Vannoy*, 848 F. App'x 624, 628 (5th Cir. 2021) (28 U.S.C. § 2254 petition raising *Brady* claim was untimely where it was filed more than one year after petitioner learned of facts underlying claim); *Jimerson v. Payne*, 957 F.3d 916, 925 (8th Cir. 2020) (*Brady* claim raised in habeas petition was untimely where petition was filed 6 days after expiration of one-year limitations period for newly discovered evidence); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111, 113 (2d Cir. 2000) (*Brady* claim was time-barred where § 2254 petition was filed almost two years after petitioner obtained exculpatory materials).

### c. Appellants Are Not Entitled to Equitable Tolling.

In an effort to revive their time-barred claims, appellants assert that they are entitled to equitable tolling of the limitations period because (1) the district court granted numerous extensions of time for the filing of their supplemental motions and the government's response, and (2) some of the appellants were either unrepresented or had been

effectively abandoned by counsel during the delay (App. Br. 118-124). Neither of these circumstances justifies equitable tolling in this case.

A defendant is "entitled to equitable tolling" only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks and citation omitted); *see also Cicero*, 214 F.3d at 203 (to warrant equitable tolling, the petitioner must demonstrate that "'extraordinary circumstances' beyond [his] control [made] it impossible to file [his claim] on time"). This Court has emphasized that equitable tolling "is to be employed 'only sparingly.'" *Cicero*, 214 F.3d at 203.

As discussed supra, appellants were not diligent in pursuing their belated *Brady* claims. They waited until just days before the expiration of the one-year limitations period to request that the district court unseal the documents they believed would support their claim. *See Schmitt v. Zeller*, 354 F. App'x 950, 951-952 (5th Cir. 2009) ("[A] component of the obligation to pursue rights diligently is not to wait until near a deadline to make a filing, then seek equitable tolling when something goes awry. . . . Leaving little margin for error is incautious and not diligent."). Then,

App 1850

even after the court unsealed the documents, appellants waited another six or more years before filing their supplements.

Appellants contend that the extensions of time granted by the district court tolled the statute of limitations (App. Br. 118, 124), but nothing in the record demonstrates that the court meant to toll the limitations period, misled appellants, or lulled them into inaction. Appellants requested, and the court granted, extensions of time starting in 2010, long after the February 20, 2008, limitations deadline had passed. There was thus no period of time left to toll, and the district court's orders could not have induced appellants to late file. *See United States v. Baxter*, 761 F.3d 17, 31 (D.C. Cir. 2014) (rejecting argument that defendant was entitled to equitable tolling because he "'relied on orders entered by the district judge' that enlarged the time for filing" his § 2255 motion, where judge entered extension order two months after filing deadline had passed; "[defendant] could not have let the deadline pass in reliance upon an order that the court had not yet entered"); *Fierro v. Cockrell,* 294 F.3d 674, 683-84 (5th Cir. 2002) (district court's scheduling order predicated on "mistaken assumption" about statute of limitations "could not have contributed to [petitioner's] failure to comply with the

one-year statute of limitations," where order was issued weeks after limitations period had expired); *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000) (order granting extension of time two days *after* expiration of statute of limitations did not "lull[] [petitioner] into inaction"); *cf. Prieto v. Quarterman*, 456 F.3d 511, 515 (5th Cir. 2006) (equitable tolling warranted where petitioner "requested and received his extension of time *before* the deadline to file his habeas petition passed" (emphasis in original)).

In ruling on appellants' motions for extensions of time (see, e.g., Supp. App. 117-119), the district court did not indicate, either explicitly or implicitly, that it would excuse an untimely filing. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984) (noting that equitable tolling may be appropriate where "court has led the plaintiff to believe that she had done everything required of her"); *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (district court's order permitting filing of supplemental § 2255 motion did not "lull" defendant into inaction; "[n]othing in the order referred to the statute of limitations

or to filing additional claims").[30] And, as the court noted, "the government—from the first motion for extension of time—consistently emphasized that it would object to newly raised claims as untimely." *Martin*, 2022 WL 1618869, at *10.[31] On these facts, the district court's extension orders, granted at appellants' requests, did not create "'extraordinary circumstances' beyond [appellants'] control." *Cicero*, 214 F.3d at 203.

---

[30] Notably, appellants' motions did not request tolling of the statute of limitations or suggest that they were entitled to a one-year period starting in June or October 2010 because of their alleged inability to access the previously sealed documents.

[31] At a status conference on May 17, 2013, the government reiterated:

> [T]he one-year deadline has long since come and gone for filing a 2255. These defendants have filed, in one guise or another, 2255s, and so what they're trying to do now is supplement. And, of course, we're not on just an open field anymore when it comes to supplements. In order to be timely, whatever claims they raise at this point have to relate back to the claims that they made in their timely filed 2255s.

> And I wanted to make that point because I know, since I've entered the case, I've always said to the lawyers who want extensions that I don't oppose any requests for extensions, but we are not waiving any statute of limitations in this case. (Supp. App. 652.)

Nor did appellants' allegedly sub-par representation or lack of representation by counsel. This Court has held that a "prisoner's ignorance of the law or unfamiliarity with the legal process will not excuse his untimely filing, nor will a lack of representation during the applicable filing period." *See Cicero*, 214 F.3d at 203; *see also Johnson*, 544 U.S. at 311 ("we have never accepted pro se representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness"); *United States v. Petty*, 530 F.3d 361, 365 (5th Cir. 2008) ("Proceeding pro se is alone insufficient to equitably toll the AEDPA statute of limitation."); *Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006) ("It is clear that pro se status, on its own, is not enough to warrant equitable tolling."). Of course, it is well settled that "there generally is no constitutional right to effective counsel in collateral proceedings." *United States v. Scurry*, 992 F.3d 1060, 1069 (D.C. Cir. 2021).

Although an attorney's "professional misconduct . . . could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling," *Holland*, 560 U.S. at 651, Sweeney has not shown that his attorney's conduct was "so outrageous

or so incompetent as to render it extraordinary." *See Pollard*, 416 F.3d at 56 (quotation marks and citation omitted). Sweeney cites letters he had written his first habeas counsel (Jenifer Wicks) expressing his frustration with their communication and dissatisfaction with her efforts to pursue collateral relief (see App. 1793-1814), but nothing in the record demonstrates abandonment. To the contrary, Wicks timely filed Sweeney's initial § 2255 motion, raising 17 claims of ineffective assistance of trial and appellate counsel, trial-court error, and prosecutorial error (App. 951); made efforts to obtain the documents unsealed by then-Chief Judge Hogan (App. 1791); and communicated with Sweeney about the proceedings (*see* App. 1796 (Sweeney letter to Wicks describing "our recent fusillade of e-mails"); App. 1800 (Sweeney letter to Wicks noting "[Wicks's] letter dated March 5, 2008, along with several of our conversations"); App. 1802 (Sweeney letter to Wicks referring to "your e-mail to me dated March 9, 2010")). *See Downs v. McNeil*, 520 F.3d 1311, 1321-22 (11th Cir. 2008) (cataloguing cases of equitable tolling and distinguishing between "attorney negligence" (e.g., missed deadlines), which do not warrant tolling, and "serious misconduct" (e.g., repeated misrepresentations, failure to file any § 2255

App 1855

motion, and refusal to communicate with defendant), which may support tolling); *Baldayaque v. United States*, 338 F.3d 145, 151-152 (2d Cir. 2003) ("while the normal errors made by attorneys may not justify equitable tolling," tolling may be justified where attorney does no legal research on defendant's case, does not attempt to speak with him, and "fail[s] to file [any § 2255] petition at all").

In any event, even if Wicks unreasonably delayed filing a supplemental motion, nothing prevented Sweeney himself from complying with AEDPA's statute of limitations by filing a pro se supplement. Sweeney clearly understood that time was of the essence (*see* App. 1796 (Sweeney letter to Wicks discussing § 2255 amendment procedure and urging pursuit of supplemental motion "without further delay" and to "avoid the pitfalls" of "sitting without continuing the fight")). Having been present at his own trial and having received access to the previously sealed material, he was well versed in the factual underpinnings of his asserted *Brady* claims. Indeed, in a letter to counsel dated August 9, 2010, he meticulously laid out six potential *Brady* and Jencks Act claims based on the previously sealed documents, with citations to the "dates and times that these issues were addressed in the

trial transcripts" (App. 1818-22), and over a year earlier he had composed a detailed list of transcript cites indicating when suspected *Brady* information had been placed under seal (App. 1824-25). Sweeney also highlighted relevant legal authority (App. 1797-98), and suggested additional grounds for relief (App. 1793-1794, 1800). Sweeney was thus aware of the factual basis for his supplemental claims and demonstrated sufficient understanding of their legal significance that he could have timely asserted his claims even without the assistance of counsel. At the very least, he has not shown that "the actions of . . . his initial habeas counsel . . . made it impossible for him to file his [supplemental] § 2255 motion within AEDPA's statute of limitations, as required." *See Pollard*, 416 F.3d at 56 (defendant could not show "extraordinary circumstances" justifying equitable tolling, where, notwithstanding habeas counsel's alleged deficiencies, there was "nothing that prevented [defendant] . . . from researching or further analyzing the facts that he knew to determine if they presented a valid claim"); *see also Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir. 2004) (equitable tolling not warranted where,

despite attorney's alleged malfeasance, defendant could have filed "a pro se petition and save[d] his . . . claims from dismissal as untimely").[32]

Sweeney's reliance (at 121-122) on *United States v. McDade*, 699 F.3d 499 (D.C. Cir. 2012), is misplaced. In *McDade*, the defendant researched an ineffective-assistance-of-counsel claim, obtained affidavits to support it, and "advised post-conviction counsel by letters of his wish to raise [the] claim." 699 F.3d at 505. His post-conviction counsel inadvertently omitted the claim from the initial § 2255 motion but filed an amended motion including the claim "only 30 days past the one-year limitations period." *Id.* In concluding that equitable tolling was warranted, this Court distinguished McDade's case from *Pollard* and *Cicero*, where the defendants waited years past the limitations deadline to file supplemental motions. *Id.* This case is more like *Pollard* and *Cicero* than *McDade*. Here, Sweeney waited nearly six years after the February 20, 2008, limitations deadline to raise *Brady* claims he could have raised

---

[32] This Court has denied equitable tolling "in far more grievous circumstances, as in *Cicero*, where the prisoner was unable to finish his legal research before the statute of limitations expired after being stabbed by another inmate, hospitalized, placed in protective segregation with highly limited access to a law library, and separated from his legal papers." *Pollard*, 416 F.3d at 56 (citing *Cicero*, 214 F.3d at 201, 203-04).

in his initial motion had he exercised due diligence. As discussed supra, even if Sweeney did not gain access to the previously sealed documents until June 2010, his supplemental motion came more than three years after the expiration of the extended limitations period for newly discovered evidence. Unlike McDade, then, Sweeney did not demonstrate an "unusual level of diligence" or fall victim to "extraordinary" circumstances that prevented him from filing on time; instead, he "sat upon his rights." *Cicero*, 214 F.3d at 203.

### 3. Even If Not Procedurally Barred or Untimely, Appellants' Government-Misconduct Claims Lack Merit.

On appeal, appellants specifically challenge the district court's rulings as to what they categorize as three classes of *Brady* material: "(1) documents revealing evidence of alternative theories of key charged crimes; (2) documents regarding acknowledged lies by government witnesses; and (3) information revealing benefits provided to government witnesses" (App. Br. 54). We address these categories in turn.

### a. Documents Allegedly Revealing Evidence of Alternative Theories.

Appellants argue that the government "knowingly withheld" evidence that undermined the government's theory at trial or that reflected "alternative leads" and "inconsistent accounts" (App. Br. 55). Specifically, appellants point to (1) information suggesting "other suspects" in the murder of Robert Smith (App. Br. 55), (2) interview notes documenting allegedly inconsistent statements by James Montgomery regarding the murder of Timothy Benton (App. Br. 63), and (3) prior statements of Charles Bender that purportedly conflicted with his trial testimony regarding the murder of Anthony Fortune (App. Br. 65). Appellants fail to sustain their burden of demonstrating that any of these alleged violations requires reversal under *Brady*.

### i. The Robert Smith Murder

Appellants assert that the government violated its *Brady* obligations by failing to disclose two documents previously sealed by the trial court: (1) notes of an interview of government witness Andre Murray reporting rumors that Petey Johnson (a.k.a. "Fat Petey") had killed Smith, and (2) an ex parte pleading in which the government indicated

that it had identified Andre Chappelle and Anthony Hawkins, "a known associate of Samuel Carson" (App. 1259), as Smith's murderers (App. Br. 55-56). Appellants have not established a reasonable probability that disclosure of either of these documents would have resulted in a different outcome.

First, Andre Murray's statements had only minimal, if any, exculpatory value. Titled "Murder of Keith Johnson," the notes read in pertinent part:

> Wit. heard Gooch telling Draper to kill Keith. Wit. did not hear Draper return to advise Gooch he killed Keith. He just heard Gooch give the order.
>
> The word is that Fat Petey started messing w/Butchie – killed Butchie to get back at Draper → mere rumor. (App. 1270.)

According to appellants, this information was exculpatory because it showed that Petey Johnson had a motive to kill Smith (as revenge for Sweeney having killed Petey's brother, Keith), and may have in fact killed Smith (App. Br. 60-61).[33] But, as the note makes clear, this information was "mere rumor" (App. 1270). Nothing in the document indicates where or when Murray may have heard this rumor. Without

_____

[33] Petey Johnson and Smith were "drug-dealing partners" (5/30/01AM Tr. 16).

more, this unsubstantiated hearsay was not *Brady* material. *See United States v. Derr*, 990 F.2d 1330, 1335–36 (D.C. Cir. 1993) (no *Brady* violation where witness's statement was "hearsay that would not be admissible within any recognized exception to the rule excluding such evidence" (citing *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) (to be "material" under *Brady*, undisclosed information or evidence acquired through that information must be admissible)); *see also United States v. Santos*, 486 F. App'x 133, 135 (2d Cir. 2012) (witness's statement was not *Brady* because it "consisted of rumors amounting to inadmissible hearsay[] [and] would not have led to admissible evidence because [witness] could not identify a single source for the statements"); *Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998) (failure to disclose "rumor" was not *Brady* violation where evidence was "so weak, so remote, and so inconclusive that it is highly unlikely that it would have had any effect whatever upon the verdict").

Furthermore, the record shows that, at the time of trial, appellants already knew or suspected that Petey Johnson was a person of interest in the Smith murder. In cross-examining SA Lisi about his investigation of the murder, defense counsel elicited the following:

Sweeney's counsel: How about Petey Johnson? Did you pick him up?

Lisi: Yes, sir, because it was believed he was a witness.

Sweeney's counsel: To Robert Smith's murder?

Lisi: Yes, sir.

Sweeney's counsel: Okay. And you questioned him not just as a witness, but as a possible suspect?

Lisi: I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed. So he may have called somebody to alert them that "Butchie" was there. (App. 535-536.)

Thus, appellants knew that Johnson was on the scene and that he was suspected of assisting in the murder. Given what they knew, appellants have not explained how Murray's report of inadmissible hearsay would have materially contributed to their defense. *See United States v. Hsia*, 30 F. App'x 1, 3 (D.C. Cir. 2001) (finding no *Brady* violation where defendant "was fully aware of the information"); *In re Sealed Case No. 99-3096*, 185 F.3d 887, 897 (D.C. Cir. 1999) (information may "not be material for *Brady* purposes" if it "is the equivalent of that which the defense already had"); *see also United States v. Ahrensfield*, 698 F.3d 1310, 1321 (10th Cir. 2012) ("Because the [undisclosed] information . . . duplicated information defendant already had, it was not material.");

*Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) (noting that several circuits agree that "where the defendant was 'aware of the essential facts that would enable him to take advantage of the exculpatory evidence,' the government's failure to disclose it did not violate *Brady*").

Second, although the information about Chappelle and Hawkins was exculpatory, appellants have not shown a reasonable probability that disclosure of this information, or of Murray's statements, would have resulted in a different outcome. Appellants have failed to develop any evidence that Chappelle and Hawkins were the perpetrators, despite having had access to the ex parte pleading since at least 2010. Likewise, appellants have known about Petey Johnson's alleged role in the Smith murder since at least May 30, 2001, when SA Lisi testified about his suspicions. Yet, in the 24 years since then, appellants have proffered no evidence supporting a theory that Johnson was the actual perpetrator.[34]

---

[34] Even assuming they had no knowledge of Johnson's suspected participation in the murder until they received the unsealed material in June 2010, appellants made no apparent effort to investigate or develop a theory of third-party liability in the nearly 15 years since they have had access to the information. It is appellants' burden to demonstrate materiality under *Brady*. *See United States v. Borda*, 848 F.3d 1044, 1066-67 (D.C. Cir. 2017).

Their failure to develop these alternative theories is not surprising given this Court's determination that there was "[a]mple evidence" that "Carson murdered Smith, 'either alone or in conjunction with others,'" and that "[t]he evidence was more than sufficient . . . to conclude that Smith's murder was in furtherance of the conspiracy." *Carson*, 455 F.3d at 363-364. Appellants thus fail to establish how the unsubstantiated "word" on the street speculating that Petey Johnson might have killed Smith, or the government's early identification of Chappelle and Hawkins, would have seriously undermined the government's evidence of Carson's and Sweeney's agreement to murder Smith. *See Lesko v. Secretary Pennsylvania Department of Corrections*, 34 F.4th 211, 233 (3d Cir. 2022) (where, for 20 years, defendant possessed suppressed document indicating that witness had psychiatric condition but "never presented any evidence" that said condition would affect witness's ability to testify accurately, defendant could not rely on "pure speculation" to establish *Brady* materiality).

Appellants claim that they were prevented from "challeng[ing] Special Agent Lisi with his apparent bias and investigative tunnel-vision" concerning the Smith murder (App. 88). However, they ignore

that they were provided all of Lisi's unredacted notes and FBI 302 reports in advance of his testimony (Supp. App. 571-573).[35] Using these notes and reports, defense counsel thoroughly cross-examined Lisi about other people who might have had a motive to kill Smith (Supp. App. 592-610, 616-619), including unindicted individuals who attempted to kill Smith in the early 1990s (Supp. App. 600-601, 607-610), and further elicited that the FBI had interviewed one other suspect in Smith's murder who was not an identified member of the charged conspiracy (Supp. App. 622).

Moreover, even assuming arguendo that the alleged *Brady* material would have caused the jury to view the evidence of Smith's murder in a different light, it still would not have changed the outcome. Smith's murder was not charged as a substantive offense, but only as a racketeering act (conspiracy to murder) and, even then, only as to Sweeney and Carson (App. 685-687). However, strong evidence supported multiple other predicate acts found by the jury, only two of

---

[35] Weeks before trial, the government disclosed a redacted copy of the notes which contained unredacted names of drug suppliers and others, including Petey Johnson, with whom Smith had dealt drugs, and police reports identifying suspects in the 1991 shooting of Smith at Hope Village halfway house (Supp. App. 047-077).

which were required for conviction (App. 729-733, 739-740; Supp. App. 636-641, 645-649). *See United States v. McGill*, 815 F.3d 846, 946 (D.C. Cir. 2016) (finding any error as to one predicate act harmless where "it could not have had any effect on the RICO judgment because at least two unchallenged convictions for predicate acts remained regardless").

Additionally, even assuming that the nondisclosure prejudiced appellants' ability to challenge the admission of Smith's statements under the Confrontation Clause,[36] there is no reasonable probability that it affected the verdict because there was substantial evidence other than Smith's statements (recounting Sweeney's admissions) to support the charges about which his statements were admitted. Notably, several of the crimes Smith referenced were not even charged as substantive offenses in the indictment (Supp. App. 611-613 (e.g., the Keith Johnson

_____

[36] To establish *Brady* materiality as to the admission of Smith's statements, appellants would have to show that (1) had this information been disclosed, there was a reasonable probability that the trial court would not have found by a preponderance of the evidence that Smith was murdered by appellants, *see Carson*, 455 F.3d at 362 ("preponderance of the evidence" standard applies to "predicate factual findings" supporting admission of statements under Federal Rule of Evidence 804(b)(6)), and (2) had Smith's statements not been admitted, it was reasonably probable that appellants would have been acquitted. As explained infra, appellants make neither showing.

murder and Michael Jones shooting)). As to others, such as the Maryland triple murder, the trial court noted that there was a "considerable amount of evidence" apart from Smith's testimony (Supp. App. 620-621). *See infra* at 102-103 (discussing strength of triple-murder evidence).

Likewise, the evidence of the Anthony Pryor kidnapping was overwhelming: (1) an eyewitness saw four men arguing with Pryor, demand that he get out of his truck, and shoot him as he tried to run away, and subsequently saw the trunk door of the assailants' car in the street after they fled with the victim; (2) another eyewitness saw the trunkless car pull into the Arthur Cappers housing complex in D.C., and saw Sweeney and others abandon the car and throw clothing and other items into the trash; (3) police found the trunkless car with bloodstains on the rear bumper, and clothing items, car parts, and duct tape in and around it; (4) Coates's fingerprints were on the car; and (5) Coates and Sweeney admitted to other co-conspirators their roles in the offense. *See Carson*, 455 F.3d at 343 & n.5 (summarizing evidence).

Strong evidence also supported Sweeney's guilt of the Donnell Whitfield murder: (1) Whitfield's cousin, John Venable, who was with Whitfield shortly before the shooting, testified that he heard gunshots,

saw Sweeney run from the scene with a gun in his hand, and found

Whitfield lying on the ground, dying (Supp. App. 547-550); (2) cartridge

casings recovered from the scene of the murder were found to have been

fired from a 9-millimeter gun recovered from Sweeney's grandmother's

apartment (Supp. App. 553-554); and (3) Sweeney separately confessed

the killing to co-conspirators Reginald Switzer, Arthur Rice, Charles

Bender, and James Montgomery (Supp. App. 557 (Switzer); App. 440-441

(Bender); Supp. App. 538-539 (Rice); Supp. App. 561-563 (Montgomery)).

In sum, "[c]onsidering the withheld evidence in the context of the

entire record, . . . it is too little, too weak, or too distant from the main

evidentiary points to meet *Brady*'s standards." *See Turner v. United

States*, 582 U.S. 313, 326 (2017) (internal quotation marks and citation

omitted).[37]

---

[37] Notably, none of appellants' *Brady* claims, even if successful, undermines their convictions for narcotics conspiracy and RICO conspiracy, for each of which appellants received life sentences. The evidence supporting these conspiracy convictions was overwhelming. The FBI investigated appellants for three years and discovered "a long history of drug-dealing and an extraordinary breadth of violent acts." *Carson*, 455 F.3d at 339. FBI video cameras captured Martin, Carson, and Coates selling drugs. *Id.* "In addition to dealing marijuana, appellants Carson and Sweeney would help supply other members of the group." *Id.* at 340. "Indeed, "[t]he evidence was overwhelming that Sweeney, Carson, and

### ii. Montgomery's Prior Statements about the Benton Murder

Appellants next contend that the government violated *Brady* by failing to disclose SA Lisi's notes reflecting statements by James Montgomery about the Timothy Benton murder that were inconsistent with Montgomery's trial testimony (App. Br. 63-64). At trial, Montgomery testified that he and Maurice Proctor killed Benton (App. 360-365). However, according to Lisi's notes, Montgomery previously stated that Proctor and Carson were the murderers (App. 1274).

We agree that the prior statements were impeaching, but once again, appellants fail to show *Brady* materiality. Appellants were not charged with the Benton murder, either as a substantive offense or as a predicate of their drug-conspiracy or RICO-conspiracy charges. Indeed, as Montgomery acknowledged, the murder had nothing to do with the K

---

Coates were coconspirators[.]" *Id.* at 365. Likewise, there was substantial evidence supporting the RICO conspiracy convictions, even excluding those offenses implicated by the alleged *Brady* violations. For each appellant, the jury unanimously agreed upon many more than the two racketeering acts necessary to support such a conviction (see App. 720-747).

Street conspiracy (Supp. App. 432-434), and Montgomery himself pled guilty to the murder (Supp. App. 416-420).

Furthermore, any impeachment value was minimal at best. Montgomery's credibility was extensively impeached on a wide range of topics. Over the course of five days, defense counsel vigorously cross-examined him on (1) his lengthy criminal history, including his guilty plea to RICO conspiracy, and his admitted participation in seven murders and numerous violent crimes; (2) his inconsistent and evolving accounts of the events charged in this case; and (3) his admitted past lies to prosecutors, law enforcement, grand juries, and judges (see, e.g., Supp. App. 435-454, 463-480, 483-494).[38] "The trial judge even acknowledged that he could not 'imagine a witness that you could have for which there is more impeachment material than has already been supplied here.'" *Martin*, 2021 WL 4989983, at *12 (citing ECF No. 1170 at 62–63). There

---

[38] Montgomery entered three separate cooperation agreements in connection with his involvement in the K Street conspiracy (Supp. App. 413-421). He acknowledged that he had not been completely forthcoming with the government under the first two agreements, particularly with respect to his involvement in the murders of Chrishauna Gladden, Maurice Hallman, Leonard Hyson, Timothy Benton, and the triple murders in Maryland (Supp. App. 449-454, 457-461).

is no reason to believe any additional impeachment, about an uncharged murder, would have persuaded the jury to view the evidence of appellants' guilt differently. *See United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009) ("Cumulative impeachment evidence is generally not material because the marginal effect of additional impeachment is relatively small and unlikely to result in a different outcome."); *Derr*, 990 F.2d at 1336 ("an incremental amount of impeachment evidence on an already compromised witness does not create a 'reasonable probability' that the balance would have swung in favor of [defendant]"). In fact, there is good reason to believe the opposite; Montgomery's prior statements *implicated* Carson in the Benton murder and therefore carried a substantial risk of prejudice. As such, there is no reasonable probability that, had the jurors learned of the statements, they would have returned an acquittal.

### iii. Charles Bender's prior statements about the Anthony Fortune Murder.

As to the prior statements of Charles Bender, appellants have not shown the suppression of information that is exculpatory or impeaching. Bender testified at trial that Martin told him that he (Martin) had killed

Fortune (App. 453-454). This testimony was consistent with a prior statement noted in an FBI 302 report, wherein Bender related that Martin admitted that he had "pulled a gun and shot Fortune" (App. 1369, 1379). In neither instance did Bender mention Carson in relation to the Fortune murder. Because the two statements were fully consistent, the prior statement did not constitute *Brady* material.

That Carson was proven to have been the actual shooter does not render Bender's statements exculpatory. Although, in the wake of the murder, Martin had boasted to Bender and others that he had pulled the trigger (see App. 453-454 (Bender); Supp. App. 530-533 (Byars); Supp. App. 540-541 (Rice)), Martin was ultimately convicted on an aiding and abetting theory. *See Martin*, 2021 WL 4989983, at * 5 (citing *Carson*, 455 F.3d at 342).

### b. Documents Revealing Alleged Lies by Government Witnesses

Appellants next contend that the government violated *Brady* by failing to disclose the prosecution file on government witness Theodore Watson from another jurisdiction (App. Br. 66-73). Appellants claim that the file contained letters in which Watson "repeatedly acknowledged to the government . . . his own history of duplicity" (*id.* at 66).

Watson was convicted of an unrelated drug charge in the United States District Court in Greenbelt, Maryland (Supp. App. 344-345). While he was serving his sentence at Northern Neck Regional Jail in Virginia, he met Sweeney, who was also incarcerated (Supp. App. 346). Sweeney told Watson about his exploits, including the kidnapping and shooting of Anthony Pryor and the kidnapping of Keith Johnson (Supp. App. 347-349). He also confessed to having killed a couple of women (Supp. App. 352). Sweeney told Watson that he had been trying to locate James Montgomery because he knew that Montgomery was going to testify against him (Supp. App. 351).

Watson was extensively cross-examined on his lengthy criminal record and his history of cooperating with the government. Watson, who at the time of trial was 60 years old, had been in and out of prison for much of his adult life (Supp. App. 358). From 1963 to 2000, Watson was convicted of receiving stolen property, possession with intent to distribute heroin (twice), escape, and conspiracy to distribute a controlled substance (twice) (Supp. App. 354-357). His Greenbelt conviction was based on his fraudulent acquisition of a DEA registration number, which he obtained through his position as a pharmacy assistant, and which he

then used to illegally procure narcotics "for [his] own benefit" (Supp. App. 363, 369). Watson explained to the prosecutors in Greenbelt that someone else had devised the pharmaceutical scheme, but they did not believe him (Supp. App. 369-370).

Watson had been a cooperator "since the '70's" (Supp. App. 373), and had provided information to law enforcement in Washington, D.C., Maryland, and California (Supp. App. 380-385). At the same time, however, he had continued to deal drugs (Supp. App. 385-387). Watson acknowledged that he "had been around the system long enough to know that . . . [he] could work off [his] sentence by providing substantial assistance to the federal authorities" (Supp. App. 360), and that was his purpose for testifying in this case (Supp. App. 371-372).

Watson acknowledged that he entered into a plea agreement in the Greenbelt case with the hope of receiving a 5K1.1 letter from the government recommending a downward sentencing departure for substantial assistance (Supp. App. 359-360). Watson explained that he ultimately did not receive a 5K1.1 letter because he "didn't provide the

substantial assistance that they needed" and because the prosecutor in that case "did not like [him]" (Supp. App. 360-362).[39]

On the belief that the Greenbelt prosecutor had found Watson unreliable, defense counsel requested that the government review the Greenbelt prosecution file for *Brady* material (Supp. App. 374-376). The court ordered the government to do so (Supp. App. 376).

The following day, the government represented that it had reviewed the Greenbelt file and that there was "nothing . . . that suggest[ed] any *Brady* or Jencks material" (Supp. App. 409). The government explained that the assistant U.S. attorney in that case, Sandra Wilkinson, had indicated in a letter that Watson did not receive a 5K1.1 letter because she "didn't believe his cooperation was of a significant enough nature to qualify," not because "it was not worthy of belief or it was incredible" (*id.*). The government had also spoken with an MPD detective with whom Watson had cooperated, and "he indicated similarly that Mr. Watson had never provided him with information that

---

[39] Watson testified that he wrote several letters to the Greenbelt prosecutor, offering information in exchange for "more lenient treatment" (Supp. App. 400-401). Defense counsel requested that those letters be turned over as Jencks, but the court denied the request (Supp. App. 402).

he felt was untrustworthy of any kind" (*id.*). The government offered the file for the trial court to review, but the court declined to do so (Supp. App. 409-410). Nevertheless, the court placed the file under seal at defense counsel's request (Supp. App. 410).

Appellants now claim that the file, which was unsealed by the district court in 2008, contains a "copious amount of evidence that Watson chronically lied and schemed in pursuit of a sentencing departure" and that "the government was well aware of his untrustworthy nature" (App. Br. 69). Appellants specifically highlight letters in which Watson acknowledged that he had not told the truth in his initial meeting with the Greenbelt prosecutor and claimed that he had in the past "lied[,] connived and schemed to get things done" or to "obtain [his] . . . freedom" (*id.* at 70 (citing App. 1178, 1181, 1209-1210). However, none of Watson's self-serving statements undermines confidence in the verdict.

First, although the few isolated statements (buried in 37 handwritten pages) that appellants rely upon are arguably impeaching in that they suggest that Watson was previously untruthful, their impeachment value is minimal at best. In context, these broad,

unspecified claims of falsehood are reasonably understood as a *mea culpa*

offered in a desperate attempt to convince the Greenbelt prosecutor of

Watson's changed ways and desire to cooperate.[40] Overly general and

unmoored to any specific facts, these statements are only weakly

impeaching. *See Gonzalez v. Wong*, 667 F.3d 965, 985 (9th Cir. 2011)

(contrasting, in context of *Brady* claim, impeachment value of "hard

evidence" of witness's past lies with witness's admission on cross-

examination that he "could lie," and noting that "everyone can lie").

Second, contrary to appellants' contention (at 71-72), the

statements at issue do not support the conclusion that Watson did not

receive a 5K1.1 letter because the Greenbelt prosecutor determined that

he had lied. Indeed, in two separate letters to the district court in

Maryland, AUSA Wilkinson explained that she had concluded that

Watson did not provide substantial assistance warranting a sentencing

---

[40] Watson followed his admissions of having lied in the past with assurances that he had never "lied or welched" or "gone contrary once [he] had given '[his] word'" (App. 1181, 1210, 1222). Watson's letters were replete with supplications to Wilkinson to give him another chance at cooperating and/or recommend a reduced sentence (see, e.g., App. 1178-1179, 1181-1182, 1193, 1198-1199, 1225-1226).

departure (App. 1202-1203, 1205). Wilkinson made no suggestion that Watson's credibility or reliability factored into this determination.

In any event, there is no reasonable probability that had the jury learned of Watson's statements, they would have returned a different verdict. "While evidence that promises dramatic impeachment is certainly a legitimate basis for a *Brady* argument, this evidence does not meet the 'reasonable probability of acquittal' test." *See Derr*, 990 F.2d at 1336 (internal citation omitted) (noting that suppressed impeachment evidence would not overcome the evidence of guilt). Watson was a minor witness whose only contribution to the government's case was to recount Sweeney's admissions to having participated in the kidnappings of Anthony Pryor and Keith Johnson. The Johnson kidnapping was not charged in the indictment. As to the Pryor kidnapping, the government presented strong evidence apart from Watson's corroborating testimony, as discussed supra. Thus, Watson's testimony likely had little, if any, impact on the outcome. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (noting that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict," but may be material if it is "the *only* evidence linking [the

defendant] to the crime" (emphasis in original)); *United States v. Buchanan*, 891 F.2d 1436, 1444 (10th Cir. 1989) ("where a prosecuting witness is not key to the government's case, his credibility is not material; hence the failure to reveal impeachment evidence concerning a minor witness does not violate *Brady*").

Further, Watson was already substantially impeached on a number of topics including his lengthy criminal record, his history of serving as a government informant in hopes of obtaining reduced sentences, and his deceitful conduct giving rise to his Greenbelt conviction (*see, e.g.*, Supp. App. 354-360, 363-373, 381-401).[41] Any additional impeachment with statements of unspecified falsehoods would have been merely cumulative, and therefore immaterial. *See Oruche*, 484 F.3d at 599 (failure to disclose grand jury transcript of witness's admission to lying in another case was not *Brady* violation where witness was "thoroughly impeached" regarding prior convictions, benefits received in exchange for

---

[41] Notably, the trial court instructed the jury that the testimony of cooperating witnesses should be examined "with caution" and weighed with "great care" because "[a] witness who realizes that he may be able to obtain his freedom, receive a lighter sentence, or obtain other benefits by giving testimony favorable to the prosecution, has a motive to testify falsely" (Supp. App. 629).

testimony, and past lies, and impeachment value of grand jury testimony "would have been negligible and cumulative"); *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.").

Finally, any prejudice here was to Sweeney alone. The district court instructed the jury:

> The statements testified to by Mr. Watson is evidence limited to Mr. Sweeney and cannot be considered as evidence against any of the other co-defendants. . . . [Y]ou may consider Mr. Watson's testimony with respect to the charges against . . . Sweeney, but you may not consider it in any way when deciding whether the government has proved beyond a reasonable doubt that any of the other defendants have committed any crime. (Supp. App. 404.)

Accordingly, even assuming error, Coates, Carson, and Martin have no grounds for relief.[42]

---

[42] This Court has never subscribed to the principle that "there is no need to conduct a defendant-by-defendant analysis of how the violations impacted each defendant or each count" (App. Br. 89). To the contrary, the Court has carefully parsed the materiality of alleged *Brady* violations in cases involving multiple defendants and multiple charges. *See, e.g., United States v. Wilson*, 605 F.3d 985, 1007-1011 (D.C. Cir. 2010) (analyzing effect of *Brady* violation as to each defendant and each

### c. Information Regarding Relocation Assistance to Witnesses

Appellants claim that the government "withheld information related to the improper payments to, and hidden locations of, two one-time government witnesses, John Pinkney and Cheree Owens, whom appellants were unable to call for their own defense at trial" (App. Br. 73). Appellants argue that, contrary to the government's representations at trial that it was unaware of Pinkney's and Owens's whereabouts, an interview with Owens in 2014 showed that the government "deliberately moved" the two and then "either lost track of them or consciously decided not to disclose their location or make efforts to find them" (App. Br. 75). This assertion is unsupported by the record.

On December 10, 1996, Pinkney and Owens testified before a Maryland grand jury investigating the triple murders of Alonzo Gaskins,

relevant count). By suggesting that prejudice should be presumed because "one cannot know what piece of evidence the jury found most persuasive" (App. Br. at 89-90), appellants attempt to evade their burden of proving materiality and ignore that the jury was expressly instructed to consider each defendant and each charge separately (Supp. App. 626-628, 630-632). *See Andrew v. White*, 62 F.4th 1299, 1329 (10th Cir. 2023) (rejecting argument that there is a "presumption of materiality" for some *Brady* violations).

Darnell Mack, and Melody Anderson, which took place down the street from where Pinkney and Owens lived. *Carson,* 455 F.3d at 376. Owens testified that, about two weeks after the murders, she overheard Dennis Green on his cell phone saying that he and others "just took three people out of the street." *Carson,* 455 F.3d at 376. Pinkney and Owens both testified that Green later threatened them and tried to extort money from them. *Id.* at 377. The government subsequently developed evidence that Sweeney and others committed the murder.

"After the United States Marshals Service and an investigator hired by Sweeney's attorney could not locate Owens and Pinkney to call them as witnesses during the trial, Sweeney and Carson moved to admit into evidence the transcript of the Maryland grand jury testimony of Owens and Pinkney." *Id.* In a written opposition filed on November 16, 2000, the government noted that after Pinkney and Owens testified in the Maryland grand jury, "[t]he police soon came to believe that they were being used by Pinkney and Owens" (App. 628 at n.1). The government explained:

> This belief was based on the fact that Pinkney and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then

demanded additional funds. The police also learned that Pinkney and Owens owed Dennis Green . . . money for drugs. After investigating more fully, the police found nothing to corroborate the stories of Pinkney and Owens. A short time later, Pinkney and Owens seemingly disappeared. (*Id.*)

The trial court ultimately denied appellants' motion for admission of the grand jury testimony, and this Court upheld that ruling on direct appeal. *See Carson*, 455 F.3d at 376.

During post-conviction proceedings, Carson represented that on May 29, 2014, his attorney and an investigator, Dale Vaughan, located Owens in Virginia and interviewed her at her home (App. 1059). Owens refused to sign an affidavit, but Vaughan executed an affidavit recounting her statements (App. 1059; Supp. App. 120-122). According to Vaughan's affidavit, Owens stated that the FBI moved her and Pinkney "at least ten times in the six months that followed [their] testimony" and paid for their moving expenses and housing (Supp. App. 121). About seven months after Pinkney testified, the FBI moved the couple to Tampa, Florida (*id.*). Owens admitted that, after staying in the Tampa apartment "a short time," she and Pinkney "moved to a house on their own" (*id.*). Owens claimed that they never heard from anyone in the FBI or Prince Georges County after they moved to Florida (*id.*).

Contrary to appellants' assertion (at 75-76), Owens's 2014 statements do not demonstrate that that the government misrepresented its payments to Pinkney and Owens or suppressed information about their whereabouts. Indeed, Owens's description of the assistance she received from the government was consistent with the government's pretrial representations. Owens stated that the government relocated her and Pinkney and gave Pinkney money to cover their rent and moving expenses, but that she and Pinkney eventually moved to a new home on their own (Supp. App. 121). The government represented that Pinkney and Owens "were given a considerable amount of money that was to be used for their relocation," and that they ultimately "disappeared" (App. 628 at n.1). Nothing in Owens's interview suggests that the government was aware of Owens's and Pinkney's location at the time of trial, three years after the final relocation to Tampa; had given them additional, undisclosed payments; or had maintained contact with them.[43] Indeed,

---

[43] Whereas Carson indicated in a post-conviction pleading that his counsel and his investigator had located Owens in Virginia (App. 1059), appellants' brief indicates that Carson's investigator located Owens in Florida (App. Br. 43). Appellants repeatedly cite to appendix pages 1766-1768 to support their factual assertions regarding Owens, but those pages are inapposite.

Owens made clear that the couple had no further contact with the government after they were moved to Florida, seven months after their 1996 grand jury appearance, and that they in fact consciously decided to part ways with the government shortly after the Florida move.

In any event, as the district court recognized, *Martin*, 2021 WL 4989983, at *7, the government complied with its *Brady* obligations by disclosing before trial Pinkney's and Owens's grand jury testimony, the relocation payments, and the fact that the couple absconded with the government's money. The government was under no obligation to disclose any additional *Giglio* information because neither Pinkney nor Owens testified at trial. *See United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (holding that *Giglio* did not apply when the government "did not ever call" its confidential informant as a witness); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (finding "no authority that the government must disclose promises of immunity made to individuals the government does not have testify at trial").

Furthermore, there is no reasonable likelihood that, even if the jury had heard from Owens and Pinkney, it would have acquitted Sweeney, Carson, and Coates of the triple murder. The government presented

substantial evidence that Sweeney, Carson, and Coates killed Gaskins, Mack, and Anderson during the course of a botched robbery attempt concocted after Sweeney and Carson saw Gaskins win a large sum of money in Las Vegas. *See Carson*, 455 F.3d at 344-345 (summarizing evidence). Montgomery's testimony about the details of the crime was largely corroborated by (1) Cinama Hawkins, the lone surviving victim of the attack (Supp. App. 498-502); (2) evidence that all 12 .40-caliber shell casings recovered from the scene were consistent with having been fired by a Glock, as Montgomery said they were (Supp. App. 506, 513-514); (3) Sweeney's fingerprint, which was recovered from the crime scene (Supp. App. 505, 509-510); and (4) incriminating statements made by Sweeney and Coates about their roles in the offense and their suspicions that Montgomery was cooperating against them, *see Carson*, 455 F.3d at 345 n.7. In contrast, Pinkney's and Owens's expected testimony, even if believed, would have been of little value to appellants, as it did nothing more than suggest that Green and his cohorts did something to three people in the street. Neither Pinkney nor Owens had witnessed anything that Green and his accomplices had done, nor had they clarified that Green was talking about the triple murder, as opposed to something else.

Indeed, it is unlikely that their testimony would have been admissible at all, given that it simply relayed hearsay. *See Derr*, 990 F.2d at 1335–36 (inadmissible hearsay not material under *Brady*). And, in the nearly 25 years since appellants have known about Pinkney's and Owens's grand-jury testimony (see Supp. App. 268-269 (discussing disclosure)), they have offered no evidence to corroborate that Green committed the triple murder. Further, had Pinkney and Owens testified, they would have been subject to substantial impeachment based on their motive to implicate Green, given the drug debt they owed him, and their apparent misuse or theft of government funds intended for their relocation. Balanced against the strongly corroborated evidence of Sweeney's, Carson's, and Coates's guilt, there is no reason to believe that the jury would have credited their testimony.

## II. Appellants' Claim that the Trial Court Erred by Reviewing Submissions In Camera and Placing Them Under Seal is Not Properly Before this Court and Is, In Any Event, Procedurally Barred, Untimely, and Meritless.

Appellants assert that the trial court improperly reviewed materials in camera for alleged *Brady* and Jencks violations and erred in placing these materials under seal (App. Br. 76-83). They claim that the

court "failed to follow the procedures this Court has set out for in camera review," neglected its duty to review the evidence for *Brady* and Jencks material, and "encouraged" the government's "repeated failures to meet its disclosure obligations" (*id.* at 77-80). This claim is not within the scope of the COA, and even if it were, it is procedurally barred, time barred, and meritless.

### A.    The COA Does Not Encompass Appellants' Challenge to the Trial Court's In-Camera-Review Procedures.

Pursuant to 28 U.S.C. § 2253(c)(1)(B), appellants must obtain a COA before this Court may entertain their claim that the trial court improperly reviewed documents in camera. Section 2253(c)(2) provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." The statute further requires that the certificate of appealability "indicate which specific issue or issues satisfy the showing required by paragraph (2)." 28 U.S.C. § 2253(c)(3).

"Appellate review is limited to the issue(s) specified in the COA." *United States v. Weaver*, 195 F.3d 52, 53 (D.C. Cir. 1999). "[O]rdinarily, to present new claims on the merits, a habeas petitioner 'would have to

amend his habeas petition to add his new claims' or 'file a second or successive habeas application.'" *Waters v. Lockett*, 896 F.3d 559, 571 (D.C. Cir. 2018) (citation omitted). This Court will not grant a COA on any claim that the district court did not consider. *Id. See also Buck v. Davis*, 580 U.S. 100 (2017) ("When a court of appeals sidesteps [the COA] process by first deciding the merits of an appeal, . . . it is in essence deciding an appeal without jurisdiction." (citation omitted)).

This Court granted a COA on only two specific questions: "(1) whether the government's allegedly improper withholding of certain materials submitted to the district court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to that sealed material." *Coates*, No. 21-3072 (Order, December 23, 2022). Appellants have not sought an expansion of the COA. The Court should therefore decline to review this claim. *See United States v. Bertram*, 762 F. App'x 1, 5 (D.C. Cir. 2019) (declining to consider arguments "made for the first time on appeal [from denial of § 2255 motion], even though the relevant facts were fully known to [defendant] when he was before the district court").

## B. Appellants' Claim is Procedurally Defaulted and Time Barred.

Even if this Court were to grant an expansion of the COA, appellants still would not be entitled to relief because their challenge to the trial court's in camera review of the sealed material is procedurally barred and untimely. Appellants failed to raise this challenge on direct appeal despite being aware of the factual basis for the claim. As discussed infra, the trial court indicated on the record and in appellants' presence, often at appellants' request, that it would review certain materials in camera (see, e.g., App. 183; Supp. App. 262- 273, 277), and it made a point of having those materials marked as court exhibits (Supp. App. 123). During the pendency of their direct appeal, appellants filed a motion to review the sealed documents, describing in detail the specific documents they suspected contained possible *Brady* or Jencks material (Supp. App. 092-108). Nonetheless, they failed to challenge the trial court's in-camera-review procedures in their direct appeal. Appellants make no attempt to establish the requisite cause and prejudice to excuse their procedural default. Moreover, because they did not raise this claim on or

before February 20, 2008, within the one-year statute of limitations for their § 2255 motions, this claim is time barred.[44]

### C.    Appellants' Claim of Trial-Court Error is Meritless.

Even on its merits, appellants' challenge to the trial court's review procedures must fail. The Jencks Act expressly provides that a court must conduct an in camera inspection of any statement the government claims is not subject to disclosure under the Act. *See* 18 U.S.C. § 3500(c); *Goldberg v. United States*, 425 U.S. 94, 108 (1976) ("We have recognized that a government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are statements producible under s 3500."). Additionally, if any portion of a statement is withheld from a defendant and the defendant objects, "the court shall . . . seal the entire statement for appellate review." *United States v. Mason*, 523 F.2d 1122, 1128 (D.C. Cir. 1975) (citing 18 U.S.C. § 3500(c)).

---

[44] Although Sweeney's and Coates's initial § 2255 motions challenged their appellate counsel's failure to identify portions of the sealed material for this Court to review on direct appeal (App. 962, 1035-1036), none of the appellants challenged the trial court's use of the in-camera-review procedure or its decision to place the reviewed material under seal.

As to alleged *Brady* material, this Court has noted that "prosecutorial review of possible *Brady* materials [i]s normally sufficient"; however, in camera review may be appropriate where a defendant has "identified 'exculpatory evidence [that the prosecution] withheld,'" or where there is "a need to balance a special interest in secrecy (apart from normal prosecutorial interests) against the interest in defense access to marginal exculpatory material." *See United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)); *see also United States v. Caldwell*, 7 F.4th 191, 208 (4th Cir. 2021) (in camera review appropriate where defendant makes "plausible showing" that "information sought exists and that it would be both material and favorable to his defense" (cleaned up)); *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (in camera review of FBI 302s "was not only proper, but probably required"). Neither *Brady* nor the Jencks Act gives the defendant "the unsupervised authority to search through the [government's] files." *See Ritchie*, 480 U.S. at 59 (*Brady*); *Palermo v. United States*, 360 U.S. 343, 354 (1959) (Jencks); *United States v. Tarantino*, 846 F.2d 1384, 1416–17 (D.C. Cir. 1988) ("[U]nder *Brady*, 'the prosecutor is not required to deliver his entire

file to defense counsel[.]"); *United States v. North American Reporting, Inc.*, 761 F.2d 735, 740 (D.C. Cir. 1985) ("[defendants] were not entitled to access to the prosecutors' notes" in search of Jencks material).

Here, the trial court followed the appropriate procedures for review of alleged Jencks and *Brady* material, and in nearly every instance did so at the defense's request. For example, when the government provided the defense redacted copies of SA Lisi's grand jury testimony and FBI 302 reports upon his first appearance on the witness stand in January 2001, Sweeney's counsel requested the following:

> Your Honor, we would ask, and we think it's consistent with the very specific language of the Jencks Act that the . . . redacted information – not that it just be placed under seal, but that the court review it in camera.
>
> And I would submit to the court the Act requires the court to conduct a full in camera evaluation of the substance of the testimony, and . . . this is very important.
>
> . . . I would ask the court to review all of the grand jury testimony that is redacted and all the 302's so that the court can make an independent evaluation, because I would submit to the court that, Your Honor, you are in a much, much better situation and posture to evaluate this testimony than the court of appeals is. You're familiar with this case. You know what the respective parties' theories are. You have much more ability to give this a contextual analysis than the court of appeals can. So we would ask for that process to be done (App. 181-183.)

The court agreed to do so, noting that the Jencks Act "requires it" (App. 183). Subsequently, when Lisi retook the stand in May 2001 to testify about Robert Smith's statements, defense counsel again requested that the court review Lisi's unredacted 302 reports for information about other people who may have wanted to kill Smith (Supp. App. 566-568). The court ultimately ordered the government to turn over the unredacted reports (Supp. App. 571-572).

Appellants also asked the court to review the FBI 302 reports and notes of interviews with Charles Bender for *Brady* and Jencks material (Supp. App. 522-527). When the court completed its review and failed to detect further evidence requiring disclosure, appellants requested that the documents be placed under seal and made part of the record (Supp. App. 527).

Similarly, during a pretrial hearing on June 16, 2000, Sweeney's counsel asked to review the government's "investigative file" on James Montgomery for undisclosed *Brady* material (Supp. App. 262-264, 273; *see also* App. 576 ("Motion to Compel Discovery")). Counsel explained that he had learned from an earlier *Brady* disclosure that Montgomery had accused unindicted individuals of committing some of the charged

murders (Supp. App. 271-272). When the trial court suggested that it, rather than defense counsel, could review the file, Sweeney's counsel acknowledged that special security concerns might justify in camera review (Supp. App. 264, 267).[45] The court ruled that it would review the file and hold a second hearing if necessary (Supp. App. 272-273). In a written order issued on July 13, 2000, the trial court indicated that its review of the file, which contained, inter alia, numerous FBI 302 reports,

[45] The security concerns were well founded. As this Court has noted, "some of the appellants have a history of murdering or attempting to murder potential witnesses against them." *Carson*, 455 F.3d at 339. The government presented ample evidence that appellants had intimidated and committed, or conspired to commit, acts of violence against numerous witnesses, including Montgomery. *See id.* at 345-347 & n.7; App. 254; Supp. App. 565 (government had identified 15 witnesses whom appellants had conspired to kill). In Carson's words, they needed to "approach it like a full time job." *Carson*, 455 F.3d at 346. In light of the "special interest in secrecy" arising from these security concerns, s*ee Brooks*, 966 F.2d at 1505, the trial court correctly concluded that in camera inspection was appropriate. *See also United States v. Hickey*, 767 F.2d 705, 709 (10th Cir. 1985) (holding that in camera review of file containing details of witness's plea agreement was justified, where, given defendant's "propensity for violence" and conviction of plotting the murder of another witness, government had "justifiable concern with safety").

Similar security concerns supported the government's filing ex parte a notice to the court regarding changes to appellants' location of confinement (App. 1248). In that notice, the government described in detail appellants' history of intimidation and retaliation against witnesses (App. 1249-1267).

notes of interviews, and grand-jury testimony, revealed *Brady* information to which Sweeney was entitled—namely, that Robert Smith had informed Prince George's County authorities that Montgomery (and not Sweeney) had committed the triple murders (Supp. App. 019-020). Later, when Montgomery took the stand at trial, Carson moved for disclosure of all FBI 302 reports recounting Montgomery's statements (Supp. App. 426). The court reviewed the reports a second time, agreed that they constituted Jencks Act material, and ordered disclosure of the reports in their entirety (Supp. App. 426-427).[46]

The record thus belies appellants' assertion that the court abused the in-camera-review procedure and failed to thoroughly examine the disputed material or hold the government to its disclosure obligations.[47]

---

[46] The court permitted the government to redact information that raised "security concerns," such as "the location of a particular interview" (Supp. App. 427-428).

[47] Contrary to appellant's contention (at 79-80), Theodore Watson's Greenbelt prosecution file was not subject to disclosure under the Jencks Act because it did not "relate[] to the subject matter as to which [Watson] ha[d] testified." 18 U.S.C. § 3500(b). *See United States v. Cardillo*, 316 F.2d 606, 614-15 (2d Cir. 1963) ("[I]f the statement deals only with the witness's general background and personal history and does not deal with the events and activities testified to on direct examination, it is not producible under the Act."). "[A] defendant cannot compel a district court

To the extent there was error, any error was invited. *See United States v. Long*, 997 F.3d 342, 353 (D.C. Cir. 2021) ("It is settled that a defendant 'may not complain about invited error' on appeal.").

Nor is there support for appellants' accusation that the trial court "made clear to the government that it could avoid its disclosure obligations with impunity" (App. Br. 82-83). To the contrary, the court repeatedly reminded the government of its obligations under *Brady* and the Jencks Act (see, e.g., Supp. App. 290-292 (regarding murder of Robert

judge to sift through every record in the government's possession merely by speculating that somewhere in those records there might be Jencks Act statements." *United States v. Moore*, 651 F.3d 30, 75 (D.C. Cir. 2011). Although the court did not independently review the file for *Brady* material, it was justified in accepting the government's representations that the file contained no such material, because appellants failed to specifically "identif[y] 'exculpatory evidence [that the prosecution] withheld.'" *See Brooks*, 966 F.2d at 1505; *see also Ritchie*, 480 U.S. at 59 ("In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), it is the [government] that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."); *United States v. Stuart*, 923 F.2d 607, 613 (8th Cir. 1991) ("speculat[ion] . . . that evidence might exist in other files in other jurisdictions does not require either the government to turn files over to a defendant wholesale, or the trial court to conduct an in camera review of government files for evidence favorable to the accused"). In any event, the court placed Watson's file under seal at appellants' request (see App. 279).

Smith); Supp. App. 263-267, 274-277 (regarding triple murders and murder of Donnell Whitfield); App. 274 (regarding Theodore Watson)), and specifically ordered the government to disclose "any and all evidence in its possession which . . . may indicate that persons other than [appellants] attempted or had reason to murder [Robert] Smith" (App. 621-622). Where appellants proffered a reason to believe that certain material contained *Brady* information, the court indicated that it would review the material, make an independent assessment, and hold a further hearing if necessary (see, e.g., Supp. App. 263-273, 277 (regarding triple murders and James Montgomery); Supp. App. 522-527 (regarding Charles Bender)). This approach fully comported with this Court's precedent. *See Brooks*, 966 F.2d at 1505. Thus, even if appellants could surmount the jurisdictional, procedural, and time bars that apply to this claim, they cannot establish that they are entitled to relief on the merits.

### III. Appellate Counsel Was Not Ineffective in Failing to Challenge on Direct Appeal the Trial Court's Specific Evidentiary Rulings Pertaining to the Sealed Material.

Appellants assert that their appellate counsel rendered ineffective assistance by failing to challenge the district court's evidentiary rulings

regarding the sealed material, and therefore failing to raise their *Brady* claims (App. Br. 91). Because appellants have demonstrated neither deficient performance nor prejudice, this contention too must fail.

## A.    Standard of Review and Legal Principles

To establish ineffective assistance of counsel, a defendant must prove that: (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.

To demonstrate "deficient performance," a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This standard requires a defendant to show that, in light of all the circumstances as they appeared at the time of the conduct, "counsel's representations fell below an objective standard of reasonableness," or "prevailing professional norms." *Id.* at 688, 690; *Nix v. Whiteside*, 475 U.S. 157, 165 (1986). "'Surmounting [this] high bar is never an easy task.'" *United States v. Brinson-Scott*, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Judicial scrutiny of counsel's performance must be highly

deferential. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

"The objective standard of reasonableness for appellate counsel does not require counsel to pursue every possible argument on behalf of a criminal defendant." *Waters*, 896 F.3d at 568. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). "This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). "When a defendant argues appellate counsel failed to raise a particular claim, it is difficult to demonstrate that counsel was incompetent, because generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Waters*, 896

F.3d at 568 (internal quotation marks and citations omitted). Where, as here, "the record does not explicitly disclose . . . counsel's actual strategy or lack thereof . . . , the presumption may only be rebutted through a showing that no sound strategy posited by the [opposing party, here the government] could have supported the conduct." *United States v. Abney*, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (citation omitted; alteration in original).

To satisfy the prejudice prong of *Strickland*, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, he must show that counsel's errors "actually had an adverse effect on the defense." *Id.* This Court has noted that "when it comes to ineffective-assistance claims leveled against appellate counsel, there is not much daylight between *Strickland*'s deficiency prong and its prejudice prong." *Lockett*, 896 F.3d at 570. "If appellate counsel reasonably opts not to raise an issue with little or no likelihood of success, then there is usually no 'reasonable probability' that

raising the issue would have changed the result of a defendant's appeal."

*Id.*

This Court reviews the denial of a § 2255 motion on the ground of ineffective assistance of counsel de novo. *United States v. Aguiar*, 894 F.3d 351, 355 (D.C. Cir. 2018).

## B.   Discussion

Appellants argue that their appellate counsel performed deficiently by failing to comply with this Court's "repeated directives" to identify in their brief on direct appeal specific evidentiary rulings made by the trial court based on the sealed material, and that this "unreasonable error" "effectively blocked appellants from having their strongest arguments considered" (App. Br. 93-94). Because appellants cannot show that the ignored issues were stronger than the issues presented, much less demonstrate a reasonable probability that, had they been presented, appellants would have been successful on appeal, appellants are not entitled to relief.

First, contrary to appellants' assertion (at 92-94), appellate counsel did not violate any order of this Court by not raising the identified *Brady* issues in their brief on direct appeal. This Court did not order counsel to

raise those issues; rather, it made clear that any such issues were to be presented in their brief instead of by motion to the Court (App. 750). Although appellate counsel did not choose to challenge the precise rulings they had identified in their joint motion for review of the sealed material, they did raise several *Brady* claims in their brief. They argued that (1) the government's belated disclosure of FBI notes showing an alleged inconsistency in Charlene Wilson's testimony materially prejudiced the defense (*Carson*, No., 02-3015, App. Br. 143), (2) the government violated its *Brady* obligations by failing to disclose that Montgomery claimed he and Reginal Switzer had planned to kill Donnell Whitfield (*id.* at 179), and (3) the district court responded "lackadaisically" to their numerous *Brady* and Jencks Act requests, demonstrating judicial bias (*id.* at 90-92). That these arguments were ultimately rejected does not mean that appellate counsel was deficient in failing to press the *Brady* claims they chose to forgo.

To the contrary, as discussed supra, those claims were meritless, and, as this Court has held, "counsel does not perform deficiently by declining to pursue a losing argument." *See United States v. Watson*, 717 F.3d 196, 198 (D.C. Cir. 2013); *see also Baxter*, 761 F.3d at 24 n.4 (noting

that defendant's ineffective-assistance claim predicated on meritless *Brady* claim "fail[ed] for the same reason his *Brady* claim fail[ed]"; "test for prejudice under *Brady* and *Strickland* is the same").

Appellants highlight five government witnesses (Theodore Watson, James Montgomery, Reginald Switzer, Andre Murray, and Arthur Rice) about whom *Brady* and/or Jencks Act material was requested by trial counsel (App. Br. 95-97), but in no instance have appellants established that the undisclosed material would have created a reasonable probability of a different outcome, such that appellate counsel's failure to challenge the nondisclosure was both deficient and prejudicial. Regarding Watson, as we have argued supra, the letters contained in his Greenbelt prosecution file had minimal, if any, impeachment value and would have been merely cumulative of other efforts to discredit Watson on cross-examination.[48]

---

[48] Appellants' reliance (at 100) on *United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015), is misplaced. In that case, the suppression of letters and notes of conversations involving a cooperating witness was held to be material because (1) the information undermined the credibility of the government's "star witness"; (2) it could have been used to show that the witness and two other cooperators had perjured themselves or had coordinated their testimony, which they had denied doing; (3) the government's case "pivoted entirely on the credibility of [the witness] and

As to Montgomery, appellants complain only that they were given redacted FBI 302 reports when they requested information pertaining to the Robert Smith murder (App Br. 95), but since the unsealing of the unredacted reports by the district court in 2008, appellants have failed to identify any undisclosed information in those reports that amounted to *Brady* or Jencks material. Likewise, as to Reginal Switzer, appellants dispute the trial court's ruling that the prosecutors' notes were not Jencks material (App. Br. 96), but they do not explain why this ruling was erroneous. *See United States v. Doost*, 3 F.4th 432, 437 (D.C. Cir. 2021) ("The defendant bears the burden of demonstrating both elements of ineffective assistance under the *Strickland* standard.").

With respect to Murray, appellants contend that they were erroneously denied disclosure of the following Jencks material: (1) records kept by Detective Michael Fulton documenting information

his two cohorts"; and (4) it "rais[ed] the prospect that [the witness] and the prosecutor were hiding something from the jury." *Id.* at 18-21. In this case, by contrast, Watson was a minor witness whose letters to a prosecutor in an unrelated case, vaguely claiming to have lied in the past, offered little in the way of impeachment and were merely "collateral because they did not directly bear on the factual evidence underlying the government's case." *See id.* at 20.

provided by Murray, and (2) unredacted letters Murray had written to AUSA Kenneth Wainstein (App. Br. 96). In neither instance have they shown trial-court error, much less appellate-counsel error for failing to raise these claims. Murray testified that he had previously served as an informant, providing Fulton information about the location of guns on the street and who possessed them (Supp. App. 313-315). The government represented that this information was not Jencks because it was entirely unrelated to the subject matter of Murray's trial testimony (Supp. App. 316-317). Nothing in the record belies this representation or suggests that the court erred in determining that any such information was not subject to disclosure.[49] As to Murray's letters to AUSA Wainstein, appellants ignore that they successfully used the letters to impeach Murray's claim that he had not sought any assistance from the government, and that the trial court permitted them to offer the letters into evidence if they wished (Supp. App. 318-339). Appellants have not

---

[49] It is unclear from the record whether Detective Fulton had ever even possessed a written or recorded statement from Murray that would qualify as a "statement" within the meaning of the Jencks Act, 18 U.S.C. § 3500(e). Appellants point to no such statement, and we are aware of none.

shown how the redacted information, which pertained to offenses unrelated to this case (Supp. App. 323), would have been relevant or admissible, and would have undermined confidence in the verdict.

Finally, as to Rice, appellants complain (at 97) that the district court did not provide a more fulsome explanation for its conclusion that the FBI 302 report pertaining to Rice was "clearly not a Jencks Act statement" (App. 469). But other than reciting the legal standard, they point to no evidence in the record to undermine the court's assessment. Lisi's 302 reports were in "the nature of witness summaries" (Supp. App. 311). Nothing in the record suggests that the report at issue was "signed or otherwise adopted or approved by" Rice, 18 U.S.C. § 3500(e)(1), or was "a substantially verbatim recital of an oral statement made by [Rice] and recorded contemporaneously with the making of such oral statement," § 3500(e)(2). *See United States v. Moore*, 651 F.3d 30, 75 (D.C. Cir. 2011), ("interview reports . . . written by law enforcement officers, not by the witnesses themselves[,] generally do not qualify as Jencks Act statements"); *see also Palermo*, 360 U.S. at 350 (noting that Jencks Act was meant to prevent "the undiscriminating production of agent's summaries of interviews regardless of their character or completeness,"

and that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations").[50] Given the weakness of these claims, appellants cannot show that "no sound strategy" justified appellate counsel's decision to forgo them in favor of other challenges. *See Abney*, 812 F.3d at 1087.[51] This is especially so considering the breadth and complexity of the case (a multi-defendant trial spanning nine months and involving a 64-count indictment) and the difficulty, and necessity, of selecting only a

---

[50] In their "Statement of the Case," appellants suggest that Rice's 302 should have been turned over as *Brady* material because Rice claimed to have seen Martin and Carson fleeing the scene of the murders of Maurice Hallman and Leonard Hyson, while Montgomery testified at trial that he (Montgomery) and Carson were the shooters (App. Br. 25). Appellants do not address this in the "Argument" section of their brief, but we note that this claim is meritless nonetheless. Rice's statement was not exculpatory; rather, it was clearly *inculpatory* as to both Martin and Carson. To the extent it would have undermined Montgomery's testimony, what little impeachment value it carried was vastly outweighed by its potential prejudice to Martin and Carson.

[51] That the record is bereft of evidence of appellate counsel's strategy is chargeable to appellants alone. Appellants had 14 years—from February 20, 2007, when their convictions became final, to October 27, 2021, when the district court denied their § 2255 motions—to develop a factual basis for their ineffective-assistance claims. Nothing prevented them from obtaining affidavits from their appellate attorneys during that 14-year period.

limited set of issues to raise on appeal. *See Jones*, 463 U.S. at 746. "Experienced advocates have emphasized the importance of winnowing out weaker arguments on appeal . . . . Selecting the most promising issues for review has assumed a greater importance in an era when the time for oral argument is strictly limited in most courts and when page limits on briefs are widely imposed."); *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (citations omitted) (noting that "strong presumption" of reasonable professional assistance, together with "the reality that effective appellate advocacy often entails screening out weaker issues," means that appellate counsel need not raise "every colorable or non-frivolous issue on appeal" (citations omitted)). Appellate counsel jointly filed a brief "rais[ing] two hundred pages' worth of detailed constitutional and evidentiary arguments." *Martin*, 2022 WL 1618869, at *13. Because appellants have not established that any of the unraised claims were clearly stronger than those that were asserted on appeal, they cannot show deficient performance, and because they have not shown a reasonable probability that any of the unraised claims would have

resulted in reversal of their convictions, they cannot demonstrate *Strickland* prejudice.[52]

## IV. Carson's Claim of Ineffective Assistance of Trial Counsel Is Not Properly Before This Court, and In Any Event, Is Untimely and Meritless.

In his supplemental § 2255 motion, filed on April 9, 2015, Carson argued for the first time that his trial counsel rendered ineffective assistance due to an alleged conflict of interest (App. 1318-1324). In an affidavit attached to Carson's motion, trial counsel Lexi Negin-Christ averred that she and her co-counsel, Joseph Beshouri, faced "insurmountable" judicial bias which prevented them from, inter alia, "effectively cross-examin[ing] witnesses, respond[ing] to late *Brady* disclosures[,] . . . [and] mak[ing] effective strategic decisions" (App. 1425). She also asserted that she feared the court would withhold payment for

---

[52] Appellants contend that prejudice must be presumed (App. Br. 97), but this case does not present the sort of Sixth Amendment deprivations of counsel that the Supreme Court has recognized as presumptively prejudicial. *See Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance."); *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) (prejudice presumed when "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding").

her services or hold her in contempt if she pressed objections and arguments that would "irritate the judge" (App. 1426-1427). The district court found that this ineffective-assistance claim was untimely under § 2255(f). *Martin*, 2021 WL 4989983, at *12.[53] Carson contends that the district court erred by rejecting this claim without a hearing (App. Br. 129). This Court should decline to entertain Carson's claim because it is not properly before the Court. Alternatively, this claim should be rejected as time barred and meritless.

As appellants acknowledge (at 124 n.20), this Court's certificate of appealability did not include Carson's challenge to his trial counsel's representation. Appellants nonetheless attempt to tether this challenge to their claim that the trial court erred by placing documents under seal and failing to appropriately examine them for *Brady* material (*id.*). As explained supra, however, that claim is also outside the scope of the COA. Appellants do not ask this Court to expand the COA, *see Waters*, 896 F.3d

---

[53] Carson's supplemental motion asserted a number of deficiencies in his trial counsel's representation (App. 1318-1330). Although the district court did not specifically mention the alleged conflict of interest in denying Carson's claim, it noted that all of the asserted deficiencies, with the exception of one (not raised in this appeal), were time barred. *See Martin*, 2021 WL 4989983, at *12.

at 571 (suggesting that explicit request for expansion of COA is required).
Accordingly, this Court should decline to consider Carson's ineffective-
assistance-of-trial-counsel claim. *See In re Sealed Case*, 809 F. App'x 6, 9
(D.C. Cir. 2020) (declining to consider claim that appellate counsel had
conflict of interest, "because it [wa]s not encompassed within the
certificate of appealability").

Even if appellants' brief is construed to implicitly request an
expansion of the COA, this Court should decline to do so. "When making
a COA determination, [this Court] 'look[s] to the District Court's
application of AEDPA to petitioner's constitutional claims and ask[s]
whether that resolution was debatable amongst jurists of reason."
*Waters*, 896 F.3d at 571 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336
(2003)). Here, no reasonable jurist could doubt the district court's
conclusion that Carson's ineffective-assistance claim was time barred.

Carson's initial § 2255 motion broadly alleged ineffective assistance
of trial counsel based on a "failure to investigate" and "failure to object to
inadmissible evidence" (App. 988). As the district court correctly noted,
only one of Carson's supplemental ineffective-assistance claims
"plausibly relate[d] back to Carson's allegation of trial counsel's 'failure

to investigate'—the failure to investigate whether Carson had a rental car when Smith was murdered." *Martin*, 2021 WL 4989983, at \*12. "The remaining claims in Carson's second motion," including the allegation that his counsel labored under a conflict of interest, "d[id] not relate back and c[a]me years after § 2255(f)'s time limit." *Id. See Watkins v. Stephenson*, 57 F.4th 576, 581 (6th Cir.), *cert. denied sub nom. Watkins v. Chapman*, 144 S. Ct. 222 (2023) (amended habeas petition alleging ineffective assistance of trial counsel "for failing to request self-defense jury instructions, failing to object to [an] allegedly biased juror, and failing to communicate with [defendant] before trial" did not relate back to original claim alleging that counsel "failed 'to investigate and raise a defense'"); *Hernandez*, 436 F.3d at 858 ("claim of ineffective assistance of counsel on cross-examination did not relate back to the claims contained in the original [§ 2255] motion" alleging "failure to object to the admission of evidence"); *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective

assistance claim based upon an entirely distinct type of attorney misfeasance.").

Carson ignores § 2255(f)'s time bar; instead, he asserts that this Court should grant him relief on the merits. This, however, the Court should not do. Carson's allegation that his trial counsel labored under a conflict of interest is a thinly veiled attempt to revive the meritless judicial-bias claim he asserted on direct appeal. "[I]t is well settled that [a defendant] cannot 'circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion.'" *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (ellipses in original; citation omitted).

On direct appeal, this Court rejected appellants' argument that the trial court, inter alia, "improperly 'demeaned' and 'threatened' defense counsel during trial when he cut them off and instructed them to be seated, referred to (and admonished against) 'frivolous' objections, suggested they were attempting to delay the trial or cause a mistrial, warned of possible contempt citations, and in fact cited two defense lawyers for contempt." *Carson*, 455 F.3d at 358 (internal citations omitted). Appellants contended that "these remarks, taken together, reveal[ed] such bias on the part of the trial judge that they could not, and

did not, receive a fair trial." *Id.* Carson's trial counsel made the same claims in her affidavit supplementing Carson's § 2255 motion (App. 1425-1427), and Carson repeats those claims in the present appeal (App. Br. 124-130). However, this Court has already held that "[t]he judge's comments during the trial did not reach a level of hostility that prevented a fair trial"; rather, "the trial comments reflect[ed] the judge's attempt to exercise his discretion to control the trial." *Carson*, 455 F.3d at 358. While this Court on direct appeal was focused on the question of judicial bias, Carson's present claim relies on the same factual predicate: the allegedly biased comments of the trial judge. The Court found that those comments were not sufficiently "belittling" or frequent, particularly "in the context of a long and difficult trial," to require reversal. *Carson*, 455 F.3d at 359-360. Carson should not be permitted to relitigate issues this Court has already resolved.

Should the Court choose to consider the merits of Carson's claim, it nevertheless must affirm. *United States v. Shark*, 51 F.3d 1072, 1076 (D.C. Cir. 1995), is dispositive. In *Shark*, this Court held that "friction between trial counsel and the court" was "insufficient as a matter of law" to establish a conflict-of-interest claim under *Cuyler v. Sullivan*, 446 U.S.

App 1916

335, 349-350 (1980) (holding that if "an actual conflict of interest adversely affected his lawyer's performance," a defendant need not demonstrate prejudice). *Shark*, 51 F.3d at 1076. The Court explained:

> We very much doubt that mere fear of rebuke from the court could ever give rise to a conflict of interest sufficient to establish a predicate for ineffective assistance. Were that the case, any provocation of the court, even on the smallest matter, could be maneuvered into an excuse for invalidating a conviction. Usually, when a defendant claims that a judge's hostility impaired defense counsel's zealous advocacy, the right that defendant seeks to redeem on appeal is the right to a fair trial. . . .

> Of course, if judicial expressions of dissatisfaction were severe enough to lead defense counsel to make decisions that are both objectively deficient and prejudicial, the *Strickland* requirements for showing ineffective assistance would be satisfied. But a defendant cannot avoid those requirements by seeking to make out a claim of ineffective assistance under the more lenient *Cuyler* standard when the asserted conflict of interest is said to arise from ordinary friction between a judge and defense counsel at trial.

*Id.*

Subsequently, the Court, relying on *Shark*, held that, standing alone, fear of a contempt sanction is "insufficient to show a conflict of interest." *United States v. Taylor*, 139 F.3d 924, 931-932 (D.C. Cir. 1998) ("Because all attorneys potentially face contempt citations, no particular attorney can be considered ineffective due to a concern that he or she

might be so cited."). Together, *Shark* and *Taylor* foreclose Carson's conflict-of-interest claim.[54]

Under *Strickland*, Carson's claim also must fail, for he establishes neither deficient performance nor prejudice. Although Carson's trial counsel asserted in her affidavit that the trial judge made "implicit threats" to withhold compensation if the attorneys did not comply with the court's directives (App. 1426), nothing in the record supports this assertion. Unlike the judge in *Walberg v. Israel*, 766 F.2d 1071, 173 (7th Cir. 1985), upon which Carson relies (at 126-127), the judge here never threatened to deny a request for payment by any of the attorneys, nor did he suggest that he would take any action directed at the attorneys' financial interests if they did not do as the court said.[55]

---

[54] "This [C]ourt has been careful . . . to reject 'defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test." *United States v. Gray-Burriss*, 791 F.3d 50, 62–63 (D.C. Cir. 2015) (quoting *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996)).

[55] In *Walberg*, 766 F.2d at 1075, the Seventh Circuit noted that "it is implicit in any system where trial judges appoint counsel who receive fees—indeed in any system where judges rule on attorney's fees, whether or not the judge appointed counsel—that counsel has an economic incentive to comply with the judge's wishes, and this may at times create

While the judge did ultimately hold two of the defense attorneys in contempt for violating his orders,[56] as this Court concluded, such a sanction was well within the court's discretion and did not exhibit bias. *See Carson*, 455 F.3d at 358-359; *see also United States v. Jackson*, 627 F.2d 1198, 1205 n.18 (D.C. Cir. 1980) (rejecting bias claim where trial judge's comment that counsel was "courting a contempt citation" was "an expression of his disciplinary powers to maintain order in the court and to ensure adherence to his rulings"; "[j]udges also have some obligation to protect the respect due their position lest they lose their necessary stature with the jury."). Notably, Judge Jackson never threatened to hold Carson's attorneys in contempt or take any disciplinary action against them. Indeed, Carson points to no specific statement of the court that

a division of loyalties." This generally will not render a lawyer "incapable of representing his client in a constitutionally adequate fashion." *Id. Cf. United States v. Taylor*, 139 F.3d 924, 932 & n.8 (D.C. Cir. 1998) (noting that "[a]lthough a 'defendant's failure to pay fees may cause some divisiveness between attorney and client,' courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client"). It is only "in extreme cases [that] a fatal conflict of interest may arise." *Walberg*, 766 F.2d at 1075. Carson has not shown this to be an "extreme case."

[56] Counsel for former codefendants Gary Price and Vincent Hill were held in contempt during trial (Supp. App. 340-341, 623-624). The district court vacated the contempt rulings after the case had ended (App. 97-98).

could even arguably suggest that it would take disciplinary measures against Carson's attorneys. Carson thus fails to demonstrate that the court's comments and rulings had a detrimental impact on his counsel's representation.

Further, any perceived conflict was belied by counsel's performance throughout the trial. Carson's counsel vigorously cross-examined witnesses; filed motions for, inter alia, disclosure of *Brady* and Jencks Act information (see, e.g., Dkt. 329, 412, 554), mistrial and severance (Dkt. 527), exclusion of evidence (Dkt. 588, 596), and remedies for the government's belated disclosure of *Brady* material (Dkt. 594); and forcefully argued that the government had violated its obligations under *Brady* and the Jencks Act (see, e.g., Supp. App. 281-289). Despite Ms. Negin's broad assertions that she and co-counsel Beshouri attempted to "appease" the judge by "giving up objections, arguments and motions that would irritate the judge" (App. 1427), she failed to indicate any specific objection, argument, or motion that they chose to forgo to protect their own interests.[57] Even now on appeal, Carson identifies no action he

---

[57] Should this Court determine that Carson has made a "colorable claim" of ineffective assistance of trial counsel, and that the record does not

believes his counsel should have taken, much less any action that would

have made a different verdict reasonably likely. Carson thus fails to carry

his burden under *Strickland*.

"conclusively demonstrate" whether he is entitled to relief, the proper
remedy would be to remand for the district court to make any necessary
factual findings. *See United States v. Pole*, 741 F.3d 120, 126 (D.C. Cir.
2013) (citation omitted).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
Assistant United States Attorneys

_____/s/_____
ELIZABETH GABRIEL
MD Bar
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 28081 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
ELIZABETH GABRIEL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 4th day of April, 2025, I have caused a copy of the foregoing brief for appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellants:

John Longstreth
Jonathan M. Cohen
Tre Holloway
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

Mark Lanpher
Allen Overy
Shearman Sterling US LLP
1101 New York Avenue NW
Washington, D.C. 20005
mark.lanpher@aoshearman.com

Katherine Stoller
Allen Overy
Shearman Sterling US LLP
599 Lexington Avenue
New York, NY 10022
katherine.stoller@aoshearman.com

Eric Hans Kirchman
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
kirchlaw@cs.com

David B. Smith
108 North Alfred Street
Alexandria, VA 22314
dbs@davidbsmithpllc.com

<div style="text-align: right;">

_____/s/_____

ELIZABETH GABRIEL
Assistant United States Attorney

</div>

# A D D E N D U M

<div style="border:1px solid #ccc; padding:10px;">

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 153. Habeas Corpus (Refs & Annos)

</div>

28 U.S.C.A. § 2253

§ 2253. Appeal

Currentness

**(a)** In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

**(b)** There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

**(c)(1)** Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--

  **(A)** the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

  **(B)** the final order in a proceeding under section 2255.

**(2)** A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

**(3)** The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 967; May 24, 1949, c. 139, § 113, 63 Stat. 105; Oct. 31, 1951, c. 655, § 52, 65 Stat. 727; Pub.L. 104-132, Title I, § 102, Apr. 24, 1996, 110 Stat. 1217.)

28 U.S.C.A. § 2253, 28 USCA § 2253
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

§ 2255. Federal custody; remedies on motion attacking sentence, 28 USCA § 2255

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 334 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 160 of 166

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 153. Habeas Corpus (Refs & Annos)

28 U.S.C.A. § 2255

§ 2255. Federal custody; remedies on motion attacking sentence

Currentness

**(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

**(d)** An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of--

  **(1)** the date on which the judgment of conviction becomes final;

  **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 335 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 161 of 166

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**(g)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(h)** A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain--

**(1)** newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

**(2)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 967; May 24, 1949, c. 139, § 114, 63 Stat. 105; Pub.L. 104-132, Title I, § 105, Apr. 24, 1996, 110 Stat. 1220; Pub.L. 110-177, Title V, § 511, Jan. 7, 2008, 121 Stat. 2545.)

28 U.S.C.A. § 2255, 28 USCA § 2255
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 336 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 162 of 166

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 223. Witnesses and Evidence (Refs & Annos)

18 U.S.C.A. § 3500

§ 3500. Demands for production of statements and reports of witnesses

Currentness

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

**(c)** If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

**(d)** If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

**(e)** The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

  **(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 337 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 163 of 166

**(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

<div align="center">

**CREDIT(S)**

</div>

(Added Pub.L. 85-269, Sept. 2, 1957, 71 Stat. 595; amended Pub.L. 91-452, Title I, § 102, Oct. 15, 1970, 84 Stat. 926.)

18 U.S.C.A. § 3500, 18 USCA § 3500
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
 Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
  Title III. Pleadings and Motions

Federal Rules of Civil Procedure Rule 15

Rule 15. Amended and Supplemental Pleadings

Currentness

**(a) Amendments Before Trial.**

**(1)** *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course no later than:

**(A)** 21 days after serving it, or

**(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

**(2)** *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

**(3)** *Time to Respond.* Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

**(b) Amendments During and After Trial.**

**(1)** *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

**(2)** *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

**(c) Relation Back of Amendments.**

Rule 15. Amended and Supplemental Pleadings, FRCP Rule 15

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 339 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 165 of 166

**(1)** *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or

**(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

**(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and

**(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

**(2)** *Notice to the United States.* When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

**(d) Supplemental Pleadings.** On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

**CREDIT(S)**

(Amended January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; amended by Pub.L. 102-198, § 11, December 9, 1991, 105 Stat. 1626; amended April 22, 1993, effective December 1, 1993; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009; April 24, 2023, effective December 1, 2023.)

**<Amendments received through April 1, 2024>**

---

**Footnotes**

---

Case 1:98-cr-00329-RCL    Document 1375-11    Filed 04/06/26    Page 340 of 348
USCA Case #21-3072    Document #2109456    Filed: 04/04/2025    Page 166 of 166

1    If the proposed amendment to Rule 15(a)(3) ... changing the time period is approved by the Judicial Conference, the following additional sentence will be added to the Committee Note: "Amended Rule 15(a)(3) extends from 10 to 14 days the period to respond to an amended pleading."

Fed. Rules Civ. Proc. Rule 15, 28 U.S.C.A., FRCP Rule 15
Including Amendments Received Through 4-1-2025

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Appellee,<br><br>    v.<br><br>SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,<br><br>        Appellants. | No. 21-3072<br>(consolidated with Nos. 21-3073, 21-3078, 22-3016, and 23-3015)<br><br>    1:98-cr-00329-RCL-2<br>    1:98-cr-00329-RCL-3<br>    1:98-cr-00329-RCL-4<br>    1:98-cr-00329-RCL-6 |

## UNOPPOSED MOTION TO REMAND THE RECORD AND TO STAY THE DEADLINE FOR DEFENDANTS-APPELLANTS' REPLY BRIEF

Pursuant to D.C. Circuit Rule 41(b), Defendants-Appellants Samuel Carson, Sean Coates, William Kyle Sweeney, and Jerome Martin (together, "Defendants-Appellants"), respectfully submit this unopposed motion to remand the record to the district court for that court to consider recently disclosed material and develop the record as pertinent to the issues on appeal, and to stay the deadline for the filing of Defendants-Appellants' reply brief pending resolution of this motion. Specifically, Defendants-Appellants state as follows:

1.    As framed by this Court in granting certificates of appealability, the above-captioned consolidated cases present, *inter alia*, the issue of whether the government's allegedly improper withholding of certain materials submitted to the

App 1935

district court under seal violated Defendants-Appellants' due-process rights. *See* Order, *United States v. Coates*, No. 21-3072 (D.C. Cir. Dec. 23, 2022).

2.    Pursuant to the government's continuing obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), counsel for Plaintiff-Appellee the United States has made recent, supplemental *Brady* disclosures to undersigned counsel for Defendants-Appellants on three occasions since the filing of Plaintiff-Appellee's brief on April 4, 2025. The disclosures were made on April 11, 2025; April 22, 2025; and May 7, 2025.

3.    Each disclosure contains information related to Defendants-Appellants' claims in the above-captioned consolidated cases, including related to the murder of Robert "Butchie" Smith and, in particular, information regarding alternative suspects for the shooting.

4.    This evidence is central to Defendants-Appellants claims. As set forth in Defendants-Appellants' opening brief, trial testimony that Defendants-Appellants were responsible for Smith's murder was extraordinarily significant because it not only "supported a portion of the indictment" but also "formed the basis of the trial court's findings that all Appellants, either directly or through their participation in the conspiracy, were responsible for Smith's murder, which in turn caused the trial court to permit into evidence numerous hearsay statements Smith had made before his murder." Br. of Appellants at 12. In short, the murder of Smith was "a crime

that formed a key aspect of the government's case against all Appellants." *Id.* at 55;

*see also id.* at 12-14, 21-22, 27-31, 42, 55-66, 80-82, 88.

5.    Moreover, during the first hearing on the government's motion to admit

Smith's statements as hearsay against the Defendants-Appellants, defense counsel

specifically requested *Brady* material related to Smith's murder.  *Id.* at 27 (citing

App. 145-147).  The government stated it had none, and the trial court unequivocally

stated that, if the government had any, it should turn it over.  *Id.* at 27-28 (citing

App.144-147).  Defense counsel made repeated requests for evidence as to other

possible suspects in Smith's murder.  *See id.* at 28-29 (citing App. 223-224, 621).

6.    After consulting the record and speaking with their clients, it is the

understanding of undersigned counsel for Defendants-Appellants that the material

provided in the recent disclosures was not previously disclosed to defense counsel.[1]

7.    Defendants-Appellants recognize that the materiality of suppressed or

otherwise undisclosed *Brady* evidence "must be evaluated in the context of the entire

record," *United States v. Bagcho*, 151 F.Supp.3d 60, 73 (D.D.C. 2015) (quoting

*United States v. Agurs*, 427 U.S. 97, 112 (1976)), and that undisclosed evidence must

---

[1] Counsel for Plaintiff-Appellee the United States has stated that, because all the closed files in this case have not been located (and the government's search remains ongoing), the government has been unable to ascertain whether the recently disclosed material was previously disclosed to defense counsel.

be considered "collectively, not item-by-item," *United States v. Lloyd*, 71 F.3d 408, 413 (D.C. Cir. 1995) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

8.    A limited remand of the record to the district court pursuant to D.C. Circuit Rule 41(b) will enable the district court to consider the recently disclosed material and develop the record while this Court retains jurisdiction over the consolidated cases. *See, e.g.*, *United States v. Todd*, 287 F.3d 1160, 1163-65 (D.C. Cir. 2002) (remanding the record to district court for "further factual development" regarding facts that were otherwise "neither fully litigated nor part of the [existing] appellate record"); *United States v. Lawson*, 15 F.3d 1160 (Table), 1994 WL 9944, at *1 (D.C. Cir. 1994) (remanding the record to district court "for a further hearing and specific findings" on certain factual issues).

9.    Accordingly, Defendants-Appellants respectfully request that this Court remand the record to the district court to consider the recently disclosed material and develop the record while this Court retains jurisdiction over the consolidated cases.

10.    Defendants-Appellants further respectfully request that this Court stay the deadline for the filing of Defendants-Appellants' reply brief pending resolution of this motion. Defendants-Appellants' reply brief is otherwise currently due on June 3, 2025.

11.    Counsel for Defendants-Appellants conferred with counsel for Plaintiff-Appellee the United States, who stated that they do not oppose a limited remand for the district court to consider the recently disclosed material and develop the record as pertinent to the issues on appeal.

Respectfully submitted,

/s/ *Mark Lanpher*

Mark Lanpher
Allen Overy Shearman Sterling US LLP
1101 New York Avenue NW
Washington, D.C. 20005
(202) 508-8000
mark.lanpher@aoshearman.com

*Counsel for Sean Coates*

/s/ *Eric Kirchman*

Eric Hans Kirchman
Law Office Of Eric H. Kirchman
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
(301) 762-2909
kirchlaw@gmail.com

*Counsel for William K. Sweeney*

/s/ *John Longstreth*

John Longstreth
K&L Gates LLP
1601 K St. NW
Washington, D.C. 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Jerome Martin, Jr.*

/s/ *David B. Smith*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
(703) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

May 27, 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume and length limitations of Federal Rule of Appellate Procedure 27(d) and D.C. Circuit Rule 27(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font and contains 807 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

*/s/ John Longstreth*
John Longstreth

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing through the Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ John Longstreth*
John Longstreth

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 21-3072**                    **September Term, 2024**

**1:98-cr-00329-RCL-4**
**1:98-cr-00329-RCL-2**
**1:98-cr-00329-RCL-3**
**1:98-cr-00329-RCL-6**

**Filed On: May 29, 2025** [2118055]

United States of America,

        Appellee

    v.

Sean Coates, also known as Birdy,

        Appellant

------------------------------

Consolidated with 21-3073, 21-3078,
22-3016, 23-3015

## O R D E R

It is **ORDERED**, on the court's own motion, that the briefing schedule entered on January 31, 2025, be suspended pending further order of the court.

           **FOR THE COURT:**
           Clifton B. Cislak, Clerk

     BY:   /s/
           Michael C. McGrail
           Deputy Clerk

App 1942